## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRISTOL-MYERS SQUIBB COMPANY and
PFIZER INC.,

      Plaintiffs,

      v.

AUROBINDO PHARMA USA INC. and
AUROBINDO PHARMA LTD.,

      Defendants.

C.A. No. 17-cv-374-LPS
(CONSOLIDATED)

## PLAINTIFFS' OPENING POST-TRIAL BRIEF
## ON SIGMAPHARM LABORATORIES, LLC'S INFRINGEMENT

Dated: December 20, 2019

*Of Counsel:*

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs Bristol-Myers Squibb
Company and Pfizer Inc.*

# **TABLE OF CONTENTS**

I.  Nature & Stage of the Proceedings ..................................................................1

II.  Summary of the Argument ............................................................................1

III.  Statement of Facts.........................................................................................3

    A.  '208 Patent ..........................................................................................3

    B.  '945 Patent ..........................................................................................4

        1.  Claim Construction ...................................................................4

IV.  Argument ......................................................................................................5

    A.  Infringement Legal Standard ...............................................................5

    B.  Sigmapharm's ANDA Products Will Infringe the '208 Patent's Asserted Claims ....................................................................5

        1.  Sigmapharm's ANDA Products Will Infringe Claim 13 ...........5

        2.  Sigmapharm's ANDA Products Will Infringe Claim 104.............................................................................................9

    C.  Sigmapharm's Manufacturing Process Will Infringe Claim 104 of the '208 Patent........................................................................9

    D.  Sigmapharm's ANDA Products Will Infringe the '945 Patent's Asserted Claims ..................................................................10

        1.  Common Technical Background ...............................................10

        2.  Solid-State Nuclear Magnetic Resonance (SSNMR) ..............13

        3.  Sigmapharm's ANDA Products Contain Crystalline Apixaban Particles ..................................................................14

        4.  The Composition of Sigmapharm's 2.5 mg and 5 mg Tablets Is the Same ................................................................21

        5.  The Crystalline Apixaban Particles in Sigmapharm's ANDA Products Will Have a $D_{90}$ of Less than 89 Microns ....................................................................................21

V.  Conclusion & Remedies ..............................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. TorPharm, Inc.*,
    300 F.3d 1367 (Fed. Cir. 2002)...............................................................................................5

*Acorda Therapeutics Inc. v. Mylan Pharmaceuticals Inc.*,
    817 F.3d 755 (Fed. Cir. 2016)...............................................................................................5

*Align Technology, Inc. v. 3Shape A/S*,
    C.A. No. 18-1949-LPS-CJB, 2019 WL 4536562 (D. Del. Sept. 19, 2019)...............................8

*Aro Manufacturing Co. v. Convertible Top Replacement Co.*,
    377 U.S. 476 (1964)...............................................................................................................10

*Bayer AG v. Elan Pharmaceutical Research Corp.*,
    212 F.3d 1241 (Fed. Cir. 2000).............................................................................................5

*Bristol-Myers Squibb Co. v. Mylan Pharmaceuticals Inc.*,
    C.A. No. 09-651-LPS, 2013 WL 12322088 (D. Del. Oct. 17, 2013) ....................................13

*Martek Biosciences Corp. v. Nutrinova*, *Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009).............................................................................................23

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)...............................................................................................9

**Statutes**

35 U.S.C. § 271(a) .......................................................................................................................5

35 U.S.C. § 271(e) ...................................................................................................................5, 24

35 U.S.C. § 285.............................................................................................................................24

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| ANDA | Abbreviated New Drug Application |
| Asserted Claims | For the '208 Patent, claims 13 and 104.<br>For the '945 Patent, claims 21 and 22. |
| FDA | United States Food and Drug Administration |
| Patents-in-Suit | The '208 Patent and '945 Patent |
| BMS | Bristol-Myers Squibb Co. |
| Pfizer | Pfizer, Inc. |
| Plaintiffs | BMS and Pfizer |
| Sigmapharm | Sigmapharm Laboratories, LLC |
| Sunshine Lake | Sunshine Lake Pharma Co., Ltd. and HEC Pharm USA Inc. |
| Unichem | Unichem Laboratories, Ltd. |
| UF | Uncontested Facts (D.I. 672, Ex. 1) |
| POSA | Person of ordinary skill in the art.  For the '208 Patent, a POSA would have the characteristics described at UF ¶ 20 as of September 21, 2001; for the '945 Patent, a POSA would have the characteristics described at UF ¶ 31 as of February 24, 2011. |
| FOF | Plaintiffs' Proposed Findings of Fact |
| CoC | Certificate of Correction |
| XRPD | X-ray Powder Diffraction |
| SSNMR | Solid-State Nuclear Magnetic Resonance |
| USP | United States Pharmacopeia |

## I.      Nature & Stage of the Proceedings

Plaintiffs Bristol-Myers Squibb Co. and Pfizer Inc. filed patent infringement actions against 25 generic pharmaceutical companies that challenged the patents protecting Plaintiffs' novel, blockbuster anticoagulant, Eliquis®.  U.S. Patent No. 6,967,208 (the "'208 Patent") specifically claims apixaban, which is the active chemical compound in Eliquis®, and U.S. Patent No. 9,326,945 (the "'945 Patent") covers certain compositions containing apixaban.  Plaintiffs' claims against 22 of those companies were resolved before trial.  Between October 23, 2019, and November 13, 2019, the Court held a trial for Plaintiffs' claims against the remaining three.  This memorandum is Plaintiffs' opening post-trial brief on their infringement claims against Sigmapharm Laboratories, LLC ("Sigmapharm"); it is accompanied by Plaintiffs' proposed findings of fact on their infringement claims against Sigmapharm ("FOF").  "Sigmapharm's ANDA products" refers to the 2.5 mg and 5 mg apixaban tablets that are the subject of Sigmapharm's ANDA No. 210053.  FOF ¶ 6.  The asserted claims against Sigmapharm are claims 13 and 104 of the '208 Patent and claims 21 and 22 of the '945 Patent.  FOF ¶¶ 8, 30.

## II.    Summary of the Argument

Sigmapharm infringes the '208 Patent's asserted claims in two separate ways.  First, Sigmapharm's ANDA products contain apixaban; that is all that is required for Sigmapharm to infringe claim 13.  Because the apixaban in Sigmapharm's ANDA products includes crystalline apixaban, Sigmapharm also infringes claim 104.  Second, the manufacturing process that Sigmapharm uses to make its ANDA products begins with—and uses—crystalline apixaban.  Sigmapharm performs that process in Pennsylvania, so each use of crystalline apixaban separately infringes claim 104.

Sigmapharm does not dispute the facts necessary to find both modes of infringement; instead, it argues only that the asserted claims do not actually cover apixaban because, in Sigmapharm's view (and only Sigmapharm's view), apixaban is outside the scope of claim 1, from which both asserted claims depend.  That reading of claim 1 has no foundation in chemistry, common English usage, or simple logic.  And the reasoning that Sigmapharm uses to arrive at that reading has no foundation in any case law.

Plaintiffs have also met their burden of proving by a preponderance of the evidence that Sigmapharm's ANDA products will infringe asserted claims 21 and 22 of the '945 Patent. Sigmapharm contests only two claim limitations:  whether its ANDA products contain crystalline apixaban particles and whether those crystalline apixaban particles have a $D_{90}$ particle distribution less than 89 microns.  Both limitations are satisfied.

Plaintiffs' expert, Dr. Jerry Atwood, performed appropriately sensitive x-ray powder diffraction ("XRPD") tests that identified crystalline apixaban particles in Sigmapharm's ANDA products.  Sharp peaks in Dr. Atwood's XRPD testing of Sigmapharm's ANDA products corresponding with known peaks for crystalline apixaban establish the presence of crystalline apixaban particles in those products.  Dr. Atwood's testing is further supported and confirmed by Dr. Eric Munson's Solid-State Nuclear Magnetic Resonance ("SSNMR") analysis.

The testimony of Sigmapharm's experts, Drs. Michael Zaworotko, David Apperley, and Robert Schurko, failed to undermine the presence of crystalline apixaban particles in Sigmapharm's ANDA products.  Dr. Zaworotko did no testing at all.  Instead, he relied on XRPD tests that were insufficiently sensitive to detect crystalline apixaban particles.  Dr. Apperley's SSNMR testing, the only testing relied on by Dr. Schurko, was not sufficiently sensitive to rule out the presence of crystalline apixaban in Sigmapharm's ANDA products.

The evidence further establishes that Sigmapharm's ANDA products meet the asserted claims' crystalline apixaban particle size limitation.  First, there is no legitimate dispute that the crystalline material identified in Sigmapharm's ANDA products constitutes "particles."  Crystals are particles; Sigmapharm's belated attempt to transform its "no crystals" defense into a "no particles" defense has no support in the record.  Nor is there any legitimate dispute that those particles satisfy the particle size limitation.  The manufacturing steps Sigmapharm undertakes in its (unsuccessful) attempt to avoid crystalline apixaban particles ensure that the crystalline apixaban particles that do form are well within the claimed particle size limit.

## III.   Statement of Facts

### A.      '208 Patent

Plaintiffs have asserted two claims of the '208 Patent in this case:  Claims 13 and 104.  Claim 13 recites:

> A compound according to claim 8, wherein the compound is:
>
> 1-(4-methoxyphenyl)-7-oxo-6-[4-(2-oxo-1-piperidinyl)phenyl]-4,5,6,7-tetrahydro-1H-pyrazolo[3,4-c]pyridine-3-carboxamide
>
> or a pharmaceutically acceptable salt form thereof.

'208 Patent (JTX-1) at 269:1-6 & Dec. 2, 2008 CoC.  It is undisputed that the chemical compound recited in claim 13 is apixaban.  UF ¶ 36; FOF ¶¶ 2, 9.  Claim 104 recites "[a] compound according to claim 13, which is a crystalline compound," '208 Patent (JTX-1) at Dec. 2, 2008 & Sept. 11, 2018 CoCs—i.e., crystalline apixaban.

The Court construed one claim term of the '208 Patent: "pharmaceutically acceptable salts."  D.I. 381 at 1.  It is undisputed that Sigmapharm's ANDA products do not contain an apixaban salt, so this construction is not relevant to infringement of claim 13.  Claim 104 does not contain the construed term, so it is also not relevant to infringement of that claim.  The

– 3 –

parties agreed that all other claim terms from the '208 Patent have their plain and ordinary

meaning to a person of ordinary skill in the art.  D.I. 182 at 2; UF ¶ 23.

### B.    '945 Patent

The '945 patent is titled "Apixaban Formulations" and is directed to solid pharmaceutical

compositions of apixaban.  '945 Patent (JTX-2); Tr. 323:4-5 (Atwood).  Claim 12, the

independent claim from which asserted Claims 21 and 22 depend, FOF ¶ 30, reads:

> A solid pharmaceutical composition comprising
>
> a therapeutically effective amount of apixaban and a
> pharmaceutically acceptable diluent or carrier,
>
> wherein apixaban comprises crystalline apixaban particles,
>
> wherein the crystalline apixaban particles have a $D_{90}$ equal to or
> less than about 89 μm, and
>
> wherein, as measured using a USP Apparatus 2 at a paddle rotation
> speed of 75 rpm in 900 mL, of a dissolution medium at 37° C., at
> least 77 wt % of apixaban in the pharmaceutical composition
> dissolves within 30 minutes in the dissolution medium, and the
> dissolution medium is 0.05 M sodium phosphate at a pH 6.8
> containing 0.05% sodium lauryl sulfate.

'945 Patent (JTX-2) at 10:13-27; FOF ¶ 31.  Claims 21 and 22 further limit that the compositions

comprise 2.5 or 5 mg of apixaban, respectively.  '945 Patent (JTX-2) at 10:46-49; FOF ¶ 30.

### 1.    Claim Construction

The Court construed "apixaban particles have a $D_{90}$," to have its plain and ordinary

meaning, which is that 90% of the volume of the crystalline apixaban particles have a diameter

of less than or equal to 89 microns.  FOF ¶ 33.  The asserted claims do not require measurement

of apixaban particle size by any particular method nor measuring the starting API.  FOF ¶ 34.

The parties agreed that all other terms, including "wherein apixaban comprises crystalline

apixaban particles," would have their plain and ordinary meaning.  FOF ¶ 35.  During trial, the

parties' experts agreed that the plain and ordinary meaning of that limitation covers any amount of crystalline apixaban that can be detected in the pharmaceutical composition.  FOF ¶¶ 36-37.

## IV.   Argument

### A.   Infringement Legal Standard

The "infringement inquiry" under 35 U.S.C. § 271(e)(2)(A) is "whether, if a particular drug were put on the market, it would infringe the relevant patent."  *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 760 (Fed. Cir. 2016).  This determination is based on consideration of all the relevant evidence, including the ANDA filing, other materials submitted by the accused infringer to the FDA, and other evidence provided by the parties.  *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002).

A patent claim is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent."  35 U.S.C. § 271(a).  A patent claim is literally infringed if each limitation of the asserted claim is literally practiced by the accused product. *See, e.g.*, *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Where infringement is contested, Plaintiffs have the burden of proving infringement by a preponderance of the evidence.  *Id.*

### B.   Sigmapharm's ANDA Products Will Infringe the '208 Patent's Asserted Claims

#### 1.   Sigmapharm's ANDA Products Will Infringe Claim 13

Sigmapharm's ANDA products undisputedly will contain apixaban, UF ¶ 57.  There is also no dispute that apixaban is the compound expressly recited in claim 13.  FOF ¶¶ 2, 9, 14.

At trial, Sigmapharm's only non-infringement defense was its assertion that apixaban— whether in Sigmapharm's product or in general—does not satisfy claim 13's preamble, which is

"A compound according to claim 8."  The parties agree that claim 8, which is not asserted, also expressly recites apixaban, so Sigmapharm's theory turns on whether apixaban satisfies claim 8's preamble, "A compound according to claim 1."  Sigmapharm was the only defendant at trial that presented this defense, which is effectively the same as Sigmapharm's improper-dependency invalidity argument.[1]

The testimony, however, showed that a POSA would have understood apixaban to be within claim 1's scope.  Plaintiffs' chemistry expert, Professor David MacMillan, testified that "Apixaban is a compound of claim 1," Tr. 288:16 (MacMillan), and explained his reasoning in detail, both in general during Plaintiffs' case in chief, Tr. 281:15-288:20 (MacMillan), and in rebutting Sigmapharm's specific arguments, Tr. 1627:1-1631:25 (MacMillan Rebuttal), FOF ¶¶ 16-25.

Sigmapharm's only basis for disputing infringement is that apixaban, in Sigmapharm's view, has more "substituents" attached to rings M, E, A, and Q than claim 1 allows.  Tr. 687:1-13 (Heathcock).  To arrive at that conclusion, Sigmapharm's chemistry expert Dr. Clayton Heathcock counted *every* hydrogen atom bonded to the M, E, A, and Q rings in apixaban as a "substituent," Tr. 689:19-690:6, 699:4-10 (Heathcock), because a "substituent" is simply "something that is bonded to some particular position," Tr. 700:4-5 (Heathcock).

But the claim language does not refer to the number of "substituents" attached to Rings M, E, A, and Q; rather, it is the number of R groups that those rings have been "substituted with" that matters.  '208 Patent (JTX-1) at 237:12-20, 237:60-61, 238:20-21, 238:34-36.  That is a critical difference.  While Dr. Heathcock counted *every* hydrogen atom attached to the claimed

---

[1] Sigmapharm bears the burden of proof on validity.  Plaintiffs will respond more fully to any invalidity arguments raised by Sigmapharm in response to Sigmapharm's briefing on the issues for which it bears the burden of proof.

ring structures as a "substituent" simply because they are "bonded to some particular position," Tr. 700:4-5 (Heathcock), the actual claim language of "substituted with" refers only to the number of ***changes*** from the chemical structure recited in the claim, Tr. 286:10-21, 300:24-301:8 (MacMillan), 1628:8-1631:13 (MacMillan Rebuttal).  For example, if a compound has the same chemical structure depicted in the claim (i.e., there are no changes from what the claim recites), a POSA would have understood that compound is "substituted with" 0 R groups.  Tr. 300:24-303:9 (MacMillan) ("[I]f you say, I'm going to substitute with zero R groups, you are basically saying, I'm going to make no substitutions."); Tr. 286:10-21, 315:3-14 (MacMillan).  Likewise, if a compound differs at one position from the chemical structure depicted in the claim, a POSA would have understood that it is "substituted with" 1 R group, and so on for additional substitutions.  Tr. 315:3-11 (MacMillan).  The '208 Patent even explains that "substituted" refers to hydrogens being "replaced."  '208 Patent (JTX-001) at 113:66-114:3.[2]  Applying the actual claim language, Dr. MacMillan explained that a POSA would have understood that Rings M, A, and Q in apixaban are "substituted with" 0 $R^{1a}$, $R^4$, and $R^{4a}$ groups, respectively, because those rings appear in apixaban exactly as they are depicted in claim 1.  Tr. 286:12-17 (MacMillan), 1628:8-23-1630:31 (MacMillan Rebuttal); FOF ¶¶ 16-17, 20-23.  A POSA would similarly have understood that Ring E in apixaban is "substituted with" 1 R group because the only difference between the Ring E "phenyl" structure recited in claim 1 and Ring E in apixaban is a single methoxy ($-OCH_3$) group.  Tr. 1631:5-10 (MacMillan Rebuttal); FOF ¶¶ 18-19.  Thus, when applying the claim language, a POSA would readily have understood that apixaban falls within the scope of claim 1.  Tr. 281:15-283:7 (MacMillan), 1627:5-1631:25 (MacMillan Rebuttal); FOF ¶ 15.

---

[2] Dr. MacMillan testified that this usage is consistent with the plain meaning of "substituted." Tr. 300:8-23, 302:7-303:9 (MacMillan).

The flaws in Sigmapharm's logic became apparent during its own expert's testimony. Sigmapharm's expert, Dr. Heathcock, conceded that under his interpretation of claim 1, "apixaban, which is a compound that the '208 Patent is about and which the '208 Patent expressly claims, is not within the scope of claim 1," Tr. 718:8-12 (Heathcock), and that "none of the compounds that are specifically disclosed in the '208 Patent would fall within the scope of claim 1," Tr. 713:8-14 (Heathcock).  Indeed, Dr. Heathcock admitted that under Sigmapharm's interpretation of claim 1, "a person of ordinary skill *would not understand claim 1 to cover any chemical compound*."  Tr. 713:15-19 (Heathcock) (emphasis added); FOF ¶ 24.  Sigmapharm's non-infringement defense would therefore require the Court to conclude that a POSA would have understood claim 1—and therefore every claim in the '208 Patent—to be a nullity.

Sigmapharm never sought construction of any limitation in claim 1; it agreed that claim 1's limitations have their plain meaning, UF ¶ 34.  But its non-infringement defense clearly does not apply the plain meaning.  Further, the case law overwhelmingly weighs against Sigmapharm's interpretation.  "Where a particular construction of an independent claim would nullify claims that depend from it," as Sigmapharm urges here, "the doctrine of claim differentiation creates a presumption that such a construction is improper." *Align Tech., Inc. v. 3Shape A/S*, C.A. No. 18-1949-LPS-CJB, 2019 WL 4536562, at *2 n.4 (D. Del. Sept. 19, 2019) (quoting *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1368 (Fed. Cir. 2012)).  Likewise, the Federal Circuit has long held that a construction under which "a preferred (and indeed only) embodiment in the specification"—like apixaban and all of the other examples in the '208 Patent here—"would not fall within the scope of the patent claim … is *rarely, if ever, correct* and would require highly persuasive evidentiary support." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (emphasis added).  Sigmapharm has

– 8 –

offered no such evidence.  Its expert, Dr. Heathcock, even acknowledged that "a person skilled in the art reading the '208 patent would have thought that the patent drafters intended to claim apixaban."  Tr. 712:20-23 (Heathcock).  Even if the Court were to reopen claim construction to consider Sigmapharm's unorthodox non-infringement argument, Sigmapharm simply could not prevail.

### 2.    Sigmapharm's ANDA Products Will Infringe Claim 104

As explained below in the context of the '945 Patent, Sigmapharm's ANDA products will contain not just apixaban—they will also contain apixaban in its crystalline form.  *See infra* § IV.D.3; FOF ¶ 63.[3]  Plaintiffs' experts confirmed the presence of crystalline apixaban in Sigmapharm's ANDA products using two different analytical methods.  *See infra* § IV.D.3; FOF ¶¶ 63-64, 73, 83-84, 93.  Sigmapharm's ANDA products will therefore literally infringe claim 104 of the '208 Patent.  FOF ¶ 26.

### C.    Sigmapharm's Manufacturing Process Will Infringe Claim 104 of the '208 Patent

Sigmapharm will also infringe claim 104 of the '208 Patent by using crystalline apixaban in the United States to manufacture its ANDA products.  FOF ¶ 27.

The manufacturing process for Sigmapharm's ANDA products proceeds in two main steps:  First, Sigmapharm manufactures a "drug product intermediate" that is the subject of Drug Master File No. 030774; next, Sigmapharm mixes that drug product intermediate with excipients to make its ANDA products.  FOF ¶¶ 28, 96.  Sigmapharm performs these steps in Bensalem, Pennsylvania.  FOF ¶¶ 28-29.  The "starting material" that Sigmapharm uses in the first step is "Apixaban … crystalline Form I."  PTX-1068 at SIGMA-APIX0013820; FOF ¶¶ 28-29; Tr.

---

[3] In his closing, Sigmapharm's counsel conceded that any crystalline apixaban material would satisfy the limitation in claim 104.  Tr. 1890:4-9 (Mizerk).

262:18-13 (Spireas) ("Look, we're using a Medichem material with crystalline particles."); *see also* FOF ¶¶ 72, 96.  That is a use of a patented material—crystalline apixaban, which is recited in claim 104—within the United States.  That use is an independent act of infringement.  *See, e.g.*, *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 484 (1964) ("[I]t has often and clearly been held that unauthorized use, without more, constitutes infringement.").

### D. Sigmapharm's ANDA Products Will Infringe the '945 Patent's Asserted Claims

Sigmapharm disputes infringement of only two limitations: "wherein apixaban comprises crystalline apixaban particles" and "wherein the crystalline apixaban particles have a $D_{90}$ equal to or less than about 89 microns."  FOF ¶ 32.  Plaintiffs' experts demonstrated that both limitations are met based on X-ray powder diffraction tests, solid state nuclear magnetic resonance tests, and Sigmapharm's manufacturing process.

#### 1. Common Technical Background

This common background addresses issues and principles relevant to both Sigmapharm and Sunshine Lake.

##### (a) Technical Experts Relating to XRPD Testing and Particle Size

**Dr. Jerry Atwood** is Plaintiffs' expert on infringement of the '945 Patent by Sigmapharm and Sunshine Lake.  Dr. Atwood is a Professor of Chemistry at the University of Missouri, and he has worked on the preparation and analysis of pharmaceutical formulations for about 40 years.  FOF ¶ 40; PTX-788.  He performed XRPD testing and analyzed Sigmapharm's and Sunshine Lake's manufacturing processes to determine whether their ANDA products contain crystalline apixaban particles and whether those particles have a $D_{90}$ of less than or equal to 89 microns.  FOF ¶¶ 65, 70, 83, 96-99, 101.

**Dr. Harry Brittain** is Sunshine Lake's expert on noninfringement of the '945 patent.  Tr. 1051:9-19 (Brittain).  He currently operates his own consultancy and has experience in both academia and the pharmaceutical industry.  Tr. 1047:10-17, 1048:10-23 (Brittain).

**Dr. Michael Zaworotko** is one of Sigmapharm's experts with respect to the '945 Patent infringement analysis.  FOF ¶ 41.  He is a professor of crystal engineering at the University of Limerick.  *Id.*

### (b)    *Crystalline and Amorphous Materials in Pharmaceutical Compositions*

Pharmaceutical compositions are made up of an active pharmaceutical ingredient (or API) that treats a disease and one or more excipients.  FOF ¶ 42.  Here, the API is apixaban.  *Id.* Excipients are components that serve some function other than treating a disease.  *Id.*  The API and excipients in a pharmaceutical composition can have different physical forms.  Tr. 327:2-327:11 (Atwood); FOF ¶ 44.  Crystalline particles are made up of molecules arranged in a long-range order called a crystal lattice or array.  FOF ¶ 43.  Amorphous materials, in contrast, lack long-range order.  FOF ¶ 44.  Crystalline and amorphous forms of a material can coexist in the same pharmaceutical composition, but amorphous substances tend to convert to a crystalline form over time.  FOF ¶¶ 44-46.  Amorphous forms are at a higher energy state than crystalline forms, so thermodynamics drives amorphous forms to convert to a lower-energy crystalline form or crystallize.  Tr. 328:20-329:13 (Atwood); FOF ¶ 44.

### (c)    *Crystallization and Particle Size*

Two classical models describe the process of crystallization:  nucleation and crystal growth.  Nucleation occurs when molecules join together in a lower-energy crystal array to form a crystalline particle.  FOF ¶ 45.  When crystalline particles first form, they are generally on the order of a few nanometers.  *Id.*  Crystal growth can occur after nucleation.  Once a crystal forms,

it will tend to convert surrounding amorphous material as additional molecules join the lower-energy crystal array. FOF ¶ 46. The parties' experts agree that the classical models of nucleation and crystal growth are valid models. FOF ¶ 49. These models were well known as of 2010 and apply to solid pharmaceutical compositions. FOF ¶ 47.

Aspects of Sigmapharm's and Sunshine Lake's manufacturing processes are similar. Both processes involve attempts to create amorphous dispersions with rapid drying and a small amount of apixaban relative to other ingredients in the ANDA products. FOF ¶ 50. In both processes, inhibiting molecular mobility of apixaban limits crystal growth. *Id.* The excipient povidone (which is used in both Sunshine Lake's and Sigmapharm's manufacturing processes and ANDA products) is known to limit crystal growth. *Id.*

### (d)   *X-ray Powder Diffraction (XRPD)*

The experts agree that XRPD is an appropriate method to identify the presence of crystalline apixaban particles and distinguish between crystalline and amorphous materials. FOF ¶ 51. The identity of a material can be determined by visually comparing a portion of its XRPD pattern to a known reference. FOF ¶ 52. As Dr. Zaworotko conceded, a single sharp peak in an XRPD pattern is indicative of crystallinity. FOF ¶ 54. And Dr. Brittain testified that Dr. Zaworotko's explanation of crystal structure and definitions of genuine XRPD peaks are accurate. Tr. 1055:11-18 (Brittain). It is not necessary to match all peaks in an XRPD pattern to identify a crystalline material in a sample. FOF ¶ 55.[4]

---

[4] The patent claims asserted here are not limited to a specific polymorph and cover any crystalline form. Moreover, they do not require specific peaks to be present in contrast to the claims at issue in, for example, *Bristol-Myers Squibb Co. v. Mylan Pharm. Inc.*, C.A. No. 09-651-LPS, 2013 WL 12322088, at *3 (D. Del. Oct. 17, 2013).

When a material of interest is a small proportion of a sample, a more sensitive XRPD
method may be necessary to detect that minor component.  FOF ¶ 56.  Performing slower scans
by increasing the count time per step increases the sensitivity of an XRPD test.  FOF ¶ 57.  There
is no dispute that increasing count time is an appropriate method to detect components that are a
small portion of a sample.  FOF ¶ 59.

### 2.      Solid-State Nuclear Magnetic Resonance (SSNMR)

In addition to conducting XRPD testing, Plaintiffs also conducted SSNMR testing on
Sigmapharm's ANDA products.

#### (a)      Technical Experts Relating to SSNMR

**Dr. Eric Munson** is plaintiffs' expert with respect to SSNMR.  He is a professor at
Purdue University and head of the Department of Industrial and Physical Pharmacy.  FOF ¶ 60.

**Dr. David Apperley** is Sigmapharm's expert who conducted SSNMR tests.  FOF ¶ 61.
He is a professor at Durham University in the United Kingdom.  *Id.*  **Dr. Robert Schurko** is
Sigmapharm's expert who analyzed SSNMR testing of Sigmapharm's ANDA products.  *Id.*  He
is a professor at Florida State University in the Department of Chemistry and Biochemistry.  *Id.*

#### (b)      SSNMR Analysis

The experts agreed that SSNMR is an appropriate tool to analyze pharmaceutical
compositions and to distinguish crystalline and amorphous materials.  FOF ¶ 62.  SSNMR tests
produce spectra in which crystalline materials produce sharp peaks that can be visually
distinguished from broad peaks created by amorphous materials.  *Id.*  As exemplified below,
small sharp peaks appearing on large broad amorphous peaks represent crystalline material:



PTX-393 at 782 fig.4; FOF ¶ 62.

A pure crystalline sample is used as a reference to determine the position and shape of peaks in the SSNMR spectra.  FOF ¶ 62.  A material can be identified in a mixed sample as crystalline based on a comparison of the peaks in the sample and the reference material.  *Id.*  This comparison can be accomplished visually without measuring the widths of the peaks.  *Id.*

### 3. Sigmapharm's ANDA Products Contain Crystalline Apixaban Particles

Plaintiffs have proven by a preponderance of the evidence that Sigmapharm's ANDA products comprise crystalline apixaban particles.  FOF ¶ 63.  Plaintiffs' experts Dr. Atwood (XRPD) and Dr. Munson (SSNMR) each presented test results that independently demonstrate the presence of crystalline apixaban particles in Sigmapharm's ANDA products.

### (a)    Dr. Atwood's XRPD Testing Shows the Presence of Crystalline Apixaban Particles

Dr. Atwood's XRPD tests demonstrate that crystalline apixaban particles are present in Sigmapharm's ANDA products.[5]  FOF ¶ 83.  Based on his XRPD testing of Sigmapharm's 5 mg tablet, Dr. Atwood concluded that Sigmapharm's ANDA products contain crystalline apixaban particles.  FOF ¶ 73.  Dr. Atwood used scans of varying degrees of sensitivity, including scans with count times of 30 to 100 seconds.  FOF ¶ 70.  Sigmapharm's ANDA products contain only 3.125% apixaban.  *Id.*  Long count times were used so that the tests would be sensitive enough to detect crystalline components of the small amounts of apixaban in Sigmapharm's ANDA products.  *Id.*

In his XRPD analysis of Sigmapharm's sample, Dr. Atwood identified four peaks characteristic of crystalline apixaban.  FOF ¶ 72.  He observed three peaks that are listed in the '945 Patent at 12.3, 12.9, and 27.1 degrees and a peak at 22.0 degrees that is consistent with Sigmapharm's XRPD analysis of its crystalline form N-1 apixaban starting material.  *Id.*

---

[5] Dr. Atwood used standard sample preparation methods, and neither the age of the samples nor their transportation and storage raised any concerns about their authenticity or integrity. FOF ¶¶ 65-69.

Sigmapharm did not contest that peaks at 12.3, 12.9, 22.1, or 27.1 are characteristic of crystalline apixaban.  FOF ¶ 74.  Nor did Sigmapharm present any evidence that those peaks in the XRPD scans of Sigmapharm's tablets are caused by any material other than crystalline apixaban particles.  *Id.*  Because each of the peaks that Dr. Atwood identified indicates the presence of crystalline apixaban, the presence of even one is sufficient to prove the presence of crystalline apixaban particles.

Although conceding that a single peak indicates the presence of crystalline material, Tr. 969:17-19 (Zaworotko); FOF ¶ 54, Dr. Zaworotko claimed that the industry standard is to identify ten peaks in a sample, citing the United States Pharmacopeia ("USP").  Tr. 972:24-973:1 (Zaworotko).  But the recommendation in the USP does not apply here because it refers to a comparison to the Powder Diffraction File, which contains over 60,000 reference patterns.  FOF ¶ 75.  In contrast, Sigmapharm's ANDA products have only a few known components.  FOF ¶ 77.  As Dr. Zaworotko admitted, "[w]hat is appropriate will vary from sample to sample."  Tr. 972:20-23 (Zaworotko); FOF ¶ 76.  No specific number of peaks is required.  FOF ¶ 76.

Further, the USP also teaches that "identification of the phase composition of an unknown sample by XRPD is usually based on the visual or computer-assisted comparison of a ***portion*** of its x-ray powder pattern to the experimental or calculated pattern of a reference material." Tr. 339:21-340:4 (Atwood), 972:1-15 (Zaworotko); FOF ¶ 52 (emphasis added). Dr. Atwood did precisely that.

Dr. Atwood's reliance on a few characteristic peaks is also consistent with Sigmapharm's own XRPD analysis. Sigmapharm performed a limit of detection study on its XRPD method for analyzing its tablets. FOF ¶ 78. That study relied on only two characteristic peaks to determine when crystalline apixaban particles were detectable by its fast scan XRPD method. FOF ¶¶ 78, 81.

Finally, Dr. Atwood explained that he did not observe the remaining peaks because they would be obscured by excipients. Tr. 361:13-362:4 (Atwood). Dr. Atwood's initial scan of Sigmapharm's ANDA products revealed large peaks in the 10-11 and 18-19 range. FOF ¶ 79. Due to size of those peaks, Dr. Atwood knew they were caused by excipients because they were much larger than any possible apixaban peak given the small amount of apixaban (3.125%) in Sigmapharm's ANDA products. Tr. 356:25-357:9 (Atwood); FOF ¶ 70. Dr. Atwood experimentally confirmed that these large peaks were excipients by testing Sigmapharm's placebo, which is all the excipients without apixaban. FOF ¶ 80. The XRPD pattern of the placebo had the same large peaks in the ranges of 10-11 and 18-19 degrees. *Id.*

(b) ***Dr. Zaworotko Relied on Testing that Fails to Undermine Dr. Atwood's Opinion that Crystalline Apixaban Is Present in Sigmapharm's ANDA Products***

The testing evidence relied on by Dr. Zaworotko does not undermine Dr. Atwood's opinions. Dr. Zaworotko did no testing of his own. FOF ¶ 81. Rather, he relied on testing of

Sigmapharm's drug product intermediate (before tableting) by Catalent, a third-party testing company.  *Id.*  As Dr. Zaworotko conceded, those tests used a count time of only one second.  Tr. 978:16-23, 979:5-14 (Zaworotko); FOF ¶ 81.  Catalent's tests were therefore not sufficiently sensitive to detect crystalline apixaban when the entire amount of apixaban in the intermediate was only 6.6%.  FOF ¶¶ 81, 96.  Moreover, testing of the drug intermediate does not address whether Sigmapharm's final tablets contain crystalline apixaban.

Sigmapharm's own XRPD analysis on its final tablets for purposes of stability testing is likewise irrelevant.  FOF ¶ 81.  The limit of detection for Sigmapharm's XRPD method is 5%, but the tablets contain only 3.125% apixaban.  FOF ¶¶ 70, 81.  Even if the apixaban in Sigmapharm's ANDA products was entirely crystalline, Sigmapharm's XRPD test would not detect it.  Indeed, Dr. Zaworotko admitted that Sigmapharm's XRPD testing is invalid to determine whether Sigmapharm's ANDA products contain crystalline apixaban particles.  FOF ¶ 81.  Dr. Atwood did not need to perform a limit of detection study because he was able to detect four characteristic peaks and was not quantifying how much crystalline apixaban is present in Sigmapharm's ANDA products.  FOF ¶ 82.

### (c)   *Dr. Munson's SSNMR Testing Also Confirms the Presence of Crystalline Apixaban Particles*

Dr. Munson conducted SSNMR testing on Sigmapharm's ANDA products and concluded that they contained crystalline apixaban.  FOF ¶ 84.  He compared the SSNMR spectra of the Sigmapharm tablet to the spectra of BMS's crystalline form N-1 apixaban API.  FOF ¶ 85.  Through that comparison, Dr. Munson identified twelve features in the Sigmapharm tablet spectra that correspond to peaks in crystalline apixaban form N-1 spectra.  *Id.*  Six of the features Dr. Munson observed in the Sigmapharm sample spectra are clearly resolved peaks that have the

same location and shape as peaks in the crystalline apixaban reference sample.  *Id.*  Two of the matching, clearly resolved peaks are shown below as presented in PDX-7.15.



The other six features Dr. Munson observed in the tablet spectra were partially resolved peaks in that they appear as shoulders or other features on another peak.  FOF ¶ 85.  Based on the twelve clearly or partially resolved peaks that Dr. Munson observed, he concluded that Sigmapharm's ANDA products contain crystalline apixaban.  FOF ¶ 84.

Five of the peaks associated with crystalline apixaban were not visible because they were obscured by very large peaks caused by excipients.  FOF ¶ 86.  As Dr. Munson explained, "it's fairly typical that you would see peaks obscured by excipients."  Tr. 557:4-13 (Munson).  His conclusion that Sigmapharm's tablets contain crystalline apixaban was not affected because the majority of the crystalline apixaban SSNMR peaks in the Sigmapharm tablet were well or partially resolved.  FOF ¶¶ 85-86.

Dr. Munson also observed certain artifacts in the Sigmapharm tablet spectra.  Those artifacts were a spinning side band and some baseline distortion, where the baseline was not

completely flat.  FOF ¶ 87.  These artifacts are normal in SSNMR testing and did not impair Dr.

Munson's analysis.  *Id.*

The testimony offered by Sigmapharm's two experts on SSNMR, Dr. Apperley and Dr.

Schurko, does not undermine Dr. Munson's conclusions.  Dr. Apperley conducted SSNMR

testing that was not sufficiently sensitive.  FOF ¶ 89.  Indeed, Dr. Apperley testified that his

experiments cannot support a conclusion that Sigmapharm's tablets contain no crystalline

apixaban: "The experiments were not designed for that end."  Tr. 760:23-761:1 (Apperley).  Dr.

Apperley did not know the limit of detection for two of his three experiments, and the limit of

detection for the third experiment was about 1.5% or higher.  FOF ¶ 90.  Because the tablet is

only 3.125% apixaban, Dr. Apperley admitted that his test could not have detected apixaban

even if half of the apixaban in Sigmapharm's tablet was crystalline.  Tr. 761:8-14 (Apperley);

FOF ¶¶ 70, 90.

Dr. Schurko did not perform any testing of his own.  FOF ¶ 91.  Instead, he relied on Dr.

Apperley's and Dr. Munson's data.  But the only thing Dr. Schurko could say about Dr.

Apperley's unreliable testing is that it provides no evidence that Sigmapharm's tablets contain

crystalline apixaban.  Tr. 831:20-832:1 (Schurko); FOF ¶ 90.  As explained above, however, Dr.

Apperley's tests were insufficiently sensitive to rule out the presence of crystalline apixaban in

Sigmapharm's ANDA products.  FOF ¶¶ 89-90.  And when Dr. Schurko presented Dr. Munson's

data to the Court, he reprocessed it using different parameters.  FOF ¶ 92.  Dr. Schurko admitted

on cross examination that the spectra he presented to the Court used different line broadening

parameters that changed the appearance of the spectra.  *Id.*

4.      **The Composition of Sigmapharm's 2.5 mg and 5 mg Tablets Is the Same**

Sigmapharm's 2.5 mg and 5 mg tablets are made using the same manufacturing processes.  FOF ¶ 64.  Sigmapharm's experts do not contest that the 2.5 mg and 5 mg tablets would be the same with respect to their composition.  *Id.*  Thus, Dr. Atwood's and Dr. Munson's tests also show that Sigmapharm's 2.5 mg ANDA tablets contain crystalline apixaban particles.

5.      **The Crystalline Apixaban Particles in Sigmapharm's ANDA Products Will Have a $D_{90}$ of Less than 89 Microns**

Sigmapharm's first line of defense with respect to the particle size limitation is to contend that its ANDA products do not contain crystalline apixaban *particles* at all.  Sigmapharm suggests that, because its manufacturing process involves the preparation of an amorphous dispersion, the apixaban will be bound to the excipients and will not exist in the form of discrete particles.  Sigmapharm's "no apixaban particles" theory is, at best, simply a repackaging of its contention that its products do not contain crystalline apixaban.

As Plaintiffs' expert, Dr. Myerson, testified, all crystals are particles.  FOF ¶ 102. Sigmapharm assumes that the apixaban molecules in its ANDA products remain completely dissolved in a solid solution and do not exist separate from the so-called amorphous dispersion. But, as explained in detail above, Dr. Atwood's and Dr. Munson's testing results disprove that premise.  Sharp peaks in Dr. Atwood's XRPD testing and Dr. Munson's SSNMR testing reveal that crystalline apixaban can, and does, form in Sigmapharm's ANDA products.  These peaks, which correspond with characteristic peaks of crystalline apixaban, show that crystalline apixaban particles are, in fact, present as particles which are separate and distinct from other components, such as povidone, in Sigmapharm's products.  FOF ¶¶ 72-73, 84-85.  The extent to which crystalline apixaban particles agglomerate or combine with other materials in

– 21 –

Sigmapharm's ANDA products is irrelevant.  The '945 Patent specification makes perfectly clear that the particle size analysis addresses individual apixaban particles that are present in an agglomerate.  FOF ¶ 102.

Sigmapharm's suggestion that its particles do not satisfy the $D_{90}$ particle size limitation is equally without merit.  Dr. Atwood analyzed Sigmapharm's manufacturing process and explained that the particle size of crystalline apixaban particles in Sigmapharm's ANDA products could not even come close to the 89-micron $D_{90}$ particle size threshold in the asserted claims due to constraints imposed by that process.  FOF ¶¶ 97-99, 101.  In particular, Sigmapharm's manufacturing process attempts to avoid forming crystalline apixaban particles in part by using a polymer povidone, which is known to inhibit crystal growth.  FOF ¶ 95. Sigmapharm's manufacturing process starts by dissolving crystal form N-1 apixaban in a solution with povidone.  FOF ¶ 96.  That mixture is spread into trays and rapidly dried using a vacuum drying process.  *Id.*  The resulting solid is a drug intermediate that contains 6.6% apixaban and 93.1% povidone.  *Id.*

As Dr. Atwood explained, three features of Sigmapharm's process prevent large crystalline apixaban particles from forming when this process is used.  First, rapid drying leaves the apixaban rather uniformly dispersed throughout the polymer.  FOF ¶ 97.  The apixaban will not have sufficient time during drying to coalesce and crystallize into large particles.  Second, apixaban is only 6.6% of the intermediate, so the apixaban pockets will be small relative to the polymer and other excipients.  FOF ¶¶ 96, 98.  Because the small amount of apixaban will be evenly dispersed in a much larger amount of polymer, the apixaban regions must be small. When crystalline particles first form, they are on the scale of nanometers.  FOF ¶ 45.  89 microns is 89,000 nanometers.  *Id.*  That means the apixaban crystals would have to grow four to five

orders of magnitude to even approach the scale of 89 microns.  As Dr. Atwood testified, that amount of growth is not possible because "there's just not going to be enough apixaban in these pockets to form particles of 89 microns."  Tr. 384:10-22 (Atwood).  Third, the crystalline pockets of apixaban will be separated by polymer and other excipients and unable to come together to form larger crystals.  FOF ¶ 99.  Dr. Zaworotko testified that amorphous dispersions are designed to prevent crystallization by limiting molecular mobility, and he conceded that once crystal nucleation occurs, crystal growth requires continued molecular mobility.  Tr. 923:3-15, 970:9-16 (Zaworotko); FOF ¶¶ 49, 95, 99.  Thus, when crystalline apixaban particles form in Sigmapharm's ANDA products, which has been proven to occur, surrounding povidone will limit further crystallization to the apixaban in each domain.  FOF ¶ 99.  In essence, Sigmapharm's attempted design around, in the end, ensured that their ANDA products fall squarely within the claims and practice the critical particle-size cutoff.

Notably, Dr. Zaworotko did not explain how crystalline apixaban particles in Sigmapharm's ANDA products could conceivably exceed the 89-micron $D_{90}$ threshold in view of those constraints.  FOF ¶ 100.  Instead, Sigmapharm's defense depends on its assertion that Plaintiffs were required to conduct a precise $D_{90}$ calculation in order to prove infringement.  But that is not the law.  Infringement can be shown by "any method of analysis that is probative of the fact of infringement," and, in some cases, "circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) ("As detailed above, Martek presented testimony from two experts, each of whom conceptually analyzed the accused process and testified that it must meet the functional claim limitation based on the composition of Lonza's culture medium and the known effects of chloride concentration on stainless steel corrosion.").  Here, Plaintiffs offered ample evidence supporting the satisfaction of

the disputed claim limitations, including XRPD and SSNMR evidence establishing the existence

of crystalline apixaban particles in Sigmapharm's ANDA products and a detailed explanation as

to how the specific steps of Sigmapharm's manufacturing process necessarily prevent those

particles from exceeding the claimed particle size threshold. FOF ¶¶ 63, 94, 103.

## V.  Conclusion & Remedies

For the reasons above, Plaintiffs respectfully request that the Court find that

Sigmapharm's making, using, offering to sell, or selling in the United States, or importing into

the United States Sigmapharm's ANDA products will literally infringe the asserted claims of the

'208 Patent and the '945 Patent and, therefore, that the submission of Sigmapharm's ANDA

infringes those claims under 35 U.S.C. § 271(e)(2)(A). Plaintiffs further request that the Court

enter an order pursuant to 35 U.S.C. § 271(e)(4)(A) providing that the effective date of any

approval of Sigmapharm's ANDA shall be a date which is not earlier than the latest expiration

date of the Patents-in-Suit, including any extensions and/or additional periods of exclusivity to

which Plaintiffs are or become entitled, and an order permanently enjoining Sigmapharm, its

affiliates, subsidiaries, and each of its officers, agents, servants and employees and those acting

in privity or concert with them, from making, using, offering to sell, or selling in the United

States, or importing into the United States Sigmapharm's ANDA products until after the latest

expiration date of the Patents-in-Suit, including any extensions and/or additional periods of

exclusivity to which Plaintiffs are or become entitled.[6]

---

[6] Plaintiffs' complaint also seeks any appropriate relief under 35 U.S.C. § 285. *See* Compl., D.I. 1 in C.A. No. 17-408-LPS, Prayer for Relief ¶ 5 (Apr. 10, 2017). No party has yet made a motion for fees, and, at this point, that issue is premature. Plaintiffs may seek fees as permitted by the Federal Rules.

Dated: December 20, 2019

*Of Counsel:*

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs Bristol-Myers Squibb
Company and Pfizer Inc.*