# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY and PFIZER INC., <br><br> Plaintiffs, <br><br> v. <br><br> AUROBINDO PHARMA USA INC. and AUROBINDO PHARMA LTD., <br><br> Defendants. | C.A. No. 17-cv-374-LPS (CONSOLIDATED) |

## PLAINTIFFS' OPENING POST-TRIAL BRIEF
## ON UNICHEM LABORATORIES, LTD.'S INFRINGEMENT

Dated: December 20, 2019

*Of Counsel:*

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
Katherine P. Kieckhafer (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs Bristol-Myers Squibb Company and Pfizer Inc.*

# TABLE OF CONTENTS

I.      Nature & Stage of the Proceedings ................................................................1

II.     Summary of the Argument ............................................................................1

III.    Statement of Facts ........................................................................................2

    A.      '208 Patent ...........................................................................................2

    B.      '945 Patent ...........................................................................................3

IV.     Argument .....................................................................................................4

    B.      Unichem's ANDA Products Will Infringe the '208 Patent's
          Asserted Claims ..................................................................................4

    C.      Unichem's ANDA Products Will Infringe the '945 Patent's
          Asserted Claims ..................................................................................5

        1.      Technical Experts ......................................................................5

        2.      Technological Background .........................................................6

        3.      Dr. Berkland's SEM-EDS analysis showed that the
            apixaban particles in Unichem's ANDA Products are
            approximately one micron each .................................................8

        4.      Dr. Berkland's analysis of Unichem's manufacturing
            process confirms his conclusions ............................................14

        5.      Unichem's expert, Dr. Genck, conducted irrelevant
            testing and ignored the Court's claim construction order ........15

V.      Conclusion & Remedies .............................................................................18

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abbott Labs. v. TorPharm, Inc.*,
  300 F.3d 1367 (Fed. Cir. 2002)...........................................................................................4

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*,
  817 F.3d 755 (Fed. Cir. 2016)............................................................................................4

*Bayer AG v. Elan Pharm. Research Corp.*,
  212 F.3d 1241 (Fed. Cir. 2000)..........................................................................................4

*Eli Lilly and Co. v. Teva Pharm. USA, Inc.*,
  619 F.3d 1329 (Fed. Cir. 2010)....................................................................................4, 17

*In re Gabapentin Patent Litig.*,
  503 F.3d 1254 (Fed. Cir. 2007)....................................................................................4, 17

*Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*,
  232 F. Supp. 3d 632  (D. Del. 2017)................................................................................17

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  579 F.3d 1363 (Fed. Cir. 2009).........................................................................................13

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
  665 F.3d 1269 (Fed. Cir. 2012).........................................................................................17

**STATUTES, RULES, AND REGULATIONS**

35 U.S.C. § 271(a) ....................................................................................................................4

35 U.S.C. § 271(e) ..............................................................................................................4, 18

35 U.S.C. § 285............................................................................................................................18

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
| --- | --- |
| '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| ANDA | Abbreviated New Drug Application |
| Asserted Claims | For the '208 Patent, claims 13 and 104.<br>For the '945 Patent, claims 21 and 22. |
| FDA | United States Food and Drug Administration |
| Patents-in-Suit | The '208 Patent and '945 Patent |
| BMS | Bristol-Myers Squibb Co. |
| Pfizer | Pfizer, Inc. |
| Plaintiffs | BMS and Pfizer |
| Sigmapharm | Sigmapharm Laboratories, LLC |
| Sunshine Lake | Sunshine Lake Pharma Co., Ltd. and HEC Pharm USA Inc. |
| Unichem | Unichem Laboratories, Ltd. |
| Defendants | Sigmapharm, Sunshine Lake, and Unichem |
| UF | Uncontested Facts (D.I. 672, Ex. 1) |
| POSA | Person of ordinary skill in the art.  For the '208 Patent, a POSA would have the characteristics described at UF ¶ 20 as of September 21, 2001; for the '945 Patent, a POSA would have the characteristics described at UF ¶ 31 as of February 24, 2011. |
| FOF | Plaintiffs' Proposed Findings of Fact |
| CoC | Certificate of Correction |
| SEM | Scanning Electron Microscopy |
| EDS | Energy Dispersive X-ray Spectroscopy |

## I.   Nature & Stage of the Proceedings

Plaintiffs Bristol-Myers Squibb Co. and Pfizer Inc. filed patent infringement actions against 25 generic pharmaceutical companies that challenged the patents protecting Plaintiffs' novel, blockbuster blood thinner, Eliquis®.  U.S. Patent No. 6,967,208 (the "'208 Patent") specifically claims apixaban, which is the active chemical compound in Eliquis®, and U.S. Patent No. 9,326,945 (the "'945 Patent") covers certain compositions containing apixaban.  Plaintiffs' claims against 22 of those companies were resolved before trial.  Between October 23, 2019, and November 13, 2019, the Court held a trial for Plaintiffs' claims against the remaining three.  This memorandum is Plaintiffs' opening post-trial brief on their infringement claims against Unichem Laboratories, Ltd. ("Unichem").  It is accompanied by Plaintiffs' proposed findings of fact on their infringement claims against Unichem ("FOF").  "Unichem's ANDA products" refers to the 2.5 and 5 mg apixaban tablets that are the subject of Unichem's ANDA No 210108.  FOF ¶ 6. The asserted claims against Unichem are claims 13 and 104 of the '208 Patent and claims 21 and 22 of the '945 Patent.  FOF ¶¶ 8, 15.

## II.   Summary of the Argument

Unichem has stipulated to infringement of the '208 Patent's asserted claims.  UF ¶ 14; D.I. 665.  Notably, Unichem does not join defendant Sigmapharm's contention that apixaban products cannot infringe the patent because the claims do not cover apixaban (or any other compound in the world).

Plaintiffs have offered ample evidence to prove that Unichem's ANDA products infringe the asserted claims of the '945 Patent.  Unichem admits that the apixaban in its product is crystalline.  To determine particle size of that crystalline material, Dr. Berkland analyzed Unichem's 5 mg tablet using a well-known technique, SEM-EDS.  He analyzed thousands of

crystalline apixaban particles from Unichem's tablets, and from sample to sample, tablet to tablet, granule to granule, every such particle he observed was approximately 1 micron in size. There is overwhelming evidence, therefore, that the $D_{90}$ of the crystalline apixaban in Unichem's ANDA products is well below the claimed threshold of 89 microns. Unichem's evidence does nothing to undermine Dr. Berkland's conclusions. Unichem's expert, Dr. Genck, analyzed the wrong material and based his opinion on a claim construction this Court expressly rejected.

For these reasons, Plaintiffs ask the Court to find that Unichem has infringed the asserted claims of the '208 and '945 Patents and provide the requested relief.

## III.   Statement of Facts

### A.   '208 Patent

The '208 Patent is about a group of compounds that are effective Factor Xa inhibitors. '208 Patent (JTX-1). Plaintiffs have asserted two claims of the '208 Patent in this case: Claims 13 and 104. Claim 13 recites:

> A compound according to claim 8, wherein the compound is:
>
> 1-(4-methoxyphenyl)-7-oxo-6-[4-(2-oxo-1-piperidinyl)phenyl]-4,5,6,7-tetrahydro-1H-pyrazolo[3,4-c]pyridine-3-carboxamide
>
> or a pharmaceutically acceptable salt form thereof.

'208 Patent (JTX-1) at 269:1-6 & Dec. 2, 2008 CoC. It is undisputed that the chemical compound recited in claim 13 is apixaban. UF ¶ 36; FOF ¶¶ 2, 9. Claim 104 recites "[a] compound according to claim 13, which is a crystalline compound," '208 Patent (JTX-1) at Dec. 2, 2008 & Sept. 11, 2018 CoCs—i.e., crystalline apixaban.

The Court construed one claim term of the '208 Patent: "pharmaceutically acceptable salts." D.I. 381 at 1. It is undisputed that Unichem's ANDA product contains apixaban, so this construction is not relevant to infringement. The parties agreed that all other claim terms from

– 2 –

the '208 Patent have their plain and ordinary meaning to a person of ordinary skill in the art. D.I. 182 at 2; UF ¶ 23.

**B.    '945 Patent**

The '945 Patent is directed to solid pharmaceutical compositions of apixaban.  FOF ¶ 17. Claim 12, the independent claim from which asserted Claims 21 and 22 depend, FOF ¶ 15, reads:

> A solid pharmaceutical composition comprising
>
> a therapeutically effective amount of apixaban and a pharmaceutically acceptable diluent or carrier,
>
> wherein apixaban comprises crystalline apixaban particles,
>
> wherein the crystalline apixaban particles have a $D_{90}$ equal to or less than about 89 µm, and
>
> wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 mL, of a dissolution medium at 37° C., at least 77 wt % of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate.

'945 Patent (JTX-2) at 10:13-27; FOF ¶ 16.  Claims 21 and 22 add the further limitation that the compositions comprise 2.5 and 5 mg of apixaban, respectively.  '945 Patent (JTX-2) at 10:46-49; FOF ¶ 15.

Unichem disputes only a single limitation of the asserted claims.  The limitation requires the crystalline apixaban particles in Unichem's ANDA products have a $D_{90}$ equal to or less than about 89 µm.  FOF ¶ 18.  But Unichem offers no evidence to rebut Plaintiffs' proof that Unichem's ANDA products meet this limitation.  Instead, it only points to the particle size of its pre-formulated apixaban based on a claim construction argument it lost.

## IV.   Argument

### A.   Infringement Legal Standard

The "infringement inquiry" under 35 U.S.C. § 271(e)(2)(A) is "whether, if a particular drug were put on the market, it *would* infringe the relevant patent." *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 760 (Fed. Cir. 2016).  This determination is based on consideration of all the relevant evidence, including the ANDA filing, other materials submitted by the accused infringer to the FDA, and other evidence provided by the parties. *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002).

A patent claim is infringed when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent."  35 U.S.C. § 271(a).  A patent claim is literally infringed if each limitation of the asserted claim is literally practiced by the accused product. *See, e.g.*, *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Where infringement is contested, Plaintiffs have the burden of proving infringement by a preponderance of the evidence.  *Id.*

A patent need not describe all the steps that may be used to prove infringement.  *Eli Lilly and Co. v. Teva Pharm. USA, Inc.*, 619 F.3d 1329, 1345 (Fed. Cir. 2010).  The suggestion that a patent specification, much less the claims, must describe all of the ways a claim limitation could be measured or tested is legally flawed.  *In re Gabapentin Patent Litig.*, 503 F.3d 1254, 1261-62 (Fed. Cir. 2007).

### B.   Unichem's ANDA Products Will Infringe the '208 Patent's Asserted Claims

Unichem has stipulated to infringement of the '208 Patent's asserted claims.  UF ¶ 17; D.I. 665; FOF ¶ 14.

### C.      Unichem's ANDA Products Will Infringe the '945 Patent's Asserted Claims

The '945 Patent claims apixaban formulations with certain properties.  FOF ¶¶ 16-19. One of those properties, and the only limitation at issue in this case, is that the crystalline apixaban particles in the solid pharmaceutical composition must have a $D_{90}$ particle size equal to or less than 89 microns.  FOF ¶¶ 18, 20.

There are many ways to create a solid pharmaceutical composition with this property. One way is via the methods disclosed in the patent, (FOF ¶ 49), like dry granulation, in which the starting apixaban API is not dissolved during the manufacturing process.  FOF ¶¶ 49, 101. The patent describes measuring the particle size of the starting apixaban API and then discloses the formulations and manufacturing processes used to create a solid pharmaceutical composition with that API.  FOF ¶ 49.

But that is not the only way.  Unichem dissolves its starting apixaban API in solution and then recrystallizes the apixaban during the manufacturing process in such a way to ensure the apixaban particles remain very small, well under 89 microns.  FOF ¶¶ 81-93.  When the starting apixaban API is dissolved, it is in solution and is no longer crystalline, so the particle size of the starting apixaban API does not provide any information about the particle size of apixaban in Unichem's ANDA products.  FOF ¶¶ 50, 56, 100-102.  The only way to assess the particle size of the crystalline apixaban in Unichem's ANDA products, therefore, is to measure the size of the apixaban from Unichem's tablets.  That is what Plaintiffs' expert Dr. Berkland did.

### 1.      Technical Experts

**Dr. Cory Berkland** is Plaintiffs' expert on infringement by Unichem of the '945 Patent. Dr. Berkland is the Solon E. Summerfield Distinguished Professor at the University of Kansas. FOF ¶ 27.  His research focuses on pharmaceutical formulation and the delivery of

pharmaceuticals to patients.  *Id.*  Dr. Berkland performed scanning electron microscopy and

energy dispersive x-ray spectroscopy ("SEM-EDS") and analyzed Unichem's manufacturing

processes to determine whether Unichem's ANDA products contain crystalline apixaban

particles having a $D_{90}$ of less than or equal to 89 microns.  FOF ¶¶ 51, 81.

      **Dr. Allan Myerson** is Plaintiffs' expert on validity of the '945 Patent.  Dr. Myerson is a

professor at the Massachusetts Institute of Technology whose research focuses on

pharmaceutical manufacturing with an emphasis in issues related to crystallization, solid forms

of pharmaceuticals, and novel solid dosage forms including solid pharmaceutical formulations.

FOF ¶ 29.

      **Dr. Wayne Genck** is Unichem's expert for the '945 Patent infringement analysis.  He is

chief engineer and owner of Genck International with experience in particle size distribution of

solid materials.  FOF ¶ 30.

      **Dr. Walter Chambliss** is Defendants' expert for the '945 Patent validity analysis.  He is

a professor emeritus and a research professor in the pharmaceutics department at the University

of Mississippi with experience in the BCS Classification, dissolution testing, and formulation

development.  FOF ¶ 31.

### 2.  Technological Background

      There are many methods of measuring particle size, including laser light scattering and

imaging.  FOF ¶ 32.  One such imaging technique is called scanning electron microscopy

("SEM").  FOF ¶ 33.  SEM uses a high-powered microscope with an electron beam as the energy

source.  FOF ¶ 33.  The electron beam is projected onto the surface of the sample and electrons

are reflected back up to a detector.  FOF ¶ 33.  The detector converts the electrons into an image.

FOF ¶ 33.  At the same time, the imaging software produces a scale bar in the image.  FOF ¶ 33.

Imaging techniques, such as SEM, are a standard technique for measuring particle size, including in solid pharmaceutical compositions. FOF ¶ 34. A POSA simply takes a picture of a pharmaceutical sample and measures the size of the particles in that picture using the scale bar. FOF ¶ 35. For example, in Reverchon, published in 2008, the authors measured the particle size of hydroxypropyl methylcellulose ("HPMC") and ampicillin composite microparticles using SEM. FOF ¶¶ 39-41. These composite microparticles are a powder, which are an example of a solid pharmaceutical composition. FOF ¶¶ 39-40. The authors measured particles size using SEM by examining 20 images and then calculated the $D_{50}$ and $D_{90}$ particle sizes. FOF ¶¶ 41-42. The results were compared to $D_{50}$ and $D_{90}$ measurements obtained on the same samples using laser light scattering and found to be comparable.[1] FOF ¶ 42.

Energy dispersive x-ray spectroscopy ("EDS") is an analytical technique that uses the exact same SEM instrument to identify particular components in a sample. FOF ¶ 36. When the electron beam hits the sample, the sample emits x-rays that are collected by a separate detector. FOF ¶ 36. Particular atoms of an element will produce a particular x-ray that can be used to identify that element. FOF ¶ 36. For example, carbon emits a specific x-ray that is different from the x-ray emitted by oxygen or nitrogen. FOF ¶ 36. The EDS detector converts the x-ray signals into colors representing each element. FOF ¶ 36. The image that is generated is also known as an elemental map. FOF ¶ 36.

SEM-EDS is an analytical technique that uses SEM and EDS on the same sample. FOF ¶ 37. A POSA creates an image of the sample using SEM, and then generates an elemental map

---

[1] Contrary to Unichem's assertion, the results obtained by different methods are comparable. In Bosquillon, published in 2001, the results of SEM measurements were compared to four other measurement techniques, including laser light scattering. FOF ¶ 43. The results from all five methods were comparable. FOF ¶ 43. In conducting the SEM particle size measurements, Bosquillon measured only 100 particles. FOF ¶ 43.

using EDS that is superimposed onto that SEM image to identify the elements that make up the sample.  FOF ¶ 37.  The prior art discloses the use of SEM-EDS on pharmaceutical compositions.  FOF ¶¶ 38-39.

While SEM is a useful technique to measure particle size when the identity of a substance is known, SEM-EDS can be used to identify and measure particle size of a particular component in a mixture.  FOF ¶ 44.  By overlaying the elemental map from EDS on top of an SEM image, a POSA can identify the particular component to be measured.  FOF ¶ 44.

SEM-EDS was a routine and well-understood technique at the time of the invention. FOF ¶ 45.  Dr. Myerson used it previously on pharmaceutical compositions.  FOF ¶ 46. Unichem's expert Dr. Genck admitted that SEM-EDS was available as of the date of the invention.  FOF ¶ 47.  Both Dr. Genck and Defendants' expert Dr. Chambliss admitted that imaging techniques, such as SEM-EDS, could be used to measure particle size.  FOF ¶ 48. Obtaining a $D_{90}$ from particle size data is a mathematical calculation that is done either by software or by hand.  FOF ¶ 48.  Dr. Chambliss agreed that a POSA could use particle size results from image analysis to calculate a $D_{90}$.  FOF ¶ 48.

### 3. Dr. Berkland's SEM-EDS analysis showed that the apixaban particles in Unichem's ANDA Products are approximately one micron each

Dr. Berkland used SEM-EDS to measure the particle size of the crystalline apixaban in Unichem's ANDA products.  FOF ¶ 51.  Because apixaban was the only ingredient in Unichem's ANDA products that contained the element nitrogen, Dr. Berkland was able to use nitrogen as an identifier for apixaban.  FOF ¶ 52.

Dr. Berkland first ran a number of controls.  FOF ¶ 53.  He tested the Unichem starting apixaban API using SEM-EDS.  FOF ¶ 53.  Dr. Berkland's analysis showed that the apixaban API showed a uniform distribution of nitrogen across the entire particle.  FOF ¶ 55.  Though the

particle size of Unichem's starting apixaban API was quite large, that has no bearing on the particle size of apixaban in its final ANDA Products because Unichem dissolves the API during the manufacturing process.  FOF ¶ 56.

Dr. Berkland also examined the three main excipients used in Unichem's manufacturing process by SEM-EDS, croscarmellose sodium, lactose anhydrous, and microcrystalline cellulose. FOF ¶¶ 53, 57.  Dr. Berkland reviewed Unichem's ANDA to obtain excipients from the very same vendors used by Unichem.  FOF ¶ 54.  He then confirmed they were in fact the same by comparing the certificates of analysis for the excipients he received with those contained in Unichem's ANDA.  FOF ¶ 54.  His analysis demonstrated that none of the excipients contained nitrogen and the excipient particles had particle sizes averaging 100 microns.  FOF ¶ 57.

Having confirmed the nitrogen signal could be used to distinguish apixaban from the other excipients, Dr. Berkland then analyzed a 5 mg tablet sample of Unichem's ANDA products.  SEM-EDS only looks at the surface of the sample, so Dr. Berkland could not use the intact tablet to determine particle size.  FOF ¶ 59.  If he had tried, he would have seen only the surface of the tablet with its coating.  *Id.*  Dr. Berkland used a standard, common method to prepare a sample of the contents of the tablet.  FOF ¶ 60.  He first fractured the tablet and then gently removed some of the core material with a razor blade.  FOF ¶ 58.  The core material consisted of granules, which are composites of the excipient particles with apixaban particles deposited onto them during Unichem's manufacturing process.  FOF ¶ 89.  This created a powder that could be placed in a sample holder and analyzed via SEM-EDS.  FOF ¶ 58. Creating a powder from a tablet in order to analyze the contents is a standard procedure in the industry and was used both by Sunshine Lake's expert Dr. Brittain in conducting XRPD on a

Sunshine Lake sample and by Sigmapharm in performing XRPD on Sigmapharm's ANDA products.  FOF ¶ 60.

Dr. Berkland's images show that each granule contained a continuous distribution of oxygen and carbon, consistent with his expectation and consistent with his analysis of the excipient particles.  FOF ¶ 70.



In contrast, the distribution of nitrogen on the granules, representing apixaban, was significantly different.  FOF ¶¶ 71-72.[2]  The nitrogen signal appeared as small, discrete islands separated from one another.  *Id.*  These islands of apixaban particles were very small, averaging approximately 1 micron in size.  FOF ¶¶ 72-73.  This is almost 100 times smaller than the threshold of 89 microns.  FOF ¶ 74.  Dr. Berkland did not observe a single apixaban particle approaching 89 microns.  FOF ¶ 75.

---

[2] The nitrogen signal on the granules was also different from the nitrogen signal for the starting apixaban API, which only contains apixaban and had a contiguous nitrogen signal over the entire particle to reflect that.  FOF ¶ 72.

Dr. Berkland demonstrated that this sample preparation method had no impact on the particle size of the sample because the size of the granules he liberated from the tablet was consistent with the particle size of the excipients that went into the manufacturing process.  FOF ¶ 61.  The size of the granules liberated from the tablet was also consistent with the particle size of the common blend reported in Unichem's ANDA.  FOF ¶ 62.  Finally, if any breakage of granules had occurred, there would have been visual evidence in the images.  FOF ¶ 63.  Dr. Berkland did not see any indication the granules were broken.  *Id.*

Dr. Berkland analyzed a representative number of granules and apixaban particles.  He tested tablets from three different batches of Unichem's 5 mg ANDA Product.  FOF ¶ 64.  From batch GAPH16004, he tested three different tablets.  FOF ¶ 64.  From batch GAPH16003, he tested two different sites on the sample holder from a single tablet.  FOF ¶ 64.  Dr. Berkland tested a single tablet and single site from batch GAPH16002.  FOF ¶ 64.  Dr. Berkland randomly selected granules to analyze, consistent with methods he used previously.  FOF ¶ 65.  In total, Dr. Berkland examined 68 granules.  FOF ¶ 66.

But the size of the granules is not what is at issue:  it is the particle size of the crystalline apixaban on the granules that is at issue in this case.  FOF ¶ 67.  The term "particles" in the '945 Patent refers to individual apixaban particles, whether they exist singly or are agglomerated.  FOF ¶ 67.  Of the granules Dr. Berkland analyzed, only 85% had apixaban particles deposited on the surface.  FOF ¶ 68.  This is consistent with Unichem's manufacturing process in which excipients are added after granulation in an amount equal to approximately 15% of the tablet weight.  FOF ¶ 68.  Each granule containing apixaban had dozens to hundreds of apixaban particles on the surface of the excipient particle.  FOF ¶ 69.  That means that, in total, Dr. Berkland observed and measured thousands of apixaban particles.  FOF ¶ 69.  Any criticism that

Dr. Berkland did not measure a sufficient or representative number of particles is therefore misplaced.  As discussed above, the prior art publications describe particle size measurements conducted using SEM that analyzed only 20 images, (FOF ¶ 41), or 100 particles of interest, which is less than the thousands of apixaban particles Dr. Berkland measured.  FOF ¶ 43.

Dr. Berkland concluded the samples he tested were representative of Unichem's ANDA products because "from granule to granule, tablet to tablet and batch to batch" Dr. Berkland consistently observed the same pattern, "which told [him] that the apixaban particle size was consistently around 1 micron."  Tr. 623:25-624:6, 628:12-22 (Berkland); FOF ¶ 76.  A POSA would understand that solid pharmaceutical compositions would need to have content uniformity, such that the same amount of active ingredient would be contained in every tablet.  FOF ¶ 77.  Therefore, a POSA would expect apixaban to be uniformly distributed throughout Unichem's ANDA products, as Dr. Berkland observed, and not concentrated as large crystalline apixaban particles.  FOF ¶ 78.  There was no indication in Unichem's ANDA that there were any problems with content uniformity.  FOF ¶ 79.

Because the apixaban particles Dr. Berkland observed in Unichem's ANDA products had a particle size approximately 100 times smaller than 89 microns, he concluded that the apixaban particles in Unichem's ANDA products had a $D_{90}$ by volume far less than 89 microns.  FOF ¶ 80.  Dr. Berkland did not calculate the precise $D_{90}$ of the apixaban particles contained in Unichem's tablets because he did not have to.  FOF ¶ 80.  First, it is not required by the claims.  The particle size limitation merely sets a threshold; it does not require Plaintiffs to calculate the precise $D_{90}$ particle size of apixaban in Unichem's tablets.  Second, the particle size of every crystalline apixaban particle Dr. Berkland observed in apixaban in Unichem's ANDA products

was consistently so far below that threshold that performing a $D_{90}$ calculation was unnecessary.[3] FOF ¶ 80.

Plaintiffs have, therefore, offered ample evidence that the $D_{90}$ of the apixaban particles in Unichem's ANDA products is equal to or less than 89 microns.  Infringement can be shown by "any method of analysis that is probative of the fact of infringement," and, in some cases, "circumstantial evidence may be sufficient."  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372, 1374 (Fed. Cir. 2009) ("As detailed above, Martek presented testimony from two experts, each of whom conceptually analyzed the accused process and testified that it must meet the functional claim limitation based on the composition of Lonza's culture medium and the known effects of chloride concentration on stainless steel corrosion.").  As an example, if an invention claims a vehicle that travels at speeds of one hundred miles an hour or less and the accused device is a bicycle, the inventor does not have to prove the limits of speed of the bicycle to prove infringement.   Plaintiffs have not precisely calculated the $D_{90}$ of the apixaban in Unichem's ANDA products because it was unnecessary—the preponderance of the evidence demonstrates that Unichem's 2.5 and 5 mg ANDA Products infringe claims 21 and 22 of the '945 Patent.  FOF ¶¶ 113-116.

---

[3] Unichem's expert Dr. Genck used the same logic.  Dr. Genck relied on particle size testing of Unichem's starting API reported in Unichem's ANDA and particle size testing he performed on Unichem's starting API.  FOF ¶¶ 95-96.  The two separate analyses gave results that differed by 150 microns.  FOF ¶ 97.  However, because the particle sizes were sufficiently above the 89 micron threshold, the difference did not impact Dr. Genck's conclusion that the particle size of the starting API did not meet the limitations of the '945 Patent.  FOF ¶ 98.  Dr. Genck admitted he was not looking for a specific value, he just wanted to show the particle size was sufficiently above the threshold of 89 microns.  FOF ¶ 99.

**4.     Dr. Berkland's analysis of Unichem's manufacturing process confirms his conclusions**

Dr. Berkland next examined Unichem's manufacturing process, as reported in its ANDA, to confirm that his experimental observations were consistent with how Unichem made its tablets.  FOF ¶ 81.

Unichem uses a process called fluidized bed manufacturing.  FOF ¶ 82.



First, dry excipients including lactose anhydrous, microcrystalline cellulose, and croscarmellose sodium are fed into a fluidized bed granulator and air is passed underneath.  FOF ¶ 83.  In parallel, the starting apixaban API is completely dissolved in two volatile solvents, methylene chloride and isopropyl alcohol.  FOF ¶ 84.  The concentration of apixaban in this solution is dilute—just 1.2 percent.  FOF ¶ 84.

The dilute apixaban solution is then sprayed onto the surface of the excipient particles floating in the fluidized bed granulator.  FOF ¶ 85.  Small droplets of the dilute apixaban solution impact the surface of the dry excipients.  FOF ¶ 85.  The use of a high temperature and volatile solvents ensures that the solvents evaporate quickly, leaving behind very small apixaban

particles.  FOF ¶¶ 86-87.  The result is a granule consisting of an excipient particle with apixaban

particles deposited on the surface.  FOF ¶ 89.  The use of a dilute apixaban solution with only 1.2

% apixaban, volatile solvents, and the overall manufacturing process and parameters ensure that

only very small apixaban particles are deposited on the surface of the excipient particles.  FOF ¶¶

84-89.

    After granulation, further steps are performed to produce a tablet.  FOF ¶ 90.  None of

these steps would impact the size of the apixaban particle in Unichem's ANDA products.  FOF

¶ 90.  Additionally, there are no material differences in the manufacturing processes used to

produce Unichem's 2.5 and 5 mg ANDA Products.  FOF ¶ 92.  Thus, the apixaban particle size

would be the same in the 2.5 mg tablet as it is in the 5 mg tablet.  FOF ¶ 92.

    The particle sizes Dr. Berkland observed using SEM-EDS, therefore, were entirely

consistent with the apixaban particle size a POSA would expect from Unichem's manufacturing

process.  FOF ¶ 91.  This evidence further supports the conclusion that Unichem's ANDA

products infringe Claims 21 and 22 of the '945 Patent.  FOF ¶ 93.

### 5.    Unichem's expert, Dr. Genck, conducted irrelevant testing and ignored the Court's claim construction order

    None of the evidence offered by Unichem's expert, Dr. Genck, undermines Plaintiffs'

proof that Unichem's ANDA products infringe the asserted claims of the '945 Patent.

    First, Dr. Genck relied on irrelevant testing.  He relied on particle size testing performed

on Unichem's starting apixaban API as reported in Unichem's ANDA.  FOF ¶ 95.  Dr. Genck

also independently tested Unichem's starting apixaban API.  FOF ¶ 96.  However, as mentioned

above, and as Dr. Genck himself acknowledged, Unichem dissolves its API in solvents which

then recrystallize during the manufacturing process.  FOF ¶ 100.  Dr. Genck had absolutely no

evidence, nor did he even suggest, that the particle size of Unichem's starting apixaban API is

the same as the particle size of the apixaban in Unichem's ANDA products.  FOF ¶ 102.  He

even agreed that the crystalline apixaban in the tablets would not be the same as the starting API.

FOF ¶ 103.  The particle size of Unichem's starting apixaban API is therefore completely

irrelevant to determining whether Unichem's ANDA products infringe the claims of the '945

Patent.

Tellingly, Dr. Genck made no assessments of the apixaban particle size in Unichem's

ANDA products and admitted he does not know the particle size of apixaban in Unichem's

tablets.  FOF ¶¶ 105-106.  He conducted no analysis of any kind on Unichem's ANDA products,

including no analysis by SEM-EDS.[4]  FOF ¶ 105.

Dr. Genck also applied a claim construction in forming his opinions that was expressly

rejected by this Court.  During claim construction, Dr. Genck proposed that the term "apixaban

particles have a $D_{90}$" be construed as "$D_{90}$ is measured by laser light scattering (such as Malvern

light scattering) of bulk apixaban particles."  Tr. 1193:11-15 (Genck); FOF ¶ 108.  The Court

rejected that construction, instead adopting the plain and ordinary meaning.  FOF ¶ 109.  The

Court expressly noted that "[n]othing in the patent requires particle size to be measured one and

only one way, in particular only by a laser light scattering method using only bulk apixaban

particles, as Unichem contends."  D.I. 380 at 10; FOF ¶ 110.

Dr. Genck acknowledged the Court's claim construction opinion but stated "I'm not

necessarily saying that because it is an opinion, that I'm going to agree with it as a person – a

person of ordinary skill in the art."  Tr. 1195:7-22 (Genck); FOF ¶ 111.  In direct contradiction to

this Court's order, it remains Dr. Genck's opinion that the only particle size testing method

claimed by the '945 Patent is one that measure the particle size of the starting apixaban API by

---

[4] Similarly Dr. Genck did not offer any experimental evidence that subsurface apixaban particles existed in Unichem's ANDA products.  FOF ¶ 104.

laser light scattering.  Tr. 1195:23-1196:3 (Genck).  "[E]xpert testimony that is inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact."  *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, 232 F. Supp. 3d 632, 635 (D. Del. 2017).

Using that improper construction, Dr. Genck opined on the validity of the '945 Patent.[5] Tr. 1186:25-1188:12 (Genck).  In his opinion, to the extent the '945 Patent allows for the SEM-EDS method used by Dr. Berkland, it must be invalid.  *Id.*  He points specifically to the lack of any description of SEM-EDS in the specification and that development of any such technique would require undue experimentation.[6] *Id.*

But that is not the law.  "The test for written description, however, has never been whether the patent includes a description of the steps that may be used to prove infringement." *Eli Lilly and Co.*, 619 F.3d at 1345.  The suggestion that a patent specification, much less the claims, must describe all of the ways a claim limitation could be measured or tested is legally flawed.  *In re Gabapentin Patent Litig.*, 503 F.3d at 1261-62.  It was unnecessary therefore for the inventors to disclose in the '945 Patent specification every possible method of measuring particle size that might be used to prove infringement, including SEM-EDS.

Additionally, "[i]t is well established . . . that a specification need not disclose what is well-known in the art" to be enabling.  *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012).  SEM-EDS is a common and well-known technique, both Dr. Genck and Dr. Chambliss admitted as much.  FOF ¶¶ 45-48.  Therefore, imaging techniques like

---

[5] Dr. Genck, however, did not submit an expert report on invalidity.  FOF ¶ 94.  The single report submitted by Dr. Genck was a rebuttal report on noninfringement.  FOF ¶ 94.

[6] Unichem bears the burden of proof on validity.  Plaintiffs will respond more fully to any invalidity arguments raised by Unichem in response to Unichem's briefing on the issues for which it bears the burden of proof.

SEM-EDS do not have to be described in a patent to satisfy the written description or enablement requirements.

Dr. Genck's validity opinion is therefore not only contrary to this Court's claim construction opinion but also contrary to the Federal Circuit's law on written description and enablement.

## V.    Conclusion & Remedies

For the reasons above, Plaintiffs respectfully request that the Court find that Unichem's making, using, offering to sell, or selling in the United States, or importing into the United States of Unichem's ANDA products will literally infringe the asserted claims of the '208 Patent and the '945 Patent and, therefore, that the submission of Unichem's ANDA infringes those claims under 35 U.S.C. § 271(e)(2)(A).  Plaintiffs further request that the Court enter an order pursuant to 35 U.S.C. § 271(e)(4)(A) providing that the effective date of any approval of Unichem's ANDA shall be a date which is not earlier than the latest expiration date of the Patents-in-Suit, including any extensions and/or additional periods of exclusivity to which Plaintiffs are or become entitled, and an order permanently enjoining Unichem, its affiliates, subsidiaries, and each of its officers, agents, servants and employees and those acting in privity or concert with them, from making, using, offering to sell, or selling in the United States, or importing into the United States Unichem's ANDA products until after the latest expiration date of the Patents-in-Suit, including any extensions and/or additional periods of exclusivity to which Plaintiffs are or become entitled.[7]

---

[7] Plaintiffs' complaint also seeks any appropriate relief under 35 U.S.C. § 285.  *See* Compl., D.I. 1 in C.A. No. 17-382-LPS, Prayer for Relief ¶ 5 (Apr. 10, 2017).  No party has yet made a motion for fees, and, at this point, that issue is premature.  Plaintiffs may seek fees as permitted by the Federal Rules.

Dated: December 20, 2019

Respectfully submitted,

FARNAN LLP

*Of Counsel:*

/s/ Michael J. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)

William F. Lee (admitted *pro hac vice*)
Brian E. Farnan (Bar No. 4089)
Kevin S. Prussia (admitted *pro hac vice*)
Michael J. Farnan (Bar No. 5165)
Andrew J. Danford (admitted *pro hac vice*)
919 N. Market Street, 12th Floor
Timothy A. Cook (admitted *pro hac vice*)
Wilmington, DE 19801
Katherine P. Kieckhafer (admitted *pro hac vice*)
Tel: (302) 777-0300
WILMER CUTLER PICKERING
Fax: (302) 777-0301
   HALE AND DORR LLP
farnan@farnanlaw.com
60 State Street
bfarnan@farnanlaw.com
Boston, MA 02109
mfarnan@farnanlaw.com
Tel: (617) 526-6000
Fax: (617) 526-5000

*Counsel for Plaintiffs Bristol-Myers Squibb*
*Company and Pfizer Inc.*

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363