## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY AND PFIZER INC., | ) ) ) |
| Plaintiffs and Counterclaim-Defendants, | ) ) |
| v. | )   C.A. No. 17-374-LPS ) |
| AUROBINDO PHARMA USA INC., et al., | ) ) |
| Defendants and Counterclaim-Plaintiffs. | )   (CONSOLIDATED) ) ) |

### **DEFENDANTS' OPENING POST-TRIAL BRIEF ON INVALIDITY**

Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Dustin L. Taylor
Femi Masha

HUSCH BLACKWELL LLP

120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
dustin.taylor@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street
Suite 300
Madison, WI 53701
Tel: (608) 234-6032
Tom.Heneghan@huschblackwell.com

*Counsel for Sigmapharm Laboratories LLC*

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.

1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

Paul H. Kochanski
Kendall K Gurule

LERNER, DAVID, LITTENBURG,
KRUMHOLZ & MENTLIK, LLP

20 Commerce Drive
Cranford, NJ 07016
Tel: (908)654-5000
pkochanski@lernerdavid.com
kgurule@lernerdavid.com

*Counsel for Sunshine Lake Pharma Co., Ltd.
and HEC Pharm USA Inc.*

Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning

GREENBLUM & BERNSTEIN, P.L.C.

1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

*Counsel for Unichem Laboratories Ltd.*

Karen L. Pascale
Robert M. Vrana

YOUNG, CONAWAY, STARGATT &
TAYLOR LLP

Rodney Square
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.

1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

Dated: December 20, 2019

DocID: 4837-2528-5806.19

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     **THE '208 PATENT IS INVALID.** ................................................................. 2

    A.     Claims 13 and 104 Are Invalid for Improper Dependency Due to the Claim Term "Substituted With" and Reciting Hydrogen in Four Markush Groups. ........ 2

        1.     Plaintiffs' claim construction, never advanced during *Markman*, is legally incorrect, based on extrinsic evidence, and contrary to intrinsic evidence. ...................................................................................... 2

        2.     Claim 1 would have to be written differently in order to cover apixaban. ..................................................................................................... 5

        3.     Even Plaintiffs' proposed construction does not eliminate invalidity issues, but instead renders the Markush groups improper and still leaves multiple dependent claims invalid. ................................................. 6

    B.     Claim 13 Is Invalid for Failure to Enable the Full Scope Including Pharmaceutically Acceptable Salts of Apixaban. ................................................... 7

        1.     The Court's claim construction requires a salt form capable of contacting tissues in humans or animals. ................................................... 8

        2.     Standard of Law ...................................................................................... 9

        3.     No example in the '208 Patent is a salt of apixaban, and pharmaceutically acceptable apixaban salts are not enabled. ................... 10

        4.     Apixaban cannot be made into a salt suitable for use in contact with the tissue of humans or animals. ............................................................. 10

        5.     If administered, an apixaban salt would be impermissibly toxic. ............. 15

        6.     The *Wands* factors confirm the lack of enablement. ................................ 16

    C.     The Asserted Claims Do Not Meet the Written Description Requirement. ......... 17

        1.     Standard of Law. .................................................................................... 17

        2.     The '208 Patent does not provide sufficient description to inform a POSA that the inventors possessed pharmaceutically acceptable apixaban salts. ......................................................................................... 17

– iii –

3.      The named inventors who synthesized apixaban admitted they did not synthesize or invent a pharmaceutically acceptable salt of apixaban. ........................................................................................ 19

D.      Claim 104 Encompasses a "Pharmaceutically Acceptable Salt Form" and Is Therefore Also Invalid. ............................................................................................ 20

II.     THE '945 PATENT IS INVALID FOR FAILING TO COMPLY WITH 35 U.S.C. § 135 AND AS OBVIOUS UNDER 35 U.S.C. § 103. ................................................. 21

A.      Introduction. ........................................................................................................... 21

B.      The Breadth of the $D_{90}$ LIMITATION Renders the Asserted Claims Invalid for Failing to Comply with the Written Description and Enablement Requirements. ........................................................................................................ 22

1.      At Plaintiffs' urging, the Court construed the $D_{90}$ LIMITATION as having its plain and ordinary meaning. ................................................... 22

2.      The Asserted '945 Claims are invalid for failing to satisfy the written description requirement of Section 112. ................................... 23

3.      The Asserted '945 Claims are not enabled over their full scope. ............ 31

4.      Determining the $D_{90}$ of the bulk apixaban is not enabled by the '945 Patent. ....................................................................................................... 33

C.      The Asserted Claims Are Obvious Under 35 U.S.C. § 103. ................................. 34

1.      Law of obviousness. .................................................................................. 34

2.      The physical properties of apixaban were well known in the prior art. .... 34

3.      The state of the Art in 2009-2010 establishes that a POSA would have been motivated to combine the prior art to arrive at the claimed invention. ................................................................................................... 34

4.      The Asserted '945 Claims are obvious over the prior art. ........................ 37

III.    CONCLUSION ................................................................................................................. 39

DocID: 4837-2528-5806.19

# TABLE OF AUTHORITIES

Page

## Cases

*Alcon Research Ltd. v. Barr Labs., Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014) ........................................................................ 9

*Allvoice Developments US, LLC v. Microsoft Corp.*,
   No. C10-2102 RAJ, 2011 WL 12854654 (W.D. Wash. Dec. 21, 2011) ................................ 21

*Apotex v. Cephalon*,
   2011 U.S. Dist. LEXIS 125859 (E.D. Pa. 2011), *affirmed*, 500 Fed. Appx. 959 (Fed.
   Cir. 2013) ....................................................................................... 31

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) ........................................................... 17, 23, 27

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
   616 F.3d 1249 (Fed. Cir. 2010) ......................................................................... 3

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006) .......................................................................... 3

Bos. Science Corp. v. Johnson & Johnson,
   647 F.3d 1353 (Fed. Cir. 2011) .................................................................... 19, 33

*Boston Scientific Corp. v. Johnson & Johnson*,
   647 F.3d 1353 (Fed. Cir. 2011) ....................................................................... 28

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*,
   541 F.3d 1115 (Fed. Cir. 2008) .................................................................... 17, 19

*Dow Chem. Co. v. Sumitomo Chemical Co.*,
   257 F.3d 1364 (Fed. Cir. 2001) ....................................................................... 23

*Eli Lilly & Co. v. Teva Pharms, USA, Inc.*,
   657 F.Supp.2d 967 (S.D. Ind. 2009) .................................................................... 23

*Eli Lilly v. Teva Pharms, USA, Inc.*,
   619 F.3d 1329 (Fed. Cir. 2010) .................................................................... 23, 31

*Enzo Biochem, Inc. v. Gen–Probe Inc.*,
   323 F.3d 956 (Fed. Cir. 2002) ......................................................................... 17

*Enzo Life Scis., Inc. v. Abbott Labs.*,
   No. CV 12-274-LPS, 2017 WL 3585618 (D. Del. Aug. 15, 2017) ........................................ 10

– v –

*Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*,
   928 F.3d 1340 (Fed. Cir. 2019) ...................................................................... 10

*Fromson v. Advance Offset Plate, Inc.*,
   720 F.2d 1565 (Fed. Cir. 1983) ........................................................................ 3

*Hockerson-Halberstadt, Inc. v. Avia Grp. International, Inc.*,
   222 F.3d 951 (Fed. Cir. 2000) .......................................................................... 2

*Idenix Pharm. LLC v. Gilead Scis. Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019) ...................................................................... 17

*In re Harnisch*,
   631 F.2d 716, 206 USPQ 300 (CCPA 1980) .................................................... 6

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) .................................................................... 9, 31

*Knowles Elecs. LLC v. Cirrus Logic, Inc.*,
   883 F.3d 1358 (Fed. Cir. 2018) ...................................................................... 19

*KSR v. Teleflex*,
   550 U.S. 398 (2007) ........................................................................................ 34

*MagSil Corp. v. Hitachi Glob. Storage Techs. Inc.*,
   687 F.3d 1377 (Fed. Cir. 2012) ...................................................................... 10

*Medichem, S.A. v. Rolabo, S.L.*,
   437 F.3d 1157 (Fed. Cir. 2006) ...................................................................... 34

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
   831 F.3d 1350 (Fed. Cir. 2016) .................................................................... 2, 7

*Ormco Corp. v. Align Technology, Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007) ...................................................................... 12

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006) .................................................................... 2, 7

*Pharm. Res., Inc. v. Roxane Labs., Inc.*,
   253 F. App'x 26 (Fed. Cir. 2007) ................................................................... 17

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................ 4

*PowerOasis, Inv. v. T-Mobile USA, Inc.*,
   522 F.3d 1299 (Fed. Cir. 2008) ...................................................................... 31

DocID: 4837-2528-5806.19

*Process Control Corp. v. HydReclaim Corp.*,
   190 F.3d 1350 (Fed. Cir. 1999) ............................................................................... 7

*Rivera v. ITC*,
   857 F.3d 1315 (Fed. Cir. 2017) ...................................................................... 27, 28

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008) ........................................................................ 31, 33

*Trs. of Boston Univ. v. Everlight Elecs., Co.*,
   896 F.3d 1357 (Fed. Cir. 2018) ...................................................................... 31, 33

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991) ............................................................................ 17

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ............................................................................... 4

## Statutory Authorities

35 U.S.C. § 103 ................................................................................................ 35, 38, 39

35 U.S.C. § 112 ........................................................................................................... 1

35 U.S.C. §135 ......................................................................................................... 21

DocID: 4837-2528-5806.19

**ABBREVIATIONS**

| | |
|---|---|
| The '208 Patent | U.S. Patent No. 6,967,208 |
| The '306 Publication | U.S. Patent Application Publication No. 2007/0191306 to Munir N. Nassar et al. |
| The '945 Patent | U.S. Patent No. 9,326,945 |
| ANDA | Abbreviated New Drug Application |
| API | Active pharmaceutical ingredient |
| Asserted '208 Claims | Claims 13 and 104 of U.S. Patent No. 6,967,208 |
| Asserted '945 Claims | Claims 21 and 22 of U.S. Patent No. 9,326,945 |
| BMS | Plaintiff Bristol-Myers Squibb Company |
| Carreiro | Jennifer Carreiro & Jack Ansell, "Apixaban, An Oral Direct Factor Xa Inhibitor: Awaiting the Verdict," EXPERT OPINION INVESTIGATIONAL DRUGS 17(12):1937-45 (2008) |
| D-PF | Defendants' Proposed Findings of Fact on Invalidity |
| EDS | energy dispersive x-ray spectroscopy |
| FDA | U.S. Food and Drug Administration |
| FDA Guidance 1997 | FDA GUIDANCE FOR INDUSTRY, DISSOLUTION TESTING OF IMMEDIATE RELEASE SOLID ORAL DOSAGE FORMS, CDER (Aug. 1997) |
| HEC | Defendant HEC Pharm USA Inc. |
| LDA | lithium diisopropylamide |
| Nause | International Publication No. WO2010/147978 titled "Dosage Forms of Apixaban" was filed based upon a June 16, 2009 priority document (U.S. Provisional Application 61/187,442) |
| NDA | New Drug Application |
| Pfizer | Plaintiff Pfizer Inc. |
| Plaintiffs | BMS and Pfizer |

– viii –

| Pinto 2007 | Donald J.P. Pinto et al., "Discovery of 1-(4-Methoxyphenyl)-7-oxo-6-(4-(2-oxopiperidin-1-yl)phenyl)-4,5,6,7-tetrahydro-1H-pyrazolo[3,4-c]pyridine-3-carboxamide (Apixaban, BMS-562247), A Highly Potent, Selective, Efficacious, and Orally Bioavailable Inhibitor of Blood Coagulation Factor Xa," J. MED. CHEM. 50(22):5339-56 (2007), |
|---|---|
| POSA | Person of Ordinary Skill in the Art |
| PSUF | Parties' Statement of Uncontested Facts, Pretrial Order, Exhibit 1 (D.I. 672–1.) |
| SEM | Scanning Electron Microscopy |
| Sigmapharm | Defendant Sigmapharm Laboratories, LLC |
| Sunshine Lake | Defendant Sunshine Lake Pharma Co., Ltd. |
| Unichem | Defendant Unichem Laboratories, Ltd. |
| Wei | U.S. Patent Application Publication No. 2006/0160841 to Chenkou Wei et al. |

DocID: 4837-2528-5806.19

## INTRODUCTION

The Asserted '208 Claims are invalid under 35 U.S.C. § 112 (pre-AIA) for (i) improper dependency; (ii) failure to enable the full scope of the claims; and (iii) insufficient written description. The first ground concerns Claim 1's recitation that various rings are "substituted with" Markush group lists that include hydrogen. The second and third grounds arise from the attempt to claim "pharmaceutically acceptable salts." Because apixaban's pKa for its most acidic and most basic moieties is well outside the physiological pH range, it is a neutral compound, not ionizable in the range, and having no pharmaceutically acceptable salts that can meet the Court's claim construction of that term. As confirmed in the inventors' own testimony and all of the contemporaneous documentation—including correspondence, articles, FDA submissions, and more—the specification does not contain a written description showing possession specifically of a pharmaceutically acceptable salt of apixaban.

Turning to the '945 Patent, the Asserted '945 Claims are likewise invalid under Section 112 for (ii) insufficient written description; and (ii) failure to enable the full scope of the claims. The Asserted '945 Claims have been construed to cover determining the $D_{90}$ LIMITATION of not only bulk apixaban particles (prior to tableting) but also apixaban particles after being formulated into a finished composition. The '945 Patent neither describes nor enables the breadth of the Asserted '945 Claims as so construed.

The Asserted '945 Claims are also invalid as obvious under 35 U.S.C. § 103. Apixaban and its physical properties were known in the prior art, which teaches each limitation of the Asserted '945 Claims, and a POSA would have been motivated to combine the prior art by the express recognition in the state of the art of the need for safer and more effective methods of delivering apixaban.

DocID: 4837-2528-5806.19

## ARGUMENT

I.   **THE '208 PATENT IS INVALID.**

A.   **Claims 13 and 104 Are Invalid for Improper Dependency Due to the Claim Term "Substituted With" and Reciting Hydrogen in Four Markush Groups.**

Claims 13 and 104 are invalid because they purport to claim subject matter not encompassed by Claim 1, from which they depend. A dependent claim which recites subject matter that does not overlap with a claim from which it depends is invalid because "it does not 'incorporate by reference all the limitations of the claim to which it refers' and 'then specify a further limitation of the subject matter,' . . . ." *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1291 (Fed. Cir. 2006) (holding invalid a dependent claim "with non-overlapping subject matter."); 35 U.S.C. § 112. 4th paragraph (pre-AIA); *see also Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362 (Fed. Cir. 2016) ("A dependent claim that contradicts, rather than narrows, the claim from which it depends is invalid.").

Here, it is undisputed that dependent Claims 13 and 104 recite the compound apixaban; that Markush groups $R^{1a}$, $R$, $R^4$, and $R^{4a}$ all list hydrogen as a member; and that Claim 1 limits rings M, E, A, and Q to at most two members of each Markush group, but that the structures in apixaban corresponding to those rings include four or more hydrogens. The parties also agree that the pertinent claim language should be construed according to its plain and ordinary meaning. The only question before the Court is whether that plain and ordinary meaning counts hydrogen as a member of the Markush groups that the rings are "substituted with."

1.   Plaintiffs' claim construction, never advanced during *Markman*, is legally incorrect, based on extrinsic evidence, and contrary to intrinsic evidence.

Looking first to the language of Claim 1 itself, *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000) ("Claim construction analysis begins with the claim language itself."), each of the four Markush groups specifically recites hydrogen as its first

– 2 –

member. Dr. MacMillan's treatment of hydrogen as a substituent effectively ignores hydrogen as a member of the Markush groups R, $R^{1a}$, $R^4$, and $R^{4a}$. (Tr. 702:15–22 (Heathcock).)

Not counting the hydrogens as substituents when the rings are "substituted with" those Markush group members renders the inclusion of the hydrogens in those Markush groups meaningless surplusage. Markush groups R, $R^4$, and $R^{4a}$ are not used in the claims except in the "substituted with" phrase for those ring structures, which would render the inclusion of hydrogen in those groups completely meaningless under the treatment Dr. MacMillan proposes. Allowing the patentee to argue that such explicit claim language "specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim."). Dr. MacMillan's treatment of hydrogen would render its inclusion in the Markush groups "functionally meaningless." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010). The only construction that gives any meaning to the plain claim language, which includes hydrogen in those Markush groups, counts them as substituents in the "substituted with" limitations.

The language of other, dependent claims further confirms that hydrogens must count as substituents for these "substituted with" limitations. *See Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570 (Fed. Cir. 1983) ("Significant evidence of the scope of a particular claim can be found on review of other claims."). As Dr. Heathcock explained, Claim 1 requires that Ring E be substituted with **at least one** member from Markush group R. Dr. Heathcock then explained that thirty-six of the structures in dependent Claim 3, and four of the compounds

– 3 –

recited in dependent Claim 8, have **no** substituent **other** than hydrogen on the structures corresponding to ring E of Claim 1.

The specification, which is always highly relevant and usually dispositive as the single best guide to the meaning of claim language, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), also confirms that hydrogen counts as a substituent on these ring structures. Under the heading "Definitions," the patent repeats substantially the same definition of "substituted with" twice:

> The term "substituted," as used herein, means that any one or more hydrogens on the designated atom is replaced with a selection from the indicated group . . . .
>
>     . . .
>
> "Substituted" is intended to indicate that one or more hydrogens on the atom indicated in the expression using "substituted" is replaced with a selection from the indicated group(s) . . . .

(D-PF ¶ 34; JTX-1 col.113:66-114:1, 117:43-46.) Those definitions accurately reflect the plain and ordinary meaning a POSA (or even one of Dr. Heathcock's undergraduate organic chemistry students) would ascribe to the phrase "substituted with." (D-PF ¶ 35.) That definitional language in the specification explaining the plain and ordinary meaning requires **replacing one or more hydrogens**, and does not encompass replacing **no** hydrogens. If instead zero (0) hydrogens are replaced the correct term would be "unsubstituted." (D-PF ¶ 36.) Also, "substitute with" applies only to replacing a "hydrogen," and not any other element. (D-PF ¶ 35.)

The definitional language in the specification for "substituted" nowhere indicates that hydrogen is not a substituent. The one sentence to which Dr. MacMillan points regarding heteroatoms confirms that hydrogen is a substituent, and that the opposite of having a substituent such as hydrogen would be to describe the group as unsubstituted. The term "unsubstituted" in the specification cannot mean the same thing as "substituted with 0," as Plaintiffs propose, because the definitional language in the specification specifically requires that "substituted"

– 4 –

means replacing "one or more **hydrogens**," not replacing **zero** hydrogens. Accordingly, the specification clearly requires that hydrogen.

        2.     <u>Claim 1 would have to be written differently in order to cover apixaban.</u>

Dr. Heathcock acknowledges that the plain and ordinary meaning of substituted, as stated in the patent and explained in his testimony, means that Claim 1 as drafted would not cover any actual, real-world compounds. (Tr. 700:6–10 (Heathcock).) While the patentees may have intended Claim 1 to cover apixaban as recited in Claims 8 and 13, the claim language they drafted simply does not cover apixaban. (*Id.* at 700:11–13.)

Dr. Heathcock also indicated that the language in claim 1 for each of these rings could have been written differently to cover apixaban, if the patentees had chosen to do so. First, it would have needed to change "substituted with" to "unsubstituted or substituted with." The low end on the range of substituents would need to be changed from "substituted with 0" to "unsubstituted or substituted with 1" to the maximum permissible number of substituents. Also, hydrogen would have to be removed as a member of each Markush group. The way the patent uses the term "substituted," starting the range of the number of permissible substitutes with zero does not mean the same thing as "unsubstituted." (*Id.* at 700:14–702:14.) If those parts of Claim 1 were re-written as Dr. Heathcock suggests, there is one other part of Claim 1 that would also need to be amended, but there is no suggestion that change would require anything more than routine draftsmanship. (*See id.* at 702:22–705:13.) Dr. Heathcock's observation that the claims should include "unsubstituted" as an option instead of "substituted with 0" (where the patent has defined "substituted" as meaning to replace at least one hydrogen) is consistent with the term "unsubstituted" as it appears throughout the specification of the '208 Patent, and is the way the claims in one of Dr. MacMillan's own patents were drafted when he sought to cover an unsubstituted structure. (D-PF ¶ 42; Tr. 1648:4-7 (MacMillan).)

– 5 –

3.      Even Plaintiffs' proposed construction does not eliminate invalidity issues, but instead renders the Markush groups improper and still leaves multiple dependent claims invalid.

Dr. MacMillan's refusal to count hydrogens as substituents also treats those members of the Markush groups differently from every other member, which would render the Markush groups themselves improper. A Markush grouping is improper if all the members (i) do not share a "single structural similarity or (ii) a "common use." MPEP 706.03(y)II; *In re Harnisch*, 631 F.2d 716, 721-22, 206 USPQ 300, 305 (CCPA 1980). For this reason, too, Dr. MacMillan's reading of the claims is necessarily incorrect.

Moreover, even Dr. MacMillan's treatment of hydrogen (which differs from every other member of the Markush group; effectively ignores hydrogen as a substituent in all four of the rings; and contradicts the definitional language in the specification explaining the plain and ordinary meaning of "substituted with") does not eliminate the improper dependency issue. Instead, Dr. MacMillan's proposed treatment would exclude dozens of embodiments expressly recited in dependent claims 3 and 8. (Tr. 705:17-709:13 (Heathcock).) Claim 1 requires at least 1 substituent on Ring E. Dr. MacMillan's treatment of hydrogen improperly excludes 36 of the structures recited in dependent claim 3, and 4 of the compounds in dependent claim 8. (*Id.*)

Although Dr. MacMillan claims he was applying Dr. Heathcock's construction regarding Ring E, at no point did Dr. Heathcock testify in support of that construction; instead, Dr. MacMillan is the only basis for that construction. Dr. Heathcock never testified to any such interpretation at trial. Instead, Dr. MacMillan was inaccurately describing Dr. Heathcock's expert reports. Those reports disclosed the opinion that, taken together, rings D and E allowed at most four substituents total, but at no point has Dr. Heathcock ever opined that ring E need not have any substituents if ring D has a substituent. Only Dr. MacMillan has advanced that interpretation, and he is certainly the only witness to testify at trial to that construction, which

– 6 –

plainly contradicts the express language of Claim 1.

Plaintiffs argued in closing that Dr. MacMillan's approach should be preferred because, under it, some portion of the claims would be valid. (Tr. 1788:19-1792:12 (Plaintiffs' closing).) That argument is simply an admission that even Dr. MacMillan's interpretation does not eliminate the improper dependency issue, and would not preserve the validity of dependent Claims 3 and 8. When not even Plaintiffs can propose a construction that would eliminate the issue of improper dependency, there is no basis for adopting an understanding contrary to the overwhelming intrinsic evidence (including the language of Claim 1, the language of other claims, and the express definitional language in the specification confirming the plain and ordinary meaning) based solely on the extrinsic evidence in the testimony of Dr. MacMillan, which is both internally inconsistent and squarely rebutted and refuted by Dr. Heathcock.

It makes no difference whether the patentees intended to claim apixaban, or whether they could have covered apixaban with properly drafted claims, because it does not matter whether "the patentee was attempting to claim what might otherwise have been patentable subject matter," *Pfizer*, 457 F.3d at 1292, nor does it matter whether the improperly dependent claim "could have been properly drafted . . . as an independent claim." *Id.* The Court must not rewrite Claims 13 and 104 to preserve their validity. *Id.*; "[W]here . . . claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated . . . ." *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999); *see also Multilayer Stretch*, 831 F.3d at 1362.

## B. Claim 13 Is Invalid for Failure to Enable the Full Scope Including Pharmaceutically Acceptable Salts of Apixaban.

Claim 13 of the '208 Patent claims a "pharmaceutically acceptable" salt form of apixaban, which the Court has construed to require the salt be suitable for use in contact with the

– 7 –

tissues of humans or animals without excessive toxicity, irritation, allergic response, or other

problem or complication. No such salt form of apixaban can exist as a fundamental principle of

chemistry. Because apixaban is not ionizable, any salt formed would be unstable and would

immediately disproportionate upon its inevitable exposure to moisture. In fact, Plaintiffs' expert

Dr. MacMillan admitted that any apixaban salt simply "can't get to the tissue . . . ." (Tr. 1651:15-

16 (MacMillan).)

>1.   The Court's claim construction requires a salt form capable of contacting tissues in humans or animals.

Claim 13 requires a "pharmaceutically acceptable salt form" of apixaban. The patentee

did not merely claim "salts of apixaban," but "pharmaceutically acceptable" salts of apixaban.

The claims do not require apixaban itself to be "pharmaceutically acceptable," but only the

claimed salts. The Court has construed "pharmaceutically acceptable salts" to mean:

> Derivatives of the disclosed compounds wherein the parent compound is modified by making acid or base salts thereof, which are, within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio.

(DTX 590-1.) This construction includes the patent's definition of "pharmaceutically

acceptable." (Mem. Op., 6-7, D.I. 380.) Although the term refers to "sound medical judgment," a

medical doctor would not make the determination of whether a carrier, salt, or other compound is

"pharmaceutically acceptable." Rather, that determination would be made by others before a

drug would be available for a medical doctor to potentially prescribe for the care of a patient. (D-

PF ¶ 100-101; Tr. 868:5-869:20 (Zusman).)

The Court's construction expressly requires that the salt form be used "in **_contact_** with

the tissues of human beings and animals." (DTX 590-1 (emphasis added).) Plaintiffs vigorously

opposed the Court's claim construction because, as their own documents show, they knew that

– 8 –

apixaban does not have a pharmaceutically acceptable salt form. Plaintiffs argued not one, but two alternative constructions. First, Plaintiffs argued for a construction of pharmaceutically acceptable salts that would encompass ***any*** acid or base salt. (Mem. Op., 5, D.I. 380.) Then, Plaintiffs argued for a different construction that would encompass any salt form in which the counter-ion is not itself explicitly toxic, like a cyanide salt. (*Id.*) The Court **<u>rejected</u>** both of those constructions. (*Id.*) Plaintiffs nevertheless reargued these same rejected claim constructions at trial.

Plaintiffs' Dr. MacMillan conceded that no apixaban salt would ever come into contact with human or animal tissue. (Tr. 1650:8-1652:6 (MacMillan) ("That's why it can't get to the tissue to do that damage.").) Although he argues that the salt could not damage the tissue because it would never reach the tissue, this misses the point. Because Plaintiffs admit that no apixaban salt could ever come into contact with human or animal tissue, an apixaban salt that is "suitable for use in contact with the tissues of human beings and animals" is not enabled.

2.     <u>Standard of Law</u>

"To prove that a claim is invalid for lack of enablement, a challenger must show by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without 'undue experimentation.'" *Alcon Research Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 188 (Fed. Cir. 2014) (quoting *In re Wands*, 858 F.2d 731, 736–37 (Fed. Cir. 1988)). "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *Wands*, 858 F.2d at 737. These factors include:

> "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.*

– 9 –

"Enablement serves the dual function in the patent system of ensuring adequate disclosure of the claimed invention and of preventing claims broader than the disclosed invention." *MagSil Corp. v. Hitachi Glob. Storage Techs. Inc.*, 687 F.3d 1377, 1380-81 (Fed. Cir. 2012). "Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *Id.* at 1381. "[T]he specification must teach those of skill in the art how to make and how to use the invention **as broadly as it is claimed**." *Enzo Life Scis., Inc. v. Abbott Labs.*, No. CV 12-274-LPS, 2017 WL 3585618, at *8 (D. Del. Aug. 15, 2017), *aff'd sub nom. Enzo Life Scis., Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340 (Fed. Cir. 2019) (emphasis in original).

      3.    <u>No example in the '208 Patent is a salt of apixaban, and pharmaceutically acceptable apixaban salts are not enabled.</u>

The '208 Patent specification does not include any example of any apixaban salt, let alone any pharmaceutically acceptable apixaban salt. (Tr. 33:17-19 (Buckton).) The specification describes the synthesis of apixaban in Example 18. (D-PF ¶ 7; JTX-1 col.101:48-102:67; Tr. 54:2-11 (Buckton).) The specification provides a general method for making salts of compounds which are readily ionizable. (D-PF ¶ 8; Tr. 32:9-23 (discussing JTX-1 col.117:1-13).) This is the only disclosure of salt formation in the '208 Patent. (D-PF ¶ 10; Tr. 33:9-16 (Buckton).) Although the process teaches how to make a salt generally, it does not ensure that the salt will be pharmaceutically acceptable. A POSA would follow this same process to make sodium ethoxide, which all agree is not a pharmaceutically acceptable salt and is described as a "hazardous compound." (D-PF ¶¶ 151; Tr. 41:21-42:18 (discussing DTX-620).)

      4.    <u>Apixaban cannot be made into a salt suitable for use in contact with the tissue of humans or animals.</u>

The Court's construction of the term requires that any apixaban salt be "suitable for use in contact with" with human or animal tissue. No apixaban salt can meet this definition because

– 10 –

apixaban is not ionizable due its pKa values. Any salt form would disproportionate immediately, meaning no salt could exist to be administered, or ever placed into contact with tissue.

### a.   There are no apixaban salts in existence.

All evidence introduced at trial proves that, prior to this litigation, no salt of apixaban had ever been made. The inventors of the '208 Patent testified that they had never made salts of apixaban nor knew of anyone who had made any apixaban salt. (D-PF ¶¶ 49-57.) Neither is the working group co-chair, Dr. Knabb, nor the head of the cardiovascular medicinal chemistry group at BMS, Dr. Wexler, knew of any salt of apixaban having been made outside this litigation. (D-PF ¶ 66, Tr. 230:1-3, 232:2-21 (Knabb); Tr. 1549:8-20 (Wexler.) BMS documents from that time of the invention repeatedly state that there is no salt form of apixaban. (D-PF ¶¶64, 65, 68, 73, 74; Tr. 228:16-229:26 (Knabb) (discussing DTX 188.05 ("Salt form: none")); DTX-635.1 ("there is no salt form"); DTX-634.1 ("salt formation was not an option"); DTX-636.2 (same); 633.4 ("apixaban does not exist as a salt form").)

### b.   Apixaban is not ionizable.

The reason no one bothered to attempt to make an apixaban salt is because no such salt would be pharmaceutically acceptable. **No** pharmaceutically acceptable salt of apixaban can exist as a fundamental matter of chemistry. A salt is formed "when an acid [and] base come together in solution in an ionized form." (D-PF ¶ 82; Tr. 17:3-7 (Buckton).) To make a salt, it is necessary to first ionize the compound by protonating (adding a proton) or deprotonating (removing a proton) the compound. (D-PF ¶ 84; Tr. 19:19-21 (Buckton).) "pKa" is a measure of a molecule's capability to donate a proton and is therefore used to describe how readily a drug substance will ionize. (D-PF ¶¶ 85-86; Tr. 18:11-19:4 (Buckton).) Acids and bases are divided into categories that range from "very strong" to "extremely weak," based on their pKa value. (D-PF ¶ 87; DTX-576.6.) Very strong acids and bases have a pKa of less than 0 (acids) or greater than 14 (bases).

– 11 –

(*Id.*) "If the pKa value of a very weak base is less than three, or that of a very weak acid is greater than ten, salt formation will be very challenging since only a few counterions are available . . . ." (D-PF ¶ 89; DTX-574.14 (Byrn); Tr. 19:22-11 (Buckton).) Indeed, there are no known pharmaceutical products made from compounds with a pKa of less than 4.6. (D-PF ¶ 91; DTX-575.3; Tr. 21:23-22:21 (Buckton).)

A compound within the three to ten pKa range is referred to as being "ionizable," whereas compounds that cannot form salts are known as "neutral" or non-ionizable. (D-PF ¶ 84; Tr. 17:21-18:10 (Buckton).) The acid pKa of apixaban is 13 to 15 and the base pKa is about zero. (D-PF ¶ 109; Tr. 19:12-18 (Buckton); Tr. 1426:16-1428:18 (Scheidt).)



(*Id.*) Defendants' experts, as well as Plaintiffs' experts, do not know of any pharmaceutical product made from a compound with a pKa value similar to apixaban. (D-PF ¶¶ 93-97; Tr. 5:1-2, 10:17-24, 21:15-18 (Buckton); Tr. 1412:22-1413:1 (Scheidt); Tr. 1656:20-22 (MacMillan).) The fact that no salt of a similar compound has ever been used in a pharmaceutical application is strong evidence of nonenablement. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1318 (Fed. Cir. 2007).

Numerous industry publications, including publications authored by Plaintiffs'

– 12 –

employees, state this well-known property of apixaban and describe apixaban as not ionizable. (D-PF ¶¶ 75-79; DTX-580.4; DTX-583.6; 582.2 ("Apixaban is . . . non-ionizable . . . ."); DTX-579.1; DTX-581.4.) Plaintiffs' internal documents also establish that apixaban is not-ionizable. (D-PF ¶¶ 67-74; Tr. 230:10-231:5 (Knabb) (discussing DTX-193, which described apixaban as a "neutral compound"); DTX-635.1 (BMS-562247 [apixaban] is neutral, there is no salt form"); DTX-634.1 ("Due to the lack of an ionizable group, salt formation was not an option."); DTX-636.2 (describing apixaban as a "neutral compound so salt formation not an option"); DTX-632.36 (describing apixaban as "non-ionizable"); DTX-633.4 (describing apixaban as lacking a charged group).) Most tellingly, '208 Patent inventor Patrick Lam wrote in a May 2008 e-mail that "[a] neutral compound is one that does not have an ionizable hydrogen at pH 1 to 8. **Apixaban falls inside this category**. . . . [T]his is a fundamental chemical property that one can be [sic] predicted accurately. There is no exception known." (D-PF ¶ 74; DTX-629.1 (emphasis added).) Plaintiffs even told FDA that apixaban was not ionizable as part of Plaintiffs' effort to obtain the NDA for Eliquis®. (D-PF ¶¶ 80, 81; DTX-630.2 ("BMS-562247-01 [apixaban] is a non-ionizable compound."); DTX-631.5 (describing apixaban as "non-ionizable").)

Although Plaintiffs try to discredit their own prior admissions by limiting their import to questions of solubility, that argument is not a plausible reading of the evidence. The statements in these documents that no apixaban salt exists are not always connected to statements regarding solubility. (*See e.g.*, D-PF ¶ 65; DTX-188.5; Tr. 233:6-20; D-PF ¶ 74; DTX-629.1; Tr. 1658-7-1661:15 (MacMillan).) Plaintiffs' arguments also conflate cause and effect. Apixaban is not ionizable and cannot be used to make a pharmaceutically acceptable salt. That is why, a salt form cannot be used to improve solubility. (D-PF ¶ 59; Tr. 51:16-20 (Buckton) (these documents "say you couldn't make the salt and therefore you cannot use a salt to improve the solubility of

– 13 –

apixaban."). The references to solubility exist because issues of solubility can sometimes be addressed by making a salt form. Some salts are more soluble than the neutral form of the compound, dissolving into their cation and anion in an aqueous environment. The alleged "salts" that Dr. Jacobsen claims to have made, however, do not form such a solution—for example, instead of dissolving as a stable anion and cation, the apixaban sodium "salt" would deprotonate a water molecule, ripping the hydrogen off the $H_2O$ and leaving an extremely basic sodium hydroxide molecule. (D-PF ¶ 137, Tr. 1419:4-18 (Scheidt).) Statements characterizing apixaban as non-ionizable thus are not merely referring to effect on solubility, but to the fact that no ionized form of apixaban can exist in a physiological range.

> c.  *Apixaban's pKa values mean that any salt form will be unstable and disproportionate immediately.*

Salt formation from compounds outside the physiological acceptable range "tend to have poor physical stability in the solid state" and "can easily disproportionate in water and even in the solid state under certain conditions." (D-PF ¶ 90; DTX-574.14 (Byrn); Tr. 19:22-11 (Berkland); *Id.* at 39:18-40:14 ("I don't think a salt like this would survive the process of coating in terms of the same issue with formulation . . . it's too unstable to survive that . . . .").) When a salt will "disproportionate," the salt "would break up into its component parts." (Tr. 21:5-8 (Buckton).) It will no longer be a "salt." (D-PF ¶ 103; Tr. 1766:15-1767:4 (Myerson).)

> d.  *There is no way to prevent an apixaban salt from encountering moisture.*

The '208 Patent does not teach anything about protecting an apixaban salt from moisture. (D-PF ¶ 104; Tr. 1767:5-7 (Myerson).) Indeed, **no amount** of experimentation could produce a pharmaceutical formulation that protects a compound from **any** exposure to moisture. (Tr. 39:18-40:14 (Berkland).) Even in Dr. Jacobsen's experiments—wherein he actively attempted to avoid exposure to moisture—there was evidence of disproportionation and reversion to the neutral

– 14 –

form. (Tr. 1527:1-3 (Jacobsen).)

Unable to identify any teaching in the '208 Patent that would inform a POSA how to prevent a salt from disproportionating, Plaintiffs instead relied on the testimony of Dr. Myerson. Dr. Myerson's opinions, however, are curtailed by his assumptions such that he cannot provide any useful information to the Court. Plaintiffs first asked Dr. Myerson to assume that salt forms of apixaban had been made **and** that those salts were pharmaceutically acceptable. (D-PF ¶¶ 106, 107; Tr. 1769:8-12, 1770:19-1771:8 (Myerson).) With those assumptions limiting his opinions, Dr. Myerson then opined that a POSA would know to use various techniques to avoid moisture, including manufacturing the salts under anhydrous conditions, the use of blister packs, desiccants, and tablet coatings. (Tr. 1734:17-1738:17 (Myerson).) These techniques, however, will merely **reduce** or **limit** the exposure to water, not **eliminate** such exposure. (D-PF ¶ 131.) Dr. Myerson's own example of Pradaxa, which he identified as a "marketed drug with active pharmaceutical ingredients that need to be protected from moisture," demonstrates this difference. (*Id.* at 1737:22-1738:17.) Initially, the pKa of the neutral compound is 4 and 6.7, which is well within the "green zone." (*Id.* at 1767:21-1768:22.) Moreover, although patients are instructed to "remove only one capsule from the opened bottle at the time of use," opening the bottle would expose the contents of the bottle to the atmosphere, which contains moisture. (*Id.* at 1737:22-1738:17.) Thus, even Dr. Myerson's selected example of a pharmaceutical product that "need[s] to be protected from moisture" will not eliminate all exposure, it can only reduce it.

5.      If administered, an apixaban salt would be impermissibly toxic.

Even if, hypothetically, apixaban salts could be maintained in salt form until they came into contact with human or animal tissue (which they cannot), such salts would nonetheless not be "within the scope of sound medical judgment, suitable for use with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or

– 15 –

complication, commensurate with a reasonable benefit/risk ratio." (DTX-590.1.)

When an apixaban "salt" disproportionates in the body it will cause a localized pH that is known to be damaging not only to human tissue, but even to machinery used during the pharmaceutical process. (D-PF ¶ 141; DTX-567.18-19; Tr. 42:19-44:6 (Buckton).) The apixaban salts Dr. Jacobsen created would cause a localized pH equivalent to "concentrated sodium hydroxide" (100,000 times more basic than pharmaceutically acceptable products such as Tums) or "concentrated battery acid" (100,000 times more acidic than pharmaceutically acceptable products such as Coca-Cola). (D-PF ¶¶ 142-143; Tr. 1429:19-1430:16; 1431:12-1432:2 (Scheidt).) Although the salt may dissipate and dilute, changing the pH, the pharmaceutical salt product will **first** come into contact with human or animal tissue. "It's that dissolving surface that is dangerous." (D-PF ¶ 144; Tr. 64:12-67:24 (Buckton).)

>        6.      The *Wands* factors confirm the lack of enablement.

The lack of enablement is confirmed by consideration of the factors set forth in *In re Wands*, which are identified in section I.B.2 above. (*See* Tr. 1400:20–1401:5 (Scheidt; DDX 16-5.) Here, the "quantity of experimentation necessary" is unlimited, because it has not been shown possible to make an apixaban salt usable "in contact with tissue," a requirement for a pharmaceutically acceptable salt under the Court's claim construction. (D-PF ¶ 82-97.) The patent contains no "direction or guidance" about how to make such a pharmaceutically acceptable salt of apixaban. It includes no "working examples" of such a salt. (D-PF ¶¶ 11-14.) The nature of the invention is reflected in the contemporaneous publications which all overwhelmingly indicate that apixaban had no pharmaceutically acceptable salt form. (D-PF ¶¶ 64-81.) The state of the prior art included many pharmaceutically acceptable salts but only for compounds with a pKa in the "green box" pH range described above, and none for any compound like apixaban, which is not ionizable in that pH range. (D-PF ¶¶ 109-111.) The relative skill in the art is not genuinely

– 16 –

disputed, but it is agreed that those of skill in the art in the teams that worked to develop apix-aban and the other compounds of the '208 Patent all agreed at the time that apixaban was not ionizable in a physiological pH range and had no pharmaceutically acceptable salt form. (D-PF ¶¶ 61-74.) The chemical and pharmaceutical arts are generally considered "unpredictable," and the breadth of the claims as trying to lasso in non-existent salt forms is exactly the reason they are not enabled. *Pharm. Res., Inc. v. Roxane Labs*., Inc., 253 F. App'x 26, 29 (Fed. Cir. 2007).

### C.     The Asserted Claims Do Not Meet the Written Description Requirement.

#### 1.     Standard of Law.

"To fulfill the written description requirement, a patent owner 'must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent.'" *Idenix Pharm. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1163 (Fed. Cir. 2019); *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991)). The written description requirement is met only when the disclosure "allow[s] one skilled in the art to visualize or recognize the identity of the subject matter purportedly described." *Enzo Biochem, Inc. v. Gen–Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002). That assessment "requires an objective inquiry into the four corners of the specification" as the hallmark of written description is disclosure. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).

#### 2.     The '208 Patent does not provide sufficient description to inform a POSA that the inventors possessed pharmaceutically acceptable apixaban salts.

It is undisputed that the '208 Patent specification does not disclose any apixaban salt. (JTX-1 col.101:48-102:67; Tr. 54:2-11 (Buckton)). The '208 Patent instead discloses only: the synthesis of apixaban (D-PF ¶ 7; JTX-1); a general method of salt formation that ignores the pKa

value of the compound (D-PF ¶ 13; Tr. 32:24-33:16 (Buckton); and the identification of apixaban in a list of eighty compounds, which are collectively followed by "or a pharmaceutically acceptable salt" (JTX-1 col.62:36-66:7, 265:40-268:41 (Claim 8).) None inform a POSA that the inventors possessed pharmaceutically acceptable apixaban salts.

> a.      '208 Patent inventor Mr. Orwat admitted that Example 18 does not disclose apixaban salts.

Example 18 makes **no** mention of any salt form. (D-PF ¶ 7; JTX-1 col.174:21-175:51.) Moreover, Michael Orwat—who was responsible for the synthesis of apixaban as described in Example 18—testified he never made a salt of apixaban and admitted that Example 18 does not describe how to synthesize an apixaban salt. (Tr. 246:13-17, 252:6-8 (Orwat).)

> b.      The '208 Patent's general description of salt formation does not show possession of a pharmaceutically acceptable apixaban salt.

A POSA would not understand the general description of salt formation at column 117 to teach that the inventors possessed an apixaban salt that would be, within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problems without complication with a reasonable benefit/risk ratio. (D-PF ¶ 48; Tr. 48:1-13 (Buckton); Tr. 1436:14-18 (Scheidt).) The disclosure in Column 117 does not inform a POSA how to make a pharmaceutically acceptable salt of apixaban "[b]ecause apixaban is not one of these compounds. It doesn't have a free acid or free base form . . . ." (D-PF ¶¶ 8-11; Tr. 32:24-33:16 (Buckton).) Thus, this disclosure does not demonstrate possession of apixaban salts.

> c.      The listing of 80 compounds "or a pharmaceutically acceptable salt form thereof" does not demonstrate possession of an apixaban salt.

The application for the '208 Patent, as filed, did not include any claim for apixaban "or a pharmaceutically acceptable salt form" thereof. Asserted Claims 13 and 104—both of which

– 18 –

claim pharmaceutically acceptable apixaban salts—were not included in the original application for the '208 Patent. (D-PF ¶ 15; D.I. 182-9 at 36-134.) Instead, the '208 Patent application listed approximately 80 compounds, collectively followed by "or a pharmaceutically acceptable salt form thereof." (JTX-1 col.62:36-66:7, 265:40-268:41 (Claim 8).) A POSA would have understood those claims to cover only the pharmaceutically acceptable salt forms of those compounds which would have such a form—those which were ionizable in a physiological pH range. While many of the examples in the specification disclose salt forms, Example 18 (apixaban) conspicuously does not. (*Compare e.g.* JTX-1 col.159:22-24 (Example 1), 160:44-47 (Example 2), 161:54-56 (Example 4); 162:6-11 (Example 5), 171:55-61 (Example 14); 176:31-58 (Example 20); 183:6-7 (Example 37) *with* JTX-1 col.174:21-175:51.) The patentee cannot meet the written description requirement for pharmaceutically acceptable apixaban salts by disclosing a list of compounds, some of which have such salts and some of which do not. *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1367 (Fed. Cir. 2011) (holding that in the absence of blaze marks "as to what compounds other than those disclosed as preferred, might be of special interest . . . simply describing a large genus of compounds is not sufficient to satisfy the written description requirement as to particular species or sub-genuses."); *Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358, 1365-1368 (Fed. Cir. 2018) (upholding determination that disclosure of genus (solder pads that can be connected to a board failed to disclose possession of "the newly claimed species of such pads—pads that are connectable to a board specifically using a reflow process.").

3.  The named inventors who synthesized apixaban admitted they did not synthesize or invent a pharmaceutically acceptable salt of apixaban.

Mr. Orwat, who synthesized apixaban, admitted that he never made a salt form of it. (Tr. 244:10-11, 250:8-9 (Orwat); *see also* (Tr. 47:2-11 (Buckton).) Dr. Pinto, in whose lab Mr. Orwat worked, never made any apixaban salts of apixaban nor does he know if were ever made. (Tr.

– 19 –

1553:11-1554:2 (Pinto); (Tr. 45:22-47:1 (Buckton).) Dr. Pinto testified that he did not invent any pharmaceutically acceptable apixaban salts. (Tr. 1554:13-15 (Pinto).) None of the inventors made an apixaban salt. (*See e.g.* Tr. 1550:14-19 (Qiao); Tr. 1555:21-23 (Kifer).)

Mr. Orwat claimed that he briefly discussed with Dr. Pinto a possible way to make a salt of apixaban, although no contemporaneous records reflect any such discussion. However, he discussed using lithium diisopropylamide ("LDA") (Tr. 250:23-251:1 (Orwat)), an extremely strong base. A salt of apixaban made with LDA would not be a pharmaceutically acceptable salt because it could not come in contact with the tissue of humans or animals. Mr. Orwat admitted he has never made a salt of a product used for clinical testing using LDA, and is not aware of any FDA-approved pharmaceutical that is a salt form made using LDA. (*Id*. at 250:2-11.)

### D. Claim 104 Encompasses a "Pharmaceutically Acceptable Salt Form" and Is Therefore Also Invalid.

Claim 104 necessarily covers salt forms of apixaban, too. Claim 104 claims "**[a] compound** according to claim 13, which is a crystalline compound." (JTX-1 at BMSAPIX-10263503 (emphasis added).) It is undisputed—and indeed the Court has already found—that salts are compounds. (Mem. Op., 5, D.I. 380.) Moreover, Claim 104 utilizes the disjunctive "**a** compound," of Claim 13, meaning that both compounds of Claim 13 are also included in Claim 104 (provided that the compounds are also crystalline).

That other claims recite compounds and "pharmaceutically acceptable salts thereof," while Claim 104 omits that phrase does not mean Claim 104 excludes pharmaceutically accept-able salts. When Plaintiffs added Claim 104 to the lawsuit the day before Defendants' last *Markman* brief was due, they expressly represented that it raised **no** issues of claim construction. In addition, Claim 13 expressly defines what its "compounds" are (as any claim would be required to do), and specifically says that its compounds are **either** apixaban **or** a pharma-

– 20 –

ceutically acceptable salt thereof. The fact that other dependent claims, which Plaintiffs have

now dropped from suit, appear to recite a pharmaceutically acceptable salt of a pharmaceutically

acceptable salt does not in any way alter this language of Claim 13, but instead raises questions

as to the invalidity of those claims that are no longer asserted in this suit.[1]

## II.   THE '945 PATENT IS INVALID FOR FAILING TO COMPLY WITH 35 U.S.C. § 135 AND AS OBVIOUS UNDER 35 U.S.C. § 103.

### A.   Introduction.

The earliest effective filing date for the '945 Patent is February 25, 2010. (D-PF ¶ 157.)

The Asserted '945 Claims recite the following limitations: "LIMITATIONS A-D," the $D_{90}$

LIMITATION, and the DISSOLUTION LIMITATION as illustrated in the below chart:

|  | CLAIM LIMITATION(S) |
|---|---|
| LIMITATION A | 12. A solid pharmaceutical composition comprising a therapeutically effective amount of apixaban |
| LIMITATION B | and a pharmaceutically acceptable diluent or carrier, |
| $D_{90}$ LIMITATION | wherein apixaban comprises crystalline apixaban particles, wherein the crystalline apixaban particles have a $D_{90}$ equal to or less than about 89 μm, |
| DISSOLUTION LIMITATION | and wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 mL, of a dissolution medium at 37°C, at least 77 wt % of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate. |
|  |  |
|  | 21. The composition as defined in claim 12, |
| LIMITATION C | wherein the pharmaceutical composition comprises 2.5 mg of apixaban. |
|  |  |
|  | 22. The composition as defined in claim 12, |
| LIMITATION D | wherein the pharmaceutical composition comprises 5 mg of apixaban. |

(D-PF ¶¶162-164; JTX-2 col.10:14-28, 10:46-49.)

---

[1] Claims reciting a "pharmaceutically acceptable salt" of a "pharmaceutically acceptable salt" would themselves be invalid for indefiniteness. *See e.g.*, *Allvoice Developments US, LLC v. Microsoft Corp.*, No. C10-2102 RAJ, 2011 WL 12854654, at *6 (W.D. Wash. Dec. 21, 2011) (finding claim that recited "linking . . . using the link data" invalid as indefinite).

DocID: 4837-2528-5806.19

The clear and convincing evidence introduced at trial establishes that the Asserted '945 Claims are invalid (i) for lack of written description and enablement under Section 112, as well as (ii) obvious under Section 103. Each bases of invalidity is discussed in detail.

**B.    The Breadth of the $D_{90}$ LIMITATION Renders the Asserted Claims Invalid for Failing to Comply with the Written Description and Enablement Requirements.**

       1.    <u>At Plaintiffs' urging, the Court construed the $D_{90}$ LIMITATION as having its plain and ordinary meaning.</u>

Claim 12 is directed to solid pharmaceutical composition(s) comprising apixaban "wherein the crystalline ***apixaban particles have a $D_{90}$*** equal to or less than 89 µm." (D-PF ¶ 162; JTX-2 col.2:12-17, Claim 12 (emphasis added). The bolded language is referred to as the "$D_{90}$ LIMITATION."

At Plaintiffs' urging, the Court construed the $D_{90}$ LIMITATION to have its "plain and ordinary meaning." (D-PF ¶ 165; D.I. 381; PSUF 34.) The Court relied on the statement in the '945 Patent that a "$D_{90}$ of 89 µm means that ***90% of the volume of particles*** in an apixaban composition have a diameter less than 89 µm." (D-PF ¶ 165; D.I. 380 at 9-10 (emphasis added).) It is undisputed that the $D_{90}$ LIMITATION is a *calculated* value, and cannot be directly measured. (D-PF ¶ 166; Tr. 649:20-650:2 (Berkland); Tr. 1670:9-1671: 11 (Myerson); Tr. 1145:11-1146:21 (Genck); Tr. 1349:17-1350:4 (Chambliss).)

At claim construction, Defendants argued the $D_{90}$ LIMITATION claims should be construed commensurate in scope with the '945 Patent disclosure (determining the $D_{90}$ of the apixaban particles of the pre-formulated bulk apixaban using laser light scattering.) Plaintiffs argued, and the Court agreed, that the $D_{90}$ LIMITATION encompassed determining the $D_{90}$ of the apixaban

particles **either** before **or** after being formulated.[2] As shown below, this interpretation renders the Asserted '945 Claims invalid for separately failing to satisfy the (i) written description and (ii) enablement requirements of Section 112.

> 2. <u>The Asserted '945 Claims are invalid for failing to satisfy the written description requirement of Section 112.</u>

The test for written description is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms.,* 598 F.3d at 1351. Determining whether the inventors had possession of what is claimed requires "an objective inquiry into the four corners of the specification from the perspective of a POSA."[3] *Id.* at 1351. The '945 Patent specification simply does not describe nor contemplate determining the $D_{90}$ of the apixaban particles once formulated. In a case on all fours with the present case, the Federal Circuit noted:

> Even though Lilly won on claim construction, the district court ruled that the breadth of the limitation rendered the Particle Size Patents invalid for failure to comply with the written description requirement of 35 U.S.C. §112, first paragraph. The district court noted that the Particle Size Patents **did not disclose the idea of measuring the particle size of raloxifene extracted from a tablet, nor did the inventors perform any tests to determine how the granulation or tableting process could affect particle size**. Moreover, the district court concluded, after reading the patent, a person of ordinary skill in the art would not understand **how to extract raloxifene particles from a formulation in order to determine  whether they fall within the claimed particle size range** and, in fact, **would have no indication that size measurements on anything other than unformulated raloxifene would bear any relevance to the invention**.

*Eli Lilly v. Teva Pharms, USA, Inc.*, 619 F.3d 1329, 134 (Fed. Cir. 2010) (quoting *Eli Lilly & Co.*

---

[2] Dr. Berkland would limit the scope of $D_{90}$ LIMITATION to *only* determining the $D_{90}$ of the apixaban post-formulation (D-PF ¶ 193; Tr. 637:24-639:23 (Berkland).) This is inconsistent with the Court's claim construction, the '945 Patent and the law. *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001).

[3] The Parties' respective experts' opinions would not change under either Party's definition of a POSA. (D-PF ¶ 160, PSUF ¶¶ 31-33.)

DocID: 4837-2528-5806.19

*v. Teva Pharms, USA, Inc.*, 657 F. Supp.2d 967, 1027 (S.D. Ind. 2009) (emphasis added).

A POSA reading the '945 Patent encounters the same disclosure deficits presented in the patent asserted in *Eli Lilly*. Here, like there, *a* POSA would not have considered the '945 Patent inventors to have been in possession of the full scope of the $D_{90}$ LIMITATION for at least the following reasons: (a) the '945 Patent only discloses determining the $D_{90}$ of the bulk apixaban **before it is formulated**; (b) the '945 Patent ties the bulk apixaban particle size to the increased *in vivo* dissolution of tableted apixaban; (c) the '945 Patent does not contemplate determining the $D_{90}$ of apixaban particles extracted from a tablet, or disclose any techniques to determine the same; and (d) the prior art provides no guidance to a POSA for determining the $D_{90}$ of apixaban after tableting. Each point is discussed below.

        a.    *The '945 Patent only describes determining the $D_{90}$ of the bulk apixaban.*

The '945 Patent only describes determining the $D_{90}$ of bulk apixaban particles by the laser light scattering technique, which the '945 also describes as the "invention" in several places . (D-PF ¶¶ 167, 169, 172; JTX-2 col.1:56-60; 1:64-2:3, 2:7-11, 2:18-23, 2:32-38, 2:39-43, 2:53-54, 2:62-65, 3:37-40, 3:60-64, 9:29-32; Tr. 1146:22-1152: 18, 1153:4-12 (Genck); Tr. 643:11-15, 641:6-10 (Berkland); Tr. 1339:11-14 (Chambliss).) A POSA would clearly understand that the '945 Patent is referencing measuring the $D_{90}$ of bulk apixaban because, as Plaintiffs' experts admit, laser light scattering is not suitable to determine the $D_{90}$ of an API once formulated into a solid composition. (D-PF ¶ 168.)

The '945 Patent also discloses several examples where tablets containing either 2.5 mg or 5 mg of apixaban are formulated using bulk apixaban of having different $D_{90}$ values. (D-PF ¶ 170; JTX-2 col.4:30-33; Tr. 1155:11-19, 1158:3-17 (Genck).) A POSA reading these examples would understand that the $D_{90}$ being discussed was the bulk apixaban $D_{90}$ at least because the

– 24 –

'945 Patent states:  "In the examples below, the **particle size for apixaban drug substance** was

measured using a Malvern particle size analyzer." (D-PF ¶ 171; JTX-2 col.6:16-18 (emphasis

added); Tr. 1150:19-1152:7 (Genck).)

A POSA reading the '945 Patent would understand that the '945 Patent exclusively refers

to laser light scattering to determine the $D_{90}$ of bulk apixaban. (D-PF ¶ 167).

> b. *The '945 Patent considers the $D_{90}$ of the bulk apixaban to be*
> *critical in improving in vivo dissolution of tableted apixaban.*

A POSA reading the '945 Patent would not understand that anything other than the $D_{90}$ of

bulk apixaban would be relevant to the inventors' claimed composition. The '945 Patent teaches

a POSA that the inventors regarded the $D_{90}$ of the bulk apixaban particles to be critical in

improving the *in vivo* dissolution of the apixaban formulated in a tablet. (D-PF ¶ 172; JTX-2

col.1:64-2:3, 1:56-60, 2:53-54, 9:29-32; Tr. 1154:23-1155:10 (Genck); Tr. 1746:15-20

(Myerson).) For example, Figures 3 and 4 of the '945 Patent expressly correlate the $D_{90}$ of the

bulk apixaban drug substance with the *in vivo* dissolution of apixaban from a tablet containing

2.5 mg apixaban (FIG 3) or 5 mg apixaban (FIG 4)). (D-PF ¶ 173; Tr. 1157:8-11, 1158:3-17

(Genck); Tr. 1336:20-1337:14 (Chambliss).)

The '945 Patent prosecution history supports this position.  Plaintiffs argued to the

USPTO, to obtain issuance of the '945 Patent, that the particle size of the bulk apixaban affects

the bioavailability of apixaban after it is tableted. (D-PF ¶ 174; DTX-458.15; Tr. 1332:5-1333:2

(Chambliss).)

That the '945 Patent uses laser light scattering to determine the $D_{90}$ of the bulk apixaban

is not surprising, as this was the standard in the pharmaceutical industry in 2010 (and even

today). (D-PF ¶ 177; Tr. 1145:11-19 (Genck); Tr. 1339:5-14 (Chambliss).) The testimony of Dr.

Patel, a named inventor of the '945 Patent as well as Plaintiffs' Rule 30(b)(6) witness confirmed

– 25 –

that (i) the inventors only determined the $D_{90}$ of bulk apixaban, and (ii) he was not aware of any efforts by the inventors to determine the $D_{90}$ after tableting. (D-PF ¶¶ 156, 178; Tr. 1127:15-20, 1127:24-1128:2 (Patel)).)  At no point does the '945 Patent discuss, describe or attempt to determine the $D_{90}$ of the apixaban after tableting.

> c.    *The '945 Patent does not describe or disclose ascertaining the $D_{90}$*
> *of the apixaban particles after formulation.*

All of the particle size data in the '945 Patent is based on tablets where the $D_{90}$ was calculated from the particle size of the <u>bulk apixaban.</u> (D-PF ¶ 179; Tr. 1746:15-20 (Myerson); Tr. 1150:5-1152:7 (Genck); Tr. 1336:20-1337:14 (Chambliss).) The '945 Patent simply does not describe or disclose either (i) the $D_{90}$ value of apixaban post-formulation – including in any example of the '945 Patent; (D-PF ¶ 180); Tr. 1157:12-18,  1152:8-18 (Genck); Tr. 1342:20-1343:1 (Chambliss).); or (ii) any technique that would permit a POSA to measure the particle size and determine the $D_{90}$ of the apixaban in a solid composition. (D-PF ¶ 181; Tr. 1152:8-18 (Genck).) Dr. Myerson specifically testified that "the **'945 Patent discloses no such test. I agree**." (D-PF ¶ 182; Tr. 1745:10-16 (Myerson) (emphasis added))

The experts agree that the wet and dry granulation manufacturing processes disclosed in the '945 Patent could impact the particle size (and the $D_{90}$) of the bulk apixaban such that a POSA would not have been able to predict the size of, or $D_{90}$ of, the apixaban particles after undergoing the disclosed methods of manufacture. (D-PF ¶ 183; Tr. 1157:12-18, 1152:8-18 (Genck); Tr. 1342:20-1343:1 (Chambliss).) That is, knowing both the $D_{90}$ of the bulk apixaban drug substance and the manufacturing process would not have provided sufficient information to

– 26 –

a POSA to permit determination (in 2010 or even today) the $D_{90}$ of the tableted apixaban.[4] (D-PF ¶ 185; Tr. 1153:13-22 (Genck); Tr. 1342:20-1343:1 (Chambliss).)

A POSA reading the '945 Patent would have understood that the inventors were **not** in possession of the claimed invention where the $D_{90}$ of the apixaban was determined after formulation. The description of a patent "must clearly allow" a POSA "to recognize that the inventor invented what is claimed" to prevent the patentee from later asserting inventive rights over subject matter the patentee did not invent. *Ariad Pharm.,* 598 F.3d at 1351. Here, Plaintiffs have asserted the Asserted '945 Claims cover what the inventors did not possess or even contemplate and, in so doing, have rendered the claims invalid under Section 112.

Plaintiffs' attempt to excuse the '945 Patent's lack of disclosure by arguing that: (i) such techniques were so well known in the art that they need not be described; and (ii) the '945 Patent need not disclose how to determine the $D_{90}$ LIMITATION because a patent does not need to describe steps used to prove infringement. Neither position has merit.

> d. *A POSA would not have known how to determine the $D_{90}$ LIMITATION of an API after formulation.*

> > i. **The state of the art does not support Plaintiffs' position that determining the $D_{90}$ post formulation was known.**

Because a patent specification is viewed from the perspective of a POSA, there are limited instances where a patentee may rely on information that is "well-known in the art" to meet the written description requirement. *Rivera v. ITC,* 857 F.3d 1315, 1322 (Fed. Cir. 2017). This is not one of those instances. While what is "well-known" to a POSA "may be used to inform **what is actually in the specification,**" such information, however, cannot be used to

---

[4] Dr. Myerson, Plaintiffs' expert, did **not** disagree, noting that "other than saying it would be the same or possibly smaller, that's the best I can do." (D-PF ¶ 184; Tr. 1749:14-21, 1725:12-1726:1 (Myerson).)

– 27 –

"teach limitations that are not in the specification." *Id.* (emphasis added); *see also Boston Scientific Corp. v. Johnson & Johnson,* 647 F.3d 1353, 1366 (Fed. Cir. 2011).

The evidence at trial flatly contradicts Plaintiffs' assertion that determining the $D_{90}$ of apixaban particles once tableted was so well known that it need not be described by the '945 Patent. In fact, the evidence overwhelmingly supports the opposite finding—determining the $D_{90}$ LIMITATION of apixaban particles after tableting was **not** known (much less well-known) by a POSA. The prior art provides no guidance that would have enabled a POSA to determine the $D_{90}$ LIMITATION of apixaban particles in a solid composition. (D-PF ¶¶ 186-192).

Both parties' experts testified that they were unaware of a single publication or example available at the time of the invention (or even today) where the particle size of the API was measured and $D_{90}$ determined after the API was formulated into a tablet. For example, Dr. Myerson testified:

> Q.     We discussed a number of publications, and I do believe we're in agreement, but would you agree with me that none of the documents that you discussed today [or] were cited in your expert report determined the $D_{90}$ of an API in a finished dosage form?
>
> A.     That's correct.

(D-PF ¶ 188; Tr. 1746:21:1747:1 (Myerson).) Dr. Chambliss and Dr. Genck agreed. (D-PF ¶ 187; Tr. 1339:19-1340:2 (Chambliss); D-PF ¶ 189; Tr. 1178:20-25 (Genck).

Moreover, Dr. Berkland, who's credentials far exceed a POSA, admitted that, before this case, he had never attempted to determine the $D_{90}$ of an API post-formulation. (D-PF ¶ 190; Tr. 651:13-17 (Berkland).) Even here, Dr. Berkland admitted he did not calculate the $D_{90}$ value of the apixaban in Unichem's ANDA product, despite viewing a few granules (some of which contained apixaban) shaved from a Unichem tablet. (D-PF ¶ 191; Tr. 629:6-9 (Berkland ).)

Finally, Plaintiffs' counsel conceded that the prior art does not show a determination of

– 28 –

the $D_{90}$ of an API after tableting. (D-PF ¶ 192). Instead, Plaintiffs' position in support of written

description support is premised on the argument that certain "techniques" were known to a

POSA that **could have been used** to measure the $D_{90}$, even though there is no evidence a POSA

was aware of, or would have used, these techniques for that purpose:

> THE COURT: This point about whether the $D_{90}$ is measured in the bulk before
> the tableting or at the end after the tableting, have you identified any evidence
> before me where outside of this litigation, either a patent or other reference or any
> witness, ever measured $D_{90}$ or particle size after tableting.
>
> ***
>
> MS. WIGMORE: The answer is yes, there are particle size measurements in the
> prior art. I gave the exhibit numbers during my presentations. **The $D_{90}$ in a tablet**
> **that's not in the prior art** but the techniques that are in the references that I
> mentioned show how to measure the particle size that you can get from the tablet,
> and the $D_{90}$ is a mathematical calculation that can be made.

(D-PF ¶ 192; Tr. 1941:5-10; 16-23 (Plaintiffs' Closing).)

Defendants disagree with Plaintiffs' argument that knowing about a technique equates to

a POSA knowing how to use that technique for any purpose whatsoever. This is folly – akin to

attributing the knowledge of how to build the Empire State building (or any structure) to anyone

who knew about a hammer.  Knowing about a tool and generally how that tool functions is not

the same as knowing how to use that tool to achieve a specific, never-before disclosed result

(without any guidance from either the '945 Patent or the state of the art).

The fact that the "techniques" Plaintiffs identified have never before been used to

determine the D90 value of a tableted API belies Plaintiffs' assertion and conclusively

establishes that such techniques were not so well-known in the art at the time of the invention

that the '945 Patent need not describe them. (D-PF ¶¶ 194-195).

Certainly, Plaintiffs cannot dispute that very little (if any) knowledge existed in the prior

art describing using the techniques in the manner that Plaintiffs now seek to do. That is,

determining the D90 of an API after it has been formulated. While Dr. Berkland may have used

– 29 –

known techniques, he used them (in 2019 no less, not in 2010) in a unique and novel way not contemplated by the prior art and certainly not disclosed in the '945 Patent. (D-PF ¶¶ 190-191, 194; Tr. 1178:6-19, 1201:24-1202:23 (Genck).) Dr. Berkland used SEM in combination with EDS (D-PF ¶ 193; Tr. 597:13-600:1, 604-23-25 (Berkland)), which were known microscopy methods in 2010.  But, such tools were not known by a POSA for determining the D90 of tableted API particles. (D-PF ¶¶ 194, 195; Tr. 1178:6-19 (Genck).)

The prior art describing the use of SEM-EDS and other microscopy methods establishes these techniques were not known (or even able) to determine the D90 of tableted API. (D-PF ¶ 199; DTX-343.10-12; Tr. 1181:9-1184:16 (Genck).) Rather, SEM-EDS visually observes and measures a single dimension (e.g., length) or 2-dimensional cross sections—not volume. (*Id*.)

Dr. Berkland pointed to a 2008 article by Reverchon to assert that a POSA would have known to use SEM-EDS to determine the D90 value of a tableted API. (PTX-402; Tr. 607:18-608:22 (Berkland).) However, Reverchon used SEM-EDS to verify powder uniformity (D-PF ¶ 201; PTX-402 at 187; Tr. 666:8-14 (Berkland).) before tableting and to determine the pre-formulation D90 of a mixture of unadulterated powder API and excipient before formulation . (D-PF ¶ 203-204; PTX-402 at 192).) Reverchon did not determine the D90 of an API after tableting. (D-PF ¶¶ 203-204.)

And, importantly, a POSA reading the '945 Patent in 2009-2010 would not have contemplated using SEM-EDS because it cannot differentiate between apixaban and excipients in the '945 Patent. (D-PF ¶ 196-198; Tr. 612:13-613:14 (Berkland); JTX-2 col.7:19-45; Tr. 1748:2-18 (Myerson).) The '945 Patent discloses povidone which contains nitrogen, the only atom Dr. Berkland could use to distinguish the apixaban from the Unichem excipients. (*Id.*)

### ii.    The $D_{90}$ LIMITATION must be described by the '945 Patent.

Plaintiffs argue that the '945 Patent need not describe a technique to determine the $D_{90}$

– 30 –

LIMITATION for tableted apixaban because "the test for written description has never been whether the patent includes a description of the steps that may be used to prove infringement." (Tr. 1856:4-9 (Plaintiffs' closing) (citing *Eli Lilly*, 619 F.3d at 1388).)

Plaintiffs' argument misses the mark. Every limitation set forth in a claim must have a meaning and, to satisfy the written description requirement, the patent specification must "actually or inherently disclose the claim element."*PowerOasis, Inv. v. T-Mobile USA, Inc.,* 522 F.3d 1299, 1306 (Fed. Cir. 2008). Here, the '945 Patent does not describe determining the D$_{90}$ LIMITATION of tableted apixaban particles. (D-PF ¶ 166.)

Even in the case Plaintiffs cite for the proposition that the D$_{90}$ LIMITATION need not be described the court concluded the opposite and found the limitation indeed needed to be described. *See Eli Lilly*, 619 F.3d at 1388; *see also Apotex v. Cephalon*, 2011 U.S. Dist. LEXIS 125859 *71-74 (E.D. Pa. 2011), *aff'd*, 500 Fed. Appx. 959 (Fed. Cir. 2013) (finding lack of written description for determining particle size in finished tablet on similar facts).

3.    The Asserted '945 Claims are not enabled over their full scope.

To meet the enablement requirement, the patent "must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. *Trs. of Boston Univ. v. Everlight Elecs., Co.,* 896 F.3d 1357, 1362 (Fed. Cir. 2018); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008). The Asserted '945 Claims have been construed to cover determining the D$_{90}$ LIMITATION of pre-formulated and post-formulated apixaban, and thus the patent must enable both embodiments. *Sitrick*, 517 F.3d at 1000. The clear and convincing evidence, adduced at trial, shows that a POSA reading the '945 Patent could not determine the D$_{90}$ of the tableted apixaban particles without undue experimentation. The "*Wands* factors" guide the analysis of whether the patent specification requires undue experimentation. *In re Wands,* 858 F.2d at 735.

– 31 –

a.      *Factors (2) Direction/Guidance and (3) Working Examples*

It is undisputed that the '945 Patent does not provide any examples or other guidance for determining the $D_{90}$ of apixaban after formulation. (D-PF ¶¶ 180-182). Rather, the '945 Patent discloses only determining the $D_{90}$ of the bulk apixaban. (D-PF ¶ 167-171).

b.      *Factor (4) Nature of the Invention*

The nature of the invention would have led a POSA to understand the inventors compared only the $D_{90}$ of the bulk apixaban to the bioavailability of the tableted apixaban. The '945 Patent expressly correlates the $D_{90}$ values of bulk apixaban with the dissolution profiles tablets manufactured from the different sized bulk apixaban. (D-PF ¶ 172-174). During prosecution, applicants relied on the relationship between the $D_{90}$ of the bulk apixaban and the bioavailability of the various sized tableted apixaban particles to obtain the patent. (D-PF ¶ 174).

c.      *Factors (1) Quantity of Experimentation; (5) State of the Art; (6) Relative Skill in the Art; and (7) Predictability of the Art.*

The evidence at trial establishes that, as of 2009-2010, the prior art fails to provide a single example wherein the $D_{90}$ of an API was determined after the API was formulated into a solid composition. (D-PF ¶¶ 186-192). The experts from both parties testified that they were unaware of a single publication (available in the 2009-2010 timeframe or even today) where the $D_{90}$ of an API was determined after it was formulated in a tablet, and were likewise not aware of any such calculation being performed. (D-PF ¶¶ 188-187).

Dr. Berkland admitted that, before this case, he had not attempted to estimate the $D_{90}$ of an API after tableting (D-PF ¶ 190; Tr. 651:13-17 (Berkland)) and that he did not calculate (in 2019) the $D_{90}$ value of the apixaban particles in Unichem's ANDA product either. (D-PF ¶ 191; Tr. 629:6-9 (Berkland).)  Even if a technique other than laser light scattering could be used, a POSA would recognize that using a different particle size measurement techniques (or even

– 32 –

using different sample preparation/testing parameters) would yield results that do not correlate to other particle size measurement techniques. (D-PF ¶¶ 200, 206).  In short, the state of the art reflects that, to date, no amount of experimentation has permitted a POSA to determine the $D_{90}$ of API after tableting.

> ### d.      Factor (8) Breadth of the Claims

Both the written description and enablement issues are of the Plaintiffs' own making. Having obtained a claim construction that encompasses determining the $D_{90}$ LIMITATION of apixaban particles after formulation, Plaintiffs must now successfully defend against challenges to enablement and written description. *See Trs. of Boston Univ.,* 896 F.3d at 1365. "Put differently: if [Plaintiffs] wanted to exclude others from what [they] regarded as [their] invention, [the] patent needed to teach the public how to make and use that invention. That is 'part of the *quid pro quo* of the patent bargain.'" *Id.* (quoting *Sitrick,* 516 F.3d at 999).

> ### 4.      Determining the $D_{90}$ of the bulk apixaban is not enabled by the '945 Patent.

The '945 Patent does not provide sufficient guidance to enable a POSA to determine the $D_{90}$ of the bulk apixaban even using the Malvern laser light scattering disclosed. (D-PF ¶ 205; Tr. 1344:11-15 (Chambliss).) The '945 Patent lacks critical information that would enable a POSA to reproduce the testing disclosed in the '945 Patent. (D-PF ¶ 205; Tr. 1343:10-1346:3 (Chambliss).) Not only the different particle size techniques impact the particle size measurement results, but the testing parameters and conditions can also impact the particle size measurement results. (D-PF ¶ 206 (Tr. 1217:1-1218:21 (Genck).)

For example, the '945 Patent does not disclose the optical model (e.g., Fraunhofer or Mie theory), the Malvern equipment or data analysis program used. (D-PF ¶ 207; Tr. 1343:18-24 (Chambliss).) The '945 Patent also does not inform a POSA how the sample was dispersed (what

– 33 –

medium used, whether a dispersion agent was used) or how the sample was prepared (e.g., was it sonicated and under what conditions; the concentration range, length of measuring time or sample cell.) (D-PF ¶ 208; Tr. 1343:25-1344:10 (Chambliss).) Without this information, a POSA would not be able to provide results that correlate to the '945 Patent.

### C.    The Asserted Claims Are Obvious Under 35 U.S.C. § 103.

####     1.    Law of obviousness

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); *see also KSR v. Teleflex*, 550 U.S. 398, 427 (2007). While obviousness requires an expectation of success in combining prior art, "[o]bviousness does not require absolute predictability of success". *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (citation omitted).

####     2.    The physical properties of apixaban were well known in the prior art.

- Apixaban was known to be a "potent, selective, orally bioavailable Factor Xa inhibitor with demonstrated antithrombotic efficacy." (D-PF ¶ 210; DTX-349.9; DTX-312.3; JTX-1 at Abstract, 269:1-6, 270:5-8; DTX-344.3; Tr. 1674:2-5, 1752:22-25 (Myerson); Tr. 1235:2-18 (Chambliss).)

- Apixaban was also known to be poorly water soluble. (D-PF ¶ 212; DTX-303 at ¶ [0006]; DTX-349.7; DTX-344 at 31:1-3; DTX-355.2; Tr. 1237:20-1240:18 (Chambliss).)

- Apixaban's bioavailability was likewise known in the prior art. (D-PF ¶ 213; DTX-349.8; DTX-312.6; Tr. 1235:20-1237:19 (Chambliss).)

- Apixaban was further known to exist in the crystalline state in the prior art. (D-PF ¶ 214; DTX-359.9; DTX-344.4-5; DTX-344.38-39; DTX-349.9; Tr. 1321:4-7 (Chambliss); also Tr. 811:7-813:23 (Schurko).)

####     3.    The state of the Art in 2009-2010 establishes that a POSA would have been motivated to combine the prior art to arrive at the claimed invention.

During 2009-2010, a POSA, like BMS observed in Nause,[5] would have recognized the "continuing need to find safe, effective methods of delivering … apixaban," and would have been motivated to improve on the then-known apixaban compositions. (D-PF ¶ 217; DTX344.4 at 11-12; Tr. 1321:19-1322:14, 1331:12-22 (Chambliss).) With this recognition and knowing the physical properties of apixaban, including that apixaban was highly potent and poorly water soluble, a POSA would have been motivated to reduce the particle size to improve (i) content uniformity in any solid composition and (ii) bioavailability by enhancing the dissolution rate to improve chances of FDA approval as well as obtain a biowaiver. (D-PF ¶¶ 215, 218, 226; DTX-320.14; DTX-336.63; DTX-364.1-2; Tr. 1230:13-1231:19, 1240:19-1241:11, 1242:12-1243:7, 1244:4-1245:18, 1245:24-1247:19 (Chambliss).) A POSA would have had an expectation of success in this endeavor as particle size reduction was a well-known technique.

A POSA would have been motivated increase the bioavailability of apixaban even though apixaban was in Phase III clinical trials, because the POSA would have been aware that cardiovascular drugs in clinical trials suffered an eighty percent (80%) failure rate, and that drugs that made it to Phase III trials still suffered a forty percent (40%) failure rate at a cost of hundreds of millions of dollars and years of development time.[6]  (D-PF ¶¶ 219, 220, 221; DTX-368.1-2; Tr. 1263:10-21, 1313:24-1314: -24 (Chambliss).)

Even though some prior art, i.e., Carrerio, Pinto 2007, Eriksson and Teague, characterized the bioavailability of apixaban as "good" or "high," a POSA would have independently considered the bioavailability data and results and drawn their own conclusions

---

[5] Even if not prior art to the '945 Patent, Nause is a contemporary document showing the state of the art and the knowledge of a POSA in 2009-2010. (D-PF ¶ 247, Tr. 1321:19-1322:14, 1331:4-22).)

[6]     This is consistent with BMS' own contingency plans in case the apixaban clinical trials failed. (D-PF ¶ 232; Tr. 204:12-24 (Knabb); Tr. 1754:20-1755:18 (Myerson).)

– 35 –

and sought to improve the bioavailability of apixaban since (i) these publications were all authored by or based upon publications authored by individuals employed or associated with BMS, and (ii) these characterizations were inconsistent with BMS's contemporaneous statement in Nause recognizing the need for safer more efficient ways to deliver apixaban. (D-PF, ¶¶ 222-224; DTX-312.10, DTX-319.1, PTX-320, PTX-480 (n. 33); Tr. 1363:18-1377:7, 1391:9-1392:2 (Chambliss).)

A POSA would also have been motivated to reduce the apixaban particle size to achieve rapid dissolution and seek a biowaiver to waive expensive regulatory hurdles, including bioequivalence testing. (D-PF ¶ 226; DTX-320.14; DTX-364.1-2; Tr. 1245:24-1247:19 (Chambliss).) While only biowaivers for BCS Class I drugs were available in the U.S. in 2009-2010, biowaivers were available for BCS Class I and III drugs in Europe, and scientific publications were advocating biowaivers for BCS Class III drugs in the U.S. at that time. (D-PF ¶¶ 227, 228, 229; DTX-355.7, DTX-364.3; DTX-437.2; Tr. 1755:23-1756:5 (Myerson); Tr. 1259:1-25, 1260:4-18, 1379:1-24, 1392:4-8 (Chambliss).)

To the extent that a POSA could know apixaban's effective dosage and been able to determine its BCS classification or even considered the BCS, the POSA would still have been motivated to reduce the apixaban particle size to improve bioavailability. (D-PF, ¶¶ 225, 236, 237; DTX-320.5-6; Tr. 1252:11-25, 1257:9-1258:24, 1317:3-11 (Chambliss).) The POSA would have known that BCS Class III drugs did not fall into a one-size-fits-all category and approached each drug individually based upon its unique physical properties. The POSA would also have known that the bioavailability of BCS Class III drugs was dependent upon many factors, and could be "strongly dependent" upon the excipients in the composition. (D-PF ¶ 230; PTX-429 at 4; Tr. 1757:6-1759:6 (Myerson).) In the case of ranitidine—the BCS Class III drug discussed in

– 36 –

Blum (PTX-429)—the bioavailability varied by approximately fifty percent (50%) based solely on the excipient used (sorbitol vs. sucrose). (D-PF ¶ 231; Tr. 1759:7-1760:20 (Myerson).)

        4.    <u>The Asserted '945 Claims are obvious over the prior art.</u>

The Asserted '945 Claims are invalid as obvious under Section § 103 over the following combinations of prior art references and the state of the art:

- **Carreiro** and **Wei** in view of **FDA Guidance 1997**;

- **The '306 publication** and **Wei** in view of **FDA Guidance 1997**;

- **The '208 Patent** and **Wei** in view of **FDA Guidance 1997**; and

- **Nause** in view of **FDA Guidance** 1997.

        *a.*    *Carreiro and Wei In View of FDA Guidance 1997*

Carreiro teaches administering a therapeutically effective amount of apixaban, 2.5 mg and 5 mg, and a pharmaceutical acceptable diluent or carrier. (D-PF ¶ 235; DTX-312.7, DTX-312.9; Tr. 1752:18-1753:4 (Myerson); Tr. 1322:23-1323:10 (Chambliss).) As such, Carreiro teaches LIMITATIONS A-B, C-D. (D-PF ¶ 267.)

The remaining $D_{90}$ LIMITATION and DISSOLUTION LIMITATION are also taught in the prior art. Wei teaches "small" apixaban crystals, i.e., apixaban particles having a $D_{90}$ of less than about 30 μm. (D-PF ¶¶ 254, 256; DTX-359 at ¶¶ [0020], [0041]-[0046]; Tr. 1233:21-25, 1234:1-9, 1319:7-15, 1319:25-1320:6, 1323:11-17, 1326:16-18, 13127:25-1328:3 (Chambliss).) Wei also teaches improving the bioavailability of apixaban by reducing the apixaban particle size to such "small … particles" to enhance the dissolution rate. (D-PF ¶ 255; DTX-359 at ¶ [0003]; Tr. 1247:20-1248:17 (Chambliss).)

Additionally, all features of the DISSOLUTION LIMITATION are expressly taught by FDA Guidance 1997 except for the recited dissolution rate of "77% . . . within 30 minutes." (D-PF ¶¶ 258-263, 265, 266; DTX-320.6, DTX-320.15-60; Tr. 1261:13-1262:22 (Chambliss).) In that

– 37 –

regard, FDA Guidance 1997 teaches that the dissolution rate for BCS Class III drugs should be 85% in 15 minutes to ensure that bioavailability is not limited by dissolution rate, which subsumes and teaches the recited 77% in 30 minutes dissolution rate. (D-PF ¶¶ 264, 266; DTX-320.6; Tr. 1323:16-1324:8 (Chambliss).)  The experts agree that this in not innovative.  (D-PF ¶ 266; Tr. 1753:10-1754:19 (Myerson); Tr. 1261:13-1262:22, Tr. 1323:16-1324:8 (Chambliss).

As such, the state of the art would have motivated a POSA to combine Carreiro and Wei in view of FDA Guidance 1997 to render the Asserted '945 Claims invalid under Section 103. (D-PF ¶ 267.)

> b.    The '306 Publication and Wei In View of FDA Guidance 1997

The '306 publication discloses therapeutically effective apixaban dosages of 2.5 mg to 10 mg, which may be administered in tablets comprising a pharmaceutical acceptable carrier, once daily. (D-PF ¶¶ 239, 240; DTX-303 at ¶¶ [0051], ¶ [0081], [0062]-[0063]; Tr. 1232:16-20, 1317:18-1318:6, 1325:16-1326:2, 1326:11-14  (Chambliss).) The '306 publication thus teaches LIMITATIONS A-B, C-D. (D-PF ¶ 268.) The remaining $D_{90}$ LIMITATION and DISSOLUTION LIMITATION are taught by Wei and FDA Guidance 1997 as discussed in Section II.C.4.a, *supra*.

In view of the state of the art, a POSA would have been motivated to combine the '306 publication and Wei in view of FDA Guidance 1997 to arrive at the claimed invention, and render the Asserted '945 Claims obvious. (D-PF ¶ 268.)

> c.    The '208 Patent and Wei In View of FDA Guidance 1997

The '208 Patent teaches compositions, such as a tablet or capsule, comprising a therapeutically effective amount of apixaban, 2.5 mg and 5.0 mg, and a pharmaceutically acceptable carrier. (D-PF ¶¶ 242-245; JTX-1 col.155:7-10, 270:5-8; Tr. 1318:19-23, 1327:18-24 (Chambliss).)  The '208 Patent accordingly discloses LIMITATIONS A-B, C-D. (D-PF ¶ 269.) The remaining $D_{90}$ LIMITATION and DISSOLUTION LIMITATION are respectively taught in Wei and

– 38 –

FDA Guidance 1997 as discussed in Section II.C.4.a, *supra*.

A POSA knowing the state of the art would accordingly have been motivated to combine the '208 Patent and Wei in view of FDA Guidance 1997, and would thus consider the Asserted '945 Claims obvious. (D-PF ¶ 269.)

> d.      *Nause In View of FDA Guidance 1997*

Nause teaches administering compositions, such as immediate release tablets, comprising a therapeutically effective amount of apixaban, 2.5 mg or 5 mg, and a pharmaceutical acceptable carrier. (D-PF ¶¶ 248, 249; DTX-344.4, DTX-344.75; Tr. 1320:15-1321:3, 1321:8-18 (Chambliss).) Nause thus discloses LIMITATIONS A-B, C-D. (D-PF ¶ 270.)

Turning to the D$_{90}$ LIMITATION, Nause discloses crystalline apixaban. (D-PF ¶ 250; DTX-344.4-5, DTX-344.38-39; Tr. 1321:4-7 (Chambliss); Tr. 811:7-813:23 (Schurko).) Although Nause is silent as to the apixaban particle size, a POSA would have been motivated to use "small" apixaban particles to improve the bioavailability given the express teaching in Nause recognizing the "continuing need to find safe, effective methods of delivering … apixaban." (D-PF ¶ 251; DTX-344 at 11-12; Tr. 1321:19-1322:14, 1330:8-14, 1331:4-22 (Chambliss).) While Nause teaches similar dissolution testing methods, FDA Guidance 1997 teaches the DISSOLUTION LIMITATION as discussed in Section II.C.4.a, *supra*.

As such, a POSA would consider the Asserted Claims obvious over Nause in view of FDA Guidance 1997 and the state of the art. (D-PF ¶ 270.)

## III.      <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that the Asserted Claims of the '208 and '945 Patents be held invalid. Claims 13 and 104 of the '208 Patent are invalid under Section 112 for improper dependency as well as lack of enablement and written description of the claimed pharmaceutically acceptable salt of apixaban

– 39 –

Claims 21 and 22 of the '945 Patent are, likewise, invalid under 35 U.S.C. § 112 for failure to satisfy the written description and enablement requirements as well as invalid under 35 U.S.C. § 103 as obvious over the prior art and state of the art at the relevant time.

DocID: 4837-2528-5806.19

Dated: December 20, 2019

OF COUNSEL:
Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Dustin L. Taylor
Femi Masha
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
dustin.taylor@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street
Suite 300
Madison, WI 53701
Tel: (608) 234-6032
Tom.heneghan@huschblackwell.com

OF COUNSEL:
Paul H. Kochanski
Kendall K Gurule
LERNER, DAVID, LITTENBURG,
KRUMHOLZ & MENTLIK, LLP
20 Commerce Drive
Cranford, NJ 07016
Tel: (908)654-5000
pkochanski@lernerdavid.com
kgurule@lernerdavid.com

Respectfully submitted,

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Sigmapharm Laboratories LLC*

*/s/ Karen L. Pascale*
Karen L. Pascale
Robert M. Vrana
YOUNG, CONAWAY, STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Counsel for Sunshine Lake Pharma Co., Ltd.
and HEC Pharm USA Inc.*

– 41 –

OF COUNSEL:
Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning
GREENBLUM & BERNSTEIN, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Unichem Laboratories Ltd.*

– 42 –