**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

———————————————————————

BRISTOL-MYERS SQUIBB COMPANY AND )
PFIZER INC.,                     )
                                 )
   Plaintiffs and Counterclaim-Defendants, )
                                 )
   v.                            )        C.A. No. 17-374-LPS
                                 )
AUROBINDO PHARMA USA INC., et al., )
                                 )        (CONSOLIDATED)
   Defendants and Counterclaim-Plaintiffs. )

———————————————————————

### DEFENDANTS' PROPOSED FINDINGS OF FACT ON INVALIDITY

Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Dustin L. Taylor
Femi Masha

HUSCH BLACKWELL LLP

120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
dustin.taylor@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street
Suite 300
Madison, WI 53701
Tel: (608) 234-6032
Tom.Heneghan@huschblackwell.com

*Counsel for SigmaPharm Laboratories LLC*

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.

1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

Paul H. Kochanski
Kendall K Gurule

LERNER, DAVID, LITTENBURG,
KRUMHOLZ & MENTLIK, LLP

20 Commerce Drive
Cranford, NJ 07016
Tel: (908)654-5000
pkochanski@lernerdavid.com
kgurule@lernerdavid.com

*Counsel for Sunshine Lake Pharma Co., Ltd. and HEC
Pharm USA Inc.*

Karen L. Pascale
Robert M. Vrana

YOUNG, CONAWAY, STARYGATT &
TAYLOR LLP

Rodney Square
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning

GREENBLUM & BERNSTEIN, P.L.C.

1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

*Counsel for Unichem Laboratories Ltd.*

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.

1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

Dated: December 20, 2019

## TABLE OF CONTENTS

I.   THE '208 PATENT ................................................................................................... 1

A.   The '208 Patent Disclosures ........................................................................... 1

B.   The '208 Patent Is Invalid for Improper Dependency ..................................... 4

C.   The '208 Patent Does Not Describe and Enable a POSA to Make a "Pharmaceutically
Acceptable Salt" of Apixaban ...................................................................... 10

   1.   The Inventors of the '208 Patent Testified They Did Not Make or Invent Apixaban
   Salts.  10

   2.   Apixaban Is a Non-Ionizable Compound. .............................................. 11

   3.   Pharmaceutically Acceptable Salts Cannot Be Made From a Compound that Is Not
   Ionizable ................................................................................................... 15

   4.   The Salts Made by Dr. Jacobsen Are Not Pharmaceutically Acceptable ................... 21

II.  The '945 Patent ................................................................................................... 27

A.   Background of the '945 Patent ...................................................................... 27

B.   The '945 Asserted Claims Are Invalid for Failure to Comply With the Written
Description and Enablement Requirements of 35 U.S.C. § 115 ......................... 29

   1.   The '945 Patent Only Describes Determining the $D_{90}$ of the Bulk Apixaban ............ 29

   2.   The '945 Patent Considers the $D_{90}$ of the Bulk Apixaban to Be Critical in Improving
   in Vivo Dissolution of Tableted Apixaban. ............................................ 31

   3.   The '945 Patent Does Not Describe or Disclose Ascertaining the $D_{90}$ of the Apixaban
   Particles After Formulation ..................................................................... 32

   4.   A POSA Would Not Have Known How to Determine the $D_{90}$ Limitation of an API
   After Formulation and the Claims Require This Determination. ............... 34

   5.   The '945 Patent Does Not Enable a POSA to Determine the $D_{90}$ Value of Bulk
   Apixaban. ................................................................................................ 38

C.   The '945 Asserted Claims Are Invalid Under 35 U.S.C. § 103 Over the Prior Art and
State of the Art. ........................................................................................... 38

1.      Physical Properties of Apixaban Were Known in the Prior Art. ................................ 38

2.      The State of the Art as of 2009-2010 Establishes That a POSA Would Have Been Motivated to Combine the Prior Art to Arrive at the Claimed Invention. ........................... 39

3.      Primary Prior Art References (Carreiro, the '306 Publication, the '208 Patent, and Nause) ...................................................................................................................................... 42

4.      Secondary References (Wei and FDA Guidance 1997) ............................................ 45

5.      Invalidity Claim Charts ............................................................................................. 47

**ABBREVIATIONS**

| | |
|---|---|
| The '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| The '306 Publication | U.S. Patent Application Publication No. 2007/0191306 to Munir N. Nassar et al. (DTX-303) |
| The '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| Asserted '208 Claims | Claims 13 and 104 of U.S. Patent No. 6,967,208 |
| Asserted '945 Claims | Claims 21 and 22 of U.S. Patent No. 9,326,945 |
| BMS | Plaintiff Bristol-Myers Squibb Company |
| Carreiro | Jennifer Carreiro & Jack Ansell, "Apixaban, An Oral Direct Factor Xa Inhibitor: Awaiting the Verdict," EXPERT OPINION INVESTIGATIONAL DRUGS 17(12):1937–45 (2008) (DTX-312) |
| Dahan | Dahan et al., Prediction of Solubility and Permeability Class Membership: Provisional BCS Classification of the World's Top Oral Drugs, Dec. 2009 (DTX-437) |
| Defendants | Unichem, Sunshine Lake, and Sigmapharm |
| EDS | energy dispersive x-ray spectroscopy |
| Eriksson | Eriksson et al., Comparative Pharmacodynamics and Pharmacokinetics of Oral Direct Thrombin and Factor Xa Inhibitors in Development, 2009 (PTX-320) |
| FDA Guidance 1997 | FDA GUIDANCE FOR INDUSTRY, DISSOLUTION TESTING OF IMMEDIATE RELEASE SOLID ORAL DOSAGE FORMS, CDER (Aug. 1997) (DTX-320) |
| HEC | Defendant HEC Pharm USA Inc. |
| Kola and Landis | Kola and Landis, Can the pharmaceutical industry reduce attrition rates? Nature Reviews/Drug Discovery, Vol 3, August 2004, 711–715 (DTX-368) |
| LDA | lithium diisopropylamide |
| Nause | International Publication No. WO2010/147978 titled "Dosage Forms of Apixaban" was filed based upon a June 16, 2009 priority document (U.S. Provisional Application 61/187,442) |

| | |
|---|---|
| | (DTX-344) |
| Pfizer | Plaintiff Pfizer Inc. |
| Plaintiffs | BMS and Pfizer |
| Pinto 2007 | Donald J.P. Pinto et al., "Discovery of 1-(4-Methoxyphenyl)-7-oxo-6-(4-(2-oxopiperidin-1-yl)phenyl)-4,5,6,7-tetrahydro-1H-pyrazolo[3,4-c]pyridine-3-carboxamide (Apixaban, BMS-562247), A Highly Potent, Selective, Efficacious, and Orally Bioavailable Inhibitor of Blood Coagulation Factor Xa," J. MED. CHEM. 50(22):5339–56 (2007) (DTX-349) |
| POSA | Person of Ordinary Skill in the Art |
| PSUF | Parties' Statement of Uncontested Facts, Pretrial Order, Exhibit 1 (D.I. 672–1.) |
| SEM | Scanning Electron Microscopy |
| SigmaPharm | Defendant SigmaPharm Laboratories, LLC |
| Stegemann | S. Stegemann et al., When Poor Solubility Becomes an Issue: From Early Stage to Proof of Concept, 31 EUR. J. PHARMACEUTICAL SCI. 249–61 (2007) (DTX-355) |
| Sunshine Lake | Defendant Sunshine Lake Pharma Co., Ltd. |
| Teague | Sobieraj-Teague et al., New Anticoagulants for Atrial Fibrillation, Seminars in Thrombosis and Hemostasis, 2009 (PTX-480) |
| Unichem | Defendant Unichem Laboratories, Ltd. |
| Wei | U.S. Patent Application Publication No. 2006/0160841 to Chenkou Wei et al. (DTX-359) |
| Yu | Lawrence X. Yu et al., Biopharmaceutics Classification System: The Scientific Basis for Biowaiver Extensions, 19(7) PHARMACEUTICAL RES. 921–25 (2002) (DTX-364) |

# I.   THE '208 PATENT

## A.   The '208 Patent Disclosures.

1.   The '208 Patent issued on Nov. 22, 2005. (JTX-1.) It was filed on September 17, 2002, and claims priority to previous applications whose earliest priority date is Sept. 21, 2001. (PSUF ¶ 18.)

2.   Plaintiffs' and defendants' experts offered definitions of a POSA that differed in wording, as stated in PSUF ¶¶ 20, 21.

3.   Under either definition, a POSA "essentially is a chemist, anorganic medical chemist . . . what would be involved in the synthesis of small molecules" who "would consult with professionals in related issues in related to development, including analytical formulation," which "is the point where pharmaceutical salts are produced, and . . . where they're selected and used in pharmaceutical products." (Tr. 14:12–25 (Buckton).)

4.   The opinions offered by each side's experts as to the validity or infringement of the '208 Patent do not change based on which definition of a POSA is applied. (PSUF ¶ 22.)

5.   Throughout the '208 Patent, "pharmaceutically acceptable" modifies not only "salts," but also "carrier." (E.g., JTX-1 col.5:55–56, 66 ("pharmaceutically acceptable salt"); JTX-1 col.5:55–56 ("pharmaceutically acceptable carrier").)

6.   The '208 Patent defines "pharmaceutically acceptable" to mean "those compounds, materials, compositions, and/or dosage forms which are, within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio." (JTX-1 col.116:40–47.) Thus, "pharmaceutically acceptable" refers to carriers, compounds (including salts), materials,

compositions, and dosage forms. (*Id*.)

7.    The '208 Patent describes the synthesis of apixaban in Example 18. (JTX-1 col.174:21–175:51; Tr. 54:2–11 (Buckton).)

8.    The '208 Patent does not disclose a pharmaceutically acceptable salt (or any other salt) of apixaban in Example 18. Instead, it discloses a general method salt formation:

> The pharmaceutically acceptable salts of the present invention can be synthesized from the parent compound that contains a basic or acidic moiety by conventional chemical methods. Generally, such salts can be prepared by reacting the free acid or base forms of these compounds with a stoichiometric amount of the appropriate base or acid in water or in an organic solvent, or in a mixture of the two; generally, non-aqueous media like ether, ethyl acetate, ethanol, isopropanol, or acetonitrile are preferred. Lists of suitable salts are found in *Remington's Pharmaceutical Sciences*, 17th ed., Mack Publishing Company, Easton, Pa., 1985, p. 1418, the disclosure of which is hereby incorporated by reference.

(JTX-1 col.117:1–13; Tr. 32:9–23 (Buckton).)

9.    This disclosure does not inform a POSA how to make a pharmaceutically acceptable salt of apixaban "[b]ecause apixaban is not one of these compounds. It doesn't have a free acid or freebase form . . . ." (Tr. 32:24–33:16 (Buckton).)

10.    This is the only disclosure in the '208 Patent that would give a POSA any guidance regarding how to make a pharmaceutically acceptable salt of apixaban. (*Id*. col.33:9–16.)

11.    The '208 Patent only discloses the existence of salts generally, without any specific disclosure of any salt of apixaban or any pharmaceutically acceptable salt of apixaban. (*Id*. col.44:20–45:6.)

12.    Before Plaintiffs sued Defendants on the '208 Patent, Plaintiffs had filed a Certificates of Correction  adding Claims 104 through 118. (JTX-1 BMSAPIX10263488–500.)

13.    Plaintiffs assert that SigmaPharm and Unichem infringe Claims 13 and 104 of the '208 Patent. (PSUF ¶ 16.)

14.     Claim 13, as corrected, claims:

13. A compound according to claim 8, wherein the compound is:

> 1-(4-methoxyphenyl)-7-oxo-6-[4-(2-oxo-1-piperidinyl)phenyl]-4,5 ,6 ,7 -
> tetrahydro-1H-pyrazolo-[3 ,4-c]pyridine-3-carboxamide
>
> or a pharmaceutically acceptable salt form thereof.

(JTX-1 col.269:1–6.)

15.     Asserted Claim 13 did not appear in the original '208 Patent application. (D.I.
182–9 at 36–134 (original application.)

16.     In September 2018—one year and five months after Plaintiffs sued SigmaPharm
and Unichem on the '208 Patent—Plaintiffs received a second Certificate of Correction
correcting the chemical name of apixaban and a third Certificate of Correction, which corrected
Claim 104. (JTX-1 at BMSAPIX10263502–503.)

17.     Claim 104, as corrected, claims "A compound according to claim 13, which is a
crystalline compound." (*Id.* at p. 152, 157.)

18.     The Court construed the term "pharmaceutically acceptable salts" in the
'208 Patent to mean "derivatives of the disclosed compounds wherein the parent compound is
modified by making acid or base salts thereof, which are, within the scope of sound medical
judgment, suitable for use in contact with the tissues of human beings and animals without
excessive toxicity, irritation, allergic response, or other problem or complication, commensurate
with a reasonable benefit/risk ratio." (D.I. 381 at 1; *see also* PSUF ¶ 23.)

19.     During claim construction, Plaintiffs originally proposed that "pharmaceutically
acceptable salt" means "derivative wherein the compound is modified by making an acid or base
salt." (Mem. Op., 5, D.I. 380.)

20.     Plaintiffs then revised their proposed construction to "derivative wherein the

compound is modified by making an acid or base salt acceptable for use in the pharmaceutical arts, such as the salts disclosed at U.S. Patent No. 6,967,208, column 116, lines 51–67, and in Remington's Pharmaceutical Sciences, 17th ed., Mack Publishing Company, Easton, Pa., 1985, p. 1418." (*Id.*)

21.     The Court rejected Plaintiffs' proposed construction and found that although "Plaintiffs agree that the claimed salts must be 'acceptable for use in the pharmaceutical arts,' . . . Plaintiffs' revised construction provides no guidance as to the meaning of 'acceptable for use in the pharmaceutical arts.'" (*Id.* at 7 (citation omitted).)

22.     The Court also noted that, "[i]n Plaintiffs' view, a pharmaceutically acceptable salt of the type claimed in the patent 'need not come directly into contact with human tissue" and does not have 'independent safety limitations like the ones Defendants are seeking to introduce." (*Id.* at 5 (citations omitted).)

23.     Moreover, "[t]he patent does not support the conclusion that the patentee intended its definition of 'pharmaceutically acceptable' to modify 'compound' but not to also modify 'salts,' particularly given that it is undisputed that 'salts' are also 'compounds.'" (*Id.* at 8.)

**B.     The '208 Patent Is Invalid for Improper Dependency.**

24.     Defendants called Dr. Clayton Heathcock to testify about the claims of the '208 Patent. (Tr. 677:22–677:24 (Heathcock).) The Court found Dr. Heathcock qualified to testify as an expert on organic chemistry and medicinal chemistry (*Id.* at 683:18–683:22).

25.     Dr. Heathcock and Dr. MacMillan offered slightly different opinions on the level of ordinary skill in the art, but each agreed that their opinions would be the same under either definition. (Tr. 683:23–685:5 (Heathcock); Tr. 277:10–278:13 (MacMillan).) Dr. Heathcock himself had all the qualifications of a person of ordinary skill in the art as of the priority date of

the '208 Patent. (Tr. 685:6–9 (Heathcock).)

26.     Dr. Heathcock opined that Claim 1 of the '208 Patent does not read on the
compound apixaban, disagreeing with Dr. MacMillan's opinion that Claim 1 reads on the
compound apixaban. (*Id.* at  685:21–686:23.)

27.     Apixaban's chemical structure includes several rings, labelled P, M, A, E, and Q
in Claim 1. (*Id.* at 687:2–4; *see* DDX 6-5.) The number of substituents present in apixaban for
each of rings M, A, E, and Q exceeds the number permitted by Claim 1. (*Id.* col.687:4–13.)

28.     Claim 1 requires that each of rings M, E, A, and Q be "substituted with" at most 2
substituents from Markush groups $R^{1a}$, R, $R^4$, and $R^{4a}$, respectively. (*Id.*; JTX-1 col.237:22–23,
237:60–61, 238:20–21, 238:34–36 ) In comparing a compound like apixaban to this claim
language, a person of ordinary skill in the art would determine how many substituents the
structure corresponding to a ring has by looking at the list of Markush group members, and then
just count how many of those members are attached by a bond to the corresponding ring. (Tr.
689:19–690:5 (Heathcock).) Dr. Heathcock explained that "you're just counting, really." (*Id.*
col.690:6.)

29.     Claim 1 does not read on apixaban because a limitation requires that Ring M be
substituted with at most 2 members from Markush group $R^{1a}$ (JTX-1 col.237:22–23), but the
patent lists hydrogen as a member of group $R^{1a}$ (JTX-1 col.238:62–239:8) and apixaban has four
hydrogens attached to the structure corresponding to Ring M. (Tr. 689:1–689:18, 690:7–12
(Heathcock); *see also* DDX 6-9.)

30.     Claim 1 also does not read on apixaban because a limitation requires that Ring E
be substituted with at most 2 members from Markush group R (JTX-1 col. 237:60–61), but the
patent lists hydrogen as a member of group R (JTX-1 col.238:5–16) and apixaban has four

hydrogens attached to the structure corresponding to Ring E, in addition to one $OCH^3$, which is also a member of group R, so it is substituted with a total of five members of group R. (Tr. 690:14–691:7 (Heathcock); *see also* DDX 6-10.) Because five members is more than two, this is another limitation that apixaban fails to meet. (Tr. 691:6–7 (Heathcock).)

31.     Claim 1 also does not read on apixaban because a limitation requires that Ring A be substituted with at most two members from Markush group $R^4$ (JTX-1 238:20–21), but the patent lists hydrogen as a member of group $R^4$ (JTX-1 240:48–64) and apixaban has four hydrogens attached to the structure corresponding to Ring A. (Tr. 691:9–692:2 (Heathcock); *see also* DDX 6-11.) Because four is more than two, this is a third limitation from Claim 1 that apixaban fails to meet. (*Id.* col.689:25–692:2.)

32.     Claim 1 also does not read on apixaban because a limitation requires that Ring Q be substituted with at most 2 members from Markush group $R^{4a}$ (JTX-1 238:34–36), but the patent lists hydrogen as a member of group $R^{4a}$ (JTX-1 240:65–241:13) and apixaban has eight hydrogens attached to the structure corresponding to Ring A. (Tr. 692:6–692:19 (Heathcock); *see also* DDX 6-12.) This is a fourth limitation in Claim 1 that apixaban fails to meet. (*Id.* col.692:20–692:21.)

33.     Dr. MacMillan does not count the group member hydrogen when determining the number of substituents on the rings. (Tr. 692:22–693:1 (Heathcock).) He counts all the other group members; there is no other member of the group he does not count when determining the number of substituents, but treats hydrogen differently. (*Id.* col.689:25–693:9.)

34.     The patent itself explains what the word "substituted" means, twice, in its "Definitions" section. (JTX-1 col.113:66–114:3, 117:43–49; Tr. 693:12–693:16 (Heathcock).) In both places, it indicates that "substituted" in this patent means, or indicates, that "one or more

hydrogens . . . is replaced with a selection from the indicated" group, i.e., with a member of the

recited Markush group. (JTX-1 col.113:66–114:3, 117:43–49; Tr. 693:17–693:23 (Heathcock)):

> The term "substituted," as used herein, means that any one or more hydrogens on
> the designated atom is replaced with a selection from the indicated group . . . .

(JTX-1 col.113:66–114:1.)

> "Substituted" is intended to indicate that one or more hydrogens on the atom
> indicated in the expression using "substituted" is replaced with a selection from
> the indicated group(s) . . .

(*Id.* col.117:43–46.)

35.    Those definitions do not differ from the meaning a POSA would give the term;

they instead reflect what an ordinary, educated person, even an undergraduate in an organic

chemistry course, would understand the term to mean. (Tr. 693:25–694:5 (Heathcock).)

36.    That definitional language in the specification explaining the plain and ordinary

meaning requires **_replacing_** one or more hydrogens, and does not encompass replacing no

hydrogens—if instead zero (0) hydrogens are replaced the correct term would be

"unsubstituted." (*Id.* at 694:6–694:13.)

37.    Dr. MacMillan identifies two circumstances in which he would count a hydrogen

as a substituent: if the hydrogen is attached to a nitrogen, or if the hydrogen were to replace an

atom other than hydrogen attached to a carbon. (*Id.* at  694:14–694:21.)

38.    Although the patent describes substitution on a nitrogen in a heterocycle ring,

nothing in that description would suggest to a POSA that a hydrogen counts as a substituent only

when attached to a heteroatom. (*Id.* at 695:6–695:24.) Instead, the patent states, "[t]he nitrogen

atom may be substituted or unsubstituted (i.e., N or NR wherein R is H or another substituent, if

defined)." (*Id.* at 695:6–695:24; JTX-1 col.115:43–45.) Thus, the specification indicates that

hydrogen (H) counts as a **_substituent_** when it is used as such in the structural formula, and uses

the word "unsubstituted" where there is no substituent.

39.     Nothing in any of the four Markush groups ($R^{1a}$, R, $R^4$, and $R^{4a}$) indicates that the hydrogen listed counts as a member of those groups only when a heteroatom like nitrogen is substituted with the group. (*Id.* at 695:25–696:4.) Nothing in the definitional language in the specification explaining the plain and ordinary meaning indicates that hydrogen counts only on a heteroatom like nitrogen. (*Id.* at 696:6–696:13.)

40.     "In both cases they talk about the replacement on the designated atom, and the atom could be nitrogen or it could be carbon for that matter. It could be something else. It could be oxygen. But most commonly, it would be carbon or nitrogen." (*Id.*) A POSA would not treat the term "substituted" any differently whether referring to a carbon or a heteroatom, like nitrogen. (*Id.* at 696:14–18.)

41.     Dr. MacMillan also testifies that a hydrogen could count as substituted if it replaced an atom other than hydrogen on a compound like carbon tetrachloride (*Id.* at 696:19–698:13, Tr. 311:2–8 (MacMillan).) However, nothing in the patent suggests that the term "substituted" can refer to replacing an atom other than hydrogen. (Tr. 698:22–699:3 (Heathcock).) Replacing an atom other than hydrogen would be contrary to the definitional language in the specification explaining the plain and ordinary meaning of "substituted." (*Id.* at 698:22–699:3.) It would be contrary to a POSA's understanding of "substituted" to treat hydrogen as a substituent only if it replaced an atom other than hydrogen. (*Id.* at 699:4–699:10.)

42.     Dr. Heathcock's observation that the claims should include "unsubstituted" as an option instead of "substituted with 0" (where the patent has defined "substituted" as meaning to replace at least one hydrogen) is consistent with the term "unsubstituted" as it appears throughout the specification of the '208 Patent, and is the way the claims in one of

Dr. MacMillan's own patents was drafted when it sought to cover an unsubstituted structure. (Tr. 1648:4–7 (MacMillan).)

43.    Dr. Heathcock acknowledges that the plain and ordinary meaning of substituted as stated in the patent and explained in his testimony means that Claim 1 as drafted would not cover any actual, real-world compounds. (Tr. 700:6–10 (Heathcock).) While the patentees may have intended Claim 1 to cover apixaban as recited in Claims 8 and 13, the claim language they drafted does not cover apixaban. (*Id.* at 700:11–13.)

44.    Dr. Heathcock also indicated that the language in Claim 1 for each of these rings could have been written differently to cover apixaban, if the patentees had chosen to do so. First, it would have needed to change "substituted with" to "unsubstituted or substituted with." The low end on the range of substituents would need to be changed from "substituted with 0" to "unsubstituted or substituted with 1" to the maximum permissible number of substituents. Also, hydrogen would have to be removed as a member of each Markush group. The way the patent uses the term "substituted," starting the range of the number of permissible substitutes with 0 does not mean the same thing as "unsubstituted." (*Id.* at 700:14–702:14.)

45.    Dr. MacMillan's treatment of hydrogen effectively ignores hydrogen as a member of the Markush groups R, $R^{1a}$, $R^4$, and $R^{4a}$ because Dr. MacMillan states that a hydrogen could never substitute a hydrogen and "substitute" in the '208 Patent refers only to hydrogen. (*Id.* at 702:15–703:22.)

46.    Moreover, even Dr. MacMillan's treatment of hydrogen—which treats hydrogen differently from every other member of the Markush group, effectively ignores hydrogen as a substituent in all four of the rings M, A, E, and Q for groups R, $R^1$, $R^4$, and $R^{4a}$ and contradicts the definitional language in the specification explaining the plain and ordinary meaning of

"substituted with"—would not be sufficient to overcome the improper dependency issue in the claims. Instead, Dr. MacMillan's proposed treatment would exclude dozens of embodiments expressly recited in dependent Claims 3 and 8. Claim 1 requires at least 1 substituent on Ring E. Treating hydrogen in the way Dr. MacMillan does excludes 36 of the structures recited in dependent Claim 3, and 4 of the compounds in dependent Claim 8. (*Id.* at 705:15–709:13.)

C.     **The '208 Patent Does Not Describe and Enable a POSA to Make a "Pharmaceutically Acceptable Salt" of Apixaban.**

47.     After reviewing the '208 Patent, a POSA would not have been able to make a salt of apixaban that would be within the scope of sound medical judgment suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problems without complication with a reasonable benefit/risk ratio. (Tr. 44:7–19 (Buckton); Tr. 1436:9–13 (Scheidt).)

48.     After reviewing the '208 Patent, a POSA would conclude that the inventors were **not** in possession of a salt of apixaban that would be within the scope of sound medical judgment suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problems without complication with a reasonable benefit/risk ratio. (Tr. 48:1–13 (Buckton); Tr. 1436:14–18 (Scheidt).) A POSA would instead conclude that the salt did not exist and could not be made without undue experimentation. (*Id.*)

1.     *The Inventors of the '208 Patent Testified They Did Not Make or Invent Apixaban Salts.*

49.     The '208 Patent inventors testified they did not make salts of apixaban or invent salts of apixaban, which is "in keeping with the notion that [a POSA] would read from the patent that [a POSA] wouldn't believe it was a pharmaceutical salt because it's a non-ionizable compound in that sense." (Tr. 47:12–25 (Buckton).)

50.     A POSA in 2001 would thus not conclude that the '208 Patent inventors possessed a pharmaceutically acceptable salt of apixaban, but would instead "conclude that the salt didn't exist and . . . that you couldn't make a pharmaceutically acceptable salt of apixaban." (*Id*. at 48:1–13.)

51.     Mr. Orwat never made a salt form of apixaban. (Tr. 244:10–11 (Orwat); Tr. 250:8–9 (Orwat); *see also* (Tr. 47:2–11 (Buckton).)

52.     Mr. Orwat claims he had a "brief discussion" with '208 Patent inventor Don Pinto about making a salt of apixaban using LDA as a base. (Tr. 250:23–251:1 (Orwat).) Mr. Orwat does not know the pKa of LDA, has never made a salt of a product used for clinical testing using LDA, and is not aware of any FDA-approved pharmaceutical that is a salt form made using LDA. (*Id*. at 251:2–11.)

53.     Mr. Orwat did not know whether a strong base can be toxic if it comes in contact with human skin. (*Id.* at 253:3–5.)

54.     Dr. Pinto never made any salts of apixaban nor does he know if apixaban salts were ever made. (Tr. 1553:11–1554:2 (Pinto); Tr. 45:22–47:1 (Buckton).)

55.     Dr. Pinto testified that he was responsible for inventing Claim 13, but that he did not invent any pharmaceutically acceptable salt forms of apixaban. (*Id*. at 1554:3–15.)

56.     Dr. Jennifer Qiao never made a salt of apixaban nor does she know of anyone who ever made a salt of apixaban at BMS. (Tr. 1550:14–19 (Qiao).)

57.     Ms. Stephanie Kifer never made a salt of apixaban. (Tr. 1555:21–23 (Kifer).)

### *2.      Apixaban Is a Non-Ionizable Compound.*

58.     Internal memorandum and presentations at BMS, as well as third-party industry articles, and even BMS' own statements to FDA as part of its NDA uniformly state that apixaban

is non-ionizable and thus cannot be used to make a salt form. (Tr. 23:16–31:22 (Buckton).)

59.     These documents do not simply refer to the salt not improving the solubility of apixaban, but instead "say you couldn't make the salt and therefore you cannot use a salt to improve the solubility of apixaban." (*Id.* at 51:16–20.)

60.     The difficulty of ionizing apixaban impacts not only solubility, but also "the stability of those salts" and "how to process those salts." (Tr. 1435:5–20 (Scheidt).)

> ### a.     *Plaintiffs' witnesses testified at trial that apixaban is not ionizable at the physiological pH range.*

61.     The physiological pH range "is the range at which the drug or product may be exposed to at various places in the body . . . ." (Tr. 231:6–21 (Knabb).)

62.     Dr. Knabb agreed that apixaban is not ionizable in a physiological relevant range. (*Id.*)

63.     '208 Patent inventor Mr. Orwat also agreed that apixaban is not ionizable in a physiological range. (Tr. 250:21–22 (Orwat).)

> ### b.     *Internal BMS documents recognize that apixaban is not ionizable.*

64.     A December 3, 2001 e-mail written by Robert Knabb—the Factor Xa inhibitor working group co-chair—identified the salt form of apixaban as "none." (Tr. 228:16–229:25 (Knabb).)

**Data Summaries**[i]

| CMC |
| --- |
| • Chemical properties: Neutral compound. HPLC logP = 2.1 |
| • Solubility: 0.047 (pH1.1), 0.056 (pH3.4), 0.046 (pH7.2), 0.0423 (pH8.5) mg/ml. |
| • Salt form: None |
| • Stability (studies in progress) |
| • Amorphous/crystalline material: Crystalline, polymorphs and solvates identified. |
| • Synthesis: 8 steps high yield. Preferred polymorph obtained at the last chemical step. |
| • Analytical method status: in progress by analytical lab in Wilmington. |

65.     Although the issue being addressed in the bullet point immediately above this statement was "solubility," the "salt form: none" language is not indented below "solubility" and

the issue addressed immediately below is "stability." (DTX-188.5; Tr. 233:6–20 (Knabb).)

66. Dr. Knabb never made a salt of apixaban. (Tr. 231:25–232:1 (Knabb).) He is not aware of any salts made at BMS or outside of the instant litigation. (*Id*. at 230:1–3, 232:2–16.) While at BMS, he was unaware of any plans to make salt forms of apixaban. (*Id*. at 232:17–21.)

67. In February 2002, BMS employees prepared a presentation titled "Factor Xa Inhibitor Program: Research Program Review." (*Id.* at 230:10–231:5 (discussing DTX-193).) The presentation described apixaban as a "neutral compound, so salt formation not an option to improve solubility." (*Id*.)

68. An internal memorandum dated June 9, 2002, states that "[s]ince BMS-562247 [apixaban] is neutral, **there is no salt form**." (DTX-635.1 (emphasis added); Tr. 31:12–22 (Buckton); Tr. 1433:21–25 (Scheidt).)

69. An internal memorandum titled "BMS-562247-01 FORM Selection Report" dated March 17, 2003, states that "[d]ue to the lack of an ionizable group, salt formation was not an option." (DTX-634.1; Tr. 28:25–29:12 (Buckton); Tr. 1433:21–25 (Scheidt).)

70. An internal presentation entitled "The Discovery of Apixaban, a Potent and Selective Orally Bioavailable Coagulation Factor Xa Inhibitor," describes apixaban as a "highly potent, selective, **neutral** factor Xa inhibitor," which means that overall, the structure is neutral. (DTX-4.39; Tr. 1553:2–10 (Pinto).)

71. An internal presentation at BMS, when describing properties of apixaban, states that it is a "neutral compound so salt formation not an option." (DTX-636.2; Tr. 29:13–25 (Buckton); Tr. 1433:21–25 (Scheidt).)

72. The development plan for BMS-562247 states that "[s]ince [apixaban] is non-ionizable in salt formation and cannot be used to enhance solubility." (DTX-632.36; Tr. 30:1–20

(Buckton); Tr. 1433:21–25 (Scheidt).)

73.     DTX-633 is another internal BMS document, which states that apixaban lacks a charged group, which "means that apixaban does not exist as a salt form . . . ." (DTX-633.4; Tr. 30:21–31:11 (Buckton).) Once again, the document states that because apixaban "isn't an acid, it's not a base, it is not a neutral compound, and therefore you can't make a salt you could use in a pharmaceutical." (Tr. 31:3–11 (Buckton); Tr. 1433:21–25 (Scheidt).)

74.     In May 2008, '208 Patent inventor Dr. Lam wrote in an e-mail that:

A neutral compound is one that does not have an ionizable hydrogen at pH 1 to 8. Apixaban falls inside this category. I don't know if we have done pH dependent solubility. The reason it is not done is that this is a fundamental chemical property that one can be [sic] predicted accurately. There is no exception known.

(DTX-629.1; Tr. 1658:7–1661:15 (MacMillan).)

    c.      *Third-Party publications teach that apixaban is not ionizable.*

75.     A 2008 article titled "Apixaban, an oral direct Factor Xa inhibitor: awaiting the verdict" authored by Jennifer Carreiro and Jack Ansell states that "[a]pixaban has no ionizable groups . . . ." (DTX-580.4; Tr. 25:25–26:14 (Buckton).)

76.     A 2013 article titled "Effect of famotidine on the pharmacokinetics of apixaban, an oral direct factor Xa inhibitor," written by Yijay V Upreti et al., states that "[a]pixaban is a compound that lacks ionizable groups in its molecular structure . . . ." (DTX-583.6; Tr. 28:2–16 (Buckton); Tr. 1433:16–20 (Scheidt).) Two of the authors of DTX-583 were employed at BMS at the time the article was written. (DTX-583.1)

77.     A 2015 article titled "Relative Bioavailability of Apixaban Solution or Crushed Tablet Formulations Administered by Mouth or Nasogastric Tube in Healthy Subjects," written by Yan Song et al., states that "[a]pixaban is . . . non-ionizable . . . ." (DTX-582.2; Tr. 27:8–28:1 (Buckton).) Each of the authors of DTX-582 was employed at BMS at the time the article was

written. (DTX-582.1; Tr. 27:13–14 (Buckton).)

78.    A 2016 article titled "Improving the Solubility and Bioavailability of Apixaban via Apixaban-Oxalic Acid Cocrystal" and authored by Yong Chen et al., states that "[t]here are no ionizable moieties in the molecular structure of [apixaban] . . . ." (DTX-579.1; Tr. 24:25–25:24 (Buckton).)

79.    A 2017 article titled "Novel Oral Anticoagulants in Atrial Fibrillation: Update on Apixaban," authored by Kenechukqu Mezue et al., states that "[g]astric acid modifying agents such as famotidine do not affect absorption of apixaban **because of its lack of an ionizable group** and pH-independent solubility." (DTX-581.4; Tr. 26:15–27:7 (Buckton); *see also* Tr. 1433:11–15 (Scheidt).)

> ### d.    BMS told FDA that apixaban is not ionizable.

80.    When BMS submitted its NDA for apixaban to FDA, BMS stated that "BMS-562247-01 [apixaban] is a non-ionizable compound." (DTX-630.2; Tr. 23:20–24:11 (Buckton).)

81.    Section 2.3.P.2 of BMS's NDA for apixaban also states that apixaban "is non-ionizable." (DTX-631.5; Tr. 24:12–24 (Buckton); *see also* Tr. 1433:7–10 (Scheidt).)

> ### 3.    Pharmaceutically Acceptable Salts Cannot Be Made From a Compound that Is Not Ionizable.

82.    "A salt is a solid, usually crystalline material, which is precipitated when an acid [and] base come together in solution in an ionized form and produce the salt." (Tr. 17:3–7 (Buckton).)

83.    Although salts are made to improve the solubility of compounds in the gastrointestinal tract, salts are also made to improve stability "so they can be milled or processed in pharmaceutical ways." (*Id*. at 17:8–20.)

84.    In order to make a salt, it is first necessary to ionize the compound. (*Id.* at 19:19–

21.) A compound that can be made into a salt is referred to as being "ionizable," which means that if the compound is a base, it has the capability to add a proton, and if it is an acid, then it has the capability to lose a proton. (*Id*. at 17:21–18:10.) Neutral, or "non-ionizable" compounds are considered to be neither an acid nor a base. (*Id.*)

85.     pKa, as a measure of acid and base, is used to describe how readily a drug substance will ionize. (*Id*. at 18:11–19:4 (discussing DTX-576).)

86.     pKa is a measure of a molecule's capability to donate a proton. (Tr. 1411:12–14 (Scheidt).) Because each area of a molecule has different functional groups, and those functional groups have different acidities associated with the group, a compound has more than one pKa. (Tr. 14:15–21 (Buckton).)

87.     Acids and bases are divided into categories from "very strong" to "extremely weak," as shown in the chart from DTX-576.6:

Table. *Classification of Acids and Bases According to Strength*

| Attribute | pKa | |
|---|---|---|
| | Acids | Bases |
| Very strong | < 0 | > 14 |
| Strong | 0 – 4.5 | 9.5 – 14 |
| Weak | 4.5 – 9.5 | 4.5 – 9.5 |
| Very weak | 9.5 – 14 | 0 – 4.5 |
| Extremely weak | > 14 | < 0 |

88.     To be considered a candidate for making a pharmaceutically acceptable salt, the compound must have a pKa between three and ten. (Tr. 1411:22–1412:2 (Scheidt).)

89.      "If the pKa value of a very weak base is less than three or that of a very weak acid is greater than ten, salt formation will be very challenging since only a few counterions are available . . . ." (DTX-574.14 (Byrn); Tr. 19:22–11 (Berkland).)

90.     Outside of this range, the material becomes "very, very acidic" (below three) or

"very, very basic" (above ten). (Tr. 1412:3–9 (Schedit).)

91.     A 2010 paper by pharmaceutical company Eli Lilly examined 302 marketed basic

compounds and found that no marketed products existed that were derived from compounds with

a pKa below 4.6. (DTX-575.3; Tr. 21:23–22:21 (Buckton).) The paper found this boundary (with

a pKa of 5), below which the material is too basic to produce a stable pharmaceutical salt. (*Id.*)

92.     Dr. Graham Buckton testified on behalf of SigmaPharm and Unichem as an

expert witness in pharmaceutical sciences, including pharmaceutical formulation, pharmaceutical

materials, solid state forms, salt selection, and dosage forms. (Tr. 5:1–2, 10:17–24 (Buckton).)

93.     Dr. Buckton is unaware of any salt that has ever been used pharmaceutically that

was derived from a drug with a pKa of about zero. (*Id.* at 21:15–18.)

94.     Dr. Buckton is unaware of a salt that has ever been used pharmaceutically that is

derived from a drug compound with a pKa of about 13. (*Id.* at 21:19–22.)

95.     Dr. Karl Scheidt is a chemist with an advanced degree in chemistry, medicinal

chemistry and pharmaceutical chemistry, and has experience in research, design, and

development of small molecules of drugs and drug candidates. (Tr. 1401:14–23 (Scheidt).) He is

familiar with the level of ordinary skill of such a person as of the 2001–2002 timeframe. (*Id.* at

1401:24–1402:2.)

96.     Dr. Scheidt is unaware of any existing salts made from compounds with a pKa

outside this range. (*Id.* at 1412:22–1413:1.)

97.     Dr. MacMillan could not identify any pharmaceutically acceptable salt made from

a compound that, when put into an environment with a pH of three to ten, is completely

unionized. (Tr. 1656:17–22 (MacMillan).)

       **a.**      ***A medical doctor would not determine whether a salt is***
                  ***"pharmaceutically acceptable"***

98.     After a pharmaceutical chemist makes a compound, the compound then goes to a team of biologists to assess potency and selectivity in different animal models. (Tr. 1403:3–17 (Scheidt).) It is also evaluated for potential toxicology and formulation considerations. (*Id*.)

99.     A pharmaceutical chemist—not a medical doctor—would thus need to confirm that the salt could be purified. (*Id.* at 1413:14–17.)

100.    The determination of whether a compound is suitable for use in context with tissues of human beings and animals without excessive toxicity, irritation, allergic response, or any other problem or complication, is made by others before a drug would be available for a medical doctor/cardiologist to potentially prescribe the drug for the care of a patient. (Tr. 868:5–869:20 (Zusman).)

101.     "That information would be determined on the basis of the compilation of information determined by a pharmaceutical or medicinal chemist, by a toxicologist, by those who are conducting the clinical trial that ultimately might lead to the approval of a drug for administration to a human; and finally, by the Food and Drug Administration, [who] would determine whether the drug was effective and safe in the treatment of patients with various clinical disorders." (*Id*. at 869:7–20.)

> **b.    Salts formed from compounds outside the acceptable pKa range cannot be formulated to be administered as salts.**

102.    Salt formation from compounds outside this acceptable pKa range "tend to have poor physical stability in the solid state" and "can easily disproportionate in water and even in the solid state under certain conditions." (DTX-574.14 (Byrn); Tr. 19:22–11 (Buckton); *Id*. at 39:18–40:14 ("I don't think a salt like this would survive the process of coating in terms of the same issue with formulation . . . it's too unstable to survive that . . . .").)

103.    When a salt will "disproportionate," the salt "would break up into its component

parts." (Tr. 21:5–8 (Buckton).) It will no longer be a "salt." (Tr. 1766:15–1767:4 (Myerson).)

104. The '208 Patent does not teach anything about protecting an apixaban salt from moisture. (Tr. 1767:5–7 (Myerson).)

105. Even if successfully formulated, the salt will have a different solubility to the freebase of the drug or the free acid of the drug. (Tr. 98:20–-99:11 (Buckton).) Thus, "it will be damaging to have a blend of the salt and the non-salt material in whatever you are offering to the patient. It will be uncontrolled." (*Id.*)

106. Plaintiffs' counsel asked Dr. Myerson to assume that sodium, potassium, and hydrochloride salts of apixaban had been made. (Tr. 1769:8–12 (Myerson).)

107. Plaintiffs' counsel asked Dr. Myerson to assume that the sodium, potassium, and hydrochloride salts of apixaban that had been made were pharmaceutically acceptable. (*Id.* at 1770:19–1771:8.)

> **c.** **Salts formed from compounds outside the acceptable pKa range are unsafe.**

108. When trying to make a pharmaceutically acceptable salt, a POSA would take into account the pKa of the compound, the ability to purify the salt, the potential for degradation, the need for a solid state characterization, and the stability of the salt. (Tr. 1410:21–14:11 (Scheidt).)

109. The below chart shows the percentage of neutral and charged apixaban in environments at various pH levels:



(*Id.* at 1426:16–1432:2.) As shown, the acid pKA for apixaban is 13 to 15, and the base pKa is about zero. (Tr. 19:12–18 (Buckton).)

110.    The general window to form a pharmaceutically acceptable salt is between three and ten, shown with the green box. (Tr. 1428:11–14; *see also* DTX-574.14 (Byrn) (noting that salts made from compounds with a pKa outside of the three to ten range "can easily disproportionate in water and even in the solid state under certain conditions.").)

111.    When the compound disproportionates within the "green box," the pH of the resulting product is between three (similar to lemon juice, vinegar, or Cola-Cola) and ten (similar to an antacid like Tums or Milk of Magnesia). (*Id.* at 1428:11–1429:2, 1430:17–19.)

112.    Compounds with pKas outside of this range have pH values that are orders of magnitude lower or higher. (*Id.* at 1429:24–1430:4.)

113.    Purity is "very important" when developing a compound for pharmaceutical use because the POSA must make sure it is known what kind of drug is being made and that the drug is one-hundred-percent pure. (Tr. 1413:2–7 (Scheidt).)

114.    "Drug analysts play an indirect but very important role in creating the basis for highly efficient drug therapy by giving analytical support to **synthetic**, biotechnological, pharmacological, pharmaceutical technological, **clinic**, etc., research to find the most efficacious

drug material and its optimal dosage form." (DTX-602.3 (emphasis added).) "Much more important is the role of drug analyt in the other area, in securing the highest possible *safety* for drug therapy." (*Id*. (emphasis in original).)

115.    Impurities in the bulk drug product can cause adverse safety effects such that "[a]nalytical activities concerning impurities are among the most important issues in modern pharmaceutical analysis . . . ." (DTX-602.3; *see also,* Tr. 1413:2–17 (Scheidt).)

116.    Although small amounts of impurities may not be a major concern to a synthetic organic chemist who is looking to see if a compound can be made, they would be "very, very important" to a POSA when trying to make a salt that is suitable for use in contact with the tissues of human and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio, because the POSA would not have "been able to assess the toxicology or the pharmacology of those particular compounds that [were] made." (Tr. 1414:1–15 (Scheidt).)

### *4.    The Salts Made by Dr. Jacobsen Are Not Pharmaceutically Acceptable.*

117.    Prior to this litigation, there is no evidence of an apixaban salt ever having been made. (*See, e.g.*, Tr. 230:1–3, 232:2–16 (Knabb).)

118.    The only apixaban salts to have ever been made were made by Dr. Eric Jacobsen, who was retained by Plaintiffs for this litigation. (Tr. 1302:11–25 (Kowey); Tr. 1649:19–1650:2 (MacMillan); Tr. 1767:18–20 (Myerson).)

119.    Although he is a medicinal chemist, Dr. Jacobsen offered no opinion as to whether the salts he created are "within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk

ratio." (*See* Tr. 1530:18–1531:14, 1539:21–1541:1 (Jacobsen).)

> **a.    *Dr. Jacobsen made two apixaban salts by using very strong bases and failed to make a HCl-apixaban salt.***

120.    Dr. Jacobsen made a potassium and sodium-apixaban salt by using potassium hexamethyldisilazane and sodium hexamethyldisilazane, both of which are "very, very strong bases" used in organic chemistry. (Tr. 1410:3–13 (Scheidt).) These were not, however, pharmaceutically acceptable salts under the Court's claim construction. (*Id*.)

121.    The extreme pKa values of apixaban forced Dr. Jacobsen to use the solvent tetrahydrofuran when making the sodium and potassium salts, which does not have any acidic protons and would therefore not protonate the apixaban-salt. (Tr. 1416:8–22 (Scheidt).)

122.    Dr. Jacobsen did nothing to isolate the salts he made. (Tr. 1539:2–5 (Jacobsen).) He did not even consider further purification because "[t]here was no intention of using the residue as a pharmaceutical product." (*Id*. at 1539:10–17.)

123.    When attempting to make the hydrochloride-apixaban salt, Dr. Jacobsen conducted a titration where sequential amounts of HCl were added to neutral apixaban. (Tr. 1520:18–1522:18 (Jacobsen).) At 68.1 equivalents of HCl, only 74% of neutral apixaban converted to a hydrochloride-apixaban salt. (*Id*. at 1522:6–18 (discussing PDX 11.17).)

124.    Although Dr. Jacobsen attempted to make a hydrochloride salt, the protonation event occurred at a different site, was only done in solution, and was never isolated as a solid. (Tr. 1410:15–20 (Scheidt).)

125.    Dr. Jacobsen admitted that he "made no effort to isolate" the apixaban-HCl salt. (Tr. 1525:16–23 (Jacobsen).)

126.    The drawing to the right depicts



apixaban with a red square showing the most acidic site of apixaban—where a POSA would try to deprotonate and make the corresponding anion—and blue squares showing the most basic sites—where a POSA would try to protonate and make the corresponding cation. (Tr. 1423:25–1424:25 (Scheidt).)

127.    Although Dr. Jacobsen claimed to have protonated the nitrogen (shown in the red square), NMR data instead shows that protonation occurred at the lactam ring. (*Id*. at 1425:1–23.) If the lactam ring is the site of protonation, then the resulting product is not an apixaban molecule. (*Id*. at 1426:4–15.)

128.    Industry sources likewise suggest that if apixaban protonation were to occur, it would do so at the lactam ring. (*Id*. at 1425:24–1426:3.)

###### b.    Dr. Jacobsen's salts were not purified.

129.    Dr. Jacobsen did nothing to purify the salts he made. (Tr. 1539:2–5 (Jacobsen).)

130.    Although Dr. Jacobsen did not purify the salts he created, he testified that it would be a "routine matter" to do so and "[t]he only precaution that would have to be taken would be to exclude moisture from the manipulations." (*Id.* at 1523:24–1524:9.)

131.    It is impossible to indefinitely exclude moisture. (Tr. 88:3–90:17 (Buckton) (discussing how formulation efforts will reduce, but not eliminate, exposure to moisture); Tr. 1651:5–16 (MacMillan).)

132.    Dr. Jacobsen could not isolate his salts from moisture even in laboratory conditions. (Tr. 1526:13–1527:14 (Jacobsen) (noting that "there was a small amount of water in our NMR solvent," which caused some conversion).)

133.    In the NMR spectra of Dr. Jacobsen's experiments, there is evidence of "small amounts of impurities." (Tr. 1413:22–25, 1417:25–1418:9 (Scheidt); Tr. 36:14–19 (Buckton)

(noting "that there was retained solvent with a degradation product and there were impurities in the salts that Dr. Jacobsen formed").)

134.    A POSA would not be able to purify Dr. Jacobsen's salts because "[t]hey would be very unstable and wouldn't be able to withstand purification." (Tr. 36:20–24 (Buckton).)

135.    Dr. Kowey had no knowledge of whether the apixaban salts were stable or whether they spontaneously converted to neutral apixaban. (Tr. 1304:2–7 (Kowey).)

136.    Although Dr. Jacobsen performed limited solid state characterization "to indicate anion formation," a POSA would need to see additional solid state characterization to understand the nature of what was made. (Tr. 1415:12–20 (Scheidt).)

      *c.*      ***Dr. Jacobsen's salts are not safe.***

137.    When Dr. Jacobsen's sodium salt encounters water, the apixaban anion removes a proton from water, which creates neutral apixaban and sodium hydroxide, which is not pharmaceutically acceptable. (*Id.* at 1419:4–18.)

138.    Although these compounds on their own—such as when they are formed by the deprotonation of apixaban—are toxic to human tissue and not pharmaceutically acceptable, the compounds may be used as inactive ingredients in pharmaceutically acceptable products because the compound will react with another compound and become pharmaceutically acceptable. (*Id.* at 1486:15–1487:6.) "Just like a recipe, what you start with is different than what you end up with." (*Id.*)

139.    Even if Dr. Jacobsen's salts survived the formulation process, the coating will dissolve off when administered to a patient, "and at the dissolving surface of the compound, there will be an extreme pH, very high or very low, depending on which salt we're talking about . . . ." (Tr. 40:2–14 (Buckton).)

140.     The pKa of the drug substance causes the extreme pH that is not pharmaceutically acceptable. (*Id*. at 40:15–21.) When compounds that are very weak acids or bases are combined with very strong acids or bases to form a salt, "the resulting salt will end up with a pH at the surface which would be extreme, very high pH or very low pH." (*Id*.)

141.     The Handbook of Pharmaceutical Salts warns that compounds with low pKa values of the base can produce salts that are corrosive to "metal containments, manufacturing tools, and parts of machinery." (DTX-567.18–19 ("[D]rug salts whose saturated aqueous solution has a pH 2.5 or lower are definitively corrosive."); Tr. 42:19–44:6 (Buckton).)

142.     When Dr. Jacobsen's potassium and sodium-apixaban salt products disproportionate, they would have localized pH of 15, which is equivalent to "concentrated sodium hydroxide" and be 100,000 times more basic than pharmaceutically acceptable products such as Tums. (Tr. 1431:12–1432:2. (Scheidt).)

143.     If Dr. Jacobsen's apixaban-HCl was made, then the localized pH would be negative two (-2), which is equivalent to "concentrated battery acid" and 100,000 times more acidic than pharmaceutically acceptable products such as Coca-Cola. (*Id.* at 1429:19–1430:16.)

144.     "[I]t is dissolving the surface that is damaging, and that dissolving surface in contact with the biological membrane would be something like pH ten, sodium or potassium. It's that dissolving surface that's damaging." (Tr. 66:7–19 (Buckton).)

145.     Dr. Kowey did not do any tests on any salts Dr. Jacobsen in terms of irritation, allergic response, or toxicity. (Tr. 1303:9–20 (Kowey).)

146.     Dr. Kowey made no assumptions about the pH value of the apixaban salt when it disproportionates. (*Id*. at 1304:8–14.)

147.     Plaintiffs instead asked Dr. Kowey to assume that the largest dose of apixaban

would introduce 1 milligram of sodium, potassium, or hydrochloride. (*Id.* at 1303:21–24, 1293:16–24.)

148.    Dr. Kowey agreed during his deposition, however, that if the salt had a pH value of zero (0) when it disproportionated, it could not be administered because "[y]ou can't administer anything with a pH of zero. **I mean that's toxic**. That's very acidic obviously." (*Id.* at 1305:5–10 (emphasis added).)

149.    It is immaterial and irrelevant whether the individual anions and cations (sodium, potassium, and HCl) and the neutral compound (apixaban), could be used in pharmaceutical products separately, when not combined as a salt. (Tr. 40:22–41:7 (Buckton).) Although they are safe to administer separately, "the salt is not safe to administer because of this very high local pH that you would get when the salt would be dissolving, which would be likely to be damaging to the human tissue." (*Id.*)

150.    A salt formed by the combination of an anion and cation would not necessarily have the same pharmaceutical properties as the individual ion. (Tr. 1405:5–8 (Scheidt).)

151.    Although ethanol and sodium are not damaging to human skin or tissue, sodium ethoxide, a salt made from those substances, is damaging to the tissue because ethanol has a pKa of 15, which is similar to apixaban's pKa of 13. (Tr. 41:8–20 (Buckton).) Indeed, the material safety data sheet for sodium ethoxide identifies the product as "a hazardous compound." (*Id.* at 41:21–42:18 (discussing DTX-620); *see also* Tr. 1405:17–1406:9 (Scheidt).)

152.    Although isobutene is a pharmaceutically acceptable substance used in aerosols and propellants, and lithium ion is a pharmaceutically acceptable substance used to treat central nervous disorders, isobutene combined with lithium generates t-butyllithium, a "very dangerous material" that is known to "cause severe burns if it ever came in contact with human tissue." (Tr.

1406:10–1407:5 (Scheidt).)

153.     Although aluminum is a pharmaceutically acceptable cation used in antacids, and chloride is a common counterion in drug formulation, when aluminum is combined with chloride, it generates aluminum trichloride, which is not pharmaceutically acceptable. (*Id*. at 1407:6–20.)

154.     It is also immaterial and irrelevant that there is one milligram of sodium, potassium, or HCl generated when the apixaban salt disproportionates. (Tr. 64:12–67:24 (Buckton).) When the apixaban salt dissolves, the dissolving surface in contact with the biological membrane would be damaging, which will occur before the 1 mg is dissolved in a larger volume, such as the stomach. (*Id*. at 66:7–19.)

## II.     THE '945 PATENT

### A.     Background of the '945 Patent.

155.     The '945 Patent, titled "Apixaban Formulations," issued on May 3, 2016. (JTX-2.) It claims priority to U.S. Patent Application No. 13/579,796, which has a 35 U.S.C. § 371(c) date of October 10, 2012 and is a national stage entry of International Patent Application No. PCT/US2011/025994, filed on February 24, 2011, which claims priority to U.S. Provisional Patent Application 61/308,056, filed on February 25, 2010. (PSUF ¶¶ 24, 29.)

156.     The '945 Patent lists the following inventors: Jatin Patel, Charles Frost, Jingpin Jia, and Chandra Vemavarapu. (PSUF ¶ 25.)

157.     The earliest effective filing date for the '945 Patent is February 25, 2010. (JTX-2; Tr. 600:18–601:4 (Berkland); Tr. 1228:4–17 (Chambliss)) and the priority date is no later than February 24, 2011. (PSUF ¶ 30.)

158.     The definition of a POSA applied by Plaintiffs' experts for the purposes of the

asserted '945 Patent claims is:

> A person that has a Ph.D. or Master's degree or a Bachelor's degree with commensurate experience in chemistry, chemical engineering, pharmacy, pharmaceutical science or an equivalent discipline and has an understanding of the properties of active pharmaceutical ingredients, the design of solid pharmaceutical dosage forms, and knows or has access to techniques to characterize solid pharmaceutical products.

(PSUF ¶ 31.)

159.    The definition of a POSA applied by Defendants' experts for the purposes of the

asserted '945 Patent claims is:

> A person that has a  Ph.D. in pharmaceutical sciences or a closely related field with two or more years of experience in that field or a master's degree in pharmaceutical sciences or a closely related field and five or more years of experience, or the equivalent, in pharmaceutical formulation, or a bachelor's degree in chemistry, pharmaceutics, or chemical engineering, and significant work experience in the manufacture and characterization of materials having pharmaceutical interest. That POSA would have been capable of designing and formulating pharmaceutical formulations, including immediate release compositions of low solubility active pharmaceutical ingredients, such as, for example, apixaban for thromboembolic therapy. This POSA at the relevant time had training in, experience in, and/or an understanding of particle size and dissolution testing that frequently accompanies the development of pharmaceutical formulations. Such a person generally would have supervised and/or collaborated with others having skill and/or expertise in the testing discussed above.

(PSUF ¶ 32)

160.    The opinions offered by each side's experts as to the validity and infringement of

the '945 Patent do not change based on which of the two definitions in paragraphs 158 and 159 is

applied. (PSUF ¶ 33.)

161.    Plaintiffs assert that Defendants infringe Claims 21 and 22 of the '945 Patent. (Tr.

135:8–13 (Plaintiffs' Opening Statement).)

162.    Both Claims 21 and 22 depend from Claim 12, which recites:

12. A solid pharmaceutical composition comprising a therapeutically effective amount of apixaban and a pharmaceutically acceptable diluent or carrier,

> wherein apixaban comprises crystalline apixaban particles,

> wherein the crystalline apixaban particles have a D90 equal to or less than about 89 µm, and
>
> wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 mL, of a dissolution medium at 37° C, at least 77 wt% of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate.

(JTX-2 at 10:14–27.)

163.    Claim 21 recites "[t]he composition as defined in claim 12, wherein the pharmaceutical composition comprises 2.5 mg of apixaban." (*Id.* at 10:46–47.)

164.    Claim 22 recites "[t]he composition as defined in claim 12, wherein the pharmaceutical composition comprises 5 mg of apixaban." (*Id.* at 10:48–49.)

165.    The Court construed one claim term of the '945 Patent, "apixaban particles that have a D90", to have its plain and ordinary meaning. (D.I. 381 at 1). As support, the Court cited to the specification noting that "D90 of 89 µm means that 90% of the volume of particles in an apixaban composition have a diameter less than 89 µm" (D.I. 380 at 9–10.) The parties agreed that all other claim terms from the '945 Patent have their plain and ordinary meaning to a person of ordinary skill in the art. (D.I. 182 at 2; (PSUF ¶ 34).)

## B.    The Asserted '945 Claims Are Invalid for Failure to Comply With the Written Description and Enablement Requirements of 35 U.S.C. § 112.

### 1.    The '945 Patent Only Describes Determining the D90 of the Bulk Apixaban.

166.    The parties agree the D90 value of a particle population is a calculated value, as opposed to a directly measured value. (Tr. 649:20–650:2 (Berkland); Tr. 1670:9–1671:11 (Myerson); Tr. 1145:11–1146:21 (Genck); Tr. 1349:17–1350:4 (Chambliss).)

167.    The '945 Patent only discloses determining the D90 of the bulk apixaban particles (before formulation) and making this determination using laser light scattering. (Tr. 1146:22–

1147:5, Tr. 1152:8–18, 1153:4–12 (Genck); Tr. 643:11–15, Tr. 641:6–10 (Berkland); Tr.

1339:11–14 (Chambliss).)

168.    It is not disputed that laser light scattering is not suitable to determine the $D_{90}$ of

API that has been removed from a tablet or other solid pharmaceutical composition. (Tr.

1146:22–1147:5, 1152:8–18; 1153:4–12, 1192:19–1193:1 (Genck); Tr. 643:11–15, Tr. 641:6–10

(Berkland); Tr. 1339:11–14 (Chambliss).)

169.    The '945 Patent describes determining the $D_{90}$ of the bulk apixaban particles

(prior to formulation) using laser light scattering in multiple places, (Tr. 1146:22–1152:18

(Genck)), including the following:

   a.  "Accordingly, the invention provides a pharmaceutical composition comprising
       crystalline apixaban particles having a $D_{90}$ equal to or less than about 89 µm as
       measured by laser light scattering method, .." (JTX-2 at 2:7–11)

   b.  "The range of particle sizes preferred for use in the invention is $D_{90}$ less than 89
       µm . . . . The particle sizes stipulated herein and in the claims refer to particle
       sizes were determined using a laser light scattering technique." (JTX-2 at 2:18–
       23)

   c.  "The invention further provides . . . a composition comprising crystalline
       apixaban particles having a $D_{90}$ equal to or less than about 89 µm as measured by
       laser light scattering. . ." (JTX-2 at 2:32–38)

   d.  "The present invention also provides a dry granulation process for preparing a
       composition comprising crystalline apixaban particles having a $D_{90}$ equal to or
       less than about 89 µm as measured by laser light scattering, and a
       pharmaceutically acceptable carrier." (JTX-2 at 2:39–43)

   e.  "Additionally, tablets made using larger particles ($D_{90}$ of 89 µm) had lower
       exposures compared to tablets made using the same process but with particle size
       of $D_{90}$ of 50." (JTX-2 at 2:62–65)

   f.  "Particle size distribution can be measured by laser light scattering technique as
       known to those skilled in the art and as further disclosed and discussed below."
       (JTX-2 at 3:37–40)

   g.  "The invention can indeed be viewed in alternative terms as a composition
       comprising crystalline apixaban particles having a mean particle size equal to or
       less than about 89 µm, as measured by Malvern light scattering,. . .". (JTX-2 at
       3:60–64)

170.    The '945 Patent discloses several examples where tablets containing either 2.5 or 5 mg of apixaban are formulated by using bulk apixaban of different particle sizes. (JTX-2 at 4:30–33; Tr. 1155:11–19, 1158:3–17 (Genck).)

171.    The $D_{90}$ determination in the examples of the '945 Patent was made using the apixaban bulk substance (before it is processed into the formulation), as stated by the following disclosure in the '945 Patent: "In the examples below, the particle size for apixaban drug substance was measured using a Malvern particle size analyzer." (JTX- 2 at 6:15–18; Tr. 1150:19–1152:7 (Genck).)

### 2.    The '945 Patent Considers the $D_{90}$ of the Bulk Apixaban to Be Critical in Improving in Vivo Dissolution of Tableted Apixaban.

172.    A POSA reading the '945 Patent would conclude that the inventors regarded the particle size of the bulk apixaban particles, as reflected in the $D_{90}$ value (determined before processing into a formulation) as critical in improving the *in vivo* dissolution of the apixaban formulated in a tablet. (Tr. 1154:23–1155:10 (Genck); Tr. 1746:15–20 (Myerson); JTX-2 at 1:64–2:3, 1:56–60, 2:53–54, and 9:29–32.)

173.    Figures 3 and 4 of the '945 Patent correlate the $D_{90}$ of the apixaban drug substance (before formulation) with the dissolution of the apixaban in 2.5 mg apixaban tablets (FIG 3) or 5 mg apixaban tablets (FIG 4)). (Tr. 1157:8–11, 1158:3–17 (Genck), Tr. 1336:20–1337:14 (Chambliss).)

174.    Plaintiffs argued to the USPTO, to obtain the patent's issuance, that the particle size of the bulk apixaban unexpectedly and surprisingly affects the bioavailability of apixaban after it is tableted. (Tr. 1332:5–1333:2 (Chambliss); Tr. 1158:18–1160:1 (Genck); DTX-458.15.)

175.    There was nothing surprising, or unexpected, in the data shown in the '945 patent or prosecution history. Figures 3 and 4 simply show an expected linear relationship between the

particle size and the dissolution rate (*i.e.*, as the apixaban particle size was reduced, the dissolution rate increased), and a POSA would know that increasing the dissolution rate would improve the bioavailability of apixaban.  (Tr. 1333:11–1334:5, 1336:20–1338:3 (Chambliss).)

176.    The statement in the '945 Patent that it was surprising that decreasing particle size of apixaban increased the dissolution rate based upon apixaban being a BCS Class III drug "conflates solubility with dissolution." (Tr. 1334:7–1336:18; also Tr. 1244:22–1245:18 (Chambliss).) The statement also ignores that the bioavailability of BCS Class III drugs were known to be dependent upon many factors, and that in fact the bioavailability may be "strongly dependent" upon the excipients. (PTX-429 at 4; Tr. 1757:6–1759:6 (Myerson).)

177.    The typical practice in the pharmaceutical industry when determining a $D_{90}$ value of an API is to measure the bulk API particle size and determine the $D_{90}$ before the API is subjected to formulation steps. (Tr. 1145:11–19 (Genck); Tr. 1338:25–1339:14 (Chambliss); Tr. 1744:10–1745:8 (Myerson) (not routine to measure API after tableting).)

178.    Dr. Patel, a named inventor of the '945 patent as well as Plaintiffs' Rule 30(b)(6) witness testified at trial that "[t]he particle size was assessed for the API" prior to formulation.  (Tr. 1127:15–20 1128:2 (Patel).)  Dr. Patel testified at trial that he was not aware of any efforts made at BMS to identify the particle size of the API within the formulation.  (Tr. 1127:24–1128:2 (Patel).)  Dr. Patel testified that he agreed with the statement at Column 2, lines 7–11 of the '945 patent that "Accordingly, the invention provides a pharmaceutical composition comprising crystalline apixaban particles having a $D_{90}$ equal to or less than about 89 micrometers as measured by laser light scattering method and a pharmaceutically acceptable diluent or carrier."  (Tr. 1128:3–1129:2 (Patel).)

**3.**    ***The '945 Patent Does Not Describe or Disclose Determining the $D_{90}$ of the Apixaban Particles After Formulation.***

179.    All of the purported unexpected or surprising results as well as all data argued to the USPTO for patentability were based upon finished tablets manufactured from bulk apixaban having a "$D_{90}$ less than or equal to 89 µm." (Tr. 1743:21–1744:5, 1745:17–1746:20 (Myerson); Tr. 1150:5–1152:7 (Genck); Tr. 1336:20–1337:14 (Chambliss); Tr. 1127:15–1128:2, 1129:3–1130:9 (Patel).)

180.    The '945 Patent does not describe or disclose the $D_{90}$ value of apixaban particles post-formulation – including in any of the examples of the '945 Patent. (Tr. 1157:12–18, 1152:8–18 (Genck); Tr. 1342:20–1343:1 (Chambliss).)

181.    The parties agree that the '945 Patent does not disclose any technique that would permit a POSA to measure the size of post-formulated apixaban or to determine the $D_{90}$ value of apixaban post-formulation. (Tr. 1152:8–18 (Genck); Tr. 1745:9–16 (Myerson).)

182.    Dr. Myerson, Plaintiffs' expert, testified

Q. Thank you. In fact, the '945 Patent does not disclose a test that would permit a person of skill in the art to measure the size of the apixaban particles and determine the $D_{90}$ after those particles had been formulated into a tablet; is that correct?

A. Yes. **And the '945 Patent discloses no such test. I agree**.

(Tr. 1745:9–16 (Myerson)(emphasis added).)

183.    The parties agree that the wet and dry granulation manufacturing process disclosed in the '945 Patent could impact the particle size, and thus a POSA reading the '945 Patent would not have been able to predict the size of the apixaban particles or their $D_{90}$ value after undergoing the disclosed methods of manufacture. (Tr. 1157:12–18, 1152:8–18 (Genck); Tr. 1342:20–1343:1 (Chambliss).)

184.    Dr. Myerson testified with respect to the actual $D_{90}$ of the apixaban particles after undergoing either of the methods of manufacture disclosed in the '945 Patent that "other than saying it would be the same or possibly smaller, that's the best I can do." (Tr. 1749:14–21,

1725:12–1726:1 (Myerson).)

185.    Knowing both the $D_{90}$ of the bulk apixaban drug substance and the manufacturing process disclosed in the '945 Patent would not have provided sufficient information to a POSA to be able to determine the $D_{90}$ particle size distribution of the apixaban particles post-formulation. (Tr. 1153:13–22 (Genck); Tr. 1342:20–1343:1 (Chambliss).)

### 4.    A POSA Would Not Have Known How to Determine the $D_{90}$ of an API After Formulation.

186.    There is no prior art article that describes measuring the particle size of an API and determining the $D_{90}$ of an API after the API has been formulated into a finished composition such as a tablet. (Tr. 1746:21–1747:25 (Myerson); Tr. 1339:19–1340:2 (Chambliss); Tr. 1178:20–25 (Genck).)

187.    Dr. Chambliss testified:

Q.    Are you aware of any situation where the $D_{90}$ of an API after tableting was determined?

A. Never, in 30-something years in this business, I've never heard of that being done.

Q. Thank you. Are you aware of any literature or peer-reviewed publications teaching how to determine the $D_{90}$ of an API after being formulated into a finished composition?

A. No, I'm aware of none.

(Tr. 1339:19–1340:2 (Chambliss).)

188.    Dr. Myerson testified:

Q.    We discussed a number of publications, and I do believe we're in agreement, but would you agree with me that none of the documents that you discussed today [or] were cited in your expert report determined the $D_{90}$ of an API in a finished dosage form?

A. That's correct.

(Tr. 1746:21:1747:1 (Myerson).)

189.    Dr. Genck testified:

Q.      Are you aware of any reports in the literature of measuring the $D_{90}$ equivalent spherical volume of an active pharmaceutical ingredient that had already been formulated into a tablet?

A.      No, I'm not. I certainly was not aware of one in the 2010/2011 time frame and I'm not aware of one today.

(Tr. 1178:20–25 (Genck).)

190.    Dr. Berkland, who has credentials exceeding a POSA in this case, admitted that, before this case, he had never attempted to estimate the $D_{90}$ of an API after it had been formulated into a finished dosage form. (Tr. 651:13–17 (Berkland).)

191.    Dr. Berkland admitted that, even in this case, he did not attempt to calculate the $D_{90}$ value of the apixaban particles in Unichem's ANDA product, despite attempting to view a few granules (some of which contained apixaban) shaved from a Unichem tablet. (*Id.* at 629:6–9).

192.    Plaintiffs' counsel conceded, on direct questioning from the Court, that there is no prior art showing a determination of the $D_{90}$ of an API after tableting:

> THE COURT: This point about whether the D90 is measured in the bulk before the tableting or at the end after the tableting, have you identified any evidence before me where outside of this litigation, either a patent or other reference or any witness, ever measured D90 or particle size after tableting.
>
>                          ***
>
> MS. WIGMORE: The answer is yes, there are particle size measurements in the prior art. I gave the exhibit numbers during my presentations. **The D$_{90}$ in a tablet that's not in the prior art** but the techniques that are in the references that I mentioned show how to measure the particle size that you can get from the tablet, and the D$_{90}$ is a mathematical calculation that can be made.

(Tr. 1941:5–10, 1941:16–23 (Plaintiffs' Closing).)

193.    Dr. Berkland used SEM in combination with EDS in analyzing the Unichem 5 mg apixaban tablets. (Tr. 597:13–600:1; 604:23–25 (Berkland).)  Dr. Berkland testified that, in his view, the scope of the claims is limited to determining the $D_{90}$ of the apixaban particles by analyzing the contents of the pharmaceutical composition. (Tr. 637:24–639:23 (Berkland).)

194.    SEM and EDS were known microscopy methods as of the filing date of the

'945 Patent, but were not known for the purpose of "estimating" a $D_{90}$ value of API particles

after being incorporated into a solid pharmaceutical dosage form. (Tr. 1178:6–19, 1201:24–

1202:23 (Genck).) There is no literature where the method employed by Dr. Berkland in his

infringement analysis was used to determine the $D_{90}$ value of an API after the API had been

incorporated into a solid pharmaceutical dosage form.  (*Id.* at 1219:25–1220:5.)

195.    Dr. Genck testified:

Q. Was the use of SEM-EDS generally known to those of skill in the art in 2010?

A. Yes, it was, but for different applications.

Q. What types of applications would it have been used for?

A.  For example, one of which is simply looking to particle shape. That you could do if
    you kind of want to get a feel for porosity. In other words, how are the particles held
    together, is there a void volume there? You could get that. And then if you want to
    use the EDS capabilities, you could do a little bit of issuing measurement in terms of
    chemical analysis, but nothing to do with the volume of particles.

(*Id.* at 1178:6–19.)

196.    The SEMS-EDS method requires an atomic diagnostic or marker that is unique to

the particle to be viewed to distinguish that particle from other particles. Apixaban, for example,

contains nitrogen which is not contained in the other excipients in the Unichem ANDA products.

(Tr. 612:13–613:14 (Berkland).)

197.    The compositions of Table 4 of the '945 Patent contains povidone, which contains

nitrogen atoms as an excipient of the tablet prepared using the wet granulation process that were

evaluated in the BE study. (JTX-2 at 7:19–45; Tr. 1748:2–18 (Myerson).)

198.    SEM-EDS could not be used to identify apixaban particles in a tablet if the tablet

contained an excipient having a nitrogen atom because there would be no atomic diagnostic or

marker to distinguish apixaban from the excipient. (Tr. 613:3–14 (Berkland).)

199.    Merkus describes SEM-EDS as permitting visual observation and measurement of a single dimension (*e.g.*, length) or 2-dimensional cross sections. There is no teaching in Merkus to use SEM-EDS to determine the equivalent spherical diameter of particles, which is the basis of the $D_{90}$ limitation. (DTX-343.10-12 (Merkus).)  Merkus would inform a POSA that results from one particle size measurement technique cannot be accurately compared to the results of a different particle size measurement technique. (Tr. 1181:6–1184:16 (Genck).)

200.    DTX-305, Gregory E. Amidon et al., *Particle, Powder, and Compact Characterization*, *in* Developing Solid Dosage Forms: Pharmaceutical Theory and Practice 163–86 (Yihong Qiu et al. eds., 1st ed. 2009), states at pages 1–2:

> Each particle sizing method, replete with its own assumptions, will result in a unique measure of particle size and distribution, since a real sample exhibits a range of shapes and sizes whose complexity is compounded when analyzing multi-component systems such as formulations. Since no two methods of particle sizing will result in the same numbers, it becomes important to distinguish between different methods, and to use the same type of analysis when comparing lots of API, excipients or formulations, examining differences in performance that process changes make, etc.".

201.    Reverchon, et al, *Supercritical fluid assisted production of HPMC composite microparticles,* J. of Supercritical Fluids, 46 (2008) 185–196, used SEM-EDS to verify powder uniformity before tableting (Tr. 666:3–14 (Berkland); PTX-402, p. 187).)

202.    Reverchon used SEM-EDS to determine the pre-formulation powder mixture of HPMC and ampicillin (before these ingredients were formulated into tablets). (PTX-402, p. 192 ("Drug release of SAA coprecipitates was analyzed from ***tablets and from gelatin capsule containing co-precipitated microparticles* . . . .**").)

203.    Reverchon did not determine the $D_{90}$ value of an API. At most, Reverchon provided an estimated $D_{90}$ value of an unadulterated powder mixture of two components before those two components were formulated into a tablet or gelatin capsule. (PTX-402, p. 192.)

204.     Reverchon did not determine the $D_{90}$ value of an API after tableting. (*Id.*)

### 5.     *The '945 Patent Does Not Enable a POSA to Determine the $D_{90}$ of Bulk Apixaban.*

205.     The '945 Patent lacks critical information that would enable a POSA to reproduce the testing disclosed in the '945 Patent and therefor obtain meaningful results that would correlate to what is disclosed in the '945 Patent. (Tr. 1343:9–1346:3 (Chambliss).)

206.     Not only do the different particle size techniques impact the particle size measurement results, but the testing parameters and conditions can impact the particle size measurement results as well, even when using the same technique. (Tr. 1217:1–1218:21 (Genck).)

207.     The '945 Patent does not disclose the optical model (e.g., Fraunhofer or Mie theory) that was used in the $D_{90}$ calculation, the precise Malvern equipment or data analysis program used. (Tr. 1343:18–24 (Chambliss).)

208.     The '945 Patent does not inform a POSA how the sample was dispersed (what medium used, whether a dispersion agent was used) or how the sample was prepared (for example, was it sonicated and under what conditions; the concentration range or length of measuring time or sample cell.) (*Id.* at 1343:25–1344:15.)

### C.     The Asserted '945 Claims Are Invalid Under 35 U.S.C. § 103 Over the Prior Art and State of the Art.

#### 1.     *Physical Properties of Apixaban Were Known in the Prior Art.*

209.     The chemical structure of apixaban was known in the prior art. (DTX-303 at [0026]; DTX-312.5; DTX-344.3; Tr. 1232:2–8 (Chambliss).)

210.     Apixaban was known to be a "potent, selective, orally bioavailable Factor Xa inhibitor with demonstrated antithrombotic efficacy" (DTX-349.9; DTX-312.3; JTX-1 at

Abstract, 269:1–-6 (Claim 16), 270:5–8 (Claim 27); DTX-344.3; Tr. 1674:2–5, 1752:22–25 (Myerson); Tr. 1235:2–18 (Chambliss).)

211.    At the relevant time, a POSA would have known the deficiencies of the existing Factor Xa inhibitors, and been motivated to locate better alternatives. (DTX-312.3; DTX-344.03.)

212.    Apixaban was known to be poorly water soluble. (DTX-303 at ¶ [0006]; DTX-349.7; DTX-344 at 31:1–3; DTX-355.2; Tr. 1237:20–1240:18 (Chambliss).)

213.    Apixaban's bioavailability was also known in the prior art. (DTX-349.8; DTX-312.6; Tr. 1235:20–1237:19 (Chambliss).)

214.    Apixaban was further known to exist in the crystalline state in the prior art. (DTX-359.9; DTX-344.4–5, DTX-344.38–39; DTX-349.9; Tr. 1321:4–7 (Chambliss); Tr. 811:7–813:21 (Schurko).)

215.    At the relevant time, it was also known that with highly-potent drugs, especially compounds with low water solubility, to use a "small" particle size API to ensure maximum oral bioavailability and content uniformity in the drug product. (DTX-359 at ¶¶ [0003], [0020], [0041]-[0046], DTX-336.63; Tr. 1244:4–1245:18 (Chambliss).)

216.    A micronization step, however, is not required to obtain bulk apixaban particles having a "$D_{90}$ equal of less than 89 µm," nor required for content uniformity. (PTX-476 at BMSAPIXE4286, Figure 3; Tr. 1694:21–1695:9 (Myerson).)

    **2.    *The State of the Art as of 2009–2010 Establishes That a POSA Would Have Been Motivated to Combine the Prior Art to Arrive at the Claimed Invention.***

217.    As of 2009–2010, a POSA, as BMS did in Nause, would have recognized the "continuing need to find safe, effective methods of delivering … apixaban," and would have been motivated to improve on the then-known apixaban compositions as stated in BMS's own

Nause patent application. (DTX-344.4 at 2:11–12; Tr. 1321:19–1322:14, 1331:12–22 (Chambliss).)

218.    Knowing that apixaban was highly potent and poorly water soluble, the skilled artisan would have been motivated to reduce the particle size of the apixaban to improve (i) uniform content in any solid composition as well as (ii) bioavailability by increasing the dissolution rate. (Tr. 1230:13–1231:19, 1240:19–1241:11, 1242:22–1243:7 (Chambliss).)

219.    The prior art reports that, during 1991–2000, cardiovascular drugs in clinical trials had an approximately eighty-percent (80%) failure rate. (DTX-368.1–2; Tr. 1263:10–1264:21, 1313:24-1314:7 (Chambliss).)

220.    The prior art also reported that for the period 1991–2000, drugs undergoing Phase III clinical trials had an approximately forty-percent (40%) failure rate. (DTX-368.2; Tr. 1263:10–1264:21, 1313:24–1314:7 (Chambliss).)

221.    Failures of drugs in clinical trials can result in the loss of hundreds of millions of dollars and five to ten years of development time. (Tr. 1314:8–24 (Chambliss).)

222.    The statements in Carreiro (DTX-312), Pinto 2007 (DTX-349), Eriksson (PTX-320) and Teague (PTX-482) cited by Plaintiffs as characterizing the apixaban data and test results as showing apixaban to be "rapidly" or "readily" absorbed and/or characterizing the bioavailability of apixaban as "good" or "high" are from and/or based upon publications authored at least in part by researchers employed by and/or otherwise affiliated with BMS. (*See* DTX-312.10, DTX-319.1, PTX-320, PTX-480 (n. 33); Tr. 1363:18–1377:7, 1391:9–1392:2 (Chambliss).)

223.    Carreiro, Pinto 2007, and Eriksson were written at least in part by authors employed and/or otherwise affiliated with BMS. (DTX-312.10, DTX-349.1, PTX-320; Tr.

1363:18–1377:7, 1391:9–1392:2 (Chambliss).)

224.     Teague relied on such a BMS publication when characterizing apixaban as "rapidly absorbed." (PTX-480 at BMSAPIXE4449, (n.33 at 4454).)

225.     BCS classification of drugs is API dosage dependent. (DTX-320.5–6; Tr. 1252:11–25, 1257:9–20, 1317:3–11 (Chambliss).)

226.     One of the benefits of the BCS classification system is biowaivers, which may be used to waive or avoid expensive regulatory hurdles including bioequivalence testing. (DTX-320.14; DTX-364.1–2; Tr. 1245:24–1247:19 (Chambliss).)

227.     At the time of invention, biowaivers for BCS Class I and III drugs were available in Europe. (Tr. 1755:23–1756:5 (Myerson); Tr. 1392:4–8 (Chambliss).)

228.     Biowaivers were also available for BCS Class I drugs in the U.S., and a manufacturer could negotiate with the FDA to lower/reduce the regulatory hurdles for Class III drugs in the U.S. at the time of the invention. (Tr. 1379:1–24 (Chambliss).)

229.     Even though biowaivers were not available for BCS Class III drugs at the relevant time, a POSA would have known that scientific publications had advocated that "biowaivers for BCS Class III drugs [were] scientifically justified" and "that biowaivers [should] be extended to BCS Class III drugs with rapid dissolution property", and in any event, the prior art recognized BCS Class III drugs could benefit from particle size reduction, including improving dissolution rate and bioavailability. (DTX-355.7; DTX-364.3; DTX-437.2; Tr. 1755:23–6 (Myerson); Tr. 1259:1–25, 1260:4–18, 1392:4–8 (Chambliss).)

230.     The bioavailabilities of BCS Class III drugs were known to be dependent upon many factors, and in fact, that the bioavailability may be "strongly dependent" upon the excipients. (PTX-429 at 4; Tr. 1757:6–1759:6 (Myerson).)

231.     The bioavailability of ranitidine – a BCS Class III drug and the only API discussed in Blum (PTX-429) – can vary by fifty percent (50%) based solely on the excipient used (i.e., sorbitol vs. sucrose). (Tr. 1759:7–1760:20 (Myerson).)

232.     Consistent with BMS' stated recognition in Nause that safer more effective methods of delivering apixaban was needed (DTX-344.4 at 2:11–12; Tr. 1321:19–1322:14, 1331:12–22 (Chambliss)), BMS was concerned that the apixaban clinical trials disclosed in the prior art (including Carreiro) may fail, and had a back-up plan in place. (Tr. 204:12–24 (Knabb); Tr. 1754:20–1755:18 (Myerson).)

233.     Carreiro (DTX-312), Pinto 2007 (DTX-349), Nause (DTX-244), Stegemann (DTX-355), Yu (DTX-364), Kola and Landis (DTX-368) and Dahan (DTX-437) are all, at least, references showing the state of the art at the relevant time that would motivate a POSA to combine the prior art to arrive at the claimed invention.  (*Id.*; PSUF ¶ 109; Tr.1230:14–24, 1231:4–19, 1244:22–1245:18, 1252:11–25, 1258:4–24, 1262:24–1263:9, 1315:4–17, 1324:15–1325:8, 1327:2–11, 1328:18–1329:5, 1331:4–23 (Chambliss).)

### 3.   *Primary Prior Art References (Carreiro, the '306 Publication, the '208 Patent, and Nause)*

### a.   *Carreiro*

234.     Carreiro is prior art under 35 U.S.C. § 102(b) to the '945 Patent. (DTX-312; PSUF ¶ 101.)

235.     Carreiro discloses treating humans in need of an antithrombotic agent with apixaban compositions having a therapeutically effective amount of apixaban, i.e., dosages of 2.5 mg and 5 mg, and a pharmaceutical acceptable diluent or carrier. (DTX-312.7, DTX-312. 9; Tr. 1752:18–1753:4 (Myerson); Tr. 1322:23–1323:10 (Chambliss).)

236.     Carreiro also discloses treatment with apixaban dosages as high as fifty (50) mg

where "[n]o dose-limiting adverse effects were noted, such that there was no concern of apixaban's safety at doses higher than 10 mg." (DTX-312.6; Tr. 1316:2–1317:2 (Chambliss).)

237.   Because an apixaban dosage of 11 mg would have made apixaban a BCS Class IV drug (i.e., low solubility, low permeability), while a 10 mg dosage makes apixaban a BCS Class III drug (i.e., high solubility, low permeability), one skilled in the art reading Carreiro could not know the BCS classification of apixaban based upon the dosages being tested. (DTX-320.5–6; Tr. 1257:9–1258:24, 1317:3–11, 1384:3–7 (Chambliss).)

### b.   The '306 Publication.

238.   The '306 Publication is prior art under 35 U.S.C. § 102(b) to the '945 Patent. (DTX-303; PSUF ¶ 103.)

239.   The '306 publication discloses administering therapeutically effective apixaban dosages of 2.5 mg to 10 mg once daily to "prevent or treat diseases associated with Factor Xa including venous thrombosis, deep vein thrombosis and acute coronary syndrome in human patients." (DTX-303 at ¶¶ [0081], [0062]-[0063]; Tr. 1317:18–1318:6, 1325:16–24 (Chambliss).)

240.   The '306 publication discloses that these apixaban dosages may be administered in tablets, which include a pharmaceutically acceptable diluent or carrier. (DTX-303 at ¶ [0051]; Tr. 1232:16–20, 1325:25–1326:2, 1326:11–14 (Chambliss).)

### c.   The '208 Patent

241.   The '208 Patent issued on November 22, 2005 and is prior art under 35 U.S.C. § 102(b) to the '945 Patent. (JTX-1.)

242.   The '208 Patent is directed to apixaban and other compounds in the same chemical class, and states that the "invention relates generally to lactam-containing compounds

and derivatives thereof which are inhibitors of trypsin-like serine protease enzymes, especially factor Xa, pharmaceutical compositions containing the same, and methods of using the same as anticoagulant agents for treatment of thromboembolic disorders." (JTX-1 col.1:16–25; Tr. 1318:14–17 (Chambliss).)

243.    Claim 13 of the '208 Patent recites apixaban. (JTX-1 col.269:1–7; Tr. 1318:18 (Chambliss).)

244.    Claim 27 of the '208 Patent recites a solid pharmaceutical composition comprising a therapeutically effective amount of apixaban as well as a pharmaceutically acceptable carrier. (JTX-1 col.270:5–8; Tr. 1318:19–20, 1327:18–24 (Chambliss).)

245.    The '208 Patent further discloses oral dosage forms (e.g., tablets or capsules) of apixaban along with a "pharmaceutical carrier" according to "standard pharmaceutical practice." (JTX-1 col.155:7–10; Tr. 1318:21–23 (Chambliss).)

246.    The '208 Patent discloses that for a tablet, the compounds of this invention generally may be present in an amount of about 1 to 100 mg, or 5 to 10 mg per dosage unit with a second anti-coagulant, and discloses 2.5 and 5 mg per dosage. (JTX-1 col.156:23–28, 157:6–11, 157:24–32; Tr. 1318:24–1319:1, 1328:10–16 (Chambliss).)

### d.    Nause

247.    Nause first published December 23, 2010, and is prior art to the '945 Patent under at least 35 U.S.C. § 102(e). Even if not prior art to the '945 Patent, Nause is a contemporary document showing the state of the art and the knowledge of a POSA in 2009–2010. (DTX-344.1; Tr. 1321:19–1322:14, 1331:4–22 (Chambliss).)

248.    Nause discloses treating humans in need of an antithrombotic agent with apixaban compositions, such as immediate release tablets, having a therapeutically effective amount of

apixaban, i.e., a 5 mg dosage, and a pharmaceutical acceptable diluent or carrier. (DTX-344.4, DTX-344.75 (Example 7/Table 8); Tr. 1320:15–1321:3 (Chambliss).)

249.     Nause also teaches that the 5 mg apixaban tablet may be split in half and administered twice daily, for a 2.5 mg apixaban composition. (DTX-344 .4; Tr. 1321:8–18 (Chambliss).)

250.     Nause discloses crystalline apixaban. (DTX-344.4–5, DTX-344.38–39; Tr. 1321:4–7 (Chambliss); *see also* Tr. 811:7–811:23 (Schurko).)

251.     Although Nause is silent as to the particle size of the crystalline apixaban, a POSA would have been motivated to use "small" sized apixaban particles to enhance the dissolution rate and thereby improve the bioavailability of crystalline apixaban given the express teaching in Nause recognizing the "continuing need to find safe, effective methods of delivering … apixaban." (DTX-344.4; Tr. 1321:19–1322:14, 1330:8–14, 1331:4–22 (Chambliss).)

252.     Nause also teaches dissolution testing conditions and methods that are similar to those in FDA Guidance 1997. (DTX-344.71; Tr. 1331:4–11 (Chambliss).)

*4.     Secondary References (Wei and FDA Guidance 1997)*

*a.     Wei*

253.     Wei is prior art under 35 U.S.C. § 102(b) to the '945 Patent. (DTX-359; PSUF ¶ 110.)

254.     Wei, as well as other references, teaches that apixaban was known in the crystalline form. (DTX-359 at ¶¶ [0041]-[0046] (Examples 1–3).6–7; Tr. 1233:21–25 (Chambliss); *see also* DTX-344.4–5, DTX-344.38–39; DTX-349.9; Tr. 1321:4–7 (Chambliss); Tr. 811:7–813:23 (Schurko).)

255.     Wei also teaches enhancing the dissolution rate and improving the bioavailability

of crystalline apixaban by reducing the particle size of the apixaban crystals to "small … particles." (DTX-359 at ¶ [0003]; Tr. 1247:20–1248:17 (Chambliss).)

256. Wei described the "large" apixaban crystals as those having a $D_{90}$ of greater than about 100 microns, and "small" apixaban crystals as those having a $D_{90}$ of less than about 30 microns. (DTX-359 at ¶ [0020]; Tr. 1234:1–9, 1319:7–15, 1319:25–1320:6, 1323:11–17, 1326:16–18, 1327:25–1328:3 (Chambliss).)

### b. FDA Guidance 1997

257. FDA Guidance 1997 is prior art under 35 U.S.C. § 102(b) to the '945 Patent. (DTX-320; PSUF ¶ 102.)

258. FDA Guidance 1997 taught both the "(1) basket method (Apparatus I) and (2) the paddle method (Apparatus 2)" dissolution test methods. (DTX-320.15; Tr. 1261:13–1262:6 (Chambliss).)

259. FDA Guidance 1997 also taught a paddle speed of 50–75 rpm. (DTX-320.16; Tr. 1262:7–8 (Chambliss).)

260. FDA Guidance 1997 further disclosed the "volume of dissolution medium is generally 500, 900, or 1000 mL." (DTX-320.15; Tr. 1262:8–9 (Chambliss).)

261. Intentionally Left Blank

262. FDA Guidance 1997 additionally disclosed that "All dissolution tests for IR dosage forms should be conducted at $37 \pm 0.5°C$." (DTX-320.16; Tr. 1262:10–11 (Chambliss).)

263. FDA Guidance 1997 additionally disclosed that to simulate intestinal fluid, "a dissolution medium of pH 6.8 should be employed." (DTX-320.15; Tr. 1262:12–17 (Chambliss).)

264. FDA Guidance 1997 further disclosed for BCS Class III drugs that the dissolution

rate should be 85% in 15 minutes in order to ensure that the bioavailability of the drug is not

limited by dissolution rate, which subsumes and teaches the recited 77% in 30 minutes

dissolution rate recited in the Asserted '945 Claims. (DTX-320.6; Tr. 1323:16–1324:8

(Chambliss).)

265.    FDA Guidance 1997 lastly disclosed that, for drugs like apixaban that are

sparingly or poorly water soluble, "use of a surfactant such as sodium lauryl sulfate is

recommended." (DTX-320.15; Tr. 1262:18–-22 (Chambliss).)

266.    The experts agree that there is nothing "innovative" about these testing methods

and conditions disclosed in FDA Guidance 1997. (Tr. 1753:10–1754:19 (Myerson); Tr. 1261:13–

1262:22, Tr. 1323:16–1324:8 (Chambliss).)

### 5.    *Invalidity Claim Charts*

267.    Based upon the motivation taught in the prior art and state of the art (D-PF ¶ 233),

one skilled in the art would have considered the Asserted '945 Claims invalid over Carreiro and

Wei in view of FDA Guidance 1997 as demonstrated in the below claim chart.

| CLAIM LIMITATION(S) | PRIOR ART REFERENCE |
| --- | --- |
| 12. A solid pharmaceutical composition comprising a therapeutically effective amount of apixaban | (DTX-312.7, DTX-312.9; Tr. 1752:18–1753:4 (Myerson); Tr. 1322:19–1323:10 (Chambliss).) |
| and a pharmaceutically acceptable diluent or carrier, | (DTX-312.7, DTX-312.9; Tr. 1752:18–1753:4 (Myerson); Tr. 1322:19–1323:10 (Chambliss).) |
| wherein apixaban comprises crystalline apixaban particles, wherein the crystalline apixaban particles have a $D_{90}$ equal to or less than about 89 $\mu$m, | (DTX-359 at ¶¶ [0003], [0020], [0041]-[0046]; Tr. 1233:21–25, Tr. 1234:1–9, 1247:20–1248:17, 1319:7–15, 1319:25–1320:6, 1323:11–17 (Chambliss).) |
| And wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 mL, of a dissolution medium at 37°C, at least 77 wt % of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and | (DTX-320.6, DTX-320.15–16; Tr. 1261:13–1262:22, 1323:18–1324:8 (Chambliss).) |

| | |
|---|---|
| the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate. | |
| | |
| 21. The composition as defined in claim 12, | |
| wherein the pharmaceutical composition comprises 2.5 mg of apixaban. | (DTX-312.7, DTX-312.9; Tr. 1752:18–1753:4 (Myerson); Tr. 1322:19–1323:10, 1326:24–1327:1 (Chambliss).) |
| | |
| 22. The composition as defined in claim 12, | |
| wherein the pharmaceutical composition comprises 5 mg of apixaban. | (DTX-312.7, DTX-312.9; Tr. 1752:18–1753:4 (Myerson); Tr. 1322:19–1323:10, 1326:24–1327:1 (Chambliss).) |

268.    Based upon the motivation taught in the prior art and state of the art (D-PF ¶ 233),

one skilled in the art would have considered the Asserted '945 Claims invalid over '306

publication and Wei in view of FDA Guidance 1997 as demonstrated in the below claim chart.

| CLAIM LIMITATION(S) | PRIOR ART REFERENCE |
|---|---|
| 12. A solid pharmaceutical composition comprising a therapeutically effective amount of apixaban | (DTX-303 at ¶¶ [0051], ¶¶ [0062]-[0063], [0081]; Tr. 1232:16–20, 1317:18–1318:6, 1325:12–1326:2 (Chambliss).) |
| and a pharmaceutically acceptable diluent or carrier, | (DTX-303 at ¶ [0051]; Tr. 1232:16–20, 1325:25–1326:2, 1326:11–14 (Chambliss).) |
| wherein apixaban comprises crystalline apixaban particles, wherein the crystalline apixaban particles have a $D_{90}$ equal to or less than about 89 μm, | (DTX-359.6–7 at ¶¶ [0003], [0020], [0041]-[0046]; Tr. 1233:21–25, 1234:1–9, 1247:20–1248:17, 1319:7–15, 1319:25–1320:6, 1326:16–18 (Chambliss).) |
| And wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 mL, of a dissolution medium at 37°C, at least 77 wt % of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate. | (DTX-320.6, DTX-320.15–16; Tr. 1261:13–1262:22, 1326:19–22 (Chambliss).) |
| | |
| 21. The composition as defined in claim 12, | |

| | |
|---|---|
| wherein the pharmaceutical composition comprises 2.5 mg of apixaban. | (DTX-303 at ¶ [0081], ¶¶ [0062]-[0063]; Tr. 1317:18–1318:6, 1325:16–24 (Chambliss).) |
| | |
| 22. The composition as defined in claim 12, | |
| wherein the pharmaceutical composition comprises 5 mg of apixaban. | (DTX-303 at ¶ [0081], ¶¶ [0062]-[0063]; Tr. 1317:18–1318:6, 1325:16–24 (Chambliss).) |

269.    Based upon the motivation taught in the prior art and state of the art (D-PF ¶ 233), one skilled in the art would have considered the Asserted '945 Claims invalid over '208 patent and Wei in view of FDA Guidance 1997 as demonstrated in the below claim chart.

| CLAIM LIMITATION(S) | PRIOR ART REFERENCE |
|---|---|
| 12. A solid pharmaceutical composition comprising a therapeutically effective amount of apixaban | (JTX-1 col.1:16–25, 269:1–7, 270:5–8; Tr. 1318:14–20, 1327:13–24 (Chambliss).) |
| and a pharmaceutically acceptable diluent or carrier, | (JTX-1 col.155:7–10, 270:5–8; Tr. 1318:18–23, 1327:18–23 (Chambliss).) |
| wherein apixaban comprises crystalline apixaban particles, wherein the crystalline apixaban particles have a $D_{90}$ equal to or less than about 89 μm, | (DTX-359.6–7 at ¶¶ [0003], [0020], [0041]-[0046]; Tr. 1233:21–25, 1234:1–9, 1247:20–1248:17, 1319:7–15, 1319:25–1320:6, 1327:25–1328:3 (Chambliss).) |
| And wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 mL, of a dissolution medium at 37°C, at least 77 wt % of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate. | (DTX-320.6, DTX-320.15–16; Tr. 1261:13–1262:22, 1328:4–9 (Chambliss).) |
| | |
| 21. The composition as defined in claim 12, | |
| wherein the pharmaceutical composition comprises 2.5 mg of apixaban. | (JTX-1 col.156:23–28, 157:6–11, 157:24–32; Tr. 1318:24–1319:1, 1328:10–16 (Chambliss).) |
| | |
| 22. The composition as defined in claim 12, | |
| wherein the pharmaceutical composition comprises 5 mg of apixaban. | (JTX-1 col.156:23–28, 157:6–11, 157:24–32; Tr. 1318:24–1319:1, 1328:10–16 (Chambliss).) |

270.     Based upon the motivation taught in the prior art and state of the art (D-PF ¶ 233), one skilled in the art would have considered the Asserted '945 Claims invalid over Nause in view of FDA Guidance 1997 as demonstrated in the below claim chart.

| CLAIM LIMITATION(S) | PRIOR ART REFERENCE |
| --- | --- |
| 12. A solid pharmaceutical composition comprising a therapeutically effective amount of apixaban | (DTX-344.4, DTX-344.75 (Example 7/Table 8); Tr. 1320:15–1321:3, 1329:15–1330:3 (Chambliss).) |
| and a pharmaceutically acceptable diluent or carrier, | (DTX-344.4, DTX-344.75 (Example 7/Table 8); Tr. 1320:15–1321:3, 1330:4–7 (Chambliss).) |
| wherein apixaban comprises crystalline apixaban particles, wherein the crystalline apixaban particles have a $D_{90}$ equal to or less than about 89 μm, | (DTX-344.4–5, DTX-344.38–39; Tr. 1321:4–7, 1330:8–14 (Chambliss); Tr. 811:7–813:23 (Schurko).) |
| And wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 mL, of a dissolution medium at 37°C, at least 77 wt % of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate. | (DTX-320.6, DTX-320.15–16; Tr. 1261:13–1262:22, 1330:16–20 (Chambliss).) |
|  |  |
| 21. The composition as defined in claim 12, |  |
| wherein the pharmaceutical composition comprises 2.5 mg of apixaban. | (DTX-344.4; Tr. 1321:8–18, 1330:21–1331:2 (Chambliss).) |
|  |  |
| 22. The composition as defined in claim 12, |  |
| wherein the pharmaceutical composition comprises 5 mg of apixaban. | (DTX-344.4, DTX-344.75 (Example 7/Table 8); Tr. 1320:15–1321:3, 1330:21–1331:2 (Chambliss).) |

Dated: December 20, 2019

Respectfully submitted,

*/s/ John C. Phillips, Jr.*

OF COUNSEL:
Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Dustin L. Taylor
Femi Masha
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
dustin.taylor@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street
Suite 300
Madison, WI 53701
Tel: (608) 234-6032
Tom.heneghan@huschblackwell.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Sigmapharm Laboratories LLC*

OF COUNSEL:
Paul H. Kochanski
Kendall K Gurule
LERNER, DAVID, LITTENBURG,
KRUMHOLZ & MENTLIK, LLP
20 Commerce Drive
Cranford, NJ 07016
Tel: (908)654-5000
pkochanski@lernerdavid.com
kgurule@lernerdavid.com

*/s/ Karen L. Pascale*

Karen L. Pascale
Robert M. Vrana
YOUNG, CONAWAY, STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Counsel for Sunshine Lake Pharma Co., Ltd.
and HEC Pharm USA Inc.*

OF COUNSEL:
Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning
GREENBLUM & BERNSTEIN, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Unichem Laboratories Ltd.*