```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
       BRISTOL-MYERS SQUIBB COMPANY
 4     and PFIZER INC.,                    : CIVIL ACTION
                          Plaintiffs,      :
 5     v                                   :
                                           : (Consolidated)
 6     AUROBINDO PHARMA USA INC.,          :
                                           : NO. 17-374-LPS
 7                          Defendant.

 8                              - - -

 9                         Wilmington, Delaware
                         Wednesday, October 23, 2019
10                         Bench Trial - Volume A

11                              - - -

12     BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge

13     APPEARANCES:             - - -

14
                    FARNAN, LLP
15                  BY:  MICHAEL J. FARNAN, ESQ.

16                      and

17                  WILMER CUTLER PICKERING HALE and DORR, LLP
                    BY:  AMY K. WIGMORE, ESQ.
18                      (Washington, District of Columbia)

19                      and

20                  WILMER CUTLER PICKERING HALE and DORR, LLP
                    BY:  ANDREW J. DANFORD, ESQ.,
21                      TIMOTHY A. COOK, ESQ., and
                        KEVIN M. YURKERWICH, ESQ.
22                      (Boston, Massachusetts)

23                          Counsel for Bristol-Myers Squibb
                            Company and Pfizer Inc.
24

25     Valerie J. Gunning             Brian P. Gaffigan
       Official Court Reporter        Official Court Reporter
```

1    APPEARANCES:   (Continued)

2
                   PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
3                  BY:  JOHN C. PHILLIPS, JR., ESQ.

4                        Counsel on behalf of SigmaPharm
                         Laboratories, LLC; Unichem Laboratories,
5                        Ltd.,

6                  and

7                  HUSCH BLACKWELL, LLP
                   BY:  PHILIP D. SEGREST, JR., ESQ., and
8                       DON J. MIZERK, ESQ.
                        (Chicago, Illinois)
9
                   and
10
                   HUSCH BLACKWELL, LLP
11                 BY:  THOMAS P. HENEGHAN, ESQ., and
                        DUSTIN L. TAYLOR, ESQ.
12                      (Madison, Wisconsin)

13                       Counsel on behalf of SigmaPharm
                         Laboratories, LLC
14

15

16

17

18

19

20                          - oOo -

21                    P R O C E E D I N G S

22                 (REPORTER'S NOTE:  The following trial was held

23   in open court, beginning at 5:00 p.m.)

24                 THE COURT:  Good afternoon.  We'll have you put

25   your appearances on the record, please.

```
 1              MR. FARNAN:  Good afternoon, Your Honor.

 2              THE COURT:  Good afternoon.

 3              MR. FARNAN:  Michael Farnan on behalf of

 4   plaintiffs.  With me today is Amy Wigmore, Andrew Danford,

 5   Tim Cook, and Kevin Yurkerwich from WilmerHale.

 6              THE COURT:  Good afternoon.

 7              Good afternoon.

 8              MR. PHILLIPS:  Good afternoon, Your Honor.  Jack

 9   Phillips on behalf of SigmaPharm.  With me in the courtroom

10   is Don Mizerk, Dustin Taylor of Husch Blackwell, and Peter

11   Motus, in-house counsel at SigmaPharm.

12              I'm also here for Unichem by myself.

13              THE COURT:  All right.  Anybody else want to put

14   their appearance on the record?

15              Okay.  So we're here for technically the

16   beginning of our trial.  Because we're just limited to it's

17   one witness tonight, is that correct?

18              MS. WIGMORE:  (Nodding yes.)

19              THE COURT:  Okay.  A couple of things.  One is

20   I'm going to let much of my staff go given the hour that

21   we're doing this.  So my thought was we would not formally

22   admit any of the evidence.  We can just obviously use the

23   exhibits and lay all the foundation you need to formally

24   move the evidence in.  I was going to wait until we really

25   start the trial on the 31st so I don't have to keep track of
```

1    all of that today.

2              I guess that was about it.  Any questions about

3    that?

4              MS. WIGMORE:  We do have one question, Your

5    Honor.  As to the timing, we do appreciate the Court making

6    itself available afterhours.  We understand we have from

7    5:00 until 6:45.  We had submitted our expected time frames

8    and I understand the defendants said that they would take

9    about an hour and we would take 45 minutes.  We want to

10   ensure given the limited available of the witness that we

11   had enough time to do the cross if the direct did not stay

12   within those time limits.

13             THE COURT:  What is the current expectation as

14   to the length of the direct?

15             MR. MIZERK:  Our expectation is to keep it

16   within an hour.

17             THE COURT:  All right.  Then it sound like we

18   probably won't have any problems.

19             Anything else from plaintiffs before we get

20   started?

21             MS. WIGMORE:  No, thank you.

22             THE COURT:  Any question or anything from

23   defendants?

24             MR. MIZERK:  No, Your Honor.

25             THE COURT:  Then you can call your witness.

Buckton - direct

```
 1                    MR. MIZERK:  Your Honor, defendants SigmaPharm

 2     and Unichem call Dr. Graham Buckton.

 3                    THE COURT:  Okay.

 4                    ... GRAHAM BUCKTON, having been first duly

 5     sworn, was examined and testified as follows ...

 6                    THE COURT:  Good afternoon, Dr. Buckton.  Thank

 7     you for being here.

 8                    THE WITNESS:  Thank you.

 9                    THE COURT:  You may proceed.

10                    MR. MIZERK:  Thank you, Your Honor.  And thank

11     you for accommodating Dr. Buckton's schedule.

12                         DIRECT EXAMINATION

13     BY MR. MIZERK:

14     Q.     Good afternoon or afternoon, Dr. Buckton.  Would you

15     please introduce yourself to the court?

16     A.     My name is Graham Buckton.

17     Q.     Where do you currently reside?

18     A.     29 Tamworth Drive, Fleet Hampshire; and that is the

19     U.K.

20     Q.     Now, I'd like to talk a little bit about your

21     background, education and training as it relates to the

22     issues we will be discussing.  I understand that you

23     prepared some slides to -- or demonstrative exhibits to help

24     you explain your testimony today; is that correct?

25     A.     That's right.
```

Buckton - direct

Q.      Turning to your first slide, DDX-1-2.  Can you
provide and overview of your educational history?

A.      Yes, I have a Bachelor of Pharmacy degree from the
Chelsea College of London from 1978-1981.

              And a Ph.D. from King's College, University of
London from 1982 to 1985, in the assessment of the
wettability of powders.

              And I was awarded the Doctor of Science degree
from the University of London in 1997 for research work in
pharmaceutical materials science.

Q.      And turning to your next slide, DDX-1-3.  What was
your first academic employment?

A.      I was employed as a lecturer in pharmacy at Kings
college in University of London from 1984 to 1988.

              I then moved to the School of Pharmacy,
University of London which became the UCL School of
Pharmacy.  I was there until 2015.

              And I was Senior Lecturer, Leader and then
Professor in Pharmaceutics from 2001 to 2007.  I was Head of
the Department of Pharmaceutics.

Q.      What is the significance of the title Professor at
the UCL?

A.      In U.K., I think it is slightly different here, that
we have Lecturer, Senior Lecturer, so Senior Lecturer is
someone more experienced in teaching.  Leader is someone who

Buckton - direct

1    achieved a standard in research.  Professor is someone who

2    has excelled in teaching administration and research.  So it

3    is kind of a senior grade rather than starting grade.

4    Q.    Now, you mention in addition, you were the Chair of

5    the or Head of the Department of Pharmaceutics from 2001 to

6    2007.  What is pharmaceutics?

7    A.    Pharmaceutics the process of taking a drug substance

8    and making it into a suitable quality, safe and efficacious

9    medicine that can be given to a patient.

10   Q.    What steps does that process generally involve?

11   A.    It involves studying the drug substance itself and

12   that would involve usually selecting a salt form or a

13   polymorphic crystalline form of the drug substance, and then

14   it involves taking the knowledge of that drug substance and

15   interacting the drug with excipients, finding a suitable way

16   to manufacture a stable and effective dosage form that can

17   be administered to a patient.

18   Q.    Now, when did you retire from teaching at UCL?

19   A.    In 2015.

20   Q.    Now, we have discussed -- and when you were retired,

21   were you given any title by the university?

22   A.    I was made Emeritus Professor of Pharmaceutics.

23   Q.    We discussed a little bit of your career in academia.

24   Have you also worked in the pharmaceutical industry?

25   A.    Yes, I have collaborated with Industry throughout my

Buckton - direct

1    career.

2              In 2000, I formed my own company, PharMaterials

3    Limited.   I was Chief Executive Officer of PharMaterials

4    from 2000 to 2012.

5    Q.     Can you describe the business of PharMaterials?

6    A.     Yes, it is a material characterization company.   And

7    then we moved into salt selection of polymorph screening,

8    then formulation development, analytical development,

9    manufacture of, and then clinical trial supply.

10   Q.     And what work did PharMaterials perform regarding

11   salt selection or salt formation?

12   A.     It's known as API, and we would screen based on the

13   pKa of the API.   A range of salts that could be formed

14   with suitable acids or bases.   And we would look at the

15   properties of the salts that were produced in terms of

16   solubility, stability.   And processability.

17   Q.     And while you were CEO of PharMaterials.   Did

18   PharMaterials win any awards?

19   A.     We won the Queen's Award for Enterprise for

20   International Trade.

21   Q.     When did you stop working for PharMaterials?

22   A.     I sold the company in 2012 to a U.S. called PII.

23   Q.     Turning to the next slide, DDX-1-4.   Can you describe

24   some of your significant associations professionally?

25   A.     The Royal Pharmaceutical Society of Great Britain,

Buckton - direct

1    the Royal Society of Chemistry, the American Association of

2    Pharmaceutical Scientists, and the Academy of Pharmaceutical

3    Sciences of Great Britain.

4    Q.    Are you currently serving in any other civic roles in

5    the pharmaceutical field?

6    A.    I sit on the Chemistry Pharmaceutical Standards

7    Subcommittee of the Commission on Human Medicines which in

8    the U.K. is the body which grants product license

9    applications.  And each month we review new license

10   applications and advise on whether we think they should be

11   taken to market or not.

12          I also sit on the Steering Committee of the

13   Handbook of Pharmaceutical Excipients.

14   Q.    And have you personally received any awards in the

15   field of pharmaceutical sciences?

16   A.    I won the Pfizer Award, British Pharmaceutical

17   Conference Science Award, the Academy of Pharmaceutical

18   Sciences Medal, and the British Pharmaceutical Conference

19   Chair.

20   Q.    Now, turn to DTX-571 in your binder.

21   A.    571?

22   Q.    DTX-571.  Yes.

23   A.    (Witness complies.)

24   Q.    What is DTX-571.

25   A.    That's my CV.

Buckton - direct

1   Q.      And is your CV accurate as of that date?

2   A.      I believe it is.

3   Q.      And what year is that CV?

4   A.      2018, I would say.

5   Q.      And are there any substantial changes between that

6   date and today?

7   A.      No.

8   Q.      Now, Dr. Buckton, have you previously testified in

9   federal court as an expert in pharmaceutical sciences

10  including pharmaceutical formulations, pharmaceutical

11  materials, solid state forms, salt selection, and dosage

12  forms?

13  A.      Yes, I have testified in the U.S. federal court I

14  think probably five times.

15  Q.      And have you been a registered pharmacist?

16  A.      Yes, from 1982 until a year or so ago.

17          MR. MIZERK:  Your Honor, defendants offer

18  Dr. Buckton as an expert witness in pharmaceutical sciences,

19  including pharmaceutical formulation, pharmaceutical

20  materials, solid state forms, salt selection and dosage

21  forms.

22          THE COURT:  Any objection?

23          MS. WIGMORE:  No objection.

24          THE COURT:  He is so recognized.

25          MR. MIZERK:  Okay.  Turn to the next slide.

Buckton - direct

1    BY MR. MIZERK:

2    Q.    Dr. Buckton, can you give us a very high level

3    overview of the topics we will be addressing today?

4    A.    Yes.

5              THE WITNESS:  Has the screen died?

6              THE COURT:  Technical glitch.

7              THE WITNESS:  Okay.  Let's do this.  (Looking at

8    the slides handed up.)

9              THE COURT:  I assume that was not what you were

10   testifying about, what is on the screen.

11   BY THE WITNESS:

12   A.    I'm going to usee the slides.  It says I'm going to

13   talk about an overview of the '208 patent.  And then I'm

14   going to talk about the '208 patent is enabled and also in

15   relation to whether the '208 patent has a written

16   description.

17   Q.    Now I'd like to turn your attention to the '208

18   patent which is JTX-1, claims 13 and 104.

19             MR. MIZERK:  We'll try to work without the

20   screen for a few minutes.

21             THE COURT:  That's fine.  I do have your slides

22   in front of me.

23   BY MR. MIZERK:

24   Q.    Are claims 13 and 104 of the '208 patent the claims

25   that you will be advising or be addressing in your testimony

Buckton - direct

1    today?

2    A.      They are.

3    Q.      Okay.  Have you reached an opinion about whether or

4    not claims 13 and 104 of the '208 patent are invalid for

5    lack of enablement?

6    A.      It's my opinion they are invalid for lack of

7    enablement.

8    Q.      Can you briefly summarize why you have reached that

9    conclusion?

10   A.      So on the next slide, the first most significant

11   point is that apixaban is not considered to be an ionizable

12   molecule, it is considered to be non-ionizable.  And I will

13   address that point.

14           Despite that, another expert in this case has

15   synthesized some salts outside of what I would regard as

16   normal conditions.

17           And I have other points to address those salts

18   which have been synthesized.  And my opinions are.

19           That there is no precedent for use of a salt of

20   a neutral compound in a pharmaceutical.

21           And I regard those salts as be uncontrolled and

22   variable because they have very short existence.

23           They're very unstable and will change, and that

24   will have a significance in relation to their function and

25   use.

1           And I regard them to be too unstable to be

2     formulated into a usable pharmaceutical product.

3           And if they did make it to into a pharmaceutical

4     product, because of the nature of the salts, the localized

5     pH would be dangerous to tissue because it would either be

6     an extremely high or extremely low pH.  I would expect it to

7     be irritant or toxic.

8           And based on that, I think it would be an

9     adverse benefit to this ratio of using those kind of salts.

10          And because there was therefore no

11    pharmaceutically acceptable salt, I believe the '208 patent

12    doesn't give a POSA a way to make a pharmaceutically

13    acceptable salt of apixaban.

14    Q.    Now, turning to your next slide, have you reached an

15    opinion about whether claims 13 and 104 of the '208 patent

16    are invalid for language of written description?

17    A.    Yes, it is my view they are invalid for lack of

18    written description primarily because apixaban is considered

19    to be a non-ionizable molecule which doesn't form salts and

20    therefore a POSA would consider the inventors did not

21    possess the salts of apixaban because they would have seen

22    that salts could not be formed.  And,

23          I think those inventors testimony about whether

24    or not they made salts of apixaban and whether they invented

25    salts of apixaban, the inventors have said they didn't make

1    salts of apixaban.  There were no examples of apixaban salts

2    in the patent.

3              And a POSA would conclude that the general

4    method of salt formation of the patent which requires the

5    material to be an acid or base would not apply to apixaban

6    which is not an acid or a base in that context.

7              And a POSA would conclude that pharmaceutically

8    acceptable salts of apixaban would not be possible, so I

9    don't believe they were made or indeed could be made, so

10   therefore I don't believe there is written description for

11   them.

12   Q.    Okay.  Now, just going into a few background issues.

13   Do you have an understanding of whom would be considered a

14   person of ordinary skill in the art with respect to the '208

15   patent?

16   A.    Yes.  The person of ordinary skill essentially is a

17   chemist, an organic medicinal chemist, whatever term you

18   wish to use, that would be involved in the synthesis of

19   small molecules.

20             And they would consult with professionals in

21   related issues in related to development, including

22   analytical formulation, and clinical.  Particularly in

23   relation to formulation, that is the point where

24   pharmaceutical salts are produced, and that is the point

25   where they're selected and used in pharmaceutical products.

Buckton - direct

1              My interest would in relation to formulation,

2     particularly pharmaceutical salts in this case.

3     Q.      Okay.  Now, you are referring to DDX-1-9, but in

4     reaching your opinions regarding enablement and written

5     description, is this the basic definition of a person of

6     skill in the art that you used in analyzing the issues in

7     this case?

8     A.      Yes, it is.

9     Q.      Now, I would like to turn to the next slide, which is

10    DDX-1-10, which has again claims 13 and 104 of the '208

11    patent.  And I would like to review the '208 patent as it

12    relates to pharmaceutically acceptable salt forms of

13    apixaban.

14              First, I'd like to talk about the claims at

15    issue.  Looking again at claims 13 and 104, how many

16    compounds are covered by the claims of the patent?

17    A.      The claim 13 has to cover at least two compounds.

18    The first compound by chemical name there is apixaban, and a

19    pharmaceutically acceptable salt thereof.  If a

20    pharmaceutically acceptable salt were possible, that would

21    be a compound in its own right and that would be the second

22    compound, and if more than one pharmaceutically acceptable

23    salts were possible, then there would be more than two

24    compounds.  And, clearly, claim 104 is through a crystalline

25    compound of claim 13.  The number would be the same.  It

Buckton - direct

 1    would be the restriction that it was crystallized.

 2    Q.      Are there any examples of any salts of apixaban in

 3    the '208 patent?

 4    A.      No, there aren't.

 5    Q.      Now, one last thing before we get into some of the

 6    other issues.  Did the Court construe any terms in claim 13

 7    that you're aware of?

 8    A.      Yes.  A pharmaceutically acceptable salt was

 9    construed by the Court.

10    Q.      Do you have that -- you've reproduced that definition

11    on DDX-1-11; is that correct?

12    A.      That's right, and that's the construction that I used

13    through giving my opinions.

14    Q.      Thank you.

15              MR. MIZERK:  Your Honor, we're having a little

16    technicality difficulty here.

17              THE COURT:  It's our problem?  Okay.  Sorry.  I

18    don't have the help to fix it, but can we work from the

19    copies?

20              MR. MIZERK:  We can work from the hard copy and

21    from the exhibits in the binder if that's okay.  We just

22    won't have the benefit of putting them up on the screen.

23              THE COURT:  I've got the binder and I've got the

24    slides.

25              MR. MIZERK:  We will do our best to try and get

Buckton - direct

1    through this.

2    BY MR. MIZERK:

3    Q.      All right.  Dr. Buckton, I'd like to talk a little

4    bit generally about salts.  What is a salt?

5    A.      A salt is a solid, usually crystalline material which

6    is precipitated when an acid base come together in solution

7    in an ionized form and produce the salt.

8    Q.      And can you please describe -- I think we've already

9    just done that.  You mention now, why would one make salts

10   of a pharmaceutical compound?

11   A.      You would make it for a variety of reasons.  One of

12   the main reasons is solubility.  Weak acids and weak bases

13   have a variable solubility through, for example, the pH of

14   the gastrointestinal tract.  We start off with a low

15   solubility and pick up with a higher solubility and

16   basically the other way around.

17            So we make salts.  We improve the solubility of

18   compounds in the gastrointestinal tract.  We also make salts

19   to improve stability so they can be milled or processed in

20   pharmaceutical ways.

21   Q.      Now, if we turn to your next slide, DDX-1-12, you

22   mentioned acidic.  What is the acidity or basicity of any

23   compound due to?

24   A.      Quite simply, it's due to functional groups on the

25   chemical structure of the API, which are acid or base.

1    They're ionizable, and that means that if they're a base,

2    they have the capability to add a proton, and if they're an

3    acid, they have capability to lose a proton.

4    Q.    And what are non-ionizable or neutral compounds?

5    A.    They're considered to be neither an acid or a base,

6    so they don't add or remove a proton.  So, for example, in

7    relation to solubility, they would have the same solubility

8    throughout the whole gastrointestinal tract whether it's an

9    acid or a base.  It would vary, the solubility throughout

10   the GI tract.

11   Q.    Okay.  Can you turn to DTX-576 in your binder?

12   A.    Yes.

13   Q.    And what is DTX-576?

14   A.    That's a chapter on -- from the Handbook of

15   Pharmaceutical Salts on physiochemical background.

16   Q.    Okay.  Now, turning to page 6 of DTX-576 --

17   A.    Yes.

18   Q.    -- now, is there a parameter that is used to describe

19   how readily a drug substance will ionize?

20   A.    Yes.  pKa is used as such a parameter, and on that

21   page there's a table classifying acids and bases according

22   to strength, and there you see for acids very strong acids

23   have a pKa of less than zero, extremely weak acids have a

24   pKA of greater than 14, and exactly the other way around for

25   bases.  Very strong bases have a pKa of greater than 14 and

Buckton - direct

```
 1    extremely weak bases have a pKa of less than zero.
 2    Q.     And what is exactly pKa?
 3    A.     pKa technically is a negative log of the association
 4    constant, but a pKa is a measure of an acid and base.
 5    Q.     Okay.  And now if we look at one of your slides, I
 6    think you prepared a slide that illustrates the relationship
 7    between pKa and the strength in acid or base?
 8    A.     Yes.  That's the table I just talked about in the
 9    document here.
10    Q.     Okay.  That's DDX-1-13; right?
11    A.     Yes.
12    Q.     And where would apixaban fit on this chart?
13    A.     If you turn over to the next slide, DDX-1-14, the
14    values which another expert, who will give testimony, Dr.
15    Jacobsen proposed for apixaban, its acid pKa is 13 to 15 and
16    its base pKa is about zero.  On that basis, apixaban would
17    be at one end of very weak, going into extremely weak for
18    both its acid groups, basic group.
19    Q.     And is it necessary to ionize a compound in order to
20    make a salt?
21    A.     Yes.
22    Q.     Now, I'd like to draw your attention to DTX-574.
23    A.     Okay.
24    Q.     What is DTX-574?
25    A.     That's a paper by Byrn and others.
```

Buckton - direct

1  Q.      Now, I'd like to draw your attention to the paragraph

2  at the bottom of the second column on page 14.

3  A.      Okay.

4  Q.      Could you read that paragraph for the record?

5  A.      If the pKa value of a very weak base is less than

6  three or that of a very weak acid is greater than ten, salt

7  formation will be very challenging since only a few

8  counterions are available, and the salts formed tend to have

9  poor physical stability in the solid state.  Such salts can

10  easily disproportionate in water and even in the solid state

11  under certain conditions.

12  Q.      Now, what does that mean about the formulation of

13  salts?

14  A.      That means that to have a salt which is physically

15  stable and doesn't break apart into its component parts, you

16  are working within a pKa range of three to ten, according to

17  this device.

18  Q.      And how does apixaban fall on this three to ten pKa

19  range?

20  A.      For the base pKa is zero, which on a large scale, it

21  is well removed from three, and the acid is 13 to 15,

22  analogue (analogue) scale well removed from ten.  So it's

23  outside of this range.  (Analog, not log.

24  Q.      If we look back at DTX-574 and the passage that you

25  just read, there's a sentence at the end that says, such

Buckton - direct

1   salts can easily disproportionate in water and even in the

2   solid state under certain criteria, under certain

3   conditions.

4   A.      Yes.

5   Q.      What does disproportionate mean?

6   A.      Essentially, it means that the salts would break up

7   into its component parts, so it would -- in this case, it

8   would be apixaban in the salt form, it would come apart.

9   Q.      And what does that mean with respect to the ability

10  to make a salt with apixaban?

11  A.      That means that if you did, because its pKa is out of

12  this region, that it would be liable to disproportionate.

13  It would be unstable, and in the presence of water or water

14  vapor, it would be likely to be very unstable.

15  Q.      Okay.  Now, are you aware of a salt that has ever

16  been used pharmaceutically that is derived from a drug with

17  a compound or drug compound with a pKa of about zero?

18  A.      I'm not aware of one, no.

19  Q.      And are you aware of a salt that has ever been used

20  pharmaceutically that is derived from a drug compound with a

21  pKa of about 13?

22  A.      I'm not aware of that either.

23  Q.      I'd like to turn your attention to DTX-575.  What is

24  DTX-575?

25  A.      This is a paper by scientists at Eli Lilly, a major

Buckton - direct

1    pharmaceutical company, on the physical stability of salts

2    and weak bases in the solid state.

3    Q.    Now, can you describe how this article bears on your

4    opinions in this case, if at all?

5    A.    Yes.  In this case they look at marketed product, and

6    although they surveyed I think 302 marketed compounds which

7    were basic, and they looked to see what pKa's existed in

8    marketed compounds to see if there was a lower cutoff beyond

9    which people were not taking full salts into marketed

10   pharmaceuticals.

11                  And if you look at Figure 1 on page 003 at

12   the end, that's a plot of the various actives which have

13   been used to make salts, and each individual salt on there

14   is a compound with a base, and what you can see is that

15   pretty much below five, there are no salts being made, but

16   the free form is what is the existing there at the bottom

17   line.

18                  So the lowest they found was at 4.6, and

19   they say that seems to be a boundary of a pKa of five below

20   which the material is too basic to produce a stable

21   pharmaceutical salt.

22   Q.    And if you look at the Figure 1 on DTX-575, page 3,

23   where on that chart would apixaban be plotted?

24   A.    It would be zero, so it would be on the far left-hand

25   side.

Buckton - direct

1    Q.      Now, we've been talking about base compounds or basic

2    compounds.  Does this article say anything about the salts

3    of weak acids?

4    A.      It essentially is about bases, this article, but it

5    says the inverse will be true for acids.  The same in

6    reverse would happen for acids.  That's the only comment on

7    that.

8    Q.      Now, would it matter or would it matter if the salt

9    were made in an inorganic solvent instead of an aqueous

10   solvent with respect to its properties as a potential drug

11   compound?

12   A.      I don't think it matters whether the salt is made

13   with an organic solvent or aqueous based solvent when you've

14   isolated the properties properly, whatever those properties

15   are.

16   Q.      Having reviewed some of the background on salts, I

17   would like to move on to a specific discussion about

18   apixaban.  I'd like to draw your attention to DTX-630.

19   A.      630?

20   Q.      What is DTX-630?

21   A.      That's part of the crystal mass NDA for apixaban

22   submitted to the FDA.

23   Q.      So if we turn to page 2 of the exhibit, there's a

24   statement in the middle of the page on pKa.

25           Do you see that?

Buckton - direct

1    A.     Yes.

2    Q.     Now, first, what is BMS-562247-01?

3    A.     That is the code for apixaban.  That's clear from the

4    header at the top of the page.

5    Q.     And what is the statement regarding apixaban?

6    A.     It says apixaban is a non-ionizable compound.

7    Q.     And what does that mean?

8    A.     It means that it isn't acting as an acid or a base,

9    as we talked about earlier.  And in the top of this table,

10   it says the solubility of apixaban was not affected by

11   changes in pH.

12   Q.     Now, let's turn to DTX-631.  What is DTX-631?

13   A.     That's another part of the BMS ANDA for apixaban.

14   Q.     So --

15   A.     NDA, sorry, for apixaban.

16   Q.     And if we turn to page 5, there's another section

17   regarding the attributes of apixaban and there's a section

18   on solubility.

19          Do you have that?

20   A.     Yes.

21   Q.     What did BMS tell FDA about the solubility of

22   apixaban?

23   A.     It says, since the compound is non-ionizable, its

24   solubility is (0.04 mg/ml) is not pH-dependent.

25   Q.     Okay.  Let's turn to DTX-579.  What is DTX-579?

Buckton - direct

1    A.      That's a paper in a journal.  It's about improving

2    the solubility and bioavailability of apixaban by cocrystal

3    formation.

4    Q.      On the first page in the second column, there's a

5    sentence -- the second column, there's a sentence that

6    begins, "There are no."

7            Do you see that, kind of midway down?

8    A.      Yes.  It's about five lines up in the right-hand

9    column, the right-hand side of the penultimate paragraph,

10   yes.

11   Q.      And, first of all, there's a reference to apx in that

12   sentence.

13           Do you see that?

14   A.      I do.  That's an abbreviation for apixaban.

15   Q.      Okay.  And with the understanding, what does this

16   article say about whether there are any ionizable moieties

17   in apixaban?

18   A.      It says there are no ionizable moieties in the

19   molecular structure of apixaban, thus increasing the

20   solubility of apixaban via salt formation could be

21   impossible.  So it's saying that because apixaban is a

22   neutral compound and doesn't form salts, that's it for

23   solubility.  You can't change the solubility by making a

24   salt.

25   Q.      Okay.  Let's turn to DTX-580.  What is DTX-580?

Buckton - direct

```
 1   A.      That is another paper.  It's an Expert Opinion on

 2   Apixaban, an oral direct Factor Xa inhibitor:  awaiting the

 3   verdict.

 4   Q.      Now, on page 4 of the exhibit, DTX-580, first, in the

 5   left-hand column toward the bottom of the, the bottom

 6   quarter of the page, there is another sentence that begins

 7   "Apixaban has no ..."  Do you see that?

 8   A.      I do.  It's in the penultimate paragraph, one, two,

 9   three, four, about six lines up:  "Apixaban has no ionizable

10   groups and therefore does not exhibit pH dependent aqueous

11   solubility."

12   Q.      And, again, what does that mean having no ionizable

13   groups?

14   A.      It means it is not acting as an acid or a base.

15   Q.      Turn to DTX-581.

16   A.      (Witness complies.)

17   Q.      What is DTX-581?

18   A.      It's another paper called:  Novel Oral Anticoagulants

19   in Atrial Fibrillation:  Update on apixaban.

20   Q.      Now, if we turn to page 4, there is a section in the

21   middle of the first column called drug-drug interactions.

22   Do you see that?

23   A.      I do.

24   Q.      And there is a sentence that begins gastric acid

25   modifying agents.  Do you see that?
```

Buckton - direct

1    A.      Just at the end of it.  Yes.

2    Q.      So what does this article say about apixaban?

3    A.      It says apixaban, because of its lack of an ionizable

4    group and pH independent solubility.  So it is talking about

5    property of apixaban which says it is not an acid or a base.

6    It is a neutral compound and it therefore has pH independent

7    solubility.

8    Q.      If you turn DTX-582.

9    A.      Yes.  That's a paper --

10   Q.      What is DTX-582?

11   A.      A paper on relative bioavailability of apixaban

12   solution for crushed tablet formulations.

13   Q.      Okay.  Where are all the authors of DTX-582 employed?

14   A.      They're from Bristol-Myers Squibb.

15   Q.      Now, if we turn to the bottom of page 1, there is a

16   sentence at the bottom of the page that begins "apixaban is

17   a biopharmaceutic."  Do you see that?

18   A.      I do.

19   Q.      And what does the author of this article say about

20   apixaban in DTX-582?

21   A.      Going to the next page, it says, at the top line of

22   the next page, that it's non-ionizable.  Changes in pH do

23   not affect, do not affect aqueous solubility of apixaban, so

24   they're saying the same.  It's a neutral compound, it is not

25   an acid or base, it is non-ionizable, and therefore

Buckton - direct

1    solubility is flat through the gastrointestinal tract.

2    Q.      Now, if we turn to DTX-583.  What is DTX-583?

3    A.      It's a paper on the effect of famotidine on the

4    pharmacodynamics of of apixaban.

5    Q.      Where do authors Ms. Wang and Ms. Pursley work?

6    A.      They're from Bristol Myers Squibb.

7    Q.      Now, turn to Page 6 of the Exhibit 583.  There is a

8    sentence that says -- toward the bottom of the left-hand

9    column, there is a sentence that begins:  "The lack of

10   pharmacokinetic drug."  Do you see that?

11   A.      Yes.

12   Q.      What does this article say about apixaban?

13   A.      So the last three lines on that column say:  Apixaban

14   is a compound that lacks ionizable groups in its molecular

15   structure and its aqueous solubility is not acted on by

16   changes in pH.

17   Q.      Now, we have gone through a few documents that

18   indicate that apixaban was non-ionizable.  Did BMS

19   understand that because apixaban was non-ionizable, could

20   not be made into a salt form?

21   A.      Yes, they did.  All these documents talk about

22   solubility.  That they need to make it into a salt form.  It

23   wouldn't happen with a non-ionizable compound.  But, yes,

24   BMS had internal documents that say they understood that.

25   Q.      Okay.  Let's review some of those internal documents.

Buckton - direct

1    Can you turn to DTX-634?  What is DTX-634?

2    A.    This is an internal Bristol Myers Squibb memo dated

3    the 17th of March, 2003.

4    Q.    Now, if we look kind of at the second column,

5    drawing your attention -- or the second paragraph.  What

6    does DTX-634 say about whether a salt form of apixaban was

7    possible?

8    A.    Third line down, it talks about the aqueous

9    solubility of being 0.04 milligrams per mL.  And it says due

10   to the lack of an ionizable group, salt formation was not an

11   option.  So, in other words, they aren't able to make the

12   salt in order to enhance that solubility.

13   Q.    Now, I'd like to draw your attention to DTX-636.

14   What is DTX-636?

15   A.    That's an internal presentation at Bristol-Myers

16   Squibb.

17   Q.    If you turn to page 2 of the exhibit.

18   A.    Yes.

19   Q.    What does this document say about salts of apixaban?

20   A.    The second bullet point.  It says that apixaban is

21   insoluble in water.  Solubility actually of 27 micrograms

22   per mL.  And apixaban is a neutral compound, so the salt

23   form is not an option.  It is a neutral compound.  They

24   can't make a salt out of it, and therefore you have to use

25   solubility that you have.

Buckton - direct

1    Q.      Okay.  I'd like to turn your attention now to

2    DTX-632.

3    A.      Okay.

4    Q.      What is DTX-632 when you have it in front of you?

5    A.      Yes.  That's development plan for apixaban from

6    Bristol-Myers Squibb.

7    Q.      So if we turn to page 36 of the document which I

8    think is 36.  There is a discussion of the Final Form No. 5.

9    Do you see that?

10   A.      36, Final Form No. 5.  Yes, I do.

11   Q.      And what does this document say about apixaban in

12   salts?

13   A.      It says that it's non-ionizable in salt formation and

14   cannot be used to enhance solubility.

15   Q.      So what is the importance of this document?

16   A.      It's the same as the other document inasmuch as the

17   Bristol-Myers Squibb understands that it is not an acid or a

18   base, it is a non-ionizable compound, and therefore you

19   can't make a pharmaceutically acceptable salt because it is

20   a non-ionizable compound.

21   Q.      Turning to DTX-633.  What is DTX-633?

22   A.      I think it's another internal Bristol Myers Squibb

23   document.

24   Q.      If you turn to page 4 in the first full paragraph.

25   There is a discussion of language of a charged group.  Do

Buckton - direct

1    you see that?

2    A.      Yes.

3    Q.      And what does this document say about salts in

4    apixaban?

5    A.      Third line down, it says:  The lack of a charged

6    group means apixaban does not exist as a salt form that can

7    have different solubility depending on pH.

8            So, once again, it is saying because it isn't an

9    acid, it's not a base, it is not a neutral compound, and

10   therefore you can't make a salt you could use in a

11   pharmaceutical.

12   Q.      Turning to DTX-635.  Can you tell us what is DTX-635?

13   A.      This is another Bristol-Myers Squibb internal memo

14   dated June 9th, 2002.

15   Q.      And if we turn and look at the bottom of the page,

16   there is a sentence that begins:  Since BMS562247.  Do you

17   see that?

18   A.      Yes.

19   Q.      Again, what is BMS562247?

20   A.      When we look to that, that is apixaban.

21   Q.      What does this document say about apixaban?

22   A.      It says it's neutral, and there is no salt form.

23   Q.      Now, did you make any attempts to synthesize any

24   salts with apixaban in connection with rendering your

25   opinions in this case?

Buckton - direct

1   A.      No, I didn't.

2   Q.      And why not?

3   A.      Because I, like the Bristol-Myers Squibb people,

4   regard it as a neutral compound which isn't amenable to salt

5   formation and wouldn't make an acceptable salt.

6   Q.      Now, if we turn to DDX-1-21, one of your slides, we

7   can use them as a way to solve our technical problems.

8   A.      Yes.

9   Q.      I think there is, we reprinted, and this is also in

10  JTX-1, the patent at column 117, lines 1 to 13.  What is

11  this section of the '208 patent that is reproduced here in

12  your slide, DDX-1-21?

13  A.      This is a general method in the patent for making

14  salts.  What it says in a general method is that it has a

15  compound that contains a basic or acidic moiety.  So it's

16  talking specifically about those compounds of the invention

17  which are chargeable acids or bases.  And it says that it

18  would react to the free acid or freebase forms of these

19  compounds with a stoichiometric amount of an appropriate

20  base or amount in suitable solvents.  So it's a general

21  method describing how you would make salts of those

22  compounds of the invention which are readily ionizable and

23  could make a pharmaceutically acceptable salt.

24  Q.      Does this passage tell a person of skill in the art

25  in 2001 how to make a pharmaceutically acceptable salt of

Buckton - direct

1    apixaban?

2    A.    No, it doesn't.

3    Q.    Why not?

4    A.    Because apixaban is not one of these compounds.   It

5    doesn't have a free acid or free base form, and it isn't the

6    basic or acidic moiety as we have seen from the comments of

7    all Bristol-Myers Squibb scientists, and that is how it

8    would be viewed.

9    Q.    Now, can you point to anything in the '208 patent

10   that would give a person of ordinary skill in the art in

11   2001 any guidance regarding how to make a pharmaceutically

12   acceptable salt in apixaban?

13   A.    No.   This is the only information material in the

14   '208 patent, and it is in general things that relates to

15   ionizable compounds of which a POSA would regard apixaban

16   does not do that.

17   Q.    Are there any working examples of a pharmaceutically

18   acceptable salt of apixaban in the '208 patent?

19   A.    No.

20   Q.    Now, to change the subject a little bit, do you

21   understand that plaintiffs' expert, Dr. Jacobsen attempted

22   to make salts of apixaban?

23   A.    Yes.

24   Q.    So why does everyone else that we -- everyone else

25   that we reviewed here think that apixaban was not ionizable

1    and does not form a salt, yet Dr. Jacobsen says apixaban is

2    ionizable and capable of being made into a salt?

3                    MS. WIGMORE:  Objection, Your Honor.

4                    MR. MIZERK:  I'll withdraw it.  What?

5                    THE COURT:  If you want to withdraw the

6    question?

7                    MR. MIZERK:  I'll withdraw the question.  I'll

8    rephrase it.

9                    THE COURT:  Okay.

10   BY MR. MIZERK:

11   Q.      Can you reconcile Dr. Jacobsen's statements about

12   apixaban with all of the statements we just reviewed?

13   A.      Yes.  So apixaban, as everyone has said in the

14   documents we've looked at so far, is a non-ionizable neutral

15   compound.  If you take that in context, that in relation to

16   a pharmaceutically acceptable salt which is in a defined pKa

17   and pH range, that would be a viable salt.

18                    Dr. Jacobsen has looked at salts which would be

19   stable outside of that range, so they're not within the

20   range that would be pharmaceutically acceptable.  So it's

21   kind of apples and oranges, really.  A different area.

22   Q.      Now, did you prepare a slide to help explain your

23   comments about Dr. Jacobsen's efforts?

24   A.      Yes.  That is DDX-1-22.

25   Q.      Okay.  In looking at DDX-1-22, can you explain again

Buckton - direct

1   how Dr. Jacobsen's work compares to the testimony and

2   articles that we just reviewed?

3   A.       It's quite complicated figure.  But the axis along

4   the bottom is pH, and there is a very wide long axis of pH,

5   and then the Y axis is fraction.  So that's the amount of

6   the drug which is ionized in a particular pH.  So the blue

7   line is the completely ionized apixaban, the red line is the

8   neutral apixaban.

9              On this figure, there are two big As, which are

10  the ones that Dr. Jacobsen suggested a pKa of 0, at which

11  point the apixaban would be 50 percent ionized/50 percent

12  unionized.  On the far right-hand side, 13 rather than 15.

13  At that point, half is ionized, half of it is unionized.

14             The key part of this is the salts that

15  Dr. Jacobsen is forming would be stable at pHs which are

16  extremely high and which are extremely low, in the minus 2

17  of 1M and kind of 14 at the other end.

18             In the area of the table everyone is talking

19  about in those documents we just looked at is the area where

20  a pharmaceutically acceptable salt would be formed, which is

21  pretty much in the kind of pKa 3 to 10, which we talked

22  about from the Burn article.  And in that region pH 3 to 10,

23  there would be ionization of those kind of salts.  There is

24  no ionization of apixaban at all in that region.  That is

25  why it is called by neutral by everyone else, because it is

Buckton - direct

1    not ionized in that region.

2    Q.    All right.  Now, what salts would Dr. Jacobsen

3    attempt to make?

4    A.    On the right-hand side of this in the salts which

5    would be stable or high pH.  At the far left hand of this

6    are salts which would be stable if they were at a low pH.

7    He looked to make a hydrochloride salt.

8    Q.    Now, can you describe the stability of the salt that

9    Dr. Jacobsen claims to have made?

10   A.    From my discussions with Dr. Scheidt, who will give

11   evidence in this case later on, he studied that and came up

12   with the view that they lasted about two days in the

13   environment which was intended to keep them stable.

14   Q.    And can you describe the purity of the salt that Dr.

15   Jacobsen claims to have made?

16   A.    It came from discussions with Dr. Scheidt.  He

17   analyzed the results and said that there was retained

18   solvent with a degradation product and there were impurities

19   in the salts that Dr. Jacobsen formed.

20   Q.    And in your view, would a person of skill in the art

21   be able to purify Dr. Jacobsen's salt?

22   A.    No.  They would be very unstable and wouldn't be able

23   to withstand purification, and that came up in the

24   discussions with Dr. Scheidt as well.

25   Q.    Did Dr. Jacobsen demonstrate that whatever he

Buckton - direct

1    made could be administered to a human or an animal without

2    harm?

3    A.      No.

4              MS. WIGMORE:  Objection, Your Honor.  That's

5    outside the scope of his report.

6              THE COURT:  Can you point to where it's in his

7    disclosures?

8              MR. MIZERK:  It's in his report 47 through 50.

9              THE COURT:  47 through 50?

10             MR. MIZERK:  His expert report, 47 through 50.

11             MS. WIGMORE:  I don't see it there.

12             THE COURT:  Can you resolve the objection?

13   We'll have to pass up a copy of the report?

14             MS. WIGMORE:  The reply report?

15             THE COURT:  What was the question again, please?

16             MR. MIZERK:  I think the question was:  Did Dr.

17   Jacobsen demonstrate that whatever he made could be

18   administered to a human or an animal without harm.

19             THE COURT:  I'm sorry.  I will I will need you

20   to ask it again.

21             MR. MIZERK:  Did Dr. Jacobsen demonstrate that

22   whatever salt he made could be administered to a human or

23   animal without harm?

24             THE COURT:  Okay.  And you're saying we can find

25   his opinion at tab 5 of this binder, I believe, 47 through

Buckton - direct

1   50.

2                    MR. MIZERK:  Yes.

3                    THE COURT:  Ms. Wigmore, you don't see it there?

4                    MS. WIGMORE:  I do not.  I have a standing

5   reference though to Dr. Jacobsen.

6                    MR. MIZERK:  He's talking about 47.  He's

7   talking about the resulting product that's referenced in Dr.

8   Jacobsen's report.

9                    THE COURT:  I want to make sure I have the right

10  tab.  Is his technology background the right section?  The

11  reply report?

12                   MS. WIGMORE:  The reply report.

13                   THE COURT:  Tab 6?

14                   MR. MIZERK:  Tab 6.

15                   THE COURT:  My mistake.  47 seems to be an

16  analysis of whether it would be useful with humans.  Is that

17  not correct, Ms. Wigmore?

18                   MS. WIGMORE:  I think the statement, the

19  question as stated is not indicated in the report, so there

20  is a reference to the salts, but as was phrased in the

21  question, that is not in the report.

22                   THE COURT:  All right.  Well, let's see what

23  the answer is and then if you think the answer is not

24  within the scope of the report, you can move to strike it.

25  Try again.

Buckton - direct

1    BY MR. MIZERK:

2    Q.     All right.  So did Dr. Jacobsen demonstrate that

3    whatever he made could be administered to humans without

4    harm?

5    A.     No.

6    Q.     And why not?

7    A.     Why not?  Why did he not do that?

8    Q.     Well, so was there any -- let me rephrase the

9    question.

10                 How would you -- did Dr. Jacobsen explain

11   how you would take a salt, any of the salts that he made and

12   prepared them so that they could be administered to humans

13   or animals?

14   A.     No.  I mean, just to kind of be clear, Dr. Jacobsen

15   made salts in the bottom of a flask which were dried under

16   vacuum and that's the end of the investigation.  There was

17   nothing beyond that.

18   Q.     Now, BMS's other experts say that you could formulate

19   the salt that Dr. Jacobsen says he made with other

20   excipients to make it safe to administer.

21                 Do you agree?

22   A.     I don't believe the salt would survive efforts to

23   formulate it to make it safe to administer, and even if it

24   did survive the formulation, I don't believe it would be

25   safe to administer, because it would dissolve with an

Buckton - direct

```
1    extreme pH.
2    Q.      Now, Dr. Myerson states that if a salt was caustic,
3    you could just put a coating on it so it wouldn't burn a
4    person's mouth when administering.
5            Do you agree?
6    A.      No.  I don't think a salt like this would survive the
7    process of coating in terms of the same issue with
8    formulation, you again have to formulate it and coat it.  I
9    think it's too unstable to survive that, and even if it did
10   survive that, ultimately, if you give it to a patient, the
11   coating will dissolve off, and at the dissolving surface of
12   the compound, there will be an extreme pH, very high or very
13   low, depending on which salt we're talking about, and that
14   extreme pH at the dissolving surface I regard as likely.
15   Q.      Why do you say that the pH would be extreme when it
16   would dissolve?
17   A.      Because of the pKa of the drug substance.  When you
18   get to very weak acids or bases in the formed salts with
19   very strong acids or bases, the resulting salt will end up
20   with a pH at the surface which would be extreme, very high
21   pH or very low pH.
22   Q.      Now, plaintiffs' experts say that because sodium is
23   safe to administer and un-ionized apixaban is safe to
24   administer, then a sodium salt of apixaban would be safe to
25   administer.
```

Buckton - direct

1          Do you agree?

2    A.      I agree that both of those individually are safe to

3    administer, sodium is safe to administer, apixaban is safe

4    to administer, but the salt is not safe to administer

5    because of this very high local pH that you would get when

6    the salt would be dissolving, which would be likely to be

7    damaging to the human tissue.

8    Q.      Now, did you provide any examples of substances which

9    are pharmaceutically unacceptable salts?

10   A.      In my report, I thought about sodium ethoxide, which

11   is a salt with sodium and ethanol, and both ethanol and

12   sodium are not damaging to human skin or human tissue, but I

13   think if you make the salts out of them, you end up with a

14   very strong base, because ethanol has a pKa which is broadly

15   similar to the pKa of apixaban -- over 15.  Apixaban is 13

16   to 15.  It's not the same, but they're both in that kind of

17   area.

18   Q.      If you turn --

19   A.      It is damaging the tissue.  Very strong base which is

20   caustic.  Individual parts are fine.  The salt is not.

21   Q.      So if you turn to DTX-620, do you have that in front

22   of you?

23   A.      620?

24   Q.      There might be a -- that tab was placed in there.

25   A.      I don't have DTX-620.

Buckton - direct

1    Q.       Right before 30.

2             THE COURT:  It's hiding in there.

3             THE WITNESS:  Hiding.  I've got it.  Yes.

4    You're right, it was hidden well.

5    BY MR. MIZERK:

6    Q.     What is DTX-620?

7    A.     That's a material safety data sheet for sodium

8    ethoxide.

9    Q.     And if you look on the first page, there's a section

10   titled, Potential Acute Health Effects?

11   A.     Yes.

12   Q.     What does that section state?

13   A.     Potential acute health effect rather than chronic.

14   That's one application.  And it says, Hazardous in case of

15   skin contact (corrosive irritant), and also it says the same

16   dry contact and by inhalation and the amount of tissue

17   damage depends on the length of contact, and then it

18   continues.  It describes it as a hazardous compound.

19   Q.     Now, please turn to DTX-567 in your binder.

20           And if you turn to -- what is DTX-567?

21   A.     567, that is another chapter in the handbook of

22   pharmaceutical salts.

23   Q.     And if I can direct your attention to page 18 of the

24   exhibit, which I think is 98 at the top.

25   A.     Okay.  98 at the top, yes.

Buckton - direct

1   Q.      And there's a section titled Corrosiveness.

2           Do you see that?

3   A.      Yes.

4   Q.      And what does this section discuss?

5   A.      This talks about basic compounds being formed into

6   salts with acid, and on that section you just pointed me to,

7   it says that, about four lines down, that the lower the pKa

8   value for the base, the more acidic will be the aqueous

9   solution of such a salt.  So this is particularly talking

10  about bases that are formed and that are corrosive to

11  pharmaceutical manufacturing equipment, so they will corrode

12  or dent public presses or mixing.  The lower pKa, the more

13  acidic will be the aqueous solution on the surface of the

14  salt.

15          On Table 5 on the next page, it talks about

16  corrosive nature of two particular salts, one with pKa of

17  6.2, which is slightly corrosive, and one with a pKa of

18  2.92, which is highly corrosive.

19  Q.      And what does it say, what does the article say about

20  what happens to those salts when they, or those compounds

21  when they come into contact with stainless steel?

22  A.      It says they will corrode it, so they will damage it,

23  pit it, change its color.

24  Q.      And is that because they're in solution or they're

25  just --

Buckton - direct

1   A.      No.   They -- the corrosive salts will take up water

2   from the atmosphere and it will be mediated through the

3   water from the atmosphere that it gives rise to the

4   corrosive nature.   So they recommend storing something at

5   75 percent relative humidity and leaving it to see if it

6   causes damage to stainless steel equipment.

7   Q.      Now, in your view, Dr. Buckton, would a person of

8   skill in the art in about 2001 after reviewing the '208

9   patent have been able to make a salt with apixaban that

10  would be within the scope of sound medical judgment

11  suitable for use in contact with human beings and animals

12  without excessive toxicity, irritation, allergic response

13  for the problem of complications mentioned with a reasonable

14  benefit/risk ratio?

15  A.      No, they wouldn't, because of the reasons I've talked

16  about.   Apixaban is not ionizable in the reasonable range,

17  and anyone would understand outside of that range, you're

18  going to end up with salts which are not going to be

19  pharmaceutically acceptable.

20  Q.      If we the turn our -- now I'd like to turn our

21  attention to the written description questions.   We

22  talked about sections of the -- is there anything in

23  the '208 patent that would convey to a person of ordinary

24  skill in the art that the inventors possessed a salt of

25  apixaban?

Buckton - direct

1    A.      No, there isn't.

2    Q.      Are there any examples in the patent of a salt of

3    apixaban?

4    A.      No.

5    Q.      Now, we've talked about sections of the '208 patent

6    that reference salts generally.

7                        Do any of those sections indicate

8    possession by the inventors of a salt of apixaban

9    specifically?

10   A.      No.  The general sections just relate to those

11   materials which are capable of forming salts, not for

12   apixaban, which wouldn't be capable of doing so.

13   Q.      Now, I'd like to -- I think we've made a couple --

14   did you look at any inventor, the testimony from the

15   inventors in forming your opinions in this case?

16   A.      Yes.

17   Q.      All right.  Now, I think you prepared a few slides of

18   some of the inventor's testimony; is that correct?

19   A.      Yes.

20   Q.      If we turn to DDX-1-24, do you see that?

21   A.      Yes.

22   Q.      What did Mr. Pinto say about whether he made any

23   salts with apixaban?

24   A.      The question is:  "Did your lab ever attempt to make

25   salts with apixaban?"

Buckton - direct

1                    The answer was:  "No."

2                    The question:  "Do you know if any salts of

3       apixaban have ever been made?"

4                    And the answer is:  "No."

5                    And then clarification:  "Just so the

6       record is clear, you don't know whether apixaban salts were

7       ever made.  Is that right."

8                    And he answered:  "I don't know."

9       Q.     And what did Mr. Pinto say about whether he invented

10      any pharmaceutically acceptable salts of apixaban?

11      A.     I think that's on the next slide.

12      Q.     DDX-1-25?

13      A.     Yes.  I think the question was:

14                   "I want to direct you to claim 13.  Are you

15      responsible for inventing claim 13 in column 269.  Are you

16      responsible for inventing claim 13?

17                   "Yes.

18                   And then:  Is the chemical name in claim 13

19      apixaban?"

20                   And the answer is:  "Yes."

21                   And then the question is:  "Now, you see it

22      says, 'or a pharmaceutically acceptable salt form thereof'?"

23                   The answer is:  "Yes."

24                   "Did you invent any pharmaceutically

25      acceptable salt forms of apixaban?"

Buckton - direct

 1              The answer is:  "No."

 2   Q.    And then Mr. Orwat.  Did Mr. Orwat -- what did

 3   Mr. Orwat say about apixaban salts?

 4   A.    It says:  "Question:  Now, this doesn't say that you

 5   identify a salt form of apixaban like you had for DPC423;

 6   right?

 7              The answer is:  "Correct."

 8              "Question:  Did you ever synthesize a salt form

 9   of apixaban?"

10              The answer is:  "No.  Don Pinto and I discussed

11   it, but I never did."

12   Q.    Okay.  And how does this testimony from the inventors

13   and the other testimony that you reviewed in the course

14   of rendering your opinions affect your opinions about

15   whether the patent itself conveys to a person of ordinary

16   skill in the art that the inventors possessed salts of

17   apixaban?

18   A.    So as I've said, I think the patent doesn't describe

19   salts of apixaban because it's a non-ionizable compound and

20   it was not described there, and the inventors have said they

21   didn't make salts of apixaban and didn't invent, didn't

22   invent salts of apixaban.  So that's in keeping with the

23   notion that you would read from the patent that you wouldn't

24   believe it was a pharmaceutical salt because it's a

25   non-ionizable compound in that sense.

48

Buckton - direct

1   Q.      Now, would a person of ordinary skill in the art in

2   2001 after reviewing the '208 patent have been able to

3   conclude that the inventors were in possession of a salt of

4   apixaban that would be within the scope of sound medical

5   judgment suitable for use in contact with the tissues of

6   human beings and animals without excessive toxicity,

7   irritation, allergic response, or other problems with

8   complication commensurate with a reasonable benefit/risk

9   ratio?

10  A.      I think for the reasons I just stated, you would not

11  conclude that.  You would conclude that the salt didn't

12  exist and you would conclude that you couldn't make a

13  pharmaceutically acceptable salt of apixaban.

14              MR. MIZERK:  Your Honor, we have nothing

15  further.

16              THE COURT:  Okay.  Cross-examination.

17              MS. WIGMORE:  I believe my binders have been

18  handed up already.

19              THE COURT:  I am not sure of that.  I don't

20  think I have it.  So if you could pass two up?

21              MR. YURKERWICH:  Your Honor, the binder was

22  passed to you.

23              THE COURT:  Oh, was it the one you handed during

24  the exam?  My mistake.  I didn't realize what it was.  We

25  could use one more, though.

Buckton - cross

```
 1                    MR. YURKERWICH:  Sure.

 2                    MS. WIGMORE:  Have we confirmed the equipment is

 3      still not working?

 4                    THE COURT:  Sorry.  We'll have it ready for next

 5      week.

 6                    You may proceed when are you ready.

 7                           CROSS-EXAMINATION

 8      BY MS. WIGMORE:

 9      Q.    Good afternoon, Dr. Buckton.  I'm Amy Wigmore.  We

10      haven't met before.

11      A.    Good afternoon.

12      Q.    Could you please turn in the book of demonstratives

13      that defendants counsel gave you?

14      A.    Yes.

15      Q.    To slide DDX-1-11.

16      A.    1-11.  Yes.

17      Q.    And this is the claim construction of

18      "pharmaceutically acceptable salts."  Do you have that?

19      A.    That's it.

20      Q.    Do you see the reference in that construction to the

21      phrase "within the scope of sound medical judgment?"

22      A.    Yes, I do.

23      Q.    You are not a medical doctor; correct?

24      A.    That's correct.

25      Q.    And you understand that Dr. Jacobsen is not a medical
```

Buckton - cross

1   doctor; correct?

2   A.      That's correct.

3   Q.      Now, you were asked whether Dr. Jacobsen had shown

4   that these salts were suitable for use but you understand

5   that Dr. Kowey is a medical doctor who is giving an opinion

6   in this case; correct?

7   A.      Not on that, but I think he has given an opinion.

8   Q.      Is it your understanding Dr. Kowey has not addressed

9   the issue of "suitable for use" under this construction?

10  A.      I don't think he has done an independent assessment

11  beyond what Dr. Jacobsen produced, as far as I remember.

12  Q.      So you have no response to Dr. Kowey's opinions on

13  the question of "suitable for use?"

14  A.      I don't think that's being considered.  I don't think

15  he has considered the issues around the salt.  I don't think

16  he has considered the local pH, the instability, the issues

17  that I have.  I think it is more an acceptance that the salt

18  was formed and a view that the individual components on

19  their own right might be suitable to use but not anything

20  about the salt.

21  Q.      But we can agree that you do not have medical

22  judgment to apply here; correct?

23  A.      I have pharmaceutical judgment to apply here.  I'm

24  not a medic.  In my life, I have been a pharmacist, I have

25  regulatory and medical experience but not a medic for sure.

Buckton - cross

```
1   Q.      Now, one of the reasons to make a salt is to alter

2   the solubility of the active pharmaceutical ingredient;

3   correct?

4   A.      That's correct.

5   Q.      Now, you read from a number of BMS documents and

6   publications statements about how a salt would not improve

7   the solubility of apixaban.  Do you recall that?

8   A.      I do.

9   Q.      Now, that doesn't mean you cannot make a salt of

10  apixaban; correct?

11  A.      Well, all of those documents say you can't make a

12  salt of apixaban.  They were that you could make, as

13  Dr. Jacobsen has done, a salt of apixaban.  It just isn't

14  going to be pharmaceutically acceptable.  You couldn't use

15  it.

16  Q.      There were documents you read that referred to the

17  salt not improving the solubility of apixaban; correct?

18  A.      I don't agree.  I think the documents say you

19  couldn't make the salt and therefore you cannot use a salt

20  to improve the solubility of apixaban.

21  Q.      Now, in the case of apixaban, there was no need to

22  make a salt because it would not improve solubility;

23  correct?

24  A.      I don't agree with that either.  Quite possibly, if

25  this was an ionizable compound, as with most ionizable
```

Buckton - cross

1    compounds, it would improve solubility, but this isn't an

2    ionizable compound so you can't say hypothetically whether a

3    salt would have improved solubility.

4    Q.    You summarized some testimony from the '208 patent

5    inventors on direct.  Do you recall that?

6    A.    I do.

7    Q.    Now, you discussed the testimony of Michael Orwat,

8    one of the inventors of apixaban, correct?

9    A.    That's correct.

10   Q.    And you agree that Mr. Orwat also testified that he

11   discussed with Dr. Pinto, another inventor possible ways to

12   make a salt form of apixaban; correct?

13   A.    That's correct.

14   Q.    And they discussed forming a salt of apixaban by

15   using a strong base; correct?

16   A.    I believe that is right, yes.

17   Q.    And Mr. Orwat also testified that the inventors did

18   not need to pursue a salt of apixaban because apixaban

19   performed very well as is without making a salt; correct?

20   A.    That's correct.

21   Q.    Now, you agree that apixaban can be ionized; correct?

22   A.    It can.  That is at extreme of pHs, it can be

23   ionized.  Yes.

24   Q.    And you agree apixaban has been ionized in

25   Dr. Jacobsen's lab; correct?

Buckton - cross

1   A.      Somehow in the solvent, it must be ionized.  I agree.

2   Q.      And he ionized the apixaban more than once, correct?

3   A.      He made two salts for sure, yes.

4   Q.      Now, you personally have never attempted to ionize

5   apixaban; correct?

6   A.      I haven't done any experiments, that's correct.

7   Q.      It was never your opinion that it's impossible to

8   make a salt form of apixaban; correct?

9   A.      Correct.  It's not impossible to make the salt form.

10  It is impossible to make a pharmaceutical acceptable form.

11  Q.      And you agree that Dr. Jacobsen did make a sodium

12  salt of apixaban; correct?

13  A.      It may be disputed.  With my discussion of Dr.

14  Scheidt, I think he agrees that that is the case, but he

15  will give testimony I'm sure.

16  Q.      And you personally haven't given a contrary opinion;

17  correct?

18  A.      Absolutely not.  I have no reason to dispute it here,

19  I think I said, yes.

20  Q.      And you have no reason to dispute that Dr. Jacobsen

21  made a potassium salt of apixaban, direct?

22  A.      That's my understanding from Dr. Scheidt.  I haven't

23  independently assessed that, but I have got no reason to

24  doubt it.

25  Q.      And you have not given a contrary opinion; correct?

Buckton - cross

1    A.      I haven't, no.

2    Q.      Now, the compound apixaban is described in Example 18

3    of the '208 patent; correct?

4    A.      That's right.  Yes.

5    Q.      And the synthesis of apixaban is also described in

6    that example; correct?

7    A.      I think that example is a balance of synthesis of

8    apixaban, that's correct.

9    Q.      As to the neutral form of apixaban, you do not

10   dispute that the patent provides written description of that

11   neutral apixaban compound; correct?

12   A.      It's not something I have given any thought to, but

13   that example is about that.  So I suspect you would have

14   probably concluded that was the case.  I haven't really done

15   that exercise.

16   Q.      And you did not dispute that the patent provides

17   written description for crystalline apixaban; correct?

18   A.      I don't remember what it says about crystalline or

19   not crystalline.  It is not something I have been looking at

20   the salt formation.  I haven't looked at that.  I could look

21   at that if you wanted me to.

22   Q.      You have not offered an opinion in this case that the

23   crystalline form of neutral apixaban is not adequately

24   enabled or described; correct?

25   A.      That's correct.

Buckton - cross

1    Q.      Now, you did not perform any laboratory experiments

2    as part of your work for this case; correct?

3    A.      That's correct.

4    Q.      You did not attempt to make any salts of apixaban as

5    parts of your work; correct?

6    A.      Yes.

7    Q.      You could have tried to make salts of apixaban;

8    right?

9    A.      Well, I said in my direct testimony that to try and

10   make pharmaceutically acceptable salts of a compound which

11   is recognized to be neutral and non-ionizable is a futile

12   exercise.  You could potentially with salts as Dr. Jacobsen

13   has done.  You can't make pharmaceutically acceptable salts.

14   Q.      But you didn't try to do that?

15   A.      Absolutely, I didn't do any practical work.

16   Q.      And did you not attempt to purify any salts of

17   apixaban as part of your work on this case; right?

18   A.      I didn't do any practical work.  Correct.

19   Q.      You didn't attempt to formulate any apixaban salts;

20   correct?

21   A.      I still didn't do any practical work.  That's

22   correct.

23   Q.      Now, you testified that Dr. Scheidt offered opinions

24   about purity and stability of Dr. Jacobsen's salts.  Do you

25   recall that?

Buckton - cross

1   A.      I do.

2   Q.      But you don't independently have any opinions about

3   whether those salts were pure or stable; correct?

4   A.      My views on that are from a discussion with

5   Dr. Scheidt.  He was the one who analyzed the data so I was

6   taking his view on that.  I haven't done an independent

7   analysis of the data.

8   Q.      So, just so it's clear, you didn't analyze Dr.

9   Jacobsen's salt data to form any independent opinions on

10  that; correct?

11  A.      That's correct.

12  Q.      Now, you mentioned that you're not a medical doctor.

13  You do not prescribe any anticoagulants; correct?

14  A.      That's correct.

15  Q.      And you are not an expert in organic chemistry;

16  correct?

17  A.      No, I am not a synthetic chemist.  I agree.

18  Q.      You are not an expert in organic synthesis; correct?

19  A.      I am not.  Yes.

20  Q.      You are not an expert in medicinal chemistry;

21  correct?

22  A.      Those things are the same thing essentially, so I

23  agree.

24  Q.      And you are not an expert in drug discovery; correct?

25  A.      That's the same thing.  They're synonyms.  I agree.

1  Q.      Have you ever synthesized an active pharmaceutical

2  ingredient before?

3  A.      Well, I think it depends on your level of expiration

4  of that.  I made many salts, so those are active

5  pharmaceutical ingredients.  The process of making a salt is

6  a synthesis, it makes a new compound, but in terms of the

7  big bit that you make the salt out of, no, I haven't

8  synthesized the drug base, just the salt.

9  Q.      Now, the general concepts of salt formation were well

10  established long before September 21st of 2001; correct?

11  A.      That's correct.

12  Q.      When making a salt of a pharmaceutical compound, you

13  would generally use counterions that had been used for

14  previous drug substances that were deemed to be safe;

15  correct?

16  A.      Yes, that is a good general starting point.

17  Absolutely.

18  Q.      And those commonly used acids or bases would be

19  the starting point for a salt screen to make salts of

20  pharmaceutical compounds; correct?

21  A.      All pharmaceutical compounds or suitable pKa.  That

22  would be correct.

23  Q.      Now, hydrogen chloride is a popular counterion to use

24  in making pharmaceutically acceptable salts of suitably

25  ionizing materials; correct?

Buckton - cross

1    A.       That's correct.

2    Q.       And of those products that are marketed today as acid

3    addition salts, the hydrochloride salt is the most commonly

4    used counterion; correct?

5    A.       That's correct.

6    Q.       And sodium is also a popular counterion for preparing

7    pharmaceutically acceptable salt forms; correct?

8    A.       That is correct.

9    Q.       Are you familiar with the textbook Remington's

10   Pharmaceutical Sciences?

11   A.       Yes, I heard of it.  Yes.

12   Q.       And if you refer in your binder to Tab 3.

13              THE COURT:  Not the binder you have.

14              MS. WIGMORE:  Yes, a separate binder.  I

15   apologize.

16              (Binder passed forward.)

17              THE WITNESS:  Thank you.

18              THE COURT:  Tab 3.

19              MS. WIGMORE:  Turn to Tab 3.

20              THE COURT:  Let's make the screen come down.

21              MS. WIGMORE:  JTX-10.

22   BY THE WITNESS:

23   A.       Sorry.  What was that?

24   Q.       Tab 3?

25   A.       Yes.

Buckton - cross

1    Q.       You will see a JTX-10.  Do you recognize that as the

2    Remington's Pharmaceutical Sciences?

3    A.       Yes.

4                 THE COURT:  PTX-10.

5                 MS. WIGMORE:  It's JTX-10.

6                 THE COURT:  Oh, mine says PTX-10.

7                 MS. WIGMORE:  That is JTX-10.  My apologies.

8    BY MS. WIGMORE:

9    Q.       Now, Remington's is incorporated by reference in the

10   '208 patent specification; correct?

11   A.       I believe that is correct.

12                THE COURT:  I believe plaintiffs' screen works.

13                MS. WIGMORE:  Just so the record is clear, this

14   does say JTX.  We can work this out.

15                THE COURT:  This does.  My hard copy doesn't.

16   We'll straighten it out.

17                And no worries for the defendants.  It's not a

18   test about whether the screen works.

19   BY MS. WIGMORE:

20   Q.       So if we could turn please to Table 2 of Remington

21   which is on pages 14 to 18.  And, Dr. Buckton, you are

22   welcome to use a hard copy but we can now blow it up on the

23   screen.

24   A.       I think with my eyesight, it's probably harder.  It's

25   the top numbers.

Buckton - cross

1    Q.       The top numbers.  And you will see there is a Table 2

2    called FDA Approved Commercially Marketed Salts.

3    A.       Yes.

4    Q.       You see that?

5    A.       Yes.

6    Q.       And this is a list of salts used in commercially

7    approved products; correct?

8    A.       Yes.

9    Q.       And if you go to the bottom chart, these are the

10   salts made with cations; correct?

11   A.       Yes.

12   Q.       Do you see, towards, well on the right-hand side,

13   right below the bottom entry is sodium?

14   A.       Yes.

15   Q.       And 61.97 percent of commercially available cations

16   salts are made with sodium; correct?

17   A.       Yes.

18   Q.       So that is the most prevalent cation used in cation

19   pharmaceutical salts?

20   A.       For pharmaceutically acceptable salts, yes.

21   Q.       Right above that, you see potassium is used in

22   10.82 percent of commercially available pharmaceutical

23   salts; correct?

24   A.       I see that, yes.

25   Q.       And that is the second highest number at

Buckton - cross

1    10.82 percent; correct?

2    A.      Yes.

3    Q.      Now, if you go up to the an ion salts above that in

4    the table, do you see toward the bottom of the first column

5    the reference to the hydrochloride salts?

6    A.      Yes.

7    Q.      And 42.98 percent of anion salts that are

8    commercially approved pharmaceutical products use

9    hydrochloride, correct?

10   A.      That's correct.

11   Q.      So that is the most common ion used in anion

12   salts of pharmaceutical products; is that correct?

13   A.      That is correct.

14   Q.      Now, a variety of different methods of administration

15   are described in the '208 patent; is that correct?

16   A.      I think that's right.  I don't remember them now, but

17   I think that's right.

18   Q.      It doesn't require tablet only; is that correct?

19   A.      I think there are a variety.  My memory is sketchy

20   just now, but I think there are a variety of.

21   Q.      Including intravenous; is that correct?

22   A.      Maybe we could look.  It might be better than me --

23   Q.      Okay.

24   A.      I guess you're probably right as you state it.

25   Q.      Do you agree the patent is not limited to any

                            Buckton - cross

1    specific dosage form?

2    A.      I don't think the claim is limited to a specific

3    dosage form.  It's limited to the existence of a salt, so it

4    would be a dosage form in which the salt could exist.

5    Pharmaceutically acceptable salt rather, I should say.

6    Q.      Now as of 2001, there were tablet coatings known in

7    the art that would enable the tablet to get to the stomach

8    before dissolving; is that correct?

9    A.      Well, there are tablet coatings known in the art.

10   Generally speaking, a tablet would get to the stomach

11   before dissolving anyway and a tablet could be coated and

12   get to the stomach before it dissolves.  Those things are

13   possible, yes.

14   Q.      And you agree that technology existed in 2001; is

15   that correct?

16   A.      Conceptually, that's absolutely true.  As I said,

17   it isn't viable to do that with a material that is

18   enormously unstable, but for something which is sufficiently

19   stable and suitable to be processed, that's conceptually

20   possible.

21   Q.      Do you agree that the majority of tablets get to the

22   stomach before dissolving?

23   A.      Yes, I do.

24   Q.      Until they come off, coatings on tablets can prevent

25   contact with biological tissue; correct?

63
Buckton - cross

1    A.    Yes.   The coating will, a non-functional coating,

2    which I think is what you're talking about, will start to

3    come off very rapidly.

4                I don't know -- I don't know if anyone

5    knows when the coating actually comes off.  Often its intent

6    is for aesthetic purposes or to not have a taste on the

7    tongue.   So whether it comes off during through the

8    esophagus or whether it comes off when it gets to the

9    stomach, I don't know.

10   Q.    Do you agree there are tablet coatings that will stay

11   on until the pharmaceutical composition makes it to the

12   stomach?

13   A.    Yes, there are.   You could have an enteric coat,

14   which would go beyond the stomach, so there are coatings

15   which could get to the stomach, yes.   That would be in

16   the intestine.   Enteric coating is released after the

17   stomach.

18   Q.    Those enteric coatings were known as of

19   September 2001; is that correct?

20   A.    That's correct.

21   Q.    Now, the pH of the stomach when empty is about 1.5 to

22   2; correct?

23   A.    I think that's -- that's kind of a Western male

24   figure, so that certainly isn't always true.   A female

25   stomach would be a higher pH than that.   Various ethnic

Buckton - cross

1    groups would have a significantly higher pH than that.   The

2    Western male, 1.5 to 2, is kind of an average.

3    Q.      The human stomach has glands that secrete gastric

4    acid; correct?

5    A.      Yes.

6    Q.      And gastric acid contains hydrochloric acid; is that

7    correct?

8    A.      Yes.

9    Q.      The pH of the secreted gastric acid is not dangerous

10   to the stomach itself; is that correct?

11   A.      Not the stomach, that's correct.

12   Q.      And if the sodium apixaban salt form

13   disproportionates apixaban, it will produce sodium

14   hydroxide; is that correct?

15   A.      Correct.

16   Q.      Only one equivalent of sodium hydroxide will be

17   produced for every equivalent of sodium apixaban; is that

18   correct?

19   A.      That fact is correct, but that's not what I'm talking

20   about.   I'm talking about the pH of the dissolving surface,

21   not --

22   Q.      And we'll come to that.

23   A.      Sorry.

24   Q.      First I wanted to establish the ground rules.

25   A.      It would be technically correct, yes.

Buckton - cross

1   Q.      For one salt molecule, there's one hydroxide molecule

2   that is generated when the sodium apixaban

3   disproportionates; correct?

4   A.      I lost that one.  I apologize.

5   Q.      Sure.  I will repeat it.  For one salt molecule,

6   there's one hydroxide molecule that is generated when the

7   sodium apixaban disproportionates; right?

8   A.      Yes.

9   Q.      And that is a very small amount of hydroxide ion

10  relative to the size of the stomach as a whole; correct?

11  A.      I would say if you take a dissolving salt of

12  apixaban, if you position it, by the time it dilutes into

13  the stomach, I don't believe it's damaging.  I believe it's

14  damaging when the solid surface is in contact with a

15  biological membrane, so I agree that when it dilutes out,

16  away from the dissolving surface, I would not regard it as

17  being dangerous.  It would be un-ionized apixaban, which

18  wouldn't be dangerous.

19  Q.      Now, in terms of the potassium salt, if the potassium

20  salt of apixaban disproportionates, it will produce

21  potassium hydroxide; is that correct?

22  A.      Yes.

23  Q.      And only one equivalent of potassium hydroxide will

24  be created for every equivalent of the apixaban; is that

25  correct?

Buckton - cross

1    A.       Yes.  You still understand I don't regard that as

2    relevant, but I agree it's true.

3    Q.       Understood.  So for one molecule of potassium

4    apixaban salt, there's one hydroxide molecule that is

5    formed; is that correct?

6    A.       Yes.

7    Q.       And that would be a very small amount of the

8    hydroxide ion relative to the size of the stomach as a

9    whole; is that correct?

10   A.       As I said, for the sodium, it is the dissolving the

11   surface that is damaging, and that dissolving surface in

12   contact with the biological membrane would be something

13   like pH ten, sodium or potassium.  It's that dissolving

14   surface that's damaging.

15                    When it dissolves off, as you just said, I

16   do not believe it will be damaging because it's dissolved

17   into a much larger volume and it will be the neutral

18   apixaban, which I wouldn't regard as damaging.  Purely the

19   dissolving surface I regard as damaging.

20   Q.       And, again, focusing on the stomach, we will come to

21   the dissolving surface, but focusing on the stomach, with

22   respect to a hydrochloride salt, if it disproportionates,

23   it will produce a hydronium ion and a chloride ion; is that

24   correct?

25   A.       Yes.

Buckton - cross

1    Q.      And it will generate one equivalent of a hydronium

2    ion and one equivalent of a chloride ion; is that correct?

3    A.      That's correct.

4    Q.      Now, those in the stomach as a whole would be a very

5    small portion of the --

6    A.      I won't repeat it again.  That's the same thing, the

7    dissolving surface.

8    Q.      Now, your opinion addresses the effect of apixaban

9    salt on the, what you call the localized pH; is that

10   correct?

11   A.      That's correct.

12   Q.      And the localized pH is different from the total pH

13   of the stomach; is that correct?

14   A.      That's correct.

15   Q.      Now, your analysis did not consider the effect of

16   apixaban salt or their counterions on the total pH of the

17   stomach; is that correct?

18   A.      That's correct.

19   Q.      You did not consider the effect of the apixaban salt

20   or its counterions on the total pH of the body; is that

21   correct?

22   A.      Absolutely not.  I don't think there would be any

23   meaningful change there.  I don't regard it as toxic when it

24   has gone away from the dissolving surface.

25   Q.      Now, your use of the term localized pH is based on

Buckton - cross

1   whatever amount of apixaban may have been disproportionated

2   at the dissolving surface of a pharmaceutical composition at

3   a particular time; is that correct?

4   A.      It's what is on the surface of the solid particle,

5   which is an unstirred layer of enormously high concentration

6   on the surface of a solid particle which is in contact with

7   a biological membrane.

8              The concentration term has a meaning there

9   because it is an unstirred, essentially, a saturated layer

10  around the dissolving particle.

11  Q.      But you're talking only about whatever ions are at

12  the dissolving surface; is that correct?

13  A.      I'm talking about the dissolving surface.  Once

14  it's moved away from the dissolving surface, it would be

15  diluted.  It's the dissolving surface when you have a

16  very high concentration of a very extreme pH.  On that

17  dissolving surface in that particular region is that which

18  is damaging.

19  Q.      Now, Eliquis is marketed as a 2.5 or 5-milligram

20  tablet; is that correct?

21  A.      I think that's right, yes.

22  Q.      And the total tablet weight of the uncoated

23  2.5-milligram tablet is 100 milligrams; is that correct?

24  A.      I don't know if I know that, but I will take your

25  word, especially if you are going to tell me that's true.

Buckton - cross

1    Q.      Is the total tablet weight of the five milligrams

2    uncoated tablet 200 milligrams?

3                   Do you know?

4    A.      I may have known.  I don't remember sitting here, but

5    I've got no reason to dispute what you are telling me.  I'm

6    sure if it's wrong, someone else will tell me.

7    Q.      Is it fair to say that you did not take into

8    consideration the total size or weight of the tablet itself

9    in forming your opinion?

10   A.      I don't think that's relevant because the tablet will

11   disintegrate into smaller parts, so I didn't want the tablet

12   sitting as a solid lump necessarily that's damaging,

13   although that could be if the drug was at the surface of the

14   tablet.

15   Q.      Do you know what percentage --

16   A.      The drug particles themselves, which are damaging,

17   because it's the surface of the dissolving drug particle.

18   Q.      Now, we talked about a hundred milligram tablet and a

19   200-milligram tablet.

20                   Do you know what percentage of the Eliquis

21   tablet is made up of the active ingredient apixaban?

22   A.      Did you say the 25-milligram and 200-milligram?  Is

23   that what you said?

24   Q.      No.  Sorry.  The whole tablet is a hundred milligrams

25   for the 2.5-milligram dose.

1    A.      Right.

2    Q.      And 200 milligrams for the five-milligram dose.

3            Do you know what portion of the tablet,

4    the entire tablet is made up of the active ingredient

5    apixaban?

6    A.      If you are right, that it's 2.5 and 100, kind of

7    heading towards 2.5 percent I would say.

8    Q.      That's a very small portion of the overall tablet;

9    correct?

10   A.      I would say it is not the significant factor because

11   the tablet will disintegrate and it will be the dissolving

12   drug in terms of what that comes in contact with

13   specifically at the surface of the dissolving drug

14   particle.

15   Q.      But you'd agree there are a number of excipients in

16   the tablet beyond the active ingredient; right?

17   A.      Absolutely, yes.

18   Q.      Now, Eliquis is an FDA approved drug; is that

19   correct?

20   A.      Yes.

21   Q.      Apixaban is the active pharmaceutical ingredient in

22   Eliquis; is that correct?

23   A.      I don't know if my previous answer suggested I

24   thought Eliquis itself was damaging.  I didn't want to

25   suggest that in terms of that ratio.  And it would be a

1   non-pharmaceutically acceptable salt of apixaban that

2   would be damaging.  It may well have been my answer there

3   suggested that apixaban and Eliquis was damaging.  I

4   wouldn't want to suggest that.

5   Q.     So we can agree that apixaban itself, a neutral form,

6   has a favorable benefit/risk ratio; is that correct?

7   A.     Yes.

8   Q.     And in terms of the amount of, if there's an apixaban

9   salt, that still is going to be a very small portion of the

10  overall tablet that the active ingredient comprises; is that

11  correct?

12  A.     It would be -- well, it depends how you formulate it.

13  Yes, it would probably be a small percentage of the overall

14  tablet.  Most drugs are a small percentage of the overall

15  tablet.

16  Q.     Now, if an apixaban salt is administered to a

17  patient, it will be un-ionized in the body; is that correct?

18  A.     What are we talking about?

19  Q.     Once the tablet gets into the stomach and enters

20  into the system of the patient, it converts to neutral

21  apixaban; correct?

22  A.     If you take it in phases, I don't think the apixaban

23  salt would make it to the formulation.  It's not stable

24  enough to be formulated.  Should it get into the formulation

25  in some way, it would be unstable as soon as it came into

Buckton - cross

1    contact with any matter.  So, in essence, it would have, I

2    think, broken down before it got there, but it certainly

3    would break down on the surface side of any contact with

4    water, I think.

5    Q.      Let's talk about salts more generally.  When a salt

6    form of an API is administered --

7    A.      Yes.

8    Q.      -- it is actually the neutral form, the freebase form

9    of the active pharmaceutical ingredient that has the

10   therapeutic effect in the body; is that correct?

11   A.      That's correct.

12   Q.      The salt will ultimately convert to the neutral form;

13   is that correct?

14   A.      It will be not a salt.  Most likely, it will be

15   absorbed as a neutral form.  That's correct.

16   Q.      So it's not the salt that's the therapeutically

17   effective ingredient; is that correct?

18   A.      Well, ultimately, in terms of the thing that's

19   getting onto a receptor somewhere in the body, that will not

20   be the salt, but the salt in terms of its properties are

21   what will allow that drug to be sufficiently soluble in

22   order to have its therapeutic effect.

23                  The salt is undoubtedly part of the

24   therapeutic, you know, process.  The salts will have

25   different bioavailability to a non-salt, which is why it's

Buckton - cross

1    important to control it.

2    Q.      Do you agree that the therapeutic effect of an

3    apixaban salt post absorption would be based on the free base

4    form of apixaban?

5    A.      Yes, I do.  Post absorption, absolutely.

6    Q.      Now, you talked on your direct examination about

7    column 117 of the '208 patent, which discusses

8    pharmaceutically acceptable salts.

9            Do you recall that?

10   A.      Is that the method?

11   Q.      The term pharmaceutically acceptable and

12   pharmaceutically acceptable salts are described in columns

13   116 and 117 of the '208 patent.

14   A.      I didn't describe that part of the patent.  I

15   described the Court's claim construction in relation to

16   that.

17                   MS. WIGMORE:  Are we able to pull up column

18   117 of the patent, which is JTX-1.

19   BY MS. WIGMORE:

20   Q.      Do you recall testifying on direct about this

21   paragraph that begins, "The pharmaceutically acceptable

22   salt"?

23   A.      I thought you were talking about what is a

24   pharmaceutically acceptable salt.  This is a general method

25   for making a pharmaceutically acceptable salt.

Buckton - cross

1    Q.      Yes.

2    A.      My apologies if I was misunderstanding you, but this

3    is the general method, yes.

4    Q.      And this is described in the specification; is that

5    correct?

6    A.      Yes, indeed, it is.

7    Q.      Now, one of the methods described here for making a

8    pharmaceutically acceptable salt is to perform a salt

9    formation reaction in an organic solvent.  If you go about

10   halfway down this paragraph, do you see the phrase, in an

11   organic solvent?

12   A.      Yes.

13   Q.      Now, the formation of a salt does not have to occur

14   in the presence of water; is that correct?

15   A.      It doesn't have to, no.

16

17

18   Pgs 74,16-87,20 left intentionally blank to preserve pagination

19

20

21

22

23

24

25

Buckton - cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Q.    And the '208 patent states that performing the salt

21    formation reaction with an acid or a base in nonaqueous

22    media is preferred; correct?

23    A.    Yes.

24    Q.    Nonaqueous media is another way of referring to an

25    organic solvent; correct?

Buckton - cross

1  A.     That's correct, yes.

2  Q.     Now, there are techniques for drying organic

3  solvents, correct?

4  A.     There are.

5  Q.     Dry granulation is a technique that would have less

6  exposure to water relative to wet granulation; correct?

7  A.     So dry granulation compared to wet granulation, no.

8  Wet granulation is a process of making something to tablet

9  generally which involves deliberately adding water.  So dry

10  granulation doesn't involved adding water.  Inherently, it

11  is a dryer process, not a dry process.  You shouldn't

12  believe dry means dry.

13  Q.     Now, film coatings can slow the penetration of;

14  water, correct?

15  A.     Penetration of water where or how?  So some film

16  coatings can slow some penetration of water somewhere.

17  That's a very broad question of very many coatings.

18  Q.     Can film coating reduce exposure of moisture to API?

19  A.     Can they?

20  Q.     Yes.

21  A.     Some could.  It depends.  You would have to look at

22  which film coating and in which circumstance.

23  Q.     Now, packaging can protect compounds that have been

24  formulated from exposure to moisture; correct?

25  A.     Packaging can -- I'm sorry.  Can protect?

Buckton - cross

1    Q.      Can protect compounds that have been formulated from

2    exposure to moisture.

3    A.      Packaging can -- say you isolate a compound, a

4    formulation that you have made, and it will be in whatever

5    the environment is that you have isolated in if you select

6    a package which is impermeable to water.  That is possible

7    to do.

8    Q.      Now, packaging techniques to protect drugs from

9    moisture were known as of September 2001; correct?

10   A.      Packaging techniques were known in that time.  We

11   would have whatever was inside the pack would be what was

12   ever inside the pack.  That would be your water content,

13   yes.

14   Q.      Now, an aluminum film blister was a packaging

15   technique that could be used to reduce moisture as of 2001;

16   correct?

17   A.      It could be used to seal whatever was inside from

18   whatever was outside.  So it would stop the transfer.  It

19   wouldn't mean the inside was dry.

20   Q.      And glass is another material that was used to

21   package pharmaceutical products in some instances; correct?

22   A.      Lots of objects could be, yes.

23   Q.      And glass provides protection against moisture

24   exposure; correct?

25   A.      Glass does but the top generally doesn't.  The cap

Buckton - cross

1    generally not.

2    Q.     But moisture is not going to penetrate through glass;

3    correct?

4    A.     Not through the glass.  It will go through the cap.

5    That is the easy route in.

6    Q.     And glass packaging was known as of September 2001;

7    correct?

8    A.     It certainly was.

9    Q.     Now, the use of desiccants is another technique that

10   can reduce a drug product's exposure to moisture as part the

11   packaging; correct?

12   A.     Yes, that's true.

13   Q.     And the use of desiccants was known prior to

14   September of 2001; correct?

15   A.     Yes, it was.  So clearly you could do it to try to

16   reduce it.  Whether it would be effective, you could try.

17   Q.     Now, you addressed the Court's claim construction

18   briefly on your direct.  Do you recall that?

19   A.     Yes.

20   Q.     And in your opening report, you addressed principles

21   of claim construction generally; correct?

22   A.     Yes, slightly longer than I had today.  Yes.

23   Q.     The context of a claim can be particularly helpful in

24   interpreting the claim meaning; correct?

25               MR. MIZERK:  Objection, Your Honor.  Are we

Buckton - cross

1  going into claim construction?  I think it has already been

2  done.

3            THE COURT:  Where are we going?

4            MS. WIGMORE:  We're addressing the issue of

5  claim 104 which he said covers the salt form of apixaban.

6            THE COURT:  I'll give a little leeway here.  You

7  can.

8            Do you need the question again?

9            THE WITNESS:  Yes.

10            THE COURT:  Ask it again.

11  BY MS. WIGMORE:

12  Q.    The context of a claim can be particularly helpful in

13  interpreting the claim meaning.

14  A.    The context of a claim can be particularly helpful

15  interpreting the claim meaning?

16  Q.    Yes.  If it is helpful, Dr. Buckton, you can refer to

17  your opening report, which is Tab 5, Paragraph 35.

18  A.    All right.  That sounds like it would be helpful.

19  Q.    And we can also get that on the screen if that is

20  easier.

21            I am referring to the second sentence of

22  paragraph 35, which says:  The context of a claim can be

23  particularly helpful in interpreting the claim meaning.

24            Do you see that?

25  A.    Yes.

92

Buckton - cross

1    Q.      Do you agree with that?

2    A.      It seems reasonable, doesn't it.

3    Q.      Now, the next sentence says:  Other claims may inform

4    the meaning of a term in a particular claim.

5            Do you agree with that?

6    A.      It sounds reasonable.

7    Q.      And the next sentence says:  It is my understanding

8    that terms are usually used consistently throughout a

9    patent, and therefore the meaning of a term in one claim may

10   help inform the meaning of the same term in other claims.

11           Do you agree with that?

12   A.      Yes.

13   Q.      Now, let's pull up from the defendants' demonstrative

14   claim 13.  Yes.  This is DDX-1.  Do you recognize this is

15   the language for claim 13?

16   A.      I do.

17   Q.      And claim 13 refers to a compound according to claim

18   8 which then lays out the formula for apixaban or a

19   pharmaceutically acceptable salt form thereof.

20           Do you see that?

21   A.      Yes.

22   Q.      Now, let's turn to claim 27, which is in column 270.

23   Claim 27 --

24           MR. MIZERK:  Your Honor, we object to this line

25   of questioning, it just seems like it is claim construction

Buckton - cross

1    and this isn't something for the witness.  It is way beyond

2    the scope of the direct.

3              MS. WIGMORE:  There is an agreement that plain

4    meaning governs every term except for the one Your Honor

5    construed.  There is an issue of whether claim 104 covers

6    the pharmaceutically acceptable salt form thereof.  And

7    using the very principles articulated in Dr. Buckton's

8    report, we're addressing the context surrounding the claim

9    term.

10             MR. MIZERK:  Your Honor, claim construction is

11   over with.  I think if they wanted to raise this claim

12   construction issue, there was a time to do it other than

13   when we are in trial.

14             THE COURT:  I will overrule it.  I will hear the

15   evidence.  You can make the argument later.

16   BY MS. WIGMORE:

17   Q.    So do you see that claim 27 refers to a compound of

18   claim 13?

19   A.    Yes.

20   Q.    And then it refers to:  or a pharmaceutically

21   acceptable salt form thereof.  Do you see that?

22   A.    Yes.

23   Q.    So the compound of claim 13 here is apixaban;

24   correct?

25   A.    Compound of claim 13 is apixaban, yes.

Buckton - cross

1   Q.      Now, let's go to claim 55.

2   A.      So is the pharmaceutically acceptable salt.  But,

3   yes, carry on.

4   Q.      Let's back up.  Let's go back to 27.  So you are

5   saying that the claim 13 here refers to apixaban or a

6   pharmaceutically acceptable salt form thereof?

7   A.      Say that again?

8   Q.      Are you saying that the term claim 13 as used here in

9   claim 27 refers -- let me just finish the question.

10  A.      Yes.

11  Q.      -- refers to both apixaban and a pharmaceutically

12  acceptable salt form of apixaban?

13  A.      I think I understand what you are saying.  Claim 13

14  said apixaban or a pharmaceutically acceptable salt, and

15  now this is also saying apixaban or a pharmaceutically

16  acceptable salt or a pharmaceutically acceptable salt is

17  what you are saying.

18  Q.      Well, that's my question.

19  A.      That would seem to me to be a mistake, wouldn't it.

20  It seems clear that apixaban or a pharmaceutically

21  acceptable salt of claim 13, yes, they didn't need to add

22  pharmaceutically acceptable salt again.

23  Q.      But they did, correct?

24  A.      Yes.  That was overzealous writing, I would have

25  thought, but that is how it seems to get.

Buckton - cross

1    Q.      We can agree that claim 13 as used in this claim

2    refers to both apixaban and a pharmaceutically acceptable

3    salt form thereof, that this phrase at the end of the claim

4    is extraneous; is that right?

5    A.      On the face of it.  It must have been.  We are doing

6    this kind of at hoc, aren't we?  So there is a claim 27.

7    But, yes, on the face of it, that would seem to be

8    unnecessary and, as I say, perhaps overzealous drafting.

9    Q.      Let's go to claim 55.

10            Claim 55 also refers to a compound of claim 13.

11   Do you see that?

12   A.      Yes.

13   Q.      And after that, it also refers to:  or a

14   pharmaceutically acceptability salt form thereof.  Do you

15   see that?

16   A.      Yes.  I think it says a compound.  Now we get into

17   the semantics of it.  That would seem to me to say there is

18   more than one option to the compound of claim 13.

19   Otherwise, would it not say "the" compound of claim 13 if it

20   believed it was only one?

21   Q.      But we can agree the term "or a pharmaceutically

22   acceptable salt form thereof" would be extraneous if

23   compound of claim 13 is read to encompass the salt form?

24   A.      If a compound of claim 13 means you are choosing one

25   of the compounds of claim 13, then one of them is apixaban

Buckton - cross

| 1 | and others would be salt, if salts could form, then that is |
|---|---|
| 2 | one of those compounds, and in that context, "pharmaceutically |
| 3 | acceptable salt" would seem to be extraneous, unnecessary. |
| 4 | Q.     But that phrase does appear in claim 55; correct? |
| 5 | A.     It does.  It says "a" compound, it doesn't say, |
| 6 | rather than, "the" compound.  It does seem to be overzealous |
| 7 | use of adding "pharmaceutically acceptable salt." |
| 8 | Q.     Now, let's turn to claim 104.  I will go back to the |
| 9 | DDX on this slide. |
| 10 | Claim 104 claimed a compound according to claim |
| 11 | 13, which is a crystalline compound; correct? |
| 12 | A.     Yes. |
| 13 | Q.     There is no specific reference in this claim to a |
| 14 | pharmaceutically acceptable salt form thereof; correct? |
| 15 | A.     That's correct. |
| 16 | Q.     Now, I'm changing topics.  Just so it's clear, we're |
| 17 | going to take that off the screen.  You are not offering an |
| 18 | opinion on the issue of infringement in this case; correct? |
| 19 | A.     That's correct. |
| 20 | Q.     You are not offering an opinion on the issue of |
| 21 | obviousness or anticipation; correct? |
| 22 | A.     That's correct. |
| 23 | Q.     You are not offering an opinion on the issue of |
| 24 | improper dependency; correct? |
| 25 | A.     That's correct. |

1   Q.      And you are not offering an opinion on the issue of

2   indefiniteness; correct?

3   A.      That's correct.

4   Q.      Now, you have been retired for several years;

5   correct?

6   A.      I retired from the university, yes.

7   Q.      And since your retirement, essentially all of your

8   professional time has been spent working on litigation

9   matters; correct?

10  A.      Well, as I said in my introduction, apart from the

11  one day a month that I go to the regulatory committee, that

12  would be true.  One day of month on regulatory and other

13  time which may not be many more than that on litigation,

14  yes.

15  Q.      Now, before your work on this case, you had not done

16  any research involving anticoagulants; correct?

17  A.      Not as far as I know.  The compounds we had in

18  PharMaterials, I don't remember.  We were dealing with 10 a

19  week.  Possibly some of those were anticoagulants.  I

20  generally have no idea, so not that I remember.

21  Q.      And before your work on this case, you had not heard

22  of Factor Xa which is the mechanism for Eliquis; correct?

23  A.      That's correct.

24          MS. WIGMORE:  No further questions at this time.

25          THE COURT:  Okay.  Redirect.

Buckton - redirect

```
 1          MR. MIZERK:  Yes, Your Honor.  Just a few

 2   questions.

 3                    REDIRECT EXAMINATION

 4   BY MR. MIZERK:

 5   Q.      Dr. Buckton, during your examination by plaintiffs'

 6   counsel, she went through a number of examples of how you

 7   might incorporate a salt of apixaban in a formulation with

 8   other excipients.  Do you remember that?

 9   A.      I don't remember the question was so specific to a

10   salt of apixaban, but we talked about various formulations.

11   Q.      Okay.  So she talked about -- you remember you talked

12   about there being 2.5 milligrams of apixaban --

13   A.      Okay.  Yes.

14   Q.      -- in a tablet with 100 milligrams total?

15   A.      Yes.

16   Q.      And so you would have to formulate that apixaban in a

17   tablet with other excipients; right?

18   A.      Correct.

19   Q.      Now, how much experimentation would it take for a

20   person of skill in the art to formulate a salt of apixaban

21   in the manner that Eliquis was formulated?

22   A.      Eliquis would be a lot of experimentation, and that

23   would be very, very much easier than a salt which is

24   extraordinarily unstable.  So the apixaban salts that Dr.

25   Jacobsen made in extremely positive condition last two days
```

Buckton - redirect

1    and they're not going to last any time at all if you take

2    them out and try to formulate them in any way.

3              The notion you can take make them into a tablet

4    is not a viable one.  And even if you made some of it into a

5    tablet, it would be variable.  And we touched in my

6    examination on the fact the salt will have a different

7    solubility to the free base of the drug or the free acid the

8    drug.  So it will be damaging to have a blend of the salt

9    and the non-salt material in whatever you are offering to

10   the patient.  It will be uncontrolled.

11   Q.    And how much moisture would it take in order to

12   destabilize the salts of apixaban that Dr. Jacobsen claims

13   to have made?

14   A.    It would take very little but you would have to do

15   the experimentation.  There is a lot of work to be done in

16   terms of giving it any notion of an independent existence,

17   that it could be manipulated at all.  It is very, very

18   unstable materials.

19   Q.    Now, I think plaintiffs' counsel spent a little time

20   with you going over some claims of the patent in trying to

21   make some arguments about claim 27 and other claims of the

22   patent.  Do you recall that?

23   A.    Yes.

24   Q.    Can you turn to JTX-1?

25   A.    This?

Buckton - redirect

1    Q.      It's in the binder you should have.

2    A.      Yes.

3    Q.      If you turn to, the patent itself has 276 columns.

4    A.      Yes.

5    Q.      If you turn to the pages that follow the printed

6    patent part of it or the typical printing?

7    A.      Yes.

8    Q.      Column 276.  There are a number of pages that follow.

9    Do you see those?

10   A.      Yes.

11   Q.      Column 2, 76, there are a number of pages that

12   follow.          Do you see those?

13   A.      Yes.

14   Q.      Okay.  And what are those called?

15   A.      It's the corrections.

16   Q.      And how many pages of correction does this patent

17   have?

18              MS. WIGMORE:  Your Honor, I will object to the

19   relevance.

20              THE COURT:  Do you object?

21              THE WITNESS:  About 13.

22              THE COURT:  Overrule the objection.  Thirteen?

23              THE WITNESS:  Thirteen.

24              MR. MIZERK:  Sorry.  Was it overruled?

25              THE COURT:  It was overruled.  He answered.

```
1    BY MR. MIZERK:

2    Q.    So is it fair to say there were a lot of mistakes in

3    the patent that needed to be corrected by the patentee?

4              MS. WIGMORE:  Your Honor, I object.  The

5    mistakes, he's attributing them to the patentee, but

6    mistakes can be made by the Patent Office.  I just wanted to

7    make that clear.

8              THE COURT:  Okay.  You've made that clear.  I

9    will overrule the objection.

10             You can answer the question.

11             THE WITNESS:  It is unclear.

12             MR. MIZERK:  Your Honor, we have nothing

13   further.

14             THE COURT:  Thank you very much.  You can step

15   down.

16             THE WITNESS:  Thank you.

17             (Witness excused.)

18             THE COURT:  Thank you much very much.  That's it

19   for tonight.  Right?

20             MR. MIZERK:  Correct, your Honor.

21             THE COURT:  Very impressive.  6:45 precisely.

22   Be careful as you leave.  Some of the lights may be out.

23   And we'll see you on the 31st.

24             MR. MIZERK:  Thank you, your Honor.

25             (Court recessed at 6:46 p.m.)
```

1

2          I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.

3

4                          /s/ Brian P. Gaffigan
                          Official Court Reporter
5                           U.S. District Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25