```
1                   IN THE UNITED STATES DISTRICT COURT
                    IN AND FOR THE DISTRICT OF DELAWARE
2
                                   - - -
3   BRISTOL-MYERS SQUIBB COMPANY
    and PFIZER INC.,                      : CIVIL ACTION
4                        Plaintiffs,      :
    v                                     :
5                                         : (Consolidated)
    AUROBINDO PHARMA USA INC.,            :
6                                         : NO. 17-374-LPS
                        Defendant.
7
                                   - - -
8
                            Wilmington, Delaware
9                       Thursday, October 31, 2019
                          Bench Trial - Volume B
10
                                   - - -
11
    BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
12
    APPEARANCES:               - - -
13
                FARNAN, LLP
14              BY:  MICHAEL J. FARNAN, ESQ.

15                  and

16              WILMER CUTLER PICKERING HALE and DORR, LLP
                BY:  AMY K. WIGMORE, ESQ., and
17                   HEATHER M. PETRUZZI, ESQ.
                     (Washington, District of Columbia)
18
                    and
19
                WILMER CUTLER PICKERING HALE and DORR, LLP
20              BY:  WILLIAM F. LEE, ESQ.,
                     ANDREW J. DANFORD, ESQ.,
21                   TIMOTHY A. COOK, ESQ.,
                     KEVIN S. PRUSSIA, ESQ., and
22                   SHIRLEY X. LI CANTIN, ESQ.
                     (Boston, Massachusetts)
23
                          Counsel for Bristol-Myers Squibb
24                        Company and Pfizer Inc.

25  Valerie J. Gunning              Brian P. Gaffigan
    Official Court Reporter         Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3                  PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
                   BY:   JOHN C. PHILLIPS, JR., ESQ.

4                         Counsel on behalf of SigmaPharm
                          Laboratories, LLC; Unichem Laboratories,
5                         Ltd., Zydus Pharmaceuticals (USA) Inc.,
                          Sunshine Lake Pharma Co., Ltd., and
6                         HEC Pharm USA

7                      and

8                  HUSCH BLACKWELL, LLP
                   BY:   PHILIP D. SEGREST, JR., ESQ., and
9                        DON J. MIZERK, ESQ.
                         (Chicago, Illinois)
10

11                     and

12                 HUSCH BLACKWELL, LLP
                   BY:   THOMAS P. HENEGHAN, ESQ., and
13                       DUSTIN L. TAYLOR, ESQ.
                         (Madison, Wisconsin)

14                        Counsel on behalf of SigmaPharm
                          Laboratories, LLC
15

16                     and

17                 GREENBLUM & BERNSTEIN, P.L.C.
                   BY:   P. BRANKO PEJIC, ESQ.,
                         PAUL A. BRAIER, ESQ., and
18                       JILL M. BROWNING, ESQ.
                         (Reston, Virginia)

19                        Counsel on behalf of Unichem
20                        Laboratories, Ltd.

21

22

23

24

25

```
 1    APPEARANCES:   Continued)

 2
                      YOUNG CONAWAY STARGATT & TAYLOR, LLP
 3                    BY:  KAREN L. PASCALE, ESQ.

 4                         and

 5                    LERNER DAVID LITTENBURG KRUMHOLZ & MENTLIK, LLP
                      BY:  PAUL H. KOCHANSKI, ESQ., and
 6                         KENDALL K. GURULE, ESQ.
                           (Westfield, New Jersey)
 7
                              Counsel on behalf of Sunshine Lake
 8                            Pharma Co., Ltd., and HEC Pharm USA

 9

10

11

12

13                            - oOo -

14                    P R O C E E D I N G S

15              (REPORTER'S NOTE:  The following bench trial was

16    held in open court, beginning at 8:32 a.m.)

17              THE COURT:  Good morning, everyone.

18              (The attorneys respond, "Good morning, Your

19    Honor.")

20              THE COURT:  Let's, since we're going to treat

21    this as the first day of trial, we'll start with putting

22    your appearances on the record.

23              Good morning.

24              MR. FARNAN:  Good morning.  Michael Farnan on

25    behalf of plaintiff.  With me today is Bill Lee.
```

```
 1                    MR. LEE:  Good morning, Your Honor.

 2                    MR. FARNAN:  Amy Wigmore.

 3                    MS. WIGMORE:  Good morning.

 4                    THE COURT:  Good morning.

 5                    MR. FARNAN:  Kevin Prussia.

 6                    MR. PRUSSIA:  Good morning.

 7                    MR. FARNAN:  Andrew Danford.

 8                    MR. DANFORD:  Good morning, Your Honor.

 9                    MR. FARNAN:  And behind them is Shirley Cantin,

10       Tim Cook, and Heather Petruzzi.

11                    THE COURT:  Good morning.

12                    MS. PASCALE:  Good morning, Your Honor.

13                    THE COURT:  Good morning.

14                    MS. PASCALE:  Karen Pascale for Sunshine Lake;

15       and with me again from the Lerner David firm is Paul

16       Kochanski.

17                    MR. KOCHANSKI:  Good morning, Your Honor.

18                    THE COURT:  Good morning.

19                    MS. PASCALE:  And Kendall Gurule.

20                    THE COURT:  Good morning.

21                    Good morning.

22                    MR. PHILLIPS:  Good morning, Your Honor.  Jack

23       Phillips on behalf of SigmaPharm and Unichem.

24                    In the courtroom on behalf of SigmaPharm is Don

25       Mizerk.
```

```
 1                      THE COURT:  Good morning.
 2                      MR. PHILLIPS:  Philip Segrest.
 3                      THE COURT:  Good morning.
 4                      MR. PHILLIPS:  Thomas Heneghan.
 5                      MR. HENEGHAN:  Good morning, Your Honor.
 6                      MR. PHILLIPS:  And Dustin Taylor.
 7                      MR. TAYLOR:  Good morning, Your Honor.
 8                      MR. PHILLIPS:  Mr. Mizerk certain will address
 9    the Court in opening for SigmaPharm.
10                      On behalf of Unichem, we've got Branko Pejic.
11                      MR. PEJIC:  Good morning, Your Honor.
12                      MR. PHILLIPS:  Paul Braier.  Mr. Braier will
13    address the Court in opening for Unichem.
14                      MR. PEJIC:  And Jill Browning also.
15                      MR. PHILLIPS:  I'm sorry?
16                      MR. PEJIC:  And Jill Browning also.
17                      MR. PHILLIPS:  Oh, I'm sorry.  Jill Browning
18    hiding back in the back.
19                      Thank you, Your Honor.
20                      THE COURT:  Welcome.
21                      All right.  So of course we're here for trial.
22    We have the preliminaries on my end.
23                      As you may or may not know, I have another bench
24    trial next week which is going to impact my time with you.
25    I'll have a further update probably later today, but it may
```

1    well be that we are ending our days around 3:45 next week

2    instead of the laterare hours that I had previously told

3    you.

4              I may be able to make up a little of that lost

5    time by staying with you a little bit longer tomorrow, but

6    things are in flux, we're working that out.  We'll get all

7    of your hours in, but they may move around just a little

8    bit.

9              Actually, I think that was my only thing.  Are

10   there any issues from the plaintiffs before we get started?

11             MR. LEE:  Your Honor, I think one question and I

12   think we have some issues before the opening.

13             Does Your Honor want to resolve objections for

14   the witnesses who will testify this morning or after the

15   openings?

16             THE COURT:  I would rather try and do it now if

17   there are issues.

18             MR. LEE:  There are a discrete number of issues,

19   I think, going both ways.  We have two that we want to

20   raise.

21             THE COURT:  Give me just one second.

22             (The Court and deputy clerk confer.)

23             THE COURT:  Thank you.  We'll start with your

24   first two issues then.

25             MR. LEE:  Thank you, Your Honor.

1              The first issue that I raised the last time we

2      were in the pretrial was the question of whether we need to

3      call a records custodian, and we have been unable to reach

4      agreement.   The only issue is authentication because these

5      are not being offered for the truth, they're offered as

6      corroboration of the activities that took place during the

7      diligence period, but the objections still stand.

8              The challenge is that we have to bring a witness

9      here to have testify as to nothing other than

10     authentication.   The witness probably isn't available until

11     November 11th, which puts him out of order, but we've been

12     unable to reach agreement.

13             I thought maybe this morning that one

14     possibility is that we just offer a declaration

15     authenticating them to eliminate the need for an expert --

16     for the witness to appear.

17             THE COURT:   Okay.   Do you want to move on to the

18     second issue?

19             MR. LEE:   Yes.   And the second issue is very

20     brief.

21             There is a demonstrative from one of the

22     defendants.   It is -- if you have a copy of your slide deck,

23     it's 13-8.

24             (Counsel confer.)

25             THE COURT:   Thank you.   DDX 13-8?

1             MR. LEE:  Yes, DDX 13-8.  And, Your Honor, the

2    only reason we've been unable to resolve our concern about

3    it is, we've asked what it is and we have been unable to get

4    an answer.

5             I'm just looking for the source of the

6    information so I can know what demonstrative is.

7             THE COURT:  All right.  Well, are you speaking

8    to both objections or --

9             MR. PEJIC:  Yes, Your Honor.

10            THE COURT:  Why don't you come to the podium for

11   me, please.

12            Good morning.

13            MR. PEJIC:  Branko Pejic on behalf of the

14   defendants, Your Honor.

15            As to the records custodian issue, there are --

16   we did actually compromise on certain notebooks.  Those are

17   the notebooks that were actually testified to by the

18   inventors.  There are other notebooks being relied upon to

19   try to swear behind the prior art reference on the '945

20   patents that were not spoken to by any of the inventors, and

21   those are the notebooks that we maintain our objection to.

22            And this is the first we've heard of a potential

23   for a declaration.  I'm certainly, on our first break, happy

24   to talk with plaintiffs' counsel to see if we can resolve

25   that.

1            THE COURT:  Okay.  Are you speaking on behalf of

2      all defendants on that issue?

3            MR. PEJIC:  I believe so.  Yes, Your Honor.

4            THE COURT:  All right.  And your demonstrative?

5            MR. PEJIC:  And the demonstrative, as we told

6      them last night, is simply what the evidence will show.

7      There are parts of the USP as well as calculations that go

8      into reaching that conclusion.  Our witnesses have been

9      deposed upon it, Dr. Chambliss, in particular, and we

10     believe the evidence will show that.

11           I'm not quite sure that I understand the dispute

12     with -- I'm saying that is what the evidence will show.

13           THE COURT:  All right.  But some of that

14     evidence includes the USP and Dr. Chambliss's expected

15     testimony, correct?

16           MR. PEJIC:  Yes, Your Honor.

17           THE COURT:  Okay.  Thank you.

18           Mr. Lee, does that help you on either of those?

19           MR. LEE:  Yes, Your Honor.  The reason I need

20     the source is to know how to respond to it if I'm going to

21     respond in opening, but if that is the representation, we'll

22     take that and we'll withdraw the objection.

23           THE COURT:  Okay.  And it sounds like they're

24     willing to talk about a declaration.  Do you need more than

25     that at this time?

```
 1                    MR. LEE:  No, Your Honor.  Thank you.

 2                    THE COURT:  Thank you.

 3                    Was there more to say about that?

 4                    No, I was just going to -- may I get my slides

 5      back?  I apologize.

 6                    THE COURT:  You can have mine back.  I don't

 7      need it yet.

 8                    MR. PEJIC:  Thank you.

 9                    THE COURT:  Was that all the issues that

10      plaintiffs wanted to do raise for today, Mr. Lee?  Mr. Lee,

11      any other plaintiff issues?

12                    MR. LEE:  No, I understand that they have some

13      objections to our opening.

14                    THE COURT:  We will turn to those now then.

15                    Good morning.

16                    MR. MIZERK:  Good morning, Your Honor.  Don

17      Mizerk for defendants.

18                    There is an issue for plaintiffs' sides in the

19      opening.  Two of their slides, at least, PDX-1.8 and 1.25,

20      we, as the Court probably knows, yesterday, I think it was,

21      there was a DE 677 that we withdrew our -- we withdraw our

22      objections to our obviousness defense with respect to the

23      '208 patent.  And in exchange, plaintiffs agree that they

24      will, quote:  Will not elicit testimony concerning objective

25      indicia of nonobviousness of plaintiffs' 13 or 104 of the
```

1    '208 patent from any witness.

2              So we think for plaintiffs to argue in their

3    opening statement about secondary consideration evidence

4    that they agreed they would not be producing, we just don't

5    want the Court to be misled during the course of the trial

6    that the defendants are going to allow or not object to any

7    presentation of secondary consideration evidence with

8    respect to the '208 patent.

9              So that's -- you know, they can say whatever

10   they want, I guess, during opening statement about what the

11   evidence will show, but when they agreed they're not going

12   to present evidence on this topic, we think it is a bit

13   disingenuous.

14             THE COURT:  Okay.  That is one objection.  Is

15   there another?

16             MR. MIZERK:  No, Your Honor.  The only question

17   I had was, we had a question about exhibits that were

18   entered in the -- Dr. Buckton's segment.  Did you want us to

19   address the exhibits that were entered now, or do you want

20   to wait until we -- after opening statements?

21             THE COURT:  Why don't you do it now.  I meant to

22   raise that.  Thank you.  I don't think there are any

23   objections about those.  We do need to make the record so

24   yes, thank you for reminding me.

25             MR. MIZERK:  There were no objections in the

1     exhibits that we would move in would be DTX-567, 571, 574,

2     575, 576, 579, 580, 581, 582, 583, 584, 590, 620, 630, 631,

3     632, 633, 634, 635, and 636.

4                THE COURT:  Any objection to those Dr. Buckton

5     exhibits?

6                MS. WIGMORE:  One moment, Your Honor.

7                THE COURT:  Sure.

8                MS. WIGMORE:  584 was used?

9                MR. MIZERK:  I believe it was used.

10               THE COURT:  Why don't you all double-check that

11    one at a break, but with respect to the others, any

12    objections?

13               MS. WIGMORE:  No objection.

14               THE COURT:  So the others are admitted, and you

15    will come back to me on the 584 I think it is.

16               (Above-referenced exhibits were admitted into

17    evidence.)

18               MR. MIZERK:  Thank you, Your Honor.

19               THE COURT:  Thank you.

20               We'll hear the response on 1-8 and 1-25.

21               MR. LEE:  Your Honor, secondary considerations

22    are out, but that evidence is still -- some of that evidence

23    is still relevant for three purposes.

24               Let me go from the specific to the more general.

25               In Your Honor's construction of

1    "pharmaceutically acceptable salt," there is a risk-benefit

2    analysis done and determined by sound medical judgment.

3    That is a determination made as a moment in time.  The

4    determination for the moment in time would be as of the time

5    of the invention.  And it's compared to what would be

6    otherwise available.  You can't make a risk-benefit ratio

7    determination without some comparison to what was available

8    at that time.

9           So some of the evidence, not all of it, but some

10   of the evidence on what was available at the time, what the

11   benefits of apixaban over what's available at the time are

12   part of the risk benefit analysis Your Honor has

13   incorporated into your claim interpretation so the evidence

14   is relevant for that purpose.

15          The second is in some of the exhibits that were

16   just introduced that Dr. Buckton testified to, they

17   specifically discuss the development program of Eliquis of

18   apixaban at DuPont and BMS.  They referred to it generally

19   and specifically.  It would be a little unfair for them to

20   be able to use documents that have snippets out of the

21   development program without our being able to put them in

22   context generally.

23          And then as the advisory community notes

24   recognize in a trial, there's going to be background

25   information about the product, the party, the development

```
 1    of the invention that while not specifically relevant to

 2    precise issues in the case are necessary to provide the full

 3    context.

 4                So going from the specific to the more general,

 5    all of these, the Aristotle article, the Heroes of Chemistry

 6    Award are relevant for those purposes, and we would offer

 7    them, Your Honor, only for those purposes.

 8                THE COURT:  All right.  So I think you agree

 9    that if the only basis for relevance of a piece of evidence

10    in this trial is secondary considerations, it's no longer

11    relevant.  If that were the sole basis.

12                MR. LEE:  If that were the sole basis.

13                So, Your Honor, in the stipulation, the experts

14    who were offering testimony on secondary considerations, we

15    withdraw that and we won't offer that.

16                THE COURT:  Okay.  So this objection is

17    overruled but before you sit, it does remind me yesterday's

18    letter was encouraging.  Do the plaintiffs believe it will

19    shorten the trial, or is it too soon to say?

20                MR. LEE:  Your Honor, the best we can say is

21    we're hopeful.

22                THE COURT:  All right.  You're not willing to

23    give back hours at this time.  Do I understand that

24    correctly?

25                MR. LEE:  Not with the possibility you're going
```

1        to take them back anyways.

2                    THE COURT:  Defendants, are you in the same

3        position in terms of the hours, you're not ready to give any

4        back yet but hopeful perhaps?

5                    MR. PEJIC:  Correct Your Honor.

6                    MR. KOCHANSKI:  Correct, Your Honor.

7                    MR. MIZERK:  Yes, Your Honor.

8                    THE COURT:  Okay.  All right.  How many openings

9        should I be expecting from the defendants today?

10                   MR. MIZERK:  Your Honor, three, but we

11       coordinated so there is no duplication.

12                   THE COURT:  Okay.

13                   MR. HENEGHAN:  Judge, excuse me.  We have one

14       other issue.

15                   THE COURT:  If you do, come on back.

16                   MR. HENEGHAN:  The Court may recall that during

17       discovery, there was a dispute about whether or not certain

18       aspects of the SigmaPharm manufacturing process were trade

19       secrets and should be given extra protection.  And so the

20       parties have worked out an agreement, at least between the

21       parties, as to how that information should be handled so

22       that we don't have to ask the Court to close the courtroom.

23                   We realize that is a tall order, and so we don't

24       want to get sidetracked by that, so the parties have agreed

25       that a particular demonstrative that will be shown during

1    Dr. Atwood's testimony, PDX-5.32, which makes reference to

2    the part of the process that SigmaPharm asserts is trade

3    secret, we have agreed to the language in that slide, and

4    the parties have agreed that Dr. Atwood will not become any

5    more specific about that part of the process other than what

6    is on that slide.

7                 And the parties have also agreed that to the

8    extent the documents describe that part of the process, that

9    those documents would be submitted into evidence under seal

10   assuming the Court grants us that permission.

11                 THE COURT:  And that is unopposed?

12                 MR. HENEGHAN:  Unopposed.  We agreed to that.

13                 THE COURT:  Codefendants have no objection,

14   right?

15                 MR. MIZERK:  No objection, Your Honor.

16                 MR. PEJIC:  Correct, Your Honor.

17                 THE COURT:  And plaintiffs agree?

18                 MS. WIGMORE:  No objection.

19                 THE COURT:  Okay.  Then we will proceed in that

20   manner.  It sounds like it will be workable.  If there are

21   any problems, we'll let you know.

22                 MR. HENEGHAN:  And we've been able to work

23   pretty cooperatively so I'm sure there won't be a problem.

24                 THE COURT:  I appreciate that.

25                 Okay.  Any other issues from defendants before

1    we get to openings?

2                  MR. PEJIC:  No, Your Honor.

3                  MR. MIZERK:  No, Your Honor.

4                  MR. KOCHANSKI:  No, Your Honor.

5                  THE COURT:  All right.  Then I think we will

6    hear openings.

7                  Do you have another copy of your slides?

8                  MR. LEE:  I do.

9                  THE COURT:  I have one.

10                 (Demonstratives passed forward.)

11                 MR. LEE:  May I proceed, Your Honor.

12                 THE COURT:  Go ahead.

13                 MR. LEE:  May it please the Court.  My name is

14   Bill Lee, and together with my colleagues from the

15   WilmerHale and Farnan firms, I represent the plaintiffs,

16   Bristol-Myers Squibb and Pfizer.

17                 BMS and Pfizer are two of the world's leading

18   innovative pharmaceutical companies.  Together they have

19   accounted for many of the last century's greatest

20   pharmaceutical breakthroughs.

21                 This case is about one of those breakthroughs,

22   an anticoagulant called Eliquis which has benefitted

23   millions of patients around the world.

24                 There are, as the Court knows, three remaining

25   defendants in the case:  SigmaPharm, Sunshine Lake, and

1    Unichem.  Each is, of course, seeking to offer a generic

2    version of Eliquis.

3             Millions of Americans suffer from thromboembolic

4    disorders.  This is depicted on the screen in Slide No. 1.2.

5    These are disorders caused by excessive blood clotting.

6    Blood clots that form in the blood vessels because of a

7    condition called thrombosis can lead to numerous problems

8    and, most importantly, can be fatal.

9             One set of problems arises from blood clots that

10   form in the chambers of the heart.

11            Many people suffer from arrythmia called atrial

12   fibrillation.  Afib, actually, more than 2.5 million people

13   in the United States have Afib today.

14            Afib causes one of the heart's chambers to

15   contract in an irregular way.  That irregularity can cause

16   stagnant blood to remain in the chamber as shown on the

17   screen now, and that blood can form clots.

18            If a clot breaks free, it can naturally flow to

19   the brain where it can cause a stroke.  Because Afib

20   increases the likelihood that these clots will form, Afib

21   increases the risk of stroke.

22            Many people are also at risk for the formation

23   of blood clots in their legs.  Patients who decrease

24   mobility, such as the elderly, or patients who have recently

25   had orthopedic surgery are at a particularly high risk.

1          If a blood clot forms in the veins in the

2   patient's leg, it can cause a painful condition called deep

3   vein thrombosis or, as Your Honor will learn, DVT, and that

4   might just be the beginning of the patient's problems.

5          As the slide now depicts, if a clot breaks free,

6   it can travel to the lung.

7          Blood clots that make their way to the arteries

8   and lungs can cause a pulmonary embolism, which is a

9   dangerous, and again, sometimes fatal condition.

10          Deep vein thrombosis and pulmonary embolisms

11   afflict up to 600,000 individuals in the United States each

12   year and are implicated in approximately 100,000 deaths in

13   the United States each year.

14          Blood thinners, or anticoagulants, are used to

15   treat and treat thromboembolic disorders.  Simply stated,

16   anticoagulants reduce the risk that blood clots will form.

17   This reduces the risk that the clot will break free and

18   cause a stroke, pulmonary embolism, or other serious

19   condition.

20          Patients who have Afib or who are at risk

21   for DVT take anticoagulants for long periods of time.

22   Sometimes, indeed, for the rest of their entire lives to

23   mitigate the risk of serious clots.

24          Now, anticoagulants, as the Court will learn,

25   presents several unique drug development challenges.  First,

1    anticoagulants necessarily work in a specific therapeutic

2    window.

3           As the evidence will show, the therapeutic

4    window or index is the window between a therapeutically

5    effective dose and a dose that can cause harmful side

6    effects.

7           If not enough of the drug gets into the

8    bloodstream, the drug will not have the desired effect.  If

9    too much of the drug gets into the bloodstream, the patient

10   will suffer uncontrolled bleeding.

11          Second, anticoagulants for these chronic

12   conditions where patients need to take it perhaps for the

13   rest of their lives need to be easy to take.  An

14   easy-to-take pill was necessary.

15          The first major oral anticoagulant was a drug

16   called Warfarin, also sold under the brand name Coumadin.

17          Warfarin was not and is still not an optimal

18   drug.  It was first commercialized as rat poison in 1948 and

19   was approved as a drug in 1954.

20          Warfarin is, however, Your Honor, a highly

21   effective anticoagulant, and quickly became the standard of

22   care for patients with thromboembolic disorders.  It

23   remained the standard of care for nearly 60 years.

24          But Warfarin had limitations that made

25   anticoagulant therapy challenging for many patients.

1    Warfarin, as the Court will learn, had a very narrow

2    therapeutic index.  As a result, doctors were required to

3    monitor patients closely, and patients were required to

4    undergo frequent blood tests.  Warfarin also had many

5    undesirable interactions with food and other drugs.

6              As the evidence will show, a food-drug

7    interaction and drug-drug interaction can cause harmful side

8    effects, including bleeding, and in the most serious

9    circumstances, stroke.

10             Warfarin interacts with common foods and spices

11   like green vegetables, ginger, garlic, and can cause harmful

12   side effects.  It can also have unwanted reactions to other

13   drugs, including common over-the-counter drugs like pain

14   relievers.

15             Food-drug interactions can also result in

16   patients failing to take prescribed dosage, a problem called

17   compliance.  Compliance is the degree to which a patient

18   correctly follows the medical advice of dosing regime.

19             A medication can be effective only if there is

20   compliance and the patient takes the drug as prescribed.

21   Warfarin's limitations, its food-food interactions, its

22   food-drug interactions make compliance more difficult.

23             But notwithstanding its limitations, Warfarin

24   was better than untreated disease creating the risk of fatal

25   stroke.  There was still a need for something better.

1              The pharmaceutical industry answered this call,

2     and as shown on Slide 1.6, particularly began in the 1990s

3     to search for a better solution.

4              Dozens of leading pharmaceutical companies, the

5     Court will learn, started research programs to find a more

6     and better anticoagulant, one that would overcome Warfarin's

7     limitations, but most of these programs failed.

8              Despite dozens of companies investing

9     significant amounts of time, effort, and money to develop

10    and improve an anticoagulant, including those shown on this

11    slide, only four companies discovered molecules that

12    ultimately became FDA-approved drugs.  Those were, as now

13    shown on the slide, Boehringer Ingelheim, DuPont

14    Pharmaceuticals, Bayer, and Daiichi-Sankyo.

15             The research that led to the drug issue began at

16    DuPont.  In 2001, Bristol-Myers Squibb acquired DuPont

17    Pharmaceuticals and simplicity for most purposes, I'll refer

18    to them collectively as BMS for the rest of the opening.

19             The drug that emerged from the BMS's program is

20    called Eliquis.  Since receiving FDA approval in 2012, it

21    has, as I said, transformed the lives of millions of

22    patients with thromboembolic disorders.  Clinical trials,

23    including trials published in the *New England Journal of*

24    *Medicine* as shown on slides PDX-1.8, had shown Eliquis to be

25    superior to Warfarin for certain large patient populations,

1  including, Your Honor, for the prevention of strokes

2  resulting from atrial fibrillation.

3          Eliquis is approved for each of the disorders I

4  discussed with Your Honor earlier.

5          It has been shown to reduce the risk of stroke

6  and other major blood clots in patients with Afib.  It has

7  been shown prevent deep vein thrombosis and pulmonary

8  embolism in patients who have had major orthopedic surgery,

9  and it is indicated for the treatment, not just prevention,

10  of deep vein thrombosis and pulmonary embolism.

11          All of this is reflected in the label, the

12  package insert shown on PDX-1.9.

13          Now, before Eliquis was approved, BMS and Pfizer

14  entered into a co-development agreement in part to complete

15  the extensive clinical trials that Your Honor will hear

16  about.

17          Since Eliquis was approved, as I said, it has

18  been used to treat literally millions of patients.

19          This is, the evidence will show, truly a

20  breakthrough drug that has become a block bluster drug.

21          Now, as is true with many breakthroughs, this

22  did not happen without a lot of hard work.  The evidence

23  will show the complexing challenging work that went into the

24  discovery of apixaban, and it will also reveal the separate

25  and challenging work that resulted in the discovery of how

1    to formulate apixaban so it could be delivered to patients.

2                 Those are the two inventions before Your Honor.

3                 Now, DuPont had a long history with

4    anticoagulants.  By the late 20th Century, it actually had

5    the right to Warfarin and was selling it under the trade

6    name, brand name, Coumadin.  By the early 1990s, DuPont had

7    started to look for ways to develop a better version of

8    Warfarin.  But the search was not simple.  As was true for

9    much of the pharmaceutical industry, DuPont wasn't even

10   precisely sure where to start.

11                As the evidence will show, blood coagulation is

12   a very complex process, and I have a simple slide to

13   demonstrate that hopefully.  It's PDX-1.12.

14                A stimulus starts a cascade of chemical

15   reactions that causes a clot to form.  Your Honor will hear

16   about this process in more detail from people much more

17   qualified than I am to talk about it, but the process can be

18   conceptualized as a series of incrementally increasing

19   falling dominos as shown on this slide.  Each domino

20   represents an enzyme in the body.  Each enzyme must form in

21   order and perform its function in order for the clot to

22   form.

23                Anticoagulants, Your Honor, work by disrupting

24   this cascade.  If the cascade can't function, the clot will

25   not form.

1          Now, Warfarin takes a scattershot approach to

2     this task.  It reduces the body's ability to use vitamin K

3     which is required to make many of these enzymes.  That

4     effectively removes the enzymes from the chain.  That is how

5     Warfarin, as shown on slide PDX-1.13, blocks clot formation.

6          But this scattershot approach, perhaps targeting

7     any number of enzymes within the cascade, is responsible for

8     many of Warfarin's limitations.  The biological effects

9     amplify each step of the cascade, and as a result, small

10    changes in the amount of upstream enzymes can have a

11    significant effect downstream.  And many foods contain

12    vitamin K, the various foods I mentioned earlier, green,

13    leafy vegetables that are otherwise good for people with

14    cardiovascular disorders.  This extra vitamin K can actually

15    disrupt how Warfarin functions.

16         When DuPont began its research program, it tried

17    to develop drugs that would block the activities of a

18    specific enzyme in the cascade, rather than the scattershot

19    approach of Warfarin.

20         The next-to-the-last enzyme in the series is

21    called thrombin.  It is now shown on PDX-1.14.

22         If that enzyme can be blocked, at that point in

23    the cascade, the clots would not form.

24         DuPont spent years searching for an effective

25    thrombin inhibitor, but it failed to find one suitable for

1    clinical use.

2              Around 1994, the DuPont team turned their

3    attention to the next enzyme in the cascade.  That enzyme is

4    called Factor Xa, which is usually written with a 10 in

5    Roman numeral form.

6              The logic was similar to the target of the

7    thrombin inhibitor.

8              If Factor Xa's activity could be blocked with a

9    drug, clots would not form.

10             When the BMS team started this project, there

11   were no approved Factor Xa inhibitors anywhere.

12             No one even knew whether it was possible to

13   design a Factor Xa inhibitor that would work in patients.

14             The team recognized the difficulty and

15   uncertainty of the project but was convinced, in the

16   legitimacy of science, behind disrupting a single enzyme in

17   the cascade.  They believed it was sound.  They believed

18   they could demonstrate it was sound.

19             And as the company selling Warfarin, they felt

20   an obligation to come up with something better that would

21   make the risk-benefit ratio of the new product better.

22             From the beginning, this was a

23   resource-intensive project.  BMS organized the research into

24   multiple teams as shown on PDX-1.16.  These teams, Your

25   Honor will learn, made over 10,000 compounds, each of which

1     was tested.

2              BMS started testing whether its compounds were

3     effective to Factor Xa inhibitors in the biology portion of the

4     project.

5              Your Honor will hear from Robert Knabb today,

6     the scientist who oversaw the biology portion of this

7     project and worked on the leadership team.

8              The team's earlier successes came in 1997 and

9     1998 when they discovered two compounds, DPS 423 and DPS

10    906.  Both drugs went in their clinical trials.

11             Neither drug emerged from clinical trials.  Both

12    had problems.

13             But as I said earlier, the BMS researchers viewed

14    the program as critically important.  So even while these

15    two compounds, these two promising compounds were making

16    their way through clinical studies, they kept making other

17    compounds.

18             In 1999 and 2000, BMS researchers made hundreds

19    of new compounds with a specific structure.  Most of them

20    they found were good Factor Xa inhibitors in a test-tube, but

21    they were not effective in animals.

22             The compounds could not work as drugs in humans.

23             Then came the key breakthrough.  The key

24    breakthrough came when BMS scientists started making

25    compounds with something called a lactam ring.

1               The Court will hear from one of these

2       scientists, Michael Orwat, who first made apixaban later

3       today.

4               On slide PDX-1.19, you will see the graphic

5       depiction of apixaban or Eliquis.

6               On the right-hand side, you will see the

7       terminal lactam ring which is highlighted in red.

8               As the evidence will show, lactams are chemical

9       groups that have a nitrogen, a carbon, and an oxygen as

10      shown on the right-hand portion of this slide.  And in

11      addition to having the three atoms, the nitrogen and carbon

12      must be part of a ring.

13              The compounds that Mr. Orwat discovered had

14      surprising and remarkable properties.  When he used this

15      lactam discovery with compounds known to be good Factor Xa

16      inhibitors in a test-tube, the compounds became tolerable

17      and usable in living things, including, eventually,

18      patients.

19              The lactam ring and its discovery solved the

20      problem how to make an effective inhibitor that could

21      operate outside of the test-tube, and made it possible to

22      have an effective drug.

23              Mr. Orwat made apixaban for the first time on

24      January 3, 2001.  PDX-1.20 is an excerpt from his laboratory

25      notebook.  You will see outlined in red the lactam ring.

1            BMS applied for a patent on these

2     lactam-containing compounds in 2001 and the Patent Office

3     issued the '208 patent.

4            The focus of the '208 patent is the lactam

5     group.  It says so in the title of the patent.

6            And the patent, Your Honor, specifically

7     discloses apixaban.

8            There is a specific example in the patent,

9     Example 18, now shown on PDX-1.22.  Example 18 has the

10    chemical name for apixaban, and the remaining portion of the

11    example tells one of ordinary skill in the art precisely how

12    to make it.

13           Indeed, apixaban is also specifically claimed in

14    the '208 patent.  There are two asserted claims before Your

15    Honor from the patent.  Claim 13 specifically claims

16    apixaban, there is no dispute about that, or the

17    pharmaceutically acceptable salt form.

18           Claim 104 claims the apixaban compound when it

19    is in crystalline form.

20           As shown on PDX-1.24, the timeline, the Factor

21    Xa project at BMS spanned almost two decades.  It began in

22    1994.  Apixaban was first synthesized in 2001, and apixaban

23    was not approved by the FDA until 2012.

24           As I said, to arrive at apixaban, BMS and DuPont

25    made over 10,000 compounds.  At least six different labs

1    were involved in making these compounds and hundreds

2    actually made it to testing in animals.

3              Dozens of scientists were named in the

4    publications reporting on the research, and the '208 patent

5    and apixaban were widely praised.

6              In fact, in 2015, the American Chemical Society

7    awarded apixaban the Heroes of Chemistry award.  A photo,

8    which is PDX-1.25, includes two of the witnesses you will

9    hear today:  Dr. Knabb and Mr. Orwat.

10             Now, inventing the apixaban compound made it

11   possible to provide an improved anticoagulant, but another

12   challenge remained.  How do you get it to patients in a

13   consistent and effective way?  And that that led to the '945

14   patent.

15             The '945 patent is entitled:  Apixaban

16   formulations.

17             It was filed in, 2011, issued in 2016, and

18   claims priority to an application that was filed in 2010 as

19   is evident from the face of the patent.

20             There are four named inventors including Jatin

21   Patel, who was a technical team lead, and who will tell the

22   Court about the invention.

23             As of the mid-2000s, as the evidence will

24   demonstrate, apixaban had been well studied in the clinic.

25   It had been in clinical trials for some number of years and

1   was about to enter Phase III clinical trials.

2           Early clinical studies demonstrated that

3   apixaban tablets were efficacious, rapidly absorbed, and had

4   good oral bioavailability.

5           Now, bioavailability is central to the '945

6   invention to understand it.  So what is it?

7           To be effective, apixaban must get into the

8   bloodstream.  Bioavailability is the measure of the amount

9   of blood absorbed into a patient's bloodstream compared to

10  the amount of drug administered.  100 percent

11  bioavailability means that 100 percent of the administered

12  drug was absorbed, and 50 percent bioavailability, of

13  course, means that 50 percent of the drug was absorbed and

14  the other half passed through the body.

15          As apixaban was entering the critical Phase III

16  clinical trials, the team noticed something unexpected and

17  concerning.

18          As the Court will hear, based upon apixaban's

19  properties, one of ordinary skill in the art, at the time of

20  the invention, would not have predicted that the dissolution

21  rate of apixaban would influence bioavailability.

22          BMS, however, unexpectedly found that apixaban's

23  dissolution rate actually did affect its bioavailability.

24  Specifically, BMS discovered that a slower dissolving

25  apixaban tablet would result in lower bioavailability.  That

 1    was completely unexpected and concerning.

 2            Having determined the dissolution rate affected

 3    apixaban's bioavailability, the team discovered a

 4    dissolution rate threshold.  They discovered that if

 5    77 percent by weight of the apixaban tablet could dissolve

 6    in 30 minutes, you could guarantee consistent apixaban

 7    exposure in bioavailability.

 8            But merely identifying the threshold, Your

 9    Honor, was not end of the story.  The team now had to find a

10    way to control dissolution rate.

11            The team engaged in a three-year study to

12    examine the factors that could impact dissolution rate.

13            They considered manufacturing parameters.

14            They considered drug substance parameters.

15            They considered a variety of formulation

16    factors.

17            In the end, they discovered that there was only

18    one factor among all of these possibilities that materially

19    impacted the dissolution rate, and that was the particle

20    size of the active ingredient.  That particle size was

21    89 microns or less.

22            In the patent itself, as now shown on the screen

23    on PDX-1.29, the inventors described the discovery that they

24    identify as surprisingly and unexpected.  A discovery that

25    compositions containing apixaban particles of a $D_{90}$ of less

1    than 89 microns led to consistent exposure and consistent

2    therapeutic effect when 77 percent of apixaban by weight in

3    composition dissolves in 30 minutes.

4              A $D_{90}$, as Your Honor may recall from the *Markman*

5    proceedings, simply means the 90 percent of the volume of

6    the particles have a particle size less than the identified

7    value here of 89 microns.

8              The '945 patent's asserted claims are directed

9    to pharmaceutical compositions having these special

10   properties that ensure consistent bioavailability.  We've

11   asserted two claims, claims 21 and 22, that are directed to

12   the 2.5 milligram and 5 milligram tablets.  Both claims

13   depend from claim 12.

14             Most of the limitations of these claims are not

15   in dispute.  I'm only going to focus, for opening purposes,

16   upon two to preview the focus of the evidence.

17             The first is the crystalline limitation.  This

18   comprising claim simply requires that the defendant's

19   tablets contain some, a comprising claim, crystalline

20   apixaban.

21             The second is the particle size limitation,

22   which is a key part of the invention.

23             The asserted claims require that the crystalline

24   apixaban particles in the defendant's tablets have a $D_{90}$, a

25   distribution equal to or less than 89 microns.

1          So with that as the background, let me turn to

2    the issue of infringement.

3          The '208 patent is asserted against all

4    defendants except Sunshine Lake who is not challenging

5    validity or infringement of that patent.

6          The '945 patent, asserted against all three.

7          The infringement issues for the '208 patent are

8    straightforward, and our chemist, Professor MacMillan, the

9    former chairman of the chemistry department of Princeton,

10   whose qualifications are summarized on PDX-1.32, will

11   explain why.

12         Each defendant is seeking to make a product that

13   contains apixaban so they all necessarily infringe the

14   compound patent, which specifically describes the structure

15   of apixaban.

16         Unichem actually acknowledges this undisputed

17   fact and has stipulated to infringement.

18         SigmaPharm contests whether it has or uses

19   crystalline apixaban, which is required by claim 104.

20         The evidence will show, as Dr. MacMillan will

21   explain, that it does.

22         Now, each of the defendants also infringes the

23   '945 patents asserted claims.  For the '945 patent, the

24   infringement dispute will focus on the two limitations that

25   I just discussed with Your Honor from claims 21 and 22

1    derived from claim 12.

2              The Court will hear from three experts on these

3    limitations.

4              Dr. Jerry Atwood will address crystallinity and

5    particle size.

6              Dr. Eric Munson will address crystallinity;

7              And Dr. Cory Berkland will address particle

8    size.

9              The evidence will demonstrate that all three of

10   the defendants infringe the asserted claims.

11             So let me turn now to the invalidity arguments.

12             For the '208 patent, there are now, as a result

13   of the narrowing we've engaged in, only two invalidity

14   arguments left.  The defendants raise a 112 challenge to the

15   claims, and what they characterize as an improper dependency

16   argument to the claims.

17             Neither has merit.

18             First, the defendants argue that claim 13 is not

19   enabled because a person of ordinary skill in the art could

20   not make a pharmaceutically acceptable salt form of

21   apixaban.

22             You will recall Your Honor decided this issue or

23   heard this issue and reached a decision on construction in

24   the *Markman* proceeding.  You have heard about this last week

25   when Dr. Buckton testified.

1          As shown on PDX-1.35, claim 13 is directed to

2  apixaban or its pharmaceutically acceptable salt forms.

3          The Court has construed "pharmaceutically

4  acceptable salts" as follows.

5          And I have broken Your Honor's claim

6  interpretation down into two portions or two components.

7          The construction has essentially two components.

8  You have to be able to make a salt and the salt must be, to

9  quote Your Honor, "within the scope of sound medical

10  judgment, suitable for use in contact with the tissues of

11  human beings and animals without excessive toxicity,

12  irritation, allergic response, or other problem or

13  complication, commensurate with a reasonable risk-benefit

14  ratio."

15          So what will the evidence show?  What will the

16  defendants offer you to carry their burden, including

17  invalidity by clear and convincing evidence?

18          Here is what Your Honor will hear.

19          There is no question the first element is

20  satisfied.

21          The evidence will demonstrate that one of

22  ordinary skill could make apixaban salts, and this could be

23  done using the techniques expressly described in the '208

24  patent and known to one of ordinary skill in the art.

25          If I bring up PDX-1.37, these are portions of

1    the patent at column 116, lines 48 to 67, carrying over to

2    117, 1 through 13.

3              As you can see, the patent provides a detailed

4    description of how pharmaceutically acceptable salts are

5    made.  It describes modifying the parent compound with acid

6    or base salts.  It refers to conventional methods that can

7    be used, and it specifically refers and incorporates, by

8    reference, Remington's Pharmaceutical Sciences, that

9    provides a list of salts that are suitable for

10   pharmaceutical use.

11             Now, significantly, Your Honor, none of the

12   defendants has done any experiment to try to make a salt of

13   apixaban.  None of their experts has done a single

14   experiment to try to make a salt of apixaban.

15             But someone has.  And the person who has is our

16   expert, Professor Eric Jacobsen, a chemistry professor at

17   Harvard, who tried and immediately succeeded.

18             As you will hear, Professor Jacobsen will

19   explain that a student working at his direction, using the

20   techniques described in the patent and those well known to a

21   person of ordinary skill in the art, at the time of the

22   invention, made three different apixaban salts, the sodium

23   salt, potassium salt, the hydrochloric salt, in less than a

24   day.

25             Professor Jacobsen did a sensitive test to

1    confirm the salts were formed, and he will explain just why

2    he's sure they are apixaban salts.

3            The three salts that Professor Jacobsen's

4    students made are actually disclosed in the specification.

5            Alkali salts, disclosed on the left-hand side of

6    PDX-1.40, include, it is undisputed, both sodium and

7    potassium.

8            As you can see a little bit further down in the

9    left-hand column, there is a specific disclosure of the use

10   of hydrochloride.

11           The process of forming these salts, Your Honor,

12   was so simple using techniques available of one of ordinary

13   skill in the art at the time of the invention, that it would

14   be able to show the entire process in a video that is less

15   than three minutes long.

16           Now, the defendants contend that some BMS

17   documents suggest that apixaban cannot be ionized ever.

18           Mr. Mizerk walked through some of those

19   documents with Dr. Buckton, but you now know, or you will

20   know, that it can be done because Dr. Jacobsen did it.  And

21   his graduate student did it in a matter of minutes.

22           And as our witnesses will explain, those

23   documents, the documents that Mr. Mizerk walked Dr. Buckton

24   through, were written in a specific context.  And the

25   context was the question of whether apixaban could be

1    ionized to increase solubility.

2             Those documents, Your Honor will hear, reflect

3    BMS's internal judgment of the drug development team that at

4    the time it could not make an apixaban salt that would solve

5    any solubility concerns that might arise with apixaban.

6             There is a difference between "need not make"

7    and "could not make."

8             The development team need not make or did not

9    need to make an apixaban salt because it would not improve

10   solubility.

11            Dr. Jacobsen's work proves that a salt could

12   have been made.

13            There also will be, in our view, Your Honor, no

14   question that the salts Professor Jacobsen made satisfy the

15   second element of Your Honor's construction, which requires

16   sound clinical judgment.

17            The Court will hear from only one clinician who

18   can offer an opinion based upon sound medical judgment.

19            Our expert, Dr. Kowey, of the Lankenau Heart

20   Institute over in Philadelphia.  Dr. Kowey is a practicing

21   cardiology who has, over 40 years, treated thousands of

22   patients for the disease condition we have discussed.

23            Dr. Kowey will testify that salt and drug

24   compounds are common.

25            Warfarin, actually, Your Honor will learn, is a

1   sodium salt.

2           Dr. Kowey will also testify that he would not

3   there to be any clinically meaningful difference between

4   administering Eliquis and administering a tablet containing

5   apixaban salt like the ones that Professor Jacobsen made.

6           He will testify that in his sound medical

7   judgment, the medical risk-benefit analysis made the

8   apixaban salts pharmaceutically acceptable.

9           He will describe a common sense conclusion.

10  Whatever tiny amount of irritation, if any, that could

11  result from taking a 10 milligram dose of apixaban salt, the

12  largest dose of apixaban, that risk is vastly outweighed by

13  the therapeutic benefit of apixaban, and the improvement

14  that apixaban provided over Warfarin.

15          Significantly, Dr. Kowey is the only clinician

16  that will offer you an opinion based upon sound medical

17  judgment.

18          The defendants, who have the burden of proof,

19  will have an expert, a clinician, Dr. Zusman, who has not

20  offered in his report a contrary opinion.  He criticized

21  Dr. Kowey for offering his opinion, but then he admits in

22  his report itself, that the apixaban salt, and I quote this

23  for Your Honor because it's their own clinician, would be

24  "unlikely to have any appreciable effect."

25          Now, Professor MacMillan, our medicinal chemist,

1     will bring this all together in the enablement framework.

2     He will explain Professor Jacobsen's experiment involved

3     techniques described in the patent were known to one of

4     skill in the art.  He will rely in part on Dr. Kowey's

5     testimony, and explain that a person of ordinary skill in

6     the art would have understood Professor Jacobsen's salts or

7     the salts that would be made by one of ordinary skill in the

8     art, to be pharmaceutically acceptable; and then he will walk

9     through, on a disciplined basis, each of the *Wands* factors

10    to explain just why claim 13 is enabled.

11            The defendants nonenablement argument, Your Honor,

12    the evidence will establish, rests solely on speculation.

13            First, they claim they cannot -- a salt could

14    not be made, but they did nothing to prove that.

15            They then claim a salt might be -- not be

16    stable, but they did nothing to prove that.

17            They then claim it might not be able to be

18    purified.  They did nothing to prove that.

19            They then claim it might not be able to be

20    formulated.  Again, they did nothing to prove it.

21            Not a single experiment by experts who are fully

22    qualified to do those experiments to support any of these

23    hypothesis.

24            Now, the defendants also packaged this same

25    argument as a written description argument.  But as our

1    experts will explain, the inventors disclosed standard

2    techniques to make pharmaceutically acceptable salts of

3    apixaban, and a person of ordinary skill in the art would

4    have known those salts were pharmaceutically acceptable.

5              As the evidence will demonstrate, as the Federal

6    Circuit has recognized, makings salts in contrast to

7    discovering the compounds is routine work because there are

8    a limited number of salts, the techniques, as Dr. Buckton

9    admitted last week, for making salts have been known for

10   decades, and the test to determine the characteristic of

11   those salts have been routine for decades.

12             For essentially the same reason that there is an

13   enablement problem, there's no written description problem.

14             Now, let me turn to this second defense that

15   they call improper dependency.

16             The claim, as I understand it, reduces to an

17   argument that claim 13 falls outside the scope of claim 1

18   from which claim 13 depends indirectly.

19             Only SigmaPharm raises this argument, and it has

20   called it both an improper dependency argument and a

21   noninfringement argument.

22             The issue, at least in my view, is essentially

23   the same no matter which legal lens you view it through.

24   The only difference might be the burden of proof.

25             Here is the issue.

1          PDX-1.43 is on the screen now.  We saw earlier

2     that claim 13 expressly claims apixaban.  There is no

3     dispute about that.

4          Claim 13 depends from claim 8 which lists

5     several chemical compound by name.  Apixaban is one of those

6     compounds.

7          Now, claim 8, in turn, depends on claim 1.

8     Claim 1, which is on the screen now in PDX-1.44, is a very

9     broad genus claim.  It spans nearly six columns.

10         To be clear, Your Honor, plaintiffs have not

11    asserted a claim 1 in this case, and its validity and its

12    breadth is not at issue before Your Honor.

13         This slide, PDX-1.45, shows one of the many

14    structural components addressed in claim 1.  And the claim

15    calls it Ring M in the upper left-hand corner of PDX-1.45.

16         Claim 1 recites molecules that have this ring

17    structure in the core.  As you can see on the right-hand

18    side, apixaban has this ring structure.

19         It is undisputed that a person of ordinary skill

20    in the art, a chemist, would understand each of the points

21    on this red highlighted hexagon to represent a carbon, as

22    chemists know, and that for two of the points, it would be

23    two hydrogen atoms attached to carbon.

24         The same is true for Ring M; that's how one of

25    ordinary skill in the art would understand it.

1          So those hydrogen atoms are not drawn here

2    because, for simplicity and convenience, chemists understand

3    the meaning and don't draw them.

4          But on PDX-1.45, we have drawn them and added

5    them so Your Honor can see them.

6          Now, claim 1 requires Ring M to be, and the

7    words are important, to be "substituted with 0 to $2R^{1a}$."  $R^{1a}$

8    is a variable group that can come from a long list of

9    options in claim 1, one of which is hydrogen.

10          SigmaPharm's expert, Dr. Clay Heathcock,

11    apparently contends that apixaban falls outside the scope of

12    claim 1 because Ring M, this Ring M as shown on the

13    right-hand side, has more than two hydrogens.  It has four

14    hydrogens.

15          But the claim term doesn't say "has."  The claim

16    term is "substitution."  It is not enough that a ring

17    already have hydrogen.

18          A person of ordinary skill in the art would know

19    that Ring M and apixaban already had the four hydrogens.

20    There is no substitution.

21          But the objective facts will indicate just how

22    illogical this argument is.

23          If SigmaPharm's interpretation of claim 1 is

24    correct, it is undisputed, Your Honor, that every specific

25    disclosed compound in the specification of the patent would

1    fall outside of the claim 1.

2              It is also undisputed that if SigmaPharm's claim

3    interpretation of claim 1 was correct, literally no compound

4    of any kind on the face of the earth would fall within the

5    scope of claim 1.

6              That interpretation as a matter of express

7    language and simple logic cannot be correct.

8              Everyone admits that claim 13 specifically

9    claims apixaban.  Everyone concedes that claim 13 is

10   dependent on claim 1.

11             Grammatical gymnastics can't change that.

12             So let me finally turn quickly to the '945

13   patent challenges to validity.  There are four:

14   Obviousness, indefiniteness, written description, and

15   enablement.

16             The first is obviousness, but for whatever the

17   combinations, Your Honor, the defendants' proposition

18   reduces to a simple contention:  That it would have been

19   obvious for a person of ordinary skill in the art to use a

20   smaller particle size to increase the apixaban's

21   bioavailability.

22             The Court will hear much about the general

23   connection between the particle size and bioavailability.

24   But what you will not hear and what the evidence will now

25   show is any motivation for a person of ordinary skill in the

1    art to apply those teachings to apixaban.

2              There is not a single statement in the prior art

3    of any issues or concerns for the bioavailability of

4    apixaban.  The prior art expressly reported that apixaban

5    had rapid absorption and good bioavailability during

6    clinical testing.

7              The Court will hear from Professor Allan

8    Myerson, who is shown on PDX-1.48.  He is a professor at the

9    Massachusetts Institute of Technology and an expert on

10   pharmaceutical formulation.

11             He will explain that there was no need and,

12   therefore, no motivation for a person of ordinary skill in

13   the art to turn their general knowledge about the connection

14   between particle size and bioavailability to apixaban.

15             Put simply, a generalized theory of improving

16   bioavailability, this is what the defendants will offer,

17   Your Honor, is not enough to overcome the explicit teachings

18   and prior -- that there was no problem to overcome.

19             Now, the evidence will also demonstrate that

20   even if a person of ordinary skill in the art had been

21   motivated to improve apixaban's bioavailability, that person

22   would not have expected that the way that you got there was

23   to reduce particle size to accomplish that goal.  If it were

24   otherwise, the BMS team would not have spent three years

25   coming to that conclusion or tested all of the other

1    different parameters.

2            I expect the defendants will also contend the

3    asserted claims of the '945 patent are indefinite because

4    the particle size -- because particle size measurements are

5    inconsistent and thus not comparable with one another.

6            But the claims do not require comparing

7    particle size measurement techniques.  All the claims

8    require is that the composition have a distribution of

9    apixaban particles equal to or less than 89 microns.

10           The claims specifies the distribution value,

11   $D_{90}$, and identifies unit of measurement, microns.

12           Particles are three-dimensional material.  Each

13   technique measures particle size a little differently, but

14   simply because the means by which the technique measures the

15   particle difference does not make the claim indefinite.

16           That is not the law of indefiniteness as shown

17   on slide 1.50.  The mere theoretical possibility that you

18   might get a different number using different techniques does

19   not render the claim indefinite.

20           The question is whether a person of ordinary

21   skill in the art would be able to understand the scope of

22   the claim.

23           Once again, Your Honor, the defendants will not

24   present you any experimental data comparing particle size

25   measurements with different techniques.

1             And this is an important fact because several

2    papers that Dr. Myerson described to you actually

3    demonstrate the consistency and result among the techniques.

4             We also expect that the defendants will suggest

5    the '945 patent claims are not supported by the written

6    description because there is no specific example of how to

7    measure particle size distribution.

8             But this is not a process patent.  The asserted

9    claims are to a pharmaceutical composition.  There is no

10   claim to a novel method of measuring particle size.  The

11   claim is to a composition that has specific properties.

12            The written description question is not whether

13   the inventors knew or disclosed every different way to

14   measure particle size.  The question is whether the

15   inventors were in possession of a composition with the

16   properties in question.  Professor Myerson will explain what

17   they do.

18            And, finally, we expect the defendants will

19   argue that the patent doesn't enable one of ordinary skill

20   in the art to make the claimed formulation because he or she

21   would not know how to measure the particles.  This is

22   recycling the same argument.

23            Dr. Myerson will explain the patent enables a

24   person of ordinary skill in the art to make the

25   pharmaceutical composition formulation with the claimed

properties, and that a person of ordinary skill in the art,

at the time of the invention, would have been aware of

multiple techniques in doing so.

The invention claimed in the '208 patent, Your

Honor, is a result of a decade's long effort to develop a

better treatment for life-threatening blood clots and blood

clotting disorders.

And the formulation invention claimed in the

'945 patent allowed effective patients to access that

compound by way of an easy-to-use pill with consistent

efficacy and performance.

As I said earlier, but it's always important to

remember, millions of patients, millions of patients have

benefitted from these -- from apixaban.

In the end, we will ask the Court to render

judgment in favor of BMS and Pfizer that each of the

asserted claims are infringed, that we have carried our

burden in proving infringement to you.

That the defendants, who have not offered the

Court a single experimental result or opinion from any

clinician on Your Honor's claim construction, has failed to

carry their burden of proving by clear and convincing

evidence the asserted claims are invalidity.

And in the end, we will ask Your Honor to enjoin

the defendants from launching their generic products until

```
 1    after the patent has expired.

 2              Thank you.

 3              THE COURT:  Thank you very much.

 4              We'll hear the defendants' opening arguments.

 5              MR. MIZERK:  Your Honor, may I approach?

 6              THE COURT:  You may, yes.

 7              MR. MIZERK:  Good morning, Your Honor.  My name is

 8    Don Mizerk with my colleagues at Husch Blackwell and Philips

 9    Spence, we represent SigmaPharm Laboratories in the matter.

10              Now, this case, we think, is about SigmaPharm

11    and others who seek to provide a generic alternative to

12    Eliquis by expressly following the procedures that Congress

13    laid out for challenging patents in this context.

14              We believe that we have certified that our ANDA

15    product does not infringe any valid claim of the

16    patents-in-suit, and we're down to four claims in this case:

17    The two claims of the '208 and the two claims in the '945

18    patent.

19              And I would briefly provide the Court an

20    overview of the evidence we think the Court will receive and

21    see regarding the contested issues in the case during the

22    course of the trial.

23              Can we turn to the first slide?

24              First, since we talked about this with

25    Dr. Buckton last week, we would like to talk about the
```

1        invalidity of the '208 patent and claims 13 and 104.

2               Now as Your Honor may recall, we heard from

3        Dr. Buckton regarding the enablement and written description

4        issues, the first two on the chart.

5               The third issue, with respect to invalidity of

6        the '208 patent, is 112, paragraph 4, invalidity position

7        regarding improper dependency.

8               So if we go to the next slide.

9               On the first issue, enablement, a patent

10       disclosure is required to permit a person of skill in the

11       art as of the filing date, 2001, to make and use the full

12       scope of the claimed invention.

13              Putting the improper dependency issue aside,

14       claims 13 and 104 claim, in addition to apixaban, a

15       pharmaceutically acceptable salt of apixaban.

16              The pharmaceutically acceptable salt of apixaban

17       part of the -- is at least half of both of these claim

18       scope.  Half.

19              Now, there should not be any dispute over this,

20       but apparently plaintiffs will argue that claim 104 does not

21       cover pharmaceutically acceptable salts of apixaban.

22              We believe that this issue was already resolved

23       in the *Markman* decision that your Court -- that Your Honor

24       had issued on page 8 where the Court stated:  "The patent

25       does not support the conclusion that the patentee intended

1    its definition of pharmaceutically acceptable to modify

2    compound but not to also modify salts, particularly given it

3    is undisputed that salts are also compounds."

4            So, Your Honor said salts are compound, and we,

5    indeed, believe that a compound, according to claim 13,

6    is -- includes both apixaban and a pharmaceutically

7    acceptable salt of apixaban.

8            Now, as we have already seen, we believe that

9    the evidence will show that apixaban is not like most

10   compounds.  It is neutral.  It is not ionizable.  BMS never

11   made any salt of apixaban before the patent was issued or

12   after, or before it was applied for or after, and there is

13   no example of any salt of apixaban in the patent.

14           The evidence will show that it was just an

15   accepted fact in the field that apixaban was not ionizable

16   and could not be made and used in a pharmaceutical as a

17   salt.  It was just basic understanding.

18           It was shown in the literature.  It was shown in

19   BMS's own documents, and it was what BMS even told the FDA.

20           Can we turn to the next slide.  The next one.

21           BMS -- this is what -- since apixaban, BMS

22   562247 is neutral, there is no salt form.

23           Now, plaintiffs said salts were made but as

24   predicted, these salts disproportionated in less than a day

25   and were unstable.

1              Apixaban has a pKa of about 0 on the basic side

2    and 13 to 15 on the acidic side.  But the literature teaches

3    that anything with a pKa on less than 5 on the basic side

4    was unusable as with anything greater than 10 pKa on the

5    acidic side.

6              And the evidence will show that compounds with

7    similar pKa's had never been used in a salt form in a

8    pharmaceutical product.

9              So in the context of the relevant art,

10   pharmaceuticals, apixaban, as a salt, was just a nonstarter.

11   A POSA would not know what to do with it.

12             And there is a reason for that.  In the pH range

13   of 0 to 13, any attempt to make a salt of apixaban will

14   disproportionate.  That means it will go back, it will

15   revert to the two compounds that you used to create it.

16             And if the pH is below 0 or above 13, the

17   product is dangerous to people.

18             Turn to the next slide.

19             Even Dr. Kowey claims, plaintiffs had a slide

20   about him, he will admit that you can't administer anything

21   with a pH of 0.  That is toxic, he said.

22             That is what the evidence will show.

23             Thus, the evidence will show, and has already

24   shown, that a person of ordinary skill in the art could not

25   make and use a pharmaceutically acceptable salt of apixaban

1    without undue experimentation.

2            Now moving on to the written description.

3            The expected evidence on this issue is, again,

4    similar to what we presented with respect to -- what we

5    expect to present with respect to enablement.

6            The evidence will show that the inventors also

7    did not possess a pharmaceutically acceptable salt of

8    apixaban.  Again, there is no example of any apixaban salt

9    in the patent, and there is a general description -- all

10   there is is a general description of making salts

11   conventionally.

12           And the evidence will show that this does not

13   show possession specifically of a salt of apixaban, a

14   pharmaceutically acceptable salt of apixaban as claimed.

15           The inventors never made a salt, and a POSA

16   would look at this general description and come to the

17   conclusion that the inventors just did not possess -- did

18   not have this.  They were not in possession of a

19   pharmaceutically acceptable salt of apixaban specifically as

20   claimed.

21           And, finally, with respect to the '208 patent --

22   next slide -- the question of improper dependency.

23           Now, plaintiffs want to pass this issue off as

24   some kind of technical argument.  But that is simply not the

25   case.

1             Plaintiffs write dependent claims have to

2    further narrow the claim from which they depend or they are

3    invalid.

4             And, if we go to the next slide, we say that the

5    way they wrote claim 1, and you saw it, it was on six

6    columns, they tried to do a very elaborate claiming of this

7    patent, and they made claim 13 and claim 104 dependent on

8    claim 8 and on claim 1.

9             Now, we're not saying that they couldn't have

10   written claim 13 as an independent claim and claimed just

11   apixaban.  If they had done that, we would not be here -- we

12   would not making this argument.  But, instead, they did it

13   in this convoluted fashion, and they created this -- they

14   created this problem.

15            And if we turn to the next slide.

16            Now, the evidence will show that because of the

17   way that the applicants wrote claim 1, they missed apixaban.

18   They really missed everything.  And because they missed

19   apixaban, their efforts to claim apixaban in 13 and 104, and

20   specifically, make claims 13 and 140 invalid.

21            Now SigmaPharm's expert, Dr. Heathcock, will

22   explain this in detail.  But the bottom line is, claim 1

23   provides long lists, Markush groups, that can be used on

24   each of the various locations in the chemical structure.

25   $R^{1a}$, R, $R^{4a}$, R4, et cetera.  And some of the positions

1    require 0 to 2 of the Markush options in the place -- in the

2    position, and some require 1 to 2.

3                And the problem for plaintiffs is that each of

4    these Markush groups include H, hydrogen.  They include H.

5    And plaintiffs want to do their counting of ignoring the H

6    on the ring.

7                But H is in each of these Markush groups, and

8    plaintiffs provide no consistent way to count, do the

9    counting that they're talking about, without ignoring the H.

10               So even if they -- on two they say we don't, we

11   substituted on this place, well, it doesn't -- if they --

12   they have to change their position in order to make that

13   work for other positions.  So they can't consistently apply

14   their definition and have the claims cover apixaban.

15               Therefore, the evidence will show that claims 13

16   and 104 are invalid for improper dependency.

17               Now, let's move on to the '945 patent and

18   infringement.

19               We believe that plaintiffs will not be able

20   to --

21               Turn to the next slide.

22               We believe plaintiffs will not be able carry

23   their burden to prove that SigmaPharm's ANDA product

24   infringes claim 8 and 22 of the '945 patent.

25               Now, there are three -- at least three reasons

 1     for this.

 2              First, SigmaPharm's ANDA product does not

 3     contain crystalline apixaban.

 4              Second, SigmaPharm's ANDA product does not

 5     contain crystalline apixaban particles.

 6              Third, SigmaPharm's ANDA product does not

 7     contain crystalline apixaban particles with a $D_{90}$ equal to or

 8     less than 89 microns.

 9              Now, SigmaPharm uses a process to prepare its

10     ANDA product that is designed to ensure that there is no

11     crystallinity, or no crystalline apixaban in the finished

12     product.  They do this by using a proprietary process, but

13     the underlying science on which this process is based is

14     well known and established.  It is supported by the

15     scientific literature for creating solid -- stable solid

16     amorphous dispersions, also known as solid solutions.

17              This is a common way to make amorphous forms of

18     drug substances.

19              Can you turn to the next slide?

20              This next slide kind of gives you a schematic of

21     the process that SigmaPharm uses.  And the evidence will

22     show that this process used by SigmaPharm starts with

23     apixaban and PVP, this polyvinylpyrrolidone, whichever one

24     you want to use, and it completely dissolves the materials

25     into solids.

 1          So the -- they create -- they dissolve

 2    everything.  And by dissolving the material, including the

 3    apixaban and the solvent, all traces of crystalline material

 4    are completely erased.  Everything is completely dissolved.

 5          And the material is converted into a solution,

 6    which itself is amorphous, in which everything is evenly

 7    distributed and homogeneous.

 8          Now, the solution contained PVP, apixaban and

 9    solvent, and excluding the solvents, the mixture is about

10    93 percent PVP, 93 PVP, and 6 percent apixaban.

11          So there is a massive amount of PVP and a very

12    small amount of apixaban all mixed homogeneously in

13    solution.

14          And then what -- then what SigmaPharm does is

15    they then remove the solid using a process.  And after the

16    solvent is removed, a solid amorphous dispersion, or a solid

17    solution, is created where the apixaban is distributed

18    throughout the PVP.

19          Now if you turn to the next slide.

20          And what you have here is, this is tested, is an

21    amorphous product.  The XRPD testing confirms that the

22    process that SigmaPharm uses was successfully deployed by

23    SigmaPharm to maintain the amorphous and homogeneous

24    distribution of the apixaban in the solid solution and that

25    there is no crystalline apixaban.  For example, this is one

1    of the illustrations, and the bottom line is what

2    crystalline apixaban looks like.

3             The blue line is what a placebo, without

4    apixaban looks like.

5             And then the red line is what the amorphous drug

6    substance looks like, the 6 percent API amorphous apixaban

7    that's used to then make the tablet.

8             And then what SigmaPharm does is they take this

9    substance that is amorphous, they granulate it, and they add

10   additional material -- excipients, and they compress it into

11   tablets.

12            And plaintiffs will just simply not be able to

13   prove that SigmaPharm does not perform this process

14   competently, and cannot show that any crystalline apixaban

15   exists in the finished tablet.

16            At the end of the day, there literally will be

17   no evidence showing the presence of any crystalline apixaban

18   in SigmaPharm's ANDA product.

19            But crystalline apixaban is not the extent of

20   the limitation.  It also requires crystalline apixaban

21   particles.  Particles.

22            As the evidence from the process that we

23   described shows, there are no crystalline apixaban particles

24   in our process.  We have a granulation that is made up of

25   apixaban and PVP and other excipients.

1          And any particles in the final ANDA product will

2     have PVP in them and are, therefore, not crystalline

3     apixaban particles.   That's what their experts will concede

4     this.

5          But wait.   But wait.   There is still more.

6          The claims require crystalline apixaban

7     particles with a $D_{90}$ of less than 89 microns.   $D_{90}$ means that

8     90 percent of the crystalline apixaban particles by weight

9     present are less than 89 microns in diameter.

10          No such measurements were made.   There is no

11     evidence of -- by any -- you can talk about techniques to

12     measure diameter, none of them were used with respect to

13     SigmaPharm's product.   There is no evidence of crystalline

14     apixaban particles of any size in the SigmaPharm product,

15     much less a distribution that is claimed.

16          And there is even more.   During prosecution, the

17     applicants also distinguished their purported invention from

18     prior art that disclosed solid amorphous dispersions of

19     apixaban, like we have, like SigmaPharm has.

20          And they -- and they -- these included up to

21     40 percent crystalline apixaban.   And plaintiffs can't show

22     any -- reconcile the arguments they made to the Patent

23     Office with the arguments they're making in this claim to

24     claim that SigmaPharm's product infringes these claims.

25          Moving on to the '208 patent noninfringement.

1                    Next slide.

2                    There's two basic arguments.  Again, it's the

3      improper dependency.

4                    We don't think the plaintiffs will not be able

5      to carry their burden that SigmaPharm's ANDA products

6      infringe claims 13 and 104 of the '208 patent.

7                    And even though plaintiffs withdrew assertions

8      of infringement of claim 1, which was referenced in the

9      opening statement of plaintiffs's, plaintiffs, nevertheless,

10     have to prove infringement of claim 1 in order to prove

11     infringement of claim 13 or claim 104.

12                   So we'll turn to the next slide.

13                   For many of the same reasons that we stated with

14     respect to improper dependency, plaintiffs will not be able

15     to prove SigmaPharm infringes claim 1 of the '208 patent.

16     And failure to infringe an independent claim means, as a

17     matter of law --

18                   Next slide.  Same argument, next slide.

19                   -- means that it's a -- means that it's a

20     required conclusion that the dependent claims are not

21     infringed.  So if they can't prove we infringe claim 1, then

22     we don't even get to claim 13, we don't get to claim 104.

23                   With respect to claim 104, there is also a

24     nuance that I wanted to bring to your attention in that we

25     really have two accused products with respect to claim 104

1    of the '208 patent.

2              Plaintiffs have now alleged, and this was the

3    subject of a motion practice I think Your Honor addressed a

4    while back, that the starting material SigmaPharm imports to

5    make its product, to make its amorphous dispersion, contains

6    crystalline material.

7              Now, we acknowledge that this starting material

8    does include crystalline apixaban.  However, the finished

9    product, as we just discussed, the ANDA product, does not.

10   Therefore, the ANDA product does not infringe claim 104

11   which additionally requires crystalline apixaban.

12             SigmaPharm's witnesses are set forth in

13   Exhibit 7 of the PTO, Your Honor, and because of all the

14   changes, the witnesses are fluid.

15             So in summary, we just want you to -- we believe

16   the evidence will show that SigmaPharm's ANDA product does

17   not infringe and plaintiffs have not shown that it infringes

18   either claim 13 or 104 of the '208 patent; that the two

19   claims asserted in the '208 patent are invalid for improper

20   dependency and for failure -- enablement and for written

21   description.

22             And that plaintiffs have failed to prove that

23   SigmaPharm's ANDA product infringes any claim asserted of

24   the '945 patent, and that for the reasons my colleague will

25   discuss, the claims asserted in the '945 patent are not

```
 1    valid.
 2              We look forward to presenting our case to Your
 3    Honor, and we appreciate all the time and attention your
 4    staff have given to us.
 5              Thank you very much.
 6              THE COURT:  Thank you very much.  We'll hear
 7    from the next defendant.
 8              Do we have another defendant?
 9              MR. BRAIER:  Good morning.
10              THE COURT:  Good morning.
11              MR. BRAIER:  May I please the approach the
12    bench?
13              THE COURT:  Yes.
14              (Binders passed forward.)
15              MR. BRAIER:  Good morning, Your Honor.  My name
16    is Paul Braier.  I'm here on behalf of the defendant,
17    Unichem.
18              Before I actually get into what the evidence
19    will show, I'd like to take a quick -- a brief description
20    of who Unichem is since you may not have heard of them prior
21    to this litigation.
22              Founded in 1944, Unichem is one of the oldest
23    and largest Indian pharmaceutical companies.  They have over
24    500 product registrations worldwide and, they market products
25    including in the United States and in Europe.
```

1            One strength of Unichem's state of the art

2   research center is the development of unique drug dosage

3   delivery systems, especially for tablet technologies, one

4   for new and for old drugs.

5            Next slide.

6            Unichem has submitted Paragraph IV

7   certifications both as to the '208 and to the '945 patent,

8   Your Honor.  Unichem challenges the validity of the '208

9   patent and validity and noninfringement and infringement of

10  the '945 patent.

11           Counsel for SigmaPharm has addressed invalidity

12  of the '208 patent, so I will now address Unichem's argument

13  of noninfringement of the '945 patent, as well as the

14  implication that plaintiffs' theory of infringement

15  actually invalidates the asserted claims.

16           In part, Your Honor, the asserted claims are

17  directed to a finished pharmaceutical composition such as a

18  tablet comprising apixaban.

19           Among other limitations, the claims require

20  crystalline apixaban particles having a $D_{90}$ equal to or less

21  than about 89 microns.  The issues of infringement in this

22  case center mainly around this so-called $D_{90}$ limitation.

23           For the purposes of this opening statement to

24  Your Honor, the two main issues for this Court are, first,

25  whether the Unichem -- whether the Unichem product meets

1    this limitation; and second, whether the plaintiffs' theory

2    of infringement invalidates the asserted claims of the '945

3    patent for lack of written description and/or enablement.

4            Next slide.

5            The '945 patent defines the $D_{90}$.  Essentially it

6    means that 90 percent of the volume of the apixaban

7    particles have a diameter less than the specified number; in

8    the case, 89 microns.  Other counsel --

9            (Court reporter interjects and requests counsel

10   to slow down.)

11           THE COURT:  Try your best to slow down.  You do

12   want to have a good record of this, I'm sure.

13           MR. BRAIER:  I apologize.

14           Next slide, please.

15           Your Honor has already ruled that the term

16   "apixaban particles" have a $D_{90}$ should be afforded its plain

17   and ordinary meaning.  Plaintiffs may argue that Unichem is

18   disregarding your Your Honor's claim construction, but Your

19   Honor has recently ruled in the pretrial memorandum and

20   order that this is not the case.

21           In this regard, Unichem will show that to the

22   extent that plaintiffs and their expert, Dr. Berkland,

23   assert that the particle size of the apixaban particles

24   after tableting must be the basis of $D_{90}$ determination, the

25   asserted claims are invalid for failure to satisfy the

1    enablement and written description requirements because the

2    '945 patent does not disclose or suggest that method and

3    neither does the prior art, nor a person of ordinary skill in

4    the art would have known at the time.

5              Next slide.

6              The evidence will show that both the Unichem DMF

7    and the ANDA require that the $D_{90}$ of apixaban API used for

8    the Unichem product to be between 150 and 1,000 microns.  And

9    as case law holds, this is a legally binding requirement for

10   the product, with civil and criminal penalties for violation.

11             The evidence will show that the exhibit batches

12   of the apixaban for the Unichem product comply with both the

13   DMF and ANDA specifications, and Unichem will also show that

14   this is corroborated by the testing of Unichem's expert,

15   Dr. Wayne Genck.

16             Next slide.

17             Plaintiffs attempt to demonstrate infringement

18   using what we refer to as the Berkland method.  The evidence

19   will show that the Berkland method has no basis in

20   peer-reviewed publications or anywhere in the prior art.  It

21   involves scraping granules from a tablet with a razor blade

22   and measuring the length and width of a few selected

23   particles.  This is not a $D_{90}$, Your Honor.  This is just the

24   length of a few particles.

25             The evidence will show that Dr. Berkland never

1   determined the $D_{90}$ of the particles -- of the apixaban

2   particles in the Unichem ANDA product.

3               The evidence will show that plaintiffs developed

4   the Berkland method just for this litigation and for the

5   purposes of alleging infringement by Unichem.

6               The evidence will show Dr. Berkland did not

7   include any controls to ensure that the sampling method did

8   not alter the size and nature of the particles that he

9   scraped off the tablet.

10               Dr. Berkland made no attempt to show that the

11   very few granules that he did essentially shave off and

12   viewed were representative of the granules in the unaltered

13   tablet.

14               And the evidence will show that Dr. Berkland did

15   not observe a statistically significant number of particles,

16   but he only observed a statistically insignificant, just a

17   handful, of particles of the tablets.

18               Next slide, please.

19               However, even if Your Honor were to find

20   infringement by Unichem, the inquiry would not end there.

21               Unichem will show that plaintiffs' theory of

22   infringement against the Unichem product stretches the scope

23   of the claim to such an extent that they have --   that the

24   claims do not meet the enablement requirement or the written

25   description requirement of 35 U.S.C., Section 112.

1              In this regard, Unichem will show that the

2    asserted claims and disclosure of the '945 patent can only

3    satisfy the requirements of Section 112 if they are applied

4    to a tablet manufactured as disclosed in the patent, or, I'm

5    sorry, manufactured from a bulk apixaban having a $D_{90}$ equal

6    to or less than about 89 microns.

7              The '945 patent does not teach, and as of the

8    effective date of the '945 patent, there was no known way to

9    determine the $D_{90}$ of the drug particle -- of drug particles

10   after they had been formulated into a tablet.

11             And, lastly, the evidence will show that a POSA

12   reading -- a person of ordinary skill in the art reading and

13   considering the two methods of manufacture disclosed in the

14   '945 patent, namely, wet granulation and dry granulation,

15   would not have been able to predict the size of particles

16   once formulated into a tablet, and would not have been able

17   to measure or determine the $D_{90}$ of such particles.

18             So in summary, Your Honor, the evidence will

19   show that plaintiffs have not shown infringement of claims

20   21 and 22 of the '945 patent, and the $D_{90}$ limitation has not

21   been met.  But even if it is met, if Your Honor finds that

22   the limitation is met, then the only way to do that is by

23   reading this claim so broadly as to invalidate the claims.

24             Thank you, Your Honor.

25             THE COURT:  Thank you very much.

```
 1                    THE COURT:  Good morning.
 2                    MR. KOCHANSKI:  Good morning, Your Honor.  Paul
 3       Kochanski for -- and my colleague, Kendall Gurule, for the
 4       defendants Sunshine Lake Pharma Co., Limited, and HEC Pharm,
 5       Inc., U.S. or HEC Pharm USA, Inc.
 6                    In this proceeding, we are only arguing
 7       noninfringement of the '945 patent and the asserted claims
 8       21 and 22.
 9                    In presenting our argument, not a fancy slide
10       show, I just want to introduce our two witnesses.
11                    The first witness will be Dr. Yong Chen.  I
12       would ask him to stand, please.
13                    Dr. Yong Chen is the head of the excipient
14       department at Sunshine Lake Pharm.
15                    And the second witness will be Dr. Harry D.
16       Brittain, there (indicating), who is our expert who will
17       testify about certain analysis of the testing that was done.
18                    In that regard, Dr. Chen will testify that prior
19       to filing its ANDA, Sunshine Lake had knowledge of a foreign
20       equivalent of the '945 patent which disclosed a
21       pharmaceutical composition including particulate crystalline
22       apixaban, and that the particle size of the crystalline
23       apixaban in final composition had to have a $D_{90}$ less than or
24       equal to 89 microns.
25                    With this information, Sunshine Lake and
```

1    Dr. Chen will testify that they attempted to develop an

2    apixaban pharmaceutical composition using bulk crystalline

3    apixaban having a $D_{90}$ greater than 300 microns to start off

4    with, and to develop a manufacturing process that would

5    convert that bulk crystalline apixaban to an amorphous form,

6    thereby not having crystalline apixaban in the

7    pharmaceutical composition, the final pharmaceutical

8    composition.

9            Dr. Chen will further testify, and the evidence

10   will show, that Sunshine Lake was, indeed, successful in

11   developing such a product.  Based upon his personal

12   knowledge, which he will testify -- and I should mention

13   Dr. Chen will be testifying through an interpreter here in

14   court -- but based upon his personal knowledge, Dr. Chen

15   will testify and discuss an analysis done by Sunshine Lake

16   which demonstrated that the intermediate compounds that were

17   formed and subsequently the final composition did not

18   contain crystalline apixaban particles but rather contained

19   amorphous apixaban.

20           He will also testify in that regard that the

21   process, the manufacturing process, produced an amorphous

22   dispersion, which you have heard about earlier this morning,

23   amorphous solid dispersion where the crystalline -- where

24   the crystalline apixaban was converted to an amorphous form

25   and it does not contain particulate manner.

1          But notwithstanding the fact that Sunshine Lake

2     was able to demonstrate that in its final product the

3     apixaban was amorphous and not crystalline, there are always

4     bumps in the road.

5          The plaintiff will attempt to rely on Sunshine

6     Lake's ANDA to show that in the written description in the

7     ANDA, and in some of the disclosure, that Sunshine Lake

8     admitted that it's final product had converted back to

9     crystalline apixaban.

10          This information was incorrect.  Dr. Chen will

11     specifically testify that during the preparation for his

12     testimony at a deposition in this case, the mistake was

13     realized at that time, and as he testified to and as he will

14     testify to here, he indicated that it was incorrect and that

15     the person, the author, described -- inaccurately described

16     the data that was contained in the ANDA application.  The

17     data in the ANDA application totally refuted the

18     statements made.

19          Further, Dr. Chen will testify that recognizing

20     that there was a mistake in the written portion of the

21     ANDA, that Sunshine Lake filed an amendment with the FDA

22     correcting those errors such that the information contained

23     in the ANDA was consistent with the data also provided to

24     the FDA;

25          That in Sunshine Lake's manufactured product, or

1    its exhibit batches, that's used for its stability studies,

2    that, from the very beginning up until three years later,

3    which was this past year, that the apixaban, the amorphous

4    apixaban, did not convert to a crystalline form and it does

5    not convert into a crystalline form.

6              To support Dr. Chen's testimony, Sunshine's lake

7    own analysis, XRPD analysis, we're relying upon Dr. Harry G.

8    Brittain.  Dr. Brittain is an expert in physical chemistry

9    and physical pharmaceutics and is well known as an expert in

10   XRPD procedures and analysis.

11             Dr. Brittain will testify that the Sunshine Lake

12   manufacturing process, in producing its pharmaceutical

13   composition, leads to consequences which result in the

14   apixaban being amorphous and amorphous in its intermediate

15   form and also amorphous in its final form.

16             And, again, he will also discuss issues

17   regarding an amorphous dispersion which we have heard about

18   early this morning.

19             Dr. Brittain also will testify about XRPD

20   testing he did of both the 2.5 milligram Sunshine Lake

21   apixaban tablet and the 5 milligram tablet.

22             He will explain in detail what the XRPD patterns

23   show and provide his conclusions, as the evidence will show,

24   that the crystalline apixaban starting material, bulk

25   material, is not crystalline -- when processed is not

1     crystalline in Sunshine Lake's ANDA product.

2            Dr. Brittain will also testify concerning his

3     analysis of Dr. Atwood's, the defendant's own -- excuse me,

4     the plaintiffs's only witness who will speak as to Sunshine

5     Lake.

6            He will testify as to Dr. Atwood's analysis of

7     one pill, one 2.5 milligram apixaban tablet, and that the

8     conclusions that Dr. Atwood reached rather than supporting a

9     finding that the Sunshine Lake apixaban final product

10    contains a crystalline particulate of apixaban, that

11    Dr. Atwood's results really support the fact that the

12    apixaban in Sunshine Lake's final product is amorphous.

13           He will show -- Dr. Brittain will testify

14    further that, in fact, the -- when one looks at the scans

15    produced by Dr. Atwood as compared to the scans produced by

16    Dr. Brittain, that they're complementary.  They are almost

17    identical, which they should be in light of the fact that

18    they are both testing a 2.5 milligram tablet from the same

19    batch from Sunshine Lake.

20           Finally, Dr. Brittain will address one of the

21    same issues raised by SigmaPharm and that is that there was

22    no testing undertaken by Dr. Atwood or anyone else that

23    demonstrated that even if there was crystalline apixaban in

24    the Sunshine Lake final product, that it would meet the

25    limitation $D_{90}$ equal to or less than 89 microns.

```
 1                    Therefore, in conclusion, Dr. Brittain will

 2      testify that based upon the evidence of both parties,

 3      Sunshine Lake and the plaintiffs, that there is no

 4      crystalline apixaban in the final ANDA product, that there

 5      is no particulate crystalline apixaban in the final product,

 6      and that there is no support or no evidence for the

 7      statement that Sunshine Lake's apixaban has a $D_{90}$ of equal or

 8      less than 89 microns.

 9                    Thank you, Your Honor.

10                    THE COURT:  Thank you very much.

11                    We will take a short recess before we call our

12      first witness.

13                    (Brief recess taken.)

14                    *      *      *

15                    (Proceedings reconvened after recess.)

16                    THE COURT:  I've been advised there's not just

17      three openings, there may be more?

18                    MR. PEJIC:  Yes, Your Honor.

19                    THE COURT:  All right.  Come on up.

20                    MR. KOCHANSKI:  That was also my fault, Your

21      Honor.  I am messing up the order a little bit.

22                    THE COURT:  No problem.

23                    MR. KOCHANSKI:  I apologize.

24                    MR. PEJIC:  I am just here to speak to the

25      invalidity of the '945 patent on behalf of all three
```

1   defendants.

2               THE COURT:  Okay.

3               MR. PEJIC:  And may I approach?

4               THE COURT:  Yes, you may.

5               You may proceed when you are ready.

6               MR. PEJIC:  Thank you, Your Honor.

7               Good morning.  My name is Bronco Pejic, and I'm

8   here on behalf of all three defendants.  And I am here to

9   discuss the invalidity of the '945 patent.

10              The Court has already heard the noninfringement

11  arguments of SigmaPharm and Sunshine Lake, as well as the

12  unique noninfringement and invalidity argument on behalf of

13  Unichem.

14              Here, we're going to talk about the failure of

15  the '945 patent disclosure to enable the claims under 112 as

16  well as enablement and indefiniteness, as well as the

17  invalidity in view of the prior art under Section 103.

18              Defendant's expert Dr. Chambliss, who has over

19  35 years of experience in formulating pharmaceutical

20  compositions, including ingredients like apixaban that do

21  have disadvantages, will testify and the evidence will show

22  that asserted claims 21 and 22 are directed to a combination

23  of well-known features, and are the result of known

24  formulation processes.

25              Dr. Chambliss will also testify, and the

1   evidence will also show, that all the elements of the

2   asserted claims were known in the prior art, but in addition

3   to that, the '945 patent is devoid of many critical details

4   to a person of skill in the art, specifically including any

5   method of measuring the particle size or determining the $D_{90}$

6   of the apixaban particles after tableting.

7           Without these critical details, a skilled

8   artisan would not understand the inventors to have described

9   and in possession of full scope of the claimed invention at

10  the relevant time.  The POSA would not be able to practice

11  the full scope of the invention without undue

12  experimentation, and the POSA would not be able to discern

13  the metes and bounds of the asserted claims.

14          Next slide.

15          The next slide.

16          Next slide.

17          Okay.  Returning to the asserted claims.

18          The asserted claims are a combination of

19  well-known features.  The features include a tablet, a solid

20  pharmaceutical composition, a therapeutically effective

21  amount of apixaban and pharmaceutical acceptable carrier,

22  crystalline apixaban particles having a $D_{90}$, as Your Honor

23  has heard, 90 percent of the volume is less than 89 microns,

24  and the finished composition has certain dissolution results

25  at least 77 percent of the apixaban composition dissolves

1     within 30 minutes.

2               This is based upon a well-known dissolution test

3     and testing conditions.

4               New slide, please.

5               With respect to the prior art and what was known

6     about apixaban, and as alluded to by plaintiffs, at the time

7     of invention of the '945 patent, apixaban chemical structure

8     were known in the art.  Apixaban's efficacy was known in the

9     prior art.  That is, apixaban was known to a skilled artisan

10    as a potent, orally bioavailable inhibitor that demonstrated

11    antithrombotic activity for both acute and nonacute

12    conditions.

13              Apixaban also was known to have low oral

14    bioavailability and a slow onset of action, and which leads

15    to the result there was a motivation to improve these

16    characteristics.

17              You have heard from plaintiffs that there was no

18    motivation, but we will talk about that later and show that,

19    indeed, there was.

20              The prior art also showed that apixaban existed

21    in the crystalline state.

22              And as such, as I was alluding to, one skilled

23    in the art would have known apixaban had low water

24    solubility, and would formulate the drug products

25    accordingly regardless of the BCS classification.

1          In fact, according to the USP criteria at the

2     time, apixaban was known to be practically insoluable.

3          Next slide, please.

4          The prior art also recognized that -- pardon me.

5          The prior art also recognized these problems and

6     motivated the person of skill in the art.  In that regard,

7     the evidence will show that a skilled artisan facing these

8     known drawbacks and disadvantages of apixaban would have

9     used well-known techniques to formulate the finished

10    composition recited in the asserted claims.

11         Specifically, the skilled artisan have known and

12    been motivated to reduce the particle size of the

13    crystalline apixaban particles to achieve both a uniform

14    blend of this potent drug and a pharmaceutical composition,

15    and to achieve rapid dissolution of poorly water soluble

16    apixaban from the finished composition.  That's how the

17    bioavailability is increased.

18         And now to the motivation to combine these

19    references.

20         If, for no other reason, the evidence will show

21    and that a skilled artisan would be motivated to achieve

22    rapid dissolution of the apixaban particles not only to

23    improve the bioavailability, but to obtain bio waivers from

24    the FDA during clinical development of the drug product or

25    in making changes to the drug product after approval by the

 1    FDA.

 2              The reason why this is important is it reduces

 3    regulatory hurdles, burdens, and associated costs.  In fact,

 4    this is what plaintiffs were doing when they were developing

 5    the product that eventually became the subject of the '945

 6    patent.

 7              Unsuccessfully, I might add.

 8              Next slide, please.

 9              You will also have heard, and will hear, that

10    one skilled in the art would not have been motivated to

11    reduce the particle size because the apixaban drug products

12    commercially available are BCS Class III.

13              However, BCS Class III classification depends

14    upon the dose of the apixaban in the final composition, and

15    during the time of the invention of the '945 patent, the

16    apixaban was being studied in clinical trials and doses that

17    would result in the apixaban product being classified as

18    either a BCS Class III, which means that it is highly

19    soluble with low permeability, or BCS Class IV, which is low

20    solubility, low permeability.

21              And this is all dependent upon the dose.

22              You will also hear further why the skilled

23    artisan would not have been motivated to reduce the particle

24    size of the crystalline apixaban particles because apixaban

25    was receiving favorable clinical trial results.

1            At the time of invention, apixaban had cleared

2    Phase II clinical trials and was in the process of Phase III

3    clinical trials.  But the evidence will show to the

4    contrary, indeed, as skilled artisan would have been

5    motivated to improve the bioavailability because a skilled

6    artisan would not have viewed favorable clinical results as

7    a reasonable basis to stop all efforts at improving the

8    bioavailability of the apixaban.

9            Essentially, you just never count your chickens

10   until they hatch.

11           History is replete with examples of drugs that

12   have failed Class III -- Phase III trials and never made it

13   to the market, resulting in significant loss of money and

14   resources to the sponsor.

15           In fact, a 2004 publication, which is well

16   earlier than the date of invention, reported that new drugs

17   for treatment or prevention of cardiovascular conditions has

18   success rate of only about 20 percent.  In other words, they

19   failed 80 percent of the time.

20           The evidence will show, and I think the Court

21   will conclude, that this would be a reasonable basis and

22   motivation to increase the bioavailability.

23           Further, during the testing, the oral

24   bioavailability data showed that the percent absorption of

25   apixaban was much lower than desired.

1          The data also showed that as plaintiffs noted

2    earlier, that the time required to achieve peak blood levels

3    was about three hours.  Three hours seems short, but at that

4    point in time, it was slower than the other drugs in

5    development for the same cardiovascular conditions, which is

6    important when treating emergency cardiovascular conditions

7    such as a stroke.  Again, there would have been motivation

8    to improve and get better bioavailability.

9          Next slide.

10          Okay.  Knowing these realities, a reasonable

11    person of ordinary skill in the art would not cease trying

12    to improve the properties of a yet unproved drug.

13          Turning to the limitation for the dissolution

14    profile.

15          The evidence will also show that the claimed

16    dissolution testing method and conditions were not only

17    standard, but they were part of the FDA protocol and

18    disclosed in the USP.

19          Next slide.

20          Turning to the invention of the '945 patent and

21    invalidity under 112, the evidence will show that even

22    though the asserted claims are a combination of known

23    features, the limited disclosure of the '945 patent

24    demonstrates that the inventors were not in possession of

25    and did not enable the full scope of the claimed invention.

1                    As you can --

2                    Next slide.

3                    The evidence will show that the '945 patent does

4      not teach a skilled artisan how to determine the $D_{90}$ after

5      the apixaban has been tableted.  The reason that this

6      matters is $D_{90}$, as I think Your Honor is aware but I'll

7      remind, is that $D_{90}$ is not a value that is measured like

8      diameter or length.  Rather, it is a property that is

9      calculated to and determined based upon particle size.  So

10     the trick is, how do you measure the particle size in a

11     tablet?

12                   The '945 does not disclose how to do this.  The

13     '945 patent only discloses how to determine the $D_{90}$ of the

14     bulk apixaban.

15                   This is noteworthy because all the data included

16     in the '945 patent, prosecution history and argued to the

17     USPTO for patentability of the '945 patent, was based upon

18     measuring bulk apixaban particles with laser light

19     scattering during development.

20                   The evidence will show that, in fact, during

21     development, the inventors never tested the apixaban

22     particles or determined the particle size or $D_{90}$ of the

23     particles in the tablet and, rather, that the inventors only

24     measured the bulk apixaban with laser light scattering

25     during development, and that is the basis of the '945

1    patent.

2              In fact, the plaintiffs will not provide a

3    single prior art document where the $D_{90}$ of an API was

4    determined after the API had been tableted.

5              The next slide.

6              The evidence will also show a skilled artisan

7    reading the '945 patent and considering the two methods of

8    manufacture disclosed, wet and dry granulation, the skilled

9    artisan would understand the methods to sufficiently impact

10   the particle size of the bulk apixaban such that the skilled

11   artisan would not be able to predict the size and determine

12   the $D_{90}$ of the apixaban particles in the finished composition

13   based upon the $D_{90}$ of the bulk apixaban used to manufacture

14   that tablet.

15             This is the situation from the *Teva* and *Apotex*

16   case where the plaintiffs recite particles size in the

17   claim, but the specification only discloses how to measure

18   the bulk API, and the methods of manufacture disclosed in

19   the specification do not permit one skilled in the art to

20   predict the size of the API in the tablet.

21             The Federal Circuit has affirmed invalidity of

22   at least two patents based upon this reasoning.

23             Next slide.

24             So the evidence will further show that the

25   skilled artisan reading the '945 patent prosecution

1    history -- gesundheit -- would not find sufficient

2    disclosure, for instance, testing conditions, sampling

3    techniques, data, software, and other things that you will

4    hear about from plaintiffs as to why the '945 is enabled,

5    but none of these are described in the '945 patent, nor

6    mentioned.

7              And so the skilled artisan would not understand

8    the specification of the '945 patent to allow him or her to

9    practice the full scope of the claimed invention without

10   undue experimentation, nor to be able to understand the

11   metes and bounds of the asserted claims.

12             As such, we believe the evidence will show that

13   the asserted claims are invalid under 35 U.S.C., 112, for

14   failure to satisfy the written description and enablement

15   requirements, as well as being indefinite.

16             Thank you, Your Honor.

17             THE COURT:  Okay.  Thank you.

18             Does that complete the opening statements?

19             MR. PEJIC:  Yes, Your Honor.

20             THE COURT:  All right.  Then you may call your

21   first witness.

22             MR. LEE:  Your Honor, the plaintiffs call Dr.

23   Robert Knabb.  K-n-a-b-b.

24             THE COURT:  Okay.  Thank you.

25             MR. LEE:  Can we ask the notebooks with the

Knabb - direct

1    exhibits in them, can we give them to the Court and counsel

2    as witness goes up to the witness stand?

3              THE COURT:  Yes, you can pass them around.

4              ... JAMES ROBERT KNABB, having been first duly

5    sworn, was examined and testified as follows ...

6              THE COURT:  Good morning, Dr. Knabb.  Welcome.

7              THE WITNESS:  Good morning.

8              THE COURT:  You may proceed.

9              MR. LEE:  Your Honor, I understand that fact

10   witnesses must be sequestered.  They could have been here

11   for the opening.  I don't know if there are any fact

12   witnesses left.

13             THE COURT:  You would know better than me.  If

14   you see anyone you object to, then you will have to say

15   something.

16             (Counsel confer.)

17             MR. LEE:  I think we're okay.

18             THE COURT:  Okay.  Great.

19                    DIRECT EXAMINATION

20   BY MR. LEE:

21   Q.    Good morning, Dr. Knabb.

22             THE COURT:  Hold on.  Why don't you all go

23   confer.

24             (Counsel confer.)

25             MR. LEE:  There was one fact witness.

Knabb - direct

```
 1                    THE COURT:  There was one.

 2                    (Pause.)

 3                    THE COURT:  He appears to be stepping out.

 4                    MR. LEE:  I think we're fine.

 5                    THE COURT:  Okay.  You may proceed.

 6    BY MR. LEE:

 7    Q.       Good morning, Dr. Knabb.

 8    A.       Good morning.

 9    Q.       Would you introduce yourself to the Court?

10    A.       My name is Robert Knabb.

11    Q.       Would you briefly describe your educational

12    background?

13    A.       I received a bachelor of science in pharmacology from the

14    Pennsylvania State University, and a Ph.D. from the

15    University of Virginia in physiology.

16    Q.       What did you do after you received your Ph.D.?

17    A.       I spent the next three-and-a-half years doing

18    post-doctoral research, the first year continuing on at the

19    University of Virginia, and then for two-and-a-half years in

20    the Cardiology Division of Washington University School of

21    Medicine.

22    Q.       Have you ever worked for BMS?

23    A.       Yes.

24    Q.       For how long did you work for BMS?

25    A.       From 2001 until 2017.
```

Knabb - direct

1    Q.      And in 2017, what did you do?

2    A.      I retired.

3    Q.      Before BMS, where did you work?

4    A.      I worked for the DuPont company in a variety of

5    departments that had different names at different times but

6    all were related to pharmaceuticals.

7    Q.      When did you begin working at DuPont?

8    A.      In 1985.

9    Q.      How did you come to work for BMS?

10   A.      So in 2001, the DuPont company chose to sell its

11   pharmaceutical business to Bristol-Myers Squibb, and on

12   October 1st, that transition was complete and I became a

13   Bristol-Myers Squibb employee.

14   Q.      What was your role, generally, at DuPont and

15   Bristol-Myers Squibb?

16   A.      So I was a research scientist, initially heading a

17   single laboratory in the cardiovascular research group, and

18   then as I gained additional experience and responsibilities,

19   ultimately supervising multiple laboratories and teams of

20   scientists.

21   Q.      In the late 1980s, what was the focus of your

22   research at DuPont?

23   A.      At that time, we began working on anticoagulants, and

24   specifically oral anticoagulants, looking for inhibitors of

25   thrombin.

1  Q.      And, Dr. Knabb, what are you doing today, other than

2  testifying?

3  A.      I am a small business owner.

4  Q.      Now, what is an oral anticoagulant?

5  A.      So as has been discussed during the opening,

6  anticoagulants are drugs which interfere with the process of

7  blood coagulation.  And although blood coagulation is a

8  natural defensive process and essential in the case of

9  injury, when it occurs inappropriately, inside blood

10  vessels, it results in thrombotic diseases.

11         An oral anticoagulant is a drug that interferes

12  with that process and can be given orally.

13  Q.      What diseases does an oral anticoagulant treat?

14  A.      Among the most important are prevention of stroke,

15  particularly in patients with the heart arrhythmia atrial

16  fibrillation, prevention and treatment of deep vein

17  thrombosis, and pulmonary embolism.

18  Q.      Now, what are the consequences of not treating one of

19  these disease conditions?

20  A.      Well, these are serious diseases.  When the blood

21  vessel is occluded by a clot, it results in downstream

22  injury, necrosis, or death of the tissue, and in certain

23  circumstances, many of these diseases can be fatal.

24  Q.      How many patients each year suffer from one of these

25  disease conditions?

Knabb - direct

1    A.      Millions of patients in the U.S. suffer from atrial

2    fibrillation are at risk of stroke, and millions of patients

3    have deep vein thrombosis or pulmonary embolism, all are at

4    risk of it.

5    Q.      Now, I would like to focus you on the period when you

6    began your work on oral anticoagulants.

7            What was available on the market at that point

8    in time?

9    A.      So in the United States, the only available oral

10   anticoagulant was Warfarin sold under the trade name

11   Coumadin.

12   Q.      What is Warfarin?

13   A.      Warfarin is a drug which interferes with the actions

14   of Vitamin K and is therefore called a Vitamin K antagonist.

15           Now, Vitamin K is necessary in the liver for the

16   production of functional coagulation proteins, multiple

17   proteins within the coagulation system.

18   Q.      Who sold Warfarin?

19   A.      It was sold at that time by DuPont.

20   Q.      Under what brand name?

21   A.      Coumadin.

22   Q.      Were there any problems in using Warfarin?

23   A.      Quite a few.

24           As the usage became even more common, the

25   reports of problems became more common.  Most importantly,

Knabb - direct

1    Coumadin was known to be a narrow therapeutic index drug,

2    which means that if you have too much of it, you were at

3    significant risk of bleeding.  If you have too little, you

4    are ineffective.

5    Q.     What were the consequences of the fact that Coumadin

6    or Warfarin had a narrow therapeutic window or index?

7    A.     So first of all, it results in a very high risk of

8    bleeding.  But in order to minimize that risk, or make it

9    acceptable for patients, Coumadin needed to be given with

10   very close monitoring and dose titration.

11          So patients were required on Coumadin, and they

12   still are because it is still in use for certain

13   indications, are required to come in frequently for

14   blood testing of the extent to which their blood is

15   anticoagulated.

16          When that blood test result is obtained by the

17   physician, the physician can choose to modify the dose.

18   They will increase the dose if the levels are too low, they

19   will decrease the dose if the levels are too high, and that

20   means the patient has to come back again and have their

21   blood tested again to see that it is in the desired range.

22   Q.     Have you heard of the concept of a food-drug

23   interaction?

24   A.     Yes.  And Warfarin is notorious for that because, as

25   I said, it is a Vitamin K antagonist.

1          One of the consequences of food interactions is

2     that there is a variety -- there is varying levels of

3     Vitamin K in the diet, depending on what you eat.  If you

4     eat a salad one day, you can have high levels of Vitamin K.

5     If you eat only carbohydrates and meats the next day, you

6     have very little.

7          So changes in the diet change the level of

8     Vitamin K and therefore change the effectiveness of

9     Coumadin.

10    Q.    Have you heard the concept of a drug-drug

11    interaction?

12    A.    Yes.  And, again, Warfarin or Coumadin is one of the

13    drugs that appears on the list of really having problems

14    with drug-drug interactions that can either -- again, either

15    increase or decrease the effect of coagulation level.

16    Q.    What were the reasons that your team was interested

17    in developing an improved oral anticoagulants in 1990?

18    A.    So throughout that period of time, in the '70s and

19    '80s, the use of oral anticoagulation around the world was

20    increasing.  In the U.S., that meant increased use of

21    Coumadin.

22          Because it was shown that those drugs were

23    effective but had those liabilities, DuPont, selling

24    Coumadin, took the strategy that if someone is going to help

25    these patients by coming up with a new and improved oral

Knabb - direct

1    anticoagulants, it should be us, it should be DuPont

2    replacing their own product with an improved version.

3    Q.      When did you begin to look for an improved oral

4    anticoagulant?

5    A.      So the earliest work, to my knowledge, began in 1987

6    when I started looking at a thrombin inhibitor that was

7    actually synthesized in a different department in DuPont.

8    Q.      What is a thrombin inhibitor?

9    A.      So in the sequence of blood coagulation, there are a

10   number of proteins which are referred to as enzymes, meaning

11   that they catalyze or convert other proteins from one form

12   to another.

13            In that sequential process, it begins with one

14   protein or enzyme activating another.  And then that one, in

15   turn, acts on another one, finally leading to the generation

16   of thrombin.

17            Thrombin is the enzyme which then cleaves

18   fibrinogen, a circulating blood protein, converts to fibrin,

19   which is the component of an insoluble fibrin clot.

20   Q.      For how long did DuPont pursue the possibility of a

21   thrombin inhibitor?

22   A.      So as I said, we began that in about 1987, and a

23   couple of years later, a chemical program to look for

24   additional inhibitors was instituted.  We continued that

25   work until the mid-1990s.

Knabb - direct

1    Q.      Did any of the thrombin inhibitors you were working on

2    make it to clinical development?

3    A.      No.

4    Q.      What biological target did DuPont pursue after

5    thrombin inhibitors?

6    A.      So during the course of the thrombin inhibitors, we

7    developed assays for other coagulation proteins.  One of

8    those was Factor Xa, and we began to look for specific

9    Factor Xa inhibitors in 1994.

10   Q.      What is a -- what is Factor Xa?

11   A.      So in that sequential process that I described, the

12   enzyme or protein which is responsible for the generation of

13   thrombin from its inactive precursor is called Factor Xa.

14   Q.      Let me bring up on the screen PDX-2.2, if we could.

15           Do you have that before you?

16   A.      Yes.

17   Q.      Now, this is a little bit more complicated than my

18   dominos demonstrative.

19           Using PDX-2.2, can you explain what this tells

20   the Court about the coagulation cascade?

21   A.      So there are multiple ways in which the coagulation

22   cascade can be activated, but essentially they all lead to

23   the generation of fibrin.

24           Fibrin is the insoluble component of a blood

25   clot.  It can only be formed in the body by the actions of

Knabb - direct

1    thrombin.   And thrombin is generated from its inactive

2    precursor pro-thrombin by a complex that includes Factor Xa.

3                 So that's shown -- all of those steps are shown

4    in the bottom in green as the common pathway.

5                 All coagulation goes through that pathway.

6    Q.    What were the reasons that the DuPont team focused

7    research on Factor Xa in the bottom right-hand corner?

8    A.    So during the time that we were conducting the

9    thrombin inhibitor program, our laboratory, as well as

10   others around the world, were doing work to compare the

11   inhibition of thrombin and Factor Xa.

12                Evidence began to accumulate that at the same

13   level of thrombosis prevention or the same level of

14   efficacy, you could actually observe lower levels of

15   bleeding when that efficacy was obtained by inhibiting

16   Factor Xa as opposed to inhibiting thrombin.

17   Q.    Now, can we have PDX-2.22 on the screen.

18                What enzymes on the coagulation cascade does

19   Warfarin target?

20   A.    So Warfarin interferes with the synthesis or the --

21   the synthesis of an active protein in the liver, and it

22   affects Factor II, which is prothrombin, Factor VII, Factor

23   IX and Factor X.

24                So multiple proteins in the coagulation cascade

25   as well as other proteins which aren't even directly in the

Knabb - direct

1    coagulation cascade.

2    Q.     Are there similarities among and between the enzymes

3    in the coagulation cascade?

4    A.     Yes.

5           So these enzymes are all considered -- it's

6    called a serine protease, meaning that they have the amino

7    acid serine in their active site.  The active sites are

8    actually very similar in their structure.

9           And so although these working on proteins, there

10   is very good selectivity.  When you try to inhibit one with

11   a small molecule, it is often the case that one will inhibit

12   multiple enzymes.

13   Q.     And is this similarity and the possibility of

14   inhibiting multiple enzymes one of the challenges that you

15   encountered in your research?

16   A.     It is, because our objective was to develop a

17   selective and specific Factor Xa inhibitor.

18   Q.     What were the properties of a Factor Xa inhibitor

19   that you were searching for?

20   A.     So there were a number.  We were trying to replace

21   Coumadin, which had been in use for a long time, but it was

22   an oral anticoagulant and it was effective.

23          So first of all, we needed a drug which was

24   orally active.  We needed one which was effective and potent

25   and could be given at low doses.  We needed to be selective

Knabb - direct

1   for the target we had chosen, and we needed to have

2   favorable pharmacokinetic properties, or the profile of the

3   drug in the body based on its absorption and elimination.

4            We wanted it to have a long half-life or

5   duration in the body so that the fluctuation in levels

6   between the peak that is obtained shortly after you take a

7   dose does not differ greatly from the trough, the level that

8   the drug reaches shortly before its time to retake the next

9   dose.

10  Q.      As you pursued these different goals, did you

11  encounter any challenges?

12  A.      Several challenges.  And it took several years to

13  even begin to solve those problems because we really were

14  trying to solve multiple problems at the same time.

15  Q.      How many people were working on the Factor Xa drug

16  discovery project?

17  A.      So the program was in place for a number of years,

18  and it certainly varied over time.

19            But at its peak, we had a team of chemists where

20  you include the synthetic chemists and the computational

21  chemists that approached 20 people, and a similar number in

22  the biology and other groups working on the project.

23  Q.      And how did the size of the Factor Xa team compare to

24  other research projects at DuPont Pharmaceuticals at this

25  time?

Knabb - direct

1    A.      It was one of the largest programs that they had ever

2    had.

3    Q.      What was your role in the Factor Xa team?

4    A.      So I was the lead of the biology group in the Factor

5    Xa program, and I had the title of being the Factor Xa

6    inhibitor working group co-chair.

7    Q.      How many compounds were synthesized by chemists as

8    part of the Factor Xa program?

9    A.      So the program was in place for about 10 years, from

10   1994 to 2004, and during that time, well over 10,000

11   compounds were made.

12   Q.      Did the biology team or the biology portion of the

13   team test each of those 10,000 compounds?

14   A.      Yes.  Every one of those compounds was tested.

15   Q.      Did the research team keep a record of the test

16   results for each of the compounds made?

17   A.      Yes.

18   Q.      Where were those records kept?

19   A.      So the primary or first repository of data by either

20   the chemists, biologists, or other scientists is in

21   laboratory notebooks.  These laboratory notebooks are

22   expected to be kept in a secure location.

23           The data is meant to be recorded in a prompt and

24   timely manner.

25           The information that is entered is witnessed by

1    another scientist who didn't participate in that experiment.

2            And then the laboratory notebooks are

3    microfilmed regularly to ensure that there is a permanent

4    record citing when the work was done.

5    Q.    Did BMS keep those records in any other way?

6    A.    So laboratory notebooks are the primary repository

7    but they're not very useful to a large number of people.  So

8    the data from the laboratory notebooks is subsequently

9    entered into a variety of different electronic databases.

10            MR. LEE:  Your Honor, I'm going to put on the

11    screen a page from PTX-98.  It's not in the notebook because

12    of its sheer volume, and I am just putting up a page so we

13    can look at an exemplary entry.

14            THE COURT:  Okay.

15    BY MR. LEE:

16    Q.    Do you have a page from PTX-98 on the screen?

17    A.    Yes.

18    Q.    Do you recognize this format of spreadsheet?

19    A.    Yes.  This appears to be an export of data, tables

20    that -- the table that is created is columns and rows from

21    the electronic database.

22    Q.    And what information is included in the compound

23    database?

24    A.    So it is quite extensive.  The first column shows the

25    chemical structures of the compounds.  The second column

Knabb - direct

1    shows the identifier number for the compound.  And then

2    there's information about the form, the lot number, where it

3    was made, and if you were to scroll across to the right, you

4    would find literally hundreds of columns which include the

5    data from various tests that were part of the program that

6    these compounds were evaluated in.

7    Q.    And this database includes the 10,000 compounds you

8    referred to earlier?

9    A.    Yes.

10   Q.    Of the more than 10,000 compounds made by the Factor

11   Xa program, how much advanced to clinical testing?

12   A.    We took five compounds into human clinical trials.

13   Q.    Now, turn, if you would, to Tab 2 in your binder.

14         Do you have that before you?

15   A.    Yes.

16   Q.    Do you find PTX-1383?

17   A.    Yes.

18   Q.    Can you tell us what PTX-1383 is?

19   A.    So this is a copy of a slide presentation that was

20   part of what we call a portfolio review for the Hopewell

21   site.  Now, the Hopewell site was one of the research

22   locations for Bristol-Myers Squibb and as part of reviewing

23   all the programs at that site, we conducted a review of the

24   Factor Xa inhibitor program.

25   Q.    Who prepared this document?

1    A.      So members of the working group would have

2    contributed parts of it, but it was largely prepared under

3    the direction of myself and my chemistry co-chair, Patrick

4    Lamb.

5    Q.    Turn, if you would, to the page that, in the bottom

6    right-hand corner, ends with 3367, and I will put it up on

7    the screen as well and enlarge it.

8            Do you have that before you?

9    A.      Yes.

10   Q.    Would you explain to His Honor what this page shows?

11   A.      So this is a representation of the chronology of the

12   program focusing on the years from 1998 through 2003 when

13   this review was conducted.  And really, it's a graphical

14   representation of the many compounds that were identified as

15   leads or compounds of interest, things which had at our

16   first -- after several assays were conducted, passed the

17   criteria to be considered for development.

18            And then for each of those compounds, there are

19   a series of lines or a line that changes color as you go

20   across the screen to represent the phase of development that

21   the compound was in at those various time points shown

22   across the top.

23   Q.    So to be more specific, what is shown in the

24   left-hand column?

25   A.      Those are the identifier numbers for a variety of

Knabb - direct

1    compounds that were considered lead to the program.

2    Q.      And if we follow some of the horizontal lines, you

3    find a circle with a star in the middle.

4             What does that indicate?

5    A.      So at both DuPont and Bristol-Myers Squibb, we had a

6    process which was called nomination.  And it denotes the

7    formal transition of a compound from the work primarily

8    being done in the drug discovery organization to being

9    conducted in the drug development organization where the

10   objective is to move the compound forward into clinical

11   trials.

12   Q.      What was the first compound nominated for clinical

13   development?

14   A.      It's denoted as DPC 423.

15   Q.      When was that nominated for clinical development?

16   A.      In March 1998.

17   Q.      How many years had the program been underway?

18   A.      About four years at that point.

19   Q.      What happened to DPC 423?

20   A.      So after it was nominated, in the development

21   organization, larger quantities of the compound are

22   synthesized according to the criteria that are necessary for

23   clinical trials.

24             It entered into Phase I clinical trials in

25   December of that year, and was in the middle of Phase I

Knabb - direct

1    studies.  Additional studies were being done on the compound

2    for support, later studies, and in those studies it was

3    found that there was a retinal pathology, something that

4    could only be seen under the microscope in rodents exposed

5    to high levels of DPC 423.

6    Q.    What was the result for DPC 423?

7    A.    The compound was immediately discontinued from

8    further study because of the nature of the pathology or the

9    toxicity and the fact that it couldn't be monitored or

10   predicted.  Even though it only occurred in rodents, it was

11   still significant enough that the team discontinued it.

12   Q.    What was DPC 906?

13   A.    So DPC 906 was one of the next compounds that we had

14   identified as one of interest and advanced into development.

15         Now, can I, just for a minute, talk about our

16   strategy there?

17         Why did we have another one waiting in the wings

18   when DPC 423 was going forward?

19         We had a strategy of continually putting in

20   backups so that in the event that something went wrong, like

21   it did with 423, we didn't have to go back to the drawing

22   board and start all over again.  We had a backup compound

23   waiting in the wings already progressing and ready to take

24   its place.

25   Q.    Turn, if you would, to Tab 3 in your notebook.

1    A.      (Witness complies.)

2    Q.      Do you find PTX-308?

3    A.      Yes.

4    Q.      What is it?

5    A.      So this is another program review.  It was not

6    conducted -- this was conducted while many of us in the

7    cardiovascular research group were still at a site here in

8    Wilmington, and it occurred in October of 2002.

9    Q.      Please turn to page that ends in the bottom

10   right-hand corner 266892.  And I will put it on the screen

11   as well.

12   A.      Okay.

13   Q.      Do you see the title "Why Additional Backups"?

14   A.      Yes.

15   Q.      Is that referring to the same strategy you just

16   described to the Court?

17   A.      Yes.

18   Q.      And then what follows is discontinued Factor Xa

19   inhibitors.  Correct?

20   A.      Yes.

21   Q.      And in the right-hand column, the label is "Reason

22   For Discontinuation"?

23   A.      That's right.

24   Q.      And what is the information generally that is

25   recorded in that column?

Knabb - direct

1    A.      So as we advanced multiple compounds through the

2    years, leading up to 2002, we had some compounds which

3    progressed nicely and others which had problems very early

4    on.

5           The reasons for discontinuation, so on that

6    previous graph, the lines which ended in an X denoted

7    compounds which had progressed to a certain point and then

8    were dropped, they were discontinued.

9           This column in this table is the reasons why

10   those compounds had to be discontinued.

11   Q.      Were the reasons all the same?

12   A.      Not at all.  In fact, they're quite different, and

13   what we learned was that it was unexpected and we had

14   toxicities occur in unexpected ways.

15   Q.      And just so the record is clear, when you refer to

16   the prior chart, you were referring to PTX-1383 and the

17   chart with the horizontal lines.  Correct?

18   A.      Yes.

19   Q.      Now, what did you conclude from the fact that you

20   were confronting a variety of different problems?

21   A.      So, No. 1, that it's not easy to come up with

22   something that satisfies all your criteria and is safe and

23   well tolerated.

24          No. 2.  We really learned to expect the

25   unexpected.  That when you think you've solved one problem

1    and you develop something new that solves that problem, you

2    never know when you are going to be surprised by an

3    unexpected toxicity coming up that you have never even

4    thought about before.

5    Q.    What did the chemists on the Factor X team do to

6    address these problems?

7    A.    So along with our strategy to continually put backups

8    into the program, into development, the chemists looked for

9    compounds which were structurally diverse.  So it wasn't

10   just a matter of taking one of the early leads and making

11   something which was closely related to it, the objective was

12   always to incorporate as many novel groups, as much

13   innovation in the compound as possible.

14   Q.    So let's turn to apixaban structurally --

15   specifically.

16         Are you familiar with the structure of apixaban?

17   A.    I am.

18   Q.    Could I have PDX-2.3, please?

19         What is shown on PDX-2.3?

20   A.    This is a representation of the chemical structure of

21   apixaban.

22   Q.    What is the chemical group shown in the lower

23   right-hand side of apixaban?

24   A.    So that ring structure that contains the nitrogen and

25   is a six-membered ring with the oxygen coming off of it is

1    referred to as a lactam.

2    Q.    What led the team to make Factor Xa inhibitors that

3    had a lactam ring?

4    A.    So as part of the program, and the objective of

5    continually incorporating chemical diversity and novel

6    groups, the team explored a large number of substitutions,

7    and that is how we ended up ultimately with 10,000

8    compounds.

9          The lactam group was one of those substitutions

10   that was explored in order to incorporate chemical diversity

11   in the program.

12   Q.    Are you familiar with the concept of "low clearance"?

13   A.    Yes.

14   Q.    Would you explain to the Court what low clearance

15   means to a chemist or biologist?

16   A.    So drugs are foreign substances in the body and the

17   body takes care of them and in different ways.  But

18   ultimately, these foreign substances are either degraded or

19   eliminated in the body.  That process of degradation and/or

20   clearance and/or elimination is called clearance.

21   Q.    Is low clearance better or worse?

22   A.    It's better.

23   Q.    Are you familiar with the concept called "volume of

24   distribution"?

25   A.    Yes.

Knabb - direct

1    Q.      Would you explain to us what the concept of volume of

2    distribution is?

3    A.      So it's a little bit harder to explain, but if you

4    think about the body as being made up of multiple

5    compartments, so the body is made up of cells.  So you have

6    a compartment which is the inside of cells.  You have a

7    compartment which is the outside of cells.  And then you

8    have other compartments, such as the blood, which is a

9    tissue all of its own and exists as a third compartment.

10            The volume of distribution is a measure of how

11   extensively a drug or another substance distributes within

12   those multiple compartments.

13   Q.      Is a low volume of distribution good or bad?

14   A.      Well, it can be good or bad in different ways.

15            Now, we were looking for an oral anticoagulant,

16   something that worked directly in the blood.  So a small

17   volume of distribution, that would mean that the drug was

18   mostly in the blood, would be very good for the activity of

19   the drug and for keeping it away from tissues where it would

20   not have a benefit and, in fact, could only have a side

21   effect.

22   Q.      And was the team searching for a compound that had

23   low clearance and a low volume of distribution?

24   A.      So the team was looking for a compound that had a

25   sufficiently long half-life, and included in that are

1    balancing out the volume distribution and the clearance to

2    have something with that right half-life.

3              In fact, it was only the very low clearance

4    that we observed with the lactam containing compounds like

5    apixaban that allowed us to have a compound with a low

6    volume of distribution because it still had an acceptable

7    half-life.

8    Q.    When did DuPont first make apixaban?

9    A.    In early 2001.

10   Q.    What team came up with the structure for apixaban?

11   A.    So it was developed in the laboratory of Don Pinto

12   and first synthesized by Mike Orwat.

13   Q.    Turn back, if you would, to Tab 2 in your notebook

14   and to the page 33367 that we looked at previously.

15   A.    Okay.

16   Q.    Do you have that before you?

17   A.    Yes.

18   Q.    Would you tell us which compound is apixaban?

19   A.    So apixaban is denoted on this slide by its BMS

20   number.  BMS562247.

21   Q.    Did apixaban have any other code names at BMS?

22   A.    Yes.

23              So prior to the acquisition of DuPont Pharma by

24   BMS, apixaban was denoted as AG-0023 at DuPont.

25   Q.    All right.  Now, I'd like to move to a different

1    topic.  Turn, if you would, to Tab 5 in your binder.

2    A.    Okay.

3    Q.    Do you find DTX-632?

4    A.    Yes.

5    Q.    Do you recognize it?

6    A.    Okay.  There we go.

7          I do.

8    Q.    What is it?

9    A.    So this is the document that was prepared by the

10   early or exploratory development team for apixaban at

11   Bristol-Myers Squibb.  And this document specifically is

12   part of a review at what was considered a decision point.

13         And in the drug discovery and development

14   programs at BMS, there are various milestones that are

15   recognized at the company with various reviews and

16   approvals.  Those decision points are called DP.  And in

17   this case, it's DP 4 which is a formal decision to advance a

18   compound into human clinicals studies.

19   Q.    Now, turn, if you would, to page ending 7370 in the

20   bottom right-hand corner.

21   A.    Okay.

22   Q.    Do you see at the bottom of this page the title

23   current issues and strategy for API synthesis?

24   A.    Yes.

25   Q.    And this discussion continues to the next page;

Knabb - direct

1    correct?

2    A.      That's right.

3    Q.      Let me turn you to the next page, to paragraph 5

4    specifically.

5            Do you see the paragraph that begins, final

6    form?

7    A.      Yes.

8    Q.      What does final form refer to?

9    A.      So pharmaceutical agents, compounds, chemicals, can

10   exist in various physical forms that might differ based on

11   the crystalline structure.  They might differ based on their

12   level of hydration.  There can be multiple crystalline forms

13   for a single compound.  So one of the teams within

14   Bristol-Myers Squibb development was charged with

15   identifying the form that would be taken forward into the

16   dosing formula for those human clinical studies.

17   Q.      Now, are you familiar with the concept of solubility?

18   A.      Yes.

19   Q.      What is the concept of solubility?

20   A.      So quite simply, it is how much of a substance, a

21   drug or another substance goes into solution, dissolves in a

22   solvent.  In the case of pharmaceuticals, we're talking

23   about how much does it dissolve into water or blood.

24   Q.      So let me draw your attention to the third sentence

25   of paragraph 5.  Since BMS-562247- 01, that refers to

Knabb - direct

1  apixaban; is that correct?

2  A.    Yes.

3  Q.    Since BMS56224701 is non-ionizable, salt formation

4  cannot be used to enhance solubility.

5         Have I read that correctly?

6  A.    Yes.

7  Q.    What is the issue that is being addressed in this

8  sentence?

9  A.    So it specifically relates to the solubility of

10  BMS562247.

11  Q.    And what is it saying to you and others about the

12  fact that apixaban is non-ionizable and its effect on

13  solubility?

14  A.    So one of the things that, one of the things that

15  development teams will do is to try and make different salts

16  to address solubility.  In the course of development, higher

17  solubility is often helpful, even if it's not absolutely

18  needed.  What this is referring to is, would you make a salt

19  of apixaban to make it more soluble and what it's saying is

20  that it's non-ionizable.  And it is referring to, although

21  not explicitly stated, it's non-ionizable in the

22  physiological range, which is what's relevant to solubility

23  in, for development as a pharmaceutical.

24  Q.    Now, there have been a number of documents that have

25  come into evidence already.  For the documents you've

Knabb - direct

1   reviewed, did you ever see the question of apixaban,

2   apixaban and its ionizable nature discussed outside the

3   context of solubility?

4   A.      No.

5   Q.      Was the development team telling you that apixaban

6   could never be ionizable?

7   A.      No.

8   Q.      Was the development team saying that apixaban could

9   never form a salt?

10  A.      No.

11  Q.      What did the development team decide about the salt

12  form of apixaban and solubility?

13  A.      That it was not an approach for enhancing solubility.

14  Q.      Now, were there other documents that addressed the

15  question of whether creating a salt form was an approach to

16  address solubility?

17  A.      So this was a frequent topic of discussion at the

18  time because, as I said, in the course of development, even

19  if you don't need higher solubility, there are often

20  studies, such as toxicology studies, where it's helpful to

21  have higher solubility.  So it was discussed at various

22  times.  I'm sure it was in some of the development team

23  minutes and other documents in the same context, salt

24  formation to enhance solubility.

25  Q.      During these meetings when you're considering the

Knabb - direct

1    possibility of salt formation to enhance solubility, did

2    anyone ever express a concern that a salt form would be

3    toxic?

4              MR. TAYLOR:  Objection.  Calls for hearsay.

5              THE COURT:  Response?

6              MR. LEE:  Well, if somebody expressed a concern,

7    am I not offering it for the truth of what the person said,

8    but the fact that it was said or not said would have some

9    relevance.

10             MR. TAYLOR:  With the limited effect of, on the

11   listener, we withdraw the objection.

12             THE COURT:  Okay.  All right.  You can answer.

13             THE WITNESS:  So, I'm sorry.  Can you repeat the

14   question?  I lost track there.

15             MR. LEE:  I'm not sure, but I will try.

16   BY MR. LEE:

17   Q.    You described to us the meetings that you attended

18   where solubility and the question of whether salt form of

19   apixaban could address solubility.

20             Do you recall those?

21   A.    Yes.

22   Q.    In those meetings, did anyone ever express to you any

23   concern that a salt form would be toxic?

24   A.    No.

25   Q.    Did anyone ever express to you in those meetings that

1  a salt form would cause excessive irritation?

2  A.    No.

3  Q.    Did BMS ever make a salt form to address solubility?

4  A.    Not to my knowledge.

5  Q.    Did it make a salt form to address any other issue?

6  A.    Not to my knowledge.

7  Q.    Now, Dr. Knabb, have you published any papers

8  describing the development of apixaban?

9  A.    I have been a co-author on several papers about

10 apixaban, yes.

11 Q.    Turn, if you would, to tab 6 in your notebook.

12 A.    Okay.

13 Q.    Do you recognize this document?

14 A.    Yes.

15 Q.    What is it?

16 A.    So this is a review article published in the Journal

17 of Medicinal Chemistry by several of my collaborators in the

18 Factor XA inhibitors working group in drug discovery.

19 Q.    And what were the reasons that you decided in

20 February of 2010 to publish the review article on the

21 discovery of Factor XA inhibitors?

22 A.    So the program was a longstanding and heavily

23 resourced program at both DuPont and BMS and had come up

24 with 10,000 compounds over ten years.  And we were all very

25 proud of our work and felt that it had a good story to tell,

Knabb - direct

```
 1    and by 2010, apixaban had progressed through a number of

 2    Phase 1, Phase 2 and had even completed the first of its

 3    Phase 3 studies.

 4                   It was showing an incredibly promising

 5    profile and we had confidence that it would make it as a

 6    drug and potentially as a very good replacement for

 7    Warfarin.  So at that time, the team who had worked on

 8    bringing these compounds forward published a review of where

 9    apixaban came from.

10    Q.    And were you involved in the clinical trials for

11    apixaban?

12    A.    I was.

13    Q.    What was your role?

14    A.    So in 2005, when apixaban was approaching either some

15    of its Phase 2 studies, I made the decision to transition

16    from my role in drug discovery, in cardiovascular drug

17    discovery, into the global clinical research group in drug

18    development, and I was a study director and a member of

19    various teams on the Phase 2 and Phase 3 studies of apixaban

20    and also in preparing some of the documents for its

21    regulatory submissions.

22    Q.    How many clinical trials did BMS conduct before

23    apixaban was approved in the United States?

24    A.    So there were a large number of studies, as I said,

25    across different phases of development and in multiple
```

1    indications, but we really had about six very pivotal

2    studies in the Phase 3 program alone.

3    Q.    And how many patients were enrolled in these clinical

4    studies?

5    A.    Tens of thousands.

6    Q.    When was apixaban first approved by the FDA?

7    A.    In December of 2012.

8    Q.    In total, how long did it take to develop, to

9    discover and develop apixaban?

10   A.    Well, we started looking in 1994 and we had our first

11   approval in the United States in 2012, so it was a full

12   18 years of effort.

13   Q.    What is the brand name for apixaban?

14   A.    Eliquis.

15   Q.    What are the approved dosage amounts for Eliquis?

16   A.    So the dosage amounts are in general, 2.5 or

17   5 milligrams given twice daily.

18   Q.    What was the role of Pfizer in the development of

19   Eliquis?

20   A.    So because we planned for a very large and

21   time-consuming and expensive development program in multiple

22   indications, BMS made the decision to seek a partner to

23   assist in both the development and the ultimate

24   commercialization of Eliquis, and in 2006 an agreement was

25   formed between BMS and Pfizer to collaborate on that

1  process.

2  Q.    Turn, if you would, to tab 1 in your notebook, which

3  is PTX-325.

4          Do you see that?

5  A.    Yes.

6  Q.    And turn, if you would, to the page that has the

7  number in the bottom right-hand corner, 9331.

8  A.    Okay.

9  Q.    What is this?

10  A.    So this is a printout of the package label or package

11  insert or what's referred to as USPI for Eliquis 2.5 and

12  5-milligram tablets.

13  Q.    And do you see the section entitled indications and

14  usage?

15  A.    Yes.

16  Q.    What is described under the category of indications

17  and usage?

18  A.    So this represents what the FDA has judged to be the

19  acceptable indications, the things that are, clinical

20  studies demonstrated efficacy and safety, and they include a

21  variety of clinical indications based on the variety of

22  clinical trials that we conducted.

23  Q.    Now, the indications of usage refer to atrial

24  fibrillation, deep vein thrombosis and pulmonary embolism;

25  is that correct?

Knabb - direct

1    A.       Correct.

2    Q.       Are these conditions you described to the Court at

3    the beginning of your testimony today?

4    A.       Yes.

5    Q.       There is one word I want to ask you about in the

6    second bullet point.  There's a word prophylaxis.  What does

7    that mean?

8    A.       Prophylaxis is a term used, to describe a treatment

9    which is intended to prevent a condition or a disease.

10   Q.       Now, if I could go back to the full package insert,

11   there's a box warning in the upper left-hand corner.

12   A.       Yes.

13   Q.       Are there risks associated with using Eliquis?

14   A.       Yes.

15   Q.       What are the risks?

16   A.       So the risks of Eliquis, like with all

17   anticoagulants, includes a risk of bleeding.  In addition to

18   risks that might, may or may not have been observed in the

19   clinical trial program, the FDA includes warnings with

20   certain, some drugs as a box warning to call attention to a

21   significant, important risk.

22                    This box warning could be based on class

23   effect, things that have been observed either with Eliquis

24   or other related drugs, but the box warning appears at the

25   beginning of the package insert, so it's in a prominent

Knabb - direct

1    position, and it's boxed to basically draw attention to it

2    for both the physicians and the patients.

3    Q.      How many patients have been treated with Eliquis

4    since it's was FDA approved?

5    A.      Millions of patients.

6    Q.      Now, let's talk a little bit more about the clinical

7    trials for apixaban.  Turn, if you would, to tab 4 in your

8    notebook.

9    A.      Okay.

10   Q.      Do you have that before you?

11   A.      Yes.

12   Q.      What is it?

13   A.      So this is a reprint of a publication in the New

14   England Journal of Medicine describing the results of the

15   pivotal study, referred to as Aristotle of apixaban compared

16   to Warfarin in patients with atrial fibrillation.

17   Q.      I think most of us know this, but for the record --

18              MR. TAYLOR:  Your Honor, Dustin Taylor.

19              Defendants object to the use of this exhibit

20   with the witness.  They've not established a personal

21   knowledge.  He's not listed as an author, and we also admit,

22   excuse me, object to introduction of this as an exhibit.

23   It's improper opinion testimony.

24              THE COURT:  All right.  Well, in terms of

25   objecting to it being admitted, is that an objection that

1    should have been raised this morning?

2              MR. TAYLOR:  It had not yet been used with one

3    of the witnesses.

4              THE COURT:  Did they disclose to you in advance

5    of today they intended to use it with this witness?

6              MR. TAYLOR:  Yes, and we made our objection to

7    them at that time.

8              THE COURT:  Was it brought to my attention?

9              MR. TAYLOR:  Not this morning.  No, your Honor.

10             THE COURT:  It's untimely and overruled in terms

11   of admission.  But you think he is not a proper witness to

12   talk about this document?

13             MR. TAYLOR:  Yes, Your Honor.  He's not listed

14   as an author and they have not established he has any

15   personal knowledge or experience with this document.

16             THE COURT:  Mr. Lee?

17             MR. LEE:  I think I can address that concern,

18   Your Honor.

19             THE COURT:  You'll lay some foundation?  Let's

20   see where it goes.

21   BY MR. LEE:

22   Q.    Is there a clinical name for the trial that's

23   described in this article?

24   A.    Referred to as Aristotle.

25   Q.    And were you involved in the Aristotle studies?

Knabb - direct

1    A.     I was.

2    Q.     And did you receive the results of the Aristotle

3    studies?

4    A.     I did.

5    Q.     Does this article report on the results of the

6    Aristotle studies?

7    A.     Yes.

8    Q.     And are the Aristotle studies actually referred to in

9    the package insert?

10   A.     Yes.

11   Q.     All right.  Now, what do the Aristotle --

12              THE COURT:  I think there may be an objection.

13   Hold on.

14              MR. TAYLOR:  Your Honor, we maintain our

15   objection.  He's free to publish the Aristotle studies or

16   discuss the Aristotle study, but this is an article

17   discussing something with which he has personal knowledge

18   of, not something he personally has knowledge of itself.

19              THE COURT:  Mr. Lee?

20              MR. LEE:  Two things, Your Honor.  If they had

21   this objection, at least as we understood the rules of

22   the road, it should have been made this morning.  But the

23   second is to go back to something I argued this morning.

24   The question of the risk/benefit analysis occurs at a moment

25   in time.  The moment in time is at the time of the

1    invention.  This is part of a state of the art at that

2    moment in time.

3                    THE COURT:  All right.  Anything else?

4                    MR. TAYLOR:  That does not respond to the issue

5    that he has no personal knowledge of this specific article.

6    He's free to discuss the Aristotle study, but to use an

7    article discussing something of which he has personal

8    knowledge of without an establishment that he has personal

9    knowledge of this specific article we believe is improper.

10                   THE COURT:  All right.  I'm not persuaded it's

11   improper.  The objection is overruled.

12                   MR. TAYLOR:  Thank you, Your Honor.

13                   THE COURT:  Would you repeat the question.

14   BY MR. LEE:

15   Q.    And what did the Aristotle study report?

16   A.    So the Aristotle study evaluated over 18,000 patients

17   who were treated in a blinded manner with either Warfarin,

18   vitamin K antagonist, or apixaban, and those patients were

19   studied, followed for the prevention of stroke and other

20   clots for a period averaging over two years.

21                   In that study, when I said it was a blinded

22   study, that means that neither the physicians who were

23   treating the patients nor the patients themselves knew which

24   treatment they had been assigned to randomly.  When results

25   were decoded and the randomization was uncovered, it was

1    found that apixaban not only had superior efficacy at

2    preventing strokes, but it also had a substantially lower

3    risk of major bleeding.

4    Q.    Are you familiar with a study called the Amplified

5    Study?

6    A.    Yes.

7    Q.    And the Amplified Extended Study?

8    A.    Yes.

9    Q.    Briefly, what did they show?

10   A.    So the Amplified Study in some respects is very

11   similar to the Aristotle study in that it was a blinded

12   comparison between apixaban and Warfarin.  But in this

13   case, the study evaluated patients who were found to have a

14   deep vein thrombosis, a pulmonary embolism, or both.  And

15   when you have those conditions, you need to be treated for

16   them.

17          So it followed -- you follow patients on

18   treatment again in a blinded manner and you evaluate whether

19   they have a recurrence of the symptoms and signs of that

20   disease.

21   Q.    Now, I'm getting close to the end, Dr. Knabb.  Let me

22   just ask you this:  You told His Honor that when the project

23   started in 1994, you were looking for an oral anticoagulant

24   that would address the limitations of Warfarin; is that

25   correct?

1    A.    Yes.

2    Q.    Let me wind the movie forward to 2001, when apixaban

3    was first made.

4              Do you have that in mind?

5    A.    Okay.

6    Q.    When you discovered that compound, did you discover a

7    compound that had benefits over Warfarin?

8    A.    Absolutely.

9    Q.    What were those benefits?

10   A.    So it is more convenient to take.  It is more

11   effective, and it is safer.

12   Q.    For the patient?

13   A.    For the patient.

14   Q.    Are you proud of the work that your team did?

15   A.    Extremely.

16             MR. LEE:  Your Honor, we would offer PTX-219,

17   308, 325, 560 and 1383, which are the exhibits I addressed.

18             I'm not going to offer DTX-632 because it was

19   offered through Dr. Buckton.

20             THE COURT:  Okay.  Any objection?

21             MR. TAYLOR:  No objections other than which

22   those you've overruled.

23             THE COURT:  Okay.  I adhere to my overruling and

24   I admit all of those exhibits.

25             (The above-mentioned exhibits were admitted into

```
 1    evidence.)

 2              MR. LEE:  And Ms. Wigmore just reminded me,

 3    PTX-98 as well I addressed.

 4              THE COURT:  98?

 5              MR. TAYLOR:  No objection.

 6              THE COURT:  All right.

 7              (PTX-98 was admitted into evidence.)

 8              MR. LEE:  Your Honor, that completes the

 9    examination.

10              THE COURT:  All right.  Cross-examination.

11              MR. TAYLOR:  Yes, Your Honor.  Your Honor, may I

12    approach the witness?

13              THE COURT:  Yes.

14              (Mr. Taylor handed notebooks to the witness and

15    the Court.)

16                         CROSS-EXAMINATION

17    BY MR. TAYLOR:

18    Q.    I believe it's morning.  Good morning, Dr. Knabb.

19    A.    Good morning.

20    Q.    I have not looked at my watch.  I'm not a hundred

21    percent sure.

22              Are you being compensated for your appearance

23    here today?

24    A.    I'm not being compensated to testify, no.

25    Q.    Have you ever been convicted of a crime?
```

Knabb - cross

```
1    A.     No.

2    Q.     Now, when you first testified about Apixaban on

3    January 10, 2001, it was being referred to as AG0023; is

4    that correct?

5    A.     That's correct.

6    Q.     That was also known as BMS562247?

7    A.     That was the number assigned when it transitioned to

8    BMS, yes.

9    Q.     On your direct you discussed the 10,000 compounds

10   your group made.

11          Do you remember that?

12   A.     Yes.  It was well over 10,000 compounds.

13   Q.     Of those well over 10,000 compounds, how many were

14   salt forms of apixaban?

15   A.     None.

16   Q.     And please turn to DTX-188 in your binder.  That's

17   tab 2.

18   A.     Okay.

19   Q.     You saw this document at your deposition?

20   A.     Yes.

21   Q.     And you have no reason to doubt that this is an

22   e-mail you wrote on December 3rd, 2001?

23   A.     No reason to doubt.

24   Q.     Please turn to DTX-188.03, the third page.

25   A.     Okay.
```

Knabb - cross

1    Q.      This is a DEDIT program data summary?

2    A.      That's correct.

3    Q.      And this is for BMS562247?

4    A.      Yes.

5    Q.      That's apixaban?

6    A.      Yes.

7    Q.      As the working group chair, you had the ultimate

8    responsibility for assembling submissions to the DEDIT

9    Committee?

10   A.      That's right.  Co-chair.

11   Q.      Co-chair?

12   A.      Yes.

13   Q.      And you prepared this document as part of your

14   ordinary course of business?

15   A.      Yes.

16   Q.      Please turn to page 5 of the document, DTX-188.05.

17   A.      Okay.

18   Q.      And do you see the third bullet down on that page?

19   A.      Yes.

20   Q.      And that identifies the salt form as none; is that

21   correct?

22   A.      Yes.

23   Q.      Okay.  And this is discussing apixaban?

24   A.      This is discussing the form of apixaban which was

25   being advanced to nomination.

```
 1   Q.      Now, in fact, you are not aware of any salts that
 2   were made of BMS562247?
 3   A.      That's correct.
 4   Q.      Please turn to DTX-193 in your binder.  That is tab
 5   3.
 6   A.      Okay.
 7   Q.      Now, this is a copy of a set of slides for the
 8   research review program from 2002?
 9   A.      Right.
10   Q.      And please turn to page DTX-193.00042.  It's also on
11   your screen if that's easier for you.
12   A.      Yes, that's easier.  Okay.
13   Q.      The author of this section, options for development,
14   is Bob Knabb?
15   A.      That's right.
16   Q.      And that's you?
17   A.      That is me.
18   Q.      You prepared these slides as part of your ordinary
19   course of business?
20   A.      Yes.
21   Q.      Please turn to the next page, DTX-193.00043.
22   A.      Okay.
23   Q.      This section discusses BMS562247?
24   A.      Yes, it does.
25   Q.      Once again, that's apixaban?
```

Knabb - cross

1   A.      Yes.

2   Q.      The second bullet point states, apixaban is a neutral

3   compound, so salt formation is not an option to improve

4   solubility.  Correct?

5   A.      That is what it says.

6   Q.      And in discussing DTX-632 with Mr. Lee, you said

7   apixaban is not ionizable in a physiological relevant range;

8   is that correct?

9   A.      A physiological relevant range, yes.

10  Q.      Does that refer to a pH range?

11  A.      It does.

12  Q.      What pH range is that?

13  A.      About pH 1 to 8.5.

14  Q.      Okay.  And is the physiological range important for

15  use of a product as a pharmaceutical?

16  A.      So in general, when we talk about the physiological

17  pH range, it is the range at which the drug or product may

18  be exposed to at various places in the body, very acidic in

19  the stomach and then more neutral in the tissues and in some

20  cases, even slightly alkaline.  So it's the range at which

21  the drug will be exposed.

22  Q.      Just a few final questions, Dr. Knabb.  You did not

23  synthesize apixaban?

24  A.      I did not.

25  Q.      You never made a salt of apixaban?

Knabb - cross

1    A.      I did not.

2    Q.      You don't know of any salt forms that were made of

3    apixaban?

4    A.      At BMS?  Are you asking me am I aware of any salt

5    forms made at BMS?

6    Q.      Yes.

7    A.      To my knowledge, there were none made at BMS.

8    Q.      And outside of this litigation, you were not aware of

9    any salt forms made of apixaban?

10   A.      That's correct, but I was present in the courtroom

11   this morning during the opening arguments, so I am aware

12   that salt forms have been made.

13   Q.      Correct.  But outside of the context of litigation,

14   you are unaware of any salt form of apixaban that has

15   actually been made?

16   A.      Unaware, yes.

17   Q.      And while at BMS, you were not aware of any plans to

18   make a salt form of apixaban?

19   A.      We concluded that one wasn't needed.

20   Q.      So you were unaware of any plans to do so?

21   A.      That's correct.

22           MR. TAYLOR:  No further questions.  Pass the

23   witness.

24           THE COURT:  Thank you.

25           Is there any more cross for this witness?

Knabb - redirect

1          MR. TAYLOR:  Sorry.  I apologize.  No, Your

2    Honor.

3          THE COURT:  Okay.  All right.  Mr. Lee?

4                    REDIRECT EXAMINATION

5    BY MR. LEE:

6    Q.    Dr. Knabb, just a couple questions.  In the binder

7    that you were just looking at, turn to tab 2, if you would.

8    I want to bring you to the page that you were being asked

9    about that has Bates No. 8974 in the bottom right-hand

10   corner.

11   A.    Mm-hmm.

12   Q.    It's DTX-188.  We'll go to the page that says 005 at

13   the bottom.

14          Do you recall being asked about this?

15   A.    Yes.

16   Q.    And you were asked about salt form:  None?

17   A.    Yes.

18   Q.    What is the issue being addressed in the bullet point

19   immediately above this?

20   A.    Solubility.

21   Q.    All right.  Now, you told us that there were

22   discussions about whether a salt form could address

23   solubility; correct?

24   A.    That is the context in which we discussed salt

25   formation, was solubility.

1   Q.      Did anyone ever suggest to you that it was impossible

2   to make a salt form?

3   A.      No.

4   Q.      Is there a difference between can't be made and don't

5   need to be made?

6   A.      Absolutely.

7                   MR. LEE:   Thank you, Your Honor.

8                   THE COURT:   You may step down.   Thank you very

9   much.

10                  THE WITNESS:   Do I leave these here?

11                  THE COURT:   They would appreciate it if you take

12  it as will the next witness, I'm sure.

13                  (Witness excused.)

14                  THE COURT:   You may call the next witness.

15                  MR. LEE:   Thank you, Your Honor.   Our next

16  witness is Michael Orwat, and Mr. Danford will do the

17  examination.

18                  THE COURT:   All right.

19                  ... MICHAEL ORWAT, having been duly sworn as a

20  witness, was examined and testified as follows ...

21                  THE COURT:   Good morning, Mr. Orwat, or maybe

22  good afternoon.   We're right at noon.

23                  You may proceed.

24                       DIRECT EXAMINATION

25  BY MR. DANFORD:

1   Q.      Good afternoon.   Could you please introduce yourself

2   to the Court?

3   A.      I'm Michael Orwat.

4   Q.      Where do you work?

5   A.      I work at Bristol-Myers Squibb.

6   Q.      What is your position at Bristol-Myers Squibb?

7   A.      I'm a research chemist.

8   Q.      And what are your responsibilities as a research

9   chemist?

10  A.      I synthesize chemical analogs for biological testing.

11  Q.      How long have you worked at BMS?

12  A.      31 years.

13  Q.      And has the name of the company changed in those

14  31 years?

15  A.      Yes, it has.

16  Q.      What was the name of the company when you first

17  joined it?

18  A.      DuPont Pharmaceuticals.

19  Q.      How is it that you came to work at BMS?

20  A.      BMS acquired DuPont Pharmaceuticals.

21  Q.      Could you describe for me your educational

22  background?

23  A.      I attended the University of Pittsburgh for

24  undergraduate and then I went to the University of Rochester

25  for graduate work in organic synthesis.

Orwat - direct

1   Q.      What degree did you attain from the University of

2   Rochester?

3   A.      Master's.

4   Q.      And in what year did you attain that Master's degree?

5   A.      1988.

6   Q.      What did you do after you got your Master's degree?

7   A.      I immediate started working at DuPont.

8   Q.      What was your position at DuPont when you started?

9   A.      I was a chemist.

10  Q.      And in the mid-1990s, what projects were you working

11  on as a chemist at DuPont?

12  A.      I was in the Factor XA program.

13  Q.      When did you start working on Factor XA?

14  A.      About 1996.

15  Q.      Was that the beginning of the Factor XA program?

16  A.      No.  Several labs had already been working on it for

17  a few years.

18  Q.      How long did work on the Factor XA program?

19  A.      About eight years.

20  Q.      Were there other labs at DuPont working on Factor XA?

21  A.      Yes.  Over the course of the eight years, there was

22  at least three or four other chemistry labs working on it.

23  Q.      Were any of the compounds that you made as part of

24  the Factor XA program taken into clinical development?

25  A.      Yes.

Orwat - direct

1    Q.      How many?

2    A.      Two.

3    Q.      What was the first of those compounds?

4    A.      DPC423.

5    Q.      When did you synthesize DPC423?

6    A.      '97 or -- 1997 or 1998.

7               MR. DANFORD:  Can I please have up PDX-3.2.

8    BY MR. DANFORD:

9    Q.      Mr. Orwat, do you recognize the chemical structure

10   shown here?

11   A.      Yes.

12   Q.      What is it?

13   A.      It's DPC423.

14   Q.      After DPC423 went into clinical trials, did you stop

15   working on Factor XA inhibitors?

16   A.      No.  It was common practice to continue working on

17   backup analogs in case there were problems with the lead

18   compound.

19   Q.      And did you encounter any problems with DPC423?

20   A.      During further studies, it was found that DPC423

21   caused retinal lesions in rodents.

22   Q.      What happened with DPC423 after that issue arose?

23   A.      The clinical trials were stopped.

24   Q.      Now, you mentioned that you had made a second

25   compound that went into clinical development out of the

Orwat - direct

1    Factor XA program.  What was that other compound?

2    A.      The other compound was apixaban.

3    Q.      When did you first synthesize apixaban?

4    A.      January of 2001.

5            MR. DANFORD:  Could I please have up PDX-3.3.

6    BY MR. DANFORD:

7    Q.      Do you recognize the chemical structure shown here?

8    A.      Yes.

9    Q.      What is it?

10   A.      That is apixaban.

11   Q.      Who came up with the chemical structure for apixaban?

12   A.      Dr. Don Pinto and myself.

13   Q.      In looking at the chemical structure, if I focus in

14   on the piece in the lower right-hand corner, what is the

15   name of that chemical group?

16   A.      That is a lactam.

17   Q.      And what was the reason that you included a terminal

18   lactam at that position in the structure for apixaban?

19   A.      Through a lot of trial and error, we arrived at that

20   lactam structure to include in our compound and it improved

21   the biological properties of our analogue.

22   Q.      What biological properties were you seeking to

23   improve?

24   A.      We were looking for compounds with low volume

25   distribution and low clearance.

Orwat - direct

1    Q.      What was the reason that you were looking for

2    compounds with those properties?

3    A.      To avoid the toxicities that we had observed in

4    previous compounds.

5    Q.      Were you successful in avoiding those toxicities by

6    including a lactam group at that position?

7    A.      Yes, we were.

8    Q.      Now, before you synthesized apixaban, were you aware

9    of any disclosure in the literature of a Factor XA inhibitor

10   with a lactam in that position?

11   A.      No, I was not.

12           MR. TAYLOR:  Your Honor, we object to the

13   relevance of this testimony.  All of this is about prior art

14   defenses and there's not a prior art defense.  None of this

15   is relevant to whether he made salts of apixaban, whether

16   it's pharmaceutically acceptable or whether the language in

17   claim 1 properly encompasses apixaban itself, so we will

18   give some leeway for background, but obviousness is gone and

19   comparison of this to the prior art is just not relevant to

20   this case.

21           MR. DANFORD:  Two ans(check) on that, Your

22   Honor.

23           First, he was the inventor of this patent.

24   We're giving the background of his invention.  The specific

25   questions I just asked about the prior art, they raised a

1    written description defense in the case.

2            You'll see when we get to the patent that the

3    title of the patent is lactam-containing compounds.  A key

4    part of this is whether he's in possession of

5    lactam-containing compounds and where that came from, so we

6    want to lay that background and provide that context,

7    especially where they're raising a written description

8    defense.

9            MR. TAYLOR:  No.  Whether these are

10   lactam-containing compounds is not relevant to the written

11   description defense.  That's relevant to whether he was in

12   possession of salts of apixaban.  He's not talking about

13   salts of apixaban.  He's talking about this lactam ring,

14   which has nothing to do with apixaban.

15           THE COURT:  Well, relevance is a pretty broad

16   concept, topic, especially in a bench trial.  They've got

17   their hours.  If this is how they want to use them, I'm not

18   going to stop them.

19           Overruled.  Go ahead.

20           MR. DANFORD:  Thank you.

21   BY MR. DANFORD:

22   Q.    So the question to you, if I can remind you, is:

23   Before you synthesized apixaban, were you aware of any

24   disclosure in the literature of a Factor Xa inhibitor with a

25   lactam in that position?

1  A.    No, I was not.

2  Q.    Who first synthesized apixaban?

3  A.    I did.

4  Q.    Mr. Orwat, if you could pull out the binder that is

5  in front of you and turn to tab 1 in that binder.

6          Do you have PTX-152 before you?

7  A.    Yes.

8  Q.    Do you recognize PTX-152?

9  A.    Yes.

10  Q.    What is it?

11  A.    It's a DuPont laboratory notebook.

12  Q.    Whose laboratory notebook is it?

13  A.    It's mine.

14  Q.    And who made the entries in this laboratory notebook?

15  A.    I did.

16  Q.    If we could turn to page DPC13051-50.  What compound

17  were you trying to make here?

18  A.    Apixaban.

19  Q.    What day did you perform this experiment?

20  A.    This experiment was started January 3rd of 2001.

21  Q.    Did you successfully obtain apixaban from this

22  experiment?

23  A.    Yes, I did.

24  Q.    And was this the first time that you successfully

25  made apixaban?

Orwat - direct

1    A.    Yes, it was.

2    Q.    What did you do with the apixaban after you made it?

3    A.    It was submitted for biological testing.

4    Q.    Did you obtain -- did you receive the results of that

5    biological testing?

6    A.    Yes, I did.

7    Q.    What did the results of that testing show?

8    A.    It showed it was a highly potent Factor XA inhibitor.

9    Q.    Is this the last time that you made apixaban?

10   A.    No, it's not.

11   Q.    What is the reason that you made apixaban on those

12   other occasions?

13   A.    Because of the compound's continued success, it was

14   required for further biological testing.

15   Q.    If I could have you turn to tab 2 in your binder.

16             Do you have PTX-153 before you?

17   A.    Yes, I do.

18   Q.    Do you recognize PTX-153?

19   A.    Yes.  It's the -- yes.

20   Q.    What is it?

21   A.    It's another DuPont laboratory notebook.

22   Q.    Whose laboratory notebook is it?

23   A.    It's also mine.

24   Q.    Who made the entries in this notebook?

25   A.    I did.

Orwat - direct

1    Q.      If we could turn to page DPC12648-18.  What is the

2    compound that you are attempting to make here?

3    A.      This is another synthesis of apixaban.

4    Q.      When did you perform this experiment?

5    A.      This was started June 29th of 2001.

6    Q.      Did you successfully obtain apixaban from this

7    experiment?

8    A.      Yes, I did.

9    Q.      I want to scroll down the page, if we could, to some

10   of the numbered paragraphs, and specifically focus you in on

11   step 6 that's listed.

12           What is described in step 6 on this page?

13   A.      Here I tried a variety of solvent mixtures to

14   re-crystallize apixaban.

15   Q.      Were you successful in crystallizing apixaban?

16   A.      Yes.  It readily re-crystallized and I obtained

17   beautiful white crystals that had a sharp melting point.

18   Q.      Did you ever make salts in the course of your work on

19   the Factor XA program at DuPont?

20   A.      Yes, I did.

21   Q.      And did you ever consider making a salt form of

22   apixaban?

23   A.      Yes.  Dr. Pinto and I discussed the possibility of

24   having to make salts of apixaban because we were concerned

25   about the solubility of apixaban.

1    Q.      What approaches to making salts of apixaban did you

2    consider?

3    A.      Treating apixaban with a strong base.

4    Q.      Did you believe that you could make a salt of

5    apixaban?

6    A.      Yes.

7    Q.      Did you have any concern that a salt form of apixaban

8    would be toxic?

9    A.      No, I did not.

10   Q.      Did you ever make a salt form of apixaban?

11   A.      No, I did not.

12   Q.      What was the reason that you did not make salts of

13   apixaban?

14   A.      It was determined that the solubility of apixaban was

15   sufficient.

16   Q.      Do you recall at your deposition that you were asked

17   whether apixaban has an ionizable moiety that would readily

18   form a free base?

19   A.      Yes.

20   Q.      Do you recall what your answer was?

21   A.      I said, no, not a free base.

22   Q.      Why did you provide that answer?

23   A.      Because the question did not make scientific sense.

24   Q.      What about that sentence did not make scientific

25   sense?

1    A.      You cannot ionize a compound to make a free base.

2    Q.      Did you receive any U.S. patents for your work

3    relating to apixaban?

4    A.      Yes, I did.

5    Q.      If you can turn to tab 3 in your binder, which is

6    JTX-01.

7              Do you recognize JTX-1?

8    A.      Yes.

9    Q.      What is JTX-1?

10   A.      It's the United States patent.

11   Q.      Are you an inventor of this patent?

12   A.      Yes, I am a.

13   Q.      What is the patent number?

14   A.      6,967,208.

15             MR. DANFORD:  And, Your Honor, just for the

16   record, I'm going to read in undisputed Fact Number 13,

17   which states that BMS owns the '208 patent that we're

18   discussing here.

19             THE COURT:  Okay.

20   BY MR. DANFORD:

21   Q.      Mr. Orwat, what is the title of this patent?

22   A.      Lactam-containing compounds and derivatives thereof

23   as Factor XA inhibitors.

24   Q.      And what does lactam-containing in this title refer

25   to?

1    A.      It's referring to the structural element as shown in

2    apixaban on the right hand portion.

3    Q.      Just so I'm clear, is that the same lactam structure

4    in apixaban that we were just looking at?

5    A.      That's correct.

6    Q.      Are there other compounds described in this patent

7    that have that same terminal lactam structure?

8    A.      Yes.

9    Q.      If we could turn to column 174 in the patent and

10   specifically focus in on Example 18.

11           Do you have that before you?

12   A.      Yes.

13   Q.      What is described in Example 18 of the '208 patent?

14   A.      It shows the complete synthesis of apixaban.

15   Q.      Who was responsible for coming up with the complete

16   synthesis that's described in Example 18?

17   A.      I was.

18   Q.      Mr. Orwat, have you received any recognition for your

19   role in the discovery of apixaban?

20   A.      Yes, I have.

21   Q.      If we could show PDX-3.4, please.

22           Mr. Orwat, do you recognize this photograph?

23   A.      Yes, I do.

24   Q.      What is this a photograph of?

25   A.      It's a picture of the recipients of the ACS Heroes of

1    Chemistry Award from 2015.

2    Q.    And who received that award that year?

3    A.    The key people that were involved in the discovery of

4    apixaban.

5    Q.    Are you in this photo?

6    A.    Yes, I am.

7    Q.    Where are you?

8    A.    I'm second from the left.

9    Q.    Who else won the award with you?

10   A.    Next to me is Dr. Don Pinto.  Next to him is Dr.

11   Pancras Wong followed by Dr. Bob Knabb, Dr. Mimi Quan, and

12   finally, Dr. Patrick Lam.

13   Q.    What is the Heroes of Chemistry Award?

14   A.    It's an award given by the American Chemical Society

15   for a significant contribution in chemistry.

16   Q.    What did you receive the honors, the Heroes of

17   Chemistry Award for?

18   A.    In acknowledgment of the significant contributions

19   apixaban has made to people's lives.

20   Q.    Did you consider it an Honor to receive that award?

21   A.    Yes.  It was a very great Honor.

22   Q.    Thank you, Mr. Orwat.

23         MR. DANFORD:  And just before I step down, I

24   would like to enter into evidence PTX-152, PTX-153 and to

25   the extent not already in evidence, JTX-1 of the patent

1    itself.

2                    THE COURT:  Any objection?

3                    MR. SEGREST:  No, Your Honor.

4                    THE COURT:  Those are all admitted.  Thank you.

5                    (PTX-152, PTX-153 and JTX-1 were admitted into

6    evidence.)

7                    MR. SEGREST:  May I approach, Your Honor?

8                    THE COURT:  You may.

9                    (Mr. Segrest handed a notebook to the witness.)

10                        CROSS-EXAMINATION

11   BY MR. SEGREST:

12   Q.    Good afternoon, Mr. Orwat.  Did you develop DPC423?

13   A.    I made DPC423, yes.

14   Q.    Did you develop a salt form of DPC423?

15   A.    Yes, I did.

16   Q.    Was DPC423 ionizable in a physiological range?

17   A.    The chemical compound of DPC423 is basic and I was

18   able to produce many salts of it.

19   Q.    And it's basic in a physiological range; is that

20   correct?

21   A.    Yes.

22   Q.    Now, when you made those many salts of the parent

23   compound of DPC423, did you have any concerns about their

24   toxicity?

25   A.    No, I did not.

1   Q.      But DPC423 was withdrawn from trials because of the

2   lesions produced in rats; is that right?

3   A.      That's correct.

4   Q.      Did your job at DuPont or BMS include conducting

5   clinical or pre-clinical trials?

6   A.      No.

7   Q.      Did it include testing the toxicity of the compounds

8   you were synthesizing?

9   A.      No.

10  Q.      Now, you're the person who synthesized apixaban;

11  right?

12  A.      Yes.

13  Q.      And you also synthesized a crystalline form of

14  apixaban; right?

15  A.      Yes.

16  Q.      Did you synthesize multiple batches of apixaban?

17  A.      I did.

18  Q.      And you described the crystalline form as having

19  beautiful white flakes; right?

20  A.      Yes.

21  Q.      Were there other batches of apixaban you synthesized

22  that didn't have those beautiful white flakes?

23  A.      I don't recall what the initial batches looked like.

24  Q.      Do you recall testifying at your deposition that they

25  were a white powder?

Orwat - cross

1    A.      It's possible.

2    Q.      So not all of the batches of apixaban you made were

3    crystalline; right?

4    A.      The early batches I did not determine if they were

5    crystalline or not.

6    Q.      Are you also named as an inventor on the '945 patent?

7    A.      I am not sure.

8    Q.      Did you ever make a salt of apixaban?

9    A.      I did not.

10   Q.      Would your job at DuPont have included evaluating

11   whether salts of compounds were pharmaceutically acceptable?

12   A.      In general, when we set out to make salts, we would

13   follow the listing of whatever was generally regarded as

14   safe as acceptable salt forms.

15                  So --

16   Q.      Is that the list in Remington's, for example?

17   A.      Yes.

18   Q.      So as far as you were concerned, anything from that

19   list was a suitable candidate for a salt; right?

20   A.      Yes.

21   Q.      Is apixaban ionizable in a physiological range?

22   A.      No.

23   Q.      What base did you and Don Pinto consider using to

24   make a salt of apixaban?

25   A.      We had a brief discussion and initially, we discussed

1    using LDA, lithium diisopropylamide.

2    Q.    Are you aware of any FDA approved pharmaceuticals

3    that are a salt form made using lithium diisopropylamide?

4    A.    No, I'm not.

5    Q.    That's a very strong base; right?

6    A.    It is.

7    Q.    Does it have a pKa of 36?

8    A.    I don't know offhand what its pKa is.

9    Q.    Have you ever made a salt of a product that was used

10   for clinical testing with LDA?

11   A.    No, I have not.

12   Q.    Tab 1 in the binder I gave you is JTX-1, which I

13   think is also in your other binder.

14         And we're going to turn to column 174, which is

15   Bates number BMS API X10263436.

16         Now, do you see Example 18 in the column 174?

17   A.    Yes, I do.

18   Q.    Okay.  And is that compound named the compound

19   apixaban?

20   A.    Yes, except there's a mistake where it says pyrazole,

21   it should be pyrazolo.

22   Q.    Is that a typographical error?

23   A.    Yes, it is.

24   Q.    And does the description that follows this heading,

25   does the language that follows this heading describe how to

Orwat - cross

1    synthesize apixaban?

2    A.      What was the question?

3    Q.      I'm sorry.  Does the language that follows this

4    heading in Example 18 describe how to synthesize apixaban?

5    A.      Yes.  It shows each part.

6    Q.      And does it describe how to synthesize a salt of

7    apixaban?

8    A.      Not here, no.

9    Q.      So still in JTX-1, let's turn back to column 565,

10   which is on BMS API X10263407.  And let's zoom in on the

11   paragraph at the bottom of column 16.

12           Does this paragraph describe the general

13   chemical process for making salts?

14   A.      Yes.

15   Q.      Is there any reference in there to the specific base

16   that you and Dr. Pinto discussed using?

17   A.      Not specifically, but it does mention alkali.  That

18   would include lithium, potassium and sodium, line 53.

19   Q.      Is there any specific base that's listed here that's

20   as strong as the base that you and Dr. Pinto discussed

21   using?

22   A.      Any of the alkali bases could be as strong or very

23   similar.

24   Q.      And when you are working with a very strong base like

25   that, do you use protective gear?

1    A.      We wear protective gear with everything we use in the

2    laboratory.

3    Q.      Can a very strong base be toxic in it comes in

4    contact with human skin?

5    A.      I don't know.

6            MR. SEGREST:  No further questions Your Honor.

7            THE COURT:  Anything from any other defendant?

8            MR. TAYLOR:  No, Your Honor.

9            THE COURT:  All right.  Any redirect?

10           MR. DANFORD:  Yes.  Very briefly.

11           THE COURT:  Okay.

12                      REDIRECT EXAMINATION

13   BY MR. DANFORD:

14   Q.      Mr. Orwat, you were asked some questions about

15   DPC423.

16           Do you recall that?

17   A.      Yes.

18   Q.      And you were asked some questions about salts of

19   DPC423.

20           Do you recall that?

21   A.      Yes.

22   Q.      And you were asked questions about the toxicity of

23   the DPC423 when it went into clinical trials.

24           Do you recall that?

25   A.      Yes.

Orwat - redirect

1    Q.      Are you aware of any connection between the salt form

2    of DPC423 and the toxicity that was observed in those

3    clinical trials?

4            MR. SEGREST:  Objection, Your Honor.  It's not

5    showing that he can answer that.  Evaluating toxicity, that

6    wasn't part of his job.

7            MR. DANFORD:  I'm asking him if he was aware.

8    They asked him about that.  They opened the door.

9            THE COURT:  Overruled.  Why don't you ask the

10   question again.

11   BY MR. DANFORD:

12   Q.      All right.  Are you aware of any connection between

13   the toxicity observed in the clinical trials of DPC423 and

14   its salt form?

15   A.      No.

16   Q.      You were asked some questions about lithium

17   diisopropylamide.

18                Do you recall that?

19   A.      Yes.

20   Q.      Are you familiar with the term alkali base?

21   A.      Yes.

22   Q.      What is an alkali base?

23   A.      It's a base formed with mainly lithium, sodium, or

24   potassium.

25   Q.      Is LDA an alkali base?

1    A.      Yes.

2                 MR. DANFORD:  If we could have up column 565 of

3    the '208 patent that we were looking at, and if you could

4    zoom in on that paragraph, please.

5    BY MR. DANFORD:

6    Q.      Do you see the reference in line 53 to alkali salts?

7    A.      Yes.

8    Q.      How do you make an alkali salt?

9    A.      You react the compound with an alkali base.

10   Q.      Is a reaction with lithium diisopropylamide a way to

11   make an alkali salt?

12   A.      Yes.

13   Q.      If we could get the next page of the '208 patent up,

14   please.

15                You were asked some questions about the

16   synthesis of apixaban shown in Example 18.  This section at

17   the top of paragraph, the column 117 was not a section of

18   the patent that you were shown; is that correct?

19   A.      Yes.

20   Q.      What is described in this paragraph?

21   A.      It describes making a salt in a non-aqueous medium.

22   Q.      And is this a method of making salt of the compounds

23   described in this patent?

24   A.      Yes.

25                MR. DANFORD:  Thank you.  No further questions.

```
 1                    THE COURT:  Okay.  Thank you very much.  You may
 2     step down.  If you don't mind grabbing the binders, that
 3     will be helpful.
 4                    We'll take our lunch break.  We'll get started
 5     around 1:15 or so.  We'll be in recess.
 6                    MR. HENEGHAN:  I think we have a
 7     misunderstanding of the pretrial order.  I just wanted to
 8     address it before the next witness.  We can certainly wait
 9     until after lunch.
10                    THE COURT:  It can wait.
11                    MR. HENEGHAN:  We can address it then.
12                    (Luncheon recess taken.)
13                         *    *    *
14                    1:18 p.m., AFTERNOON SESSION
15                    THE COURT:  Good afternoon.  There's an issue
16     you want to discuss?
17                    MR. HENEGHAN:  Really just a fine clarification,
18     Judge.
19                    We had read the pretrial order to require issues
20     about witnesses to be raised in the morning but issues about
21     exhibits to be raised before the witness.  And if you want
22     everything in the morning, we just wanted know that.
23                    THE COURT:  I want everything in the morning.  I
24     apologize if it's not clear.
25                    MR. HENEGHAN:  Okay.  No problem.
```

```
 1                    THE COURT:  Okay.  Thank you.

 2                    All right.  Will you call your next witness.

 3                    Good afternoon.

 4                    MS. WIGMORE:  Good afternoon, Your Honor.  Our

 5      next witness will be called by deposition designation.  The

 6      witness is Spiridon Spireas, Chief Executive Officer of

 7      SigmaPharm Laboratories, and there will be four exhibits

 8      that will be referenced during this testimony.

 9                    I'll read off the deposition exhibit numbers and

10      the corresponding trial exhibit numbers.

11                    Deposition Exhibit Nos. 37, 42, 48, and 54

12      corresponds to Trial Exhibit Nos. PTX-1031, PTX-1000,

13      PTX-1037, and PTX-1038.

14                    We move those into evidence.  Now we understand

15      there is no objection.

16                    MR. SEGREST:  That's correct, Your Honor.

17                    THE COURT:  Okay.  Those are all admitted.

18                    MS. WIGMORE:  And one additional note, for the

19      time breakdown for these designations, the BMS designations

20      are ten minutes and two seconds, and the defendant's

21      designations are seven minutes and two seconds.

22                    THE COURT:  Okay.  So going forward, you just

23      need to give us a percentage breakdown, and we'll just apply

24      that to however long it takes.

25                    MS. WIGMORE:  Okay.  Thank you.
```

```
 1                    MR. TAYLOR:  In this instance, it's 60/40.

 2                    THE COURT:  60/40?

 3                    MR. TAYLOR:  Yes.

 4                    THE COURT:  Do you agree with that?

 5                    MS. WIGMORE:  I will take his word for it.

 6                    MR. TAYLOR:  That's according to Microsoft

 7    Excel.

 8                    THE COURT:  All right.  Go ahead and play it

 9    when you're ready.

10                    (Deposition designations of Spiridon Spireas

11    placed into the record.)

12                    "Question:  Would you please state your name and

13    address fo the record?

14                    "Answer:  Name is Spiro, S-P-I-R-O.  In fact,

15    official first name is Spiridon.  S-P-I-R-I, D as in David,

16    O, N as in Nancy.  Spireas.  S as in Sam, P as in Peter, I,

17    R as in Robert, E, A, S as in Sam.

18                    "Question:  And you're the Chief Executive

19    Officer of SigmaPharm Laboratories, LLC, right?

20                    "Answer:  Yes, correct.

21                    "Question:  Is it okay today if I just refer to

22    SigmaPharm Laboratories, LLC, as SigmaPharm?

23                    "Answer:  That's fine.

24                    "Question:  Okay.  You are also the chairman of

25    the board of SigmaPharm, right?
```

 1                 "Answer:  Yes.

 2                 "Question:  And that means that you're also one

 3      of SigmaPharm's directors, right?

 4                 "Answer:  Yes.

 5                 "Question:  Do you understand that at today's

 6      deposition, that you're appearing as a corporate

 7      representative of SigmaPharm?

 8                 "Answer:  Yes, I have been told that.

 9                 "Question:  So Dr. Spireas, did you come here

10      today prepared to testify on behalf of SigmaPharm on each of

11      the topics for which you understand you've been designated?

12                 "Answer:  Yeah.

13                 "Question:  Let's take a look at Tab 40.

14                 "I'm going to mark as Exhibit 37 a document

15      labeled 2.3.P drug product bearing the Bates numbers

16      SIGMA_APIX0050559 to 614.

17                 "My first question is, do you recognize

18      Exhibit 38?

19                 "Mr. Wezowski:  37.

20                 "Question:  I'm sorry.  37?

21                 "Answer:  Yeah, that's a module included in some

22      amendment that we have made for our apixaban tablets.

23                 "Question:  Okay.  So this is part of

24      SigmaPharm's submissions to the FDA for its apixaban ANDA;

25      correct?

1            "Answer:  Yes.

2            "Question:  The apixaban that is being referred

3    to in the second row of the table on page 2 of Exhibit 37 is

4    the apixaban that SigmaPharm obtains from Medichem; correct?

5            "Answer:  No.

6            "Question:  What is that apixaban?

7            "Answer:  It is the molecule of apixaban.

8            "Question:  Where does SigmaPharm obtain that

9    molecule of apixaban?

10            "Answer:  We obtained it from Medichem in a

11    crystalline form.  But we don't care about the crystalline

12    form.  It's the molecule of apixaban.  It so happens to

13    be in a crystalline form when we obtained it, but the drug

14    substance, it does not discuss the form of a crystal.

15            "Question:  My question is, the apixaban that

16    SigmaPharm uses to start manufacturing its proposed apixaban

17    drug product is crystalline.

18            "Answer:  How many times are you going to ask me

19    that question?  I already gave you the answer.

20            "Question:  Give me a yes-or-no answer.

21            "Answer:  Yes, yes, yes.

22            "Question:  SigmaPharm uses the apixaban that it

23    receives from Medichem to manufacture what it calls an

24    apixaban drug product intermediate, right?

25            "Answer:  SigmaPharm uses the molecules that it

 1    receives from Medichem in whichever form.  The crystalline

 2    form that I said yes three times uses those molecules to

 3    manufacture the drug product of the intermediate.

 4              "Question:  SigmaPharm refers to that drug

 5    product intermediate as apixaban amorphous 6.58 percent,

 6    right?

 7              "Answer:  Yes.

 8              "Question:  When I refer to SigmaPharm's

 9    apixaban drug product intermediate today, I'm going to be

10    referring to apixaban amorphous 6.58 percent.  Can we agree

11    on that?

12              "Answer:  Of course, whatever you want.

13              "Question:  SigmaPharm is the company that

14    manufactures SigmaPharm's proposed drug product

15    intermediate, right?

16              "Answer:  Yes.

17              "Question:  And SigmaPharm manufactures its

18    apixaban drug product intermediate in Bensalem,

19    Pennsylvania, right?

20              "Answer:  Correct.

21              "Question:  SigmaPharm uses its apixaban drug

22    product intermediate to manufacture its proposed apixaban

23    drug product, right?

24              "Answer:  Yes.

25              "Question:  The apixaban drug product that's

1    manufactured with SigmaPharm's apixaban drug product

2    intermediate is the drug product that's the subject of

3    SigmaPharm's apixaban ANDA, right?

4              "Answer:  Correct.

5              "Mr. Wezowski:  Object to form.

6              "Question:  And SigmaPharm manufactures its

7    apixaban drug product also in Bensalem, Pennsylvania, right?

8              "Answer:  Yes.

9              "Question:  Exhibit 42 shows a manufacturer lot

10   number for the apixaban used in each of the three batches of

11   SigmaPharm's apixaban drug substance intermediate, right?

12             "Answer:  Yes.

13             "Question:  Okay.  And that's a -- strike that.

14             "And that's a -- that's Medichem's lot number

15   for the apixaban that it provides to SigmaPharm, right?

16             "Answer:  Yeah, that's Medichem material.

17             "Question:  Okay.

18             "Answer:  Look, we're using a Medichem material

19   with crystalline particles.

20             "Do you want me to give you a written statement?

21   Don't ask me these questions again.  All this thing now for

22   you to verify that, we're using Medichem crystalline

23   material.

24             "Question:  Does Section 1.9 at pages 78 and 79

25   of Exhibit 48 accurately describe the method by which

1    SigmaPharm test batches of its drug product intermediate for

2    compliance with --

3              "Answer:  Well --

4              "Question:  -- a crystallinity by x-ray

5    diffraction specification?

6              "Answer:  Yeah.  I mean, if this is the current

7    revision number, yes.

8              "Question:  Okay.

9              "Answer:  Which I believe it is.

10             "Question:  So how did SigmaPharm decide to set

11   the parameters that are shown on page 78 of Exhibit 48?

12             "Answer:  I think that the parameters are

13   basically set by the machine.  In other words, the machine

14   has some standard parameters that are basically used, and

15   there's a couple of parameters that are kind of variable

16   that we decide to use based on sensitivity and all those

17   things.

18             "Question:  What are the variable parameters?

19             "Answer:  I guess the variable is the step size

20   that shows how -- how much is discounting process.  So,

21   basically, the principle, to explain a little bit, the

22   principle is that an x-ray, a ray of the beam, heats the

23   sample in a holder, and then there's a lot of diffractions

24   that happen inside that sample.  If the -- if the sample is

25   crystalline, diffractions will happen.

1          "And those diffractions will follow a pattern of

2    a -- what we call a 2-theta angle -- 2-theta is T --

3    2-theta, T-H-E-T-A, angle.  And basically, it will give you

4    peaks if the diffractions are within that 2-theta angle

5    pattern.

6          "And you're going to see different peaks at

7    different 2-theta angles.  So you're going to have to set

8    your -- the range of set of theta angles that you're

9    interested that is set by knowing what you're looking for.

10          "So we know for a fact that given -- given

11    crystals of -- different forms of crystals of apixaban

12    published in the literature or, you know, published in the

13    literature or known to us by, by our vendor, the Medichem

14    people, has 2-theta angles from, I don't know, 10 -- I'll

15    give you an example now -- from 10 to 40 degrees of 2-theta

16    angle, then we're going to put a range of, I don't know, 7

17    to 43.

18          "That's how we decide to put the range.  That's

19    a variable.

20          "So the step how fast the crystalline is

21    happening is another variable how -- I'm sorry -- how fast

22    the x-ray is moving in terms of angle to create the 2-theta

23    angles.  And here, it's .02 degrees in this specific one.

24    And then how -- how much does it stay in each step, that's

25    the one second.

1              "The other stuff is kind of standard for the

2    machine.

3              "Question:  Okay.  So just to confirm, the

4    variables then are the 2-theta range, the step size and the

5    step time?

6              "Answer:  I believe so.  It may be that some --

7    the other ones, I think it's pretty much standard for the

8    machine, the specific machine that you're using.

9              "Question:  Okay.  How did SigmaPharm set the

10   step size shown in the parameters on page 78 of Exhibit 48?

11             "Answer:  That is pretty standard.  So usually,

12   this is the step size that we put in.

13             "Question:  I believe you mentioned earlier that

14   the step time and the step size affect the sensitivity of

15   the test; is that right?

16             "Answer:  May.  I do not know, but I would

17   assume.

18             "Question:  How does the step time affect the

19   sensitivity of the test?

20             "Answer:  You have to understand that I'm not

21   an expert in x-ray crystallography.  Whatever I know I know

22   based on my knowledge, but based on my experience over the

23   years as a professor and as a researcher.  A researcher.

24   But I'm not an expert in x-ray crystallography, so I cannot

25   give you expert answers.

1              "Question:  Okay.

2              "Answer:  It's only based on logic and

3       understanding.

4              "Question:  Okay.  What is your understanding of

5       how the step time affects the sensitivity of the x-ray

6       diffraction test?

7              "Answer:  The understanding is based on logic.

8       So if you increase the time of the scanning in each step

9       that you're doing, you may have a little bit more

10      sensitivity.

11             "But how much, I do not know.  Is it going to

12      be -- is it true?  I do not know 100 percent.

13             "So whatever I'm telling you now, I'm not

14      telling you as a fact witness, I'm telling you as a

15      self-pro-claimed knowledgeable person on x-ray diffraction,

16      which I'm not.

17             "Question:  Let's turn to page 46 of Exhibit 48.

18      And it has the Bates number ending in 476.

19             "Answer:  Um-hmm.  Okay.

20             "Question:  Do you see Section 31.1 titled

21      crystallinity by X-ray diffraction?

22             "Answer:  Of course.

23             "Question:  Does Section 3.11, which begins on

24      the page having the Bates number ending in 476 and ends on

25      the page having the Bates number 478, accurately describe

1 the method by which SigmaPharm tests batches of its apixaban

2 drug product for compliance with its crystallinity by X-ray

3 diffraction specification?

4   "Answer:  I believe so, yes.

5   "Question:  And SigmaPharm uses the method

6 described in Section 3.11 to test its apixaban drug product

7 for compliance with both its drug product release

8 specification and its drug product stability specification,

9 right?

10   "Answer:  I believe so, yes.

11   "Question:  Okay.  So the step time that

12 SigmaPharm uses to analyze crystallinity by X-ray

13 diffraction in its drug product is shorter than the step

14 time that it uses to analyze crystallinity by X-ray

15 diffraction in its drug product intermediate, right?

16   "Answer:  Yeah, but I mean, this doesn't mean

17 that we cannot change that.  I mean, if the FDA wants us to

18 change, we'll change it.

19   "Question:  Okay:

20   "Answer:  Increase it.  Whatever the FDA wants

21 us to do.

22   "Question:  Okay.  But in the current version of

23 SigmaPharm's proposed test method for X-ray diffraction, the step

24 time for the drug product method is shorter than the step  time

25 for the drug product in the intermediate method; is that right?

1          "Answer:  Obviously.

2          "Question:  Okay.  The analyses that SigmaPharm

3   has done to determine whether crystalline apixaban is

4   present in its apixaban drug product so far have used the

5   method described in Section 3.11 of Exhibit 48, right?

6          "Answer:  Obviously, yeah.

7          "Question:  Has SigmaPharm ever analyzed a

8   sample of its apixaban drug product using the method shown

9   in Section 3.11 and concluded that crystalline apixaban is

10  present in the sample?

11         "Answer:  We never conclude that had apixaban is

12  present in any sample that we have tested so far.

13         "Question:  Okay.  So the method described in

14  Section 3.11  of Exhibit 48 has never detected

15  crystalline apixaban?

16         "Answer:  We have never found using this method,

17  we have never found in this machine, we have never found in

18  any of our samples that we tested crystalline apixaban,

19  yeah.

20         "Question:  Okay.  So FDA asked SigmaPharm to

21  determine the detection limit for the crystallinity by X-ray

22  diffraction method for its apixaban drug product, right ?

23         "Answer:  Lately, yes.

24         "Question:  Okay.  And, by the way, you mean

25  October 2017, right?

Spireas - designations

1          "Answer:  Yes, October.  And we applied later, I

2     remember.

3              "Question:  SigmaPharm concluded in this

4     addendum that the detection limit for crystallinity by X-ray

5     diffraction for apixaban tablets 2.5 milligram and 5

6     milligram is five percent, right?

7              "Answer:  Yeah.  But how do they conclude

8     that?  How do we conclude that?  Is there any -- have they

9     done --

10             "Question:  Well, take a moment and review the

11    document if you need to.

12             Answer:  Oh, here it is.  So the conclusion is,

13    obviously, they have written here that is five percent.

14             Question:  So SigmaPharm was able to detect the

15    crystalline apixaban contained in the sample described in

16    the upper left corner of -- of page 64 in the lab notebook

17    that's Exhibit 55, right?

18             "Answer:  I see here that we were able to detect

19    it at two percent.

20             "That's the two percent, right, the third one?

21             "Question:  Okay.  Well, SigmaPharm concluded

22    that the detection limit for crystallinity by x-ray

23    diffraction method for apixaban tablets, 2.5-milligram and

24    5-milligram, is five percent, right?

25             "Answer:  Yeah, the analytical chemistry

1    department concluded that.  I don't conclude that.

2                    "Question:  So you disagree with SigmaPharm's

3    analytical department's conclusion?

4                    "Answer:  Maybe I disagree.  I have to look at

5    it more.  But I can see here on page 12 of 13 with Bates

6    number that ends at 805 of Exhibit 54 that there is a peak

7    that they are looking at two percent overlay.  The two

8    percent diffractogram."

9                    (End of videotaped deposition.)

10                   MR. LEE:  Your Honor, the plaintiffs call

11   Professor David MacMillan and Mr. Danford will present the

12   witness.

13                   THE COURT:  That's fine.

14                   ... DAVID MACMILLAN, having been duly sworn as a

15   witness, was examined and testified as follows ...

16                   THE COURT:  Mr. MacMillan, welcome.

17                   THE WITNESS:  Good afternoon.

18                   THE COURT:  You may proceed.

19                         DIRECT EXAMINATION

20   BY MR. DANFORD:

21   Q.    Good afternoon.

22   A.    Good afternoon.

23   Q.    Would you please introduce yourself to the Court?

24   A.    Yes.  I'm professor David MacMillan.

25   Q.    Where do you work?

MacMillan - direct

1   A.      I work at Princeton University.

2   Q.      What do you do at Princeton?

3   A.      I'm a professor of organic chemistry.

4   Q.      How long have you been a professor of organic

5   chemistry?

6   A.      I've been a professor for 21 years now.

7   Q.      What is your educational background?

8   A.      My educational background was I received my

9   undergraduate degree at the University of Glasgow in the

10  U.K.

11                I completed my Ph.D. studies at the

12  university of California, Irvine, and I did post-doctoral

13  studies at Harvard University in Massachusetts.

14  Q.      In what year did you get your Ph.D.?

15  A.      I received my Ph.D. in 1996.

16  Q.      What are your job responsibilities as a professor of

17  organic chemistry at Princeton?

18  A.      At Princeton, my job responsibilities are, first

19  of all, to teach organic chemistry, but also to run a

20  research group where we study the development of new

21  chemical reactions that we hope will be beneficial to the

22  pharmaceutical sector.

23  Q.      How does your research relate to the pharmaceutical

24  sector?

25  A.      It relates in we develop new chemical reactions that

1    allow us to hopefully accelerate how to built molecules or how

2    to design molecules that could become medicine and at the same

3    time we do studies in the area of chemical biology or

4    biology, which allows you to think about potential use

5    there, therapeutic area for medicinal chemists to work on.

6    Q.    What is medicinal chemistry?

7    A.    Medicinal chemistry is the science of chemists

8    devising, building, testing and ultimately developing new

9    medicine.

10   Q.    And how does your research relate to that area of

11   medicinal chemistry?

12   A.    My research relates to that because we devise new

13   chemical reactions that allow you to make new bonds, which

14   hopefully will accelerate where you make medicines or think

15   about new types of medicines to make.

16   Q.    Have you published any scientific papers?

17   A.    Yes, we have.

18   Q.    Were those publications peer-reviewed?

19   A.    Yes, they were.

20   Q.    How many publications do you have?

21   A.    At the moment, around about 130 publications.

22   Q.    What do those publications relate to?

23   A.    Those publications again relate to developing new

24   catalytic reactions for medicinal chemistry as well as

25   chemical biology publications that help us think about ways

1   to discover new therapies to be used.

2   Q.    Do you do any consulting work?

3   A.    I do.

4   Q.    Who do you consult for?

5   A.    At the present time I consult for a number of

6   pharmaceutical companies.

7   Q.    What is the nature of the issues that you address

8   through that consulting work?

9   A.    In that consulting work, I did about, 90 percent of

10  it is medicinal chemistry and about ten percent of it is

11  what's called process chemistry.

12  Q.    Have you received any honors or awards for your work

13  the in field of chemistry?

14  A.    Yes.

15  Q.    What are some of the awards that you received?

16  A.    In 2012, I was elected to become a member of the

17  American Academy of Scientists.  In the same year I was

18  elected to become a fellow of the Royal Society in London.

19              Recently, I became a member of the --

20  recently, I became a member of the National Academy of

21  Sciences here in the U.S.

22  Q.    Could you please take out the binder before you and

23  turn to tab 1.

24              Do you have PTX-811 before you?

25  A.    I do.

MacMillan - direct

1    Q.      Do you recognize PTX-811?

2    A.      Yes.

3    Q.      What is it?

4    A.      That's my resumé.

5    Q.      Is PTX-811 an accurate summary of your educational

6    and professional experience?

7    A.      Yes, it is.

8              MR. DANFORD:  Your Honor, plaintiffs offer

9    Professor David MacMillan as an expert in organic and

10   medicinal chemistry.

11             MR. SEGREST:  No objection.

12             THE COURT:  Okay.  He is so recognized.

13   BY MR. DANFORD:

14   Q.      Have you been retained as an expert by the plaintiffs

15   in this case, Dr. MacMillan?

16   A.      Yes, I have.

17   Q.      And are you being compensated for your work on this

18   case?

19   A.      Yes, I am.

20   Q.      Is your compensation dependent on the outcome of this

21   litigation or the opinions that you are offering?

22   A.      No, it's not.

23   Q.      What issues are you addressing in this phase of the

24   case?

25   A.      In this phase of the case I'm addressing issues on

MacMillan - direct

1    infringement.

2    Q.    Did you reach any conclusion about whether SigmaPharm

3    will infringe any claim of the '208 patent?

4    A.    Yes, I did.

5    Q.    What did you conclude?

6    A.    I concluded that SigmaPharm will infringe on several

7    of the claims in this.

8    Q.    Have you prepared any slides to explain your

9    infringement opinion?

10   A.    Yes.

11          MR. DANFORD:  If we could have up PDX-4.2.

12   BY MR. DANFORD:

13   Q.    Could you please summarize your infringement opinions

14   for the Court?

15   A.    Sure.  This is a summary of my infringement opinions.

16   The two bullet points show, first of all, SigmaPharm,

17   SigmaPharm's proposed ANDA products do indeed infringe

18   claims 13 and 104, and also their use of crystalline

19   apixaban in its proposed manufacturing process will also

20   infringe claim 104.

21          MR. DANFORD:  Your Honor, just for the record,

22   we have also asserted the '208 patent against the defendant

23   Unichem, but Unichem has stipulated to infringement, that is

24   docket 665, so we will not be addressing that.

25          In Sunshine Lake, the '208 patent is not being

MacMillan - direct

1    challenged by them, so he again has no opinions to offer

2    with respect to them on infringement.

3            THE COURT:  Okay.  Thank you.

4    BY MR. DANFORD:

5    Q.    Can we have up PDX-4.3, please.

6            What materials did you consider in forming

7    your infringement opinion?

8    A.    So, again, this is a summary of materials I

9    considered for my infringement opinion.  First of all, the

10   '208 patent, the prosecution history of the '208 patent, the

11   Court's claim construction, FDA submissions, the ANDA

12   submissions by SigmaPharma as well as SigmaPharm's

13   admissions, the uncontested facts in this case.  A

14   discussion I had with another expert in the case, Dr. Jerry

15   Atwood, as well as the deposition testimony of a SigmaPharm

16   representative.

17   Q.    Let's start with the item at the top of the list.

18   Have you reviewed the '208 patent?

19   A.    Yes, I have.

20   Q.    If we could have up PDX-4.4.  What is the title of

21   the '208 patent?

22   A.    The title of the '208 patent is "Lactam-Containing

23   compounds and derivatives thereof as Factor XA inhibitors."

24   Q.    What do the words lactam-containing compound refer

25   to?

1  A.     A lactam to an organic chemist is a ring compound

2  which contains a nitrogen which is bonded to a carbonyl,

3  but more commonly, a ring compound, it's known as a

4  lactam.

5  Q.     What is the priority date of the '208 patent?

6  A.     September 21st, 2001.

7  Q.     What were you doing in September of 2001?

8  A.     In September of 2001, I was a professor of organic

9  chemistry at Cal Tech.

10  Q.     Have you offered any opinion about the qualifications

11  of a person of ordinary skill for purposes of the '208

12  patent?

13  A.     Yes, I have.

14          MR. DANFORD:   If we could have up PDX-4.5.

15  BY MR. DANFORD:

16  Q.     What is your opinion with respect to the

17  qualifications of a person of ordinary skill of the '208

18  patent?

19  A.     The qualifications of a person of ordinary skill for

20  the '208 patent are summarized here, and the first bullet

21  point, basically, it's a professional with a graduate degree

22  in organic chemistry, pharmaceutical chemistry, or an

23  equivalent discipline, with experience in a range of areas,

24  which are listed at the bottom of 01.

25          Worked with a team of professionals with

1    training in related disciplines, in a range of areas, again,

2    those areas are detailed at the of the slide.

3    Q.      Do you understand that the defendants have also

4    offered a definition of person of ordinary skill for the

5    '208?

6    A.      Yes, I do.

7    Q.      Would your analysis change depending on which

8    definition is adopted?

9    A.      No, it would not.

10   Q.      As of September 2001, did you have all the

11   qualifications of a person of ordinary skill in the art

12   under either side's definition?

13   A.      Yes, I did.

14   Q.      Let's have PDX-4.6.

15           What claims of the '208 patent are asserted in

16   this case?

17   A.      In the '208 patent, the asserted claims are 13 and

18   104.

19   Q.      What is claim 13 directed to?

20   A.      Claim 13, as it states here, is directed towards a

21   compound, according to claim 8, wherein the compound is,

22   and then it goes on to give the formal chemical name for

23   apixaban, or a pharmaceutically acceptable salt form

24   thereof.

25   Q.      Just so I have it for the record, where is the

MacMillan - direct

1    chemical name shown in claim 13 that corresponds with

2    apixaban?

3    A.     Sure.

4             Just below compound, beginning

5    1-4(methoxyphenyl, then running for three lines all the way

6    down to the bottom, that's the formal chemical name of

7    apixaban.

8             MR. DANFORD:  And, Your Honor, just for the

9    record, Undisputed Fact 36 says that that name there is, in

10   fact, the chemical name for apixaban so we won't go through

11   what each of those word mean.

12            THE COURT:  Thank you.

13   BY MR. DANFORD:

14   Q.    Could we go down to claim 104.

15            What is claim 104 directed to?

16   A.    Claim 104 is directed to a compound according to

17   claim 13, which is apixaban, which is a crystalline compound

18   with emphasis on crystalline.

19   Q.    And for purposes of infringement, what's the

20   difference between claim 13 and 104?

21   A.    13 basically relates to apixaban or a

22   pharmaceutically acceptable salt.  And 104 is apixaban as a

23   crystalline compound.

24   Q.    Let's turn to your infringement opinions for claim

25   13.

MacMillan - direct

1          Have you considered whether SigmaPharm's

2     proposed ANDA products will infringe claim 13?

3     A.      Yes, I have.

4     Q.      And if we could have up PDX-4.7.

5          What is your opinion as to whether SigmaPharm's

6     proposed ANDA products will infringe claim 13?

7     A.      It is my opinion that SigmaPharm's products do,

8     indeed, infringe claim 13.

9     Q.      What are the reasons for your opinion?

10    A.      Basically because in the ANDA documents, it states

11    that we have apixaban; and the second part is the

12    uncontested facts in this case that state they have

13    apixaban.

14          MR. DANFORD:   And, Your Honor, just for the

15    record again, Uncontested Fact 57 says that SigmaPharm's

16    proposed ANDA products contain apixaban.

17    BY MR. DANFORD:

18    Q.      If we could look back to the language in claim 13.

19    At the beginning of the claim, it refers to a compound

20    according to claim 8.

21          Have you considered whether apixaban is a

22    compound according to claim 8?

23    A.      Yes, I have.   It's a compound of claim 8.

24    Q.      How did you reach that conclusion?

25    A.      I reached that conclusion by reading the claim 8 and

1    making that judgment.

2    Q.    Well, let's look at the language of claim 8.

3              If we could have PDX-4.8 up, please.

4              What is the reason that you say that apixaban is

5    a compound of claim 8?

6    A.    So if you read language of claim 8, shown here, it's

7    a compound, according to claim 1, wherein the compound is

8    selected from the group.

9              And then it goes on and gives 41 examples; and

10   one of those examples is, again, apixaban shown by the

11   formal chemical name shown there.

12   Q.    And just so we're clear on it, is the compound name

13   for apixaban actually written out in claim 8?

14   A.    Yes, it is.

15   Q.    All right.  Now, looking at claim 8, it again refers

16   to a compound according to claim 1.  Have you considered

17   whether apixaban is a compound of claim 1?

18   A.    Yes.

19   Q.    What did you conclude?

20   A.    It is, indeed, a compound of claim 1.

21   Q.    Let's have PDX-4.9.

22             What do you have shown here?

23   A.    So this is claim 1 involving all of its components,

24   elements, and limitations.

25   Q.    And did you go through all the elements of claim 1

1    and compare them to apixaban?

2    A.    Yes, I did.

3    Q.    Have you prepared a demonstrative to show how

4    apixaban corresponds to the limitations of claim 1?

5    A.    Yes.

6    Q.    If we could have up PDX-4.10, please.

7          What does this slide show?

8    A.    So this is the chemical structure of apixaban, and if

9    you actually look to what is in the middle of it, you will

10   see P and M, which is a pyridyl combined with another

11   lactam ring.

12         And then if you go to the top left-hand corner

13   in the blue box, that's $R^{1a}$ in the claim 1 patent.

14         We then go to the bottom left-hand corner,

15   that's group G, which contains a phenyl ring, R which is a

16   methoxy.  You then move over to the right-hand side, you see

17   the Z bond connected to a carbocycle, which in this case is

18   a phenyl, and then you have this B group at the end

19   which is a Q group which contains a lactam which involves Q1

20   carbonyl.  And you put the whole thing together, you have

21   apixaban.

22   Q.    Just so the record is clear, what are those different

23   letters that you have up on the screen referring to?

24   A.    Those are basically referring to the variables of a

25   working Markush group and the elements of claim 1.

MacMillan - direct

1    Q.      And are you showing all the elements of claim 1 on

2    this slide?

3    A.      Yes.

4    Q.      Is there any difference between those elements as

5    they're described in claim 1 and how they appear in

6    apixaban?

7    A.      No, there is not.

8    Q.      Are you aware that SigmaPharm is disputing that

9    apixaban is a compound according to claim 1?

10   A.      Yes.

11   Q.      Do you agree with that?

12   A.      No, I do not.

13   Q.      Why do you disagree with that?

14   A.      I disagree with it because SigmaPharm are using a

15   logic to describe organic molecules that basically doesn't

16   make sense, and they're using a logic that no other organic

17   chemist or people of -- a person skilled in the art would

18   use as they're thinking about looking at the structures of

19   the molecules.

20   Q.      Have you prepared a demonstrative to show what's

21   wrong with SigmaPharm's argument?

22   A.      Yes.

23   Q.      If we could have PDX-4.11, please.

24           What do you have shown here?

25   A.      So this is Ring M in claim 1 of the '208 patent.

MacMillan - direct

Q.      And could you explain to us how a person of ordinary
skill in the art would have understand this language from
the claim described in claim M?

A.      Yes.  Actually, I have a laser point here.

            THE WITNESS:  Is it okay if I use the laser?

            THE COURT:  Sure.

BY THE WITNESS:

A.      So if you look at this structure.

            Let's see it's working.

            So if you look at the structure, you can see --
make sure the laser pointer works -- that this ring here is
Ring M.  An organic chemist has a convention that everyone
uses, they use it from their earliest days of organic
chemistry, that these lines, these are bonds.  You see the
bonds going around the frame.

            Now, where the bonds meet, or where those lines
meet, those are actually carbons.  And they're always read,
and that's why they're formed that way, to show how you draw
them actually out.  It saves a lot of time.

            But the second thing you have to know is that
all carbons are typically bonded to four bonds.  You can see
that this one only has two and that is because the organic
chemist, the missing bonds, are always hydrogen.  They
always have to be hydrogen.  So you know that here and here,
there's two extra hydrogens and you know there are two

1    hydrogens there.

2    Q.      And just so the record is clear, how many hydrogens

3    atoms are attached to Ring M as it is shown here in the

4    language of patent?

5    A.      Yes.  As you can see, there are clearly four:  One,

6    two, three, four.

7    Q.      Okay.  And have you drawn out the chemical structure

8    for Ring M to show all the atoms in that structure?

9    A.      Yes, I have.

10   Q.      All right.  Let's have that.

11           So what are you showing on the right-hand side?

12   A.      So the right-hand side, this is the one -- this the

13   fully drawn-out version.  This is the one that people would

14   first, you know, the very first that you would do when

15   you're learning organic chemistry the very first time, but

16   then you quickly learn to leave them out of drawing to save

17   them all that time drawing out the carbons and hydrogens.

18   Q.      Is there any difference between the structure shown

19   on the left-hand side and the structure shown on the

20   right-hand side?

21   A.      There is absolutely no difference.

22   Q.      Have you considered whether Ring M is present in

23   apixaban?

24   A.      Yes, I have.

25   Q.      Let's have PDX-4.13 up.

MacMillan - direct

1          **What are you showing here?**

2     A.     So this, again, is the chemical structure of

3     apixaban.

4     Q.     And where is Ring M in apixaban?

5     A.     So you can clearly see, the ring shown in red,

6     completely maps on to what is Ring M in the '208 patent.

7     Q.     Is there any difference between Ring M as it appears

8     in the apixaban and how it is shown in claim 1?

9     A.     No, absolutely no difference.

10    Q.     Now, I'm looking at the language of claim 1, and it

11    refers to Ring M is substituted with 0 to 2 $R^{1a}$.

12          How many $R^{1a}$ groups are substituted on Ring M in

13    apixaban?

14    A.     Well, it's pretty clear you see there is absolutely

15    no groups, there's zero $R^{1a}$ groups are substituted, and you

16    can see that because here it is and there it is over there.

17    So no, zero $R^{1a}$ are substituted.

18    Q.     And just walking through that again, why is it that

19    you say there are zero $R^{1a}$?

20    A.     Because this is the same as that.  There's the four

21    hydrogens, and these are four hydrogens.

22    Q.     What is your understanding of SigmaPharm's position

23    as to how much $R^{1a}$ are substituted on Ring M in apixaban?

24    A.     So SigmaPharm's position is there are four $R^{1a}$

25    substituents that are now located on this Ring M of

MacMillan - direct

1  apixaban.

2  Q.     And what are the four $R^{1a}$ groups that they say are

3  stuck on Ring M on apixaban?

4  A.     So they are saying there's four $R^{1a}$, and that those

5  four $R^{1a}$'s of hydrogen that are substituted on the Ring M on

6  the '208 patent.

7  Q.     Do you agree that a person of ordinary skill would

8  understand that the four hydrogen atoms on Ring M of

9  apixaban are substitutions?

10 A.     No, they would not.

11 Q.     Why do you disagree with that?

12 A.     It is pretty straightforward, actually.

13         So if you think about it, they're saying they're

14 0 to 2, it's a maximum if you go on here.  So what they're

15 saying is you can have maximum of 2, for example, hydrogens

16 here, but that would mean there would have to be absolutely

17 nothing there.  And if you have nothing on a carbon here, that

18 cannot exist.

19         And so you realize also that SigmaPharm are

20 making the same argument for three other rings on this

21 molecule, so you start to realize that a person of skill

22 in the art, if they were to believe SigmaPharm's logic, it

23 would be contemplating molecules that cannot exist on the

24 Planet Earth at the present time, which, obviously, I don't

25 think we can look at it that way.

MacMillan - direct

1   Q.      Okay.  And let me break that down in pieces.

2           So is SigmaPharm making the same argument with

3   respect to other portions of the molecule in apixaban?

4   A.      Yes, they are.

5   Q.      And what is your opinion with respect to that

6   argument as it is presented with respect to the other

7   limitations of claim 1?

8   A.      It would, again, lead to a molecule that just

9   couldn't exist on earth at the present time.

10  Q.      Okay.  And just so we're clear, if you read claim 1

11  the way that SigmaPharm does, would there be any molecule

12  that would be covered by claim 1?

13  A.      No.

14  Q.      So putting this all together, what is your opinion

15  as to whether apixaban is a compound according to claim 1?

16  A.      Apixaban is a compound of claim 1.

17  Q.      And what is your opinion as to whether SigmaPharm's

18  proposed ANDA products will infringe claim 13?

19  A.      It is my opinion that SigmaPharm's products will

20  infringe claim 13.

21  Q.      Let's move on to claim 104.  And if we could have up

22  PDX-4.14.

23          Have you considered whether SigmaPharm's

24  proposed ANDA products infringe claim 104?

25  A.      Yes, I have.

289

MacMillan - direct

1    Q.      And what did you conclude?

2    A.      I concluded that they do, indeed, have crystalline

3    compounds in their ANDA products.

4    Q.      How did you reach that conclusion?

5    A.      I reached that conclusion because I had a discussion

6    with another expert in this case.

7                MR. SEGREST:  Objection, Your Honor, to any

8    discussion with Dr. Atwood would be hearsay.

9                Now, I understand experts have some leeway on

10   hearsay, but there has been no foundation laid in

11   Dr. MacMillan's report that it will be necessary for him to

12   rely on the opinions of Dr. Atwood in this case.

13               MR. DANFORD:  Your Honor, in his report he said

14   that he had a discussion with Dr. Atwood and that he is

15   relying on Dr. Atwood for his analysis of the crystallinity

16   with respect to the proposed ANDA product.

17               MR. SEGREST:  We agree that's what he says.

18   That is insufficient to establish a foundation or relying on

19   the opinions of another expert.

20               Under Rule 703, he has to establish that it's a

21   type of information that is ordinarily and customarily

22   relied upon by people in his field, and there is no

23   disclosure of that in his report.

24               THE COURT:  Well, I will overrule that for now

25   and we'll see what we hear on further foundation.  You can

1    renew your objection if you think it has merit.

2              Go ahead.

3    BY MR. DANFORD:

4    Q.    Could you just remind me, what was the basis again

5    for your conclusion that apixaban is, or SigmaPharm's

6    proposed ANDA product infringes claim 104?

7    A.    It is because it contains crystalline compound in

8    their ANDA product.

9    Q.    And you described for us a discussion that you had

10   with Dr. Atwood?

11   A.    Yes.  I had a discussion with Dr. Jerry Atwood, who

12   explained to me that through his analysis, he was able to

13   detect, in fact, there was crystalline apixaban.

14   Q.    Is an opinion from another expert like Dr. Atwood the

15   type of material you would consider in your work?

16   A.    Yes.

17             MR. SEGREST:  Objection Your Honor.  That was

18   not disclosed in his report.

19             MR. DANFORD:  He disclosed he's relying on Dr.

20   Atwood.  I really don't understand the basis for the

21   objection.

22             THE COURT:  So you knew he relied on the expert.

23   Right?

24             MR. SEGREST:  Yes, Your Honor.

25             THE COURT:  So the argument is that he didn't

MacMillan - direct

1  specifically say I relied on him because that's the kind of

2  thing I would do?

3              MR. SEGREST:  Yes Your Honor.  He didn't --

4  there was no foundation laid to establish that this is the

5  type of expert that he could rely on and such, acting is as

6  a mere conduit for hearsay.

7              THE COURT:  I'm overruling the objection.  You

8  can go on.

9  BY MR. DANFORD:

10 Q.    All right.  So to sum up, based on your discussion

11 with Dr. Atwood, what is your opinion with respect to

12 whether SigmaPharm's proposed ANDA product will infringe

13 claim 104?

14 A.    It is my opinion that SigmaPharm's proposed ANDA

15 products will indeed infringe claim 104.

16 Q.    Have you considered whether SigmaPharm's

17 manufacturing process will infringe claim 104 of the '208

18 patent?

19 A.    Yes, I have.

20 Q.    What did you conclude with respect to SigmaPharm's

21 proposed manufacturing process?

22 A.    It was also my opinion that the manufacturing process

23 will also infringe claim 104.

24 Q.    If we can have up PDX-4.15.  What are the reasons

25 that you've concluded that SigmaPharm's manufacturing

 1  process will infringe claim 104?

 2  A.    Well, the compound according to claim 13, which is a

 3  crystalline compound, is claim 104, and that SigmaPharm uses

 4  crystalline apixaban to manufacture its tablets in the

 5  United States.

 6  Q.    What material did you consider in forming your

 7  opinions as to whether SigmaPharm's manufacturing process

 8  will infringe claim 104?

 9  A.    I relied upon SigmaPharm Laboratory's DMF.

10  Q.    If you could turn to tab 3 in your binder, please.

11  Do you have PTX-1068 before you?

12  A.    Yes.

13  Q.    Do you recognize PTX-1068?

14  A.    Yes.

15  Q.    What is it?

16  A.    Its SigmaPharm Laboratory's document DMF.

17  Q.    Is this one of the documents you considered in

18  forming your opinion?

19  A.    Yes.

20  Q.    Have you prepared a demonstrative summarizing

21  the portions of PTX-1068 relevant to your infringement

22  opinion?

23  A.    Yes.

24  Q.    If we could have up PDX-4.16.  What are you showing

25  here?

MacMillan - direct

1    A.      So this is an excerpt from that DMF document.  And as

2    you can see, they're producing the tablet as referenced in

3    the general properties section, the starting material,

4    apixaban is crystalline Form I.

5    Q.      What does that mean to you?

6    A.      That means to me that they're applying apixaban

7    crystalline Form I for their -- really infringing claim

8    104.

9    Q.      Did you review any other documents from SigmaPharm's

10   ANDA?

11   A.      Yes.

12   Q.      If you could turn to tab 4 in your binder, which is

13   PTX-1011.

14             Do you recognize this document?

15   A.      Yes.

16   Q.      What is PTX-1011?

17   A.      This is SigmaPharm Laboratories' ANDA document.

18   Q.      Is this one of the materials you considered in

19   forming your infringement opinion?

20   A.      Yes.

21   Q.      Have you prepared a demonstrative summarizing the

22   portions of this document relevant to your infringement

23   analysis?

24   A.      Yes.

25   Q.      If we could have up PDX-4.17, please.  What does this

1 slide show?

2 A.      This shows from the ANDA document the address of

3 where the tablets are manufactured by SigmaPharm, which is

4 in Bensalem, Pennsylvania, U.S.

5 Q.      What happened to that facility in Bensalem?

6 A.      This is for the test and -- perform stability

7 testing, but most importantly, manufacture apixaban in

8 Bensalem, Pennsylvania.

9 Q.      Is crystalline apixaban used by SigmaPharm at that

10 facility in Bensalem, Pennsylvania?

11 A.      Yes.

12 Q.      So taking this all together, what did you conclude as

13 to whether SigmaPharm's use of apixaban in its manufacturing

14 process will infringe claim 104?

15 A.      Based on the fact they're using crystalline apixaban

16 in their manufacturing process, they clearly are infringing

17 claim 104.

18 Q.      Now, were you here in the courtroom just now when

19 plaintiffs presented a video of Dr. Spireas' testimony?

20 A.      Yes.

21 Q.      What effect did that testimony have on your opinion

22 about whether SigmaPharm's manufacturing process infringes

23 claim 104?

24 A.      It confirmed my opinion.

25          MR. DANFORD:   Your Honor, we'd like to move into

MacMillan - cross

1    evidence Exhibit PTX-811, PTX-1068, and PTX-1011, which were

2    just discussed during his examination.

3                    THE COURT:  Any objection?

4                    MR. SEGREST:  No objection.

5                    THE COURT:  They're all admitted.

6                    (PTX-811, PTX-1068, and PTX-1011 were admitted

7    into evidence.)

8                    MR. DANFORD:  Pass the witness.

9                    THE COURT:  Cross-examine.

10                    MR. SEGREST:  Your Honor, may I approach the

11   witness?

12                    THE COURT:  You may.

13                    (Mr. Segrest handed notebooks to the witness and

14   to the Court.)

15                    CROSS-EXAMINATION

16   BY MR. SEGREST:

17   Q.    Dr. MacMillan, I'm Phillip Segrest.  You may recall

18   we met before during your deposition.

19   A.    Yes.  Good afternoon.

20   Q.    So let's look at the '208 patent.  It's Joint Trial

21   Exhibit 1, tab 1 in your folder.  And I want to direct your

22   attention to column 12, which is the ninth page of the

23   document, and line 53 of column 12 there.  A little bit

24   further down.  Get the picture, please.

25                    So do you see the picture here that is referred

1    to as Formula II in the specification?

2    A.    Yes.

3    Q.    And turning over to column 237 --

4    A.    237?

5    Q.    237, 122nd page of the document.  And direct your

6    attention up at line, the start of line 5.

7          Is this claim 1 of the '208 patent?

8    A.    Yes.

9    Q.    Okay.  And is this referred to as formula one in

10   claim 1 of the '208 patent the same as Formula II from

11   column 12 of the specification?

12   A.    Yes, sir.

13   Q.    Now, let me direct you to column 13, which is the

14   tenth page of the document.  We're going to look at

15   the figure there at line 20.  Show the text above it as

16   well.

17          Does the specification describe these figures as

18   Formula IIa and IIb in this example?

19   A.    Yes.

20   Q.    Over in claim 237, lines 40 and 45, do the same

21   figures, IIa and IIb, appear there?

22   A.    Yes, they do.

23   Q.    And so here in the specification, does it explain

24   that M4 is Z-A-B on line 15?

25   A.    Yes, it does.

1  Q.     So looking at column 237 and 238, does claim 1

2  describe the relationship between Z-A and B and what order

3  they're in?

4  A.     It states with respect to Z, I believe at column 238, it

5  states that Z, the substituent, it says Z and B are attached

6  to two atoms, different atoms on A.

7  Q.     Okay.  And, again, going back to claim 14, it's on

8  the tenth page of the document, and we'll look at lines 12

9  through 13.

10          So is this -- that starts with the word

11  provided, does that refer to that B as well?

12  A.     Sorry.  Can you say that again?

13  Q.     Sure.  The colloquy that starts provided that B, is

14  that referring to that B that we were just talking about?

15  A.     To be honest with you, I have not read through this,

16  the details of the claim in a reasonable amount of time.  I

17  believe, I assume it probably is, but, you know, I'm

18  assuming that's what it is.

19  Q.     And does this refer to the -- something else it talks

20  about here, triazolone, quinolone and isoquinoline, does it

21  need to be substituted or unsubstituted?

22  A.     Does it state whether it has to be substituted or

23  unsubstituted.

24  Q.     The words substituted and unsubstituted appear here,

25  don't they?

MacMillan - cross

1   A.      In this thing we're looking at?  No, it does not.

2   No, it does.  Sorry.

3   Q.      So where the patent means unsubstituted, it uses the

4   word unsubstituted; right?

5   A.      So I think I understand where you're going.  Yes.  I

6   mean, so there are different ways to say unsubstituted.

7   Obviously, unsubstituted means unsubstituted, but also if

8   you see the OR groups, that also would be unsubstituted by

9   any definition of a POSA.

10  Q.      Well, claim 1 doesn't use the word unsubstituted,

11  does it?

12  A.      I would have to go through all of claim 1 to answer

13  that comprehensively accurately, but if you say it doesn't,

14  I will take your word for it.

15  Q.      You're not aware of any usage of unsubstituted in

16  claim 1; right?

17  A.      Again, I didn't commit it to memory, so I don't even

18  know if you can go with unsubstituted.

19  Q.      Any definition a POSA would use, the patent actually

20  has the definitions a POSA would use for substituted,

21  doesn't it?

22  A.      It has several ways it uses the word substituted,

23  yes.

24  Q.      Let's look at claim 113, which I think is about page

25  59.  This claim started definitions section?

MacMillan - cross

1    A.    Yes.

2    Q.    Lines 66 and 67 at the bottom, again, that's a

3    description of what the term substituted is used in this

4    patent means?

5    A.    It gives the term substituted as herein.  It gives

6    one of the ways in which it's used in the patent.  It does

7    describe other ways in the patent of how substitute, and

8    what it can mean.

9    Q.    So here's the bottom of claim 113 and carrying over

10   to the top of 114.  Isn't this a definition of the term

11   substituted in this patent?

12   A.    What I would say, it's a term that describes one of

13   the ways in which substituted is used in this patent.  It

14   does describe other ways of using the word substituted in

15   this patent, too.

16   Q.    And the way that it says here, "substituted" as used

17   in the patent, does it say that, make sure I got this right,

18   that "any one or more, one or more hydrogens on the

19   designated atom is replaced with the selection from the

20   indicated group"?

21   A.    I'm sorry.

22   Q.    Does the definition here of "substituted" say that

23   "one or more of the hydrogens on the designated atom is

24   replaced with a selection from the indicated group?"

25   A.    It says here, the term "substituted" herein, if

1    you're referring to that, says that "any one or more

2    hydrogens on the designated atom is replaced with a

3    selection from the indicated group."

4              Yes.  If you're asking me does it specifically

5    say that here?  Yes, it absolutely does.  Yes.

6    Q.    And you're not using this definition of "substituted"

7    in your analysis of claim 1, are you?

8    A.    When I use the definition of "substituted," first and

9    foremost, I use the common and normal definition of what

10   "substituted" would be to an organic chemist.

11             And then I also considered this one, which I

12   think is consistent with that same definition, but, again,

13   there are other parts of the patent which use the word

14   "substituted" in a different way with respect to, for

15   example, substituents on nitrogen.

16             And so I think it's a -- you know, wholistically

17   you have to consider all those things.  That's how I

18   define when I use the word "substituted."

19   Q.    So the word "substituted" in your infringement

20   analysis for Ring M, for example, you don't replace one or

21   more hydrogens, do you?

22   A.    Well, you don't have to because if you use zero

23   substitutions, then it modifies the word "substitution."

24   Q.    So you're saying that where you -- where the patent

25   claim requires "substituted," you're saying that you're

1    using unsubstituted instead because it says substituted was

2    zero or two?

3    A.      To a person of skill in the art, to a chemist, when

4    you say we're using zero R, we're going to substitute it

5    with zero R groups, that's the same as saying, I'm going to

6    subject it to no change.  It's exactly the same thing.

7             So the zero modifies substitution, so you no

8    longer -- there is no replacement, clearly.

9    Q.      And that doesn't match this definition, right,

10   because you're not replacing one or more hydrogens?

11   A.      I think it does.  If you just think about it in terms

12   of 0 to 2 R, you are using zero R for substitution, it

13   exactly says that.

14   Q.      Are you replacing more than one hydrogen?

15   A.      You're not replacing any hydrogens.

16   Q.      So you're not replacing one hydrogen?

17   A.      You're not replacing any hydrogens.

18   Q.      So you're not replacing one or more hydrogens?

19   A.      So let me see if I can make that understandable.

20             Basically, to a chemist, when a chemist looks at

21   something and says, we're making no changes to the molecule,

22   or we're making no substitutions, then we know we're making

23   no substitutions.  We're using zero substitutions.

24             So you don't then say, well, where am I doing a

25   replacement if I'm make no replacements?

1   Q.      So you agree with me that you're not replacing one or

2   more hydrogens.

3   A.      I would -- I would say that what we're doing is

4   we're -- honestly, we're just doing no substitutions.  We

5   have zero substitutions by the very straightforward language

6   as stated.

7   Q.      Okay.  So where claim says it's substituted, you're

8   doing no substitutions, right?

9   A.      What the claim is saying is it's substituted with 0

10  to 2 $R^{1a}$.

11          And if you substitute -- if you say, I'm going

12  to substitute with zero R groups, you are basically saying,

13  I'm going to make no substitutions.  It is very

14  straightforward.

15          And the second part isn't -- you know, an

16  organic chemist would know that implicitly.  The second part

17  is that they would also understand if the logic was the

18  other way around, then they would realize the compounds

19  would have to have only two hydrogens and, you know, have

20  carbons that have absolutely nothing on them, which would be

21  physically impossible.

22  Q.      So that would mean that the claim is defective,

23  right?

24  A.      It would mean that the person of skill in the art

25  would clearly see the plain meaning of the claim which is

1    the zero substitution.

2    Q.    So a person of skill in the art couldn't reconcile

3    substituting zero with this language about "substituted

4    means replacing one or more?"

5    A.    They absolutely could.

6    Q.    So are they going to replace one or more?

7    A.    No, because they understand you are taking zero --

8    between zero substitutions.  Basically, it is very clear

9    language to a chemist.

10   Q.    Let's turn to column 117, and lines 42 through 48.

11         Does this part, is this still in the definition

12   section?

13   A.    Yes, it is.

14   Q.    Does it have the word "substituted" in quotation

15   marks?

16   A.    Yes, it does.

17   Q.    And does it again say that "substituted indicates

18   that one or more hydrogens on the atom indicate in the

19   expression using 'substituted' is replaced?"

20   A.    Yes, it does.

21   Q.    And there is no other place in the patent where the

22   word "substituted" appears in quotation marks in a

23   definition other than these two that we looked at; right?

24   A.    Correct.  And at the same time, the word

25   "substituted" is used in other places to describe where, for

MacMillan - cross

1    example, hydrogen would be incorporated into the -- for

2    example, in a nitrogen.

3    Q.    So let's look at column 115.  Lines 44 through 46.

4            Let's make it 43 through 46.

5            Is this what you are talking about where it says

6    a hydrogen can be incorporated on a nitrogen?

7    A.    That's correct.

8    Q.    And does it say the nitrogen atom may be substituted

9    or unsubstituted?

10   A.    Yes, it does.

11   Q.    Okay.  And then it has a parenthetical, right?

12           Does the parenthetical introduce with "i.e."?

13   A.    That's correct.

14   Q.    Okay.  And then it gives two possibilities in the

15   parenthetical, right?  You have an N or an NR?

16   A.    That's correct.

17   Q.    And the N is an unsubstituted nitrogen; right?

18   A.    It could be.  It doesn't have to be, but it could be.

19   Q.    And NR is where you've got nitrogen substituted with

20   the R, right?

21   A.    Wherein R is hydrogen or another substituent.

22   Q.    Right.

23           So there's the two options.  There's substituted

24   and unsubstituted; right?

25   A.    In this -- at the beginning, yes.

MacMillan - cross

1  Q.     Yes.

2  A.     It says substituted or unsubstituted.

3  Q.     And substituted corresponds to NR because R is a

4  substituent, right?

5  A.     What they're stating here is where you have a

6  nitrogen or an NR, where the R could be hydrogen or another

7  substituent.

8          So what they're basically saying is where

9  nitrogen doesn't have -- so nitrogen doesn't have to have a

10 hydrogen on it whereas carbon typically does.  When you draw

11 out a carbon system and you don't show any bonds, that has

12 to have a hydrogen on it.

13         With nitrogen, that's not the case in the way

14 that organic chemists convention.

15         So here, what we have to state is that N or NR

16 wherein R is H or another substituent.

17 Q.     So where it's just the N and there's no R substituent

18 on it, they refer to that as unsubstituted; right?

19 A.     You wouldn't necessarily refer to that as

20 unsubstituted.

21         For example, if I drew a pyridine ring which

22 contains a nitrogen, you wouldn't say it was unsubstituted.

23 You would just say it's a pyridine nitrogen.  But it

24 wouldn't have an R group on it.

25         Does that make sense?

MacMillan - cross

1    Q.      Would you say that it's substituted?

2    A.      You wouldn't say R on it.

3    Q.      So this is the case where this is substituted, you

4    put it as an R or H or another substituent, right?

5    A.      Right.

6    Q.      So H is a substituent in NR, right?

7    A.      Yes, it is.

8    Q.      So if there is an H attached to the N, that N is

9    substituted with the H in the way it is used here, right?

10   A.      It can be, yes.

11   Q.      Go to column 237, the page under 22.  And let's go

12   down line 23.

13           So does line 23 indicate that the M ring is

14   substituted with 0 to 2 $R^{1a}$?

15   A.      Yes.

16   Q.      It is also expressly showing an $R^{1a}$ in the formula,

17   right?

18   A.      That is correct.

19   Q.      That was added by an amendment in response to a

20   restriction requirement, wasn't it?

21   A.      I don't know that information off the top of my head.

22   Q.      And let's go to column 238, starting out at line 62.

23           So is this where the patent defines the $R^{1a}$ group

24   that is substituted on the M?

25   A.      Yes, it is.

MacMillan - cross

1    Q.     And I think you used the term "Markush group"

2    earlier.

3                This is a Markush group, isn't it?

4    A.     Yes, I believe that is correct.

5    Q.     And H is a member of this Markush group, right?

6    A.     Yes, it is.  It's one of the variables listed under

7    $R^{1a}$.

8    Q.     So that makes H one of the substituents for $R^{1a}$,

9    right?

10   A.     It makes it one of the possible variables, yes.

11   Q.     Would that phrase substituted with 0 to 2 $R^{1a}$ be any

12   different in scope for this claim if -- the way you reading

13   it, if we took the H out of the Markush group?

14   A.     I'm not sure.  I would have to go and look at that

15   broadly.

16               My instincts would be it may not be different,

17   but I haven't done the 100 percent full analysis of every

18   possible molecule that would be in this claim 1.

19   Q.     Well, for all of these Markush groups on these rings,

20   doesn't your interpretation render the first member of the

21   Markush group essentially meaningless?

22   A.     No.  I mean, hydrogen has meaning.  It's got meaning.

23   Q.     But you told me it never gets substituted even though

24   the claim says "substituted."

25   A.     Well, no, because $R^{1a}$ can be a hydrogen, and when you

MacMillan - cross

1    have a Markush group that has an $R^{1a}$ group, and you can

2    replace it with a hydrogen, that is definitely replacing it

3    with something else.  So something has meaning.

4    Q.    But "substituted" means replacing one or more

5    hydrogens; right?

6    A.    Substituted can mean replace.  I mean, one or more,

7    as I detailed in my report, "substituted" to an organic

8    chemist broadly means you are substituting -- you are

9    replacing one atom with another atom.  It doesn't have to be

10   a hydrogen.

11   Q.    But the patent says that for this patent,

12   substituting means replacing one or more hydrogens; right?

13   A.    So in this patent, there is really two ways it can be

14   used.  There's where you would take a hydrogen on a carbon

15   and replace it with something else, or where you would

16   incorporate a hydrogen on to a nitrogen and you would be

17   substituting it that way, too.

18   Q.    But the patent, it says, "substituted means replacing

19   one or more hydrogens," right?

20             MR. DANFORD:  I object to these questions.  I

21   mean, they didn't seek a claim construction on this term.

22   As far I understand it, it is the plain and ordinary meaning

23   that applies to "substituted."

24             MR. SEGREST:  Well, as far as we understand

25   what the patent says, "substituted" means it is the plain

1    and ordinary meaning.  The plaintiffs didn't seek a

2    construction.  They're arguing for a construction that is

3    diametrically opposed to the expressed language in the

4    patent.

5              THE COURT:  I'll overrule it.  You can ask the

6    question if you want to.

7              MR. SEGREST:  Thank you, Your Honor

8    BY MR. SEGREST:

9    Q.    You're saying you would never replace one or more

10   hydrogens with a hydrogen, right?

11   A.    What I'm saying is -- yes, so you wouldn't do that.

12   And if you conceptually did that in a thought experiment, it

13   wouldn't be a substitution, it would be the same thing.

14   Q.    Yes.  So any place where it says "substituted" with a

15   Markush group that includes a hydrogen, you're saying you

16   would never do that because you would never replace the

17   hydrogen with a hydrogen, right?

18   A.    You would never replace a hydrogen with a hydrogen,

19   that's right.

20   Q.    You're treating that hydrogen differently from every

21   other member of the Markush group, aren't you?

22   A.    The thing you have to keep in mind is you're starting

23   with a molecule which is in the patent, and then you're

24   saying you're substituting on to that.  So if it's a carbon

25   and you are substituting on a carbon, then you would be

1    replacing what is shown on the structure was a hydrogen with

2    something else.

3              Now, obviously, you would never replace a

4    hydrogen with a hydrogen, given it's the same molecule, but

5    if you are taking a Markush group and it's defined and

6    you're replacing that with a hydrogen, that makes sense and

7    of course I would see that.  Or if you have a nitrogen and

8    you're putting a nitrogen on a hydrogen, that is also

9    substituting and the patent speaks to that, too.

10             So there's a number of different ways you can

11   use it in the patent.

12   Q.    My question, though, it wasn't all that.  My question

13   is, aren't you treating the hydrogen member different from

14   all the other members of the Markush group?

15   A.    No.

16   Q.    So if any other member of this Markush group appears

17   for the substitution, it replaces one or more hydrogens;

18   right?

19   A.    The R group can also -- well, depending on where --

20   if -- some parts of the patent, the R group will represent

21   something that's going on nitrogen or, the way you're seeing

22   it, replacing a hydrogen.

23   Q.    And it's not uncommon in the literature to see

24   hydrogen referred to as a substituent, is it?

25   A.    There is a difference between substitution and

1   substituent.

2               So you can see hydrogen used as the word

3   "substituent," but beyond that, again, I say this in my

4   report, you can still substitute things with hydrogen if

5   you're replacing something other than hydrogen.  So, for

6   example, if you have carbon tetrachloride and you replace

7   one of the chlorines with the hydrogen, then in that case,

8   hydrogen is doing substitution.

9   Q.     But that doesn't -- that's the definition in this

10  patent which says it replaces one or more hydrogens, right?

11  A.     You're asking me -- I think you were asking me

12  about the plain and ordinary meaning of "substitution."

13  Q.     So you're saying the plain and ordinary meaning is

14  something different from the definition in the patent;

15  right?

16  A.     No, that's not what I'm saying.  What I'm saying is

17  that there is a plain and ordinary meaning of "substitution"

18  which is larger, more broad, but organic chemists

19  understand, and this is a component of it, the way that it's

20  being used in the patent, which is that -- say it's a narrowed

21  version, but it is something that's completely consistent

22  with the plain and ordinary meaning.

23  Q.     Now, not all of the rings say they can be substituted

24  with zero; right?

25  A.     That is correct.

MacMillan - cross

1    Q.      Is it the G ring that has to be substituted with one

2    to two hydrogens?

3    A.      I think --

4    Q.      I mean -- I'm sorry.  I said one to two hydrogens.

5    It's one to two members of the group that it specifies?

6    A.      I can walk you through it, but I think it's the G

7    which encompasses D and E.  We have to look at D and E as a

8    collective of the two.

9            So I think it's one to four, I think, if I'm not

10   mistaken.

11   Q.      Let's look at column 237.

12   A.      (Witness complies.)

13   Q.      And let's look at about line 50 through the end.

14           Let's move up a little bit, lines 35 through the

15   end.

16           Okay.  So this is the G group, right?  That

17   Formula 2A and 2B?

18   A.      That is correct.

19   Q.      Okay.  And it draws out Rings D and E, right?  That

20   those two together are the G group?

21   A.      That's right.

22   Q.      But D can be absent, right?

23   A.      That's right.

24   Q.      And in apixaban, D is absent, isn't it?

25   A.      That's correct.

MacMillan - cross

1   Q.    And so it's the E ring that is substituted with 1 to

2   2 R in line 56, right?

3   A.    Yes.

4   Q.    Which means that where D is absent, the G ring is

5   substituted with 1 to 2 R, right?

6   A.    Within that qualification, if you would say it that

7   way, that part is true, but there's also the case -- maybe

8   you're not going this way, and that's fine, but as D and E

9   is a combination, though, it's the combination of the two

10  that you would consider.

11          But if you're just focusing upon the E ring,

12  certainly, yes, that part is correct.  It's 1 to 2 R.

13  Q.    Now, in apixaban, the R substituent is not a hydrogen

14  on the D ring, right?  It's something else.

15  A.    On the D ring, or the E ring?

16  Q.    On the E ring.

17  A.    On the E ring, yes, it's not.

18  Q.    And there are other compounds in the '208 patent

19  where there is no substituent other than hydrogen on the D

20  ring, right?  Or the E ring, right?

21  A.    You would have to point me to those words.

22  Q.    Did you consider that in reaching your opinion about

23  what "substituted" means?

24  A.    You know, if I say this, I think as an organic

25  chemist, I feel pretty reasonably good about what the word

MacMillan - redirect

1    "substituted" means.  But at the same time, if you mean in

2    the context of the patent, again, I go back to the way as I

3    stated before.  The definitions and context which they're

4    showing are clearly defining what "substituted" means.

5    Q.    Yes, I mean in the context of the patent.

6          Did you consider whether the way you were

7    interpreting "substituted" to mean "unsubstituted" excludes

8    some of the specific compounds that are recited in dependent

9    claims?

10   A.    I don't know that to be true.  So you would have to

11   show me compounds to walk me through that because I don't

12   know if I believe that, to be honest.

13         MR. SEGREST:  No further questions.

14         THE COURT:  Anything else from the defendants?

15   No?  Okay.

16         MR. BRAIER:  No.

17         THE COURT:  Redirect?

18         MR. DANFORD:  Can we have back PTX -- or JTX-1,

19   the '208 patent, and go back to column 237, claim 1.

20         And specifically, if you could highlight 15 down

21   to line 25 to show the ring M structure.

22                    REDIRECT EXAMINATION

23   BY MR. DANFORD:

24   Q.    Professor MacMillan, you were asked some questions

25   about what "substituted" means.

MacMillan - redirect

1              Do you recall that?

2    A.      I do.

3    Q.      What does it mean to a person of ordinary skill in

4    the art where the claim says, "Ring M is substituted with 0

5    to 2 $R^{1a}$?

6    A.       It means that on that ring system, substituted

7    with 0 to 2 R, if it's substituted with no groups, that

8    means that no groups have been added to it.  It's pretty

9    straightforward.

10              It means one group has been added.  You can add

11   one group.  If it is two groups, you can add two groups.

12   Q.      How many hydrogen atoms do you have to replace when

13   the ring is substituted with zero?

14   A.      You replace none of them.

15   Q.      You were asked some questions about $R^{1a}$ and the

16   listing of hydrogen.

17              If we could go down the column just a bit to

18   show the ring P structure, which is going to be below that.

19              I think Mr. Segrest asked you about $R^{1a}$.  Do you

20   recall that?

21   A.      I do.

22   Q.      And he asked you whether hydrogen $R^{1a}$ could be

23   hydrogen in any structure in the patent.

24              Do you remember that?

25   A.      Yes.

MacMillan - redirect

1    Q.      For that ring P, can $R^{1a}$ be hydrogen?

2    A.      Yes.

3    Q.      I want to show you, if you go back to the text that

4    you were looking at in column 113 and over to column 114.

5    A.      (Witness complies.)

6    Q.      I want to get that sentence that includes all the way

7    through that first paragraph at the top of 114.

8            Do you recall discussing this text with

9    Mr. Segrest?

10   A.      Yes.

11   Q.      And do you see in the line that goes from line 2 to 3

12   at the top of column 114 that it says, "The substitution

13   results in a stable compound?"

14   A.      Yes.

15   Q.      What does that mean to you?

16   A.      That means, to me, a stable compound is one which

17   is -- that can exist and is stable that you could have it

18   available to you, and it doesn't -- it's not so incredibly

19   high energy that it would instantaneously would fall apart.

20   Q.      If substituted with zero meant that you removed a

21   hydrogen and didn't put anything back in its place, would

22   that be a stable compound?

23   A.      Well, no, it would not.  In fact, if you did that

24   with two of them, then that just takes it to a higher level

25   of extreme.

MacMillan - redirect

1              MR. DANFORD:  No further questions.

2              THE COURT:  Thank you.  You may step down.

3              If you don't mind, you might want to take the

4    binders with you.

5              MS. WIGMORE:  Your Honor, our next witness will

6    be Jerry Atwood.  We do have a number of binders to a hand

7    out, if that is all right.

8              THE COURT:  Okay, that's fine.  You can go ahead

9    and pass up the binders.

10             (Demonstratives passed forward.)

11             ... JERRY ATWOOD, having been first duly sworn,

12   was examined and testified as follows ...

13             THE COURT:  Good afternoon, Dr. Atwood.

14   Welcome.

15             THE WITNESS:  Good afternoon, Your Honor.

16             THE COURT:  I have two binders.  Is that what I

17   should have?

18             MS. WIGMORE:  Yes.  One it says SigmaPharm and

19   one says Sunshine Lake.

20             THE COURT:  That's what I have.

21             Okay.  You may proceed.

22             MS. WIGMORE:  Good afternoon, Dr. Atwood.

23             THE WITNESS:  Good afternoon.

24             MS. WIGMORE:  May we approach, Your Honor, with

25   the laser pointer?

1                  THE COURT:  Sure.

2                  THE WITNESS:  Thank you.  I was looking for

3      that.

4                        DIRECT EXAMINATION

5      BY MS. WIGMORE:

6      Q.     Can you please introduce yourself?

7      A.     My name is Jerry Atwood.  I'm a Professor of

8      Chemistry at the University of Missouri.  I've been

9      Professor of Chemistry at the University of Missouri for

10     26 years, following on 26 years at the University of

11     Alabama.

12     Q.     Dr. Atwood, were you retained as an expert for

13     Bristol-Myers Squibb or BMS and Pfizer in this case?

14     A.     Yes, I have been.

15     Q.     Have you prepared a demonstrative summarizing the

16     issues you will be addressing today?

17     A.     I have.

18                  MS. WIGMORE:  Can we pull up PDX-5.2.

19     BY MS. WIGMORE:

20     Q.     Using PDX-5.2, what issues does your testimony relate

21     to?

22     A.     Two issues:  infringement of the '945 patent by

23     SigmaPharm, and infringement of the '945 patent by Sunshine

24     Lake.

25     Q.     Now, do you understand, Dr. Atwood, that a different

Atwood - direct

1    expert, Dr. Berkland, is addressing the issue of whether the

2    third defendant, Unichem, infringes the '945 patent?

3    A.    That's my understanding, yes.

4    Q.    Are you offering any opinions about validity?

5    A.    I am not.

6              MS. WIGMORE:  If we could turn please to

7    PDX-5.3.

8    BY MS. WIGMORE:

9    Q.    Is this a summary, Dr. Atwood, of your educational

10   background and employment history?

11   A.    Yes, it is.

12   Q.    Can you please describe your educational background,

13   starting with high school?

14   A.    I took a Bachelor's Degree in Chemistry and

15   Mathematics at what is now Missouri State University.

16            I went immediately to the University of Illinois

17   where I took a Ph.D. in inorganic and organic chemistry in

18   1968.

19   Q.    And where do you work?

20   A.    Currently, I'm Curator's Professor of Chemistry

21   at the University of Missouri in Columbia, Missouri.

22   Q.    What is your experience with respect to the

23   preparation and analysis of pharmaceutical formulation?

24   A.    I've been doing work in the preparation and analysis

25   of pharmaceutical formulations for about 40 years.

1   Q.      How many publications do you have in the field of

2   chemistry?

3   A.      Not that I'm counting, but I think it's 751.

4   Q.      What is the focus of your research?

5   A.      The focus of my research now and for the past

6   30 years or so has been in an area called supramolecular

7   chemistry.

8   Q.      What is that?

9   A.      That is chemistry beyond the molecule.  It's a

10  chemistry of the way an API would interact with excipients

11  and the way excipients would interact with one another in a

12  pharmaceutical formulation.

13  Q.      Do you currently hold any editorial positions on

14  journals?

15  A.      Yes.  I hold -- I'm a member of the editorial board

16  of the ACS Journal of Crystal Growth and Design, a journal

17  called Supramolecular Chemistry, and the journal called the

18  Journal of Coordination Chemistry.

19  Q.      Have you received any awards in the field of

20  chemistry?

21  A.      I have.

22  Q.      And can you give us a few examples?

23  A.      I received the Isaac Christiansen award in

24  macrocyclic chemistry a few years ago.

25          I received an award from the Polish Academy of

1    Science for my work generally in chemistry.

2            And I received the award in Supramolecular

3    Chemistry from the Royal Society of Chemistry three or four

4    years ago.

5    Q.      Do you have any experience, Dr. Atwood, as a

6    testifying expert in patent cases?

7    A.      Yes, I have.

8    Q.      Can we please pull up PTX-788 which is Tab 1 in your

9    first binder, Dr. Atwood, if you would like to refer to

10   that?

11           Do you recognize this document?

12   A.      Yes.  This is a version of my CV.  I see it's a few

13   months old.

14   Q.      And does this exhibit provide an accurate summary of

15   your education and professional experience?

16   A.      It does.

17           MS. WIGMORE:  Your Honor, plaintiffs offer

18   Dr. Atwood as an expert in pharmaceutical formulation and

19   analysis.

20           MR. HENEGHAN:  No objection.

21           MR. KOCHANSKI:  No objection.

22           THE COURT:  He is recognized.

23   BY MS. WIGMORE:

24   Q.      Dr. Atwood, you testified previously that you were

25   retained by BMS and Pfizer as an expert.  Are you being

1   compensated for the time you spent working on this case?

2   A.      Yes, I am.

3   Q.      Does your compensation depend in any way on the

4   substance of your opinions or on the outcome of the case?

5   A.      No, it does not.

6   Q.      Do you understand that claims 21 and 22 are the

7   asserted claims of the '945 patent?

8   A.      Yes, that's my understanding.

9   Q.      Turning to PDX 5.4, what types of evidence did you

10  consider in forming your opinions about infringement?

11  A.      I considered the '945 patent and its file history,

12  the Court's claim construction, relevant scientific

13  literature, the defendants's ANDAs and DMFs, the

14  defendants's samples, and the parties' uncontested facts.

15  Q.      Now, we'll come to the details of your opinions

16  shortly, but what were your ultimate conclusions regarding

17  infringement of the '945 patent by the two defendants you

18  mentioned, SigmaPharm and Sunshine Lake?

19  A.      My ultimate conclusion is that both SigmaPharm and

20  Sunshine Lake infringe claims of the '945 patent.

21  Q.      And are you referring specifically to claims 21 and

22  22?

23  A.      I am.

24          MS. WIGMORE:   Now, let's pull up on the screen

25  JTX-2.

1    BY MS. WIGMORE:

2    Q.    Do you recognize this as the '945 patent?

3    A.    Yes.

4    Q.    What is the title of the '945 patent?

5    A.    It's entitled "Apixaban Formulations."

6    Q.    Now, on that first page of the patent, I direct your

7    attention to the portion titled "Related Application Data."

8         Do you see that?

9    A.    I see that.

10   Q.    Do you see the reference to a provisional application

11   filed on February 25th of 2010?

12   A.    Yes.  I see that.

13   Q.    For purposes of your opinion in this case, did you

14   assume that was the date of invention for the '945 patent

15   claims?

16   A.    I did.

17   Q.    Now, several lines above that on the same page,

18   do you see the reference to the PCT filed on February 24,

19   2011?

20   A.    Yes.

21   Q.    If the priority date is February 24th of 2011, would

22   that have any impact on the opinions you have formed in this

23   case?

24   A.    It would not.

25   Q.    Do you understand, Dr. Atwood, that a patent is to be

1    read in light of the knowledge of a person of ordinary skill

2    in the art?

3    A.    Yes, that's my understanding.

4    Q.    Turning to PDX-5.5, what is shown on this slide?

5    A.    This is showing my view of a person of ordinary skill

6    in the art of the '945 patent.

7    Q.    Could you read that definition, please?

8    A.    A person with a Ph.D. or Master's degree or a

9    Bachelor's degree with commensurate experience in chemistry,

10   chemical engineering, pharmacy, pharmaceutical science or an

11   equivalent discipline and has an understanding of the

12   properties of active pharmaceutical ingredients, the design

13   of solid pharmaceutical dosage forms, and knows or has

14   access to techniques to characterize solid pharmaceutical

15   products.

16   Q.    Dr. Atwood, do you agree with this definition of a

17   person of ordinary skill in the art for the '945 patent?

18   A.    Yes.  That's my definition.

19   Q.    Did you apply this definition in forming your

20   opinion?

21   A.    I did.

22   Q.    Turning to slide PDX-5.6, do you understand that the

23   defendants have also offered a definition of a person of

24   ordinary skill in the art for the '945 patent?

25   A.    Yes.

1   Q.      Would your opinions change in any way if the

2   defendant's definition were adopted?

3   A.      They would not.

4   Q.      Now, in terms of your own qualifications, do you meet

5   the definition of person of ordinary skill in the art

6   offered by both of the parties in this case?

7   A.      Yes.  I'm at least such a person of ordinary skill.

8   Q.      Now, before we get into the details of your opinion,

9   and we'll take that PDX off the screen, I'd like to go over

10   some of the science relating to the '945 patent.

11           First of all, what is an active pharmaceutical

12   ingredient or API?

13   A.      An API is that portion of a pharmaceutical

14   formulation which actually is effective in treating the

15   disease in question.

16   Q.      Now, for the ANDA product at issue in this case, what

17   is the API?

18   A.      The API is apixaban.

19   Q.      Generally speaking, what is a pharmaceutical

20   composition?

21   A.      A pharmaceutical composition is made up of an API and

22   one or more excipients, the excipients being blended with

23   the API to carry out some specific function properties of

24   the formulation.

25   Q.      What is an excipient?

1   A.      An excipient is an ingredient in a pharmaceutical

2   formulation which is not the active entity in treating the

3   malady in question.

4   Q.      Now, turning to PDX-5.7, explain for us what are

5   crystalline particles.

6   A.      Crystalline particles are particles composed of a

7   crystalline substance, and the crystalline substance is that

8   which contains molecules arranged in an ordered fashion in a

9   crystal lattice.

10          What I'm showing here is the molecules in

11  question are these three-dimensional triangles, and one can

12  see that they're regularly arranged in this simulation of

13  crystalline particles.

14  Q.      What does it mean for the API in a solid

15  pharmaceutical composition to comprise crystalline

16  particles?

17  A.      It means that there are some crystalline particles in

18  the formulation.

19  Q.      Does an API have to be entirely crystalline in order

20  to comprise crystalline particles?

21  A.      No, not at all.

22  Q.      Now, turning to PDX-5.8, what does the term amorphous

23  refer to?

24  A.      Amorphous refers to a solid, in this case represented

25  by, again, three-dimensional triangles, but it's a solid

Atwood - direct

1   with no long range or three-dimensional order.

2   Q.     And can crystalline and amorphous material co-exist

3   in the same pharmaceutical composition?

4   A.     They can, but an amorphous substance is always at a

5   higher energy and given in the fullness of time, it will

6   revert to a crystalline formation, the crystalline formation

7   being a lower energy.

8   Q.     Can a pharmaceutical composition contain both the

9   crystalline and the amorphous form of the same material?

10  A.     It can, but, again, the amorphous portion may be

11  openly subject to crystallization due to fullness of time.

12  Q.     Turning to PDX-5.9, what have you shown here?

13  A.     I've shown here in this simulation four pockets of

14  crystalline order in a sea of amorphous triangular shaped

15  molecules.

16  Q.     And what does the dark blue signify on PDX-5.9?

17  A.     The dark blue regularly arranged triangles represents

18  the crystalline portion.

19  Q.     And what is the light blue?

20  A.     The light blue represents the amorphous portion of

21  this particular mixed material.

22  Q.     Now, turning to tab 3 in your binder, there's a

23  document marked PTX-367.

24         Do you recognize this document?

25  A.     Yes.  This is an article by Yu entitled, amorphous

1    pharmaceutical solids:  Preparation, characterization and

2    stabilization.

3    Q.      And is this article published in a reliable

4    publication?

5    A.      It is.  It's published in advanced drug delivery

6    reviews.

7    Q.      Did you rely on this publication in forming your

8    opinions?

9    A.      Yes, I did.

10   Q.      Turn, please, to the page ending in Bates number 183.

11   In the left-hand claim, there's a heading, 3.1.2.

12           Do you see that?

13   A.      Yes, I do.

14   Q.      Could you read for us, please, the name of that

15   heading?

16   A.      The heading is 3.1.2, degree of crystallinity.

17   Q.      Please read the first sentence under that heading.

18   A.      Amorphous solids may co-exist with and have the

19   potential to convert to crystalline solids.

20   Q.      What does it mean for amorphous solids to have the

21   potential to convert to crystalline solids?

22   A.      As I said a few slides previously, amorphous solids

23   are at a higher potential energy than crystalline solids, so

24   they have the potential to move to the lower energy

25   crystalline formation, and the presence of a crystalline,

1    the presence of pockets of crystallinity will tend to

2    convert the amorphous solids even more quickly to

3    crystalline solids.

4    Q.    What is the role of thermodynamics in

5    crystallization?

6    A.    The role of thermodynamics is all important.

7    Thermodynamics states that, loosely speaking, states that a

8    system at high energy will move to a lower energy.  An

9    amorphous substance is at higher potential energy.  A

10   crystalline substance is at a lower potential energy.

11                 So an amorphous substance always has the

12   thermodynamic potential to move to the lower energy

13   crystalline situation.

14   Q.    Now, Dr. Atwood, based on your experience in this

15   field, are you familiar with classical models of nucleation

16   and crystal growth?

17   A.    Yes.

18   Q.    And do those theories apply to solid materials?

19   A.    Oh, yes, absolutely.

20   Q.    Turning to slide PDX-5.10, have you prepared a

21   demonstrative to explain classical models of nucleation and

22   crystal growth?

23   A.    Yes.  At the start of this slide, I have an

24   arrangement of triangles representing molecules.

25   Q.    Are these amorphous?

Atwood - direct

1    A.      In an amorphous array.

2    Q.      And what is nucleation?

3    A.      Nucleation means that if a few of these molecules

4    come together to form a low energy crystal array, then that

5    would form a nucleus around which other amorphous material

6    will convert to crystalline material.  As the slide is

7    showing here, the eight dark colored triangles have now

8    nucleated, and in the fullness of time they will convert

9    surrounding amorphous material to this crystalline form.

10   Q.      What is a seed crystal?

11   A.      A seed crystal would be -- that concept is that one

12   would take a crystal, again, such as this, this section of

13   blue triangles representing a crystalline entity and drop

14   that seed crystal in amongst amorphous material or into a

15   solution, thereby functioning as a seed model to convert

16   the, in this case, the amorphous material to crystalline

17   material, there by moving from higher energy to lower

18   potential energy.

19   Q.      Now, you talked about nucleation.  What is the size

20   of the crystal at the outset of the nucleation process?

21   A.      At the outset of the nucleation process, it's

22   nanometers, two or three nanometers, perhaps.

23   Q.      And we've heard reference to the term micron.  How

24   does a nanometer relate to a micron in terms of size?

25   A.      A thousand nanometers is one micron.

Atwood - direct

1    Q.      So we've talked about nucleation.   What is crystal

2    growth?

3    A.      Crystal growth is the process by which after the

4    nucleation event, the crystal grows.   In other words, the

5    nucleus converts, and I'm slowly showing in the mockup here

6    surrounding amorphous material into the lower energy

7    crystalline array.

8    Q.      How does the size of the crystals evolve over time?

9    A.      The size of the crystals will evolve over time to

10   convert all of the amorphous material into crystalline, but

11   if the amorphous material exists in pockets, then this will

12   put a limitation on the amount of material that can be

13   converted to crystal.

14   Q.      Now, you talked about limits on the ability of a

15   crystal to grow.   How, if at all, does the amount of a given

16   material in a composition impact the ability of the crystal

17   to grow?

18   A.      If one has a formulation, a mixture, and a large

19   amount of potentially crystalline material, that material

20   will find a way to crystallize rather quickly.   On the

21   other hand, if in that formulation, there's a small amount

22   of material with potential to crystallize, that may take a

23   considerable amount of time.   However, once the

24   crystallization starts, the material surrounding that seed

25   crystal will rather quickly convert to crystalline.

Atwood - direct

```
 1    Q.      And will the amount of the material in the

 2    composition impact the size that the crystals will

 3    ultimately reach?

 4    A.      Oh, yes.  If one had, take, for example, three

 5    percent potentially crystalline material in otherwise -- an

 6    otherwise polymeric matrix, this will place a strict limit

 7    on the amount of material, crystalline material that can

 8    come together and form crystal.

 9    Q.      How, if at all, does the space available from a

10    pharmaceutical composition impact how large the crystals can

11    grow?

12    A.      If in the space of a pharmaceutical formulation one

13    has, say, a pocket of ten nanometers on edge, then the

14    crystal can only grow ultimately to ten nanometers on edge.

15    Q.      How, if at all, do other components in a

16    pharmaceutical composition impact how large the crystal can

17    grow?

18    A.      They will place a limit on how large the crystal can

19    grow, because the other components will function to separate

20    and keep the small pockets of crystallinity, for example,

21    separated.

22    Q.      Were the classical models of nucleation and crystal

23    growth known in the art in 2010?

24    A.      Oh, yes, they were well-known in 2010.

25    Q.      And do those models apply to solid pharmaceutical
```

1    composition?

2    A.    Yes.

3    Q.    Now, I'd like to turn to a brief discussion of

4    analytical techniques.

5              Based on your experience in the field, are

6    you familiar with a technique known as X-ray powder

7    diffraction or XRPD?

8    A.    I am.  I did my first X-ray powder diffraction

9    pattern in 1963, and I did my most recent one about 14 days

10   ago.

11   Q.    Now, turning to PDX-5.16, can you explain for us

12   using this demonstrative generally how XRPD works?

13   A.    Yes.  I will attempt to use the green pointer, or

14   maybe I will just talk it through since I can't see the

15   green pointer myself.

16             The X-ray powder diffractometer is shown

17   schematically on the left and it consists of three primary

18   components.  On the extreme left is the X-ray tube and this

19   is responsible for generating the X-ray beam.

20             On the extreme right of the schematic is

21   something called the detector.  The detector is going to

22   detect photons that have been scattered or diffracted by the

23   sample, which is shown in the middle of the instrument.

24             The important item here is that as one increases

25   the X-ray beam or X-ray tube in a clockwise direction by

1    theta degrees, and one increases the detector in a

2    counterclockwise direction by theta degrees.

3                    The overall difference between the X-ray

4    incident X-ray beam and the diffract X-ray beam is two theta

5    degrees.  The term two theta is used commonly to describe

6    the angle of diffraction of peaks from X-ray powder

7    diffraction.

8    Q.    Now, turning to the right-hand side of PDX-5.16, how

9    are the results of an XRPD experiment reflected?

10   A.    The results are shown most clearly in this

11   particular, as it's called here, Figure 4.  The top portion

12   shows the result of a scan starting at about 3 degrees and

13   going out to about 37 or 8 degrees in 2-theta.

14                   One sees the presence of peaks.  The peak being

15   represented by the number of counts, which the detector

16   picks up, the counts moving up the Y axis.

17                   So what we see in the top portion of Figure 4 is

18   the result of the experiment done on the left-hand portion

19   where the sample is a crystalline substance.

20   Q.    Let me stop you there.

21                   The top portion of Figure 4 you indicated shows

22   the presence of crystalline.  Why is that the case?

23   A.    The presence of sharp peaks are the hallmark of a

24   crystalline substance.

25   Q.    And what is shown below that and on that Figure 4?

1    A.      The small sort of featureless line shown at the

2    bottom is the result that one would obtain if the sample

3    were an amorphous substance.

4    Q.      And --

5    A.      If the sample does not have regular crystal order,

6    then x-rays will not be diffracted in a regular fashion, but

7    rather will just be scattered and one will see sort of an

8    amorphous hill or hump.

9    Q.      Now, you use the word "diffraction."  Are you

10   familiar with the term "diffractogram"?

11   A.      Yes.  Figure 4 would be, the top portion, especially,

12   would be called a diffractogram.  An x-ray powder

13   diffraction pattern is referred to as a diffractogram.

14   Q.      Can XRPD distinguish between amorphous and

15   crystalline forms of the same compound within the same

16   sample?

17   A.      Within the same sample, what one would see if, again,

18   we look at Figure 4, and let's assume that we have, say,

19   50 percent amorphous and 50 percent crystalline, then what

20   one would see would be the crystalline pattern at the top of

21   Figure 4, but there would be, at around 20 degrees in the

22   baseline of the crystalline pattern, a falling off as one

23   moves to higher angle.  In other words, one would see a

24   superposition of a crystalline amorphous hump with sharp

25   peaks due to the crystal portion of the material being

1    analyzed.

2    Q.    Can an XRPD pattern be used to identify a component

3    material present in a mixture?

4    A.    Oh, yes.  The pattern which we see at the top of

5    Figure 4 is, it's a fingerprint of a particular crystalline

6    solid.

7            So most crystalline solids will have quite

8    different fingerprints.  Some will have fingerprints that

9    are rather similar if their internal structures are similar.

10   But an x-ray powder diffraction pattern means to a

11   diffraction person the same thing that a fingerprint would

12   mean to a forensic scientist.  A fingerprint of a

13   crystalline substance is the x-ray diffraction pattern.

14   Q.    If we could turn, please, to Tab 4 in your binder,

15   PTX-409.

16           Can you identify PTX-409 for us, please?

17   A.    Yes.  This is a section out of the USP, United States

18   Pharmacopeia, from 2005.

19   Q.    And let me stop you there.

20           What is the U.S. Pharmacopeia?

21   A.    The United States Pharmacopeia is a large volume

22   which contains all kinds of useful information which has

23   been completely vetted by the United States Pharmacopeia

24   foundation.

25   Q.    Is that a reliable publication in your field?

1   A.      Yes.  It's a reliable publication for a wide variety

2   of different tests and measurements particularly.

3   Q.      Including XRPD?

4   A.      Yes.

5   Q.      If we could turn, please, to the page ending in Bates

6   473.

7           There is a heading on the top of the page after

8   the number 941.  What does that heading say?

9   A.      Yes.  It says, "X-Ray Diffraction/Physical Tests."

10          In other words, this is a section of the

11  Pharmacopeia related to physical tests.  And they're

12  particularly focusing, in this section, on x-ray

13  diffraction.

14  Q.      Now, in the right-hand column, last paragraph, could

15  you read the sentence beginning "Identification," the first

16  sentence of that paragraph?

17  A.      "Identification of crystalline materials can be

18  accomplished by comparison of x-ray powder diffraction

19  patterns obtained for known materials with those of the

20  unknown."

21  Q.      And do you see there's a footnote 2 after the word

22  "known"?

23  A.      I see there's a footnote 2.

24              MS. WIGMORE:  If we could pull up that footnote.

25  BY MS. WIGMORE:

Atwood - direct

1   Q.      What is being referred to in footnote 2?

2   A.      Footnote 2 states, "The International Center For

3   Diffraction Data, Newtown Square corporate campus," address,

4   continuing, "maintains a file on more than 60,000

5   crystalline materials, both organic and inorganic, suitable

6   for such comparisons."

7   Q.      Now, Dr. Atwood, the sentence you read from, the text

8   of this page from the USP, is that the method that -- how

9   does that method compare with the method you used in this

10  case?

11  A.      This is the method I've used.

12          However, there's two ways to compare material.

13  One would be if it happens to be if the substance one is

14  analyzing happens to be among the 60,000 that is in the file

15  would that we just referred to.

16          The other would be to have an authentic sample

17  of a crystalline substance to compare to another sample to

18  see if there is a match between the two.

19  Q.      If we could turn --

20  A.      That comparison would be useful for identification

21  purposes.

22  Q.      If we could turn, please, to PTX-681, which is Tab 5

23  in your binder.

24          What is this document, Dr. Atwood?

25  A.      This is the 2018 United States Pharmacopeia.

1    Q.      Is this just a later version of the same type of

2    publication we just referred to?

3    A.      It is.

4    Q.      If we could turn to the page ending in Bates number

5    493.

6                 And we have 494.  There we are.

7                 Okay.  493, the heading, "Quantitative Phase

8    Analysis."

9                 Do you see that?

10   A.      I see that.

11   Q.      Could you read the first sentence under that heading?

12   A.      "If the sample under investigation is a mixture of

13   two or more known phases, of which not more than one is

14   amorphous, the percentage (by volume or by mass) of each

15   crystalline phase and of the amorphous phase can in many

16   cases be determined."

17   Q.      What is a phase composition?

18   A.      A phase composition just means a crystal form.  For

19   example, if we were using crystal form N-1 of apixaban, that

20   would be a known phase composition.

21   Q.      And if you could turn to the heading above that,

22   "Qualitative Phase Analysis (Identification of Phases)."

23                 Could you please read the sentence immediately

24   below that heading?

25   A.      "The identification of the phase composition of an

 1    unknown sample by XRPD is usually based on the visual or

 2    computer-assisted comparison of a portion of its x-ray

 3    powder pattern to the experimental or calculated pattern of

 4    a reference material."

 5    Q.     How does the method described there compare to the

 6    method you applied in this case?

 7    A.     It's the method I used.

 8           And this particular section from the USP is

 9    particularly relevant because it states that visual

10    comparison can be used to compare a known pattern to an

11    unknown pattern.  And the part I wanted to focus on is

12    comparison of a portion of its x-ray powder patent.

13           So one would not have to have a complete x-ray

14    powder pattern from 3 degrees to 36 degrees in order to

15    make the comparison that the USP is referring to here.

16    Q.     Now, let's turn to JTX-2, the '945 patent.

17           I want to direct your attention to Table 2 and

18    column 5.

19           What is shown in Table 2?

20    A.     Table 2 of the '945 patent lists two crystal forms.

21    One is form N-1, and the other is form H2-2.

22    Q.     And these are crystal forms of what compound?

23    A.     These are crystal forms of apixaban.  The form N-1 is

24    a non-hydrated, a non-sulfated form, and form H 2-2 is a

25    hydrated form of apixaban.

1    Q.      And what form of crystalline apixaban is used in

2    Eliquis?

3    A.      Form N-1.

4    Q.      And what form of apixaban is used in the preparation

5    of the ANDA products that the defendants have in this case?

6    A.      Form N-1.

7    Q.      Now, how are the peaks listed here under form N-1 in

8    Table 2 of the '945 patent used to identify crystalline

9    apixaban particles in a sample?

10   A.      The crystalline form N-1, apixaban particles, one

11   sees in Table 2 a listing of six peaks in 2-theta values.

12   And these would function as a fingerprint for crystal

13   forming N-1.

14   Q.      Does that mean these are the only peaks associated

15   with crystalline form N-1 of apixaban?

16   A.      No, crystalline form N-1 has a rather rich pattern

17   with many peaks associated with it.

18           These are six peaks that have been called out

19   specifically in the '945 patent specification as being

20   useful for identifying crystal form N-1.

21   Q.      Is it necessary to find every peak listed here to

22   determine that crystalline apixaban particles are present in

23   a sample?

24   A.      No, it's not.  It's -- the peak listing is very much

25   like a fingerprint.  One would like to have a full

1    fingerprint, but it's not necessary to identify Jerry Atwood

2    by having a full fingerprint.  It's quite possible that a

3    partial fingerprint will suffice.

4    Q.    Dr. Atwood, are you familiar with the concept of

5    counting statistics in relation to XRPD analysis?

6    A.    Yes.

7    Q.    Turning to slide PDX-5.17.

8          Can you explain, first of all, what is a count

9    in XRPD testing?

10   A.    Oh, the count number means that the counter that I

11   showed in the little simulation where the x-ray tube was

12   moving up and the detector was moving up, the detector is

13   counting photons that have been diffracted by a sample.

14   Q.    What is a count time in an XRPD analysis?

15   A.    The count time has to do with the speed with which

16   the diffraction experiment is carried out.  It's the amount

17   of time that one takes to carry out the x-ray diffraction

18   experiment.

19   Q.    Now, using PDX 5.17, can you explain how counting

20   statistics apply to XRPD analysis?

21   A.    This is particularly an important point not only for

22   this litigation but for x-ray powder diffraction in general.

23          Counting statistics state that if one collects a

24   count number, say 100 counts, the standard deviation is the

25   square root of that number or 10.

1          So if we collect 100 counts, it will be plus or

2     minus 10.  And as I've listed here on the slide, the percent

3     standard definition would be 10 percent.

4          On the other hand, if we do the same experiment

5     but spend 10 times as long and collect 1,000 counts, that's

6     1,000 plus or minus the square root of 1,000, which is 31.6.

7          If we scale that back to 100 counts, that would

8     be 100 plus or minus 3.16.  In other words, the standard

9     definition, the percent standard deviation would be 3.16.

10    Q.    How does the standard definition bear on the

11    sensitivity of an XRPD experiment?

12    A.    That is a really important point for what we're

13    discussing here.

14          If one gets a low standard deviation, in other

15    words, if one amasses a large count number so it has a

16    relatively low standard deviation on a percentage basis,

17    then one can detect material that is present, perhaps, in

18    low quantities.

19    Q.    So the higher the count time, the more sensitive the

20    analysis; is that correct?

21    A.    Exactly.  As we're seeing on this slide, the percent

22    standard deviation is important.  We would like to have as

23    low a standard deviation that we can get so that the counts

24    that we get are significant for the purpose involved.

25    Q.    And you mentioned that the amount of the material

1    present is relevant in analyzing the standard deviation.

2             Can you explain that for us, please?

3    A.      Yes.  If we carry out an experiment which has

4    100 percent of the given compound in the sample holder for

5    the x-ray powder diffraction pattern, we'll get a rather

6    good pattern.

7             If we had something that has only 3 percent of

8    the crystalline material with 97 percent something else,

9    then the pattern will only be about 3 percent as strong as

10   it would have been in the pure material.

11            So in that situation, we might want to count it

12   ten times, 100 times, as long as we would have counted it

13   had it been a pure sample.

14   Q.      Does that increase the sensitivity of the test?

15   A.      To increase the sensitivity and to get the percent

16   standard deviation to an acceptable level.

17   Q.      Now, Dr. Atwood, what was the state of the art in

18   February of 2010 with respect to XRPD analysis?

19   A.      I've just been, everything I've been discussing

20   relates to the State of the art in 2010.

21   Q.      So all of that information was known to a person of

22   skill in the art at that time?

23   A.      It was.

24            MS. WIGMORE:  Your Honor, I don't know if you

25   want to inform to take an afternoon break, but we're at a

Atwood - direct

1    good spot.

2              THE COURT:  All right.  If you want to take

3    an afternoon break, thank you for asking.  The break is

4    likely to be 20 minutes, but I will be back as soon as I

5    can.

6              (Short recess taken.)

7                        -   -   -

8              (Proceedings resumed after the short recess.)

9              THE COURT:  All right.  I think we're ready to

10   resume.

11   BY MS. WIGMORE:

12   Q.    Dr. Atwood, currently, the asserted claims of the

13   '945 patent, returning to JTX-2, can you please read claim

14   21 for us?

15   A.    21, the composition as defined in claim 12, wherein

16   the pharmaceutical composition comprises 2.5 milligrams of a

17   apixaban.

18   Q.    And how does claim 22 compare to claim 21?

19   A.    It's the same, but it comprises five milligrams of

20   apixaban.

21   Q.    Now, do you understand that each of the asserted

22   claims 21 and 22 depend on independent claim 12?

23   A.    Yes.

24   Q.    Have you prepared a demonstrative showing all of the

25   limitations of the asserted claims?

Atwood - direct

1    A.    Yes, I have.

2    Q.    Turning to PDX-5.18, is this that chart showing all

3    of the claim limitations at issue for these two claims?

4    A.    Yes.  This is the chart I've prepared to show the

5    claim limitations of claims 21 and 22.

6    Q.    Now, do you understand, Dr. Atwood, that the

7    defendant SigmaPharm and Sunshine Lake dispute only two

8    limitations of claim 21 and 22?

9    A.    That is my understanding.

10         MS. WIGMORE:  And, your Honor, the uncontested

11   facts, I don't know if your preference is for us to identify

12   them or read them, but the other limitations are addressed

13   in our uncontested facts statement.

14         THE COURT:  You might want to read it.

15         MS. WIGMORE:   So for SigmaPharm, I directed

16   the Court's attention to uncontested facts 56 through 59,

17   and, in addition, there has been an agreement between the

18   parties since then that SigmaPharm will not contest the

19   dissolution limitation, which is the last limitation under

20   claim 12.

21         As to Sunshine Lake, we direct the Court's

22   attention to uncontested facts 64 through 67 and 69.

23   BY MS. WIGMORE:

24   Q.    So with that in mind, Dr. Atwood, have you prepared a

25   demonstrative showing the limitations that remain in

1   dispute?

2   A.      Yes, I have.  I've just ticked off the ones that are

3   not in dispute.

4   Q.      And --

5   A.      In this chart.

6   Q.      And can you identify for us the ones that remain in

7   dispute, please?

8   A.      Still in dispute, wherein apixaban comprises

9   crystalline apixaban particles and then wherein the

10  crystalline particles have a $D_{90}$ equal to or less than about

11  89 microns.

12  Q.      Now, starting with the one you just read, which is

13  the fifth line on this slide of claim limitation, do you see

14  the phrase, apixaban particles have a $D_{90}$ as it appears in

15  that claim limitation?

16  A.      Yes.

17  Q.      You understand that the Court construed that phrase

18  to have a plain and ordinary meaning?

19  A.      Yes.

20  Q.      Is that the construction you applied in your

21  infringement analysis?

22  A.      Yes.

23  Q.      What would a person of ordinary skill in the art at

24  the time of invention have understood to be the plain

25  meaning of apixaban particles have a $D_{90}$?

Atwood - direct

1    A.    The $D_{90}$ means 90 percent of the volume would be equal

2    to or less than about 89 microns.

3    Q.    Is the --

4    A.    And make that diameters since it's given in microns

5    rather than -- cubic microns.

6    Q.    Now, let's turn to, in the '945 patent, to column 3,

7    and there's a paragraph at line 20 beginning, the term

8    particles.

9          Do you see that?

10   A.    Yes, I see that.

11   Q.    Could you read that paragraph, please?

12   A.    The term particles refers to individual drug

13   substance, whether the particles exist singly or are

14   agglomerated.  Thus, a composition comprising particulate

15   apixaban may contain agglomerates that are well beyond

16   the size limit of about 89 microns specified herein.

17   However, if the mean size of the primary drug substance

18   particles (i.e., apixaban) comprising the agglomerate are

19   less than about 89 microns individually, then the

20   agglomerate itself is considered to satisfy the particle

21   size constraints defined herein and the composition is

22   within the scope of the invention.

23   Q.    What is an agglomerate?

24   A.    An agglomerate would be a situation in which one had

25   one particle and then another particle which would somehow

1    adhere to the first particle and an agglomerate, of course,

2    could have several such individual crystalline particles

3    agglomerated together.

4    Q.    And what does the '945 patent instruct a person of

5    skill in the art with respect to assessing the size of

6    particles within an agglomerate?

7    A.    Well, the statement is very clear here, that if

8    there's an agglomerate, one should consider the individual

9    components of the agglomerate, not the agglomerate itself in

10   terms of the size limitation.

11   Q.    Now, we've talked about one term of the '945 asserted

12   claims.

13               As to the remaining terms of claims 21 and

14   22, do you understand that the parties have agreed they

15   should be construed according to their plain and ordinary

16   meaning?

17   A.    Yes.  That's my understanding.

18   Q.    And is that the approach that you took in analyzing

19   infringement?

20   A.    It is.

21   Q.    Now, I'd like to turn to your individual infringement

22   analyses, and we'll start with SigmaPharm and complete that

23   and then we'll turn to Sunshine Lake.

24               So with SigmaPharm in mind, let's focus again on

25   the disputed limitation.  Looking at PX-5.20, what is the

1    first of those two disputed limitations?

2    A.    The first disputed limitation is, "Wherein apixaban

3    comprises crystalline apixaban particles."

4    Q.    And what would a person of skill in the art

5    understand that term to mean based on its plain and ordinary

6    meaning?

7    A.    The plain and ordinary meaning to a person of

8    ordinary skill would be that there are some crystalline

9    apixaban particles.

10   Q.    Does this claim, does either of the asserted claims

11   contain any numerical or percentage limitation on the amount

12   of crystalline apixaban that must be present?

13   A.    No.   Just the term comprises, meaning that there will

14   be some crystalline apixaban particles there in.

15   Q.    How did you assess whether SigmaPharm's ANDA product

16   meets this limitation?

17   A.    I did X-ray powder diffraction experimentation, which

18   is the method of choice for determining crystallinity.

19   Q.    And did you do that XRPD analysis on a sample of

20   SigmaPharm's ANDA product?

21   A.    Yes, I did.   A 5 milligram tablet of SigmaPharm.

22   Q.    And from where did you obtain that sample of

23   SigmaPharm's ANDA product?

24   A.    I obtained it from counsel and it came in a bottle

25   that was, that had SigmaPharm marking on it.

1   Q.      And do you understand that that sample originated

2   from SigmaPharm?

3   A.      That's my understanding, yes.

4   Q.      Is there anything about the shipping or storage

5   conditions of the SigmaPharm sample that would cause you

6   concern regarding its integrity?

7   A.      No.  The sample came to me in good condition.

8   Q.      And how did you store it?

9   A.      I stored it at, on a shelf in my office.

10  Q.      And did you store it at the temperature conditions

11  specified on the label?

12  A.      Yes.

13  Q.      Now, what was the dosage strength of the SigmaPharm

14  apixaban tablet you tested?

15  A.      It was five milligrams.

16  Q.      Did you take any step to prepare the SigmaPharm

17  tablet for testing?

18  A.      Yes.  The testing was going to be X-ray powder

19  diffraction to detect the crystallinity.  The tablet is

20  coated with an Opadry coating, and I first lightly -- I

21  took a piece of fine grain sandpaper and lightly sanded the

22  Opadry coating off.

23              Then with the sample itself in the form of

24  tablet, I crushed and lightly ground it to a powder so it

25  would be amenable to X-ray diffraction analysis.

1   Q.      Now, do you have any concern about whether that

2   method of preparing the sample affected the integrity of the

3   material?

4   A.      No, no concern at all.  I've been preparing samples

5   like this for 30 years and the technique I used would not

6   affect the integrity of the sample.  It simply renders the

7   sample amenable to X-ray powder diffraction.

8   Q.      And is that a technique that has been used by others

9   in the field?

10  A.      Oh, yes.

11  Q.      Now, Dr. Atwood, we've been discussing the

12  preparation of the sample.  Once you completed the

13  preparation, what did you do next?

14  A.      Once I completed the preparation, I introduced the

15  sample into a sample holder, leveled the sample in the

16  sample holder and affixed the sample holder on the X-ray

17  diffractometer.

18  Q.      And we'll come to the details of your testing in a

19  moment, but generally speaking, what did you conclude from

20  the results of your testing of SigmaPharm's ANDA product

21  with respect to crystalline material?

22  A.      My conclusion was that there's crystalline, apixaban,

23  in SigmaPharm's five-milligram tablet.

24  Q.      Now, let's turn back to Table 2 of the '945 patent.

25          How, if at all, did you use this Table 2, which

1  we talked about previously, in your analysis of SigmaPharm's

2  ANDA products?

3  A.      I used Table 2 as a guide, realizing that SigmaPharm

4  used form N-1 initially.  I looked to see if any of these

5  six characteristic peaks of crystal form N-1 of apixaban

6  were present in the SigmaPharm tablet.

7  Q.      Now, I direct your attention to the sentence that

8  appears immediately above this table in the '945 patent,

9  beginning at column 4, lines 56, and carrying over to column

10  5, line 3.

11          Do you have this passage of the '945 patent in

12  mind, Dr. Atwood?

13  A.      I do.

14          Should I read it?

15  Q.      Well, rather than read it, I just want to ask you a

16  few questions about it.

17          Did you apply -- did you use calibrated

18  equipment as described here in your testing?

19  A.      Yes.

20  Q.      And did you do your testing at room temperature?

21  A.      I did.

22  Q.      And do you see the phrase -- do you see the phrase

23  "2-theta plus or minus 0.1" in the second line of that

24  passage?

25  A.      Yes.

1   Q.      What does that refer to?

2   A.      That refers to the peak positions, that's the 2-theta

3   value, and the USP maintains that the 2-theta value should

4   be within the range plus or minus .1-degree.

5            So, for example, if the value were 10.6, 2-theta

6   were 10.6, the peak should be from 10.5 to 10.7 degrees

7   2-theta.

8   Q.      So is there a 0.1 margin of error in this analysis?

9   A.      It's margin of error, yes.

10  Q.      Now, turning to PDX-5.21, what does this slide show?

11  A.      This slide shows the same Table 2, but the heading is

12  "Peaks Identified in SigmaPharm's ANDA Product."  And I have

13  highlighted 12.3, 12.9 and 27.1 as three peaks which I

14  detected using XRPD and SigmaPharm's ANDA product.

15  Q.      And these are peaks that you found that are

16  associated with the peaks in the '945 patent?

17  A.      Yes, exactly.  These are peaks called out in the '945

18  patent as being characteristic of crystal form N-1.

19  Q.      Now, we'll come to the details of the peaks that you

20  identified in a moment, but I first want to spend a few

21  minutes on the peaks that you have not highlighted in this

22  table.

23            What did you conclude about the characteristic

24  peaks at 10.0, 10.6, and 18.5?

25  A.      I concluded that these peaks could not be

1    individually located because of the presence of crystalline

2    excipients in much higher measure.

3            Keep in mind that in SigmaPharm's ANDA product,

4    if memory serves me, the percent of apixaban was 3.125.

5    This means that there was almost 97 percent excipients and

6    some of those excipients are quite crystalline.

7            If, for example, there's an excipient peak in

8    the range of 10 to 10.6 degrees, then it will completely

9    overshadow the 10.0 and 10.6 from crystal forming N-1.

10   Q.     What is the amount of the excipient matter?

11   A.     The amount of excipients matters because the size of

12   the x-ray peak that we get will be dependent on two factors.

13   One is the -- just the inherent size of some peaks.  Some

14   peaks are larger than others.  But if we have a crystalline

15   product that's present at, say, 48 percent, and apixaban

16   present at 3.125 percent, the crystalline substance at --

17   the excipient crystalline substance, if it overlaps the

18   positions called out in Table 2, well, that's the apixaban

19   positions.

20   Q.     Does that mean that those particular peaks, the

21   ones you have not highlighted here, are not present in

22   SigmaPharm's ANDA product?

23   A.     No, quite the opposite.  They're certainly present,

24   and, in fact, there are peaks there.  It's just that those

25   peaks are due to excipients rather than to -- the large

1    nature of the peaks means they're due to the excipient

2    rather than to crystal form N-1 of apixaban.

3    Q.    And as to the peaks for the crystalline apixaban,

4    they are matched by the excipients; is that your conclusion?

5    A.    Yes, 10.0, 10.6 and 18.5.  However, the excipient has

6    windows at 12.3, 12.9 and 27.1 where one has the opportunity

7    to detect crystalline apixaban, if it's present, and,

8    indeed, it was present.

9    Q.    Now, let's turn to PTX-1074, which is Tab 12 in your

10   binder.

11         Is this a portion of SigmaPharm's ANDA that you

12   reviewed in forming your opinion?

13   A.    It is.  This is entitled "Description and Composition

14   of the Drug Product."

15   Q.    And turning to the page ending with Bates number 702.

16         Do you see Table 1?

17         What is the title of Table 1?

18   A.    Table 1 is:  "Composition of Common Blend For

19   Apixaban Tablets, 2.5 Milligram and 5 Milligram."

20   Q.    And under the components column on the left-hand

21   side, do you see a reference to apixaban (drug substance)?

22   A.    I do.  And as I was just saying, if we go on across

23   to percent, weight over weight, we see 3.125, which is the

24   percentage by weight of the total apixaban drug product.

25   Q.    How, if at all, does the amount of apixaban in

Atwood - direct

```
 1    SigmaPharm tablets impact the size of the crystalline

 2    apixaban peaks relative to the size of the excipients peaks?

 3    A.      They're going to be rather small compared to the

 4    crystalline excipient peaks.

 5                  For example, mannitol has a good single crystal

 6    x-ray diffraction pattern, and it's present at 22.5 percent.

 7                  So one is going to expect the mannitol peaks

 8    will be about, on average, seven times as large as the

 9    apixaban peaks.

10    Q.      Let's turn to PTX-1098, which is at Tab 14 of your

11    binder.

12                  And you may want to have a look at that and see

13    if you want the hard copy.

14                  What is this document?

15    A.      Yes.  I think I'll take a hard copy.

16    Q.      Sure.  It's Tab 14.

17                  THE COURT:  There is a counter your left, if you

18    want to use it.

19                  THE WITNESS:  Thank you very much.

20                  I hope I didn't need Volume 2.

21                  MS. WIGMORE:  Not yet.

22    BY THE WITNESS:  So you are directing me to?

23    BY MS. WIGMORE:

24    Q.      Tab 14, which should be PTX-1098.

25    A.      Tab 14.  You know, I have a feeling that ...
```

1    Q.      Oh, okay.

2    A.      I can find Tab 14 in just a moment.

3    Q.      We can get you another version of it.

4    A.      Oh, no, no.  It hasn't -- it hasn't come completely

5    undone, just ...

6            You know, being a university professor, we have

7    to be able to do things like this.  (Reassembling the binder

8    which had become undone.)

9    Q.      Okay?

10   A.      Okay.

11   Q.      Okay.  Thank you.  Now if you could look now to Tab

12   14.

13   A.      (Witness complies.)

14           Yes, I have Tab 14.  It's PTX-1098?

15   Q.      Yes.  What is PTX-1098?

16   A.      PTX-1098 is the entirety of all the x-ray diffraction

17   studies I did on SigmaPharm products.

18   Q.      So if we could turn within that exhibit to page 2.  I

19   want to ask you, first of all, about this text that appears

20   above that diffractogram.

21           What are you testing here?

22   A.      Yes.  This has file name apix11.

23           The file name, the instrument, the x-ray

24   diffractometer that I used, if I were to say it's apixaban

25   and then run another one with the same name, it would

1    overwrite the first one.  So I make sure, even though apix11

2    may seem a bit obscure, I wanted to make sure I hadn't

3    already assigned that file name so that the file would be

4    preserved.

5    Q.     So this is a file name you assigned to the SigmaPharm

6    tablet that you tested?

7    A.     Exactly.  To this particular run of the SigmaPharm

8    tablet.

9    Q.     And, again, focusing you on the text above the

10   diffractogram, what does the term "step" refer to?

11   A.     "Step" means that I scanned through, the range was

12   from 9 degrees to 19 degrees, by the way.  And I scanned

13   through using steps of .02 degrees.

14          So that means I instructed the instrument to do

15   a count at 9.00 degrees, 9.02 degrees, 9.04 degrees and so

16   forth up to 19 degrees.

17   Q.     Now, you mentioned a range of 9 to 19.  What does

18   "range" refer to?

19   A.     Range just means the 2-theta values.  I'm starting at

20   9 degrees 2-theta and scanning for 19 degrees 2-theta.

21   Q.     And what does "CNT time" stand for?

22   A.     CNT time is the count time.  This means that at each

23   step, I spent 100 seconds counting the photons that arose at

24   that point.  So at 9.00, 100 seconds' count time.  9.02,

25   another 100 seconds' count time, stepping through to

1    19 degrees.

2    Q.    And remind us from your tutorial earlier this

3    afternoon, what impact does this lower count time have on

4    the sensitivity of an XRPD scan?

5    A.    The photo count time means I'm amassing more counts.

6    So the relative standard deviation will be quite low.

7    Q.    Now, you've shown us that SigmaPharm's ANDA product

8    contains 3.125 percent apixaban.  How, if at all, does that

9    affect the count time necessary to detect crystalline

10   apixaban?

11   A.    It means that I'll probably have to use a rather long

12   count time, like 100 seconds.

13               Now, I should point out that these prominent

14   peaks that one sees at about 18 degrees -- let's see.

15   Maybe -- I think I've been taught subsequently how to use

16   this pointer.

17               Maybe the --

18   Q.    A little farther up there's a pointer.

19               Would be helpful if I used it and pointed for

20   you?

21   A.    That would be --

22               MS. WIGMORE:  May I approach?

23               THE COURT:  Yes.

24               THE WITNESS:  -- helpful because I don't think

25   gesturing to what I'm seeing on the screen here was going to

```
 1    do much good.

 2                THE COURT:  No, that won't do much good.

 3                MS. WIGMORE:  The pressure is on me.

 4                THE WITNESS:  Okay.  So I'm initially pointing

 5    out that the peak at between 18 and 19 degrees.

 6    BY MS. WIGMORE:

 7    Q.    There we go.  This peak.

 8    A.    You were making me feel a better bit better there,

 9    for the record.

10          That peak is quite large.  And then if we -- we

11    see several rather large peaks up -- these peaks are

12    excipient peaks.

13    Q.    Okay.  So just breaking that down, let's focus first

14    on the range between 10 and 11 degrees.

15    A.    Yes.

16    Q.    What do you see in that range?

17    A.    Oh, between 10 and 11 degrees, I see two peaks; and

18    these peaks, again, are too large to be apixaban peaks.

19    Q.    And then you mentioned between 18 and 19 degrees.

20    What do you see there?

21    A.    I see large excipient peaks in that range.

22    Q.    And so based on these excipient peaks that you saw,

23    between 10 and 11 degrees and 18 and 19 degrees, how did

24    that impact your assessment of the peaks in Table 2 of the

25    '945 patent and whether they're present?
```

1    A.       That means that I'm not going to be able to find the

2    10.0 and the 10.6 peak, and I'll certainly won't be able to

3    find the 18.0 -- the 18.5 peak because of the masking of the

4    excipients.

5    Q.       Dr. Atwood, what is a placebo?

6    A.       A placebo is the exact formulation but without the

7    API.

8    Q.       Did you receive a sample of the placebo tablet from

9    SigmaPharm?

10   A.       I did.

11   Q.       And if we could pull up PTX-1107.  Looking at the

12   text at the top of the page, what is it?

13   A.       Yes.  This is the SigmaPharm placebo tablet and I run

14   this at 9 to 19 degrees for the range, a count time of a

15   hundred seconds.  So this is just the placebo.  There's no

16   API here.  And this says, just as I was pointing out, that

17   in the 10 to 11-degree range, or the 10 to 10.6-degree

18   range, there are large excipient peaks.

19               Now, large is a matter of speaking.  They

20   are not large at the 18-degree peak, for example, but

21   they're very large compared to what a three percent apixaban

22   peak would look like.

23   Q.       And what did you see at a range between 18 and 19 in

24   SigmaPharm's placebo?

25   A.       A very large excipient peak.

1    Q.      So how did your testing of this placebo impact your

2    opinion about whether the three peaks you mentioned were, in

3    fact, blocked by excipients?

4    A.      It informed and confirmed my opinion that excipient

5    peaks were blocking the three peaks that I had mentioned

6    in the listing of the six in one crystalline apixaban

7    peaks.

8    Q.      Now that we talked about the peaks you did not

9    see, let's move on to the peaks that you did, in fact,

10   observe.

11           Turning to PDX-5.21, remind us which peaks you

12   identified in SigmaPharm's ANDA product.

13   A.      12.3, 12.9 and 27.1.

14   Q.      So let's return to PTX-1098, which is your analysis

15   of SigmaPharm's tablet.

16           If we turn to page 8, what is the range at

17   the top where you collected --

18   A.      The range here is the same.  This is the range from 9

19   to 19 degrees with a count time of 100 seconds per step,

20   .02 degrees per step.

21           So what I've done here is I've taken that

22   initial run and I simply mask everything below 12 degrees

23   and everything above 13 degrees.

24   Q.      And let me just pause there.  When you say you mask

25   it, what do you mean by that?

Atwood - direct

1    A.      I just physically mask it.  I took the, the 9 to

2    19-degree pattern that we looked at moments before and I

3    expanded the scale so that the top was about 344 count.

4    Q.      And so this is the same image that you took

5    initially, but this is a different way of viewing it?

6    A.      Exactly the same image, but a different way of

7    viewing it.  And I'm viewing it over a two-degree range,

8    from 11 to 12, even though the peaks themselves are from 12

9    to 13, just because in order to view something, there's a

10   distance that's convenient to the eye.

11              If I want to view my index finger, this is

12   a good distance to view it at about a foot or 18 inches.  If

13   I try to view it like that, it's hard to see.

14   Q.      And when you say "like that," you mean right in front

15   of your eye?

16   A.      Right in front of my nose.  So what I'm doing is, if

17   I make the scale too large for these peaks that show up

18   here, it compresses them.  If I make the scale just from 12

19   to 13, it's a little bit hard to see.

20   Q.      So on page 8 of PTX-1098, we're just looking at the

21   same diffractogram from a different view?

22   A.      Yes, the first one, the one with the crushed tablet.

23   Q.      Okay.  Now, what does -- if we turn to PDX-5.22, is

24   this the same diffractogram that we just looked at, but with

25   your own markings on it?

1    A.    It is.   This is the same diffractogram.   This is

2    Apix11 is the file name, hundred second count time and so

3    forth.   And what I've done is, I've just put a box around

4    the peaks that come to a maximum at 12.4 degrees and a box

5    around the peaks that comes to a maximum at 12.9 degrees.

6    Q.    And what are those peaks?

7    A.    Those are apixaban, crystalline apixaban peaks.

8    Q.    Now, are you familiar with the concept of noise as it

9    relates to an XRPD diffractogram?

10   A.    Yes, yes.   While we're doing the scan, the X-ray beam

11   is on, and there will be cosmic rays, there will be scatter

12   off the so-called beam stop.   You know, there will be a lot

13   of photons that don't represent peaks at all, but are just

14   what we call noise.

15   Q.    Now, turning to PDX-5.23, what is shown here?

16   A.    I've indicated what noise looks like.

17   Q.    Is this the same diffractogram that we were just

18   looking at with an additional marking?

19   A.    Exactly.

20   Q.    And how does an ordinary person of skill in the art

21   distinguish peaks from noise?

22   A.    Peaks are distinguished from noise in that one would

23   like the peaks to be larger than noise, certainly, but if

24   one looks to see sort of the baseline, if we have a peak,

25   it's not going to be just a spike that comes up at one count

1    and then back down at the next, but rather we'll see if we

2    look at the 12.4, the peak starts up and then it's gradually

3    trending up and it stays up for -- well, it stays up for

4    about .3 or .4 degrees.

5    Q.    And how does that compare to noise?

6    A.    Oh, noise is just a momentary fluctuation up and

7    then back down, just a few counts and then the counts fall

8    off.

9    Q.    Now, what count time was used in this scan?

10   A.    This was the initial scan that we looked at, so it's

11   a count time of 100 seconds per step and the step size was

12   .02 degrees.

13   Q.    Now, staying within PTX-1098, let's turn to page 14.

14         Is this also a scan of SigmaPharm's ANDA

15   product?

16   A.    I have to admit I'm going to take advantage over Your

17   Honor, everyone in the audience, by actually looking at the

18   hard copy here, which is going to be -- it's going to show

19   up better, at least to me.

20   Q.    Certainly.

21   A.    Yes, I'm looking at it.  I can see yours looks pretty

22   good now.

23   Q.    Okay.  And is this a scan of SigmaPharm's crushed

24   tablet?

25   A.    This is.

1   Q.      And what, if you turn to PDX-5.24, is this a

2   demonstrative with your markings on that very same scan?

3   A.      It is.  It is.  What we see here is, there's a rather

4   large excipient peak, which is below 27 degrees, and there's

5   the start of a large excipient peak above about

6   27.25 degrees, but there's a 27.1 peak just on the edge of

7   that large excipient peak, and note that the 27.1 peak

8   doesn't just come up quickly and go back down, but rather it

9   comes up, stays up for probably three or four steps of

10  counting.

11  Q.      Now, we've talked about your comparison of your XRPD

12  scan to Table 2 of the '945 patent.

13          Do you also compare your scan results to

14  information concerning SigmaPharm's starting API?

15  A.      I did, I did.

16  Q.      If we could turn, please, to PTX-1009, which I think

17  you can see on the screen, Dr. Atwood, but it would be Tab 6

18  in your binder?

19  A.      Thank you.

20  Q.      What is the title of this exhibit?

21  A.      This is from Catalent Micron Technologies.  It's a

22  final report to SigmaPharm Labs.

23  Q.      And is this a document produced by SigmaPharm in this

24  case?

25  A.      It is.

1    Q.      What is the study name on this cover of this report?

2    A.      The study's name is X-ray powder diffraction of

3    apixaban API.

4    Q.      Now, turning within this exhibit to page with Bates

5    number ending 897, what is shown on this page of Exhibit

6    PTX-1009?

7    A.      This is SigmaPharm's own form N-1, initial starting

8    material.

9    Q.      And is this --

10   A.      As an XRPD.

11   Q.      Okay.

12   A.      So it looks like it is rather pure crystal form in

13   one.

14   Q.      All right.  And if we turn to the next page of this

15   exhibit, I want to direct your attention to the area at

16   22.1 degrees.

17           What do you see at 22.1 degrees in the scan of

18   the SigmaPharm starting API?

19   A.      What we have here at the 22.1 degrees and then on the

20   right is 43.4 percent.  Now, this means that the peak at

21   22.1 degrees is almost half as tall as the tallest peak in

22   the pattern.

23   Q.      So --

24   A.      43 percent of the strongest peak in the pattern, so

25   it's a strong and dominant peak in the pattern.

1    Q.      And that's a peak you found within SigmaPharm

2    starting at apixaban API?

3    A.      This is a peak which is easily observable in

4    SigmaPharm's starting API.

5                    If you go back there, perhaps --

6    Q.      To the first page of the exhibit?

7    A.      Yes.  No.  The XRPD pattern.

8    Q.      That would be at page ending 897.

9    A.      Yes.  Okay.  So we're looking at -- Your Honor, if

10   you look here, it's 20 degrees and then 30 degrees and the

11   tick marks are every two degrees.  So if you go to the first

12   tick mark -- you are doing a great job with that pointer.

13   There is 22.2 degrees.  It's quite a large peak.  It's about

14   the fourth largest peak in the pattern.

15   Q.      Now, did you -- let's return to PTX-1098, which is

16   your own scan of SigmaPharm's ANDA product.

17                    Turning to page 12, what is the range where you

18   collected data on this particular page?

19   A.      I collected data here from 21.75 to 22.25.

20   Q.      And turning to PDX-5.25, is this that same scan with

21   your own markings?

22   A.      It is.

23   Q.      And what did you observe in this scan?

24   A.      One observes the peak at 22 degrees and, importantly,

25   the peaks that I'm observing, Your Honor, they're not really

1    huge peaks.  They are rather small peaks carefully measured,

2    because the amount of apixaban in the crushed tablet is only

3    3.125 percent.

4    Q.    Now, how does this peak you found at 22 degrees

5    compare to the peak in SigmaPharm's testing of its own

6    starting crystalline API?

7    A.    It matches.

8    Q.    And what, if any, effect did this have on your

9    opinion about whether the crystalline apixaban limitation is

10   satisfied?

11   A.    Of the six peaks listed in the patent, in Table 2, I

12   found three of those, the other three being -- and also the

13   22-degree peak was found.  It's not called out specifically

14   in Table 2 of the '945, but we know because we've seen

15   SigmaPharm's API, which is in one, crystal form in one,

16   apixaban, that there is a peak of 22.0 degrees.  And it's in

17   the tablet.

18   Q.    Let's turn to PDX-5.26.

19            What is shown here?

20   A.    What I have shown here is an expanded version of

21   Table 2, so I've got the 10.0 and 10.6 peaks blocked by

22   excipients, the 18.5 blocked by excipients, but now there is

23   the 12.3, the 12.9, 22.1, and 27.1.

24            Characteristic peaks of apixaban crystal form

25   N-1.

1    Q.      And the 22.1 peak in the table comes from the

2    SigmaPharm API analysis, is that right?

3    A.      Exactly.  Exactly.  I observed it at 22.0 that it's

4    within plus or minus .1 of the 22.1.

5    Q.      Based on all of your testing, what did you conclude

6    about whether SigmaPharm's ANDA products contain crystalline

7    apixaban?

8    A.      SigmaPharm's ANDA product contains crystalline

9    apixaban, clearly.

10   Q.      Dr. Atwood, based on your work in the field, are you

11   familiar with the phrase "limit of detection"?

12   A.      I am.

13   Q.      What does limit of detection refer to?

14   A.      Limit of detection is a term that is normally used to

15   one that is doing quantitative analysis.  In other words, if

16   one is trying to assess how much of a material is

17   specifically there.

18           A limit of detection means that if one gets

19   enough material present in the sample to detect it, it's

20   above the limit of detection.  If it's below the limit of

21   detection, then one doesn't detect it.

22   Q.      Did you perform a limit of detection analysis with

23   respect to your testing for crystalline apixaban in

24   SigmaPharm's ANDA product?

25   A.      I did not.  I did not need to because I detected the

1    four peaks.

2    Q.      Now --

3    A.      They were clearly -- excuse me.

4           They were clearly above the limit of detection

5    of my method because I detected them.

6    Q.      Were you here for the testimony by deposition of

7    Dr. -- Mr. Spireas?

8    A.      I was.

9    Q.      Did you hear his testimony about the 5 percent limit

10   of detection in SigmaPharm's detection of its ANDA product?

11   A.      I heard that.  I didn't hear it completely clearly

12   from where I was sitting, but I heard it.

13   Q.      So if we take that testimony about a 5 percent limit

14   of detection and SigmaPharm's testing of its ANDA product,

15   how would that 5 percent limit of detection that they have

16   impact the reliability of the results?

17   A.      Well, if they have 100 -- if 100 percent of their

18   apixaban is crystalline, there's only 3.125 percent apixaban

19   in the tablet.  If the limit of detection is 5 percent, then

20   even 100 percent crystalline apixaban would be below the

21   limit of detection.

22   Q.      Now, did you attempt to quantify the amount of

23   crystalline apixaban present in SigmaPharm's ANDA product?

24   A.      I did not.

25   Q.      Why not?

Atwood - direct

1    A.        There was detectable crystalline apixaban in

2    SigmaPharm's ANDA product.

3              I didn't attempt to quantify it.

4    Q.     Did the claims require any specific amount of

5    crystalline apixaban?

6    A.     The claims do not.  They used the term "comprising."

7    Q.     Now, did you consider any testing performed by

8    SigmaPharm on its ANDA product with respect to the issue of

9    whether crystalline apixaban is present?

10   A.     I did.

11             And I hope you are going to direct me to the

12   right...

13   Q.     Let's turn to PDX-5.27.

14             And using this demonstrative, how, if at all,

15   did SigmaPharm's testing of its own ANDA product impact your

16   opinion about the presence of crystalline apixaban?

17   A.     It didn't affect my opinion, one way or the other.

18   Q.     Why not?

19   A.     SigmaPharm used a short scan time, .5 to 1 second per

20   step --

21   Q.     How did that compare to yours?

22   A.     -- using 100 seconds per step.

23             This small percentage of apixaban is below the

24   5 percent limit of detection if that's what their limit of

25   detection was.

1          And that just means that the testing that

2    SigmaPharm did is not sufficiently sensitive to detect,

3    according to the testimony we heard here, to detect even

4    100 percent crystalline apixaban, in the SigmaPharm product.

5    Q.    Now, Dr. Atwood, you've explained the testing you've

6    conducted on the SigmaPharm 5 milligram ANDA product.

7          Have you reached a conclusion as to whether

8    there is crystalline apixaban present in SigmaPharm's

9    2.5 milligram ANDA product?

10    A.    I have.  I did not test the 2.5 milligram tablet.  I

11    didn't have 2.5 milligram tablets, nor did I need them

12    because the method of making the material is the same.  It's

13    just that everything is scaled down at 2.5.  The same

14    percentage of mannitol and all the excipients are found in

15    both the 5 milligram and the 2.5 milligram tablets.

16    Q.    So what is your opinion as to whether SigmaPharm's

17    2.5 milligram ANDA product contains crystalline apixaban

18    particles?

19    A.    My reading of SigmaPharm's ANDA documents shows that

20    if there is crystalline apixaban in 5 milligrams, there

21    will be in 2.5 milligrams because the processes are just the

22    same.

23    Q.    Are there any material differences in manufacturing

24    between the 2.5 milligram and the 5 milligram tablets that

25    would impact the presence of crystalline apixaban?

1   A.      No, it's just everything is there in half measure at

2   the 2.5 milligram compared to the 5 milligram.

3   Q.      Dr. Atwood, are you familiar with Dr. Eric Munson?

4   A.      I am.  I have known Eric for 25 years probably.

5   Q.      Now, we will hear directly from Dr. Munson next week

6   but, generally speaking, what role did Dr. Munson play in

7   this case with respect to SigmaPharm's ANDA products?

8           MR. HENEGHAN:  Your Honor, I have an objection.

9   Dr. Atwood testified at his deposition and also mentioned

10  in his report that he had spoken with Dr. Munson about

11  Dr. Munson's NMR testing, but he didn't have any conclusions

12  about it, and I don't think it's appropriate for him to just

13  say he likes Dr. Munson, he thinks Dr. Munson did a good

14  job.

15          That's not really an opinion here, it is outside

16  his area of expertise, and all he is doing is supporting

17  another expert on the same subject.

18          MS. WIGMORE:  Your Honor, Dr. Atwood offered in

19  his report the opinion that Dr. Munson's testing, which he

20  reviewed and discussed with Dr. Munson, confirms his opinion

21  because the same exact issue arises with Dr. Buckton relying

22  on Dr. Scheidt.  It's part of his expert report.

23          MR. HENEGHAN:  If I could address that, Judge.

24          THE COURT:  Yes.

25          MR. HENEGHAN:  The difference is at his

1     deposition, Dr. Atwood acknowledged that he had not seen

2     Dr. Munson's results before he drafted his expert report, it

3     was only afterwards.

4              At the time of his report, he had spoken with

5     Dr. Munson on the phone but had not seen his results.  So I

6     don't think it's appropriate for him to comment on it now.

7              MS. WIGMORE:  Except the exact same thing --

8              THE COURT:  Is he going to say he didn't look at

9     it before he formed his opinion in his report?

10             MS. WIGMORE:  Well, he will say that he had a

11    conversation, understood the results much like the experts

12    on the defendants' side had phone calls to understand

13    without seeing the data and still give opinions about it on

14    the stand.

15             THE COURT:  Okay.  Why doesn't this just go to

16    the weight?  Why is it inappropriate to hear the testimony

17    and then you can cross-examine him on it?

18             MR. HENEGHAN:  I will cross him on this.

19             THE COURT:  All right.  Then I will overrule him

20    on it.

21             Go ahead.

22    BY MS. WIGMORE:

23    Q.    Dr. Atwood, did you speak to Dr. Munson before

24    submitting your opening expert report about his testing?

25    A.    I did, and if I could offer just one comment.

1      I've done a lot of solid state NMR work myself,

2   and, in fact, I have been qualified as an expert in a case

3   in this court under Judge Sleet for solid state NMR.  So I

4   know a lot about it.

5           But over the last ten years or so, I haven't

6   kept up the way Dr. Munson has, so Dr. Munson now far

7   exceeds my expertise in that area.  But I do know what solid

8   state NMR does, what it is capable of, and so forth.

9   Q.     And did you talk to Dr. Munson about his testing and

10  ultimately review his data?

11  A.     I did.

12  Q.     And how, if at all, did Dr. Munson's SSNMR testing on

13  SigmaPharm's ANDA products impact your opinion?

14  A.     It confirmed my opinion completely.  Dr. Munson found

15  a large number of solid state NMR peaks corresponding to

16  crystalline apixaban.

17  Q.     So if we could turn back to your claim limitation,

18  PDX-5.28.

19          What is your opinion about whether the wherein

20  apixaban comprises crystalline apixaban particles limitation

21  is satisfied with respect to the SigmaPharm ANDA product?

22  A.     It's satisfied.

23  Q.     So let's move on to the -- and we can put a checkmark

24  there and move to the next disputed limitation, which is --

25  is it okay with you if I refer to it in shorthand as the

1  particle size limitation?

2  A.     Yes.

3  Q.     Now, do you recall testifying previously about

4  classical models of nucleation and crystal growth?

5  A.     Yes.

6  Q.     Do those models bear on your opinion with respect to

7  the particle size that will ultimately be reached in

8  SigmaPharm's ANDA product?

9  A.     They certainly did.

10  Q.     Now, remind us, when a particle converts from

11  amorphous to crystalline, what size will it be at the time

12  of conversion?

13  A.     The material starts with a small amount of material

14  converting, and the articles that one sees in the literature

15  shows that a few molecules come together and then they go

16  apart in equilibrium, and eventually, eventually being

17  probably a few nanoseconds, enough material comes together

18  so that it no longer falls apart, but then it begins to

19  grow.

20  Q.     And when it first forms, did you testify that it

21  would be in terms of nanometers, the size of the crystalline

22  particle?

23  A.     The initial crystalline particles will be in the size

24  of -- size order of nanometers.

25  Q.     Now, the threshold and the claim limitation at issue

Atwood - direct

1    here is 89 microns.

2              How does that compare to nanometers?

3    A.    89 microns is 89,000 nanometers.

4    Q.    Now, did you consider SigmaPharm's manufacturing

5    process in forming your opinions about particle size?

6    A.    I did.

7    Q.    How did you become familiar with SigmaPharm's

8    manufacturing process for its ANDA products?

9    A.    I found documents.  I don't have -- I don't have my

10   hand right on them, but I think you will take me to them.

11   Q.    Did you review portions of SigmaPharm's ANDA and DMF?

12   A.    Yes.

13   Q.    Now, let's pull up PTX-1029.

14              Is this a portion of SigmaPharm's ANDA?

15   A.    It is.

16   Q.    And on the top line next to that heading 2.3.S, what

17   is the title of this portion?

18   A.    "Drug Substance."

19   Q.    And if we could turn, please, to the page ending in

20   Bates number 258.

21              Do you see the heading "Physical Description"?

22   A.    Yes.  "Physical Description:  The drug substance,

23   apixaban, is a white to pale yellow crystalline powder."

24   Q.    And if you move down on the same page to the heading

25   "Polymorphism," do you see that?

1    A.      I see that.

2    Q.      Could you read the sentence that follows?

3    A.      "The manufacturing process employed by the

4    manufacturer of the drug substance, Medichem manufacturing

5    (Malta) Ltd, consistently produces form 1 (form M as

6    referenced from patent WO2014/108919A2) of the drug

7    substance, apixaban."

8    Q.      So what substance is used at the starting point of

9    the SigmaPharm ANDA manufacturing process?

10   A.      The form M referenced here is apixaban form N1 as

11   referred to in the '945.

12   Q.      Now, on the next exhibit, I won't put it on the

13   screen, but I would just like you to have a look in your

14   binder at Tab 13 to PTX-1077.

15           MS. WIGMORE:  And this is a document, Your

16   Honor, that will be submitted under seal.

17           THE COURT:  Okay.

18           THE WITNESS:  Yes, I have PTX-1077.

19   BY MS. WIGMORE:

20   Q.      And without reading any of the details from the

21   document, do you recognize this as a portion of the DMF

22   relating to SigmaPharm's ANDA products?

23   A.      Yes.

24   Q.      And does it address the manufacturing process and

25   process control for the SigmaPharm ANDA product?

1    A.      It does.

2    Q.      Did you rely on this document in forming your

3    opinion?

4    A.      I did.

5    Q.      And so we'll put that aside and we'll submit that

6    under seal.

7                 If we could pull up PTX-1034 on the screen.

8                 Do you recognize this as a portion of

9    SigmaPharm's ANDA?

10   A.      Yes.

11   Q.      And what is the title of this document after the

12   number at the top of the page?

13   A.      Manufacturing process and process controls.

14   Q.      Dr. Atwood, have you prepared a demonstrative to

15   assist you in explaining the general features of

16   SigmaPharm's manufacturing process that bear on your

17   particle size opinion?

18   A.      I have.

19   Q.      Let's turn to PDX-5.32.

20                What starting material begins the process?

21   A.      Crystalline apixaban starting material begins the

22   process.  Crystal form N1.

23   Q.      And, generally speaking, what does SigmaPharm do with

24   that crystalline apixaban material?

25   A.      First, it dissolves the crystalline apixaban and

1    mixes it with the polymer povidone.

2    Q.      What is the next step in the process, generally

3    speaking?

4    A.      The dissolved and mixture polymer crystal apixaban is

5    spread into trays and vacuum dried.

6    Q.      And what is formed when the solution dries?

7    A.      The drug intermediate, which is 6.6 apixaban, and

8    93.1 percent povidone.

9    Q.      And what are the final steps after that in the

10   manufacturing process?

11   A.      The final steps are milling, granulation, tableting

12   and coating.

13   Q.      Now, based on the testing you've already described

14   for us, do crystalline apixaban particles forms in

15   SigmaPharm's ANDA product?

16   A.      My testing shows that they do.

17   Q.      Are there any aspects of the process that you just

18   described in general that limit the size of the crystalline

19   apixaban particles in SigmaPharm's ANDA product?

20   A.      Yes, yes.  There's the general limitation that the --

21   that apixaban is only 3.125 percent, but if we look at the

22   drug intermediate, 6.6 apixaban, 93.1 percent polymer,

23   povidone, this drug intermediate is going to be thoroughly

24   mixed.  I don't think it's going to have long-term apixaban

25   in the polymers separated from it, but, rather, a thorough

1    mixing job is one to do in an industrial operation of this

2    sort.

3    Q.      What is the impact of vacuum drying on the particle

4    size?

5    A.      Well, vacuum drying means that the material is going

6    to be dried very quickly, so even if the apixaban had an --

7    was looking for an opportunity to associate with other

8    apixaban, the vacuum drying will cause apixaban to exist in

9    my estimation rather uniformly in pockets, which is largely

10   polymer, povidone.

11   Q.      And you mentioned the relatively small amount of

12   apixaban in the intermediate.  What is the impact of that

13   on the particle, the crystalline particle size that will

14   form?

15   A.      There just won't be enough apixaban in these

16   individual pockets to form large crystalline apixaban

17   pockets.

18   Q.      What is the impact of the other ingredient,

19   excipients in the SigmaPharm ANDA product on the size of the

20   crystalline apixaban that will form?

21   A.      The limitation is apixaban, the apixaban is vacuum

22   dried, kept in position in the polymer matrix in small

23   pockets.

24           Once it's dried and there's a polymer

25   matrix with pockets of apixaban in it, the apixaban that

1    crystallizes will be that which is in the small pockets.

2    There won't be the possibility for apixaban as it

3    crystallizes to mix and mingle with other crystal apixaban

4    pockets and form large crystals.

5    Q.    Dr. --

6    A.    But, rather, the process that we are looking at here

7    is a process which is going to cause -- it's going to put a

8    limit on the size of apixaban crystals even if the apixaban

9    crystallized a hundred percent.

10   Q.    And when you say it's going to put a limit, how much

11   of a limit in relation to the 89-micron threshold in the

12   claim limitation?

13   A.    My best estimate would be a couple orders of

14   magnitude, so the crystals are going to start forming at

15   something of the order of ten microns, maybe.  But ten

16   microns, in order to exceed 89, in order -- excuse me.  Ten

17   nanometers as initial -- in order to exceed 89 microns,

18   there's orders of magnitude of growth that we have to

19   happen, and due to the way that the manufacturing process is

20   set up, there's just not going to be enough apixaban in

21   these pockets to form particles of 89 microns with a D-90 or

22   89 microns, for example.

23   Q.    And just so the record is clear, when you mentioned

24   the size of the crystal apixaban particles will be a

25   formation, you were referring to nanometers, not microns; is

1    that correct?

2    A.    I initially said microns and I hope that's the only

3    lapse that I've made through my testimony, but it should

4    have been, it should have been microns.

5    Q.    Now, based on everything that you've described about

6    the SigmaPharm manufacturing process, did you draw any

7    conclusions about the particle size of the crystalline

8    apixaban in SigmaPharm's ANDA product, the crystalline

9    particles in SigmaPharm's ANDA product?

10   A.    Yes.   They are going to be small.   I would estimate

11   they're going to be two orders of magnitude below the

12   89 microns.

13   Q.    Now, does the age of the SigmaPharm tablet you tested

14   affect your opinion about whether they meet the particle

15   size limitation?

16   A.    Most of the motion and most of the crystallization in

17   my opinion occurs rather quickly, so if one, if one tablets

18   a material and one has a two-year shelf life, it's not the

19   case that the material sits around and suddenly at the

20   two-year mark, suddenly, it crystallizes.   Rather, the

21   crystallization is going to occur early on and not much

22   crystallization is going to be occurring as one runs up

23   against the, the shelf life situation.

24   Q.    Dr. Atwood, did you attempt to calculate a $D_{90}$ for

25   the crystalline apixaban particle in SigmaPharm's ANDA

1    product?

2    A.      I didn't attempt to calculate one other than to say

3    that I think it's two orders of magnitude below 89 microns.

4    Q.      Now, you explained that SigmaPharm's process involves

5    combining apixaban with a polymer, povidone.  Does that mean

6    that the particles you have to analyze in assessing particle

7    size involve a combination of apixaban and povidone?

8    A.      No, no.  The patent is quite clear that it's the

9    apixaban particles that are to be considered, not an

10   agglomeration of apixaban with a large povidone, large

11   diffuse povidone particle next to it.

12   Q.      All right.  So let's turn to our list of limitations

13   at PDX-5.33.

14           Based on everything that you've discussed,

15   what is your opinion as to whether the limitation wherein

16   the crystalline apixaban particle have a $D_{90}$ equal to or less

17   than about 89 microns is satisfied with respect to the

18   SigmaPharm ANDA product?

19   A.      In my opinion, this limitation is clearly satisfied.

20   Q.      What is your opinion as to whether claims 21 and 22

21   are infringed with respect to SigmaPharm's ANDA product?

22   A.      My opinion is they're both infringed, and keeping in

23   mind I tested the 5 milligram, but the 2.5 milligram,

24   everything was just cut down in half, half as much polymer,

25   half as much apixaban.

1   Q.      Is your opinion that the infringement would also

2   exist with respect to that 2.5-milligram tablet?

3   A.      Yes, yes.  The processes are just the same and the

4   ingredients leading into the final tablet are just the same,

5   so 2.5 milligrams, check.

6              MS. WIGMORE:  Your Honor, we're ready to move

7   to the next defendant, so this might be a good breaking

8   point.

9              THE COURT:  I think it will take more than one

10  minute, so we'll save that for tomorrow.

11             An update.  Tomorrow I'm available from 11:00

12  until 2:30 now and then Monday and Tuesday, right now it

13  looks like 8:30 to 3:30.  As of now, I have another trial

14  team coming in at 4:00.  You have to keep that in mind.  You

15  may need to break down some of your materials at 3:30 on

16  Monday and Tuesday.

17             If any of that changes, we'll let you know.

18  Otherwise, we'll be in recess until 11:00 o'clock tomorrow

19  morning.  Have a nice evening.

20             MR. SEGREST:  Could Dr. Atwood be reminded that

21  he's still under oath?

22             THE COURT:  I can't hear what you are saying.

23             MR. SEGREST:  Never mind.

24             THE COURT:  All right.  Have a good night.  See

25  you tomorrow.

1          (Court adjourned at 5:00 p.m.)

2

3

4          I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.

5

6                          /s/ Brian P. Gaffigan
                          Official Court Reporter
7                          U.S. District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25