```
 1                    IN THE UNITED STATES DISTRICT COURT
                     IN AND FOR THE DISTRICT OF DELAWARE
 2
                                      - - -
 3      BRISTOL-MYERS SQUIBB COMPANY
        and PFIZER INC.,                        : CIVIL ACTION
 4                          Plaintiffs,    :
        v                                       :
 5                                              : (Consolidated)
        AUROBINDO PHARMA USA INC.,              :
 6                                              : NO. 17-374-LPS
                            Defendant.
 7
                                      - - -
 8
                               Wilmington, Delaware
 9                           Friday, November 1, 2019
                              Bench Trial - Volume C
10
                                      - - -
11
        BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
12
        APPEARANCES:             - - -
13
                     FARNAN, LLP
14                   BY:  MICHAEL J. FARNAN, ESQ.

15                        and

16                   WILMER CUTLER PICKERING HALE and DORR, LLP
                     BY:  AMY K. WIGMORE, ESQ., and
17                        HEATHER M. PETRUZZI, ESQ.
                          (Washington, District of Columbia)
18
                          and
19
                     WILMER CUTLER PICKERING HALE and DORR, LLP
20                   BY:  WILLIAM F. LEE, ESQ.,
                          ANDREW J. DANFORD, ESQ.,
21                        TIMOTHY A. COOK, ESQ.,
                          KEVIN S. PRUSSIA, ESQ., and
22                        SHIRLEY X. LI CANTIN, ESQ.
                          (Boston, Massachusetts)
23
                               Counsel for Bristol-Myers Squibb
24                             Company and Pfizer Inc.

25      Valerie J. Gunning            Brian P. Gaffigan
        Official Court Reporter       Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3            PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
             BY:   JOHN C. PHILLIPS, JR., ESQ.

4                      Counsel on behalf of SigmaPharm
                       Laboratories, LLC; Unichem Laboratories,
5                      Ltd., Zydus Pharmaceuticals (USA) Inc.,
                       Sunshine Lake Pharma Co., Ltd., and
6                      HEC Pharm USA

7                  and

8            HUSCH BLACKWELL, LLP
             BY:   PHILIP D. SEGREST, JR., ESQ., and
9                  DON J. MIZERK, ESQ.
                   (Chicago, Illinois)
10

11                 and

12           HUSCH BLACKWELL, LLP
             BY:   THOMAS P. HENEGHAN, ESQ., and
13                 DUSTIN L. TAYLOR, ESQ.
                   (Madison, Wisconsin)

14                     Counsel on behalf of SigmaPharm
                       Laboratories, LLC
15

16                 and

17           GREENBLUM & BERNSTEIN, P.L.C.
             BY:   P. BRANKO PEJIC, ESQ.,
                   PAUL A. BRAIER, ESQ., and
18                 JILL M. BROWNING, ESQ.
                   (Reston, Virginia)
19

20                     Counsel on behalf of Unichem
                       Laboratories, Ltd.

21

22

23

24

25

1      APPEARANCES:  Continued)

2

3                   YOUNG CONAWAY STARGATT & TAYLOR, LLP
                    BY:  KAREN L. PASCALE, ESQ.

4                        and

5                   LERNER DAVID LITTENBURG KRUMHOLZ & MENTLIK, LLP
                    BY:  PAUL H. KOCHANSKI, ESQ., and

6                        KENDALL K. GURULE, ESQ.
                         (Westfield, New Jersey)

7

8                        Counsel on behalf of Sunshine Lake
                         Pharma Co., Ltd., and HEC Pharm USA

9

10

11

12

13

14                       - oOo -

15                   P R O C E E D I N G S

16             (REPORTER'S NOTE:  The following bench trial was

17     held in open court, beginning at 11:04 a.m.)

18             THE COURT:  Good morning, everyone.

19             (The attorneys respond, "Good morning, Your

20     Honor.")

21             THE COURT:  Are there any issues the plaintiffs

22     want to raise that you anticipate coming up today?

23             MS. WIGMORE:  Not by plaintiffs.

24             THE COURT:  There are for the defendants.

25             MR. PEJIC:  Yes.

```
 1                    THE COURT:  Come on up.

 2                    MR. PEJIC:  Yes, a few minor issues.

 3                    Branko Pejic on behalf of the defendants.

 4                    First off, I'm pleased to tell the Court I

 5      think we resolved the notebook issue and authentication.

 6      We're awaiting the declaration from plaintiffs, but I don't

 7      anticipate any problems.

 8                    THE COURT:  Good.  Thank you.

 9                    MR. PEJIC:  No. 2, the parties are talking about

10      potentially altering the order of proof in a way that might

11      make the more efficient for the Court, the witnesses and the

12      experts grouping it more patent by patent so you do not have

13      experts jumping up and down, but we'll be discussing that

14      further today and we'll apprise the Court as soon as we have

15      resolution or at least a little bit more bedrock as to what

16      we're discussing here.

17                    THE COURT:  Okay.

18                    MR. PEJIC:  Thirdly, we unfortunately one small

19      objection to the demonstrative by plaintiffs.

20                    May I approach?

21                    THE COURT:  Sure.

22                    (Documents passed forward.)

23                    MR. PEJIC:  Can we have PTX-1204 on page 42.

24                    Okay.  And what happens here, Your Honor, is

25      the demonstrative is slightly misleading and inaccurate.
```

1    And I'd like to draw your attention particularly to the

2    demonstrative on where dry mixing on the left.

3              THE COURT:  So I --

4              MR. PEJIC:  This is from the Berkland report.  I

5    apologize, Your Honor.

6              THE COURT:  But what you've handed me is 6-19?

7              MR. PEJIC:  Yes, Your Honor.  And this is the

8    demonstrative that plaintiffs would like to use.  And I'd

9    like to draw your attention particularly to the dry mixing

10   step.

11              If looking at the demonstrative it appears that

12   in the dry mixing step you have granules that are created

13   that are then put into the granulator where apixaban is

14   sprayed on them and ultimately resulting in granules that

15   were added at the beginning with only apixaban on the

16   surface.

17              In reality what happens as when D. Berkland went

18   to court is the excipients are mixed together and put in the

19   granulator.  Apixaban is sprayed upon all of the excipients

20   together and then you have your granules, which is a mixture

21   of excipient and apixaban, including apixaban on the surface

22   and subsurface.

23              We asked plaintiffs simply -- back to the

24   demonstrative, I apologize -- to change the color of the

25   blue excipients in the dry mixing to indicate that they are

1   excipients and not the ultimate granules that result at the

2   end of the process.

3             I understand this is a bench trial and Your

4   Honor knows what to do with it, but I did want to bring it

5   to your attention, that it's actually different than even

6   represented in the Berkland report.

7             THE COURT:  All right.  Thank you.  Good

8   morning.

9             MS. WIGMORE:  Good morning, Your Honor.  The

10  expert report of Dr. Berkland makes clear in paragraph 200

11  that he may rely on visual aids and/or demonstratives that

12  will relate to his opinion.  This diagram that was shown by

13  Mr. Pejic was in his report but the demonstrative that is

14  before you we believe is perfectly consistent and

15  appropriate.  If they want to cross-examine him about the

16  colors of the particles, they are welcome to do that, but we

17  don't believe we're required to record every different

18  excipient on the demonstrative.  We just want something for

19  him to easily explain the essence of the process.

20            THE COURT:  And you anticipate he's going to say

21  that 6-19 is an accurate representation of what he believes

22  happened?  Is that right?

23            MS. WIGMORE:  Correct, and he'll make clear

24  there are multiple excipients in the part of his process as

25  part of his testimony.

```
1                    THE COURT:  Okay.

2                    MR. PEJIC:  If he does that, I don't have a

3    problem.   It just wasn't clear from the demonstrative.

4                    THE COURT:  Well, to the extent there is still

5    an objection to the demonstrative, I'm going to overrule it.

6    We'll hear the testimony, and I'm confident with

7    cross-examination and the other witnesses, I will not be

8    misled.

9                    MR. PEJIC:  I understood.

10                   THE COURT:  But certainly you'll have a chance

11   the chance to prevent that from happening.

12                   Does anybody want their copy back?

13                   MR. PEJIC:  That's actually plaintiffs'.

14                   MS. WIGMORE:  We will hand it up for the next

15   witness, so we can take it back and hand it back up.

16                   THE COURT:  Why don't you hand it back.

17                   MR. LEE:  Your Honor, on the order of proof, I'm

18   not I'm not quite sure I understand what the procedure is,

19   but I know that, particularly what happened, bouncing back

20   and forth between infringement, invalidity for one patent,

21   infringement, invalidity for the same patent defendant by

22   defendant is not going to make a lot of sense, but we'll

23   work with them.

24                   THE COURT:  Yes.   If you work something out and

25   it fits within the time frames I'm given you, it will be
```

1    agreeable to me.

2            MR. LEE:  Okay.

3            THE COURT:  If you don't work it out, then I

4    will deal with it.

5            MR. LEE:  Thank you, Your Honor.

6            THE COURT:  Do you want to call your witness

7    back to the stand.

8            ... JERRY L. ATWOOD, having been previously duly

9    sworn, was examined and testified further as follows ...

10            THE COURT:  Good morning Dr. Atwood.  Welcome

11    back.

12            THE WITNESS:  Good morning, Your Honor.

13            THE COURT:  You are, of course, under oath

14    still.

15            THE WITNESS:  Yes.

16            THE COURT:  You may proceed.

17            MS. WIGMORE:  Your Honor, I believe there may

18    be a fact witness in the courtroom.  We have a sequestration

19    order.

20            THE COURT:  Yes.

21            (Unidentified speaker):  I think we have a

22    witness here from Sunshine Lake, and if Dr. Atwood is going

23    to testify about Sunshine Lake in your infringement case

24    against Sunshine Lake, I would like him to be able to stay.

25            MS. WIGMORE:  No.  There's an order that all

1    fact witnesses are sequestered.

2              THE COURT:  That is the order.

3              MR. KOCHANSKI:  Thank you.  I will ask the fact

4    witness to go.

5              THE COURT:  I think we're continuing with

6    Sunshine Lake.  Is that right?

7              MS. WIGMORE:  We have one question about

8    SigmaPharm and then we'll move to Sunshine Lake.

9                   DIRECT EXAMINATION (Continued)

10   BY MS. WIGMORE:

11   Q.    Good morning, Dr. Atwood.  I just want to follow up

12   with a question about your infringement testimony regarding

13   SigmaPharm yesterday.

14                 You recall toward the end of the day you

15   offered some testimony about the size of the crystal in

16   apixaban particles that would form as part of the

17   SigmaPharm's manufacturing process?

18   A.    Yes.

19   Q.    And do you recall that you offered testimony, at

20   first you mentioned the word micron, but then you made a

21   clarification?

22   A.    I seem to recall that I might have clarified microns

23   with microns other than a thousand nanometers being one

24   micron.

25   Q.    Okay.  So just so the record is clear, when the

Atwood - direct

1  particles, the crystalline apixaban particles form as part

2  of SigmaPharm's manufacturing process, what is the size

3  range of those crystalline apixaban particles?

4  A.    They're of the order of nanometers.

5  Q.    Thank you.  We'll now move onto the Sunshine Lake

6  infringement analysis, and let's put up the claim limitation

7  for claims 21 and 22.

8         And, again, we'll take them in order, starting

9  with the limitation wherein apixaban comprises crystalline

10 apixaban particles.

11        Now, you testified yesterday about the plain

12 meaning of that term to a person of skill in the art.

13        Do you recall that?

14 A.    I recall that.

15 Q.    Now, how did you assess whether Sunshine Lake's ANDA

16 product meets this limitation?

17 A.    I carried out X-ray powder diffraction studies on

18 Sunshine Lake 2.5-milligram tablet.

19 Q.    And we'll come to the details of that testing in a

20 moment, but generally, what is your opinion regarding

21 whether Sunshine Lake's ANDA product satisfies this claim

22 limitation wherein apixaban comprises crystalline apixaban

23 particles?

24 A.    My opinion is that Sunshine Lake does satisfy this

25 requirement.  Sunshine Lake's product satisfies this

1   requirement.

2   Q.      Did you review Sunshine Lake's ANDA documents in

3   connection with forming your opinions about infringement?

4   A.      I did.

5   Q.      Now, what type of apixaban does Sunshine Lake start

6   with in its manufacturing process?

7   A.      Sunshine Lake starts with crystalline form N1

8   apixaban.

9   Q.      Turning to PTX-846, is this a portion of Sunshine

10  Lake's ANDA?

11  A.      Yes, it is.

12  Q.      And on the right-hand side on the top of the page,

13  what is the title there?

14  A.      Pharmaceutical development.

15  Q.      And on the left-hand side, what tablets are referred

16  to?

17  A.      Apixaban tablets 2.5 milligrams and 5 milligrams.

18  Q.      Now, I direct your attention to the page ending in

19  Bates number 1956.

20          At the top of the page, could you please

21  read the first full paragraph?

22  A.      The detailed figures and tables for the exhibit

23  batches were presented below, which showed that the

24  polymorphic form of apixaban drug substance underwent phase

25  conversion randomly among the three forms, form N-1,

1    amorphous and dihydrate form, during the tablet stability

2    and no regularity can be observed (see the table below for

3    details).

4    Q.    And what does that tell you about whether there is

5    crystalline apixaban in Sunshine Lake's ANDA product?

6    A.    It tells me that there is crystal form N1.

7    Q.    Do you see the reference to the term "phase

8    conversion" in the paragraph you just read?

9    A.    Yes, I do.

10   Q.    What is phase conversion?

11   A.    Phase conversion would refer to converting from

12   amorphous to crystalline or one crystalline phase to another

13   crystalline phase.

14   Q.    Now, can you please read the next paragraph after the

15   ONE you just read from this exhibit?

16   A.    Also for the future commercial production, samples

17   used for the stability investigation will be produced using

18   the manufacturing process as that for the exhibit batches,

19   and also the stability conditions will be the same as that

20   for the exhibit batches.  Thus, it can be concluded that the

21   polymorph conversion can consistently occur during the

22   stability of apixaban tablets.

23   Q.    What is polymorph conversion?

24   A.    Polymorph conversion would be conversion of amorphous

25   to form 1, form 1 to amorphous, dehydrate to form 1.

1    Conversion of phases, one to another.

2    Q.      Now, do you see the table that appears immediately

3    below the paragraph you just read?

4    A.      Yes, I see that.

5    Q.      What is the title of that table?

6    A.      Polymorph conversion of apixaban during the tablet

7    stability.

8    Q.      And if you turn to the polymorphic conversion column,

9    what is recorded in the row for six month accelerated for

10   the 5 milligram tablet?

11   A.      Six month accelerated for the 5 milligram tablet,

12   amorphous form, N-1 (part conversion.)

13   Q.      And what does that mean?

14   A.      That means that amorphous form, form N-1 was

15   observed, but also crystalline -- excuse me.  The amorphous

16   form was observed but also crystalline form N-1, and there

17   had been conversion from amorphous to crystalline form N-1.

18   Q.      What does that tell you about whether there is

19   crystalline apixaban in Sunshine Lake's ANDA product?

20   A.      It tells me that there is.

21   Q.      And how did this impact your opinion about whether

22   crystalline apixaban limitation is satisfied?

23   A.      It confirms the opinion I have based on my own

24   testing.

25   Q.      Now, are there other studies in this same table for

1    which there is no conversion to crystalline apixaban?

2    A.      There are.

3    Q.      And does that change your opinion about whether this

4    crystalline apixaban present in Sunshine Lake's ANDA

5    product?

6    A.      No, it does not.

7    Q.      And why not?

8    A.      It does not for the following reason.

9            First of all, the part highlighted is six month

10   accelerated whereas if we go down to the exhibit batches

11   below, these are not accelerated studies.  So the

12   accelerated study was done to mimic a longer term stability

13   test than just six months.

14   Q.      Now, turning back to your testing of Sunshine Lake's

15   ANDA product, how did you obtain samples of those products?

16   A.      I received samples of Sunshine Lake 2.5 milligram

17   tablets by Federal Express.

18   Q.      And do you have an understanding of where those

19   samples originated?

20   A.      My understanding is these originated with Sunshine

21   Lake.

22   Q.      What was the dosage strength of the Sunshine Lake

23   apixaban tablets that you received and tested?

24   A.      It was 2.5 milligrams.

25   Q.      Did you take any steps to prepare those tablets for

Atwood - direct

1    testing?

2    A.      I did.

3    Q.      What steps did you take?

4    A.      I took the normal steps that I would with a tablet.

5    I removed the Opadry coating by using fine grade sandpaper

6    and lightly sanding off the Opadry coating.  I lightly

7    brushed the powder off the remaining interior of the tablet

8    to make it appropriate for x-ray diffraction testing.

9    Q.      Is that the same method you applied when you

10   described yesterday your preparation of the SigmaPharm ANDA

11   product samples?

12   A.      It was.  It's a standard method of preparation,

13   taking a tableted material and rendering it appropriate for

14   x-ray powder diffraction study.

15   Q.      Do you have any concerns about whether your sample

16   preparation method affected the integrity of the apixaban in

17   the Sunshine Lake samples?

18   A.      I have no concerns.  My method of handling did not

19   affect the form of apixaban in the 2.5 milligram Sunshine

20   Lake tablet.

21   Q.      After you prepared the sample, what did you do next?

22   A.      Once I prepared the sample, I loaded the sample into

23   the x-ray powder diffraction sample, carefully leveled it

24   with a glass slide, and carried out x-ray powder diffraction

25   studies.

1    Q.      Now, we'll come to the details of your testing in a

2    moment, but generally what did you conclude from the results

3    of your XRPD testing of Sunshine Lake's apixaban material?

4    A.      My conclusion was there was crystalline form N-1 of

5    apixaban present.

6    Q.      Let's turn back to JTX-2 which is the '945 patent.

7    And we'll go again to Table 2.

8            Did you use this table in assessing whether

9    Sunshine Lake's ANDA product comprised crystalline apixaban?

10   A.      I did.

11   Q.      And did you focus on looking for form N-1 as you

12   described yesterday with respect to SigmaPharm?

13   A.      Yes.  Form N-1 is the anhydrous form of apixaban.

14   Q.      Now, yesterday we looked at column 4, line 65 to

15   column 5, line 3.  And just to return to that, do you recall

16   reference to the calibration of a diffractometer?

17   A.      I do.

18   Q.      Did you follow that method?

19   A.      I did.  I calibrated the diffractometer carefully.

20   Q.      Did you conduct your testing at room temperature?

21   A.      Yes, I did.

22   Q.      And remind us what the 2-theta plus or minus 0.1

23   refers to in this passage?

24   A.      2-theta is the position of the peak in question.  And

25   it's, according to the USP, relevant at this point in time.

1    This should be within plus or minus .1.  So, for example, if

2    the peak in the patent said 10.0, that would mean 9.9 to

3    10.1 would be the applicable range.

4    Q.    Let's turn to PDX-5.36.  What is shown on this slide?

5    A.    Oh.  This slide shows again Table 2 from the '945

6    patent.  And I also highlighted the 12.3 and 27.1 peaks.

7    Q.    Why did you highlight those peaks?

8    A.    I highlighted those because I was able to locate

9    those in amongst the other peaks from excipients and so

10   forth in the 2.5 milligram SigmaPharm -- Sunshine Lake

11   tablet.

12            Excuse me, Your Honor.

13   Q.    Now, we'll come back to those shortly, but I would

14   first like to focus on the peaks that are not highlighted

15   here:  the peaks at 10.0, 10.6, 12.9, and 18.5.

16            What did you conclude with respect to those

17   peaks?

18   A.    I concluded they were present because crystal form

19   N-1 was present.  However, these peaks were masked or

20   obscured by excipients.

21            The Sunshine Lake material has 2.5 milligrams of

22   apixaban, and that means there is 97.5 milligrams of other

23   excipients, some of which are crystalline and have, of

24   course, being in much larger quantity, higher peaks.

25   Q.    Now, let's turn to PTX-843.

1            Is this another portion of Sunshine Lake's ANDA?

2    A.    Yes, it is.

3    Q.    If we could turn, please, to the page ending in Bates

4    No. 398.

5            Do you see the table on that page?

6    A.    I do.

7    Q.    What is the title of that table?

8    A.    Composition of Apixaban Tablets, 2.5 milligram and

9    5 milligram.

10    Q.    And in the first row of that table, what is the

11    percentage of apixaban in Sunshine Lake's tablet?

12    A.    As I just said, it's 2.5 percent in the apixaban in

13    the Sunshine Lake 2.5 milligram tablet.

14    Q.    How does the percentage of apixaban in the tablet

15    impact the size of the crystalline apixaban peaks relative

16    to excipient peaks?

17    A.    The apixaban peaks will be relatively small.  For

18    example, anhydrous lactose is 48 percent of the tablet, and

19    anhydrous lactose has many peaks.

20    Q.    Now, let's turn to PTX-960.  And if you would like a

21    hard copy of this, Doctor, it's in Tab 10 of the binder in

22    front of you.

23            The title of this exhibit is Exhibit C, and

24    that's Tab 10.

25    A.    Yes, Exhibit C.  PTX-960.

Atwood - direct

1    Q.      What is this Exhibit, PTX-960?

2    A.      PTX-960 is a complete compilation of all the XRPD

3    studies that are ran on Sunshine Lake material.

4    Q.      Now, turning to page 2 of PTX-960.  What is this?

5    A.      This is the crushed tablet.  It's a scan from 3

6    degrees to 28 degrees.  And it's a continuous, it's a rather

7    quick scan mode.  The count time for step is six seconds.

8    Q.      Is that the only count time you used in your testing

9    of Sunshine Lake's tablet?

10   A.      No, not at all.  I used it for the crushed tablet as

11   an entirety to see what kinds of peaks one would observe.

12           And, of course, there are some peaks that are

13   quite sharp and quite large.  These are excipient peaks.

14   Q.      So keeping your attention on page 2 of PTX-960, what

15   did you see in this quick scan between 10 and 11 degrees?

16   A.      Between 10 and 11 degrees, there is a very large and

17   relatively broad at the base peak due to excipients.

18   Q.      What did you observe between 18 and 19 degrees?

19   A.      Between 18 and 19, particularly from about 18

20   and-a-half on to 19, there is a very large and again broad

21   at the base excipient peak.

22   Q.      Now, we saw in Table 2 of the '945 patent, there are

23   peaks listed as 10.0, 10.6, and 18.5.  How did these

24   excipient peaks that you observed impact your assessment of

25   those particular apixaban peaks?

1    A.      The peaks that I observed from excipients, as we

2    see in this slide, Your Honor, will completely obscure the

3    smaller apixaban peaks in the 10 to 10.6 range and again

4    18.5 to 19 degree range.

5    Q.      Now, you mentioned you ran some slower scans on

6    Sunshine Lake material.  Let's turn to page 8 of PTX-960.

7            What is this diffractogram?

8    A.      This is again the crushed tablet, but here I'm doing

9    a slow scan of count time of 100 seconds per step in the

10   range of 12 to 13.1 degrees.

11   Q.      And in this slower scan, what did you observe around

12   12.9 degrees?

13   A.      Around 12.9?

14   Q.      Yes.

15   A.      Oh, around 12.9, one is running up on a very large

16   excipient peak.

17   Q.      And how did you know that was an excipient peak?

18   A.      For two reasons.  Knowing what the excipients are

19   will allow one to know that, but the main reason just

20   visually here is this peak is very large.  Apixaban being

21   present only in 2.5 percent in the formulation, one is not

22   going to see large peaks from the apixaban.

23   Q.      And when you say "large peaks," you are referring to

24   what begins at 12.9 and then continues on in the 13 range?

25   A.      Exactly.  This is the run up to a much larger peak;

Atwood - direct

1    and, of course, I have only scanned this to 13.1.  So had I

2    gone a little bit higher, that excipient peak would have

3    gone yet higher.

4    Q.    Now, let's turn to Table 2 of the '945 patent.  We

5    now talked about the peaks that were obscured by excipients,

6    and I want to focus on the other peaks that you have

7    highlighted in this table.  Remind us what peaks you did

8    identify in your testing.

9    A.    The peaks at 12.3 and 27.1 degrees 2-theta.

10   Q.    So returning back to PTX-960, your analysis of

11   Sunshine Lake's tablet, let's turn to page 21.

12         For this particular portion of the exhibit, what

13   was the range where you collected data?

14   A.    Oh, thank you.  It's much clearer now.

15         The range here is 12.1 to 12.6 degrees.

16   Q.    And you plotted data below the heading you just

17   referred to.  Why did you plot the data in this particular

18   way?

19   A.    I plotted the data in this particular way because I'm

20   using a step size of .01 degrees, so I'm scanning

21   .5 degrees.  That would mean I'm doing 50 specific steps and

22   counting each of those steps for 1,000 seconds.

23   Q.    And why did you use the count time of 1,000 seconds?

24   A.    To see if there is in fact a peak in this range.

25   Q.    And you testified about count time yesterday.  Just

Atwood - direct

1    remind us briefly, what is the relationship between count

2    time and sensitivity of an XRPD test?

3    A.      A longer count time will produce more counts and the

4    standard deviation of the count number goes to the square

5    root of the count number.  So as one amasses more counts,

6    the standard deviation effectively is smaller.  The

7    significance of the peak can be more easily discerned using

8    a slow scan speed or a long count time.

9    Q.      Does using the slower count time make the test more

10   or less sensitive?

11   A.      It makes the test more sensitive.

12   Q.      Now, you have testified that Sunshine Lake's ANDA

13   product contains 2.5 percent of apixaban.  How, if at all,

14   does that affect the count time that is necessary to detect

15   crystalline apixaban -- crystalline apixaban particles in

16   Sunshine Lake's tablet?

17   A.      The count time should be relatively long to detect a

18   minor crystalline component such as apixaban in the

19   2.5 milligram Sunshine Lake tablets.

20   Q.      Now, turning to PDX-5.37.  Is this the same scan that

21   we were looking at a moment ago but with your own marking in

22   red?

23   A.      Yes.  What I have done here is I have just drawn a

24   straight edge down and discovered that the tip of the peak

25   is at 12.4 degrees.

Atwood - direct

1   Q.     On what basis did you conclude there is a peak at

2   12.4?

3   A.     On the basis of the fact that there is a large and

4   significant peak well above baseline in this range.  And

5   also that this peak is not just a spike in noise, Your

6   Honor.  It's a broad peak.  One sees in this range of some

7   tenths of a degree that the peak is growing and then the

8   peak is diminishing, as a real peak would do.

9   Q.     Turn to PDX-5.38.  What have you shown here?

10  A.     Here, I have simply put a box around the peak which

11  comes to a maximum of 12.4 degrees.  And I have shown what

12  the noise would look like off to the right-hand side.

13  Q.     And you testified about this yesterday but remind us

14  how a person of skill in the art would distinguish between

15  noise and a peak?

16  A.     There are two ways.  The noise will be a random

17  fluctuation due to cosmic rays, scatter off of other parts

18  of the instrument, and the noise will be a short burst, so

19  it might be up for one count time, down for the next count

20  time.  And the peaks will not be high.  They will be

21  relatively small.

22  Q.     Now, you identified this peak at 12.4.  If we could

23  return to Table 2 of the '945 patent.

24         What peak does that correspond with?

25  A.     That is the 12.3 degree peak, plus or minus .1 as the

1    USP defines the variance limit.

2    Q.    Now, let's focus on the 27.1 degree peak.   Turning

3    back to PTX-960.   Let's go to page 23.

4          In this particular diffractogram, what is the

5    range where you collected data?

6    A.    The range here was 26.9 degrees to 27.3 degrees.

7    Q.    And if we turn to PDX-5.39.

8          Is this that same diffractogram with your own

9    marking in red?

10   A.    It is.   I simply indicated the position of the peak

11   which is clearly resolved on the shoulder of an excipient

12   peak at somewhat higher angle.

13   Q.    And how did you identify that as a peak?

14   A.    I identified that as a peak again by the fact that it

15   has height but it also has breadth as here in here, Your

16   Honor, I am doing the steps of 0.01 degrees.   So in .05 on

17   the scale at the bottom, that would be five separate counts

18   that were done, that were taken of 1,000 seconds each.

19   Q.    That count time was 1,000 seconds?

20   A.    Yes.

21   Q.    Now, let's go back to Table 2 once more.   You told us

22   about the peaks you identified from Table 2.   Did you also

23   analyze the sample of Sunshine Lake's starting API that it

24   uses at the beginning of its manufacturing process?

25   A.    I did.

Atwood - direct

1    Q.      And why did you analyze the starting API?

2    A.      The starting API is crystal form N-1 according to

3    Sunshine Lake, and according to my evaluation of the pattern

4    that I get from Sunshine Lake's starting API.  And that will

5    show that in fact there is more than these six peaks.  These

6    six peak are shown in the '945 patent as representative and

7    an identifiable fingerprint of crystal form N-1, but there

8    will be other peaks present in the entire pattern of crystal

9    form N-1.

10   Q.      Let's return to PTX-960 at page 26.

11           If you look at the top of this diffractogram,

12   what you testing here?

13   A.      This is an x-ray powder diffraction pattern for

14   Sunshine Lake's API.

15   Q.      And this is the starting API in their manufacturing

16   process?

17   A.      That is how it was represented to me.

18   Q.      If you turn to PDX-5.40.

19           Is that the same diffractogram we just looked at

20   with your own marking in red?

21   A.      It is.  I have indicated that the -- excuse me.  I

22   have indicated that the largest, the most intense peak in

23   the pattern of Sunshine Lake's API is at 16.9 degrees.

24   Q.      Now, is that 16.9 degree peak listed in Table 2 of

25   the '945 patent?

1    A.      It is not.

2    Q.      Does that mean it cannot be used as a characteristic

3    peak of crystalline apixaban?

4    A.      No, not at all.  Crystalline apixaban as we see on

5    this slide here has many peaks of the 16.9 being a prominent

6    peak.

7    Q.      Did you analyze Sunshine Lake's ANDA product to

8    determine whether this 16.9 degree peak was present?

9    A.      Yes, I did.

10   Q.      And if we can turn in PTX-960 to page 13.

11           Is this another scan of Sunshine Lake's ANDA

12   product?

13   A.      Yes.  This is crushed tablet, from 16.7 to

14   17.2 degrees.  So I'm looking specifically to see if there

15   is a feature at 16.9 degrees here.

16           It's a step size of 0.1 degrees and 1,000

17   seconds per counting per step, so it is a quite slow scan in

18   this region.

19           Focus to see if there is a peak associated to

20   the 16.9.

21   Q.      Turning to PDX-5.41.

22           Is that the same scan with your own marking in

23   red?

24   A.      Yes, it is.  It shows that there is in fact a peak at

25   16.9.  And, of course, this is on the side of a larger

Atwood - direct

1    excipient peak at a lower 2-theta value.

2    Q.      The larger excipient peak is up here (indicating)?

3    A.      Yes, that is an excipient peak which had I gone to

4    lower angle, one would see that excipient peak more clearly.

5    But what we see is the API, crystalline API, crystal form

6    N-1, the peak is clearly visible on the side of the larger

7    excipient peak.

8    Q.      Now, let's turn to PDX-5.42.

9            Is this the summary of all the peaks that you

10   identified and looked for in Sunshine Lake's XRPD in

11   Sunshine Lake's material?

12   A.      It is.

13   Q.      And how many peaks did you find in total?

14   A.      I found three.  I found two of the six called out

15   specifically in the '945 patent, and then the 16.9 degree

16   peak which was clearly a prominent peak in the API of

17   Sunshine Lake's crystalline material.

18   Q.      What did you conclude about the other peaks listed in

19   the '945 patent?

20   A.      As I stated, on the slide, those peaks are present

21   but they're blocked by larger peaks of excipients.

22   Q.      Now, are the three peaks identified in Sunshine

23   Lake's ANDA product sufficient to reach a conclusion on

24   whether the ANDA products contain crystalline apixaban

25   material?

Atwood - direct

1    A.      They are.

2    Q.      And based on your analysis, what did you conclude

3    about that?

4    A.      Sunshine Lake's ANDA product contains crystalline

5    apixaban, crystal form N-1.

6    Q.      Now, Dr. Atwood, you explained that you tested

7    Sunshine Lake's 2.5 milligram ANDA product.  Have you

8    reached a conclusion as to whether crystalline apixaban

9    particles are present in Sunshine Lake's 5 milligram

10   product?

11   A.      Yes, I have.

12   Q.      What did you conclude?

13   A.      My conclusion is that they are also, crystalline

14   apixaban is also present in the 5 milligram Sunshine Lake

15   tablet, because the 5 milligram tablet is composed of

16   exactly the same materials in exactly the same measure as

17   the 2.5 milligram tablet, manufactured under the same

18   process.

19   Q.      Are there any material differences in the

20   manufacturing between the 2.5 and 5 milligram tablets that

21   would impact the presence of crystalline apixaban?

22   A.      No, there are not.

23   Q.      Dr. Atwood, are you aware Dr. Harry Brittain has been

24   retained by Sunshine Lake to respond to your opinion?

25   A.      Yes, I understand that.

Atwood - direct

1   Q.      And have you reviewed his expert report responding to

2   your opinion?

3   A.      I have.

4   Q.      I'd like to focus your attention on the peak you

5   identified at 12.4 degrees in Sunshine Lake's ANDA product.

6   Did Dr. Brittain suggest that peak was due to an excipient?

7   A.      He did.

8   Q.      Turning to PTX-843, at page 398.  What excipient did

9   Dr. Brittain say caused the peak you found at 12.4 degrees?

10  A.      Dr. Brittain's opinion was that it was anhydrous

11  lactose.

12  Q.      What is anhydrous lactose?

13  A.      Anhydrous lactose is a crystalline excipient present

14  at 48 percent of the apixaban tablet.

15  Q.      Turning to PDX-5.43.

16          Please describe why you disagree with

17  Dr. Brittain's opinion that the 12.4 degree peak is

18  attributable to lactose anhydrous?

19  A.      First, Dr. Brittain examined a sample of lactose

20  anhydrous.  It was a sample he had on his shelf, and I would

21  note as an initial matter, the vendor for the material which

22  Dr. Brittain had was not same vendor that Sunshine Lake uses

23  for their anhydrous lactose.

24          Second, and most telling, Dr. Brittain's lactose

25  anhydrous is not in fact anhydrous, it is in fact hydrate.

Atwood - direct

1  Q.    How do you know that?

2  A.    I obtained a sample of Dr. Brittain's material from

3  Dr. Brittain, his lactose anhydrous, and I performed a test

4  called thermogravimetric analysis, or TGA.  This is a test

5  one would use to find if the material were anhydrous or if

6  the material were hydrated to some extent.

7  Q.    Now, turning to PTX-962.

8          What is this exhibit?  And we can turn to the

9  next page.

10  A.    This exhibit has a sample labeled:  Lactose,

11  Brittain.

12          This was an example of the anhydrous lactose

13  which Dr. Brittain had provided to counsel, and which

14  counsel had provided to me.

15  Q.    And did this show testing you performed on

16  Dr. Brittain's lactose anhydrous sample?

17  A.    Yes, this is the result of the thermogravimetric

18  analysis.

19  Q.    What is a thermogravimetric analysis, or TGA?

20  A.    So TGA is done in the following fashion.  One way is

21  to insert a certain amount of material into a small vessel

22  and then one measures the weight change as that vessel is

23  heated under a constant increase in temperature.

24          If the material, for example, were in fact

25  anhydrous, then there would be a flat line graph until one

 1    got the decomposition point of the lactose which is just

 2    under 200 degrees.

 3    Q.      What did your analysis show?

 4    A.      My analysis in fact showed that there is a weight

 5    loss of 1.6 percent beginning below 100 degrees and ending

 6    by about 130 degrees.

 7    Q.      What did you conclude from that?

 8    A.      This weight loss is due to the presence of water in

 9    the so-called anhydrous lactose.  In other words,

10    Dr. Brittain's anhydrous lactose was substantially hydrated.

11    Q.      And does that turn it into some other form of

12    lactose?

13    A.      Yes, it's lactose monohydrate or a crystal form of

14    lactose monohydrate, which means that Dr. Brittain's

15    anhydrous lactose was not in fact anhydrous lactose.  It had

16    substantial amount of hydrated lactose.

17    Q.      Is this lactose monohydrate an ingredient in Sunshine

18    Lake's ANDA products?

19    A.      No.

20    Q.      So can the peak at 12.4 degrees be attributable to

21    lactose anhydrous?

22    A.      No, the peak at 12.4 degrees is attributable to

23    lactose monohydrate.

24    Q.      The peak in the analysis that you did is not

25    attributable -- is that attributable?

Atwood - direct

 1   A.      Sorry.  The peak in the analysis that I did.  Some of

 2   the other peaks are due to hydrated lactose.

 3   Q.      The peak at 12.4 in your testing, is that

 4   attributable to any form of lactose in Sunshine Lake's ANDA

 5   product?

 6   A.      It is not.  Sunshine Lake's ANDA product uses lactose

 7   anhydrous.

 8   Q.      And if we could return to PDX-5.43.

 9           What is the third reason you disagree with

10   Dr. Brittain?

11   A.      The third reason is just a practical matter with

12   regard to the x-ray powder diffraction pattern, the peak is

13   too small to be from lactose anhydrous.  The peak at

14   12.4 degrees.

15           Lactose anhydrous has large peaks associated

16   with it, and it's present at 48 percent of the entire

17   formulation.

18           So were that peak to be due to lactose

19   anhydrous, it would be much, much larger than the peak I

20   assessed.

21   Q.      Now, are you aware that Dr. Brittain's has suggested

22   that the material in Sunshine Lake's ANDA product that you

23   tested, that it actually converted between the time of your

24   first test and the time of the later test to create lactose

25   anhydrous?

Atwood - direct

1  A.      I'm aware of that opinion.

2  Q.      Do you agree?

3  A.      No, not at all.

4  Q.      If we could turn briefly to PDX-960 again at page 8.

5          Is this where you identified the peak at

6  12.4 degrees in the Sunshine Lake ANDA product?

7  A.      Yes.  Yes.  This is crushed tablet, and the peak is

8  clearly visible at, right at 12.4 degrees.

9  Q.      What is the date of the particular test?

10  A.      This is November 7, 2018.

11  Q.      Now, based -- did the results of Dr. Brittain's

12  opinion on lactose anhydrous in any way change your opinion

13  about the presence of this peak at 12.4?

14  A.      No.

15  Q.      Now, do you understand Dr. Brittain has also

16  performed his own testing on Sunshine Lake's tablets?

17  A.      Yes, I have that understanding.

18  Q.      And if we could turn to PDX-5.44.  Does

19  Dr. Brittain's testing in any way change your opinions about

20  the presence of crystalline apixaban in the Sunshine Lake

21  ANDA product?

22  A.      It does not.

23  Q.      If you could walk us through the reasons shown on

24  this slide?  Please do so.

25  A.      I listed four reasons.

1          First of all, Dr. Brittain's carries out a

2     fast scan.  And a fast scan is not capable of observing

3     important but small features in an XRPD pattern.

4     Q.     Does the speed of the scan affect the accuracy or

5     sensitivity of the results?

6     A.     Oh, yes.  A fast scan is just like glancing quickly

7     around the room.  One sees some things but not detail.

8     Q.     How did the amount of apixaban in Sunshine Lake's

9     ANDA product influence the scan speed that is necessary to

10    detect it?

11    A.     It's a small percentage, as I showed here,

12    2.5 percent.  This means one does not expect, nor will one

13    find large peaks associated with crystalline apixaban

14    because it is only present at 2.5 percent of the entire

15    sample, the entire formulation sample.

16    Q.     What is scan averaging?

17    A.     Scan averaging is a method that has been done some

18    years ago, particularly for forms of spectroscopy like NMR

19    spectroscopy.  Scan averaging would be if you scan the room

20    quickly once, quickly two times, quickly three times,

21    quickly four files, an average what one saw.

22    Q.     Did Dr. Brittain employ scan averaging in his testing

23    of the Sunshine Lake material?

24    A.     He did.

25    Q.     Did that compensate for the quick speed of his scan?

1    A.      No, because running four or five or more fast scans

2    and then averaging the result will not compensate for the

3    fact that one need to run a slow scan, amass a significant

4    number of counts so that the standard deviation of the peak

5    is in the acceptable range.

6    Q.      On the whole what did you conclude about the

7    sensitivity of Dr. Brittain's testing?

8    A.      His testing was totally insufficient in terms of

9    sensitivity to detect crystalline apixaban given the

10   parameters of the composition of the tablet, small

11   percentage of apixaban, large percentage of rather

12   crystalline excipients.

13   Q.      Now, turning back, to our claim limitation chart,

14   PDX-5.45.

15           Based on everything you discussed, what did you

16   conclude about whether Sunshine Lake's ANDA products have

17   apixaban comprising crystalline apixaban particles?

18   A.      Sunshine Lake's ANDA product has crystalline apixaban

19   particles within the composition.

20   Q.      So having placed a checkmark next to that limitation,

21   we'll move on to the last disputed limitation which we

22   referred to in shorthand yesterday as the particle size

23   limitation.  Do you have that in mind?

24   A.      I have that in front of me.

25   Q.      Do you recall testifying previously about classical

Atwood - direct

1    models of nucleation and crystal growth?

2    A.    Yes.

3    Q.    Do those classical models bear on your opinion with

4    respect to the particle size of crystalline apixaban

5    particles in Sunshine Lake's ANDA product?

6    A.    They do.

7    Q.    Now, generally speaking, remind us what is the size

8    of the crystals of apixaban when they initially begin to

9    form?

10   A.    When the crystals initially begin to form, they will

11   be of the order of a few nanometers, one or two nanometers.

12   In other words, just small crystalline organizations.

13   Q.    How does that compare to the claim limitation of

14   89 microns or -- at or below 89 microns?

15   A.    89 microns is 89,000 nanometers.

16   Q.    Now, let's turn to Sunshine Lake's manufacturing

17   process.  How did you become familiar with their process for

18   making their ANDA products?

19   A.    I read documentation.

20   Q.    Let's turn to PTX-910.

21         Is this a portion of Sunshine Lake's ANDA?

22   A.    It is.

23   Q.    And what is the title in the top right-hand corner?

24   A.    This is:  Manufacture.

25   Q.    And did you rely on this document in forming your

Atwood - direct

1    opinion?

2    A.      Yes, I did.

3    Q.      Turning to PDX-5.49.

4            What type of apixaban does Sunshine Lake use at

5    the beginning of this process?

6    A.      Sunshine Lake uses crystalline apixaban form N-1.

7    Q.      What is the next step in their process?

8    A.      The crystalline apixaban is dissolved and mixed with

9    a polymer povidone.

10   Q.      And what is the next step after that?

11   A.      The solution of polymer and apixaban is sprayed on to

12   a fluidized bed of the intragranular excipients.  And here I

13   noted that these include anhydrous lactose, microcrystalline

14   cellulose.

15   Q.      What is a fluidized bed?

16   A.      A fluidized bed just means the materials, anhydrous

17   lactose, microcrystalline cellulose, are in a mobile

18   situation.

19   Q.      What -- after the step of spraying the solution on to

20   the fluidized bed, what is the next step?

21   A.      The next step is rapid drying.

22   Q.      And after that step, what is the remainder of the

23   process?

24   A.      One then has the final product ready to be milled,

25   blended, tableted, and coated.

Atwood - direct

1    Q.        Now, based on your testing, do crystaline apixaban

2    particles form in Sunshine Lake's ANDA products?

3    A.        My testing shows unequivocally, crystalline particles

4    in Sunshine Lake's ANDA product.

5    Q.        And does Sunshine Lake's ANDA support that opinion?

6    A.        It does in the section we went to earlier in my

7    testimony this morning.

8    Q.        Are there any aspects of the manufacturing process

9    that you just described that limit the size of the

10   crystalline apixaban particles in Sunshine Lake's ANDA

11   product?

12   A.        Yes, there are.

13   Q.        What is the impact of the rapid drying on the size

14   of the crystalline apixaban particles?

15   A.        So we're at the fourth step, when it is time for

16   rapid drying, and we have the dissolved apixaban mixed with

17   a polymer, and it has been sprayed on to the fluidized bed.

18   So the material now has about 2.5 percent apixaban, and

19   rapid drying is going to mean the apixaban does not have the

20   opportunity --

21           I'm giving you the idea that apixaban might want

22   to come together with other apixaban.  It will not have the

23   opportunity to come together and form large pockets of

24   apixaban just because it's well separated as it goes into

25   step 3 and comes out of step 3, and then rapid drying

1    will capture apixaban in small pockets rather uniformly

2    distributed among the excipients.

3    Q.    What is the impact of the relatively small percentage

4    of apixaban in Sunshine Lake's process on the size of the

5    crystalline apixaban particles that were formed?

6    A.    The small amount of apixaban that is present means

7    that in these small pockets of apixaban, as I was saying,

8    rather uniformly distributed among the excipients, there is

9    just not much apixaban.  So if this were to crystallize

10   completely in these small pockets, this places a distinct

11   limitation on the size to which crystals could grow.

12   Q.    And what is --

13   A.    There is just not enough material in these individual

14   pockets to support the growth of crystals of 89,000

15   nanometers, for example.

16   Q.    What is the impact of the amount of excipients in the

17   process on the size of the crystalline apixaban particles

18   that were formed?

19   A.    The excipients function in terms of separating the

20   apixaban.  They function as a method separate and keep

21   apart the apixaban in a uniform distribution within the

22   formulation.

23   Q.    Now, Sunshine Lake contends that that manufacturing

24   process avoids crystalline apixaban.  Do you agree with

25   that?

Atwood - direct

1    A.      No, I don't agree with that.

2    Q.      What, if any, affect does the manufacturing process

3    have on the particle size of this crystalline apixaban?

4    A.      The manufacturing process means that there will not

5    be large crystalline apixaban entities, large crystallites

6    of apixaban.

7    Q.      Did you attempt to calculate the $D_{90}$ for the

8    crystalline particles in Sunshine Lake's ANDA product?

9    A.      I did not attempt to do a calculation as chemists might

10   do if a chemist had a lot of serial number numbers and so

11   forth, but given the amount of apixaban present and the way

12   in which the formulation is carried out, together with the

13   rapid drying, there will be small pockets of apixaban and

14   these small pockets of apixaban will limit the size of

15   crystals that can grow, probably to the order of a few

16   nanometers, 10 nanometers perhaps.

17   Q.      Now, how does that compare to the claim limitation we

18   have been discussing?

19   A.      The claim limitation is 89,000 nanometers.

20   Q.      So turning to PDX-5.50, or claim limitation chart.

21   What is your opinion with respect to whether this last

22   disputed claim limitation, wherein the crystalline apixaban

23   particles have a $D_{90}$ equal to or less than about 89 microns

24   is met with respect to Sunshine Lake's ANDA products?

25   A.      This claim limitation is clearly met with Sunshine

Atwood - direct

1   Lake's ANDA product.

2   Q.      What is your opinion as to whether claims 21 and 22

3   of the '945 patent are infringed with respect to Sunshine

4   Lake's ANDA product?

5   A.      My opinion is that I have just shown that claim 21 is

6   infringed and claim 22 must be infringed because the process

7   for the 5 milligram apixaban is the same as the process with

8   the 2.5 milligram process.

9           MS. WIGMORE:  Your Honor, I have some exhibits

10  to offer at this point in time.

11          THE COURT:  Okay.

12          MS. WIGMORE:  PTX-788, PTX-409, JTX-2 which is

13  the '945 patent, PTX-1009, PTX-1029, PTX-1074, PTX-1077

14  which is offered under seal, PTX-1098, PTX-1107, PTX-846,

15  PTX-910, PTX-960, PTX-962, PTX-1034, and PTX-843.

16          THE COURT:  Any objections?

17          MR. HENEGHAN:  No objection from SigmaPharm

18  other than just to note that the sealing of 1077 is a

19  stipulation.

20          THE COURT:  Right.

21          MR. HENEGHAN:  We agree.

22          MR. KOCHANSKI:  No objection from Sunshine Lake,

23  Your Honor.

24          THE COURT:  You are done with the witness?

25          MS. WIGMORE:  Yes, Your Honor.

```
 1              THE COURT:  We'll take just a five minute

 2    recess, and we'll do cross-examination.

 3                   (Brief recess taken.)

 4              *      *      *

 5                   (Proceedings reconvened after recess.)

 6              THE COURT:  We're ready for cross-examination.

 7              MR. HENEGHAN:  Thank you, Your Honor.  Tom

 8    Heneghan began on behalf of SigmaPharm.

 9                        CROSS-EXAMINATION

10    BY MR. HENEGHAN:

11    Q.     Good afternoon, Dr. Atwood.  We have not met before.

12    My name is Tom Heneghan and I represent SigmaPharm.

13    A.     Thank you.  Nice to meet you.

14    Q.     Nice to meet you.

15             In this matter, you drafted two reports;

16    correct?

17    A.     Correct.

18    Q.     One dated February 15th, 2019 and then a second

19    report with additional analysis dated May 22nd, 2019.  Does

20    that sound right?

21    A.     That sounds correct.

22    Q.     Okay.  Then after both of your reports were

23    submitted, your deposition was taken in this case on June

24    4th of this year.  Does that sound right?

25    A.     Yes, I recall that.
```

Atwood - cross

1    Q.      Okay.   And I wanted to clarify this micron versus

2    nanometer thing because I think I'm still a little bit

3    unsure what you meant.   If we could put up page 384 of the

4    trial testimony from yesterday, which I think maybe is the

5    part, and if we highlight lines 10 through 22.   Take a

6    second to look at that and I will ask you a question about

7    it.

8    A.      (Pause.)

9            Yes, I have refreshed myself on this testimony.

10   Q.      So at this point, you were talking about your theory

11   about how crystals start to form in the SigmaPharm product;

12   correct?

13   A.      Correct.

14   Q.      And I think what you are saying here is when that

15   starts, it's 10 nanometers?

16   A.      Exactly correct.

17   Q.      I just wanted to make sure.

18   A.      I realize --

19   Q.      I wanted to get it squared away.

20   A.      I realize that I had made a 10 to the 3rd error by

21   saying microns instead of nanometers, but thanks for

22   pointing that out.

23   Q.      So when those crystals start to form under your

24   theory, we're talking about a couple nanometers in size?

25   A.      Correct.

Atwood - cross

1   Q.      Okay.  Do you remember yesterday near the end of the

2   day when you were asked about Dr. Munson's work in this

3   case?

4   A.      Yes.

5   Q.      And the testing of the SigmaPharm product done by

6   Dr. Munson is different from what you did; correct?

7   A.      Correct.  I used x-ray powder diffraction and he used

8   solid state NMR.

9   Q.      And yesterday you testified about talking to

10  Dr. Munson on the phone and there seemed to be a little

11  confusion about whether you reviewed his actual work at that

12  time or just spoke with him on the phone.  Do you remember

13  that?

14  A.      I recall that.

15  Q.      But if we look at your opening report, there is no

16  discussion of the conclusions of Dr. Munson's work; correct?

17  A.      I don't recall as I sit here but I'll accept your

18  representation.

19          MR. HENEGHAN:  And, Your Honor, I realize I

20  failed to hand out the notebooks.  Let me grab those.

21          THE COURT:  Okay.  Sure.

22          MR. HENEGHAN:  May I approach?

23          THE COURT:  You may.

24          MR. HENEGHAN:  Thank you.

25          (Binders passed forward.)

1          MR. HENEGHAN:  I might refer to the big binder

2    but here is some additional stuff.

3          THE WITNESS:  Okay, thank you.

4    BY MR. HENEGHAN:

5    Q.    If you take a look at tab 6 in that smaller binder, it

6    is a transcript of your deposition.

7    A.    Yes, I have tab 6.

8    Q.    Okay.  If you could turn to page 22 of that

9    deposition.  And this is a condensed version of the

10   deposition, so there are four pages reproduced on each page,

11   so I'm talking about the actual page of the deposition, not

12   page of the transcript.

13   A.    Yes, I have page 22.

14   Q.    Okay.  And if you look at line 21 on page 22 through

15   line 4 on page 23, I'll ask you if that refreshes your

16   recollection whether or not you had any discussion of

17   Dr. Munson's work in your opening report.

18   A.    This refreshes my recollection.

19   Q.    So am I correct there is no discussion of the

20   conclusions of Dr. Munson as work in your original report?

21   A.    Yes, that is what the testimony shows here.

22   Q.    And your comments in the opening report are based

23   solely on your conversation with Dr. Munson and nothing

24   else; correct?

25   A.    Yes, I agree with that.  I don't have a -- clearly a

1    firm memory of that time in February.

2    Q.    Well, if you could --

3    A.    But I remember speaking to Dr. Munson first.

4    Q.    Okay.  You just accepted his opinion without any

5    review of the results of his work -- correct? -- at that

6    time?

7    A.    At that time, I think that is probably accurate.

8    Q.    And you, yourself had not done any solid state NMR

9    analysis on any of the materials with regard to this

10   litigation; correct?

11   A.    Correct.

12   Q.    Let's go back to some of the background that you

13   gave and some of the credentials you talked about.  You have

14   testified in a lot of cases; is that fair to say?

15   A.    Yes, over the past 30 years.

16   Q.    And based on the disclosure in your opening report,

17   just in the last four years alone, you identified 18 cases

18   where you testified either at deposition or at trial in your

19   opening report; correct?

20   A.    That sounds about right.

21   Q.    However, your testimony has not always been accepted

22   by the courts in which you have appeared.  Do you agree with

23   that?

24            MS. WIGMORE:  Objection, Your Honor.

25            THE COURT:  Upon what basis?

Atwood - cross

1                   MS. WIGMORE:  Relevance.

2                   MR. HENEGHAN:  Your Honor, they have held out

3      all of his testimony and expertise, and there are times

4      when courts have not accepted his work.  It's related to

5      credibility.

6                   THE COURT:  Why would that not be relevant?

7                   MS. WIGMORE:  As long as he doesn't get into

8      the substance of the testimony, but we shouldn't be talking

9      about the testimony and opinions of another case.

10                  MR. HENEGHAN:  I'm not going to talk about the

11     substance of his opinions, but I'm going to talk about the

12     substance of the court's findings about his opinions.

13                  THE COURT:  I will allow it.  It's all broadly

14     relevant to what weight I should give to him as a

15     fact-finder.

16     BY MR. HENEGHAN:

17     Q.      I will go back to my question, Dr. Atwood.  Your

18     testimony has not always been accepted by the courts before

19     which you have appeared.

20              Is that fair to say?

21     A.      I don't have a clear recollection, but I'm willing to

22     accept that representation.

23     Q.      And just for specifics, in the Abbott versus Sandoz

24     case in the Northern District of Illinois, the Court found

25     that you had offered unsupported conclusions without

1    establishing any substantive or empirical evidence to

2    support your conclusions.

3              Do you recall that?

4    A.    I recall testifying in that case, but I don't recall

5    the specific portion that you are taking me to.

6              MR. HENEGHAN:  And, judge, just for the record,

7    I will put in the citation.  That case, that conclusion from

8    the Court appears at 486 Fed. Supp.  2d 767 on page 776, and

9    that's the Northern District of Illinois in 2007.

10   BY MR. HENEGHAN:

11   Q.    Also in Lupin versus Abbott in the Eastern District

12   of Virginia, the Court referred to your opinion as

13   conclusory and abstract.

14             Do you recall that?

15   A.    I don't recall that specifically, but I do recall

16   testimony in that case.

17   Q.    All right.  And just for the purposes of the record,

18   this citation to that finding is 491 F. Supp.2d. 563 at

19   page 569, and that's the Eastern District of Virginia in

20   2007?

21             Dr. Atwood, also in Saffran versus Johnson

22   & Johnson in the Eastern District of Texas, the Court

23   expressed doubt about your credibility?

24             Do you recall that?

25   A.    I don't recall that specifically, but I do recall

1    that case.

2              MR. HENEGHAN:  And just for the record, that

3    citation is 2:07-CV-451-TJW in the Eastern District of

4    Texas, March 31st, 2011.

5    BY MR. HENEGHAN:

6    Q.    So at least three Federal Courts have openly

7    questioned your credibility as an expert witness; is that

8    right?

9              MS. WIGMORE:  Objection, your Honor, to the

10   characterization.

11             THE COURT:  That does seem a bit much.  It's a

12   little argumentative.  It's sustained.

13             MR. HENEGHAN:  All right.  I will move on.

14   Thank you.

15   BY MR. HENEGHAN:

16   Q.    Let's talk a little bit about the handling of the

17   samples from SigmaPharm in this case.  Okay?

18   A.    Surely.

19   Q.    You would agree with me that it's important to test

20   samples as soon as possible if you're trying to test

21   unexpired product as a general principle?

22   A.    As a general principle, when I receive a sample for

23   testing, I test it as soon as possible unless I'm directed

24   not to do so.

25   Q.    Were you directed not to do so in this case?

1          MS. WIGMORE:  Your Honor, I will object to any

2     communications with counsel.  This is clearly protected by

3     the Federal Rules.

4          MR. HENEGHAN:  Judge, this is outside of the

5     Rule 26 protections for communications with experts.

6          MS. WIGMORE:  It's not outside.  That's exactly

7     what Rule 26 protects, communications between attorneys and

8     experts up until --

9          THE COURT:  The witness just volunteered the

10    principle of possibly being directed not to do something.

11         MR. HENEGHAN:  And, Judge, maybe I can cut to

12    the chase here.

13         Actually, Dr. Atwood tested the stuff as soon as

14    he got it.  We're not going there.  I don't want to get

15    sidetracked on an issue -- that's not the point I'm trying

16    to make.

17         THE COURT:  Let's move on.

18    BY MR. HENEGHAN:

19    Q.     Let's move on and let me take this at a different

20    angle.

21         It's your understanding that plaintiffs' counsel

22    received SigmaPharm's samples in this case on January 31st,

23    2018; is that correct?

24         Does that sound right?

25    A.     Could I have -- I don't have a --

Atwood - cross

1    Q.      Sure.

2    A.      I have a clear understanding of when I received the

3    samples, but I'm not -- are you asking me --

4    Q.      Let me refresh your recollection.  It's not a memory

5    test.  Let me refresh your recollection.  Okay?

6              If you would go back to that transcript we were

7    looking at before and look at page 33 beginning at line 21,

8    and then it carries onto the next page for a few lines.  But

9    it talks about when plaintiffs' counsel received a sample

10   from SigmaPharm, and the date I had asked you about was

11   January 31st, 2018.

12   A.      Oh, yes, I'm agreeing with that here.  Thanks for

13   refreshing my recollection.

14   Q.      No problem.

15   A.      I'm looking at page 34 of the deposition transcript.

16   Q.      Thank you.

17             However, you did not receive the samples from

18   plaintiffs' counsel until November 29th, 2018, 11 months

19   later; is that right?

20   A.      I believe that's correct.

21   Q.      Thank you.

22   A.      I don't have a clear recollection of the date, but it

23   was around November of 2018.

24   Q.      I'm happy to direct you to the deposition to refresh

25   your recollection, too.

 1                    If you would take a look at page 32, lines

 2    1 through 9, that might refresh your recollection about the

 3    date you received it.

 4    A.      What page were you taking me to, counsel?

 5    Q.      I'm sorry.  Page 32, line 1.  Let me double-check.

 6    Maybe I have my note wrong here.

 7                    I'm sorry.  It's page 33, line 1.  I can't read

 8    my own scribble here.

 9    A.      Yes.  On page 33, line 1, I'm asked about receiving

10    the samples that were outside BM on November 29th, and I

11    state, yes, I have no reason to basically doubt that.

12    Q.      Okay.  So we're in agreement that's when you received

13    it?

14    A.      As I sit here today, I have no reason to doubt that.

15    Q.      Okay.  Fair enough.

16                    Now, when you received that sample, it was in a

17    plastic bottle; correct?

18    A.      That's my recollection.

19    Q.      And the foil seal on that bottle was already open

20    when you received it; isn't that right?

21    A.      Yes, that's my recollection, and my recollection is

22    refreshed by the fact that I always take photographs when I

23    receive samples, and I believe I've seen a document in the

24    last day or so, the photograph showing the foil seal was

25    broken in that sample.

1    Q.        You're getting a little bit ahead of me.  Let's look

2    at in PTX-1097, the picture that's on page 16 of your

3    report.

4                        And so the picture on the right, that's the

5    picture showing the condition of the bottle when you

6    received it; is that correct?

7    A.        Yes, yes.  That's -- those are photos that I took

8    upon receipt of the sample.

9    Q.        Photos you took and that were contained in your

10   opening report?

11   A.        Correct.

12   Q.        Right.  Now, as far as the testing you performed, you

13   did not perform any testing on the non-ground tablet that

14   you received from SigmaPharm, did you?

15   A.        That's correct.  It would be nearly impossible to

16   perform definitive testing on a sample which is the tablet

17   that is coated.  One needs to remove the coating, and in

18   order to get precise values of the peaks, one needs to make

19   sure that the sample fills a sample chamber, Your Honor.

20   And the sample chamber, if this were the chamber, it

21   would have to be completely level.  If the sample is mounted

22   higher or doesn't fill up to that level, then the values

23   of 2 theta would be off as much as several tenths of a

24   degree.

25   Q.        And that's why you don't perform testing on a

 1    non-ground tablet?  That's not standard in your view?

 2    A.      Correct.

 3    Q.      Do you remember yesterday when you referred to the

 4    USP as a source for specifications for various

 5    pharmaceutical testing?

 6    A.      Yes.

 7    Q.      And so if you go to the big binder now, we'll go back

 8    to the big binder and look at tab 5.  And I will ask that

 9    PTX-681 be put on the screen and that we go to page 8 of

10    that document while you find it there.

11            Do you recall testifying about that document?

12    A.      Yes.  This is the 2018 United States Pharmacopeia.

13    Q.      Yes.  If you turn to page 8 of that document or the

14    eighth page of that particular exhibit, I should say, which

15    I believe in the upper left-hand corner is designated 6696

16    if that helps.

17    A.      I have 6696.

18    Q.      Okay.  And do you recall yesterday you testified

19    about some of the language on that page?

20    A.      I recall that.

21    Q.      Let's turn back two pages to 6694.  Oh, I'm sorry,

22    no.  I apologize.  I'm looking for the particular reference.

23    Actually, turn back just to 6696.

24            And do you see in the middle of the page where

25    there are about six bullet points?

1    A.      Yes.

2    Q.      I'd like to refer you to the paragraph that begins

3    right below those bullet points.  It begins with the word,

4    therefore.

5    A.      Yes, I see that.

6    Q.      You see in the USP it says, therefore, it is

7    advisable to compare the diffraction pattern of the

8    non-ground specimen with that corresponding to a specimen of

9    smaller particle size (for example, a milled specimen).

10   A.      I see that.

11   Q.      And you didn't do that in this case; right?  You

12   didn't do a non-ground sample?

13   A.      No, but what the USP is referring to here, in all

14   cases, if this is a sample holder, the sample has to be

15   filled to the level and it has to be leveled off.

16             What the USP is referring to is a crushed

17   sample versus a thoroughly ground sample.  But in each case,

18   the sample would have to be level with the diffracting plane

19   in order to get values that are good, plus or minus one

20   point degree.

21   Q.      In your testimony yesterday, you did not refer to

22   that part of the USP; right?  The part we just read?

23   A.      I don't recall referring to this part, but...

24   Q.      Let's turn to page 697.  And if we look in the middle

25   of that page, there's again a bunch of bullet points.  I

1    would like to direct your attention this time actually above

2    the bullet points.

3              Right above the bullet points in the prior

4    paragraph, there's a sentence that begins:  It is generally

5    sufficient.

6              Do you see that sentence?  And they're going to

7    highlight it for you.

8              And that sentence says, it is generally

9    sufficient to scan past the ten strongest reflections

10   identified in a single phase X-ray powder diffraction

11   database files.

12             Do you see that?

13   A.    I see that.

14   Q.    And you didn't scan past ten reflections with the

15   SigmaPharm product, did you?

16   A.    No.

17   Q.    I should say the ten strongest reflections?

18   A.    No, that's not what they are referring to here

19   though.  They are referring to --

20   Q.    Doctor, my question is:  You didn't scan past the ten

21   strongest reflections, did you?  That's my question.  That's

22   not something you did?

23   A.    That's a hard question to answer because I may well

24   have scanned past the ten strongest reflections in carrying

25   out the scan.

1   Q.      Well, do you know?

2   A.      But many of those would have been masked.

3   Q.      Do you know?

4   A.      Because I'm dealing in my scan with a material that's

5   2.5 or 5 or 3.125 percent.

6   Q.      Are you saying you don't know if you scanned past the

7   ten?

8   A.      Excuse me.  Versus pure materials, which is what is

9   being referred to in the USP here.

10  Q.      So you don't know if you did or not?

11  A.      Could I have that question again?

12  Q.      You don't know if you did or not scan past the ten

13  strongest reflections?

14  A.      No, that's not relevant to my test, nor is the

15  section you took me to relevant to the test that I was

16  doing.

17  Q.      Let me ask you a question about the next paragraph

18  that starts with, it is sometimes difficult.

19          Do you see that?  And then it has the bullet

20  points below.

21          Let's highlight that, plus the bullet points.

22  A.      Yes, I see that.

23  Q.      And the beginning of that paragraph says, it is

24  sometimes difficult or even impossible to identify phases in

25  the following cases:  And then it lists, I think, nine

1    cases.

2              Do you see that?

3    A.    Yes, I see that.

4    Q.    Okay.  And as far as the circumstances of your

5    testing, the first, second, fifth and sixth cases all apply

6    to the circumstances of testing the SigmaPharm product,

7    don't they?

8    A.    I agree with that.  It was difficult, but not

9    impossible.  The testing I did was not testing that one

10   would do just by pouring a sample into a chamber and running

11   it.  It was difficult, but not impossible, as my results

12   show.

13   Q.    And my question though, and the point was that of the

14   nine circumstances identified by the USP that make it

15   difficult or even impossible to identify phases, four of

16   those cases of the nine are present in relation to the

17   SigmaPharm product; is that right?

18   A.    The second one is the one that's offered is the

19   component to be identified or present in lows mass fractions

20   of the analyzed amount.  And it says, generally less than

21   ten percent.  And, of course, here we're dealing with if it

22   were, if the sample were a hundred percent crystallinity, it

23   would be 3.125 percent.

24   Q.    Well, let's talk about the first one,

25   non-crystallized or amorphous substances.  There's amorphous

1    substance in the SigmaPharm sample, isn't there?

2    A.     There are amorphous substances.

3    Q.     And then the second one that you just acknowledged,

4    the components are present in low mass fractions.

5           Then what about the fifth one, the formation of

6    solid solutions?  Isn't the SigmaPharm product a solid

7    solution after it goes through the manufacturing process and

8    is dried?

9    A.     What's referred to by solid solution here is that

10   it will be a solid, but it will not have any order.  It

11   will have the disorder that's normally related to a

12   solution.  The material I dealt with was not a solid

13   solution.  It was crystalline phases.  In fact, you can

14   even see that there are crystalline phases of excipients,

15   not just of API.

16   Q.     Well, let's talk about the next category, the

17   presence of disordered structures that alter the unit cell.

18   That's also present in the SigmaPharm product, isn't it?

19   Disordered structures?

20   A.     Disordered structures that order the -- that alter

21   the unit cell, that's referring to the unit cell of the

22   analyzing question, which would be if I found peaks that

23   were not from the patent.

24   Q.     Are you saying --

25   A.     But I actually -- I actually found peaks called out

1    in the patent, which is to say that the unit cell of the

2    apixaban had not been altered.  The unit cells of the

3    crystalline apixaban were well ordered.

4    Q.    Are you saying there are no disordered structures in

5    the sample that you tested?

6    A.    No.  I'm saying that there are no disordered

7    structures that alter the unit cell of the crystalline

8    apixaban in the sample that I tested.

9    Q.    Well, let's take a look at one of your demonstratives

10   from yesterday.  Could we put up Demonstrative, Plaintiffs'

11   Demonstrative 5.8.

12             I had been referring to this since I first saw

13   it as the shark teeth.  This is your demonstrative

14   demonstrating your point about how amorphous substances

15   appear; is that correct?

16   A.    Correct.

17   Q.    And this is disordered; is that correct?

18   A.    It's disordered.

19   Q.    Yes.

20   A.    And there is no unit cell associated with --

21   Q.    Dr. Atwood --

22   A.    -- something like that.

23   Q.    This will go much more quickly, Dr. Atwood, if you

24   answer my question.  This is disordered; right?

25   A.    It's amorphous.

1    Q.      Right.  And therefore disordered?

2    A.      Well, it's not disordered in that it was never

3    ordered.  You know, the point I'm making is that what we

4    see in the schematic I have here is a picture of something

5    which is disordered, but I'm not representing that it was

6    at one time ordered in the unit cell and now it's

7    disordered.

8    Q.      I did not ask you if it was at one time ordered.

9    That was not my question.  Let's look at 5.9.  I'm sorry.

10   Plaintiffs' Demonstrative 5.9.

11           So this is your theory about how crystalline

12   particles start to form; right?  So now we have the

13   disordered shark teeth, and we have some shark teeth that,

14   the darker ones you say are representations of crystals

15   starting to form; right?

16   A.      Correct.

17   Q.      All right.  So even at this point with your theory

18   moving forward, there's still disordered amorphous

19   particles; right?

20   A.      There are disordered sections of amorphous material

21   in this schematic.

22   Q.      Right.  Let's go back to -- we can take that down.

23           Let's go back to the actual sampling and testing

24   you did of the SigmaPharm product.

25           To prepare the SigmaPharm sample for testing,

1  you crushed one five milligram tablet; right?

2  A.      After de-coating using sandpaper, yes.

3  Q.      All right.  And then for all the tests you performed,

4  you used the same crushed tablet for all the tests; is that

5  correct?

6  A.      I don't have a clear recollection of that, but I

7  think that's correct.  I think I crushed the tablet, put it

8  in a sealed glass vial, and used that material for the test

9  I did.

10  Q.      My understanding is that you put the crushed tablet,

11  as you said, in a separate vial.  Then you take out a

12  sample, run a test, right, then return that sample to that

13  same vial.  And even then when it's time to run another

14  test, you take another sample out from the same one crushed

15  tablet; right?

16  A.      That's my normal way of carrying out an experiment or

17  set of experiments.

18  Q.      So even if the testing you did like you did in this

19  case is spread over a couple of months, you're still just

20  using that same one crushed tablet; right?

21  A.      That is correct, which has been sealed in a glass

22  vial.

23  Q.      All right.  And so it's not fair to say they are

24  using the same sample, but you're drawing the sample from

25  the same crushed tablet.  Is that a good way to describe it?

Atwood - cross

1    A.      That's a perfectly good way to describe it, but it's

2    the same sample of material.

3    Q.      Right.

4    A.      It's the initial crushed tablet.

5    Q.      Right, right.  You testified yesterday about the

6    process SigmaPharm uses to make its apixaban tablets and I

7    would like to follow up a little bit about that with you.

8    Okay?

9                If we put up on the screen 1097A.

10               MR. HENEGHAN:  And, Judge, just for the Court's

11   edification, I discussed this with plaintiffs' counsel.

12   This exhibit is a page and the next exhibit is a page,

13   another page out of Dr. Atwood's report, and a part of the

14   page that would show the part we're protecting as trade

15   secret, I've redacted.  And so plaintiffs are aware what the

16   redactions are and everybody is fine with it.

17               THE COURT:  Okay.  Thank you.

18   BY MR. HENEGHAN:

19   Q.      Now, the process that you describe in your report,

20   and if you would like, I can refer you to the page in your

21   report, or do you want to follow on on the screen?  That's

22   fine.

23   A.      I'm perfectly good following along on the screen.

24   Q.      Now, the process that SigmaPharm uses involves

25   dissolving povidone and BHA in methanol to form a solution;

1    is that correct?  To start?

2    A.      Yes.  That's coming from the relevant SigmaPharm

3    document that's referenced there.

4    Q.      Right.  So what we're seeing on the screen is your

5    recounting of what you understand about the process from

6    reviewing SigmaPharm's documents.  Is that fair?

7    A.      That's correct.

8    Q.      And then that solution is heated to 48 degrees

9    Centigrade and the apixaban API is added and completely

10   dissolved until a clear solution is formed; right?

11   A.      Well, you added a few words.  The statement is, and

12   apixaban is added and mixed at 600 RPM plus or minus 50 RPM

13   for 30 minutes or until a clear solution.

14   Q.      Well, I think you said yesterday that the mixing is

15   very thorough as a commercial process.  I believe that was

16   your testimony yesterday.

17                   Does that sound right?

18   A.      Yes.  I'm not disputing that the mixing would be done

19   in a thorough process.

20   Q.      Right.  Thank you.

21                   After drying and milling, SigmaPharm ends up --

22   and let's go, I'm sorry.  Let's go to 1097B, which is just

23   the next page of your report continuing to describe the

24   process.

25                   After drying and milling, SigmaPharm ends up

 1    with a milled and dried material that are granules made

 2    up of a mixture of apixaban, povidone and BHA; is that

 3    right?

 4    A.     Yes.   I agree with that, that sentence that's

 5    highlighted.

 6    Q.     And SigmaPharm refers to that material as the drug

 7    product intermediate; right?

 8    A.     That's what I figure and that's my recollection.

 9    Q.     Now, one of the documents that you considered as part

10    of your original report is a report from Catalent that

11    analyzed that drug product intermediate.

12              Do you recall that?

13    A.     I recall that, but you'll need to refresh --

14    Q.     Sure.

15    A.     -- the Catalent document.

16    Q.     Absolutely.   Well, you testified about that Catalent

17    document yesterday.

18              Do you recall that?

19    A.     Yes.   I don't remember the details of it, but I

20    remember testifying about a Catalent document.

21    Q.     Okay.   And let me just double-check.   I believe it's

22    number 6 in your big binder there.

23    A.     Number 6 --

24    Q.     I'm sorry.   I think you might have the Sunshine Lake

25    binder.

```
 1                    THE COURT:  We'll approach with the SigmaPharm
 2      binder.
 3                    MR. HENEGHAN:  Sorry for the confusion.
 4                    THE COURT:  Put those things over to the left if
 5      you want.
 6                    THE WITNESS:  Thank you, Your Honor.  I was
 7      looking at the Sunshine Lake binder.
 8                    (Mr. HENEGHAN handed a binder to the witness.)
 9                    THE WITNESS:  Okay.  So you're taking me to tab
10      6?
11                    MR. HENEGHAN:  Tab 6, yes.
12                    And while Dr. Atwood is looking for that, let's
13      put up PTX-1009, which is a Catalent report.
14                    THE WITNESS:  Yes, I have it here.
15      BY MR. HENEGHAN:
16      Q.    And if you could go to page 5 of that document.
17                    Do you see page 5?  It's also on the screen
18      if that's easier.
19      A.    Oh, okay.  Yes.  I just didn't see a page 5
20      associated with that.  Yes.
21      Q.    It's actually the fifth page.  I'm sorry.  I don't
22      know if it's paginated.
23      A.    It's not, but, yes.
24      Q.    Okay.
25      A.    I've got it.
```

Atwood - cross

1   Q.      Now, yesterday when you talked about this exhibit,

2   PTX-1009, you didn't talk about this page, did you, with

3   this particular graph?

4   A.      I don't believe I did.

5   Q.      This page of the Catalent report shows an XRPD scan

6   that has no crystalline peaks for the drug product

7   intermediate; isn't that right?  That's the red line on the

8   graph?

9   A.      If you represent that is the drug product, it looks

10  like an amorphous entity from the look of the XRPD.

11  Q.      Well, if we look at the key at the top, on the top

12  right corner, it shows what the three colored lines are, the

13  black line being apixaban API.  The blue line, dark blue, it

14  almost looks black on here, but the lower amorphous line is

15  the placebo for apixaban, and then the red line is the

16  amorphous apixaban 6.58 percent, which would be the drug

17  product intermediate.

18  A.      Yes, I see that and I see the key now.

19  Q.      Okay.

20  A.      Thank you.

21  Q.      All right.  And so if we look at the red line

22  compared with the black line, the black line is the

23  crystalline fingerprint of the API before SigmaPharm mixes

24  it with povidone; isn't that right?

25  A.      That's my recollection, yes.

Atwood - cross

1    Q.      And the red line is the drug product intermediate

2    after it goes through the manufacturing process you just

3    described; is that correct?

4    A.      Well, this is -- it's not after the process I

5    described, but this is after the process of mixing the

6    apixaban with the povidone.

7    Q.      Right.  It's the drug product intermediate?

8    A.      Yes.  I will accept that, certainly.

9    Q.      Now, in your original report in February, you did

10   not offer any criticism of this graph or this report, did

11   you?

12   A.      Well, I don't recall, but I'm not offering any

13   criticism of this graph in this report right now.

14   Q.      Okay.

15   A.      This is -- this is the intermediate, which is the

16   apixaban mixed with the polymer.

17   Q.      Which is amorphous?

18   A.      Oh, to the extent that one can interpret the graph,

19   the XRPD here, it looks amorphous.

20   Q.      Now, Dr. Atwood, in general, you would agree with me

21   that an amorphous solid is usually described as possessing

22   crystal-like short-range molecular arrangement, but lacking

23   long-range order.

24           Do you agree with that?

25   A.      I agree with what you said you if leave out the

1   crystal-like, because the essence of being crystal-like is

2   long-range order.  Amorphous materials have short-range

3   order.

4   Q.   And do you recall yesterday your testimony about the

5   Yu article?

6   A.   I do.

7   Q.   And then, again, is in the binder, the big binder.

8   Let me direct you to it.  And it's PTX-367.

9                If you could put that up.  It's number

10  three in your binder.

11  A.   Yes, I have the Yu article in front of me.

12  Q.   Okay.  And do you recall -- you recall testifying

13  about this article yesterday; right?

14  A.   I do.

15  Q.   And you talked about a particular section on

16  crystallinity.

17               Let's go to the page before that, which is the

18  fourth page of that document and look at the section called,

19  starting 3.1 structure.  It starts in the left-hand column

20  about halfway down.

21  A.   Yes.  I'm at 3.1 structure.

22  Q.   And if we can highlight just the first sentence of

23  that section that carries over into the next column a little

24  bit.

25               It starts, the structure of an amorphous

Atwood - cross

1    solid is the beginning of the sentence.  Yes, that works.

2              So what the Yu article says is the structure of

3    an amorphous solid is usually described as possessing

4    crystal-like short-range molecular arrangement, but lacking

5    long-range order.

6              And that is what the Yu article says; is that

7    right?

8    A.    I agree with you.

9    Q.    In fact, you've testified to that very point in the

10   past, haven't you?

11   A.    You'll have to refresh me.

12   Q.    Sure.

13   A.    Certainly, amorphous material has short-range order,

14   but it differs from crystalline in that crystalline

15   possesses long-range order.

16   Q.    Do you recall your testimony in the Dexilant trial in

17   California?

18            MS. WIGMORE:  Your Honor, I object.  This is

19   not impeachment.  The witness agreed with the statement, so

20   I'm not sure why we are bringing in testimony from

21   elsewhere.

22            MR. HENEGHAN:  He just asked me to refresh his

23   recollection about it.

24            MS. WIGMORE:  But he testified previously that

25   he agreed with the question.

1          THE COURT:  I'm going to allow it.

2          MR. HENEGHAN:  If we could go to tab 11.

3    BY MR. HENEGHAN:

4    Q.    Do you recall testifying in that case, Dr. Atwood, in

5    California?

6    A.    I recall that case, but I don't recall the details of

7    my testimony there.

8    Q.    All right.  And we are looking at page 895, starting

9    at line 12, and then going down to the bottom of the page.

10          So does this refresh your recollection that at

11   that former case you testified about short-range order and

12   long-range order, amorphous versus crystalline?

13   A.    Yes, and that's my testimony as I sit here right

14   now.  Amorphous has short-range order as in one molecule is

15   pressing against the wall of the other molecule, but the

16   difference is that crystalline entities have long-range

17   order.

18   Q.    And your testimony in that case that is up on the

19   screen here refers to an illustration.  Let's show that.

20          If we look at tab 7, the second page of that

21   document.  Can we turn that?  Thank you.

22          So in that case, instead of the shark teeth, you

23   used these graphics to short of show the difference between

24   crystalline and amorphous; is that correct?

25   A.    Yes.

Atwood - cross

1    Q.      And so on the right hand we have the amorphous solid

2    and that shows the lack of long-range order; is that

3    correct?

4    A.      Correct.

5    Q.      Let's talk about the analysis of your testing of the

6    SigmaPharm product.

7            You based your work on the SigmaPharm product on

8    the peaks recited in the '945 patent; right?

9    A.      Yes, as the basis.  I believe I added one other peak

10   from the XRPD pattern of crystal form N1.

11   Q.      Well, let's talk a little bit about the '945 patent.

12   The claims of the '945 patent asserted here do not recite

13   any particular peak values; right?

14   A.      The claims don't.

15   Q.      Right.

16   A.      The claims -- the patent itself calls out the two

17   theta values that we've been referring to.

18   Q.      Right.  Let's look at JTX-2, column 5, Table 2.

19           So this is the part of the specification of

20   the '945 patent, and this is what you were just talking

21   about, the place where it calls out the six peaks for form

22   N-1.

23           And form N-1 is the crystalline apixaban that's

24   the subject of the claims being asserted in this case; is

25   that right?

1    A.     Correct.

2    Q.     Okay.  And those six peaks are all that you look for

3    in the sample of the apixaban product in your testing; isn't

4    that right?

5    A.     I looked for these six first, but I may well have

6    looked for an additional peak in the SigmaPharm material.

7    Q.     Well --

8    A.     Having access to the SigmaPharm XRPD showing that

9    they start with crystal form N-1.

10   Q.     Meaning other references that showed apixaban

11   diffractograms?  Is that what you mean?

12   A.     A SigmaPharm reference, yes.

13   Q.     Let me direct your attention back to your transcript

14   in this case, which is the small binder, and I think that it

15   is tab 6.

16   A.     Yes, I have tab 6.

17   Q.     Okay.  If you can open it up to the transcript page

18   104.

19   A.     I have 104.

20   Q.     Okay.  And I'm going to read to you a question -- a

21   series of questions and answers, starting at line 7.

22            "Question:  Now, the '945 patent, Exhibit D-4,

23   that identifies six characteristic peaks; right?

24            "Answer:  Could you -- could you take me to the

25   point?

1          "Question:  Sure.  '945 patent, Exhibit D-4,

2     column 5, lines 5 through about 14, Table 2.

3          "Answer:  Yes.  There are six peaks listed

4     characteristic of N-1.

5          "Question:  Were these the only peaks that you

6     looked for in the sample?

7          "Answer:  They were.

8          "Question:  So you didn't look to see if any of

9     the other peaks from these references were present in the

10    sample; is that right?

11         "Answer:  Correct.  There are -- these are the

12    peaks that are listed as in the '945, and my reading of the

13    '945 is that these are the peaks that one should use to

14    determine whether crystal form N-1 is present.

15         Do you recall that testimony?

16    A.    I'm refreshing myself on it now, yes.

17    Q.    So those six peaks in the patent are the only ones

18    you looked at against the sample of the apixaban product?

19    A.    According to the testimony that you've just read at

20    this point, that appears to be the case.

21    Q.    And the timing of that testimony, that testimony

22    was given by you under oath after your second report, wasn't

23    it?

24    A.    Correct.

25    Q.    Now, of the six peaks in the '945 patent, you only

Atwood - cross

1  found three; right?  Let's look at PDX-5.21.

2  A.    My answer would be I found three.

3  Q.    Right.  And this is Plaintiffs' Demonstrative Exhibit

4  5.21 that you used during your direct testimony.  This

5  identifies those three peaks you found compared to the total

6  six from the patent; is that right?

7  A.    Correct.

8  Q.    So for the apixaban fingerprint, you only matched

9  three points?

10  A.    I would agree with that, but I would leave out the

11  only.  I matched three points, THREE peaks.

12  Q.    Now, am I correct that you ran at least 11 sets of

13  XRPD scans on the apixaban product?

14  A.    I'm sure I ran several, but I don't remember the

15  exact number.

16  Q.    Well, let me refresh your recollection with your

17  deposition again.

18          If you look at page 132 beginning at line

19  17, that should refresh your recollection about how many

20  scans you ran.

21          And if you read down to the top of page 133,

22  you'll see the numbers.

23  A.    So you're taking me to the point where I don't know

24  the answer to that precisely, it wasn't very many, and I

25  produced all the ones I ran?

 1   Q.       And then I take you to the top of the next page that

 2   says:  Do you know if it was 11?  I don't know the number.

 3   That sounds reasonable.

 4   A.       Yes.

 5   Q.       My question is --

 6   A.       As I'm sitting here, it still sounds reasonable.

 7   Q.       Okay.  Okay.  But the opinions disclosed in your

 8   original report only rely on a couple of those scans; is

 9   that right?

10   A.       You would have to refresh me on how many I used, but

11   it depends on the care with which I took to run the scan.  I

12   would have, of course, initially run a rather fast scan and

13   then I would have delved into more detailed scans as the

14   demand for the amount of material present and the level of

15   crystallinity required.

16   Q.       Let's talk a little bit about the particle size.  You

17   have offered opinions here about the particle size

18   limitation of the '945 patent; right?

19   A.       I have.

20   Q.       But you did not do any test to measure the particle

21   size, did you?

22   A.       No.

23   Q.       You offer a theory but no empirical evidence to

24   support that theory; is that correct?

25   A.       I offer an interpretation of the method of preparing

1    the SigmaPharm material, and my interpretation of that

2    method follows along from the method, and it leads me to the

3    conclusion which I stand by that the apixaban present in

4    3.125 percent of the total --

5    Q.      Doctor, you're way beyond my question.

6    A.      -- is well --

7    Q.      You're way beyond my question.

8           THE COURT:  Why don't you try again.

9           MR. HENEGHAN:  Thank you.

10   BY MR. HENEGHAN:

11   Q.      You offer a theory, but without any empirical

12   evidence to support that theory; is that correct?  Just like

13   in the Abbott versus Sandoz case that we talked about a

14   little earlier.

15          MS. WIGMORE:  Your Honor, I object.

16          THE COURT:  I will strike that.  Do you want an

17   answer to your question or no?

18          MR. HENEGHAN:  I'm happy to have him answer the

19   question.

20   BY MR. HENEGHAN:

21   Q.      You offer a theory, but no empirical evidence to

22   support that theory; correct?

23   A.      Could I have the question again?

24   Q.      Sure.  You offer a theory, but no empirical evidence

25   to support that theory; correct?

Atwood - cross

1    A.      I was looking for the part before the theory.

2    Refresh me on what the theory is in your question.

3    Q.      This theory of nucleation and crystallization, that

4    is your theory of how there are crystal apixaban particles

5    in the SigmaPharm product; correct?

6    A.      Well, it's a theory, but it's a theory that is

7    represented in numerous references as I refer to; and what

8    I'm doing is I'm pointing out I observed crystallinity in

9    the XRPD pattern and I'm now addressing the point given

10   the way in which the material is prepared, is it possible

11   that large crystals form or is it very likely that the

12   crystals that form will be small due to the manner in which

13   Sigmapharm's ANDA -- the method of preparation that one

14   finds in Sigmapharm's ANDA.

15   Q.      So let's get back to my question.  I understand that

16   theory.  My question is there is no empirical evidence

17   related to the SigmaPharm product that supports that theory;

18   correct?  There is no measurement of any particle size.

19   There is no test showing particle size or particles,

20   crystalline particles at all other than your interpretation

21   of the XRPD; right?

22   A.      Well, I was about to agree with you until you threw

23   in the interpretation of the XRPD.  Now, the XRPD is simply

24   showing that the crystalline particles are large enough that

25   they're in fact crystalline.

Atwood - cross

1    Q.      But there is no empirical evidence of the particle

2    size at all?

3    A.      I was going to agree with that.  I did no testing of

4    the particle size, but I simply offered an interpretation

5    based on the ANDA documents that I saw.

6    Q.      Now, the '945 patent talks about measuring particle

7    size by laser light scattering, doesn't it, for the

8    specification?

9    A.      It does.

10   Q.      You didn't do that with the SigmaPharm product, did

11   you?

12   A.      I did not.

13   Q.      Now, I believe you were here yesterday during opening

14   statements; is that right?

15   A.      I was here yesterday.

16   Q.      And so you heard Unichem counsel, Mr. Braier, talking

17   about the Berkland method that plaintiffs used to try to

18   measure particle size in the Unichem product.  Do you recall

19   that?

20   A.      I recall that.  And I don't know the details of the

21   Berkland method.  I do know there are methods for measuring

22   particle size in mixtures of materials, but when I -- as I

23   think I testified, when I last measured particle size

24   myself, I was isolating specific material and measuring

25   particle size not involving mixtures.

Atwood - cross

1    Q.      So you didn't use this Berkland method yourself on

2    the SigmaPharm product, right?

3    A.      Well, I certainly didn't use, I didn't use any

4    physical test on the particle size on the SigmaPharm

5    material.

6    Q.      You also didn't make any effort to measure or

7    determine what percentage of apixaban in the SigmaPharm

8    product converted to crystalline under your theory;

9    right?

10   A.      No.  My reading of the claim of the '945 was the

11   reason I did not try to take it to that point, because of

12   comprising crystalline material.  In my opinion, it is

13   sufficient to show it is crystalline material.

14   Q.      Dr. Atwood, I didn't ask you for your reason.  I

15   didn't ask you for your reason why you didn't do it, just

16   confirm that you didn't do it; right?

17   A.      Well, I was giving you the answer, but it was a "no

18   but" answer.

19   Q.      Also, you did not measure or determine what

20   percentage of apixaban in -- excuse me -- the SigmaPharm

21   product was any particular particle size at any particular

22   time under your theory; right?

23   A.      Could I have that question again?

24   Q.      Sure.  It's a little bit long.  I apologize.  You did

25   not measure or determine what percentage of apixaban in the

 1    SigmaPharm product was any particular particle size at any

 2    particular time under your theory; correct?

 3    A.      That is true.  I did not measure particle size for

 4    Sigmapharm's material.  Now, I did measure particle order,

 5    so the size was large enough to be crystalline, but I didn't

 6    make a measurement which would reveal the size of the

 7    crystalline.

 8    Q.      Is that one of those "yes, but" answers?

 9    A.      I think that is a "no, but" answer.

10    Q.      Let's talk about another area of your testimony from

11    yesterday.  If we could put JTX-2 back up on the screen.

12    That is the '945 patent, and go to column 3 of that patent,

13    lines 20 through 30.  It's a little tough to read in its

14    regular size.

15            So if you could take a look at that for second,

16    Dr. Atwood, and refamiliarize yourself, and I will ask you

17    some questions about it when you are ready.

18    A.      Yes, I'm familiar with this paragraph.

19    Q.      In fact, you testified about this paragraph

20    yesterday; right?

21    A.      I believe I did.

22    Q.      You read from this section of the patent.  It talked

23    about particles being agglomerated.  Do you recall that?

24    A.      I recall that.

25    Q.      Okay.  The patent here is talking about apixaban

Atwood - cross

1    particles bound to each other as an agglomeration, isn't it?

2    A.      Yes, that's my reading of this paragraph.

3    Q.      It says individual drug substance particles, and

4    that's a reference to apixaban in this context; right?

5    A.      It is.

6    Q.      But you would agree with me that if apixaban

7    crystallized around or on the surface of some other

8    particle, that would be something more than apixaban;

9    correct?

10   A.      So the agglomerate, as you are describing it, would

11   be apixaban.

12   Q.      I'm not describing agglomerate.  You misunderstood

13   me.  I'm not describing agglomerate.  We just confirmed

14   that the agglomerate referred to in the patent is individual

15   particles of apixaban agglomerated on to each other.  I'm

16   talking about something different, so let me repeat my

17   question.

18           You agree with me that if apixaban crystallized

19   around or on the surface of some other particle, that would

20   be something more than apixaban; right?

21   A.      I agree with that.

22   Q.      So in that situation, the particle would be a

23   composite particle and not an apixaban particle; right?

24   A.      The particle you described would be an agglomerate

25   particle and it would be an agglomerate of apixaban and some

1    other substance.

2    Q.    Well, let's go to your deposition again.  Page 153.

3    A.    I have 153.

4    Q.    Okay.  If you could look at, beginning at line 7.

5    I'll read a question and answer to you from that deposition.

6              "Question:  So it wouldn't be an apixaban

7    particle, it would be a composite particle of some sort?

8              "Answer:  Composite particle, yes, yes.  That's

9    a good point.  I wouldn't mind incorporating that into the

10   argument."

11             Do you recall that question and that answer?

12   A.    Well, I recall the question and the answer but I

13   don't recall the material leading up to that.

14   Q.    And those composite particles that I just described

15   would not be apixaban particles that can meet the size

16   limitation of the '945 patent, would they?

17   A.    So you are referring to an apixaban crystal

18   agglomerated on to something else?

19   Q.    Correct.

20   A.    It would be the size of the apixaban particle, not

21   the size of the agglomerate that was relevant to the claims

22   of the '945 patent.

23   Q.    Let's see if we can stipulate to my question.  Those

24   composite particles would not be apixaban particles that can

25   meet the size limitation of the '945 patent; right?

Atwood - cross

```
 1   A.      I believe I agree with that, because as I understand

 2   your particles, they're not actually apixaban but rather

 3   they're apixaban and something else.

 4               MR. HENEGHAN:  Thank you, Dr. Atwood.  That's

 5   all I have.

 6               THE COURT:  Thank you.  We'll hear the remaining

 7   cross.

 8               MR. HENEGHAN:  Let me suggest you swap the two

 9   big binders.  I think you are going to use the next one.

10               MR. KOCHANSKI:  Yes, please go back to the

11   Sunshine Lake binders.

12               THE WITNESS:  Fortunately, I have enough space

13   here for them.

14               THE COURT:  Counsel, I am confused by your

15   agreement on the fact witness sequestration.

16               MR. LEE:  Why don't we take one away.

17               THE COURT:  That's fine.

18               The Sunshine witness has walked back in.  Is

19   that by agreement?

20               MS. WIGMORE:  No.

21               MR. KOCHANSKI:  I'm sorry, Your Honor?

22               THE COURT:  Could you explain the situation to

23   your client, please?  Your witness is back in the courtroom.

24               MR. KOCHANSKI:  The witness is, the fact witness

25   is not in the room.
```

Atwood - cross

1              THE COURT:  Okay.  I thought I saw the witness

2    come in after leaving.

3              MR. KOCHANSKI:  No, no, no.  He is not in the

4    room.

5              THE COURT:  He is not in the room.

6              MR. KOCHANSKI:  No.

7              THE COURT:  Okay.  Great.

8              MR. KOCHANSKI:  Good afternoon, Doctor.  Paul

9    Kochanski.  We met before when I was taking your deposition

10   representing Sunshine Lake.

11             THE WITNESS:  Good afternoon.

12                         CROSS-EXAMINATION

13   BY MR. KOCHANSKI:

14   Q.    I'd like to go back to some of the testimony we

15   started with this morning and that is your review of the

16   Sunshine Lake ANDA statements.  Do you remember that?

17   A.    I reviewed several things this morning, so you will

18   have to take me to specific statements.

19   Q.    Okay.  Let me assist you.  PTX-846, page 1956.

20             MR. KOCHANSKI:  PTX-846, 1956.  Can you do it?

21             MR. LEE:  Sure.

22             MR. KOCHANSKI:  Thank you.

23             MR. LEE:  You're welcome.

24   BY MR. KOCHANSKI:

25   Q.    Of course, this document was being testified to this

1   morning, Doctor?

2   A.      It's a bit faint on my screen.  Could you tell me

3   where it is?  Thank you.  This will be much more useful.

4   Q.      Let me ask you to go to your booklet.  It's tab

5   number 7, and it is page No. 159.

6   A.      Oh, I have what appears to be -- yes, I have the

7   document.

8   Q.      Okay.  And do you remember reading the first two

9   paragraphs of that page, Doctor?

10  A.      Oh, yes.  I recall that.  Thank you.

11  Q.      And based upon those two paragraphs, you have made

12  the assumption that such analysis of apixaban product has

13  crystal N-1 in the final product?

14  A.      Well, no, no.  I think my opinion is Sunshine Lake's

15  product has crystalline material in the final product based

16  on my testing.  I was using this simply to indicate that as

17  of six month accelerated stability testing, there was

18  crystal form N-1.

19  Q.      And, well, let me ask you this, Doctor.  You

20  testified that certain statements in the Sunshine Lake ANDA

21  application demonstrates that apixaban and Sunshine Lake's

22  product converts to a crystalline form over time.  And what

23  you relied upon is a large lab scale batch, six month

24  accelerated; correct?

25  A.      That's correct.

1    Q.      You didn't -- did you review the entire chart showing

2    that for the exhibit batches -- which is -- did you read

3    that and review that?

4    A.      I reviewed it at some point in time, but, of course,

5    I don't recall it as I sit here right now.  I have not

6    reviewed it recently.  I am focused simply on this

7    particular table, as I did at the time I read the full

8    document.

9    Q.      Do you have an understanding, Doctor, that the

10   exhibit batches are the batches made with the manufacturing

11   process that will produce the commercial product?

12   A.      That's my understanding.

13   Q.      Okay.  And if we look at Table 3.2P28-6, for all the

14   exhibit batches that are shown on that table, was there any

15   evidence of conversion of the amorphous form of apixaban to

16   a crystalline form for all the studies that were done?

17   A.      No.

18   Q.      Okay.  And do you know, Doctor, what is the basis for

19   these tables?  What type of analysis was done?

20   A.      I don't recall specifically in the document, but the

21   analysis would have had to have involved X-ray powder

22   diffraction.

23   Q.      Okay.  To assist you in that regard, if you turn two

24   pages, 1958 through 1965, are those all XRPD patterns?

25   A.      Yes.  These are all XRPD patterns related to certain

 1   stability samples, it appears.

 2   Q.     In fact, again, if you look at the table, 3.2P, on

 3   the right-hand side it says location of the figures and the

 4   locations it gives is to identify those specific XRPD

 5   patterns; isn't that correct?

 6   A.     Could I have that one more time?

 7   Q.     Sure.  If you look at the table, 3.2P28-6, on the

 8   right-hand side there's a column that says, location of

 9   figures.

10   A.     Yes.

11   Q.     Okay.  And that location of figures is correlated

12   with what follows as the XRPD patterns; is that correct?

13   A.     Yes, yes.  I understand the relation, so what I'm

14   looking at just below your highlighted location of figures

15   would be information on page 1958.

16   Q.     I'm sorry?  Which one are you looking at, Doctor?

17   A.     I'm looking at 3.2.P.2.8-7.

18   Q.     Okay.  And how about if you go down to 3.2.P.2.8-8

19   and turn to page 162.

20   A.     Yes, I have 162.

21   Q.     And those are the XRPD patterns for batch

22   11054018111?

23   A.     Could I have that number again?  The one I have is

24   -22.

25   Q.     Okay.  11054018111.  I just want you to correlate it,

Atwood - cross

1    Doctor.

2    A.    What page are you taking me to?

3    Q.    Okay.

4    A.    The page I have was in the 156-2.

5    Q.    Okay.  Let's make it easier for you.  If you look --

6    rather than looking at the Bates number, which you are

7    familiar with, Bates numbers, look at the page that says

8    page 159.  It's right above the Bates number.

9    A.    Yes, I have 159.

10   Q.    Okay.  On the right-hand side, do you see that

11   column?  Location of figures?

12   A.    I see that.

13   Q.    Okay.  Going down to the second box, it identifies a

14   figure, 3.2P-28-8?

15   A.    I see that.

16   Q.    And isn't it the figure shown on page 162?

17   A.    I'm getting there.  I was on the Bates 162.  That's

18   remarkably close.  It's only a few digits off.

19   Q.    I understand, Doctor.  I understand.

20   A.    Okay, yes.  I'm finally with you on this.

21   Q.    Okay.  So those are the XRPD patterns that are

22   referenced in the table we've been looking at; is that

23   correct?

24   A.    Yes.

25   Q.    And but for, but for the large scale batch six-month

Atwood - cross

1    accelerated, but for that, all the other results of the XRPD

2    testing showed amorphous apixaban; is that correct?  And

3    that's on page --

4    A.    So are you asking me a statement or are you asking me

5    to evaluate the XRPD?

6    Q.    No, I'm not asking you to evaluate it.  I'm just

7    saying, that's what has been shown on the table.

8    A.    Okay.  Okay.  I'm completely with you.  I thought

9    maybe you wanted me to evaluate the XRPD pattern.

10   Q.    No.  Thank you, Doctor.

11             Let me ask you this:  With respect to this

12   particular page, that is page 159, and the statements at the

13   top, were you advised that Sunshine Lake forwarded amendments

14   to the FDA correcting the portions that you relied upon,

15   that you are relying upon here at trial, indicating that

16   they were incorrect?

17   A.    I don't recall that.  If I were so informed, I don't

18   recall it, but I may have been informed.

19             Now, keep in mind what I was relying on

20   here was my, I thought it was my own testing and I was

21   simply using this to indicate six-month accelerated -- there

22   was a document that indicated form N-1.

23   Q.    I understand.

24             Were you ever advised that the head of the

25   excipient department of Sunshine Lake testified during his

1    deposition that there were a number of errors in the written

2    description concerning what is here and that the written

3    description didn't conform to the actual data that was sent

4    to the FDA?

5                 MS. WIGMORE:  Objection, Your Honor.

6                 THE COURT:  Because it goes to what you would

7    have advised him?

8                 MS. WIGMORE:  No.  Because he's characterizing

9    testimony that's not in the record and it's not accurate.

10                 MR. KOCHANSKI:  We'll have Dr. Chen testify

11   about that.

12                 THE COURT:  Okay.  Then we'll sustain the

13   objection.

14                 MR. KOCHANSKI:  Thank you, Your Honor.

15   BY MR. KOCHANSKI:

16   Q.    We don't have to cover a lot of the same ground.  Was

17   the scope of your analysis of the Sunshine Lake apixaban

18   tablets the same as the scope of your analysis you did with

19   the SigmaPharm apixaban tablets?

20   A.    It was very similar.  The Sunshine Lake tablet I used

21   was 2.5-milligram.  The type of testing I did was the same

22   type, XRPD testing was the same type.  However, Sunshine

23   Lake uses different excipients from SigmaPharm, so there

24   will have been different areas of masking of the crystalline

25   apixaban.

1  Q.     Well, your technical analysis was the same in using

2  your XRPD?

3  A.     Yes, I agree with that.

4  Q.     Okay.  Did you do fast scans and slow scans for the

5  Sunshine Lake product?

6  A.     I probably did.  I certainly did slow scans.

7  Q.     Okay.  And do you remember about how many scans you

8  did?

9  A.     I don't recall that.

10 Q.     In looking at tab ten, which is PTX-960, if I counted

11 them and I told you there were approximately around 12,

12 would that sound about right?

13 A.     That sounds about right.

14 Q.     Okay.

15 A.     I have not counted them myself then.

16 Q.     As you just testified, Doctor, you only performed an

17 analysis on the 2.5-milligram Sunshine Lake apixaban tablet?

18 A.     That's right.

19 Q.     Okay.  And you did no testing whatsoever and analysis

20 of the five-milligram tablet?

21 A.     No.  I didn't feel that I needed to.

22 Q.     Did you receive the five-milligram tablet from

23 counsel to test?

24 A.     I don't believe I did.

25 Q.     Okay.  So you were only provided the 25 milligrams --

1    the 2.5-milligram; is that correct?

2    A.      That's my recollection.

3    Q.      And you were also provided some API?

4    A.      I was.

5    Q.      Okay.   Now, about how many tablets were you provided

6    of the 2.5-milligram Sunshine Lake apixaban product?

7    A.      I tested one tablet.   I don't recall how many I was

8    provided.

9    Q.      Do you believe you were provided more than just one

10   tablet or only one tablet?

11   A.      I don't recall as I sit here right now.

12   Q.      Okay.

13   A.      The one tablet would have been sufficient.   I

14   probably only tested one tablet.

15   Q.      When you received the one tablet or tablets, were

16   they in a sealed container?

17   A.      To the best of my recollection, they were.   I know I

18   took a photograph at the time of receipt.

19   Q.      And that was a photograph that was included in your

20   expert report?

21   A.      I believe so.

22   Q.      And so the photograph will say what it says, will

23   show what it shows; right?

24   A.      I think so.   My typical method when I receive samples

25   from the outside is I photograph them so I don't have to try

Atwood - cross

1    to remember what I received.

2    Q.      In looking at PTX-960, those are your diffractograms,

3    your scans.   Okay.

4              If I'm reading them correctly, I think the

5    first scan that you did was some time the end of

6    October 2018?

7    A.      Yes.   It looks like, it looks like October 31, 2018.

8    Q.      Okay.   And if I remember correctly from your

9    testimony during your deposition, I think you said the same

10   thing regarding SigmaPharm.

11             When you received the material from

12   counsel, you performed the scan soon thereafter?

13   A.      Correct.

14   Q.      Okay.   And then my understanding is, is that probably

15   the last scan that you did, or last scans that you did were

16   in February 2019; is that correct?

17   A.      It looks like the last -- the scans I did in February

18   were of Sunshine Lake API.

19   Q.      Okay.   Those were the API.   But, again, you did scans

20   for about approximately a four-month period of time.

21   A.      Yes.   Yes.

22   Q.      Okay.   Now, I think you've said it a couple times

23   this morning, but just to be sure, you utilized one tablet

24   in your, your analysis of apixaban ANDA product; is that

25   correct?

1   A.      That's my recollection, yes.

2   Q.      And that's the one tablet you sandpapered off the

3   Opadry, the coating, and you crushed it, and that's the one

4   you used throughout your analysis?

5   A.      That's my recollection, yes.

6   Q.      And you are not sure how many tablets you received;

7   is that correct?

8   A.      I'm not sure.  I'm not sure.  I received -- I think

9   the photograph would show that I received a bottle.

10  Q.      Okay.

11  A.      Did the bottle have one tablet?  Yes, certainly more

12  than that.  I just -- I just don't recall.

13  Q.      So let's go to your analysis.  Let's talk about the

14  scans that you are relying upon to show that Sunshine Lake's

15  product falls within the scope of the claims.

16          As I understand your testimony this morning,

17  you're only relying on three scans to demonstrate

18  infringement.  That is a scan to show a peak at 12.3, a

19  scan to show a peak at 16.9, and a scan to show a peak at

20  27.1.

21  A.      That's my recollection, yes.

22  Q.      And I think you testified that with respect to the

23  six peaks identified in the '945 patent, you only found two,

24  and the third peak, the 16.9, was based upon the Sunshine

25  Lake API; is that correct?

1    A.      That's correct.

2    Q.      Now, how many scans did you do approximately of the

3    tablet, Doctor?  Do you remember?

4    A.      I don't recall but we have a whole collection of them

5    here in Tab 10.  Should I count?

6    Q.      No.  Let me see if I could refresh your recollection.

7    It's my -- as I remember from looking at the scans, you did

8    four slow scans at each of the regions:  the 12.3 region,

9    the 16.9 region, and the 27.1 region.  And then with respect

10   to the 27.1 region, one of those four scans had a problem

11   and you discounted it.  Isn't that correct?

12   A.      I'll have to refresh myself by looking through these.

13   If you want, I will.

14   Q.      Please.

15   A.      (Witness complies.)

16           I'm ready for your question.  I misplaced the

17   question in my memory bank.

18   Q.      You did approximately 12 scans, slow scans in the

19   regions of 12.3, 16.9, and 27.1, four scans in each region;

20   correct?

21   A.      Well, I did one slow scan in the 16.9 region, I did

22   one slow scan in the 12.4 region, and I did one show scan in

23   the 27.1 region.

24   Q.      You don't think you did more than one scan?

25   A.      Now, by slow scans, I'm referring to 1,000 seconds

1   per step, 0.01 degrees per step scans.  I did some additional

2   scans which were 100 seconds and .02 degrees per step, but I

3   think I only did one scan at 1,000 seconds.

4   Q.     Let me ask you this, Doctor.  With respect to your

5   scans of the crushed tablet, and I would ask you to look at

6   again Tab 10 and PTX-960.  In looking at the first two scans

7   you identify there, apix1?

8   A.     Yes, I have that.

9   Q.     You would consider that a fast scan at six seconds,

10  wouldn't you?

11  A.     Oh, yes.

12  Q.     Oh, yes.  And how about 100 second scan?  Would you

13  consider that a slow scan?

14  A.     Well, it depends with regard to the material.  Here,

15  I would consider that a medium scan.

16  Q.     A medium scan.  And 1,000 seconds is a slow scan in

17  your mind?

18  A.     With regard to this material, yes.

19  Q.     Okay.  Now --

20  A.     The objective, of course, was to collect enough

21  counts so that the peaks were clearly shown.

22  Q.     Now, let me ask you about apix 1 that you show at the

23  beginning of Exhibit 960.  What is shown on that scale?  And

24  that is Tab 10.

25  A.     And this is apix 1?

1   Q.      Yes.

2   A.      This is a scan which is six seconds per step from

3   three degrees to 28 degrees in 2-theta.

4   Q.      Okay.  In looking at, looking at that scan, you saw

5   no peaks to identify apixaban, crystalline apixaban in the

6   crushed tablet?

7   A.      Oh, that is correct.  Because this scan was too fast.

8   I'm seeing here the material that was 48 percent by weight,

9   for example, not material that is 2.5 percent by weight.

10  Q.      And as you testified yesterday about the USP, and I

11  think that is Tab 4, and I think the language you relied

12  upon is on page 2514.  It's the third page of the exhibit.

13  A.      So you are taking me to 2514.

14  Q.      2514, the paragraph, the last paragraph on the

15  right-hand side:  Identification of crystalline materials

16  can be accomplished by comparison of x-ray powder

17  diffraction patterns obtained from known materials with

18  those of the unknown.

19          And that is what Ms. Wigmore pointed you to the

20  footnote; correct?

21  A.      I don't.

22  Q.      Footnote 2, the International Centre for Diffraction

23  Data.

24  A.      Oh, that particular footnote.  Yes, that is the

25  footnote when it says per known samples.

Atwood - cross

1    Q.      Going back to Exhibit PTX-960, and the first scan you

2    show there.  Did you compare that scan to a known standard

3    to determine if crystalline apixaban was present?

4    A.      So you are taking me back to the first scan?

5    Q.      That's correct.

6    A.      In Exhibit C.

7            Did I -- now, the question was did you compare

8    the results of that scan with a known standard as the USP

9    suggests, that we just read?

10           First of all, there is no known standard, to

11   the best of my knowledge, in that particular reference set

12   for apixaban.  On the other hand, I do have crystalline

13   apixaban.

14           So did I compare the apix1 to the scan for

15   apixaban?  I don't recall doing that, but I recall noticing

16   that, for example, there is a large excipients between 10

17   and 11 degrees, so I would not expect to find apixaban peaks

18   between 10.0 and 10.6.  So apix1 shows me what the crushed

19   tablet is like, and it is emphasizing the material that is

20   there in abundance, not the material that is there is

21   2.5 percent.

22   Q.      Let me ask you that.  Looking at apix1, and I want to

23   be sure.  If I look at about approximately 9.3, would you

24   identify that as a peak?

25   A.      That is a peak.

1   Q.     Okay.  And if I look at 10.3?

2   A.     10.3?

3   Q.     Yes.

4   A.     Yes.

5   Q.     Is that a peak?

6   A.     Yes.

7   Q.     Okay.  And then I look at 13.1.  Is that a

8   characteristic peak of something?

9   A.     13.1, 13.2, it's a peak.  You have taken me to three

10  excipients peaks.

11  Q.     Okay.  Now, I see a lot of up and downs between the

12  peak of 10.2, 10.3, and 13.3.  What would you identify that

13  as on the scale?

14  A.     Now, you are taking me to, starting from 10 going to

15  13?

16  Q.     Yes, between the two peaks you just identified.

17  A.     And we see a lot of up and down.  That is noise.

18  That is just random noise.

19  Q.     Okay.  And then at approximately 18.9, that is a

20  peak?

21  A.     18.9 is quite a large excipient peak.

22  Q.     How about at 19.9?

23  A.     19.9 or thereabouts, it's a small excipient peak.

24  Q.     Those are peaks?

25  A.     Yes.

1    Q.      I just wanted know what your definition of a peak is.

2            Now, in your analysis, how did you -- strike

3    that.  How did you determine doing apix1 to do what you

4    called your slow scan in those certain areas, in those

5    certain regions?

6    A.      So I did apix1 to find out what the tablet shows,

7    what the excipients are showing.  I had no expectation of

8    being able to see 2.5 percent crystalline material in this

9    rather fast scan.

10           Now, knowing the pattern of apix1, this gives me

11   some information.  For example, it gives me the information

12   that I'm unlikely to see a 10.0 and a 10.6 due to apixaban

13   because there is a large excipient peak straddling.  So the

14   information I'm getting from apix1 is giving me a feeling

15   from where I should look for apixaban peaks.

16   Q.      Let me just look at your slides for one minute,

17   Doctor.

18           Which diffractogram did you use to identify

19   the 16.9 peak?

20           And maybe I could assist you in that regard.

21   A.      I'm getting there.  It will just be a moment here.

22           The diffractogram for the 16.9 is going to be

23   apix9.  And there are several -- well, there are three plots

24   of apix9.  They're exactly the same data, but the first two

25   just have different, different widths of view of the

1    pattern.

2    Q.    And do you remember when that was done?

3    A.    I remember it well, looking at the header which says

4    11/7/18.

5    Q.    Now, the 16.9 peak is not listed in the '945 patent;

6    is that correct?

7    A.    Correct.

8    Q.    How did you determine that the 16.9 peak on

9    November 7, 2018, was a peak that characterized crystalline

10   apixaban for Sunshine Lake's product?

11   A.    If Sunshine Lake's product is crystal form N-1, which

12   it comprises, in my opinion, crystal form N-1, I knew the

13   pattern for crystal form N-1, and that peak is the most

14   intense peak in the pattern of crystal form N-1, if I'm

15   remembering it correctly.

16   Q.    And how did you know the pattern for Sunshine Lake's

17   N-1 crystal?

18   A.    I don't think I knew the pattern for Sunshine Lake's

19   N-1, crystal form N-1, but I think I knew the pattern for

20   crystal form N-1.

21   Q.    Is that based on some other defendant's material?

22   A.    It certainly could have been, or it could have been

23   something I pulled out of the literature.

24   Q.    Because isn't it a fact, Doctor, you did not

25   analyze Sunshine Lake's API until February 2019; is that

1    correct?

2    A.    I agree.

3    Q.    And so you would have known from Sunshine Lake's API

4    that there was a 16.9 peak to look for?

5    A.    No.  I agree with you completely, counselor.  I would

6    not have known until I got Sunshine Lake's API and analyzed

7    it, that it was, in fact, pure form N-1.  But I did know

8    what the patterns were, form N-1, was.

9    Q.    So in coming to your conclusions, what you are saying

10   here is that you did not rely upon Sunshine Lake's scan for

11   its API to determine peak location?

12   A.    Could I have that question again?

13   Q.    When you did your scan, okay, to demonstrate the

14   three peaks that you said you did, you had not done the scan

15   of Sunshine Lake's API?

16   A.    I think that's correct.  I think that's correct, but

17   I knew at that point and from very early on what the crystal

18   pattern for form N-1 was.

19   Q.    Recognizing it.  So when you did your slow scans, you

20   already knew what you were looking for.  You already knew

21   what answer you were looking for, so it was just, if you

22   could find a peak in that area, you were going to

23   characterize it as a peak of crystal apixaban in the

24   Sunshine Lake product; is that correct?

25   A.    No.  I disagree with that completely.  I disagree

1     with that characterization.  I knew where I wanted to look

2     to see if there was a form of crystalline apixaban in form

3     N-1.

4     Q.     So you knew what answer you wanted in looking for

5     that peak?

6     A.     No.  I knew where a peak would occur and I was asking

7     myself the question, is there such a peak in Sunshine Lake's

8     material, and as it turned out, the answer was yes.

9     Q.     Okay.

10    A.     I wasn't presupposing the answer.  I was doing the

11    experiment to find out what the answer would be.

12    Q.     Mr. HENEGHAN talked about agglomeration.  Let me just

13    ask you one question to satisfy myself.

14                  As you know, you studied the Sunshine Lake

15    manufacturing process and what Sunshine Lake does, it sprays

16    a binder solution of povidone and apixaban on excipients; is

17    that correct?

18    A.     So that's my recollection.

19    Q.     And the excipients become granules; is that correct?

20    A.     Yes.  I --

21    Q.     During the process?

22                  Now, with respect to the size requirement

23    in the patent, D-90 of less than equal 89 microns, if a

24    granule with the sprayed on solution measured, that's not

25    the size you're looking for.  You just want to talk about

1    the apixaban crystal alone to satisfy the limitations of the

2    claim; is that correct?

3    A.     I agree with that, yes.

4    Q.     Okay.  Thank you.

5           Yesterday in response to one of Ms. Wigmore's

6    questions, you indicated that amorphous material has

7    the potential to convert to a crystalline form; is that

8    correct?

9    A.     That's correct.  Amorphous material is always at a

10   higher energy than its crystalline form.

11   Q.     But it is a potential?

12   A.     It's a driving force if it can overcome whatever

13   barriers the driving force can move to, the lower energy

14   crystalline form.

15   Q.     But my question is:  It has the potential, but it

16   doesn't mean it has to.  There's no a requirement that it

17   does; correct?

18   A.     I agree with that.

19   Q.     Thank you.

20          In your animation yesterday, and if I'm wrong,

21   please correct me, you only accounted for nucleation and

22   crystal growth with the amorphous material and the

23   crystalline material with the same compound?

24   A.     I take your point, with the animation where I was

25   growing in -- that was with a pocket of the same compound.

1   Q.      Right.  And none of your animation from yesterday

2   illustrated the growth of a crystal where it would be

3   apixaban would be one of the components and povidone would

4   be the other component?

5   A.      I don't quite understand the question because I would

6   not expect there to be a crystal of povidone and apixaban.

7   Rather, a crystal of apixaban and the polymer of polymer

8   particle povidone.

9   Q.      Povidone is -- when it's put in solution, it's

10  amorphous; right?  So is the crystalline apixaban when put

11  in solution, they become hardened solution, and when they

12  dry, they become amorphous; is that correct?

13  A.      Could I have that question again?

14  Q.      Yes.  With respect to povidone, when it's dissolved,

15  and let's talk specifically about the Sunshine Lake process.

16  When the povidone is dissolved in the acetic acid with the

17  crystalline apixaban, what you get is a solution; is that

18  correct?

19  A.      I would accept that representation.

20  Q.      Okay.  And in that solution, there are no crystals;

21  is that correct?

22  A.      If it's truly a solution, there will be no crystal.

23  Q.      If both of the compounds dissolve, there would be no

24  crystals?

25  A.      I agree.

1   Q.      Okay.

2   A.      If it's truly a solution, there would be no crystals.

3   Q.      Okay.  And based upon what you have seen in terms of

4   Sunshine Lake material, okay, the manufacturing process and

5   the like, what they give is an amorphous, they get a

6   droplet, which they spray on microcrystalline cellulose and

7   lactose anhydrous; is that correct?

8   A.      Those are main ingredients, yes.

9   Q.      And it's sprayed on as an amorphous substance?  When

10  it dries, it becomes amorphous?

11  A.      Yes.  If it's sprayed on, it's sprayed on as a

12  solution.

13  Q.      And when it dries, it becomes amorphous?

14  A.      That would be the objective of it.  However, there is

15  the potential for crystallization, and my experiments were

16  focused on, is that potential for crystallization realized

17  or is it not?

18  Q.      So let me ask you this:  In your animation that you

19  showed, you did not take into account the solid dispersion;

20  is that correct?

21  A.      I may take your point.  The animation I showed was

22  just a pure material, those light blue triangles.  So I

23  didn't have a second component associated with the

24  animation.

25  Q.      So you did not take into account a solid dispersion

1    in your animation.  That's correct, isn't it?

2    A.    I agree with that.

3    Q.    Okay.

4    A.    It was just an animation of triangle.

5    Q.    So we get back, we get back to your theory of pocket,

6    and much like what was asked by counsel for SigmaPharm,

7    isn't it a fact that what you've put forward here is just a

8    theory and you have taken no data, you've made no

9    measurements whatsoever to determine what the size of the,

10   the particle size of the apixaban; is that correct?

11   A.    I agree with that.  I agree with that.  The apixaban

12   must start small and how large can it grow?  As I've said,

13   the difference between the crystalline starting small at a

14   couple of nanometers and growing to 89,000 nanometers,

15   that's a lot of growth.  I don't think the process will

16   support that kind of growth.

17   Q.    Let me ask you this, Doctor:  You keep on talking

18   about pockets that are formed.  In your work, did you

19   determine if there were any pockets in the Sunshine Lake's

20   dosage form that contained this supposed crystalline

21   apixaban?

22   A.    Well, I measured the presence of crystalline

23   apixaban.

24   Q.    That's not what I asked.  You talked about the

25   crystalline apixaban being in pockets and the pockets limit

Atwood - cross

1    the growth of that crystalline apixaban if it's there.  If

2    it's there, it limits the growth.

3                        So I'm asking you:  Did you do any

4    analysis, any actual research to determine if those pockets

5    were there as you testified that they are?

6    A.    My opinion is based on the manufacturing process.

7    The fact that -- the fact that the process has a small

8    amount of apixaban and generally a large amount of polymer,

9    and the objective of the process is to get a uniform entity.

10   If we are going to press this into 2.5-milligram tablets,

11   for example, we don't want there to be more apixaban in one

12   tablet than the next tablet.  So the process has to be set

13   up and controlled so that there's homogeneity.

14   Q.    I appreciate your explanation, but, again, let me ask

15   you just a simple question.  You did not perform any

16   experiment to show or identify pockets in the Sunshine Lake

17   material, or the SigmaPharm material, or any other material.

18   You did nothing experimental to demonstrate the pockets that

19   you've been talking about.  That's all theoretical?

20   A.    I didn't do any experiment to verify the size of

21   pockets.  The size of pockets and the existence of pockets

22   comes from my understanding of the process whereby one is

23   seeking to get a uniform distribution of apixaban in the

24   material that is to be tableted.

25                        If it's not a uniform distribution of apixaban,

1   then it is not going to be 2.5 milligrams per pressed

2   tablet.

3   Q.     So you just assumed that these pockets exist, but

4   you've never seen one?

5   A.     I assume an atom exists and I've never actually seen

6   an atom.

7   Q.     No, that is not what I want to ask you.  You're the

8   one who talked about pockets, Doctor.  You're the one who

9   said there's crystalline apixaban in those pockets, and I'm

10  asking you, just very simply, yes or no:  You've never done

11  experiments to prove yourself that these pockets exist that

12  you are talking about?

13  A.     I have not done such an experiment, but I didn't need

14  to do such an experiment because it's basic science based on

15  the manufacturing process that such exists.

16  Q.     So the answer is no, you've never done any

17  experiments; is that correct?

18  A.     That was my answer, no, but.  I didn't need to.

19  Q.     You talked about breadth in terms of identifying

20  peaks.  Okay.  Let me ask you this:  It's my understanding

21  you're identifying breadth as the number of steps as part of

22  your scan; is that correct?

23  A.     I think that's fair, yes.

24  Q.     But isn't it a fact, doctor, that steps do not have

25  any set size?  The operator of the XRPD apparatus sets the

Atwood - cross

1  steps.

2  A.      I agree with that.  The steps I was using were .01

3  for the Sunshine Lake material.  .01 degrees.

4  Q.      Keeping that in mind, you also said peak breadth is

5  defined by count time.  Do you remember that?  This morning.

6  A.      Peak breadth is defined by count time.  Well, I take

7  your point of the count time is, if we have in mind any of

8  the XRPD patterns, Your Honor, there is a count time, but

9  there is a step and the step is just before in the line just

10  before the count time.  The step is where we define the

11  breadth of the peak, and in Sunshine Lake's material, the

12  step was always .01 degrees.  So that was one step.  The

13  next step .01, the next step .01.  That is defining the

14  breadth of the peak.  If it's five steps, it's .05 degrees

15  wide.

16  Q.      But you have no axis to show count time, that

17  doesn't, to show breadth.  So let me ask you this:  You use

18  the count time as a thousand seconds; correct?

19  A.      Yes.

20  Q.      And on your diffractograms you have no axis that

21  represents that count time in terms of plotting out your

22  scan?

23  A.      Count time is the amount of time that the counter is

24  making a measurement at a given step.  There doesn't, there

25  doesn't need to be an axis for that.  That's the parameter

1    that comes from that is how many counts are obtained in that

2    step.

3    Q.      As to how many counts that determines the breadth?

4    A.      No, the breadth of the peak is the number of steps

5    wide the peak is.

6    Q.      You talked about intensity.  Just a couple more

7    questions, Doctor.

8              Based upon your scan of Sunshine Lake's API, the

9    most intense peak was the 16.9 peak, wasn't it?

10   A.      That is my recollection, yes, of the API.

11   Q.      However, on your full scans of the Sunshine Lake

12   2.5 milligram tablet, you were not able to find a peak at

13   16.9, were you?

14   A.      By full scan you mean?

15   Q.      The scan of the crushed tablet from 3 degrees 2-theta

16   to I think you said 30 degrees 2-theta.

17   A.      The scan is from 3 to 28 degrees 2-theta.

18   Q.      Yes.  And my question is, and what I asked is over

19   that, over that range, would you have expected to find

20   16.9 -- a peak at 16.9 degrees 2-theta?

21   A.      Well, the count time for step was six seconds.

22   Q.      Yes.

23   A.      I would not have expected to find a peak.  Now,

24   perhaps your point is could I have scanned the entire

25   pattern at 1,000 seconds and .01 steps?  The answer is I

1    could have.  However, that would have taken, without pulling

2    out a calculator, I don't know, probably two weeks or so to

3    do one scan.  And it is not necessary because I'm interested

4    in interrogating the pattern focusing on 16.9 degree peak.

5    I'm interested in interrogating the pattern in the range of

6    16.9 to see if there is a peak.  I'm not interested in 16.0

7    because that is not an appropriate region for apixaban.

8    Q.    Again, 16.9 degrees 2-theta was most intense peak

9    that you were able to identify on Sunshine Lake's API?

10   A.    I agree.

11   Q.    Being that the most intense peak, wouldn't you expect

12   to see it on the full scan of the crushed tablet?

13   A.    Not at a speed of, which gives six count time.

14   Because six second count time, I'm doing it, I'm doing it a

15   factor of over 200 more in order to find, collect enough

16   counts so that I can tell that there is a peak there.  It's

17   a little bit like, if you want to, if you want to examine my

18   report, you can't do it from a distance of two peaks, just

19   flipping through.

20   Q.    I understand that.  I understand that, Doctor.  Let

21   me just get, understand one last thing.  I think you have

22   testified to this a couple of times.  Are the presence of

23   sharp peaks with a plus or minus .1 degree of 2-theta, of a

24   known peak, are they the only criteria you relied upon to

25   identify a peak on your XRPD scans?

1    A.      Could I have that question one more time?

2    Q.      Sure.   On the presence of sharp peaks, within plus or

3    minus 0.1-degree 2-theta of a known peak, that was the only

4    criterion you used in analyzing Sunshine Lake's product,

5    ANDA product that identifies a peak on the XRPD pattern?

6    A.      That is a main criterion.

7    Q.      That was the criterion you used?

8    A.      A second criterion, though, is the peak needs to be

9    reasonable in size for the amount of material that is there.

10   In other words, when we look at apix1, the first scan, I see

11   a huge peak at about 10.3.   That peak is too big.   It's too

12   intense.   So the peaks have to be reasonable for the amount

13   of material that is present.

14   Q.      When you say reasonable size, what are you

15   addressing?   The height of the peak, the intensity, or the

16   breadth of the peak?

17   A.      Well, in case of a given substance like apixaban,

18   it's the height of the peak because the breadth is very

19   similar for all the peaks.

20   Q.      And in evaluating breadth, you are saying an

21   acceptable breadth would be .01 to .05 degrees 2-theta?

22   A.      Well, an acceptable breadth would be more than .01

23   because that would be just a spot.

24   Q.      But it has to be at least that much.

25   A.      It has to be somewhat more than that.

1    Q.      And how much more?

2    A.      Well, I'm looking at the Sunshine Lake I is the

3    identifier, and this is crushed 2.5 milligram tablet, and

4    we're looking at the peak that is about 12.4.

5            So the width of this peak, it starts at about

6    12.25 and it ends at about 12.53 or 4.  So it had a width of

7    about -- the width at half height of this peak is about

8    .15 degrees, something like that.

9    Q.      .15?

10   A.      Yeah, that would be the -- one often measures a peak,

11   not at the apex where it is narrow.  It is at half height.

12   It would be at about .15.

13               MR. KOCHANSKI:  Thank you, Dr. Atwood.

14               THE COURT:  Any further cross-examination.

15               MR. PEJIC:  Nothing further, Your Honor.

16               THE COURT:  Redirect.

17               MS. WIGMORE:  Good afternoon, Dr. Atwood.  Just

18   a few questions.

19               THE WITNESS:  Good afternoon.

20                    REDIRECT EXAMINATION

21   BY MS. WIGMORE:

22   Q.      I'll start with Sunshine Lake.  Just since you have

23   that clear in your mind, we're going to return to PTX-846,

24   and page 159.  This is the portion of Sunshine Lake's ANDA

25   that Mr. Kochanski showed you, and I want to direct your

1    attention to the paragraph immediately above the table.

2    A.      Yes.

3    Q.      Does that paragraph remain in Sunshine Lake's ANDA?

4    A.      My recollection is that it does.

5    Q.      And do you recall Mr. Kochanski asking you about

6    whether you had any evidence about the 5 milligram Sunshine

7    Like ANDA tablet?

8    A.      I recall that.

9    Q.      If we return to the table to the paragraph below

10   that.  You see the reference to the 5 milligram strength.

11   And if we could look at the six month accelerated study for

12   that 5 milligram tablet, what does it say?

13   A.      It says amorphous form plus form N-1 (part

14   conversion).

15   Q.      What does that mean?

16   A.      That means that using the XRPD techniques in-house,

17   that crystalline apixaban, form N-1, crystalline apixaban

18   was observed.  By part conversion, I think that means that

19   was partially amorphous and partially crystalline.

20   Q.      Was that observed in Sunshine Lake's 5 milligram

21   tablet?

22   A.      Yes.

23   Q.      Now, I'm going to turn to SigmaPharm so you have that

24   clear in your mind.

25           Do you recall being asked by Mr. Heneghan about

1    testimony you had given in prior cases?

2    A.      I recall that.

3    Q.      And he gave you I believe three examples of cases

4    where he indicated your testimony was not accepted.  Do you

5    recall that?

6    A.      I recall that.

7    Q.      Approximately how many cases have you testified in,

8    Dr. Atwood?

9    A.      In trial?

10   Q.      Yes.

11   A.      Probably over my career, 35 cases.

12   Q.      Have there been cases in which your testimony was

13   accepted and credited by the Court in the area of XRPD?

14   A.      Indeed.  Most of the time.

15   Q.      And has your testimony on XRPD been credited in this

16   Court?

17   A.      It has.

18   Q.      Now, I'd like to refer you to the deposition

19   testimony that Mr. Heneghan showed you.  Do you recall that

20   he asked you to look at testimony from your transcript at

21   page 153, line 7?

22   A.      Yes.  I recall him asking that.

23   Q.      So he read you the testimony from 153, line 7.  He

24   read your answer up through line 12.  I'd like you to read

25   the rest of your answer from line 13 to line 17.

1    A.              "Answer:  (Continuing)  Well, the basic point is

2    that in Zaworotko's assumption, it's apixaban and povidone,

3    a polymer, but in fact it's not.  As we can clearly see from

4    the XRPD patterns, there are lots of other materials

5    present, crystalline materials."

6    Q.      Thank you.

7                    MR. HENEGHAN:  Your Honor, could we also read

8    for completeness the next question and answer?

9                    MS. WIGMORE:  No, this is one full question of

10   which he read a portion of it.  I'm just completing the

11   answer.

12                   THE COURT:  Overruled.  Go ahead.

13   BY MS. WIGMORE:

14   Q.      Now, put that aside.  You were also asked about

15   testimony relating to your reliance on the peaks in the '945

16   patent.  Do you recall that?

17   A.      Yes.

18   Q.      Now, did you provide a reply report in this case,

19   Dr. Atwood?

20   A.      Yes.

21   Q.      And in your reply report, did you provide opinion

22   about the peaks and SigmaPharm's API?  If you could turn to

23   page 9.

24                   Did you look at SigmaPharm's tablet --

25   SigmaPharm's API to determine the crystalline peaks in the

1  ANDA?

2  A.    Yes.

3  Q.    And if we turn to page 11 of your reply report, did

4  you provide an opinion about the 22-degree peaks relative to

5  the SigmaPharm API?

6          MR. HENEGHAN:   I just object to using the report

7  for testimony.   I impeached him with it.   It's hearsay.

8          THE COURT:   Are you trying to refresh his

9  recollection?

10          MS. WIGMORE:   Yes.   We can put the report down.

11  BY MS. WIGMORE:

12  Q.    I will just ask you, Dr. Atwood:   Did you provide an

13  opinion in your reply report about the 22 degrees peak in

14  the correspondence with the API peak?

15  A.    I did.   The 22-degree peak was, if memory serves me,

16  43 percent in peak height compared to the 16.9-degree peak,

17  so it was about the third highest peak in the pattern of

18  crystal form N-1, the API.

19  Q.    And just so the record is clear, you referred to the

20  22-degree peak was for the SigmaPharm testing; is that

21  correct?

22  A.    Yes, yes.

23  Q.    And the 16.9-degree peak you just referred to was

24  with respect to the Sunshine Lake tablet; is that correct?

25  A.    Correct.   Thanks for separating those two.

1    Q.    Now, you were asked about the timing of your testing.

2          Do you recall that?

3    A.    I do.

4    Q.    Let's pull up PTX-590.  This is the Court's claim

5    construction order.  What is the date of this order?

6    A.    This is 18 October 2018.

7    Q.    And you testified earlier that you did Sunshine Lake

8    testing beginning at the end of October 2018.

9          Do you recall that?

10   A.    Correct.

11   Q.    And did you begin the SigmaPharm testing in November

12   of 2018?

13   A.    I did, early November.

14   Q.    Now, with respect to your opinions about the presence

15   of crystalline apixaban in the defendant's ANDA product, do

16   you have an opinion as to whether that crystalline would

17   begin to form after two or more years?

18   A.    No, no.  The science is that the crystalline form

19   will begin to appear rather quickly, and crystalline form is

20   at a low energy, so it will convert amorphous form around

21   the crystalline form rather quickly.  I would expect that at

22   the two-year mark that the conversion is pretty much over.

23   It's probably -- conversion at the one month mark or

24   two-month mark would be substantial.

25          MS. WIGMORE:  Thank you, Dr. Atwood.  No further

 1    questions.

 2                    THE COURT:  All right.  I have a few questions

 3    for you, Dr. Atwood.

 4                    THE WITNESS:  Yes.

 5                    THE COURT:  XRPD testing, as I understand it,

 6    you did a test on a crushed tablet of SigmaPharm; is that

 7    correct?

 8                    THE WITNESS:  Correct.

 9                    THE COURT:  And another one on a crushed tablet

10    of Sunshine Lake's.  Right?

11                    THE WITNESS:  Yes, that's correct.

12                    THE COURT:  You also had some API, just active

13    pharmaceutical ingredient for each of those two defendants.

14    Is that right?

15                    THE WITNESS:  Yes.  I received samples of API

16    from each defendant at some point in time.

17                    THE COURT:  And somehow you had some XRPD

18    information on the excipients as well; is that right?

19                    THE WITNESS:  Yes.  The excipients are rather

20    standard excipients and I generally have those around my lab

21    and I don't memorize the patterns, of course, but I can

22    easily obtain patterns for all the common excipients.

23                    THE COURT:  And for those excipients that were

24    relevant here, do you look those peaks up in a table

25    somewhere or did you run specific XRPD tests on those

1    excipients for this trial?

2              THE WITNESS:  That's a good question.  I could

3    have looked them up, but the problem with looking them up is

4    they may have been run slightly differently than the way I

5    normally run XRPDs, so typically, I take excipients that I

6    have in my lab and I run them so that everything is the

7    same.  You know, the instrument is the same, the hands doing

8    the loading are the same.

9              THE COURT:  And that is what you did in this

10   case.  Is that correct?

11             THE WITNESS:  Exactly.

12             THE COURT:  So would it have been possible to

13   take the crushed tablet for either of them and somehow

14   separate out the excipients from the apixaban?

15             THE WITNESS:  That's really a good question.  I

16   have a method called density separation, and it just

17   physically separates components of different densities, one

18   from another.

19             Could I have done that?  I think the answer is

20   yes, but the difficulty there would be I might be out a lot

21   of material because the loading of the tablets is quite low

22   and SigmaPharm is 2.5 milligrams and all of that material

23   will probably not be crystalline.  There will probably be

24   some residual amorphous material.

25             MR. PEJIC:  Your Honor, I hate to interrupt, but

1    the parties have stipulated that density separation will not

2    be discussed in the case, and stipulated that Dr. Atwood's

3    method was not available at the time of invention of the

4    '945 patent.

5            THE COURT:  Thank you.  I saw a letter

6    yesterday.

7            MR. PEJIC:  I apologize, Your Honor.  I just

8    want to bring that up.

9            THE COURT:  I appreciate that.  I didn't know

10   that that is what I was asking about.

11           THE WITNESS:  I'm sorry if I wondered.

12           THE COURT:  Just in theory, if one were looking

13   at a sample of just apixaban and it was partly amorphous and

14   partly crystalline apixaban, just at a high level, what

15   would an XRPD of that look like?

16           THE WITNESS:  Excellent question.  So if my hand

17   is the pattern of crystalline apixaban, what one would see

18   is with amorphous, one would see sort of amorphous rise of

19   the baseline and then peaks on top of it and then the

20   amorphous part going away.

21           Your Honor, if we looked at -- I won't go there,

22   but we've shown a pat, shown a pattern before where you can

23   see on the crushed tablet, there are peaks that rise like

24   that and then sharp peaks come out of the crushed tablet.

25   That rise of the baseline was due to amorphous material in

1    the tablet.

2              THE COURT:  Okay.  And then in the XRPD that you

3    did show, which I recognize are apixaban plus the

4    excipients, is there -- and I understand that you see

5    something in the intensity of the peaks that correlate in

6    some rough fashion with the amount of apixaban in that

7    sample.  Is that right?

8              THE WITNESS:  Exactly right, Your Honor.

9              THE COURT:  But if I were further interested in

10   understanding, of the apixaban, how much of that is

11   crystalline versus how much of that apixaban is not

12   crystalline, is there anything in XRPD's analysis that

13   you've shown us that would answer that question?

14             THE WITNESS:  I don't think so.  Now, if we

15   had -- if we had a pure sample of the apixaban which was

16   partly crystalline and partly amorphous, that might be

17   probative, but the problem is the amorphous apixaban is just

18   going to be sort of a broad rise in the baseline, and we

19   already have polymers in much greater abundance that have

20   the same sort of rise in the baseline.

21             So I think -- I wouldn't bring up a topic like

22   density separation.

23             THE COURT:  No, we're not going to.  All right.

24   Thank you.  Anything further to follow up?

25             MS. WIGMORE:  I just have some clarification to

Atwood - recross

1    make sure the record is clear.

2    BY MS. WIGMORE:

3    Q.      You were asked about the API testing that you did and

4    is it correct that you received an API sample from Sunshine

5    Lake and tested it?

6    A.      That's my recollection, yes.

7    Q.      With respect to SigmaPharm, did you rely on the API

8    XRPD that they produced with their ANDA?

9    A.      Exactly.  In fact, I think I showed a slide with that

10   on it.

11                   MS. WIGMORE:  Thank you, Your Honor.

12                   THE COURT:  Thank you.  Follow-up.

13                            RECROSS EXAMINATION

14   BY MR. HENEGHAN:

15   Q.      Points of clarification.  So the point of that is

16   that you didn't yourself test the SigmaPharm API; right?

17   A.      That's my recollection.  I saw the -- from one of the

18   ANDA documents.

19   Q.      Right.  You saw a diffractogram that was provided to

20   you on paper as opposed to doing a test yourself and writing

21   your own?

22   A.      Yes, that's my recollection.

23   Q.      And the other one, I think you said that the

24   SigmaPharm tablet you tested was 2.5.  Actually, it was the

25   five-milligram, wasn't it?

```
 1    A.      If I said 2.5, it was -- SigmaPharm was 5 and

 2    Sunshine Lake was 2.5.

 3                    MR. HENEGHAN:   Thank you.

 4                    THE COURT:   Thank you.   Any follow-up?

 5                    MR. KOCHANSKI:   No, Your Honor.

 6                    THE COURT:   All right.   Thank you very much.

 7    But before you go, since we're almost to the weekend here,

 8    just a few things.

 9                    We're going to charge the time of my exam 50/50

10    to both sides, and then for next week, where we are is, I'm

11    available 8:30 to 3:30 Monday and Tuesday, 8:30 to 3:30

12    Monday and Tuesday.

13                    I can now do 12:30 until 7:00 on Thursday.   No

14    trial on Wednesday.   I can do 8:30 to 3:30 again on Friday.

15    And then the following week, Monday is a holiday.   I'm

16    available on Tuesday, the 12th, from 1:30 to 7:00, 1:30 to

17    7:00 on the 12th.   And on the 13th, 8:30 to 6:00.   That's

18    how things look as of now.

19                    Any questions about that or any other issues

20    before we break?

21                    MR. LEE:   Not from the plaintiffs, Your Honor.

22                    THE COURT:   From the defendants?

23                    MR. HENEGHAN:   No Your Honor.

24                    MR. PEJIC:   No, Your Honor.

25                    MR. KOCHANSKI:   No, Your Honor.
```

1          THE COURT:  You may step down.  Have a nice

2    weekend.

3          THE WITNESS:  Thank you, Your Honor.

4          (Witness excused.)

5          (Court adjourned at 2:25 p.m.)

6

7

8       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

9

10                        /s/ Brian P. Gaffigan
                      Official Court Reporter
11                      U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25