```
 1                    IN THE UNITED STATES DISTRICT COURT
                     IN AND FOR THE DISTRICT OF DELAWARE
 2
                                    - - -
 3     BRISTOL-MYERS SQUIBB COMPANY
       and PFIZER INC.,                        : CIVIL ACTION
 4                          Plaintiffs,    :
       v                                       :
 5                                         : (Consolidated)
       AUROBINDO PHARMA USA INC.,              :
 6                                         : NO. 17-374-LPS
                            Defendant.
 7
                                    - - -
 8
                             Wilmington, Delaware
 9                        Monday, November 4, 2019
                           Bench Trial - Volume D
10
                                    - - -
11
       BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
12
       APPEARANCES:              - - -
13
                     FARNAN, LLP
14                   BY:  MICHAEL J. FARNAN, ESQ.

15                        and

16                   WILMER CUTLER PICKERING HALE and DORR, LLP
                     BY:  AMY K. WIGMORE, ESQ., and
17                        HEATHER M. PETRUZZI, ESQ.
                          (Washington, District of Columbia)
18
                          and
19
                     WILMER CUTLER PICKERING HALE and DORR, LLP
20                   BY:  WILLIAM F. LEE, ESQ.,
                          ANDREW J. DANFORD, ESQ.,
21                        TIMOTHY A. COOK, ESQ.,
                          KEVIN S. PRUSSIA, ESQ., and
22                        SHIRLEY X. LI CANTIN, ESQ.
                          (Boston, Massachusetts)
23
                              Counsel for Bristol-Myers Squibb
24                            Company and Pfizer Inc.

25     Valerie J. Gunning            Brian P. Gaffigan
       Official Court Reporter       Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3                 PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
                 BY:   JOHN C. PHILLIPS, JR., ESQ.

4                         Counsel on behalf of SigmaPharm
                         Laboratories, LLC; Unichem Laboratories,
5                         Ltd., Zydus Pharmaceuticals (USA) Inc.,
                         Sunshine Lake Pharma Co., Ltd., and
6                         HEC Pharm USA

7                     and

8                 HUSCH BLACKWELL, LLP
                 BY:   PHILIP D. SEGREST, JR., ESQ., and
9                       DON J. MIZERK, ESQ.
                       (Chicago, Illinois)
10

11                    and

12                HUSCH BLACKWELL, LLP
                 BY:   THOMAS P. HENEGHAN, ESQ., and
13                     DUSTIN L. TAYLOR, ESQ.
                       (Madison, Wisconsin)

14                        Counsel on behalf of SigmaPharm
                         Laboratories, LLC
15
                     and
16
                 GREENBLUM & BERNSTEIN, P.L.C.
17               BY:   P. BRANKO PEJIC, ESQ.,
                       PAUL A. BRAIER, ESQ., and
18                     JILL M. BROWNING, ESQ.
                       (Reston, Virginia)
19
                         Counsel on behalf of Unichem
20                       Laboratories, Ltd.

21

22

23

24

25

1    APPEARANCES:   Continued)

2
             YOUNG CONAWAY STARGATT & TAYLOR, LLP
3            BY:  KAREN L. PASCALE, ESQ.

4                  and

5            LERNER DAVID LITTENBURG KRUMHOLZ & MENTLIK, LLP
             BY:  PAUL H. KOCHANSKI, ESQ., and
6                  KENDALL K. GURULE, ESQ.
                  (Westfield, New Jersey)
7
                      Counsel on behalf of Sunshine Lake
8                     Pharma Co., Ltd., and HEC Pharm USA

9

10

11

12

13                      - oOo -

14              P R O C E E D I N G S

15          (REPORTER'S NOTE:  The following bench trial was

16    held in open court, beginning at 8:34 a.m.)

17          THE COURT:  Good morning, everyone.

18          (The Attorneys respond, "good morning, Your

19    Honor.")

20          THE COURT:  Did you have a nice weekend?  Are

21    there any issues from plaintiff?

22          MS. WIGMORE:  We do have a protective order

23    issue, Your Honor.

24          THE COURT:  Okay.

25          MR. LEE:  Two issues, Your Honor.  One is just

1    reporting.   On the issue of the declaration of the

2    laboratory notebook, on the authentication, we've agreed

3    upon a declaration.

4                THE COURT:  You have agreed upon it?

5                MR. LEE:  Yes.

6                MR. PEJIC:  Yes, Your Honor.

7                MR. LEE:  If we can file it on the docket, Your

8    Honor, if that's sufficient.

9                THE COURT:  That's fine.

10               Is that agreeable to the defendants?

11               MR. PEJIC:  That's fine.

12               THE COURT:  And then a protective order issue?

13               MR. LEE:  Yes, Your Honor.  Ms. Wigmore will

14   address it.

15               THE COURT:  All right.

16               Good morning.

17               MS. WIGMORE:  Good morning.  This is an issue

18   that has been raised by Unichem, but they requested that we

19   bring it to Your Honor's attention as a request for a

20   protective order to prevent their two scientific officers,

21   Dr. Sofay, from having access to the plaintiff's

22   confidential information under the protective order.

23               Now, the protective order in the case, which is

24   DI-48, has been in place for some time.  At the beginning of

25   the trial, Unichem requested that we extend access to

1    protective material to their chief scientific officer so

2    that he can participate in general trial preparation

3    activities.

4           He is responsible for active pharmaceuticals to

5    finish dosages and analytical research and clinical research

6    at Unichem.  He is responsible for guiding Apotex process

7    research, analytical method development, IPR groups, new

8    project selection, and exploring and implementing new

9    technologies.

10          To the extent they need him to be present in the

11   courtroom, we have no objection.  To the extent they want

12   him to be present for trial preparation activities, we have

13   no objection.

14          But what we do object to is him having

15   unfettered access to our very large volume of confidential

16   material produced in the case.  We've attempted to reach a

17   compromise by asking them are there particular categories of

18   documents that they would like for him to see, but they have

19   not agreed to narrow it in any way.

20          And so our concern is their proposal is not

21   workable.  We need to know if he's going to be having access

22   to materials that involve BMS's detailed IMS data on

23   prescriptions, commercial leadership team, slide decks

24   including financial and strategic information,

25   profit-and-loss statements, and perhaps most importantly,

1    documents that have information concerning other BMS

2    products that could about be at issue between the companies

3    in the future.

4            So again, we have no problem with him being

5    present in the courtroom, but we are not comfortable with

6    someone in that competitive decision-making role of a chief

7    scientific officer having access to all of the details of

8    our production.  We don't see why that would be necessary at

9    this juncture.

10           THE COURT:  So when you say you are okay with

11   him being there for general trial prep, what is it that you

12   are comfortable with in that regard?

13           MS. WIGMORE:  What we are comfortable with is if

14   there are exhibits that they have shared with us that they

15   plan to use at trial, and we have the opportunity to know

16   what those are, we have no objection at the him being

17   present and meetings about those, or if they want to share

18   particular exhibits that they want him to be present while

19   they're discussed, we're happy to look at those.  And if

20   there aren't any issues such as those I've just raised, we

21   have no objection.

22           But right now we have -- there's a massive

23   database of all of our client's confidential information,

24   and we can't agree to unfettered access.

25           THE COURT:  Okay.  I'll hear from Unichem then.

1          MR. PEJIC:  Yes, Your Honor.  The first thing I

2     have to say is this appears to be a complete breakdown of

3     the meet-and-confer process.

4          We asked plaintiffs to advise us what

5     information they did not want our chief scientific officer

6     to see.  We said absolutely, we'll set that out there.  We

7     said we will not give him unfettered access to the database.

8     They identified the NDA.  We said we will not give him

9     access to the NDA.  We asked them to tell us what else they

10     didn't want him to see, and I will represent now we will

11     give him access to any of the information that counsel has

12     identified.

13          We would just like to avoid any situation of a

14     technical violation of the protective order just by

15     proximity to the information by walking through the war

16     rooms.

17          We're not going to give him any of this

18     information.  It doesn't bear on any arguments Unichem is

19     even going to make.

20          And this is what we asked for last week.  And

21     hearing this --

22          THE COURT:  So it sounds like you're agreeable

23     to what was proposed this morning.

24          MR. PEJIC:  I have been asking them since Friday

25     for this information, so absolutely.

```
1              THE COURT:  All right.  Is that agreeable to

2   you, recognizing that you may -- he or she may be physically

3   proximate to the information but won't have really access to

4   it, just maybe in a room with it?

5              MS. WIGMORE:  That is fine, Your Honor.  We

6   obviously disagree with the characterization in the

7   meet-and-confer process.

8              We cannot identify every document we don't want

9   him to see because there are so many in the production, but

10  if they can commit to us he will not be reviewing our

11  confidential documents, particularly those in the categories

12  I just mentioned, we think that is satisfactory.

13             MR. PEJIC:  Your Honor, we've already made that

14  representation.

15             THE COURT:  Okay.  Well, sounds like you all

16  worked this one out.

17             MR. PEJIC:  Thank you, Your Honor.

18             THE COURT:  Any other issues from plaintiff this

19  morning?

20             MR. LEE:  No, Your Honor.

21             THE COURT:  How about issues from defendants?

22             MR. HENEGHAN:  Your Honor, Tom Heneghan on

23  behalf of SigmaPharm.

24             We just have one issue related to the

25  demonstrative slides for Dr. Munson who will be testifying
```

1   today.

2          There is a group of seven pages of the

3   demonstrative slides that I will, just for the record, list

4   them:

5          7.15.  This is PDX-7.15, 7.16, 7.17, 7.19, 7.20,

6   7.21 and 7.22.

7          If I may approach, Judge, I will hand up a paper

8   copy of the slide deck.

9          Let's turn to page 7.20, which is one of them,

10   and I will use that as an example.

11          (Document passed forward.)

12          THE COURT:  Okay.  I have it.

13          MR. HENEGHAN:  So the underlying graph that is

14   in that slide is from Dr. Munson's report, so we don't

15   object to that slide.  It's the blowup.  So what happens is

16   the way this was blown up, the lines become very pixelated.

17   It actually changes the width of the lines.  It changes

18   where the peak actually falls.  It just -- the blowup

19   mischaracterizes what the lines are.  And so that's our

20   problem with this, is that it is not a fair demonstrative

21   because it's just the process of blowing it up changes the

22   shape of the line.

23          THE COURT:  The blowup would be what is in the

24   yellow rectangles and then expanded --

25          MR. HENEGHAN:  Right, sort of pulled out like

1    what we see electronically.  And so our problem is the

2    blowup isn't accurate.

3                    THE COURT:  All right.  Even though you will be

4    able to cross-examine and make that clear that this looks

5    different, right?

6                    MR. HENEGHAN:  We could, yes.  But the point is

7    the width of the lines is an important issue of this case,

8    and it just changes what it actually is.

9                    THE COURT:  All right.  Thank you.

10                   Any response?

11                   Good morning.

12                   MR. PRUSSIA:  Good morning, Your Honor.  Kevin

13   Prussia.

14                   There is no dispute that this is from

15   Dr. Munson's report.  It is a blowup to aid the Court in his

16   analysis.  As Your Honor knows, it is a demonstrative.  It

17   is not evidence and if they want to cross-examine him on it,

18   it goes to the weight.

19                   THE COURT:  Is the blown up portion, is that in

20   his report as well?

21                   MR. PRUSSIA:  The blown up portion was not.

22   This part of the demonstrative is to blow it up to aid the

23   Court through his analysis.

24                   THE COURT:  Okay.  Any response?

25                   MR. HENEGHAN:  Well, just the fact that the

1   blowup was not in his report really is part of the point,

2   too, is that he didn't testify about the blowup, our experts

3   have not seen the blowup until just now -- until last night,

4   and so it just changes what that graph shows.  And he could

5   make the same points without the blowup.

6             THE COURT:  All right.  I'm going to overrule

7   the objections.  I think all of this just goes to, you know,

8   the disputed facts.  The witness will presumably make clear

9   that it's a blow up.

10            I personally find it helpful because it's

11  awfully small of the things that need to be seen, and

12  everybody will have a chance to put in context what the real

13  evidence in there is related and what isn't, so the

14  objection is overruled.

15            Anything else from defendants?

16            MR. HENEGHAN:  Not from SigmaPharm.

17            MR. PEJIC:  Not from Unichem.

18            MR. KOCHANSKI:  Nothing from Sunshine Lake, Your

19  Honor:

20            THE COURT:  All right.

21            MR. LEE:  So, Your Honor, our next witness is

22  Mr. Eric Munson.  Mr. Prussia will do the examination.

23            THE COURT:  Okay, great.  You may call the witness.

24            ... DR. ERIC MUNSON, having been first duly

25  sworn, was examined and testified as follows ...

1              THE COURT:  Good morning, Dr. Munson.  Welcome.

2              THE WITNESS:  Thank you.

3              THE COURT:  You may proceed when you are ready.

4                      DIRECT EXAMINATION

5    BY MR. PRUSSIA:

6    Q.      Good morning, Dr. Munson.  Please introduce yourself

7    to the Court.

8    A.      My name is Eric Munson.

9    Q.      Dr. Munson, have you been retained by the plaintiffs

10   in this case?

11   A.      Yes, I have.

12   Q.      Are you being compensated for your work in this case?

13   A.      Yes, I am.

14   Q.      Is your compensation dependent on the outcome of the

15   litigation?

16   A.      It is not.

17   Q.      Is your compensation based on the substance of your

18   opinions?

19   A.      It is not.

20   Q.      What issues in this case have you been asked to

21   address?

22   A.      So I have been asked to determine whether there is

23   crystalline apixaban present in SigmaPharm's ANDA tablet.

24   Q.      Do you understand that a different expert,

25   Dr. Atwood, is addressing the issue of infringement with

Munson - direct

1    respect to SigmaPharm?

2    A.    I am aware of that.

3    Q.    Are you offering any opinions with respect to

4    infringement of the '945 patent?

5    A.    I am not.

6    Q.    Are you offering any opinions about the '208 patent

7    in this case?

8    A.    I am not.

9    Q.    Are you offering any opinions about patent validity?

10   A.    I am not.

11         MR. PRUSSIA:   Let's call up PDX-7.2 on the

12   screen.

13   BY MR. PRUSSIA:

14   Q.    Dr. Munson, what is reflected on this slide?

15   A.    So what's shown on this slide is a summary of my

16   education as well as my current job.

17   Q.    What is your educational background?

18   A.    So I received my bachelor's degree from Augustana

19   College in Sioux Falls, South Dakota, in Chemistry and

20   Physics.

21         I then went and spent a year in Germany as a

22   Fulbright fellow.

23         I then continued with my Ph.D. in Chemistry from

24   Texas A&M University in 1993.

25         Followed by a short post-doctoral stint with

Munson - direct

1    Professor Alex Hines at the University of California,

2    Berkeley.

3    Q.        And where are you currently employed?

4    A.        I am currently employed at Purdue University.

5    Q.        What are your job responsibilities?

6    A.        So I am both a professor and head of the Department

7    of Industrial and Physical Pharmacy.

8              As a professor, I perform research, teaching and

9    service.

10             I am also the Dane O. Kildsig Chair in

11   Industrial and Physical Pharmacy.

12   Q.        What is the focus of your research?

13   A.        So the focus of my research is on the

14   characterization of pharmaceutical solids using a variety of

15   analytical techniques.

16   Q.        Can you give some examples of the techniques that you

17   use?

18   A.        So I use many different analytical techniques,

19   including differential scanning calorimetry,

20   thermogravimetric analysis, powder x-ray diffraction.   But

21   my emphasis is on solid state NMR spectroscopy.

22   Q.        What is solid state NMR spectroscopy?

23   A.        So solid state is a nuclear magnetic resonance

24   spectroscopy is a technique that can be used to characterize

25   pharmaceutical solids as it is related to this case.

Munson - direct

1                   So, for example, we can look at crystalline and

2        amorphous forms of compounds that may be within a

3        pharmaceutical formulation.

4        Q.      Can we refer to that SSNMR?

5        A.      Yes.

6        Q.      And how do you use SSNMR in your research?

7        A.      So I currently have three solid state NMR

8        spectrometers in my laboratory.

9                   I use it to characterize all sorts of

10       pharmaceutical solids, including pharmaceutical

11       formulations.

12       Q.      How long have you been using SSNMR in your research?

13       A.      For about 30 years.

14       Q.      Have you published on SSNMR?

15       A.      I have.

16       Q.      About how many?

17       A.      More than 100.

18       Q.      We're going to put up PTX-786 on the screen,

19       Dr. Munson.

20                   What is PTX-786?

21       A.      So this is my curriculum vitae.

22                   MR. PRUSSIA:  Your Honor, plaintiffs offer

23       Dr. Munson as an expert in pharmaceutical formulation and

24       analysis.

25                   MR. HENEGHAN:  No objection, Your Honor.

1           THE COURT:  He is so recognized.

2    BY MR. PRUSSIA:

3    Q.     Dr. Munson, what analysis were you asked to perform

4    in this case?

5    A.     So I was asked to determine whether crystalline

6    apixaban was present in SigmaPharm's ANDA tablets.

7    Q.     And what is your conclusion with respect to that?

8    A.     So I concluded that there is, indeed, crystalline

9    apixaban present in SigmaPharm's ANDA tablets.

10   Q.     What is the basis for your conclusion?

11   A.     So that is based upon the solid state NMR results

12   that I obtained of SigmaPharm's tablets.

13   Q.     Do you recall having a conversation with Dr. Atwood

14   in February of 2019?

15   A.     I do.

16   Q.     What did you tell Dr. Atwood during that

17   conversation?

18   A.     So one of the things I told Dr. Atwood was the

19   conclusions of my -- that I came to, that there was

20   crystalline apixaban present in SigmaPharm's ANDA tablets.

21   Q.     Let's talk a little bit about the basics of SSNMR.

22              What information is provided by an SSNMR

23   spectrum?

24   A.     So as it is related to this case, solid state NMR can

25   provide information about different crystalline forms of

Munson - direct

1   compounds, as well as information about excipients that are

2   present in a pharmaceutical formulation, as well as the

3   amorphous forms versus the crystalline forms of various

4   compounds.

5   Q.      How can an SSNMR spectrum tell one about the presence

6   of crystalline material in a pharmaceutical composition?

7   A.      So crystalline materials tend to have very sharp

8   resonances relative to, say, amorphous materials which tend

9   to have broader resonances.

10  Q.      Can SSNMR be used to distinguish amorphous and

11  crystalline forms of the same material?

12  A.      Yes, they can.

13  Q.      How?

14  A.      So, once again, the crystalline materials will tend

15  to have sharp lines as opposed to the amorphous materials

16  having narrow lines.  I'm sorry.  The crystalline peaks have

17  narrow lines.  The amorphous peaks have broad lines.

18  Q.      Thank you for that clarification.

19  A.      Yes.

20  Q.      Have you prepared a demonstrative to illustrate this?

21  A.      Yes, I have.

22  Q.      Let's please put up 7.3.  What is shown on PDX-7.3?

23  A.      So what's shown on PDX-7.3 is a paper we published

24  back around 2006 or so.  It's a study we did of lactose,

25  which is a common pharmaceutical excipient.

1   Q.      What is illustrated on the figure on the right?

2   A.      The figure on the right are four different what we

3   call solid state NMR spectra.  The top two correspond to two

4   different crystalline forms of lactose.  I believe the first

5   one is the monohydrate form and the bottom one, that would

6   be views of the crystalline form, is an anhydrate form.

7                   And then in C and D are two different

8   amorphous techniques we prepared using a technique called

9   lyophilization, and the other one is prepared using what we

10  call spray drying.

11  Q.      So the spectra depicted in A and B are crystalline?

12  A.      That's correct.

13  Q.      The spectra depicted in C and D are amorphous?

14  A.      That's correct.

15  Q.      And how does a skilled NMR spectroscopist know

16  that?

17  A.      A skilled spectroscopist would look at that and say

18  the top two are crystalline and the bottom two are

19  amorphous.

20  Q.      Let's turn to PDX-7.4 and let's turn to your analysis

21  of the SigmaPharm products in this case.  What examples did

22  you analyze?

23  A.      I tested two samples.  One of them was the N-1

24  crystalline apixaban API or active pharmaceutical ingredient

25  that was manufactured by BMS, and then the second one was a

Munson - direct

 1    sample five-milligram tablet that came from SigmaPharm's

 2    batch number SB0750079.

 3    Q.      Let's focus on the top line.  What is apixaban API?

 4    A.      So apixaban API corresponds to the active

 5    pharmaceutical ingredient or what we would call the drug

 6    substance.

 7    Q.      Why did you analyze apixaban API manufactured by BMS

 8    instead of apixaban API from SigmaPharm?

 9    A.      So from what I understand, the SigmaPharm API was not

10    available at the time that I performed the testing.

11    Q.      Do you have an understanding as to why that was the

12    case?

13    A.      I believe it had something to do with the SigmaPharm

14    not providing the API.

15    Q.      Where were the samples tested?

16    A.      The samples were tested at Kansas Analytical

17    Services.

18    Q.      Who tested the samples?

19    A.      So the samples were tested by doctor Matthew

20    Nethercott.

21    Q.      Who is Dr. Nethercott?

22    A.      So Dr. Nethercott worked for Kansas Analytical

23    Services.

24    Q.      What was your involvement with the analysis of the

25    samples?

Munson - direct

1   A.      So my involvement was to provide very detailed

2   directions to Dr. Nethercott about what he should do with

3   respect to both sample preparation and data acquisition.

4   Q.      Who provided the samples to the lab?

5   A.      So those are provided by counsel.

6   Q.      How were samples shipped to the lab?

7   A.      They were shipped by Federal Express.

8   Q.      Have you previously received samples for testing via

9   Fed-Ex, Federal Express?

10  A.      We received almost all of our samples via Federal

11  Express?

12  Q.      Is there anything about the shipping or storage of

13  the samples in this case that would cause you concern about

14  their integrity?

15  A.      No.

16  Q.      Please turn to PTX-1101 at tab 2 in your binder.

17  What is PTX-1101?

18  A.      This is the Exhibit C in my opening report.

19  Q.      What's contained in PTX-1101?

20  A.      These are solid state spectra corresponding to the

21  two samples that I analyzed.

22  Q.      Have you prepared demonstratives to illustrate your

23  analysis reflected in PTX-1101?

24  A.      Yes, I have.

25  Q.      Start with PDX-7.5.  What is reflected on this slide,

1    Dr. Munson?

2    A.      So what's shown on this slide is in the top, is a

3    solid state NMR spectrum, the SigmaPharm ANDA tablet, and

4    then on the bottom is shown a solid state NMR spectrum of a

5    BMS active pharmaceutical ingredient or API.

6    Q.      And how did you use the BMS API spectrum in your

7    analysis of the SigmaPharm tablet?

8    A.      So I used it to identify about approximately

9    peak-wide width and peak locations that would be present,

10   say, in the samples that might contain crystal apixaban.

11   Q.      What features in the BMS API spectrum are you looking

12   for in the SigmaPharm tablet spectrum?

13   A.      Specifically, I would look at things such as the

14   location, so the peak location, as well as the relative

15   breadth of the peak.

16   Q.      On these spectra, what does the X axis represent?

17   A.      So the X axis represents what we call parts per

18   million or PPM scale.  This is conventionally how solid

19   state or any NMR spectra are presented.

20   Q.      Why is there no Y axis on this spectra?

21   A.      We never put a Y axis on there.  It's an arbitrary

22   intensity scale.

23   Q.      Just take a step back.  In looking at these two

24   spectra, one would say they look different.  Why do these

25   two spectra look so different?

Munson - direct

1   A.      Well, the reason they look different is the fact that

2   BMS's active pharmaceutical ingredient is 100 percent

3   apixaban and the SigmaPharm tablet is only about three

4   percent apixaban.

5   Q.      Let's turn to PDX-7.6.  What is depicted on this

6   slide?

7   A.      So depicted on this slide is the relative amount of

8   the different ingredients that are present in the two

9   samples.

10  Q.      And I believe you testified there is -- strike that.

11          What percentage of the BMS API is it depicted

12  in?

13  A.      The BMS API is 100 percent apixaban.

14  Q.      What percentage of the SigmaPharm tablet is depicted

15  in?

16  A.      The SigmaPharm tablet is approximately three percent

17  apixaban.

18  Q.      How do you know the ingredient for the SigmaPharm

19  tablet?

20  A.      These came from SigmaPharm's ANDA.

21  Q.      So is it right that 97 percent of the SigmaPharm

22  tablet is comprised of ingredients other than apixaban?

23  A.      That's correct.

24  Q.      And what impact does the different amounts of

25  apixaban in the two samples have on your analysis?

Munson - direct

1   A.      So what that means is that it's going to be much more

2   difficult to see the apixaban in the NMR spectrum relative

3   to in the active pharmaceutical ingredient.

4   Q.      Turning to PDX-7.5 and focusing on the BMS API

5   spectrum, what are the large peaks in that spectrum?

6   A.      So the large peaks corresponding to the BMS API are

7   crystalline apixaban.

8   Q.      And what are the large peaks in the SigmaPharm

9   spectra?

10  A.      So the large peaks in the SigmaPharm correspond to

11  the excipients primarily.  In this case, the four large

12  peaks are due to a material called povidone.

13  Q.      And how do you know those peaks are due to povidone?

14  A.      We published several papers that have povidone

15  spectra, have read it probably in hundreds to thousands of

16  times in our laboratory.

17  Q.      All right.  If we could please pull up PTX-416, tab 2

18  in your binder, Dr. Munson.  What is PTX-416?

19  A.      So this is a paper that we published in Molecular

20  Pharmaceutics.

21  Q.      And what is the subject of this paper?

22  A.      So this is investigating miscibility and molecular

23  mobility of nifedipine-PVP amorphous solid dispersions using

24  solid state NMR spectroscopy.

25  Q.      When you say we published, the reference to Eric J.

Munson - direct

1    Munson, is that you?

2    A.      That is me.

3    Q.      Let's turn to Figure 5.  What is shown in Figure 5?

4    A.      So shown in Figure 5 is a figure that contains

5    amorphous nifedipine spectrum, and you can see the breath of

6    the peaks in amorphous nifedipine.  The corresponding PVP

7    spectrum is at the very bottom there and various ratios of

8    PVP relative to amorphous nifedipine.

9    Q.      What is PVP?

10   A.      PVP stands for polyvinyl pyrrolidinone.

11   Q.      But it's povidone?

12   A.      Povidone, yes.

13   Q.      Turn to PDX-7.7.  What's illustrated on this slide?

14   A.      So what's illustrated on this slide, the bottom

15   spectrum from that figure corresponding to povidone.  You

16   can see here that the povidone spectrum matches what's shown

17   up there on the spectrums for the big peaks.  In other

18   words, the sample is 67 percent povidone.  The NMR spectra

19   that we acquired in the papers show that indeed that is

20   povidone.

21   Q.      How do the peaks in the povidone spectrum compare to

22   the SigmaPharm spectra?

23   A.      They look practically identical.

24   Q.      Why are they so easy to identify?

25   A.      Because it's 67 percent of the formulation.

1   Q.      Okay.  Let's focus on mannitol.  How much mannitol is

2   in the SigmaPharm tablet?

3   A.      So there's about 22 percent mannitol in the

4   SigmaPharm tablet.

5   Q.      What's the NMR spectrum of mannitol known before

6   2010?

7   A.      Yes.

8   Q.      Do you know what the mannitol spectrum looked like?

9   A.      Yes, I do.

10  Q.      How do you know?

11  A.      Because we published mannitol spectra.

12  Q.      Please turn to PTX-673.  What is PTX-673?

13  A.      So this is a paper that we published around 2005 or

14  so describing the effects of sucrose in mannitol on

15  asparagine, the deamidation rates of model peptides in

16  solution and in the solid state.

17  Q.      And the reference to Eric J. Munson is you; is that

18  correct?

19  A.      That's correct.

20  Q.      If we turn to Figure 7.  What's shown in Figure 7?

21  A.      So shown in Figure 7 are solid state NMR spectra of

22  commercially supplied anhydrous mannitol crystals.  That's

23  shown up in A.

24  Q.      If we go to PDX-7.8.  What is illustrated on this

25  slide?

Munson - direct

1  A.      So what's in the bottom there is the mannitol

2  spectra, and you can see where that would be located in the

3  spectrum of the SigmaPharm tablets.

4  Q.      Now, looking under the, focusing on the SigmaPharm

5  tablet spectrum, there are black lines underneath the --

6  there is a black line underneath the red line.  What is

7  depicted by the black line?

8  A.      So that black line corresponds to the mannitol.  So

9  if we take the chemical shift scale and shrink it down to

10 where it would be appropriately placed in the SigmaPharm

11 tablet spectrum, that's where it would be located.

12 Q.      Why does it look so small in the SigmaPharm spectrum?

13 A.      So it looks so small because it's a complicated NMR

14 explanation, but essentially we're only seeing a relatively

15 small fraction of the mannitol because it's in the

16 crystalline state and what we call relaxation time.

17 Q.      Let's turn to the next excipient, microcrystalline

18 cellulose.  How much MCC is in the SigmaPharm tablet?

19 A.      There is about three percent microcrystalline

20 cellulose.

21 Q.      And was the SSNMR spectrum of microcrystalline

22 cellulose known before 2010?

23 A.      Yes.

24 Q.      How do you know?  Do you what the SSNMR spectrum of

25 microcrystalline cellulose looks like?

1    A.    I do.

2    Q.    How do you know?

3    A.    Because we published papers on it.

4    Q.    Let's turn to PTX-675.  What is PTX-675?

5    A.    So this is a research article that we published.  The

6    name of the paper, or the title of the paper is analysis of

7    structural variability in pharmaceutical excipients using

8    solid-state NMR spectroscopy.

9    Q.    And when you say we, the reference to Eric J. Munson

10   is you?

11   A.    That's correct.

12   Q.    Let's turn to Figure 9, please.  What is shown in

13   Figure 9, Dr. Munson?

14   A.    So what's shown in Figure 9 are solid state NMR

15   spectra of what's called Avicel, which is the another

16   name,  the trade name for microcrystalline cellulose.  You

17   can see that there are many different microcrystalline

18   cellulose samples that we analyzed.

19   Q.    Let's go back to your demonstrative, PTX 7.9.  What's

20   illustrated on this slide?

21   A.    That is taking one of those Avicel spectra and

22   showing about where it would be located in the spectrum of

23   the SigmaPharm tablet.

24   Q.    And, again, if we look at the SigmaPharm tablet

25   spectrum, you have a black line underneath the red line.

1   Can you please explain for the Court what is illustrated by

2   that?

3   A.      So what that black line illustrates is the

4   approximate intensity and location of the microcrystalline

5   cellulose in the SigmaPharm tablet.

6   Q.      And could you explain why the peaks in the bottom

7   spectrum of microcrystalline cellulose are so large and

8   the peaks as they appear in the SigmaPharm tablet are so

9   small?

10  A.      That's because there's only three percent

11  microcrystalline cellulose in the SigmaPharm tablet.

12  Q.      Let's turn to PDX-7.10.  What is illustrated on this

13  slide, Dr. Munson?

14  A.      So this is the BMS active pharmaceutical ingredient

15  or API spectrum in the bottom, and then because apixaban is

16  only three percent of the formulation, what's shown on the

17  top there is where it would be located in the SigmaPharm

18  tablet.

19  Q.      And, again, if you are focusing on the SigmaPharm

20  tablet spectrum, we have a blue line underneath the red

21  line; is that right?

22  A.      That's correct.

23  Q.      And could you please explain for the Court why the

24  blue line that appears in the BMS API spectrum, the peaks

25  are much more pronounced than they are in the SigmaPharm

Munson - direct

1 spectrum?

2 A.      That's because there's only three percent of apixaban

3 present in the formulation.

4 Q.      So the apixaban peaks are so small in the SigmaPharm

5 tablet spectrum.  What did you do to analyze them?

6 A.      So what we needed to do was to do a vertical

7 expansion of the spectrum.

8 Q.      And have you prepared a demonstrative to illustrate

9 vertical expansion?

10 A.      I have.

11 Q.      If you go to PDX-7.11, please.  What is depicted

12 here?

13 A.      So what's depicted here, we've taken that small

14 region of the spectrum and we've actually expanded

15 vertically so that you can see a vertical expansion of that

16 particular area.

17 Q.      Is there anything unusual about employing vertical

18 expansion in analyzing SSNMR spectrum?

19 A.      There is not.

20          MR. PRUSSIA:  Let's go to PDX-7.12, please.

21 BY MR. PRUSSIA:

22 Q.      What is depicted here, Dr. Munson?

23 A.      So this is one level of vertical expansion.  I

24 describe it as an intermediate vertical expansion of the

25 spectrum.

Munson - direct

1    Q.      You say an "intermediate vertical expansion."  Did

2    you do a further vertical expansion?

3    A.      Yes, I did.

4               MR. PRUSSIA:  Let's go to PDX-7.13.

5    BY MR. PRUSSIA:

6    Q.      What is depicted here, Dr. Munson?

7    A.      So this is an even further vertical expansion of the

8    spectrum.

9    Q.      And what conclusions did you reach based on the

10   spectrum?

11   A.      So based upon the spectrum of the SigmaPharm tablet,

12   I came to the conclusion that there is crystalline apixaban

13   present in SigmaPharm's API -- or in SigmaPharm's ANDA

14   tablet.

15   Q.      And do you have a demonstrative summarizing all of

16   your observations in this spectrum?

17   A.      I do.

18               MR. PRUSSIA:  Let's please go to 14.

19   BY MR. PRUSSIA:

20   Q.      What does this illustrate?

21   A.      So what this illustrates is the location of the peaks

22   and their corresponding -- for the crystalline BMS API, and

23   then the corresponding locations with respect to the

24   SigmaPharm tablet.

25   Q.      What do the yellow dotted lines indicate?

 1   A.      So the yellow dotted lines which would be, like,

 2   numbers 1, 4, 5, et cetera.  Those indicate peaks that were

 3   not necessarily clearly resolved with respect to their

 4   location.

 5   Q.      What do the purple lines indicate?

 6   A.      So the purple lines indicate where the lines are much

 7   better resolved compared to the yellow lines.

 8   Q.      And have you prepared demonstratives to aid the Court

 9   in your analysis of the clearly resolved peaks?

10   A.      Yes, I have.

11           MR. PRUSSIA:  Your Honor, we'd like to ask, with

12   your permission, if Dr. Munson could approach the screen.

13           THE COURT:  That's fine.

14           MR. PRUSSIA:  So as you're walking over there,

15   if we could offer there if we could go to PDX-7.15?

16   BY MR. PRUSSIA:

17   Q.      Dr. Munson, what is illustrated on slide 15 with

18   regarding peaks 9 and 10?

19   A.      So when you are looking at this slide, you can see

20   that we're focusing on peaks 9 and 10 here.  So what I have

21   done is -- that I have done an expansion here of peaks 9 and

22   10, and that is shown over here and then I have also done an

23   expansion here of this region in the SigmaPharm tablet.

24           So you can see what this expansion is here, and

25   that expansion is located right there.

1          So essentially just taking these boxes and

2     making them a little bit bigger.

3     Q.     And can you explain for the Court why, in your

4     opinion, peaks 9 and 10 are clearly resolved?

5     A.     Well, you can see, once again, that this peak lines

6     up very well with that peak and then this peak lines up very

7     well with this one.

8     Q.     And if we can go to the next slide.

9     A.     So you can -- yes.

10          Here, specifically, you can see how that -- how

11    they line up, and that lines up right on top of that one,

12    and this one lines up right on top of that one.

13    Q.     And if you go to the next slide.

14          Could you please explain to the Court your

15    analysis regarding peak 6?

16    A.     So in the case of peak 6, this is also noted in a

17    peak that is located here, what we've got here is just

18    something very similar.  We have taken this peak and it

19    lines up very well with that one, and, once again, you can

20    see how those peaks line up.

21    Q.     If we go to PDX-7.17.

22          Could you explain your analysis regarding peaks

23    2 and 3?

24    A.     So in the case of peaks 2 and 3, you can see that the

25    sharpness on top of this peak right here, and that is

1    indicated of the fact that there is a crystalline peak on

2    top of a broader, amorphous peak under here, as well as

3    right here there is another small peak present as well.

4    Q.      Now, Dr. Munson, you made reference to a peak sitting

5    on top of amorphous materials.

6            What do you mean by that?

7    A.      So there is some amorphous apixaban present in this

8    sample.  And so that what we're looking at here is a

9    crystalline peak on top of an amorphous peak.

10   Q.      What indicates to you there's amorphous material in

11   this sample?

12   A.      I'm looking at this breadth of the lines that are

13   present here.  And so they indicate to me, for example,

14   there is a peak located here that is not due to excipient,

15   so this is due to active pharmaceutical ingredient.  In this

16   particular case, amorphous apixaban is not present down

17   here.

18   Q.      How are you able to clearly resolve this as a

19   crystalline peak notwithstanding any amorphous material?

20   A.      So you can see that the narrowness of the top of the

21   peak here is characteristic of a crystalline peak that sits

22   on top of an amorphous peak.

23   Q.      And if we go back to your main summary on 18.

24           Are these -- are those all of the clearly

25   resolved peaks you observed in the SigmaPharm tablet

Munson - direct

1    spectrum?

2    A.       There was another clearly resolved peak here, No. 12.

3    Q.       We'll come back to No. 12, but let's focus on the

4    yellow lines.

5              And can you remind the Court what is depicted by

6    the yellow lines?

7    A.       So the yellow lines, it's a little bit more difficult

8    to actually determine where the crystalline peaks are

9    located compared to in the -- with the other peaks.

10   Q.       And what does it mean, you referenced earlier that a

11   peak is not clearly resolved?

12   A.       So, for example, it could be a peak that is on the

13   shoulder of another peak.  It could also be that that peak

14   happens to coincidently directly align with the amorphous

15   component as well.

16   Q.       What does a not-clearly-resolved peak tell you about

17   the presence of crystalline apixaban in the tablet?

18   A.       So it is important that there's crystalline intensity

19   or that there is peak intensity at that particular location.

20   And so I need to make sure that, indeed, all of these peak

21   locations had intensity with them.

22   Q.       All right.  Have you prepared demonstratives to walk

23   the Court through your analysis of those peaks that you

24   observed that were not clearly resolved?

25   A.       I have.

1    Q.      Let's start with peak 7 and 8.

2            MR. PRUSSIA:   If we can pull up PDX-7.19.

3    BY MR. PRUSSIA:

4    Q.      What does this slide depict regarding peaks 7 and 8?

5    A.      So here you can see peaks 7 and 8 are actually sort

6    of shoulders on top of this other peak that are present

7    here, and so they're not clearly as resolved as, say, these

8    two peaks here.

9    Q.      And what do you mean when you say it is a "shoulder"?

10   A.      So you can see, for example, it goes up and down and

11   then back up.

12   Q.      What is that large -- if you are focusing on the

13   SigmaPharm tablet spectrum, there seems to be a peak that

14   continues to go all the way up, almost beyond the range of

15   the slide.

16           What is depicted by that?

17   A.      So this peak is actually due to something that we

18   call a spinning side band.

19   Q.      What is a spinning side band?

20   A.      So we use a technique called magic-angle spinning to

21   acquire the data.   We spin the sample in a rotor, something

22   on the order of about 5,000 hertz or roughly a quarter of a

23   million rotations per minute.   And when we do that, we end

24   up seeing what we call the isotropic chemical shift.   That

25   would be this peak or the povidone.   Remember, that is a

1    very peak.  And then we also have sometimes these artifacts

2    called spinning side bands that are present.

3    Q.      Is there anything unusual about the occurrence of a

4    spinning side band?

5    A.      No, spinning side bands occur all the time.

6    Q.      And when you did your analysis, did you know that

7    that was a spinning side band?

8    A.      Yes, I did.

9    Q.      Did the spinning side band impair your analysis of

10   the SigmaPharm tablet spectrum?

11   A.      No.  I mean, once again, you can see where the peaks

12   are.  This peak over here, in fact, was masked by the

13   spinning side band.

14   Q.      Do you have any other information about the peaks

15   that were partially obscured by the spinning side band?

16   A.      So, once again, you can see that they're located --

17   where their peak locations are in the NMR spectrum, and so,

18   indeed, they are present in the top.

19   Q.      Did you have access to any other information that

20   confirmed your analysis regarding these peaks 7 and 8 being

21   due to crystalline material?

22   A.      I did.  In fact, I was looking at some data that

23   Dr. Apperley acquired.

24   Q.      Who is Dr. Apperley?

25   A.      So Dr. Apperley is one of the other experts in this

552

Munson - direct

1    case.

2    Q.      And what information did you have access to from

3    Dr. Apperley that confirmed your opinions?

4    A.      So I had access to some solid state NMR experiments

5    that Dr. Apperley performed.

6    Q.      And what did those experiments show?

7    A.      They showed that, indeed, these peaks are present.

8    And since he ran his experiments at a different spinning

9    speed, he obscured these peaks over here, but then these

10   peaks over here are resolved.

11   Q.      So when you -- strike that.

12           In other words, he moved the spinning side band;

13   is that what you are trying to articulate?

14   A.      The equivalent of that, yes.

15   Q.      And when the spinning sideband was removed, what did

16   you see?

17   A.      When the spinning sideband was removed in

18   Dr. Apperley's data, you can see where these three peaks are

19   located.

20   Q.      Let's turn to peak 5, slide 20.

21           What is depicted regarding peak 5?

22   A.      So this is a case where the amorphous component is

23   here, so the crystalline peak is riding on top.  You can see

24   the narrow crystalline peak on top of, say, a broader

25   component here.

1  Q.      And if we go to the next slide, 21.

2          What is depicted regarding peak 1?

3  A.      So in peak 1, once again, this is sitting as a

4  shoulder here, and so it's not nearly as resolved as most of

5  the other peaks in the spectrum.

6  Q.      How were you able to determine that shoulder, as you

7  call it, was due to crystalline material?

8  A.      So, once again, you can see that it lines up at

9  exactly the same t as you would anticipate for the

10 crystalline material.

11 Q.      And if you go to slide 22, what is depicted regarding

12 peak 4?

13 A.      So peak 4 is interesting in that it has both

14 crystalline and amorphous that happen to have the exact same

15 location in the spectrum.  And so you see a slightly broader

16 peak over here that is sitting on top of this.

17         And if you -- if you're careful, you can see how

18 it goes like this, and then the peak broadens out very

19 quickly in the base because of the crystalline component

20 on top and the amorphous component underneath.

21 Q.      So if the amorphous material and the crystalline

22 material are in the same position, how are you able to

23 determine that this is due to crystalline -- that this peak

24 reflects the presence of crystalline material?

25 A.      Once again, that's why we say it is partially

1    resolved, the intensity at that location.  But it's not

2    nearly as clear as some of the other peaks I pointed to

3    earlier.

4    Q.    All right.  Dr. Munson, please return to the witness

5    box.

6    A.    Thank you.

7              MR. PRUSSIA:  While you are going back, if we

8    can go to slide 23, Tom.

9    BY MR. PRUSSIA:

10   Q.    So Dr. Munson, so far we have been talking about the

11   left side of your spectrum.  So you said we would come back

12   to the right side.  Could you please walk the Court through

13   your analysis of the right side of the spectrum?

14   A.    So the challenge with the right side of the spectrum

15   is that we -- if we try to blow it up too much, if we try to

16   do too much vertical expansion, then some of those peaks

17   that are on the shoulders are lost.

18   Q.    Were you able to, nonetheless, identify any peaks

19   that supported your opinions regarding the presence of

20   crystalline material in SigmaPharm tablet?

21   A.    Indeed, I did.

22   Q.    And could you explain that to the Court, please?

23   A.    So you can see that there is a peak located here,

24   once again, it is a shoulder, so not terribly well resolved,

25   and then there's a better resolved peak located at that

 1    particular peak position there.

 2    Q.      And based on your observations, what is your

 3    conclusion regarding the presence of crystalline apixaban in

 4    the SigmaPharm 5 milligram tablet?

 5    A.      So based upon my observations, there is crystalline

 6    apixaban present in SigmaPharm's 5 milligram ANDA tablet.

 7    Q.      And we've been talking about the 5 milligram tablet

 8    because that is what you tested, but have you also reached a

 9    conclusion about SigmaPharm's 2.5 milligram tablet?

10    A.      Yes, I have.

11    Q.      What is your conclusion?

12    A.      So I have concluded that, indeed, the SigmaPharm

13    2.5 milligram tablet also contains crystalline apixaban.

14    Q.      What is the basis for that conclusion?

15    A.      So one of the bases is the fact that they were

16    manufactured essentially the same -- using same process and

17    with the same materials.  So only in a smaller tablet size.

18    Q.      Do you have any other basis?

19    A.      I do.

20    Q.      What is that?

21    A.      So as it turns out, Dr. Apperley ran the

22    2.5 milligram tablet from SigmaPharm.

23    Q.      And what did Dr. Apperley's 2.5 milligram experiment

24    tell you about the presence of crystalline material in the

25    SigmaPharm tablet?

Munson - direct

1    A.      So Dr. Apperley's experiment verified the fact that

2    the 2.5 milligram SigmaPharm tablet contained crystalline

3    apixaban.

4    Q.      So focusing back on slide 23, there are peaks in the

5    BMS API spectrum for which you have not placed a yellow or

6    purple line.

7            Is that right?

8    A.      That is correct.

9    Q.      And why is that?

10   A.      So in many cases, once again, we have these very

11   large peaks due to the pharmaceutical excipients, such as

12   povidone and other excipients, and so what happens is that

13   some of the peaks in the apixaban, crystalline apixaban

14   spectrum happen to line on top of the povidone, and you can

15   see that for several of these peaks.

16   Q.      I think you have a demonstrative to aid the Court in

17   your analysis of this.

18           MR. PRUSSIA:  Can we go to 24.

19   BY MR. PRUSSIA:

20   Q.      What is depicted on slide 24?

21   A.      So what is shown on slide 24 is, once again, those

22   red peaks corresponding to where there's just two larger

23   peaks due to mostly the povidone that is present here.

24           In this particular case where the yellow peak is

25   located, this is now on top of a spinning sideband from the

1    povidone.  And so you can see it's a little bit narrower at

2    the top so you can potentially see that there, but I didn't

3    identify that in my report.

4    Q.    And does the fact that these five peaks were not able

5    to be observed effect your conclusion that the SigmaPharm

6    tablet contains crystalline apixaban?

7    A.    It does not.

8    Q.    Why not?

9    A.    Once again, it is not -- it's fairly typical that you

10   would see peaks obscured by excipients.  And, once again,

11   you can see that the majority of peaks that are present in

12   the SigmaPharm ANDA tablet can be identified either pretty

13   well resolved or partially resolved in the spectrum.

14   Q.    Are there any peaks in the API spectrum that are

15   absent in the SigmaPharm tablet spectrum?

16   A.    No.

17   Q.    Are there any artifacts that affect your

18   interpretation of the SSNMR experts?

19   A.    Well, I mentioned one artifact, which was a spinning

20   sideband.  You can also see that potentially the baseline is

21   not perfectly flat.  Sometimes in the bottom here you can

22   see a baseline that is flatter here compared to what you

23   will see at the top there.  And so there is a little bit of

24   what we call baseline distortion due to the vertical

25   expansion that we did.

Munson - direct

1          But this had no impact with respect to me being

2    able to determine if crystalline apixaban was present in

3    SigmaPharm's ANDA tablet.

4    Q.     Are these sorts of baseline distortions normal?

5    A.     Yes, they are.

6    Q.     And did they interfere with interpreting your

7    analysis of the spectra here?

8    A.     They did not.

9    Q.     You understand that SigmaPharm has hired an

10   individual by the name of Dr. Schurko to respond to your

11   analysis?

12   A.     Yes.

13   Q.     And did Dr. Schurko attempt to analyze your data?

14   A.     Yes, he did.

15   Q.     Did Dr. Schurko process your data the same way that

16   you did?

17   A.     No.

18   Q.     And how was Dr. Schurko's processing different from

19   yours?

20   A.     Well, he did many different ways of processing the

21   data, including not using the same parameters I recorded in

22   my opening report.

23   Q.     And what does that mean about Dr. Schurko's analysis

24   of your data?

25   A.     That I don't find it useful.

Munson - direct

1   Q.      Why is that?

2   A.      Because, once again, the data was processed in such a

3   way to, for example, diminish the signal-to-noise ratio or

4   to decrease the resolution.

5   Q.      You mentioned noise.  What is noise?

6   A.      So noise is something that you will find in any NMR

7   experiment.

8   Q.      If you go to slide 25, what is depicted here?

9   A.      So this is the noise.  This section right here

10  contains only essentially noise associated with an NMR

11  spectrum for the SigmaPharm tablet.

12  Q.      Is noise in an NMR spectra normal?

13  A.      Yes.

14  Q.      Did the noise in your spectra impact your analysis?

15  A.      No, it did not.

16  Q.      Why not?

17  A.      As you can see, the noise floor here is very small,

18  and once again if you look at the heights of the peaks that

19  we're looking at over here, these peaks are much larger than

20  the noise floor that you can see there.  So the

21  signal-to-noise is really quite fit to the spectra.

22  Q.      And what is signal to noise?

23  A.      So signal to noise is the ratio of the height of the

24  signal peak over here and various peaks in the spectrum

25  compared to the root mean square average of the noise.

1    Q.      What does the signal-to-noise ratio tell you about --

2    strike that.

3              Does the signal-to-noise ratio give you a

4    confidence level with respect to your conclusion?

5    A.      Yes, it does.

6    Q.      How so?

7    A.      So, once again, you want to make sure that for limit

8    of detection, that you're about a signal-to-noise ratio of a

9    factor of three for detection and a factor of ten for

10   quantitation.  So typically, what you would do is take this

11   noise level and actually take roughly the peak height times

12   2.5 and then compare that to the peak, the signal-to-noise

13   ratio here from the peak to peak locations, and so you can

14   see that this is well in excess of the limit of quantitation

15   here.

16   Q.      How does the signal-to-noise ratio of your experiment

17   compare to those run by SigmaPharm's experts?

18   A.      So SigmaPharm's experts ran signal-to-noise, or ran

19   experiments that had extremely poor signal to noise to the

20   point of where you really couldn't observe peaks with sort

21   of one exception.

22   Q.      And what's that exception?

23   A.      So Dr. Apperley ran a solid state NMR spectrum of a

24   2.5-milligram tablet, and when he ran that spectra, what

25   he found was that he ran it for a longer period of time

1    in a larger rotor, which is basically what I did, and I

2    was able to use some of that data to analyze Dr. Apperley's

3    results.

4    Q.    Now, going back to the signal-to-noise ratio, did

5    you actually measure the signal-to-noise ratio in your

6    spectrum?

7    A.    I didn't provide a numerical value, but you can see

8    that's a signal much larger than the noise.

9    Q.    Do you recall that Dr. Schurko criticized you for not

10   measuring the line widths of your peaks?

11   A.    Yes.

12   Q.    And what is the line width of the peaks?

13   A.    Typically, we refer to a line width as the width of

14   the peak, what we call the full width at half height.  So,

15   for example, on this peak here, it would be at the halfway

16   point, you would actually measure what that value is at the

17   halfway point.

18   Q.    What does measuring the line width of a peak tell you

19   about the presence of crystalline material in samples?

20   A.    I mean, as long as the peak width is comparable, the

21   line width may vary slightly in a crystalline material.  You

22   can see very evidently the line width here is very

23   comparable to the line width that's present here.

24   Q.    Does one need to measure line width to determine that

25   there's crystalline apixaban present in the SigmaPharm

Munson - direct

1      tablets?

2      A.      No, you don't.

3      Q.      And why not?

4      A.      Once again, an experienced NMR person or really

5      anybody can see the fact that these line widths are very

6      comparable to the line width that you have for the BMS

7      active pharmaceutical ingredient.

8      Q.      So if you didn't measure the line width of the peaks,

9      then what methodology did you use to determine the peaks

10     that you observed, in fact, reflected the presence of

11     crystalline apixaban?

12     A.      So I used my expertise in solid state NMR and the

13     fact that, once again, you can obviously see that the line

14     widths are very comparable.

15     Q.      And what experience have you had using this

16     analytical approach to distinguish between crystalline and

17     amorphous forms of the material?

18     A.      This is the approach we always use.

19     Q.      And if we go to PTX-393.  Could you please identify

20     this?

21     A.      So this is a paper that we published back in 2006,

22     '07, somewhere in there, and essentially, we looked at the

23     impact or processing, things such as relaxation times and

24     impact to formulation stability.

25     Q.      And did you prepare a demonstrative showing how this

1    paper described the analytical approach you applied in this

2    case?

3    A.    I did, indeed.  As you can see, my name is located

4    right up there.

5    Q.    If we go to slide 26, please.  What does this, what's

6    depicted on this slide PDX-7.26?

7    A.    So this is the slide that contains crystalline

8    lactose, and this is the same, from the same paper that

9    we've done at the very beginning showing the difference

10   between crystalline and amorphous lactose.

11             And so what has happened here is that we

12   compared samples in such a way that they're a mixture of

13   crystalline and amorphous lactose that are present here.

14   Q.    And what is depicted by the red circles and the E

15   spectrum on the figure on the right?

16   A.    So you can see what a crystalline peak would look

17   like on top of an amorphous peak.  You can see, for example,

18   over here that there's a crystalline peak that's sitting on

19   a broader amorphous peak.  There are some sharp crystalline

20   peaks that are sitting on top of a broader amorphous peak

21   and, once again, a sharp crystalline peak sitting on top of

22   a broad amorphous peak.

23   Q.    Blow up the slide.  What does this illustrate?

24   A.    So you can see those two sharp crystalline peaks that

25   are sitting on top of the broad amorphous peaks.

1    Q.      So what does this paper show regarding the ability of

2    a skilled SSNMR spectroscopist to determine the presence of

3    crystalline any API in a mixture that includes amorphous

4    material?

5    A.      It would tell a skilled solid state NMR

6    spectroscopist that there's indeed both amorphous material

7    as well as crystalline material present in this particular

8    sample.

9    Q.      Now, are you aware of any reference in the literature

10   stating that a skilled SSNMR spectroscopist needs to measure

11   the line width of a peak in order to conclude that

12   crystalline material is present in a sample?

13   A.      I'm not aware of any.

14   Q.      Now, what's your understanding of Dr. Schurko's

15   opinion regarding the presence of crystalline material in

16   the SigmaPharm tablet?

17   A.      He doesn't believe that there is any.

18   Q.      And do you agree?

19   A.      I do not.

20   Q.      Why not?

21   A.      Because of the pronouncement of my whole explanation

22   that I've given today.

23              MR. PRUSSIA:  Thank you, Dr. Munson.

24              Your Honor, plaintiffs offer PTX-786,

25   PTX-1101, PTX-416, PTX-673, PTX-675, PTX-393, PTX-1074 and

Munson - direct

1    PTX-178.

2              THE COURT:  Any objection?

3              MR. HENEGHAN:  Your Honor, we had a hearsay

4    objection to PTX-673 and 675.  We don't object to Dr. Munson

5    referring to them, but the articles as a whole should come

6    in.  We're waiting to hear his testimony on that.

7              THE COURT:  Did you not understand that those

8    were to be raised at 8:30 in the morning?

9              MR. HENEGHAN:  I did, Your Honor.

10             THE COURT:  Okay.  Overruled.  Those are all

11   admitted.

12             (PTX-786, PTX-1101, PTX-416, PTX-673,

13   PTX-675, PTX-393, PTX-1074 and PTX-178 were admitted into

14   evidence.)

15             MR. PRUSSIA:  I pass the witness, Your Honor.

16             MR. HENEGHAN:  May I?

17             THE COURT:  Yes.

18             MR. HENEGHAN:  May I approach, Your Honor?

19             THE COURT:  You may.

20             MR. HENEGHAN:  Dr. Munson, this is an additional

21   binder of other exhibits I may ask you about.  I will make

22   sure I tell you what tab numbers to look at.

23             THE WITNESS:  Thank you.

24             MR. HENEGHAN:  Also, keep this one handy, too.

25             THE WITNESS:  Very good.

Munson - cross

```
 1                    (Mr. Heneghan handed binders to the Court and to

 2      the witness.)

 3                              CROSS-EXAMINATION

 4      BY MR. HENEGHAN:

 5      Q.      Good morning, Dr. Munson.  My name is Tom Heneghan

 6      and I represent SigmaPharm.  I have a few questions for you.

 7      A.      Very good.

 8      Q.      Just going back to some of your introductory

 9      comments, I don't know if you were here last week for part

10      of the testimony, but we heard a lot of testimony about

11      XRPD.  And I know you referred in your testimony to XRPD.

12      Those are different acronyms for the same thing; is that

13      correct?

14      A.      Correct.

15      Q.      We're talking about the same thing.  Okay.

16              And XRPD is different from NMR; right?

17      A.      Yes, it is.

18      Q.      And you are not offering opinions on any XRPD

19      analysis in this case?

20      A.      I am not.

21      Q.      All right.  Am I also correct that the peaks that are

22      shown in XRPD spectra are different than the kinds of peaks

23      that are shown in NMR spectra, generally?

24      A.      Well, if you don't mind, can I clarify because --

25      Q.      Please.
```

Munson - cross

1    A.      XRPD are not the spectra.  They're diffraction

2    patterns.

3    Q.      Thank you for that correction.

4    A.      Okay.  So could you repeat the question.

5    Q.      Sure.  Let me rephrase it.  The point I'm trying to

6    make is that peaks in XRPD indicate different things than

7    peaks in NMR indicate, typically?  For example, NMR spectra

8    show peaks for both amorphous and crystalline material, and

9    the fact that a peak is present is not necessarily an

10   indication of crystalline.  It depends on the peak.  It has

11   to be interpreted whereas in XRPD, if something is

12   amorphous, it might not show any peaks.

13   A.      I guess I'm still trying to follow.  So in a powder

14   X-ray diffraction pattern, you'll have a halo and then

15   you'll have sharp peaks corresponding to crystalline

16   material.  In the solid state NMR spectrum, you'll have

17   sharp peaks corresponding to a crystalline material, and

18   then you'll also have broader peaks corresponding to

19   amorphous material.

20   Q.      Which is the point I'm trying to make, which is that

21   they're just different kinds of analysis.

22   A.      Yes.  They're different kinds of analysis.  That

23   being said, they've both got crystalline and amorphous

24   materials.

25   Q.      Right, but in different ways?

Munson - cross

1    A.      In different ways.

2    Q.      That's the only point I was trying to make, just so

3    that there's no confusion that they're somehow analogous.

4    They are just different?

5    A.      Yes, they are.

6    Q.      You mentioned in your testimony that you have drawn

7    conclusions from Dr. Apperley's data?

8    A.      That's correct.

9    Q.      All right.  Do you recall your reply report in this

10   case?

11   A.      I do.

12   Q.      And that was a report that you submitted after you

13   had seen Dr. Apperley's data; is that correct?

14   A.      That's correct.

15   Q.      Okay.  If you look in your binder there, the one I

16   just handed up at tab 5, do you see that that is a copy of

17   your reply report?

18   A.      It certainly looks like it, yes.

19   Q.      You're welcome to review it in its entirety, but I

20   can represent to you that it's a full copy.

21   A.      Thank you.

22   Q.      Nothing missing.

23   A.      That's fine.  Thank you.

24   Q.      If you could turn to page 29 of that report and

25   particularly paragraph 44.

Munson - cross

1                    And about in the middle of that paragraph,

2      do you see a statement where you say, Dr. Apperley's

3      tests are too insensitive to reach any conclusion regarding

4      the presence of crystalline apixaban in the SigmaPharm

5      tablet?

6      A.      Yes.   I also see the previous statement as well.

7      Q.      The previous statement talks about Dr. Apperley's

8      tests having much higher signal-to-noise levels than the

9      tests you performed.

10     A.      No.   I see it says, an examination of Dr. Apperley's

11     testing protocols and results show that, with one possible

12     exception, each of Dr. Apperley's tests have much higher

13     signal to noise, have much higher noise levels than the

14     tests I performed.

15     Q.      And that sentence continues on to, and Dr.

16     Apperley's --

17     A.      Dr. Apperley's are too insensitive to reach any

18     conclusions regarding the presence of crystalline apixaban

19     in SigmaPharm tablets.

20     Q.      That's what you wrote in your reply report?

21     A.      That's what I wrote in my reply report.   That's

22     correct.

23     Q.      Can we agree during the course of your testimony that

24     if I refer to NMR, you'll understand I'm talking about solid

25     state NMR, just the shorthand?

Munson - cross

1    A.        Sure.

2    Q.        Personally, I have a little sort of tongue twister

3    with saying SSNMR for some reason, so I would just rather

4    shorten it NMR.   Is that okay?

5    A.        Okay.

6    Q.        Let's talk briefly just about the chronology of your

7    reports in this case.   You filed an original report on

8    February 15th, 2019; is that right?

9    A.        About that, yes.

10   Q.        You filed an errata to that report on March 8th,

11   2019; right?

12   A.        I believe that's correct.

13   Q.        Then after SigmaPharm's experts, Dr. Apperley and Dr.

14   Schurko, filed their reports, you then filed that reply

15   report we just referred to; right?

16   A.        That's correct.

17   Q.        Then the day before your deposition, you filed a

18   second errata to your original report, and that was on July

19   29th, 2019.

20   A.        That's correct.

21   Q.        And I think that -- obviously you mentioned you know

22   of Dr. Apperley, and you know his reputation in the NMR

23   field.

24             Is that fair?

25   A.        Of sorts.   I mean, I don't know that I ever actually

Munson - cross

1    met Dr. Apperley.  You know, once again, I know he provides

2    service work for the University of Durham.

3    Q.      In the field of NMR.

4    A.      Yes, in the field of NMR.  Once again, we're

5    reporting to NMR being solid state NMR.

6    Q.      Right.  Right.

7            So unless you correct me otherwise, any time I'm

8    referring to NMR, I'm talking about solid statement NMR,

9    okay?

10   A.      Okay.

11   Q.      Now, in your original report, you actually cite to

12   Dr. Apperley's book.  This book, right, which is marked

13   DTX-655?  You cite to Dr. Apperley's book right in your

14   report?

15   A.      Yes.

16   Q.      You also cite to an article by Dr. Apperley on the

17   comparison of crystalline and amorphous forms of drug

18   compounds; isn't that right?

19   A.      Are you referring to the nifidepine and indomethacin

20   paper?

21   Q.      I am.

22   A.      Okay.  Very good.  Yes.

23   Q.      Let's talk a little bit about some of the technical

24   NMR issues and some of the general principles of NMR.

25            Is that okay?

Munson - cross

1    A.      Okay.

2    Q.      All right.  If we look at your PDX-7.3 that you

3    showed during -- we'll put it up on the screen.

4    A.      Okay.

5    Q.      During your direct examination, you mentioned this is

6    an example of how crystalline peaks are sharper and

7    amorphous peaks are broader, right?  In general.

8    A.      Yes, this one example.  Yes.

9    Q.      But you would agree with me that not all spectra are

10   so obviously different as A and B are different from C and D

11   in this example?

12   A.      I would agree with that, yes.

13   Q.      I also wanted to ask you a couple of questions about

14   some of the blowups.

15           If we look at, for example, 7.20 from this same

16   demonstrative.

17           For some of these with the blowups, we can see

18   that the blowup, the lines are a little bit pixelated just

19   from the function of blowing them up; right?  In the

20   expanded rectangle?

21   A.      I mean, if you want to call that pixelated.  I mean,

22   yes, they're certainly not ideally as resolved as you would

23   like them to be.

24   Q.      Yes.  And as part of your testimony today, you also

25   did some additional overlay of the blowups onto the blowups

Munson - cross

1    to make a point about the similarity of the peaks in your

2    view, right?

3    A.      The blowup -- for example, yes, the blowups, there

4    was a shifting of the peaks to show that, indeed, there was

5    a high degree of overlap with respect to the peak locations

6    and peak widths.

7    Q.      Right.  And you demonstrated that point only by

8    overlaying the blowup onto the blowup, not using the

9    original chart without the pixillation; right?

10   A.      No, I showed it multiple times throughout my

11   presentation how the two peaks aligned.

12   Q.      I'm talking about when you did the overlay of the

13   blowup on top of the blowup as part of this demonstrative

14   exhibit itself.

15           Do you recall that?

16   A.      Yes.  So when I did the demonstrative on top of the

17   demonstrative, yes, I viewed them on top of each other.

18   Q.      You would agree with me that a person of ordinary

19   skill in the art of NMR would examine the position, the

20   intensity, and the shape of the peaks in reviewing NMR data,

21   wouldn't you?

22   A.      Yes.

23   Q.      In general?

24   A.      In general.

25   Q.      Okay.  And you would also agree with me that line or

Munson - cross

1   peak width provides useful information to NMR analysis;

2   correct?

3   A.      For example, if you are discriminating between narrow

4   and broad peaks, yes.

5   Q.      You have also stated in this case that the

6   characteristic broad peaks of amorphous material can be

7   easily distinguished from the much narrower sharp peaks

8   typical of crystalline systems, right?

9   A.      Generally speaking, yes.

10  Q.      And you would also agree that NMR peaks are either

11  Gaussian or Laurentian or somewhere in between.  That's a

12  fair statement of NMR principles, isn't it?

13  A.      Not really.

14  Q.      And those peaks are defined by their width, aren't

15  they?

16  A.      There's some aspect to them.

17          Are you talking about the peaks that are

18  composed of Laurentian and Gaussian?

19  Q.      Yes.

20  A.      So typically you would characterize a peak associated

21  with them.

22  Q.      And they're described by their shape, aren't they?

23  A.      Shape certainly has a feature.

24  Q.      Now, we talked a little bit about the principle of

25  spinning sidebands.

1            **Do you recall that in your direct?**

2    A.      Yes.

3    Q.      And spinning sidebands are artifacts that should be

4    considered when interpreting NMR data or NMR spectra; isn't

5    that correct?

6    A.      Yes, you should.  Yes.

7    Q.      And the tests that were run by Dr. Nethercott for you

8    in this case attempted to suppress spinning sidebands by

9    applying the TOSS experiment, didn't they?

10   A.      Yes.  "TOSS" stands for Total Side Band Suppression.

11   Q.      And that form of suppression was used by

12   Dr. Nethercott in generating the data you are relying upon

13   for your data?

14   A.      That's correct.

15   Q.      Now, you have written articles in the past that TOSS

16   can cause problems, haven't you?

17   A.      So, I may have certainly mentioned the fact that you

18   potentially can see artifacts from a TOSS spectrum.

19   Q.      And those problems would be based upon the impact of

20   the TOSS form of suppression on the NMR spectra; right?

21   A.      So not exactly.

22   Q.      Well, let's look at DTX-691.  And once we get it up

23   on the screen, we can identify it once we all see it.  It's

24   also in your binder, if you care to look at the paper.

25   A.      Okay.

Munson - cross

1    Q.      This is an article on which you are an author;

2    correct?

3    A.      That's correct.

4              MR. HENEGHAN:   Okay.  And if we turn to page 5

5    of that article.

6              And if we just highlight the first sentence of

7    that first full paragraph right in the middle of the page on

8    the left-hand side.

9              No, no.  Down, down, down.  It starts with TOSS.

10   BY MR. HENEGHAN:

11   Q.      So in this article, you identify the use of "TOSS can

12   potentially cause problems in quantification because TOSS

13   spectra only show the centerband"?

14             Right?

15   A.      That's correct.

16   Q.      So that's a place where you identify problems with

17   using TOSS?

18   A.      As it is applied to quantitation.  Yes.

19   Q.      And in this case, artifacts from spinning sidebands

20   still appeared in the spectra run by Dr. Nethercott even

21   though he used TOSS; right?

22   A.      Yes, it is not atypical to see some small artifacts

23   due to incomplete sideband suppression.

24   Q.      And if we look at your demonstrative PDX-7.19.

25             I believe you mentioned that this was a spectra

Munson - cross

1    that shows the impact of spinning sidebands; right?

2    A.     Yes.

3                  Let's talk just for a minute about what you

4    didn't do in relation to the NMR tests in this case.

5                  You did not do any kind of regression analysis

6    in this case, did you?

7    A.     No, I didn't do regression analysis.

8    Q.     And your report does not state what the limit of

9    detection was for the test run by Dr. Nethercott, did it?

10   A.     Well, I didn't specifically put a number on it as I

11   showed in my report.  I felt I didn't need to.

12   Q.     No statement of what the limit of detection for the

13   test you relied on was, right?

14   A.     Well, I didn't put a numerical value on it.  The

15   signal to noise was sufficient to see the peaks --

16   Q.     I'm sorry.  I didn't mean to interrupt you.

17   A.     To see the peaks clearly.

18   Q.     And speaking of signal to noise, your report also

19   does not provide or list a signal-to-noise ratio for your

20   results, does it?

21   A.     I didn't put a number to it, no.

22   Q.     Nothing in your report?

23   A.     No, I did not put a number in it.

24   Q.     You also --

25   A.     Well --

Munson - cross

1    Q.      I'm sorry.

2    A.      I apologize.

3            Which report are you referring to?

4    Q.      The original or the two errata or the reply.

5    A.      Okay.  So I don't believe that I did report a

6    particular number in any of them, no.

7    Q.      You also did not do any type of quantitative

8    mathematical analysis for the line widths related to your

9    work in this case, did you?

10   A.      I didn't provide a particular number or measurement

11   of the line widths, no.  With respect to a number.

12   Q.      So let's talk just for a minute about some of the

13   language you did use in your reports.

14           In your reports, when you refer to "amorphous

15   materials," in most cases you are referring to amorphous

16   apixaban, right?

17   A.      Can you give me an example?

18   Q.      Sure.  I'd be happy to.

19           If you look in that binder that I've handed up,

20   I think it's Tab 1.  Yes, Tab 1 is your deposition

21   transcript from this case.

22   A.      Okay.

23   Q.      And I would direct your attention to page 59.  And

24   the way this presents is that there are four pages

25   reproduced on one page.

Munson - cross

1   A.      Yes.

2   Q.      So look for the individual page number in the bottom

3   right of each corner to get to page 59.

4   A.      Yes.  Thank you.

5   Q.      I hope that is not too confusing.

6   A.      No, no.  Thank you.

7   Q.      I'm trying to save a little paper, cut down on the

8   size of the binder.

9           So if you look at page 59, beginning at line 22,

10  and read over to page 60, line 5.

11          And you see where it says:

12          "Question:  When you use the term 'amorphous

13  material' in here, are you referring to amorphous apixaban?"

14          And your answer is:

15          "Answer:  In most cases, yes.  So although that

16  being said, amorphous, in general, could refer to both

17  amorphous apixaban as well as amorphous excipients."

18          Do you see that?

19  A.      Yes, I do.

20  Q.      Does that refresh your recollection that in your

21  reports, in most cases, when you are referring to "amorphous

22  materials," you're referring to amorphous apixaban?

23  A.      Typically when I was referring to amorphous material,

24  I was referring to it in the region from 110 to 170 parts

25  per million in the NMR spectrum, which would be the region

1    which would contain amorphous apixaban.

2    Q.    And what you said in your deposition was that in most

3    cases, you are referring to amorphous apixaban.

4    A.    Yes, because in most cases where I used the term

5    "amorphous material," it was referring to that particular

6    region, yes.

7    Q.    And also when referring to amorphous materials in

8    your opening report, you kept the report intentionally vague

9    to avoid acknowledging that the SigmaPharm product contains

10   amorphous apixaban.

11        Isn't that right?

12   A.    I would not characterize it that way.

13   Q.    Well, let's look, again, at your deposition.  If you

14   turn to maybe just one page over to page 64.

15        And I will ask you to look at starting at line

16   4.  And I will read something to you.

17        And just for the record and so counsel for

18   plaintiff can follow along, between lines 10 and 18 of the

19   transcript is a colloquy between counsel, and I will skip

20   that part and just read the question and answer.

21        So on page 64, beginning at line 4 and going to

22   line 9, then from line 19 to page 65, line 9.

23        "Question:  I asked you about amorphous

24   materials in your opening report, and you said that you were

25   intentionally vague with that term.

1          "Now I'm asking you:  Does your opening report

2    ever acknowledge that SigmaPharm's tablet contains amorphous

3    apixaban?"

4          Then we go down to line 19 where the response

5    was actually:

6          "Answer:  So the answer is, I still believe that

7    I've answered that question.

8          "However, as I've stated previously, what I did

9    specifically when I was preparing this report, I kept it

10   vague with respect to referring to things as amorphous

11   material.

12         "And so, once again, I was not -- I was -- with

13   respect to my opinion and in order to be able to satisfy my

14   opinion, which is that 'SigmaPharm's ANDA products contain

15   crystalline apixaban,' it wasn't necessary for me to

16   identify the nature of the amorphous material, and so I just

17   left it as 'amorphous material.'"

18         That's what you testified at deposition, right?

19   A.    Yes, and I agree with that.

20         I mean, I said things were amorphous material

21   because once again, even though I had really good idea that

22   it was amorphous apixaban, there certainly could have been

23   peaks due to excipients in that region, and I didn't want to

24   specify it in my opening report.

25   Q.    Okay.  Dr. Munson, I would like to ask you a

Munson - cross

1    hypothetical question and so I would like you to make the

2    following assumptions.

3              Are you ready?

4    A.    Okay.

5    Q.    Assume that you are running an NMR test observing

6    carbon.  Okay?  Assumption number one.

7    A.    Carbon 13?

8    Q.    Yes.

9    A.    Okay.

10   Q.    Assumption number two.  It has been determined that

11   the testing you are doing has a level of detection of ten

12   percent.  Okay?  That has been determined.  You'll accept

13   that assumption.  Okay?

14             The third assumption is the composition that you

15   are testing contains three percent of the substance of

16   interest of the test.  Okay?

17             And the fourth assumption is, an NMR scientist

18   interpreting that test says that she detects the substance

19   of interest with confidence.  And so just so you can see it

20   all together, I'm just going to put my notes on the document

21   camera here.

22             So these are the assumptions if you want to take

23   a look at them to answer this question.

24             Based upon those assumptions, you would say that

25   the NMR scientist's conclusion is wrong, wouldn't you?

Munson - cross

```
 1   A.      Well, I would do it so I could get the detection
 2   limit lower.
 3   Q.      I'm asking you to make certain assumptions.  One of
 4   the assumptions is that the level of detection has been
 5   determined based on the testing that is being done to be ten
 6   percent.
 7   A.      Okay.
 8   Q.      So I'm asking you to accept these four assumptions,
 9   and under those conditions, that conclusion would be wrong,
10   wouldn't it?
11   A.      So I guess there are a few more assumptions that
12   would need to be made, so one of them would be are you
13   talking about the exact same material for the level of
14   detection of ten percent with respect to the level three
15   percent with the substance of interest.
16   Q.      So are you saying that you can't accept these four
17   assumptions to answer my question?
18   A.      Well, so, for example, are you talking about a
19   chemical compound?  Are you talking about the crystalline or
20   amorphous component?  I'm trying to figure out exactly where
21   you're going with this.
22           So, for example, in some of the papers that
23   we've published, the amorphous detection level may be much
24   higher than, say, the crystalline detection level.
25   Q.      And I'm not asking you to make assumptions that
```

Munson - cross

1    crystalline is present or not present.  This is a

2    hypothetical.  This is not the facts of this case, so I

3    don't want you to make an assumption about crystalline being

4    present.  I just want to you make these assumptions, and

5    based upon these assumptions, would you say that the

6    conclusion of a scientist making -- drawing that conclusion

7    with confidence is wrong?

8    A.    So are you defining the level of detection as two

9    hydration 03?

10   Q.    These are the parameters of my question.  If you

11   can't answer it, you can just say so?

12   A.    So, once again, if -- with some additional

13   assumptions just so that we're clear, we're talking about

14   exactly the same material where the nature of all

15   crystalline or amorphous to whatever happens to be, you're

16   detecting it.  You look, trying to see something that's

17   present at the three percent level and your level of

18   detection is ten percent.  If everything is identical in

19   both circumstances, then, yes, you would have a harder time

20   detecting something that has a level of detection of ten

21   percent and if only three percent of it was present.

22   Q.    Thank you.  Let's change tact a little bit.

23          MR. HENEGHAN:  Judge, I'm not sure what to do

24   here to go off the Elmo machine.

25          THE COURT:  I'm sure someone can help you.

Munson - cross

1              MR. HENEGHAN:  Which button I should push.

2       BY MR. HENEGHAN:

3       Q.      The SigmaPharm tablet that you tested or tablets that

4       you tested do not have a high drug content, do they?

5       A.      They have a drug content of three percent.

6       Q.      Which is not a high drug content; right?

7       A.      Okay.  It's not a high drug content.

8       Q.      And I think you would agree with me that you have

9       written in the past and published articles that a polymer

10      can be mixed with the amorphous API to form an amorphous

11      solid dispersion which has been shown to significantly delay

12      the onset of crystallization.  That's something you've said

13      in the past in articles; is that right?

14      A.      Sure.  It sounds like it was something I would have

15      said.

16      Q.      All right.  In this case, you criticized Dr.

17      Schurko for measuring line widths in his analysis; is that

18      correct?

19      A.      I believe I said it wasn't necessary in order to come

20      to the conclusion whether there was crystalline or amorphous

21      apixaban or whether there was crystalline apixaban present

22      in the SigmaPharm tablet.

23      Q.      But in your publications in the past, you discuss

24      line widths and line shapes and discuss measuring line

25      widths that have height, don't you?

Munson - cross

1    A.      I'm certain there are publications where we record

2    it, although I don't know that we ever said that you have to

3    measure it to make the determination if it's crystalline or

4    amorphous.

5    Q.      It's probably fair to say that you typically refer to

6    that type of measuring in analyzing NMR results in your

7    publications, isn't it?

8    A.      I've published a lot of papers.  I think it would be

9    less likely and less -- where the paper specifically

10   addresses that.  We published a paper that was specifically

11   addressing line widths, so we measured those.  So, yes, in

12   that particular paper, yes.  We published a couple of papers

13   where we recorded line widths.

14   Q.      Well, let's look at that ibuprofen article.  If you

15   look in your binder there for DTX-693, which we'll also put

16   up on the screen.

17   A.      What tab?

18   Q.      I will tell you what number it is.  I just have to

19   look at it quickly.  That would be tab 9.

20              If you turn to page 3 of that beginning

21   with the second sentence of that second paragraph beginning,

22   line widths are reported.

23              Do you see that?  We'll blow that up so you can

24   see it better on the screen or you're welcome to use the

25   paper.

Munson - cross

1    A.    Yes.

2    Q.    On the right-hand column, second paragraph.  No,

3    second paragraph.  Yes.

4          And then the second sentence begins with, line

5    widths are reported.

6          Do you see that?

7    A.    Yes.

8    Q.    So in this paper in particular, you're pointing out

9    that line widths are reported at full width at half maximum.

10   That's the height we've been talking about.  Right?  And

11   were measured using a 50/50 combination of Lorentzian and

12   Gaussian line shapes.  The presence of ABMS in the sample

13   alters the line shape from a pure lore to a mixture of

14   Lorentzian and Gaussian.  Right?  That's what you reported

15   in that particular paper?

16   A.    Just to be clear, AMBS stands for anisotropic bulk

17   magnetic susceptibility.

18   Q.    Thank you.  Thank you though.  Thank you for

19   clarifying that.

20          Also in your publications in the past, you have

21   noted the importance of the parameters shift intensity,

22   meaning the area of the peak and line width in analyzing

23   amorphous spectra, haven't you?

24   A.    Probably.

25   Q.    Okay.  Let's look at DTX-651, which is -- in your

1    binder, it's number six in your binder.

2              Are you there?

3    A.     Yes.

4    Q.     Okay.

5    A.     Yes.

6    Q.     And so DTX-651 is an article on which you were an

7    author along with a few others; is that correct?

8    A.     That's correct.

9    Q.     Okay.  And if we turn to page 5 of that publication

10   and we look at Table 1 down on the bottom right-hand corner

11   of that page, this table identifies the parameters for

12   analyzing the NMR spectrum of an amorphous material called

13   indomethacin; right?

14   A.     Yes.  More specifically, we were doing a

15   deconvolution of the region corresponding to the carbonyl

16   carbon of indomethacin which happened to have four different

17   components associated with it.

18   Q.     And the parameters that you identified as important

19   in that analysis are chemical shift, peak area and line

20   width; right?

21   A.     Those are parameters we reported, yes.

22              MR. HENEGHAN:  Your Honor, that's all I have.

23   Thank you.

24              THE COURT:  I assume nobody else on defendants'

25   side?

Munson - cross

```
 1                 MR. PEJIC:  No, Your Honor.

 2                 MR. KOCHANSKI:  Nothing, Your Honor.

 3                 THE COURT:  Okay.  Redirect?

 4                 MR. PRUSSIA:  Nothing, Your Honor.

 5                 THE COURT:  Okay.  Just a couple questions, Dr.

 6       Munson.

 7                 THE WITNESS:  Sure.

 8                 THE COURT:  Did you express an opinion on how

 9       much crystalline apixaban was in the SigmaPharm product?

10       That is how much, a percentage or a total?

11                 THE WITNESS:  I didn't really put a percentage

12       on it because it was like the mannitol peaks were really

13       small because they were crystalline.  Dr. Apperley reported

14       that we're only seeing a smaller amount of the crystalline,

15       so we didn't do the proper experiments to quantify.

16                 THE COURT:  Is it now your opinion though

17       that some of the apixaban of the SigmaPharm product is

18       amorphous?

19                 THE WITNESS:  Yes, some of the material in the

20       SigmaPharm product is amorphous apixaban.

21                 THE COURT:  And does that affect NMR analysis

22       you gave give you any indication as to the relative amount

23       of amorphous versus crystalline apixaban in the SigmaPharm

24       product?

25                 THE WITNESS:  So there's certainly a substantial
```

1  amount.  Okay.  Whether or not, for example, that --

2              MR. HENEGHAN:  Your Honor, could I just object

3  this is beyond his report?  He didn't opine about this at

4  all in the report.

5              THE COURT:  His objection is noted.  I will give

6  you a chance to follow up.

7              MR. PRUSSIA:  Actually, it certainly was not

8  stated in the report, but counsel elicited questions along

9  these lines during his deposition, so I think it's within

10  the bounds.

11              THE COURT:  Thank you for clarifying that for

12  me.  You can go ahead.

13              THE WITNESS:  It certainly could be applied 50,

14  60 percent crystalline material.  We just didn't do the

15  proper experiments to quantity quantify that.

16              THE COURT:  Thank you.  Any followup?

17              MR. PRUSSIA:  No, Your Honor.

18              THE COURT:  Any followup?

19              MR. HENEGHAN:  No, Your Honor.

20              THE COURT:  All right.  You may step down.

21              THE WITNESS:  Thank you.

22              (Witness excused.)

23              THE COURT:  Thank you.  We're going to take a

24  short break and then call the next witness.

25              (Short recess taken.)

Berkland - direct

1                      -   -   -

2                  (Proceedings resumed after the short recess.)

3                  MR. LEE:  Your Honor, our next witness is Dr.

4     Cory Berkland and Ms. Wigmore more will do the direct.

5                  THE COURT:  Okay.  Thank you.

6                  MS. WIGMORE:  Your Honor, I believe our exhibits

7     have been handed up during the break.

8                  THE COURT:  Okay.

9                  ... DR. CORY BERKLAND, having been duly sworn as

10    a witness, was examined testified as follows...

11                 THE COURT:  Good morning, Dr. Berkland.

12    Welcome.

13                 THE WITNESS:  Good morning.

14                 THE COURT:  You may proceed.

15                        DIRECT EXAMINATION

16    BY MS. WIGMORE:

17    Q.      Dr. Berkland, please introduce yourself.

18    A.      My name is Cory Berkland.

19    Q.      Have you been retained by Bristol-Myers Squibb

20    Company and Pfizer, Inc. as an expert witness in this case?

21    A.      Yes, I have.

22    Q.      Generally speaking, what issue have you been asked to

23    address?

24    A.      I've been asked to address the particle size in

25    Unichem's ANDA tablets, specifically in the apixaban

Berkland - direct

1   particle size.

2   Q.      Are you offering any opinions about the '208 patent

3   in this case?

4   A.      No.

5   Q.      Are you offering any opinions with respect to any

6   defendant other than Unichem?

7   A.      I'm not.

8   Q.      And are you offering any opinions about patent

9   validity?

10  A.      No.

11  Q.      Let's put PDX-6.2 on the screen.  Is this a summary

12  of your educational background and employment history?

13  A.      Yes, it is.

14  Q.      What is your educational background?

15  A.      In 1998 I received a Bachelor's degree in chemical

16  engineering from Iowa State University, and at the

17  University of Illinois I received a Master's and Ph.D.

18  degrees in chemical engineering.  For the Ph.D.'s, the

19  department head changed its name to chemical and

20  bioelectrical engineering, but it's still a chemical

21  engineering degree.

22  Q.      Where do you currently work?

23  A.      I am currently employed at the University of Kansas.

24  Q.      And what positions do you hold at the University of

25  Kansas?

Berkland - direct

1  A.      I hold a named professorship called the Solon E.

2  Summerfield Distinguished Professor, and I'm employed as a

3  professor in the Department of Pharmaceutical Chemistry, and

4  also the Department of Chemical and Petroleum Engineering.

5  Q.      What are your job responsibilities?

6  A.      As a professor at the University of Kansas, I have

7  responsibilities to conduct research, to teach courses, and

8  also to participate in service.

9  Q.      Do you have any publications, Dr. Berkland?

10  A.      Yes.

11  Q.      Approximately how many?

12  A.      Approximately 175 papers published.

13  Q.      What is the focus of your research?

14  A.      My research encompasses pharmaceutical formulation,

15  and also the delivery of pharmaceuticals to patients.

16  Q.      Turning to PDX-6.3.

17           Have you received any awards or recognition for

18  your research?

19  A.      Yes, I have.

20  Q.      Are there any awards or honors that you are

21  particularly proud of?

22  A.      The first award over there is the Controlled Release

23  Society Young Investigator Award.  I received that early in

24  my career, and that is an international award that goes to

25  one individual.

Berkland - direct

1              And then down at the bottom, a couple of years

2      ago, I was inducted into the National Academy of Inventors.

3      That National Academy in the United States recognizes

4      achievements in developing creative new approaches to

5      research and products and patenting activity.

6      Q.      Do you have any patents?

7      A.      I do.

8      Q.      Approximately how many?

9      A.      About 65.

10     Q.      We'll put on the screen PTX-787 which is Tab 1 of

11     your binder.

12              Can you please identify this document?

13     A.      This is a copy of my CV.

14     Q.      And does this CV provides an accurate summary of your

15     education and professional experience?

16     A.      Yes.

17              MS. WIGMORE:  Your Honor, we offer Dr. Cory

18     Berkland as an expert in the preparation and analysis of

19     pharmaceutical formulations.

20              MS. BROWNING:  No objection.

21              THE COURT:  Okay.  He is so recognized.

22     BY MS. WIGMORE:

23     Q.    Dr. Berkland, you testified previously that you were

24     retained by BMS and Pfizer as an expert in this case.

25              Have you been compensated for the time you have

1    spent working on the case?

2    A.    I have.

3    Q.    Does your compensation depend in any way on the

4    substance of your opinions or the outcome of the case?

5    A.    No, it does not.

6    Q.    What were you asked to do in this case?

7    A.    I was asked to evaluate Unichem's ANDA tablets, and

8    specifically to look at the apixaban particles in those

9    tablets.

10   Q.    Did you focus on any particular claims of the '945

11   patent?

12   A.    Yes, I did.

13   Q.    Do you understand that claims 21 and 22 of the '945

14   patent are asserted against Unichem?

15   A.    I do.

16   Q.    Did you analyze whether Unichem infringes each of

17   those claims?

18   A.    Yes, I did.

19   Q.    Turning to PDX-6.4, please explain what types of

20   evidence you reviewed in forming your opinions.

21   A.    In forming my opinions regarding claim infringement,

22   I analyzed the '945 patent; also the claim construction

23   opinion from the Court.

24             I reviewed Unichem's ANDA documents, portions of

25   their ANDA documents, as well as witness testimony.

Berkland - direct

1          And then I considered publications relating to

2     the analysis of pharmaceutical formulations.

3     Q.     Now, we'll come to the details of your analysis

4     momentarily but using PDX-6.5, how did you go about

5     conducting your infringement analysis.

6     A.     First I assessed the limitations of the asserted

7     claims, and I identified specific claim limitations that

8     were important for my analysis.

9          I performed a technique of analysis called

10    SEM-EDS, and we'll talk about that momentarily, and then I

11    reviewed Unichem's manufacturing process as set forth in

12    their ANDA documents.

13    Q.     And again, we'll walk through the details shortly,

14    but what, generally, did you conclude with respect to

15    infringement?

16    A.     I concluded that Unichem's ANDA tablets did indeed

17    infringe the claims.

18    Q.     And that you are referring to the asserted claims 21

19    and 22 of the '945 patent?

20    A.     Yes.

21    Q.     Dr. Berkland, were you present in the courtroom for

22    the testimony of plaintiff's expert Dr. Jerry Atwood?

23    A.     I was.

24    Q.     Did you hear testimony from Dr. Atwood concerning the

25    technical background relating to the '945 patents?

1    A.      Yes, I did.

2    Q.      Did you agree with that technical background offered

3    by Dr. Atwood?

4    A.      I did.

5    Q.      We won't repeat that technology background, but I

6    would like to spend a few minutes talking about the

7    technology you used in your analysis.

8            Are you familiar with scanning electron

9    microscopy or SEM?

10   A.      Yes, I am.

11           MS. WIGMORE:  If we could put up PDX-6.6.

12   BY MS. WIGMORE:

13   Q.      Could you explain for us, please, what is SEM and how

14   it works?

15   A.      Certainly.

16           Scanning electron microscope is a high-powered

17   microscope, and it utilizes an electron beam as the source

18   of energy.  Sometimes we think about with the normal

19   microscope, we're taking pictures with just an ambient lamp

20   light.  Here, we're using an electron beam.

21           That electron beam is shown on the left, is

22   projected onto a surface, and then electrons are reflected

23   back up to the detector.

24           That detector converts the electrons that are

25   hitting the surface of the detector into an image that we

1    see shown above the detector.

2            The -- this is a high-powered technique so it

3    can resolve images less than a micron in size pretty easily.

4    Q.    What is a scale bar in the context of SEM?

5    A.    Since this is a highly automated microscope, it

6    has -- creates the image, it also notes the magnification of

7    the image that's being projected.

8            So the software at the same time produces a

9    scale bar, and you can see that down in the lower left-hand

10   corner of the picture shown on the screen.

11   Q.    What is the scale bar on this particular screen?

12   A.    On this particular screen, we see from each of the

13   hashmarks on the end of the black line that it is

14   100 microns.

15   Q.    Turning to PDX-6.7.

16           Please explain what is EDS and how it works.

17   A.    EDS is an analytical technique that utilizes the

18   exact same instrument.  So we have the same electron beam

19   source that is hitting the surface of the sample.  And in

20   this case, a powder that is prepared on a surface.  And this

21   time we're actually collecting x-rays that are emitted from

22   the surface of the sample.

23           We know what particular atoms will emit a

24   certain type of x-ray.  So, for example, carbon will add a

25   specific x-ray that's emitted, oxygen will have its own, and

Berkland - direct

1    nitrogen will have its own as well.  And what I have done in

2    the picture above the detector is shown that you can convert

3    these into colors.

4              So in this case every time you see blue, that is

5    the distribution of a carbon in the image.  Oxygen is in

6    green distributed across the image, and nitrogen is in red

7    and its location distributed in the image.

8    Q.    Now, what does the term "EDS" stand for?

9    A.    It stands for energy dispersive x-ray spectroscopy.

10   Q.    Are you familiar with the term SEM-EDS?

11   A.    SEM-EDS is the jargon that I will use, which is

12   simply a combination of these two techniques on the same

13   analytical machine.

14   Q.    And how do those techniques work together?

15   A.    SEM allows us to take photographs, so to speak or get

16   an image of the powder on the surface as shown here.  And

17   then we can use the energy dispersive x-ray spectroscopy to

18   determine the identity when -- and location of particular

19   atoms across the image.

20   Q.    Can you SEM alone to measure particle size?

21   A.    Yes, you can.

22   Q.    In what circumstance?

23   A.    If you know the identity of the substance that you're

24   looking at, for example, the excipient lactose anhydrous,

25   you can simply measure the particle size and know that that

1     is the size of lactose anhydrous.

2     Q.      In what circumstances would you combine SEM with EDS

3     to measure a particle size in a sample?

4     A.      When you have a mixture of ingredients and you're

5     trying to determine the identity of a particular particle in

6     the image, you would want to add a spectroscopic method like

7     EDS.

8     Q.      What is an elemental map in the context of SEM-EDS?

9     A.      An elemental map is simply a way to refer to the

10    distribution of one particular atom across the surface of

11    the sample.

12    Q.      How is the SEM-EDS method used to measure particle

13    size?

14    A.      We can use the EDS technique to determine the

15    identity of a particular particle, and then we can combine

16    that with the scanning electron microscope to measure the

17    size of that particle.

18    Q.      Now, let's pull up on the screen JTX-2.

19            Do you recognize this as the '945 patent?

20    A.      Yes.

21    Q.      Now, turning to the section on the first page,

22    titled, "Related Application Data."

23            Do you see reference to a provisional

24    application filed on February 25th of 2010?

25    A.      I see that.

Berkland - direct

1   Q.      And for purposes of your opinions in this case, did

2   you assume that was the date of invention for the '945

3   patent?

4   A.      Yes, I did.

5   Q.      Do you see the reference above that to a PTC

6   application filed February 24th of 2011?

7   A.      I see that.

8   Q.      Would your opinions change in any way if the priority

9   date was 2011 versus 2010?

10  A.      My opinions would not change.

11  Q.      Turning to PDX-6.8.

12          Were you in the courtroom when Dr. Atwood

13  presented this definition of a person of ordinary skill in

14  the art for the '945 patent?

15  A.      Yes.

16  Q.      Is that the definition you applied in forming your

17  opinions in this case?

18  A.      It is.

19  Q.      Turning to PDX-6.9.

20          Are you aware that defendants have offered this

21  definition of a person of ordinary skill in the art for the

22  '945 patent?

23  A.      Yes, I am.

24  Q.      And would your opinions change in any way if the

25  defendants' definition were adopted?

1  A.    No, my opinions would not change.

2  Q.    In terms of your own qualification, do you meet

3  either of the two definitions of the plaintiff's or the

4  defendants' for a person of ordinary skill in the art?

5  A.    Yes, I do.

6  Q.    Do you satisfy both of them?

7  A.    I do.

8        MS. WIGMORE:  If we could turn now to the

9  asserted claims of the '945 patent.  Again, JTX-2 -- let's

10 focus first on claim 21.

11 BY MS. WIGMORE:

12 Q.    Can you read that claim for us, please?

13 A.    Claim 21 states:  "The composition as defined in

14 claim 12, wherein the pharmaceutical composition comprises

15 2.5 milligrams of apixaban."

16 Q.    Now, turning to claim 22.  How does claim 22 vary

17 from claim 21?

18 A.    The text is the same except for this is a higher

19 dose.  This is the 5 milligram dose.

20 Q.    Now, do you understand that each of the asserted

21 claims, 21 and 22, depends on independent claim 12 of the

22 '945 patent?

23 A.    Yes.

24 Q.    Now, with that in mind, if we could turn to PDX-6.10.

25       Have you prepared a demonstrative illustrating

1    all the limitations of asserted claims 21 and 22?

2    A.      Yes, I have.

3    Q.      And do you understand that with respect to Unichem,

4    only one claim limitation is in dispute with respect to

5    these asserted claims?

6    A.      That's my understanding.

7    Q.      And have you checked off the claims that are not in

8    dispute?

9    A.      Yes, I have.

10               MS. WIGMORE:   Now, Your Honor, for the record,

11   the undisputed limitations are addressed in uncontested

12   facts 73 through 79 of the pretrial order.

13               In addition, just directing the Court's

14   attention to uncontested fact 26, that the '945 patent is

15   owned by BMS and Pfizer.

16               THE COURT:   Thank you.

17   BY MS. WIGMORE:

18   Q.      Now, Dr. Berkland, turning back to this demonstrative

19   of the claim limitation, what is the sole disputed

20   limitation with respect to Unichem?

21   A.      The sole disputed claim limitation says:   "wherein

22   the crystalline apixaban particles have a $D_{90}$ equal to or

23   less than about 89 microns."

24   Q.      And is that a limitation you analyzed with respect to

25   the Unichem ANDA products?

1  A.     Yes, it is.

2  Q.     Now, do you understand that the Court was asked to

3  construe the phrase, "apixaban particles have a $D_{90}$" as it

4  appears in this limitation?

5  A.     That's my understanding.

6  Q.     Do you understand the Court construed that phrase to

7  have its plain and ordinary meaning?

8  A.     Yes.

9  Q.     Is that the construction you applied in your

10 analysis?

11 A.     Yes, it is.

12 Q.     What would a person of ordinary skill in the art at

13 the time of the invention have understood to be the plain

14 and ordinary meaning of apixaban particles have a $D_{90}$?

15 A.     That would indicate that the $D_{90}$ is 90 percent of the

16 particles being less than 89 micron -- less than or equal to

17 about 89 microns by volume.

18 Q.     Now, let's discuss how you went about analyzing

19 Unichem's ANDA product to determine whether this limitation

20 is satisfied.

21        Did you conduct any testing?

22 A.     Yes, I did.

23 Q.     What technologies did you use to test Unichem's ANDA

24 products for infringement?

25 A.     I used the SEM-EDS technology we just discussed.

1    Q.      Is the SEM-EDS technology discussed specifically in

2    the '945 patent?

3    A.      No, it is not.

4    Q.      What was the state of the art with respect to the

5    SEM-EDS technology as of the date of the invention claimed

6    in the '945 patent?

7    A.      SEM-EDS have been used on pharmaceutical solids and

8    had been used to determine particle size as of the date of

9    the patent.

10   Q.      Dr. Berkland, did you invent using the SDM EDS test

11   methods for that purpose?

12   A.      No, I did not.

13   Q.      Is it called the Berkland's method?

14   A.      No, it is not.

15   Q.      If you turn to tab 3 in your binder, I direct your

16   attention to PTX-394.

17              Are you familiar with this document?

18   A.      Yes, I am.

19   Q.      What is it?

20   A.      This is a book by Merkus.

21   Q.      When was this book published?

22   A.      This book was published in 2009, if I recall

23   correctly.

24   Q.      And generally speaking, what does this publication

25   discuss in relation to your opinion?

Berkland - direct

1    A.      This discloses the use of imaging techniques, and

2    specifically electron microscopy for determining particle

3    size.

4    Q.      And if we could turn, please, to the page ending in

5    Bates number 1804.

6              Do you see the Section 6.3.11?

7    A.      Yes, I do.  Thank you.

8    Q.      What is the title of that section?

9    A.      This section reviews image analysis.

10   Q.      And what specifically is discussed before that

11   heading?  Below that heading?

12   A.      It indicates that image analysis can be used to

13   determine the particle size simply from taking a picture and

14   measuring the size of the particles in that picture.

15   Q.      Is SEM referenced specifically?

16   A.      Yes, it is.

17   Q.      Let's turn now to tab 4 in your binder, which is

18   PTX-362.

19              Are you familiar with this document?

20   A.      Yes.

21   Q.      What is it?

22   A.      This is a publication by Liu.

23   Q.      And when was this publication published?

24   A.      In 2009.

25   Q.      What does the Liu article discuss?

Berkland - direct

1    A.      The Liu article discusses this combination of

2    scanning electron microscopy and EDS for the analysis of

3    pharmaceuticals.

4    Q.      And if we could turn, please, to the page ending in

5    Bates number 116.  Please describe what is shown in Figure

6    6.

7    A.      Figure 6 shows a cross-section of a solid, a

8    pharmaceutical solid, and both SEM and EDS are used to take

9    a picture and subsequently analyze the composition of that

10   cross-section.

11   Q.      There's a reference below the figure to EDX.  What

12   does EDX refer to?

13   A.      EDX is just a slightly different way of referring to

14   EDS, so electron -- I'm sorry.  X-ray dispersive

15   spectroscopy that I've been discussing.

16   Q.      So EDX and EDS mean the same thing?

17   A.      Yes.

18   Q.      If we could turn to tab 5 in your binder, I'd like to

19   pull up PTX-402.

20               Are you familiar with this document?

21   A.      Yes, I am.

22   Q.      What is it?

23   A.      This is an article by Reverchon.

24   Q.      When was it published?

25   A.      This was published in 2008.

1    Q.      What does this article address?

2    A.      This article again is about pharmaceuticals and

3    specifically uses the SEM-EDS technique to measure the size

4    and composition of pharmaceutical particles.

5    Q.      Now, if you could turn to the abstract in this

6    article in the second paragraph, do you see the third

7    sentence beginning, SAA?

8    A.      Yes.  Thank you.

9    Q.      And what is that sentence referring to?

10   A.      This sentence is just explicitly saying what I

11   mentioned before, that scanning electron microscopy in

12   combination with energy dispersive X-ray spectroscopy can be

13   used to analyze these composite microparticles that are a

14   pharmaceutical.

15   Q.      And turning to the next sentence, what specifically

16   was being analyzed with SEM-EDS technology in this

17   publication?

18   A.      An excipient called HPMC, which is hydroxypropyl

19   methylcellulose, and an API or active ingredient,

20   ampicillin.

21   Q.      Is that a pharmaceutical composition?

22   A.      Yes.

23   Q.      Turning to tab 6 in your binder, let's pull up

24   PTX-412.

25           Are you familiar with this document?

Berkland - direct

1    A.      Yes, I am.

2    Q.      What is it?

3    A.      After the table of contents, we've produced the

4    chapter from this book.  The chapter is by Zeng.

5    Q.      And what does this chapter address?

6    A.      The entire book is about pharmaceuticals and the

7    specific chapter addresses analysis of pharmaceutical

8    particles.

9    Q.      And if you turn to Section 11.7.2 on page ending

10   2547, what is the title of that section?

11   A.      It's entitled Microscopy and Image Analysis.

12   Q.      And what is described in this section?

13   A.      This again describes the use of microscopy and

14   specifically scanning electron microscopy to determine

15   particle size.

16   Q.      Does that include in pharmaceutical composition?

17   A.      Yes.  The entire book, which was published in 2011,

18   is about pharmaceutical composition.

19   Q.      As of February of 2010, was SEM-EDS considered a

20   reliable method for analyzing particle size?

21   A.      Yes.

22   Q.      Have you personally used SEM before this case to

23   measure particle size?

24   A.      Yes, I have.

25   Q.      Are you aware of any instances in which SEM or EDS

1  has been used to analyze particle size of a material in a

2  pharmaceutical composition?

3  A.    I am.

4  Q.    Are there any examples of that in the articles you

5  just described?

6  A.    If we turn back to tab 5, the article by Reverchon,

7  specifically, there was analysis done on the hydroxypropyl

8  methylcellulose particles in combination with an active

9  pharmaceutical ingredient, ampicillin, and particle size was

10  determined.

11  Q.    And Reverchon is 402?

12  A.    Yes.

13  Q.    Now, using PDX-6.12, what were the main steps of your

14  analysis?

15  A.    To begin to conduct this analysis using SEM-EDS, I

16  started with control, control substances, which we'll talk

17  about in a moment, and then I analyzed material from

18  Unichem's tablets using the same technique, and finally, I

19  compared the results to what might be expected from

20  Unichem's manufacturing process as disclosed in their ANDA

21  documents.

22  Q.    So taking those steps one by one, let's turn to

23  PDX-6.13.

24        What were the controls that you analyzed?

25  A.    I first analyzed Unichem's starting API.  This would

1    be before it was formulated in any way.  I will refer to it

2    as bulk or starting API material.  And I also analyzed the

3    excipients that Unichem employed in their tablet, including

4    lactose anhydrous, microcrystalline cellulose and

5    croscarmellose sodium.

6    Q.    Now, with respect to the Unichem starting API you

7    referred to, how, if at all, does that compare with the API

8    or the apixaban in Unichem's final product?

9    A.    Well, we know from Unichem's process that the

10   starting API is dissolved at the very beginning and then

11   sprayed onto the excipients that I highlight here, so the

12   size of the starting API really doesn't matter.

13   Q.    Would the size of the starting API tell us anything

14   about the size of the apixaban particles in Unichem's final

15   product?

16   A.    No.

17   Q.    From where did you obtain samples of Unichem's

18   starting API?

19   A.    They were provided to me by counsel.

20   Q.    And do you understand where they originated from?

21   A.    Yes.  My understanding is that Unichem provided them.

22   Q.    How did you obtain the excipients you tested?

23   A.    To obtain the excipients, I first analyzed Unichem's

24   ANDA documents to determine the exact excipients and the

25   vendors they used for those excipients and then I obtained

Berkland - direct

1    those excipients directly from the vendors.

2    Q.    What, if anything, did you do to confirm that the

3    excipient samples that you ordered were the same as those

4    used by Unichem?

5    A.    In Unichem's ANDA documents, there's something called

6    the Certificate of Analysis for each ingredient, and I

7    referenced the Certificates of Analysis and directly

8    compared those to the excipients that I sourced from the

9    vendors to make sure that they agree.

10   Q.    Now, we've been discussing starting API and excipient

11   control.  How did you analyze these controls?

12   A.    I utilized the SEM-EDS technique.

13   Q.    Did you utilize the chemical structures of Unichem's

14   starting API and excipients?

15   A.    I did.

16   Q.    Turning to PDX-6.14, what did you glean from that

17   analysis?

18   A.    When you look at the chemical structures of the API

19   which is shown on the left, apixaban, and compared it to

20   each of the excipients on the right-hand side,

21   croscarmellose sodium, microcrystalline cellulose and

22   lactose, we can see that apixaban is the only compound that

23   contains nitrogen.

24   Q.    Now, aside from the four chemicals shown on the

25   screen, are there any other ingredients in Unichem's ANDA

Berkland - direct

1    products?

2    A.    Yes.

3    Q.    How do the chemical components of those ingredients

4    compare to apixaban?

5    A.    In addition to these, there's a very small quantity

6    of sodium laurel sulfate and magnesium sulfate that are

7    added later.  Neither of those contain the nitrogen atoms.

8    Q.    Did you identify any component of Unichem's ANDA

9    product other than apixaban that contains nitrogen?

10   A.    I did not.

11   Q.    How did that bear on your analysis?

12   A.    They told me that I could use nitrogen as a

13   diagnostic or a marker for the location of apixaban using

14   SEM-EDS.

15   Q.    Turning to tab 9 in your binder, I'm showing you

16   PTX-1222.

17              Are you familiar with this document?

18   A.    Yes, I am.

19   Q.    What is it?

20   A.    This document is a compilation of the images that

21   produced for Unichem's starting API.

22   Q.    Let's turn to page 48 of PTX-1222.  What is shown

23   here?

24   A.    So that's a -- it's a little dark on the screen.  We

25   can see here the various large crystals that appear in

614

Berkland - direct

1    Unichem's API.

2                    If we look in the lower left-hand corner,

3    there's a scale bar that says 500 microns.  These particles

4    then are several hundred microns in size.  The other feature

5    I'd like to point out is that there are circles on the

6    surfaces of many of these particles with the title Map Data.

7    That indicates a region where I went on to conduct the EDS

8    method.

9    Q.    So this particular slide shows your analysis of the

10   starting Unichem API; is that right?

11   A.    That's correct.

12   Q.    And, again, does that tell us anything about the

13   particle size in the final product?

14   A.    No.

15   Q.    Now, turning to tab 10 in your binder, I'm showing

16   you PTX-1205.

17                    Are you familiar with this document?

18   A.    Yes, I am.

19   Q.    What is it?

20   A.    These are compilations of data that I produced for

21   each of the ingredients that I was testing with the API and

22   the excipient as well as the Unichem tablet.

23   Q.    Now, we'll walk through those individual pieces.

24                    Turning to page 3 of PTX-1205, what is shown

25   here?

Berkland - direct

```
 1   A.     If you have a good memory, you'll recognize the
 2   picture in the middle of the screen.  That's the one we just
 3   looked at for Unichem's API.  We see large crystals and we
 4   also see the 500-micron scale bar down in the corner.  And
 5   recall that I mentioned I had encircled various regions on
 6   the surface of the crystals.
 7                    Those regions I then used the EDS method to
 8   determine the distribution of carbon, oxygen and nitrogen on
 9   the surface of these Unichem particles.
10   Q.     And what does the red region on this exhibit
11   indicate?
12   A.     You can see the red regions are nitrogen if you use
13   the legend in the upper left-hand corner and it shows that
14   the nitrogen is uniformly distributed across the crystalline
15   apixaban particle surface much in the same way that the
16   oxygen and carbon are uniformly distributed.
17   Q.     So what does this exhibit tell us about the particle
18   size of apixaban in Unichem's starting API?
19   A.     It doesn't tell us anything because Unichem's process
20   first dissolves this API and then sprays it onto the
21   excipient.
22   Q.     So just for clarification, the question was, what
23   does this tell us about the particle size of Unichem's
24   starting API?
25   A.     I'm sorry.
```

Berkland - direct

```
 1                   The starting API is large, and it's on the order
 2       of several hundred microns in size.
 3       Q.      What does this image tell us about the particle size
 4       of Unichem's -- apixaban in Unichem's final ANDA product?
 5       A.      It doesn't tell us the particle size of the final
 6       apixaban API particles.
 7       Q.      Is that because of the dissolving that you mentioned
 8       previously?
 9       A.      That's correct.
10       Q.      Now, you've shown us your imaging and elemental
11       mapping of the apixaban starting API.  Did you also analyze
12       the three excipients that you discussed?
13       A.      I did.
14       Q.      Turning to PDX-12.19, which is tab 11 in your binder,
15       I'll direct your attention to page 44.
16                   Are you familiar with this document?
17       A.      Yes, I am.
18       Q.      What is it?
19       A.      This is SEM of one of the excipients used for my
20       control experiments.
21       Q.      Which excipient is that?
22       A.      This is croscarmellose sodium.
23       Q.      And did you conduct similar images for the other
24       excipients you discussed?
25       A.      I did.
```

Berkland - direct

1    Q.      Turning to PTX-1220, which is tab 12 in your binder,

2    on page 44.

3            What is shown here?

4    A.      This is the scanning electron micrograph again, and

5    with the regions of interest encircled that I conducted the

6    EDS analysis.  And this is for lactose anhydrous.

7    Q.      And turning now to PTX-1221, which is tab 13 in your

8    binder, at page 32.

9            What is shown here?

10   A.      We have here an SEM image, scanning electron

11   micrograph of microcrystalline cellulose, and again, I

12   highlight the regions that I conducted of the EDS analysis.

13   Q.      Now, you've shown us your images of the three

14   excipients.  Generally speaking, what did you observe in

15   your imaging of the excipients in Unichem's ANDA product?

16   A.      I observed that the particle size was typically

17   around 100 microns, give or take, and I observed that there

18   was no nitrogen present on any of these excipients.

19   Q.      Do these images of the excipients tell us anything

20   about the particle size of apixaban in Unichem's final

21   product?

22   A.      No.

23   Q.      Now, if we turn back to your -- the three steps of

24   your analysis, which is PDX-6.12, you described the analysis

25   of controls you conducted.

Berkland - direct

1    **What was your next step?**

2    A.    **My next step was to compare what I saw in the**

3    **controls to Unichem's tablets.**

4    Q.    **What dosage of apixaban did you test?**

5    A.    **I tested the 5 milligram dose.**

6    Q.    **And what, if anything, did you do to prepare the**

7    **Unichem tablet for testing?**

8    A.    **To obtain a sample for imaging and EDS analysis, I**

9    **fractured the tablet and then I gently removed some of the**

10   **core material with a razor blade, creating a powder that I**

11   **then placed on the surface of the sample holder and put in a**

12   **scanning electron microscope for analysis.**

13   Q.    **Is this a method you used previously?**

14   A.    **Yes.**

15   Q.    **Is this a standard method in the industry?**

16   A.    **It is.**

17   Q.    **Could you have used the whole tablet for your**

18   **imaging?**

19   A.    **You can't use the whole tablet because the scanning**

20   **electron microscope looks at surfaces, and if you had an**

21   **intact tablet, you would only see the surface of the tablet.**

22   Q.    **Now, what did you do to determine whether the**

23   **fracturing process had any impact on the particle size of**

24   **the material in the Unichem tablets?**

25   A.    **As I started collecting images of the tablet -- or**

Berkland - direct

1    the powder material liberated from the core of the tablet, I

2    noticed the size of the powder particles, called granules,

3    that were on the surface were consistent with the size of

4    the excipients that were used in the starting formulation.

5    Q.      What did that tell you?

6    A.      That told me that there was really no change to the

7    granules from the starting excipient particles, which meant

8    that I hadn't somehow adulterated the sample.

9    Q.      Now, after liberating the granules from the tablets

10   as you just described, what did you do next?

11   A.      Next, I started going through many tablets and

12   conducting the SEM-EDS analysis.

13   Q.      Turning to PDX-6.15.

14           Please explain the amount of testing you did on

15   the material from the Unichem tablets.

16   A.      I just -- as a high overview, I analyzed three

17   different tablets in a single batch and then single tablets

18   from three different batches provided by counsel from

19   Unichem.

20           The three tablets from different -- from the

21   same batch are denoted GAPH1004, tablet 1, tablet 2, and

22   tablet 3.

23           And then if we start at the top row and move

24   down, GAPH1002, 1003 and 1004 are different batches, and I

25   analyzed one tablet from each of those batches.

1   Q.      In total, how many granules did you analyze?

2   A.      Well, in addition, I also analyzed two sites from a

3   single tablet in Batch No. GAPH1003.

4           And in total, I analyzed 68 granules.

5   Q.      Now, do the granules contain apixaban particles?

6   A.      Most of them do, yes.  But we know from the

7   manufacturing process that some additional excipient is

8   added in after the apixaban is sprayed onto the surface to

9   create the granules.  So I expected about 85 percent of the

10  particle surfaces, the granule surfaces that had apixaban,

11  and that was consistent with my observations.

12  Q.      As a general matter, how does the number of apixaban

13  particles compare to the number of granules?

14  A.      The number of apixaban particles on a single granule

15  was dozens, if not hundreds, of apixaban particles on one

16  granule.

17  Q.      How did you determine which granules to test?

18  A.      I randomly picked granules from a region of powder on

19  the surface of the sample holder.

20  Q.      Is that consistent with methods you have used in the

21  past?

22  A.      Yes.  Random selection is the way to try to minimize

23  error by picking particular regions at random.

24  Q.      Turning to PDX-1215, which is Tab 14 in your binder,

25  what is this document?

621

Berkland - direct

1  A.       This is a scanning electron micrograph of granules,

2  powder particles, that were liberated from the core of the

3  Unichem tablet, and again, I have encircled regions of

4  interest where I went on to conduct the EDS analysis.

5           MS. WIGMORE:  Your Honor, may Dr. Berkland

6  approach the screen to describe his analysis?

7           THE COURT:  He may.

8           MS. WIGMORE:  And let's turn, while you're

9  making your way over there, to page 44 of PTX-1215.

10          THE COURT:  Just make an effort to keep your

11 voice up so we can hear you.

12          THE WITNESS:  Sure.

13 BY MS. WIGMORE:

14 Q.       So what is shown on page 44?

15 A.       On page 44, we can see a scanning electron micrograph

16 image.  Individual particles that I selected for further

17 analysis by EDS are encircled by white.  And I also note the

18 scale bar down in the corner is 100 microns.

19 Q.       So does -- so we have context, what are you imaging

20 here?

21 A.       These are granules, powder particles liberated from

22 the core of the Unichem tablet.

23          MS. WIGMORE:  If we could go to PTX-1205, page

24 7.

25 BY MS. WIGMORE:

1   Q.      What is shown on this slide?

2   A.      On this slide, we see the same image presented in the

3   middle.   This is just the scanning electron microscope

4   picture, and then now, I conducted the analysis on these

5   regions of interest and shown the results by attaching lines

6   to those regions of interest.

7   Q.      What does map data refer to?

8   A.      Map data refers to the distribution of each of the

9   atoms across the surface that has been analyzed.   So we see

10  a continuous blue structure, that means carbon is present

11  across the surface.   When you see a continuous oxygen and so

12  forth, that's the position of each of those atoms on the

13  surface analyzed.

14  Q.      And how did you determine which areas to map?

15  A.      I randomly selected granules from the sample on the

16  picture in front of us.

17  Q.      What does the red portion signify on this exhibit?

18  A.      The red portion, which unfortunately has washed out a

19  little bit here but we will see it in a subsequent image, is

20  the distribution of nitrogen on the surface of each of these

21  granules.

22          MS. WIGMORE:   So let's move to PDX-6.6.

23          THE COURT:   Before you do that, on the washed

24  out, the boxes that appeared black here in the courtroom, I

25  should understand there's red in those; is that right?

1          THE WITNESS:  That's right.  They're speckled

2     with red.

3          THE COURT:  I see that now.  Thank you.

4          MS. WIGMORE:  And we'll now move to a blowup of

5     the regions, which is PDX-6.16.

6     BY MS. WIGMORE:

7     Q.    What is shown here, Dr. Berkland?

8     A.    Usually when I teach, I ask the lights to be put

9     down, but ...

10          So what's shown here is one of those granules

11    where I've conducted the analysis, I've encircled the

12    surface of the granule.  The distribution of the carbon and

13    oxygen are continuous as you would expect because those

14    atoms were present across the excipient particle.

15          And then the distribution of nitrogen is

16    different.  There's speckles -- islands of nitrogen that are

17    separated from one another.

18    Q.    And what conclusions did you draw from the nature of

19    those red areas in this elemental map?

20    A.    Those red areas would represent areas that are rich

21    in apixaban, apixaban particles, and they are very small and

22    separated from one another.

23          Using the scale bar on the lower left-hand side,

24    you can approximate the size of them at about 1 micron.

25    Q.    So what conclusions did you draw about the size of

1     the apixaban particles in the Unichem tablet from this

2     analysis?

3     A.      From granule to granule, tablet to tablet and batch

4     to batch, I consistently saw this pattern and the size of

5     red domains which told me that the apixaban particle size

6     was consistently around 1 micron.

7                   MS. WIGMORE:  Now, if we could turn to PDX-6.17.

8     BY MS. WIGMORE:

9     Q.      What is shown on this slide?

10    A.      Just to close the loop on this analysis, I wanted to

11    show the distribution of nitrogen on the starting Unichem

12    API and compare that to the size of apixaban particles and

13    the distribution of nitrogen on the granules.

14                  As a starting point here, we see that the

15    crystalline apixaban starting API is very large.  Here's the

16    100-micron scale bar.  So this is a several-hundred micron

17    crystal that begins the process.

18                  The distribution of nitrogen is contiguous,

19    which means that it's connected and it is present throughout

20    the surface.

21                  Granules that I imaged and analyzed, however,

22    are much smaller.  So I have shown proportions of the

23    starting Unichem API, even to a single granule, in this

24    image.

25    Q.      And how does the red region in the granule at the end

1  of the process in the final tablet compare to that from the

2  starting API?

3  A.    I think we'll have to go to the next slide to be able

4  to see it.

5         And here you can see that same image that I

6  analyzed on the granule.  We have now blown this up, the

7  scale bar here is only 10 microns, not 100 microns, and we

8  can see that the apixaban particles are around a micron in

9  size.

10  Q.    And what did you conclude from this analysis about

11  the size of the apixaban particles in the final Unichem ANDA

12  product?

13  A.    Consistently, across everything that I examined, the

14  apixaban particles were around 1 micron in size.

15  Q.    And how does that compare to the claim limitation?

16  A.    The claim limitation is equal to or less than about

17  89 microns or 89 microns in size.

18  Q.    So --

19  A.    And it's 100 times smaller than that.

20  Q.    So it is within the scope of that claim.

21  A.    Correct.

22  Q.    Thank you, Dr. Berkland.  If you could return to the

23  witness stand.

24  A.    (Witness complies.)

25  Q.    Now, you walked us through one of your tablet

```
 1    analyses, but that you testified that you performed several.
 2              How did the results for the other tablets you
 3    analyzed compare to what you just showed us?
 4    A.    The results were the same.
 5    Q.    So just so that we have them in the record, I would
 6    like you to turn to PTX-1214, which is tab 15 in your
 7    binder.
 8              Pulling up page 40, are you familiar with this
 9    document?
10    A.    I am.
11    Q.    And what is it?
12    A.    This is an analysis of the granules liberated from
13    the Unichem tablet.
14    Q.    And did you conduct the same elemental mapping
15    exercise that you just showed us in connection with this
16    sample?
17    A.    I did.
18    Q.    And how did your conclusions compare?
19    A.    My conclusions were the same.
20    Q.    Let's turn now to tab 16 in your binder, PTX-1216, at
21    page 44.
22    A.    (Witness complies.)
23    Q.    What is shown here?
24    A.    What is shown here are the granules liberated from
25    another Unichem tablet.
```

Berkland - direct

1   Q.      And did you conduct the same analysis with the

2   elemental mapping?

3   A.      I did.

4   Q.      Did you reach the same conclusion?

5   A.      I did.

6   Q.      Let's turn to tab 17, PTX-1217, at page 50.

7           What is this document?

8   A.      This document is, again, granules, powder liberated

9   from the Unichem tablet.

10  Q.      Did you perform the same elemental mapping analysis

11  on this sample?

12  A.      Yes, I did.

13  Q.      Did you reach the same conclusions as you've

14  described?

15  A.      I did.

16  Q.      Let's turn now to PTX-1218 and tab 18 of your binder.

17          Turning to page 104, what is shown here?

18  A.      This, again, is another SEM of powder granules

19  liberated from the core of the Unichem tablet.

20  Q.      And did you perform the same elemental mapping

21  analysis we looked at previously?

22  A.      Yes, I did.

23  Q.      Did you reach the same conclusions?

24  A.      I did.

25  Q.      And are those elemental mapping analyses contained

1    within the exhibits we've just looked at?

2    A.    They all are.

3    Q.    Dr. Berkland, in the course of your SEM-EDS

4    analysis of the material from Unichem ANDA tablets, did

5    you identify any apixaban particle, particles that were

6    above 89 microns?

7    A.    No.

8    Q.    How did the particles you observed compare to the 89

9    micron threshold?

10   A.    The particles I observed were consistently about one

11   micron in size, which is a hundred times smaller.

12   Q.    Now, you testified that you randomly identified

13   granules in tests.  How did you determine that the sampling

14   was representative?

15   A.    I determined the sampling was representative because

16   I would first go to the image.  I would randomly select an

17   area to image in the first place, and then within the image

18   I would randomly select particles to analyze.  I also

19   conducted that across multiple tablets and across multiple

20   batches and even two different sites in the same tablet.

21   Seeing the consistent results gave me confidence in the

22   data.

23   Q.    Did you see anything in your test results or

24   Unichem's ANDA that indicated the apixaban was not uniformly

25   distributed in the tablet?

Berkland - direct

1   A.      No.  It was clearly uniformly distributed.

2   Q.      And based on your experience in the field, would you

3   have an expectation as to whether the apixaban would be

4   uniformly distributed in a pharmaceutical composition?

5   A.      It should be, yes.

6   Q.      Now, did you attempt to calculate a precise $D_{90}$

7   value for the crystalline apixaban particles in Unichem's

8   ANDA product?

9   A.      I did not.

10  Q.      Why not?

11  A.      The claim limitation is equal to or less than a D90

12  of 89 microns.  My observation was the particle size was

13  consistently around one micron, rarely deviating at all from

14  that size or very little from that size.  That's 100 times

15  smaller.  So I didn't see a reason to calculate an exact D90

16  value.

17  Q.      And when you say rarely deviating, did you see any

18  deviations that were anywhere near the 89 micron limit?

19  A.      No.

20  Q.      Now, did you analyze -- turning to the third step of

21  your analysis, which is on PDX-6.12, what was the third

22  step?

23  A.      So next I analyzed Unichem's manufacturing process to

24  see if their documentation and process used was consistent

25  with what I observed in the samples.

1   Q.      How did you develop an understanding of Unichem's

2   manufacturing process?

3   A.      I evaluated specific sections of the ANDA document.

4   Q.      Now, turning to tab 19 in your binder, I'm showing

5   you what has been marked as PTX-1126.

6                Do you recognize this document?

7   A.      Yes.

8   Q.      Is this a portion of the Unichem ANDA that you relied

9   on?

10  A.      Yes, it is.

11  Q.      And what is the title of this section of the ANDA in

12  the upper right-hand corner or actually right under the

13  table of contents heading?

14  A.      It's called the description of manufacturing process

15  and process controls.

16  Q.      Now, turning to tab 20, and before I do move on to

17  tab 20, this particular document we're just looking at,

18  PTX-1126, which tablet does that section of Unichem's ANDA

19  address?

20  A.      This is for the 2.5-milligram strength tablet.

21  Q.      Now let's turn to tab 20, PTX-1127.  Is this another

22  portion of Unichem's ANDA?

23  A.      It is.

24  Q.      And what is the title of this portion?

25  A.      It carries the same title, description of

1    manufacturing process and process controls.

2    Q.      What tablets does this portion of Unichem's ANDA

3    relate to?

4    A.      This portion relates to the five-milligram dose.

5    Q.      Now, have you prepared a demonstrative to help you

6    explain Unichem's manufacturing process and how it bears on

7    your particle size?

8    A.      I have.

9    Q.      Turning to PDX-6.19, can you explain generally what

10   is shown here?

11   A.      Yes, I can.  So Unichem uses a process called

12   fluidized bed manufacturing, and what they do is, they take

13   the dry ingredients, you'll recall lactose anhydrous,

14   microcrystalline cellulose and croscarmellose sodium from

15   before, and I've shown those dry ingredients, the excipients

16   in the upper left-hand corner in blue.

17   Q.      And let me just stop you there.  Are you meaning

18   to indicate that they are all the same by using the color

19   blue?

20   A.      No.  They're all dry powder.  They're blended with

21   one another.  They're all substrates for the apixaban spray,

22   so for simplicity, I've made them all blue.

23   Q.      But there are three different excipients in this part

24   of the process; is that correct?

25   A.      That's correct.

1  Q.     All right.

2  A.     So those three excipients, the dry ingredients, are

3  fed into a fluidized bed granulator and then air is passaged

4  underneath them, so they're kind of floating around and

5  mixing with one another.  And then in parallel, the process

6  describes taking the Unichem starting API, the big

7  crystalline material that we saw earlier, and completely

8  dissolving that in a mixture of solvents.

9  Q.     And let me just pause there for one moment.  How much

10 apixaban is dissolved in solution at that stage of the

11 process?

12 A.     The concentration of apixaban in the solution is

13 1.2 percent, so it's a very dilute solution of apixaban.

14 And then at that point, that solution is fed through a

15 nozzle and sprayed onto the surface of these dry particles

16 as they're floating around in the fluidized bed granulator

17 and that process continues.

18              Apixaban-containing droplets impacts the

19 surface of the dry ingredients.  The volatile solvents

20 evaporate off leaving behind small apixaban particles.  And

21 just for reference there, I've shown a blowup of what we

22 call a granule, and a granule is a composite of the blue

23 excipient particle, whether it's lactose anhydrous,

24 microcrystalline cellulose or croscarmellose sodium the

25 deposited apixaban particles in red on the surface.

Berkland - direct

1    Q.      How does the small amount, the one percent amount of

2    apixaban that is dissolved in solution at the early stages

3    of process bear on the particle size of the apixaban in the

4    final product?

5    A.      When you use a dilute solution of the API and

6    evaporate out the solvent, one would expect to get very

7    small particles.

8    Q.      Now, based on your review of this process, did you

9    form any conclusions about the size of the apixaban

10   particles in the Unichem ANDA product?

11   A.      Yes.  My conclusion was that the data that I created,

12   the apixaban particle size that I observed, was consistent

13   with the processing method used by Unichem.

14   Q.      Now, you have shown us certain portions of the

15   process.

16                   If we turn to PDX-6.20, what is shown here?

17   A.      After this fluidized bed process where you have the

18   dried and formed apixaban particles on the surface of the

19   granule, there are some subsequent steps involved in

20   creating a final tablet.

21   Q.      And do any of those steps impact your opinion about

22   the particle size of the apixaban particles in Unichem's

23   final ANDA product?

24   A.      No, they do not.

25   Q.      Now, having walked us through the entire

Berkland - direct

1  manufacturing process, how does it impact your opinions

2  concerning the particle size of crystalline apixaban in

3  Unichem's ANDA product?

4  A.    What Unichem discloses in their ANDA process to

5  create the Unichem tablets of apixaban would create an

6  apixaban particle size that is consistent with my

7  observations, the actual data I collected.

8  Q.    And remind us what the observations show.

9  A.    Sure.   I observed an apixaban particle size of around

10 one micron.

11 Q.    Now, you testified that the samples you analyzed were

12 from the five-milligram Unichem ANDA product.

13       Do you recall that?

14 A.    Yes.

15 Q.    Have you formed an opinion about the particle size in

16 Unichem's 2.5 milligram ANDA product?

17 A.    I have.

18 Q.    What is your opinion?

19 A.    My opinion is that the apixaban particle size would

20 be the same.

21 Q.    Are there any material differences in the way the 2.5

22 milligram and the five milligram Unichem ANDA products are

23 made?

24 A.    No.

25 Q.    Would any of the steps from the 2.5 milligram process

Berkland - direct

1   have a material impact on the particle size of apixaban

2   relative to the five milligram process?

3   A.      No.

4   Q.      Now, turning back to PDX-6.11, your list of claim

5   limitations.

6                   With respect to the only disputed

7   limitation wherein the crystalline apixaban particles have a

8   D90 equal to or less than about 89 microns, what is your

9   opinion as to whether that limitation is satisfied by the

10  Unichem ANDA product?

11  A.      My opinion is that this claim limitation is

12  satisfied.

13  Q.      And what is your opinion as to whether Unichem's

14  ANDA products will infringe claims 21 and 22 of the '945

15  patent?

16  A.      My opinion is that Unichem's ANDA products infringe

17  claims 21 and 22.

18                   MS. WIGMORE:  Your Honor, we offer PTX-787,

19  PTX-394, PTX-362, PTX-402, PTX-412, PTX-1222, PTX-1205,

20  PTX-1219, PTX-1220, PTX-1221, PTX-1215, PTX-1214, PTX-1216,

21  PTX-1217, PTX-1218, PTX-1126 and PTX-1127.

22                   THE COURT:  Any objection?

23                   MS. BROWNING:  No objection.

24                   THE COURT:  Those are all admitted.

25                   PTX-787, PTX-394, PTX-362, PTX-402, PTX-412,

 1    PTX-1222, PTX-1205, PTX-1219, PTX-1220, PTX-1221, PTX-1215,

 2    PTX-1214, PTX-1216, PTX-1217, PTX-1218, PTX-1126 and

 3    PTX-1127 were admitted into evidence.)

 4              MS. WIGMORE:  No further questions.

 5              THE COURT:  Thank you.  We'll have

 6    cross-examination.

 7              MR. PEJIC:  May I approach?

 8              THE COURT:  You may approach.

 9              (Mr. Pejic handed binders to the witness and to

10    the Court.)

11              THE WITNESS:  Thank you.

12                      CROSS-EXAMINATION

13    BY MS. BROWNING:

14    Q.    Good morning, Dr. Berkland.  My name is Jill

15    Browning.  We have not met, but I will be asking you a few

16    questions about your testimony today.

17    A.    Good morning.

18    Q.    And if it's okay with you, I'm also going to refer to

19    the technology that you described with the abbreviation

20    SEM-EDS.

21    A.    Okay.

22    Q.    You testified, I just want to confirm, that the bulk

23    API, the bulk apixaban had a much larger size than

24    89 microns; is that correct?

25    A.    That's correct.

Berkland - cross

1   Q.      Do you remember providing an opinion in this case in

2   one of your expert reports with respect to the D90 that's

3   claimed in the '945 patent, that it requires evaluating the

4   particle size distribution of the crystalline apixaban

5   particles in a solid composition, solid pharmaceutical

6   composition?

7   A.      Perhaps, but I'm hoping you could point me to that.

8   Q.      Absolutely.

9           MS. BROWNING:   Could we please turn to PTX-1204

10  that's in your witness binder, and if you could look at

11  paragraph 48.

12          THE COURT:   The binder you just handed him?

13          MS. BROWNING:   Pardon?

14          THE COURT:   The binder you just handed him?

15          MS. BROWNING:   Yes, yes.   Exactly.   Your cross

16  binder.

17          THE WITNESS:   Mine says DTX on the tab.   Can you

18  help me?

19  BY MS. BROWNING:

20  Q.      Right.   First it says DTX and then it goes to the PTX

21  numbers.   It actually starts with a JTX number and then it

22  goes to the DTX number.   Sorry for the confusion.

23  A.      Yes.   Now I see it.   Okay.

24  Q.      Okay.   And do you see that you indicate in there that

25  the D90 claims in the '945 patent require -- I will wait

Berkland - cross

1     until you get to it.  In that last sentence of paragraph 48

2     that's shown there?

3     A.      Yes.

4     Q.      So in your view, the D90 that's measured must be

5     measured in a solid pharmaceutical composition; is that

6     correct?

7     A.      Of course, you want to know the D90 particle size of

8     what's in the tablet, but that requires you to evaluate the

9     content of the tablet.

10    Q.      And you also testified I believe earlier on direct

11    that the Court had construed the particular claim term

12    apixaban particles having a D90.

13            Do you recall that?

14    A.      I think I recall that, but, again, perhaps you could

15    point me to it.

16    Q.      Absolutely.

17            Could we please put up on the screen DTX-590,

18    the claim construction order in this case, and you'll look

19    at the bottom, the bottom where it says apixaban particles

20    have a D90, and the Court's construction was simply the

21    plain and ordinary meaning.

22    A.      I see that.

23    Q.      So did the Court's definition indicate that the D90

24    must be determined in a solid pharmaceutical composition?

25    A.      I believe that's correct, but you have to

Berkland - cross

 1    disassemble, so to speak, the tablet in order to see the

 2    particle size of apixaban.

 3    Q.      In your view, though, you're saying that if the '945

 4    patent requires the $D_{90}$, of the apixaban particles, it must

 5    be measured in the actual tablet; correct?

 6    A.      No.

 7    Q.      What is your view?

 8    A.      My view is that you have to determine the apixaban

 9    particle size that is present in the solid pharmaceutical

10    composition.  However --

11    Q.      Okay.  Then I think we're in agreement that --

12            THE COURT:  Hold on.  Hold on.  I don't -- were

13    you done with your answer?

14            THE WITNESS:  No.

15            THE COURT:  Could you let him finish that

16    answer?

17            MS. BROWNING:  Certainly.

18    BY THE WITNESS:

19    A.      However, the way to do that is to analyze the

20    contents of the tablet.

21    BY MS. BROWNING:

22    Q.      But it must be the contents of the actual

23    pharmaceutical tablet, in your view?

24    A.      I think that's a fair statement.

25    Q.      Do you agree that the '945 patent disclosing using

Berkland - cross

1    the Malvern laser light scattering method to measure the $D_{90}$

2    of the apixaban particle?

3    A.      I recall that it uses the Malvern technology you are

4    referring to.  I don't recall if it says bulk apixaban

5    particles or not.  You would have to point that out to me.

6    Q.      Sure.  And maybe we could pull up JTX-2 at column 2,

7    lines 7 through 12, and JTX-2 is also in your binder, the

8    first tab in your binder.  The patent.

9    A.      (Pause.)

10            I'm there.

11   Q.      Okay.  And you see that it says that you measure by

12   laser light scattering method the 89 to determine the

13   crystalline apixaban particle $D_{90}$?

14   A.      I'm sorry.  I think you read that slightly out of

15   order, maybe adjusted the wording a little bit.

16            Could you ask the question again.

17   Q.      Sure.

18            Do you see that it says, "Accordingly, the

19   invention provides a pharmaceutical composition comprising

20   crystalline apixaban particles having a $D_{90}$ equal to or less

21   than about 89 microns as measured by laser light scattering

22   method"?

23   A.      I see that text.

24   Q.      And did you testify earlier on direct that you could

25   not use laser light scattering method to actually measure a

1   tablet; correct?

2   A.      I don't recall testifying in that regard.  I remember

3   saying that you wouldn't use SEM on an intact tablet, but

4   you will have to refresh my memory if I used those exact

5   words.

6   Q.      Do you agree with me that the '945 patent does not

7   disclose using the Malvern light scattering method to

8   measure the $D_{90}$ of the apixaban in the finished tablet?

9   A.      I don't see how one could use laser diffraction in a

10  finished tablet or a laser light scattering method.

11  Q.      Thank you.

12          MS. BROWNING:  Could we turn to Figure 3 of this

13  same patent?

14  BY MS. BROWNING:

15  Q.      Do you recognize this figure from the patent?

16  A.      Yes.

17  Q.      Do you see on the X axis, it has "drug substance

18  particle size $D_{90}$ in microns."  Do you see that?

19  A.      Yes.

20  Q.      When it says "drug substance particle size $D_{90}$," what

21  is your understanding with respect to what was measured to

22  determine that $D_{90}$ particle size distribution?

23  A.      That would be the size of the apixaban particles.

24  Q.      In the bulk before it's processed and formed into a

25  tablet?

Berkland - cross

1   A.      I didn't conduct that analysis.  You'd have to walk

2   me through what exactly was measured here.

3   Q.      So you have no understanding with respect to how the

4   '945 patent measured the drug substances of the apixaban

5   particle, the $D_{90}$?

6   A.      I think that was a question.  I do know that they

7   used laser light scattering.

8           I was suggesting that I didn't know exactly the

9   procedure that was done for this figure.  You'd have to take

10  me back to that, to see if it was this -- I think you said

11  it was a starting drug substance or bulk drug substance?

12  Q.      Right, the drug substance particle size $D_{90}$, how was

13  that measured in the '945 patent.  That was the ultimate

14  question.

15          You don't have any recollection?

16  A.      We can go to that section, if you would like.  I

17  recall where it is.

18  Q.      Well, my question, though, is, wouldn't you agree

19  with me that the drug substance particle size that was

20  measured was the bulk apixaban before it was processed into

21  the tablet?

22          Regardless of how it was measured, it was the

23  bulk substance that was measured, not the finished tablet.

24  A.      I'm sorry.  It would be helpful, since we're looking

25  at this figure in isolation, if we could go to the

1    associated text.

2    Q.      Sure.  Sure.

3    A.      I don't recall where that is, so maybe you could help

4    me.

5    Q.      Maybe we will come back to that question, but it

6    sounds like -- first of all, I guess, do you have an

7    understanding with respect to how the '945 patent measured

8    the apixaban particle?  Did you read the '945 patent to

9    determine that?

10   A.      Yes.

11   Q.      And what is your understanding with respect to how

12   the '945 patent discloses measuring the apixaban particles?

13   A.      So I recall, as we discussed, in using laser light

14   scattering, but the claim isn't limited to any particular

15   method.  It just claims a particular size of the API.

16   Q.      Did the '945 patent ever disclose what the particle

17   size is of the apixaban in the finished tablet?

18   A.      I don't recall.  You maybe have to take me to that

19   section.

20           I recall they used a method called dry

21   granulation where they put ingredients together and created

22   a tablet.

23           Is that what you are referring to?

24   Q.      Well, did you provide any opinions in this case,

25   especially in your expert report, regarding whether those

1  methods of manufacturer, like the dry granulation or the wet

2  granulation, whether those methods of manufacture that were

3  disclosed in the '945 patent would impact the particle size

4  of the bulk API as it is formulated and made into a finished

5  tablet?

6  A.    I don't recall conducting that analysis.  I was

7  focused on determining the apixaban particle size in

8  Unichem's tablets.

9  Q.    So you testified at length earlier about some of the

10 steps that you took to analyze the Unichem tablets; correct?

11 A.    That's correct.

12 Q.    Okay.  And for convenience and brevity, I'm going to

13 refer to this method as the Berkland method.

14       You testified that you used a razor to scrape

15 the exposed surface of a Unichem tablet; is that correct?

16 A.    That is correct.

17       You can refer to it as the Berkland method, but

18 I will just note for the record that it's common to analyze

19 the contents of a tablet using this sample preparation

20 method.

21 Q.    Well, you would agree with me that you certainly

22 didn't cite anything from the literature in your expert

23 report that shows this method of sample preparation; right?

24 The preparation method that you used in obtaining the

25 granules from the tablet?

Berkland - cross

```
 1   A.      That is true.  I don't recall citing anything.

 2   Q.      And then you used the scanning electron microscope

 3   along with EDS to take images; correct?

 4   A.      That's part of the analysis I conducted, yes.

 5   Q.      Okay.  And you described that technology and you

 6   described how it worked in your demonstrative.

 7                The '945 patent does not provide any of that

 8   background information on this particular method; correct?

 9   A.      A person of skill would know that they could use an

10   appropriate technique --

11   Q.      But that's not my question.

12   A.      I'm sorry.  I wasn't finished.

13                (Continuing):  -- to determine the particle size

14   of apixaban in a solid dosage form.

15   Q.      But the '945 patent itself didn't describe any such

16   method; correct?

17   A.      I haven't really looked deeply into that, but I don't

18   recall a microscopic method being stated explicitly.

19                However, I will say that the person of skill

20   would know they could use a variety of techniques and

21   appropriate techniques to determine the apixaban particle

22   size.

23   Q.      But you don't recall whether or not the '945 patent

24   discloses scoring a tablet and scraping out with a razor

25   blade certain granules from the tablet and then using
```

1    SEM:XPD to analyze particle size?

2    A.    I don't think the way you construed that approach was

3    disclosed in the '945 patent.

4    Q.    Or the way that you conducted your test.  That was

5    not disclosed in the '945 patent; correct?

6    A.    The specifics of it were not disclosed, but, again, a

7    person of skill would know to select an appropriate particle

8    analysis technique.

9    Q.    I understand that you think someone of skill in the

10   art may have known how to do that, even though it is not

11   cited; there is nowhere in the literature that describes it.

12   Certainly not at the time of 2010 or 2011, but certainly

13   also you can agree with me that it wasn't in the '945

14   patent, the method that you utilized to work the samples;

15   right?

16   A.    If you're asking if I'm right about your entire

17   statement, I'm sure I could find support in the literature

18   for the way you prepared the sample from a tablet core for

19   SEM-EDS analysis.

20            However, you are correct that my specific

21   approach, the steps I took to prepare and analyze the

22   sample, were not disclosed in the '945 patent.

23   Q.    The SEM-EDS images that you provided and that you

24   made some calculations on, those are images in two

25   dimensions; is that correct?

Berkland - cross

1   A.      It's a picture --

2   Q.      And did you calculate, though, the images --

3   A.      I'm sorry.  I wasn't finished.

4   Q.      -- in two dimensions?

5                   THE COURT:  Do you want to give your answer?

6                   THE WITNESS:  Yes, I would like to.  Thank you.

7                   THE COURT:  Go ahead.

8   BY THE WITNESS:

9   A.      It's a picture on a screen or page so it was in two

10  dimensions.

11  BY MS. BROWNING:

12  Q.      And I believe that you testified on direct that you

13  agree that you did not actually provide a $D_{90}$ measurement for

14  the equivalent spherical diameter; correct?

15  A.      I did not calculate a specific number for the $D_{90}$,

16  that's correct.

17  Q.      I'm going to have you please turn to PTX-1204.

18  That's your opening expert report.

19              And if you could go to paragraph 76.

20  A.      Sorry.  I'm almost there.

21              Okay.

22  Q.      If you can look at the last sentence.  And you

23  indicate there that the granules shown in the image above

24  itself has an average diameter of approximately 55 microns?

25  A.      That's not the sentence that is highlighted, so I'm

1    confused.

2    Q.    Well, hold on.  It's not the very last sentence.

3    Sorry.  It starts with -- it's in the middle.

4          It starts with:  "The granules shown in the

5    image" -- there you go.  Perfect -- "is approximately 55

6    microns, measuring 40 microns across and 70 microns

7    vertically based on the scale bar shown, meaning each

8    apixaban particle is much, much smaller than that."

9          How did you get that 55 micron number?  Did you

10   just add 40 and 70 and then divide by two?

11   A.    That's a reasonable way to approximate this

12   particular granule.  If you wanted to see it on the screen,

13   just scroll down just a little bit, but I'll leave that to

14   you.

15   Q.    But that's not really a diameter; right?  I mean, you

16   didn't really use the term diameter in the appropriate way?

17   Right?  I mean, if you're addressing the diameter of

18   something like a sphere, like you're supposed to be

19   measuring for the D90, then isn't that really a straight

20   line passing from side to side to the center of a

21   sphere?  And I'm not really sure what particular measurement

22   this is that you calculated, but it's not a diameter; is

23   that correct?

24          MS. WIGMORE:  Your Honor, I object.  I'm not

25   sure that's the question.

1          THE COURT:  Let's try that question again,

2   please.

3   BY MS. BROWNING:

4   Q.      So you used the term diameter throughout your report;

5   right?

6   A.      Correct.

7   Q.      And how did you use that term?  What did you use that

8   term to mean?

9   A.      If we were to take -- we can't quite see the particle

10  there on the top, but that's a granule.  If we were to take

11  that granule, which is kind of oval in shape and turn it

12  into a sphere, that is the diameter that I'm talking about.

13  Laser diffraction does that and you can also take an image

14  and do the same thing.

15  Q.      Laser diffraction does measure the diameter of a

16  sphere.  I agree with you on that.  But what you did was

17  simply measure in two dimensions a length and a height and

18  then divide by two, and that's not a diameter; is that

19  correct?

20  A.      Well, first of all, I think you mischaracterized my

21  testimony.  I didn't say that laser light scattering

22  measured the equivalent spherical diameter by volume.  It

23  doesn't.  It actually measures the scattering of laser and

24  then it uses a computer and a known conversion to

25  mathematically calculate an equivalent spherical diameter by

1    volume.

2    Q.    Correct.  I agree with you.

3    A.    And so I'm indicating here that I used a similar

4    process.  I took an image that's in three-dimension and I

5    approximated what that would be, what its spherical diameter

6    would be.  And I say it's an approximation, approximately

7    55 microns.

8    Q.    Right.  And my only point was that you really can't

9    take a two dimensional measurement.  There's really no

10   mathematical formula that let's you calculate the volume of

11   a sphere from a length or a width measurement, which is what

12   you have done with the micron scale.  You measured the

13   length and the width.  So in two dimensions, basically; is

14   that correct?

15             MS. WIGMORE:  Your Honor, we're not getting

16   questions, we're getting testimony.

17             THE COURT:  It sounded more like testimony than

18   a question.  Why don't you try and state it as a question.

19             MS. BROWNING:  Thank you, Your Honor.

20   BY MS. BROWNING:

21   Q.    To your knowledge, does the '945 patent ever discuss

22   measuring the D90 equivalent spherical diameter of the

23   apixaban in a finished tablet?

24   A.    I'm sorry.  Do you think a particular technique or --

25   Q.    Using any technique?

Berkland - cross

1    A.      It would be difficult, for example, to put a tablet

2    into a laser diffractometer and get anything that made

3    sense.  It would be difficult to just put a tablet into a

4    microscope and get any information that made sense.  And

5    what I said before, the person of skill would know that you

6    would want to look at the API in the composition.

7    Q.      But does the '945 patent ever discuss measuring the

8    D90 equivalent spherical diameter of apixaban that even

9    was liberated from a finished tablet?

10   A.      I didn't conduct a thorough analysis of the patent in

11   that regard.  I would be happy to have you walk with me

12   through it and answer your question.

13   Q.      Before this case, you have not ever estimated the D90

14   of an API that was formulated into a finished tablet; is

15   that correct?

16   A.      That's correct.  Observed API particles liberated

17   from a tablet, but to answer your question, you're correct.

18   Q.      When you designed the method that you decided to go

19   with in this case, did you consult the '945 patent?

20   A.      I certainly knew the content of the '945 patent in

21   terms of the claim limitations and how they were construing

22   the term or defining the term of API particle size, D90, and

23   you're right.  There's one technique in there which will

24   show you how to do that.  What I'm saying is that there are

25   others.

```
 1    Q.      And my question was:  When you actually designed your
 2    method, did you consult the '945 patent before you designed
 3    your method?
 4    A.      I read the '945 patent, but I didn't really need to
 5    consult it to break open the tablet and analyze the
 6    contents.
 7    Q.      Do you recall having your deposition taken in this
 8    matter?
 9    A.      Yes.
10    Q.      I'm going to play for you now a video clip that I
11    want you to listen to after we have this testimony.
12              THE COURT:  Do we know what that clip is?  What
13    pages?
14              MS. BROWNING:  We do, Your Honor.  It is page
15    198 and the transcript is provided in the witness book
16    that we just handed up.  It's page 198, lines 14 through
17    15.
18              THE COURT:  Thank you.  Okay.
19              (The videotape clip was played as follows.)
20              "Question:  Did you consult the '945 patent when
21    developing the Berkland technique?  And if so, what
22    portions?
23              "Answer:  I don't recall doing that for
24    developing the method, and I sort of stepped through the
25    logic, starting in paragraph 46, of how a person of skill
```

Berkland - cross

1    would arrive at this approach to particle size assessment."

2                    (End of videotape clip.)

3    BY MS. BROWNING:

4    Q.    So does that refresh your recollection with respect

5    to whether you consulted the '945 patent when you developed

6    your method?

7    A.    I think that's consistent with what I stated before.

8    Q.    Then let's go through a little bit more about what

9    you did do.

10                   So you tested a total of five tablets; is

11   that correct?  And I think you have a demonstrative.  We can

12   pull that up.  It's PDX-6.15 to refresh your recollection.

13   A.    Thank you.  Yes, correct.

14   Q.    And all the tablets tested were five milligram

15   tablets; is that correct?

16   A.    That's correct.

17   Q.    You never tested a 2.5-milligram tablet; is that

18   correct?

19   A.    Correct.

20   Q.    And you only measured 68 particles total from the

21   five tablets, not 68 particles per tablet, but just 68

22   granules.  You analyzed 68 granules total?

23   A.    Yes.  You said that a couple of different ways.  So I

24   analyzed 68 granules, correct.

25   Q.    And you did not determine, at least you didn't

Berkland - cross

1   disclose it in your report, how many particles of apixaban

2   were in a Unichem tablet; is that correct?

3   A.      That's correct.

4   Q.      And you didn't determine how many granules were in a

5   tablet either, did you?

6   A.      No, I did not.

7   Q.      So let's take a look at your reply expert report.

8   It's at PTX-1226.  And if you can turn to page 13 at

9   paragraph 35.

10  A.      Paragraph 35?

11  Q.      Correct.  And I want to direct your attention to the

12  sentence that says, about in the middle there, the particle

13  size of the granules in the common blend have an approximate

14  D50 less than 150 microns.

15          So what do you mean by D50?

16  A.      That would be similar to the mean.  If it's a bell

17  curve or Gaussian distribution, it means that 50 percent of

18  the granules are larger than that size.

19  Q.      Would that also mean that 50 percent of the granules

20  are larger than that size?

21  A.      I say it's less than 150, so I don't know from that

22  statement.

23  Q.      But if the D50, if the approximate D50 is less than

24  150 microns, so you're saying 50 percent of the population

25  would be 150 microns or less; is that correct?

1  A.      Somewhere in this report I think I produced the exact

2  number.  Otherwise, it's in Unichem's ANDA documents.  Where

3  I'm getting confused by your question is if the number is

4  135 microns, this is D50, then half would be less than that

5  and half would be more, but I'm saying approximate D50 is

6  less than 150 microns.

7  Q.      If you want to look at the underlying support, you

8  can go to PTX-1128 in your binder, and it's on the -- the

9  pages are at the bottom.  I will give you the Bates number.

10  It's 1182.

11  A.      Okay.

12  Q.      This is the page you cited to in your report; is that

13  correct?

14  A.      It looks right.

15  Q.      So just by way of background, we're looking at the

16  bottom part where it says, particle size distribution dry

17  sieving method; is that correct?

18  A.      Yes.

19  Q.      And then did you select as the D50 approximate value

20  the 48.54 by weight, weight by weight.  Is that the

21  calculation that you started with to determine the D50?

22  A.      I think any one of those would give closely the same

23  result.

24  Q.      What do you mean that any one of those would give

25  close to the same result?

1  A.      Well, there's three batches listed there and one says

2  48.17 weight per weight and so forth.  They're close to the

3  same.

4  Q.      Agreed.  How did you arrive at the calculation of the

5  D50?

6  A.      I said it was approximately, and if you -- I can't

7  recall the exact size of the 100 mesh.  I don't know if you

8  see that 100 hash tag in the left-hand column at the bottom,

9  but that -- assuming that mesh size -- I shouldn't assume

10 anything up here, but that mesh size is probably close to

11 150 microns and now we have about 50 percent of the

12 particles retained, so half go through and that's the logic

13 that I used.

14          I would want to look up -- I would want to

15 remind myself what the hundred mesh size is, but that's the

16 logic anyway.

17 Q.      Right.  Now, understood.  I understand that the 40

18 mesh going down to the hundred mesh goes from the biggest

19 opening down to the smallest opening; is that correct?

20 A.      Correct.

21 Q.      So we established that you didn't estimate the number

22 of particles or the number of granules in a tablet; is that

23 correct?

24 A.      When you say particles, do you mean apixaban

25 particles?  I'm just a little lost.

Berkland - cross

```
 1   Q.      Sure.   So I thought we had established earlier that
 2   you didn't provide the number of apixaban particles in an
 3   actual tablet; is that correct?
 4   A.      That is not quite correct.   It didn't appear in my
 5   report.
 6   Q.      And you didn't also in your report provide the number
 7   of granules; is that correct?
 8   A.      It came up in my deposition that I gave an estimate.
 9   Q.      And you didn't also in your report provide the number
10   of granules in a Unichem Apixaban tablet; is that correct?
11   A.      That's correct.
12   Q.      So you simply made a judgment that measuring 68
13   granules in five tablets was sufficient; isn't that correct?
14   A.      As a person of skill, I was confident on reliability
15   of the data and I made a judgment that looking from granule
16   to granule and apixaban particles to apixaban particles,
17   they were consistent amongst one another and with the
18   production method.   So, yes, I concluded that that was the
19   apixaban particle size.
20   Q.      But there was nothing in the literature that
21   suggested to you that 68 granules would be a statistically
22   significant number of granules to measure in an apixaban
23   tablet; is that correct?
24   A.      I had no reason to believe that it was not
25   significant.
```

Berkland - cross

1   Q.      Do you agree that the scanning electron microscope

2   method that you used does have some limitations based on,

3   for example, the limited number of particles or the sample

4   size that can be tested?

5   A.      I recall that is mention in one of the citations I

6   rely on in my report and the context to me is speaking to

7   somebody who maybe is a novice in microscopy, not a person

8   of skill.

9   Q.      So I want to direct your attention to DTX-421, which

10  is, I think, the second tab in your binder.

11  A.      Is it 412?

12  Q.      421, DTX.  You will have to go back to a little bit

13  earlier on in the binder.

14  A.      Thank you.

15  Q.      Do you recognize this document?

16  A.      I do.

17  Q.      Is this the Merkus document that you testified to

18  earlier?

19  A.      Yes.  Yes, it is.

20  Q.      And if you could turn to DTX-421.138-139, and for

21  convenience, I am referring to the Bates-stamped numbers

22  below.  So at the bottom of the page.

23  A.      129 was the last three digits?

24  Q.      139.  138 -139, yes.

25  A.      Okay.

Berkland - cross

1    Q.      So do you see the section that says, "7.2 microscopy

2    technique"?

3    A.      So that's 138.  I see that.

4    Q.      Yes, 421.138.

5            And it mentions the same method that -- the same

6    scanning electron microscope that you employed in your

7    method; is that correct?

8    A.      Are you in the first sentence or where are you?  I'm

9    sorry.

10   Q.      Yes.  On page DTX-421.138.  The first sentence that

11   says, "Three types of microscopic techniques can be

12   distinguished for particle characterization"?

13   A.      I see that.

14   Q.      Okay.  And it also includes the scanning electron

15   microscopy.  Is that correct?

16   A.      Yes.

17   Q.      And that was the same SEM that you used in your

18   analysis?

19   A.      Yes.

20   Q.      So if you could take a look at -- I'll direct your

21   attention to pages 144-145 of this same document.

22   A.      (Witness complies.)

23   Q.      Do you see on this page it says, under 7.2.1.7,

24   "Limitations and Problems"?

25   A.      I do.

Berkland - cross

1    Q.     And I just want to be clear we're still in the same

2    7.2 section that applies to the SEM technique that you also

3    used.

4              And if you could look on the next page, on page

5    145, the second full paragraph on that page.

6              It says:  "For determination of particle size

7    distributions, there is a strong limitation to the width of

8    the distribution.  This is due to the fact that only a

9    limited number of particles is allowed in a field of view to

10   avoid overlapping particles, that only a limited range of

11   sizes can be measured at a single magnification at

12   reasonable precision, and that typically only a few hundred

13   particles are being measured."

14             In your case -- first of all, do you agree with

15   that statement?

16   A.     That's what the text says, yes.

17   Q.     Do you agree with that statement?  Do you agree with

18   this part of the text?

19   A.     In the circumstances where only a limited number of

20   particles is allowed in a field of view, that can create

21   issues.  I understand what the author is saying.

22   Q.     And in this case, the author was saying only a few

23   hundred particles are being measured and that was considered

24   to be a drawback.

25             Would you agree with me that that's what the

1    author is trying to convey?

2    A.      The author is saying only a few hundred particles,

3    but just for clarification, in my analysis, 68 granules

4    would contain hundreds and even thousands of apixaban

5    particles, which I testified about at deposition.

6    Q.      But you only looked at 68 granules; correct?

7    A.      But the granules are not what's at issue; it's the

8    apixaban particles.

9    Q.      And if you look at -- I'm going to direct your

10   attention now to a little bit further down the page, to

11   7.2.1.8, the first paragraph.

12           It says:  "Non-representative (sub) sampling is

13   a major error source in results coming from microscopic

14   analysis due to the very small sample size and the small

15   numbers of particles inspected."

16           Do you agree with this statement?

17   A.      That is what the statement says:  Subsampling can be

18   an issue, but again, as it relates to my testimony, I saw a

19   very large number of apixaban particles; and those apixaban

20   particles were consistent from granule to granule, tablet to

21   tablet, batch to batch.

22           So I wouldn't construe that as

23   non-representative subsampling.

24   Q.      But do you agree that the limited sampling is a

25   possible source for error?

1   A.      That can happen, yes.

2   Q.      I want to direct your attention next to PTX-412.

3   A.      I'm sorry, but my PTX-412 doesn't have a document in

4   it.

5           If you could provide me a copy?

6   Q.      Yes, we will have to do that because that would be

7   unfortunate.

8   A.      Well, I don't mind.

9           MS. BROWNING:  Could we have PTX-412 --

10          MR. PEJIC:  I think in his direct binder.

11   Tab 6.

12          MS. BROWNING:  Oh.

13          THE COURT:  That's the other binder.

14          MS. BROWNING:  So Tab 6.

15          THE COURT:  Tab 6 possibly.

16          THE WITNESS:  Thank you, Counsel.

17   BY MS. BROWNING:

18   Q.      I'm going to direct your attention to the Bates

19   number 2547, which is also page 396, if that's easier.

20   A.      Okay.

21   Q.      And I'll direct your attention to Section 11.7.2 on

22   this page, "Microscopy and Image Analysis"?

23   A.      I'm with you.

24   Q.      Okay.  And we're going to go down to about the middle

25   of the page where it starts "However."

1          "However, there are a number of limitations

2     associated with the use of microscopy for measuring particle

3     size.  First, microscopy is a subjective measure that is

4     prone to observer bias and error."

5          Do you agree with that statement?

6     A.    This is in context, so reading, just reading the

7     sentence immediately prior to the yellow highlighted region,

8     it's referring to microscopy and image analysis.  That is

9     the direct measurement of particle size and, therefore, can

10    be used as a reference method.

11         So you can see the particles and you can measure

12    them.

13         Now, I agree with the statement highlighted, but

14    it's in that context where user error and bias could happen,

15    but why would it be the reference method if that were the

16    case.

17    Q.    But in this case, you're just able to measure

18    individual particles that you actually observed; correct?

19    A.    That's true.  You have to see them on the screen in

20    order to discern their size.

21    Q.    It also indicates that:  "A sufficient number of

22    particles should be counted randomly, and this can be very

23    time consuming and tedious, although the drawback has been

24    partly solved by the use of automatic image analysis

25    techniques."

1              Is that correct?  Is that what that says?

2     A.      That is correct, and that is what it says and --

3     Q.      But --

4     A.      -- if you are referring to my testimony, I would

5     state that as a person of skill, I had to image a sufficient

6     number of particles, and I did it randomly as specified in

7     this section.

8     Q.      But you didn't use any of the automatic image or

9     analysis techniques that's referred to here; correct?

10    A.      No, I did not.

11    Q.      So I'll direct your attention to the next page,

12    page 397 or the Bates number 2548.

13              And the first full paragraph -- actually above,

14    above that.  There you go.  Starting with -- Yes -- "Due to

15    limitations mentioned above in particular" --

16    A.      I'm sorry.  Can you point me -- I didn't mean to

17    interrupt, but I would like to be with you and I didn't see

18    that.

19    Q.      Page 397, first full paragraph.

20    A.      Did you say immediately above "laser diffraction"?  I

21    thought you were reading below that.

22    Q.      Correct.

23    A.      Okay.

24    Q.      "Due to the limitations mentioned above in

25    particular, the danger of unrepresentative sampling,

Berkland - cross

1    microscopy, and image analysis are often a development tool

2    and is rarely used as a quality or production control

3    technique."

4                Do you agree with that?

5    A.      To the extent that I agreed with the previous

6    statements.  There are limitations.  A person of skill is

7    aware of those limitations and conducts the experiment

8    appropriately.

9    Q.      I want to direct your attention to PTX-402, which is

10   an article that you testified on direct.  It's the Reverchon

11   article.

12   A.      Okay.

13   Q.      And correct me if I'm wrong, but I believe that you

14   testified that this was measuring a pharmaceutical

15   composition using SEM and EDX?

16   A.      I think that's a question; right?  And I don't recall

17   if you are quoting me exactly, but I will take your

18   representation.

19   Q.      The measurement that was performed by SEM and EDX,

20   wasn't that on powders before it was in a tablet or before

21   it was -- I guess two things.

22                One.  It wasn't a solid pharmaceutical

23   composition; correct?

24   A.      I'm sorry.  Could you just be a little bit more clear

25   with your question?

1    Q.      Sure.  Why don't you go to section 2.3.

2    A.      2.3?

3    Q.      Right.  2.3, which is on page 2242.

4    A.      Okay.

5    Q.      And I believe you testified that the SEM-EDX was used

6    to scan these two combined ingredients; is that correct?

7    A.      I'll agree with that.

8    Q.      And if you will look at the last sentence of the

9    first paragraph where it says, "At least 20 SEM images were

10   taken for each run at different levels to verify powder

11   uniformity."  Correct?

12           So wasn't the method employed the SEM-EDX method

13   used just to verify powder uniformity?

14   A.      It was used for that, but there's also a table

15   produced, Table 1, that has the particle size as determined

16   by SEM.

17   Q.      And what was the particle size determination made

18   with respect to?  Was it powders that had been liberated

19   from a tablet, from a solid composition, or was it simply

20   powder that were in bulk and combined before they were

21   tableted?

22   A.      It was the powders, of course, because that's the --

23   that's how you get a particle size.

24           However, powders are a solid pharmaceutical

25   composition.  They're an example of a solid pharmaceutical

Berkland - cross

1    composition.  So I don't think you can distinguish a tablet

2    from a powder.  They both fall into this umbrella term.

3    Q.     So, finally, I want to direct your attention to

4    PTX-362, and this is the Liu article that I believe you

5    discussed earlier.

6    A.     Yes.

7    Q.     Would you agree with me that this article is limited

8    to using the SEM-EDS to simply map where a sodium ion went

9    following a dissolution test?  And Section 2.6 on page 114

10   is where it discusses the SEM-EDS method, and there's

11   nothing in here with respect to measuring particle size, is

12   there?

13   A.     There are a couple questions there.  I will tell you

14   I relied on an article to show that SEM-EDS can be used in

15   pharmaceutical compositions, but --

16   Q.     But for what purpose?

17   A.     I'm sorry.

18   Q.     But --

19   A.     I wasn't looking at particle size.

20   Q.     So do you agree with me that this article has nothing

21   to do with measuring the particle size using the SEM-EDS?

22   A.     I would agree with that.  I have not reviewed the

23   whole article, so with the caveat that I don't want you to

24   have to sit here while I look through the article to see if

25   it's mentioned, but I don't recall seeing the particle size

Berkland - cross

1    or measurement in this document.

2    Q.      So we talked quite a bit about your method that you

3    employed where you broke the tablets open and you used a

4    razor blade to scrape the granules out of the samples.

5            You didn't use a control to ensure that that

6    sampling technique that you used did not impact the

7    characteristics of the sample to be tested; is that

8    correct?

9    A.      I'm not sure what you mean by controls you used, so

10   what I did do, a person of skill would know they can break

11   open a tablet, look at what's inside the tablet.  A person

12   of skill would know to compare the particle size compressed

13   into the tablet to the particle size of the excipients that

14   come back out of the tablet.  That would certainly be a

15   control in the evidence.

16           And then the third piece of evidence is

17   that if I had done something to adulterate the particle size

18   in some way, I would have expected that to be evident in my

19   analysis.  If a granule breaks, then you would see a portion

20   of that granule that didn't look the same as the other

21   portion of the granule, either by electron microscopy or by

22   EDS.

23   Q.      So you made the judgment not to have a control to use

24   in this test; is that correct?

25   A.      Again, I'm not certain by what you mean have a

1    control here.  I will just rely on my previous answer.

2    Q.    So you have testified as an expert witness in other

3    cases?

4    A.    I have.

5    Q.    And didn't a Court recently refuse to rely on your

6    opinion based on your failure to have a control where in

7    your judgment you determined you did not need a control as

8    well?

9          Do you recall that?

10   A.    I'm not aware of the specifics of that, but I believe

11   that's -- that perhaps came up at deposition.  I have no

12   idea what's in regard to a control or what the matter is.

13   Q.    Do you recall being an expert witness in Supernus

14   firms versus TWI?  I believe you were an expert for

15   Supernus?

16   A.    That sounds correct.

17   Q.    Are you aware of whether or not the Judge credited

18   your testimony?

19   A.    I'm not aware.

20   Q.    So I can hand up copies all around or I can just

21   provide the cite, but the cite is 265 F.Supp.  3d 490,

22   District of New Jersey in 2017.  And the Judge mentioned in

23   the opinion, more perplexingly, Dr. Berkland did not prepare

24   any control TEM images of solutions with known, solid

25   oxcarbazepine -- I probably butchered that name -- to

1  confirm that the TEM images of the filtered solution

2  actually displayed and dissolved oxcarbazepine.

3                    Are you aware of that statement by the

4  Court?

5  A.     Not aware of that statement.  I believe I was

6  representing TWI in that matter, but I'm not aware of that

7  statement.

8                    MS. BROWNING:  Nothing further.  Thank you for

9  your time today.

10                   THE COURT:  Thank you.  There's nothing else

11  from the defense side.  Is that correct?

12                   MR. KOCHANSKI:  Nothing, your Honor.

13                   THE COURT:  All right.  Redirect?

14                   MS. WIGMORE:  No questions, your Honor.

15                   THE COURT:  No questions?

16                   MS. WIGMORE:  No, your Honor.

17                   THE COURT:  You may step down.  Thank you.

18                   (Witness excused.)

19                   MR. LEE:  Your Honor, the plaintiffs rest on the

20  issues to which we bear the burden of proof.

21                   THE COURT:  Okay.  All right.  Is there anything

22  from defendants before we get to your witnesses then?

23                   MR. MIZERK:  Don Mizerk for SigmaPharm.

24                   We do move for a directed verdict with respect

25  to the evidence that has been presented by plaintiffs.  They

Berkland - cross

1    have, you know, just very briefly, and we can go in more

2    detail, if necessary, but we do not believe that the

3    plaintiffs have carried their burden to prove infringement

4    on either the '208 patent or the '945.

5              With respect to the '945 patent, with respect to

6    SigmaPharm, there has been no evidence whatsoever about the

7    existence of any particles in the SigmaPharm product let

8    alone a D90 analysis.  Dr. Atwood made some conclusory

9    statements, but he did not.

10             But let me remind the Court that if we have, I

11   think it's JTX-2, if you look at column 2, lines 21 to 23,

12   it states, the particle sizes stipulated herein and in the

13   claims refer to particle sizes determined using a laser

14   light scattering technique, and there's also further

15   references to what they are discussing about drug substance

16   particles also at column 3, lines 20 to 21.

17             We've seen no evidence at all with respect to a

18   particle.  What you've seen is Dr. Atwood talking about a

19   crystalline structure that he alleges occurs embedded in the

20   polymer matrix.  There's no particle of anything that he has

21   identified.

22             With respect to the '208 patent, plaintiffs were

23   required to produce evidence with respect to all elements of

24   claim 1 of the '208 patent, and they do not produce, you

25   know, go through all the elements.  They put a big picture

 1   of the claim on the patent but they didn't talk about all

 2   the rings that were required to be present in apixaban in an

 3   effort to prove each element of claim 1 with respect to the

 4   '208 patent.  Therefore, we would ask at least in these

 5   readings that a directed verdict be entered.

 6                  THE COURT:  All right.  Do you want to respond?

 7                  MR. LEE:  I can respond briefly, sort of picking

 8   up at the end.

 9                  We took claim 1 of the '208 patent and said that

10   apixaban was a compound covered by claim 1 of the '208

11   patent and no one has suggested otherwise.  That's

12   sufficient to show that it's covered by claim 1 and covered

13   by the subsequent claims.

14                  As to the question of infringement of the '945

15   patent, the '945 patent is not a method of measuring

16   particles.  It doesn't claim a method of measuring

17   particles.  Most of the examination went to whether you use

18   precisely the same method disclosed in the '945 as opposed

19   to those methods known to those of ordinary skill in the

20   art at the time of the invention is irrelevant, and the case

21   law makes it clear it's irrelevant.  You have to use a

22   reliable method, as Dr. Berkland has, to measure the

23   particle size.

24                  And as to Dr. Atwood, he has a very specific

25   explanation of the manner in which the product is made.  The

Berkland - cross

1   fact that the polymers create these small pockets and that

2   it is the crystalline apixaban form which is going to be

3   found is going to confine those particles, which

4   incidentally is very consistent with Dr. Berkland's product.

5

6          So across all of these infringement issues,

7   there's ample evidence.  This improper dependency argument,

8   Your Honor, they bear the burden of proof.  They are trying

9   to make it into a noninfringing argument to shift the burden

10  of proof to us.  It doesn't matter because apixaban falls

11  within the scope of claim 1.

12          THE COURT:  Thank you.  Anything else you want

13  to add from SigmaPharm?

14          MR. MIZERK:  No, Your Honor.

15          THE COURT:  Other defendants?

16          MR. PEJIC:  Thank you, Your Honor.  Branko Pejic

17  on behalf much Unichem.

18          Unichem would like to move for a directed

19  verdict because the plaintiffs have not carried their burden

20  on the '945 patent.  There has been no evidence or actual

21  measurement of the D90 of the apixaban tablets, I'm sorry,

22  the apixaban particles in the ANDA tablet.

23          Dr. Berkland only observed a statistically

24  insignificant number of granules and containing an

25  insignificant, statistically insignificant number of

1    apixaban API.

2              He made an unreliable estimate based upon a

3    method nowhere in peer-reviewed articles or even the prior

4    art any place, and for those reasons, we move for a directed

5    verdict.

6              THE COURT:  We'll hear the response.

7              MR. LEE:  I mean, the patent, as I said, Your

8    Honor, is not a method of measuring particle size.  The

9    Federal Circuit law is clear that if you have a requirement

10   of particle size in distribution, all that's required is

11   that you meet that limitation, but what Dr. Berkland said is

12   I didn't give you the precise D90 because I know it's in all

13   the particles I observed, or in the one micron area, that

14   the D90 was far below 89 microns.  That's sufficient.

15             This is an effort to transform a composition

16   of matter claim into a method of measurement claim.  That's

17   not what the claim says.

18             THE COURT:  Thank you.  Any further from

19   Unichem?

20             MR. PEJIC:  No, Your Honor.

21             THE COURT:  Okay.

22             MR. KOCHANSKI:  This is tough to be number

23   three, Your Honor, because it's just repetition.  But in any

24   event, the defendant Sunshine Lake also moves for a directed

25   verdict for failure of the plaintiff to meet -- the

Berkland - cross

1     plaintiffs to meet their burden of proof in showing that

2     each and every element of the claims 21 and 22 were met.

3                    For Sunshine Lake, even assuming that Dr. Atwood

4     was correct and his scans were correct, his diffractograms

5     were correct, to show that there was crystalline apixaban,

6     there were three things that Dr. Atwood had to show.

7     Crystalline apixaban, that the crystalline apixaban was

8     particulate and, finally, that the crystalline apixaban

9     particles had a D90 of, equal to or less than 89 microns.

10                   For Sunshine Lake, I submit that he -- his total

11    testimony was theoretical.  There was no evidence whatsoever

12    that the apixaban, the crystalline apixaban, which he said

13    was in the compound, was in particulate form.  She showed no

14    evidence of that whatsoever, and there is no evidence to

15    show that.

16                   Likewise, with respect to the D90, as it was and

17    he admitted he didn't do D90 measurements, again, merely

18    relying upon a theoretical theory with respect to

19    crystalline apixaban in pockets and he showed no evidence

20    that such pockets even exist.  Everything was theoretical

21    and therefore we believe that he did not, plaintiffs have

22    not met their burden of showing infringement.

23                   Thank you, Your Honor.

24                   THE COURT:  Thank you.

25                   MR. LEE:  So without being repetitive, Your

1    Honor, as to Sunshine Lake, the XRPD shows the apixaban

2    particles and Dr. Atwood testified to those, so that

3    Sunshine Lake's ANDA, notwithstanding the fact that they

4    tried to change the ANDA, and then the testimony of the

5    manufacturing process confirms Dr. Atwood's opinions on

6    particle size.

7                And for each of the defendants, we can go

8    through each limitation, Your Honor, because you'll recall

9    that the undisputed facts are the other limitations were

10   satisfied and we read into the record the undisputed

11   limitations and just concentrated on the ones that people

12   claimed were missing.

13               THE COURT:  Is there anything further from

14   Sunshine Lake?

15               MR. KOCHANSKI:  No, Your Honor.

16               THE COURT:  All right.  I will take all of the

17   motions under advisement, but we'll continue with the trial.

18   First, we'll have a lunch break around half-an-hour.  We'll

19   look for you at 12:45.  We're in recess.

20               (Luncheon recess taken.)

21               *    *    *

22               12:50 p.m., Afternoon Session

23               THE COURT:  Good afternoon.  Defendant's turn.

24               MR. MIZERK:  Your Honor, good afternoon.

25   SigmaPharm presents -- is going to call Dr. Heathcock,

1    Clayton Heathcock to the stand, and Mr. Segrest, my

2    colleague, will handle the examination.

3                     THE COURT:  Okay.  That's all fine, thank you.

4                     MR. LEE:  And, Your Honor, Mr. Cook will do the

5    cross-examination.

6                     THE COURT:  Okay.

7                      ... DR. CLAYTON HEATHCOCK, having been first

8    duly sworn, was examined and testified as follows ...

9                     THE COURT:  Good afternoon, Dr. Heathcock.

10   Welcome.

11                    THE WITNESS:  Thank you.

12                    THE COURT:  You may proceed.

13                    MR. SEGREST:  Your Honor, may I approach the

14   witness?

15                    THE COURT:  Yes, you may.

16                    (Binders passed forward.)

17                          DIRECT EXAMINATION

18   BY MR. SEGREST:

19   Q.      Good afternoon.  Could you state your name again,

20   just by way of introduction to the Court?

21   A.      Clayton Heathcock.

22   Q.      And what, in general, are you here to testify about?

23   A.      I have been asked to give testimony about the claims

24   of the '208 patent.

25   Q.      Moving to the slide 2.

1          Could you tell us a little bit about your

2     background, starting with where you went to school.

3     A.      Yes.   I did my undergraduate work at Abilene

4     Christian College, a college in Texas.   Received a bachelor

5     of science degree there in 1958.

6          I went to -- I worked for a couple of years and

7     then entered the University of Colorado in Boulder for

8     graduate work.   I received my doctorate there in 1963 in the

9     area of organic chemistry.

10          Following that, I went to Columbia University on

11     a National Science Foundation post-doctoral fellowship to

12     work for one year with Gilbert Stark there in New York City.

13     Q.      And what did you do after your post-doc?

14     A.      While I was at Columbia, I was -- I interviewed a few

15     universities and was offered a position as assistant

16     professor at the University of California in Berkeley,

17     California, and I went there in August of 1964 to take that

18     position up.

19     Q.      And how long were you at Berkeley?

20     A.      I spent my whole career there.   I retired as a

21     professor of chemistry in 2004 after 40 years' service.   I

22     was dean at the time and was -- continued as dean for

23     another year.

24          I left that position in 2005, and then I was

25     recalled as the chief scientist for an interdisciplinary

1  research institute with which I worked for three more years,

2  and finally went off the UC payroll in 2008.

3  Q.    Before you were dean, were you also department chair

4  at one time?

5  A.    Yes.  During my time at Berkeley, I served as

6  vice-chair of the department for a few years, and as chair

7  for a few years, and then I was dean for a total of

8  six-and-a-half years.

9  Q.    Have you done any consulting work?

10  A.    Yes.  During my career, I had a number of

11  opportunities to consult with pharmaceutical companies.

12  Many of them were short, one and two day ad hoc arrangements

13  where I would sign a confidentiality agreement so that I

14  could meet with the medicinal chemists to give a seminar and

15  spend time there.

16          But I had three long-term retainerships:  One

17  with Merck in the '60s and '70s, one with Abbott

18  Laboratories when I was a member of their scientific

19  advisory committee in the '80s and '90s, and then most

20  recently, I was a member of the scientific advisory board

21  and consulted for Flexicon, a Biopharma company located in

22  Berkeley.

23  Q.    And what has been the primary focus area of your

24  research over the course of your career?

25  A.    I'm an organic chemist, and my work has been in the

general area of organic and medicinal chemistry with

emphasis on the synthesis of complex molecules of the sort

that are frequently -- have medicinal properties.

Q.      And in general, how has your research been funded?

A.      Mostly it was, say the majority, probably 60 percent,

was funded by grants from the National Institutes of Health,

either the Cancer Institute or the General Medical Studies

Institute or Cardiovascular Institute.

I also had research support from the National

Science Foundation, maybe 25, 30 percent of my funding, and

then some smaller amount, direct research grants from

companies like Merck and Abbott and Pfizer.

Q.      Now, have you served as a member of any governmental

panels or boards in your field?

A.      Yes.  For four years I was a member of the National

Institutes of Health.  Medicinal Chemistry Study Section, I

chaired that group for a couple of years, and the role of

that group was to meet several times a year for a few days

and review and rank research grant proposals that were

submitted for funding to do research work in medicinal

chemistry.

Q.      And moving on to slide 2.

What have your teaching responsibilities been

while you were at Berkeley?

A.      Well, as a professor in a school like Berkeley, of

1   course you teach classes, and I taught undergraduate

2   classes, mainly the beginning organic chemistry course,

3   although one year I did teach in freshman chemistry.  And

4   then, of course, I taught classroom courses for graduate

5   students as well; that would be in the area of organic

6   synthesis and natural products chemistry.

7           My main activity, though, would have been the

8   individual mentor apprentice relationship I had with my

9   graduate students and post-docs who were working on their

10   research projects which I had -- of which I was the

11   supervisor.

12   Q.    About how many of those graduate and post-doc

13   students did you work with over the years?

14   A.    About 80 students completed their Ph.D.s under my

15   supervision, and I had about 50 post-docs over the years.

16           They almost all went to jobs immediately from my

17   lab, jobs in the pharmaceutical or Biopharma industry,

18   because their main skill that they learned in my lab was the

19   ability to design and make complicated organic compounds.

20   Q.    What's this book that is shown on the slide here?

21   A.    That's the cover of a textbook of which I was the

22   coauthor.  The first edition was written with my colleague,

23   Andrew Streitwieser, I think published in about 1975.  It

24   eventually had four editions.  This the fourth edition.  And

25   it was translated into a number of foreign languages.

1           We estimated at one point that about 500,000

2    students had learned their organic chemistry with that book

3    as their blueprint.

4    Q.    Did your teaching responsibilities and your textbook

5    include any instruction on nomenclature and naming

6    conventions in chemistry?

7    A.    Yes, certainly.  The beginning organic chemistry

8    course, of course, you teach the language of the field.  You

9    teach all the meanings of the various terms and

10   nomenclature, name compounds and so forth.

11   Q.    Have you received any notable honors in your career?

12   A.    Quite a few.  A few I single out here on this slide.

13           A Prelog Medal which was awarded by the Swiss

14   Federal Institute of Technology to me in 1991.

15           I was elected to the National Academy of

16   Sciences in 1995.

17           And I have been a member of the American

18   Chemical Society now for 60 years, and ten years ago they

19   created a special class of members called fellows and I was

20   a member of that first class in 2009.

21   Q.    And it's not listed on the slide here, but did you

22   also receive a Pfizer Award in synthetic organic chemistry?

23   A.    Yes, that was during, I think, in the early 1990s.

24   Pfizer gave an award to some, more or less, senior

25   researcher every year, and then they would have a symposium

 1   with a couple of young students who were just getting

 2   started, so to speak, and I was a recipient of one of those

 3   Pfizer Awards along about 1990 or so.

 4   Q.    Are you named as an inventor on any patents?

 5   A.    Yeah, I have two patents, both issued around -- also

 6   around late '80s or early 1990s.  So they're numbered here

 7   on this slide.

 8   Q.    Let's pull up a copy of DTX-998.  This is Tab 2 in

 9   your book.

10         Dr. Heathcock, what is this document?

11   A.    This is a copy of my curriculum vitae.

12   Q.    Does it describe everything that was on those first

13   two slides and other details of your career?

14   A.    Yes, it does.

15   Q.    Do you remember when this was last updated?

16   A.    Well, I probably checked it within the last year or

17   so.  It hasn't changed a lot for a few years.

18         MR. SEGREST:  We move to qualify Dr. Clayton

19   Heathcock as an expert on organic chemistry and medicinal

20   chemistry.

21         MR. COOK:  No objection.

22         THE COURT:  He is so recognized.

23   BY MR. SEGREST:

24   Q.    Were you here in court when Dr. MacMillan testified?

25   A.    No, I was not.

1    Q.      Have you had a chance to review a transcript of his

2    testimony?

3    A.      Yes, I did.

4    Q.      Now, moving to slide 4.

5            Do you have an opinion as to the level of

6    ordinary skill in the art for the technology of the '208

7    patent?

8    A.      Yes.  It's outlined here from my expert report, and

9    it basically describes the kind of person that I would have

10   trained and who left my lab to go work at a pharmaceutical

11   company or a medicinal chemist that I interacted with when I

12   was a consultant.

13           Basically, these would be usually someone who

14   have been trained in the art of making compounds, organic

15   chemistry, or usually synthetic organic chemistry, and had

16   begun to study the literature of biology to determine what

17   was interesting and what might -- how they might use their

18   organic chemistry skills to make organic compounds.

19           So this is a description of that sort of person

20   that's on this slide.

21   Q.      Did Dr. MacMillan, in his trial testimony, also opine

22   on the level of ordinary skill in the art?

23   A.      Yes, he did.

24           As I recall, it was focused more on the teamwork

25   definition, but that's perfectly all right with me because

1    he had all the same attributes and qualifications that I

2    think I've covered in my definition.

3    Q.     Would your analysis in this case be any different

4    under plaintiff's proposed level of ordinary skill?

5    A.     No.

6    Q.     As of September of 2001, did you have all the

7    qualifications of a person of ordinary skill in the art

8    under both sides' definition?

9    A.     Yes.

10   Q.     Let's turn to Tab 3 in your binder.  This is the

11   transcript from Friday, and we're going to go to pages 277

12   through 278.

13            Did Dr. MacMillan, in his trial testimony -- I'm

14   sorry.

15            MR. SEGREST:  Let's go to page 288, line 14

16   through 16.

17            Can we go to page 288?

18            I apologize about that.

19            Lines 14 through 16.

20   BY MR. SEGREST:

21   Q.     Now, did Dr. MacMillan testify that in his opinion

22   apixaban is a compound of claim 1?

23   A.     Yes, he did.  That's what it says in this transcript.

24   Q.     Now, just to be sure the record is clear about the

25   patent law terminology and concepts we'll be using, do you

1    understand that infringement occurs when each and every

2    element of a properly construed patent claim is present in

3    the accused product?

4    A.    Yes, I understand that.

5    Q.    So when Dr. MacMillan testified that apixaban is "a

6    compound of claim 1," do you understand that to mean that in

7    his opinion each and every element of claim 1 is present in

8    apixaban?

9    A.    Yes, I understand that's what that would mean.

10   Q.    Do you agree with Dr. MacMillan's opinion about that?

11   A.    No, I don't.

12   Q.    Now, if I asked you whether a claim or part of a

13   claim covers or reads on a compound or structure, do you

14   understand that would also similarly be asking whether each

15   and every element of that claim or part of the claim is

16   present in that compound or structure?

17   A.    Yes, I do.

18   Q.    Now, do you have an opinion as to whether claim 1 of

19   the '208 patent covered apixaban?

20   A.    Yes, I do.

21   Q.    And what is that opinion?

22   A.    In my opinion, it does not because apixaban does not

23   meet all the limitations laid out in claim 1.

24         MR. SEGREST:  So let's go to slide 5.

25   BY MR. SEGREST:

1    Q.      What does this slide show?

2    A.      This is the chemical structure of apixaban, and

3    apixaban has several rings, and the rings are labeled here

4    by letters:  P, M, E, A, and Q, and then below in the

5    box is summarized various limitations that the claim 1

6    specifies for substituents that can be present on each of

7    four of these rings:  M, E, A, Q.

8    Q.      Before we get too far into the details, can you

9    summarize for us just at a high level why you think that

10   claim 1 does not cover apixaban?

11   A.      Well, because I think that the number of substituents

12   on each of these four numbered -- or lettered rings is

13   greater than the number permitted by the limitation.

14          MR. SEGREST:  Let's go to slide 6.

15   BY MR. SEGREST:

16   Q.      Do you have an opinion as to whether claim 8 of the

17   '208 patent covers apixaban?

18   A.      Yes.

19   Q.      And what is that opinion?

20   A.      It does not because it does not meet, in particular,

21   the limitation of a compound according to claim 1.

22   Q.      Now, is that apixaban that's recited down in the body

23   of claim 8?

24   A.      Yes, that's the name of apixaban that is shown here

25   on this slide, and it is named as one of the compounds in --

 1    that are named in claim 8.

 2    Q.     So were you saying before that that highlighted

 3    language, a compound according to claim 1, that's the

 4    limitation that's not met?

 5    A.     That's right.

 6              MR. SEGREST:  Let's go to slide 7.

 7    BY MR. SEGREST:

 8    Q.     Do you have an opinion as to whether claim 13 of the

 9    '208 patent covers apixaban?

10    A.     Yes, I do.

11    Q.     And what is that opinion?

12    A.     The same thing.  It does not cover apixaban because

13    although it recites the name of apixaban, it is not a

14    compound according to claim 8.

15    Q.     Moving on to slide 8.

16              Do you have an opinion as to whether claim 104

17    of the '208 patent covers apixaban?

18    A.     Yes, I do.

19    Q.     And what is that opinion?

20    A.     Likewise, it does not cover apixaban because it is

21    not -- the crystalline compound is not a compound according

22    to claim 13.

23              MR. SEGREST:  Let's go back and look at some of

24    the details on claim 1 according to slide 9.

25    BY MR. SEGREST:

Heathcock - direct

1    Q.    Now, do you have an opinion as to whether the

2    limitation ring M being substituted with 0 to 2 $R^{1a}$ covers

3    apixaban?

4    A.    Yes, I do.

5    Q.    What is that opinion?

6    A.    Well, it does not because if you read the text of the

7    limit -- of the claim, it says that ring M is substituted

8    with 0 to 2 $R^{1a}$s.

9    Q.    And what is $R^{1a}$?

10    A.    And then just following that, in the claim language,

11    it gives a list of $R^{1a}$s.  That would be what you lawyers call

12    a Markush group.  It could be called a shopping list, but

13    it's a list of permissible things that can be $R^{1a}$s.

14    And the first thing in that list is H.  And if

15    you look at the structure in the box, at the lower right,

16    you can count that there are actually four Hs attached to

17    ring M, and that's more than two, and that's why apixaban

18    fails this test in the -- this limitation.

19    Q.    Let's break that down just a little bit.

20    Now in comparing a compound like apixaban as

21    shown in the box in the bottom right, to this claim

22    language, how would a person of ordinary skill in the art

23    determine how many substituents the structure corresponding

24    to ring M has?

25    A.    Well, you look at the list of substituents, and

1    it's the list that's -- $R^{1a}$ at each occurrence is selected

2    from, and then you would just count how many of those things

3    are attached by a bond to ring M.  And you can see that

4    there are 4 of those things.  They're all hydrogen attached

5    to ring M.

6              So you're just counting, really.

7    Q.    And what is the maximum number of $R^{1a}$ substituents

8    that this claim element allows?

9    A.    The limitation says 0 to 2.

10   Q.    And so in your view, it's not within the range 0 to

11   2?

12   A.    Four -- yeah, four is more than two.

13   Q.    Okay.  Moving on to slide E.

14             Now did Dr. MacMillan testify specifically about

15   how the ring E substitution limitation in particular reads

16   on apixaban?

17   A.    Not specifically.

18   Q.    Okay.  But in your opinion, does the apixaban

19   compound meet this limitation about ring E?

20   A.    No, it does not.

21   Q.    Why not?

22   A.    For the same reason the claim specifies that ring E

23   is substituted with one or two Rs, and then if you look at

24   the list of Rs, again, one of the first things that's listed

25   is hydrogen, and there are actually -- if you look at the

1    structure in the box and count the things that are attached

2    to ring E by bonds, four of them are hydrogen.  And then

3    further down the list, you see OCH3 and you see that there

4    is one OCH3 attached by a bond to ring E, and so that means

5    there are five things attached to ring E from that list:

6    Four Hs and one OME -- or OCH3, and that five things is more

7    than two, so this also fails.

8    Q.      Moving on to slide 11.

9            Did Dr. MacMillan testify specifically about how

10   the ring A limitation, in particular, reads on apixaban?

11   A.      Again, not specifically.

12   Q.      In your opinion, does the apixaban compound meet this

13   limitation about ring A?

14   A.      No, it does not.

15   Q.      Why not?

16   A.      Same reason.  The claim specifies that A is to be a

17   carbocycle, and A is a carbocycle here.  It's a six-membered

18   ring carbocycle.  But it's further to be substituted with 0

19   to 2 R$^4$s cores.

20           And then that text is followed with a list of

21   R$^4$s.  And again, the first item in that list is H, and if

22   you look at the structure in the box, you will see that

23   there are actually one, two, three, four Hs attached by

24   bonds to ring A.

25           And since one is more than the limited range of

Heathcock - direct

1    0 to 2, this is a third failure of the limitations for this

2    structure.

3    Q.     Well, let's look next at slide 13.

4           I'm sorry.  Slide 12.

5           There we go.

6           Did Dr. MacMillan testify specifically about how

7    the ring Q structure would read on apixaban?

8    A.     No, not specifically.

9    Q.     In your opinion, does the apixaban compound meet this

10   limitation about ring Q?

11   A.     No, it does not.

12   Q.     And why?

13   A.     Again, same reason.  Ring Q is specified as a

14   six-membered ring, which it is, but that ring is to be

15   substituted with 0 to 2 $R^{4a}$s.  And then there's a list of

16   $R^{4a}$s, and again, the first item in the list is H.  So if you

17   go down to the box in the lower right and you count how many

18   Hs are attached to ring Q, there are eight.  And eight is

19   clearly more than two.

20           So this is the fourth area where apixaban fails

21   the limitations of claim 1.

22   Q.     When Dr. MacMillan counts how many substituents there

23   are on one of these four rings, M, E, A, and Q, in the

24   apixaban compound, does he count the hydrogen atoms?

25   A.     No, he doesn't count the hydrogen atoms.  He counts

1   the others, but not the hydrogen in each case.

2   Q.     Are there any of these other members of the Markush

3   group or the shopping list that he doesn't count when he's

4   counting substituents?

5   A.     No.  He doesn't use some of them because they don't

6   appear, but he doesn't.

7   Q.     Well, when of them appears, does he use it?

8   A.     Yes.  He used the OCH3, which appears on one of the

9   rings.

10             MR. SEGREST:  Now, let's go to slide 13.

11   BY MR. SEGREST:

12   Q.     Does the patent describe what it means by the word

13   "substituted"?

14   A.     Yeah.  There are two places where the patent seems to

15   be giving a definition because it refers to the term

16   "substituted" in quotation marks.

17             In each case it indicates that for the purposes

18   for -- as used herein, that "substituted" means one or more

19   hydrogens on the designated atom is replaced with a

20   selection from whatever the indicated -- from the indicated

21   group.

22             And it basically says the same thing in those

23   two locations.

24   Q.     Does this definition differ in any way from the plain

25   and ordinary meaning that a person of ordinary skill in the

1    art would ascribe to the term "substituted?"

2    A.      No, I think this would be what any ordinary, educated

3    person, even the undergraduate students that I refer to in

4    my teaching experience, would understand "substituted" to

5    mean.

6    Q.      Does this definition encompass replacing none of the

7    hydrogens?

8    A.      Well, it says one or more hydrogens.  I mean, yeah,

9    if you're doing a replacement you would be -- you are

10   replacing one or more.

11   Q.      If you didn't replace any of the hydrogens, what term

12   would you use to describe that?

13   A.      Well, then it would be "unsubstituted."

14   Q.      Are there any circumstances in which Dr. MacMillan

15   says he would count hydrogen as a substituent?

16   A.      Yes.  He said that if it's attached to nitrogen for

17   the purpose of this patent, he would consider that's a

18   substituent.

19           And he also said that you could consider a

20   hydrogen on carbon as having been substituted on that carbon

21   if it replaced some other atom.

22   Q.      Now, in your view, do either of those understandings

23   comport with what a person of ordinary skill in the art

24   would think about the term?

25   A.      Well, a person of ordinary skill would certainly

1    understand that you could have a substitution or a

2    substituent on nitrogen just as you can on carbon or any

3    other atom, and certainly you could substitute a -- some

4    atom with a hydrogen, and that would constitute a

5    substitution process.

6    Q.    Well, let's look at slide 14.

7          What does this part of the patent describe?

8    A.    On this column, 115 in the patent, there's a

9    paragraph that is describing heterocyclic groups or

10   heterocyclic rings.

11         A heterocycle is a ring compound that contains

12   at least one atom other than carbon.  And, for example, it

13   could contain nitrogen.

14         And then further down in this paragraph, there

15   is a sentence that is highlighted here that says:  "The

16   nitrogen atom may be substituted or unsubstituted.  That is,

17   N or NR wherein R is H or another substituent."

18         And this is what Dr. MacMillan pointed to as

19   authority for considering H a substituent when it's attached

20   to nitrogen.

21   Q.    Now, is there anything here in the patent indicating

22   that a hydrogen counts as a substituent only when it is

23   attached to a heteroatom such as nitrogen?

24   A.    No.

25   Q.    Now, is there anything in any of the four Markush

1    groups we looked at $R^{1a}$, R, $R^4$, or $R^{4a}$, that indicates

2    hydrogen is a member of those groups only when attaching to

3    a heteroatom such as nitrogen?

4    A.    No, there's not.

5    Q.    Go back to slide 13.

6            Is there anything in these definitions of

7    substituted that distinguishes between carbon and a

8    heteroatom like nitrogen?

9    A.    No.   In both cases they talk about the replacement

10   on -- the designated atom, and the atom could be nitrogen or

11   it could be carbon for that matter.   It could be something

12   else.   It could be oxygen.   But most commonly, it would be

13   carbon or nitrogen.

14   Q.    So you agree that a hydrogen can be substituted on a

15   nitrogen, but would a POSA treat the term "substituted" any

16   differently if you're talking about a carbon or if you're

17   talking about a heteroatom like nitrogen?

18   A.    No, I don't think so.

19            MR. SEGREST:   Go to the transcript, page 311,

20   lines 2 through 8.

21            There we go.

22   BY MR. SEGREST:

23   Q.    What was the other circumstance that Dr. MacMillan

24   agrees a hydrogen can count as a substituent?

25   A.    Well, he says here, he says in his testimony that

1    hydrogen bonded to carbon can count as a substituent or be

2    viewed as having been substituted on that carbon if it

3    replaces some other atom that had previously been at that

4    carbon position.

5    Q.      Now, what does the transcript there on line 6 report

6    as the compound that Dr. MacMillan supposedly is said is an

7    example of that type of replacement?

8    A.      Well, it reads carbon methyl chloride, but I think

9    that was a transcription error --

10   Q.      Is carbon methyl chloride the name of any actual

11   compound you know of?

12   A.      No, I think he probably said carbon tetrachloride and

13   it was misunderstood.

14   Q.      Now, is carbon tetrachloride a compound that

15   Dr. MacMillan had used as an example previously in this

16   case?

17   A.      Yes, he used it as an example in his report.

18   Q.      In fact, is there any references in his report in

19   this part of the transcript?

20   A.      I think if you go up to about the beginning sentence

21   he says:  "I say this in my report."  Yeah, and then he goes

22   on.

23              MR. SEGREST:  Now, let's go to slide 15.

24   BY MR. SEGREST:

25   Q.      What does this slide show about carbon tetrachloride

1    and the hydrogen?

2    A.    Well, carbon tetrachloride is a carbon with four

3    chlorines attached to it.  You can see that one of them is

4    colored red in this structure, and then on the right is

5    another compound whose name is chloroform, and in that

6    compound it has three chlorines attached to the carbon and

7    one H.

8            And so I think what Dr. MacMillan is saying is

9    if you somehow cause one of the chlorines of carbon

10   tetrachloride to be replaced by a hydrogen, either by some

11   kind of reaction or just conceptually, that that would mean

12   that that hydrogen could be viewed as a substituent even

13   though it is attached to a carbon.

14   Q.    Now, is there anything in this patent that uses the

15   term "substituted" to refer to replacing something other

16   than a hydrogen?

17   A.    No, I didn't see anything in the patent that this is

18   really -- that this is not really pertinent to anything in

19   the patent.

20           MR. SEGREST:  Let's go to slide 13 again.

21   BY MR. SEGREST:

22   Q.    Would replacing something other than a hydrogen be

23   consistent with this language in the definition section

24   about substituted?

25   A.    No, that would be outside this definition.  This

1    specific definition says that you are replacing a hydrogen

2    by some selection from the group, not vice-versa.  So this

3    would not be a part of one of these two definitions.

4    Q.    Would a person of ordinary skill in the art think

5    that hydrogen counts as the substituent only if it's

6    replacing some group other than hydrogen?

7    A.    No, I don't think so.  I use the term of "hydrogen

8    substituent" commonly in describing compounds that have --

9    you know, can have different things attached to a certain

10   position.

11   Q.    Would a person of ordinary skill in the art describe

12   a chloroform molecule -- sorry.  Let me start that over.

13         Would a person of ordinary skill in the art

14   describing a chloroform molecule describe that as a carbon

15   tetrachloride in which a hydrogen is substituted for a

16   chlorine?

17   A.    Well, you could view it that way.  I don't think

18   there would normally be a reason to describe it that way.

19   Q.    So when we talk about a substituent and is

20   substituted with, and whether a ring has certain members on

21   it, do all those mean the same thing?

22   A.    Well, in my -- in my understanding, if I talk

23   about -- if I'm talking about a series of compounds to

24   someone and I want to talk about related compounds, I can

25   say, you would have different substituents at this

1    particular position.  You could have H or NH 2, or CH 3, and

2    I consider H as one of the things that could be a

3    substituent just like I would consider methyl or amino.

4            And so "substituent" to me is a description of

5    something that is bonded to some particular position.

6    Q.    Now, does your understanding of claim 1 mean that it

7    does not cover any actual compounds?

8    A.    Yes.  Unfortunately for the inventors, I don't think

9    that their claim 1 covers anything that I have been able to

10   pick up.

11   Q.    Do you think they intended to cover apixaban?

12   A.    I think they wanted to.  I just think it was -- the

13   patent was incorrectly constructed.

14   Q.    Were you asked in your deposition if the language

15   could have been written differently so that it would cover

16   apixaban?

17   A.    Yes, I was asked that several times, as a matter of

18   fact.

19   Q.    In your opinion, could it have been written

20   differently so that it covered apixaban?

21   A.    Yes.  I think it -- I think it could have been

22   written differently.

23            MR. SEGREST:  Go back to slide 11.

24   BY MR. SEGREST:

25   Q.    Now for ring A here, how could this language have

1    been rewritten so that it would read on apixaban?

2    A.    Well, what I would do to make this include apixaban

3    is to insert after carbocycle the words unsubstituted or so

4    it would read, a C3 to 10 carbocycle unsubstituted or

5    substituted with, and then I would change the 0 to 2 to 1 to

6    2, and then in the list following that, I would remove the

7    H.

8         So then you would have a limitation that says,

9    clearly, that the ring could be unsubstituted or it could be

10   substituted with some number of things from the list, and

11   that list would not include H because that would be covered

12   by the unsubstituted.

13        You would have to do that in all the different

14   places where that limitation causes apixaban to be outside.

15   Q.    So that's three different changes, right?  Add

16   unsubstituted, change the range so it's 1 to 2, and take

17   hydrogen out of the Markush group.

18   A.    Yes.

19   Q.    Did you describe all three of those changes at your

20   deposition?

21   A.    In my deposition, I think I only said add

22   unsubstituted option and remove H from the list.  I did not

23   immediately, off the top of my head, think about the fact

24   that you no longer need the 0 if you added unsubstituted as

25   the default.  So I didn't say that you need to change the 0

Heathcock - direct

1    to 2 to 1 to 2.

2    Q.    Now, without making that change, did having a 0 on

3    that range the way this patent uses the word "substituted"

4    the same thing as unsubstituted?

5    A.    Well, not quite.  I don't really see it quite that

6    way.

7           I think that -- especially because they define

8    substitution as replacing one or more of something, so I

9    think the 0 thing is a little bit troubling to me.  I don't

10   quite think it means unsubstituted.

11   Q.    But unsubstituted would have accomplished what they

12   were trying to do?

13   A.    Yes.  In my opinion that would have taken care of it.

14   You do that in each of the -- for each of the four ranges.

15   Q.    Using Dr. MacMillan's understanding of when hydrogens

16   count as substituents, would the scope of these limitations

17   about ring A and the other ones, M, E, and Q, be any

18   different if the Markush group did not include hydrogen?

19   A.    No, because he's really not considering the H in --

20   he's effectively ignoring the H in each of these groups.  So

21   his -- his conclusion wouldn't be different.

22           MR. SEGREST:  In the patent, can you take us to

23   claim 1, which is at column 237?  I think it's page 122 of

24   the exhibit.

25           Page 122, column 237.  There we go.

1   BY MR. SEGREST:

2   Q.      If we change the language down in the ring structures

3   the way you suggested, is there any other part of this claim

4   that would also have to be changed to account for those

5   differences?

6   A.      You want to highlight that five-membered ring on

7   about line 25 so I can see it better, further down?

8   Q.      Sure.   That is right below the cursor there.

9   A.      Yeah.

10          This doesn't really affect apixaban being within

11  the claim limitation if you were to rewrite it the way I

12  just suggested, but it was something that was brought up in

13  my deposition that in this particular ring, which I think is

14  ring P, it shows only $R^{1a}$, and there are certain compounds

15  when $R^{1a}$ could be H and if you remove the H from the $R^{1a}$

16  Markush group, that that subset of compounds would,

17  therefore, be excluded.

18          Now, that would not include apixaban or any of

19  the compounds that are named in claim 8, for example, but it

20  would exclude some possible compounds.   So you have to take

21  care of that fine detail.   I think there would be ways to do

22  that.

23  Q.      Did your language that you suggested before address

24  this fine detail?

25  A.      It wouldn't address it.   You would have to add some

1   other fine point to allow it to have not only the remaining

2   $R^{1a}$ set that would no longer have H in it, but to also

3   prevent HEP in that position if you wanted HEP at that

4   position.

5   Q.     So you haven't made a suggestion.  But do you think

6   that a reasonably skilled patent attorney could suggest a

7   way to redraft this part and still cover the same scope?

8   A.     I think so.

9               MR. COOK:  Objection, Your Honor.

10              THE COURT:  Do you want to respond to the

11  objection?

12              MR. SEGREST:  I'm not sure what the objection

13  is.

14              MR. COOK:  He's asking for a conclusion of what

15  a skilled patent attorney would do.  The witness hasn't been

16  qualified as a patent attorney.

17  BY MR. SEGREST:

18  Q.     Now, do you have any patents?

19  A.     Pardon?

20  Q.     Do you have any patents?

21  A.     I have patents, yes.

22  Q.     Did you work with patent attorneys on those?

23  A.     Yes.

24  Q.     Did you rely on them to draft the claims?

25  A.     Yes.

1    Q.      Did you talk with them about the claim scope?

2    A.      Yes, I did.

3    Q.      Did they make any suggestions about what to put in

4    the claims?

5    A.      More I made suggestions about what to put in the

6    claims.

7    Q.      Did they suggest the wording to make sure it covered

8    what you wanted it to?

9    A.      Yes, they did.

10                  THE COURT:  I will overrule the objection and

11   give it the weight that it merits.

12                  Go ahead.

13                  MR. SEGREST:  Yes, Your Honor.

14   BY MR. SEGREST:

15   Q.      Let me direct you to the transcript, page 313, line

16   18 through 314, line 12.

17                  Now, did you see in your review Dr. MacMillan's

18   testimony about whether his way of counting substituents

19   would also exclude some other compound specifically recited

20   in the dependent claims?

21   A.      Yes, I see that.

22   Q.      Now, if you count substituents the way Dr. MacMillan

23   says to, are there compounds recited in the patent-dependent

24   claims that even under his interpretation claim 1 would not

25   cover?

1  A.      Yes, there are.

2              MR. SEGREST:  Now, let's go back to slide 10.

3  BY MR. SEGREST:

4  Q.      On this ring E, what is the minimum number of R

5  substituents that are allowed?

6  A.      The limitation is 1 to 2, so you have to have at

7  least 1 and no more than 2.

8  Q.      So let's -- the patent is Tab 1 in your book.  Let's

9  go to claim 3 which starts on column 245, page 126 of this

10 exhibit.

11             Now, are there any structures in this claim 3

12 corresponding to ring E in claim 1 that do not have at least

13 one substituent other than hydrogen?

14 A.      Yes.  This claim depicts part structures that would

15 correspond to the G unit in the general genus structure, and

16 that comprises rings D and E.  And I went through to look at

17 examples where ring E would not have one R group if you

18 ignore hydrogens; that is, if you used Dr. MacMillan's

19 approach.  And I identified about 36 examples that would not

20 have at least one hydrogen on ring E -- one R group on ring

21 E.

22 Q.      Let's go over to column 249 of the same claim.  This

23 is lines 30 through 35.

24             Now, are there any structures in this call-out

25 that would not have at least one substituent other than

Heathcock - direct

1    hydrogen on ring E?

2    A.    Yes.  The structure in the upper right, there are

3    two six-membered rings there.  Either one could be E.  The

4    line to the top right on the right-hand ring is where it's

5    attached to the rest of the molecule, so that is not an R

6    substituent, but you will notice neither of these rings has

7    anything other than hydrogens attached to it in that

8    compound in the upper right.

9             And the same thing is true for the compound in

10   the lower left.  It -- whichever ring you assign as ring E,

11   there are only hydrogens attached.  There are no R groups so

12   there would not be at least one R group in this case.

13            So you have to count the hydrogens here to get

14   any R groups attached to those rings.

15   Q.    Would the claim language in -- or would the language

16   in claim 1 about ring E read on either of those structures?

17   A.    No, not really because -- because there are way too

18   many hydrogens I think in both case.

19   Q.    You said way too many hydrogens.  This is under --

20   I'm sorry, I should have specified.

21            Under Dr. MacMillan's interpretation --

22   A.    Oh.

23   Q.    -- would the claim language about ring E on claim 1

24   read on either of these two structures under Dr. MacMillan's

25   way of counting substituents?

1    A.     No because the claim language said has to have one or

2    two Rs, and if do you not count H as an R, there would be

3    zero Rs attached to either one of the rings in these two

4    examples.

5    Q.    Now, claim 3 stretches from column 245 on to column

6    254, and I think it's also covered in a couple of the

7    certificates of correction.

8           Have you counted how many of the structures

9    depicted in claim 3 do not have at least one substituent

10    other than hydrogen?

11    A.     Yes, I counted 36.

12           MR. SEGREST:  Let's go to claim 8 of the patent,

13    which is column 265, page 136 of the exhibit.

14           Shrink the call-out there for a minute.

15    BY MR. SEGREST:

16    Q.    Now, in claim 8, are there compounds recited in which

17    the structure corresponding to ring E does not have at least

18    one substituent other than hydrogen?

19    A.     Yes, there are.  This claim names whole structures,

20    not just part structures like claim 3 did.  And you have to

21    go through each of the names and write out the chemical

22    structure, and I have done that with some help.

23           And there are actually four compounds in this

24    list in which ring E does not have any R groups other than

25    hydrogen.

1      MR. SEGREST:  Now, let's pull up the named

2   compound in lines 53 through 55.

3   BY MR. SEGREST:

4   Q.    Would the claim 1 language about ring E as

5   Dr. MacMillan interprets it read on that compound?

6   A.    No, this is one of the four examples.

7   Q.    And why does it not read on this compound?

8   A.    Because ring E in this compound does not have one or

9   two R groups other than -- if you ignore hydrogen.

10  Q.    I think you may have already answered this, but how

11  many of the named compounds in claim 8 would not be covered

12  under Dr. MacMillan's interpretation?

13  A.    Four.

14  Q.    I asked you earlier about honors and awards.  Have

15  there been any recent developments in that regard for you?

16  A.    Well, actually, yes.  About a month ago I learn that

17  one of my former students who started a company and became

18  wealthy at a young age has made a gift of $25 million to the

19  University of California for the purpose of building a new

20  chemistry building.  And the university has decided they're

21  going to name it Heathcock Hall in my honor.

22  Q.    What work did that donor do with you when he was a

23  student?

24  A.    He name was Terry Rosen, and he was -- he worked on

25  the statins, the cholesterol lowering compounds, and was the

1    coinventor of the two patents that I mentioned earlier on.

2                    MR. SEGREST:  Pass the witness.

3                    THE COURT:  Okay.  Cross-examination.

4                    MR. COOK:  Your Honor, may we approach with

5    binders?

6                    THE COURT:  You may.

7                    (Binders passed forward.)

8                              CROSS-EXAMINATION

9    BY MR. COOK:

10   Q.    Good afternoon, Dr. Heathcock.  My name is Tim Cook,

11   and I'm the attorney for the plaintiffs.

12                We met at your deposition; correct?

13   A.    Correct.

14   Q.    Before we turn to the substance, I'd like to look at

15   your first slide, which is DDX-6-1.

16                There's a logo at the bottom of the slide;

17   correct?

18   A.    Yes.

19   Q.    And it's SigmaPharm Laboratories' logo; correct?

20   A.    Yes.

21   Q.    And you're testifying only on behalf of SigmaPharm

22   here today; correct?

23   A.    That's my understanding.

24   Q.    You're not testifying on behalf of Unichem, which is

25   the other defendant that is challenging the '208 patent in

1    this case; correct?

2    A.      No, I'm not.

3    Q.      Turning to the substance, I want to see if we can

4    agree on some basic propositions.  The '208 patent describes

5    how to make apixaban; correct?

6    A.      I'm sorry.  Can you speak -- just so I -- I didn't

7    catch that.

8    Q.      Sure.

9            The '208 patent describes how to make apixaban;

10   correct?

11   A.      Yes, it does.

12   Q.      And Example 18 of the '208 patent describes a

13   procedure for making apixaban; correct?

14   A.      Well, I have to check.  I'm going to take your word

15   for it.  I know there's an example.

16   Q.      Okay.  One of the examples of the '208 patent

17   describes how to make apixaban; correct?

18   A.      Yes.

19           MR. COOK:  Let's have DDX-6-7.

20   BY MR. COOK:

21   Q.      Claim 13 of the '208 patent, which is shown here,

22   recites a chemical name; correct?

23   A.      Yes.

24   Q.      And the name recited in claim 13 is another name for

25   apixaban; correct?

1    A.      Yes, it is.

2    Q.      And claim 8 of the '208 patent also recites several

3    chemical names; correct?

4    A.      Yes, it does.

5               MR. COOK:  And let's have DDX-6-6.

6    BY MR. COOK:

7    Q.      As you have shown here, one of the names recited in

8    claim 8 is the chemical name for apixaban; correct?

9    A.      Yes, that's correct.

10   Q.      Claims 8 and 13 both specifically and expressly name

11   apixaban; correct?

12   A.      They do.

13   Q.      And your opinion is simply that claim 1 of the '208

14   patent does not cover apixaban; correct?

15   A.      For the reasons I gave, yes, it did not meet the

16   limitations that are laid out in the claim.  And because of

17   that, these compounds, since they depend on claim 1, do not

18   meet that limitation and so they are not covered by this

19   claim although they're named in it.

20   Q.      Okay.  You agree that a person skilled in the art

21   reading the '208 patent would have thought that the patent

22   drafters intended to claim apixaban; correct?

23   A.      Yes, I think that's what they wanted to do.

24   Q.      And you also agree that the '208 patent is about

25   apixaban; correct?

1    A.      Well, it's about a group of compounds.  It's about --

2    of which apixaban is certainly an important member, it's

3    about -- it's about compounds of that type including

4    apixaban.

5    Q.      Okay.  There are several specific compounds that are

6    disclosed in the '208 patent; correct?

7    A.      Yes, there are.

8    Q.      And as you interpret claim 1, none of the compounds

9    that are specifically disclosed in the '208 patent would

10   fall within the scope of claim 1; correct?

11   A.      That's right.  For the technical reason that I

12   recited, the claims are written in such a way that they do

13   not cover the compound that they -- that I think they wanted

14   to cover.

15   Q.      Okay.  And more generally, in your view, a person of

16   ordinary skill would not understand claim 1 to cover any

17   chemical compound; correct?

18   A.      I couldn't think of a compound that you could

19   construct that would meet those very strict limitations.

20   Q.      Okay.  Well, let's look at Tab 7 in your binder,

21   which is PTX-777.

22   A.      Tab 7?

23   Q.      Yes.

24   A.      Okay.  All right.

25   Q.      PTX-777 shows the chemical structure of apixaban;

1   correct?

2   A.      Yes.

3   Q.      And let's go to Tab 8 in your binder, which is

4   PTX-775.

5   A.      All right.

6   Q.      PTX-775 also shows the chemical structure of

7   apixaban; correct?

8   A.      Yes, it does.

9   Q.      Now, a person of ordinary skill in the art in 2001

10  would have understood the compound that is depicted in

11  PTX-777 to be the same compound that is depicted in PTX-775;

12  correct?

13  A.      Yes.

14  Q.      And chemists normally depict complicated structures

15  like apixaban with line structures, like the one shown in

16  PTX-777; correct?

17  A.      That is the conventional way we would draw the -- the

18  777 way is the way we normally use.

19  Q.      Okay.  Now, you've identified four limitations in

20  claim 1 that you believe apixaban does not satisfy; correct?

21  A.      Yes.

22  Q.      And the reasoning for why you think apixaban falls

23  outside the scope of claim 1 is the same for each of those

24  four positions; correct?

25  A.      Yes.  Similar, yes.

 1    Q.      You testified about a ring M limitation of claim 1;
 2    correct?
 3    A.      Yes, that's one of the rings.
 4            MR. COOK:   Let's have DDX-6-9.
 5    BY MR. COOK:
 6    Q.      The ring M limitation in claim 1 depicts a chemical
 7    structure; correct?
 8    A.      Yes, it does.
 9    Q.      And that's the structure shown in the upper
10    right-hand corner of DDX-6-9; correct?
11    A.      Yes.
12    Q.      Let's look at Tab 9 in your binder, which is PTX-779.
13            Let me know when you are there.
14    A.      Yes, I can just look at it on my screen.
15    Q.      Okay.   The structure depicted on the left of PTX-779
16    is the same structure that is depicted in the ring M
17    limitation in claim 1; correct?
18    A.      Yes, it is.
19    Q.      And a person of skill in the art in 2001 would have
20    understood the two structures in PTX-779 to depict the same
21    chemical subunit; correct?
22    A.      Yes.   They mean the same thing.
23    Q.      So a person of ordinary skill in the art would have
24    understood the structure expressly given for ring M in claim
25    1 to have four hydrogens; correct?

1    A.      Yes.

2    Q.      Let's look at your slide DDX-6-9.

3            And this slide shows the language of the ring M

4    limitation in claim 1; correct?

5    A.      That's right.

6    Q.      The ring M limitation in claim 1 says that ring M is

7    substituted with 0 to 2 $R^{1a}$; correct?

8    A.      Yes.

9    Q.      The express language of claim 1 says substituted with

10   0 to 2 $R^{1a}$; correct?

11   A.      Yes, it does.

12   Q.      Now, the phrase "with 0 to 2" describes the

13   substitution in this claim limitation; correct?

14   A.      Yes.  Well, the -- I'm sorry.  Repeat the question.

15   Q.      The phrase "with 0 to 2" describes the substitution

16   in this claim limitation; correct?

17   A.      Yes, that describes how many of these $R^{1a}$s can be a --

18   use 0 to 2.

19   Q.      Now, you've interpreted the phrase ring M is

20   substituted with 0 to 2 $R^{1a}$ to allow only 0 to 2 $R^{1a}$ groups

21   to be attached to ring M; correct?

22   A.      Yes, I have.

23   Q.      But the word "attached" doesn't appear in the ring M

24   limitation; correct?

25   A.      No, it doesn't.  That's just the way a person

 1    understands the way we use the language of the substituents

 2    and substituted.

 3    Q.      Right.  But the word "attached" does not appear in

 4    the claim limitation; correct?

 5    A.      That's correct.

 6    Q.      Now, let's go to your slide DDX-6-5.

 7            Here, you say that ring M requires 0 to 2

 8    substituents from group $R^{1a}$; correct?

 9    A.      Right.

10    Q.      The word "substituent" doesn't appear in the ring M

11    limitation; correct?

12    A.      Well, substituent is -- it's clearly related to

13    substituted.  And so yes, it doesn't appear in this -- in

14    this way, but it's -- it's a close relative to the word

15    "substituted."

16    Q.      Right.  But the word "substituent" doesn't appear in

17    the claim; correct?

18    A.      No, the word doesn't appear.

19    Q.      And the word "substituent" doesn't appear in claim 1

20    at all; correct?

21    A.      I don't know.  Claim 1 is about four pages and so --

22    Q.      You're not aware of any --

23    A.      I haven't looked.

24    Q.      -- appearance of the term --

25    A.      I haven't looked for it, so I can't really answer

 1    that question, honestly.

 2    Q.      You pointed to a few compounds in claims 3 and 8 that

 3    might not be covered under Dr. MacMillan's interpretation of

 4    claim 1; correct?

 5    A.      Yes.

 6    Q.      But before I wrap up, I just want to make sure I have

 7    your understanding of claim 1 straight.

 8            Under your interpretation of claim 1, apixaban,

 9    which is a compound that the '208 patent is about and which

10    the '208 patent expressly claims, is not within the scope of

11    claim 1; correct?

12    A.      That's right.

13    Q.      In fact, as of your deposition, you hadn't identified

14    a single example in the '208 patent that you believed was

15    within the scope of claim 1; correct?

16    A.      That's correct.

17    Q.      And under your interpretation of claim 1, it's

18    impossible for any compound to fall within claim 1's scope;

19    correct?

20    A.      I -- yeah, I can't think of something so I -- yeah.

21            MR. COOK:  Okay.  Nothing further.

22            THE COURT:  Okay.  Redirect?

23                    REDIRECT EXAMINATION

24    BY MR. SEGREST:

25    Q.      You were asked whether the word "attached" appears in

1   the claim limitations; right?

2   A.      Yes.

3   Q.      And asked whether the word "substituents" appear in

4   these claim limitations?

5   A.      That's right.

6   Q.      Now, would a person of ordinary skill in the art

7   seeing the phrase "is substituted with" think that the

8   things that are being substituted onto the atom are

9   substituents?

10  A.      Well, yes.  I mean, if you say something is

11  substituted with a list of things, then we understand that

12  that list of things can each individually be attached at

13  that position, and then they would be substituents.  That's

14  what -- those concepts sort of go together.

15  Q.      So the list of things here would be things like $R^{1a}$,

16  right?

17  A.      Yes.

18  Q.      And every item in that list of things you're calling

19  a substituent, right?

20  A.      Yes.

21  Q.      Is that what a person of ordinary skill in the art

22  would call that -- those items?

23  A.      Yes, sir.  Yes, certainly.

24  Q.      And is that the terminology they would use with the

25  word "substituted with"?

1    A.      Yes, that's right.  That is the way I read

2    "substituted with" to mean.

3    Q.      And then when the atom is substituted with a

4    substituent, what's the relationship between that

5    substituent and the atom?

6    A.      Well, they're attached together by a bond.

7    Q.      So is that being attached together again part of the

8    understanding of a person of ordinary skill in the art would

9    bring to the term "substituted"?

10   A.      Yes, I believe so.

11                MR. SEGREST:  No further questions.

12                THE COURT:  Okay.  You can step down.  Thank you

13   very much.

14                THE WITNESS:  You're welcome.

15                MR. COOK:  Your Honor?

16                THE COURT:  Yes.

17                MR. COOK:  We would submit PTX-777, 775, and

18   779.

19                THE COURT:  Any objection?

20                MR. SEGREST:  No objection.

21                THE COURT:  Okay.  Those are all admitted.

22                (PTX-777, 775, and 779 were admitted into

23   evidence.)

24                THE COURT:  Mr. Segrest, if you wouldn't mind

25   coming and grabbing these binders.

1              Then you can call your next witness.

2                   (The attorneys clear the witness stand of

3      binders.)

4              MR. SEGREST:  Your Honor, a housekeeping matter.

5      I think we used his -- Dr. Heathcock's CV, PTX-998.  We want

6      to move that in.

7              THE COURT:  Any objection?

8              MR. LEE:  No objection.

9              THE COURT:  Okay.  It's admitted.

10                  (PTX-998 was admitted into evidence.)

11             MR. MIZERK:  Your Honor, SigmaPharm's next

12     witness, and I think it's on behalf of SigmaPharm and

13     Unichem, would be Dr. David Apperley, and Mr. Heneghan will

14     be conducting the examination.

15             THE COURT:  Okay.

16             MR. MIZERK:  Your Honor, it's on behalf -- it's

17     just on behalf of SigmaPharm.

18             THE COURT:  Okay.

19             ... DR. DAVID APPERLEY, having been first duly

20     sworn, was examined and testified as follows ...

21             THE COURT:  Good afternoon, Dr. Apperley.

22     Welcome.

23             You may proceed.

24             MR. HENEGHAN:  Thank you.

25             MR. HENEGHAN:  Tom Heneghan on behalf of

Apperley - direct

1      SigmaPharm.  May I approach?

2                      THE COURT:  You may.

3                      MR. HENEGHAN:  Thank you.

4                      Dr. Apperley, here are a binder of exhibits, one

5      for the Court.

6                              DIRECT EXAMINATION

7      BY MR. HENEGHAN:

8      Q.      Good afternoon, Dr. Apperley.

9      A.      Good afternoon.

10     Q.      Would you please state your name for the record?

11     A.      David Apperley.

12     Q.      Thank you.

13             Could you tell us about your formal education?

14     And you will see we have some slides here to summarize some

15     of your background.

16     A.      So I received a bachelor of science degree, chemical

17     sciences, from the University of Anglia in 1982.  I then

18     went to the Open University in Milton Keynes to work towards

19     a Ph.D., which was awarded in 1986, working on the nuclear

20     magnetic resonance spectroscopy of solids.

21     Q.      And when you say you were working on NMR study of

22     solids, is that what your thesis was on?

23     A.      Yes.

24     Q.      Can you tell us where you currently work?

25     A.      Durham University in the UK.

Apperley - direct

1      MR. HENEGHAN:  Can we see the next slide,

2  please.

3  BY MR. HENEGHAN:

4  Q.     How long have you been at Durham?

5  A.     Since 1986.

6  Q.     Please tell us about your experience at Durham.

7  A.     So I started in 1986, working in the University of

8  Durham Industrial Research Laboratories and working in the

9  solid state NMR service.  And I built up extensive

10  experience with my time there working on a vast range of

11  materials, including pharmaceuticals.

12  Q.     What other materials did you work on -- or what other

13  range of materials did you work on during that time period?

14  A.     Polymers, glasses, pretty much anything that was

15  solid.

16  Q.     Did anything significant happen at Durham in 2003?

17  A.     In 2003, we relocated the NMR service to the

18  chemistry department, and I moved down with it and I have

19  been there ever since.

20  Q.     And what are your main responsibilities in that role

21  at Durham?

22  A.     So my main responsibilities are to provide solid

23  state NMR spectra and interpretation for researchers in

24  Durham and also to provide spectra and interpretation on a

25  commercial basis for researchers in other UK universities

1   and also for commercial original organization.

2   Q.      Have you published in the field of solid state NMR?

3   A.      Yes, I've published -- coauthored one book and now

4   approaching 200 articles in the scientific literature.

5   Q.      Dr. Apperley, I'm holding up a copy of what's been

6   marked as DTX-655, <u>Solid State NMR Basic Principles and</u>

7   <u>Practice</u>.

8           Is this your book?

9   A.      Yes.

10  Q.      And I think you said you have published approaching

11  200 scientific articles?

12  A.      That's correct, yes.

13  Q.      And we are scrolling through these slides showing

14  some particular choices from that list.  Can you tell me why

15  you chose these particular ones to highlight for this case?

16  A.      So these are articles that are either published in

17  pharmaceutical journals or are relevant to pharmaceutical

18  materials.

19  Q.      So of the 200, these are particularly relevant to

20  your work in this case?

21  A.      Yes.

22  Q.      Do you consider yourself an expert in performing

23  solid state NMR tests and analyzing those results?

24  A.      Yes, I do.

25  Q.      Dr. Apperley, can we establish that throughout your

1    testimony any time we refer to NMR, we are referring in

2    particular to solid state nuclear magnetic resonance

3    testing -- I'm sorry -- resonance testing?

4    A.     Yes.

5    Q.     Thank you.

6           I'm showing you here on the screen what has been

7    marked as Defendants' Trial Exhibit DTX-547.  Is that a copy

8    of your current curriculum vitae?

9    A.     Yes.

10   Q.     Are the accomplishments and the work you just

11   described reflected in your curriculum vitae?

12   A.     Yes, they are.

13   Q.     As well as additional work and other things you've

14   done in your professional life?

15   A.     Yes.

16   Q.     Dr. Apperley, have you been retained by Defendant

17   SigmaPharm Laboratories in this matter to conduct NMR

18   analysis of SigmaPharm's apixaban ANDA products?

19   A.     Yes.

20   Q.     Have you been retained by SigmaPharm to provide your

21   expert opinions regarding that work?

22   A.     Yes.

23   Q.     Do you believe that you possess the training,

24   education, and experience required to provide expert

25   opinions regarding the analysis of the results of that work?

Apperley - direct

1    A.      Yes, I do.

2    Q.      Are you being compensated for your time dedicated to

3    your work on this matter?

4    A.      I am.

5    Q.      Do you have any affiliation with any of the parties

6    in this case?

7    A.      No.

8    Q.      Does your compensation for your work in this case

9    depend in any way on the outcome of this litigation?

10   A.      No.

11           MR. HENEGHAN:  Your Honor, at this time I would

12   like to proffer Dr. Apperley as an expert in NMR testing and

13   analysis.

14           MR. PRUSSIA:  No objection, Your Honor.

15           THE COURT:  He is so recognized.

16           MR. HENEGHAN:  Thank you.

17   BY MR. HENEGHAN:

18   A.      Dr. Apperley we have heard a lot about XRPD analysis

19   during this trial.

20           Are NMR and XRPD different analytical tools?

21   A.      Yes, they are.

22   Q.      How are they different?

23   A.      XRPD is sensitive to long-range order, solid state

24   NMR is sensitive to short-range order.

25   Q.      And how is that difference significant in relation to

Apperley - direct

1    your work in this case?

2

3    A.     So the implication of that is in solid state NMR, a

4    spectrum can contain both crystalline and amorphous

5    material.

6               THE COURT:  Doctor, I need you to speak up a

7    little bit so I can hear you.

8               THE WITNESS:  Okay.

9               THE COURT:  Could you have him answer that

10   question again?

11              MR. HENEGHAN:  Sure.  I will just re-ask the

12   question, Judge, if that's okay.

13   BY MR. HENEGHAN:

14   Q.     How does that different significant in relation to

15   your work in this case, the difference between XRPD and NMR?

16   A.     So an NMR, because it's sensitive to short-range

17   order, an NMR spectrum can contain peaks from both amorphous

18   and crystalline material.

19   Q.     And how does XRPD analysis differ from that in

20   relation to that basis?

21   A.     Diffraction techniques are sensitive just to

22   long-range order.

23   Q.     And are NMR peaks different as between crystalline

24   materials and amorphous materials?

25   A.     Yes.  Generally, amorphous materials get broader

 1    peaks than crystalline material.

 2              It's perhaps easiest to demonstrate that with an

 3    example.

 4              MR. HENEGHAN:  Okay.  Can we see DTX-50 and

 5    particularly at page 5 of that exhibit?

 6    BY MR. HENEGHAN:

 7    Q.    Is this the example you wanted to see?

 8    A.    Yes, it is.

 9    Q.    Okay.  Can you use this chart to explain to us just

10    in general -- let me just grab a laser pointer.

11              MR. HENEGHAN:  I think it might help if I'm able

12    to point.

13    BY THE WITNESS:

14    A.    So if you look in the region of the spectrum, it's

15    about 134 ppm on the horizontal axis.

16    Q.    About that?

17    A.    A little bit to the left of that.  Yes.

18    Q.    Okay.

19    A.    So the peak in the trace -- the black trace at the

20    bottom is relatively narrow and is consistent with a

21    crystalline substance.

22              The peak at the same position in the red trace

23    is much broader and is consistent with an amorphous

24    material.

25    Q.    And can I just point out, I was making a mistake.  I

Apperley - direct

1    was to the right of 130.  134 is actually to the left of 130

2    because it reads from right to left.  I have been struggling

3    with this all week.  I apologize.

4              So is this the area that we're talking about?

5    A.    That's the area.

6    Q.    Okay.  I'm sorry.

7              Go ahead.  I didn't mean to interrupt you.

8              You mentioned the red peak and the black peak.

9    A.    Yes.  So they're significantly different in widths,

10   and that reflects whether one is crystalline or the other is

11   amorphous.

12   Q.    And in this particular example, can you tell us what

13   the red line or the red trace is a sample of?

14   A.    So the red trace is from a sample of SigmaPharm's

15   2.5 milligram tableted material.

16   Q.    And the black trace or the black line along the

17   bottom there?

18   A.    The black line is from crystalline apixaban.

19   Q.    And this happens to be a chart from this case.  We'll

20   talk about that in a little bit more detail later, but this

21   was just an example of narrow versus broad?

22   A.    Yes.

23   Q.    I'd like to start briefly with your conclusions in

24   this case.  Did you perform NMR testing of SigmaPharm's ANDA

25   product?

1   A.      Yes.

2   Q.      And did you analyze the results of those tests?

3   A.      Yes, I did.

4   Q.      Have you formed any opinions about that work?

5   A.      Yes.

6   Q.      And what are those opinions?

7   A.      So in my opinion, based on the measurements I have

8   carried out, there is no evidence to support the conclusion

9   that SigmaPharm's ANDA product contains crystalline

10  apixaban.

11  Q.      And is that opinion supported by the testing you did?

12  A.      Yes, it is.

13  Q.      How so?

14  A.      So I carried out multiple tests, and both on

15  crystalline apixaban to determine that it was detectable in

16  an NMR spectrum and tableted material to establish that

17  apixaban was detectable in tablets.  And also a range of

18  experiments to confirm the accuracy and appropriateness of

19  those measurements.

20  Q.      Let's talk about those three sets of tests, starting

21  with the first one.

22          Could you briefly describe the first set of NMR

23  tests you conducted in this matter?

24  A.      So the first set of tests were carried out on a

25  sample of crystalline apixaban and on a 2.5 milligram

1    SigmaPharm tableted sample.

2              MR. HENEGHAN:  And if we could show Exhibit

3    DTX-549 on the screen.

4    BY MR. HENEGHAN:

5    Q.     Do you recognize this document, Doctor?

6    A.     Yes.

7    Q.     And does this exhibit, DTX-549, contain all of the

8    data and the results of your first set of tests?

9    A.     It does.

10   Q.     And was this attached in its entirety to your expert

11   report in this matter?

12   A.     Yes.

13   Q.     What was the purpose of this particular set of tests,

14   the ones shown in DTX-549?

15   A.     So, in this set of tests, I wanted to establish the

16   optimum conditions, experimental conditions for the

17   detection of crystalline apixaban, and to establish the

18   appearance of an NMR fingerprint for crystalline apixaban in

19   terms of the line positions and line widths in the spectrum.

20   And then I wanted to establish that I could actually detect

21   the apixaban in the tableted material.

22   Q.     And was that second purpose to detect apixaban in the

23   tableted material in either form, crystalline or amorphous?

24   A.     Yes, in either form.

25   Q.     How did you conduct this test?

1    A.       So I have used the technique called

2    cross-polarization with magic-angle spinning and using a

3    broke --

4    Q.       Doctor, if you could just slow down a little bit,

5    especially with the technical stuff?

6    A.       All right.  Sorry.

7    Q.       What was that, magic-angle spinning?

8    A.       Magic-angle spinning.

9    Q.       Thank you.

10   A.       Or MAS.

11            Along with Bruker Advanced III HD Spectrometer

12   and a full millimeter MAS probe.

13   Q.       And what type of spectrum were you trying to see in

14   that testing?

15   A.       Yes.  I was -- so I've used that technique to record

16   a carbon 13 spectrum from a sample of crystalline apixaban.

17   I then used the same technique to record a spectrum from

18   tableted material, taking great care to make sure there was

19   no cross-contamination between samples to the extent they

20   used separate rotors for the two samples.

21   Q.       Why is it important to make sure that you avoid

22   cross-contamination in that situation?

23   A.       Any time that you are working with a bulk sample and

24   a sample that is diluting that material, you need to be

25   careful to make sure you don't contaminate the dilute system

Apperley - direct

1    with the concentrated one.

2    Q.      And in this particular situation, which would be the

3    dilute system?

4    A.      The tableted material.

5    Q.      Do you recall what percentage of apixaban is in the

6    SigmaPharm product?

7    A.      Approximately 3 percent.

8    Q.      And so contrarily, there would be 100 percent

9    crystalline apixaban in the API sample?

10   A.      Yes.

11   Q.      And those are the two things you don't want to mix.

12   A.      Indeed.

13   Q.      Unless you mix them on purpose for another reason,

14   and we'll talk about that a little bit later.

15   A.      Indeed.

16   Q.      Why were those particular tests method selected for

17   these tests?

18   A.      So those are the common type of measurements I do on

19   any materials of this type.

20   Q.      Is this typical of the instrumentation that's

21   available to NMR practitioners, the equipment you used?

22   A.      Indeed, it is, yes.

23   Q.      Under what experimental conditions were the tests

24   conducted?

25   A.      So the tests were carried out with a sample spin rate

1    of 10 kilohertz and with a temperature regulated to

2    28 degrees Celsius.

3              The crystalline apixaban was -- the spectrum

4    from that was acquired or accumulated over a period of one

5    hour.

6              The spectrum from the tableted material was

7    accumulated over a period of 16 hours.

8    Q.    And I would just like to clarify some of the

9    language.  If you look back at that exhibit we used as the

10   example.

11             I'm sorry.  Let me just find the reference here.

12   I think it was page 5 of that exhibit.

13             Go to page 5.

14             I'm sorry.  Let me look at my notes here and I

15   will direct you to the right one.

16             I'm sorry.  It's 550, page 5.

17             So you mentioned just now testing the

18   crystalline in apixaban.

19             In the testing result, is that designated with

20   the legend API?

21   A.    Yes.

22   Q.    So when you see API, we're talking about the sample

23   of crystalline apixaban?

24   A.    Yes.

25   Q.    And when we're talking about the significant tableted

1  material, the legend says tablet.

2  A.    Yes.

3  Q.    Okay.  And we'll get into the two different tablets

4  tests, but I just want to make sure we're all understanding

5  the language of how we're approaching it here.

6            I think that you testified that you ran the

7  crystalline apixaban spectrum on an accumulation of one hour

8  and the tableted material on an accumulation of about

9  16 hours; is that right?

10 A.    That's right.

11 Q.    Why did you utilize more time or repetitions for the

12 tableted material than for the crystalline apixaban?

13 A.    So the signal-to-noise ratio in the spectrum is

14 proportional to the amount of material in the sample

15 contained in the rotor, and the crystalline apixaban is or

16 was -- 100 percent of the sample was under study so it gives

17 us a spectrum with a high signal-to-noise ratio in a

18 relatively short period of time.

19            The tableted material containing approximately

20 3 percent of apixaban, it takes a lot longer to build up a

21 reasonable signal-to-noise ratio for the peaks relevant to

22 apixaban.

23 Q.    Is it standard NMR practice to use longer

24 accumulation time to detect a dilute material?

25 A.    Indeed, it is.

Apperley - direct

1          MR. HENEGHAN:  Let's show DTX-549, page 4.

2    BY MR. HENEGHAN:

3    Q.     What were the results of the tests of the crystalline

4    apixaban?

5    A.     So this is the spectrum from the crystalline

6    apixaban, and it shows 19 resolved signals and -- which can

7    be used to determine whether apixaban is detectable in

8    tableted material.

9    Q.     When you say "these" or "this," you're referring to

10   the exhibits on the screen right now?

11   A.     Yes, sorry.

12   Q.     That's okay.

13          DTX-549, page 4.

14          And if we look across the top of that graph,

15   there's a series of numbers with little hashmarks above all

16   the peaks.

17          Are those the numbers that correspond to the

18   location of each peak on the graph?

19   A.     Indeed.

20   Q.     What were the results of the NMR spectra you ran on

21   the tableted material?  What did it show you?

22   A.     So the tableted, the spectrum from the tableted

23   material was consistent with the presence of apixaban.

24          MR. HENEGHAN:  Can we show page 6 of that

25   exhibit.

1              Thank you.

2    BY MR. HENEGHAN:

3    Q.      What does this page 6 show you?

4    A.      So this is the spectrum from tableted materials.  It

5    shows a range of signals.  The largest ones are from the

6    excipient in the sample.  There is a range of signals

7    between 100 and 170 on the scale and that are consistent

8    with the apixaban.

9    Q.      So this shows apixaban, but does it show crystalline

10   apixaban?

11   A.      It's not consistent with the presence of crystalline

12   apixaban.

13   Q.      Did you compare the NMR spectra of the crystalline

14   apixaban to the NMR spectra of the SigmaPharm tablets?

15   A.      I did.

16              MR. HENEGHAN:  Can we show DTX-549, page 9.

17

18   BY MR. HENEGHAN:

19   Q.      What do we see -- well, first let me ask:  Do you

20   recognize this exhibit?

21   A.      Yes.

22   Q.      And is it contained in your report in Exhibit C to

23   your report?

24   A.      Yes.

25   Q.      So what does DTX-549, page 9 show us?

Apperley - direct

1   A.      So we have two -- two lines here.

2   Q.      Okay.

3   A.      The black line is from crystalline apixaban.  The red

4   line is from the SigmaPharm 2.5 milligram tablet material.

5           And the red line shows significantly broader

6   peaks than the material -- the spectrum from the crystalline

7   material, and that's consistent where an amorphous sample.

8           Also, there is a signal missing at about 121.7

9   ppm, which is present in the crystalline spectrum from the

10  crystalline sample.

11  Q.      Does this chart, similar to the first chart we looked

12  at, show a difference between broad amorphous lines as

13  compared to sharp crystalline lines?

14  A.      Yes.

15  Q.      And what would be a good example of that from this

16  chart?

17  A.      I think it's looking at the range between about 125

18  and 135.  The red -- the black -- the peaks on the black

19  trace are well separated, and it's actually a broad range of

20  signal for the tableted material.

21  Q.      Is there any similarity related to the region shown

22  here between 110 and 170 to anything else?

23  A.      Yes, the regions are similar.  So that confirms that

24  apixaban is detectable in the tableted material.

25  Q.      What specific peaks in the 110 to 170 ppm range do

1    you find to be significant?

2            And let me put up DTX-549, page 4, to look at

3    while you tell us about that.

4    A.    So all of the peaks in the range from 110 up to 170

5    ppm are significant in this case.

6    Q.    So can we highlight, using the numbers on the top,

7    the peaks from 161.7 to 113.4?

8    A.    So, yes.  That whole range is the important range.

9    Q.    And how many peaks are shown there?

10   A.    12.

11   Q.    And this is the chart of the crystalline apixaban,

12   right?

13   A.    Yes.

14   Q.    Does this test give you an indication as to whether

15   the apixaban in the tableted material is present in its

16   crystalline form?

17           MR. HENEGHAN:  And let's look back at page 9 of

18   that same exhibit.

19           Thank you.

20   BY MR. HENEGHAN:

21   Q.    Does this give you an indication, this particular

22   chart, of whether the apixaban in the tableted material is

23   present in its crystalline form?

24   A.    The line width in the spectrum from the tableted

25   material suggests amorphous material.  And the absence of

1   the line at the 121.7 ppm in the tableted material suggests

2   that there is no crystalline material detectable in the

3   tableted sample.

4   Q.   Again, the tableted material being the red line.

5   A.   Yes.

6   Q.   Did you conduct any calibration tests on the

7   spectrometer prior to conducting this analysis?

8   A.   Yes, I carried out a range of tests.

9        I optimized the instrument dependent

10  experimental parameters and carried out a referencing

11  experiment to correctly position zero ppm in the scale, and

12  also carried out a number of measurements to determine the

13  optimum sample dependent parameters.

14  Q.   And is that the standard calibration you would

15  perform any time you conduct this type of NMR testing?

16  A.   Yes, I regularly do those calibrations.

17  Q.   As far as NMR, in your opinion, is solid state NMR

18  testing the best method of analyzing the SigmaPharm tablets

19  to determine crystallinity?

20  A.   No.

21  Q.   Why is that?

22  A.   The limit of detection is too high with respect to

23  the crystalline material to detect load levels of

24  crystalline material.

25  Q.   Did you perform any additional NMR testing to see if

1    you could gain additional insight?

2    A.    Yes, I carried out two further sets of tests.

3    Q.    And did those additional rounds of testing, were they

4    with different parameters?

5    A.    The second set used the same basic experimental

6    parameters but with a larger sample size and a different

7    spin rate.

8    Q.    Okay.  Let's talk about that second test.

9          Could you tell us what the -- what product was

10   the subject of the second test you ran?

11   A.    So the second test was upon the -- again, on the 2.5

12   SigmaPharm ANDA product.

13             MR. HENEGHAN:  Okay.  So could we show Exhibit

14   DTX-550, please.

15   BY MR. HENEGHAN:

16   Q.    Does DTX-550 that's up on the screen now contain all

17   of the data and results of your second test?

18   A.    Yes.

19   Q.    And that was attached to your expert report in this

20   case?

21   A.    Yes.

22   Q.    What was the purpose of that second test?

23   A.    So the second test was designed to try and detect

24   crystalline apixaban in the tableted material.

25   Q.    How did you conduct this test?

1    A.      So this test was carried out under the same basic

2    experimental conditions but with a larger sample container,

3    so more sample mass, and has a different spin rate as

4    compared to the first set of tests.

5    Q.      And why did you do that?

6    A.      The more sample you can get into the rotors, the more

7    sensitive; the more signal you're going to get, so the more

8    sensitive the result is going to be, so the more confident

9    you can be with the interpretation of the spectrum.

10   Q.      And did the test, in fact, result in an improved

11   signal-to-noise ratio?

12   A.      Yes, it did.

13   Q.      Let's talk about those results.

14           What did the results of your analysis of the

15   second test show?

16   A.      So the second test showed improved signal-to-noise

17   ratio.  It gave a spectrum with significantly broader lines

18   than the -- than that from the crystalline apixaban.  Again,

19   consistent with amorphous material.  And there was no

20   evidence in that spectrum for the presence of crystalline

21   apixaban.

22           MR. HENEGHAN:  Let's put up page 5 of DTX-550.

23   BY MR. HENEGHAN:

24   Q.      I believe you testified that 550 is the result of

25   that second test; correct?

1   A.      The red trace, the red line, is the result of the

2   second test, yes.

3   Q.      And this happens to be the chart we talked about

4   earlier as an example of line breadth versus line sharpness,

5   right?

6   A.      That's right.

7   Q.      Let's talk about the actual test results in relation

8   to this graph then.

9           What does this chart show?

10  A.      So this chart shows the spectrum from the crystalline

11  apixaban, that is the black trace at the bottom, and then

12  two traces above that from the tableted material.  The red

13  trace comes from the 64-hour experiment, and -- yeah, I

14  should say that the -- in addition to using the -- an

15  increased sample size, I used a longer accumulation time, so

16  I increased the accumulation time from 16 hours to 64.

17          And that red trace, the red line, is the sum of

18  those four-component spectrum.

19  Q.      So basically if we look at the legend up here, the

20  black trace and the blue trace are the results of that first

21  set of tests, right?  The crystalline apixaban and the

22  16-hour accumulation of the SigmaPharm tablet, right?

23  A.      Yes.  Yes, that's right.

24  Q.      And then the red trace is the second test, the same

25  strength of the SigmaPharm tablet but this time a larger

1    sample accumulated for four times as long.

2    A.      That's right.

3    Q.      Can you explain to us what this comparison between

4    those three NMR spectra show?

5    A.      The first thing to know is that the spectra from the

6    16- and 64-hour measurements are consistent, so the peaks

7    are in the same place and have generally the same shape.

8              MR. HENEGHAN:   Could we highlight from about 170

9    to 120?

10             Thank you.

11   BY THE WITNESS:

12   A.      So that's the important range.

13             The signal-to-noise ratio in the trace from the

14   64-hour experiment is improved so the line is smoother.

15             And neither of them match the ppm lines from the

16   crystalline apixaban.

17   BY MR. HENEGHAN:

18   Q.      Is there anything that you see that is missing in the

19   tablet test that leads you to draw that conclusion?

20   A.      So in the red spectrum, there's a peak missing at

21   121.7 ppm that is present in the spectrum from the

22   crystalline apixaban.

23   Q.      Am I indicating the right spot with the laser

24   pointer?

25   A.      Yes, that's the correct position.

1          So that is strongly indicative that there is no

2    crystalline apixaban detectable in the tableted material.

3    Q.     Why is that indicative of that finding?

4    A.     The crystalline apixaban to be present, I need to be

5    able to see all of the lines that relate to its fingerprint

6    in the spectrum, and that simply isn't the case here.

7    Q.     Is there any misalignment of the peaks or do you have

8    any concerns about misalignment of the peaks in this

9    comparison?

10   A.     The -- I'm confident that the precise position of the

11   176 ppm --

12   Q.     This one here?

13   A.     The one on the left.  Yes.

14          (Continuing):  -- is not an indication of any

15   misalignment because as I have already said, the red traces

16   are the sum of the four-component spectra and the other

17   signals in those spectra do align.

18   Q.     Was this spectrum from your second test, the one

19   shown by the red line, was that processed in the same way as

20   your other sets of tests up to that point?

21   A.     So for that one, I used a Gaussian apodization

22   function with a time constant of 20 milliseconds.  That's

23   approximately equivalent to an exponential apodization

24   function with line broaden of 30 hertz which I used for my

25   subsequent measurements.

1   Q.      And "subsequent" meaning your third round of tests.

2   A.      My third round of test.

3   Q.      We'll get to that soon.

4           Does the NMR testing you did indicate the

5   presence of crystalline apixaban in the SigmaPharm tablets?

6   A.      No, it doesn't.

7   Q.      Referring you back to the exhibit still on the

8   screen, do you see the large red peak at about 115 ppm?

9   A.      Yes.

10  Q.      Do you have an opinion as to what that is?

11  A.      That is a spinning sideband relating to the peak of

12  176 ppm.

13  Q.      Which is the big one --

14  A.      The big one.

15  Q.      -- way over here (indicating)?

16  A.      Yes.

17  Q.      What is a spinning sideband?

18  A.      So a spinning sideband is a residual signal resulting

19  from the magic-angle spinning used to produce the spectrum.

20  Q.      On what does its position in the spectrum depend?

21  A.      So it's position depends on the spin rate used to

22  obtain the spectrum.

23  Q.      Can you still interpret the spectra with the spinning

24  sideband present?

25  A.      Yes.  There's enough information in the rest of that

1   region to allow an interpretation.

2   Q.     Do you have any opinion on whether the spinning

3   sidebar is obscuring information that might affect your

4   analysis of the results of this test?

5   A.     I did further measurements later on at different spin

6   rates, so this spinning sideband is in a different position,

7   and that shows there was nothing there that would affect my

8   interpretation of that spectrum.

9   Q.     I think you testified earlier that the spinning side

10  rate is dependent on the speed of the spin rate.

11  A.     Yes.

12  Q.     So when you change the spin rate, the spinning

13  sideband is still there, it just moves to a different spot.

14  A.     Yes.

15  Q.     So then you can see what was under the one at the

16  other spin rate.

17  A.     Yes.

18  Q.     Is that a fair way to put it?

19  A.     That's right.

20  Q.     Well, let's talk about that third set of tests, the

21  subsequent test as you had called them before.

22          MR. HENEGHAN:   If we could look at Exhibit 551.

23  BY MR. HENEGHAN:

24  Q.     Do you recognize this document, Dr. Apperley?

25  A.     Yes.

Apperley - direct

1    Q.      Does Exhibit 551 contain the results of your third

2    set of tests?

3    A.      It does, yes.

4    Q.      And was the entirety of your data and analysis from

5    the third set of tests contained in your expert report?

6    A.      Yes.

7    Q.      Okay.  Let's go through those third set of tests one

8    by one or a little more individually.

9               Was one of the tests you did in that subsequent

10   round a test of a mixture of crystalline apixaban and

11   placebo?

12   A.      Yes.

13              MR. HENEGHAN:  Can we look at DTX-551, page 6.

14   BY MR. HENEGHAN:

15   Q.      So is this showing traces from that blend that you

16   created of crystalline apixaban and placebo?

17   A.      Yes, the bottom two trace.

18   Q.      So the blue is the placebo and the green and the

19   black are combinations of the placebo with the crystalline

20   apixaban?

21   A.      Correct.

22   Q.      Why did you do that mixture and perform those tests?

23   A.      I wanted to know what the spectrum would have applied

24   if the tableted material contained wholly crystalline

25   apixaban and for use to compare with the tableted material.

Apperley - direct

1  Q.      In addition to doing a test of a combination of

2  crystalline apixaban and placebo, did you also test a

3  mixture of placebo, crystalline apixaban, and the SigmaPharm

4  tablets?

5  A.      Yes.  I created two further mixtures with

6  approximately -- aiming at approximately 50 percent

7  crystalline material, or crystalline apixaban in the total

8  amount of apixaban, and also approximately 20 percent

9  crystalline apixaban out of the total apixaban content.

10  Q.      And why did you make those mixtures?

11  A.      So they were also for comparison with the SigmaPharm

12  tableted samples.

13  Q.      To what end?

14  A.      To determine whether crystalline apixaban could be

15  detected.

16          And to establish some sort of form of limit of

17  detection.

18  Q.      And was it also meant to give you an idea of what the

19  SigmaPharm tablets would look like if they had crystalline

20  apixaban in them?

21  A.      If they had, yes.

22  Q.      And did you find any such evidence in the actual

23  SigmaPharm tablets and match that mixture spectrum?

24  A.      No.

25  Q.      Did you also run additional analyses of other batches

1    of 2.5 milligram apixaban tablets that you received from

2    SigmaPharm?

3    A.    Yes, I ran two further batches to look for

4    crystalline apixaban.

5    Q.    So why did you do those additional batches?

6    A.    Just for added confidence.

7    Q.    Just to make sure they were consistent?

8    A.    As a repeat, yes.

9    Q.    Did you also analyze just the placebo itself?

10   A.    Yes.

11   Q.    Why did you do that?

12   A.    So the interpretation of the spectra is, depending on

13   the rate that -- the region of the spectrum, between 110 and

14   170 ppm.   I needed to be absolutely certain there were no

15   signals from the placebo in that range that would affect my

16   interpretation, so I ran placebos to establish that there

17   were, indeed, no placebo signals in that range.

18   Q.    And what experimental conditions were used for that

19   particular analysis?

20   A.    I used exactly the same conditions as for the other

21   tests in this set.

22   Q.    How does that compare generally with accepted

23   procedures for an experiment such as this?

24   A.    It is logical to use exactly the same conditions so

25   that you can then make a direct comparison between spectra.

Apperley - direct

1   Q.      What did the results of those tests demonstrate?

2   A.      So they demonstrated there is no interference from

3   placebo and, therefore, that my conclusion that there is no

4   crystalline apixaban detectable in the spectrum is valid.

5               MR. HENEGHAN:  Let's look back at DTX-550, page

6   5.

7               Thank you.

8   BY MR. HENEGHAN:

9   Q.      We talked about the spinning sideband and whether or

10  not that might obscure the spectrum in a particular point.

11              Is a single point in the spectrum dispositive of

12  the question of whether crystalline apixaban is detected?

13  A.      No.

14  Q.      Why is that?

15  A.      To --

16  Q.      Why isn't a single spot dispositive?

17  A.      Because you need to see all the peaks that relate to

18  the crystalline apixaban in this case in the spectrum, not

19  just one.  They all must be present if crystalline apixaban

20  is present.

21  Q.      Are all of the peaks for crystalline apixaban present

22  in any of the tests you performed solely on the SigmaPharm

23  tableted product?

24  A.      No.

25  Q.      How does that relate to your opinion in this matter?

1    A.      So that -- that leads me to conclude there is no

2    evidence to support a conclusion that SigmaPharm ANDA

3    product contains crystalline apixaban.

4              MR. HENEGHAN:  Thank you, Dr. Apperley.  We have

5    no further questions.

6              THE COURT:  All right.  We'll take a short break

7    before we get to cross-examination.

8              (Brief recess taken.)

9              *     *     *

10              (Proceedings reconvened after recess.)

11              THE COURT:  Cross-examination.

12              MR. PRUSSIA:  Thank you.

13                   CROSS-EXAMINATION

14   BY MR. PRUSSIA:

15   Q.      Good afternoon, Dr. Apperley.

16   A.      Good afternoon.

17   Q.      Nice to see you again.  We met at your deposition.

18              Do you recall that?

19   A.      Yes.

20   Q.      You agree that SSNMR is a useful tool to analyze

21   pharmaceutical compositions, right?

22   A.      Yes.

23   Q.      And SSNMR is a good tool for distinguishing amorphous

24   and crystalline pharmaceutical material; correct?

25   A.      Yes.

Apperley - cross

1   Q.      And you agree that SSNMR can provide information

2   about the crystallinity of a drug substance that is not

3   easily obtained from XRPD; correct?

4   A.      Yes.

5   Q.      Now, you have not analyzed the SSNMR data produced by

6   Dr. Munson in this case, right?

7   A.      Correct.

8   Q.      And so you have no opinions regarding Dr. Munson's

9   analysis in this case, right?

10  A.      No.

11  Q.      And you -- so you have no basis to dispute any of

12  Dr. Munson's opinions in this case, right?

13  A.      No.

14  Q.      Let me just re-ask my question because there's an

15  ambiguity in the transcript.

16          You have no opinions regarding Dr. Munson's

17  analysis in this case; correct?

18  A.      I have no opinions on that.

19  Q.      And you also have no opinions regarding Dr. Atwood's

20  analysis in this case; correct?

21  A.      Correct.

22  Q.      And you didn't talk to any of SigmaPharm's experts in

23  this case in connection with forming your opinions in this

24  case; correct?

25  A.      Correct.

Apperley - cross

1  Q.      And so you didn't talk to Dr. Schurko in connection

2  with forming your opinions in this case; correct?

3  A.      Correct.

4  Q.      Your opinions here are limited to the SSNMR

5  experiments that you conducted on the SigmaPharm tablet;

6  correct?

7  A.      Correct.

8  Q.      So you are not offering any opinion on whether the

9  SigmaPharm tablet infringes the '945 patent; correct?

10  A.      Correct.

11  Q.      And you are not providing an opinion with respect to

12  any other issues in this case; correct?

13  A.      Correct.

14  Q.      Now, you know what a limit of detection is; correct?

15  A.      Yes.

16  Q.      The limit of detection is the level at which one can

17  detect a material of interest in an SSNMR experiment;

18  correct?

19  A.      Correct.

20  Q.      And so let's take an example where you run an SSNMR

21  experiment on a tablet.

22          Are you with me so far?

23  A.      Yes.

24  Q.      Okay.  And the material of interest in the tablet is

25  just 3 percent, okay?

1                      Are you with me?

2    A.      Yes.

3    Q.      And the limit of detection is 10 percent.

4    A.      Yes.

5    Q.      You got that?

6            In that scenario, the material of interest

7    cannot be detected by the experiment.

8            Do you agree with me?

9    A.      I think it is very unlikely.  It would depend exactly

10   on the experiment, but I think it is very unlikely.

11   Q.      It cannot be detected by the experiment; correct?

12   A.      There are conditions when you could detect it.

13           If you're talking about a carbon spectrum, then

14   it would be difficult to detect, yes.

15   Q.      So let's be clear about this because we're talking

16   about a carbon 13 SSNMR experiment, right?

17   A.      Right.

18   Q.      So in that example, where the material of interest is

19   3 percent and the limit of detection is 10 percent, that

20   experiment would not detect the material of interest;

21   correct?

22           MR. HENEGHAN:  Judge, I just have an objection

23   to the hypothetical because of additional conditions being

24   added.  I would just like to have Dr. Apperley understand

25   what are the assumptions he's being asked to make, but now

1    the carbon 13 is new assumption added on to the original

2    hypothetical.  It just seems unclear to me.

3                    THE COURT:  At this point, I think you had

4    better restate the question.

5                    MR. PRUSSIA:  Thank you.

6    BY MR. PRUSSIA:

7    Q.    We're talking about a carbon 13 SSNMR experiment.

8                    Do you have that, Dr. Apperley?

9    A.    Right.

10   Q.    And the limit of detection is 10 percent.

11                   Are you with me?

12   A.    Right.

13   Q.    The material of interest is 3 percent.  Okay?

14   A.    Yes.

15   Q.    The experiment will not detect the material of

16   interest.

17                   Do you agree with me?

18   A.    I can't definitively answer that.

19   Q.    You just don't know, right?

20   A.    Don't know.

21   Q.    All right.  You conducted three sets of experiments

22   in this case, right?

23   A.    Yes.

24   Q.    And the entirety of those experiments are reflected

25   in DTX-549, 550, and 51 which you walked through with

1    counsel, right?

2    A.      Yes.

3    Q.      And for DTX-549, that was report 1, the first one you

4    saw, you showed to the Court -- do you remember that?

5    A.      Yes.

6    Q.      -- you didn't determine the limit of detection for

7    that experiment; correct?

8    A.      Correct.

9    Q.      So you don't know the limit of detection for the

10   experiments you conducted on report 1, right?

11   A.      Correct.

12   Q.      And you didn't determine the limit of detection for

13   the experiments identified in DTX-550 of report 2; correct?

14   A.      Correct.

15   Q.      And so you don't know the limit of detection for the

16   experiments that you conducted in report 2; correct?

17   A.      Correct.

18   Q.      Now, you did conduct a limit of detection in the --

19   for the experiments reported in DTX-551 report 3; correct?

20   A.      Yes.

21   Q.      And the limit of detection that you identified was

22   about 1.5 percent of the total material in the sample;

23   correct?

24   A.      Yes.

25   Q.      And that estimate has an error associated with it as

1   well; correct?

2   A.      Yes.

3   Q.      And you don't know how large that error is; correct?

4   A.      Correct.

5   Q.      But any error would be in the direction of a higher

6   limit of detection.

7           You agree with that?

8   A.      Yes.

9   Q.      So in other words, the limit of detection for the

10  experiments in your report 3 could be higher than

11  1.5 percent; correct?

12  A.      Yes.

13  Q.      And you just don't know how high it is, right?

14  A.      Correct.

15  Q.      Now, the apixaban in the SigmaPharm tablet is only

16  about 3 percent of the tablet; correct?

17  A.      Correct.

18  Q.      So about half of the apixaban in the SigmaPharm

19  tablet that you tested could be crystalline, and your

20  experiment would not have detected it, right?

21  A.      I think one of the experiments I carried out in my

22  third set of tests, I created a 50 percent crystalline,

23  50 percent -- yes, 50 percent crystalline composition.  And

24  the spectrum from that did not match any of the spectra from

25  the SigmaPharm tableted materials.  So I doubt very much the

1    limited detection was that high.

2    Q.    I'm not asking for your speculation here,

3    Dr. Apperley.  I have a very specific question.

4                In view of the limit of detection of your

5    experiments that you report in report 3, about half of the

6    apixaban in the tablet could be crystalline and your

7    experiments would not be capable of detecting it; correct?

8    A.    I don't think the results are consistent with that.

9    Q.    Okay.  You took a deposition in this case, right?  I

10   deposed you?

11   A.    Yes.

12   Q.    And you were under oath, right?

13   A.    Yes.

14   Q.    And you gave sworn testimony that day?

15   A.    Yes.

16   Q.    Do you recall in your sworn deposition testimony I

17   asked you the question --

18             MR. HENEGHAN:  Could I have a page --

19             MR. PRUSSIA:  Well, I'm first impeaching him

20   first and then we'll show the deposition.

21             THE COURT:  You can give him a page number.

22   He's asked for a page number.

23             MR. PRUSSIA:  Okay.  It's at 23, 1 to 6.

24             MR. HENEGHAN:  Thank you.

25             THE COURT:  Thank you.

1          MR. PRUSSIA:  So we'll go ahead and do it.

2     BY MR. PRUSSIA:

3     Q.     The question I asked you was:

4            "Question:  Well, so just to be clear, if the

5     limit of detection of your experiment is between 1 and

6     1.5 percent, that means if the crystalline material is below

7     that, it would not be detected by your experiment, right?"

8            And your answer was:

9            "Answer:  In that particular set of

10    experiments."

11           That was my question and that was your answer,

12    under oath, at your deposition.

13           Is that right?

14    A.     In that set of experiments, yes.

15    Q.     And the experiments we were talking about were report

16    3, right?

17    A.     Yes.

18    Q.     And so your experiments do not support the conclusion

19    that there is no crystalline apixaban in the SigmaPharm

20    tablet; is that right?

21    A.     I found no evidence of crystalline apixaban in my

22    measurements.

23    Q.     And you can't state in absolute terms there is zero

24    crystalline apixaban in the SigmaPharm tablets; correct?

25    A.     I'm not sure that's a fair question.  The experiments

```
 1    were not designed for that end.

 2    Q.      Fair enough.

 3            The extent of your opinions in this case is that

 4    there is no indication in the data set that it includes

 5    crystalline apixaban, right?

 6    A.      There is no indication in the data set that there is

 7    crystalline apixaban.

 8    Q.      And that conclusion, your opinion, is subject to a

 9    limit of detection of your experiments; correct?

10    A.      Correct.

11    Q.      Which allows for 50 percent of the apixaban to be

12    crystalline; correct?

13    A.      In that third set of tests.  The test -- the limit

14    will be lower in the second test I did.

15    Q.      Now, you're familiar with the term spinning

16    sidebands, right?

17    A.      Yes.

18    Q.      In report 2, you reference the presence of a spinning

19    sideband in your spectrum; correct?

20    A.      Yes.

21    Q.      And you were still able to interpret the spectrum

22    even with that spinning sideband present; correct?

23    A.      Yes.

24    Q.      Now, you could have moved the sideband if you needed

25    to by changing the spinning speed; correct?
```

1    A.      Within certain limits, yes.

2    Q.      But you didn't need to because the sideband didn't

3    interfere with your interpretation of the data; correct?

4    A.      Correct.

5    Q.      And the point is just simply this:  A skilled SSNMR

6    spectroscopist can interpret an SSNMR spectra even in the

7    presence of spinning sideband; correct?

8    A.      Provided it doesn't interfere with important

9    information, yes.

10   Q.      And a spinning sideband is not an unusual occurrence

11   in an SSNMR spectrum; correct?

12   A.      Correct.

13   Q.      Now if we turn back to report 1, focusing your

14   attention on that, you were not able to draw any conclusions

15   about whether crystalline apixaban was present based on your

16   experiments in that report; correct?

17   A.      That experiment, in that report, was purely designed

18   to see if apixaban approximately 3 weight percent was

19   detectible in tableted material.

20   Q.      So the purpose of that report was not to draw any

21   conclusions about the presence of crystalline apixaban in

22   the sample, right?

23   A.      Correct.

24   Q.      And the experiment was insufficiently sensitive to

25   detect crystalline apixaban; correct?

1   A.      It would have had a much higher limit of detection in

2   subsequent measurements.

3   Q.      Well, that particular experiment was insensitive --

4   was insufficiently -- strike that.

5           That particular set of experiments was

6   insufficiently sensitive to detect crystalline apixaban;

7   correct?

8   A.      Subject to the amount of crystalline material, if it

9   had been wholly crystalline, it would have detected it.

10          MR. PRUSSIA:  Can we show the report, please.

11          Paragraph 32.

12

13  BY MR. PRUSSIA:

14  Q.      In paragraph 32 you are describing your results from

15  report 1; correct?

16  A.      Yes.

17  Q.      And you state:  "My opinion of results from report 1

18  is summarized in Exhibit C.  Overall, apixaban within the

19  tablet can be observed.  However, the signal-to-noise ratio

20  of apixaban in the tablet under the conditions used as

21  described in report 1 is not sufficient to definitively

22  determine the crystallographic form of apixaban."

23          That's what you said in your report; correct?

24  A.      Yes.

25  Q.      And that's your opinion, right?

1    A.    Yes.

2    Q.    Now, to make the experiment more sensitive, you

3    needed to improve the signal-to-noise ratio; correct?

4    A.    Correct.

5    Q.    And the higher the signal-to-noise ratio, the more

6    sensitive the scan, right?  Or the experiment, right?

7    A.    Yes.

8    Q.    And a skilled SSNMR spectroscopist is always trying

9    for the highest signal-to-noise ratio; correct?

10   A.    Yes.

11   Q.    And that's because the higher the signal-to-noise

12   ratio, the more confidence a skilled SSNMR spectroscopist

13   has in the interpretation of the data; correct?

14   A.    Correct.

15   Q.    And so generally a spectrum produced at the higher

16   signal-to-noise ratio is more reliable than one with a lower

17   signal-to-noise ratio; correct?

18   A.    In general.

19   Q.    And one of the ways one could increase the

20   sensitivity of an experiment is by running the experiment

21   longer; correct?

22   A.    Correct.

23   Q.    And a second way is by increasing the sampling

24   material; correct?

25   A.    Correct.

Apperley - cross

1   Q.      And so generally an experiment with a longer

2   acquisition time using a larger sample holder will have a

3   higher signal-to-noise ratio than an experiment with a

4   shorter acquisition time and a smaller sample; correct?

5   A.      Could you clarify that, please?  Do you mean

6   accumulation time.

7   Q.      Thank you for that.  Let me restate my question.

8           And so generally an experiment with a longer

9   accumulation time using a larger sample holder will have a

10  higher signal-to-noise ratio than an experiment with a

11  shorter accumulation time using a smaller sample; is that

12  right?

13  A.      Correct.

14  Q.      Okay.

15          And in terms of sensitivity, just to be clear, a

16  higher signal-to-noise ratio is better than a lower one;

17  correct?

18  A.      Yes.

19  Q.      Shifting gears a little bit.  We talked about

20  distinguishing between crystalline and amorphous forms in

21  your direct.

22          In general, amorphous materials give broader

23  signals in carbon 13 SSNMR spectra than crystalline

24  materials; right?

25  A.      Yes.

1    Q.      And that's something that is well accepted in the

2    field; correct?

3    A.      Yes.

4    Q.      And you showed the Court a list of publications in

5    your demonstratives, right?

6    A.      Yes.

7    Q.      And you think that those references are reflective of

8    your expertise in solid state NMR spectroscopy, right?

9    A.      Yes.

10   Q.      And you selected them because you think that these

11   papers are, as you put it on your direct, relevant to your

12   analysis in this case; correct?

13   A.      They demonstrate experience in working with

14   pharmaceutical materials.

15           MR. PRUSSIA:  If we can put up PTX-371.  It's

16   Tab 9 in your binder if you want to look at it.

17   BY MR. PRUSSIA:

18   Q.      This is one of the papers that you selected to show

19   the Court in your demonstrative; correct?

20   A.      Yes.

21   Q.      And it's a paper regarding the characterization of

22   indomethacin and nifedipine using SSNMR; correct?

23   A.      Yes.

24   Q.      And your paper examined the crystalline and amorphous

25   forms of the drug substances; correct?

1   A.      Yes.

2               MR. PRUSSIA:  And if we turn to page 882 --

3   second page of the article, Tom.

4   BY MR. PRUSSIA:

5   Q.      One of the things that you observed in the paper is

6   that pharmaceutical companies would not in general choose to

7   formulate an amorphous drug substance --

8               MR. PRUSSIA:  Go up, Tom.  There we go.  The

9   sentence starting with "However."

10  BY MR. PRUSSIA:

11  Q.      One of the things that you observed in the paper is

12  that "Pharmaceutical companies would not, in general, choose

13  to formulate an amorphous drug substance by first intent

14  because of its metastable nature."

15              Do you see that?

16  A.      Um-hmm.

17  Q.      What did you mean by the metastable nature of

18  amorphous drug substance?

19  A.      I don't know.  I probably did not write that.  I was

20  only a coauthor on the paper.  I probably simply provided

21  the experimental data.

22  Q.      Do you have any understanding of what a metastable

23  nature of an amorphous drug substance refers to?

24  A.      Sorry.  Could you repeat that?

25  Q.      Do you have any understanding of what the metastable

Apperley - cross

1   nature of an amorphous drug substance refers to?

2   A.    I'm not entirely sure.

3   Q.    Okay.  Well, let's turn to Figure 7.

4        And Figure 7-D, at the very top, shows an SSNMR

5   spectrum that includes a mixture of amorphous and

6   crystalline nifidepine; is that right?

7   A.    Yes.

8   Q.    And you can visually observe that in the SSNMR by the

9   sharp peaks sitting on top of the broad amorphous peaks.

10       Do you agree with that?

11  A.    Yes.

12  Q.    And your article actually notes that in the text, if

13  we go down into the text in the left-hand column.

14       You state:  "However, the crushed glass

15  nifedipine spectrum," and you're referring to Figure 7-B,

16  "is a mixture of both broad lines (resembling the amorphous

17  spectrum) and sharp resonances (resembling the crystalline

18  spectrum) supporting earlier XRPD findings."  Correct?

19  A.    Correct.

20  Q.    So one can look, if we go back to the figure, Figure

21  7-D, one can visually observe in spectrum 7-D the presence

22  of crystalline peaks sitting on top of broad amorphous

23  peaks.  Correct?

24  A.    Correct.

25  Q.    Now, were you in the courtroom today when Dr. Munson

1    testified?

2    A.      No.

3    Q.      You completed your last experiment on February 26th

4    of 2019.

5            Does that sound about right?

6    A.      That sounds about right, yes.

7    Q.      And you never discussed your analysis with

8    Dr. Schurko; correct?

9    A.      Correct.

10   Q.      And your written reports in this case do not identify

11   a limit of detection for your experiments; correct?

12   A.      Correct.

13   Q.      You told me the limit of detection at your

14   deposition; correct?

15   A.      Yes.

16   Q.      And so you never told Dr. Schurko the limit of

17   detection of your experiments prior to submitting your

18   report in this case; correct?

19   A.      Correct.

20   Q.      As far as you know, he is not aware -- strike that.

21   Withdrawn.

22           MR. PRUSSIA:  No other questions, Your Honor.

23           THE COURT:  Okay.  Thank you.

24           Redirect?

25           MR. HENEGHAN:  Very briefly, Judge.  Thank you.

<strong>REDIRECT EXAMINATION</strong>

BY MR. HENEGHAN:

Q.     If we could see PTX-371, that article was just up.

            MR. HENEGHAN:  I'm not sure if you have it or we could have the other side throw it up so that we can see it?

            THE COURT:  We can have plaintiff put it up.

            MR. HENEGHAN:  Okay.  Same page of the one that was just up.

            So actually it's page 887.

            Oh, yes, there you go.

BY MR. HENEGHAN:

Q.     So this is the page of the -- I'm going to look at this so I pronounce it correctly -- indomethacin article that you were a coauthor on you were just asked about and a sentence was read to you.  I'd like to read the sentence above what was read to you.

            And it says:  "It can be clearly seen that in both cases, the resonances are significantly broader than those of the crystalline spectra because of the lack of long-range repeating order in the amorphous state, which results in a wide range of orientations and environments for the carbon atoms."

            That's a basic statement of difference between amorphous peaks and crystalline peaks, isn't it?

A.     Yes.

1  Q.      You were also asked some questions about your testing

2  and the limit of detection.  I just want to make sure the

3  record is clear here.

4          In your second set of tests, you determined that

5  the limit of detection was 1.5 percent; correct?

6  A.      That was based on the third set of tests.

7  Q.      My apologies.  I'm sorry.

8          So based upon the third set of testing, you

9  determined that your limit of detection was 1.5 percent;

10 correct?

11 A.      Under the conditions used for the third set of tests.

12 Q.      And the percentage of the apixaban in the SigmaPharm

13 tableted products is 3 percent, right?

14 A.      Yes.

15 Q.      You were also asked sort of a general question about

16 the ability to interpret NMR data for someone who is

17 experienced in the art.

18          Do you recall that, generally?

19 A.      Yes.

20 Q.      That it's possible to interpret data from NMR

21 spectra?

22 A.      Yes.

23 Q.      Something like that.

24          But that interpretation is subject to standards

25 and recognized limitations, rights?

1    A.      Yes.

2    Q.      You were also asked some question about whether or

3    not the signal-to-noise ratio can be improved by running a

4    longer accumulation on a larger sample.

5              Do you recall those questions?

6    A.      Yes.

7    Q.      And, in fact, in your second set of tests, you ran a

8    longer accumulation with a larger sample, didn't you?

9    A.      I did.

10   Q.      And was the signal-to-noise ratio increased with

11   those tests?

12   A.      Yes.

13              MR. HENEGHAN:  That's all I have.  Thank you.

14              THE COURT:  Thank you.  You can step down,

15   Doctor.

16              What are the defendants going to want to do

17   next?

18              MR. MIZERK:  Your Honor, we actually are

19   finished with who we've disclosed so far.  Our timing is

20   just a little bit off, but hopefully not too much before

21   Your Honor's -- I know you have another trial coming on

22   right after us as well.

23              THE COURT:  That will be fine to stop 15 minutes

24   early, but where are we going to start tomorrow at 8:30?

25              MR. MIZERK:  Yes.

1          THE COURT:  Who?

2          MR. MIZERK:  Oh, we still have -- we have two

3    more witnesses for SigmaPharm and then we'll be -- or I

4    think two or -- and we'll be done.

5          MR. HENEGHAN:  Then we turn it over to the two

6    other defendants.

7          THE COURT:  Right.  And who are the two that

8    we're starting with tomorrow?

9          MR. MIZERK:  Oh.  It will be Dr. Schurko and --

10         MR. HENEGHAN:  Actually, we have three because

11   we learned yesterday we had an out of order.  So it will be

12   Dr. Schurko, Dr. Zaworotko and then Dr. Zusman who was

13   supposed to testify later in the week but informed us

14   yesterday he has to get back for his clinic.

15         So it will be those three witnesses.

16         THE COURT:  Okay.  All right.  Thank you.

17         MR. HENEGHAN:  And I'd like know whatever the

18   change is.

19         THE COURT:  All right.  Any issues from anyone

20   on the defendants' side before we break?  No?

21         MR. KOCHANSKI:  No, Your Honor.

22         THE COURT:  Is there anything from plaintiff?

23         MR. LEE:  Nothing for the plaintiff, Your Honor.

24         THE COURT:  Then we'll look for you at 8:30

25   tomorrow.  Thank you.

1          (Proceedings recessed at 3:15 p.m.)

2

3          I hereby certify the foregoing is a true and accurate
transcript from my stenographic notes in the proceeding.

4

5                          /s/ Brian P. Gaffigan
                        Official Court Reporter
6                          U.S. District Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25