```
 1                      IN THE UNITED STATES DISTRICT COURT
                       IN AND FOR THE DISTRICT OF DELAWARE
 2
                                    - - -
 3     BRISTOL-MYERS SQUIBB COMPANY
       and PFIZER INC.,                        : CIVIL ACTION
 4                          Plaintiffs,        :
       v                                       :
 5                                             : (Consolidated)
       AUROBINDO PHARMA USA INC.,              :
 6                                             : NO. 17-374-LPS
                            Defendant.
 7
                                    - - -
 8
                                Wilmington, Delaware
 9                           Tuesday, November 5, 2019
                             Bench Trial - Volume E
10
                                    - - -
11
       BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge
12
       APPEARANCES:              - - -
13
                     FARNAN, LLP
14                   BY:  MICHAEL J. FARNAN, ESQ.

15                        and

16                   WILMER CUTLER PICKERING HALE and DORR, LLP
                     BY:  AMY K. WIGMORE, ESQ., and
17                        HEATHER M. PETRUZZI, ESQ.
                          (Washington, District of Columbia)
18
                          and
19
                     WILMER CUTLER PICKERING HALE and DORR, LLP
20                   BY:  WILLIAM F. LEE, ESQ.,
                          ANDREW J. DANFORD, ESQ.,
21                        TIMOTHY A. COOK, ESQ.,
                          KEVIN S. PRUSSIA, ESQ., and
22                        SHIRLEY X. LI CANTIN, ESQ.
                          (Boston, Massachusetts)
23
                                Counsel for Bristol-Myers Squibb
24                              Company and Pfizer Inc.

25     Valerie J. Gunning              Brian P. Gaffigan
       Official Court Reporter         Official Court Reporter
```

```
 1    APPEARANCES:   (Continued)

 2
                     PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
 3                   BY:  JOHN C. PHILLIPS, JR., ESQ.

 4                           Counsel on behalf of SigmaPharm
                             Laboratories, LLC; Unichem Laboratories,
 5                           Ltd., Zydus Pharmaceuticals (USA) Inc.,
                             Sunshine Lake Pharma Co., Ltd., and
 6                           HEC Pharm USA

 7                       and

 8                   HUSCH BLACKWELL, LLP
                     BY:  PHILIP D. SEGREST, JR., ESQ., and
 9                        DON J. MIZERK, ESQ.
                          (Chicago, Illinois)
10
                         and
11
                     HUSCH BLACKWELL, LLP
12                   BY:  THOMAS P. HENEGHAN, ESQ., and
                          DUSTIN L. TAYLOR, ESQ.
13                        (Madison, Wisconsin)

14                           Counsel on behalf of SigmaPharm
                             Laboratories, LLC
15
                         and
16
                     GREENBLUM & BERNSTEIN, P.L.C.
17                   BY:  P. BRANKO PEJIC, ESQ.,
                          PAUL A. BRAIER, ESQ., and
18                        JILL M. BROWNING, ESQ.
                          (Reston, Virginia)
19
                             Counsel on behalf of Unichem
20                           Laboratories, Ltd.

21

22

23

24

25
```

```
1    APPEARANCES:  Continued)

2
              YOUNG CONAWAY STARGATT & TAYLOR, LLP
3             BY:  KAREN L. PASCALE, ESQ.

4                 and

5             LERNER DAVID LITTENBURG KRUMHOLZ & MENTLIK, LLP
              BY:  PAUL H. KOCHANSKI, ESQ., and
6                  KENDALL K. GURULE, ESQ.
                   (Westfield, New Jersey)
7
                      Counsel on behalf of Sunshine Lake
8                     Pharma Co., Ltd., and HEC Pharm USA

9

10

11

12

13

14                         - oOo -

15                   P R O C E E D I N G S

16             (REPORTER'S NOTE:  The following bench trial was

17   held in open court, beginning at 8:40 a.m.)

18             THE COURT:  Good morning.

19             (The attorneys respond, "Good morning, Your

20   Honor.")

21             THE COURT:  Any issues plaintiffs want to raise

22   this morning?

23             MR. LEE:  One issue.

24             MS. WIGMORE:  One issue.

25             THE COURT:  Good morning.
```

1               MS. WIGMORE:  Your Honor, we just have one

2      objection to an exhibit to be used with Dr. Genck later this

3      afternoon.  The exhibit is DTX-412.  This is a claim

4      construction declaration by the witness himself so our

5      objection is hearsay.

6               THE COURT:  Okay.

7               Good morning.

8               MR. PEJIC:  Good morning, Your Honor.

9               First off, the document is not going to be

10     offered to prove the matter of the -- to prove the truth of

11     the matter asserted, and I also do not anticipate it

12     being -- attempting to move it into evidence.  So I don't

13     believe there should be a problem.

14              THE COURT:  Okay.  I think I will wait.  I

15     appreciate you raising it.  That's the practice, but given

16     that representation, I think I will defer ruling until we

17     see if it's used and if it is offered into evidence.

18              MS. WIGMORE:  Thank you.

19              THE COURT:  Anything else from the plaintiffs?

20              MR. LEE:  Nothing from the plaintiffs.

21              THE COURT:  Is there anything from defendants?

22              MR. HENEGHAN:  Just to hand up the exhibits for

23     the first witness --

24              THE COURT:  OKAY.  If there are no issues --

25              MR. HENEGHAN:  -- just to save time.

                              Schurko - direct

1              THE COURT:  -- you can call your witness.

2              MR. MIZERK:  Good morning, Judge.  SigmaPharm

3    will be calling Dr. Robert Schurko as its witness this

4    morning.  Mr. Heneghan will conduct the examination.

5              THE COURT:  Thank you.

6               ... DR. ROBERT SCHURKO, having been first duly

7    sworn, was examined and testified as follows ...

8              THE COURT:  Good morning, Dr. Schurko.  Welcome.

9              THE WITNESS:  Hello.

10             THE COURT:  You may proceed.

11             MR. HENEGHAN:  Thank you, Your Honor.

12                       DIRECT EXAMINATION

13   BY MR. HENEGHAN:

14   Q.    Good morning, Dr. Schurko.  Could you please state

15   your full name for the record?

16   A.    Yes.  My name is Robert Schurko.

17   Q.    Can you tell us about your educational background?

18   And we'll show some slides as you speak to follow on.

19   A.    Yes.  I did my undergrad bachelor's of science in

20   chemistry honors at the University of Manitoba in Winnipeg,

21   Manitoba, Canada, and finished in 1992.

22             I continued there with a master's in chemistry,

23   which I finished in 1994.

24             And then I obtained my Ph.D. in chemistry from

25   Dalhousie University in Halifax, Nova Scotia, in 1998, and

1   my thesis was entitled "Characterization of NMR Interaction

2   Tensors in Solids By Direct and Indirect Observation of

3   Quadripolar Nuclei."

4   Q.     And just for the record, what we're showing on the

5   screen are pages from DDX-10.

6          What have you been doing since earning your

7   Ph.D.?

8   A.     After I finished my schooling and two postdoctoral

9   periods, I began my professional academic career at the

10  University of Windsor in Windsor, Ontario, Canada, in the

11  Department of Chemistry and Biochemistry.  I was an

12  assistant professor until 2005, from 2000 to 2005, and then

13  I was promoted and tenured in 2005 and then promoted to full

14  professor in 2009.

15         And I was a Golden Jubilee Chair for the 50th

16  Anniversary of the University from 2014 to 2016.

17         I recently moved to Florida State University in

18  the Department of Chemistry and Biochemistry, and will be

19  assuming the directorship of the NMR users program at the

20  National High Field Magnetic Laboratory in Tallahassee,

21  Florida, in May 2020 upon retirement of the current

22  director.

23  Q.     And have you been the chair or the founder of any

24  conferences or seminars?

25  A.     Yes.  I've been quite active in that respect.  I was

1    a past chair of the Rocky Mountain Conference on magnetic

2    resonance.  I was a committee member there for eight or nine

3    years, and then I chaired the conference.  And this is, I

4    would say, probably the most significant or largest NMR

5    focused conference in the world.

6              I founded a conference on crystal engineering

7    and emerging materials called Crystal Engineering and

8    Emerging Materials in -- for Ontario, Quebec.  The nickname

9    is CEMWOQ, and I'm involved with running that conference on

10   the executive committee to this day.  And I currently sit on

11   the executive committee and scientific panel for the

12   experimental NMR conference which is one of the premier

13   conferences for NMR and magnetic resonance imaging in the

14   world.

15   Q.    What has been the focus of your work in your

16   professional career?

17             MR. HENEGHAN:  And let's look at 10.4.

18             Thank you.

19   BY THE WITNESS:

20   A.    I have used solid state NMR, but I -- my work is

21   primarily in solid state NMR spectroscopy, and I focus on

22   the development of methods and their applications to study a

23   wide range of materials, and I do have a particular recent

24   focus on organic compounds and organic solids like active

25   pharmaceutical ingredients or APIs.

Schurko - direct

1    Q.      And have you -- what has your research activity been

2    over the last years of your career?

3    A.      Over the course of my career, I have published

4    extensively.  I have 117 peer-reviewed publications.  To

5    date, I have 274 conference lectures and presentations.  And

6    outside of this, I have more than 90 invited lectures by

7    different universities, industry partners, and government

8    institutes.

9            And I have been consistently funded over the

10   course of my career with about 3.1 million as a PI at

11   Windsor out of a total of about 8.4 million, and I recently

12   obtained a startup package at Florida State University worth

13   $4.3 million to get my new research program started there.

14   Q.      And you mentioned publications.  Have you published

15   specifically in the field of solid state NMR spectroscopy?

16   A.      Yes.  Of the 117 publications that I have, all of

17   them are about solid state NMR except eight which focus on

18   solution NMR.

19   Q.      For the purposes of your testimony today, are you

20   comfortable with us referring to NMR knowing that in this

21   content we mean solid state NMR when we say that?

22   A.      Yes, that's fine.

23   Q.      Have you been retained by Defendant SigmaPharm

24   Laboratories in this matter to analyze the results of that

25   NMR testing of SigmaPharm's ANDA products?

Schurko - direct

1    A.      Yes.

2    Q.      Have you been retained by SigmaPharm to provide your

3    expert opinions regarding that work?

4    A.      Yes.

5    Q.      Do you believe that you possess the training,

6    education, and experience required to provide expert

7    opinions regarding the analysis of the results of that work?

8    A.      Yes.

9    Q.      And I'm showing you now on the screen what's been

10   marked as Defendant's Trial Exhibit DTX-644.

11           Is that a copy of your current curriculum vitae?

12   A.      Yes, it is.

13   Q.      And are the accomplishments and work you've just

14   described to us reflected in that curriculum vitae?

15   A.      To a point because this was from back in March.  I

16   just recently moved to Florida, so there's a few more

17   publications and additional funding that aren't accounted

18   for, but for the most part, this is accurate.

19   Q.      Meaning your new position at Florida State?

20   A.      At Florida State, yes.

21           MR. HENEGHAN:  Your Honor, we would like to

22   proffer Dr. Schurko as an expert in solid state NMR testing

23   and analysis.

24           MR. PRUSSIA:  No objection to that.

25           THE COURT:  He is so recognized.

1          MR. HENEGHAN:   Thank you.

2     BY MR. HENEGHAN:

3     Q.     I'd like to start briefly, Dr. Schurko, with your

4     conclusions in this case.

5             Did you analyze the results of NMR testing of

6     SigmaPharm's ANDA products?

7     A.     Yes, I did.

8     Q.     Who performed the NMR testing that generated the data

9     that you analyzed for your work in this case?

10    A.     The work was performed in one case by Dr. Matthew

11    Nethercott and then presented in a report by Dr. Eric

12    Munson, which is one thing I reviewed, and then I also

13    reviewed a report -- not a report, but I reviewed data from

14    Dr. David Apperley.

15    Q.     Did you perform or supervise any NMR testing yourself

16    in this matter?

17    A.     No, I did not.

18    Q.     What were you asked to do in this case?

19    A.     Basically to review the reports of Dr. Munson and the

20    data of Dr. Apperley.

21    Q.     Have you formed any opinions based on your analysis

22    of that data?

23    A.     Yes.

24            I think from all of the NMR data presented,

25    there is no evidence of the crystalline apixaban in the

Schurko - direct

1     SigmaPharm ANDA product.

2                It's also my opinion that Dr. Munson's opinion

3     that there is crystalline apixaban is not supported by the

4     data in his report.

5                And I also am of the opinion that Dr. Apperley's

6     data is indicative of the presence of a non-crystalline form

7     of apixaban.

8     Q.     Dr. Schurko, we're now placing Exhibit DTX-645 on the

9     screen.

10               Do you recognize this exhibit?

11    A.     Yes, I do.

12    Q.     What is it?

13    A.     This is the figures, I believe it's Exhibit C, from

14    my report.

15    Q.     Does Exhibit DTX-645 contain all of the data and

16    results of your work in this matter?

17    A.     Yes, I believe it does.

18    Q.     Let's advance to page 5 of that exhibit.

19               And could you tell us what this chart shows?

20    A.     Yes.  This is a depiction of a peak, and it's a

21    useful depiction of a peak in the sense that we can discuss

22    the three properties that are reported for defining a peak.

23               And if I may, these three properties can be --

24    I'll just point with the laser here in just a second, but we

25    have the intensities of the peak, and that's the area

1    underneath the peak, and then we have the position of the

2    peak which is in indicated by its top, and sometimes that's

3    called a chemical shift in NMR.

4              And then we also have the line width of the peak

5    which is also very important, and we measure that in this

6    diagram at what's called full width at half height.

7    Q.    Is this chart on page 5 of Exhibit DTX-645 a chart of

8    NMR tests from the materials actually tested for this case?

9    A.    No, this is strictly a schematic diagram.  But it's

10   also useful in the sense because the peak depicted here is

11   representative of what one would expect to see for a peak

12   resulting from a crystalline sample.

13   Q.    Can you please explain a little more completely those

14   parameters that you just identified for NMR?

15   A.    Yes.

16             So again, there are three parameters:

17   Intensity, position, and the shape of the peak.

18             And the intensity is basically described by the

19   area underneath the peak.  So the more area underneath the

20   peak, the more intensity you have.

21             The position of the peak, as I mentioned, NMR

22   people like -- it's the top of the peak here that is

23   important, and we call that the chemical shift.  The

24   chemical shift is useful for distinguishing between

25   different carbon 13 sites in molecules.

Schurko - direct

1              And then we have finally the line width of the

2    peak.  And the line width of the peak can be altered for a

3    variety of reasons, but of importance to this particular

4    case is the influence of crystalline versus amorphous

5    samples on line.

6    Q.      When looking at these parameters, what do they tell

7    you about a particular peak?

8    A.      Intensity, of course, is important because without it

9    a peak wouldn't be there.  And the intensity can also tell

10   us something about the amount of sample.

11              The chemical shift and the line width tell us

12   about chemical identities and other characteristics of the

13   sample.  And in particular today, we'll focus on the

14   difference between crystalline and amorphous.

15   Q.      So how does that information you just described

16   relate to your opinions in this case?

17   A.      The line width is something that's not much focused

18   on but it's very important because crystalline amorphous

19   samples will have very, very different line widths from one

20   another.

21              Crystalline samples will generally have sharper

22   line widths in comparison to amorphous samples.

23   Q.      And what causes that difference?

24   A.      In the case of the amorphous samples, because of the

25   lack of short range order, you normally have a distribution

Schurko - direct

1    of NMR interactions, typically a distribution of chemical

2    shifts which shifts to broaden the peak.

3    Q.      Let's turn ahead in this exhibit to page 9, and I'll

4    ask you what's depicted in this particular chart.

5    A.      This is a comparison of two spectra.  And in the top

6    we have the spectrum of crystalline -- a form of crystalline

7    nifidepine, and in the bottom we have a carbon 13 NMR

8    spectrum of an amorphous form of nifedipine obtained from

9    the amount.

10   Q.      So like your other illustration, this is not

11   apixaban, it's another substance --

12   A.      This is another substance.

13   Q.      -- used for illustration of what peaks are.

14   A.      That's correct.

15   Q.      To put it simply.

16   A.      Yes.

17   Q.      Oversimply probably.

18           What is the significance of what is shown in

19   this particular chart?

20   A.      Well, I think this is a nice real example of where

21   you can see that crystalline samples have sharp peaks, we

22   see that in the top, and amorphous samples have broad peaks

23   at the bottom.  And this also illustrates that one can make

24   a visual comparison, a very simple one, even a non-expert

25   can do this, can make a visual comparison between sharp

Schurko - direct

1    peaks and broad peaks in this case, and the main reason is

2    that the peaks are well dispersed.  There's a one-to-one

3    correspondence almost, not perfectly, but almost, and

4    there's no interfering signal which is the most important

5    thing.

6    Q.    Can you explain to us why there is no interfering

7    signal?

8    A.    This is a pure form of the pharmaceutical in both

9    cases in the sense that it's not mixed with an excipient

10   matrix or it's not in a tablet.

11   Q.    Would that situation be different if these were

12   spectra of a composition where the active drug ingredient

13   you were characterizing was a minor component compared to

14   the excipients?

15   A.    Yes, these spectra would appear very different in all

16   likelihood, and there would be a significant interfering

17   signal arising from the constituents of the tablet or the

18   excipient matrix.

19   Q.    Well, let's turn away from the general NMR and into

20   the specific and the results of NMR testing that was done

21   specifically for this case.

22   A.    Okay.

23   Q.    Do you have an opinion related to the SigmaPharm

24   product based on the NMR testing you have reviewed?

25   A.    Yes.

Schurko - direct

1          Based on the NMR testing that I reviewed, I do

2    not see any evidence in any of the spectra for the

3    crystalline form of apixaban in the SigmaPharm ANDA product.

4    Q.     Is that opinion based upon your analysis of both

5    Dr. Munson's work and Dr. Apperley's work?

6    A.     Yes, it is.

7    Q.     Let's talk about Dr. Munson's work first.

8    A.     Okay.

9    Q.     What work did you undertake in this matter related to

10   Dr. Munson's testing and analysis?

11          And just for ease of reference, when I talk

12   about Dr. Munson's testing, I mean the testing done at his

13   direction.

14          Fair?

15   A.     Right.

16   Q.     Okay.  What work did you undertake in relation to

17   Dr. Munson's testing and analysis?

18   A.     I read his reports, and I analyzed the data provided

19   by Dr. Munson.

20   Q.     Did you form any opinions regarding Dr. Munson's work

21   in this case?

22   A.     I did.

23          I found that none of the NMR spectra indicative

24   of the presence of crystalline apixaban in the SigmaPharm

25   ANDA form, and that Dr. Munson's opinion that this

1    crystalline form is present is not supported by his data.

2    Q.    Do the results of Dr. Munson's test support a

3    different conclusion than what he arrived at?

4    A.    Yes.  I believe that they indicate, in fact, the

5    presence of non-crystalline apixaban in the significant ANDA

6    product.

7    Q.    Okay.  Dr. Schurko, again, referring to that DTX-645,

8    at this point moving forward to page 27 of that document --

9               MR. HENEGHAN:  And let's not crop it so we leave

10   the caption showing.

11   BY MR. HENEGHAN:

12   Q.    What does this page of the exhibit show?

13   A.    This is a spectrum that I processed from Dr. Munson'S

14   data, and this is a carbon 13 spectrum of the BMS API.  So

15   this is a crystalline form of the apixaban.

16             And this spectrum is vertically expanded so that

17   we can examine features in the baseline of the spectrum.

18   Q.    You made a reference to BMS.  Is that a shorthand

19   reference to one of the plaintiffs here, Bristol-Myers

20   Squibb?

21   A.    Bristol-Myers Squibb, yes.

22   Q.    What did your examination of this particular spectrum

23   reveal?

24   A.    In the areas that I marked in gray, we see numerous,

25   what I would refer to as artifacts.  And if you compare

1    these to the peaks in the white areas, the peaks -- or in

2    the non-gray areas, the peaks in the non-gray areas are said

3    to be absorptive, and the artifacts that we have in the gray

4    areas, you can see that they go above and below the baseline

5    and they sort of create distortions all over the place.

6              And these can be problematic, especially when

7    you're looking for low signals arising from, let's say, a

8    pharmaceutical compound in a low-weight percent in a tablet.

9              MR. HENEGHAN:  Let's draw a red box around the

10   gray area to the left.

11   BY MR. HENEGHAN:

12   Q.     Is this one of the gray areas you were just referring

13   to?

14   A.     Yes.

15   Q.     What do these spectral artifacts and distortions

16   represent in that red box?

17   A.     These are sort of the residuals of what are known as

18   spinning sidebands which are a common artifact of solid

19   state NMR experiments, especially carbon ones that you

20   conduct under magic-angle spinning.

21             The CP TOSS pulse sequence was applied under

22   Dr. Munson's direction here to suppress these sidebands, but

23   we can see there is a fair amount of residual, distorted

24   signals in these spectrum.

25   Q.     And why is that significant in relation to your

 1   opinion about Dr. Munson's opinion?

 2   A.      I think it's not -- this spectrum just illustrates

 3   the fact that these distortions are there, but I think it is

 4   particularly problematic when we consider the spectra of the

 5   SigmaPharm tablet where there's the potential for these

 6   artifacts to distort and/or interfere with peaks that could

 7   be arising from a minor component of apixaban sample.

 8            MR. HENEGHAN:   Let's turn ahead one page to page

 9   28 of DTX-645.

10            Thank you.

11   BY MR. HENEGHAN:

12   Q.      Did you see the same thing that you've described in

13   the NMR testing Dr. Munson did of the SigmaPharm tableted

14   product?

15   A.      Yes, I do.

16            And if I may, I'll use the laser pointer again.

17   Q.      And is that what we're seeing here now?  Is that what

18   this graph is?

19   A.      Yes -- so I'll describe the picture first.

20   Q.      Thank you.

21   A.      This is the carbon spectrum now of the SigmaPharm

22   tablet, and it's conducted using the so-called TOSS

23   experiment, again, to suppress the spinning sidebands.

24            Now, for instance, peaks that we see here and

25   here are absorptive, these nice -- the peaks that have sort

Schurko - direct

1    of the nice sharp tops on them, but then we see artifacts

2    over here.  We see a peak of the opposite phase.  We see a

3    peak that goes above and below the baseline.

4              And, in fact, this peak is a -- what's known as

5    a spinning sideband of this massive peak which is from an

6    excipient known as povidone.

7              And, in fact, this peak will have a mirror image

8    buried somewhere underneath this portion of the spectrum.

9              And when you have something that big and that

10   distorted underlining a portion of the spectrum, where there

11   are crucial and important peaks that one is trying to use to

12   identify a particular form of apixaban in this case, this is

13   problematic.

14   Q.    You indicated that sort of mirror image to the right

15   of the povidone peak.  Approximately where would that

16   appear?

17   A.    At about 125 parts per million or so, but, in fact,

18   it would be quite broad.  It would cover quite a spectral

19   range because this is a fairly broad peak that you can see

20   here.

21   Q.    We will touch on this a little bit more later, but

22   did you see any distortion in the NMR spectra data you

23   analyzed from Dr. Apperley's testing?

24   A.    I did not see any distortions arising from this sort

25   of CP TOSS experiment, no.

Schurko - direct

Q.      Did Dr. Munson take these artifacts and distortions

into consideration in arriving at the opinions he has

expressed in this case?

A.      In relation to his own data, there was no mention of

these artifacts or distortions or how they might impact the

analysis of the this spectra.

Q.      Let's go forward now to page 33 of this same Exhibit

DTX-645, and I'll ask if you recognize this particular

chart?

A.      Yes, I do.

Q.      What is it?

A.      This is a comparison of carbon NMR spectra from

Dr. Munson that I processed.

        And in the red, in the red spectrum is of the

crystalline apixaban, the BMS sample, and the blue spectrum

is of the SigmaPharm tablet; and the blue spectrum is

vertically expanded to allow for comparison of those very

small peaks that you see labeled 1 and 2.

Q.      And does expanding the vertical scale make the width

of the peaks appear wider?

A.      No, it shouldn't, because we want to consistently be

able to measure the line width of the peak at its half

height no matter how far up it is extended.

Q.      What conclusions does Dr. Munson draw from this from

particular spectra?

Schurko - direct

1    A.      Dr. Munson claims that the peaks --

2             THE WITNESS:  I'm going to use the laser pointer

3    with your permission.

4             THE COURT:  That's fine.  Go right ahead.

5    BY THE WITNESS:

6    A.     The peaks that in the blue spectrum that are close to

7    peaks No. 1 and 2 in the red spectrum of the crystalline

8    sample are said to arise from crystalline apixaban present

9    in the tablet.

10   Q.     And what conclusions do you draw from these spectra?

11   A.      I disagree with this, and I say that these peaks --

12   there's no evidence that these peak arise from a crystalline

13   form of apixaban in the SigmaPharm tablet.

14   Q.      Let's take a look now one more page forward to

15   page 34 of DTX-645.

16            Would you please tell us what this chart shows?

17   A.      This is a comparison, again, of the apixaban in red

18   and the tablet in blue.  And this, in fact, is just an

19   expansion from the last spectrum where we're zooming in on

20   the peak that is labeled No. 1.

21            THE WITNESS:  And, again, I'd like to use the

22   laser pointer to discuss this?

23            THE COURT:  You may freely use it.

24            THE WITNESS:  Okay.

25   BY THE WITNESS:

Schurko - direct

1  A.      So we can see here that in crystalline sample, we

2  have a peak that matches the one earlier I talked about.  It

3  has a well-defined position.  It has intensity, obviously,

4  because we can see it, and we can clearly see at half height

5  the red peak, we can measure a line width here.

6          When we look at the blue spectrum, there is

7  clearly intensity, we can see a peak.  We can mark the

8  chemical shift.  It's a little bit different than peak 1,

9  but what's not possible here is because of all the

10 interfering signal and absence of a baseline is we don't

11 know how broad this peak is.  We don't know if it arises

12 from something sharp or if it arises from something that's

13 much broader.  It's impossible to comment here.

14          And so the blue spectrum is not a useful measure

15 in this case of determining whether or not one has

16 crystalline apixaban in the sample because there's the --

17 the information on line width, which is the most important

18 factor here, is absent.

19 Q.      And just to remind us, the blue line is the line for

20 the SigmaPharm tablet.

21 A.      That's correct.

22 Q.      Does Dr. Munson rely on that peak, the one you

23 labeled as No. 1, as part of his opinions?

24 A.      Yes.

25 Q.      And what does he say about it?

1    A.        Using No. 1 and comparing more or less the presence

2    of a similar shift, in the blue spectrum, he says this is

3    evidence of crystalline apixaban without reference to line

4    width, of course, which is important for distinguishing

5    crystalline in amorphous sample.

6    Q.        Is this graph different from that example, sort of

7    the illustration you used with the nifidepine?  How is it

8    different?

9    A.        The illustration I used with nifidepine, if you

10   recall, featured a comparison of spectra that had sharp

11   peaks for the crystalline and broad peaks for the amorphous.

12   But there was no interfering signal from any excipient that

13   would prohibit a clear visual comparison without any sort of

14   mathematical or statistical analysis.

15   Q.        Does the spectrum that are shown on page 34 of

16   Exhibit DTX-645 actually support Dr. Munson's conclusion?

17   A.        No, they do not.

18              MR. HENEGHAN:  Let's turn now to page 35.  The

19   next page.

20   BY MR. HENEGHAN:

21   Q.        The same for this one.  Does this chart, this is a

22   blowup of the second peak, the peak No. 2 you labeled

23   before, does this support Dr. Munson's conclusion?

24   A.        No, we run into much the same problem in that whereas

25   the blue peak does have intensity and a chemical shift that

1   is similar to that peak No. 2, it's not really possible to

2   determine whether this peak comes from a crystalline or

3   amorphous sample because the line width is simply too broad.

4   So assigning it to a crystalline sample doesn't work here.

5   Q.      Does your examination of any of Dr. Munson's data

6   lead you to any other conclusion?

7   A.      Well, I looked at all of the peaks he talked about

8   and numerous other ones that were obstructed by excipient

9   peaks, and none of them can be used to make the claim that

10  there is crystalline apixaban in the SigmaPharm ANDA

11  tablet -- or the SigmaPharm ANDA form, pardon me.

12              MR. HENEGHAN:  Let's turn forward in Exhibit

13  DTX-645 a couple pages to page 39.

14  BY MR. HENEGHAN:

15  Q.      What is this chart indicating to you?

16  A.      This is much the same thing as we just discussed

17  except we've moved into another region of the spectrum.  And

18  with -- again, we see peaks 1 and 2, they're identified

19  as -- these are in the red spectrum they're from the

20  crystalline sample and Dr. Munson is using a comparison of

21  the red spectrum and the blue spectrum to comment on the

22  presence of crystalline apixaban in the SigmaPharm tablet.

23              And it's my contention here that once again, for

24  instance, if you take peak 2, you have a significantly

25  broader line width that is quite visible.  In the case of

1    peak 1, you can see some definition of the line on the right

2    but then it's sort of ambiguous as to what happens

3    underneath; again, because of a lot of interfering signal.

4          So it's my opinion that these peaks in the blue

5    spectrum cannot be used in any -- with any sort of

6    confidence to claim that there is crystalline apixaban in

7    the SigmaPharm ANDA form.

8    Q.    And this is not a different view of the same 1 and 2.

9    This is a different peak 1 and different peak 2?

10   A.    This is a different peak 1, a different peak 2, and a

11   different region of the spectrum.

12   Q.    And again, the blue line is the SigmaPharm tablet?

13   A.    That's right.

14   Q.    Can the peaks in 1 and 2 be used -- in the blue

15   spectrum be used to identify crystalline apixaban?

16   A.    No, they can't.  There is simply too much interfering

17   signal and no reliable way here to comment on the line width

18   of the peaks which would be very important for identifying

19   crystalline form.

20   Q.    Did Dr. Munson do any sort of quantification of peaks

21   for any of the peaks that he reviewed?

22   A.    No.  In the cases we've just reviewed, the slides

23   we've just reviewed and several other cases I outlined in

24   the report, there is more or less just a comparison of

25   crystalline, x-ray -- comparison of the crystalline sample

1    and the SigmaPharm ANDA form, and then more or less just an

2    assertion that the peaks, because they have a roughly

3    matching chemical shift, correspond to the crystalline form

4    without reference to line width or any quantification.

5    Q.    Well, let's talk now about your review of the NMR

6    work done by Dr. Apperley in this case.

7    A.    All right.

8    Q.    I'm showing you now, turning ahead a couple of pages

9    to page 47 of DTX-645, can you explain to us what this chart

10   shows?

11   A.    Sure.  I'll deal with the bottom part of it first and

12   then we can move to the top part.

13   Q.    Bottom part meaning the bottom half of the page?

14   A.    Yes.

15   Q.    Okay.

16   A.    This part in the bottom here.

17   Q.    Right.  Thank you.

18   A.    So, right.

19   Q.    Oh, very good.

20   A.    That's fine.  Great.

21   Q.    Thank you.

22   A.    So what this is, this is a comparison of spectra from

23   Dr. Apperley, that's the red one on the top, and the blue

24   one is the spectrum from Dr. Munson, and I worked these up.

25          And there is a few things to note here.

Schurko - direct

1   Q.      Before you go any farther.

2   A.      Sure.

3   Q.      These are both spectrum of crystalline apixaban.

4   A.      These are both crystalline apixaban but different

5   samples.  Dr. Munson's was called BMS API, and I believe

6   Dr. Apperley's was called SP API, SigmaPharm API.  But they

7   are both crystalline apixaban samples.

8   Q.      Neither of these are the SigmaPharm product.

9   A.      No.

10  Q.      Go ahead.  I'm sorry.

11  A.      No, that's fine.  Clarification is good here.

12          So there are a few things to note.

13          One sees a good -- there's a good one-to-one

14  correspondence between all the speaks in the spectra.  You

15  can see this, by the way, if you expand it.

16          You will notice in the blue spectrum, once again

17  we see these distortions that we talked about earlier in the

18  spectrum of Dr. Munson.  Although they're not apparent in

19  the spectrum of Dr. Apperley, but you will also notice that

20  the spectrum of Dr. Munson has higher signal to noise than

21  that of Dr. Apperley.  And you can get away with this at

22  least qualitatively.  Visually you can see, for instance,

23  more noise in the red parts here than the blue parts here.

24          So there's higher signal to noise in

25  Dr. Munson's spectrum.

803

Schurko - direct

1   Q.      Why is the signal-to-noise ratio higher in

2   Dr. Munson's spectrum?

3   A.      For comparison of this particular set of samples,

4   Dr. Munson used a larger sample container, and I believe he

5   also required a larger number of scans.  And the more sample

6   you have, the more signal you get, so the more intensity;

7   and the more scans you view, the more signal you get, so

8   there's more intensity.

9   Q.      Is Dr. Apperley's spectrum still useful even though

10  it has a lower signal-to-noise ratio?

11  A.      Yes, it has a substantial signal to noise, and I do

12  make comparisons in the report that show there's a very good

13  correspondence between these two samples.

14  Q.      Let's look now at the -- I think it's the vertically

15  expanded view is how you refer to it.  It's the top half of

16  that page.

17  A.      Sure.

18  Q.      What do we see here?

19  A.      This is a vertical expansion, again, with the intent

20  of showing the difference in the baseline.  And this just

21  shows in much the same way as the spectra we just looked at

22  that you can see these distortions in these gray areas in

23  Dr. Munson's spectra resulting from the incomplete

24  suppression of sidebands, and we don't see these distortions

25  in Dr. Apperley's.  Though once again I would like to be

1    clear and point out here that the signal to noise is clearly

2    better in Dr. Munson's than it is in Dr. Apperley's for the

3    reasons we just discussed.

4                    MR. HENEGHAN:  Let's move forward to page 57 of

5    DTX-645.

6    BY MR. HENEGHAN:

7    Q.      What is this Exhibit?

8    A.      This is from Dr. Apperley's third set of tests, and I

9    can address the top and the bottom separately.  We'll focus,

10   I guess, on the bottom first.

11                   What's representative here are three spectra

12   that I acquired that were processed -- that I processed,

13   pardon me, that were acquired by Dr. Apperley.

14                   First, the blue one at the bottom is a carbon

15   spectrum of the placebo.  And what that means is this is

16   just like -- this is a tablet without any form of apixaban

17   in it at all, be it crystalline or amorphous.

18   Q.      And that's the blue?

19   A.      That's the blue one.

20   Q.      Okay.

21   A.      And then the green spectrum, which sits on top in

22   each case, is carbon spectrum that we were just talking

23   about actually, the pure crystalline apixaban.

24   Q.      Okay.

25   A.      And by pure, of course, all I mean by that is that

1    there is no excipient.

2    Q.    It's not mixed with anything.

3    A.    It's not mixed with anything.

4          And then -- so the representation in the middle,

5    the red one sandwiched between the blue and green, is a

6    mixture.  And if I recall correctly, this mixture is

7    3 percent by weight crystalline apixaban in the placebo.

8    Q.    So this is a mixture that Dr. Apperley made adding

9    crystalline apixaban to the placebo.

10   A.    Yes.

11   Q.    Okay.  What do these spectra tell us about those

12   three substances that were tested?

13   A.    Well, first it gives us a measure of all the

14   excipient constituents as you can see in the blue spectrum.

15         And then probably more importantly, it gives us

16   a fingerprint.  You can see the whole -- the green spectrum

17   is displayed almost in its entirety here.  You can see

18   there's really nice, beautiful high resolution peaks up here

19   in green, and so that gives us a fingerprint of the

20   crystalline form.

21         And then finally, what he's sort of doing here

22   is establishing sort of a qualitative limit of detection in

23   the sense that when you have a 3-weight percent sample when

24   we conduct this experiment, you can see peaks here that you

25   can visually match because there's no interfering signal.

Schurko - direct

```
 1    You can visually match them to the crystal form without

 2    fussing around, no analysis is necessary.  And you can --

 3    you can say with a high degree of confidence here, yes,

 4    there is crystalline apixaban in this mixture.

 5    Q.      And you referred to a 3 percent -- a 3-weight percent

 6    I think you said?

 7    A.      3-weight percent.

 8    Q.      That's how much crystalline apixaban Dr. Apperley

 9    added to that placebo?

10    A.      By weight, yeah.

11    Q.      By weight.

12    A.      So 3-weight -- 3 percent of the weight of the sample

13    is the crystalline apixaban and the rest is the placebo.

14    Q.      Does the SigmaPharm tablet that was tested by

15    Dr. Munson have a similar weight of apixaban?

16    A.      Yes, it's around 3 percent.  I think it might have

17    been cited as 3.12 percent, but yes.

18    Q.      And were the peaks in that view resolved to the same

19    degree as in the red line here?

20    A.      Can you repeat the question, please?

21    Q.      Were the peaks at the same positions in that sample

22    resolved to the same degree as they're resolved in this red

23    line?

24    A.      No.  We don't see resolution of peaks in Dr. Munson's

25    data comparable to what is seen here despite the samples
```

Schurko - direct

1  having very similar weight percent.

2  Q.     Is Dr. Apperley's approach, as demonstrated by these

3  charts, generally accepted when performing this kind of NMR

4  testing?

5  A.     Yes.  This is a fairly good standardization routine,

6  especially for samples that have low weight percents.

7  Q.     Let's turn forward to page 58 of Exhibit DTX-645, and

8  then please tell us what this chart shows?

9  A.     This chart shows exactly the same comparison, except

10  just in a different spectral region.  And once again, the

11  placebo spectrum is on the bottom.  There's no crystalline

12  APX.

13           The crystalline -- sorry, crystalline apixaban.

14           On top we have the spectrum of the crystalline

15  apixaban in green and once again, sandwiched in between, we

16  have the mixture.

17  Q.     What does the 14 and 15 represent at the top?

18  A.     The 14 and 15 indicate peaks for which we can

19  identify in the red spectrum and green spectrum as having

20  intensity and position that would indicate that apixaban is

21  present in the mixture.

22  Q.     Can these particular peaks be used to verify the

23  presence of crystalline or amorphous apixaban as you did for

24  the previous exhibit?

25  A.     I would hesitate to use these particular peaks to

Schurko - direct

1   make that identification because as will you notice in this

2   part of the spectrum, there is a fair amount of signal from

3   excipient.

4              And so one would either have to make sure that

5   you have a very high signal-to-noise spectra, or you have to

6   do some sort of analysis of line width or deconvolution or

7   preferably both.  That would be the best way to use these

8   types of peaks for this sort of analysis to confirm the

9   presence of crystalline apixaban in the SigmaPharm ANDA

10  product.

11  Q.      Did Dr. Munson rely on these types of peaks in

12  drawing his conclusion?

13  A.      Yes.  Some of the figures we described earlier relied

14  on peaks analogous to this to make the claim that there is

15  crystalline apixaban in the SigmaPharm ANDA product which I

16  disagree with.

17  Q.      And what did Dr. Munson's use of these kinds of peaks

18  lead you to conclude?

19  A.      I'm sorry.  You will have to repeat that one more

20  time.

21  Q.      What did Dr. Munson's reliance on these kind of peaks

22  lead you to conclude about his opinions?

23  A.      It led me to conclude that his opinion that

24  crystalline apixaban is present in the SigmaPharm tablet is

25  not supported by this sort of data due to the interfering

1   signals and the absence of any information on the line

2   width.

3   Q.      Dr. Schurko, after review of the work of both

4   Dr. Munson and Dr. Apperley, can you summarize for us how

5   their work in this case differ from each other?

6   A.      Yes, I can.

7           I think there's sort of several elements here.

8           I think the first problem is something we

9   focused on a lot today, and that is Dr. Munson relies very

10  heavily on simply identifying the intensity of the position

11  of a peak in the spectra of the SigmaPharm ANDA products,

12  and identifying it as matching with apixaban but then not

13  going so far as to use the most important measure, the line

14  width, as a way of determining whether the form is

15  crystalline amorphous.

16          There are many papers in the literature,

17  including his own, that make the comparison of line width

18  between crystalline amorphous to make the case that a sample

19  is crystalline amorphous and that's simply not done here.

20  And furthermore, there's no quantification done to prove

21  this.

22  Q.      Are there any other differences between Dr. Munson's

23  work and Dr. Apperley's work?

24  A.      I think the presence of artifacts we discussed today

25  is problematic.  These artifacts are present in Dr. Munson's

Schurko - direct

1    work and not in Dr. Apperley's, and their presence in

2    Dr. Munson's spectra does have some influence in being able

3    to interpret with confidence the carbon 13 NMR spectra of

4    the SigmaPharm tablet or SigmaPharm ANDA form because this

5    could cause distortion or interference with peaks.  And that

6    is really problematic when peaks are of low intensity.

7    Q.      Anything else between Dr. Munson's work and

8    Dr. Apperley's work?

9    A.      Yes.

10            I think the fact that Dr. Munson didn't really

11   do any sort of standardization or establish any limits of

12   detection with the care that Dr. Apperley did is troublesome

13   as well.  This would have been useful for establishing some

14   metrics for identifying the presence of crystalline

15   apixaban.  There currently are no metrics other than his

16   assertion that the peaks correspond to crystalline samples.

17            And then finally, I think the problem I had with

18   the report was there seems to be an inconsistency in the way

19   that certain experimental parameters were reported.  Some of

20   them were kind of buried in the data sets and had to be dug

21   out.

22            There seemed to be different sequences used for

23   spectra that were being compared.

24            There were different recycle delays.  That's the

25   delays between scans that are used for samples that are

Schurko - direct

1   compared which Dr. Munson, I think, acknowledges in some of

2   his work, can be important.

3              And this sort of thing just didn't occur in

4   Dr. Apperley's work where everything was done in a very

5   systematic and upfront fashion.

6              And so for me, that was also a bit of an issue.

7   Q.    Let's change topics just a little bit here.

8              And Dr. Schurko, your expert report also

9   addresses the accepted scientific meaning of the phrase

10  "solid amorphous dispersion."

11             What is your understanding of the composition of

12  an amorphous and solid dispersion of apixaban?

13  A.    My specific reference to that in my report, yes, has

14  to do with apixaban specifically.  And this is where Nause

15  teaches that the apixaban is -- in the amorphous solid

16  dispersion there could be up to 40 percent crystalline

17  apixaban, I believe.

18  Q.    You mentioned the Nause reference.  Do you recall the

19  citation to the Nause reference?

20  A.    No, I don't.

21  Q.    Well, would reviewing your expert report refresh your

22  recollection regarding that citation?

23  A.    Yes.

24             MR. HENEGHAN:  May I approach, Your Honor?

25             THE COURT:  You may.

Schurko - direct

```
 1              (Documents passed forward.)

 2              THE WITNESS:  Thank you.

 3   BY MR. HENEGHAN:

 4   Q.      And so, Dr. Schurko, if you could turn -- excuse me.

 5   I've handed you now a copy of your April 17th, 2019,

 6   responsive expert report in this case, and I'm going to ask

 7   you to turn to paragraph 46 on page 11.  And I don't want

 8   you to read it out loud.  Just refer to that to try to

 9   refresh your recollection.

10   A.      Page 11 -- sorry.

11   Q.      Paragraph 40 --

12   A.      46.

13   Q.      46.

14   A.      Okay.  Yes, I found it.

15   Q.      Okay.  And does, looking at that paragraph, refresh

16   your recollection regarding the citation to the Nause

17   reference?

18   A.      Yes.

19   Q.      What's that citation?

20   A.      That's the -- sorry, the 2012 numbers?

21   Q.      Yes.

22   A.      U.S. 2012/0087978, and then Nause in quotation marks.

23   And Nause is spelled N-a-u-s-e.

24   Q.      Thank you.

25              You can set that aside.
```

Schurko - direct

1          Dr. Schurko, were you present in the courtroom

2     yesterday when Dr. Munson testified?

3     A.     Yes.

4     Q.     Do you recall, excuse me.

5          Do you recall that the Court asked Dr. Munson

6     some questions about whether he had determined the amount of

7     amorphous apixaban contained in SigmaPharm's products?

8          Do you recall hearing those questions?

9     A.     Yes, I did.

10    Q.     Have you also reviewed all of Dr. Munson's reports in

11    this case?

12    A.     Yes, I have.

13    Q.     And did Dr. Munson offer any opinion anywhere in his

14    reports regarding the amount of amorphous apixaban contained

15    in SigmaPharm's products?

16    A.     To the best of my knowledge, no, he did not.

17    Q.     Is there any data contained in the work upon which

18    Dr. Munson has relied in this case that could be the basis

19    for making such a quantification?

20    A.     To the best of my knowledge, there is no quantitative

21    data of this type in the report.  No.

22    Q.     How would you characterize Dr. Munson's testimony

23    yesterday on that issue?

24    A.     I'd say --

25              MR. PRUSSIA:  Your Honor, I object to that

1    because that is outside the scope of his report.

2                    THE COURT:  Overruled.

3                    You can answer.

4                    MR. HENEGHAN:  Should I re-ask the question?

5                    THE WITNESS:  Can you repeat it again?

6                    MR. HENEGHAN:  Sure.

7                    MR. PRUSSIA:  Your Honor, also, the witness's

8    characterization of Dr. Munson's opinion is not relevant.

9                    THE COURT:  I will give it the weight it

10   deserves.  Thank you.

11                   You can answer the answer.

12   BY MR. HENEGHAN:

13   Q.    Now, would you characterize Dr. Munson's testimony on

14   that particular issue yesterday in court?

15   A.    Giving the absence of any quantitative data, I would

16   have to say it is purely speculative.

17   Q.    Dr. Schurko, what conclusions do you draw based upon

18   all of the NMR material you have reviewed in this case?

19   A.    Again, I see from all the NMR data no evidence of

20   crystalline apixaban in the SigmaPharm ANDA form.

21                   I, again, have to state I disagree with

22   Dr. Munson's opinion that there is this crystalline apixaban

23   in the SigmaPharm ANDA form largely because the data just

24   doesn't support it.  And I really think collectively the NMR

25   data supports the presence of a non-crystalline form of

Schurko - cross

1       apixaban in the SigmaPharm ANDA form.

2       Q.      Thank you, Dr. Schurko.

3               MR. HENEGHAN:  I don't have any further

4       questions, but, Judge, I'd like to move into evidence

5       DTX-644 and DTX-645.

6               THE COURT:  Any objection?

7               MR. HENEGHAN:  It's the CV and his attachment to

8       it.

9               MR. PRUSSIA:  Thank you.  No objection.

10              THE COURT:  Those are admitted.

11              (DTX-644, DTX-645 were admitted into evidence.)

12              THE COURT:  Cross-examination.

13              (Documents passed forward.)

14                      CROSS-EXAMINATION

15      BY MR. PRUSSIA:

16      Q.      Good afternoon, Dr. Schurko.  Good to see you again.

17      A.      Good to see you again, Mr. Prussia.

18      Q.      You did not do any SSNMR experiments yourself in this

19      case, correct?

20      A.      I'm sorry.  I didn't catch the front of that.

21      Q.      You did not conduct any SSNMR experiments yourself in

22      this case, correct?

23      A.      No, I did not.

24      Q.      Now, you could have, correct?

25      A.      I suppose I could have.

Schurko - cross

1    Q.      You chose not to, correct?

2    A.      I didn't choose not to.  I wasn't asked to.

3    Q.      And you didn't ask to yourself either; correct?

4    A.      No.

5    Q.      And you could have replicated Dr. Munson's tests if

6    you chose to, correct?

7    A.      The grammar of the question is puzzling to me.  Could

8    you?

9    Q.      You have been retained by SigmaPharm in this case,

10   correct?

11   A.      Correct.

12   Q.      And you have access to SigmaPharm's tablets, correct?

13   A.      I have never been given a tablet.

14   Q.      You have access to SigmaPharm's tablet as one of its

15   retained experts in this case, correct?

16   A.      I don't know.

17   Q.      You could have conducted an SSNMR experiment with

18   SigmaPharm's tablets, couldn't you have?

19   A.      I suppose if they would have asked me to, I could

20   have conducted experiments.

21   Q.      And you didn't, correct?

22   A.      I did not.

23   Q.      And you did not replicate Dr. Apperley's SSNMR

24   experiments, correct?

25   A.      No.

Schurko - cross

1    Q.       No, you didn't; correct?

2    A.       No, I did not replicate any experiments.  I didn't

3    conduct any experiments of any type with any connection to

4    this case.

5    Q.       Now, you have actually performed carbon 13 SSNMR

6    experiments on pharmaceutical tablets, correct?

7    A.       Yes.

8    Q.       And you agree that carbon 13 SSNMR is a good tool to

9    identify the presence of crystalline apixaban in a tablet;

10   correct?

11   A.       Yes, I do.

12   Q.       And carbon 13 SSNMR, in your view, can stand alone as

13   a method of gauging crystallinity, correct?

14   A.       In certain cases.

15   Q.       And carbon 13 SSNMR has been used extensively to

16   differentiate crystalline API from other materials in a

17   tablet; correct?

18   A.       Yes, it has.

19   Q.       And so you agree that carbon 13 SSNMR is a useful

20   tool to detect crystalline in the presence of amorphous API;

21   correct?

22   A.       Yes, I did.

23   Q.       And, in fact, you have tried to use carbon 13 SSNMR

24   to detect crystalline APIs of low drug loads in a sample;

25   correct?

```
 1    A.      Yes, I have.

 2    Q.      Now, you prepared demonstratives for the Court to aid

 3    your direct testimony; correct?

 4    A.      Yes.

 5    Q.      And Mr. Heneghan showed the Court one slide from that

 6    demonstrative; correct?

 7    A.      Yes.

 8    Q.      And if we pull up the remainder of the DDX slides.

 9            MR. HENEGHAN:  I guess I don't understand.  We

10    showed all of the slides in the testimony.  So I want to

11    make sure.

12            THE COURT:  I didn't catch that.

13            MR. HENEGHAN:  Maybe I misidentified the

14    question.

15            THE COURT:  Is there any --

16            MR. HENEGHAN:  I thought he said we showed one

17    slide --

18            THE COURT:  Well, you showed one slide among

19    many.

20            MR. PRUSSIA:  Among many.

21            MR. HENEGHAN:  Maybe I misunderstood.

22            MR. PRUSSIA:  We'll take a look at a few of the

23    slides.

24            THE COURT:  All right.

25    BY MR. PRUSSIA:
```

1   Q.      Let me ask the question.

2               Those demonstratives identified several

3   publications that you selected as representative of your

4   expertise as you think it's relevant to this case, correct?

5               MR. HENEGHAN:  I want to point out there is a

6   mistake on this slide that we fixed last night, so maybe we

7   should use our copy of the DDX.

8               MR. PRUSSIA:  Do you have your copy?

9               MR. HENEGHAN:  Yes.  Do you mind calling up DDX,

10  I think it's 10?  Just so that the error doesn't show up.

11              Thank you.

12              MR. PRUSSIA:  We can start with DDX-7, sir.

13              Thank you.

14  BY MR. PRUSSIA:

15  Q.      And these are publications that you selected to

16  include to identify for the Court your expertise in SSNMR;

17  correct?

18  A.      Yes.

19  Q.      And if we scan through the publications that you have

20  identified, there are 11 of them here.  I counted them.

21              Just based on the titles, you would agree with

22  me that none of them are focused on carbon 13 SSNMR;

23  correct?

24  A.      No, none of them focus on carbon 13.

25  Q.      They all relate to other nuclei like chlorine and

1   nitrogen and other types of NMR; correct?

2   A.      Yes, that is correct.

3   Q.      And so it's fair to say your specialty is with those

4   other nuclei, correct?

5   A.      Not exactly.  In fact, the reason I do these other

6   nuclei -- I'm very proficient at doing carbon because

7   there's nothing complicated about doing carbon.

8           The reason I do these other nuclei is for the

9   very reason we're seeing in this case today.  In some cases

10  the concentration of an API is so low that one can't

11  distinguish it clearly using carbon NMR from the excipients

12  because the excipients have so much carbon signal.

13          So we always run carbon NMR to try to help it

14  out, but oftentimes things like chlorine or nitrogen come to

15  the rescue and sort out the problem without any difficulty.

16  Q.      And the SSNMR experiments at issue in this case are

17  carbon 13 experiments; correct?

18  A.      In which case?

19  Q.      In this case.

20  A.      Yes.

21  Q.      This case --

22  A.      I thought you were talking about --

23  Q.      This litigation.

24  A.      I thought you were talking about my papers.

25  Q.      No, I'm sorry.

1              Just to clarify so we get it clear on the

2     record, the SSNMR experiments at issue in this litigation --

3     A.      Yes.

4     Q.      -- are carbon 13 experiments; correct?

5     A.      Correct.

6     Q.      That's what Dr. Munson ran; correct?

7     A.      Yes.

8     Q.      And that's what Dr. Apperley ran; correct?

9     A.      Yes.

10    Q.      And you will agree Dr. Munson has published more than

11    you on carbon 13, SSNMR; correct?

12    A.      Without question.

13    Q.      And you cite several of Dr. Munson's papers in the

14    technical background section of your expert report in this

15    case; correct?

16    A.      Yes, I do.

17    Q.      And in that technical background section of your

18    background report, you don't cite any of your own papers;

19    correct?

20    A.      No, I don't.

21    Q.      Now, let's actually talk about your work in this

22    case.

23              We agreed earlier that you didn't perform any

24    SSNMR experiments; correct?

25    A.      Yes.

Schurko - cross

1    Q.       And you did not design any of the experiments that

2    were conducted by Dr. Apperley; correct?

3    A.       That is correct.

4    Q.       Dr. Apperley performed all of his SSNMR experiments

5    without your input; correct?

6    A.       That's right.

7    Q.       And he conducted those experiments between January

8    and February of 2019; correct?

9    A.       I will have to take your word for it, but that sounds

10   correct.

11   Q.       Okay.  And he -- so he was done with his experiments

12   by February of 2019; correct?

13   A.       As I said, I think that's right, but I will have to

14   take your word for it.

15               MR. PRUSSIA:  Okay.  If we can pull up, Tom, his

16   report, Tab 7.  The paragraph 152.

17   BY MR. PRUSSIA:

18   Q.       If we could turn to paragraph 152, we have it on the

19   screen there, Dr. Schurko.

20   A.       Ah.

21   Q.       And it states:  "I understand SSNMR experiments

22   related to SigmaPharm's ANDA products were conducted by

23   Dr. Apperley at Durham University on or around the dates

24   ranging from January 21, 2019, to February 22, 2019."

25               Do you see that?

1    A.    Yes.  So I --

2    Q.    Does that refresh --

3    A.    I'm sorry.  Go ahead.

4    Q.    Does that your refresh your recollection, Doctor?

5    A.    Yes, it does.  Thank you.

6    Q.    And so Dr. Apperley was done with his experiments by

7    the end of February 2019, correct?

8    A.    Yes.

9    Q.    And you didn't receive Dr. Apperley's analysis until

10   April 10, 2019, correct?

11   A.    Again, the chronology escapes me.  If you want to

12   refresh my memory again, that would be fine.

13          MR. PRUSSIA:  Let's go to paragraph 154.

14   BY MR. PRUSSIA:

15   Q.    Do you want to take a look at the first sentence

16   there?

17   A.    That refreshes my memory, thanks.

18   Q.    Does that refresh your recollection that you didn't

19   receive Dr. Apperley's analysis until April 10, 2019?

20   A.    Yes.

21          MR. PRUSSIA:  You can take that down, Tom.

22   BY MR. PRUSSIA:

23   Q.    And just one week later, you signed your report in

24   this case; right?

25   A.    Yes.

1    Q.      So there was about a two month period between when

2    Dr. Apperley completed his experiments and when they were

3    provided to you; correct?

4    A.      Okay.  Yes.

5    Q.      And you had his work for just one week before forming

6    your opinions in this case, correct?

7    A.      Sorry.  I'm lost on the timeline again.

8            Can we -- I agree -- sorry.  Can I --

9    Q.      Yes.

10   A.      I had the data.

11           What date again?  April 10?  I forget.  I can't

12   remember.

13   Q.      I think we just looked at it in your report.  It said

14   April 10.

15   A.      April 10, okay.

16           So I have the data on April 10, and I submitted

17   in my report when?

18   Q.      On April 17th.

19   A.      Okay.

20   Q.      So you had the data for about one week; correct?

21   A.      Yes, that sounds right.  Now I'm good.

22   Q.      So about one week of time you conducted all your

23   analysis of Dr. Apperley's work; correct?

24   A.      Yes, that is correct.

25   Q.      All right.  And you did not speak to Dr. Apperley in

 1   connection with forming your opinions in this case; correct?

 2   A.      Not at all.

 3   Q.      And so at the time you submitted your report in this

 4   case, the only information that you had regarding

 5   Dr. Apperley's work is what is reflected in the four corners

 6   of his report; correct?

 7   A.      In the four corners?

 8   Q.      In the written document, sir.

 9   A.      Yes.

10   Q.      Okay.  You didn't consult with Dr. Apperley about his

11   analysis at all; correct?

12   A.      That's correct.

13   Q.      Eventually you did review Dr. Apperley's work;

14   correct?

15   A.      Apparently on April 10th.

16   Q.      And you rely upon his SSNMR data in connection with

17   forming your opinions in this case; correct?

18   A.      Yes.

19   Q.      And Dr. Apperley tested a SigmaPharm 2.5 milligram

20   tablet; correct?

21   A.      Yes.

22   Q.      And you don't dispute that the 2.5 milligram tablet

23   is representative of the 5 milligram SigmaPharm tablet;

24   correct?

25   A.      You will have to repeat that again.  I didn't -- I

1    won't dispute, what.

2    Q.      You don't dispute that the 2.5 milligram SigmaPharm

3    tablet is representative of the 5 milligram tablet?

4    A.      You mean in terms of their composition?

5    Q.      Composition, properties.

6    A.      I would say that is fine.

7    Q.      And Dr. Apperley conducted three sets of experiments;

8    correct?

9    A.      Correct.

10   Q.      Let's start with report 1.

11           Dr. Apperley did not identify a limit of

12   detection of the experiment he conducted on report 1;

13   correct?

14   A.      I don't think he provided a number for the limit of

15   detection, no.

16   Q.      And Dr. Apperley doesn't know the limit of detection

17   of the experiment he conducted on report 1; correct?

18   A.      I don't -- I can't speak for what Dr. Apperley knows

19   or doesn't know.

20   Q.      Were you here in court yesterday when Dr. Apperley

21   testified?

22   A.      No.

23   Q.      Have you ever spoken to Dr. Apperley about his work

24   in this case?

25   A.      No.

1  Q.      So you had no information regarding a limit of

2  detection of the experiments in report 1 at the time you

3  formed your opinions in this case; correct?

4  A.      But I think we have to clarify something here.

5          A limit of detection number, I can say with

6  confidence, I don't recall seeing the number.  I say that

7  with high certainty.

8          But I guess given the experiment that he did, he

9  was able to detect signal.  That looks like a qualitative

10 limit of detection.

11         So, I mean, he didn't provide a number, if

12 that's what you are trying to get at.

13 Q.      Okay.  So we agree that --

14 A.      There's no number.

15 Q.      -- there's no number.  All right.

16         And despite not knowing the limit of

17 Dr. Apperley's experiments, you are offering the opinion

18 that his report 1 provides evidence that the SigmaPharm

19 tablet does not contain crystalline apixaban.

20         That is your opinion, right?

21 A.      I think it's the basis, the culmination of the

22 reports 1, 2, 3 -- yes.  Or I'm sorry, the test sets 1, 2,

23 and 3.

24 Q.      And report 1 is one of them, right?

25 A.      Yes.

Schurko - cross

1    Q.      But that was not Dr. Apperley's conclusion, sir, was

2    it, regarding the --

3    A.      As I said, I based my conclusion on the cumulative

4    data from test sets 1, 2, and 3.

5    Q.      Well, Dr. Apperley explicitly concluded in his report

6    it is not possible to determine with any certainty whether

7    there is any crystalline material present; correct?

8    A.      Correct.

9    Q.      And Dr. Apperley also concluded in report 1 that the

10   signal-to-noise ratio under the conditions used there were

11   not sufficient to definitively determine the form of the API

12   in the tablets.

13           That was his conclusion; correct?

14   A.      That's in the spectrum of the tablet -- the

15   2.5 milligram tablet itself.

16   Q.      So Dr. Apperley's conclusion --

17   A.      No, but there's multiple spectra.  I don't know which

18   spectrum you are talking about.

19   Q.      I'm talking about report 1.

20   A.      But there's multiple spectra in report 1.  What --

21   Q.      And in report 1, his ultimate conclusion was that the

22   signal-to-noise ratio under the conditions used there were

23   not sufficient to definitively determine the form of the

24   API; correct?

25   A.      In the spectrum of the tablet.

Schurko - cross

1                MR. PRUSSIA:  Tom, can we pull up --

2    A.      Like --

3                MR. PRUSSIA:  -- DTX-549?

4                Can we go to page 3?

5                And the first sentence and the second sentence,

6    please.

7    BY MR. PRUSSIA:

8    Q.      Dr. Apperley states:  "The API does appear to be

9    detectable in the spectrum from the tablets.  The

10   signal-to-noise ratio, under the conditions used here, is

11   not sufficient to definitively determine the form of the API

12   in the tablets."

13               This was Dr. Apperley's conclusions.

14   A.      Right.  All I was trying to clarify is the latter

15   part of the first sentence, "from the tablets."

16               The signal-to-noise spectrum of the crystalline

17   form is just fine.  I just wanted to make sure what we're

18   talking about.

19   Q.      We're talking about the tablet spectrum.

20   A.      Okay.

21   Q.      Okay?

22   A.      Yes.

23   Q.      So with that understanding, you agree Dr. Apperley's

24   conclusion -- let's take a step back.

25               Your opinion with respect to the presence of

1    the -- the lack of the presence of the crystalline form of

2    apixaban is with respect to the tablet; correct?

3    A.     Yes.

4    Q.     And Dr. Apperley's opinion with respect to the tablet

5    in report 1 was that under the conditions used, it was not

6    sufficient to definitively make that conclusion.

7           That was his opinion regarding report 1;

8    correct?

9    A.     Yes.  It's not sufficient to determine the form of

10   the API in the SigmaPharm tablet.

11   Q.     Okay.  So you did not take into account

12   Dr. Apperley's conclusions regarding report 1 in forming

13   your opinions in this case, right?

14   A.     My opinions are based, as I said, on evaluation of

15   all the data.

16   Q.     So the answer is no; right?

17   A.     Repeat the question, please.

18   Q.     You did not take into account Dr. Apperley's

19   conclusions regarding his own report 1 in forming your

20   opinions in this case; correct?

21   A.     I think I said I based my opinions taking into

22   account all of the materials I looked at.  So if I looked at

23   that report, which I think I indicated that I probably took

24   that into account in my final conclusion.

25   Q.     And your opinion is opposite his with respect to

1    report 1; correct?

2    A.      I'm not sure about that.

3    Q.      Let's turn to report 2.

4            Dr. Apperley did not identify a limit of

5    detection of the experiment he conducted in his report 2;

6    correct?

7    A.      You would have to refresh my memory here.

8    Q.      You review --

9    A.      Oh, sorry.  The number again?

10   Q.      Yes.

11   A.      No.

12   Q.      Okay.  So we agree, just to be clear, we agree that

13   Dr. Apperley did not identify the limit of detection in

14   connection with his report 2; correct?

15   A.      He did not provide a number for a limit of detection.

16   Q.      And you had no information regarding the limit of

17   detection of the experiments in report 2 at the time you

18   prepared your opinions in this case; correct?

19   A.      Correct.

20   Q.      And despite not knowing the limits of Dr. Apperley's

21   experiments, you are offering the opinion that report 2

22   provides evidence that the SigmaPharm tablet does not

23   contain crystalline apixaban; right?

24   A.      Well, I believe, if you look carefully at the way I

25   worded my opinion, I say that there is no evidence that the

1    SigmaPharm tablet contains crystalline apixaban.

2            That is what we deal with, I think, in science,

3    is we have to be careful.  Like, you have to have

4    evidence -- there's a burden of proof to show in science

5    that something is there, something is not.

6            So if there's no evidence, then I'm safe in

7    saying there is no evidence that there is crystalline

8    apixaban in the sample.  That means I can disagree with

9    someone who's making the claim that there is crystalline

10   apixaban or whatever API there is in the sample because they

11   have the burden of proof.  They're making the claim.

12           So I think the way I have stated my conclusions

13   are actually very clear.

14   Q.    And so you stated your conclusion -- strike that.

15           So you agree that you cannot offer the opinion

16   in this case that there is absolutely zero crystalline

17   apixaban in the tablet; correct?

18   A.    Any scientist who uses the word "absolutely" is doing

19   his profession a disservice.  So I have to say that I would

20   never absolutely say anything.

21           What I will say is that based on all the data I

22   evaluated, there is no evidence for the presence of

23   crystalline apixaban in the SigmaPharm ANDA form.

24   Q.    And just to be clear, when you make that conclusion,

25   that's without knowledge of the limit of detection for

1    Dr. Apperley's report 2; correct?

2    A.      If there's no evidence for the presence of any peaks

3    arising from the crystalline form, because those peaks are

4    below the limit of detection, then it doesn't matter because

5    there's no evidence for the presence of those peaks.

6    Q.      Well, just to be --

7    A.      No one has provided a spectrum that gives the

8    appropriate signal, intensity or line widths or position

9    that are above what I would be considered -- I would

10   consider to be even a reasonable qualitative limit of

11   detection.

12           So there is no evidence in any case that there

13   is crystalline apixaban.  That's what I am basing my opinion

14   on.

15   Q.      And just to be clear, if it is below the limit of

16   detection, that means it cannot be detected; correct?

17   A.      Yes.

18   Q.      Now, let's turn to report 3.

19           Dr. Apperley did identify a limit of detection

20   for these experiments identified in his report 3; correct?

21   A.      Yes.  In preparing those mixed samples -- yes, I will

22   let you continue.  Go ahead.

23   Q.      Um-hmm.

24           But you weren't aware of the limit of detection

25   at the time you formed your opinions in this case; correct?

1  A.      I'm pretty sure I had access to all three test sets

2  so yes, I was.

3  Q.      Well, he didn't identify the limit of detection in

4  his report; correct?

5  A.      Oh, no.  But the limit of detection can be inferred

6  by the way the samples were prepared because he was spiking,

7  essentially, the -- I can't remember the exact numbers.  He

8  was spiking -- he had a sample that had a SigmaPharm tablet.

9  He was spiking a particular amount of crystalline form

10  enabled to -- in order to enable resolving -- sorry.  Can

11  I -- I garbled my sentence there.

12          He was spiking a crystalline form on top of the

13  SigmaPharm tablet to see if one could see both the presence

14  perhaps of crystalline peaks and amorphous peaks perhaps

15  superimposed on one another.

16          And he does an experiment, I think, that had an

17  80/20 ratio and then maybe a 53/47 or 50/50 or something

18  like that.  And in doing that, it would be nice to be able

19  to see the picture.  I know it's in my report and maybe it

20  is in his.

21          You can see that as you go from the crystalline

22  form and then reduce the amount of crystalline form that's

23  spiked in, after you get to about 20 percent, it seems to

24  become impossible to see any crystalline form.  You can't

25  detect it.

1          So there you're below the limit of detection.

2          And if you're below the limit of detection, then

3    there's no evidence that there's a crystalline form.

4    Q.    Now, did you know -- strike that.

5          You know, because I told you at your deposition,

6    right, that Dr. Apperley identified the limit of detection

7    in his report 3 as about 1.5 percent of the total tablet?

8    A.    Sure.

9    Q.    And did you know that yesterday, he testified in

10   court that that limit could be higher due to error; correct?

11   A.    Due to error?

12   Q.    Error.

13   A.    Oh, error.

14   Q.    Did you know that?

15   A.    What kind of error?

16   Q.    Well, he just didn't know how much error could be

17   incorporated into his limit of detection.

18   A.    Oh, I see what you mean.  I thought you meant an

19   error on his part.  You're meaning like a systemic error --

20   like an analytical chemistry error.

21   Q.    Exactly.

22   A.    Right.

23   Q.    And you would agree with that?

24   A.    Sure.

25   Q.    And that error would counsel in favor of the limit of

1    detection being actually higher than 1.5 percent; correct?

2    A.    Or lower than 1.5 percent.

3    Q.    Well, it could be higher.

4    A.    The error could work both ways.

5    Q.    We just don't know; right?

6    A.    We don't know.  It is completely speculative.

7    Q.    So if Dr. Apperley is correct about his own

8    experiments, that would mean that if about 50 percent of the

9    SigmaPharm tablet could be crystalline apixaban, it would

10   not be detected by his experiments; correct?

11   A.    I wouldn't -- I can't say that is correct.  I can't

12   speculate because I have to see the evidence that shows any

13   crystalline apixaban in the SigmaPharm ANDA product.

14   Q.    You just don't know; right?

15   A.    No, it's not that I don't know.  It's that I haven't

16   seen any evidence, and that's what I rely upon to make my

17   opinion.

18   Q.    Let's shift gears and talk about your analysis of

19   Dr. Munson' opinions.

20   A.    Sure.

21   Q.    So in forming your opinions about Dr. Munson's

22   analysis, you didn't actually use Dr. Munson's figures, did

23   you?

24   A.    I didn't.

25   Q.    In fact, all of the figures you showed the Court this

1    morning, none of those are actually Dr. Munson's figures;

2    right?

3    A.      Absolutely not.

4    Q.      Absolutely aren't -- meaning.

5    A.      They're not his figures.

6    Q.      Okay.

7    A.      Not at all.

8    Q.      Thank you.

9            So you chose to create your own figures with

10   Dr. Munson's data?

11   A.      Indeed, yes.

12   Q.      In creating your own figures using Dr. Munson's

13   data -- strike that.

14           In creating your own figures, you didn't process

15   Dr. Munson's data using the same parameters that he used;

16   correct?

17   A.      That's correct.

18   Q.      You chose to process his data using different

19   parameters; right?

20   A.      Different parameters and different points of view in

21   the spectra.

22   Q.      And one parameter that you changed was the line

23   broadening parameter; correct?

24   A.      Yes.

25   Q.      I want to make sure that was reported as a "yes"?

Schurko - cross

1    A.    Yes.

2    Q.    Okay.

3    A.    Line broadening, yes.

4    Q.    And is was an important parameter in assessing carbon

5    13 SSNMR spectra; correct?

6    A.    Yes, especially with regard to the line broadening.

7    Q.    And the reason the line broadening is an important

8    parameter is it will change the appearance of the spectrum;

9    right?

10   A.    Yes, it does.

11   Q.    And you chose to change the line broadening

12   parameters that Dr. Munson used to process his SSNMR data;

13   correct?

14   A.    No, I didn't choose to change them.  I chose to use

15   different lines to achieve a spectra that could be

16   interpreted in a more meaningful fashion.

17   Q.    To make the point that you were trying to make;

18   correct?

19   A.    Oh, no.  In fact, I processed the same spectra with

20   different line broadening and showed those results in

21   multiple locations in the reports to be fair about things

22   like signal to noise and influence on line widths.

23         What I didn't do is I -- you'll notice I zoom in

24   a lot, and the reason for zooming in is that allows for

25   careful identification of peaks.  What I don't rely upon is

1    maybe what we saw yesterday in court.  I don't rely upon

2    sort of bird's-eye view of the spectra where you can't see

3    any resolution, you can't see the impact of line broadening.

4           So I take spectral processing from multiple

5    points of view and with different sets of parameters very

6    seriously.  That's the lifeblood of all the carbon NMR I

7    have ever done and a lot of the prodigal NMR that I have

8    done.

9    Q.    Dr. Munson used 30 hertz of apodization, correct?

10    A.    I think that is correct.

11    Q.    And just to be fair, apodization is a different way

12    of saying line broadening; correct?

13    A.    I'll give you that, sure.

14    Q.    And you used zero line broadening; correct?

15    A.    No, I used zero in some cases.

16    Q.    In some cases.

17    A.    Yes.

18    Q.    Well --

19    A.    Some I used 30, some I used 0, some I used 100.

20    Q.    In all the cases you showed the Court today, that

21    was -- that data was processed using 0 hertz of apodization;

22    correct?

23    A.    I don't know.  We'd have to go through --

24    Q.    We'll get back to it.

25    A.    Sure.

1   Q.      The result is that you changed the appearance of

2   Dr. Munson's spectra; correct?

3   A.      Yes.  The appearance changes.

4           MR. PRUSSIA:  Let's put up PTX-1101, please.

5   BY MR. PRUSSIA:

6   Q.      And this is the SSNMR spectra that Dr. Munson -- it's

7   also in your Tab 15 of you want to take a look at it.

8   A.      I'm sorry?

9   Q.      It's in your book at Tab 15 of you want to look at

10  it.

11  A.      Oh, I can --

12  Q.      My only question is, this is the SSNMR spectra that

13  Dr. Munson submitted with his expert report; correct?

14  A.      Do you want me to look in my book.

15  Q.      If you want to familiarize yourself with it, but I'm

16  going to go directly to page 6 as example.

17  A.      Sure.

18  Q.      And this is one of Dr. Munson's spectra showing an

19  expansion of the SigmaPharm tablet spectrum; correct?

20  A.      Yes.

21  Q.      And Dr. Munson, I think we agreed, processed all of

22  his data with a 30 hertz line broadening; correct?

23  A.      I think the two spectra -- by "all" if you mean both,

24  yes, the two spectra.

25  Q.      And if we go to DTX-645.37, Tab 10 in your book, if

 1    you want to see it.

 2              This is your spectrum of Dr. Munson's data with

 3    a process of 0 hertz of line broadening; correct?

 4    A.     That's correct.

 5    Q.     That has that right there on the page; correct?

 6    A.     Yes.

 7    Q.     And if we go to PDX-8.1, we can see -- we can see

 8    here the two spectra side by side; correct?

 9    A.     Yes.

10    Q.     And they look entirely different, don't they, sir?

11    A.     Entirely, no.

12    Q.     Well, yours is a much noisier.  Wouldn't you agree?

13    A.     Right.  Absolutely.  It's processed intentionally

14    that way, and I believe I say why I do that in the text.

15    I'd have to review the text to remember the particular logic

16    for this spectrum.

17              But one will notice the other trace matches

18    almost identically.  I think why I would have done this in

19    the first count was just to get an assessment of signal to

20    noise versus the crystalline form of the -- this is very

21    routine to process with different sets of parameters to see

22    what sort of influence your line broadening in particular is

23    having on the line width.

24    Q.     And you discounted Dr. Munson's opinions based on

25    what you considered to be a low signal-to-noise ratio;

1    correct?

2    A.      No.   I'm discounting his opinions based on -- well,

3    actually, the signal-to-noise ratio is unmeasurable in

4    certain cases.

5             I discounted opinions based on the peaks being

6    obscured by interfering signal and an absence of

7    measurements of line width, and in some cases the inability

8    to measure the signal to noise because of all the

9    interfering signal.

10            MR. PRUSSIA:   Can we go back to DTX-645.37, Tom.

11            So page 37.

12   BY MR. PRUSSIA:

13   Q.      This is the spectrum we were looking at -- the

14   spectra we were looking at earlier that was depicted in my

15   PDX; correct?

16   A.      Yes, it is.

17   Q.      And the blue line is the tablet line; correct?

18   A.      Yes, it is.

19   Q.      And --

20   A.      May I take a moment to look at the folder?

21            THE COURT:   Take your time.

22   BY THE WITNESS:

23   A.      Can you tell me what section this is, please, in the

24   folder?  What tab?

25   Q.      It's Tab 10 in your binder.

1    A.      Tab 10.

2    Q.      It's DTX-645.  It's page 37.  It's Figure 8.C.132.

3    A.      DTX-645 -- sorry.  Say it again?

4    Q.      Sure.  37.

5    A.      37.  Ah.  Okay.

6            Sorry.  Continue with what you were saying.

7    Q.      Sure.  Sure.

8            And the blue line, just to be clear, is

9    Dr. Munson's tab of data reprocessed at a different line

10   broadening; correct?

11   A.      Yes.

12   Q.      If we go to your report, if we go to Tab 7 in your

13   report, paragraph 132 --

14   A.      Yeah.  Yes.

15   Q.      -- your conclusion was:  "The SNR in this area of

16   Dr. Munson's spectrum of the SPT, which is a SigmaPharm

17   tablet, appears to be very low and is not possible to obtain

18   a meaningful estimate of the SNR for several peaks."

19           Do you see that?

20   A.      Yes, but you are taking that out of context because

21   you are not showing the figure that follows.  133.

22   Q.      Sir, Dr. Munson used 30 hertz of apodization for all

23   the spectrum?

24   A.      Yes.

25   Q.      Dr. Apperley used 30 hertz of apodization in his

1   experiments in report 3; correct?

2   A.      Yes.

3   Q.      And in providing your opinions in this case, you

4   chose not to analyze Dr. Munson's data under the same

5   parameters that he did; correct?

6   A.      No, that is not true.  Because in Figure 133, the one

7   that follows this, I showed the effect of increased

8   apodization.  I think I used 20 or 30.  I can't remember.

9               But I think we're just -- you are cherry-picking

10  one example here and taking --

11  Q.      Well, let's see if we're cherry-picking.

12              MR. PRUSSIA:  Let's go to -- in this document,

13  Tom, let's go to --

14              THE WITNESS:  I'm not sure why --

15              MR. PRUSSIA:  -- figure 123 --

16              THE COURT:  Hold on.  Hold on.  There's no

17  question asked.

18              MR. PRUSSIA:  -- which is at page 33 of this

19  document, Tom.

20  BY MR. PRUSSIA:

21  Q.      And you showed this page of your report to the Court

22  today; correct?

23  A.      Yes, correct.

24  Q.      And this spectra includes data from Dr. Munson that

25  you reprocessed at 0 hertz line apodization; correct?

1    A.     Yes.

2    Q.     Which is different than the 30 hertz that Dr. Munson

3    used; correct?

4    A.     Yes.

5    Q.     Let's go to the next one you showed the Court.

6               MR. PRUSSIA:  124, the next page, Tom.

7    BY MR. PRUSSIA:

8    Q.     This is spectra that you created from Dr. Munson's

9    data using a different line broadening parameter than he

10   did; correct?

11   A.     Yes.

12   Q.     0 versus 30; correct?

13   A.     Yes.

14   Q.     Let's go to the next one you chose to show the Court.

15   126.

16               This is data, this is spectra that you

17   processed, reprocessed with line broadening parameter,

18   different than what Dr. Munson used; correct?

19   A.     Yes.  But I think --

20   Q.     Zero versus --

21   A.     -- I think I should be allowed to state why I did

22   this because --

23   Q.     Your lawyer --

24   A.     -- multiple times that I processed something

25   differently isn't helpful to instructing the Court.

```
 1                  THE COURT:  Dr. Schurko, your attorney will have

 2      a chance to ask you questions, if you want.

 3                  THE WITNESS:  Oh, I'm sorry, Your Honor.  Okay.

 4                  THE COURT:  Just answer the question.

 5                  THE WITNESS:  Sorry.

 6                  MR. PRUSSIA:  My only question was --

 7                  THE WITNESS:  I'm sorry, I didn't mean to --

 8                  (The court reporter interposes.)

 9                  THE COURT:  Let's wait for a question.

10      BY THE WITNESS:

11      A.      Can you repeat it?  I'll let you continue.  I'm

12      sorry.

13      Q.      My only question, Dr. Schurko, you chose to show the

14      Court spectra that you created using processing parameters

15      that were entirely different what Dr. Munson used; correct?

16      A.      Yes.

17      Q.      And you said it was cherry-picking; right?

18      A.      Well, you're showing examples where the parameters

19      don't match.

20      Q.      I'm going to go through each and every single figure

21      you showed the Court this morning.

22      A.      Okay.

23      Q.      So we looked at 123.  We looked at 124.  We're

24      looking at 126.

25                  MR. PRUSSIA:  Let's go to 134, Tom.  It's on
```

Schurko - cross

1    page 39.

2    BY MR. PRUSSIA:

3    Q.      Again, this is spectra that you reprocessed using a

4    line broadening parameter that was different from what

5    Dr. Munson used; correct?

6    A.      I'll talk your word for it.

7    Q.      0 versus 30; correct?

8    A.      On the red spectrum?

9    Q.      Tablet spectrum, yes.

10   A.      On the tablet spectrum -- I don't know.  I'm not

11   sure.

12   Q.      You don't know.

13   A.      If you dug it out and that is what I said in my

14   report, I'll have to trust you.

15   Q.      Okay.  Let's move on.

16           Now, let's move to a slightly different topic.

17           Do you recall testifying what you referred to as

18   spectral artifact interference I think is the word you used

19   during direct.

20           Do you remember that?

21   A.      Yes, spectral artifacts or interfering signal.  Sure.

22   Q.      And one of the artifacts that you talked about

23   appears around 126 -- 126 ppm.

24           Do you remember that?

25   A.      You will have to guide me --

1   Q.      You describe it --

2   A.      Oh, oh, oh.  I'm sorry.  Yes.  Today.  Yes.

3   Q.      And this is an artifact you describe as a spinning

4   sideband that arises from an excipient, right?

5   A.      Yes.

6   Q.      And the excipient is povidone; correct?

7   A.      Yes.

8   Q.      You agree that Dr. Munson was actually aware of that

9   spinning sideband; correct?

10  A.      I'm not sure he mentioned it in his first report.

11  Q.      You were here when he testified in court yesterday;

12  right?

13  A.      Yes.

14  Q.      And you heard him explicitly acknowledge the presence

15  of that spinning sideband; correct?

16  A.      I can't remember.

17  Q.      You testified about two additional supposed artifacts

18  of Dr. Munson's.  There's one at 60 and one at 95 ppm;

19  correct?

20  A.      I did or he did.

21  Q.      You did.

22  A.      Today I -- I'm sorry.  Could you repeat the question?

23  Q.      You testified about two additional supposed artifacts

24  in Dr. Munson's spectra, one between -- between 60 and 95

25  ppm?

Schurko - cross

1    A.      Do you mean today in the spectral with the gray

2    boxes?

3    Q.      Sure.

4    A.      I'm talking -- I can't remember the shifts.

5    Q.      All right.

6    A.      Yeah.

7    Q.      And you think that these additional artifacts may

8    arise from excipient peaks.  Is that your testimony?

9    A.      Not in the spectra I showed today of the gray boxes.

10   Those were the pure -- that was the pure pharmaceutical.

11   Q.      Okay.  So let's talk about the artifacts that you in

12   your report say may result in excipient peaks.

13           Do you have that in your mind?

14   A.      Yeah, I think the only one that was brought up today

15   was the 125 peak.

16   Q.      Okay.  Now at the time you formed your opinions in

17   this case, you didn't know all of the ingredients in the

18   preparation of SigmaPharm's tablet; correct?

19   A.      I think I did.  I can't remember the timeline of

20   knowing that.

21           MR. PRUSSIA:  Can we pull up his deposition,

22   please.  81, line 11, to 82, line 9.

23           THE WITNESS:  Where is that?

24           THE COURT:  They're going to show you.

25           THE WITNESS:  Oh.

 1   BY MR. PRUSSIA:

 2   Q.      And there's a broken question, I suppose.  And you

 3   can read your answer, all of it.  And I'm going to focus

 4   your attention on the last sentence that appears starting on

 5   page 82, line 5 through 9.

 6               "The reason I can't say with confidence that

 7   it's there or not and limit myself to may is that I don't

 8   know all the other constituents of the preparation."

 9               Do you see that?

10   A.      Oh, yeah.  If you don't mind, I'd like to read the --

11               MR. HENEGHAN:  Objection --

12               THE COURT:  Hold on.  Only one at a time.

13               MR. HENEGHAN:  I have an objection.

14               THE COURT:  What's the objection?

15               MR. HENEGHAN:  That this is actually not

16   contrary to his testimony, and also for completeness I think

17   the entire answer ought to be read.

18               THE COURT:  The witness has asked for time to

19   read it.  Let's let him read it and then we'll see where

20   we're at.

21               MR. HENEGHAN:  Okay.

22               THE COURT:  Do you want to take your time to

23   read it, go ahead.

24               THE WITNESS:  Yes.

25               (Pause.)

Schurko - cross

1    BY THE WITNESS:

2    A.      Yeah, this is really, again, sort of out of context

3    because -- in fact, I don't think this is even talking about

4    the povidone peak.

5            I've read my deposition carefully, and so even

6    though the start of this paragraph says, "So that would be

7    in reference, for instance, to povidone," I believe I'm

8    actually talking about carbons in this section that are at

9    much lower chemical shifts.

10           So I think this is completely out of context and

11   I hesitate to give any clear answer on this.

12   Q.      All right.  Let's move on.

13           You provided some testimony this morning about

14   line widths of peaks; correct?

15   A.      Yes.

16   Q.      And you will agree that it's not necessary to measure

17   the line width of the peak in a carbon 13 SSNMR spectra to

18   determine whether the peak is due to crystalline material;

19   correct?

20   A.      That is correct, but only in the case where the peak

21   is unobstructed.

22   Q.      Just to be clear, you're not making the claim that it

23   is necessary to measure line widths; correct?

24   A.      No, not in all cases.

25   Q.      And that's because you are not aware of a single

1    reference in all of the literature that says measuring line

2    width is necessary to assess if a peak is due to the

3    presence of crystalline material; correct?

4    A.      It's not necessary to measure a line width to assess

5    that if you can make a clear visual distinction, but there

6    are numerous papers, including ones by Dr. Munson, where

7    line width measurements are made.

8              So no, I'm not aware of a paper that has that

9    explicit statement.

10   Q.      It was done, but there's nothing in the literature

11   that says you need to; correct?

12   A.      No.

13   Q.      Correct?

14   A.      You are correct.

15   Q.      Okay.  Thank you.

16   A.      You are correct.  There is nothing in the literature

17   that has any statement of that sort.

18   Q.      Just a few more questions, Dr. Schurko.

19              You have not provided any opinions about XRPD;

20   correct?

21   A.      Today you mean, or in the deposition.

22   Q.      In this case.

23   A.      No, I think we have a discussion on it in the

24   deposition if I -- yeah, we did.  But I haven't provided in

25   my report an opinion, no.

Schurko - cross

```
1   Q.      And you're not providing an opinion about whether the
2   SigmaPharm tablet infringes the '945 patent; correct?
3   A.      No.
4   Q.      And you are not providing an opinion about any
5   validity issues in this case; correct?
6   A.      No.
7   Q.      And that is with respect to either the '945 or the
8   '208 patent; correct?
9   A.      No.  I mean, yes, you are correct.
10  Q.      You are not providing any opinions with respect to
11  the infringement of the '208 patent; correct?
12  A.      That is correct.
13  Q.      All right.  Just a few more.
14              If you want to take a look at the patent, JTX-2,
15  claim 12.  It should be in your binder at Tab 2.
16              Do you want to take a look at it?
17  A.      Okay.
18  Q.      And we have claim 12 on the screen.
19              And the claim states, in part:  "Wherein
20  apixaban comprises crystalline apixaban particles."
21              Do you see that?
22  A.      Yes.
23  Q.      And in forming your opinions in this case, you didn't
24  review the Court's claim construction order; right?
25  A.      Sorry.  You will have to define what the claim -- I
```

854

Schurko - cross

```
 1    think we went through this in my deposition, too and I --

 2    oh, wait.  Is claim construction where -- claim construction

 3    is where the Court -- the Judge has to sort of decide what

 4    the definition of everything is -- I'm sorry.

 5    Q.    No, that's a good way to put it.  That's right.

 6    A.    Yeah?

 7    Q.    And you didn't review that order in connection with

 8    forming your opinions in this case?

 9    A.    No.

10    Q.    "No" meaning I'm right?

11    A.    You're right.

12    Q.    Okay.  Thank you.

13          So in forming your opinions in this case, you

14    didn't understand claim 12, the claim we're looking at, to

15    require that all of the apixaban in the tablet needed to be

16    crystalline; correct?

17    A.    I'll need your question reported again.

18    Q.    Sure.

19          In forming your opinions in this case, you

20    didn't understand claim 12 to require all of the apixaban in

21    the tablet to be crystalline; correct?

22    A.    Correct.

23    Q.    And in forming your opinions in this case, you didn't

24    consider whether the claims require a certain amount of

25    crystalline apixaban to be present in the tablet; correct?
```

Schurko - redirect

1    A.      Correct.

2    Q.      In forming your opinions in this case, you considered

3    the quality of the NMR data and whether it revealed the

4    presence of any crystalline apixaban at all to be enough;

5    correct?

6    A.      Yes.

7    Q.      That's how interpret the claim; correct?

8    A.      That is -- sorry.  The claim --

9    Q.      The patent.

10   A.      The patent claim?

11   Q.      Yes.

12   A.      No.  No, that is in my own -- in my report, the only

13   evidence I rely -- or sorry.

14           The only claim I am making is I don't think this

15   crystalline apixaban is present because I see no evidence

16   for it.  Evidence is necessary to convince me that that form

17   is present.

18   Q.      Okay.

19           MR. PRUSSIA:  No further questions, Your Honor.

20           THE COURT:  Okay.  Redirect.

21           MR. HENEGHAN:  Yes.  Thank you.

22                    REDIRECT EXAMINATION

23   BY MR. HENEGHAN:

24   Q.      Now, Dr. Schurko, your opinions in this case are not

25   based at all on the language of the patent; right?

Schurko - redirect

1   A.      No.

2   Q.      Your opinions are based upon the data you reviewed.

3   A.      The data I reviewed and that's it.

4   Q.      Why did you run some of your tests with parameters

5   different from Dr. Munson?

6   A.      At several points in the report, we were just

7   discussing I think 132 and we didn't see 133, and in some

8   cases I processed the spectrum differently to get an

9   assessment of sort of the noise level and not to

10  artificially broaden the peaks because we're trying to

11  make -- we're trying to put the best case forward for

12  detection of crystalline or amorphous form.  And in some

13  cases it is necessary to enhance the signal to noise so I'll

14  use a higher line broadening similar to what Dr. Munson did.

15          So enhancing the signal to noise in figure --

16  this is going to be, I guess it's DTX-37 and 38 of --

17  Q.      Would you like me to put something on the screen?

18  A.      Sure.

19  Q.      That is actually --

20  A.      If that is possible.

21  Q.      It is actually DTX-645, pages 37 and 38.

22  A.      Sorry.

23  Q.      That's all right.

24          So here is page 37.

25  A.      Right.

1          So here is a spectrum that is processed with

2    no line broadening.  And what I'm trying to do here is --

3    the blue spectrum, I mean, and this is what I think I was

4    discussing with Mr. Prussia, and the intent here isn't to

5    make the blue spectrum look horrible, it's to really sort of

6    have the natural line width present for comparison, for

7    potential candidates for identification of crystal peaks --

8    crystal peaks corresponding to a crystalline substance.

9          But if you go to the next spectrum --

10   Q.     So if you go to page 38.

11   A.     -- which wasn't shown, I processed this.  Okay.  So I

12   didn't use 20 but 30, but I used 20 it says at the bottom,

13   and to be honest, if you can find -- there's no real

14   difference between 20 and 30 for line broadening for peaks

15   that are about 100 hertz broad.  Well, any NMR

16   spectroscopist will tell you this.

17         The purpose of doing this is to increase the

18   signal to noise to make sure that the peaks 1 through 5 can

19   actually be clearly identified out of the noise.

20         So I always do multiple processes.  I always

21   zoom in.  I never would just take one parameter, one

22   bird's-eye view and then, you know, sketch lines on it that

23   are almost as broad as the peaks that obscure them.  I take

24   this quite seriously.  So I process from all sorts of angles

25   and parameters.

1          Whether or not they match exactly with

2     Dr. Munson is not germane.

3     Q.     You were -- it was pointed out that you didn't simply

4     rely on Dr. Munson's figures; that you ran your own figures

5     on the data.  Correct?

6     A.     Yes.

7     Q.     And actually, that is what Dr. Munson did, too,

8     right?  Because the data was not generated by Dr. Munson.

9     A.     That's right.

10    Q.     It was data by Dr. Nethercott.

11    A.     That's right.

12    Q.     And he ran his analysis on that data to get his

13    figures.

14    A.     That's correct.

15    Q.     And you ran your analysis on the data of Dr. --

16    provided to Dr. Munson or Dr. Nethercott and the data

17    provided by Dr. Apperley.

18    A.     That's correct.

19           If I may just say ...

20    Q.     Sure.

21    A.     If one person produces a set of data, and two people

22    process it differently, even if they are trying to make

23    different points, that does not invalidate one set, one set

24    of process data over the other without careful consideration

25    of multiple views, multiple parameters and so forth.

Schurko - redirect

1   Q.      Is it fair to say the data is the data?

2   A.      The data is the data.

3   Q.      You were also asked about some questions about

4   signal-to-noise ratio in Dr. Apperley's tests, and that is

5   actually a distinction of no identified number for

6   signal-to-noise ratio.

7           That applies to Dr. Apperley's first set of

8   tests, right?

9   A.      First, yeah.

10  Q.      And he ran two additional sets of tests.

11  A.      Yes.

12  Q.      And you considered all three, the data from all three

13  of those sets of tests?

14  A.      Yes, I did.

15  Q.      And you also had more than just Dr. Apperley's report

16  you also had his data.

17  A.      I had the raw data, yes.

18  Q.      I think it was suggested in one of the questions that

19  you just relied on your report and nothing else.  You had

20  data.

21  A.      I had the data.  I processed it and worked it out.

22  Q.      You were also asked the question about citing to

23  Dr. Munson's papers.

24          Do you remember those questions?

25  A.      Yes.

Schurko - redirect

1    Q.      So let me just get the timeline correct here.

2            Your report was after Dr. Munson's report, after

3    you had seen his results, right?

4    A.      Oh, yes, yes.

5    Q.      So what was the purpose of citing to Dr. -- some of

6    Dr. Munson's papers in your report about his data?

7    A.      Oh.  The primary purpose is to show examples of his

8    work that sort of have context in this case, mainly to show

9    that in his previous work, for instance, he reports all of

10   the necessary parameters very clearly.  He provides

11   information on recycle delay and relaxation concepts.

12           He does -- I have great admiration for

13   Dr. Munson, to be honest, and he has published a lot of

14   great stuff, and I just didn't see that sort of stuff

15   translate into his report.

16           So I was citing those examples to say, look,

17   this is something that is done not only in the

18   pharmaceutical company but by my sort of, you know, opponent

19   or whatever you call him, et cetera, but my opposite in this

20   case.

21   Q.      Because he didn't do that in this case?

22   A.      Yes, that's correct.

23           MR. HENEGHAN:  No further questions.

24           THE COURT:  All right.  Thank you.

25           You can step down.  Thank you very much.

Schurko - redirect

```
 1                THE WITNESS:  Do I take this stuff with me?

 2                THE COURT:  It would be helpful if you do.

 3     Thank you.

 4                MR. HENEGHAN:  Dr. Schurko, why don't you leave

 5     the laser pointer up there.  Take the binders.

 6                THE WITNESS:  Oh, yeah.  No worries.

 7                THE COURT:  You can call your next witness.

 8                MR. HENEGHAN:  Thank you, Judge.

 9                MR. MIZERK:  Your Honor, defendants -- we're

10     going to take the next witness a little bit out of order.

11     Dr. Zusman is a physician, and so he has kind of come here

12     away from his patients, and he is very quick and we're going

13     to get him in and get him out.

14                THE COURT:  Okay.

15                MR. MIZERK:  So our next witness is Dr. Randall

16     Zusman on behalf SigmaPharm and Unichem.

17                THE COURT:  Thank you.

18                 ... DR. RANDALL MARK ZUSMAN, having been first

19     duly sworn, was examined and testified as follows ...

20                THE COURT:  Good morning; and welcome,

21     Dr. Zusman.

22                THE WITNESS:  Good morning, Your Honor.

23                THE COURT:  You may approach.

24                MR. MIZERK:  Thank you, Your Honor.

25
```

1                        **DIRECT EXAMINATION**

2    BY MR. MIZERK:

3    Q.       Good morning, Dr. Zusman.

4    A.       Good morning.

5    Q.       Would you please introduce yourself to the Court?

6    A.       Yes.  My name is Randall Zusman.  I am a cardiologist

7    living in Boston.

8    Q.       And please turn to DTX-964 in your binder.

9    A.       (Witness complies.)

10   Q.       What is DTX-964?

11   A.       This is a copy of my current curriculum vitae.

12   Q.       Okay.  And is it a true and accurate reflection of

13   the -- your background and training and significant

14   professional activities during the course of your career?

15   A.       Yes, it is.

16   Q.       Can you please tell us briefly a little bit about

17   your educational background.

18   A.       Yes.

19               I received my bachelor of science degree in

20   chemistry in 1969 with highest honors and was elected to the

21   Phi Beta Kappa Honor Society from the University of

22   Michigan.

23               And I then moved to the Yale University School

24   of Medicine, where I received my MD degree was elected to

25   the Alpha Omega Alpha Honor Society in 1973.

1   Q.      And where did you go following your graduation from

2   Yale Medical School?

3   A.      I went to the Massachusetts General Hospital where I

4   was an intern in medicine for one year, and then I became a

5   junior assistant resident in medicine the following year.

6           In 1975, I moved from the Massachusetts General

7   Hospital to the National Institutes of Health in Bethesda,

8   Maryland, where I took a position as a clinical associate in

9   the hypertension endocrine branch of the National Heart,

10  Lung, and Blood Institute.

11          After a two-year position at the NIH, I returned

12  to the Massachusetts General Hospital in 1977.  I became a

13  senior assistant resident in medicine.  And,

14          In 1978, I was the chief resident in medicine in

15  the Department of Medicine at the Massachusetts General

16  Hospital.

17          In 1979, I became a clinical and research fellow

18  of the Division of Cardiology at the Massachusetts General

19  Hospital and the Harvard Medical School.  And,

20          I completed my training in 1980 when I joined

21  the faculty of both the Harvard Medical School and the

22  Division of Cardiology at the Massachusetts General Hospital

23  where I currently remain.

24  Q.      And could you please describe for us the scope of your

25  medical practice?

1  A.     So I am what is termed a noninterventional

2  cardiologist.  I don't do procedures.  I evaluate and manage

3  patients.  I have a practice in general cardiology in that I

4  don't exclude any cardiac diagnoses.

5         So I see patients with high blood pressure and

6  high cholesterol with coronary artery disease, those who

7  have had heart attacks, those who have atrial fibrillation,

8  those who have fainted, those who have the broad spectrum of

9  diagnoses that may fall under the general umbrella of

10  cardiology.

11 Q.     And do you continue to see patients?

12 A.     Yes.  I'm in full-time clinical practice.  In most

13 weeks I see patients Monday through Thursday from 8:00 to

14 4:00 p.m.  Today is an exception to that fact.  And on

15 Fridays, I generally do paperwork and other things that I'm

16 responsible for in association with the care of my patients.

17 Q.     And do you currently teach at Massachusetts General

18 as well?

19 A.     Yes, I do.

20        I teach in two areas.  I teach in continuing

21 medical education courses; for example, in the course on

22 internal medicine.  I've taught on the courses on

23 cardiology, emergency medicine, vascular surgery,

24 nephrology, et cetera.

25        I also give lectures to our interns, students,

Zusman - direct

1       residents, fellows, nurses and other healthcare providers

2       within the hospital in part of the training series that is

3       sponsored by the Department of Medicine.

4               But perhaps my most important role is as

5       attending physician in terms of teaching on the wards where

6       I'm responsible for the care of patients admitted to the

7       hospital for various cardiac diagnoses.  And in that

8       setting, I am responsible for supervising care that is

9       delivered by interns, residents, students, fellows, and

10      others, all part of the patient's care team.

11      Q.      Are you board certified?

12      A.      Yes, I'm board certified in both internal medicine

13      and in cardiovascular disease.

14      Q.      And do you have any association with the American

15      College of Cardiology?

16      A.      Yes.  I'm a fellow of the American College of

17      Cardiology.

18      Q.      And are other positions and honors that you've

19      received reflected in your CV?

20      A.      Yes.  The total sum of my career is summarized in my

21      CV, including many research participations, clinical trials

22      that I've conducted, as well as other professional

23      responsibilities that I have completed during the course of

24      my career.

25              MR. MIZERK:  Your Honor --

Zusman - direct

```
 1   BY MR. MIZERK:

 2   Q.      Do you consider yourself an expert in the education,

 3   the treatment, and care of patients with respect to a broad

 4   spectrum of cardiac diseases?

 5   A.      Yes.  I believe I fit that definition.

 6               MR. MIZERK:  Your Honor, we would ask that -- I

 7   proffer Dr. Zusman as an expert in the evaluation, the

 8   treatment, and care of patients with respect to a broad

 9   spectrum of cardiac diseases.

10               MR. LEE:  Your Honor, I have no objection to

11   your recognizing for his expertise.  His opinions are in two

12   paragraphs of his report.  I don't believe he is qualified

13   to give one of the two, but I'll explore it on

14   cross-examination.

15               THE COURT:  I will certainly recognize him,

16   then, as an expert in what he is offered on it.  We will see

17   how the examinations go.

18               MR. MIZERK:  Thank you, Your Honor.

19   BY MR. MIZERK:

20   Q.      Now, are you familiar with the drug Eliquis?

21   A.      I am.

22   Q.      And is -- we have been referring it to as apixaban

23   and it's -- just chemical name.  Is that -- do you refer to

24   it as apixaban as well?

25   A.      Yes.  Apixaban is the chemical entity that makes up
```

1    the product sold as Eliquis for a patient treatment.

2    Q.      And are you familiar with the '208 patent?

3    A.      Yes.  I reviewed the '208 patent.

4    Q.      Okay.  Now, in Dr. Kowey's report, he references the

5    Court's claim construction -- well, let me say, do you

6    remember an individual named Dr. Kowey?

7    A.      Yes.  I know who Dr. Kowey is.

8    Q.      And with respect to this case, who is Dr. Kowey?

9    A.      Dr. Kowey is a witness who I suspect will be called

10   by the plaintiff to offer opinions, and my opinions today

11   are counter to the opinion that has been offered by

12   Dr. Kowey in his report.

13   Q.      And do you remember in Dr. Kowey's report he

14   references the Court's claim construction order with respect

15   to the '208 patent?

16   A.      Yes.

17   Q.      Do you recall that?

18   A.      I'm familiar with that claim construction.

19              MR. MIZERK:  Why don't we put DDX-1-11 up on the

20   screen.

21   By MR. MIZERK:

22   Q.      And is this a copy of -- or is this a reproduction of

23   the claim construction that the Court gave to the term

24   "pharmaceutically acceptable salt"?

25   A.      Yes.  This is the claim construction provided by the

Zusman - direct

 1   Court to describe a pharmaceutically acceptable salt.

 2   Q.    Okay.  And obviously you -- did you review this in

 3   rendering opinions in this case?

 4   A.    Yes, I did.

 5   Q.    Okay.  Now, with respect to the opinion -- with

 6   respect to this definition, in terms of determining whether

 7   a compound is suitable for use in context with tissues of

 8   human beings and animals without excessive toxicity, is that

 9   something that a clinical cardiologist or a physician will

10   determine?

11   A.    No.  That determination would be made by others

12   before a drug would be available for me to potentially

13   prescribe it for the care of a patient.

14   Q.    Okay.  And what about with respect to determining

15   whether a compound is -- has excessive irritation that would

16   be of concern?  Is that something that the cardiologist or a

17   physician would determine?

18   A.    No, that's something that would be done by a

19   medicinal or pharmaceutical chemist long before the drug

20   became of any value or use in the treatment of a human

21   being.

22   Q.    Okay.  With respect to determining whether a compound

23   would result in allergic responses from an individual or an

24   animal, who would make that determination?  Would that be

25   something a cardiologist or a physician would determine?

Zusman - direct

1   A.      That information would be determined by a

2   pharmaceutical or a medicinal chemist, and much of that

3   information may be garnered as the result of the conduct of

4   a clinical trial designed to determine the efficacy, safety,

5   and side effect profile of a newly introduced pharmaceutical

6   agent or product.

7   Q.      Okay.  And with respect to determining whether a

8   compound would result in any other problem or complication

9   with respect to its administration, would that be something

10  that would be determined by someone other than a

11  cardiologist or a physician?

12  A.      So again, that information would be determined on the

13  basis of the compilation of information determined by a

14  pharmaceutical or medicinal chemist, by a toxicologist, by

15  those who are conducting the clinical trial that ultimately

16  might lead to the approval of a drug for administration to a

17  human; and finally, by the Food and Drug Administration,

18  would -- who would determine whether the drug was effective

19  and safe in the treatment of patients with various clinical

20  disorders.

21  Q.      Now, if we turn to -- if you recall in paragraph 161

22  of Dr. Kowey's reports, he states -- and I think we can turn

23  to DDX-15-2.

24          And Dr. Kowey states that:  "I have been asked

25  to assume that the sodium, potassium, and hydrochloride

Zusman - direct

1    salts of apixaban have been made; that sodium, potassium,

2    and the hydrochloride salts of active ingredients are common

3    in FDA approved products."

4             And he says:  "I would thus have no additional

5    concern about the suitability for use of a sodium,

6    potassium, or hydrochloride salt form of apixaban.  Changing

7    an active ingredient to a salt form would not alter the

8    toxicity, irritation, or allergen profile of the active

9    ingredient."

10            Do you agree with that?

11   A.     I do not.

12   Q.     Okay.  Let's break this down.  Now, first, do you

13   agree with Dr. Kowey's assumption that the sodium,

14   potassium, and hydrochloride salts of apixaban can be made?

15   A.     I have seen no evidence in the materials I have

16   reviewed that such a salt has been made.

17            MR. LEE:  Your Honor, I object.  This goes well

18   beyond his expert report now.

19            THE COURT:  Okay.  Tell me where we can find it,

20   please.

21            MR. MIZERK:  I'll rephrase.

22            MR. LEE:  It's not in the report.

23            THE COURT:  Hold on.

24            MR. MIZERK:  Let me rephrase the question.

25            THE COURT:  Okay.

Zusman - direct

```
 1   BY MR. MIZERK:
 2   Q.      Would determining whether a salt of apixaban has been
 3   made, would that be something that a physician or a
 4   cardiologist would do?
 5               MR. LEE:  Your Honor, I object.  This is beyond
 6   the scope of his report.  His entire opinion is in two
 7   paragraphs, 144 and 145.
 8               THE COURT:  All right.  Can you point me to, I
 9   don't know if I have it here, but where we can find this in
10   his prior disclosures?
11               MR. LEE:  If Your Honor has a copy, there is a
12   summary of his opinions --
13               THE COURT:  I don't think I do.
14               MR. LEE:  Let me --
15               THE COURT:  That's okay.  It's their burden,
16   really.
17               MR. LEE:  Okay.
18               THE COURT:  Let them do it.
19               If you want to approach with copies, you can.
20               MR. MIZERK:  Yes.
21               (Document passed forward.)
22               MR. MIZERK:  Your Honor, if you would turn to
23   page 42.
24               THE COURT:  I think you handed me two reports.
25   Which one?
```

1              MR. MIZERK:  Yeah.  The first one, I think, is

2      Dr. Zusman's report.

3              THE COURT:  I see it.  You gave me Kowey and

4      Zusman.

5              MR. MIZERK:  Yes.

6              THE COURT:  So page 42 of Dr. Zusman's report?

7              MR. MIZERK:  Yes, and beginning on page 42 at

8      paragraph 139.

9              THE COURT:  And I think the pending question is

10     whether -- or who would determine if these other salts could

11     be made?

12             MR. MIZERK:  Right.  And the point is that he

13     refers in paragraph 139 of Dr. Kowey's report at paragraphs

14     159 to 162, and the statement that we had on the screen is

15     Dr. Kowey's report.

16             THE COURT:  Where does Dr. Zusman disclose an

17     opinion on what type of individual with whatever

18     qualifications would determine if the salts could be made?

19             That was the question, I believe, that drew the

20     objection.

21             So has he disclosed an opinion on what that

22     person looks like that would make that assessment.

23             MR. MIZERK:  Well, I think he disclosed that

24     it's a basic question about his background about what he

25     does as a cardiologist.

Zusman - direct

1          THE COURT:  Where did he disclose an opinion as

2     to what type of qualification or what person would be able

3     to assess if these other salts have been made?

4          MR. MIZERK:  If you took -- if you look at -- I

5     think it's paragraph 150, he says:  "It is my opinion that

6     Dr. Kowey has no support and is not qualified to make his

7     conclusions as to salt forms of apixaban and whether an ion

8     change association can change the toxicity, irritation, and

9     allergen profile of apixaban."

10          THE COURT:  All right.  I understand he

11     disclosed an opinion that Dr. Kowey can't do it, but I

12     believe your question is essentially, tell me who can --

13     just tell us whether these salts have been made.

14          MR. MIZERK:  Okay.  I'll move on, Your Honor.

15     That's fine.

16          THE COURT:  The objection is sustained then.

17          Go on.

18     BY MR. MIZERK:

19     Q.    Now, do you recall -- now, do you understand

20     plaintiff's counsel, Mr. Lee, in his opening statement told

21     the Court that the evidence would show that it was your

22     opinion that salts of apixaban would be "unlikely to have

23     any appreciable effect"?

24     A.    Yes, I believe that is what Mr. Lee told the Court.

25          Mr. MIZERK:  Okay.  Why don't we put that up on

1    the screen.  It is from the transcript on 10/31, page 142,

2    beginning at lines 18.

3    BY MR. MIZERK:

4    Q.    Now is that a fair characterization of your opinion

5    in this matter?

6              MR. LEE:  Your Honor, I don't -- his commenting

7    on the opening is not relevant.  And if they want to cite to

8    some portions --

9              THE COURT:  Is it relevant?

10             MR. MIZERK:  Yes.  Sure.  In his report --

11             THE COURT:  Well, right now, it's just an

12   objection to relevance, I think.

13             MR. MIZERK:  Yeah, I don't see how -- we're

14   laying a foundation to talk about what Dr. Zusman spoke

15   about in paragraph 44 of his report, which is, I believe,

16   the section that Mr. Lee was quoting from in the opening

17   statement.

18             MR. LEE:  I have no objection to his asking

19   questions about paragraph 44.  I don't think a witness

20   should start characterizing attorney arguments.

21             THE COURT:  All right.  I'm going to overrule

22   the objection.  I think it is relevant.

23             If you told me what I should expect from his

24   opinion, I'm going to let him respond, provided that he

25   adequately disclosed it.

1          Go ahead.

2               MR. MIZERK:  All right.  So why don't we put up

3     paragraph 44 on page 16 of Dr. Zusman's report.

4     BY MR. MIZERK:

5     Q.     Dr. Zusman, was it your opinion that a salt of

6     apixaban would be unlikely to have any appreciable effect?

7     A.     No.  This totally mischaracterized what I said.

8               MR. LEE:  Your Honor --

9     BY THE WITNESS:

10    A.     And I think we can read clearly from what I wrote in

11    paragraph 44 that nowhere in this paragraph did I suggest

12    that a salt of apixaban would not have an -- potentially an

13    adverse effect on the toxicity, irritation, or allergen

14    profile of apixaban.

15              What I said was that the introduction of one

16    milligram of sodium, potassium, or hydrogen chloride would

17    not be clinically meaningful when given along with the

18    10 milligram dose of apixaban.

19              But as you will note in this paragraph, the word

20    "apixaban salt" appears nowhere in my statement, and I was

21    not referring to any agreement, if you will, that the salt

22    of apixaban would not have different properties than

23    apixaban itself.

24    Q.     Now, if chemists or drug formulators or clinical

25    researchers advised you that there were concerns regarding

 1    toxicity, irritation, allergic responses, or other

 2    complications relating to the use of the salt of apixaban,

 3    would a doctor or clinical cardiologist, in using their

 4    sound medical judgment, administer it to an individual or

 5    animal?

 6                    MR. LEE:  I object.  That opinion is nowhere in

 7    his report.

 8                    THE COURT:  Is it in his report?

 9                    MR. MIZERK:  It's his -- it's responding to

10    Dr. Kowey's statements.

11                    THE COURT:  But has he disclosed the opinion

12    that he would give in response to that question in his

13    report?

14                    MR. MIZERK:  We have nothing further.

15                    THE COURT:  Has he?

16                    MR. MIZERK:  This opinion that he provided was

17    both Dr. -- Dr. Kowey's opinion is a page long, and

18    Dr. Zusman's was, well, brief.  It was at the end of a

19    larger discussion about a ton of medical issues so the

20    parties -- the reports for both Dr. Zusman and Dr. Kowey

21    were very abbreviated with respect to this issue.  So --

22                    THE COURT:  Okay.  So perhaps it sounds like he

23    maybe did disclose this opinion.  I'm asking you where he

24    disclosed the opinion.

25                    MR. MIZERK:  Yes.  He disclosed it in

877

Zusman - direct

1    paragraph -- in his rejection of conclusions that Dr. Kowey

2    made.

3                    THE COURT:  Can you show me where?

4                    MR. MIZERK:  It's at paragraph 150, and in the

5    sections that we had identified.

6                    THE COURT:  I don't know what you mean by "the

7    sections" you identified.  Let me start with 150.

8                    150 is his rejection of Dr. Kowey.  Is that

9    right?

10                   MR. MIZERK:  Yes.

11                   THE COURT:  All right.  And what are these

12   sections that you previously identified?

13                   MR. MIZERK:  The previous page 139 through 145.

14                   THE COURT:  Paragraphs 139 to 145.

15                   So, for instance, this current question seems to

16   be, if certain information was provided, would a clinician

17   prescribe such-and-such.  Where in here or elsewhere would I

18   find --

19                   MR. MIZERK:  That would be paragraph 145, and it

20   would be in reference to the paragraphs of Dr. Kowey's

21   report at 159, 162 that he is disagreeing with.

22                   THE COURT:  Let's break it down.  145 says:  "I

23   don't believe a clinical cardiologist should make such

24   pronouncements."

25                   I don't see where that discloses an answer to

1    the question you just asked.

2              MR. MIZERK:  The pronouncements are the

3    pronouncements that are recited in Dr. Kowey's report at

4    159, 162.

5              THE COURT:  159 to 162.  So I need to look at

6    Dr. Kowey's report.

7              So, for instance, if you could point me to

8    Dr. Kowey saying if a clinician was told all these things

9    they would prescribe it, I suppose I might find that a

10   denial of that was disclosing an opinion.

11             But I'm not sure I'm seeing where even Dr. Kowey

12   is saying, sure, if clinicians were told all these things,

13   they would still prescribe it.

14             Am I missing that?  Is that disclosed here?

15             MR. MIZERK:  Well, in paragraph 161, Dr. Kowey

16   says he has just been asked to assume all these things.

17             THE COURT:  Okay.  But assuming it is different

18   from saying, hey, if he told me all these terrible things, I

19   would still prescribe it.

20             MR. MIZERK:  Okay.  Then, Your Honor, I don't

21   think it's worth continuing to debate it where we are in

22   this.

23             THE COURT:  Okay.  Then I'm sustaining the

24   objection.  I have not been pointed to anywhere that an

25   opinion was previously disclosed that would be responsive.

Zusman - cross

```
 1              MR. MIZERK:  Then we would pass the witness,

 2     Your Honor.

 3              THE COURT:  Okay.  Mr. Lee.

 4              MR. LEE:  Your Honor, may we pass forward the

 5     notebooks?

 6              THE COURT:  Sure.

 7              (Binders passed forward.)

 8              MR. LEE:  May I proceed, Your Honor?

 9              THE COURT:  You may.

10                    CROSS-EXAMINATION

11     BY MR. LEE:

12     Q.    Good morning, Dr. Zusman.

13     A.    Good morning, sir.

14     Q.    You submitted one expert report in this case;

15     correct?

16     A.    That is correct.

17     Q.    You submitted a May 22nd, 2019; correct?

18     A.    That is correct.

19     Q.    You have never supplemented that report; correct?

20     A.    That is correct.

21     Q.    You have never amended that report; correct?

22     A.    That is correct.

23     Q.    You have never informed the plaintiffs that there are

24     anything in the report that are incorrect; right?

25     A.    I do not believe there is anything in my report that
```

1    is not correct or that I do not believe.

2    Q.    Now, you understand that there are a number of issues

3    addressed in your report that are no longer at issue in this

4    trial; correct?

5    A.    I have been informed of that, yes.

6    Q.    So I want to focus you on the portions of your report

7    that remain relevant to the issues in this case.  Okay?

8    A.    Certainly.

9    Q.    Now, your report discussed Dr. Kowey's opinions about

10   pharmaceutically acceptable salts of apixaban; correct?

11   A.    I did discuss pharmaceutically acceptable salts.

12   Q.    And I want to make sure we have the universe of

13   paragraphs in your report that address that issue.  One is

14   paragraph 44 where you summarize your opinions.  Correct?

15           44, please.  I'm sorry, Mr. Lee.  44.

16   A.    So -- I'm sorry.

17   Q.    Do you have it before you?

18   A.    I believe that my opinions with regard to --

19   Q.    Dr. Zusman, my question just was, does paragraph 44

20   summarize your opinions on this pharmaceutical acceptable

21   salt issue?

22   A.    No.

23   Q.    Okay.  But it is one of the paragraphs that address

24   Dr. Kowey's opinions in paragraphs 159 to 163; correct?

25   A.    Paragraph 44 is one of the paragraphs that cites my

1    opinions with regard to Dr. Kowey's statements specifically

2    with regard to pharmaceutically acceptable salts.

3    Q.      Fair enough.

4    A.      That opinion is that summarize --

5    Q.      Doctor, my question only was, was this one of the

6    paragraphs that addresses your opinion on this issue?

7    A.      It is one of many paragraphs, yes.

8    Q.      Well, we're going to look at all of them.

9    A.      Excellent.

10   Q.      Let's turn to page -- paragraph 130.

11   A.      130.

12   Q.      Yes, sir.

13           Actually, let's go to 139.

14           MR. LEE:   Could I have the title of this section

15   that begins with paragraph 139?

16           THE WITNESS:   Yes.

17   BY MR. LEE:

18   Q.      Now, the title is, "Dr. Kowey's Opinions in Respect

19   of the Pharmaceutically Acceptable Salts Are Outside of His

20   Expertise."

21           That is the title of the section; correct?

22   A.      That is the title.

23   Q.      And you then have paragraphs 139 to 145 which address

24   the opinions that you are going to offer on this question;

25   correct?

1    A.      That is correct.

2    Q.      Now, the only other paragraph where you address this

3    issue is paragraph 150; correct?

4    A.      On which.

5    Q.      Paragraph 150.  It's on the screen now.

6            Do you see it?

7    A.      Yes.

8    Q.      Now, we have now looked at all of the portions of

9    your expert report that address the question of

10   pharmaceutical acceptable salts; correct?

11   A.      Yes, you have.

12   Q.      Okay.  Now, let's go back, if we could, to the seven

13   paragraphs under the section 10.

14           Do you have that?

15   A.      Yes.

16   Q.      Now, the first paragraph just says that Dr. Kowey

17   assumes that a sodium, potassium, and hydrochloride salt has

18   been made.  Correct?

19   A.      Yes.

20   Q.      And you refer specifically to paragraphs 159 to 162;

21   correct?

22   A.      Yes, in Dr. Kowey's reports.

23   Q.      And the salts he assumed have been made are salts of

24   apixaban; correct?

25   A.      That is correct.

1   Q.      Now, in the next paragraph you say, "I do not

2   disagree with Dr. Kowey that sodium, potassium, and

3   hydrochloride are associated with the salts of a number of

4   commercially available drugs."

5           Have I read that correctly?

6   A.      You read that correctly.

7   Q.      And it is true, is it not, that sodium salts are

8   associated with a number of commercially available drugs;

9   correct?

10  A.      That is my understanding.

11  Q.      Potassium salts are associated with a number of

12  commercially available drugs; correct?

13  A.      That is correct.

14  Q.      And the same is true of hydrochloride; correct?

15  A.      That is correct.  Just as sodium chloride, potassium

16  chloride are salts.

17  Q.      All right.

18  A.      So I think I want to make clear that there's the

19  apixaban salt and then there's the sodium chloride, common

20  table salt, potassium chloride, hydrogen chloride, which are

21  separate chemical entities and are salts.

22  Q.      Dr. Zusman, in paragraphs 159 to 162, Dr. Kowey is

23  talking about the salts of apixaban, not salts in the

24  abstract.

25          Isn't that true?

1    A.      That is true.

2    Q.      Right?

3    A.      In paragraph 140, I'm talking about sodium,

4    potassium, and hydrochloride, not the salts of apixaban.

5    Q.      We're going to get to that, I promise you.  We're

6    going to talk about what you actually talked about in

7    paragraph 44.

8            But let's look at the substance of your

9    opinions.

10           The next paragraph is 141 and what you do is you

11   summarize Dr. Kowey's opinion in paragraph 161.  Correct?

12   A.      Yes, that is correct.

13   Q.      In that paragraph he is referring to the salt form of

14   apixaban; correct?

15   A.      Yes.  A salt form of apixaban, that's correct.

16   Q.      Right.  Now, in paragraphs 142 and 143, in the

17   interest of time, you, again, are summarizing his opinions;

18   correct?

19   A.      I am.

20   Q.      Now, the substance of your opinions are in 144 and

21   145.  The first is:  "I find no support for Dr. Kowey's

22   statement."  Correct?

23   A.      I'm sorry.  I've lost where --

24   Q.      I'm sorry, paragraph 144.  It's on the screen now,

25   but you have it in hard copy.

1   A.      Yes.

2   Q.      You have it before you?

3   A.      Yes, I do.

4   Q.      You said, "I find no support for Dr. Kowey's

5   statements."

6            In paragraph 145, you said, "I do not believe

7   that a clinical cardiologist 'as he so defines himself,'

8   should make such pronouncements, particularly without any

9   literature support."  Correct?

10  A.      Yes, in writing that paragraph --

11  Q.      Dr. Zusman, is that correct?

12  A.      Can you repeat the question?

13  Q.      Is that, that paragraph, a statement of your opinions

14  in Dr. Kowey's report?

15  A.      Yes, you read this statement accurately.

16  Q.      Now, let's go back to 44 and look at the summary that

17  you provided.

18           You agree with me that paragraph 44 is in the

19  section where you summarized your opinions.  Correct?

20  A.      Your question?

21  Q.      Sure.  I'll repeat it.  I'll focus you on paragraph

22  44.

23           Do you have that?

24  A.      Yes.

25  Q.      It's in a section of your report where you are

1    summarizing your opinions; correct?

2    A.      That's one of the paragraphs of my report, correct.

3    Q.      And this is the paragraph of your report that

4    summarizes your opinion on Dr. Kowey's paragraphs 159 to

5    163.  Correct?

6    A.      I don't think this is the only place where I provided

7    my opinion.  It is one of the paragraphs.

8    Q.      Is there anything else in the summary of your report,

9    in the summary section of your report, that addresses

10   paragraphs 159 and 163 of Dr. Kowey's report?

11   A.      Well, for example, we can take paragraphs 143, 144,

12   and 145 in toto where I note he makes no -- he has no

13   foundation for his statements.  He claims that there would

14   be no change in the allergen, toxicity, or other profile of

15   the drug which is information that he would obtain from

16   others --

17   Q.      Dr. Zusman --

18   A.      -- medicinal chemists --

19   Q.      You're not answering my question.  Let me withdraw

20   the question and try to be clearer.

21          Look at page 15 of your report.  There is a

22   section entitled "Summary of Opinions"; is there not?

23   A.      Certainly.  Page 15.

24   Q.      Yes, sir.  Page 15, "Summary of Opinions."

25   A.      Yes.

1  Q.      Now, the summary of opinions goes from page 15 to

2  page 17, correct?  Is that right?

3  A.      I'm sorry, I was looking.

4  Q.      I'm sorry.

5          Is -- the summary of your opinions goes from

6  page 15 to page 17; correct?

7  A.      It does.

8  Q.      The only paragraph that addresses this question of

9  Dr. Kowey's report is paragraph 44; correct?

10 A.      With reference to four paragraphs, five paragraphs,

11 rather, of Dr. Kowey's report.

12 Q.      Right.  Now let's look at this paragraph.

13         Dr. Kowey also finds that:  "A 10 milligram dose

14 of apixaban introducing along therewith 1 milligram of

15 sodium, potassium, or hydrogen chloride into the body would

16 not be clinically meaningful," citing paragraphs 159 to 163,

17 "and would not 'have any effect on toxicity, irritation or

18 allergen profile.'"

19         Have I read that correctly?

20 A.      You have.

21 Q.      Now, you read those paragraphs 159 to 163; correct?

22 A.      Correct.

23 Q.      The salts he is talking about that have 10 milligram

24 doses of apixaban and 1 milligram of sodium or potassium or

25 hydrogen chloride are apixaban salts; correct?

Zusman - cross

```
 1                    MR. MIZERK:  Objection to form.  He is
 2      misstating the testimony, and using his summary as an anchor
 3      of what the paragraph states.
 4                    THE COURT:  All right.  You will have a chance
 5      to try to clear it up on redirect, if that is what you
 6      think.
 7                    Would you ask the question again?
 8                    MR. LEE:  Sure.
 9      BY MR. LEE:
10      Q.     In Dr. Kowey's report, he refers to a 10 milligram
11      dose of apixaban.
12      A.     He does.
13      Q.     And he refers to that 10 milligram dose being
14      introduced along with, for instance, one milligram of
15      sodium; correct?
16      A.     Correct.
17      Q.     Or one milligram of potassium; correct?
18      A.     Correct.
19      Q.     Or one milligram of hydrogen chloride; correct?
20      A.     Correct.
21      Q.     And he describes those in his report as salts of
22      apixaban; correct?
23      A.     I don't recall if he used the term "salts of
24      apixaban."  I think there are -- there is a confusion here
25      in the nomenclature.
```

Zusman - cross

1              So there are apixaban salts, which means you

2     have modified the apixaban nucleus in order to produce a

3     compound that has charged components.  A cation and an

4     anion.  That is the definition of a salt.

5              I think we're using the word "salt" too freely

6     because sodium chloride is salt.  Potassium chloride is

7     salt.  And, I guess, technically hydrogen chloride could be

8     considered salt because it has a cation and an anion.

9     Q.    Let's look at --

10    A.    The point --

11    Q.    I'm sorry.  You go ahead.

12    A.    The point that I have been trying to make is that

13    when you modify the apixaban molecule, if that is possible,

14    and I saw no evidence that it was --

15              MR. LEE:  Your Honor, he is now going well

16    beyond the question.

17              THE COURT:  I'm going to give him a chance.

18              Tell us what the point is you are trying to

19    make, please.

20    BY THE WITNESS:

21    A.    If you modify the apixaban molecule to produce a salt

22    where it's charged, cation and anion components, that

23    Dr. Kowey is not qualified to say that that molecule would

24    have the same characteristics, toxicity, irritation,

25    potential as an allergen, efficacy or safety, benefit or

 1   risk when given to a human being.

 2               That is the point of my testimony, and I think

 3   that --

 4               THE COURT:  Okay.  Dr. Zusman, we have given you

 5   a lot of leeway.  You have made your point.

 6               THE WITNESS:  Okay.

 7               THE COURT:  Now counsel has a chance to ask

 8   questions.  Please do your best to just answer the questions

 9   asked and your attorney will have a chance on redirect.

10               Mr. Lee.

11               THE WITNESS:  Yes, sir.

12   BY MR. LEE:

13   Q.    Dr. Zusman, I want to focus on the words you put down

14   on the paper earlier this year.

15               Do you have that in mind?

16   A.    Yes.

17   Q.    Okay.  Now, one of the paragraphs you specifically

18   referred to is paragraph 162 of Dr. Kowey's report.

19               You have read that paragraph, have you not?

20   A.    I have.

21   Q.    You read it carefully, have you not?

22   A.    I believe I have.

23   Q.    You responded to it in your report; correct?

24   A.    That's correct.

25               MR. LEE:  Now, let's bring up paragraph 162.

Zusman - cross

1    BY MR. LEE:

2    Q.      "In addition, to the extent a salt of apixaban

3    converts into apixaban shortly after entering an

4    individual's body, there would be no practical difference

5    from administering apixaban."

6            He is specifically referring to an apixaban salt

7    in paragraph 162, is he not?

8    A.      Dr. Kowey is, yes.  That is his opinion.

9    Q.      Now, let's go back to your paragraph 44 and see what

10   you said.

11           "Dr. Kowey also opines that a 10 milligram dose

12   of apixaban introducing along therewith 1 milligram of

13   sodium, potassium, or hydrogen chloride into the body would

14   not be clinically meaningful."

15           And then you cite the four paragraphs; correct?

16   A.      That is correct.

17   Q.      One of them is precisely the paragraph I just read to

18   you, is it not?

19   A.      That's correct.

20   Q.      And then you specifically recite his testimony that

21   the apixaban salts would not have an effect on toxicity,

22   irritation, or allergen profile; correct?

23   A.      I think, sir, you are misreading --

24   Q.      Doctor --

25   A.      -- my records --

Zusman - cross

1    Q.      -- Zusman --

2    A.      No, no.

3    Q.      -- do you specifically --

4    A.      You asked a question --

5            THE COURT:  Doctor, Doctor.  Hold on.

6            The question was, did you quote from that

7    paragraph?  That's a yes-or-no question.  Can you do that?

8            Ask the question again, Mr. Lee.

9    BY MR. LEE:

10   Q.      Do you see --

11   A.      I was quoting what Dr. Kowey said.  Would not have

12   any effect on toxicity, irritation, or allergen profile.

13           Yes, that's a quote.

14   Q.      Right.  And when he made that statement, he was

15   referring to the salts of apixaban; correct?

16   A.      Yes, that is correct.

17   Q.      Okay.  Now let's look at your last sentence.

18           "Although it is unlikely that such salts would

19   have an appreciable effect, I find no support for

20   Dr. Kowey's statement in his report that they certainly

21   would have none."

22           Have I read that correctly?

23   A.      You have.

24   Q.      Now, the phrase you used was "such salts," correct?

25   A.      Correct.

Zusman - cross

1    Q.      Let's go back to paragraph 162.

2                THE WITNESS:  Your Honor, may I continue to

3    respond?

4                THE COURT:  You have answered the question.  As

5    I said, answer the questions and your attorney will have a

6    chance to question if he wishes.

7                Go ahead, Mr. Lee.

8    BY MR. LEE:

9    Q.      Now, in your report -- in Dr. Kowey's report, the

10   phrase "no practical difference from administering apixaban"

11   is in paragraph 162; correct?

12   A.      That's correct.

13   Q.      We agree specifically that he is referring to

14   apixaban salt, paragraph 162, correct?

15               MR. MIZERK:  Objection to form.  He is

16   mischaracterizing all of these documents.

17               THE COURT:  Overruled.

18               Go ahead.

19   BY MR. LEE:

20   Q.      Is that correct?

21   A.      I don't think so.

22   Q.      Okay.

23   A.      You keep using the word "apixaban salt" and you are

24   confusing it with sodium chloride.  So I was, I believe,

25   very careful --

1   Q.      Dr. Zusman, I just asked you whether it was correct

2   or not, but let me ask you this.

3           Did Dr. Kowey say in paragraph 162:  "In

4   addition, to the extent a salt of apixaban converts into

5   apixaban shortly after entering an individual's body, there

6   would be no practical difference from administering apixaban

7   itself"?

8   A.      He said that without any evidence to support the

9   statement.

10  Q.      Dr. Zusman, can you not answer the question yes or

11  no?

12  A.      That is what he wrote.  That his report, not mine.

13  Q.      And then you specifically disagree in paragraph 44,

14  correct?  Is that right?

15  A.      Pardon me?

16  Q.      You specifically disagree in paragraph 44; correct?

17  A.      I said there is no support for that statement.  That

18  is Dr. Kowey's statement, not mine.

19  Q.      That's right.  That is what you were saying in the

20  last sentence, paragraph 44; correct?

21  A.      That's correct.

22  Q.      And when you said "such salts," you are referring to

23  the salts that Dr. Kowey was referring to; correct?

24  A.      I am referring to sodium potassium or hydrogen

25  chloride.  Nowhere in this paragraph do I say --

1   Q.      Dr. Zusman, my question was --

2                MR. MIZERK:  Objection.

3   BY MR. LEE:

4   Q.      -- yes or no.  Were you referring to the apixaban

5   salts that Dr. Kowey described in paragraph 162, yes or no?

6   A.      No.

7   Q.      Now let's go back to paragraphs 139 to 145.

8                And I want to look at the substance of your

9   opinions again.

10               In this portion of your report, you never

11  discuss a benefit/risk ratio, correct?

12               It is both on the screen and in hard copy,

13  whatever is easier for you.

14  A.      I'm just going to read through the paragraphs.

15  Q.      Sure.  Let me know when you've had a chance to do so.

16  A.      I do not use the term benefit/risk ratio.

17  Q.      Yes.  You did not offer the opinion in your report

18  that apixaban salts would be toxic; correct?

19  A.      I said there was no evidence that it was not toxic.

20  Q.      I asked you a different question, Dr. Zusman.

21               Did you offer the opinion, in your report, that

22  it would be toxic?

23  A.      No.

24  Q.      Did you offer the opinion in your report that

25  apixaban salts would result in irritation?

1   A.      That it did cause irritation?

2   Q.      Yes.

3   A.      No, only that it might.

4   Q.      Did you offer the opinion that apixaban salts would

5   cause an allergic response?

6   A.      No, only that it might.

7   Q.      You did not suggest that apixaban salts would cause

8   other problems or complications; correct?

9   A.      Only that there was no support for Dr. Kowey's

10  statement that it would be safe and effective.

11  Q.      So the answer is you did not; correct?

12  A.      I did not.

13  Q.      Now, Mr. Mizerk asked you about the Court's claim

14  construction.

15          Do you recall that?

16  A.      The claim construction.

17  Q.      Yes.  The Court's claim construction?

18  A.      Yes.

19  Q.      Do you have that in mind?

20          Now I'm going to bring it back up on the screen.

21          You recall discussing this with Mr. Mizerk;

22  correct?

23  A.      Yes.

24  Q.      And the Court has construed "pharmaceutically

25  acceptable salts," correct?

Zusman - cross

1    A.      Yes.  This is the Court's definition.

2    Q.      Now, you understand that it is describing derivatives

3    of disclosed compounds; correct?

4    A.      Yes, that is the first phrase.

5    Q.      You have read the '208 patent; correct?

6    A.      Correct.

7    Q.      It concerns apixaban among other things; correct?

8    A.      Yes.

9    Q.      That is one of the compounds disclosed; correct?

10   A.      That is one of the compounds disclosed.

11   Q.      Okay.  So let's go to the next paragraph.

12           "Making acid or base salts thereof which are

13   within the scope of sound medical judgment."  Correct?

14   A.      Yes.

15   Q.      Have I read that correctly?

16   A.      You have.

17   Q.      Now let's go down a little bit further.

18           It says, "Suitable for use in contact with the

19   tissues of human beings and animals without excessive

20   toxicity."

21           Have I read that correctly?

22   A.      Yes, you have read it correctly.

23   Q.      "Irritation"; correct?

24   A.      Correct.

25   Q.      "Allergic response"; correct?

Zusman - cross

1   A.      Yes.

2   Q.      "Or other problem or complication commensurate with a

3   reasonable benefit/risk ratio."  Correct?

4   A.      Yes, you have read the paragraph accurately.

5   Q.      And as you understand it, the word "excessive"

6   modifies toxicity, irritation, response, or other

7   complications; correct?

8   A.      It does.

9   Q.      You have not offered in your report any opinion that

10  apixaban salts would create excessive toxicity, irritation,

11  response, or other problems; correct?

12  A.      I have offered the opinion that Dr. Kowey is not

13  qualified to say that there wouldn't be such excessive

14  toxicity, irritation, allergic response.

15          And in coming to my conclusions in reviewing the

16  materials, we see the word "reasonable benefit/risk ratio,"

17  so that was always in my mind whether that was written or

18  otherwise, this is the Court's construction, is the

19  foundation on which I considered my opinion.

20  Q.      Dr. Zusman, I'll ask my question again.

21          In your only expert report in this case, you did

22  not offer any opinions about whether apixaban salts could

23  create excessive toxicity, irritation, allergic response or

24  other problem or complication.  Isn't that true?

25  A.      That is true.

1              MR. LEE:  Nothing further, Your Honor.

2              THE COURT:  Redirect.

3              MR. MIZERK:  Can you just leave that slide back

4      up?

5                      REDIRECT EXAMINATION

6      BY MR. MIZERK:

7      Q.      With respect to that last question you were asked --

8              MR. MIZERK:  Slide back up, please.

9              Highlight the portion you highlighted earlier.

10     BY MR. MIZERK:

11     Q.      With respect to the determination that you were just

12     asked about whether you offered any opinions regarding

13     whether such salts would be suitable for use in contact with

14     the tissues of human beings and animals without excessive

15     toxicity, irritation, allergic response, other problem or

16     complication, is it your opinion that that is not

17     information that a cardiologist or a physician like you or

18     Dr. Kowey would be provided?

19             MR. LEE:  Your Honor, I have two objections.

20             One is to the leading, and the second is that is

21     not in his report.

22             THE COURT:  All right.  Well, I'll certainly

23     sustain the leading objection.

24             You can try to ask the question again.

25     BY MR. MIZERK:

1   Q.      Would a physician or cardiologist like Dr. Kowey or

2   yourself be qualified to offer an opinion about whether any

3   salt of apixaban would be suitable for use in contact with

4   the tissues of human beings and animals without excessive

5   toxicity, irritation, allergic response, or other problem or

6   complication?

7   A.      Only if provided with the information on which to

8   base such a judgment.

9           So in the Court's construction, the few words

10  before "suitable, within the scope of sound medical

11  judgment," sound medical judgment provided by myself, by

12  Dr. Kowey or any other clinician would be dependent upon the

13  information provided by a medicinal chemist, a

14  pharmaceutical chemist, a toxicologist, the initial

15  administration of the drug to animals and a limited number

16  of humans, and the subsequent conduct of a clinical research

17  trial which will then demonstrate an appropriate

18  commensurate reasonable benefit/risk ratio.

19          Only after being provided with that sort of

20  information could I or any other clinician feel comfortable

21  in administering a drug to a human.  That sort of

22  information is the sort of information that is required on

23  submission to the Food and Drug Administration in order to

24  obtain approval for the sale of a product in this country.

25          MR. MIZERK:  Thank you.

Zaworotko - direct

 1              No further questions.

 2              THE COURT:  Thank you, Dr. Zusman.  You will be

 3    able to step down.  We're going to be in recess.

 4              (Brief recess taken.)

 5              *     *     *

 6              (Proceedings reconvened after recess.)

 7              THE COURT:  You may call the next witness.

 8              MR. MIZERK:  Your Honor, SigmaPharm calls

 9    Dr. Michael Zaworotko.  And Mr. Taylor will be handling the

10    direct examination.

11              THE COURT:  Okay.  Thank you.

12              ... DR. MICHAEL ZAWOROTKO, having been first

13    duly sworn, was examined and testified as follows ...

14              THE COURT:  Good morning, Dr. Zaworotko.

15              THE WITNESS:  Good morning, Your Honor.

16              THE COURT:  You may proceed when you are ready.

17              MR. TAYLOR:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19    BY MR. TAYLOR:

20    Q.    Good morning, Dr. Zaworotko.  Will you please

21    introduce yourself to the court?

22    A.    My name is Dr. Michael Zaworotko.

23    Q.    And can you please spell your name, please?

24    A.    My last name is spelled Z-a-w-o-r-o-t-k-o.

25    Q.    On behalf of the court reporter and myself, thank

1    you.

2                    Why are you here today?

3    A.      I'm here to testify regarding noninfringement of the

4    '945 patent by SigmaPharm's ANDA products.

5    Q.      And have you been present in the courtroom?

6    A.      Yes.  I attended court last Thursday and Friday.

7    Q.      And you listened to the testimony of Dr. Atwood?

8    A.      Yes, I did.

9    Q.      Did you prepare any slides to assist you in

10   presenting your testimony today?

11   A.      Yes, I did.

12   Q.      If we can take a look at DDX-8-2.

13           And, Dr. Zaworotko, if you could please turn to

14   DTX-713 in your binder.

15   A.      (Witness complies.)  Yes.

16   Q.      What is DTX-713?

17   A.      It is a copy of my CV.

18   Q.      Is this a true and accurate copy of your CV?

19   A.      Yes, it is.

20   Q.      Can you tell us a little bit about your educational

21   background?

22   A.      Yes.  My bachelor's degree was earned in chemistry

23   from Imperial College, London, in 1977.  I earned my Ph.D.

24   also in chemistry in 1982 from the University of Alabama

25   where my mentor was professor Jerry Atwood, the same Jerry

1    Atwood who is testifying in this case.

2              The subject -- specific subject of my Ph.D.

3    dissertation was structural chemistry of molecular compound

4    including organic compounds, organic metallic compound, and

5    coordination compounds.

6    Q.    Did you do any postdoctorate work?

7    A.    Yes, I did.

8              I spent three years at the University of

9    Victoria in Canada where I also studied structural

10   chemistry.

11   Q.    Where do you currently work?

12   A.    My current position is at the University of Limerick

13   in Ireland where I am the Bernal chair of crystal

14   engineering.

15             I'm also codirector of SSPC, which is the

16   Synthesis and Solid State Pharmaceutical Center.

17   Q.    Can you please provide a brief overview of your

18   involvement with the University?

19   A.    Yes.  I have a role in teaching and mentoring, in

20   particular with undergraduate, postgraduate and postdoctoral

21   students.

22             I also teach a course in the subject of crystal

23   engineering which is the study or the field of chemistry

24   that studies the design properties and applications of

25   crystalline materials.

1        And I supervise a research program, a

2   government-funded research program, in the area of crystal

3   engineering.

4   Q.    You stated you also work at the SSPC.  What is that?

5   A.    The SSPC is Ireland's national research center in the

6   area of pharmaceutical sciences.  The SSPC has quite a broad

7   scope.  It covers pharmaceutical molecules, pharmaceutical

8   materials, and drug products or medicines.

9        So I direct -- I offer the overall direction to

10  the research program which involves around 60 faculty

11  researchers at seven universities in Ireland and over 100

12  postgraduate and postdoctoral researchers.

13  Q.    Do you have any involvement with research teams with

14  the SSPC?

15  A.    Yes, I also serve as PI, or parenteral investigator,

16  of the materials research group of the center, which means

17  that I'm supervising research projects in the area of

18  pharmaceutical materials, including polymorphs, solvates,

19  and co-crystals.

20  Q.    Turning to the second page of DTX-713.  Are you a

21  member of any professional organizations that are relevant

22  to your testimony today?

23  A.    Yes.  I'm a member of several -- or a fellow of

24  several organizations, professional organizations which are

25  listed in my CV, but perhaps most pertinent to my testimony

1    today is that I served as chair of a research conference on

2    the subject of crystal engineering where I organized a

3    session on the subject of pharmaceutical solids that

4    involved both industrial and academic researchers.

5    Q.    Have you published any articles in peer-reviewed

6    journals?

7    A.    Yes.  I have published more than 400 peer-reviewed

8    articles.  These articles collectively report over 1,000

9    crystal structures.  And crystallography, crystallization,

10   including pharmaceutical materials, is the main subject of

11   these research articles.

12   Q.    Have your articles been recognized and cited by

13   others?

14   A.    Yes.  Collectively my articles have been cited more

15   than 44,000 times.  And in 2011, Thomson Reuters listed me

16   as the 20th most impactful chemist in the world from 2000

17   until 2010.

18   Q.    Are you the named inventor on any issued or pending

19   patents?

20   A.    Yes.  I have 20 issued or pending patents.

21   Q.    Have you ever been invited to give presentations in

22   the areas of crystal structures or crystal engineering?

23   A.    Yes.  I've presented more than 240 lectures around

24   the world.  I have also presented over 200 seminars at

25   companies or universities.

1    Q.      Did you present in March of this year?

2    A.      Yes, I did.  I presented at a number of

3    pharmaceutical companies in March of this year, including at

4    Pfizer.

5    Q.      Have you ever consulted with pharmaceutical companies

6    regarding crystal forms?

7    A.      Yes.  I have served as a scientific consultant or

8    scientific advisor to several companies; small, medium, and

9    large.

10   Q.      Have you served as the editor of any journals?

11   A.      Yes.  I served as the associate editor of the journal

12   *Crystal Growth and Design*, which is an American Chemical

13   Society-published journal, from the years 2006 to 2018.

14           I also served as the founding editor of the

15   journal *Crystal Engineering* from 1997 until 2003.

16           MR. TAYLOR:  Your Honor, SigmaPharm offers

17   Dr. Zaworotko as an expert witness in the areas of

18   pharmaceutical formulation and analysis, synthesis and

19   structural chemistry, crystallization, crystal engineering,

20   and x-ray crystallography.

21           MS. WIGMORE:  No objection.

22           THE COURT:  Okay.  He is so recognized.

23   BY MR. TAYLOR:

24   Q.      Dr. Zaworotko, did you review the identification of

25   who may constitute a person of ordinary skill in the art

1   listed in defendants' amended invalidity contentions for the

2   '945 patent?

3   A.      Yes, I did.

4   Q.      Do you agree with that proposed definition?

5   A.      Yes, I do.

6   Q.      Did you hear Dr. Atwood testify regarding whom he

7   considers to be a POSA for the '945 patent?

8   A.      Yes, I did.

9   Q.      Do your opinions regarding noninfringement of the

10  '945 patent change depending on which definition the Court

11  applies?

12  A.      No, they do not.

13  Q.      And do you consider yourself to be a person of

14  ordinary skill in the art under either definition?

15  A.      Yes, I do.

16  Q.      As an expert witness in this case, have you formed

17  any opinions regarding whether SigmaPharm's ANDA products

18  comprise crystalline apixaban particles?

19  A.      Yes, I have.

20          It is my opinion that SigmaPharm's ANDA products

21  are not comprised of crystalline apixaban particles.

22  Q.      Why is that your opinion?

23  A.      For two reasons.  First of all, I have reviewed XRPD

24  testing from Professor Atwood and from a company that was

25  contracted by SigmaPharm to conduct the testing.  And in my

1    opinion, these tests do not reveal any evidence that

2    supports the presence of any crystalline apixaban particles.

3    Q.      You say there was a second reason.  What is that?

4    A.      Yes.

5            The process used by SigmaPharm, which I will

6    discuss later this morning, was designed to produce what is

7    called an amorphous dispersion or amorphous solid

8    dispersion, which is a solution of apixaban in a polymer;

9    and I will explain more about that also later.

10   Q.      As an expert witness, have you formed any opinions

11   regarding whether SigmaPharm's ANDA products comprise

12   crystalline apixaban particles having a $D_{90}$ of equal to or

13   less than 89 microns?

14   A.      Yes, I have.

15   Q.      And what is that opinion?

16   A.      That there is no evidence whatsoever, as Dr. Atwood

17   testified last week, because there is no experimental data

18   that addresses the size of the apixaban particles in the

19   SigmaPharm ANDA product.

20           In addition, as I just testified, the drug

21   product developed by Sigma don't contain apixaban particles,

22   it contains an amorphous solid dispersion which is a solid

23   solution of apixaban rather than the apixaban particles.

24   Q.      Now, I apologize.  It may just be my ears, but are

25   you saying Sigma or SigmaPharm?

1    A.      Sorry.  SigmaPharm.

2    Q.      Thank you.

3            Turning to DDX-8-3.

4            Can you provide the Court an overview of your

5    expected testimony today?

6    A.      Yes.  There are three components to my testimony.

7            First of all, I'll provide a technology

8    background.  It won't be recycling what has already been

9    said.  I will be emphasizing three main issues.

10           Aspects of crystallinity.  This is amorphous

11   nature that I consider have been understated so far.

12           I'll also be emphasizing how it is important to

13   distinguish between neat amorphous solids and amorphous

14   solid dispersions.

15           And I will also be addressing the matter of how

16   one determines whether a peak is indeed a peak in an XRPD

17   pattern or if it is actually a signal which is attributable

18   to noise.

19   Q.      What are you expecting to testify regarding your

20   second point listed here?

21   A.      With respect to the second point, I will be

22   testifying about how inappropriate it is to use background

23   on neat amorphous solids when the subject matter that we are

24   addressing today is an amorphous solid dispersion.

25   Q.      And I see you are also planning to provide an

1    overview of SigmaPharm's ANDA products?

2    A.      Yes.   I will be providing an overview of the

3    manufacturing process and explaining why it's designed the

4    way it is and what it means in terms of the ANDA product.

5    Q.      And it looks like, finally, we'll be able to hear

6    your responses to Dr. Atwood's opinions.

7    A.      Yes.   I will provide my opinions responding to

8    Dr. Atwood's opinions, and I will be explaining my opinions.

9    Q.      Let's start with your first category listed here, the

10   technology background.

11            MR. TAYLOR:   If we can go to DDX-8-4.

12   BY MR. TAYLOR:

13   Q.      Dr. Zaworotko, you stated you were in the courtroom

14   when Dr. Atwood testified.  Do you have anything to add or

15   clarify to what you heard?

16   A.      Yes.

17            I would like to emphasize the words in brackets

18   at the end of my definitions of crystalline solids and

19   amorphous solids; that in addition to being, for the

20   crystalline solid, a repeating pattern of atoms or

21   molecules, there must be long range order.

22            With respect to amorphous solids, where there is

23   no repeating pattern in the structure, there will be no long

24   range order, which means there will be either short range

25   order or no order at all.

1    Q.      What do you mean by "long range order"?

2    A.      By long range order, I mean enough molecules to

3    generate enough lattice planes to generate an XRPD pattern.

4    Q.      Would a couple of nanometers be considered long range

5    order?

6    A.      Absolutely not.

7    Q.      Would 10 nanometers be considered long range order?

8    A.      Absolutely not.

9    Q.      Let's take a look at DDX-8-5.

10           What else, if anything, would you like to

11   clarify based on what you heard from Dr. Atwood's testimony?

12   A.      What I presented on the left of this slide --

13           THE WITNESS:  And if Your Honor permits, I will

14   use the laser pointer from time to time.

15           THE COURT:  That's fine.  Sure.

16   BY THE WITNESS:

17   A.      So I'm going to use the laser pointer to emphasize on

18   the left-hand side what short range order means in the

19   context of amorphous solids or neat amorphous solids.

20           So what you see here is a diagram which shows

21   how a -- textbook example of a neat amorphous solid.

22           The molecules I are denoted by the letter M.

23   There is some aggregation of the molecules.  In this case

24   they are agglomerates of M molecules, but there's random

25   orientation of those agglomerates so there is some short

1    range order but no long range order.

2           On the right of this slide, I have illustrated

3    an amorphous solid dispersion.  In this amorphous solid

4    dispersion, most typically it would be a solution of a

5    molecule in a polymer.  I have illustrated the molecules by

6    the L-shaped objects, the L-shaped gray objects, and the

7    polymer by the red squiggly lines.

8           And what we see on the right, or what I'm trying

9    to convey on the right, is that there's a small amount of

10   molecules compared to polymer, and that the molecules do not

11   touch each other in the polymer because the molecules are

12   actually bonded to the polymer, not to other molecules.

13          So on the right we have not anticipated any

14   short range order.  We simply had no order whatsoever.

15   Q.     And on the right, you are referring to the amorphous

16   solid dispersion?

17   A.     Correct.

18   Q.     And the left is a neat amorphous solid.

19   A.     Correct.

20   Q.     Where did you get these figures from?

21   A.     The figure on the left is from an article that has

22   already been introduced.

23          In my expert report and in Dr. Atwood's

24   testimony, it is from Yu, and on the right, I created this

25   diagram for use during my testimony.

1  Q.     Did you see anything in Dr. Atwood's testimony

2  similar to the neat amorphous solid shown here?

3  A.     Yes, I did.

4         MR. TAYLOR:   Cliff, if we can please pull up

5  PTX-367 on the one side and on the right, PX-5.9.

6  BY MR. TAYLOR:

7  Q.     Dr. Zaworotko, can you please explain how, if at all,

8  these two illustrations are similar?

9  A.     Both of these illustrations represent a neat

10  amorphous solid.

11         The aggregates of Ms on the left and the

12  aggregates of triangles, dark triangles on the right, both

13  exemplify short range order.  And I believe Dr. Atwood

14  called them crystalline entities but, in fact, the diagram

15  on the right, to me, represents a neat amorphous solid with

16  short range order.

17  Q.     And what -- it is a little bit cut off here, but what

18  did Dr. Atwood title this slide?

19  A.     "Amorphous and Crystalline Materials."

20  Q.     And what, in your opinion, does Dr. Atwood's slide

21  actually show?

22  A.     It actually shows a textbook example of a neat

23  amorphous solid where there is short range order.

24  Q.     Let's turn back to your demonstratives at DDX-8.6.

25         We discussed the importance of distinguishing

1    between crystalline and amorphous solid.

2              How can you tell whether material is crystalline

3    or amorphous?

4    A.    XRPD is well known as the gold standard for

5    identification of crystalline solids and for distinguishing

6    between crystalline and amorphous solids.

7              On the left we see the characteristic XRPD

8    pattern of a neat amorphous solid.

9              What you see in a neat amorphous solid, which

10   results from the internal structure, is that there are only

11   broad humps caused by halos in the XRPD, and there's a low

12   signal-to-noise ratio.

13             Conversely on the right, we have a textbook

14   example of the XRPD of a crystalline solid, and what you see

15   here, once again, is an artifact of the internal structure

16   with sharp peaks and a high signal-to-noise ratio.

17   Q.    And it's a little cut off at the bottom here.   You

18   can probably see it on your screen.

19             What exhibits have you cited to in this slide?

20   A.    Actually, I can't see it on my screen but I can see

21   it on my printout.

22   Q.    That is why we have redundancies.

23             What exhibits have you cited to on this slide?

24   A.    These are DTX-724.11 and DTX-257.5.

25   Q.    Now, how, if at all, is XRPD definitive of whether

1    additional testing is needed?

2    A.      If sharp peaks are observed, therefore there is a

3    crystalline component to the sample that is being tested.

4    However, an XRPD does not provide information about the

5    chemical composition.  Indeed, different compounds can have

6    similar or even almost identical XRPD patterns.  Therefore,

7    if sharp peaks are observed, further testing is needed to

8    confirm the identity of any crystalline solid that is

9    present in the sample.

10           With respect to amorphous solids, if an XRPD

11   pattern produces a characteristic, broad hump pattern of an

12   amorphous solid, then it is definitive and no further

13   testing is needed.

14   Q.      What do you know if you see the broad hump shown on

15   the left here?

16   A.      Observation of an XRPD pattern like the one on the

17   left would be definitively indicative of solids being tested

18   is amorphous.

19   Q.      Let's turn to the next slide, DDX-8-7.

20           Can XRPD analysis be run on a physical mixture

21   of solids?

22   A.      Yes.  And, in fact, I'm going to use my favorite

23   solid in the world to illustrate this, which is chocolate.

24   I suspect a majority of the room would agree with me on

25   that.

1            There are -- chocolate is actually a mixture.

2    It is a mixture of crystalline and amorphous solids.  Cocoa

3    butter and sugar and oil are the components that comprise

4    chocolate.  And the XRPD pattern of chocolate is simply a

5    superposition of the two crystalline XRPDs on top of the

6    amorphous halo.

7            In other words, an amorphous halo will not

8    obscure crystalline peaks because of the additive nature of

9    how combinations of solids, mixtures of solids, simply are

10   additive rather than blocking or obscuring.

11   Q.      Can XRPD be used to detect the presence of a specific

12   crystalline solid in a physical mixture of solids?

13   A.      That would depend on whether it is a major component

14   or a minor component as determined by the weight percentage.

15   Q.      What is a major component?

16   A.      A major component is the component of a mixture which

17   has the highest weight percentage.

18   Q.      What is a minor component?

19   A.      A minor component is anything that is not a major

20   component.

21   Q.      Can XRPD be used to detect a major component in a

22   mixture of solids?

23   A.      Quite frequently, yes.  One would use what is called

24   a qualitative analysis.  Another word for that would be

25   fingerprint matching.

Zaworotko - direct

1           So one would need to know a reference standard

2    and compare the experimental XRPD pattern with that

3    experimental, with that reference standard, which is also

4    collectively experimentally.

5    Q.     And what does the USP suggest regarding qualitative

6    analysis?

7    A.     The USP suggests that 10 peaks should be matched

8    within at least .2 degrees in 2-theta to be considered a

9    match.

10   Q.     Would a match of 10 peaks be definitive?

11   A.     No.  As I have already mentioned, XRPD provides no

12   chemical information, so there are circumstances where

13   different compounds or different forms of the same compound

14   can have, in effect, the same XRPD pattern.

15           So even with a fingerprint match, additional

16   testing is needed to verify the identity of the specific

17   crystalline form that was studied.

18   Q.     Now, we discussed the difference between major and

19   minor components and established that XRPD can be used on

20   major components.

21           Can it also be used to identify a minor

22   component in a physical mixture?

23   A.     Maybe.  It depends on whether the minor component is

24   present above its limit of detection or LOD.

25   Q.     What is a limit of detection?

 1    A.      We have already heard about the limit of detection

 2    this morning even.   I'll refer to limit of detection in the

 3    context of XRPD.

 4              So in the context of XRPD, it is the minimum

 5    concentration or content, I should say, weight content of

 6    the analyte of interest that would allow XRPD to detect the

 7    presence of that analyte.

 8    Q.      Now, what, if anything, does the USP say is the limit

 9    of detection expectation for a quantitative XRPD analysis?

10    A.      The USP states that around a 10 percent LOD would be

11    anticipated if all goes well.

12    Q.      That is true for every test?

13    A.      No.   Every sample is different.   Every sample has --

14    could have more peaks or less peaks and could have smaller

15    unit cells or larger unit cells.   But 10 is the ballpark

16    number.

17              The rule of thumb, though, is more is better.

18    Q.      How is a limit of detection determined?

19    A.      A limit of detection is determined through a

20    quantitative analysis of the signal to noise.

21    Q.      Are you familiar with the term "spiking study"?

22    A.      Yes, I am.

23    Q.      Or excuse me, a spiking test?

24    A.      Yes.   The USP discusses this with respect to

25    quantitative analysis.   It would involve, first of all,

1    having access to a reference standard, an authentic sample

2    of the compound in question, and then taking a placebo which

3    has none of that content present -- we've heard the term

4    "placebo."  It is essentially a mixture with everything but

5    the compound of interest present.

6              -- and then deliberately adding known amounts,

7    spiking, in other words, of the reference standard until you

8    are able to detect with a reasonable degree of certainty the

9    presence of that particular compound, crystalline solid.

10   Q.    How do you determine in quantitative analysis whether

11   a signal is a peak?

12   A.    As Dr. Atwood testified last week it's not simply

13   what it looks like.  It's not a visual observation.  It's

14   whether the signal in question has an appropriate height and

15   width to be classified as a peak.  And this is a

16   quantitative analysis that would be conducted quite readily

17   by a person of ordinary skill.

18   Q.    Now, I understand you prepared to illustrate this

19   example.

20             MR. TAYLOR:  Your Honor, may the witness step

21   down to the easel?

22             THE COURT:  He may.

23             THE WITNESS:  Thank you.

24             So I'll have to speak up a little.

25             THE COURT:  And Counsel, if you need to move to

1    be able to see, feel free.

2    BY THE WITNESS:

3    A.      What I would like to do is explain to the Court how a

4    person of ordinary skill would go about this analysis with

5    respect to determining whether a signal is peak or noise.

6              In order to do that, one must first study the

7    noise.  So what I'm going to do is draw a typical XRPD

8    pattern and the random noise that would be present over a

9    1 degree peak width.

10              So what I'm representing here is one degree in

11   2-theta.

12              The typical steps size is .01 to .02 degrees.

13   So there would be 50 to 100 data points in this region.

14              And if we were just looking at noise, what we

15   would see is a completely random pattern, and we have seen

16   quite a lot of these in SSNMR and XRPD.

17   Q.      Once the background noise has been established, how

18   do you quantify that noise?

19   A.      The way to quantify this is to take the highest point

20   of the noise and the lowest point of the noise, and this

21   would be defined as the counts associated with the noise.

22   Q.      Once that is determined, how, then, do you go on to

23   determine whether a signal is noise or a peak?

24   A.      What I would like to do is illustrate three

25   scenarios.

1          Let's, for example, pick on this signal, and

2     let's assume that it's spiked up to more than the height of

3     the noise.

4          This would be what we would call 2-sigma data.

5          Let's take another scenario where we have a

6     broader peak which goes up to around half the height of the

7     noise or below the height of the noise.

8          And thirdly, let's consider a broad peak which

9     runs over multiple steps.  That's what I mean by broad peak

10    as opposed to a single step.

11         And a person of ordinary skill would assess the

12    height and the weight, and if both of them are consistent

13    with the peak, then instead of being a signal, it would

14    become a peak.

15    Q.   So Dr. Zaworotko, I apologize for interrupting you

16    but I want to make sure the record is clear.

17         The first peak you have drawn is very tall but

18    very narrow; is that correct?

19    A.   Correct.  So the first peak has the requisite height,

20    which is more than the height of the noise, but it does not

21    have the requisite width.  So this would be regarded as

22    noise.  It would be a spurious peak that would be regarded

23    as noise.

24    Q.   And the second peak that you have drawn has a wider

25    base but does not go as high.  Is that correct?

 1    A.      That is correct.

 2            So the second peak has an appropriate width but

 3    it doesn't have an appropriate height.

 4    Q.      And what about the third peak?

 5    A.      The third peak meets the criteria of both height and

 6    width.  And, therefore, the third peak gets two checkmarks

 7    and would be classified as an observable XRPD peak.  And I

 8    will be referring to this, this diagram, later in my

 9    testimony.

10    Q.      Thank you.

11            If you can please return to the witness stand.

12    A.      (Witness complies.)

13    Q.      And let's return to your demonstratives as well and

14    take a look at DDX-8-8.

15            We discussed the difference between a neat

16    amorphous solid and amorphous solid dispersion, but can you

17    please tell us why amorphous solid dispersions are used in

18    drug products?

19    A.      The simple reason is that they're more stable.

20    Q.      And what about an amorphous solid dispersion makes

21    it more stable?

22    A.      The nature of the structure means that they will be

23    kinetically stabilized versus the neat amorphous solid.  And

24    it's also possible that because of the nature of an

25    amorphous solid dispersion that they will be

Zaworotko - direct

1    thermodynamically stable.

2    Q.      How is -- excuse me.

3            How is an amorphous solid dispersion

4    specifically designed to prevent conversion to crystalline?

5    A.      It is specifically designed to prevent conversion

6    because it prevents molecular mobility, which is a

7    requirement for crystallization to occur in a solid.

8            So if I could go back to the laser pointer.

9            In order for crystallization to occur, the

10   molecules of interest have to be able to move through the

11   solid in order to build a crystal.

12           But especially in a low concentration, amorphus

13   solid dispersion, the molecular ability will be extremely

14   restricted.  And if that happens, that results in what is

15   called kinetic stability.

16   Q.      What does kinetic stability mean?

17   A.      Kinetic stability means that the molecular motion is

18   so restricted it's often called a glass state, when it is in

19   this state, and it means a crystallization will not occur

20   within a reasonable time frame.

21           And, of course, the prototypical example of this

22   is glass itself, which is where the name comes from, which

23   as we know can survive for thousands of years without

24   crystallization.

25   Q.      How does that differ from thermodynamic stability?

Zaworotko - direct

1    A.      Thermodynamic stability means that the solid in

2    question is already in its lowest energy state and,

3    therefore, it has nowhere to go in terms of lower energy.

4    So conversion is not possible if a substance is

5    thermodynamically, or a solid, is thermodynamically stable.

6    Q.      We've heard Dr. Atwood testify that all amorphous

7    solids will convert.

8            Do you agree?

9    A.      No.  It needs to be qualified.

10           All neat amorphous solids will convert

11   eventually if given an appropriate amount of time.  But it's

12   very important to distinguish between neat amorphous solid

13   and amorphous solid dispersions.  As I like to say, they are

14   completely different beasts.

15           The rules are different, and an amorphous solid

16   dispersion is either much less likely to convert compared to

17   the neat amorphous solid or will not convert at all.

18   Q.      Now, can you please turn to DTX-764 in your binder?

19   And I also -- it is also on the screen if that is easier for

20   you.

21   A.      Just in case there is a power outage, I will use the

22   paper.

23   Q.      It has been known to happen.

24           What is DTX-764?

25   A.      DTX-764 is a peer-reviewed publication in the journal

1    *Molecular Pharmaceutics*, which is also published by the

2    American Chemical Society.  It is titled, "Long-Term

3    Physical Stability of PVP and PVPVA, Amorphous Solid

4    Dispersions," and it is written by Lehmkemper, et al.

5            MR. TAYLOR:  If we can turn to page 2 of this

6    document and blow up Figure 1.

7    BY MR. TAYLOR:

8    Q.    Dr. Zaworotko, can you please explain what Figure 1

9    in DTX-764 shows?

10   A.    This is a textbook example of a phase diagram of an

11   amorphous solid dispersion, and it helps to explain why they

12   can be both either thermodynamically stable or kinetically

13   stable.

14           On the X axis, what is plotted is the API

15   content from 0 to 100 weight percent; on the Y axis is

16   plotted temperature.

17   Q.    What is the green line shown here?

18   A.    The green line on this figure is the glass transition

19   temperature or TG.

20   Q.    And what is the significance if a compound is below

21   that green line?

22   A.    If a compound is below the glass transition

23   temperature, then it is in the so-called glassy state and

24   molecular mobility is restricted.

25   Q.    You mentioned the glass transition point at several

Zaworotko - direct

1    times.  Can you please explain to the Court what that is?

2    A.    It's the temperature at which a phase transition

3    occurs from the glassy state to what is called the rubbery

4    state where there is a much higher degree of molecular

5    mobility.

6    Q.    And returning to Figure 1 here.

7          What is the burnt orange line?

8    A.    The burnt orange line is the solubility of the API in

9    the polymer.

10   Q.    And what is the significance if a compound is to the

11   left of the burnt orange line?

12   A.    Everything to the left of the burnt orange line is a

13   thermodynamically stable composition.

14   Q.    And with that explanation, can you please explain the

15   four regions shown in Figure 1?

16   A.    Yes.  There are four distinct regions as defined by

17   the green line and the red line.

18         Regions 1 and 2 are both thermodynamically

19   stable regions, and they correspond to low API weight

20   percent, on the low side of the weight percent content of

21   the API.

22         Region 3 is the kinetically stable region which

23   is stabilized because it's a glass.

24         And region 4 is the region where crystallization

25   is highly likely because there is both high molecular

1    mobility and thermodynamic instability.

2    Q.    Now, if the API content of an amorphous solid

3    dispersion was less than 7 percent, in which region would

4    the dispersion be placed?

5    A.    And I'll use the laser pointer to point to the

6    left-hand side of the diagram.

7              3 percent would be to the far left of this

8    diagram.

9    Q.    And let the record show that you have indicated

10   Section 2 of the diagram.

11   A.    And Section 1.

12   Q.    Now, before we move on to the next section of your

13   testimony, can you please summarize the main points of the

14   technology background you have provided today?

15   A.    Yes.  I have tried to emphasize three main points.

16             The first one is the one we were just discussing

17   which is that neat amorphous solids and amorphous solid

18   dispersions should not be conflated because they're very

19   different beasts.

20             Secondly, I emphasized how important it is to

21   take into account long range order when understanding the

22   difference between amorphous solids and crystalline solids.

23             And, third, I emphasized signal to noise in my

24   diagram, which I'll refer back to later.  How does a person

25   of ordinary skill -- I forgot the most important part.  How

1    does a person of ordinary skill determine whether a signal

2    is noise or a peak.

3    Q.    And let's go ahead and move on to the next section of

4    your presentation today.  Turn to DDX-8-9.

5         And I'd like to discuss SigmaPharm's ANDA

6    products that are the subject of this litigation.

7         If you could please turn to PTX-1074 in your

8    binder.

9    A.    Yes.

10    Q.    Do you recognize this document?

11    A.    Yes, I do.

12    Q.    What is it?

13    A.    This is a section of SigmaPharm's ANDA document.  It

14    is Section 3.2.P.1.

15    Q.    And please turn to page 4 of this document, which

16    ends in Bates SIGMA_APIX5072.

17         What do SigmaPharm's ANDA products comprise?

18    A.    SigmaPharm's ANDA products comprise what is called

19    apixaban amorphous 6.58 percent, which as I will explain in

20    more detail is an amorphous solid dispersion, and several

21    other ingredients, inactive ingredients or excipients

22    including mannitol, microcrystalline cellulose, crospovidone

23    which is a polymer also known as PVP, and I'll be referring

24    to it as PVP later, silicon dioxide and magnesium stearate.

25    Q.    Do you know how SigmaPharm creates its amorphous

Zaworotko - direct

1   dispersion drug product intermediate?

2   A.      Yes, I do.

3   Q.      Let's discuss that process.

4           If we can turn to DDX-8-10.

5           Can you please describe the demonstrative you

6   prepared on the screen?

7   A.      Yes.

8           In this schematic, I have illustrated the first

9   step of SigmaPharm's manufacturing process.  Also, very

10  simply in words, it's dissolving all the solids.

11          But I will explain it a little bit more.

12          We have, we start with a solution of a substance

13  known as BHA, which is butylated hydroxyanisole and

14  methanol.  To this is added PVP and then is added apixaban.

15          And these three solids are dissolved in the

16  methanol in a process that takes around 30 minutes or

17  however long it would take for the solution to become clear

18  which is indicative of dissolution of the solids.

19  Q.      And I see you cited a source here.  It looks a little

20  cut off.

21          Is that DTX-647?

22  A.      Yes, DTX-647.

23  Q.      Let's turn to the next slide and look at what happens

24  at the second step of SigmaPharm's manufacturing process.

25          What is happening on this slide?

1   A.      Step two, which in words has produced the amorphous

2   solid dispersion, is a proprietary and quite ingenious

3   process whereby the solution of the three solids that have

4   been dissolved is quickly dried to produce a solid which is

5   an amorphous solid dispersion which is comprised mainly of

6   PVP, the polymer, and 6.6 percent apixaban; and I believe

7   there is around about 0.4 percent BHA in that solid, but it is

8   not illustrated in this schematic.

9   Q.      Do you know whether FDA has completed the scientific

10  review of SigmaPharm's DMF?

11  A.      Yes, it is my understanding that in April of 2019,

12  the FDA issued its -- a decision that the DMF documents

13  detailing the manufacturing process was adequate.

14  Q.      Let's turn to PTX-997 in your binder.  And it's also

15  on your screen.

16  A.      Yes.

17  Q.      Do you recognize this document?

18  A.      Yes, I do.  This is a portion of SigmaPharm's DMF

19  which is Section 3.2.S, for Sierra, .2.5.

20  Q.      And if we can please turn to the page ending

21  SIGMA_APIX13278.

22          What does this document in this page of this

23  document say regarding measuring components of SigmaPharm's

24  drug product intermediate?

25  A.      This particular page of the DMF -- I'm looking --

 1    Q.      Hopefully, we have no epilepsy concerns as we get to

 2    the right page.

 3    A.      This particular page of the DMF highlights how the

 4    particle size is evaluated by SigmaPharm.

 5    Q.      And are the granules discussed on this page apixaban

 6    particles?

 7    A.      No, they are no longer apixaban particles.  The neat

 8    apixaban has now been converted into the so-called drug

 9    product intermediate which is the amorphous solid dispersion

10    that I just described.

11    Q.      And if you can now please turn to PTX-1071 in your

12    binder.

13    A.      (Witness complies.)

14              Yes.

15    Q.      What does this document discuss?

16    A.      This is a report from the company Catalent which is a

17    contract company that conducts testing.  In particular, it

18    is a report of XRPD testing on seven solids.  Six of them

19    are the apixaban amorphous drug product intermediate, and

20    the seventh is the placebo of that drug product

21    intermediate; i.e., the drug product intermediate without

22    the apixaban.

23    Q.      And if we go to page SIGMA_APIX15821, which is just

24    the next page, what are the results indicate here?

25    A.      The results which are highlighted at the bottom of

1    this page are that Catalent determined the crystalline form

2    of apixaban was not detected in any of the samples as none

3    of the peaks of the known crystal forms of apixaban were

4    found to be present.

5    Q.    And if we can actually go back to the main document,

6    take down the blowup, and look at the table that was

7    referenced to in the results section.

8              Are the 2-theta values listed here limited to

9    the six peaks shown in the '945 patent?

10   A.    No.  As I mentioned earlier, more is better when it

11   comes to fingerprint matching.  And 10 is the -- the

12   ballpark for adequate matching of the fingerprints of

13   crystalline solids.

14   Q.    If we can go to page SIGMA_APIX1825 of this document,

15   and this page through 831, which we'll just take a look at

16   this page on the screen, what do we see here?

17   A.    These are the plots of the XRPD data that was

18   collected by Catalent on behalf of SigmaPharm.

19   Q.    Let's return to your demonstrative at DDX-8-12.

20             How does the XRPD of SigmaPharm's drug product

21   intermediate that we just looked at in PTX-1071 compare to

22   the XRPD of the textbook amorphous form we discussed in

23   DTX-724?

24   A.    They are very similar.  The left-hand side of this

25   slide, by the way, is -- the print is very fine there -- is

1    the apixaban drug product intermediate.  On the right-hand

2    side is the textbook example of an amorphous XRPD that I

3    showed earlier.

4    Q.    Let's take a look at the next slide.

5          Can you please explain what you are showing here

6    from DTX-650.5?

7    A.    This is called a layering plot where in this case,

8    three XRPD patterns are layered on top of each other which

9    is something that one would do in fingerprint identification

10   which can be done visually.

11         In this particular case, the bottom pattern,

12   which is in black, which has all the sharp peaks, is

13   crystalline apixaban, as received by SigmaPharm.

14         The blue line, it's quite dark blue, but it's

15   the middle line.  The blue line is the placebo.

16         And the red line, which is the top line in the

17   plot, is the drug product intermediate including the

18   apixaban.

19   Q.    Please turn to DTX-728 in your binder.

20   A.    (Witness complies.)

21         Yes.

22   Q.    Do you recognize this document?

23   A.    Yes, I do.  This is a segment of SigmaPharm's DMF

24   document.  It is section 3.2.S, for Sierra, .7.3.

25   Q.    Now, if we can turn to page 8 of this document.  What

1    does this page discuss?

2    A.      Page 8 is a tabulated report that is the results of a

3    12-month stability test.

4    Q.      And what do these 12-month stability tests show?

5    A.      What they show is that, first of all, that the

6    crystallinity -- that no crystallization is observed because

7    the specification is -- that no crystalline form of apixaban

8    is present and for each of the samples up to 12 months.

9              The conclusion was that there is no crystalline

10   apixaban.

11             They also address the water content which shows

12   that the water content did not change significantly over

13   12 months.

14   Q.      We'll take a look at that in a moment.

15             If we can return to your demonstrative at

16   DDX-8-14.

17             Would you have expected PVP to have stabilized

18   the amorphous dispersion as this testing has shown?

19   A.      Absolutely.  There is considerable scientific

20   literature on this subject.

21             Here, I present three examples from the

22   scientific literature:  DTX-768.1, DTX-767.1, and DTX-720.2.

23             Each of these are peer-reviewed publications

24   which explain why PVP does what it does in terms of not just

25   inhibiting nucleation but inhibiting crystallization which

1    comes after nucleation.

2    Q.    And let's return to the manufacture of SigmaPharm's

3    ANDA products on the next slide.

4          What happens after the drug product intermediate

5    is formed?

6    A.    The drug product intermediate, which is used for both

7    of the SigmaPharm products that I have evaluated, is

8    formulated with the mixture of excipients that I discussed

9    earlier using a process called dry granulation.

10         The dry granulation is immediately followed by

11   direct compression, which is converting the mixture into

12   tablets.

13   Q.    And I want to clarify something you said.  When you

14   refer to both, do you mean the 2.5 and the 5 milligram

15   products?

16   A.    Yes, I do.

17   Q.    What impact does this stage of manufacturing have on

18   the amount of apixaban in SigmaPharm's ANDA products?

19   A.    Because we're taking the drug product intermediate

20   and diluting it by more than 50 percent because of the mass

21   of all the excipients, the net result is that the

22   concentration of weight percent content of apixaban is

23   reduced from 6.58 percent to approximately 3 percent.

24   Q.    What is the designed goal of SigmaPharm's

25   manufacturing process?

1    A.      This manufacturing process is specifically designed

2    to limit exposure of the ingredients to moisture.

3    Q.      And what, if you know, is the expiration of

4    SigmaPharm's ANDA products?

5    A.      The ANDA products have a 24-month or two-year shelf

6    life.

7              MS. WIGMORE:  I object to the lack of foundation

8    and hearsay.

9              THE COURT:  The lack of foundation and hearsay?

10             MS. WIGMORE:  Right.  His testimony about the

11   expert, we can establish the basis for that.

12             MR. TAYLOR:  I asked what you know and he

13   answered with the assumption that he knows which is

14   establishing the foundation.

15             MS. WIGMORE:  There has been no foundation.

16             THE COURT:  If you don't think he has a basis,

17   you can cross-examine him on it.

18             Go ahead.

19   BY MR. TAYLOR:

20   Q.      I'll rephrase the question, or restate the question,

21   rather.

22             What, if you know, is the expiration date of

23   SigmaPharm's ANDA products?

24   A.      It's my understanding that SigmaPharm's ANDA products

25   have been subjected to what is called accelerated stability

Zaworotko - direct

1    testing and long-term stability testing, both of which

2    showed stability that is suitable for a shelf life of

3    24 months or two years after the manufacture of the drug

4    product intermediate.

5    Q.    And let's turn to the next slide, DDX-8-16.

6          What efforts, if any, does SigmaPharm take to

7    maintain this stability?

8    A.    SigmaPharm took considerable efforts to address the

9    matter of the potential for water to affect the stability of

10   the drug products.  Some of them I have mentioned, but I

11   will repeat them as appropriate.

12         There are six efforts that I have identified,

13   including the method of manufacture, the use of magnesium

14   stearate and mannitol as excipients is relevant because

15   they're both non-hydroscopic or hygroscopic in nature.

16         The direct compression technology used during

17   the manufacturing limits the exposure of the drug product.

18   The drug -- the mixture that leads to the drug product to

19   humidity.

20         After the tablet has been formed, a polymer

21   called Opadry II was used to coat the tablets.  Opadry

22   doesn't prevent the permeation of moisture, but it does

23   reduce the permeation of moisture into the tablets after

24   they have been formed.

25         And then once the tablets have been coated, they

1    have selected appropriate storage and packaging conditions

2    to protect the drug product from moisture.  These include

3    the type of closure system which is basically the bottle in

4    which the tablets are stored.

5              And the seals, the packages in which they're

6    sealed are done in such a fashion that exposure to moisture

7    is, at the very least, significantly reduced.

8              And these efforts are detailed in three

9    exhibits:  PTX-1072, PTX-1073, and PTX-1074.

10   Q.    Turning to the next slide.

11             Are these efforts successful?

12   A.    Yes.  As I highlight on this slide, on the right of

13   the slide, inside the box, the outcome of these efforts is

14   that both the accelerated stability tests and the long-term

15   stability tests were passed, as they showed no significant

16   water increase by a method known at KF, so water content by

17   KF, which is the Karl Fischer method, in three months.

18   Q.    I see you are identifying PTX-1073 on the slide; is

19   that correct?

20   A.    Correct.

21   Q.    Assume for me, Dr. Zaworotko, that SigmaPharm's

22   efforts to exclude moisture were not completely successful.

23   How would the inadvertent absorption of moisture affect the

24   stability of SigmaPharm's drug product?

25   A.    In this case, it would be unlikely to affect the

Zaworotko - direct

 1   stability because the Tg value of both PVP and apixaban are

 2   above 100 degrees Celsius.

 3              So in order to bring the Tg down to room

 4   temperature, which would require a large drop in the Tg of

 5   more than 70 degrees Celsius, so even if moisture did get

 6   absorbed into the drug product and did reduce the Tg, it

 7   would have to go a very long way because it has got a high

 8   starting point in terms of the TG value.

 9   Q.     Now, assume for me that the TG, the glass transition

10   point, was lowered to 70 degrees, close to the ambient

11   temperature, would you expect SigmaPharm's ANDA product to

12   form apixaban crystalline particles?

13   A.     I would not expect that to happen because of the very

14   low concentration of the apixaban in the drug product in

15   SigmaPharm's ANDA product of just 3 percent, which would

16   place it to the far left of the phase diagram and mean that

17   it would be highly likely to be in the thermodynamically

18   stable region of the phase diagram.

19   Q.     What is the effect of SigmaPharm's maintaining a

20   separation between the drug product intermediate and

21   moisture?

22   A.     The effect of the separation is that it retained --

23   it starts as an amorphous solid and it stays as an amorphous

24   solid during manufacture and during storage of the drug

25   product after it has been manufactured.

1    Q.     If we can go to DDX-8-18.

2              MR. TAYLOR:  And, Your Honor, this is a segue

3    into our next section.  If you would prefer to break for

4    lunch, this would be a preferable method, but completely --

5              THE COURT:  You can keep going.

6              MR. TAYLOR:  Yes, Your Honor.

7    BY MR. TAYLOR:

8    Q.    Now, I understand you prepared an overview of your

9    responses to Dr. Atwood's opinions.

10             MR. TAYLOR:  And if we can turn to the next

11   slide, please.

12   BY MR. TAYLOR:

13   Q.    Can you please provide the overview that you have

14   prepared?

15   A.    Yes.  I have three primary issues with respect to

16   Dr. Atwood's opinions.

17             First of all, in my opinion, there were errors

18   in his XRPD methodology, the net result of which is that all

19   of his opinions become unreliable.

20             Secondly, the XRPD testing conducted by

21   Dr. Atwood shows no evidence of crystalline apixaban

22   particles in SigmaPharm's ANDA products.  And,

23             Third, Dr. Atwood did not conduct any tests

24   concerning particle size and, therefore, has no evidence to

25   opine that there must be crystalline apixaban particles with

1   a $D_{90}$ of equal to or less than 89 microns.

2   Q.    Let's start with that first point, the errors in

3   Dr. Atwood's methodology.

4              Taking a look at DDX-8-20.

5              What methodological errors did you identify in

6   Dr. Atwood's testing?

7   A.    There are five that I would like to highlight.

8              He did not retain a laboratory notebook and keep

9   sufficient records of how he conducted his tests and handled

10  his samples.

11             He did not follow USP recommendations concerning

12  the testing.

13             He did not run a limit of detection or spiking

14  test, which is appropriate for a limit of detection test and

15  for the kind of situation we're facing which is a solid, a

16  mixture of solids.

17             He did not compare his test results to a

18  reliable reference; and

19             He did not take into account that SigmaPharm's

20  drug product intermediate and drug product are not based

21  upon neat amorphous solids, they're based upon amorphous

22  solid dispersion.

23  Q.    What is the cumulative effect of the issues you have

24  just identified?

25  A.    The cumulative effect is that I consider his test

1    results to have been unreliable and inconclusive regardless

2    of what they show.

3    Q.      Now, you mentioned issues with recordkeeping.  Were

4    there any issues you identified with the chain of custody of

5    the products that Dr. Atwood tested?

6    A.      Yes.

7              MR. TAYLOR:  If we could take a look at 8-21.

8    BY MR. TAYLOR:

9    Q.      Where did the samples Dr. Atwood tested originate?

10   A.      They originated from SigmaPharm's laboratory plant in

11   Bensalem, Pennsylvania, on January the 31st, 2018.

12   Q.      And where were they shipped on January 31st, 2018?

13   A.      They were shipped to plaintiff's attorneys in

14   Washington, D.C.

15   Q.      And where did the tablets go next?

16   A.      The tablets were shipped on October the 30th, 2018,

17   to Dr. Munson's assistant in Loveland, Colorado.

18   Q.      What did Dr. Munson's assistant do with the tablets

19   when he arrived?

20   A.      He printed a label and attached it to the container

21   in which the tablets were shipped.

22   Q.      And is that what you are showing on the screen here?

23   A.      Yes.

24   Q.      Have you seen any evidence that those tablets were

25   shipped from Loveland, Colorado, to anywhere else?

1   A.      No.   There is no evidence of when and how shipping

2   occurred from Colorado to anywhere else.

3   Q.      Let's turn to the tablets that Dr. Atwood tested.

4           When did he receive those tablets?

5   A.      He received those tablets on November the 29th, 2018,

6   from Washington, D.C., from the plaintiffs' attorneys.

7   Q.      And what did Dr. Atwood do when he received those

8   tablets?

9   A.      He took a photograph of the container which showed

10  the same label that was placed on the container in Colorado

11  and a broken seal.

12  Q.      Do you have any idea as to how Dr. Atwood tested

13  SigmaPharm's ANDA tablets when the record shows that the

14  tablets never left Loveland, Colorado?

15          MS. WIGMORE:   Objection.

16  BY THE WITNESS:

17  A.      No, I have no theory in that regard as to how

18  they ...

19          MS. WIGMORE:   Objection.

20          THE COURT:   What is the objection?

21          MS. WIGMORE:   Objection to the characterization

22  of the evidence.

23          THE COURT:   Overruled.

24  BY MR. TAYLOR:

25  Q.      I'm sorry.   If you could please answer the question.

1   A.      I have no idea and no theory as to how the tablets

2   left Colorado and ended up at Professor Atwood's lab.

3            And on top of that, if one reviews the testing

4   results, they were apparently tested on the same day even

5   though they were in two different cities.

6   Q.      Now, we're going to look at the test results in

7   detail in a few minutes, but I want to be clear.

8            What is the significance of the chain of custody

9   issues and recordkeeping that we have just discussed to your

10  opinion?

11  A.      In my opinion, this is suggestive of an overall

12  sloppiness with how the samples were handled and kept.

13  Q.      And at the bottom of the screen, you have identified

14  DTX-974 and DTX-979; is that correct?

15  A.      Correct.

16  Q.      Why is --

17            MR. TAYLOR:  If we could go to the next slide,

18  please.

19  BY MR. TAYLOR:

20  Q.      Why is a laboratory notebook so important in this

21  specific case?

22  A.      Well, it's, in general, a good laboratory practice to

23  keep an appropriate record which in almost all cases is a

24  laboratory notebook.  We've heard testimony to that effect

25  last week in this trial.

1          In this particular case, the nature of the

2    testing requires careful tracking of how the samples were

3    handled, stored, prepared, and how long they were stored

4    after preparation before testing was conducted.

5          This would be standard in this particular type

6    of test because it's important that the samples after

7    preparation are not exposed to the atmosphere which would

8    cause exposure to moisture, and that they are stored in an

9    appropriate fashion that is consistent with the sample being

10   handled.

11   Q.    I'd like to next discuss your second point regarding

12   USP recommendations.

13         What do you mean by that?

14   A.    What I mean is that -- two things in particular.

15         First of all, Dr. Atwood used sandpaper during

16   the preparation of his sample.  And,

17         Secondly, that he crushed his tablets without

18   conducting a control experiment on an intact tablet, which

19   is recommended by the USP because crushing a tablet can

20   cause phase changes in solids.  And so it's important to

21   prove that the sample prep didn't cause a phase change.

22         Therefore, the only way to do that is conduct a

23   control experiment on an intact sample, in this case,

24   tablet.

25   Q.    Why is using sandpaper a problem?

1    A.      If any grains of sand or Illumina, or whatever was on

2    the sandpaper, were released into the sample, they are

3    inorganic materials which even in low concentration could

4    have quite strong XRPD peaks and, therefore, they could

5    contaminate the resulting XRPD with an impurity that wasn't

6    present before the sample preparation.

7    Q.      We've heard Dr. Atwood testify he was required to

8    grind the tablet in order to conduct his XRPD testing.

9            Is it possible to test a tablet using XRPD

10   without grinding it?

11   A.      Yes.  It's -- as I mentioned, it is actually

12   recommended that that be conducted as a control experiment.

13           With respect to tablets, it's common practice.

14   The pharmaceutical industry in particular tests intact

15   tablets to determine if counterfeiting has occurred because

16   the XRPD in an appropriate instrument with an appropriate

17   sample holder can quite routinely test and qualitatively

18   identify the API in an intact tablet.

19   Q.      We also heard Dr. Atwood testify he was following USP

20   guidelines when he ground the sample.

21           Do you agree?

22   A.      In part.  It is recommended, it's not required, but

23   it is recommended that samples be ground, and that is to get

24   a uniform particle size and to avoid errors that can result

25   in the absence of uniform particle size.

1          So it is quite standard to prepare a sample by

2   crushing or grinding the sample, but it is not required.

3   Q.      Now, let's be very clear, Dr. Zaworotko.   Are you

4   critiquing Dr. Atwood for grinding the tablet?

5   A.      Not at all.   My criticism is that he implied it was

6   required, and it's just recommended, and that he didn't

7   conduct a control experiment, which is needed to verify the

8   sample prep, didn't, in fact, cause a phase change.

9   Q.      Let's discuss the third point on your slide regarding

10  the limit of detection.

11          Now, we've discussed limit of detection earlier

12  in your testimony today.   But why, specifically, is it

13  important to Dr. Atwood's opinions in his case that he

14  failed to establish a limit of detection?

15  A.      A limit of detection is necessary to determine if

16  XRPD is even a viable test for a given solid at a given

17  concentration.   So unless the solid is present above the

18  limit of detection, it is, by definition, not detectable

19  using the XRPD testing method.

20  Q.      If a limit of detection was set at 5 percent and the

21  amount of the crystalline material to be tested was

22  2 percent, what would evidence that peaks were shown in an

23  XRPD analysis show?

24  A.      If the LOD had been determined to be 5 percent, and

25  only 2 percent was present, it would not be detectable;

1    therefore, any peaks detected must have come from something

2    else in the sample.

3    Q.    Let's turn to your fourth point.

4          What do you mean Dr. Atwood did not compare his

5    test results to a reliable reference?

6    A.    In order to identify a specific crystal form, it's

7    necessary to have a reference standard to compare to.

8          MR. TAYLOR:  You can go to the next slide,

9    please.

10   BY MR. TAYLOR:

11   Q.    Did Dr. Atwood have access to complete

12   diffractograms?

13   A.    Yes, he did.  There were several sources where he

14   could have obtained diffractograms.

15         BMS internal documents, DTX-984;

16         The API's supply, including Medichem, DTX-652;

17         The Catalent testing results that's we discussed

18   earlier, DTX-650; and

19         Publicly available peer-reviewed articles,

20   DTX-729.

21   Q.    And turning to DDX-8-25.  Dr. Atwood claims to have

22   matched three peaks.  How many peaks are recommended?

23   A.    The rule of thumb is more is always better, but as I

24   have discussed, I believe a couple of times already,

25   industry standards suggest that 10 peaks would need to be

 1  matched in order to get a fingerprint matching to be valid.

 2  Q.    And what documents are you identifying in support of

 3  that opinion?

 4  A.    These documents are DTX-720.1, DTX-753.2, and

 5  DTX-257.4.

 6  Q.    Now, are you saying that Dr. Atwood was required to

 7  match 10 points?

 8  A.    No.  It would depend from sample to sample whether 10

 9  would be enough or would be more than enough.  It would

10  simply depend on the sample in question, which, in part, is

11  how busy the signal is.  If there aren't 10 strong peaks,

12  then you can't do 10 strong peaks.

13            In this case, there are 10 peaks that could have

14  been addressed.

15  Q.    Let's turn to the XRPD test results that Dr. Atwood

16  provided.

17            And can you please provide an overview of

18  Dr. Atwood's results.

19  A.    Yes.  He identified three peaks merely by assuming

20  they were present and explaining that they couldn't be

21  observed for one reason or another.

22            And the other three, which are highlighted,

23  Dr. Atwood claims are present but in my opinion, he was

24  actually looking at noise and claiming that the peaks are

25  present.

1           MR. TAYLOR:  Go to DDX-8-27.

2      BY MR. TAYLOR:

3      Q.      Can you please describe this slide?

4      A.      This slide presents plots of all of Professor

5      Atwood's XRPD testing.  I believe there are 11 scans.  They

6      ranged in 2-theta range and they ranged in time.

7      Q.      What data did you use to prepare this slide?

8      A.      This slide was prepared directly from Dr. Atwood's

9      raw data.

10     Q.      And what 2-theta values did Dr. Atwood focus his test

11     on?

12     A.      He mainly focused on two regions, both of them

13     relevant to a table in the '945 patent which provides a list

14     of six peaks.

15              So he mainly focused on the region to the left,

16     which is up to 19 degrees, and the region to the right,

17     which is at around 27 degrees.

18     Q.      And what is the significance of the scans 9, 10, and

19     11 shown between those two points?

20     A.      9, 10, and 11 are scans around the region of

21     21 degrees, on either side of 21 degrees.

22              A significant peak is present in the N1 apixaban

23     crystalline form that was not listed in the table in the

24     '945 patent.

25              So it appears that he was trying to match with a

1    -- a fingerprint match with the N1 form of crystalline

2    apixaban.

3    Q.     Are you aware that in sitting and listening to

4    Dr. Atwood's testimony today, he opined that there was a

5    peak at 22 degrees?

6    A.     Yes.  As I recall in his reply report, if that is the

7    correct name, he claims to have identified a peak of

8    22 degrees.

9              MR. TAYLOR:  And if we could turn to PDX-57.25.

10   BY MR. TAYLOR:

11   Q.     What are we seeing here, Dr. Zaworotko?

12   A.     What we're seeing here, and I know it is hard to see,

13   but this is -- this is the direct figure taken from

14   Dr. Atwood's report, so it is a bit faint.

15             As we see something similar to what I

16   illustrated on my flip chart, which is that it could be

17   construed there's a peak there, but it doesn't have the

18   width or the height above the noise to be considered a peak

19   in my opinion.

20   Q.     And let's return to the six peaks identified in

21   Dr. Atwood's opening report.

22             We have established Dr. Atwood ran 11 scans.  On

23   how many scans did he rely to form his opinions?

24   A.     He relied on just two of these scans.

25   Q.     And which scans were those?

1    A.        They were scan 7, which was a relatively wide scan

2    from 9 to 19 degrees, conducted at 100 seconds per step, and

3    he also relied on scan 14, which was one of four scans

4    around the area of 27 degrees.

5    Q.        Now, before we go any further and discuss the

6    specific degree points, do you agree that any of the data

7    Dr. Atwood identified shows evidence of crystalline

8    particles in SigmaPharm's ANDA products?

9    A.        No.   In my opinion, none of his testing suggests any

10   evidence of crystalline apixaban in the ANDA products -- in

11   the Sigma's ANDA products.

12   Q.        Let's dive in, then, and look at the first peek

13   listing at 10.0 degrees?

14            What does Dr. Atwood conclude here?

15   A.        He concludes that the peak at 10 degrees or

16   10.0 degrees is blocked by a hill from amorphous material.

17   Q.        Do you agree?

18   A.        No.   As I have opined, and I believe that he has

19   testified, an amorphous hill would not be expected to block

20   an XRPD block.   They would be added to.

21   Q.        Was this your chocolate example from earlier?

22   A.        Yes.

23   Q.        Now, how does -- excuse me.

24            Turning to DDX-8-30.

25            How, if at all, does Dr. Atwood's raw data

1  support your opinion that there is no peak at 10.0 degrees?

2  A.    This is Dr. Atwood's raw data plotted over a more

3  appropriate scale of -- in the X axis and the Y axis.  And

4  if you focus on the middle of this plot, and I'm pointing

5  right in the middle with my laser pointer at 10.0 degrees,

6  what you see is that there's no signal above the noise with

7  either the height or the width that would be consistent with

8  an XRPD peak.

9  Q.    Turning to DDX-8-31.

10         What are the peaks at approximately 9.35 and

11  10.4 degrees?

12  A.    The two peaks that are highlighted by red arrows are

13  excipients.  They were also observed in the placebo.

14  Q.    So in summary, what is your opinion about

15  Dr. Atwood's conclusion that there is a crystalline peak at

16  10.0 degrees?

17  A.    I disagree.  In my opinion, there is simply noise.

18  There is no signal consistent with an XRPD being at

19  10.0 degrees.

20  Q.    Let's turn to 8-32.

21         What does Dr. Atwood opine for 10.6 and

22  18.5 degrees?

23  A.    For both of these peaks, his opinion was that the

24  peak was there, that it was blocked by peaks from

25  excipients.

Zaworotko - direct

1  Q.      Do you agree?

2  A.      No, I do not.

3  Q.      Why?

4  A.      Because if you plot the peaks out, if you plot the

5  XRPD raw data, what you will see is that there is no

6  indication of a peak with a height and width that is

7  appropriate.

8              And also, blocking would not be appropriate

9  unless a peak is exactly at that position.

10 Q.      Let's take a look at that raw data at DDX-8-33.

11             How, if at all, does this data support your

12 opinion?

13 A.      What is illustrated on this slide are two lines on

14 .1 degrees from either side of 10.60 degrees.  And even

15 though there are excipient peaks in the vicinity, they have

16 already gone down to the noise by the time we get to

17 10.6 degrees.

18             So once again, and I'm highlighting with the

19 laser pointer the specific region, there is no signal that

20 is consistent with an XRPD peak in this region.  Rather, it

21 is consistent with noise.

22 Q.      Now, do you see the little point being shown right

23 around 10.6 degrees right here?

24 A.      Yes, I do.

25 Q.      What, in your opinion, is that?

1    A.       That is simply noise.

2    Q.       Why do you disagree --

3             And turn to the next slide, please, 8-34.

4             Why do you disagree there is a peak at

5    18.5 degrees?

6    A.    Well, first of all, 18.5 is the most intense peak in

7    the N 1 form.  So if any peak were to be observed, one would

8    expect the 18.5 peak to be present.

9             There is indeed a large excipient peak in that

10   region but it is positioned at 18.7 degrees on the far right

11   of the XRPD pattern, as I am indicating with the laser

12   pointer.

13            The black line indicates 18.5.  And if a peak

14   were present, one would expect to see it as a satellite.  It

15   wouldn't be blocked.  It would simply be a satellite because

16   XRPD patterns are additive.

17   Q.    And to be clear, is it your opinion that there is a

18   peak at 18.5 degrees?

19   A.    No.  There is nothing to suggest that a peak is

20   indeed present at 18.5 degrees in 2-theta.

21   Q.    Let's take a look at DDX-8-35?

22            What are your opinions regarding Dr. Atwood's

23   finding at 12.24 and 12.84 degrees.

24   A.    Once again, it's my opinion that he is taking a noise

25   peak and assigning it, I should say a noise signal and

1   assigning it as an XRPD peak.  It becomes clearer when you

2   plot his data, which is on the right, on a more appropriate

3   scale in the, on the X and Y axis.  But what he is

4   portraying as peaks are actually simply background noise.

5   Q.    And what type of review is this?

6   A.    This is simply qualitative on certain observation.

7   It doesn't look like a peak.

8   Q.    Let's take a look then at quantitative analysis and

9   turn to DDX-8-36.

10         How does a quantitative analysis support your

11   opinion?

12   A.    Using the quantitative analysis procedure that I

13   talked about earlier on my flip chart, one would first

14   determine the limits of the noise and determine if there are

15   any peaks above that noise.  In this particular case, there

16   are no peaks whatsoever above the noise so there is neither

17   height nor width that would allow a person to assign the

18   noise as a peak.

19   Q.    Let's turn to the next slide, please.

20         How many scans did Dr. Atwood conduct at

21   27 degrees?

22   A.    He conducted four scans.

23   Q.    And what intensity did those scans range from?

24   A.    The scans in terms of the time per step were 14

25   different times.  30 seconds, 100 seconds, 150 seconds, and

1    300 seconds.

2    Q.    And of these, which would be expected to be the most

3    reliable?

4    A.    The most reliable, which is the one with the highest

5    signal-to-noise ratio, would be expected to be in the

6    300-second scan.

7    Q.    On which scan did Dr. Atwood base his opinions?

8    A.    The 30-second scan, which is of the opposite extreme.

9    It's the one which should have the most noise and,

10   therefore, the least reliable.

11   Q.    Let's take a look at that scan on DDX-8-38.

12         How, if at all, does Dr. Atwood's scan 14 affect

13   your opinion?

14   A.    Once again, if we take a look at my plot of

15   Dr. Atwood's raw data, the region of interest, which is

16   27.1 degrees, has a signal, but it doesn't have the width or

17   the height consistent with it being defined as an XRPD peak.

18   Q.    And is that DTX-749 that you are basing this from?

19   A.    Yes.

20   Q.    And let's take a look at the next scan, DDX-8-39.

21         What is being shown here?

22   A.    This is the more sensitive scan.  So it has,

23   relatively speaking, a higher signal to noise.

24   Q.    And do you identify a peak at or near 27.1 degrees?

25   A.    No.  In fact, this one is even less, showing even

1    less of an indication of a signal that is consistent with an

2    XRPD peak.

3                    MR. TAYLOR:  If we can go back one slide,

4    please.

5    BY MR. TAYLOR:

6    Q.    Do you see where I'm indicating on this screen at

7    27.1?

8    A.    Yes.

9    Q.    What is that, in your opinion?

10   A.    That is simply a signal consistent with background

11   noise.

12   Q.    And the next slide, please?

13   A.    Once again, at 27.1, it is a different scale.  But

14   27.1 is actually on the low end of the noise this time, not

15   on the high end of the noise.

16   Q.    Let's go to DDX-8-40.

17                    In summary, Dr. Zaworotko, do any of the peaks

18   that Dr. Atwood claims to have identified in your opinion

19   show crystalline material at any of the 2-theta values

20   listed in the '945 patent?

21   A.    No.  In my opinion, Dr. Atwood simply assumes that

22   three of the six peaks existed but with no experimental

23   evidence.  For the other three signals, he claimed that

24   noise would, in fact, peak.

25                    Therefore, it is my opinion that no evidence has

1    been presented that suggests that there are crystalline

2    apixaban particles in SigmaPharm's ANDA products.

3    Q.      Is that surprising to you?

4    A.      No, it is not.  As we have discussed, first of all,

5    they're not pure, neat apixaban particles.  They are

6    amorphous solid dispersions.  And all of the testing

7    suggests that that amorphous solid dispersion is stable and

8    persists through the manufacturing process.

9               And the storage and testing process that

10   followed.

11   Q.      Let's take a look at the next slide, please.

12              I'm going to briefly discussion the additional

13   claim limitation regarding the $D_{90}$.

14              Do you understand Dr. Atwood has opined

15   SigmaPharm's ANDA products comprise crystalline apixaban

16   particles having a $D_{90}$ of equal to or less than 89 microns?

17   A.      Yes.

18   Q.      Do you agree?

19   A.      No, I do not agree.  There are three reasons for

20   disagreeing.

21              The first of all, the first of which is that

22   there are no apixaban particles in the first place.  There

23   are a mix of apixaban solid dispersion particles in which

24   the apixaban is dissolved in a polymer.

25              Secondly, there is no experimental testing

 1    conducted to address particle size whatsoever.

 2              And third, and this I have also mentioned

 3    previously, in the context of the crystallinity,

 4    Dr. Atwood's assumptions were based upon background which

 5    focused upon neat amorphous solids and not amorphous solid

 6    dispersions which are very different beasts, as I have

 7    testified today.

 8    Q.    In summary, Dr. Zaworotko, what is your opinion

 9    regarding whether SigmaPharm's ANDA products infringe claims

10    21 and 22 of the '945 patent?

11    A.    It is my opinion that the evidence is consistent with

12    noninfringement of the '945 patent by Sigmapharm's ANDA

13    products.

14              MR. TAYLOR:  No further questions,

15    Dr. Zaworotko.

16              We can read in the exhibits that we used.

17              DTX-257, DTX-647 -- these will all be DTXs until

18    I indicate otherwise.

19              650, 652, 713, 720, 724, 728, 729, 743, 749,

20    750, 753, 754, 764, 767, 768, 720, 974, 979, and 984.

21              For PTX we have 1071, 1073, 367, 997, 1032, and

22    we also referenced PTX-1074 which had been previously

23    admitted.

24              THE COURT:  Any objections to the admission of

25    all those exhibits?

```
 1                    (Counsel confer.)

 2                    MS. WIGMORE:  One moment, Your Honor.

 3                    THE COURT:  Sure.

 4                    MS. WIGMORE:  So it is our understanding that

 5      DTX-974, DTX-979 and DTX-984 were not used during the

 6      examination.

 7                    MR. TAYLOR:  Your Honor, it may be -- I believe

 8      they were.  I would request permission to work this out

 9      without wasting the Court's time as we figure this out.

10                    THE COURT:  That's fine.  We will take it up

11      when we come back.

12                    We're going to take a lunch break.  We'll get

13      started at 1:30.  We will be in recess.

14                    (Lunch recess taken.)

15                    *     *     *

16                    1:42 p.m., AFTERNOON SESSION

17                    THE COURT:  Did you work out the document issue?

18                    MR. TAYLOR:  Yes.  Yes, we did, Your Honor.

19                    So in addition to what I read earlier, DTX-974,

20      DTX-979 and DTX-984.

21                    THE COURT:  Were those the three you had read

22      before?

23                    MR. TAYLOR:  Yes, Your Honor.

24                    THE COURT:  Okay.  You agree those are admitted?

25                    MR. LEE:  We have no objection.  Just the
```

1      misunderstanding was if an exhibit is referenced on the

2      slide but not shown to the witness.  We understand now they

3      can all be offered.

4                    THE COURT:  That is fine by me then.  Okay.  So

5      those three are admitted as well.

6                    (All above-referenced exhibits admitted,

7      including the ones just before lunch.)

8                    THE COURT:  We'll have cross-examination.

9                           CROSS-EXAMINATION

10     BY MS. WIGMORE:

11     Q.      Good afternoon, Dr. Zaworotko.

12     A.      Good afternoon.

13     Q.      My name is Amy Wigmore.

14             Now, you offered opinions on Dr. Atwood's XRPD

15     test; correct?

16     A.      Correct.

17     Q.      And you offered criticisms about Dr. Atwood's

18     testing; correct?

19     A.      Yes, I did.

20     Q.      Now, you have a laboratory of your own; correct?

21     A.      Yes.

22     Q.      Your research group collects many XRPD scans each

23     day; correct?

24     A.      Yes.  Thousands per year.

25     Q.      Now, you did not ask for access to SigmaPharm's

 1    tablets in this case; correct?

 2    A.      Correct.   It was outside the scope of what I was

 3    asked to do.

 4    Q.      Now, you are retained by SigmaPharm in this case;

 5    correct?

 6    A.      Correct.

 7    Q.      And you could have obtained samples of SigmaPharm's

 8    tablets if you wanted to test them; correct?

 9    A.      Yes.   But there was no need for me to collect data to

10    form my opinions.

11    Q.      So you did not run any XRPD test to determine if

12    there was crystalline material in SigmaPharm's tablets;

13    correct?

14    A.      No, there was no need to.

15    Q.      And you did not conduct any test to determine the

16    particle size of any crystalline material in SigmaPharm's

17    tablets; correct?

18    A.      No, there was no need to.

19    Q.      Now, you did not test SigmaPharm's starting API

20    either; correct?

21    A.      Correct.

22    Q.      You agree that SigmaPharm's starting API is

23    crystalline apixaban form N-1; correct?

24    A.      The starting point of the process, yes, is the, as

25    received, crystalline apixaban from Medichem, as I remember.

1    Q.      And you did not test SigmaPharm's drug intermediate;

2    correct?

3    A.      No, there was no need to.

4    Q.      Now, you did not produce a laboratory notebook in

5    connection with this case; correct?

6    A.      Sorry.  I didn't quite hear the question.  There was

7    some background noise.

8    Q.      You did not produce a laboratory notebook in

9    connection with your work on this case; correct?

10   A.      Correct.  There was no need to because I didn't

11   conduct any experiments.

12   Q.      You did not conduct a single experiment in connection

13   with this case; correct, Dr. Zaworotko?

14   A.      Correct.  There was no need to.

15   Q.      Now, you dispute two claim limitations of the

16   asserted claims of the '945 patent; correct?

17   A.      Correct.

18   Q.      And one is the crystalline limitation; correct?

19   A.      Yes.  Whether or not there are crystalline apixaban

20   particles in the SigmaPharm drug product.

21   Q.      And the second limitation you dispute is whether the

22   particle size $D_{90}$ limitation is within the scope of the

23   claims; correct?

24   A.      Correct.  It was whether $D_{90}$ is less than 89 microns

25   or not.

Zaworotko - cross

1    Q.       And you understand that the Court has construed the

2    phrase "apixaban particles have a $D_{90}$" as having its plain

3    and ordinary meaning; correct?

4    A.       I don't remembered, but I believe I saw it earlier

5    during testimony this morning that that was how that

6    particular term was construed.

7    Q.       And you understand that the Court's opinion makes

8    clear that no particular type of test is required to

9    determine the size of the particles; correct?

10   A.       I'm not certain about that.  Perhaps you could

11   refresh me if there is a document or a statement that I made

12   to that effect.

13            MS. WIGMORE:  Let's pull up DTX-612, page 10.

14   BY MS. WIGMORE:

15   Q.       This is the Court's claim construction opinion, and

16   I'll direct you to the first sentence of the first full

17   paragraph on page 10.

18            It says, "Nothing in the patent requires

19   particle size to be measured one and only one way, in

20   particular only by a laser light scattering method using

21   only bulk apixaban's particles as Unichem contends."

22            Do you see that?

23   A.       Yes.  It makes sense to me.

24   Q.       Now, with respect to the other claims that have been

25   asserted, you understand the parties agree they should have

1    their plain and ordinary meaning; correct?

2    A.    I would have to be refreshed on that.

3    Q.    Okay.  If we could turn --

4          MS. WIGMORE:  Pull up the pretrial order.

5          Uncontested fact number 34.

6    BY MS. WIGMORE:

7    Q.    The second sentence says, "The parties agreed that

8    all other claim terms from the '945 patent have their plain

9    and ordinary meaning to a person of ordinary skill in the

10   art."

11         Do you see that?

12   A.    Yes.

13   Q.    Now, the claim term, "Wherein, apixaban comprises

14   crystalline apixaban particles" must be interpreted

15   consistent with its plain and ordinary meaning; correct?

16   A.    Correct.

17   Q.    And you understand that claims 21 and 22 depend on

18   independent claim 12 of the '945 patent?

19   A.    I would want to review the claims --

20   Q.    Okay.

21   A.    -- before I answer that question.

22         MS. WIGMORE:  So if we could pull up claims 21

23   and 22 of the '945 patent, which is JTX-2.

24   BY MS. WIGMORE:

25   Q.    Do you see the reference in each of claim 21 and 22

Zaworotko - cross

1    to claim 12?

2    A.      Yes, I do.

3            MS. WIGMORE:  And if we could pull up claim 12,

4    please.

5    BY MS. WIGMORE:

6    Q.      You understand that this is the independent claim on

7    which claims 21 and 22 depend?

8    A.      Yes, I recognize this claim.

9    Q.      Okay.  And there is nothing in claim -- the language

10   of claim 12 does not specify a percentage of apixaban that

11   must be crystalline; correct?

12   A.      No, it would be its plain and ordinary meaning as we

13   just discussed.

14   Q.      Okay.  So when you said no, is it actually correct

15   that there is no percentage of crystalline apixaban

16   specified in this claim.

17   A.      Correct.

18   Q.      Now, a person of skill in the art would understand

19   the phrase "Wherein, the crystalline" -- "Wherein, apixaban

20   comprises crystalline apixaban particles to include any

21   amount of crystalline apixaban that can be detected."

22   Correct?

23           MR. TAYLOR:  Objection, Your Honor.  Beyond the

24   scope.

25           This is something that the earlier expert,

1    Dr. Schurko, testified regarding the Nause reference.

2    Dr. Zaworotko did not discuss the Nause reference which is

3    what this testimony is getting at.

4              MS. WIGMORE:  We're actually just talking about

5    the meaning of the term that he says has not been satisfied.

6              THE COURT:  Didn't he give testimony on whether

7    this claim limitation is satisfied?

8              MR. TAYLOR:  Yes, Your Honor.  But there wasn't

9    a discussion of the specific percent.  As Your Honor knows

10   from the motion in limine briefing, the issue is whether

11   Nause requires up to 40 percent of it be crystalline.

12             THE COURT:  All right.  I don't think it's

13   outside the scope.  The objection is overruled.

14             You can go ahead.

15             MS. WIGMORE:  If it would help, I can repeat my

16   question.

17   BY MS. WIGMORE:

18   Q.    A person of skill in the art would understand the

19   plain and ordinary meaning of the phrase that has been

20   highlighted here:  "Wherein, apixaban comprises crystalline

21   apixaban particles to include any amount of crystalline

22   apixaban that can be detected."  Correct?

23   A.    Yes.  The word "comprise" would say to me that that

24   can be things other than crystalline.

25   Q.    Now, you agree that the meaning of the term

Zaworotko - cross

1    "crystalline" is that -- strike that.

2              You agree the plain and ordinary meaning of

3    crystalline apixaban is that it is apixaban and that it has

4    long-range order.

5              Do you recall testifying about that on direct?

6    A.    Yes.

7              To be more specific, a repeating pattern of

8    molecules in three dimensions with long-range order.

9    Q.    Now, if there is a sharp peak in an XRPD, this

10   indicates long-range order; correct?

11   A.    Yes.  It's an indication that something crystalline

12   is present in the sample.

13   Q.    So presence of sharp peaks in an XRPD pattern is an

14   indication of the presence of something crystalline;

15   correct?

16   A.    Correct.

17   Q.    And you agree that if there is a single sharp peak,

18   it's indicative of something crystalline; correct?

19   A.    Yes.

20   Q.    Now, you testified about SigmaPharm's manufacturing

21   process on direct.

22              Do you recall that?

23   A.    Yes, I do.

24   Q.    And you testified that SigmaPharm's manufacturing

25   process is designed to prevent conversion to crystalline

1    apixaban; right?

2    A.      I believe that today I testified it's designed to

3    protect or limit the exposure of the process to moisture

4    which could, in turn, lead to a higher tendency to

5    crystallize.

6             MS. WIGMORE:  Can we pull up Defendant's

7    Demonstrative Exhibit 8-5?

8    BY MS. WIGMORE:

9    Q.      Do you recall showing this picture of an amorphous

10   solid dispersion on the right-hand side of this

11   demonstrative?

12   A.      Yes, I do.

13   Q.      And that was your description of the amorphous

14   dispersion and how its designed to supposedly prevent

15   crystalline formation; correct?

16   A.      Yes.

17   Q.      Now, to the extent a crystalline particle did form in

18   this type of dispersion, you agree that there would be

19   constraints on how much that crystalline particle could

20   grow; correct?

21   A.      There would be inhibition of nucleation, and

22   inhibition of crystallization, but I can't speculate on

23   size, on how much size could grow.

24             There is a phenomenon known as Ostwald ripening,

25   which we discussed in my deposition.

Zaworotko - cross

1    Q.      Now, you testified that there is a low concentration

2    of apixaban material in this dispersion; correct?

3    A.      Yes.  6.58 percent as I recall.

4    Q.      And you testified that there is limited mobility of

5    the apixaban particles in this composition; correct?

6    A.      I testified that there is an expectation that there

7    would be limited mobility because of the known ability of

8    PVP to inhibit nucleation.

9    Q.      And once you have nucleation, does the step of

10   crystal growth require continued mobility?

11   A.      Yes, it does.

12   Q.      Now, you mentioned -- strike that.

13           Let's turn to some basics on XRPD analysis.

14           You agree that XRPD testing is the gold standard

15   for identification of the crystal form of an API; correct?

16   A.      Yes.

17   Q.      And you referred during your direct examination to

18   the USP.

19           Do you recall that?

20   A.      Yes, I do.

21           MS. WIGMORE:  Let's pull up PTX-681.

22   BY MS. WIGMORE:

23   Q.      And if you would like to look at your binder, it's

24   Tab 6.  In the binder that we handed up to you.

25   A.      Yes.

Zaworotko - cross

1   Q.      Do you recognize this as a portion of the USP or

2   United States Pharmacopeia?

3   A.      Yes, I do.

4   Q.      If we could turn, please, to the page ending in Bates

5   No. 493.

6            Do you see the heading, "Qualitative Phase

7   Analysis (Identification of Phases)"?

8   A.      Yes.

9   Q.      And under that heading, the first sentence says, "The

10  identification of the phase composition of an unknown sample

11  by XRPD is usually based on the visual or computer-assisted

12  comparison of a portion of its x-ray powder pattern to the

13  experimental or calculated pattern of a reference material."

14           Did you see that?

15  A.      Yes, I do; and that is a practice I follow every day.

16  Q.      Now, you testified that the 10 strongest reflections

17  are required for XRPD analysis; is that correct?

18  A.      I think "required" is too strong.  I think

19  "recommended" is the term that I used.

20  Q.      You would never say there is a specific number of

21  peaks that are required to match a reference; correct?

22  A.      No.  My testimony was that more is better, or it will

23  vary.  What is appropriate will vary from sample to sample.

24  Q.      So it's correct there is not a specific number of

25  peaks that is required; correct?

1  A.      No, but the industry standard is 10.

2  Q.      Just so I'm clear, when I say correct and you say no,

3  there is a bit of confusion on the record.  So I'll just ask

4  the question again and make sure the answer is clear.

5          You would never say there is a specific number

6  of peaks that are required to match a reference; correct?

7  A.      I would say that there is no fixed number which works

8  at all times and is a requirement.  The terminology in the

9  USP, it is generally sufficient is what I would agree with.

10  Q.      Now, you testified about another portion of the USP,

11  and I want to pull up PTX-409, which is Tab 5.

12          This is another portion of the USP referred to

13  on direct examination; correct?

14  A.      This is an older version of the USP, but it's one I'm

15  quite familiar with.

16  Q.      Now, if we could turn, please, to the Bates number

17  ending in 473.

18          In the right-hand column at the bottom, there is

19  a sentence beginning, "It is generally sufficient ..."

20          MS. WIGMORE:  Can you pull that up?

21  BY MS. WIGMORE:

22  Q.      And that sentence is the one you referred to when

23  testifying about the 10 peak reference.

24          Do you recall that?

25  A.      I don't recall.  I believe I provided three

1    background references.  I'm not sure if this is one of them.

2    Q.     And when the USP makes this statement about the 10

3    strongest reflections, it's referring to the powder

4    diffraction file.

5           Do you see that?

6    A.     It's -- oh, sorry.  Yes.  It's -- identified it in

7    the powder diffraction file would mean the peak listing.

8    Q.     Now, in this case, Dr. Atwood's testing did not

9    involve comparing apixaban peaks to the powder diffraction

10   file; correct?

11   A.     Well, the powder diffraction file, my interpretation

12   of this, reading it just in this sentence, is that it's a

13   peak listing from an XRPD experiment; i.e., a reference

14   standard.

15   Q.     Let's turn to footnote 2.

16          Do you see that the footnote 2 follows the

17   phrase "powder diffraction file" in the XRPD excerpt?

18   A.     Yes.

19   Q.     Let's go to footnote 2.  And footnote 2 describes:

20   "The International Center For Diffraction Data maintains a

21   file on more than 60,000 crystalline materials, both organic

22   and inorganic, suitable for such comparisons."

23          Do you see that?

24   A.     Yes, thank you.  That explains the term "powder

25   diffraction file" very well.

1   Q.      Now, in this case, Dr. Atwood was not comparing his

2   XRPD scans to this file; correct?

3   A.      It would be a reasonable assumption, but in 2005, the

4   XRPD would not have been archived with apixaban, so it

5   wouldn't have been -- he wouldn't have been able to retrieve

6   it from this file.

7   Q.      So when he did his analysis of apixaban, he was

8   looking for materials that are specified as ingredients in

9   SigmaPharm's ANDA; correct?

10  A.      Could you repeat the question, please?

11  Q.      Sure.  I'll rephrase it to make it more clear.

12          You understand that SigmaPharm's ANDA enumerates

13  all of the ingredients of its tablets; correct?

14  A.      Correct.

15  Q.      And there is also information that Dr. Atwood

16  reviewed that had the XRPD for the crystalline apixaban API

17  that SigmaPharm began this process with; correct?

18  A.      Are you asking me if Dr. Atwood used that?

19  Q.      Yes.

20  A.      Or if it is available?

21          I'm not sure if Dr. Atwood used that.  I'd have

22  to be refreshed if that is in his report -- his reports.

23  Q.      You don't remember being in the courtroom when he

24  testified about the XRPD or the crystalline apixaban API

25  from SigmaPharm?

1    A.      I don't recall that part of his testimony.

2    Q.      Okay.  So let's turn back to the portion of the USP

3    we were just reading.

4              And in the sentence immediately before that

5    reference to the 10 strongest reflections, it says, "For

6    other types of samples (e.g., inorganic salts), it may be

7    necessary to extend the 2-region scan to well beyond

8    40 degrees."

9              Do you see that?

10   A.      Yes.

11   Q.      Can we agree that apixaban is not an inorganic salt?

12   A.      Yes.

13              MS. WIGMORE:  We can take this exhibit down.

14   BY MS. WIGMORE:

15   Q.      Now, you agree that the sensitivity of an XRPD method

16   can be increased by increasing the number of counts

17   collected; correct?

18   A.      Yes.  That is one way to increase the sensitivity.

19   Q.      And you agree that increasing the count time per step

20   is a routine strategy to increase the sensitivity of an

21   XRPD; correct?

22   A.      Yes, it's one way in which that can be achieved.

23   Q.      You are familiar with the term "limit of detection";

24   correct?

25   A.      Correct.

1    Q.       And you testified about limit of detection during

2    your direct examination; correct?

3    A.       Correct.

4    Q.       You agree that the limit of detection can be improved

5    by increasing the sensitivity of the XRPD method; right?

6    A.       Yes.

7    Q.       And a limit of detection provides crucial information

8    regarding whether the diffractometer can actually detect any

9    crystalline API; correct?

10   A.       Correct.

11   Q.       If the limit of detection for an XRPD test is 5

12   percent, you would agree that the test method is invalid for

13   analyzing a component that is only 3 percent of a sample;

14   correct?

15   A.       Correct.

16   Q.       You would need to design a test to detect that

17   3 percent that would improve the limit of detection beyond

18   the amount of material present; correct?

19   A.       Correct.

20   Q.       If the material of interest is 3 percent, the limit

21   of detection would have to be below 3 percent in order to be

22   able to conclude that there is no material in the sample;

23   correct?

24   A.       That would be a minimal requirement.

25            Also, it would have to be completely crystalline

Zaworotko - cross

1    in order to be above the limit of detection.

2    Q.    So if it's not completely crystalline, you need an

3    even lower limit of detection than 3 percent; correct?

4    A.    Correct.

5    Q.    Now, I want to pull up PTX-1071.  This is an exhibit

6    you discussed on direct examination.

7          And this is a final report from Catalent to

8    SigmaPharm; correct?

9    A.    Correct.

10   Q.    You relied on this report in forming your opinions in

11   this case; correct?

12   A.    Yes, I did.

13   Q.    Now, you were not personally involved in any of the

14   testing that Catalent did reflected in this report; correct?

15   A.    Correct.

16   Q.    And if we turn, please, to the page with Bates number

17   ending at 8 -- sorry, Bates number ending in 821.

18          I'm going to direct your attention to the step

19   time.

20          Do you see that the step time that Catalent used

21   in this testing was one second?

22   A.    Yes.  That is a routine, everyday XRPD test which is

23   aimed at qualitative assessment of a salt.

24   Q.    And is step -- I'm sorry.

25   A.    Okay.

Zaworotko - cross

1   Q.      Is step time related to count time?

2   A.      Yes.

3   Q.      Is it the same thing?

4   A.      Yes.  Step time, count time, yes.

5   Q.      Now, I want to turn to one other exhibit that relates

6   to Catalent, and this is DTX-650.

7            This is another final report from Catalent to

8   SigmaPharm regarding apixaban; correct?

9   A.      Correct.

10  Q.      And if we turn to page -- the Bates number ending in

11  896.

12           Do you see there is a step time identified here

13  as one second?

14  A.      Yes, I do.

15  Q.      Thank you.  You can put that exhibit down.

16           Now, in forming your opinions, you were not

17  provided any document identifying the limit of detection for

18  the Catalent XRPD studies; correct?

19  A.      I don't recall if I did.  Sitting here right now, I

20  don't recall.

21  Q.      Let's turn to PTX-1038, which is Tab 7 in your

22  binder, if you want a hard copy, but we can pull it up on

23  the screen.

24           This is a document titled "Method Validation For

25  Crystallinity By X-Ray Diffraction of Apixaban's Finished

Zaworotko - cross

1   Product."  Correct?

2   A.      Correct.

3   Q.      This is a SigmaPharm document dated December 9th of

4   2016; correct?

5   A.      Yes; correct.

6   Q.      And this is a portion of SigmaPharm's ANDA; correct?

7   A.      I'm not sure if it's part of the ANDA or the DMF or

8   what.  I don't see anything here which shows it is part of

9   the ANDA.

10  Q.      Okay.  But we can agree it is a SigmaPharm document;

11  correct?

12          You see that heading of SigmaPharm Laboratories?

13  A.      Yes.  Yes.  Correct.

14  Q.      Okay.  So if we could turn to the page ending in

15  Bates number 797.

16          Do you see the reference to the purpose of the

17  study?

18  A.      Yes.

19  Q.      And at the end of that section, the last sentence

20  says, "As per the FDA deficiency received on October 30th,

21  2017, the detection limit for the crystallinity by x-ray

22  diffraction method was determined."

23          Do you see that?

24  A.      Yes, I do.

25  Q.      Now, if you turn to the page ending in Bates number

1    799.

2              Do you see the heading "Methodology"?

3    A.    Yes.

4    Q.    And this is a methodology for testing that SigmaPharm

5    used to assess its finished products; correct?

6    A.    I'm not familiar with this.  I'm not -- but it's

7    quite easy to read.  So this is the specification, "No

8    crystalline form of apixaban is present."

9              This is the test to verify whether or not there

10   is crystalline apixaban present.  That is how I would read

11   the specification of the information that comes below.

12   Q.    And this page describes the analytical method that

13   was used for the testing of the 2.5 and 5 milligram apixaban

14   tablets for SigmaPharm; correct?

15             If you look at the heading at the top of the

16   page.

17   A.    Correct.

18   Q.    Now, if you could turn to the heading 4.5 on that

19   same page titled "Procedure."

20             The first item under that heading says:  "Grind

21   suitable number of tablets using mortar and pestle to make

22   fine powder."

23             Do you see that?

24   A.    Yes, I do.

25   Q.    So SigmaPharm's own process involved grinding tablets

1    using a mortar and pestle; correct?

2    A.    Yes.  It's as I would expect it to be.

3    Q.    So if you turn to heading 4.4, right above that,

4    called "Parameters."

5          Do you see the reference to step time at the

6    bottom of that section?

7    A.    Yes.

8    Q.    And we agree that step time and count time are

9    synonymous; correct?

10   A.    Yes.

11   Q.    And the step time or count time that SigmaPharm used

12   in these tests was 0.5 seconds; correct?

13   A.    Correct.

14   Q.    Now, we talked previously about limit of detection.

15   You're aware that SigmaPharm did a limit of detection study

16   on its XRPD method; correct?

17   A.    That they were required by the FDA to do it, yes.

18   Q.    Now, if we could turn, please, to the Bates number --

19   page ending in Bates number 798.

20          The first portion on this page with the heading

21   "Summary" addresses the detection limit that SigmaPharm

22   identified; correct?

23   A.    Correct.

24   Q.    And the limit of detection that SigmaPharm identified

25   was 5 percent; correct?

983

Zaworotko - cross

1    A.       Correct.

2    Q.       And this means that SigmaPharm's XRPD method cannot

3    identify crystalline material that is below 5 percent of the

4    sample; correct?

5    A.       According to this test under these conditions, yes.

6    Q.       And this is a test that SigmaPharm submitted to the

7    FDA; correct?

8    A.       Correct.

9    Q.       Now, if we could -- let me just ask.  Are you aware

10   that SigmaPharm's ANDA material contains 3.125 percent

11   apixaban?

12   A.       What was the first part of that question?  Which

13   specific material are we talking about?

14   Q.       I'll restate it.

15            The final SigmaPharm ANDA products contain

16   3.125 percent apixaban; correct?

17   A.       Correct.

18   Q.       Now, you analyzed Dr. Atwood's XRPD data; correct?

19   A.       Correct.

20   Q.       And when you presented your analysis during direct

21   examination, you used some of your own figures; correct?

22   A.       Correct.

23   Q.       And in those figures, you used a different scale than

24   Dr. Atwood did; correct?

25   A.       Correct.

Zaworotko - cross

1          MS. WIGMORE:  Now, if we could pull up DDX-8-35.

2          DDX, excuse me.

3     BY MS. WIGMORE:

4     Q.    This is one of the demonstratives that you used

5     during direct examination; correct?

6     A.    Correct.

7     Q.    And on this slide, on the left hand is Dr. Atwood's

8     XRPD; correct?

9     A.    Correct.

10    Q.    And that comes from his scan 7, if you look at the

11    source on the bottom of your slide; correct?

12    A.    Correct.

13    Q.    And in Dr. Atwood's pattern, the peaks are at around

14    345 counts per second; correct?

15    A.    The signal, I would say.

16    Q.    So would you agree it is 345 degrees?

17    A.    Yes, the upper signal to be unbiased is 345.

18    Q.    And just -- and my question was unclear.  We're

19    talking about 345 counts per second; correct?

20    A.    It's that -- it's a bit blurred, but if it's CPS, it

21    would about counts per second.

22    Q.    Now, let's look at your diagram on the right-hand

23    side.

24          The peaks in your figure are under 300 counts

25    per second; correct?

1    A.      Correct.

2    Q.      So this isn't the same data that you have mapped on

3    your figure as what was shown in Dr. Atwood's scan; correct?

4    A.      I would want to review the raw data, but it's

5    possible that this was taken from the overlay plot that was

6    the compendium of all of the plots.

7    Q.      But you agree that the counts per second should not

8    change from his plot to your plot; right?

9    A.      Correct.  Unless it is from an overlay plot.

10   Q.      But you don't know.

11   A.      No, not at this -- not sitting here right now.

12   Q.      Let's turn to DDX-8-38.

13           This is another demonstrative you used during

14   your direct examination; correct?

15   A.      Correct.

16   Q.      And this slide refers to Dr. Atwood's analysis of the

17   peak he found at 27.1 degrees; correct?

18   A.      Correct.

19   Q.      Now, if we could turn to Dr. Atwood's opening report

20   at page 24.

21           MS. WIGMORE:  We're looking to Dr. Atwood's

22   opening report at page 24.

23           Sorry.  That is Dr. Apperley.

24           There we go.

25   BY MS. WIGMORE:

Zaworotko - cross

1   Q.      So this is the data from Dr. Atwood's report that you

2   are addressing on the slide we just looked at, DDX-8-38;

3   correct?

4   A.      Correct.

5   Q.      Now, Dr. Atwood's scan is from the region from 26.8

6   to 27.4 at a count time of 30 seconds; correct?

7   A.      Correct.

8   Q.      And Dr. Atwood identified in red a peak that he found

9   at 27.1 degrees; correct?

10  A.      Correct.

11  Q.      And he showed the data from 26 to 29 degrees;

12  correct?

13  A.      I think it's a narrower range than that.  26.8 to

14  27.4, according to the legend.

15  Q.      And then if you look at DDX-838 in your

16  demonstrative.

17          You show the data from 26.7 to 27.5 degrees;

18  correct?

19  A.      No.  The data is plotted from 26.8 to 27.4.

20  Q.      So it's an even narrower range than I just mentioned;

21  correct?

22  A.      I believe that is the same range that we just talked

23  about.

24  Q.      So you scan a range of less than one full degree;

25  correct?

1    A.      If we go back to Dr. Atwood's plot, I believe that

2    that is the range that was in Dr. Atwood's plot.

3    Q.      Let's turn back.

4            26.8.

5    A.      26.8 to 27.4.

6    Q.      And then the range of the entire analysis, if you

7    look in the upper left-hand corner, is 26 -- yes, 26.8 to

8    27.4; correct?

9    A.      Correct.

10   Q.      Now, you testified that SigmaPharm's tablets -- let

11   me turn back for a moment to the slide we were just looking

12   at.

13           So in Dr. Atwood's 27.1 peak, I want to direct

14   your attention to the X axis.

15           Do you see that?

16   A.      Yes, I do.

17   Q.      And do you see the 26.7 and 27.5 items on the X axis?

18   A.      I see the X axis, but there is no data.  There is no

19   data at that point.  The data starts at 26.8.

20   Q.      Do you agree that his X axis shows three degrees, the

21   entire X axis shown on the page?

22   A.      But the data -- yes, but the data is not plotted on

23   the 3 degrees.  It is plotted from 26.8 to 27.4.

24   Q.      Understood.  But I want to talk about the entire

25   presentation here.

Zaworotko - cross

1          So the whole presentation on the X axis in

2     Dr. Atwood's plot is from 26 to 28.75 -- to about 28

3     point -- or to 29?

4     A.     Could you repeat?

5     Q.     Yes, I will.

6               The X axis on Dr. Atwood's plot is showing from

7     26 degrees to 29 degrees; correct?

8     A.     The labels on the X axis, to be specific, the labels

9     on the X axis state that, but the data itself does not get

10    plotted in the range of the X axis.

11    Q.     I understand.  But again, I want to focus on the X

12    axis.

13              Now in your demonstrative, your X axis goes from

14    26.7 to 27.5; correct?

15    A.     Correct.  I believe it's a more appropriate way to

16    present the same data.

17    Q.     So you presented a different X axis in your

18    demonstrative than Dr. Atwood used in his report; correct?

19    A.     Yes.  A more appropriate X axis as I testified this

20    morning.

21    Q.     And you agree if you change the X axis, it changes

22    the way the data looks; correct?

23    A.     Possibly.  It depends on how you present it.

24              If you change the scale, yes.  But if the scale

25    is the same, then no.

1    Q.    But if you condense the X axis, it flattens the look

2    of the peaks; correct?

3    A.    I'm not condensing the X axis.  I'm plotting the data

4    in its entirety in a more appropriate range.

5    Q.    Well, we can agree you used a different X axis range

6    than Dr. Atwood did for your plot; correct?

7    A.    The graph labels are different, but the data is

8    plotted on exactly the same scale, from 26.8 to 27.4.

9    Q.    On a more compressed X axis; correct?

10   A.    No.

11   Q.    Now, you testified that SigmaPharm's tablets were

12   expired.

13              Did I hear that correctly?

14   A.    I didn't testify this morning that they're expired.

15   I believe that the samples tested might have been past

16   the -- tested by Dr. Munson and Dr. Atwood were past the

17   expiration date.

18   Q.    Now, when you say the "expiration date," the samples

19   tested were not approved products; correct?

20   A.    Then perhaps I should have -- correct.  Perhaps I

21   should have said beyond the proposed expiration date.

22   Q.    So there was no actual expiration date when these

23   tablets were tested; correct?

24   A.    Yes and no.  I would say there was no FDA approved

25   expiration date.  But the data was consistent with the

1  24-month expiration date.

2  Q.    Now, the only source you have for your testimony

3  about what the alleged expiration date was, was some

4  deposition testimony from Mr. Spireas; correct?

5  A.    I don't recall, but I'm quite familiar with FDA

6  guidances on drug substance and drug product testing, on the

7  stability tests that were conducted, and I'm quite familiar

8  with the terms "long-term stability test" and short --

9  "accelerated stability test."

10 Q.    And SigmaPharm continues to do stability tests on its

11 ANDA product; correct?

12 A.    I don't recall if I have been provided any such

13 information.

14 Q.    You haven't asked for it?

15 A.    No.

16 Q.    And you're not aware of any SigmaPharm study

17 suggesting that it's tablets are unstable after two years,

18 are you?

19 A.    Sitting here right now, I don't recall.

20 Q.    Now, if you had been given SigmaPharm's tablets, how

21 long would it have taken to do XRPD tests on those tablets?

22 A.    That would depend on whether it was a qualitative or

23 quantitative test and what the purpose of the test would be.

24 And the instrument that was used and the source of x-ray.

25        So there are a lot of variables so it is hard to

1    give even a ballpark number.  It would depend on the

2    circumstances.

3    Q.      And it is not something you thought about doing in

4    this case; correct?

5    A.      No, there was no need for me to conduct any tests.

6    Q.      Now, you testified about the tablets moving from one

7    place to another with a demonstrative exhibit.

8                Do you recall that?

9    A.      Yes, I do.

10   Q.      You don't have any doubt that Dr. Atwood received

11   samples of SigmaPharm's tablets, do you?

12   A.      No, I don't, but I think it is incredible that the

13   same sample was tested in two places on the same day.

14   Q.      You read Dr. Atwood's record; correct?

15   A.      Correct.

16   Q.      And you saw the pictures in that report of the

17   bottles of the SigmaPharm tablets that he received; correct?

18   A.      Correct.

19   Q.      Now, there is some testimony about the foil seal of

20   the tablet bottle being broken.

21                Do you recall that?

22   A.      Yes, I do.

23   Q.      Now, you understand that SigmaPharm is seeking

24   approval to sell its ANDA products to patients; correct?

25   A.      Correct.

1    Q.      And you understand that patients who take medications

2    will occasionally travel; correct?

3    A.      Correct.

4    Q.      And a patient who takes apixaban could travel with a

5    bottle of apixaban that has a broken foil seal once they

6    started using the medication; correct?

7    A.      I am really not an expert on this subject.  I have no

8    idea if it's a chronic treatment or an acute treatment and

9    if it is something that you would carry with you.

10           So I really don't feel comfortable to try to

11   answer that question because I would be guessing.

12   Q.      So you don't know anything about the amount of doses

13   that a patient takes of apixaban?

14   A.      I'm familiar with the dosage of the drug product, but

15   I'm not familiar with whether it is an acute treatment or a

16   chronic treatment.

17   Q.      But it is not your opinion -- excuse me.

18           It is not your opinion that the apixaban becomes

19   unstable once the foil seal on the bottle is broken, is it?

20   A.      I have no opinion either way on that subject.  I

21   would need to see appropriate testing before I could answer

22   that question.

23   Q.      If the tablet became unstable once the foil seal was

24   broken, then you could only have one or two tablets in a

25   bottle for them to be useful; is that right?

Zaworotko - cross

1  A.      It would depend on a number of factors, and my

2  understanding of the stability testing is that it would

3  account for certain ranges of temperature and humidity that

4  would be experienced in everyday life.

5  Q.      Now, speaking of that, you were shown the label, the

6  proposed label for the SigmaPharm samples during your

7  deposition in this case; correct?

8  A.      I reviewed my deposition testimony in the last

9  24 hours and I remember seeing a portion of it that

10  mentioned that, yes.

11  Q.      Okay.

12          MS. WIGMORE:   Let's pull up that label, which is

13  PTX-1026.

14          I want to turn to the page ending in Bates

15  No. 230.

16          This a heading, "How Should I Store Apixaban

17  Tablets."

18          If we could blow that up.

19  BY MS. WIGMORE:

20  Q.      Do you see there is a reference to excursions

21  permitted between 15 degrees Celsius and 30 degrees Celsius?

22  A.      Yes, I do.

23  Q.      So the table -- the label for the SigmaPharm tablets

24  envision excursions of the product; correct?

25  A.      Yes, it refers us to a document called "USP

1     Controlled Room Temperature."

2     Q.    Let's look at that.  Let's turn to PTX-1026.  Or

3     sorry, 1056.

4             And I want to turn to the page ending in Bates

5     No. 788.

6             About halfway down the page there is a reference

7     to "controlled room temperature."

8             Do you see that?

9     A.    Yes, I do.

10            MS. WIGMORE:  And if we could highlight below

11    that, there is a reference to -- after the 25 degrees

12    Celsius, four lines down is a reference to "transient

13    spikes."

14            Can we highlight that, please?

15    BY MS. WIGMORE:

16    Q.    It says, "Transient spikes up to 40 degrees are

17    permitted as long as they do not exceed 24 hours."

18            Do you see that?

19    A.    Yes, I do, and I recall in my deposition I said I

20    know what that means because I was in Tokyo last summer.

21    Q.    Okay.  So we can agree that transient excursions,

22    even if they're at more extreme temperatures, are envisioned

23    under both the label and the USP; correct?

24    A.    Correct.

25    Q.    Now, you have not offered any opinion that

1    SigmaPharm's 2.5 milligram product would be any different

2    from SigmaPharm's 5 milligram product in terms of whether it

3    contains crystalline apixaban particles; correct?

4    A.    Correct.  My opinion is focused upon Professor --

5    Dr. Atwood's reports and the other data that I was given.

6    Q.    But you don't believe the 5 milligram tablet would be

7    any different from the 2.5 milligram tablet in terms of the

8    type of apixaban it contains?

9    A.    I have no reason to believe either way whether it was

10   any different in the absence of further analysis of the

11   composition and any testing.

12   Q.    Now, I just want to turn back to an issue because I'm

13   not sure we got a clear answer on the record.

14         A person of skill in the art would understand

15   the plain and ordinary meaning of the phrase "Wherein,

16   apixaban comprises crystalline apixaban particles to include

17   any amount of crystalline apixaban that can be detected."

18   Correct?

19   A.    I believe I answered that by saying that comprises --

20   leads to a -- yes, I agree.  I agree with your statement.

21   Q.    Okay.  Now, Dr. Zaworotko, were you hear when

22   Mr. Heneghan cross-examined Dr. Atwood?

23   A.    Yes, I was.

24   Q.    And do you recall Mr. Heneghan asked Dr. Atwood about

25   some of his prior testimony in other cases?

1    A.      Yes, I do.

2    Q.      And Mr. Heneghan pointed out that some of

3    Dr. Atwood's testimony had been not accepted in other

4    courts.

5            Do you recall that?

6    A.      Yes, I do.

7    Q.      Now, you have been in that same situation; correct?

8    A.      Correct.

9            MS. WIGMORE:  And if we could pull up the *Jansen*

10   *Product LP v Lupin Limited*, a case from the District of New

11   Jersey.

12   BY MS. WIGMORE:

13   Q.      You testified in this case in 2014; correct?

14   A.      Correct.  I testified on invalidity, and this was my

15   first appearance in a federal court.

16           MS. WIGMORE:  And if we could pull up a portion

17   of his opinion, I believe it was on page 7 of the Westlaw

18   printout relating to Dr. Zaworotko.

19           MR. TAYLOR:  Objection, Your Honor.

20           (Counsel confer.)

21           MR. TAYLOR:  Withdrawn.

22   BY MS. WIGMORE:

23   Q.      Okay.  I want to highlight the paragraph beginning,

24   "To its chagrin."

25           It says:  "To its chagrin, the Court has

1  determined that expert witnesses, though not all, called by

2  the defense were more interested in obfuscation than in

3  helping the Court as a fact-finder 'seek the truth.'  Too

4  often -- and too repeatedly -- the Court has had to

5  importune and finally direct certain defense witnesses to

6  directly answer questions posed.  The trial transcripts will

7  identify these persons as Dr. Trevor Laird and Dr. Michael

8  Zaworotko.  Ironically, such representatives of science were

9  more interested in evasion than intellectual candor.  As to

10  their testimony, the Court, as fact-finder, invokes *falsus*

11  *in uno, falsus in omnibus*.  Each did the cause of his

12  particular defendant no good."

13          Now, were you aware of that opinion,

14  Dr. Zaworotko?

15  A.    The last few times I have been deposed, this has been

16  raised.

17  Q.    And --

18  A.    Clearly I didn't convince the Court very well in this

19  particular case.

20  Q.    But you still believe you're qualified to offer

21  opinions in this case; correct?

22  A.    Yes, I do.

23          You might be aware that there was a decision in

24  Canada which had the reverse outcome where Professors Atwood

25  and Myerson were on the other side and it was an

1    infringement case, and in that case my testimony was deemed

2    to be more reliable.

3    Q.     So just because your opinions are not accepted in one

4    particular case does not mean you are qualified to serve as

5    an expert; correct?

6    A.     You are asking me a question that I'm really not

7    familiar with the answer.  I would assume it would be it

8    depends.  It depends on what the nature of the testimony was

9    and why it was disqualified.

10   Q.     Fair enough.

11               MS. WIGMORE:  I have no further questions.

12               THE COURT:  Redirect.

13               MR. TAYLOR:  Yes, Your Honor.

14               If we can get DDX 8-25.

15                     REDIRECT EXAMINATION

16   BY MR. TAYLOR:

17   Q.     Dr. Zaworotko, you were, on cross-examination,

18   directed to the third point DTX-527, the USP, and you

19   referenced a slide in which you had three bullets points.

20               Do you remember?

21   A.     Yes, I do.

22   Q.     Is that this slide?

23   A.     Yes.

24   Q.     And what mention of the powder diffraction file do

25   DTX-720.1 or DTX-753.2 make?

1    A.      They make no reference to the powder diffraction

2    file.

3    Q.      On cross-examination --

4            MR. TAYLOR:  You can take this down.  Thank you.

5    BY MR. TAYLOR:

6    Q.      On cross-examination you were directed to PTX-1038.

7            Do you remember that?

8    A.      Not the number, I'm sorry.  But if it's a written

9    document, I am sure I can find it and go to it.

10   Q.      It was Tab 7 in your cross-examination binder.

11   A.      Yes.

12   Q.      Did you rely on this document in your direct

13   examination?

14   A.      Not directly upon this document.  I'm not sure how

15   this document links to the other documents that I reviewed,

16   if there is any link or not.

17   Q.      Do you have an understanding in this case that there

18   was XRPD testing prelitigation tested on both SigmaPharm's

19   DMF product and on its ANDA final product?

20   A.      Conducted by whom?

21   Q.      Are you aware of any third-party test?

22   A.      Catalent provided third-party testing, as I testified

23   this morning.

24   Q.      And is that the testing you relied on in your direct

25   opinion?

Zaworotko - redirect

1   A.      Yes.

2   Q.      One final thing, just to hopefully clear up

3   something.

4                   MR. TAYLOR:  If we can pull up DDX-8-35.

5   BY MR. TAYLOR:

6   Q.      And you were directed to this by opposing counsel and

7   the scan on the left pointed out that the intensity of the

8   peak did not match.

9                   Do you remember that?

10  A.      I think it was the Y axis seemed to be off.  I think

11  that was the point.

12                  And I -- I responded that I would need to see

13  the raw data file to see what the numbers were, to know if

14  this was simply a layer -- coming from a layered patent.

15  Q.      Dr. Zaworotko, I want you to take a look at this

16  diagram on the right, commit it to your memory.  And we're

17  going to take a look next at DDX-8-28.

18                  Do you see scan 17 on the data plot?

19  A.      Yes, I do.

20  Q.      Is it possible that what was shown on DDX-8-35 is

21  scan 17?

22  A.      Sitting here right now, I don't remember, but it is

23  definitely possible.  And that would explain the discrepancy

24  along the Y axis.

25                  MR. TAYLOR:  And can we pull up his rebuttal

1    report at page 103.

2                    This is Tab 1 in your binder.  Page 103.

3                    And to clarify, cross-examination binder.

4                    THE COURT:  Thank you.

5    BY THE WITNESS:

6    A.    Yes.

7    Q.    And at the bottom left-hand corner, which scan is

8    this?

9    A.    Scan 7.

10   Q.    And do you identify any crystalline peaks in the

11   range of 11 to 14 shown on this graph?

12   A.    Yes.  The peak at 13.6 to 7.

13   Q.    Do you identify any peaks at 12.24 and 12.8 degrees

14   on this graph?

15   A.    No, I do not.

16                    MR. TAYLOR:  No further questions.  Thank you.

17                    THE COURT:  Okay.  You can step down.  Thank you

18   very much.

19                    Would counsel come retrieve the binders?

20                    Thank you.

21                    MR. TAYLOR:  Thank you.

22                    (Witness stand cleared of binders.)

23                    MR. TAYLOR:  You go.  We'll take care of this.

24                    THE COURT:  Thank you.

25                    THE WITNESS:  Thank you.

 1              THE COURT:  Defendants can call their next

 2     witness.

 3              MR. KOCHANSKI:  Yes.  Your Honor, defense

 4     Sunshine Lake would like to call Dr. Chen Yong.

 5              THE COURT:  Okay.

 6              MR. KOCHANSKI:  Dr. Chen, please.

 7              And as we have informed the Court, since

 8     Dr. Chen is a Chinese speaking individual, we also have his

 9     translator here.

10              THE COURT:  Thank you.

11              (Interpreter Echo Lim placed under oath.)

12              ... DR. YONG CHEN, having been first duly sworn,

13     was examined and testified as follows ...

14              THE COURT:  Thank you all.  I thank the

15     interpreter and welcome, Dr. Chen.

16              THE WITNESS:  Thank you.

17              MR. KOCHANSKI:  May I approach?

18              THE COURT:  You may.

19              MS. WIGMORE:  Your Honor, would it be possible

20     to have the translator use a microphone?

21              THE COURT:  Yes, I was wondering about that.  I

22     don't know that we have a portable mic here, but can you see

23     where the microphone is on the front of the witness stand?

24              THE TRANSLATOR:  Here?

25              THE COURT:  I can't see, but it's the bar in

 1   front of the witness.  If you can make an effort to speak

 2   into that so we can all hear you, that will be helpful.

 3                       DIRECT EXAMINATION

 4   BY MR. KOCHANSKI:

 5   Q.      Good afternoon, Dr. Chen.

 6               Will you please identify yourself to the Court?

 7   A.      I am Dr. Yong Chen.

 8   Q.      Okay.  And, Dr. Chen, you are you presently employed?

 9   A.      Yes, I do.

10   Q.      And by whom are you employed?

11   A.      At Quanto Sunshine Lake Pharmaceutical Company.

12   Q.      Okay.  And what is your position with Sunshine Lake,

13   Dr. Chen?

14   A.      Director of the Excipient Department.

15   Q.      Okay.  And in that position, what you do is director?

16   A.      I work -- I am in charge of the polymorph form

17   research and excipient research.

18   Q.      During the course of this litigation, Dr. Chen, did

19   Sunshine Lake ask you to come to the United States to give

20   testimony at a deposition regarding crystalline apixaban?

21   A.      Yes.

22   Q.      And you were going to be the company representative;

23   is that correct?

24   A.      Yes.

25   Q.      And what did you do to prepare for that deposition,

Chen - direct

1   Doctor?

2   A.      I had gone through the ANDA, apixaban ANDA

3   application information and some of the related information.

4   Q.      Okay.  And in preparing for deposition by going

5   through the information, what did you find out?

6   A.      I found out that in the ANDA application, in the

7   company's ANDA application, the description of polymorph

8   conversion has some error.

9   Q.      And upon learning about these errors and realizing

10  they're errors, what did you do?

11  A.      I give my -- I give feedback of the errors to the

12  project team.

13  Q.      And was that the apixaban project team?

14  A.      Yes.

15  Q.      And are you a member of the apixaban project team?

16  A.      Yes.

17  Q.      All right.  And what did the project team decide to

18  do?

19  A.      We decided to make amendments on the ANDA.

20  Q.      And were you involved and participating in preparing

21  the language for the amendment that was going to be filed

22  with the FDA?

23  A.      Yes.

24  Q.      Okay.  And in the end, did you file an amendment with

25  the FDA?

Chen - direct

1   A.      We did.

2   Q.      Okay.  And when was the amendment submitted to the

3   FDA?

4   A.      The first submission was in May 2019.

5   Q.      Okay.  You say there was a first submission.  Did you

6   have to submit a second amendment to the FDA?

7   A.      Yes.

8   Q.      And when was the second submission to the FDA made or

9   the second amendment?

10  A.      Oh, in August 2019.

11  Q.      Okay.  Can you please turn to the binder, to the tab

12  marked as DTX-509, and can we put it up, please.

13  A.      Yes, I'm on it.

14  Q.      Okay.  Dr. Chen, can you identify what DTX-509 is,

15  please?

16  A.      This is the First Amendment that we filed with the

17  FDA in early May of 2019.

18  Q.      Okay.  And with respect to DTX-509, did you help

19  prepare certain sections of that amendment?

20  A.      Yes, I did.

21  Q.      And did those sections relate to polymorphism

22  conversion?

23  A.      Yes.

24  Q.      Okay.  Now, if you could turn in your binder to tab

25  marked DTX-995.

1    MR. KOCHANSKI:  And can you put it up, please.

2    THE WITNESS:  Yes, I'm on it.

3    BY MR. KOCHANSKI:

4    Q.    Okay.  And can you identify for the Court what

5    Exhibit DTX-995 is?

6    A.    This is the amendment that we submitted to FDA in

7    August of 2019.

8    Q.    And were there portions of this amendment that were

9    submitted in August 2019 that dealt with polymorph

10   conversion?

11   A.    Yes.

12   Q.    And did you help prepare this amendment, Doctor?

13   A.    Yes.

14   Q.    Okay.  Now, if I could ask you to turn in the binder

15   to tab marked DTX-996, please.

16   A.    Yes, I'm on it.

17   Q.    Okay.  Can you identify what that document is for me,

18   please?

19   A.    This is the ANDA after we had submitted the amendment

20   to -- the apixaban ANDA, this is apixaban ANDA after we had

21   submitted an amendment to the FDA.

22   Q.    And does this document, DTX-996, include discussion

23   regarding polymorph conversion?

24   A.    Yes.

25   Q.    And did you contribute to preparing the sections in

1   DTX-996 regarding polymorph conversion?

2   A.      Yes.

3   Q.      If I can now ask you to turn to the tab marked

4   DTX-994.  Can you tell me what that is, please?

5   A.      This is a letter that we sent with the amendment for

6   apixaban ANDA in August 2019.

7   Q.      And can you tell me what the letter describes?

8   A.      These letters described the content of the amendment

9   that we sent to FDA and the reason why the amendment was

10  sent twice.

11  Q.      Okay.

12          MR. KOCHANSKI:  I have no further questions for

13  the witness.

14          THE COURT:  Okay.  Cross-examination.

15                  CROSS-EXAMINATION

16  BY MS. WIGMORE:

17  Q.      Good afternoon, Dr. Chen.

18          MS. WIGMORE:  Your Honor, may we pass out

19  binders?

20          THE COURT:  You may.

21          (Binders handed to the Court and the witness.)

22  BY MS. WIGMORE:

23  Q.      Dr. Chen, my name is Amy Wigmore.

24  A.      How are you?

25  Q.      Good.  Thank you.

Chen - cross

1        You understand that a that amorphous apixaban

2   can convert to crystalline apixaban; is that correct?

3            MR. KOCHANSKI:  Your Honor, I object because

4   she's beyond the scope of the testimony that we gave this

5   afternoon.

6            THE COURT:  Ms. Wigmore?

7            MS. WIGMORE:  Your Honor, the whole point of the

8   testimony was to address a statement in the ANDA about

9   conversion from amorphous to crystalline, so I'm entitled to

10  explore that.

11           MR. KOCHANSKI:  But he didn't discuss that.  The

12  purpose of his testimony was to authenticate documents that

13  were being objected to that he was aware of, that he had

14  supplements of.

15           THE COURT:  That may have been the purpose, but

16  you put him up there to talk about, or to move into evidence

17  at least documents, and this is the subject matter of those

18  documents, isn't it?

19           MR. KOCHANSKI:  I will withdraw it.

20           THE COURT:  I don't know what okay -- you

21  withdraw it.

22           Okay.  Fine.  Go ahead.

23           MS. WIGMORE:  I will repeat the question.

24  BY MS. WIGMORE:

25  Q.    Dr. Chen, you understand that amorphous apixaban can

Chen - cross

1    convert to crystalline apixaban; is that correct?

2    A.    According to papers, it can happen.

3    Q.    In fact, Sunshine Lake has observed the conversion of

4    amorphous apixaban to crystalline apixaban in some of its

5    own studies; correct?

6    A.    In the lab, you can observe this.

7    Q.    Now, I'd like to turn to PTX-875.  Dr. Chen, this is

8    at tab 1 in your binder, but for the Court's convenience, we

9    also have a certified translation at tab 10.

10             THE COURT:   Thank you.

11   BY MS. WIGMORE:

12   Q.    Dr. Chen, do you have the document?

13   A.    Yes.

14   Q.    Now, this is an internal HEC presentation from

15   September of 2015; is that correct?

16   A.    Yes.

17   Q.    The title of the presentation is discussion on the

18   crystalline form of apixaban tablet U.S.; is that correct?

19   A.    Yes.

20   Q.    Please turn to the page ending in Bates Number

21   026531.

22   A.    I'm on it now.

23   Q.    The title of this slide is summary of Crystalline

24   Stability; is that correct?

25   A.    Yes.

Chen - cross

1   Q.      Please turn to point number three on this slide.

2   A.      Yes, I see it.

3   Q.      It says, during the stability process, amorphous

4   apixaban will partially convert to crystalline form N.   The

5   longer, the higher the conversion ratio.

6                  Correct?

7   A.      This is what it says, yes.

8   Q.      And crystalline form N in that sense refers to

9   crystalline form N-1; is that correct?

10  A.      Yes, it is.

11  Q.      Please turn to the page ending in Bates number 528.

12  A.      Yes, I'm on it.

13  Q.      Now, the title of this slide says amorphous API

14  formulations product XRD comparison map.

15                 Do you see that?

16  A.      Yes, I see it.

17  Q.      And XRD is X-ray powder diffraction; is that correct?

18  A.      Yes.

19  Q.      The next statement in the heading says, 82 percent of

20  the amorphous form converts into crystalline form N.

21                 Correct?

22  A.      Yes, this is what is written on the paper.

23  Q.      And this graph is referring to amorphous apixaban

24  converting into crystalline form N-1 apixaban; is that

25  correct?

Chen - cross

1    A.      Yes.  Yes, it can convert.

2    Q.      Please turn to the page ending in Bates No. 6522.

3    A.      Yes, I'm on it.

4    Q.      The last sentence on this page says, in the end, all

5    will convert to crystalline N.

6              Correct?

7    A.      This is what is written on this.

8    Q.      And this slide presentation is discussing stability

9    studies on Sunshine Lake's apixaban tablets; is that

10   correct?

11   A.      This is the select research of the apixaban, the

12   polymorphic form of the apixaban in the company.

13   Q.      In the company or in the tablet?

14   A.      In the tablet.

15   Q.      Thank you.

16              Now, if we could turn, please, to PTX-840.

17   This is at tab 3 of the binder, if you would like to look

18   at it.  And please turn to the page ending in Bates number

19   019.

20   A.      I'm on it.

21   Q.      If you look at the heading in the left-hand corner,

22   do you see this is an application to market a new or

23   abbreviated new drug or biologic for human use?

24   A.      Yes, I see it.

25   Q.      And below that, the applicant referred to is Sunshine

Chen - cross

1    Lake; is that correct?

2    A.      Yes.

3    Q.      In the right hand upper corner, the date of

4    submission is December 28th of 2016; is that correct?

5    A.      Yes.

6    Q.      Now, this is Sunshine Lake's ANDA application; is

7    that correct?

8    A.      This is one, this is one of the documents in the

9    application, ANDA application.

10   Q.      And if you turn, please, to the portion of this

11   document that can be found at the Bates number ending in

12   '021, do you see that reference to certification?

13   A.      Yes, I see it.

14   Q.      Multiple people at Sunshine Lake reviewed this

15   document before it was filed; is that correct?

16   A.      Yes.

17   Q.      And under the heading certification, the

18   second-to-last sentence says, The data and information in

19   this submission have been reviewed and to the best of my

20   knowledge, are certified to be true and accurate.

21           Correct?

22   A.      Yes.

23   Q.      Now, please turn to PTX-846, which is tab 4.

24           All right.  Now, this is Section 3.2.P.2 of the

25   ANDA Sunshine Lake submitted in December 2016; is that

Chen - cross

1    correct?

2    A.      Yes.

3    Q.      Now, please turn to the page ending in Bates number

4    1958.

5    A.      Yes.

6    Q.      The title of the figure on this page is XRPD pattern

7    of stability sample for lot 110540153-03, 5-milligram

8    strength larger lab-scale batch.

9            Correct?

10   A.      Yes, it is the large scale batch.

11   Q.      Now, in this figure, you see there's a circle around

12   17.1 next to six-month accelerated.

13   A.      Yes.

14   Q.      And under the figure, the text indicates that

15   17.1 degrees is a characteristic peak of form N-1; is that

16   correct?

17   A.      Yes.

18   Q.      Form N-1 is crystalline apixaban; is that correct?

19   A.      Yes.

20   Q.      In that same text below the diffractogram, there's a

21   statement, form N-1 generated at six-month accelerated.

22           Correct?

23   A.      Yes.

24   Q.      Please turn to the page ending in Bates number 1956.

25   A.      Yes, I'm on it.

Chen - cross

1    Q.      I direct your attention to the sentence immediately

2    above the table beginning, And also.

3    A.      Yes.

4    Q.      It says, And also, for the future commercial

5    production samples used for the stability investigation will

6    be produced using the manufacturing process as that for the

7    exhibit batches, and also the stability conditions will be

8    the same as that for the exhibit batches, thus it can be

9    concluded that the polymorph conversion can consistently

10   occur during the stability of apixaban tablets.

11           Did I read that correctly?

12   A.      Yes, it is, because the commercial production that we

13   have in future will be consistent with the less skilled

14   manufacturing process -- will be consistent with the exhibit

15   batches manufacturing process, and if you look at the data

16   in the table, it has shown no conversion of the polymorph

17   form.

18   Q.      The statement I just read said that polymorph

19   conversion can consistently occur.  Correct?

20   A.      That's the reason why we found out that the

21   discretion in this part of the description is -- has some

22   error.  It is not consistent with the data showing below.

23   Q.      Let's turn to the data below.  If we could look under

24   the five-milligram row at the six-month accelerated sampling

25   point.

1   A.      Yes, I see it.

2   Q.      It says, amorphous form plus 1 N-1 parts conversion.

3           Correct?

4   A.      Yes, but this is the large scale exhibit batches in

5   the lab.

6   Q.      Now --

7   A.      Not -- sorry.  Not exhibit batches.

8   Q.      Now, the manufacturing method for the larger lab

9   scale batches and the exhibit batches is the same;

10  correct?

11  A.      They are the same, but as a matter of fact, in the

12  lab, they may not be so strict with the manufacturing

13  conditions during the lab test.

14  Q.      Did you testify in your deposition, Dr. Chen, that

15  the manufacturing method used for the larger lab scale batch

16  and the exhibit batch should be the same?

17  A.      I did.

18  Q.      Now, you testified on direct examination about an

19  amendment Sunshine Lake submitted in August 2019; is that

20  correct?

21  A.      Yes.

22  Q.      That amendment was submitted after your deposition in

23  this case; is that correct?

24          THE COURT:  Is there an objection?

25          MR. KOCHANSKI:  Yes.  I object.  I don't see the

Chen - cross

```
 1    relevance whether this is before or after his deposition.

 2    His deposition was three months, three months earlier than

 3    when it was submitted.  He testified during his deposition

 4    that they would be doing further testing.

 5             They would be making further submissions and the

 6    deposition was left open, so there was -- if what we're

 7    driving at, that it wasn't produced, plaintiffs knew about

 8    what was going to happen and the deposition was left open,

 9    depending where Ms. Wigmore goes.

10             THE COURT:  The objection is overruled.  Why

11    don't you ask the question again.

12    BY MS. WIGMORE:

13    Q.      That amendment was submitted after your deposition in

14    this case; correct?

15    A.      Yes.

16    Q.      Please turn to PTX-948, which is tab 6.

17    A.      Yes, I got it.

18    Q.      And if you look in the lower left-hand corner, this

19    is Sunshine Lake's submission from August of 2019; is that

20    correct?

21    A.      Sorry.  He's on the wrong document.

22    Q.      It is tab 6.

23             THE INTERPRETER:  Six?

24             MS. WIGMORE:  Yes.

25             THE WITNESS:  Yes, I'm on it now.  Yes.
```

Chen - cross

1    BY MS. WIGMORE:

2    Q.      So just so the record is clear, this is part of the

3    Sunshine Lake amendment dated August of 2019; is that

4    correct?

5    A.      Yes.

6    Q.      Please turn to the page ending in Bates 93397.

7    A.      Yes, I've got it.

8    Q.      Figure 3.2.P.2.8-7 is the same figure we looked at

9    from Sunshine Lake's original ANDA; is that correct?

10   A.      Yes, with respect to the effect of the data.

11   Q.      So under that chart in Sunshine Lake's amended ANDA,

12   it says, form N-1 generated at six months accelerated;

13   correct?

14   A.      Yes, it has happened once in the research lab batch.

15   Q.      And that data remains in Sunshine Lake's ANDA;

16   correct?

17   A.      Yes, with respect to the data and the batch.

18   Q.      All right.  Let's turn to the page ending in Bates

19   No. 93394.

20           If we look first at the table, if you could

21   scroll up, this is the same data we looked at for the

22   five-milligram larger lab scale batch that appeared in

23   Sunshine Lake's original ANDA; is that correct?

24   A.      It is.  Yes.

25   Q.      It says there was part conversion for the six-month

Chen - cross

1    accelerated larger lab scale batch from amorphous apixaban

2    to form N-1; is that correct?

3    A.      Yes, because at the lab research, we have one

4    incident that these conditions have happened and we

5    respected that as part of the data collected from the lab.

6    Q.      If we could turn to the statement immediately above

7    this table.  The last two lines, halfway through the line

8    begins, Thus, it can be concluded that the polymorph

9    conversion can consistently occur during the stability of

10   apixaban tablets.

11           Do you see that?

12   A.      What it actually meant is that it is consistent with

13   the exhibit batch.

14   Q.      And that statement remains in Sunshine Lake's ANDA;

15   is that correct?

16   A.      Yes.

17           MS. WIGMORE:  Thank you, Dr. Chen.  No further

18   questions.

19           MR. KOCHANSKI:  A couple of questions, Your

20   Honor?

21           THE COURT:  Sure.

22                   REDIRECT EXAMINATION.

23   BY MR. KOCHANSKI:

24   Q.      Dr. Chen, looking at the binder that plaintiffs'

25   counsel gave you, PTX-846, and specifically page 159, if you

Chen - redirect

1    could look at that page, please.

2    A.      Yes.

3    Q.      And looking at the table, 3.2.P.8-6, polymorph

4    conversion of apixaban during the tablet's stability,

5    Ms. Wigmore pointed you to a six-month accelerated results.

6              THE INTERPRETER:  Can we have the Bates number

7    again?

8              MR. KOCHANSKI:  Bates number is HECAPIX001956 in

9    Tab 4.

10   BY THE WITNESS:

11   A.      Yes.

12   Q.      Looking at the table, Dr. Chen, for all the tests

13   that were done, prior to filing the ANDA application, in

14   December 2016, how many of the tests for the 5 milligram

15   large scale batch, the 5 milligram exhibit batch, and if we

16   go to the next page, the 2.5 milligram exhibit batches, how

17   many of those batches show conversion of the apixaban to

18   form N-1?

19   A.      We have only found one incident in the lab scale lab

20   research.

21   Q.      And every other test shown showed on that table

22   showed that the form of the apixaban was the amorphous form;

23   correct?

24   A.      Yes.

25   Q.      Okay.  If I could ask you to turn to Tab 6, which is

1    PTX-948.

2    A.      Yes, I'm on it.

3    Q.      And I would ask you to go to Bates number page

4    HECAPIX093394.

5    A.      Yes.  I see it.

6    Q.      On the top of that page, in front of the table, were

7    there amendments filed on that page to what was originally

8    on PTX-846, the page we were just looking at, HECAPIX001956?

9    A.      Yes.

10   Q.      Okay.  And in PTX-846, on HECAPIX001956, could you

11   read -- I will read the first paragraph on that page and you

12   tell me if I'm correct.

13              Go ahead.

14              THE INTERPRETER:  Can we find a page?

15   A.      Okay.

16   BY MR. KOCHANSKI:

17   Q.      "The detailed figures and tables for the exhibit

18   batches were presented below would show that the polymorphic

19   form of apixaban drug substance underwent phase conversion

20   randomly among the three forms, form N-1, amorphous, and

21   dehydrate form, during the tablet's stability and no

22   regularity can be observed.  See the table below for

23   details."

24              Did I read that correctly?

25   A.      So this description has some errors.  Because if

Chen - redirect

1    you -- if -- because based on the data collected from the

2    research, and in -- only in the lab research we find one

3    batch that has condition of polymorph form conversion.

4    Q.      Okay.

5    A.      And in all the exhibit batches, we found no

6    conversion of the polymorph form.

7    Q.      Okay.  And going back to Tab 6, PTX-948, and that is

8    HECAPIX93394.

9    A.      Yes.

10   Q.      Was that looking at the top paragraph on that page?

11   A.      Yes.

12   Q.      Is that the correction to the paragraph in the

13   earlier filed ANDA application in December?

14   A.      Yes.

15   Q.      Okay.  One final question, Doctor.

16          Looking at the table below.  That's on the next

17   three pages.  Page 160, 161 and 162.

18   A.      Yes, I see it.

19   Q.      Does that contain the results from the most recent

20   36-month -- excuse me, 34-month and 36-month stability

21   studies done by Sunshine Lake?

22   A.      Yes.

23   Q.      And what were the results of those studies?

24   A.      Our apixaban is -- our apixaban stayed amorphous and

25   has no conversion.

```
 1              MR. KOCHANSKI:  Thank you.  Thank you, Dr. Chen.

 2              No further questions, Your Honor.

 3              Can I read in some of the exhibits into the?

 4  Record, please.

 5              THE COURT:  Sure.

 6              MR. KOCHANSKI:  We offer DTX-509, DTX-994,

 7  DTX-995, and DTX-996.

 8              MS. WIGMORE:  No objection.

 9              THE COURT:  Those are all admitted.

10              (DTX-509, DTX-994, DTX-995, and DTX-996 were

11  admitted into evidence.)

12              THE COURT:  Dr. Chen, thank you for your

13  testimony.  I guess I'm still wondering what is your

14  explanation for what you now characterize as being errors in

15  the original ANDA?

16              THE WITNESS:  My understanding is, my opinion is

17  that the person who edited or written this paragraph has a

18  misunderstanding -- had misunderstood the data on the table

19  because they are not professional researcher.

20              THE COURT:  Okay.  Any follow-up?

21              MR. KOCHANSKI:  Thank you, Your Honor.

22              THE COURT:  Any follow-up?

23              MS. WIGMORE:  No, Your Honor.

24              THE COURT:  Okay.  Anybody else?

25              MR. MIZERK:  No.
```

```
 1              THE COURT:  Okay.  You can step down, Doctor.
 2   Thank you both.
 3              All right.  So we're pretty much at the end of
 4   our time.
 5              I am curious, what is defendants' view as to
 6   where we are in this trial at this point and whether you
 7   need four more days or not?
 8              MR. KOCHANSKI:  Okay.  Right now Your Honor, for
 9   Sunshine Lake, we have our expert, Dr. Harry G. Brittain, to
10   put on with respect to the noninfringement defense on the
11   '945 patent, and that is the only witness we have.
12              THE COURT:  Okay.
13              MR. PEJIC:  Your Honor, Unichem will put on
14   Wayne Genck for noninfringement, and then the defendants
15   will put on Dr. Walter Chambliss for invalidity of the '945
16   patent.
17              MR. MIZERK:  And then Dr. Scheidt will go on for
18   the last bit of the '208 patent.
19              THE COURT:  Okay.  And that's the sum total of
20   what is left of the defendants' case as you now see it?
21              MR PEJIC:  And I do have to apologize.  We will
22   play one small clip from Dr. Patel, probably five minutes,
23   for Unichem as well.
24              MR. MIZERK:  And there's also a few deposition
25   designations.  They're not very long.
```

```
 1              THE COURT:  Okay.  All right.  Mr. Lee.
 2              MR. LEE:  By way of clarification, Your Honor.
 3              THE COURT:  Sure.
 4              MR. LEE:  The depositions that started out at
 5    two hours now, are we now down to five minutes?
 6              THE COURT:  Roughly, how long are you currently
 7    anticipating your deposition designations?
 8              MR. LEE:  In total.
 9              MR PEJIC:  I anticipate, given the amount of
10    time today, to drop some of them, sir.
11              MR. LEE:  My question is is it five minutes or
12    two hours, Your Honor?
13              THE COURT:  Is it on the order of five to
14    20 minutes or is it on the order of two hours?  Do you know?
15              MR. PEJIC:  For Unichem, I believe it is
16    probably at five to ten minutes now.  Today went much longer
17    than anticipated.
18              THE COURT:  Okay.  And the other defendants, do
19    you know?
20              MR. MIZERK:  I'm not sure.  I think we sent them
21    the video clips and we're waiting for their response back on
22    video clips.
23              MR. LEE:  Yes, that's true.  They're
24    two-and-a-half hours.
25              THE COURT:  Okay.  Well, if you all will
```

1   obviously meet and confer on this, but I believe we're not

2   meeting tomorrow, but I have available 12:30 to 7:00 on

3   Thursday.   It sounds like we might get through all of that

4   Thursday.

5              Does that sound right to you, or is that overly

6   optimistic?

7              MR. PEJIC:   It might be optimistic.

8              THE COURT:   That might be optimistic.   Okay.

9   Fine.   So maybe more Friday.

10             Mr. Lee, are you prepared to say at this point

11  yet, are we going to need the two days next week or is it

12  too soon to say?

13             MR. LEE:   Your Honor, I was hopeful this morning

14  that we could complete the evidence by Friday and then close

15  on Tuesday.   I think given the length of today, maybe it

16  will go into Tuesday some but we should be able to close

17  Tuesday afternoon.

18             THE COURT:   Okay.   So we might be on track for

19  Tuesday finish as opposed to Wednesday is how it currently

20  looks.

21             MR. LEE:   Right.

22             THE COURT:   Okay.   Defendants agree?

23             MR. KOCHANSKI:   Yes, Your Honor.

24             MR. PEJIC:   Yes, Your Honor.

25             THE COURT:   I'm not going to schedule something

```
 1   else for Wednesday.  But I appreciate that.

 2              Yes, Mr. Lee.

 3              MR. LEE:  In terms of closing, does Your Honor

 4   have, given the various burden of proofs and multiple

 5   defendants, do you have a preference to order in which we

 6   go?

 7              THE COURT:  Not at this time I don't.  But if I

 8   form of preference, I will let you know.

 9              MR. LEE:  The real question is whether given the

10   varying burdens, if we go first, we also rebut last, but if

11   Your Honor could just tell us what you have in mind, it

12   would be helpful.

13              THE COURT:  Well, let's do this.  Why don't you

14   talk to each or and tell me on Thursday what your proposal

15   is.  If you agree to something, then I'll be fine with it.

16   And if you don't, then I'll try to figure that out Thursday.

17              MR. LEE:  And last question, Your Honor.

18              THE COURT:  Sure.

19              MR. LEE:  Our plan was to have one closing.  Is

20   that all right with Your Honor?

21              THE COURT:  That's fine by me.

22              Is there anything from defendants before we

23   break?

24              MR. MIZERK:  Not from SigmaPharm, Your Honor.

25              MR. PEJIC:  Not from Unichem.
```

```
 1              MR. KOCHANSKI:  Not from Sunshine Lake.

 2              THE COURT:  All right.  I will see you on --

 3              MR. LEE:  Your Honor, there is one other thing,

 4    you just reminded me.  Dr. Kowey will have -- if we have

 5    to take him out of order because we're not in order?  We

 6    will have to take him Friday morning.  He has the same

 7    problem that Dr. Zusman has as a treating cardiologist.

 8              THE COURT:  I assume that is not news to

 9    defendants, so ...

10              MR. MIZERK:  It's not but --

11              THE COURT:  It's not an issue.

12              MR. MIZERK:  It's not an issue.

13              THE COURT:  Thank you for that.  We'll see you

14    on Thursday.

15              (Proceedings adjourn at 3:32 p.m.)

16

17        I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.
18

19                        /s/ Brian P. Gaffigan
                          Official Court Reporter
20                           U.S. District Court

21

22

23

24

25
```