```
1                    IN THE UNITED STATES DISTRICT COURT
                     IN AND FOR THE DISTRICT OF DELAWARE
2
                                    - - -
3       BRISTOL-MYERS SQUIBB COMPANY
        and PFIZER INC.,                      : CIVIL ACTION
4                        Plaintiffs,      :
        v                                     :
5                                         : (Consolidated)
        AUROBINDO PHARMA USA INC.,           :
6                                         : NO. 17-374-LPS
                         Defendant.
7
                                    - - -
8
                             Wilmington, Delaware
9                        Thursday, November 7, 2019
                           Bench Trial - Volume F
10
                                    - - -
11
        BEFORE:       HONORABLE LEONARD P. STARK, Chief Judge
12
        APPEARANCES:              - - -
13
                     FARNAN, LLP
14                   BY:  MICHAEL J. FARNAN, ESQ.

15                        and

16                   WILMER CUTLER PICKERING HALE and DORR, LLP
                     BY:  AMY K. WIGMORE, ESQ., and
17                        HEATHER M. PETRUZZI, ESQ.
                          (Washington, District of Columbia)
18
                          and
19
                     WILMER CUTLER PICKERING HALE and DORR, LLP
20                   BY:  WILLIAM F. LEE, ESQ.,
                          ANDREW J. DANFORD, ESQ.,
21                        TIMOTHY A. COOK, ESQ.,
                          KEVIN S. PRUSSIA, ESQ., and
22                        SHIRLEY X. LI CANTIN, ESQ.
                          (Boston, Massachusetts)
23
                               Counsel for Bristol-Myers Squibb
24                             Company and Pfizer Inc.

25      Valerie J. Gunning              Brian P. Gaffigan
        Official Court Reporter         Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3            PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
             BY:   JOHN C. PHILLIPS, JR., ESQ.

4                      Counsel on behalf of SigmaPharm
                       Laboratories, LLC; Unichem Laboratories,
5                      Ltd., Zydus Pharmaceuticals (USA) Inc.,
                       Sunshine Lake Pharma Co., Ltd., and
6                      HEC Pharm USA

7                  and

8            HUSCH BLACKWELL, LLP
             BY:   PHILIP D. SEGREST, JR., ESQ., and
9                  DON J. MIZERK, ESQ.
                   (Chicago, Illinois)
10

11                 and

12           HUSCH BLACKWELL, LLP
             BY:   THOMAS P. HENEGHAN, ESQ., and
13                 DUSTIN L. TAYLOR, ESQ.
                   (Madison, Wisconsin)

14                     Counsel on behalf of SigmaPharm
                       Laboratories, LLC
15

16                 and

17           GREENBLUM & BERNSTEIN, P.L.C.
             BY:   P. BRANKO PEJIC, ESQ.,
                   PAUL A. BRAIER, ESQ., and
18                 JILL M. BROWNING, ESQ.
                   (Reston, Virginia)
19

20                     Counsel on behalf of Unichem
                       Laboratories, Ltd.

21

22

23

24

25

1    APPEARANCES:  Continued)

2

3                 YOUNG CONAWAY STARGATT & TAYLOR, LLP
                  BY:  KAREN L. PASCALE, ESQ.

4                      and

5                 LERNER DAVID LITTENBURG KRUMHOLZ & MENTLIK, LLP
                  BY:  PAUL H. KOCHANSKI, ESQ., and
6                      KENDALL K. GURULE, ESQ.
                       (Westfield, New Jersey)

7
                           Counsel on behalf of Sunshine Lake
8                          Pharma Co., Ltd., and HEC Pharm USA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          - oOo -

 2                  P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following bench trial was

 4      held in open court, beginning at 1:02 p.m.)

 5              THE COURT:  Good afternoon.

 6              (The attorneys respond, "Good afternoon.)

 7              THE COURT:  Nice to see everyone again.  Have a

 8      seat.

 9              I think we have let you know, I am available

10      until 7:00 today.  I don't know if you've had a chance to

11      discuss whether you might want to stay until then.

12              Anybody have a view?  Anybody want to speak to

13      that?

14              MR. LEE:  Wanting and planning on it are two

15      different things.

16              THE COURT:  We can wait and see how things go,

17      that's fine.

18              MR. LEE:  I think we're planning on it.

19              THE COURT:  You are planning on staying?

20              MR. LEE:  Staying until 7:00.

21              THE COURT:  Okay.  Is that the tentative plan

22      from defendants, also?

23              MR. PEJIC:  Yes, Your Honor.

24              THE COURT:  All right.  Well, we'll let folks in

25      the building know that that's our tentative plan for now.
```

1    All right.  Any issues that plaintiffs want to

2  raise before we get started?

3    MR. PRUSSIA:  Yes, Your Honor.  There is an

4  issue.

5    THE COURT:  Go ahead.

6    MR. PRUSSIA:  Your Honor, there's an issue with

7  the demonstratives that were circulated last night with

8  respect to the testimony of Dr. Chambliss, as well some

9  exhibits that he intends to offer.  And we have a few

10  binders we think we can pass up to the Court.

11    May I approach, Your Honor?

12    (Binders passed forward.)

13    THE COURT:  Yes.

14    MR. PRUSSIA:  Your Honor, the Court may remember

15  that on October 29th, the parties filed a joint letter, it's

16  Docket No. 677, and the purpose of that letter was to

17  narrow -- among the purposes of that letter was to narrow

18  defendants' prior art combinations.  There was some issue

19  about this at the pretrial conference.

20    And the letter identified four combinations, if

21  Tom wants to put it up on the screen -- Mr. Lee.

22    Specifically, these are the four bullets that

23  are in the middle of this page.  It identifies the four

24  combinations that defendants intended to move forward with

25  at trial.

1    Last night we received DDX-14.

2    If we turn to page 12, it identifies several

3    combinations, four of which are consistent with the joint

4    letter.  But then there's this fifth category that is

5    characterized as the state of the art at the time of the

6    invention.

7    THE COURT:  Right.  I understand "state of the

8    art" not to be an invalidating combination.

9    Do you have a different understanding?

10    MR. PRUSSIA:  That's our understanding as well.

11    We had the meet and confer with them last night,

12    and we asked them how they intended to use this, and it

13    wasn't exactly clear, but there, one issue that is apparent

14    to us is that there are references, and I will show the

15    Court this through the course of this demonstrative, that

16    they initially identified as part of their combinations that

17    they are now intending to use as state of the art, which,

18    generally, we wouldn't have an objection to, but the way in

19    which they're characterizing it -- and I can offer a few

20    examples for the Court --

21    THE COURT:  Well, when I've seen this before, it

22    has turned on whether or not they're trying to point to

23    something other than the four references as the place that I

24    will find the limitation in question.

25    Do you understand them to be proposing to do

1   that?

2              MR. PRUSSIA:  I -- what I understand them to be

3   using is to be filling in gaps with respect to lack of

4   motivation that are not -- that are not present -- with

5   respect to motivation that are not present with their

6   asserted combinations with these other references; that they

7   initially identified as part of combinations, they've now

8   withdrawn as part of their current combinations.

9              THE COURT:  So I think I understand.  I

10  recognize you and I are talking about their position, but --

11             MR. PRUSSIA:  Yes.

12             THE COURT:  -- there's X number of claim

13  limitations in the claim they're trying to invalidate.

14             When I've seen this before, I've said to the

15  defendants, you're going to have to identify all of those

16  claim limitations somewhere in these four prior art

17  references.

18             If I don't find it in those four and I find it

19  in the state of the art, you lose.  You agree with that;

20  right?

21             MR. PRUSSIA:  Absolutely, Your Honor.

22             THE COURT:  Okay.  But what you're saying is

23  they're telling you they're not, apparently, doing that, but

24  they're saying it goes to the motivation to combine.

25             MR. PRUSSIA:  It goes to what they say is

1    background.  And I think there are examples of what is I

2    think acceptable and appropriate use of state of the art as

3    background, and I think there's some examples in here of

4    what are not appropriate use of what was initially asserted

5    as prior art background.

6              THE COURT:  Okay.  And if you want to go through

7    them, that's fine.

8              MR. PRUSSIA:  There's one example I'll draw the

9    Court's attention to.  There's a reference called Pinto

10   2007, which was initially a combination -- part of a

11   combination that the defendants had used.

12             And if we go to slide 15, and if you want to

13   cycle through 15, 16, 17 -- well, 15 and 16 really, they're

14   using now the Pinto reference in the same way that they used

15   it in Dr. Chambliss's expert report.

16             They're using it as example of evidence as to

17   why there was motivation in their view to arrive at the

18   claimed inventions.  And we think that's improper because

19   Pinto was initially part of a combination, it was withdrawn

20   for that purpose, and now they're trying to use it for the

21   exact same purpose as part of this state-of-the-art

22   combination.  And,

23             Just to be clear, Your Honor, we're not saying

24   that they can't use anything other than the six or seven

25   references they identified to talk about the state of the

1   art.  There are some, I think, appropriate examples in this

2   deck.

3            If we go to --

4            THE COURT:  Well, let me ask you this.  Did they

5   previously use Pinto as the basis for where one would find

6   the limitation having been disclosed prior to the patent?

7            MR. PRUSSIA:  They -- not explicitly because as

8   you will hear later today, these limitations aren't

9   explicitly taught in the prior art.  There are a few they

10  say are, but especially with respect to the particle size

11  limitation and the dissolution rate limitation, it's not

12  really disclosed in the prior art.  There's a debate about

13  that between the parties as I'm sure Your Honor can

14  appreciate.

15           So they're using these references to say there

16  was a problem about apixaban that was known in the prior

17  art, and so a person of ordinary skill in the art would have

18  been motivated to make these changes and, therefore, would

19  have arrived at the claimed invention.  And,

20           That's fine if they want to make that argument,

21  but they should make that in the context of the specific

22  combinations that they articulated.  It's improper for them

23  to use Pinto 2007 and some of these other abandoned

24  references in place of that, given that they abandoned it.

25           That's one of two issues, and I'm happy to turn

1    to my friend or address the second issue.

2              THE COURT:  Is the other issue related to

3    Dr. Chambliss?

4              MR. PRUSSIA:  It is.

5              THE COURT:  You might as well go on that.

6              MR. PRUSSIA:  It relates specifically to two

7    exhibits.  These are the York references.

8              These are exhibits that we have objected to on a

9    number of grounds, but most importantly on the basis that

10   they have not been established as being available in the

11   prior art as a priority date.

12             The other side has indicated that in their view,

13   it's appropriate for their expert to rely on it because it's

14   the kind of material that an expert in this field would rely

15   upon.  And our position is no, it's not.  It's their burden

16   to establish it was a printed publication.  They have, they

17   have not identified any witness or any other way in which

18   they intend to do that.

19             Dr. Chambliss told us during his deposition that

20   he was asked to assume that they were prior art.  He did no

21   independent investigation to establish that they were.  And

22   in the course of this trial, they haven't proffered anything

23   by the way of witnesses, documents, or anything else to

24   establish that these documents are, in fact, printed

25   publications.

1  THE COURT:  Okay.  That was the two issues;

2  right?

3  MR. PRUSSIA:  Yes, Your Honor.

4  THE COURT:  All right.  Let me hear from

5  defendants.

6  MR. PEJIC:  Can you keep that back up on the

7  screen, please?

8  Thank you, Your Honor.

9  THE COURT:  Good afternoon.

10  MR. PEJIC:  As to the first point, particularly

11  Pinto 2007 is actually uncontested prior art.  And there's

12  no objection to it as evidence.  And Your Honor is

13  absolutely correct:  What we're trying to do is show what

14  the state of the art is, what one skilled in the art would

15  have understood; and Mr. Prussia is absolutely right, that

16  is the motivation to combine the references.

17  We will not rely on anything on the state of the

18  art to actually show a claim limitation.  And I believe that

19  should address that issue.

20  THE COURT:  So you accept and don't dispute that

21  if I can't find a claim limitation in these four prior art

22  references, that you are relying on combinations of them,

23  you have failed to prove invalidity due to anticipation and

24  obviousness; correct?

25  MR. PEJIC:  Absolutely, Your Honor.  That is my

1    expectation.

2                    THE COURT:  All right.  What about -- and I'm

3    not sure I've seen this dispute before.  Why should you be

4    able to use the background state of the art to meet your

5    element or your burden to show that there was a motivation

6    to combine when you initially, as I understand it, at least,

7    explicitly relied on these references as invalidating --

8    parts of invalidating combinations, and then affirmatively

9    told everyone, we're no longer relying on them as

10   invalidating references?

11                   MR. PEJIC:  I actually think that's a slightly

12   different argument because, again, as Mr. Prussia admitted,

13   we did not rely on the state of the art in those

14   combinations to show limitations.  What we relied upon it

15   was to show the motivation to combine.

16                   THE COURT:  No, no.  And that's what I meant to

17   focus on.

18                   MR. PEJIC:  Okay.

19                   THE COURT:  Previously, and this is what I

20   thought the dispute was going to be, but it wasn't -- it's

21   been limitations versus something more general.

22                   MR. PEJIC:  Um-hmm.

23                   THE COURT:  That's not the dispute here.  You're

24   all in agreement --

25                   MR. PEJIC:  Okay.

1    THE COURT:  -- about that.  It's to be a new

2    argument that, well, look, they have to show motivation to

3    combine in order to persuade you that this was obvious.  And

4    why should they be able to use something other than the four

5    prior art references they said are invalidating in order to

6    meet that element, that is, the motivation to combine?  So

7    why should I let you do that?

8    MR. PEJIC:  Well, I think is the question that

9    we abandoned?  I just --

10   THE COURT:  Yes, yes.  I don't think they're

11   saying you didn't disclose it earlier.  It's that you

12   affirmatively told them you weren't going to try to

13   invalidate these patents at this trial --

14   MR. PEJIC:  Okay.

15   THE COURT:  -- with Pinto.

16   MR. PEJIC:  Your Honor, may I approach?

17   THE COURT:  Sure.

18   MR. PEJIC:  This is actually the e-mail that we

19   were discussing in trying to narrow.  And as you can see

20   where I've highlighted, we did not have at any level

21   affirmatively give up relying upon the state of the art.

22   THE COURT:  All right.  Are you -- I've not yet

23   parsed the letters sent to me versus this e-mail.  Is there

24   some suggestion that the letter to me was inaccurate?

25   MR. PEJIC:  I'm just saying that I think

1   Mr. Prussia was slightly inaccurate in saying that we had

2   abandoned the prior art.  The state of the art, if you will.

3          THE COURT:  He directed my attention to the

4   letter sent to me.  Was the letter sent to me accurate, or

5   did it not convey your agreement accurately?

6          MR. PEJIC:  I -- I believe it was accurate in

7   that we were relying on these four primary combinations to

8   show limitations of the claims, but I don't believe we ever

9   gave up the state of the art to show motivation to combine.

10          And if the next question is whether -- why we

11   should look to this art, I think it's just Rule 703.  This

12   is the type of evidence that -- these are peer-reviewed

13   articles, they're patent publications.  This is the type of

14   evidence that experts routinely rely upon in forming

15   opinions, and so I believe it's reliable and the appropriate

16   type of evidence for an expert to rely on to show the state

17   of the art and motivation to combine.

18          THE COURT:  What about the York references?

19          MR. PEJIC:  The York references, Your Honor, we

20   are not moving -- we're not going to attempt to move them

21   into evidence as we've told the opposing counsel.

22          And will you please turn to -- it's slide 26.

23          And on the bottom two are the York references.

24   Above that is Stegemann, which is uncontested prior art, and

25   Yu, which is unobjected prior art.

1    And what this shows is one skilled in the art at

2    the time of invention would know what to do or to reduce the

3    particle size of a Class III BCS drug.

4    To the extent that it is not admissible

5    evidence, it's still proper for an expert to rely upon it,

6    and we believe that given the fact that it is

7    contemporaneous with documents that have similar statements,

8    that there is some level of reliability, and certainly Your

9    Honor is capable of according it the appropriate weight that

10   it is entitled to; and, again, we're not trying to move it

11   into evidence.

12   THE COURT:  You are not moving it into evidence,

13   and you have no evidence evidently that it was available at

14   the time.

15   MR. PEJIC:  No, sir.

16   THE COURT:  That you agree?

17   MR. PEJIC:  Yes.

18   THE COURT:  You don't have that evidence?

19   MR. PEJIC:  (Nodding yes.)

20   THE COURT:  Okay.  Thank you.  Do you want to

21   come back?

22   MR. PRUSSIA:  Just briefly, Your Honor.

23   Just on that last point, Your Honor.  If it's

24   not prior art, it's not relevant.  It's not material under

25   703, that an expert witness who is opining on alleged

```
 1    invalidity would rely upon, and shouldn't be permitted for
 2    that purpose.
 3                And if I could just briefly show Your Honor on
 4    this abandonment issue.
 5                Can we, Tom, can we pull up the table of
 6    contents for Dr. Chambliss's report?
 7                And this is Tab 6 in Your Honor's binder, and
 8    counsel as well.
 9                And if we go to iv in the table of contents, you
10    see a reference to the York -- both of the York papers that
11    we have the objection to as exhibits, but also in connection
12    with this state of the art issue.
13                They were initially identified as part of a
14    combination.  They are not part of the current four
15    combinations, and now they're trying to use it to fill in
16    gaps in the current combinations.  We think that is not
17    proper.
18                Go to the next page.
19                The same is true of the Stegemann reference
20    under G as well as if we go down to Pinto 2007.
21                So it's very clear based on Dr. Chambliss' own
22    report, these were references that they identified as part
23    of their initial set of combinations, asserted prior art
24    they were using to argue why the claims are invalid as
25    obvious.
```

1    We narrowed it down to four references.  The

2    purpose of that was to streamline the issues for trial, and

3    we think it's improper now for them over a weak later, after

4    they made this narrowing, to try and resurrect these

5    references through some so-called state of the art.  Thank

6    you.

7    THE COURT:  Well, it looks like I only have the

8    table of contents, which is fine.  I don't want the whole

9    report right now.

10    If I were to look at it, are you saying in none

11    of these conversations is Pinto or Stegemann pointed to as

12    the place where you would find one of the limitations of

13    your claim?

14    MR. PRUSSIA:  That's right, Your Honor, because

15    they are using it -- I'm not asserting that they are using

16    it to teach a limitation.  I'm asserting --

17    THE COURT:  But did they do that before they

18    allegedly abandoned their ability to do that?

19    MR. PRUSSIA:  To be fully accurate, I would have

20    to refresh myself on Dr. Chambliss' report, but my memory is

21    that they did not, because none of these limitations are

22    explicitly taught with the exception of a few that are not

23    really contested between the parties.  But on the core

24    limitations, the core ones that are inventive features of

25    this patents, what they are using is references to show that

1    there's motivation to combine.

2              THE COURT:  Okay.  All right.  Thank you.

3              I'm going to overrule the objection to the use

4    of the prior art to show that the state of the art was an

5    alleged motivation to combine.  I'm not persuaded that their

6    abandonment of these references was meant to abandon them

7    for the purposes of showing the motivation to combine.

8              Further, as I've indicated from the discussion,

9    where this dispute has, for me at least come up before, is

10   whether or not they've abandoned relying on those references

11   to be the location where one would have found a specific

12   claim limitation.  And so this is a new argument to me and

13   I'm not seeing anything that would have fairly put the

14   defendants on notice that when they attempted to make clear

15   they were not using these prior art references as

16   invalidating in the sense of here's where you find the claim

17   limitations, that they should have also realized they were

18   at least implicitly giving up, using it as a source for

19   purported motivation to combine.

20             So I will hear that argument -- I will hear that

21   evidence and give it whatever weight it merits.

22             On the objection to the York references, at this

23   point they are not speaking to move them into evidence, so

24   there really is no need to rule on the objection to whether

25   they should come into evidence.  It seems like an odd

1   purpose that defendants want to use them for.  It is hard to

2   imagine that much weight will be accorded to them, but I'm

3   not going to tell them that they can't do what they have

4   disclosed they want to do, so overruled to the extent it's

5   even an objection at this point.

6            Anything else from plaintiff?

7            MR. LEE:  Not from the plaintiffs Your Honor.

8            THE COURT:  Anything from defendant?

9            MR. PEJIC:  No, sir.  Thank you, Your Honor.

10           THE COURT:  Okay.  Then we'll call our witness.

11           MR. KOCHANSKI:  Yes.  Your Honor, I call Harry

12   G. Brittain, please.

13           THE COURT:  Okay.

14           ... DR. HARRY G. BRITTAIN, having been duly

15   sworn as a witness, was examined and testified as follows...

16           THE COURT:  Good afternoon, Dr. Brittain.

17   Welcome.

18           THE WITNESS:  Good afternoon.

19           MR. KOCHANSKI:  Judge, may I approach?

20           THE COURT:  Yes.

21           (Mr. Kochanski handed binders to the Court, to

22   the witness and to opposing counsel.)

23           MR. KOCHANSKI:  I guess that one is for the

24   court reporter.  Thank you.  May I give Dr. Brittain a

25   laser?

Brittain - direct

1    THE COURT:  Yes.  Feel free to use it, Dr.

2  Brittain.

3                 DIRECT EXAMINATION

4  BY MR. KOCHANSKI:

5  Q.     Good afternoon, Dr. Brittain.  Will you please

6  identify yourself to the Court.

7  A.     Yes.  Dr. Harry G. Brittain.

8  Q.     And, Dr. Brittain, where do you presently work?

9  A.     I'm sorry?

10  Q.     Where do you presently work?

11  A.     Presently, I'm the Institute Director At the Center

12  For Pharmaceutical Physics.

13  Q.     And what is the Center For Pharmaceutical Physics?

14  A.     The Center For Pharmaceutical Physics is the

15  consulting company I established as a vehicle to conduct my

16  own personal research as well as to supply various

17  consulting services to the pharmaceutical community.

18  Q.     Okay.  And, Dr. Brittain, were you here and present

19  in court for the testimony of Dr. Atwood and Dr. Zaworotko?

20  A.     Yes, I was.

21  Q.     Okay.  If we could turn to DDX-11-2, please.

22              Dr. Brittain, please take a look at the slide.

23  And is this a brief summary of your educational background,

24  your employment history and other accomplishments?

25  A.     Yes, this is part of that.

Brittain - direct

1    Q.       Thank you.

2             And will you please explain to the Court your

3    educational background, please?

4    A.       Yes.  I received a Bachelor's degree in chemistry

5    Queens college.  I received a Master's degree in physical

6    chemistry also from Queens College.  I received a Ph.D. in

7    physical chemistry from the City University of New York, and

8    I was a post-doctoral research fellow at the University of

9    Virginia.

10   Q.    And can you give a general overview of your work

11   experience, please?

12   A.       Yes.  I was a professor for nine years at Ferrum

13   college in West Virginia.  I moved to New Jersey to become

14   an assistant professor at Seton University.  I was promoted

15   to associate with tenure.  I went on sabbatical to E.R.

16   Squibb & Sons and did not go back and I worked at Squibb

17   throughout the merger.

18            As you can see, I became director of

19   pharmaceutical, analytical and chemical development at a

20   small company.

21            I then moved to a startup company as vice

22   president.  A little more than 20 years ago I started

23   working for myself as a consultant.

24   Q.    Based upon your work, Dr. Brittain, have you received

25   any awards?  I would ask to put up DDX-11-3.

Brittain - direct

1    A.      Yes.  I have received some awards, yes.

2    Q.      Okay.  Is there any award you're especially, you

3    know, enamored with?

4    A.      Well, I would like to call out the Research

5    Achievement Award that I received from the American

6    Association of Pharmaceutical Scientists.  I received that

7    award in recognition of my work in developing material

8    science and physical analysis in the pharmaceutical

9    industry.

10   Q.      Okay.  And during your academic and professional

11   career, Doctor, have you published any learned treatises or

12   papers with respect to your work?

13   A.      Yes.  As it says on the slide, I've edited 31 books

14   since 1992.  I've published over 345 research papers.  That

15   does not count the one that came out on Monday, and book

16   chapters.  I have presented numerous seminars in industry,

17   academia.

18   Q.      And, Dr. Brittain, can you just generally describe

19   what you believe your areas of expertise are?

20   A.      I would say that my areas of expertise are in the

21   areas of physical chemistry and physical pharmacy with a

22   special emphasis on the physical characterization of

23   pharmaceutical material.

24   Q.      And how long have you worked in these areas of

25   physical chemistry and physical pharmacy?

Brittain - direct

1   A.      Well, I've worked in physical chemistry since my

2   educational days.  In physical pharmacy, that would amount

3   to about 35 years now.

4   Q.      Okay.  And, Dr. Brittain, does your expertise include

5   any expertise in connection with X-ray powder diffraction

6   and identifying chemical species?

7   A.      Yes, it certainly does.

8   Q.      All right.  And are you a named inventor on any

9   patents?

10  A.      Yes.  I'm a named inventor now on 25 issued United

11  States patents and a number of foreign equivalents of

12  those.

13  Q.      Are any of those patents related to XRPD technology?

14  A.      Yes.  In fact, 23 of those patents involved

15  intellectual content that is derived from X-ray powder

16  diffraction subjects that I had actually performed myself.

17  Q.      If I could ask you to turn in your binder, Dr.

18  Brittain, to DTX-502.  And can you identify for me what that

19  document is?

20  A.      Yes.  This is a copy of my curriculum vitae.

21  Q.      And does this document provide an accurate summary

22  of your education, professional experience and

23  accomplishments?

24  A.      It does, yes.

25          MR. KOCHANSKI:  Your Honor, I proffer Dr.

Brittain - direct

 1   Brittain as an expert in physical chemistry, physical

 2   pharmacy with special expertise in the development and

 3   analysis of pharmaceutical formulations and in analytical

 4   methods including X-ray powder diffraction.

 5               MS. WIGMORE:  No objection.

 6               THE COURT:  He's so recognized.

 7               MR. KOCHANSKI:  Thank you.

 8   BY MR. KOCHANSKI:

 9   Q.      Dr. Brittain, have you been retained by Sunshine Lake

10   in relation to this case?

11   A.      Yes, I have.

12   Q.      And what were you asked to do with respect to your

13   retention by Sunshine Lake?

14   A.      Well, I was asked to review the nature of the

15   Sunshine Lake tablet formulations depicted in tablet

16   formulations with special regard to whether any of the

17   physical properties of the drug substance in that

18   formulation would be within the scope of the claims of the

19   '945 patent.

20   Q.      Dr. Brittain, are you being compensated for the work

21   that you've done?

22   A.      Yes.

23   Q.      And is any of your compensation dependent upon the

24   opinions that you provided or the result of this litigation?

25   A.      No.

Brittain - direct

1    Q.      Okay.  If we could put up 11-4, please.

2              Dr. Brittain, can you explain what's shown on

3    this slide?

4    A.      Yes.  This is a definition of a person of ordinary

5    skill in the art with respect to the '945 patent.  I believe

6    this is the construction that has been proposed by

7    defendants.

8    Q.      Okay.  And, Dr. Brittain, did you apply this

9    definition in forming your opinions in this case?

10   A.      Yes, I did.

11   Q.      Okay.  If we could turn to DDX-11-5.

12             Do you recognize what's on the screen at this

13   time, Dr. Brittain?

14   A.      Yes.  This is another definition, the plaintiffs'

15   definition, the plaintiffs' definition of a person of

16   ordinary skill in the art.

17   Q.      Okay.  And would your opinions in this case change if

18   plaintiffs' definition was adopted by the Court?

19   A.      No, no, they would not.

20   Q.      Dr. Brittain, are you a person of ordinary skill in

21   the art under both of the definitions offered by the parties

22   in this case?

23   A.      Yes, I would be.

24   Q.      Okay.  If we could turn to 11-6.

25             In evaluating whether Sunshine Lake's apixaban

Brittain - direct

1 tablets fall within the scopes of the '945 patent, what

2 types of material did you review?

3 A.     Well, I certainly reviewed the '945 patent.  I became

4 aware of the Court's claim construction.  I definitely

5 reviewed papers published in the scientific literature and

6 as well as in patents that were derived from the patent

7 literature.

8           I reviewed the ANDA that was filed by Sunshine

9 Lake and also the amendments that were attached to it.

10          I had received samples of Sunshine Lake's

11 tablets for my analysis.  I've also seen some stability

12 testing data that they acquired.

13          And I have reviewed expert reports that were

14 submitted by Dr. Jerry Atwood, and that would include both

15 the hard copies of the XRPD patterns he submitted as well as

16 the electronic versions of those same hard copies.

17 Q.     All right.  Dr. Brittain, although it says on

18 the slide, did you review the file history of the '945

19 patent?

20 A.     I did not review that at the time I wrote my expert

21 report.  I had seen pieces of it since then, but not --

22 before I wrote my expert report, I had not reviewed the file

23 history.

24 Q.     And how about the Court's decision on claim

25 construction?  Did you review that before you filed your

Brittain - direct

1   expert report?

2   A.      I had not seen the document, but I had been -- I had

3   been told by counsel about that certain terms were to be

4   understood with their plain and ordinary meaning and that's

5   as much as I knew at the time.

6   Q.      Dr. Brittain, do you recall Dr. Zaworotko's

7   discussion in court regarding the technology overview of the

8   principles of X-ray powder diffraction and characteristics

9   of amorphous dispersion?

10  A.      I do remember that, yes.

11  Q.      As a person of ordinary skill in the art with over

12  35 years experience, do you agree with Dr. Zaworotko's

13  testimony in this regard?

14  A.      I do.  I think he presented that testimony very

15  accurately.

16  Q.      Were the principles that Dr. Zaworotko set forth with

17  respect to crystal structure, amorphous dispersions and

18  their differences from amorphous solids and definitions of

19  genuine XRPD peaks accurate?

20          MS. WIGMORE:  Your Honor, I object.  He has not

21  offered any opinions about Dr. Zaworotko's opinions in his

22  report.

23          I think the prior question was fine, but if

24  we're getting into details about Dr. Zaworotko's opinions,

25  it's not part of his opinion.

Brittain - direct

```
 1              MR. KOCHANSKI:  No, we will not be getting into
 2   details of Dr. Zaworotko's opinion.
 3              THE COURT:  Do you object to this question?
 4              MS. WIGMORE:  As long as it's remains this with
 5   question, I do not.
 6              THE COURT:  Okay.  You can answer if you
 7   remember the question.
 8              THE WITNESS:  I'm sorry.  Could I hear the
 9   question again?
10   BY MR. KOCHANSKI:
11   Q.     The question was, Doctor:  Were the principles Dr.
12   Zaworotko set forth with respect to crystal structure,
13   amorphous dispersions and their difference from the neat
14   amorphous solids and definitions of genuine XRPD peaks
15   accurate?
16
17   A.     Yes.  Those opinions that I heard presented in court
18   are extremely accurate.
19              MR. KOCHANSKI:  Okay.  Can we please put up
20   Exhibit 518 on the screen.
21   BY MR. KOCHANSKI:
22   Q.     And, Dr. Brittain, did you review a portion of
23   Sunshine Lake's ANDA dealing with the composition and
24   formulation of apixaban tablets?
25   A.     Yes, I did.
```

Brittain - direct

1     MR. KOCHANSKI:  Okay.  And can we please turn to

2  page 2 of DTX-518.

3  BY MR. KOCHANSKI:

4  Q.    Dr. Brittain, did you review this table in

5  preparation of your expert report?

6  A.    Yes, I did.

7     MR. KOCHANSKI:  Now, you can turn to DDX-11-7.

8  BY MR. KOCHANSKI:

9  Q.    I would ask you to look at this slide.

10     Is this the table -- is this table on this slide

11  the same table from page 2 of DTX-518?

12  A.    Yes.  When I prepared this slide, I specifically

13  selected out portions of that table that dealt with the

14  composition of the core tablet.  And you notice the details

15  of coating are not on the page, but it is the core tablet.

16  Q.    And what's the importance of the composition of

17  formulation of the Sunshine Lake apixaban tablets with

18  respect to this litigation?

19  A.    Well, there's two items of import that I have

20  summarized on the right-hand side of the slide.

21     One piece is that the bulk of the tablet

22  composition, the core is excipient, and that excipient is

23  either microcrystalline cellulose, which is effectively

24  amorphous, or anhydrous lactose, which is actually quite

25  crystalline.

Brittain - direct

1          The second point to keep in mind, and probably

2     one of the most important parts, is the fact that the

3     apixaban drug substance comprises 2.5 percent of the tablet

4     weight, but in this tablet composition, there is 3.0 percent

5     of povidone -- I will call it PVP or polyvinylpyrrolidone,

6     it's the same -- and the real important point of this as

7     will become obvious is that the weight ratio of PVP to

8     apixaban is 1.2 to 1.

9          MR. KOCHANSKI:  Okay.  Now, can we turn DDX-1-8,

10    please.

11    BY MR. KOCHANSKI:

12    Q.    In your review of Sunshine Lake's ANDA material, did

13    you have the opportunity to study the Sunshine Lake

14    manufacturing process for the apixaban 2.5 milligram and

15    5 milligram tablets?

16    A.    Yes, I did.

17    Q.    Okay.  If could please turn to your binder to the tab

18    marked DTX-512, which has been previously introduced into

19    evidence here as PTX-843, and specifically, page 116.

20          And I ask you if this is what you reviewed with

21    respect to Sunshine Lake's manufacturing process?

22    A.    Well, I like the flowchart because it basically

23    summarizes the various steps that Sunshine Lake uses to

24    produce its drug product.

25    Q.    Dr. Brittain, the flowchart looks overly involved.

Brittain - direct

1    Did you prepare a demonstrative simplifying the process

2    steps?

3    A.      I did.

4            MR. KOCHANSKI:  Can we put up DDX-11-9, please.

5    BY MR. KOCHANSKI:

6    Q.      Using this simplified diagram, can you explain the

7    relevant process steps and their effect on the physical

8    state of apixaban in the Sunshine Lake product?

9    A.      Yes.

10           What I have depicted in this sort of cartoon

11   diagram are the important steps that I think need to be

12   understood in Sunshine Lake's manufacturing process.

13           At the very outset of the process, we have

14   apixaban and povidone present in dry powder form.  These

15   materials are dissolved in a solvent, glacial acetic acid.

16   We obtained at this point a true solution where the

17   substances are dissolved, so there's no particles, there's

18   no crystals, and the materials are present in the form of

19   individual molecules.

20           As the process continues, that solution is

21   sprayed, it's atomized, and we obtained droplets.  Those

22   droplets are allowed to interact with the other excipients,

23   for instance, the microcrystalline cellulose and the lactose

24   that I mentioned.

25           What we end up with excipient particles that are

1    effectively wetted with the acetic acid solution.   And in

2    that acetic acid, that's where you find the povidone and the

3    apixaban.   When you dry, and this is a very rapid process,

4    when you rapidly dry those particles, what happens is you

5    obtain a film of povidone on the surface of the excipient

6    particles that -- and that's where you find the apixaban

7    that is literally dissolved in the solid solution on the

8    surface of those particles.

9              As a result of the drying process, a lot of

10   those particles get stuck together and form granules.

11   Q.     Okay.   The particles you are talking about are the

12   microcrystalline lactose anhydrous with the coating; is that

13   correct?

14   A.     Yes.

15             In the figure, that would be the white part, the

16   central part, the middle circles.   That would be the

17   excipient particle, and the povidone and the apixaban would

18   be present in the film on those, which is the black line

19   that's encircling those little circles.

20   Q.     If you could look at DTX-503 in your binder.

21   A.     (Witness complies.)

22             MR. KOCHANSKI:   And if we could put up

23   DDX-11-10.

24   BY THE WITNESS:

25   A.     Okay.

Brittain - direct

1   Q.      Can you tell the Court what DTX-503 is, please?

2   A.      DTX-503 is a United States patent.  It's an

3   application, it's not a patent.  It's 2015/0018386.

4   Q.      Okay.  And what is the title of the patent?

5   A.      The title of the patent is:  "Amorphous Form of

6   Apixaban, Process of Preparation and Compositions Thereof."

7   Q.      And what is the nature of the invention disclosed in

8   this patent application?

9   A.      Well, actually the scope of this patent is actually

10  contained within the title.  This patent application

11  describes a process and compositions by which you can get

12  apixaban in an amorphous condition.

13          MR. KOCHANSKI:  Can we pull up DTX-503, page 10?

14  BY MR. KOCHANSKI:

15  Q.      Dr. Brittain, can you point to anything specifically

16  in the '386 application, DTX-503, where amorphous apixaban

17  and the process of obtaining the same is illustrated?

18  A.      Yes.

19          The first four examples in the '386 application,

20  they're all exceedingly similar.  But what they do is they

21  detail a process whereby you start with apixaban and at the

22  end of the process, you end up with apixaban in a

23  completely amorphous condition.

24          MR. KOCHANSKI:  Can we put up DDX-11-11, please.

25  BY MR. KOCHANSKI:

Brittain - direct

1    Q.       Referring to Example 3, can you describe the process

2    for obtaining amorphous apixaban disclosed in the '386

3    application?

4    A.       Yes.  In fact, the process is quite simple.

5               Apixaban is first dissolved in methanol.  There

6    is a whole bunch of solvents that are identified in the

7    patent specification, but here it's methanol.

8               Once that material is dissolved, then PVP,

9    molecular weight K30, is dissolved in that same solution,

10   and then the solvent is removed.

11              And the solvent in the example is removed by

12   vacuum distillation and then the product is dried, and what

13   you obtain at the end of this process is a solid material

14   that the example states is amorphous apixaban.

15   Q.       Okay.  How did the inventors of the '386 patent

16   application DTX-503 know they had amorphous apixaban?

17              MS. WIGMORE:  Objection, Your Honor.  He has no

18   knowledge of what the inventors knew.  This is not a

19   Sunshine Lake patent.

20              MR. KOCHANSKI:  I will --

21              THE COURT:  Sorry.  It's not what?

22              MS. WIGMORE:  A Sunshine Lake patent.  He asked

23   how the inventors knew.  This is a patent that belongs to

24   someone else.

25              MR. KOCHANSKI:  Can I rephrase, Your Honor?

Brittain - direct

1      THE COURT:  Sure.

2  BY MR. KOCHANSKI:

3  Q.      How did the inventors describe in the patent

4  publication that they had amorphous apixaban?

5  A.      Yes.

6          Well, if we look ed at the slide we can see --

7  I'll use the pointer (indicating) -- the amorphous apixaban

8  was characterized by x-ray diffraction, and it cites to

9  Figure 1 of the patent.  And Figure 1 is down here

10 (indicating).  This is the x-ray powder diffraction of the

11 material they obtained on performance of Example 3.

12 Q.      And what does that diffraction pattern show?

13 A.      Well, this diffraction pattern, as you can see, is

14 nothing but noise and broad bands, and that diffraction

15 pattern is characteristic of the amorphous material, which,

16 of course, is why in the example it's called amorphous

17 apixaban.

18         MR. KOCHANSKI:  Okay.  Can we now pull up

19 DTX-503, page 8.

20         And can we highlight paragraph 49, please.

21 BY MR. KOCHANSKI:

22 Q.      Dr. Brittain, what drying methods does paragraph 49

23 suggest using to achieve an amorphous solid dispersion of

24 apixaban?

25 A.      Right.  In fact, this application says you can get

Brittain - direct

1    the amorphous solid dispersion by removal of solvent, and

2    then it says you can do it by spray drying, lyophilization,

3    flash evaporation, vacuum distillation, and presumably any

4    other method you can think of to remove solvent quickly.

5    Q.      And going back to the Sunshine Lake manufacturing

6    process, what drying method does Sunshine Lake use to dry

7    its solution of the povidone and apixaban solution?

8    A.      Sunshine Lake uses a spray drying process to remove

9    the solvent.

10                  MR. KOCHANSKI:  And can we now look at that same

11   page, page 8 of DTX-503, paragraph 46, please.

12   BY MR. KOCHANSKI:

13   Q.      Dr. Brittain, can you read the two -- the two

14   sentences beginning in the paragraph 46?

15   A.      Yes.

16                  "In some embodiments, the apixaban of Formula I

17   may be dispersed within a matrix formed by a polymer in its

18   solid state such that it is immobilized in its amorphous

19   form.  The polymer may prevent intramolecular hydrogen

20   bonding or weak dispersion forces between two or more drug

21   molecules of apixaban."

22   Q.      Now, can you explain what that means to a layperson,

23   Dr. Brittain?

24   A.      Well, to a layperson, basically what this says is

25   that when you dry down the solution and you obtain the

Brittain - direct

1    solid, the solid is going to consist of a matrix of polymer,

2    which is the povidone, and present in the form of individual

3    drug molecules, attached to various places on the polymer

4    chain, you will -- that is where the apixaban will be.

5    Q.      And will this be a solid dispersion?

6    A.      Absolutely.  This is a solid dispersion, yes.

7    Q.      Is that also known as a solid solution?

8    A.      Yes, it is.

9            MR. KOCHANSKI:  Okay.  If we could turn to

10   11-12, please.

11   BY MR. KOCHANSKI:

12   Q.      Can you explain why the examples, examples 1 through

13   4 of the '386 application, are applicable to the Sunshine

14   Lake ANDA product?

15   A.      Yes.

16           Well, the four examples as I said before, the

17   four examples of the '386 application have exceedingly

18   similar methods of manufacture and, in fact, they only

19   differ in the weight ratio of povidone to apixaban.  So the

20   weight ratio is used to obtain the apixaban in the amorphous

21   solid dispersions are as low as 1 to 1 and as high as 8 to

22   1.

23   Q.      And based upon your discussion of DTX-503, Doctor,

24   what is your opinion with respect to the nature of the

25   apixaban at the conclusion of the drying step in the

1  Sunshine Lake ANDA manufacturing process?

2  A.    Yes.  Well, since -- and when the -- in that drying

3  process, the spray-drying process that we discussed earlier,

4  since the Sunshine Lake product uses a povidone to apixaban

5  ratio of 1.2 to 1, you can see that, in fact, that weight

6  ratio is well within the scope of the weight ratios that

7  were disclosed in the '386 patent application.

8  Q.    And what would -- how would that affect the stability

9  of the apixaban amorphous dispersion?

10  A.    Well, since we obtained an amorphous dispersion with

11  the apixaban dispersed in the polymer, effectively, as part

12  of a -- in individual molecules in the form of the solid

13  solution, you would expect that that amorphous dispersion

14  would be very, very stable over time.

15        MR. KOCHANSKI:  Can we turn to DDX-11-13,

16  please.

17  BY MR. KOCHANSKI:

18  Q.    Okay.  Let me now direct your attention to the '945

19  patent, the patent-in-suit here, which has been previously

20  marked as JTX-0002.

21        Dr. Brittain, do you understand that the

22  asserted claims 20, 21, and 22 depend on claim 12?

23  A.    Yes, that is my understanding.

24  Q.    Okay.  And what does claim 12 require with respect to

25  the physical state of apixaban?

Brittain - direct

1   A.      Well, claim 12 has -- just focusing in on the

2   physical aspects of the apixaban, claim 12 has a couple of

3   elements that are rather crucial, and these are things that

4   if you're going to determine whether an apixaban composition

5   is within the scope of this claim, these are elements you

6   have to prove.

7               I have summarized that at the bottom of the

8   slide.

9               Namely, first thing you need to prove is that

10  apixaban is actually in the form of particles.

11              The second thing you have to prove is that these

12  particulate -- this particles of apixaban are actually

13  crystalline.  And,

14              Then the third thing you have to prove, after

15  you have proven those two items, is that these particles

16  have a particle size distribution where 80 percent -- I'm

17  sorry, 90 percent of the apixaban particles have a diameter

18  that is smaller than or equal to 89 microns.

19  Q.      In your opinion, Doctor, listening to Dr. Atwood's

20  testimony, have the plaintiffs demonstrated any of these

21  points with respect to the Sunshine Lake ANDA product?

22  A.      No, they have not.

23              MR. KOCHANSKI:  If we could turn to DDX-11-15,

24  please.

25  BY MR. KOCHANSKI:

Brittain - direct

1  Q.       Okay.  Does the patent define, Doctor, in terms of

2  XRPD peaks, crystalline apixaban?

3  A.       Yes, it does.

4  Q.       And how does it do that?

5  A.       Well, this is the famous Table 2 out of the '945

6  patent that we heard about.

7            What the patent does is it selects out six peaks

8  from the x-ray pattern diffraction pattern, which obviously

9  will consist of more peaks than that, but it selected out

10  six peaks that it defines as being -- as characteristic.  It

11  is characteristic x-ray diffraction peak positions.

12            So it defines these as the characteristic peaks

13  by which you would -- for which you would use for

14  identification purposes.  And,

15            It also -- I just want to make a note here.  It

16  provides a degree of error, tolerance, if you like,

17  experimental error that you could apply to these peaks.

18            So, in other words, a peak doesn't have to be a

19  10.0, but it is going to be within the experimental error.

20  Q.       I notice it talks about a form N-1 and a form H2-2.

21  Are those crystalline forms of apixaban?

22  A.       Yes, they are.

23  Q.       What crystalline forms of apixaban did Dr. Atwood

24  predicate his opinion on with respect to the Sunshine Lake

25  ANDA product?

Brittain - direct

1   A.      Dr. Atwood predicated his opinion on the form N-1.

2   Q.      All right.  If we could turn to 11-16, please.

3                   If you wanted to confirm the presence of N-1,

4   crystalline apixaban, according to the disclosure of the

5   '945 patent, how would one go about that?

6   A.      First, you would, of course, run the X-ray powder

7   diffraction pattern of the sample you want to analyze, and

8   then you would look in that diffraction pattern for the

9   presence of the six peaks that were cited in form 2.

10                  What I simply did here is just create a

11  little table which basic basically illustrates what plus or

12  minus one degrees would be.  So as I said before, if you

13  were looking to see if you had a peak at 10.0 and you found

14  a peak somewhere between 9.9 and 10.1, you would say, okay.

15  Well, I have found that peak.

16  Q.      All right.  And then if we could turn to DDX-11-17,

17  please.

18                  Did you prepare a demonstrative, Doctor, on how

19  this tolerance is used in XRPD analysis of apixaban?

20  A.      Yes.  There it is.

21  Q.      And can you please describe the slide?

22  A.      Yes.  On this slide, the black trace is the X-ray

23  powder diffraction pattern that I obtained for 2.5-milligram

24  apixaban tablet formulation of the Sunshine Lake tablet.

25                  And the red boxes represent, if you like, the

Brittain - direct

1   graphical embodiment of the plus or minus table that I show

2   in the previous slide.

3                    The centroid in each box is the angle

4   that's quoted in Table 2 of the '945 patent, and the width

5   of the box is the -- represents the plus or minus .1-degree

6   tolerance that was cited in association with Table 2.

7   Q.    Dr. Brittain, just to go off track a little bit here,

8   you mentioned that the black trace on the figure is an XRPD

9   pattern derived from your own analysis of Sunshine Lake's

10  2.5-milligram tablet.

11                   If we turn to DTX-504, can you identify that

12  document for me?

13  A.    Yes.  This is the research notebook.  These are

14  pages out of my research notebook where I recorded my

15  procedures that I used to obtain the X-ray powder

16  diffraction data.

17  Q.    If we can go to page 9 of DTX-504.  And when you

18  discuss your own patterns, on this slide, what is being

19  shown, Doctor?

20  A.    Well this is the X-ray diffraction pattern that I

21  obtained for the 2.5-milligram Sunshine Lake tablet.  The

22  lot number of that tablet batch is up there.  And this is

23  the same X-ray powder diffraction pattern that I just showed

24  in the preceding slide.

25  Q.    Okay.  And if we could go to page 10, please.  And

Brittain - direct

1    what is shown here, Doctor?

2    A.      Page 10.  Yes.  I also was provided with

3    five-milligram Sunshine Lake tablets, and this is the

4    diffraction pattern I obtained for the five milligram tablet

5    formulation.

6    Q.      Now, again, is your experimental technique disclosed

7    in DTX-504, which led to the diffraction patterns that you

8    have exhibited?

9    A.      Yes.  I recorded my procedures in the laboratory

10   notebook.

11   Q.      And are those on pages 2 through 7 of your laboratory

12   notebook?  If you look at DTX-504.

13   A.      Yes, that's correct.

14   Q.      Doctor, can you describe your experimental method

15   that you used, please?

16   A.      Yes.  I will focus in on the 2.5-milligram tablet.

17           What I did there is I took five tablets from the

18   bottle that I was provided, placed those tablets in a mortar,

19   and then I ground the five tablets with a pestle down to a

20   powdered form.  I then -- that gives me a powder composite

21   that was more representative of the sample in the bottle as

22   opposed to taking one tablet.

23           I then took that resulting powder and I placed

24   it into five different sample slides.  I leveled those off.

25   As Dr. Atwood described, we used the same technique.  And

Brittain - direct

1    then I ran one after another.  The diffraction patterns are

2    the five samples that I had prepared.

3    Q.    Okay.  And, Dr. Brittain, when did you analyze

4    Sunshine Lake's tablets?

5    A.    As you can -- well, where did it go?  Thank you.

6         As you can see from the dates in the notebook,

7    I received the tablets on the 14th and I conducted the

8    X-ray powder diffraction work starting on the 15th of

9    March.

10   Q.    And --

11   A.    2019.

12   Q.    I'm sorry.  What were the tablets analyzed by

13   Sunshine Lake that you analyzed?

14   A.    My understanding from looking at the bottle is those

15   tablets were manufactured in January of 2016.

16   Q.    So how old were the Sunshine Lake tablets when you

17   performed your own assays?

18   A.    When I did my own work, these tablets were now three

19   years old.

20   Q.    All right.  If you remember, Doctor, Dr. Atwood

21   testified here that he ran a slow scan in order to better

22   identify any peaks of crystalline material presented in

23   small amounts.

24        Do you remember that testimony?

25   A.    Yes, I remember he said that.

Brittain - direct

1   Q.      Okay.  What did you do to better visualize any peaks

2   of crystalline material present in small amounts?

3   A.      Well, it's my practice if I'm looking for weak peaks,

4   it's my practice to try to lower the noise in the

5   diffraction pattern as much as I can, so the reason I obtain

6   five XRPD patterns is so I could digitally average these

7   five diffraction patterns because the resulting

8   pattern would result in a significant decrease in the amount

9   of noise, which had the effect of increasing the

10  signal-to-noise ratio.

11  Q.      Okay.  So let me ask you this, Doctor:  Your scan

12  averaging, your digital averaging that you just testified to

13  in Dr. Atwood's slow scans, are they aimed at accomplishing

14  the same goal?

15  A.      Yes.  I believe they're just two different ways to

16  try to reduce the noise in the diffraction pattern so you

17  can observe a weak feature if it happens to be there.

18  Q.      Okay.  Looking again at DDX-11-17, Dr. Brittain, I

19  notice that you've shown on the graph here relative intensity

20  to these on the Y axis instead of counts as Dr. Atwood used.

21  Why is that?

22  A.      Well, a lot of times in work that I'm conducting, I'm

23  comparing my diffraction patterns I've obtained with

24  diffraction patterns from another source.  And the only

25  rational way to compare diffraction patterns obtained on

Brittain - direct

1    different instruments is to put them on a common intensity

2    scale.

3              So it's my normal practice to normalize the

4    diffraction patterns such that the intensity of the most

5    intense peak would be 100 percent.  It does not change the

6    picture, the image of the diffraction pattern, and it

7    certainly does not change the angle at which these peaks are

8    obtained, but what it does allow me to do is if I need to

9    compare my data, let's say, with somebody else's data

10   obtained on a different instrument, it allows me to do that.

11   Q.    When you said angle, that's angle two theta?

12   A.    Yes, that's correct.

13   Q.    Okay.  Looking at DDX-1117, were you able to identify

14   any peaks within the red boxes from your scan which

15   represent the six characteristic peaks set forth in the '945

16   patent?

17   A.    No, no, I was not able to see any XRPD peaks inside

18   the boxes.

19   Q.    All right.  Did you do anything further to confirm

20   that conclusion?  And I would ask that you turn to

21   DDX-11-18.

22   A.    Yes.  Well, what I did here is I expanded the angle

23   scale, which had the effect of making the boxes wider and

24   makes it a lot easier to see what's inside the box.

25              I also expanded the intensity scale because I

1   wanted to see what the noise would look like.  In other

2   words, that's the sawtooth stuff.  You can see that's

3   associated throughout the diffraction pattern.

4              So what this allows me to do is look inside the

5   box and see whether I have a peak that could be

6   characterized as a genuine XRPD peak.

7   Q.     Okay.  And looking at DDX-11-18, are there any peaks

8   in any of the red boxes on that diffractogram?

9   A.     There are not.

10  Q.     Okay.  If we could turn to DDX-11-19, please.

11             Okay.  Can you explain what's on this slide,

12  Doctor?

13  A.     Yes.  On this slide I have -- there were two peaks

14  that just didn't fit in the previous scale expansion.  And

15  these two peaks are rather far separated on angle.  So I

16  simply expanded, the same kind expansion, intensity and

17  angle for the last two peaks to look to see whether I could

18  find anything inside the box.  And when I look inside the

19  box, I see nothing but noise, which tells me there is --

20  there's no peaks that are genuine XRPD peaks inside those

21  boxes.

22  Q.     Okay.  And looking at DDX-11-19, I see 18.5.  Is that

23  one of the characteristic peaks set forth in the table in

24  the '945 patent?

25  A.     Yes.

Brittain - direct

1    Q.      And what you've done, as I understand your testimony,

2    is you added minus one and plus one to make the box, so it

3    really, the box goes from 18.4 through 18.6?

4    A.      That's correct.  The idea there is that that is the

5    tolerance.  That's the patent, the stage.  That's where you

6    should find a peak for crystalline form N-1 if it were

7    there.

8               So if you find a peak inside the box, you

9    say there's N-1 present.  If you don't find a peak inside

10   the box, well, then, you have to say there is no N-1

11   present.  If there's peaks, it must be something else.

12   Q.      And you found no peaks inside the box?

13   A.      That's correct.  There's nothing but noise inside

14   those boxes.

15   Q.      Okay.  Dr. Brittain, did you perform the same

16   analysis with respect to Sunshine Lake's five-milligram

17   tablets?

18   A.      Yes, I did.

19   Q.      If we could turn to DDX-11-20, please.  And what is

20   shown on this slide?

21   A.      Well, this is the diffraction pattern I obtained for

22   the five-milligram tablet formulation.  Now, these tablets

23   are twice the size of the 2.5-milligram so I used 3 tablets to

24   prepare my composite it sample for the analysis.  But I still

25   took the composite sample and divided it among six slides and

Brittain - direct

1   obtained six XRPD patterns.  I performed the same kinds of

2   digital averaging and normalization, and that is what

3   results in the trace that you see on this slide.

4   Q.     On DDX-11-20, do you see any peaks within the red

5   boxes?

6   A.     No.

7   Q.     All right.  If we could turn to DDX-11-21 please.

8   Can you explain what's on DDX-11-21?

9   A.     Yes.  This is the exactly analogous scale expansion

10  that I just described for the 2.5-milligram tablet except

11  now this is for the five-milligram tablet.

12             I've expanded the angles.  I expanded the

13  intensity so I could have a very good look inside the box to

14  see whether there are any peaks there, and I look inside

15  these four boxes and I'm -- I cannot, I cannot find any

16  authentic, any genuine XRPD peaks inside those boxes.

17  Q.     What's a genuine peak, Doctor?

18  A.     Well, a genuine peak, authentic peak, I've probably

19  been using those interchangeably.  This is a peak that a

20  person of ordinary skill in the art would recognize as a

21  peak.  For instance, in between 10.0 and 10.6, you can see

22  there's a peak.  It has a large height and it has a width

23  that is pretty characteristic of an XRPD peak.  So we look

24  at that and say, that's definitely a peak.

25             We look inside the boxes and we don't see

1    anything that looks like that.

2    Q.    Okay.  Now, if we can go to DDX-11-22.  Again, is

3    this the analysis of the characteristic peaks at the far end

4    of the spectrum, 18.5, 2 theta and 27.1?

5    A.    Yes.  This is the rest of my analysis that has the

6    other two peaks that you just mentioned, or at least --

7    where they ought to be if they were present.

8    Q.    Again, you see no peaks within the red boxes?

9    A.    No, no.  Inside the box, you can see noise and

10   there's no peaks.

11   Q.    Okay.  Doctor, you keep on saying noise.  What is

12   noise?

13   A.    Well, noise is just a random signal coming out of the

14   detector.  It's due to a variety of different reasons.  It's

15   inherent to the measurement and it's, as I said, it's a pure

16   random, non--- it's hard to describe.  It's a random signal

17   that's coming out of the detector that is superimposed on

18   the entire diffraction pattern.

19   Q.    Doctor, what conclusions did you draw from your scans

20   of the 2.5-milligram apixaban tablet and the five-milligram

21   Sunshine Lake apixaban tablet based upon your own analysis?

22   A.    Yes.  I think I might even have -- yeah, I do have a

23   slide.  Okay.

24         What I concluded as a result of my XRPD

25   analysis, that neither the 2.5-milligram Sunshine Lake

Brittain - direct

1   tablet formulation nor the five-milligram Sunshine Lake

2   apixaban tablet formulation had any peaks that could

3   indicate the presence of crystalline form one in those

4   formulations.

5   Q.      Is this a conclusion you would have anticipated?

6   A.      Yes.  Well, looking at the Sunshine Lake process

7   which is clearly designed to make an amorphous solid

8   dispersion on the surface of the particles and then looking

9   at the 386 application, which is another way to make

10  amorphous solvent dispersion of apixaban in a very analogous

11  matter.  The conclusions that I reached as a result of my

12  experimental studies are exactly what I would have expected

13  based upon what was disclosed in the 386 application.

14  Q.      Okay.  Moving on, can we please pull up and look at

15  your binder at DTX-505 and page one of that exhibit.

16  A.      I have that.

17  Q.      Dr. Brittain, can you identify this document?

18  A.      Yes.  This is the document that I had seen which

19  summarizes the result of XRPD testing that was conducted by

20  scientists at Sunshine Lake.

21  Q.      And when did you receive this document, Doctor?

22  A.      I received this document either a week or two weeks

23  before I filed my expert report.  It was right about that

24  time, but I know it was just before.

25              MR. KOCHANSKI:  If we can look up DDX-11-24,

1  please.

2  BY MR. KOCHANSKI:

3  Q.    Okay.  And what did the data show?

4  A.    Well, what is reproduced here is a summary table that

5  summarizes the results of XRPD testing conducted by Sunshine

6  Lake, and you can see that these tablets were stored, some

7  for as long as three years and some for almost three years

8  when the analysis was conducted.  And,

9         In particular, what this shows is that for all

10  the exhibit batches, which are the batches that are actually

11  filed as part of the ANDA, the apixaban was amorphous and

12  there was -- and they could not detect any evidence or

13  conversion from amorphous to a crystalline form.

14         MR. KOCHANSKI:  And if we look at page 2 of

15  DTX-505.

16  BY MR. KOCHANSKI:

17  Q.    And what is shown on this slide, Doctor?

18  A.    Well, this report contained a lot of x-ray

19  diffraction data.  This an example of some data, XRPD

20  patterns that was obtained on a Sunshine Lake 5 milligram

21  tablet.

22         The top trace is the diffraction pattern that

23  they obtained for the placebo, and that is -- in other

24  words, it's just the excipients and no drug substance, and

25  the bottom trace is the diffraction pattern that they

Brittain - direct

1  obtained for the apixaban exhibit batch stored for

2  36 months.

3          You notice we're looking in the vicinity of

4  17 degrees or so, and so there should be a strong apixaban

5  N1 peak here (indicating) if it was present, and I don't see

6  it.

7  Q.    And, Doctor, obviously the two scans look the same.

8  A.    Yes.  There are peaks due to the excipients, and in

9  that regard, they look the same.  But in the region of

10 interest, over here at 17 degrees, they are the same.  In

11 fact, that there is nothing to see.  In other words, the

12 drug product x-ray diffraction pattern is just like the

13 x-ray diffraction pattern placebo.

14 Q.    Let's move on to another topic.

15         Have you had a chance to review Dr. Atwood's

16 data and analysis of Sunshine Lake's ANDA product?

17 A.    Yes, I did.  Yes, I have.  Yes.

18 Q.    And do you agree with Dr. Atwood's analysis that

19 there is crystalline apixaban in Sunshine Lake's

20 2.5 milligram apixaban tablet?

21 A.    No, I do not believe his data actually shows that.

22 Q.    With respect to the data that you received, in what

23 form was Dr. Atwood's data provided to you?

24 A.    It was provided in two different forms.  I received

25 data in the form of hard copy or papers with PDF copies of

1   x-ray diffraction patterns.  I also received a data in

2   electronic format.

3   Q.     If you would, Dr. Brittain, can you identify what is

4   marked in your binder as PTX-960?

5   A.     (Witness reviews document.)  PTX-960?

6   Q.     Yes.

7   A.     Oh, I do have that.  I'm sorry.  I couldn't find it.

8          Yes.  All right.  I have that.

9          This is an attachment to Dr. Atwood's first

10  expert report that contains hard PDF copies of a number of

11  diffraction patterns that he ran.

12  Q.     Would they be considered the graphical versions?

13  A.     I guess if you call them that.  Sure.

14  Q.     Okay.  And can you identify what is marked in your

15  binder as DTX-526?

16  A.     Got it.  Yes.

17         DTX-526 is a collection of x-ray powder

18  diffraction patterns in, as you say, graphical form.

19  They're plotted out.

20         My recollection is that this ensemble of

21  diffraction patterns was attached to his second expert

22  report.

23         I also notice at the end, there's long tables of

24  numbers.  These numbers actually are, if you like the hard

25  copy version of the electronic data that I received, these

Brittain - direct

1    are listings of the -- oh, there we are.   Good.

2    Q.      Yes, look at page -- this is page 16 of DTX-526.

3            And is this representative of the electronic

4    data that you received?

5    A.      Correct.

6            You see the left-hand column consists of angles,

7    and the right-hand column consists of intensities that were

8    observed at each one of these angles.

9            MR. KOCHANSKI:   If we can turn to DDX-11-25,

10   please.

11   BY MR. KOCHANSKI:

12   Q.      Doctor, can you tell me what this scan is, please?

13   A.      Yes.

14           This is an x-ray pattern, diffraction pattern,

15   that Dr. Atwood obtained for the apixaban drug substance

16   that is used by Sunshine Lake prior to the material being

17   dissolved in the glacial acetic acid.

18   Q.      Okay.   And just looking at DDX-11-25, approximately

19   how many peaks are present in Dr. Atwood's scan of Sunshine

20   Lake's API?

21   A.      Well, in the region that we're showing here, it is

22   probably anywhere between 20 and 25 peaks that are present.

23   Q.      And, Dr. Brittain, what peaks, looking at this scan,

24   what peaks did Dr. Atwood rely upon in analyzing Sunshine

25   Lake's tablets?

Brittain - direct

1  A.      Dr. Atwood relies on the -- either the presence or

2  absence of three peaks --

3  Q.      Okay.

4  A.      -- listed at the bottom:  12.3, 16.9, and

5  27.1 degrees 2-theta.

6  Q.      And which of the peaks in the API did Dr. Atwood find

7  to be the most intense?

8  A.      Oh, you can see from the plot here that the peak at

9  16.9 degrees is the most intense.  It's the peak -- if you

10 were to normalize this, for instance, you would call that

11 the 100 percent peak because it is the most intense.

12          MR. KOCHANSKI:  Okay.  If we could look at

13 DDX-11-26, please.

14 BY MR. KOCHANSKI:

15 Q.      Can you explain to the Court what is shown on

16 DDX-11-26?

17 A.      Yes.

18          If we narrow in our scope to the 2.5 milligram

19 Sunshine Lake tablet formulations, in the electronic data

20 that I was provided I found that Dr. Atwood had run the

21 complete x-ray pattern diffraction pattern of the 2.5

22 milligram Sunshine Lake tablet twice, and I, of course, ran

23 it once.  And,

24          Now, of course, you see the real need for

25 normalization because on different instruments, if we

1  plotted in terms of counts, you know, one diffraction

2  pattern might be way up on the ceiling and the other

3  diffraction pattern might be halfway up from the floor.

4         So by normalizing the diffraction patterns to a

5  common intensity of 100 percent, I'm able to create a direct

6  overlay of his data and my data.  And that is what I have

7  plotted on this slide.

8  Q.    Okay.  In creating this scan on DDX-112-26, did you

9  use the graphical representation of Dr. Atwood's data or the

10 electronic representations?

11 A.    Welt, I used the electronic version of Dr. Atwood's

12 data because I had, of course, the electronic version of my

13 data, and the only way to compare this data in the curved

14 manager program that I use for this purpose is to have them

15 both -- all input electronically.

16 Q.    And why is using the electronic data important?

17 A.    Well, the electronic data is exactly -- it is an

18 exact representation of Dr. Atwood's data since it basically

19 is machine-generated from diffraction patterns that he

20 obtained.

21 Q.    Now, in your opinion, Doctor, looking at your scan,

22 the green scan versus Dr. Atwood's blue and red scan, are

23 they equivalent?

24 A.    Yes.  There's -- my diffraction pattern has low noise

25 and one of Dr. Atwood's has high noise, and the other one

1  has sort of middling noise.  But nonetheless, when you look

2  at what are the genuine XRPD peaks, in other words the ones

3  that have appreciable height and appreciable width, you can

4  see that both of -- all of our patterns, in fact, have peaks

5  that have maxima at exactly the same angle and, therefore,

6  these diffraction patterns are all equivalent.

7  Q.    Would you have expected the data to be the same from

8  Dr. Atwood's full scan of the 2.5 milligram Sunshine Lake

9  tablet and your scan of the 2.5 milligram Sunshine Lake

10  tablet?

11  A.    Yes.  I mean, I carefully calibrated my x-ray

12  diffractometer so that my ultimate display data are -- have

13  angles that are at the correct angles, and I am quite sure

14  Dr. Atwood does the same thing to make sure his peaks are at

15  the same correct angles.  And as you can see, the result is

16  that, yes, we do have equivalent diffraction patterns.

17  Q.    And given you're measuring the same tablet, would you

18  have also anticipated showing the same scans?

19  A.    Yes.  In fact, that would be the expectation.

20  Because in the end, an x-ray diffraction pattern does not

21  really depend upon which machine you're looking at, because

22  you're measuring the peak heights and peak angles, and so if

23  you are measuring the same thing, you should get the same

24  results.

25  Q.    So the fact that Dr. Atwood uses a certain technique

Brittain - direct

1   to derive his scans and you used a different technique,

2   DDX-1126 shows that does not matter once you normalize the

3   data.

4   A.      That is correct.  Because in the end, what we're both

5   going to do is we're going to look in the angle regions that

6   are set forth in Table 2, and we're going to look to see

7   whether there are peaks there.  And so everything that

8   matters is the angle and whether you have sufficiently low

9   noise to see those peaks.

10  Q.      Okay.  If we can look at DDX -- again, looking at

11  DDX-1126.

12          What conclusions can you draw with respect to

13  the presence of the N1 form of apixaban?

14  A.      When you study these diagrams, it's definitely clear

15  that there are no peaks at angles of 12.3, 16.9 or 27.1.

16          Now, you can expand the angles, you can expand

17  the intensities, do all sorts of things; but in these

18  diffraction patterns, there are no peaks there.  You can't

19  find them.

20          MR. KOCHANSKI:  Okay.  Could we pull up PTX-960,

21  page 13.

22  BY MR. KOCHANSKI:

23  Q.      And if you would look at that in your binder, Doctor.

24  A.      (Witness complies.)

25  Q.      You were here for Dr. Atwood's testimony; correct?

Brittain - direct

1  A.      Yes.

2  Q.      Okay.  Do you remember Dr. Atwood's reference to this

3  scan and testifying that he found a peak at about

4  16.9 degrees 2-theta in this scan?

5  A.      I remember that is what he said.

6  Q.      In your opinion, is there a genuine or authentic peak

7  on the scan at 16.9 degrees 2-theta?

8  A.      I can't see it.  I see noise, but I can't see any

9  peak.

10             MR. KOCHANSKI:  Looking at DDX-11-27.

11  BY MR. KOCHANSKI:

12  Q.      Can you explain what this is showing in this slide?

13  A.      Yes.  Well, going through all of Dr. Atwood's

14  electronic data and looking at starting angles and ending

15  angles, I was able to determine that, in fact, Dr. Atwood

16  had recorded diffraction patterns, short-angle scans, within

17  this -- around this 17-degree region or so.  He obtained --

18  he did this experiment four times.

19             So what I did here is I normalized those

20  short-angle scans so that the most -- the highest peak, the

21  highest count number was set to an intensity of 100 and the

22  bottom was set down around 5 or so maybe.  And -- or zero.

23  It's hard to see.  I can't really tell.

24             But, anyway, what that allowed me to do, it's my

25  standard practice, it's how I compare diffraction patterns

Brittain - direct

1  obtained under different conditions.  Because if Dr. Atwood

2  used different count times, then, of course, he would end up

3  with different number of counts.  But the different number

4  of counts doesn't change what's in the diffraction pattern.

5  So if you simply transform the intensity scales so that

6  they're all on a comparable scale, this allows you to

7  overlay them and plot them.  And,

8         Remember, that procedure does not change the

9  angle.

10 Q.    Okay.  Have you heard the term "reproducibility,"

11 Doctor?

12 A.    Yes.

13 Q.    Okay.  Does this graph show reducibility --

14 reproducibility?

15 A.    Well, if there was a peak in there as Dr. Atwood

16 said, then that peak would have to be present in all four of

17 his scans.

18         Reproducibility basically says that if you

19 measure something four times, you should get the same

20 answer four times.  And when I look at this overlay of data,

21 there's lots of noise, but I do not see any reproducible

22 features in there that I could assign and attribute to the

23 presence of a genuine XRPD peak.

24 Q.    Now, you're talking about at 16.9 degrees 2-theta?

25 A.    That's correct.

Brittain - direct

1    Let's see.  We'll find 16.9 and it's right about

2    here (indicating).  So we look up in here and we see, well,

3    here's one pattern where he's got noise spike up here, but

4    remember, the width of the diffraction peak is going to be

5    .2, .3 degrees 2-theta, something like that.  That's nearly

6    the width of this entire diffraction, this entire angle

7    scan.

8    So if there was a real peak at 16.9 here, it

9    would have to be bigger than the noise, maybe a height up to

10   here, and quite wide compared to these spikes.

11   So when I look at this, all I see a lot of noise

12   speaks.  I don't see any peaks in there.

13   Q.    Thank you.  Earlier you testified -- excuse me.  If

14   there was an N-1 apixaban in Sunshine Lake's patent, would

15   you expect to easily see a peak at 16.9 degrees 2 theta?

16   A.    Well, 16.9 degrees 2 theta represents our best

17   possible chance to see a crystalline apixaban peak because

18   as Dr. Atwood's diffraction pattern shows, it's the most

19   intense peak inherent to the N-one crystal structure.  So if

20   you are going to see any peak at all in the diffraction

21   pattern that would be attributed to apixaban form N-1, it's

22   going to be a peak at 16.9 degrees.

23   Q.    Okay.  Can we pull up PTX-960, page 23.  Dr.

24   Brittain, can you tell me what this scan is?

25   A.    Yes.  This is a short angled scan, one of the ones

Brittain - direct

1   Dr. Atwood ran in the region of 27.1 degrees 2 theta.

2   Q.    And do you remember, Doctor, that Dr. Atwood

3   testified that he found a peak at about 27.1 degrees 2

4   theta?

5   A.    I remember that.

6   Q.    In your opinion, is there a genuine peak on this scan

7   at 27.1 degrees 2 theta?

8   A.    No.  What we have here, there's noise -- this is one

9   of those examples that Dr. Zaworotko discussed where you

10  could have a spike that would have an appreciable height but

11  not the width of a real peak, but that's what we have here.

12  This is simply a noise spike that happens to be big, but

13  that's not an XRPD peak.  That's not a genuine peak.  That's

14  just a noise peak.

15  Q.    Let's turn to DDX-28, please.  Can you explain what's

16  shown in this slide?

17  A.    Yes.  Again, going through Dr. Atwood's ensemble of

18  electronic data, I discovered he had run short-angled spans

19  within -- he had done it four times.  And so I went through

20  my same normalization procedure and this slide displays the

21  four short angled scans that he obtained in this region.

22  Q.    Okay.  Can we turn to DDX 29, please.

23        And can you explain what's shown in this slide,

24  doctor?

25  A.    Yes.  Well, subsequent to that previous overlay of

Brittain - direct

1  diffraction patterns was in my expert report, but subsequent

2  to that, I learned that Dr. Atwood had disavowed one of

3  those patterns because there was an instrument malfunction

4  associated with that.

5              And so what I did here is I just -- this

6  is the same three patterns not containing the instrument

7  malfunction.  I removed the instrument malfunction

8  diffraction pattern and this particular trace, this

9  represents the superimposition of the three diffraction

10 patterns that Dr. Atwood did get that represent what I will

11 call real, not contaminated.

12 Q.    And what are your conclusions from comparing Dr.

13 Atwood's data shown on this graph?

14 A.    Well, when you look at this, there's no

15 reproducibility in an XRPD feature.  Again, we have noise

16 spikes.  Depending upon the step time that Dr. Atwood used,

17 here's a broad noise spike that would correspond to one of

18 his step sizes of .02.  Here's a narrow noise spike that

19 corresponds to a step size of .01.  But nowhere in here is a

20 peak that would be a tenth of a theta wide.  And that would be

21 the minimum requirements.  There's nothing in here that's

22 greater than the noise.  I see a lot of noise spikes.  I

23 don't see any peaks.  Okay.  Could we please pull up

24 PTX-960, page 21.

25              Dr. Brittain, do you remember Dr. Atwood

Brittain - direct

1 testifying that he found a peak about 12.4 degrees 2 theta?

2 A.    Yes, I remember that.

3 Q.    And this is the scan he relied upon?

4 A.    Yes.

5 Q.    Correct?

6 A.    Yes.

7 Q.    Okay.  In your opinion, Doctor, is there a genuine

8 peak on this scale?

9 A.    Most definitely.

10 Q.    On this scan?

11 A.    Yes, most definitely, that's definitely an XRPD peak.

12 It has all the real characteristics of a real peak.  It has

13 height greater than the noise and it has the width at the

14 base.  That's characteristic of a real peak.

15 Q.    Okay.  And can we look at DDX-11-30.  Doctor, can you

16 explain what is shown on this slide?

17 A.    Yes.  Well, Dr. Atwood ran diffraction, short angle

18 diffraction patterns three times within this diffraction

19 region and now we see reproducibility now because here is

20 a peak.

21           It has got the width you'd expect for an

22 X-ray peak.  It has a significant height above the noise

23 and, most importantly, you can see now there's noise on the

24 peak, but there is the reproducible shape in there that you

25 can clearly identify as an XRPD peak, no doubt.

Brittain - direct

1    Q.      We looked earlier at Dr. Atwood's scan of the API

2    peak.

3                        Do you remember, Doctor?

4    A.      The API peak?  Yes.  Okay.

5    Q.      And do you have a recollection of when that scan was

6    undertaken?

7    A.      I did.  I'd have to look -- I'd have to look in the

8    book.  But I know it was a couple months prior to the time

9    when these short angle scans were run.

10   Q.      Okay.  So these short angle scans shown here a couple

11   months later, than the API proceeded?

12   A.      Yes, that's my recollection.

13   Q.      Okay.  Based upon your analysis of these scans, what

14   is the exact location peak that Dr. Atwood identified as

15   12.4 degrees 2 theta?

16   A.      Well, the maximum is somewhere over here.  Sometimes

17   I've convinced myself the maximum is 12.43.  Now when I look

18   at it today, it looks more like 12.44, but that's only one

19   step size difference if you are using a .01 degree step.

20                      So the maximum is 12.44.  I think today

21   looking at it, I think it's really 12.44.  That seems to be

22   I think the best estimate I can say is the peak, peak angle

23   associated with that feature.

24   Q.      And, Dr. Brittain, what did Dr. Atwood conclude was

25   the source of the peak he identified?

Brittain - direct

1  A.      Well, Dr. Atwood reported this peak at 12.4 and we

2  had this criterion of plus or minus .1 in the narrative

3  associated with Table 2.  And since 12.4 is, it's close

4  enough to 12.3, Dr. Atwood assigned the presence of this

5  peak as indicating there was crystalline apixaban in the

6  formulation.

7  Q.      Can we turn to DDX-11-31, please.  Again, making

8  reference to the colors, can you explain what's shown on

9  this graph, doctor?

10 A.      Yes.  What's shown on this graph, the black traces

11 are the three X-ray diffraction patterns that Dr. Atwood

12 obtained for the Sunshine Lake product.  These are the angle

13 scans and we definitely agree, yes, there's a peak there.

14 Q.      And those were the peaks we just showed on the

15 previous slide?

16 A.      That's correct.

17 Q.      Okay.  Continue, please.

18 A.      Now, as part of my early analysis, I pulled a bottle

19 of anhydrous lactose, what I thought was anhydrous lactose off

20 the shelf.  I ran the X-ray diffraction pattern and I used

21 that to understand what was happening in the Sunshine Lake

22 X-ray powder diffraction.

23         I thought it was anhydrous lactose, but I

24 think Dr. Atwood provided clear and convincing evidence that

25 my sample of anhydrous lactose actually contained a small

Brittain - direct

1    amount of lactose monohydrate when lactose anhydrous, it

2    spontaneously converts to the monohydrate.

3                   Monohydrate, we heard about thermodynamic

4    stability.  Well, the monohydrate in the presence of water

5    is thermodynamically more stable than the anhydrous.  So if

6    you have moisture and if your lactose sample sits around and

7    my sample had sat around for a long time, my sample had

8    plenty of opportunity to form lactose monohydrate in that

9    sample.

10   Q.    And based upon your experience, Doctor, does lactose

11   monohydrate have a peak in the region of 12.44 degrees 2

12   theta?

13   A.    Yes.  I've run the diffraction pattern of lactose

14   monohydrate many times because it's a very common excipient

15   used in a lot of different pharmaceutical formulations, and

16   it does, indeed, have a peak at 12.4 degrees 2 theta.

17   Q.    Okay.  If we can look at the scan, Doctor, and

18   looking and your red scan, the anhydrous/monohydrate, and

19   Dr. Atwood's scan, does that show reproducibility?

20   A.    Yes.  I mean, the intensities aren't quite right,

21   but, again, that's not what we're comparing.  When we're

22   doing identification in X-ray powder diffraction, remember,

23   we'll go back to the USP.  We're looking at angle

24   equivalences and you can see that in my diffraction pattern,

25   I estimated the peak at a maximum of 12.45 degrees 2 theta.

Brittain - direct

1                    We have up here a peak that, depending

2      upon which way I look at it, is either 12.43 or

3      12.442 degrees theta.  The equivalence I think is very clear

4      and reproducibly different.  Remember, both Dr. Atwood and I

5      have calibrated diffractometers.  We calibrated our

6      diffractometers where we get true and accurate numbers for

7      our peaks.  We both get peaks at 12.45, roughly.  We don't

8      get a peak at 12.3.

9                    It's I think inescapable that both of

10     these features in my sample of what I will call a

11     contaminated lactose anhydrous and Dr. Atwood's three sets

12     of short angle scans, we're all looking at the same thing.

13     We're looking at lactose monohydrate.

14     Q.    Okay.  If we can turn to DDX-11-32, please.

15                    Have you reached any conclusions, Dr.

16     Brittain, regarding the presence of N-1 crystalline apixaban

17     in Sunshine Lake's 2.5-milligram and 5-milligram tablets

18     based upon all the information that you reviewed?

19     A.    Yes.  Well, now we see there's a lot of X-ray data

20     that has been done on the Sunshine Lake formulation.  I ran

21     a series of X-ray powder diffraction studies.  Dr. Atwood

22     has run a series of studies.  We've all done these

23     significant times later after manufacture.

24                    The Sunshine Lake tablets, my X-ray, all of the

25     data shows that there are no peaks that you could attribute

Brittain - direct

1  in any of these X-ray powder diffraction patterns that you

2  could scientifically attribute to the presence of

3  crystalline apixaban in the Sunshine Lake tablet

4  formulation.

5  Q.    Okay.  And, Dr. Brittain, does the amorphous state of

6  apixaban in Sunshine Lake's tablets appear to be stable?

7  A.    Well, we know it's stable for at least three years

8  because that's how long these tablets have been stored by

9  Sunshine Lake and myself.  And in every case we've shown

10 that the drug substance is amorphous and I, presumably, if

11 Sunshine Lake continues to run their stability studies, will

12 find out what happens in the next three years.

13 Q.    If we could turn to DDX-33 and moving on to another

14 topic.  When we looked at claim 12 earlier, you indicated

15 that the claim required apixaban particles having a D90 of

16 less than or quarter to 89 microns.  Do you remember that,

17 Doctor?

18 A.    I do.

19 Q.    You heard Dr. Atwood's testimony.  How do you come to

20 a conclusion that if there were crystalline apixaban

21 particles containing a pharmaceutical composition, they

22 would have a D90 of less than or equal to 89 microns?

23 A.    Well, first of all, Dr. Atwood, as he testified, did

24 not conduct any actual real experimentation.  What he did is

25 he presented a theoretical model for how you might get

1    crystalline apixaban particles forming.  That model was

2    based upon the existence of a pure amorphous material.  I

3    believe Dr. Zaworotko called that a neat amorphous material.

4    But, in other words, it's an amorphous material that has

5    only one chemical substance in it.

6              And Dr. Atwood developed the theory that, you

7    know, could very well account for the formation of

8    particles.  But the problem, as I've put on the bottom here,

9    is that that model is for chemically pure substances, and,

10   in fact, we don't have a chemically pure substance in

11   either, in the Sunshine Lake product, because the apixaban

12   is dried down in the presence of povidone.  And we know in

13   the presence of povidone, which is a well-known nucleation

14   and crystallization inhibitor, we know that the chemical

15   tendency of povidone apixaban solid solution is to exist in

16   the form of an amorphous dispersion.

17   Q.     Finally, Doctor, do you have an opinion whether the

18   Sunshine Lake apixaban tablets fall within the scope of the

19   asserted claims 21 and 22 of the '945 patent?

20   A.     Yes.  It's my opinion that they do not, cannot be

21   considered to be within the scope of claim 12 because for

22   all the reasons I've said, there's no crystalline apixaban.

23   We have no proof that there is particles.  We have no proof

24   that those particles are crystalline and we have no proof

25   that their particle sides meets the particle size of the

Brittain - cross

1    element of claim 12.

2              MR. KOCHANSKI:  Thank you, Dr. Brittain.

3              Your Honor, I'd like to move into evidence the

4    following exhibits.  DTX-505, DTX-502, DTX-518, DTX-503,

5    DTX-504, and DTX-526, and as I indicated during the

6    testimony, DTX-512 was already moved into evidence by the

7    plaintiffs.

8              MS. WIGMORE:  No objection.

9              THE COURT:  Okay.  Those are all admitted.

10             (DTX-505, DTX-502, DTX-518, DTX-503, DTX-504,

11   and DTX-526 were admitted into evidence.)

12             THE COURT:  Cross-examination.

13                      CROSS-EXAMINATION

14   BY MS. WIGMORE:

15   Q.    Good afternoon, Dr. Brittain.

16   A.    Good afternoon.

17   Q.    Let's turn to JTX-2, which is the '945 patent.

18   A.    Yes.

19   Q.    One moment while the binders are being distributed.

20   A.    You said 2?

21   Q.    JTX-2.

22   A.    JTX.  I have it.

23   Q.    It's at tab 1 of the binder we just handed up.

24   A.    Tab 1.  I have it.

25   Q.    Now, I'm going to show you claim 12 of the '945

Brittain - cross

```
 1    patent, which you understand is the claim on which claim 201

 2    and 22 depend; is that correct?

 3    A.      Yes.

 4    Q.      And you have testified today about two limitations,

 5    the crystalline apixaban particles limitation and the D90

 6    limitation; is that correct?

 7    A.      That's correct.

 8    Q.      Now, you're aware that the Court issued a claim

 9    construction order.  You testified earlier; is that correct?

10    A.      I'm aware of that.

11    Q.      And you understand the Court construed the phrase

12    apixaban particles have a D90 as having its plain and

13    ordinary meaning; is that correct?

14    A.      That is my understanding.

15    Q.      And you understand that pursuant to the parties'

16    claim construction stipulations the phrase, where in

17    apixaban comprises crystalline apixaban particles must be

18    interpreted according to its plain and ordinary meaning; is

19    that correct?

20    A.      Yes.

21    Q.      Now, looking at that limitation, the one that's

22    highlighted here, where in apixaban comprises crystalline

23    apixaban particles, can we agree there's no reference in

24    that claim limitation to a specific percentage of

25    crystalline apixaban particles?
```

Brittain - cross

1    A.      Yes.   Lawyers have advised me that comprises means

2    you can have more than one thing.

3    Q.      So is your understanding that if there's any

4    crystalline apixaban particle in a product, that it meets

5    this limitation; correct?

6    A.      You could interpret it that way, yes.

7    Q.      Now, you testified about Dr. Atwood's testing.   Do

8    you recall that?

9    A.      I do.

10   Q.      You disagree with Dr. Atwood's opinion that the

11   apixaban crystalline particle limitation is met.

12   A.      Yes, I disagree, that's correct.

13   Q.      And you disagree with his opinion that the D90

14   limitation is met; is that correct?

15   A.      Yes, that's correct.

16   Q.      Let's talk about whether there's anything that you

17   and Dr. Atwood agree on.

18           First of all, can you agree that Sunshine Lake

19   uses the crystalline N-1 form of apixaban to manufacture its

20   ANDA product?

21   A.      Yes, that is my understanding.

22   Q.      And if we look at -- if we could pull up Dr.

23   Brittain's DDX-9.

24   A.      Mm-hmm.

25   Q.      This is your depiction of the sunshine like

Brittain - cross

1  manufacturing process; is that correct?

2  A.    That is, that is correct.

3  Q.    Now, at the beginning, you have the crystalline N-1

4  form of apixaban; right?

5  A.    Well, one of those.  I didn't really depict it, but I

6  just tried to make a different shaped particle for povidone

7  and apixaban, but that's before the material hits the acetic

8  acid, yes.

9  Q.    And what happens is the crystalline apixaban in one

10  form is dissolved during the process; is that correct?

11  A.    Yes.

12  Q.    And then what you see at the end of the process,

13  these granules, they are not the same apixaban that you

14  began the process with in terms of particle size; is that

15  right?

16  A.    Well, particle size is -- really is indefinable at

17  this point because apixaban is dissolved in the povidone

18  layer in the form of the dispersion and all of the evidence

19  that has been collected over the years about amorphous

20  dispersions, it says that instead of particulate drug

21  substance in dispersions, you have actual individual

22  molecules in a dispersion.

23  Q.    But we can agree that measuring, in the case of the

24  Sunshine Lake process, the apixaban particles before they're

25  dissolved wouldn't tell us anything about the particle size

Brittain - cross

1    at the end of the process; is that right?

2    A.      That is certainly true.

3    Q.      Okay.  Let's take that down.

4            Can we agree that Sunshine Lake's ANDA product

5    contains 2.5 percent apixaban?

6    A.      Yes, that's right.  That's in the ANDA.

7    Q.      And do you recall Dr. Atwood's testimony about the

8    classical models of nucleation and crystal growth?

9    A.      I do.

10   Q.      You agree that the models of nucleation and crystal

11   growth have a proper theoretical basis; is that correct?

12   A.      Yes.  The theoretical basis based on pure drugs, on

13   pure substances.

14   Q.      Now, Dr. Brittain, you have consulted with a number

15   of companies in the course of your career; is that correct?

16   A.      Yes.

17   Q.      And you have consulted with companies who have

18   attempted to make amorphous products; is that correct?

19   A.      Attempted is a good word.  Sometimes they do it and

20   sometimes they don't.

21   Q.      In many cases, those amorphous products have turned

22   out to be unstable; correct?

23   A.      In some cases, yes.

24   Q.      And in many cases, the amorphous products end up

25   converting to a crystalline form; correct?

1  A.      I have seen that.  If it's going to happen, it tends

2  to be a very rapid thing, though.  I will point that out.

3  Q.      Know, most of the time if a client is trying to make

4  an amorphous product and they have a problem with stability

5  in the formulation, it's because crystalline material is

6  forming; correct?

7  A.      Well, we're speaking -- we are not talking about

8  chemical stability, just physical stability?

9  Q.      Correct.

10  A.      Okay.  Yes.  If you want to make an amorphous

11  product, then if your product does spontaneously crystallize

12  sometimes during the storage, that would be a bad thing.

13  Q.      And that has happened many times in your consulting

14  work with other clients; is that correct?

15  A.      I have certainly seen that, yes.

16  Q.      And in your experience, amorphous materials can

17  convert to crystalline materials in tablet formulations; is

18  that correct?

19  A.      Yes.  I've seen that, yes.

20  Q.      Now, you have reviewed Sunshine Lake's ANDA; is that

21  correct?

22  A.      Yes.

23  Q.      And you understand that Sunshine Lake did find

24  evidence of conversion from amorphous to crystalline

25  apixaban in a large laboratory scale batch of its

Brittain - cross

1   five-milligram tablet; is that correct?

2   A.      Yes.  As I recall, they found that at one particular

3   time point, yes.

4   Q.      And Sunshine Lake reported that conversion to the

5   food and drug administration; correct?

6   A.      Yes.  I would think they have to.  You have to tell

7   FDA everything.

8   Q.      Now, Dr. Atwood's description of the conversion of

9   amorphous products into crystalline products is not simply a

10  theory; is that correct?

11  A.      It's not a theory for pure drug substances, no.

12  Q.      It's something that has actually happened with some

13  of your clients; is that correct?

14  A.      Yes, that's true.

15  Q.      And it's something that actually happened with at

16  least the laboratory, the large laboratory scale batch

17  addressed in Sunshine Lake's ANDA; is that correct?

18  A.      Well, it could be more -- see, the problem is this,

19  that I don't know exactly, all the details of that and

20  here's what I'm saying.  It might be that that batch had a

21  problem and therefore it converted under the accelerated

22  conditions.

23          Sometimes there's a failure in the container

24  closure system.

25  Q.      I'm going to ask you if you could answer my question

Brittain - cross

```
 1    yes or no:  Did they report a conversion of the large
 2    laboratory scale batch?  Yes or no?
 3    A.      Sorry.  I read too much -- yes, they recorded the
 4    conversion in the lab scale batch, yes.
 5    Q.      Now, Dr. Brittain, you did conduct some testing of
 6    your own in this case; is that correct?
 7    A.      Yes, I did.
 8    Q.      And one of the tests you did was related to Dr.
 9    Atwood's observation of a peak at 12.4 in its XRPD pattern
10    assessing the Sunshine Lake tablet; is that correct?
11    A.      Yes.  I learned that, in fact, when he filed his
12    second expert report.
13    Q.      And you testified about your testing of that 12.4
14    peak on your direct examination; is that correct?
15    A.      I did, yes.
16    Q.      And you agree that that 12.4 peak is within plus or
17    minus one degree of a characteristic peak in the '945
18    patent; is that correct?
19    A.      Yes.  If you round down, say 12.44 rounds down to
20    12.4 and 12.4 is within plus or minus .1 of 12.3.
21    Q.      Now, you agree that Dr. Atwood's XRPD pattern of
22    Sunshine Lake's ANDA product contains a peak at
23    approximately 12.4; correct?
24    A.      Well, in his, in his short angles, it did.  My
25    analysis of his full scan indicated it did not.
```

Brittain - cross

```
 1   Q.      You testified on direct that there was a reproducible

 2   peak at 12.4; correct?

 3   A.      Yes.  In the short angled scan, that's correct.

 4   Q.      And you agreed that the XRPD patterns of the Sunshine

 5   Lake tablet, according to Dr. Atwood's data, contain a

 6   definite peak at approximately 12.43 degrees 2 theta; is

 7   that correct?

 8   A.      Yes.  Dr. Atwood showed that in his short scan.   I

 9   think that's indisputable.

10   Q.      And in your report that you filed in this case, you

11   interpreted that peak to be from one of the excipients in

12   Sunshine Lake's tablet; is that correct?

13   A.      Yes.

14   Q.      You attributed that peak specifically to lactose

15   anhydrous; is that correct?

16   A.      That's correct, because at the time I didn't know my

17   lactose anhydrous in fact had lactose monohydrate in it.

18   Q.      And so what you did, you looked at Dr. Atwood's

19   pattern and you confirmed there was a peak at 12.4; is that

20   correct?

21   A.      Well, that's not quite correct.  I looked at Dr.

22   Atwood's short-angled spans and confirmed there was a peak

23   at 12.4.

24   Q.      And then you tested what you thought was your own

25   lactose anhydrous; is that correct?
```

Brittain - cross

1       A.      That's correct.

2       Q.      And you --

3       A.      Actually, it's not correct.  I actually tested my

4       sample of lactose anhydrous before I wrote my expert report.

5       Q.      Okay.  So you testified what you thought was your

6       lactose anhydrous and in your expert report, you opined that

7       the peak at 12.4 that Dr. Atwood found was attributable to

8       lactose anhydrous; is that correct?

9       A.      That's correct.  At the time, that's what I thought

10      it was.

11      Q.      But that turned out to be wrong; is that correct?

12      A.      No.  In fact, Dr. Atwood educated me on that point.

13      Q.      So it did turn out to be wrong; is that correct?

14      A.      Yes.  There was lactose monohydrate as Dr. Atwood

15      said.

16      Q.      So you sent Dr. Atwood a sample at his request of

17      the lactose material that you tested; is that correct?

18      A.      I did, yes.

19      Q.      And he tested that material with a thermogravimetric

20      analysis; is that correct?

21      A.      He did.

22      Q.      And his test showed that there was actually lactose

23      monohydrate in your sample; is that correct?

24      A.      Yes.

25      Q.      And you do not dispute Dr. Atwood's results, correct?

Brittain - cross

1    A.      No, he is perfectly correct.

2    Q.      Now, lactose monohydrate is not one of the excipients

3    listed for Sunshine Lake's ANDA product; correct?

4    A.      No, they used the anhydrous form of lactose.

5    Q.      So it is not one of the listed excipients; right?

6    A.      That is what I said.  That is correct.

7    Q.      Now, Sunshine Lake doesn't identify it anywhere

8    lactose monohydrate as an ingredient in its ANDA; right?

9    A.      That is correct, they do not.

10   Q.      So to summarize, you did your own testing on what you

11   thought was lactose anhydrous; right?

12   A.      Yes.  Sorry.

13   Q.      And Dr. Atwood confirmed that it was not actually

14   lactose anhydrous; correct?

15   A.      Well, he confirmed that it was lactose anhydrous

16   contaminated with some percentage of lactose monohydrate.

17   Q.      That is not the opinion Dr. Atwood gave in his

18   report, was it?

19   A.      I don't recall, but that is the conclusion.

20   Q.      He gave the opinion that it was lactose monohydrate;

21   correct?

22   A.      If he said the entire sample was lactose monohydrate,

23   then he would have been wrong.

24   Q.      Now, you offered an opinion today that you believe

25   that Dr. Atwood's sample converted to lactose monohydrate;

1  is that right?

2  A.    Well, not that it converted it but there was some

3  conversion.  I think the equivalence in the x-ray powder

4  diffraction pattern angles I think proves that.

5  Q.    That is not a theory you offered in your expert

6  report in this case; correct?

7  A.    Well, I couldn't because at the time I wrote my

8  expert report, I thought my sample of anhydrous lactose was

9  lactose.  It wasn't until after Dr. Atwood educated me and

10  demonstrated my sample had lactose monohydrate in it that I

11  went -- I could look at my sample of lactose monohydrate and

12  see the peak at 12.4.  My immediate conclusion, based upon

13  the thermogravimetric analysis, yes, Dr. Atwood is right.

14  My sample of anhydrous lactose had lactose monohydrate in

15  it.  But in effect what he really did is he created a

16  standard for me of where the peak for lactose monohydrate in

17  this region should be --

18  Q.    Okay.  So --

19  A.    -- for which I'm very grateful.

20  Q.    -- I'm going to have you focus on my question.

21        Now, after you learned about Dr. Atwood's

22  results, you gave a new opinion during your deposition that

23  his material must have had some conversion into lactose

24  monohydrate; is that right?

25  A.    That's correct.

Brittain - cross

1  Q.      Okay.  And then you said in your deposition that what

2  must have happened is that Dr. Atwood did not see the peak

3  at 12.4 in his November scan, but that the peak appeared in

4  a later scan and you concluded that there must have been

5  some conversion along the way; is that fair?

6  A.      That is quite correct.  My analysis of his electronic

7  data actually -- that is exactly what I show.

8           MS. WIGMORE:  Now, if we could pull up PTX-960

9  at page 8.  This is Dr. Atwood's exhibit.

10  BY MS. WIGMORE:

11  Q.      This is his November 7th of 2018 scan; correct?

12  A.      That is correct.

13  Q.      And this is the first scan he performed on the

14  Sunshine Lake material; correct?

15  A.      I know he ran a full scan that he called file apix1,

16  and what I honestly can't remember -- I believe that date

17  was earlier than this, but I can't be sure.

18  Q.      Okay.  Just so I'm clear, you testified in your

19  deposition that the first scan did not show the peak and

20  then a scan a couple months later showed the peak and,

21  therefore, it must have been a conversion to lactose

22  monohydrate; is that right?

23  A.      That's right.  When I looked at the file apix1, which

24  is the full x-ray powder pattern, and I looked at this

25  region, I could see no peak in this region.  But it's clear

1   when I look at this one, apix8, apix8, yes, that is a peak

2   there.

3   Q.     And this is the November 2018 scan; correct?

4   A.     That is correct.

5          MS. WIGMORE:   Okay.   You can take that down.

6   BY MS. WIGMORE:

7   Q.     Now, I want to talk about XRPD methodology.

8          You evaluated Dr. Atwood's XRPD testing;

9   correct?

10  A.     I did.

11  Q.     And when you -- you agree that Dr. Atwood's use of

12  slow scans was reasonable given the low level of drug

13  substance in Sunshine Lake's tablet formulation; correct?

14  A.     Yes, that is one way to do that work.

15  Q.     And you agree that increasing the count time is one

16  way to increase sensitivity; correct?

17  A.     That is correct.

18         Remember, you are trying to decrease noise.   So

19  if you increase the count time, it is an attempt to decrease

20  noise, yes.   And that will increase sensitivity, to answer

21  your question.

22  Q.     Now, you also performed some XRPD testing on the

23  Sunshine Lake tablets; correct?

24  A.     I did.

25  Q.     But you did not seek to duplicate Dr. Atwood's

Brittain - cross

1    method; correct?

2    A.      No, because I followed my own standard operating

3    procedures.

4    Q.      So you did not follow the method of using slow scans;

5    correct?

6    A.      Not in this work, no.

7    Q.      You ran faster scans on Sunshine Lake's tablets than

8    Dr. Atwood did; correct?

9    A.      I did.

10   Q.      You performed your XRPD scans at a scan rate of 2

11   degrees, 2-theta per minute; correct?

12   A.      That's correct.

13   Q.      And that would equate -- oh, you used the step size

14   of 0.01 degrees 2-theta; correct?

15   A.      Yes.

16   Q.      So the count time for your XRPD scans was 0.3 seconds

17   per step; correct?

18   A.      It is actually 0.33, but that is correct.

19              MS. WIGMORE:  So if we just turn briefly to

20   PDX-9.1.

21   BY MS. WIGMORE:

22   Q.      This just shows how you make that conversion;

23   correct?

24   A.      That's correct.  It's a little misleading, of course,

25   because we see the effect of running the diffraction pattern

Brittain - cross

```
 1    five times is to multiply that seconds per step by five.
 2    Q.      I'll ask you to focus on my question.
 3    A.      Okay.
 4    Q.      My question was, does your method convert to a step
 5    time of approximately .3 seconds per step?  Yes or no.
 6    A.      Per one scan, yes.
 7    Q.      Okay.  And Dr. Atwood, in at least some of his scans,
 8    used a count time of a thousand seconds per step; correct?
 9    A.      He did.
10    Q.      And his step size was also 0.01 degrees 2-theta;
11    correct?
12    A.      In some of the scans, yes.  Not all of the slow
13    scans, but some of them.
14    Q.      So with respect to Dr. Atwood's 1,000 count time
15    scans, your count time was 3,000 times shorter than his;
16    correct?
17    A.      No., because as I said, by running the diffraction
18    pattern five times, that actually makes my seconds per step
19    equal to 1.75.  So the number is not right, but, yeah, his
20    thousand is a lot faster than 1.7.  A lot bigger than 1.75.
21    Q.      Okay.  So let's turn to your DDX-11.26.
22    A.      (Witness complies.)
23    Q.      This is a scan overlay you created using some of
24    Dr. Atwood's patterns; is that right?
25    A.      Yes.  Two of his full patterns and then one of mine.
```

Brittain - cross

1    Q.      And you used this to suggest there was a lack of

2    reproducibility; is that right?

3    A.      No, no.  In fact, I said this demonstrates total

4    reproducibility.  His data, in terms of peak angles and peak

5    widths, is the same as mine.

6    Q.      Now, within this overlay, you included Dr. Atwood's

7    Pattern 2, which had a 6 second scan time; correct?

8    A.      Yes.  That is the red trace, I believe.

9    Q.      But he also did scans at 1,000 seconds; correct?

10   A.      But not from -- not as a full scan like this.  1,000

11   seconds was a short-angle scan.  This, what I showed in this

12   slide is just the three full scans.  His two -- he did two

13   full scans from the entire angle, and I did one.  So this

14   slide only contains the full angle scans.

15   Q.      So, therefore, it only contains Dr. Atwood's short

16   scans, right?

17   A.      No, this only contains Dr. Atwood's long scans.

18   Q.      Short in terms of count time.

19   A.      Yes.  That would be true.

20   Q.      Okay.  So this exhibit, this demonstrative does not

21   reflect Dr. Atwood's slower scan time XRPD test; correct?

22   A.      That's correct.

23           MS. WIGMORE:  Okay.  Let's turn to DDX-11-27.

24   BY MS. WIGMORE:

25   Q.      This is an overlay you created of Dr. Atwood's scans;

1   correct?

2   A.      Yes, these are his four slow-angle scans in the

3   vicinity of 16.9 degrees or so.

4   Q.      Now, this you used to suggest there was a lack of

5   reproducibility; is that correct?

6   A.      Yes.  Well, the only thing reproducible in there is

7   the noise is reproducible.

8   Q.      But on this slide, you are including a scan that he

9   did with a count time of 200 seconds and a step of .02;

10  correct?  That is one of the pieces of this demonstrative.

11  A.      I don't remember the parameters, but I will take your

12  word for it.

13  Q.      Then you also include in this same overlay one of his

14  scans at 1,000 seconds with a step time of .01, step size at

15  .01, right?

16  A.      I think that is true.  Yes.

17  Q.      So the information that you are accumulating on this

18  slide includes scans with different count times and

19  different step sizes; correct?

20  A.      Yes.

21  Q.      Now --

22          MS. WIGMORE:  You can take that down.

23  BY MS. WIGMORE:

24  Q.      In your report, you also relied on XRPD testing

25  provided to you by counsel that you understood to be from

Brittain - cross

1   Sunshine Lake; is that right?

2   A.      That is correct.

3   Q.      And in your report, you call that Exhibit F; right?

4   A.      If you say so.  I know it is an exhibit.  I just

5   don't remember the letter.

6   Q.      Okay.  And if it's easier, today you talked about it,

7   and I think you referred to DTX-505.

8   A.      Yes, that sounds right.

9   Q.      Now, when you wrote your report, you relied on that

10  testing; correct?

11  A.      Yes.

12  Q.      But when you wrote your report, you did not know who

13  conducted those studies; correct?

14  A.      That's correct.  I just knew they were conducted by

15  Sunshine Lake.

16  Q.      You never --

17  A.      Well, let me say they're reported by Sunshine Lake.

18  Q.      You never spoke to anyone who did the testing;

19  correct?

20  A.      That's correct.

21  Q.      When you wrote your report, you did not know what

22  the scan parameters were that were used in that testing;

23  correct?

24  A.      That's correct.

25  Q.      And when you wrote your report, you just accepted

1  those results at face value; correct?

2  A.    I did.

3  Q.    Now, let's turn to the particle size limitation.

4        You characterized Dr. Atwood's opinion as a

5  hypothesis that apixaban particles form and become

6  immobilized by the surrounding layer of povidone; correct?

7  A.    That sounds like a quote from the '386 application.

8  I'm sorry.  I just want to make sure I get the answer.

9  Q.    Sure.

10 A.    That's true.

11 Q.    Let me see if I can make it easier.  Let's look at

12 your report at paragraph 89.  And,

13       At the end of paragraph 89 of your report, you

14 are referring to Dr. Atwood and you say:  "He hypothesizes

15 that apixaban particles form and become immobilized by a

16 surrounding layer of povidone."

17       Do you see that?

18 A.    Yes.

19 Q.    Now, if we turn to paragraph 90, you state in the

20 first sentence:  "If there was no experimental evidence

21 available, Dr. Atwood's hypothesis could be considered as

22 being plausible."

23       Do you see that?

24 A.    Yes.

25 Q.    So you agree it could be a plausible theory; correct?

Brittain - cross

1    A.      Yes.  If you have no experimental evidence, you

2    really don't know whether the model could be used or not

3    used.  I mean, it could be right, could be wrong.

4    Q.      Let's turn to paragraph 91 of your report.

5            You give two reasons as your experimental

6    evidence against Dr. Atwood's application of the theory

7    here; correct?

8    A.      Yes.

9    Q.      And the first one is that there is no crystalline

10   apixaban in the tablets at all based on your assessments of

11   the XRPD; right?

12   A.      Of my data and Dr. Atwood's data, yes, that is what I

13   would be looking at here.

14   Q.      So there you're just contesting the existence of

15   crystalline apixaban at all; right?

16   A.      Yes, that's correct.

17   Q.      So let's move to your second reason.

18           The second reason is that, you argue, that there

19   is evidence, experimental evidence about the products;

20   right?

21   A.      Yeah.  As I said, there is no experimental evidence

22   to show that the Sunshine Lake ANDA product contains

23   discrete apixaban particles.

24   Q.      And if you look at the last sentence of your second

25   reason, it says:  "However, the literature does provide

Brittain - cross

1   information that when one drys down solutions containing

2   apixaban and povidone, one obtains amorphous dispersions and

3   not discrete particles."

4           Do you see that?

5   A.     Yes.

6   Q.     Now, the literature you are referring to there is

7   the '386 patent application you discussed on your direct

8   examination; correct?

9   A.     That is what I had in view here, yes.

10  Q.     That's the only literature you are referring to here;

11  right?

12  A.     Well, that is all I cited here, yes.

13  Q.     Okay.  And the '386 patent application is the DTX-503

14  that you talked about on direct examination; correct?

15  A.     Yes.

16  Q.     Okay.  So you walked through that patent application

17  and showed us several slides about it.

18          Do you recall that?

19  A.     I do.

20          MS. WIGMORE:  Now, if we could pull up DTX-503.

21  BY MS. WIGMORE:

22  Q.     This is a patent application that -- where the

23  applicant is Cadila Healthcare, Limited.

24          Do you see that?

25  A.     I do.

1    Q.      As far as you know, Cadila Healthcare, Limited, is

2    not affiliated with Sunshine Lake in any way; right?

3    A.      I have no idea.  Honestly.

4    Q.      And did you testify in your deposition that as far as

5    you know, they're not affiliated with Sunshine Lake?

6    A.      Yeah, I have no information.  I mean, I -- as far as

7    I know, they're not.

8    Q.      And you are not suggesting here today that this

9    patent reflects Sunshine Lake's work, are you?

10   A.      No.  When I brought this application as part of my

11   evidence, I believed it gave me information as to what would

12   be happening in the Sunshine Lake process, but, of course,

13   you know, this is a Cadila process.

14   Q.      So Sunshine Lake did not file this patent

15   application; right?

16   A.      No.

17   Q.      Sunshine Lake does not practice this patent

18   application; right?

19   A.      Sort of, but not really.

20   Q.      Not really because there are distinctions between

21   Sunshine Lake's process and the process described in this

22   patent; correct?

23   A.      That is correct.

24   Q.      And you understand the issue in this case is not

25   whether the inventors of this '386 patent application

Brittain - cross

1    infringe the '945 patent; right?

2    A.      Yes, that's correct.

3    Q.      You're trying to use this patent application to

4    support the notion that Sunshine Lake doesn't infringe the

5    patent; right?

6    A.      That's correct.  I use this patent application as a

7    means to understand what would be existing in the polymer

8    layer that contains the apixaban in the Sunshine Lake

9    process.

10   Q.      But this patent application does not describe

11   Sunshine Lake's precise process; correct?

12   A.      That is correct.

13   Q.      And Sunshine Lake does not use the exact procedure

14   described in the examples of this '386 patent application

15   for making its ANDA products; correct?

16   A.      That's true.

17   Q.      Sunshine Lake uses a different solvent than what is

18   described in this patent application; correct?

19   A.      That is correct.

20   Q.      And Sunshine Lake's process involves spray drying

21   apixaban povidone up on to an excipient; is that correct?

22   A.      That's correct.

23   Q.      The '386 application does not involve spray drying on

24   to an excipient; is that correct?

25   A.      Yes, that's correct.

Brittain - cross

1    Q.      And you don't know how long after manufacturing the

2    samples in this patent application were tested using XRPD;

3    correct?

4    A.      I do not.

5    Q.      Now, you analyzed Sunshine Lake's 2.5 milligram and

6    5 milligram tablets; correct?

7    A.      I did.

8    Q.      And you have not offered an opinion that Sunshine

9    Lake's 2.5 milligram tablet would be any different from

10   Sunshine Lake's 5 milligram tablet in terms of whether it

11   contains crystalline apixaban particles; correct?

12   A.      That's correct.  The composition is the same, it's

13   just one tablet is twice the weight of another.

14   Q.      Now, in analyzing Sunshine Lake's tablets, you

15   crushed the tablets in an agate mortar, and then reduced the

16   tablet pieces to a relative fine powder by lightly grinding

17   with an pestle; correct?

18   A.      Yes.

19   Q.      And that was an appropriate sample preparation then;

20   correct?

21   A.      Yes.

22               MS. WIGMORE:  Thank you.  No further questions.

23               THE COURT:  Thank you.  Redirect.

24               MR. KOCHANSKI:  Just a couple questions, Your

25   Honor.

Brittain - redirect

1    Can we put up DDX-1126, please.

2                    REDIRECT EXAMINATION

3    BY MR. KOCHANSKI:

4    Q.    Dr. Brittain, looking at the red scan, okay, apix1.

5              Would you look at PTX-960, the second page,

6    please?

7    A.    PTX-960.

8              Okay.  Yes, I see it.  Sure, I see that.  Yup.

9    Q.    Okay.  And looking at the scan on that page, is that

10   the scan that is shown in red on DDX-11-26?

11   A.    Yes, that's correct.  It is, yes.

12   Q.    And can you look at the top of that, the heading?

13   What's the date that scan was taken, please?

14   A.    That scan was taken on October 31st, 2018.

15   Q.    Okay.  And I think you said that the other scans, the

16   short scans, were taken in January 2019 by Dr. Atwood?

17   A.    I know some of them were, yes.

18   Q.    Okay.  Thank you, Doctor.

19             Going back to DDX-11-25.

20   A.    Okay.

21   Q.    Excuse me.  11-26.  I apologize.  11-26.  Just one

22   question.

23             Doctor, in looking at these scans, and your

24   analysis of the scans, and that is Dr. Atwood's scans, is

25   there a peak at 12.4 degrees 2-theta in Dr. Atwood's scan?

Brittain - redirect

1  A.      Not in those scans, no.

2  Q.      You can confirm that by looking at page 2 of PTX-960.

3  A.      I will do just that.

4          PTX-960.  Page 2.

5          Yes.  When I look, we have -- when I look at

6  the diffraction pattern on page 2 of PTX-960, and I look at

7  12.4, there is definitely no peak present at that angle.

8  Q.      Okay.  And the final question, Doctor.

9          Ms. Wigmore, when she asked you about DDX-11-27,

10 she indicated to you that there were -- that Dr. Atwood used

11 different counts, different step times.  Is that the reason

12 why you normalized all the short scans, to be able to

13 compare it the same?

14 A.      I normalized all the short scans so that I could

15 put -- they all had different intensities, which meant that

16 you would have had -- they would have been all over the

17 wall, in other words.  But by normalizing the intensities,

18 that allows me to superimpose them on the same intensity

19 scale.

20         Remember, normalization does not change the

21 angles.  So if there's going to be a peak at 16.9 in this

22 slide, it would be there.  And by putting on the angles'

23 intensities on a comparable scale, this allows me, then, to

24 see whether there is anything reproducible in there.

25         MR. KOCHANSKI:  Okay.  Thank you, Dr. Brittain.

```
 1                    No further questions.

 2                    THE COURT:  Okay.  Thank you.

 3                    Thank you, Dr. Brittain.  You may step down.

 4                    I think we're going to take a recess.

 5                    THE WITNESS:  Should I take the binders then?

 6                    THE COURT:  They'll take the binders.

 7                    THE WITNESS:  Oh, good.

 8                    (Brief recess taken.)

 9                    *       *       *

10                    (Proceedings reconvened after recess.)

11                    THE COURT:  You may call your next witness.

12                    MR. PEJIC:  Good afternoon, Your Honor.

13                    THE COURT:  Good afternoon.

14                    MR. PEJIC:  Unichem, the defendants, call

15      Dr. Patel, who you heard about in the opening, and

16      plaintiffs' Rule 30(b)(6) witness on particle size testing

17      via deposition.  And would the Court rather just small

18      transcripts or the entire?  I have both.

19                    THE COURT:  Small ones are fine.

20                    MR. PEJIC:  Okay.

21                    THE COURT:  Thank you.

22                    (Documents passed forward.)

23                    MR. PEJIC:  May I approach?

24                    THE COURT:  Yes.

25                    MR. PEJIC:  Thank you, Your Honor.
```

Patel - designations

 1              THE COURT:  Are you going to be playing these by

 2    video?

 3              MR. PEJIC:  Yes, Your Honor.

 4              THE COURT:  And about how long do you expect

 5    them to be?

 6              MR. PEJIC:  Five to six minutes.

 7              THE COURT:  Five to six minutes?

 8              MR. PEJIC:  Yes, sir.

 9              THE COURT:  Great.

10              MR. PEJIC:  Appreciate it.

11              THE COURT:  You may start it whenever you're

12    ready.

13              (Deposition designations of Jatin Patel placed

14    in evidence.)

15              "Question:  With respect to the API that's used

16    in the formulation, when is the particle size assessed?

17              "Answer:  The particle size is assessed for the

18    API.

19              "Question:  Prior to formulation?

20              "Answer:  Yes.

21              "Question:  Is that always the case?

22              "Answer:  In the, you know, case of apixaban,

23    from my recollection, all of the efforts were on the API.

24              "Question:  As far as you are aware, was there

25    any effort at BMS to identify the particle size of the API

1  within the formulation?

2          "Answer:  Not that I am aware of.

3          "Question:  Actually, I would like to go back to

4  Exhibit 4.  The '945 patent-in-suit.

5          "Can you take a look at Exhibit 4?

6          "Answer:  Yes.  Is there a particular portion?

7          "Question:  Can you look at column 2 and its

8  lines, say, 7 through 11.  It says:  'Accordingly, the

9  invention provides a pharmaceutical composition comprising

10  crystalline apixaban particles having a $D_{90}$ equal to or less

11  than about 89 micrometers as measured by laser light

12  scattering method and a pharmaceutically acceptable diluent

13  or carrier.'

14          "Do you see that, Dr. Patel?

15          "Answer:  Yes.  Let me read through it again,

16  just so that I completely understand it before ask you the

17  question.

18          "Yes.

19          "Question:  Do you agree with that statement?

20          "Answer:  So what I agree with, again, from a

21  technical perspective, without getting into the legal

22  jargon, is that we need a composition that has crystalline

23  apixaban particles having a $D_{90}$ equal to or less than

24  89 microns as measured by laser light scattering since that

25  was the particle size after evaluating various factors we

 1    determined would provide the greater than equal to

 2    77 percent resolution from formulations.

 3            "Question:  Could you go down a little further

 4    on column 2, and look at lines -- I believe it's 21 through

 5    23.  It states:  'The particle sizes stipulated herein and

 6    in the claims referred to particle sizes were determined

 7    using a later light scattering technique.'

 8            "Answer:  I see the statement.

 9            "Question:  You testified earlier, and I don't

10    want to mischaracterize, but you provided technical data

11    that was incorporated into the patent, and I don't want any

12    privileged information, but is that correct?

13            "Answer:  We provided various pieces of data

14    including dissolution data, particle size data, various

15    batches of tablets that were used in clinical assessments,

16    yes.

17            "Question:  Was any data on particle size --

18    strike that.

19            "Did you or your colleagues ever provide any

20    data on particle size that was generated by a method other

21    than laser light scattering in connection with this patent?"

22            "Answer:  Again, I don't know historically

23    what all we've done, but at the time, we were providing

24    information for the purpose of the patent, we provided

25    particle size using laser light scattering method.

```
 1              "Question:  Did you consider any other method to

 2    measure particle size?

 3              "Answer:  I am not familiar with all other

 4    techniques that the material science group or, you know,

 5    other members of the chemistry manufacturing and controls

 6    might have considered along the way.  I am mainly familiar

 7    with the laser light scattering method work because that

 8    usually was what was discussed in our cross-functional

 9    teams."

10              (Designations end.)

11              MR. PEJIC:  Thank you, Your Honor.

12              And now Unichem would like to introduce

13    Dr. Wayne Genck on the issues of Unichem's noninfringement

14    and invalidity of the '945 patent.  And my colleague, Jill

15    Browning, will be conducting the direct.

16              THE COURT:  Okay.  Fine.

17              ... DR. WAYNE J. GENCK, having been first duly

18    sworn, was examined and testified as follows ...

19              THE COURT:  Welcome, Dr. Genck.

20              You may proceed.

21              (Binders passed forward.)

22              MR. PEJIC:  And may I approach again?

23              THE COURT:  Yes.

24              (Demonstratives passed forward.)

25              THE COURT:  I think we're ready.
```

1        **DIRECT EXAMINATION**

2    BY MS. BROWNING:

3    Q.        Good afternoon.  Could you state your name for the

4    record?

5    A.        Yes.  My name is Wayne John Genck.

6    Q.        And where are you currently employed?

7    A.        Genck International.

8    Q.        What do you do for Genck International?

9    A.        I am a chief engineer and also owner of the

10   corporation.

11   Q.        Who were you retained by in this matter?

12   A.        Unichem.

13   Q.        Are you being compensated for your time?

14   A.        Yes, I am.

15   Q.        Does your compensation depend in any way on the

16   outcome of this matter?

17   A.        In no way.

18   Q.        Does your compensation depend in any way on your

19   testimony?

20   A.        In no way.

21   Q.        Did you prepare some demonstratives to assist in your

22   testimony today?

23   A.        Yes, I did.

24   Q.        I'm going to direct you to please turn to DDX-12-2.

25            Does this set forth your educational background?

1   A.      Yes, it does.

2   Q.      Please describe your educational background to the

3   Court.

4   A.      Sure.

5           I have a BS in chemical engineering from Iowa

6   State University in 1966;

7           And an MS from the same school in chemical

8   engineering from Iowa State in 1967;

9           A Ph.D. in chemical engineering again from Iowa

10  State in 1970; and,

11          I also received an MBA summa cum laude from

12  Loyola University in Chicago when I was working in Industry

13  in 1978.

14  Q.      What was the topic of your Ph.D. thesis?

15  A.      It was in the area of -- the title, actually, was

16  "Kinetics of Crystallization."

17          I, fortunately, when I was at Iowa State, I was

18  able to work under Dr. Morey Larson who was at the time the

19  premier crystallization design people.  And, of course,

20  since I was working on kinetics, that would necessitate I

21  would be working on particle size distributions that would

22  be necessary in order to generate a kinetic data.

23  Q.      Other than your MBA that you already testified about,

24  did you work while earning any of your other degrees?

25  A.      Sure.  When I was at Iowa State in graduate school, I

Genck - direct

1    was a member of the faculty as an instructor.  During that

2    time, I taught chemical engineering to undergraduate

3    students.  We have an area which would break out, it's

4    called "Unit of Operations For Chemical Engineering," and I

5    taught the course, or I should say the subject matter, on

6    crystallization, the design of crystallizers, precipitators,

7    and, of course, that necessitated the discussion on particle

8    shape and also particle size distribution.

9    Q.    I'm going to direct your attention in your binder to

10   DTX-999, towards the end there.  It will also pop up on the

11   screen.

12   A.    Oh, sure.  That will save some time.

13   Q.    Can you identify this document?

14   A.    Yes, I can.  That is my CV.

15   Q.    And does this CV contain an accurate representation

16   of your qualifications, experience, and publications?

17   A.    It does.

18            There's a few more clients that are not listed

19   here that occurred over the last couple of months or so, but

20   it does, indeed, contain, except for the extra clients over

21   the last couple of years -- the last couple of months, I

22   should say.

23   Q.    I'll direct your attention to DDX-99-2.

24            Have you received any awards?

25   A.    Yes, I have.

1   Q.      And tell the Court a little bit about this award.

2   A.      Yes.   I received a Professional Achievement Citation

3   in Engineering For Alumni from Iowa State University.

4           It is an award that's given to engineers

5   graduating from Iowa State, and, you know, there's literally

6   hundreds per year that are graduating out in chemical

7   engineering, mechanical, electrical, civil, et cetera.   So

8   very, very small percentage of the graduates are awarded

9   this.

10          It's quite an honor to be awarded this on the

11  part of Iowa State University.

12  Q.      So turning back to your demonstratives, to DDX-3.

13          Does this set forth your work experience in

14  general terms?

15  A.      Yes, it does.

16  Q.      And so after you got your Ph.D. in 1970, what did you

17  do?

18  A.      I -- the first job out of school was for the Morton

19  Salt Company.  I guess it really shouldn't surprise anyone

20  since my thesis was on crystallization.  And in that

21  particular case, I was working on the kinetics of

22  crystallization, improvement in size distribution, and, of

23  course, that required particle measurements.

24  Q.      What percentage of your work with Morton Salt was

25  related to particle size?

1    A.    The vast majority.  That's the reason I was hired, in

2    order to improve the properties, kinetics properties of the

3    salt manufacturing.

4    Q.    What did you do once you left Morton Salt?

5    A.    After leaving Morton Salt, I went to work for

6    Sherwin-Williams Chemicals.

7          Again, the main reason I was hired by

8    Sherwin-Williams Chemicals was because of my background in

9    crystallization, precipitation.

10         At the time, it surprises a lot of people but

11   they did an enormous number of crystals and precipitants in

12   terms of pigment manufacturing.  We were the only U.S.

13   producer of saccharine, Sweet 'N Low, for example.  So I was

14   named at the time -- it's not listed here, actually, but I

15   was at the time named as the chief person working on solid

16   state chemistry, which, of course, includes things such as

17   measurements and particle size distribution.

18         Other positions I held there were superintendent

19   of plant technical, director of new product development for

20   the entire division, we have seven plants I was working on,

21   and then finally general manager of operations where I ended

22   up actually running the plants.

23   Q.    So after you left Sherwin-Williams, what did you do?

24   A.    In 1984, I formed my own consulting company.  And

25   I -- I'm there from 1984 at the present as we speak today.

1  Q.      And what business does Genck International conduct?

2  A.      Sure.   It's a chemical engineering company, primarily

3  engaged in giving consulting to companies that have need

4  for improving particle size, improving particle quality,

5  troubleshooting, crystallization systems, design of new

6  crystallization systems, and it entails things such as solid

7  state chemistry again, polymorphism, pseudomorphism, et

8  cetera.

9          Another major part of that, of course, is

10  usually the clients want a change in size distribution or

11  consistency in size distribution as you are moving from the

12  laboratory into the pilot plant and then on into the large

13  scale plant.   So a lot of the effort is directed at particle

14  size distribution of solid materials.

15  Q.      Approximately, how many companies have you provided

16  these consulting services to?

17  A.      If you look at my CV, you will find -- well, a CV

18  is only partial of it.   But it's now over 300 companies

19  worldwide engaged in pharmaceuticals, specialty chemicals,

20  and commodity chemicals, both by batch and continuous

21  processing.

22  Q.      Do you teach courses relating to particle size?

23  A.      Yes, I do.

24  Q.      And what courses do you currently teach?

25  A.      I'm teaching the course for the American Institute

 1   of Chemical Engineers.  That's being taught once or twice a

 2   year.  It is being taught to students include from, again,

 3   pharma, specialty chemical, and commodity.

 4   Q.    What other courses do you teach?

 5   A.    I teach the course for the Center for Professional

 6   Advancement out of New Jersey.  It also offers classes in

 7   the similar subject matter.

 8         At this stage I'm teaching also the in-house

 9   classes where, for example, they would be hired on the

10   part of the client to say we have an in-house class on

11   crystallization focused on their needs.  And quite often

12   that, again, involves measurement of particles because

13   usually they are looking for improvement in that particular

14   property of the solids.

15   Q.    Over the course of your career, have you written some

16   articles?

17   A.    I have.

18   Q.    And are these listed on your CV, which is DTX-999?

19   A.    Yes, they are.

20   Q.    And did any of your articles relate to the size and

21   distribution of particles?

22   A.    Practically all of them.  I recall there's 26

23   articles.  Again, they are focused on crystallization.

24   Q.    And I will direct your attention once again to

25   DTX-999-2.

1          Have you authored any textbook chapters relating

2    to crystallization?

3    A.    Yes, I have.

4    Q.    Just very briefly, if you could perhaps describe

5    maybe one or two of these.

6    A.    Certainly.  I authored the chapter on crystallization

7    from McGraw-Hill's Third Edition of the Handbook of

8    Separation Techniques For Chemical Engineers.  That

9    particular textbook is used in many universities as far as

10   teaching is concerned.

11         I authored a chapter on crystallization

12   for solutions and melts for the Third Edition of Chemical

13   Process Equipment Selection and Design.  That would be used

14   not only by university people but also people that are

15   designing equipment.  That would be the vendors.  That would

16   be the design people as part of particular companies.

17         And one I'm very proud of, editor of Section 18,

18   which is the Liquid Solid Operations and Equipment For the

19   Eighth and Ninth Edition of what's referred to as Perry's

20   Handbook For Chemical Engineers.  This is a, and the Ninth

21   Edition just came out last year in case somebody is

22   interested in buying the same.  This is -- if you go to talk

23   to chemical engineers, and actually, when I was at Iowa

24   State, I felt the same way.

25         This is, I don't think I'm exaggerating, Perry's

1  Handbook is defined by chemical engineers as the bible for

2  the design.  In this case, I did the section on

3  crystallization and I also, as a section editor, handled

4  things such as downstream processing, filtration,

5  centrifuge, et cetera, which, of course, requires

6  measurement and change in particle size distribution.

7  Q.     So I take it you are familiar with laser light

8  scattering equipment?

9  A.     Very definitely.  I've been using it for 30 years or

10  more.

11             MS. BROWNING:  I would like to offer Dr. Genck

12  as an expert in the field of particle size, measurement

13  distribution and modification in pharmaceutical

14  preparations and request that he be allowed to so testify.

15             MS. WIGMORE:  No objection.

16             THE COURT:  He is so recognized.

17  BY MR. BROWNING:

18  Q.     Looking at your demonstrative, again, Dr. Genck,

19  looking at 12-4, what were you asked to do in this case?

20  A.     I was asked several things, the first one being

21  whether or not ANDAs, I should say Unichem's product as

22  produced by the ANDA is infringing on the claims of the '945

23  patent.

24  Q.     And were you also asked to determine whether the

25  claims as asserted against Unichem were adequately described

 1    or enabled by the '945 patent specification?

 2    A.    Yes, I was.

 3    Q.    If we take a look at your demonstrative 12-5, can you

 4    please very generally explain the materials that you

 5    reviewed in connection with rendering your expert report.

 6    A.    Sure.  Of course, obviously, I reviewed the patent,

 7    the '945 patent and its file history.

 8              I invented, reviewed some inventor deposition

 9    testimony, portions of the Unichem ANDA.  I myself tested

10    Unichem's API in order to determine the D90 particle size.

11    I also reviewed the Court's order construing the claims and

12    the Berkland report.

13    Q.    Did you review other materials?

14    A.    Yes, I did.

15    Q.    I will direct your attention to DTX-1001.  Do you

16    recognize this document?

17    A.    Yes, I do.

18    Q.    Do you recognize this document as a list of materials

19    that you reviewed in formulating your opinions that you

20    provided in this case?

21    A.    Yes, correct.  That's what I reviewed.

22    Q.    Okay.  If you could please turn in your binder or

23    they'll also show it on the screen, but JTX-2 in your

24    witness book.

25    A.    Okay.  2.

Genck - direct

1   Q.      Yes, JTX-2.

2   A.      I'm there, yes.

3   Q.      Do you recognize this as the '945 patent?

4   A.      Yes, I do.

5   Q.      And if you would stay on this first page and turn to

6   the section titled related U.S. application data, do you see

7   a reference to a provisional patent application filed on

8   February 25, 2010?

9   A.      Yes, I do.

10  Q.      Okay.  And turning to the section also on the same

11  page, do you see it indicates the application for the PCT

12  was filed on February 24th, 2011?

13  A.      Yes, I have it.

14  Q.      For purposes of your noninfringement and invalidity

15  analysis, have you assumed that the February 25, 2010, date

16  was the relevant date to evaluate the patent?

17  A.      Correct.  That's the date that I assumed.

18  Q.      Would any of your opinions change if the relevant

19  date is February 24, 2011?

20  A.      None whatsoever.

21  Q.      Did the state of the art relevant to your opinions

22  change in any significant way between 2010 and 2011?

23  A.      No, not based upon my experience.

24  Q.      Do you recall providing an expert report in this

25  matter?

Genck - direct

1   A.      I do.

2   Q.      And we'll go through the details later, but, first,

3   if we could look at DDX-12-6 of your demonstrative, do you

4   recall applying this definition of a person of ordinary

5   skill in the art when you were providing your opinions?

6   A.      Yes, I do.  I did provide an opinion on this.  If I

7   recall, this is the definition of a person of ordinary skill

8   in the art, which was by the plaintiff -- by the defense.

9   Sorry.

10  Q.      And if you could please turn to DDX 12-7, do you

11  recognize this definition as the person of ordinary skill in

12  the art applied by the plaintiffs?

13  A.      Yes, I do.

14  Q.      And do you meet the qualifications of a person of

15  ordinary skill in the art under either definition as of

16  2010-2011?

17  A.      Yes, I do.

18  Q.      Turning to demonstrative DDX-12-8, do you understand

19  in this case that only claims 21 and 22 are at issue?

20  A.      Correct.  It's my understanding that these dependent

21  claims are the ones that are of interest.

22  Q.      And you can see that these two claims depend from

23  claim 12?

24  A.      Correct.

25  Q.      Turning to DDX-12-9.  So we'll go through the details

Genck - direct

1   later, but did you render an opinion relating to

2   infringement of these claims?

3   A.      Yes, I did.

4   Q.      And could you please explain your understanding of

5   what it means for a product to infringe a claim?

6   A.      That in order to infringe upon a claim, that the

7   product must have all of the elements of the claim.

8   Q.      We're going to go through your opinions in detail

9   later, but do you recall providing an opinion on the

10  validity of the claims of the '945 patent?

11  A.      Yes, I do.

12  Q.      And turning to your demonstrative at 12-10, do you

13  recall this as being your understanding of the test that you

14  applied for the written description requirement of the

15  patent claims?

16  A.      Yes, I do.

17  Q.      And turning to Demonstrative 12-11, do you recall

18  this as being your understanding of the test that you

19  applied for the enablement requirement of a patent claim?

20  A.      Yes, it is in my report.

21  Q.      Turning back to your demonstrative, DDX-12-9, what is

22  your understanding of the subject matter to which claim 12

23  of the '945 patent is directed?

24  A.      I believe it's directed at a solid pharmaceutical

25  composition comprising a therapeutically effective amount of

Genck - direct

1    apixaban and pharmaceutically acceptable diluent or carrier

2    wherein the apixaban comprises crystalline apixaban

3    particles, and here again, where in they are crystalline,

4    having a D90 equal to or less than 89 microns, and also

5    having at the same time some certain attributes in terms of

6    solubility.

7    Q.    What is the claim limitation at issue for Unichem in

8    this case?

9    A.    It's has to do with the D90, the apixaban particles.

10   Q.    Are you aware that the Court has construed the

11   meaning of the claim phrase apixaban particles have a D90 as

12   it appears in claim 12?

13   A.    Yes, I am.

14   Q.    Do you understand the Court construed the phrase to

15   have its plain and ordinary meaning?

16   A.    That's my understanding, yes.

17   Q.    And is that the claim construction that you applied

18   when rendering your opinion?

19   A.    It is.

20   Q.    You indicated earlier that you were asked to provide

21   an opinion regarding whether the Unichem ANDA products would

22   meet all the limitations of the asserted claims of the '945

23   patent; is that correct?

24   A.    That's correct.

25   Q.    And did you render such an opinion?

Genck - direct

1    A.      Yes, I did.

2    Q.      And what is your opinion?

3    A.      That the product produced by, as produced by

4    Unichem's ANDA do not infringe.

5    Q.      And --

6    A.      And they do not meet the limitations that are in the

7    asserted claims.

8    Q.      Specifically, which limitation is not met by the

9    Unichem ANDA product?

10   A.      The D90.

11   Q.      How would one of ordinary skill in the art in 2010

12   likely have determined the D90 value of an active ingredient

13   for use in a pharmaceutical composition?

14   A.      Well, especially in the industry of pharmaceuticals

15   -- well, one that I'm most familiar with and the plain fact

16   is the one that I see the majority of the time, laser light

17   diffraction.  This seems to be or is the gold standard that

18   is being used by, especially pharma in terms of my

19   experience and reading.

20   Q.      Turning to your demonstratives at DDX-12-13, can you

21   briefly describe the laser light scattering technique that

22   we've been discussing today?

23   A.      Sure.  It's fairly unique versus other methods of

24   measuring particles.

25           The first thing one has to understand, what it's

Genck - direct

1    trying to do is to generate what is called the equivalent

2    spherical diameter.  In other words, what it's doing is

3    taking an irregular-shaped particle, generating some

4    measurements of diffraction, and diffraction once they're

5    bombarded with laser light.  And then you collect data

6    regarding the angles and also the intensity, and then what

7    it knows, it says if I get a particular value, that this

8    would be representative, this particle is representative of

9    a sphere of a particular equivalent diameter.

10                So what you get out of it is a -- a size

11   distribution based upon the refraction and diffraction of

12   the light, but that size distribution is unique in many

13   extents because it is what's referred to as the equivalent

14   spherical diameter, which you get directly from the

15   measurement.

16   Q.    So does it also calculate a D90 such as that claimed

17   in the '945 patent?

18   A.    It does.  It calculates a D90.  It calculates, I

19   think we'll see it later, a D10, a D50, a size distribution,

20   but the D90 that is referenced in the '945 patent is being

21   generated by this technique.

22   Q.    Do you have an understanding with respect to how the

23   '945 patent describes measuring the D90?

24   A.    Yes.  It's very -- no surprise.  By that I mean, you

25   don't have to guess.

Genck - direct

1    Q.      And what is that?

2    A.      The way it is used, the way it, and the only way that

3    it's described, it is measuring the D90 from laser light

4    techniques by a Malvern piece of equipment for the API bulk

5    prior to formulation.

6    Q.      So let's take a closer look at the '945 patent

7    disclosure.

8            Do you recall the '945 patent discussing the use

9    of laser light specifically?

10   A.      Yes.  As a matter of fact, it's throughout the entire

11   patent.  It's discussed many, many times.

12   Q.      If we could advance to 12-14.  Do you recognize these

13   as quotes from the '945 patent?

14   A.      These are a couple of examples that I was referencing

15   previously.

16   Q.      Could you please read the first quote from the

17   patent, which is from column 2, lines 7 through 11?

18   A.      Sure.  Accordingly, the invention provides a

19   pharmaceutical composition comprising crystalline apixaban

20   particles having a D90 equal to or less than about

21   89 microns, micron symbol, as measured by laser light

22   scattering method, and a pharmaceutically acceptable diluent

23   or carrier.

24   Q.      What would this quote from the patent have meant

25   to a person of ordinary skill in the art in the 2010 time

Genck - direct

1   frame?

2   A.      Well, what it meant in that time frame is the

3   particles, and in this case, as I mentioned, it is the bulk

4   particles prior to processing to produce a tablet or

5   anything, call it downstream, are measured by laser light

6   scattering method.

7   Q.      So the second quote is also from column 2, lines 18

8   to 23.  And we don't have to read the whole thing into the

9   record.  I'll direct your attention to the highlighted

10  sentence, last sentence that reads:  "The particle sizes

11  stipulated herein and in the claims refer to particle

12  sizes were -- I think 'that' is missing, but "were

13  determined using a later light scattering technique."

14              Do you see that?

15  A.      I do.

16  Q.      And what would this phrase have meant to one of skill

17  in the art?

18  A.      Certainly.

19              What it is telling a person of ordinary skill in

20  the art is that when the -- in the patent, when they are

21  referring to in the specification example or whatever, or

22  the verbiage itself, and in particular in the claims, in

23  particular, that the inventors, if you wish, or certainly

24  the patent is referring to particle sizes using laser light

25  scattering technique.  It is very specific on that, and

1   they're not talking about any other method that -- any other

2   method, period, in this patent.

3   Q.      So turning to DDX-12-15.  This shows yet another

4   quote from column 2 of the '945 patent, lines 32 2 to 43;

5   again, there's no need to read the entire quote.

6           But does this sentence of the patent also refer

7   to measuring the apixaban particles to determine the $D_{90}$

8   using laser light scattering?

9   A.      It certainly does.  And, again, as I had prefaced

10  this, I told you that this methodology in the specifications

11  are throughout the patent.  It's not just one spot, it's

12  everywhere in terms of what is being taught on how -- what

13  the specification is.

14          As I mentioned earlier, the $D_{90}$ is an equivalent

15  spherical diameter which represents 90 percent of the volume

16  of the particles.

17  Q.      Turning to DDX-12-16.

18          Do you see those two quotes from the '945

19  patent?  The first quote reads:  "Particle size distribution

20  can be measured by laser light scattering technique as known

21  to those skilled in the art, and it's further disclosed and

22  discussed below."

23          And the second one:  "The invention can, indeed,

24  be viewed in alternative teams as a composition comprising

25  crystalline apixaban particles having a mean particle size

1  equal to or less than about 89 microns, as measured by

2  Malvern light scattering."

3            Do you see those?

4  A.    I do.

5  Q.    What do these two statements say to a person of skill

6  in the art regarding this patent?

7  A.    Well, several things.  First of all, this is what,

8  the sixth time we have seen this in the patent in which they

9  are specifying and teaching only laser light scattering.

10            But even more so on the second one, not only

11  are they specifying a laser light scattering, they are

12  specifying a manufacture, namely, Malvern, who is the --

13  well, I suppose some could argue but to me is the best known

14  producer of laser light scattering equipment in the world.

15  There are other producers, which I think would give you a

16  similar data using laser light scattering, but the Malvern

17  is very well known, and it's the biggest one in the world.

18  But it is the laser light scattering.

19  Q.    Do you recall the '945 patent having some examples

20  where the $D_{90}$ of the apixaban particles were determined?

21  A.    Yes, I do.

22  Q.    And do you have an understanding with respect to how

23  the '945 patent indicated the particle size for apixaban was

24  to be determined?

25  A.    Very clearly.

1    It can be determined by using this particular

2  instrument, the laser light scattering instrument, and it

3  would be, again, on the bulk apixaban prior to downstream

4  processing before any other change to it.

5  Q.     If we could please turn to DDX-12-17.

6         Can you please read this quote from the patent?

7  A.     Sure.

8         "As noted, average particle size can be

9  determined by, again, the Malvern light scattering, a laser

10  light scattering technique.  In the examples below" -- and

11  those are the examples, of course, within the patent that we

12  use to generate samples -- "the particle size for apixaban

13  drug substance was measured using," again, "a Malvern

14  particle size analyzer.

15  Q.     So in the context of this quote, what would a person

16  of ordinary skill in the art have understood it meant by the

17  phrase "apixaban drug substance"?

18  A.     Well, that's -- those skilled in the art would know

19  that that measurement is being done prior to the downstream

20  processing product formulation on the drug substance itself,

21  just as you would be, for example, crystallizing out to

22  produce the product for the drug substance.

23         That is the material which is being measured by

24  the laser light scattering.

25  Q.     So before it was formulated or processed at all into

Genck - direct

1  a tablet.

2  A.      Before anything at all is done to it.  This is the

3  pure API, if I might use that, active pharmaceutical

4  ingredient.  Nothing has been done to it, and that is the

5  size distribution that a patent is talking about here again.

6          Now, we're probably up to seeing it eight times

7  in the patent.

8  Q.    Did the '945 patent disclose any method to determine

9  the $D_{90}$ or the particle size of apixaban after it was made

10  into a finished tablet?

11  A.      Not at all.  It is totally void on that.  There is

12  no discussion whatsoever about a particle size distribution

13  after processing to produce the finished goods.  No

14  discussion on what happens to the particle size during

15  processing, what is really necessary to generate the data.

16          So, in answer to the question, there is nothing

17  taught whatsoever on what happens after the API is started

18  to be processed.

19  Q.      Does a finished tablet typically include more than

20  just an API?

21  A.      Oh, yes.  It's got excipients in it, so you have

22  various excipients being added for various uses and the

23  like.  So it contains a variety of materials.

24  Q.      Does the '945 patent disclose at least one way that

25  the tablets can be made?

1    A.      It does.  In the examples, it gives you several

2    granulation examples, one of which is dry and one of which

3    wet.

4    Q.      Would a person of skill in the art in 2010 consider

5    it possible to measure the $D_{90}$ of an API based on granules

6    that may have been sliced from a finished tablet that

7    includes excipients?

8    A.      Impossible.  Back -- even back in, say, 2010, 2011,

9    it was impossible to generate a $D_{90}$ as defined or as they

10   measured in this patent.  And even today, it's not possible.

11   It's not -- I've not seen anybody having written about it and

12   the like, and I do not believe it is possible today.

13   Q.      Even knowing the $D_{90}$ of the bulk apixaban and knowing

14   the method of manufacture of the tablet, would a person of

15   ordinary skill in the art be able to predict the $D_{90}$ particle

16   size of the apixaban in a finished tablet?

17   A.      Totally impossible.  I mean, if you could do this, it

18   would be a magical breakthrough.  But no, the -- I do know,

19   everyone knows, that during the processing from the bulk

20   API to a finished goods, that it is well known that the

21   particles themselves of the drug substance have and are

22   undergoing some change in terms of particle size.

23   Q.      Reading the '945 patent, would one of skill in the

24   art view that the '945 patent contemplated the particle size

25   of the apixaban to be important?

Genck - direct

1  A.    Definitely.  That was part of their -- the core

2  opinions, you know, the core of what they thought was

3  important.  That the $D_{90}$, as measured by a laser light

4  diffraction, was a core measurement and requirement in order

5  to achieve the desired outcome.

6  Q.    I'll direct you to your demonstrative, DDX-12-18.

7        And this is a quote from the '945 patent, column

8  2, lines 44 to 54.  And we don't need to read the entire

9  thing, but I will just direct your attention to the last

10  sentence.  It reads:  "It has surprisingly been found,

11  however, that the particle size that impacts the apixaban

12  absorption rate was about a $D_{90}$ of 89 microns."

13        Do you see that?

14  A.    Yes, I do.

15  Q.    And what impact does the '945 patent indicate that

16  the particle size has?

17  A.    That it is surprising that in terms of that

18  particular size would impact the absorption rate, and they

19  came up with a value here.  So apparently what they are

20  describing is a surprising outcome that would impact upon

21  the apixaban absorption based upon this $D_{90}$ measurement for

22  the bulk of API.

23  Q.    And if I could direct you to DDX-12-19.  And, again,

24  we don't need to read the entire into the record, but what

25  would this paragraph have informed a person of ordinary

Genck - direct

1    skill in the art?

2    A.      Again, the use, again, of surprising and unexpected,

3    that it was felt that the particle size distribution as

4    measured by laser light scattering on the API would lead to

5    consistent in vivo dissolution in humans.

6            Again, in reading that, a person of ordinary

7    skill in the art would recognize that this was, again, a

8    core concept.  That the inventors had the need to be able to

9    measure the size distribution in order to achieve

10   potentially what they have found.

11   Q.      If I could direct your attention back to the '945

12   patent, which is JTX-2.  And if we could go to page 5, which

13   is Figure 3.

14           Could you generally tell me what this figure

15   describes?

16   A.      Certainly.

17           This is a -- Figure 3 is a plot of the

18   dissolution rates for, in this case, the 2.5 milligram

19   tablets using drug substance of different particle size.

20           So let's look at the Y axis first.  The Y axis

21   is the percent of the API which is dissolved in 30 minutes,

22   where the X axis, this is very important, is the $D_{90}$ of the

23   drug substance.

24           So, in other words, what this is showing, it is

25   showing that they are using -- they're starting out with the

Genck - direct

1  bulk substance.  That is, the X axis.  That's the value

2  there.  And,

3          Then they're running some dissolution tests by

4  means of mixing and the like and determining how much is

5  30 minutes.

6          So the X axis, as I said, is what is going into

7  a formulation, not to what is in the formulation.  As we

8  pointed out ten minutes ago or so, there is no way

9  predicting what the size distribution of the API is after

10 formulation.

11         This has to do with what is going in to the

12 formulation, and that is the X axis as measured by the laser

13 light scattering and the $D_{90}$.

14 Q.    Okay.  You mentioned that the Y axis had to do with

15 dissolution in 30 minutes.  What is actually being dissolved

16 on the Y axis?

17 A.    The apixaban, that is the value that they're

18 recording.  You start out at 2.5 milligrams and then you --

19 over a period of time, you are taking samples from the

20 liquid, which is being stirred, and you're determining how

21 much of it is being loaded.

22 Q.    Is it in a finished tablet?

23 A.    The --

24 Q.    On this Y axis.

25 A.    Oh, the Y axis is -- would be 4, apixaban being

1 removed out of a finished tablet.  But the important thing

2 is the X axis is for the bulk apixaban going into the

3 tablet.

4          So the problem I'm having with this plot, to be

5 honest with you, is that we don't know.  You don't know what

6 size is important in order to get these dissolution rates

7 because you don't know the size in the tablet.

8 Q.    Does Figure 3 of the '945 patent correlate the

9 particle size of the bulk apixaban with the dissolution of

10 apixaban in a finished tablet?

11 A.    Exactly.  That's what this slide is showing.

12 Q.    Does the '945 patent disclose what the $D_{90}$ of the

13 apixaban particles are in the actual finished tablet that

14 is being used in the dissolution test that is described in

15 Figure 3?

16 A.    No, it doesn't.  And as I pointed out earlier, the

17 inventors did not measure it, which is, to me, is kind of

18 curious.

19          You would think that an inventor would be --

20 have curiosity about what, what is really happening there.

21 What size do I have to get down to in my formulation to see,

22 to be able to generate the desired solubility that they are

23 shooting for.

24          It looks like was 75 percent, I think, dissolved

25 in 30 minutes.

Genck - direct

1    So they don't know.  They simply don't know what

2    size is required to reach these dissolution characteristics.

3    Q.    And so if you could please turn to Figure 4, which is

4    the next page on JTX-2, and generally, what does this

5    describe?

6    A.    This is essentially the same as Figure 3.  The only

7    difference is the -- is the same workup as Figure 4, but the

8    only difference is now the investigation is on a five

9    milligram tablet as opposed to the previous one on Figure 3,

10   which was for a 2.5-milligram tablet.

11   Q.    So without going through the figure in the same

12   detail as we just covered in Figure 3, do any of your

13   statements or opinions change with respect to Figure 4 that

14   you offered with respect to Figure 3?

15   A.    No.  It has the same deficiency in terms of not

16   knowing what we're measuring, what's going into this

17   testing.

18   Q.    I'm going to direct your attention now to DTX-458.

19                   Do you recognize this document as coming

20   from the file history of the '945 patent?

21   A.    Yes, I do, and it's an amendment going to the -- to

22   the patent, patent department, an amendment done by BMS.

23   Q.    Did you rely on this document in your expert report

24   and in providing your opinions?

25   A.    I did.

Genck - direct

1  Q.     Can you please turn to DDX-12-20.  This is back to

2  your demonstrative.

3              Do you recognize this quote from page 15

4  of the document that we were just reviewing?

5  A.     Yes.

6  Q.     It reads, the criticality of the claimed D90

7  threshold is supported by in vivo and in vitro data provided

8  in the present application.  As demonstrated in Figures 3

9  and 4 and in Table 6, the use of crystalline apixaban

10  particles with a D90 equal to or less than about 89 microns

11  resulted in consistent in vivo distribution in humans at

12  physiological pH.  Specifically, Figures 3 and 4 show the

13  dissolution rate at 30 minutes of 2.5 milligram and 5

14  milligram apixaban tablets plotted against the apixaban

15  particle size D90.

16              Taken together, the in vitro-in vivo

17  relationship that has been established based on data of

18  Table 6 and the in vitro data of Figures 3 and 4 leverage

19  the in vitro-in vivo relationship that is used in the

20  application to demonstrate the link between crystalline

21  apixaban particle size and exposure.

22              So my first question is:  What is meant by the

23  crystalline apixaban particle size?

24  A.     Oh, in this case it is meant, the particle size which

25  is being referenced in this document is the bulk substance.

1    It's the pure API prior to any processing whatsoever.

2    Q.    And would a person of skill in the art reading this

3    portion of the file history have considered the particle

4    size to be important to what the inventors considered to be

5    their invention?

6                MS. WIGMORE:   I object, Your Honor.   That's not

7    in his expert report.   The statement is, but the

8    interpretation is not.

9                THE COURT:   Do you want to tell me where it

10   is?

11               MS. BROWNING:   The interpretation?

12               MS. WIGMORE:   The question you just asked, what

13   a person of skill in the art would interpret this to mean is

14   not in his expert report.

15               MS. BROWNING:   I will withdraw the question at

16   this point.

17               THE COURT:   Okay.

18   BY MR. BROWNING:

19   Q.    Were the other parts, other parts of the file

20   wrapper that you reviewed, was that consistent with your

21   opinion?

22   A.    Oh, yes, exactly.

23   Q.    If the particle size is considered to be an important

24   factor, what would that have informed the person of skill in

25   the art regarding the type of tests that should be employed

1   when determining the particle size?

2   A.      Certainly.  It's known by those skilled in the art

3   that different techniques of particle measurement can --

4   you're measuring different parameters and they could result

5   in different values, and therefore since it is evident that

6   inventors felt that particle size was critical, that it is

7   essential that the same particle size measurement be made

8   all the time because you are not, even if you get the same

9   value, they're not the same value.  It's as simple as that

10  in terms of the real particle size using different

11  techniques.

12  Q.      I'm going to direct your attention to DTX-305.  You

13  can find that in your binder and it's also shown on your

14  screen.

15          Do you recognize this document?

16  A.      Yes.  This is a chapter and the first author is

17  Amidon, entitled Particle, Powered and Compact

18  Characterization.

19  Q.      Generally, what does this chapter by, I'm going to

20  call Amidon, discuss?

21  A.      It's discussing different ways of particle

22  measurement, but also the influence of particle measurement

23  on the ultimate use of the product.

24  Q.      Did you rely on this document in forming your

25  opinion?

Genck - direct

1  A.      I did.

2  Q.      Please turn back to your demonstrative to DDX-1221.

3  Do you recognize this quote from the DTX-305 that we were

4  just looking at?

5  A.      I do.

6  Q.      And it says, Each particle sizing method, replete

7  with its own assumptions, will result in a unique measure

8  of particle size and distribution, since a real sample

9  exhibits a range of shapes and sizes whose complexity is

10 compounded when analyzing multi-component systems such as

11 formulations.  Since no two methods of particle sizing will

12 result in the same numbers, it becomes important to

13 distinguish between different methods, and to use the same

14 type of analysis when comparing lots of API, excipients or

15 formulations, examining differences in performance that

16 process changes make, et cetera.

17         Do you see that quote?

18 A.      Yes, I do.

19 Q.      What would a person of skill in the art understand

20 from this quote from Amidon?

21 A.      This reinforces what I'm been saying all along, is

22 that different methods would produce different results, all

23 right, as far as, and particularly in this case, the

24 equivalent spherical diameter for particles.  And that what

25 this is really saying, as I said earlier, that it's

1   essential to use the same type of analysis in order to

2   come up with something which issued any correlations

3   whatsoever.

4   Q.      Does this article reflect the state of the art as

5   of the 2010/2011 time frame regarding measuring particle

6   size?

7   A.      It certainly does.

8   Q.      Turning now to a different subject, we can turn that

9   off.

10          Did you review the Unichem ANDA?

11  A.      Yes, I did.

12  Q.      And for what purpose did you review the Unichem

13  ANDA?

14  A.      Sure.  Several things I was looking for in the ANDA,

15  one of which was what are the specifications that Unichem

16  has or had, has, I should say.  Forgive me.  And then,

17  secondly, what are they measuring.  And then, thirdly, how

18  are they measuring it as far as what's being described in

19  the ANDA.

20  Q.      When you say specification, do you mean the particle

21  size specification?

22  A.      Yes.  And, I'm sorry.  Yes, the D90 that is of

23  interest to me.

24  Q.      Of the apixaban?

25  A.      Correct.  Of the bulk apixaban.

Genck - direct

1   Q.      And what is your understanding of how the Unichem

2   ANDA relates to the product that Unichem will ultimately

3   introduce into the market if FDA approved?

4   A.      It's a legal requirement.  I know part of the ANDA is

5   essential from a legal standpoint that what is applied

6   matches the ANDA promises, if I might.

7   Q.      So you indicated you reviewed the Unichem ANDA for

8   particle size specification of apixaban; is that correct?

9   A.      Yes, I did.

10  Q.      I want to direct your attention to DTX-942.  And it's

11  in your binder.  I think it might also pop up on your

12  screen, but you have it in your binder.

13  A.      Okay.  Thank you.  That makes it much easier.  Thank

14  you.

15  Q.      Okay.  And if you could turn to page 2 of DTX-942.

16          Can you identify this document, please?

17  A.      Sure.  This is a letter to the FDA Office of Generic

18  Drugs responding to some questions.  Yes.  A response.

19  Submission of answering some questions I guess on the part

20  of the FDA regarding bioavailability, the drug product, the

21  drug substance in terms of specifications.

22  Q.      And what is the date of this document?

23  A.      August 24th of 2018.

24  Q.      Did you rely on this document in forming your

25  opinions?

Genck - direct

1   A.      Yes, I did.

2   Q.      And I'm going to direct you to, back to your

3   demonstrative, DDX-12-26.

4                   Do you recognize this chart from the

5   document we were just reviewing, DTX-942?

6   A.      Yes.   It was part of a document.

7   Q.      And what does this chart indicate is the particle

8   size specification of the bulk apixaban for the Unichem

9   ANDA?

10  A.      The indication is, and it's called limits, but it's

11  also obviously to the specification, it's calling for D90

12  being between 150 and 1,000 microns.

13  Q.      And what does this chart indicate about the result of

14  the Unichem laboratory's ANDA?

15  A.      Okay.   Well, the indication is, and this is, by the

16  way, for both 2.5 milligrams and 5 milligrams at the

17  specification.   Again, as I said earlier, it's for D90,

18  between 150 and 1,000 microns.

19  Q.      And what are those values that were obtained for the

20  D90?

21  A.      They are three batches listed here and if I might

22  truncate the numbers so that you don't have to spend a lot

23  of time just reading off numbers.

24                  The first batch, if I might, its last four

25  numbers, batch 2629.   A D90 in this case was

Genck - direct

1   416.333 microns.  The second batch, the one listed in the

2   center on the table, is batch 2630.  It has a recorded D90

3   of 509.377 microns.  And then the batch to the far right,

4   which is batch 2631, it is recorded at 90.445 microns.

5   Q.     And what is your understanding of the result for the

6   batch ending in 2631 that identifies the D90 of the bulk

7   apixaban as having a D90 of 90.445?

8   A.     It's my understanding there's a typo here.  That a

9   number had been dropped during the typing, the original

10  typing of this table.

11  Q.     Do you have a basis for this understanding?

12  A.     Yes, I do.  The certificate of analysis for this

13  batch 2631.

14  Q.     So I will direct your attention to DTX-946 and if we

15  can go to page 13 of this document.  And, first, can you

16  tell me what this document is?

17  A.     Yes.  Here again, thank you for bringing it up.

18  Certificate of analysis.  This is referred to as the raw

19  material.  This is, again, for the bulk product prior to any

20  downstream processing.

21         And if we look here at the, to the far right,

22  down one, two, three, four lines down, it has the SAP number

23  and with a batch number, and you notice again this is the

24  batch that I was questioning about the timing and this is

25  the batch that began 2631.

1     And the value that is listed, if you read down

2   further under the D90, the specification again for the 150

3   to 100 microns.  At the bottom you'll find the value, the

4   real value, which was actually measured at the time, was

5   490.445 microns.  So this then is establishing my opinion

6   and finding that the four was dropped off during the

7   original table when it was being created.

8   Q.    Okay.  You relied on this document?

9   A.    Yes, I did.

10  Q.    If we could go back to your demonstrative, DDX-12-26,

11  and so this is the 2631 that is the 49, that says 90.445.

12  This is the one that should read four?

13  A.    Yes.  It should be 490.445 microns.

14  Q.    Could we please take a look at DTX-943.

15        Did you review this document in connection with

16  your opinion?

17  A.    Yes, I did.

18  Q.    And what is this document?

19  A.    It's the -- describing the methodology and the

20  parameters for carrying out the Malvern wet dispersion

21  techniques in order to generate the particle size

22  distribution by means of laser light diffraction.

23  Q.    And if we could go to page 5 of this document,

24  DTX-943-5, what is -- what does this page of this document

25  describe?

Genck - direct

1  A.      This is the -- of course, this would have been

2  developed by the analytical department.  This is the way it

3  works in pharma.

4  Q.      Of Unichem?

5  A.      Of Unichem.  I'm sorry.

6            And this is the actual operating parameters.

7  And you'll note here, it's the Malvern Mastersizer 2000.

8  This was the technique developed by Unichem and being used

9  for the laser light technique using the Malvern, which is

10 the same instrument, the same manufacturer that was

11 referenced in the '945 patent.

12 Q.      Does this document come from the Unichem ANDA?

13 A.      It does.

14 Q.      And the type of testing that Unichem performed in

15 determining D90, is there anything unusual about the method

16 that is disclosed?

17 A.      Not at all.  Very, very typical.  As I mentioned

18 previously, I've been involved with laser light diffraction

19 and usually it's Malvern just by coincidence, the biggest

20 manufacturer.  And having the hundreds of these in terms of

21 techniques that are being used by my client, that this is

22 very -- there's nothing in unusual about the testing

23 parameters that were developed and being used by Unichem in

24 order to generate the data.

25 Q.      I want to direct your attention back to DDX-12-26.

Genck - direct

1    And you recall you testified earlier about the

2    results reported in Unichem's ANDA regarding the $D_{90}$ of the

3    apixaban particles?

4    A.    Yes.

5    Q.    And I want to also now direct your attention back to

6    your demonstrative, DDX-12-9.

7    And you recognize this as claim 12 that we

8    discussed earlier?

9    A.    I do.

10   Q.    Do you compare the test results that were obtained

11   by Unichem regarding the $D_{90}$ of the apixaban to this claim 12

12   limitation of the '945 patent?  What, if anything, can you

13   conclude?

14   A.    The conclusion that those batches that we were

15   referencing, which are in the ANDA, the $D_{90}$ is much, much

16   larger, exceeding the limit of 89 microns or less on the

17   part of the claim.

18   Q.    So, in your view, would a product made in accordance

19   with the Unichem ANDA fall within the scope of claim 12?

20   A.    No, it would not.  Here again, as I said, if I

21   reinforce it again, the $D_{90}$ is -- in the batches that are

22   described in the ANDA, is, when we talk four or five times

23   larger, three to four, five, six, whatever.  Suffice it to

24   say, it's a lot bigger than what is being specified in

25   the claim, which is the $D_{90}$ equal to or less than about

Genck - direct

1    89 microns.

2    Q.    Did you also have your own testing conducted of the

3    Unichem bulk apixaban drug substance?

4    A.    I did for one of the batches, and I -- I didn't

5    realize it when it showed up, but then I realized after the

6    fact that is was actually one of the three batches that is

7    already referenced and we talked about.

8    Q.    Can you please turn to DTX-545 in your witness

9    folder?

10   A.    (Witness complies.)

11   Q.    And can you please identify this document?

12   A.    Sure.

13           That is -- I looked at the methodology that

14   was being used by Unichem in their laboratories on their

15   Mastersizer, and I essentially copied it.  All right?  And

16   because I wanted to do my own testing and I didn't want to

17   deviate from the testing that was being done by Unichem in,

18   I guess in India, in order to generate a size distribution,

19   including the $D_{90}$ for a sample of Unichem's bulk substance.

20   Q.    So did you generate this test protocol?

21   A.    Yes, I did.

22   Q.    And who did you provide this testing protocol to?

23   A.    Certainly.

24           I -- over the years, I have worked with a

25   company that provides -- that has a Malvern; all right?  I

Genck - direct

```
 1    made the choice many years ago not to purchase my own.

 2    They're pretty expensive.  So I ended up dealing with other

 3    companies on it, which I think only makes financial sense.

 4              So I took this technique to a company called

 5    Particle Technology Laboratories who I have dealt with in

 6    the past.  I've known their president and founder for

 7    35 years or so.  And I took this -- among other things, I

 8    took to them, after I received the sample, I took this

 9    testing parameter to a company called Particle Technology

10    Laboratories.

11    Q.    And what was the purpose of this test?

12    A.    I wanted to run, myself, a test to determine what I

13    would get for the particle size distribution.

14    Q.    And did you receive a sample of the apixaban from SAP

15    batch ending in 2671?

16    A.    I did.  It was shipped to me, if I recall, in -- I

17    think I received it in March or so of this year, and it was

18    shipped to me directly from Unichem.

19    Q.    Was this sample in a temperature-controlled

20    container?

21    A.    It was.

22              And to me, it was kind of fascinating the way

23    they --  I mean, I still to this day am not 100 percent, I

24    don't know how they do it, but it comes in by a company

25    called World Courier, and it's got a way of maintaining
```

1    temperature within the container.

2              And it has inside it an interesting -- here

3    again, I didn't look at it very carefully because when we

4    took it out, the World Courier person looked at it, I looked

5    at it and said, yes, looks fine in terms of no temperature

6    excursions, no issue of heating up or cooling down, it would

7    have told you, and then he took it away from me.

8              So whatever that is, it's pretty expensive.

9    Q.    How did you store this sample while it was in your

10   possession?

11   A.    Sure.  I took it and put it in a secured location

12   within my laboratory, which is within my office.

13   Q.    And what did you do next with the sample?

14   A.    After about four or five days -- in the meantime, I

15   had contacted Particle Technology Laboratories to say, when

16   are you available to run this?  I wanted to run it on a

17   Mastersizer 2000.  I knew they had one.

18             So let's say four or five days, I took it up to

19   them.  I delivered to them the sample.  It was a 10 gram

20   sample of material.  I also delivered to them this testing

21   protocol that is actually still up on the screen.

22             I discussed with technicians from Particle

23   Technology Laboratories, this is the procedure I want you to

24   use.  Here is the sample.  Let's take, again, another look

25   at your Mastersizer, even though I had seen it before, let's

1    take a look at your laboratory.

2                Everything looked fine.

3                So they -- and when they looked at this

4    procedure, they thought it's very standard, very typical.

5    Nothing was like, well, you're wrong, you know, we can't do

6    that.  It makes no sense.  No issues from that.

7                So they proceeded to go ahead and do the run.

8    Q.    Did Particle Technology Labs generate a lab report

9    for this sample?

10   A.    They did.

11   Q.    If you could turn to DTX-546 in your witness

12   notebook.

13   A.    (Witness complies.)

14   Q.    Can you identify this?

15   A.    Yes, I can.

16               It is the report issued by Particle Technology

17   Laboratories on the sample that I had given to them.

18   Q.    And is -- can you give the batch number for the

19   sample?

20   A.    Yes.  If I might truncate it.  I hope I'm not

21   confusing anybody.  I'm simply trying to drop off the first

22   numbers, if that is okay, sir.

23               It's the same number, the last four numbers,

24   2631.

25   Q.    Okay.  If we could look at page 2 of DTX-546.

Genck - direct

```
 1              Do you see this has a chart?

 2   A.     Yes, I do.

 3   Q.     Okay.  And what do the -- what does this chart show?

 4   A.     It is showing the results of two runs that were done

 5   on the sample.

 6              And as I offered up earlier, the Laser Tech --

 7   not Laser Tech.  I'm sorry.  The Malvern generates a size

 8   distribution, and it, along with the $D_{90}$, it would also give

 9   you a $D_{10}$ and a $D_{50}$ as a total size distribution.

10              So I didn't simply tell them, no, give me the

11   $D_{90}$ when I gave them this.  I said, I want the full range,

12   okay, which you normally supply.

13              So if you look at that particular product,

14   particle size, data summary, you will see listed there the

15   $D_{10}$, which is 10 percent of the volume is less than that

16   particles of that size;

17              The $D_{50}$, in that case 50 percent of the

18   particles are less than an equivalent spherical diameter of

19   X -- in this case it looked like 154 to 155; and

20              Then, finally, I guess what we're most

21   interested in, is the $D_{90}$ in which, again, the values that

22   were received were -- or generated by Particle Technology

23   Laboratories were 321 microns with a few decimals after

24   that.  And,

25              This is the $D_{90}$ of the sample they ran twice.
```

Genck - direct

1   And again, they emphasize that this is a volume-based value

2   of equivalent spherical diameter.  And as I said earlier

3   that even for a regular particle, it's forcing it into that

4   magical equivalence spherical diameter which is measured by

5   the Malvern.

6   Q.    So if we could turn back to your demonstrative to

7   DDX-12-9.  And, again, this is the same claim 12 we've been

8   discussing.

9          What, in your opinion, do the lab results that

10  you just discussed show with respect to claim 12 of the '945

11  patent regarding the Unichem ANDA product?

12  A.    Certainly.

13          Obviously, the $D_{90}$ of roughly 321 microns is

14  much, much, much larger than the value which is in the claim

15  which is calling for it to be equal to or less than 89

16  microns.

17  Q.    Now, were you in the court earlier in the trial to

18  hear Dr. Berkland provide testimony in this matter?

19  A.    Yes, I was.

20  Q.    And have you reviewed expert reports that he has

21  provided in connection with this matter?

22  A.    I have.

23  Q.    Could you describe for us just very generally your

24  understanding of the steps that Dr. Berkland performs on the

25  Unichem ANDA tablet that he received?

Genck - direct

1   A.      Sure.

2           The testing technique that he used was referred

3   to as SEM-EDS.

4           He received some tablets from I believe three --

5   three different lots from Unichem, and then he used a

6   testing protocol that, in order to use it for the SEM-EDS.

7           And at the beginning of it consists of first

8   breaking the tablets and then scraping out some of the

9   granules that are inside the tablets by the use of a razor

10  blade.

11  Q.      Were all the tablets tested by Dr. Berkland 5

12  milligram tablets?

13  A.      Yes, they were.

14  Q.      Do you recall that he testified that he tested

15  approximately 68 granules that he scraped out of those five

16  tablets?

17  A.      That's correct.  That was the total number of

18  granules that were tested, yes.

19  Q.      And what is your understanding with respect to what

20  Dr. Berkland did with the granules that he shaved from those

21  tablets?

22  A.      Then he prepared it on SEM, okay, which is you've got

23  a person to prepare it with sticky carbon and you've got to

24  put a little bit of gold on it, and then he put that into

25  the SEM device.

1    By the way, scanning electron microscope.  I'm

2    not sure -- I guess we're making the assumption everybody

3    knows about it.  I think they do.

4    And then he ran some of the -- he ran a few

5    granules on this methodology.

6    Q.    Is there a way to calculate the $D_{90}$ from the SEM-EDS

7    method that Dr. Berkland employed?

8    A.    No, not at all.  It's a microscope.  Okay?  The SEM

9    is, it's scanning electron microscope.  Okay?  And being a

10   microscope, you are not able to get a volume.  And I've

11   emphasized all along is that the Malvern is a volume

12   technique.

13   Q.    So did Dr. Berkland perform any quantitative analysis

14   on the granules that he observed?

15   A.    None whatsoever.  I don't think even a number count,

16   nothing, all right, that I could see.  So certainly nothing

17   to do the volume -- a $D_{90}$ as being specified in the patent.

18   Q.    Did Dr. Berkland attempt in his expert reports to

19   determine how many granules were contained in a Unichem ANDA

20   tablet?

21   A.    No, he didn't; included he was asked that on the

22   stand here this week, and he said he did not.

23   Q.    What is your opinion with respect to the number of

24   granules that Dr. Berkland studied?

25   A.    It is minute, and it is not statistically

1  significant.  If one looks at five tablets, out of three

2  large batches, it is very, very small, percentage-wise.

3  Q.    So --

4  A.    Or if you look at 68 granules, it is the same.  It's

5  statistically insignificant.

6  Q.    Was the use of SEM-EDS generally known to those of

7  skill in the art in 2010?

8  A.    Yes, it was, but for different applications.

9  Q.    What types of applications would it have been used

10 for?

11 A.    For example, one of which is simply looking to

12 particle shape.  That you could do if you kind of want to

13 get a feel for porosity.  In other words, how are the

14 particles held together, is there a void volume there?  You

15 could get that.

16        And then if you want to use the EDS

17 capabilities, you could do a little bit of issuing

18 measurement in terms of chemical analysis, but nothing to do

19 with the volume of particles.

20 Q.    Are you aware of any reports in the literature of

21 measuring the D90 equivalent spherical volume of an active

22 pharmaceutical ingredient that had already been formulated

23 into a tablet?

24 A.    No, I'm not.  I certainly was not aware of one in the

25 2010/2011 time frame and I'm not aware of one today.

Genck - direct

1    Q.      Do you recall Dr. Berkland rendered an opinion that

2    all the apixaban particles are distributed on the surface of

3    the granule?

4    A.      I did.

5    Q.      Do you believe that that is a correct assumption?

6    A.      I do not.

7    Q.      Based on your review of the Unichem manufacturing

8    process, do you have an opinion with respect to whether

9    there could be apixaban particles embedded within the

10   granules?

11   A.      It is likely that they are in plain fact.

12   Q.      And what steps in the Unichem manufacturing process

13   would lend themselves to embedding apixaban particles within

14   the granules?

15   A.      Sure.  I see -- there are a number of routes, okay,

16   methods by which that occur.  The first one, we'll just go

17   down the list if that's okay.

18           The first one is the lactose, which is part of

19   the excipient that's quite soluble in water.  And the

20   process that Unichem employs is the addition of water to,

21   during processing, that water being with the surfactant that

22   is being added.  So a fair amount of water that is being

23   added, which it could in turn easily dissolve some of the

24   lactose, could then, as that gets dissolved, it then goes

25   into the bed of the granule and takes with it some of the

1   apixaban particles.

2            The second technique that I could see happening

3   here is the fact that extra granular material is added.

4   So, in other words, after you dried it and then you're

5   going to add extra granular material on top of the granules,

6   and a fair amount.  It's 15 percent of the tablet.  I

7   directly see the likelihood that some of those extra

8   granular materials are going onto the surface of the

9   granules, thus masking the capability of being able to see

10  the apixaban particles.

11           And then, thirdly, you have the compression.

12  You have -- you're going to go ahead and you're making a

13  tablet.  So in making that tablet by means of the

14  compression, you are compressing together the granules,

15  which will then again will, to mask some of the API that's

16  present within the tablet.

17  Q.    Can the SEM-EDS method detect any subsurface apixaban

18  particles that are embedded in granules?

19  A.    That is one of the major deficiencies of SEM-EDS.  As

20  opposed to polarized light microscopy, which I'm quite

21  familiar with, you can't see into the particle.  Other

22  techniques could do it.  It still doesn't get you the volume

23  base.  Okay.  But the SEM can only go -- you'd be lucky if

24  you could see one or two microns below the surface and that

25  might be an exaggeration based upon what I've seen before.

Genck - direct

1    So, no, you can't -- maybe that's the reason why

2    it would be great if all the particles were on the outside

3    because it's recognized that as one of the major

4    deficiencies that are met and the plain fact is I don't

5    think they're all located on the outside.

6    Q.    I want to direct your attention now back to your

7    witness binder to DTX-343.  And I want to first ask you if

8    you recognize this book?

9    A.    Yes.  That's a textbook authored by Henk Merkus,

10   entitled Particle Size Measurements, Fundamentals, Practice,

11   Quality.

12   Q.    Okay.  And did you rely on a chapter in this book in

13   your report?

14   A.    I did.

15   Q.    And I'd like to go to page 10.  Would a person of

16   ordinary skill in the art have been aware of Merkus in the

17   2010/2011 time frame?

18   A.    Yes.  It was published before that.

19   Q.    Do you recall Merkus distinguishing the SEM method

20   from the laser light scattering method?

21   A.    He did, and he -- he was trying to classify particle

22   size distribution measurements by technique, and so he set

23   up classifications that he thought distinguished, and

24   the keyword is distinguished, between the different

25   techniques.

1  Q.      So taking a look at this quote that has been brought

2  out for us here, it reads:  In view of this, compromises

3  have to be made in categorization.  In my opinion, a good

4  way for grouping is:  And then one of the first groupings

5  is, A, fingerprint techniques:  A size-related signal for

6  each individual particle comes from some kind of

7  fingerprint.  Then, the numbers of these signals are

8  classified in size classes.

9            Do you see that?

10 A.      I do.

11 Q.      And is the SEM method that was used by Dr. Berkland

12 identified in this group?

13 A.      Yes.  It's the first one identifying as under

14 microscopy, optical, SEM, TEM, et cetera, and then referring

15 to other chapters within the text that it -- Merkus who

16 obviously is a known expert on this back then, he's

17 classifying the SEM under the fingerprint technique.

18 Q.      And I'd like to direct your attention to page 145 of

19 this document, which is just the very next page.  There you

20 go.

21            And look at the quote at the very end of Section

22 A.  Do you see that, where it says, all of these techniques

23 are counting techniques, since the quantity information

24 comes from the number of fingerprints?

25 A.      Correct.

1    Q.      What would one of skill in the art understand that

2    Group A was directed to?

3    A.      It's a counting technique.  Okay.  And basically

4    what they're really telling us, that you are picking out

5    each particle and very few particles at a time in order to

6    get a fingerprint.  Again, everybody knows that you cannot

7    get a volume by microscopy, so it's simply an idea of

8    location, maybe the size in one or two directions, but that's

9    it.

10   Q.      I want to direct you to another grouping on this same

11   page.  We're going to skip the second grouping and go to C.

12   And it reads, particle-ensemble techniques.

13           Do you see that?

14   A.      Yes, I do.

15   Q.      It states, a set of signals coming from an ensemble

16   of particles is mathematically converted to a best-fitting

17   PSD solution, using some model for particle behavior.

18           So my first question is:  What is the -- what

19   does the acronym PSD stand for?

20   A.      Oh, yes.  That's referring to a particle size

21   distribution.  So you don't get confused, it has nothing to

22   do with this case, but some people refer to this as a CSD,

23   which is crystal size distribution, but this is perfectly

24   acceptable particle size distribution.

25   Q.      Is the laser diffraction method, is that indicated in

1  this particular grouping?

2  A.    It is.   It's the third technique listed under this

3  group of listing by Merkus, under the Group C, which, again,

4  is distinguishing this methodology in general from the

5  methodology from Group A.

6  Q.    And is this laser diffraction, is this the same

7  method that's employed by the Malvern machine and described

8  in the '945 patent?

9  A.    It is.

10  Q.    In your view, are the groupings proposed by Merkus

11  reasonable?

12  A.    They are.   I think importantly, there's the emphasis

13  that they are not the same.   Okay.   Inherent in there as you

14  read the rest of the chapters, and what exactly they're

15  getting out of the different techniques.   Indeed, the

16  results are different and really not comparable.

17  Q.    Now I will turn back to your demonstrative,

18  DDX-12-21, and we talked about this earlier.   This is a

19  quote from the Amidon article?

20  A.    Yes.

21  Q.    We don't have to reread it into the record, but

22  what would a person of ordinary skill in the art have

23  understood about comparing the results of the Malvern laser

24  light scattering and the SEM-EDS method employed by Dr.

25  Berkland?

1   A.      The conclusion is from Merkus and others, things that

2   we've talked about, is that you really can't compare them,

3   and as I said, a result from one method will be different

4   from a result from another method.  And it's the old apples

5   and oranges -- the apple-to-orange comparison, okay, is that

6   they are not -- they're not comparable.

7   Q.      So in your opinion, does Amidon, does this reference

8   accurately reflect the state of the art in 2010?

9   A.      Yes, it does.

10  Q.      I'd like to direct your attention next to D DTX-341

11  in your witness binder.  Do you recognize this document?

12  (DTX-

13  A.      Yes.  The document though was authored by Malvern.

14  In other words, this was -- Malvern, it's entitled basic

15  principles of particle size analysis.  So the interesting

16  thing about this article is that it, again, authored by

17  Malvern.  The machine or the equipment that was utilized in

18  the testing and generation of the data from the '945 patent.

19  Q.      Did you rely on this article in your expert report?

20  A.      I did.

21  Q.      And would this article have been available to a

22  person of skill in the art in the 2010 time frame?

23  A.      Yes, it was.

24  Q.      And I would like to direct you to the second page of

25  this article, DTX-341-2 and direct your attention to the

1   bottom aft the bottom of the left-hand column, which states,

2   each technique is not wrong -- they are all right -- it is

3   just that a different property of the particle is being

4   measured.   It is like you measure your matchbox with a

5   centimeter ruler and I measure with an inch ruler and you

6   measure the length and I measure the width.   Thus we can

7   only seriously compare measurements on a powered by using

8   the same technique.

9                    Do you see that quote?

10  A.      I do.

11  Q.      And what would this quote have informed a person of

12  skill in the art in the 2010/2011 time frame?

13  A.      Again, a reinforcement of the circle, sources that

14  we've already talked about.   Here's Malvern.   Just supply

15  the equipment that was being utilized in the patent,

16  emphasizing that if any serious comparison whatsoever for

17  particle size, you've got to use the same technique.   If

18  not, you have a problem there.

19  Q.      You recall we discussed earlier the method that Dr.

20  Berkland used in his expert report in analyzing the Unichem

21  ADA tablet?

22  A.      Yes.

23  Q.      Sometimes we call that the Berkland method?

24  A.      Yes.   Yes, we do, right.

25  Q.      So does the '945 patent describe the method employed

Genck - direct

1    by Dr. Berkland when he was testing the, as his testing is

2    disclosed in his expert report?

3    A.      No, in plain fact, because he couldn't.  That

4    patent -- that technique, I guess that was developed for

5    this, for this matter, this litigation, was not -- was not

6    known at that time.  Not known, and to this day it's not

7    written about or used.

8    Q.      So in your view, would a person of ordinary skill in

9    the art reading the '945 patent, would they believe the

10   inventors were in possession of what we have described as

11   the Berkland method?

12   A.      There's no way.  It simply did not exist during

13   that time frame.  So I don't know how they could have

14   possibly known about it because it was just -- something

15   came up in the last six months or so, so it's a unique,

16   one-of-a-kind testing method that certainly did not exist

17   back then.

18   Q.      Would a person of skill in the art reading the '945

19   patent be able to derive the method used by Dr. Berkland

20   from either the patent or the literature that was available

21   in 2010 without undue experimentation?

22   A.      For sure.  Let's back up.

23                      First of all, it's never referenced in the

24   patent and, secondly, it was never referenced in the

25   literature as a technique to determine a D90 based upon

1   equivalent spherical diameter utilizing laser light.

2   Q.    So would a person reading the '945 patent be able to

3   derive Dr. Berkland's method from either the patent or the

4   literature that was available in 2010 without undue

5   experimentation?

6   A.    The answer is absolutely not.

7   Q.    Do you have an opinion with respect to the validity

8   of claim 12 of the '945 patent if it is read to encompass

9   finding infringement using the Berkland method?

10  A.    Yes.  My opinion is it's not taught and the Berkland

11  method, if somebody tries to use the Berkland method, that

12  claim is invalid.

13          MS. BROWNING:  I would like to move into

14  evidence DTX-305, DTX-341, DTX-343, DTX-458, DTX-545,

15  DTX-546, DTX-590, DTX-942, DTX-943, DTX-946, DTX-999 and

16  DTX-1001.

17          MS. WIGMORE:  We just have one question about

18  DTX-590.  Was that used?

19          MS. BROWNING:  No, it was not used.  I'm sorry.

20  It was -- that's a claim construction order, so I withdraw

21  that anyway.  It's a pleading.

22          THE COURT:  So you offer the rest of the list,

23  but not 590?

24          (DTX-305, DTX-341, DTX-343, DTX-458, DTX-545,

25  DTX-546, DTX-942, DTX-943, DTX-946, DTX-999 and DTX-1001

Genck - cross

1    were admitted into evidence.)

2              MS. BROWNING:  Thank you.

3              THE COURT:  Those are not objected to?

4              MS. WIGMORE:  That's correct.

5              THE COURT:  Those are admitted.  We're going to

6    take a short break, probably about ten minutes.

7              (Brief recess taken.)

8              *    *    *

9              (Proceedings reconvened after recess.)

10             THE COURT:  Have a seat.  I think we're ready

11   for cross-examination.

12             MS. WIGMORE:  May we hand up a binder?

13             THE COURT:  Yes.

14             MS. WIGMORE:  There's no binder.  Or it's

15   already up there.

16             THE COURT:  All right.

17                       CROSS-EXAMINATION

18   BY MS. WIGMORE:

19   Q.     Good afternoon, Dr. Genck.

20   A.     Good afternoon.

21   Q.     You offered opinions about patent validity here

22   today; correct?

23   A.     Correct.

24   Q.     You did not submit an opening expert report

25   addressing validity; correct?

1    A.      I -- opening report?

2    Q.      Yes.

3    A.      I don't believe an opening report.

4    Q.      You submitted a single expert report during expert

5    discovery in this case; correct?

6    A.      I thought I had a rebuttal, but -- single expert.

7    I'm sorry.  Forgive me.  Yes.

8    Q.      So it was a single report, and the title was,

9    "Rebuttal of Noninfringement Expert Report of Defendant

10   Unichem's Expert Witness Wayne J. Genck, Ph.D."; correct?

11   A.      I believe so.

12   Q.      Your opinions about noninfringement focus on a single

13   claim limitation; correct?

14   A.      That's correct.  It was the one I believe that was

15   outlined previously by agreement.

16   Q.      The only claim limitation Unichem disputes is the $D_{90}$

17   particle size limitation; correct?

18   A.      That's correct.

19   Q.      Unichem does not contest that its proposed ANDA

20   products contain crystalline apixaban particles; correct?

21   A.      Yes.  I don't know what somebody else would be

22   saying, okay, about the case, but as far as I'm concerned, I

23   have not been involved in that discussion or not -- or that

24   analysis.

25           So if another expert is saying something about

1   it, they may be.  So it would not be fair, I don't think,

2   for me to speak for other experts of which I don't know what

3   they're saying.

4               MS. WIGMORE:  Okay.  Let's pull up the pretrial

5   order Uncontested Fact No. 75.

6   BY MS. WIGMORE:

7   Q.    It says, "Unichem's proposed ANDA products contain

8   crystalline apixaban particles."

9               Do you see that?

10  A.    I do.

11  Q.    Now, turning to the '945 patent, JTX-2.  You

12  understand, and you testified on direct, that claims 21 and

13  22 depend on claim 12; correct?

14  A.    Correct.

15  Q.    And let's look at claim 12.

16              It requires a pharma -- a solid pharmaceutical

17  composition; correct?

18  A.    It does.

19  Q.    And a person of skill in the art, reading the claims,

20  would understand that it refers to a finished drug product;

21  correct?

22  A.    Correct.

23  Q.    And looking at the particle size limitations, the

24  claim itself does not recite a particular size measuring

25  technique; correct?

1    A.     The claim itself does not, no.  It's only in the

2    specification.

3    Q.     It does not refer to laser light scattering; correct?

4    A.     That's correct.

5    Q.     It does not refer to bulk apixaban particles;

6    correct?

7    A.     That's correct.

8    Q.     And can we agree that a tablet is a solid

9    pharmaceutical composition?

10   A.     We can.

11   Q.     Now, Dr. Genck, you submitted a declaration during

12   claim construction in this case; correct?

13   A.     I did.

14   Q.     And in your declaration, you suggested that this $D_{90}$

15   limitation should be construed as "$D_{90}$ as measured by laser

16   light scattering such as Malvern light scattering of bulk

17   apixaban particles."  Correct?

18   A.     I did.

19   Q.     And in your declaration you stated that:  "Laser

20   light scattering is unsuitable for testing API particle size

21   once the API has been formulated into a solid pharmaceutical

22   composition."  Correct?

23   A.     Exactly.  It can only be used for the API.  And no

24   technique, that I'm aware, can be used for -- to give it

25   similar results as a Laser Tech $D_{90}$ in a finished product.

Genck - cross

 1    I'm not aware of any.

 2    Q.      So just -- I want to take sure we're clear on what

 3    you said during claim construction.

 4            You said that the laser light scattering

 5    technique is unsuitable for testing API particle size once

 6    the API has been formulated into a solid pharmaceutical

 7    composition.

 8    A.      Correct.

 9    Q.      Was that the opinion you gave?

10    A.      That, plus any other technique I'm aware of.

11    Q.      Now, you suggested in claim construction that

12    the claims be interpreted to require using laser light

13    scattering to measure the particle size of bulk apixaban

14    particles; right?

15    A.      Correct.

16    Q.      And you are aware that the Court issued a claim

17    construction order; correct?

18    A.      Yes, I am.

19    Q.      And your --

20    A.      I want to make sure that, the plain and ordinary

21    meaning?

22    Q.      Yes.

23    A.      Yes, I just want to make sure that we're -- I'm not a

24    lawyer.  Okay?

25    Q.      Okay.

1194

Genck - cross

```
 1   A.      So I just want to make sure we're referring to the

 2   proper position -- location in all the proceedings.

 3   Q.      I understand you're not a lawyer, but you do

 4   understand that the claim is construed in a case when you

 5   are --

 6   A.      Well, maybe what you should do --

 7   Q.      Let me finish the question.

 8   A.      -- is show me what --

 9   Q.      I need to finish my question.

10           THE COURT:  Doctor, let her finish her question.

11           THE WITNESS:  My apologies.  I was not trying to

12   talk over you.

13   BY MS. WIGMORE:

14   Q.      Okay.

15           You understand that a claim is construed and

16   that construction is applied in assessing infringement;

17   right?

18   A.      Correct.

19   Q.      And you understand that the construction that you

20   proposed was not accepted; correct?

21   A.      Was not?

22   Q.      Was not accepted.

23   A.      I guess not.

24   Q.      And you understand that the term "apixaban particles

25   has a $D_{90}$" has been construed as having its plain and
```

1    ordinary meaning; correct?

2    A.    That's correct.  I'm not in a position to argue with

3    that.  Okay?  The Judge has made that decision so that, to

4    me, is a legal decision.

5    Q.    And if we turn --

6    A.    That is a legal decision.

7    Q.    If we turn to DTX-612, the claim construction order

8    at page 10.

9          The -- at page 10.

10         The first full paragraph, first sentence says:

11   "Nothing in the patent requires particle size to be measured

12   one and only one way, in particular only by a laser light

13   scattering method using only bulk apixaban particles, as

14   Unichem contends."

15         Did you see that?

16   A.    I see that.

17   Q.    And you were aware of that opinion when you prepared

18   your expert report in this case; correct?

19   A.    I was aware of that opinion, but I'm not necessarily

20   saying that because it is an opinion, that I'm going to

21   agree with it as a person -- a person of ordinary skill in

22   the art.

23   Q.    Okay.  So it remains your opinion that the only

24   particle size testing method that is claimed by the '945

25   patent is one that measures the particle size of bulk

1    apixaban API using laser light scattering; correct?

2    A.    That is correct, and several reasons for that.

3          The first one being --

4    Q.    I'm not asking you for reasons.  I'm just asking you

5    is that still your opinion even after --

6    A.    It's still my opinion since nothing was ever tested

7    in the granule or tablet.

8    Q.    Okay.  So that is the opinion you applied in

9    assessing infringement; correct?

10   A.    The opinion I applied had to do with, as a person of

11   ordinary skill in the art, interpreting what the patent is

12   teaching what they would conclude for the method of

13   measurement.

14   Q.    So in assessing infringement, your interpretation

15   was that to prove infringement, you must measure the bulk

16   apixaban API using laser light scattering; correct?

17   A.    Correct, because that's the only way to measure it.

18   You can't -- it's physically impossible to measure it in a

19   powder product.

20   Q.    Now, you had some testing conducted under your

21   direction in this case; correct?

22   A.    Correct.

23   Q.    So the only testing you had done involved testing

24   Unichem's starting API, what you called a bulk apixaban API;

25   correct?

Genck - cross

1   A.      Correct.

2   Q.      Now, you also relied on testing from Unichem's ANDA;

3   correct?

4   A.      Correct.

5   Q.      And that testing, again, only tested the particle

6   size of Unichem's bulk apixaban API; correct?

7   A.      Correct.  Just as the testing that was done in the

8   patent, only on the bulk.

9   Q.      And we'll come to that.

10          But in terms of your testing, you did not

11  conduct any testing on the apixaban in Unichem's final ANDA

12  products; correct?

13  A.      No, I didn't.  I saw no need to do it.

14  Q.      Okay.  You've been retained by Unichem in this case;

15  right?

16  A.      Correct.

17  Q.      You could have asked for samples of Unichem's final

18  ANDA products; right?

19  A.      I could have, but it would have -- I concluded --

20  could I have?  Yes, but it would have been a waste of time

21  because I knew that it's not possible to measure it and get

22  a $D_{90}$ as specified or as measured in the specification of the

23  patent.

24  Q.      You did not even try to do that, did you?

25  A.      Well, there's no reason to do it.

Genck - cross

1    If the thought occurred to me, I usually would

2    have said why.  It's physically impossible.  Nobody teaches

3    it.  Nobody taught it then, nobody taught it today.  So why

4    would you request for something in which it's going to be

5    totally worthless?

6    Q.    Now, Dr. Berkland rendered an opinion about the

7    particle size in Unichem's ANDA products, the final tablets;

8    correct?

9    A.    A particle size, but not a $D_{90}$.

10   Q.    Dr. Berkland tested the material from the final

11   Unichem tablet.

12         Can we agree on that?

13   A.    From what, the five tablets you're talking about?

14   Q.    Yes.

15   A.    Yeah, the five tablets.  Yes, right.

16   Q.    And you did not test anything from the final tablets;

17   correct?

18   A.    No.  Again, sorry to be redundant, but it would have

19   done no good.  The test results would be totally not

20   comparing apples -- apples and oranges.  It's as simple as

21   that.

22   Q.    So you limited all of the testing you relied on in this

23   case to Unichem's starting API; correct?

24   A.    You mean all the testing that I did?

25   Q.    That you relied on.  So it was the testing that you

1    had done, and the testing from the Unichem ANDA; right?

2    A.      That's correct.  That's because that is what was

3    tested in the patent.

4    Q.      Now, you are generally familiar with Unichem's

5    manufacturing process; correct?

6    A.      In general, yes.

7    Q.      Unichem uses crystalline apixaban as the starting API

8    in its manufacturing process; correct?

9    A.      I'm sorry, we disagree.  Could you just repeat it?

10   Q.      Sure.

11           Unichem uses crystalline apixaban as the

12   starting API in its manufacturing process; correct?

13   A.      I believe they do, yes.

14   Q.      And that is what you refer to as the bulk apixaban

15   API; right?

16   A.      That's correct.

17   Q.      Unichem's bulk apixaban API is dissolved during its

18   manufacturing process; correct?

19   A.      It is.

20   Q.      And then that solution, the dissolved apixaban, is

21   sprayed over excipients to form granules; correct?

22   A.      I just want to make sure.  You don't have to bring up

23   the sketch, okay?  So I'm just thinking about it.

24           Yes, that's my understanding.

25   Q.      Now, you would agree that the apixaban that is being

Genck - cross

1    sprayed on the intragranular excipient is not in the same

2    form as it was when it was bulk apixaban API; correct?

3    A.    What do you mean by "form"?

4    Q.    It is not in the same crystalline form as it was when

5    it was -- let me ask the question again.

6          You would agree that apixaban that is being

7    sprayed on the intragranular excipient in Unichem's process

8    is not in the same form of crystalline as it was when it was

9    bulk apixaban API; correct?

10   A.    Form crystalline?  I'm sorry.

11   Q.    Yes.

12   A.    If you could just -- one more -- what is throwing me

13   off is when you are saying the form of crystalline.  Okay?

14         If you could just -- I'm not trying to be

15   difficult.  If you could please say it one more time?

16   Q.    Maybe this would help.  Let's bring up your

17   deposition from June 28th, page 80, line 11 to 18.

18   A.    Um-hmm.

19   Q.    "Question:  If we go back to this granulation step,

20   step 6, that is on page 369, the -- you would agree that

21   the apixaban that's being sprayed on the intragranular

22   excipients is not in the same form as it was -- bulk

23   apixaban API" -- "as it was when it was bulk apixaban API;

24   is that correct?

25         "Answer:  That's correct."

Genck - cross

1              Were you asked that question and did you give

2     that answer in your deposition?

3     A.     Okay.  I'm just trying to find it, okay?  It's been

4     flipped around very fast, okay?

5     Q.     Okay.

6     A.     There we go.  First time I've seen it since --

7     Q.     Okay.  I'll read it again.  Sorry.

8     A.     Sure.

9     Q.     Okay.

10              "Question:  If we go back to this granulation

11    step, step 6, that's on page 369, the -- would you agree

12    that the apixaban that's being sprayed on the intragranular

13    excipients is not in the same form as it was when it was

14    bulk apixaban API; is that correct?

15              "Answer:  That's correct."

16              Was that your testimony?

17    A.     It was.  And I agree with that.

18    Q.     Okay.  Now, you did not analyze, as we talked about,

19    any Unichem tablets as part of your report; right?

20    A.     I did not.

21    Q.     You did not perform any SEM imaging on Unichem's

22    tablets; right?

23    A.     No, I saw no need to.

24    Q.     Now, you said that the method used by Dr. Berkland

25    was not known at the time of the invention.

1          Do you recall that?

2    A.     That's correct, in order to determine the $D_{90}$.

3    Q.     Now, Dr. Berkland used SEM; correct?

4    A.     Yes.

5    Q.     SEM was known at the time of the invention; correct?

6    A.     The SEM was known for use for other applications, not

7    for this application.

8    Q.     And Dr. Berkland used EDS; correct?

9    A.     Correct.  Yes, it was used for chemical

10   identification.  Again, totally unrelated to trying to get a

11   $D_{90}$.

12   Q.     EDS was used at the time of the invention and known

13   in the art; correct?

14   A.     Correct.

15   Q.     And you would agree that the combination of SEM

16   imaging with EDS was a technique that was available to a

17   person of skill in the art as of 2010; correct?

18   A.     Depends on the application.  Like, when you say known

19   for what?

20   Q.     Was it a known technique for measuring particle size?

21   A.     It was not.

22   Q.     You're saying --

23   A.     Not, not for a $D_{90}$.

24   Q.     I'm not asking about a $D_{90}$.

25   A.     What particle size are you referring to?

1   Q.    Was SEM available to analyze particle size back in

2   2010?

3   A.    What type of particle size?

4   Q.    Any type of particle size.

5   A.    You mean just a number count?

6   Q.    To observe a particle size.

7   A.    Just a number count, is that what you are referring?

8   I want to make sure when you say particle size that we're on

9   the same page.

10  Q.    Okay.

11  A.    Okay.

12  Q.    I'm talking --

13  A.    Are you talking about any particle size?

14  Q.    Yes.

15  A.    Okay.  Yes.  It could be used for some particle size

16  such as numbers and the like, but the problem we're talking

17  about, I have 50 years of this --

18  Q.    Doctor, I need an answer to my question.

19  A.    I need to clarify what you are referring to as

20  particle size.

21        THE COURT:  Doctor, she does not want the

22  clarification.

23        THE WITNESS:  It can be used for some types of

24  particle size.

25  BY MS. WIGMORE:

Genck - cross

1    Q.      Okay.

2    A.      All right.

3    Q.      Now, you say it's impossible to measure the D90 in

4    the final tablet; is that right?

5    A.      Correct.

6    Q.      But you did not even try; right?

7    A.      Because I know it's impossible.

8    Q.      All right.  Now, you offered the opinion that

9    apixaban particles could seep in as part of Unichem's

10   process and become embedded in the granules; is that

11   correct?

12   A.      Correct.

13   Q.      You testified on direct that that was likely.

14           Do you recall that?

15   A.      Correct.

16   Q.      Now, that is a theory that you have; right?

17   A.      Well, I've heard a few theories since I've been

18   around this week.  Yes, it is a theory.

19   Q.      Okay.

20   A.      That is my theory.  Highly likely because of the

21   solubility of the lactose.

22   Q.      You did no testing on the Unichem tablet to confirm

23   your theory, did you?

24   A.      No.  As I said, my theory is very likely.

25   Q.      You did not break apart any granules from Unichem's

1   tablet to analyze the contents, did you?

2   A.      That's correct.

3   Q.      You did not look at the granules under a microscope;

4   is that correct?

5   A.      No, I did not.

6   Q.      You did not use polarized light microscopy which you

7   referred to on direct; is that correct?

8   A.      No, I did not.

9   Q.      You did not use any other technique to assess the

10  contents of the granules; is that correct?

11  A.      That's correct.

12  Q.      You have no experimental evidence of any subsurface

13  apixaban particles in Unichem's ANDA product; is that

14  correct?

15  A.      You are talking experimental evidence?

16  Q.      Yes.

17  A.      There's no experiment, but my theory I believe is

18  very strong, all right, and I believe very strongly in, the

19  same thing, in that theory, because it's entirely possible

20  for that mechanism to occur.

21  Q.      I understand, Dr. Genck, but I need an answer to my

22  question.   You have no experimental evidence of any

23  subsurface apixaban particle in Unichem's ANDA product?

24  A.      That's correct.

25  Q.      Now, you don't know what the particle size is of any

1  apixaban particles that are included in Unichem's tablet; is

2  that correct?

3  A.      That are included did you say?

4  Q.      Yes.

5  A.      I'm sorry.  Just repeat it one more time.  One of the

6  words -- I wanted to make sure we're on the same page as

7  included.

8  Q.      You don't know what the particle size is of any

9  apixaban particles that are included in Unichem's tablets;

10  is that correct?

11  A.      Now, I'm sorry, sir.  I'm not trying to -- when

12  you say -- I want to make sure when you say included, are

13  you talking about inclusions or -- what do you mean by

14  included?

15  Q.      So you don't understand that question.  Is that your

16  testimony?

17  A.      No.  I deal all the time with particles.

18  Q.      Okay.

19  A.      We talk about inclusions.  Okay.  Sorry.

20  Q.      Let's go to your deposition from June 28th, page 58,

21  line 12 to 16.

22          Do you have that in front of you?

23  A.      I'm there.

24  Q.      "Question:  And you don't know what the particle size

25  is of any apixaban particles that are included in Unichem's

Genck - cross

1    tablets; correct?

2                   "Answer:   That's correct.   I do not know what

3    the D90 is."

4                   Was that your testimony?

5    A.      That's perfectly fine because you clarified for what

6    was being, my confusion of what was the word included then

7    and whether or not you are using the same word.

8    Q.      Okay.

9    A.      And I'm sorry.   I deal with liquid inclusions and the

10   like, so that's where I want to make sure again that there

11   was no confusion.

12   Q.      Okay.   So just so we're clear, you have no opinion

13   regarding the D90 of the apixaban that is in Unichem's

14   tablets; is that correct?

15   A.      That's correct.

16   Q.      You have no evidence that the particle size of

17   Unichem's bulk apixaban API is the same as the particle size

18   of crystalline apixaban in the final Unichem ANDA product;

19   is that correct?

20   A.      One last time, please?

21   Q.      You have no evidence that the particle size from the

22   bulk apixaban API is the same as the particle size from the

23   final Unichem ANDA product?

24   A.      That's correct.

25   Q.      Now, you offered testimony today about the laser

1   light scattering discussion in the '945 patent.

2            Do you recall that?

3   A.      Correct.

4   Q.      Let's turn to column 5 of the '945 patent, JTX-2, and

5   I want to direct your attention to the sentence beginning in

6   column 5, line 15.  It says, it will be appreciated by those

7   skilled in the art of manufacturing and granulation

8   processes that there are numerous known methods which can be

9   applied to producing apixaban solid dosage forms.

10           Do you see that?

11  A.      Yes, I see it.

12  Q.      And if you turn below that, do you see that there is

13  a description of, an example of how to make the apixaban

14  that's described in the patent in lines 27 to 63 of column

15  5.

16           Do you see those manufacturing processes that

17  are exemplified in the '945 patent?

18  A.      I do, but my only struggle with this, your question

19  was how to make the apixaban.

20  Q.      I will state to manufacture, the manufacturing

21  processes.  If I read -- strike that.

22           The sentence at about line 28 says, thus, the

23  invention provides a drug product manufacturing process,

24  comprising the steps, and then it lists some ways to make

25  the composition described in the patent; is that correct?

1  A.      It does.  And my confusion is when you said make the

2  apixaban.

3  Q.      Okay.

4  A.      That was your first question.  Sorry.

5  Q.      I apologize.  So these particular methods do not

6  involve completely dissolving the crystalline apixaban

7  starting material as part of the manufacturing process; is

8  that correct?

9  A.      I haven't done the calculation on how much water is

10  present for the wet granulation.

11  Q.      Do you see there's a dry granulation process

12  described here in the patent; is that correct?

13  A.      And also a wet.

14  Q.      Talking about the dry granulation?

15  A.      Okay.

16  Q.      With respect to that process, that does not involve

17  dissolving crystalline apixaban starting material; is that

18  correct?

19  A.      That's correct.

20  Q.      And you testified about the manufacturing process

21  used by BMS.

22          Do you recall that?

23  A.      By BMS?

24          MS. BROWNING:  Objection.  I think that's beyond

25  the scope of his direct testimony, the manufacturing process

1   of BMS.

2           MS. WIGMORE:  He referred to the deposition

3   testimony of Doctor Patel who was discussing the BMS

4   manufacturing process.

5           MS. BROWNING:  He did not refer to that in his

6   direct testimony today.

7           MS. WIGMORE:  We saw the clip of the testimony

8   on the screen.

9           THE COURT:  With the witness?

10          MS. BROWNING:  He might have been in the

11  courtroom when the deposition was played, but he did not

12  discuss it on his direct testimony.

13          MS. WIGMORE:  Let me ask it this way.

14          THE COURT:  Okay.

15          MS. WIGMORE:  To cut through this.

16  BY MS. WIGMORE:

17  Q.      Do you understand, you offered testimony that laser

18  light scattering is used as part of the inventor's

19  discussion in the patent.

20          Do you recall that?

21  A.      Yes, I do.  That it was -- I think I asked, it was

22  talked about eight or nine times or so as the method used to

23  get the data on the bulk API.

24  Q.      And you understand that laser light scattering was

25  used in connection with a dry granulation process in that

1    example; is that correct?

2    A.    Say it again.

3    Q.    The laser light scattering method that is discussed

4    in the example of the patent that you discussed was in the

5    contexts the of a dry granulation manufacturing process;

6    right?

7    A.    I believe a laser light scattering technique was in

8    context with what the bulk API is going into the granulator,

9    granulation, the beginning material.

10   Q.    Okay.  And that beginning --

11   A.    Not what -- not what the value is after granulation.

12   What is the size after granulation, because it simply

13   wouldn't work.  You can't do it.

14   Q.    But can we agree in a dry granulation process, the

15   bulk API is not being dissolved?

16   A.    No, it's not.

17   Q.    So we agree; is that correct?

18   A.    Correct.

19   Q.    Okay.  Now, referring to the next column of the

20   patent, column six, do you recall being asked about the

21   portion beginning at line 15 of column 6 during your direct

22   examination?  And there's a sentence there that says in the

23   example below in line 17.

24        Do you recall discussing that on direct

25   examination?

                            Genck - cross

1    A.      I guess the part -- yeah.  The part that's confusing

2    me is the sentence above there.

3    Q.      Okay.

4    A.      Talking about average particle size.

5    Q.      Okay.  But --

6    A.      Which is not the D90.

7    Q.      Okay.

8    A.      But be blunt.  Sorry.

9    Q.      So Ms. Browning read the sentence, in the examples

10   below, the particle size for apixaban drug substance was

11   measured using a Malvern particle size analyzer.

12           Do you recall that?

13   A.      I do.

14   Q.      If we go down in the same column to lines 50 and 51,

15   it says, the invention is further exemplified and disclosed

16   by the following non-limiting examples.

17           Do you see that?

18   A.      I see it.

19           MS. WIGMORE:  You can take that down.

20   BY MS. WIGMORE:

21   Q.      You have offered no opinion as to whether the

22   particle size for the five milligram Unichem product would

23   be any different than the particle size for the 2.5

24   milligram Unichem product; correct?

25   A.      Correct.

1  Q.      Now, is it your testimony that laser light scattering

2  is the only technique that provides an equivalent spherical

3  diameter?

4  A.      It is, it is my testimony that the laser light, the

5  Malvern laser light scattering device is a unique D90 based

6  upon equivalent spherical diameter.

7  Q.      Is it the only technique that gives an equivalent

8  spherical diameter?

9  A.      It's the only technique that gives equivalent

10 spherical diameter as measured by laser light scattering.

11 Q.      Maybe my question isn't clear.  I'm asking if laser

12 light, laser light scattering is the only technique that can

13 be used to get an equivalent spherical diameter.

14 A.      You can get one but it will not compare to the

15 Malvern.

16 Q.      Let's go to DTX-343.  This is the Merkus reference

17 you discussed on direct examination and I would like to

18 turn to the page with Bates number, ending in Bates number

19 2933.

20        There's a sentence that begins at the bottom of

21 that page and then carries over onto the next, so if we

22 could pull that up, the sentence beginning, particle size

23 measurement.

24        It says, particle size measurement techniques

25 are based on a variety of principles, such as visual or

1  microscopic observation, laser light scattering, and then a

2  number of other techniques are listed.

3            Do you see that?

4  A.    I see it.

5  Q.    It does mention microscopic observation.

6  A.    Right.

7  Q.    Do you see that?

8  A.    Right.

9  Q.    And SEM is a type of microscopic observation; is that

10  correct?

11  A.    It is.

12  Q.    And if we turn to the next sentence, it says, each

13  technique yields a characteristic size or a size

14  distribution of equivalent spheres, which -- for

15  non-spherical particles -- is dependent on the measurement

16  principle.

17            Do you see that?

18  A.    I see that.

19  Q.    And this is a reference that you relied on in forming

20  your opinions; is that correct?

21  A.    It doesn't change my opinions at all.

22  Q.    All right.  So let's take that down.

23            It's your opinion that measurements between

24  different particle size measuring techniques cannot be

25  compared.  Is that your testimony?

Genck - cross

A.      **Mine, mine, and also the references in terms of**
**Malvern's own article that they wrote.  They -- it was my**
**opinion I expressed during trial here that if you came up**
**with what you believe is a D90 based upon different**
**techniques and you say it's the same value, okay, it's the**
**same 89 microns, okay, based upon different techniques, in**
**reality, they are not the same.  And they will not have the**
**same dissolution capabilities.**

Q.      **Now, you'd agree there are equation methods and/or**
**algorithms that may reconcile or interconvert particle size**
**measurement results from other techniques with laser light**
**scattering techniques results; is that correct?**

A.      **They -- and there are techniques and I have attempted**
**to use them and I can tell you that they did not work.**

Q.      **Let's turn to your expert report, paragraph 114.  It**
**says, while there are equations, method and/or algorithms**
**that may purportedly reconcile or interconvert particle**
**size measurements results from other measurement techniques**
**with laser light scattering technique results, Dr. Berkland**
**does not mention nor use any such techniques.**

        **Do you see that?**

A.      **I see it.**

Q.      **You agree those techniques exist; is that correct?**

A.      **As I said, based upon they do exist, but they are**
**fraught with error because you're, in reality, you're not**

 1    going to have the same particle size distribution.

 2    Q.      Now, the testing of the Unichem bulk drug API on

 3    which you relied was performed by particle technology

 4    laboratories; is that correct?

 5    A.      Correct.

 6    Q.      And Unichem's ANDA also contains particle size

 7    testing on Unichem's bulk drug apixaban; correct?

 8    A.      Correct.

 9    Q.      Now, for at least one batch, the $D_{90}$ results that

10    Particle Technology Laboratories obtained are different from

11    what is reported in Unichem's ANDA; correct?

12    A.      They have different D values than $D_{90}$s, and well

13    within the experimental error.

14    Q.      Okay.  So let's pull up paragraph 69 of your expert

15    report, and I direct your attention to the results for batch

16    2010002631 of Unichem's bulk apixaban API.

17              Now, the Unichem's ANDA reports a $D_{90}$ for that

18    batch of approximately 490 microns.

19              Do you see that.

20    A.      I see it.

21    Q.      And now let's turn to paragraph 80 of your report.

22              For that same batch, the Particle Technology

23    Laboratories obtained a $D_{90}$ of 321 microns.

24              Do you see that?

25    A.      I do.

1   Q.      And the $D_{90}$ results between those two tests, the same

2   laser light scattering test, varied by more than

3   150 microns; correct?

4   A.      Correct.

5   Q.      And those differences were not surprising to you;

6   correct?

7   A.      Not in the least, having -- having ran Malvern's,

8   Arreba's, Microtrac's for the last 30 years, having it ran

9   actually even by the same technician with the same piece of

10  equipment, within five minutes you are going to get

11  different values.  It is -- this is not unusual at all.

12  Q.      Okay.  So you understand that there can be

13  differences between results from a sample run on the same

14  instrument, at same parameters and conditions; correct?

15  A.      Yes, and the differences in this case, of course,

16  they're all well above $D_{90}$ of 89 microns.

17  Q.      And so for you, that was enough, just that they were

18  sufficiently above the limit that you didn't need to worry

19  about the difference?

20  A.      Well above.  As I know fully well having ran this as

21  I said, or having it ran or having it -- watched it on the

22  part of my clients, not unusual at all.

23          For example, a company could run it in-house,

24  run it by the Malvern, ship it off to an outside laboratory

25  and those values will not be the same.

Genck - cross

1   Q.      Okay.  But that didn't change or affect your opinion

2   in any way; right?

3   A.      No.

4   Q.      Because the number, in your view, is so far from the

5   claimed threshold that you were comfortable; right?

6   A.      Well, I wasn't trying to look for a value.  These are

7   the reported values, okay?  I wasn't trying to force a

8   value.

9           All I'm simply saying is that they are -- the

10  fact that they are differences, it could be the mixer, it

11  could be -- I know the rpms or is the stirrer worn out?

12  There are just many reasons why, comparing two, a Malvern in

13  India versus a Malvern in Downers Grove, Illinois, you're

14  likely to get different results.

15  Q.      But you still consider the testing reliable; is that

16  right?

17  A.      Well, reliable to say that these are large particles,

18  yes.  That was the thing I was interested in.  Am I going to

19  get a much lower value or not?  And I was convinced that

20  this was a number which was reasonable compared to what the

21  two laboratories had come up with.

22  Q.      And the number here was so far above the 89 micron

23  threshold that you weren't concerned about the discrepancy

24  between the two tests?

25  A.      There was no discrepancy as far as I'm concerned.

Genck - redirect

1  You see it all time.

2  Q.    And just so we're clear, the testing that we're

3  talking about is all on the Unichem bulk apixaban API;

4  right?

5  A.    That's correct.

6  Q.    And that's the material that's dissolved before the

7  manufacturing process leads to the Unichem tablets?

8  A.    Right.  Both laboratories, both Unichem and also

9  Particle Technology Laboratories, were testing bulk material

10  by means of a Mastersizer 2000.

11            MS. WIGMORE:  Thank you.  No further questions.

12            THE COURT:  Any redirect?

13            MS. BROWNING:  Yes.  Thank you, Your Honor.

14                  REDIRECT EXAMINATION

15  BY MS. BROWNING:

16  Q.    Dr. Genck, you're aware that the Court construed the

17  claim term $D_{90}$; correct?

18  A.    Yes, I am.

19  Q.    And I think we have established this, but you're

20  aware that the Court gave it its plain and ordinary meaning?

21  A.    Correct.

22  Q.    And is that the definition that you applied when you

23  rendered your opinions in this case?

24  A.    It is.

25  Q.    Are you aware of anything in the literature, any

1 reference, any publications, or in the patents, that used

2 the Berkland method to determine a $D_{90}$?

3 A.      Not at all.  It's as I said, that's a one-offer, the

4 Berkland method, which was developed within the last year,

5 six months for this particular litigation.

6 Q.      And you testified that there are equations or

7 algorithms that you can use to convert the measurements from

8 one way to measure a particle size to another way to measure

9 a particle size; correct?

10 A.      Correct.

11 Q.      But in this case, are you aware of Dr. Berkland

12 actually using any of those algorithms to try to convert his

13 measurements to a $D_{90}$?

14 A.      Not at all.  It wasn't even discussed on his part,

15 no.

16            MS. BROWNING:  No further questions.  Thank you.

17            THE COURT:  Okay.  Thank you.  You can step

18 down, Doctor.  Thank you very much.

19            THE WITNESS:  Thank you.

20            THE COURT:  I'll ask you all to come retrieve

21 the binders.

22            Where are we?  Do you all want to keep going?

23            MR. PEJIC:  We're certainly not going to finish

24 with the next witness.

25            THE COURT:  If you would like to start, that's

1    fine with me.

2              MR. PEJIC:  I think everyone is in agreement

3    we'll get started.

4              THE COURT:  All right.

5              MR. LEE:  Your Honor, I just want to remind you

6    that Dr. Kowey, the cardiologist, needs to testify first

7    tomorrow.

8              THE COURT:  Okay.

9              MR. LEE:  He'll be ready at 8:30.

10             THE COURT:  Right, okay.  If everybody

11   understands that, that's fine.

12             MR. PEJIC:  Okay.  So --

13             THE COURT:  We'll just interrupt wherever we are

14   with this witness.

15             I can't stay past 7:00 today, and then we'll

16   start at 8:30 tomorrow with the witness that was just

17   mentioned, and we'll pick up with this witness that you are

18   about to call.  Understood?  Is that okay?

19             MR. PEJIC:  It seems okay.  Yes, Your Honor.

20             THE COURT:  All right.  Then we'll proceed that

21   way.

22             MR. PEJIC:  Unichem would like to call Dr. Walt

23   Chambliss.  I guess actually all defendants will be calling

24   Dr. Walt Chambliss on the issues of the invalidity of the

25   '945 patent.

```
 1                    THE COURT:  Okay.  Thank you.

 2                    MR. PEJIC:  May I approach?

 3                    THE COURT:  Yes.

 4                    (Binders passed forward.)

 5                    ... DR. WALTER G. CHAMBLISS, JR., having been

 6     first duly sworn, was examined and testified as follows ...

 7                    THE COURT:  Thank you.  Good evening,

 8     Dr. Chambliss.  You can have a seat.

 9                    THE WITNESS:  Thank you.

10                    THE COURT:  You may proceed when you are ready.

11                         DIRECT EXAMINATION

12     BY MR. PEJIC:

13     Q.     Good afternoon, Dr. Chambliss.

14     A.     Good afternoon.

15     Q.     Could you please introduce yourself to the Court?

16     A.     Yes.  I'm Walter Galloway Chambliss, Jr.  I live at

17     43 West Carlos Road, Memphis, Tennessee  38117.

18     Q.     Have you been retained by the defendants in this case

19     to provide opinions as to the invalidity of the '945 patent?

20     A.     Yes, I have.

21     Q.     Are you being compensated for your services in this

22     litigation?

23     A.     Yes, I am.

24     Q.     Does your -- strike that.

25                    Does your compensation depend upon the
```

1    substances of your testimony or the outcome of the

2    litigation?

3    A.      No, it does not.

4    Q.      Did you prepare some demonstratives to assist the

5    Court in your testimony?

6    A.      Yes, I did.

7              MR. PEJIC:  Could we please put up DDX-14-2.

8    BY MR. PEJIC:

9    Q.      Please tell us about your education.

10   A.      I got a bachelor's degree in pharmacy from the

11   University of Mississippi, 1977.

12              I then practiced pharmacy both in retail and

13   hospital, and went back to the University of Mississippi.

14   Got my master's in pharmaceutics in 1980, and a Ph.D. in

15   pharmaceutics in 1982.

16              MR. PEJIC:  Could we please move to slide 3.

17   BY MR. PEJIC:

18   Q.      Dr. Chambliss, could you tell us about your current

19   employment and responsibilities.

20   A.      Currently employed at the University of Mississippi

21   as professor emeritus and a research professor in the

22   pharmaceutics department.

23              Prior to that, I was a professor and research

24   professor at the University.

25   Q.      Can you tell us about some of your responsibilities

Chambliss - direct

1     as a professor.

2     A.      Yes.

3             I teach graduate-level courses in pharmaceutics

4     and drug delivery.  This semester I'm teaching a formulation

5     and development course, and I'm teaching a regulatory

6     science course.

7             I also teach, guest lectures in the

8     undergraduate pharmacy program and do some postgraduate

9     training, education, pharmaceutical scientists, and

10    regulatory professionals in a couple of courses that are

11    relevant to this case:  The BCS classification, dissolution

12    testing, and formulation development of the tablet

13    formulations.

14    Q.      Thank you.

15            Can you tell us a little bit about your prior

16    employment, and particularly what involved -- what

17    responsibilities involve formulation of pharmaceutical

18    compositions?

19    A.      Sure.

20            If I start near the bottom, the G.D. Searle,

21    that was my first company, G.D. Searle Pharmaceutical

22    Company, '82 to '84.  I was a formulator at the bench

23    developing new pharmaceutical formulations.  Most of those

24    being solid, oral dosage forms.

25            I then went to Bristol-Myers Pharmaceutical

Chambliss - direct

1    Company where I started off heading up the process

2    development group.  That's the group taking a product from

3    the research bench and scaling it up into manufacturing and

4    developing a manufacturing process for mostly, again, solid,

5    oral dosage forms.

6              I then did independent research in Bristol-Myers

7    on novel formulations, mostly for antibiotics and anticancer

8    compounds, and then managed the animal health product

9    development group.

10             I left Bristol-Myers in 1987 and joined

11   Schering-Plough Healthcare Products, where I started off as

12   associate director of pharmaceutical R&D.  I was responsible

13   for developing new formulations for the over-the-counter

14   products that were under the Schering-Plough umbrella.

15             I eventually became vice president of R&D, and

16   I was vice president for about five years where I was

17   responsible for all aspects of product development, safety,

18   part of clinical supplies as well.  And,

19             Relevant to this case as well, I was in

20   charge of the analytical method development group that was

21   responsible for developing dissolution test methods,

22   specifications, and bulk drug substance particle size

23   specifications.

24   Q.    Have you ever been recognized with any awards?

25   A.    Yes.  I'm a fellow of two professional associations.

1    I was president of the Academy of Pharmaceutical Research

2    and Science, and I was on the board of trustees of the

3    American Pharmacists Association.

4    Q.    Have you ever testified in a patent litigation

5    before?

6    A.    I have testified 10 or 11 times.

7    Q.    Has the Court ever disregarded any of your opinions

8    that you're aware of?

9    A.    The last two times I testified, the Court did not

10   accept all of my opinions.  I understand one of those is

11   probably going to be appealed.  I don't know the status of

12   the other one.

13   Q.    Okay.  Could you please turn to DTX-1002 and take a

14   look at it?

15            I believe it is on the screen as well.

16   A.    Yes.  Thank you.

17   Q.    Is this your most current CV?

18   A.    Yes, it is.

19   Q.    Does this CV accurately reflect your professional

20   achievements, awards, and education?

21   A.    Yes, it does.

22            MR. PEJIC:  Your Honor, the defendants would

23   like to proffer Dr. Chambliss as an expert in pharmaceutical

24   sciences and pharmaceutical formulations and related fields

25            MR. PRUSSIA:  No objection, Your Honor.

Chambliss - direct

1    THE COURT:  He is so recognized.

2    MR. PEJIC:  Thank you, Your Honor.

3    Could we please move to slide 4?

4    BY MR. PEJIC:

5    Q.    Dr. Chambliss, does this provide an overview of the

6    opinions you intend to offer today?

7    A.    Yes.  We'll be talking about the '945 patent, and

8    that my opinion the '945 patent claims are invalid as

9    obvious; and the '945 patent is invalid -- asserted claims

10   are invalid under 112 for lack of written description and

11   enablement, as well as being indefinite.

12   Q.    Are these opinions also set out in the expert reports

13   that you have served in this case?

14   A.    Yes, they were.

15   Q.    Thank you.

16   MR. PEJIC:  Could we move to slide 5, please.

17   BY MR. PEJIC:

18   Q.    Dr. Chambliss, do you understand this to show the

19   asserted claims 21 and 22?

20   A.    Yes, they do.

21   Q.    Were these the claim limitations that you considered

22   in preparing your opinions?

23   A.    Yes, they were.

24   Q.    In preparing your opinions, did you also consider the

25   specification of the '945 patent, the prosecution history,

1    and the Court's *Markman* order in addition to the prior art

2    that you will be discussing?

3    A.      Yes, I did.

4    Q.      Thank you.

5            In determining what prior art to consider, let's

6    talk about the date.  If you would, please turn to JTX-2 and

7    put it on the screen.  Got it?  Okay.

8            And as I was mentioning, in considering the

9    prior art and the time of invention in preparing your

10   opinions, what date did you use?

11   A.      I used the bottom left-hand column near the bottom.

12   The provisional application was filed on February 25th,

13   2010, so I used February 25th, 2010.

14   Q.      Thank you.

15           Would your opinions change if the '945 patent

16   was accorded an earlier effective filing date?

17   A.      No, they would not.

18   Q.      Can you tell us why?

19   A.      Because the prior art that I'm talking about was all

20   before this provisional date.

21   Q.      Thank you.

22           Okay.  Could we please move to slide 6.

23           Dr. Chambliss, does this reflect your

24   understanding of the law of obviousness as applied in your

25   opinions?

Chambliss - direct

1   A.      Yes.  This is what I -- my understanding of the law.

2   Q.      Could we please move to slide 7, please.

3           Dr. Chambliss, is this your understanding of the

4   law of written description and enablement as applied to your

5   opinions?

6   A.      Yes, it is.

7   Q.      Thank you.

8           And may we move now to slide 8.  Does this slide

9   show your understanding -- reflect your understanding of the

10  law of indefiniteness as applied to your opinions?

11  A.      Yes, it does.

12  Q.      Okay.  Have you considered the respective definitions

13  of a person of skill in the art or a POSA?

14  A.      Yes, I have.

15  Q.      Can we move to slide 9, please.

16          Dr. Chambliss, is this your understanding of the

17  defendants' definition of a POSA?

18  A.      Yes.  This is the definition we saw earlier today.

19  Q.      And this is what -- this is one of -- strike that.

20          Can we go to slide 10, please.

21          Is this your understanding of the plaintiffs'

22  definition of a POSA?

23  A.      Yes.  We saw this one earlier today as well.

24  Q.      Did you consider these definitions to be materially

25  different?

Chambliss - direct

1   A.      No.  They are very, very similar.

2   Q.      Do you satisfy either definition of a person of skill

3   in the art?

4   A.      I would satisfy both definitions.

5   Q.      Are you providing your testimony today from the

6   perspective of a POSA?

7   A.      Yes.  I put myself back in time, February 2010, and

8   viewed the prior art and the patent claims and the

9   specification, file history as a POSA.

10  Q.      And did you do the same thing in the expert reports

11  that were rendered in this case?

12  A.      Yes, I did.

13  Q.      Thank you.

14          Okay.  Let's start talking about the claims a

15  little bit.  Why do you think that the asserted claims are

16  obvious?

17  A.      Well, when you look at it at a high level, what is

18  being claimed is a solid pharmaceutical composition

19  comprising apixaban, which has known properties, they being

20  practically insoluble and a very potent drug, and the other

21  claim limitations are a certain particle size that you would

22  be motivated to use because that would give you advantages

23  when working with a compound like apixaban and the standard

24  dissolution testing that FDA recommends you use.

25  Q.      Okay.  May we please turn to slide 11.  And you

1   mentioned the known properties or physical properties of

2   apixaban; is that correct?  Does this slide show some of

3   those?

4   A.      Yes, it does.  Apixaban, the compound itself,

5   was known in the prior art and many of its physical

6   chemical properties were known in the art.  For example,

7   the known properties were its chemical structure,

8   pharmacological activity, its aqueous solubility and its

9   bioavailability.

10         And one of skill in the art would have been

11  motivated to reduce the particle size of the apixaban to

12  improve two major things -- one, content uniformity, as I

13  will talk about with any potent drug regardless of its water

14  solubility.

15         And, two, to increase its bioavailability by

16  enhancing its dissolution.  An advantage would be you could

17  potentially approach FDA about biowaivers to avoid

18  regulatory hurdles and improve chances of your drug

19  product.

20  Q.      Thank you.

21         Could we please move to slide 12.  Does

22  this provide a summary of your opinions of obviousness?

23  A.      Yes, it does.  This lists the combinations that I

24  will be discussing, and I will also be discussing the state

25  of art at the relevant time.

Chambliss - direct

1  Q.      Very good.

2              Now, as to the known properties of

3  apixaban, let's start with the chemical structure.  Did you

4  prepare a demonstrative?

5  A.      Yes.  I have one showing the structure from the '306

6  publication.

7  Q.      Thank you, Dr. Chambliss.

8  A.      That's in paragraph 26.

9  Q.      The '306 publication is uncontested prior art to the

10  '945 patent.

11              So let's continue to talk about '306

12  publication.  And could you please turn to page 6 and put it

13  on the screen.  It's DTX-303.

14              So, Dr. Chambliss, in talking about the '306,

15  what does this tell us?

16  A.      Well, the '306 is directed to apixaban pharmaceutical

17  compositions.  It talks about making a complex with apixaban

18  and other excipients, and it says, the complex or the

19  physical mixture may be compressed into a tablet or may be

20  filled into capsules.

21  Q.      Okay.  Does the '306 publication disclose other

22  formulations?

23  A.      Yes.  It's mainly directed toward an IV, injectable

24  formulations.

25  Q.      Okay.  Can I direct you to page 5 of DTX-303?  I

1    believe it's the middle of the left-hand column.

2    A.     Yes.   This is talking about intravenous injections of

3    doses of apixaban of five milligrams or more apixaban in a

4    single bolus injection.   That would be for an acute

5    condition where you're going to have by definition

6    100 percent bioavailability because you're injecting it

7    right into the vein.

8    Q.     And how would this inform one skilled in the art as

9    to solid formulations?

10   A.     Well, the '306 says you can use the same complex or

11   mixture in a solid dosage form by compressing into the

12   tablet or the capsule.   And you know that they're looking at

13   a five-milligram IV dose, so when you are trying to

14   formulate an oral dose, you want to get its bioavailability

15   or how much is absorbed in the body as high as possible to

16   try to match the blood levels that you get with five

17   milligrams, both the total amount that you get when it's

18   injected, because all of it's going to be injected into

19   the vein, and also how fast it gets to reach those levels.

20   Q.     Okay.   Thank you.

21          Now that we've talked a little bit about the

22   chemical structure of apixaban, was there anything known

23   about the solid state of apixaban in the prior art?

24   A.     Yes.   It was known to exist in the crystalline

25   form.

1    Q.    Can you put up, I believe it's slide 14 that you

2    prepared.

3    A.    Yes.  This is from the prior art, prior art reference

4    we'll be talking about of Wei, and there are several places

5    in Wei where it discusses crystalline apixaban.  That was

6    the point of Wei.  In paragraph 46, it's there.  The last

7    sentence says that the crystals that are made by this

8    process have a D90 of less than 20 microns, so it's making

9    small crystals.

10   Q.    Thank you.

11             Wei is uncontested prior art to the '945

12   patent.

13             MR. PRUSSIA:  Your Honor, this should be a Q&A

14   and the commentary by counsel I think is inappropriate.  If

15   there's something that he wants to read into the record with

16   respect to uncontested facts, that's fine.

17             THE COURT:  It's an unusual approach.

18             MR. PEJIC:  It was done by plaintiffs, Your

19   Honor.  I certainly would rather not do it.

20             THE COURT:  All right.  If it is uncontested, I

21   think --

22             MR. PEJIC:  Thank you.  I would rather not.  I

23   just didn't want to -- well...

24             THE COURT:  Okay.  Let's move on then.

25             MR. PEJIC:  Very good.

Chambliss - direct

1   BY MR. PEJIC:

2   Q.      So let's turn to the pharmacologic activity.  You

3   mentioned that was known in the prior art?

4   A.      Yes, it was.  I have a demonstrative showing where

5   it's disclosed in Pinto 2007, although there are other

6   places as well.

7   Q.      Very good.  Is this the slide you were talking about,

8   Dr. Chambliss?

9   A.      Yes.  That section in Pinto 2007, it says, apixaban

10  is potent, selective, and orally bioavailability fXa

11  inhibitor that demonstrates anti-thrombotic efficacy.

12  Q.      Thank you.

13          Are there other prior art references that teach

14  the pharmacological activity of apixaban?

15  A.      Yes.

16  Q.      And we'll talk about those throughout your testimony

17  today; is that correct?

18  A.      Yes.

19  Q.      Thank you.

20          As part of the pharmacological activity of

21  apixaban, was it also known, I believe you said, the

22  bioavailability?

23  A.      Yes.  There was information in the prior art about

24  the bioavailability.

25  Q.      Did you prepare a demonstrative for this?

Chambliss - direct

1  A.      Yes.  The next demonstrative is -- bioavailability

2  was also taught in Pinto 2007 as well as other publications

3  and this is Table 6 out of Pinto and the second drug listed

4  there is apixaban compound 40.

5         And if you read all the way over to the

6  right-hand column, about 58, it's hard to read, that's the

7  oral bioavailability.  So 58 percent of the administered

8  drug was absorbed, this is in dogs.  But one important

9  thing, one of the other compounds it's potentially competing

10  with is the compound right below it.  Razaxaban.  And it had

11  higher bioavailability in dogs.  It was 84 percent.

12  Q.      Okay.  How would you characterize this

13  bioavailability?

14  A.      There was room for improvement.  The formulator is

15  trying to get as much drug absorbed as fast as possible for

16  both a chronic condition, as much drug and an acute

17  condition, as much and as fast as possible.

18  Q.      All right.  Could we please put up DTX-312 at page 6

19  on the screen.  And can you tell us what this is, Dr.

20  Chambliss?

21  A.      Yes.  This is an excerpt out of another primary

22  reference we're going to be talking about more, Carreiro.  I

23  read the article.  And just above this, the heading is human

24  pharmacokinetic and pharmacodynamic data.  So before we saw

25  data in dogs, this is what was available in the prior art in

 1    humans.  And the absolute amount of drug absorbed is not

 2    here.  We don't see comparable numbers to the 58 percent in

 3    dogs, but what we do see that's very important to a

 4    formulator is that the peak plasma levels were achieved in

 5    about three hours, so, which is pretty slow.  If you are

 6    going to have a compound that's used for acute conditions,

 7    you want to get those peak blood levels faster if you can

 8    than three hours.

 9    Q.     Does Carreiro teach other bioavailability data?

10    A.     Other animal data in Carreiro.

11    Q.     Can we turn to page.  I would direct you to the top

12    left-hand column, I believe.

13    A.     Yes.  The third line down, sorry, the second line.

14    Apixaban is absorbed in chimpanzees, dogs and rats with a

15    mean oral bioavailability of 51 percent, 88 percent and

16    34 percent respectively.

17    Q.     Is this oral bioavailability?

18    A.     Yes.  This is oral bioavailability in various animal

19    models.  You see there's room for improvement there.

20    Q.     Great.  Thank you.

21           Now let's talk a little bit about the solubility

22    of apixaban.  I believe that you also mentioned one of the

23    challenges for apixaban was that it was known to have poor

24    water solubility; is that correct?

25    A.     That is correct.

1  Q.      Could we please turn to DTX-358.  Can you tell me

2  what this is, Dr. Chambliss?

3  A.      That's a chapter out of the United States

4  Pharmacopeia, the Twenty-Eighth Edition of 2005, that talks

5  about, among other things, solubility of compounds.

6  Q.      Very good.

7          Could we please turn to page 10 and look to the

8  left-hand column.

9  A.      If we could blow up that table right there.  Yes.

10 Q.      Very good.

11         Can you tell us what this is, Dr. Chambliss?

12 A.      The United States Pharmacopeia characterizes

13 compounds, including active pharmaceutical ingredients,

14 based on these criteria.  Starting with, very soluble, it's

15 less than one part of a solvent is required to dissolve the

16 drug substance to practically insoluble or insoluble where

17 it takes 10,000 parts of solvent, typically water, to

18 dissolve the drug.

19 Q.      Did you perform this calculation?

20 A.      I did for apixaban, but its, its known prior art

21 solubility of 40 micrograms per ml.  I have a demonstrative

22 on that.

23 Q.      I believe that's slide 17.  Is this the slide?

24 A.      Yes.  The solubility, .04 milligrams per ml, so you

25 have to convert that to, eventually convert it to grams

1  dissolved by number of ml's and you end up with X being

2  25,000 ml's of solvent required to dissolve the apixaban,

3  and that would fall in the practically insoluble category.

4           MR. PEJIC:  Could we please turn to slide 18.

5  BY MR. PEJIC:

6  Q.    And I believe you had testified that the

7  bioavailability of apixaban was known in more than one prior

8  art reference; is that correct?

9  A.    Yes.

10 Q.    Can you please tell us about this demonstrative?

11 A.    This demonstrative is about the solubility, and it's

12 a reference called Stegemann.

13          So I just showed the calculation, but a person

14 of ordinary skill in the art would not need to do that

15 calculation.

16          Stegemann has -- Stegemann was a review article

17 from a conference on how to handle poorly soluble drugs,

18 and it has this table here which is very handy.  It has the

19 USP criteria you see going from very poorly soluble to

20 practically insoluable, and then he started on the

21 calculations where as long as your active ingredient is less

22 than 0.01 -- 0.1 milligrams per mil, it is in that lower

23 category.

24          Remember, apixaban was 0.04, so it's well within

25 that last category.

Chambliss - direct

1          Unfortunately, a lot of drugs fall into that

2     category.

3     Q.     Thank you, Dr. Chambliss.

4          MR. PEJIC:  Could we turn to slide 19.

5     BY MR. PEJIC:

6     Q.     Does this provide other prior art references that

7     discuss the poor water solubility of apixaban?

8     A.     Yes, it was well known in the prior art that it was

9     poorly water soluble.  I have cited to three different

10    publications there.

11         The '306, where it says, "Apixaban is a weak

12    base and is sparingly soluble."

13         To Pinto 2007, the solubility of compound 40,

14    which was apixaban was shown to be approximately 40 to

15    50 micrograms per mil.  I did the calculation on the 40

16    micrograms.

17         And Nause, Nause patent application says,

18    "Apixaban has low solubility in aqueous environments."

19    Q.     Does poor water solubility and the other physical

20    characteristics of apixaban pose formulation challenges?

21    A.     Well, a formulator knows how to handle those

22    potential challenges.  There's two issues.  One is that it's

23    a potent drug.  It's talked about -- it's a potent inhibitor

24    of FAX-2.

25         So you know your dosage forms are going to have

1   maybe a small amount.  Like the apixaban that's on the

2   market is 2.5 milligrams and 5 milligrams.  That's a small

3   amount if you compare it to a typical ibuprofen tablet has

4   200 milligrams of active.  So in order to get content

5   uniformity with a potent drug, you know to reduce the

6   particle size, for example.

7            The other issue with it is this poor water

8   solubility that we talked about and said many drug compounds

9   have poor water solubility.  So you know -- a formulator

10  knows how to handle that as well, and, again, you do

11  particle size reduction is the number one technique.

12  Q.    You mentioned that a formulator would have strategies

13  in ways to address these challenges.  Do you have any

14  examples from your time in formulation in dealing with these

15  drugs having these type of characteristics?

16  A.    Yes.  I mentioned ibuprofen.  Ibuprofen is borderline

17  practically insoluble, but it's available in commercial

18  tablet formulations around the world, have been for a long

19  time.  I worked on ibuprofen.

20            Others that were potent and practically

21  insoluble like apixaban that come to mind --

22            MR. PRUSSIA:  Your Honor, all this is outside

23  the scope.

24            THE COURT:  Outside the scope of what he

25  disclosed in his report?

 1              MR. PRUSSIA:  In his report, yes.

 2              MR. PEJIC:  These are all arts.  These are all

 3      references that were discussed in his report.

 4              MR. PRUSSIA:  He -- as I understand what he's

 5      testifying to right now are not references but his personal

 6      work.

 7              THE COURT:  Are you talking about his own

 8      experience now with ibuprofen and perhaps other things?

 9              MR. PEJIC:  That, I do not know if it's in his

10      report.  But if the Court doesn't want his knowledge and

11      experience, that's just fine with me.

12              THE COURT:  I wouldn't put it that way.

13              MR. PEJIC:  I understand.

14              THE COURT:  You haven't disclosed your

15      obligation.  If you think you've met it, that's fine, we can

16      go through the analysis.

17              MR. PEJIC:  I don't think we need to spend the

18      time going through his deposition, although I do believe he

19      testified in his deposition, but that's fine.  I'll withdraw

20      it.

21              THE COURT:  Let's move on then.

22      BY MR. PEJIC:

23      Q.      We have been talking about reducing particle sizes.

24      Is there a reason why a formulator would seek to use

25      apixaban with small particle size?

1    A.      Yes, for the reasons we've talked about.  It's a

2    potent drug, so you're concerned about content uniformity

3    regardless of solubility.

4            Second, it has poor water solubility, so you

5    could have slow dissolution so you reduce particle size.

6            And the third reason is you could potentially

7    get a biowaiver from the FDA later on.

8    Q.      Okay.  In talking about the small particle size, you

9    mentioned the -- reducing the particle size could help

10   improve the content uniformity; correct?

11   A.      Correct.

12           MR. PEJIC:  Could we move to slide 12, please?

13   BY MR. PEJIC:

14   Q.      Can you tell us what you mean by content uniformity?

15   A.      Yes.  This is a book chapter of a well-known

16   pharmaceutical treatise.  The author of the chapter is

17   Lantz.  And it's talking about mixing of powders before you

18   compress a dosage form.  And,

19           It says that the first problem encountered is

20   usually one of uniformly dispersing a low-dose, high-potency

21   active ingredient -- that would be apixaban for sure -- to

22   make a tablet large enough to compress and monitor tablets

23   weights with ease.  And,

24           Then if you skip down to near the end, it says,

25   "The active ingredient must be of small enough particle size

Chambliss - direct

1    to allow relative large numbers of particles to be

2    distributed in each dosage unit."

3    Q.      Thank you.

4            MR. PEJIC:   Could we please put DTX-336 at page

5    64 on the screen.

6    BY MR. PEJIC:

7    Q.      And can you tell us what this chart from Lantz would

8    tell one skilled in the art at the time of invention?

9    A.      This is the very next page from where we were looking

10   and saying if you've got a highly potent, low-dose compound,

11   you need to reduce the particle size or you could have the

12   content uniformity problem.

13           So the title of this is "Summary of Mixing

14   Problems and Suggested Approaches."

15           A problem would be uniform distribution of a

16   potent drug.  And,

17           A suggested approach is milling, which is

18   reducing particle size.

19           Suggested equipment is standard pharmaceutical

20   equipment to cut or mill into small particles.

21   Q.      Thank you.

22           You also said additional reasons that a person

23   of skill in the art would reduce particle size was to

24   increase the dissolution rate and biowaivers.

25           How does the concepts apply to apixaban?

1  A.      Well, apixaban was poorly water soluble, so in order

2  to enhance its dissolution rate, you know you need to use

3  small particles.  And,

4          A simple analogy that I could give is if you

5  have ice tea and you add a cube of sugar, a sugar cube to

6  it, it has large-sized particles, it takes a lot of energy,

7  a lot of stirring to get that sugar cube to go into the

8  solution -- the sugar to go into the solution, although

9  sugar is water soluble.

10         If you take just powdered sugar, really fine

11  powdered sugar, and add that to the ice tea, you stir it a

12  few times, it goes right into the solution.

13         So just having a highly soluble compound by

14  changing the particle size, you slow down its dissolution

15  rate.  So if you have a compound that is poorly water

16  soluble, you've exacerbated that problem, and you really

17  need to have small particles to get it going into the

18  solution fast.

19  Q.    Okay.  I understand.

20         MR. PEJIC:  Could we please turn to DTX-320, at

21  14.  And,

22         I'll direct you to the bottom of the page.

23  BY MR. PEJIC:

24  Q.    Briefly, can you tell us about biowaivers?

25  A.    Sure.

Chambliss - direct

1       A biowaiver -- and this is from a 1997 guideline

2  from the FDA, it's one of the guidance documents that I

3  teach to FDA, in fact, in the pharmaceutical sciences, on

4  how to obtain biowaivers.  And,

5       The basic concept is, biowaiver is referring to

6  bioequivalency states, so waiving a bioequivalency state.

7  You know bioequivalency studies are human blood level

8  studies, which are expensive and time consuming.

9       So if you -- under certain conditions that we

10 will talk about in more detail later, you can apply to the

11 FDA to waive that bioavailability study and instead submit

12 dissolution data.  But the key to that, the dissolution data

13 is going to have to show that you have a rapid dissolving

14 drug product.

15 Q.    Okay.  Do other references in the prior art talk

16 about rapid dissolution and biowaivers, generally?

17 A.    Yes.  It's in several prior art references.  I've

18 pulled a couple of examples we could look at.

19       MR. PEJIC:  Okay.  Could we please turn to

20 DTX-364 at 1.  And,

21       I believe it's the bottom right-hand column.

22 BY THE ANSWER:

23 A.    Yes.  Before you blow it up, this is just -- the

24 author Yu is from the FDA.

25       This is FDA discussing how you can obtain a

Chambliss - direct

1    biowaiver and the scientific basis for obtaining a

2    biowaiver.

3    Q.      Okay.  And I think we would like to look at the

4    bottom of the right-hand column on page 1 and spilling over

5    to 2; is that correct?

6    A.      Yes.  That would be great.

7    Q.      Can you tell us what this would inform one skilled in

8    the art at the time of invention?

9    A.      Yes.  Another guidance document that I teach in two

10   postgraduate courses, the biowaiver guidance documents.  And,

11            This says -- it talks about one of them.  FDA

12   issued a guidance for industry on waivers of in vivo

13   bioavailability and bioequivalence studies for IR solid oral

14   dosage forms based on the BCS classification, which we will

15   talk about in just a minute.

16            And it talks about in order to obtain the

17   biowaiver, the drug substance must -- the drug product must

18   be in an IR, solid oral dosage form that exhibits rapid in

19   vitro dissolution.

20            MR. PEJIC:  Okay.  And I believe we also talked

21   about making small-size apixaban particles and in the

22   context of Wei, which is DTX-359.

23            And could you please put on page 6.

24            And paragraph 3, I believe.

25   BY MR. PEJIC:

Chambliss - direct

1    Q.      So is this what you were mentioning?

2    A.      Yes.  This is a paragraph 3 out of Wei, and just as a

3    reminder, this is about apixaban and about small particles

4    of apixaban, small crystalline apixaban.  And it cites to

5    what a person of ordinary skill in the art knows very well.

6    It is well known in the pharmaceutical industry that the

7    bioavailability of a sparingly soluble, organic compound is

8    often enhanced when the compound is very pure, and the

9    molecules of the compound have a small, uniform particle

10   size, high surface area, which is a direct result of

11   particle size, and short dissolution time.

12   Q.      Thank you.

13           And how did Wei achieve this faster dissolution?

14   A.      Well, Wei is all about making apixaban in small

15   crystal size.  That if you incorporate apixaban with small

16   crystal size in an immediate-release formulation, that's how

17   you could achieve rapid dissolution.

18   Q.      Thank you.

19           MR. PEJIC:  And now could we please turn to

20   DTX-337.

21   BY MR. PEJIC:

22   Q.      And do you recognize this document, Dr. Chambliss?

23   A.      This is from the same book we looked at before, with

24   Lanz, a chapter of Lanz from a mixing chapter.

25   Q.      Okay.  Will you understand it if I refer to this

1   reference as Lanz II to different it from the chapter we

2   previously talked about?

3   A.      Yes, that would be good.

4   Q.      Okay.

5           MR. PEJIC:  Could we please turn to page 6, and

6   at the bottom of the page.

7   BY MR. PEJIC:

8   Q.      Could you tell us what this would inform one skilled

9   in the art, Dr. Chambliss?

10  A.      This chapter was on reducing particle size.  So it's

11  why would a pharmaceutical formulator consider reducing

12  particle size.

13          So it says, "Size reduction has certain

14  advantages in tablet formulation development," and lists the

15  advantages.

16          And the two that we've talked about a little bit

17  already is increase the surface area, which may enhance the

18  active ingredient dissolution rate, and enhance its

19  bioavailability.

20          And it says this is particularly important with

21  compounds that are slightly soluble, such as phenacetin.  So

22  if you have a poor water soluble compound, it is even more

23  important to reduce its particle size.  And,

24          No. 2 there is to improve the tablet-to-tablet

25  content uniformity by increasing the number of particles by

Chambliss - direct

1    per unit weight.

2             So regardless of its viability, it's a potent

3    drug, you're going to reduce its particle size.

4             If we could go to the next page.  It continues

5    with some data there at the top at Figure 1 -- Figure 2,

6    sorry.

7    Q.      Could you please explain that data to us?

8    A.      Yes.

9             He's is using phenacetin, which is an analgesic,

10   as an example.  He says phenacetin has poor water solubility

11   so let's see what happens if we compare the bioavailability

12   of phenacetin in different formulations with different

13   particle sizes for the bulk drug substance.

14            The bottom two -- the bottom curve, let's focus

15   on that one, the triangles is with particle sizes greater

16   than 250 microns.  So you see very poor bioavailability.

17   And simply by enhancing -- reducing the particle size to

18   75 microns, the top two curves, you dramatically increase

19   its bioavailability.

20   Q.      Thank you.

21            MR. PEJIC:  Can we please turn now to DTX-305.

22   BY MR. PEJIC:

23   Q.      Could you tell us about this prior art reference,

24   Dr. Chambliss?

25   A.      This is a publication on "Particle Powder and Compact

1    Characterization."  The lead author is Amidon.

2              MR. PEJIC:  Okay.  Could we please turn to page

3    6?  And Figure 8.3.

4    BY MR. PEJIC:

5    Q.    Could you tell us about this and why it would inform

6    one skilled in the art, Dr. Chambliss?

7    A.    Yes.  What the Amidon publication was about is trying

8    to predict what your dissolution rate would be based on the

9    particle size of your bulk drug substance that you add to

10   your formulations.  And a simple concept is solubility -- as

11   solubility goes lower and lower, so take apixaban's about

12   40, so it would be right about there (indicating), your

13   particle size -- to get rapid dissolution, they're saying

14   80 percent in 30 minutes, you've got to have smaller and

15   smaller particles as a solubility gets worse and worse.

16             And that's a well-known phenomenon in

17   pharmaceutical science.

18   Q.    Very good.

19             And we've talked quite a bit now about rapid

20   dissolution and biowaivers.  Is this all in the context of

21   the BCS?

22   A.    Yes.  This is the BCS interrelated with biowaivers.

23   Q.    You mentioned you taught courses.  Do you teach any

24   courses that relate to the BCS?

25   A.    I teach two.  One is called a Hands-on Course in

Chambliss - direct

1  Tablet Technology, which is a week-long course, attended

2  usually by 12 to 15 FDA reviewers and pharmaceutical

3  scientists, and I do a lecture on biowaivers in the BCS

4  system and dissolution, establishing dissolution

5  specification, and just taught that in September.  And next

6  week in New Jersey I will be teaching another course, which

7  might have lecturers on the scientific principles of the BCS

8  system, how they're applied to the biowaivers in

9  establishing dissolution specification.

10  Q.     Thank you.

11         Can you please tell us how one, a person of

12  skill in the art would have used the BCS at the time of the

13  invention?

14  A.     At the time of the invention, you couldn't use the

15  BCS system because as we'll show in a demonstrative, a key

16  of the BCS is to know your dose, because you need the dose

17  to calculate the solubility, which is part of the BCS

18  classification.

19  Q.     Would one of skill in the art at the time of the

20  invention have been motivated to seek a biowaiver though?

21  A.     Eventually, there would be -- once they have a dose

22  and they could show that they have a BCS I or a BCS III, which

23  I will explain those with rapid dissolution, they could

24  apply for a biowaiver.  So they're motivated to do that.

25  It's just too early.

Chambliss - direct

1   Q.      Thank you for the clarification.

2                   MR. PEJIC:  Could we please put up DTX-364 on

3   the screen.

4   BY MR. PEJIC:

5   Q.      Can you tell us about this document?

6   A.      This is the same publication we looked at before from

7   Yu, so, again, Yu is an FDA person talking about the

8   scientific basis of biowaivers in the context of BCS

9   systems.

10  Q.      And I will direct you to the right-hand column with

11  the paragraph -- there we go.

12                  Can you tell us what this would inform one of

13  skill in the art?

14  A.      This is what we looked at before on biowaivers and

15  just didn't emphasize before the relevance of the BCS.  Here

16  it talks about the BCS guidance recommends that you can get

17  a waiver if you have a highly soluble, highly permeable

18  Class I drug as long as it's an immediate release dosage

19  form and has rapid in vitro dissolution.

20                  Later in the document that we can look at later,

21  it talks about BCS Class III waivers as well.

22  Q.      Is that on page 3?

23  A.      Yes.  Do you want to look at it now or together?

24  Q.      Go ahead.

25  A.      The right-hand column under dissolution, about

1    two-thirds of the way down.  The way the biowaiver

2    started, it was for only highly a soluble, highly permeable

3    drug.

4         The FDA started considering Class III compounds,

5    which are highly soluble but poorly permeable, that a

6    biowaiver could be appropriate as well.  And the key to

7    this, there's where it talks about Class III drug products,

8    but it says, to minimize the possibility of dissolution

9    behavior anomalies, it is found in our simulation studies

10   that it would be necessary to set a more rapid in vitro

11   dissolution rate criterion of no less than 85 percent within

12   15 minutes for Class III drugs.

13        If you have a Class I drug, you have to show

14   that it's 85 percent in within 30 minutes, a Class III drug,

15   it is 85 percent with 15 minutes.  Both are rapid

16   dissolution.

17   Q.    Okay.  You mentioned you had some demonstratives on

18   the BCS.  I would like to turn to slide 21, please.  And

19   can you tell us what this would mean to one skilled in the

20   art?

21   A.    This is the underlying principle, and it's not a new

22   concept at all.  The BCS system came out in the nineties.

23   It's what pharmaceutical scientists were thinking.  At

24   least I was trained this way in the seventies to think about

25   your drug.  Is it highly water soluble?  Is it highly

1  permeable?  Does it have any problems you are going to have

2  to address?

3          So the BCS starts with the rate of a drug

4  absorption, which impacts bioavailability, depends on first

5  a dissolution rate.  If you slowly release the drug from

6  your dosage form, you're going to impact bioavailability.

7  That's what all extended release formulations usually rely

8  on that.  You slow down dissolution.  You delay.

9          If you have a rapid release drug, dissolving

10  drug, then the solubility of the drug in the GI tract or the

11  permeability, and that's the ability of the compound to

12  actually be absorbed across that GI tract membrane becomes

13  important.  And if dissolution rate is rapid, then

14  solubility or permeability will be the rate determining

15  step.

16  Q.     Okay.  You mentioned these BCS Class I, II, III, IV;

17  correct?

18  A.     Yes.

19  Q.     Can we move to slide 22, please.  Can you tell us

20  about this slide, Dr. Chambliss?

21  A.     Yes.  This just shows the four categories.  Class I,

22  high soluble, high permeable.  We wish all drugs would fall

23  with that class, but they don't.

24          Class II is low soluble, high permeable.

25          Class III is high soluble, low permeable.

Chambliss - direct

1       Class IV is low soluble, low permeable.  A

2   formulation scientist takes different approaches depending

3   on those categories.

4   Q.   Okay.  And talking about solubility, can we please

5   turn to slide 23 and tell us what you mean by solubility in

6   the context of BCS?

7   A.   BCS is unique in this one aspect.  It's not

8   solubility the way we looked at it in the USP where it's

9   number of grams that dissolve in a volume of solvent, the

10  way scientists think about a gram per liter, milligram per

11  ml.  It has taken the assumption that a patient swallows the

12  tablet or capsules and drinks a full glass of water so that

13  they have about 250 ml's in their stomach.  As pharmacists,

14  I wish that's what they would do, but most like, but like I

15  do, they take a sip of water.  They don't have that 250

16  ml's.  That's the underlying concept.

17       So the concept is if you take a dose, say you're

18  taking a ten-milligram tablet.  Would that ten milligram of

19  active dissolve in 250 ml's of water and also acidic pH and

20  alkaline pH to simulate the drug if it goes throughout the

21  GI tract.

22       If it does dissolve in that 250 ml's, it's

23  classified as high solubility.  If it doesn't, it's

24  classified as low solubility.

25  Q.   Okay.  And could we turn next to slide 24, and I

Chambliss - direct

1  believe that you have mentioned rapid dissolution in the

2  context of BCS.  Could you please explain?

3  A.      Yes.  As we talked about, the key is 85 percent

4  release and using a standard USP dissolution apparatus,

5  50 RPM's, a hundred RPM's, it talks about the different

6  types of apparatuses.  And if it's a rapid dissolution for

7  BSC I as we saw before, within 30 minutes for BSC III, I

8  think it needs to be within 15 minutes.

9  Q.      Okay.  And you mentioned earlier that it was

10  premature when you were in drug development to use the BCS.

11  Can you tell us why?

12  A.      You don't know the doses.  When you are doing product

13  development, you're doing initial formulation development,

14  it hasn't even been in humans, so there is no dose.  That's

15  the first -- your clinical trials start with first dosing,

16  trying to establish a dose.  You do some more dose-ranging

17  studies and then you get into Phase 3 and maybe some Phase 4

18  post-marketing where you are still trying to find an optimum

19  dose.  When you are first formulating, you don't have a dose

20  at all.

21  Q.      Okay.  And do you understand that plaintiffs' expert,

22  Dr. Myerson, believes that a formulator would not be

23  motivated to reduce the particle size of apixaban because

24  the 2.5 milligram and 5 milligram commercial tablets would

25  be BCS Class III?

Chambliss - direct

1   A.      Yes, yes.  I read that.

2   Q.      Could we put up slide 25.  I believe you've created

3   this to respond.

4   A.      Yes.  I do not believe that if a person of ordinary

5   skill at the relevant time thought that apixaban was BCS

6   Class III, that they would not have reduced the particle

7   size of apixaban when they make a formulation.

8           First, at the relevant time, the dose of

9   apixaban that would be containing commercial products was

10  unknown, so you can't do that solubility calculation.

11          Second, it doesn't matter what the BCS is.  For

12  a potent drug like apixaban, you have 2.5 milligram tablets,

13  five milligram tablets, assuming you think that's the only

14  dosage we're ever going to have.  That's a potent drug.  You

15  are going to need to reduce the particle size or you're

16  going to have content uniformity issues.

17          And, third, even if you felt the dose in the

18  commercial product would result in a drug being Class III,

19  you still need to make sure that the drug has rapid

20  dissolution in order that you could possibly get the

21  biowaivers down the road from the FDA.  And as we saw

22  before, to get biowaivers, you have to have rapid

23  dissolution.  To get rapid dissolution, you need to have

24  smaller particles.

25  Q.      Thank you, Dr. Chambliss.

1    Could we please turn to DTX-437, and let's

2    discuss this rapid dissolution concept a little bit further,

3    but please tell us about this document.

4    A.    It's another publication.  The author is Dahan.

5    Prediction of Solubility and Permeability/Membership:

6    Provisional BCS Classification of the World's Top Oral

7    Drugs, a Review Article.

8    Q.    What does Dahan tell one skilled in the art about

9    rapid dissolution in the BCS at the time of invention?  I'd

10   like to direct you to page 2, the right-hand column.

11   A.    Okay.  Specifically, it's talking about a Class III

12   drug product.

13            So it says, if the in vitro dissolution of a

14   Class III drug product is rapid under physiological pH

15   conditions.  Its in vivo behavior will essentially be

16   similar to oral solution.

17            And going down to the bottom, in vitro

18   dissolution tests can ensure BE.  Hence, biowaivers for BCS

19   Class     III drugs are scientifically just and have been

20   recommended.

21            Again, it's saying the key with the BCS III

22   compound is make sure you have rapid dissolution to make

23   sure you have the bioavailability you're looking for and

24   also potentially set yourself up for biowaivers from the

25   FDA.

Chambliss - direct

1    Q.      And this is done by reducing the particle size?

2    A.      Yes.

3    Q.      Thank you.

4            Can we turn to slide 26, please.  Can you tell

5    us about this slide, Dr. Chambliss?

6    A.      This is just an excerpt of four other publications

7    that have similar concepts.

8            First, it was suggested that biowaivers be

9    extended to BCS Class III drugs with rapid dissolution

10   properties.  Again, that's the key.  You have to have rapid

11   dissolution.

12           Second, particle size reduction is one of the

13   first strategies investigated if you want to have a rapid

14   dissolution product.

15           Class III, potential benefits from particle size

16   reduction.  That is from a presentation.

17           And another one is reduce particle size to

18   maximize dissolution (also for BCS Class III).

19   Q.      Thank you.

20           Could we move now to slide 27.  And we were

21   talking about dissolution testing and the concept of BSC.

22   And can you tell us about this slide?

23   A.      Yes.  This is an FDA guidance from 1997 that lays out

24   the standard dissolution testing that is done for

25   pharmaceutical oral solid, oral dosage forms.

Chambliss - direct

1       Regardless of whether you're applying for

2   biowaivers or not, this is the standard dissolution testing

3   that you would run.  And the introduction says, the guidance

4   is developed for immediate release dosage forms and is

5   intended to provide general recommendations for dissolution

6   testing approaches for setting dissolution specification.

7       And the fourth one is the process to help

8   determine when dissolution testing is sufficient to grant a

9   waiver of in vivo bioequivalency studies.  It's laying out

10  the dissolution method that they encourage you to use, they

11  being the FDA.

12  Q.     Thank you.

13      Could we move to slide 28.  And, Dr. Chambliss,

14  we'll have you look at slide 28.  You might want to open

15  your book to DTX-320 at page 15, because I think I will have

16  some questions for you.

17  A.     Okay.  Thank you.

18  Q.     You're welcome.

19  A.     What page?

20  Q.     I apologize.  Page 15?

21  A.     Thank you.  Okay.  I'm there.

22  Q.     Okay.  Please tell us about this slide.

23  A.     This is another guidance document that I teach from.

24  It establishes how you do dissolution testing for

25  immediate-release products, and it talks about the most

Chambliss - direct

1    common employed methods are method one is the basket method.

2    Method two, the paddle method.  It talks about the agitation

3    that you could use.

4              And the reason I'm focusing on the paddle method

5    here is because that's what the claim limitations are when

6    we get to the claims.

7              The paddle method is 50 to 70 RPM's, which is

8    the claim limitation.  The volume of dissolution medium is

9    generally 500, 900 to 1,000 ml's.

10             The dissolution test should be done 37 degrees.

11   It's the claim limitation.

12             BCS.  This last one is the second one.  Next to

13   the bottom, it's talking about the dissolution medium and it

14   mentions there .1 normal HCl in 15 minutes.  So to get into

15   the guidance document at all, it also talks about pH 6.8,

16   intestinal buffer, which is what the claim limitation is

17   about.

18             And then the last one is another claim

19   limitation where the FDA guidance document, it says, if you

20   have a water insoluble or sparingly water insoluble drug

21   like apixaban, you can use a surfactant such as sodium

22   lauryl sulfate, which is another one.

23   Q.    Thank you, Dr. Chambliss.

24             In addition to biowaivers and to avoid

25   regular hurdles after approval, is there another reason one

1  skilled in the art would be motivated to improve the

2  dissolution rate and bioavailability of an active ingredient

3  during clinical trials?

4  A.     Well, you're always -- a formulator is always trying

5  to improve the drug product before it becomes

6  commercialized, so you're motivated throughout the

7  development program to try to make any improvements you can

8  to the drug product, including dissolution rate and

9  bioavailability.

10 Q.     Do you know that plaintiffs' expert, Dr. Myerson,

11 says that one skilled in the art would not be motivated to

12 reduce the particle size of the apixaban during or prior to

13 the time of invention because the status of apixaban

14 clinical trials in Phase III?

15 A.     That's what I understand.  That's not consistent with

16 my experience.

17 Q.     Can you tell --

18        MR. PEJIC:  Can you put up slide 29.

19 BY MR. PEJIC:

20 Q.     And can you also tell us why it is not consistent

21 with your experience or the prior art.

22 A.     Well, this is a publication that looked at failure

23 rates of pharmaceutical drug products over time.

24        It starts with about 90 percent of drug products

25 that are in clinical development fail.

Chambliss - direct

1           And I have felt that pain.

2                This one specifically is the Phase III trials.

3    And at Phase III, approximately 45 percent of all compounds

4    fail.  And,

5                You asked me about my personal experience.  At

6    Schering-Plough, I can recall at least two antifungal

7    compounds that were in Phase III that failed, and as a

8    pharmacist I felt --

9                MR. PRUSSIA:  Your Honor, this is outside the

10   scope again.

11               THE COURT:  Not disclosed?

12               MR. PRUSSIA:  Exactly.

13               THE COURT:  Move on.

14   BY MR. PEJIC:

15   Q.    So the prior art discloses that at the time of the

16   invention, one skilled in the art would have known that

17   there was a significant chance of failure during clinical

18   trials, and even in Phase III you were looking at about a 50

19   percent chance of failure; is that correct?

20   A.    Yes, anyone in pharmaceutical sciences knows that --

21   that data.  It's sad, but they know that data.

22   Q.    And when you have a failure of a drug trial in Phase

23   III, what does that mean to the company?

24   A.    You spent hundreds of millions of dollars in years --

25               MR. PRUSSIA:  Your Honor, again, this is nowhere

```
 1    in the report.  I object.
 2              MR. PEJIC:  I believe it is.
 3              THE COURT:  Do you want to point to where it is?
 4              MR. PEJIC:  Do we have it?
 5              THE COURT:  Do I have the report up here?
 6              If you prefer, assuming your direct is going to
 7    run into tomorrow, let's take it up tomorrow.
 8              MR. PEJIC:  Yes, let's pick this aspect up
 9    tomorrow, but ...
10              Well, Your Honor, we're actually about to get
11    into the prior art combinations and I see we have about
12    eight minutes, so it might make sense to take a break right
13    now.
14              THE COURT:  Four combinations, more than two
15    minutes each you think?
16              MR. PEJIC:  I can do my best.  What is that, a
17    commercial?  I'll practice my auction skills.  How's that?
18              THE COURT:  No, thank you.  It's probably a good
19    stopping point.
20              All right.  So I'll see you all at 8:30
21    tomorrow, and we'll start with the plaintiff's witness.
22              MR. LEE:  Thank you, Your Honor.
23              MR. PEJIC:  Thank you, Your Honor.
24              THE COURT:  Okay.  Have a good evening.
25              (Proceeding recess at 6:53 p.m.)
```

1

2           I hereby certify the foregoing is a true and accurate
transcript from my stenographic notes in the proceeding.

3

4                 /s/ Brian P. Gaffigan
            Official Court Reporter

5                 U.S. District Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25