```
 1                    IN THE UNITED STATES DISTRICT COURT
                     IN AND FOR THE DISTRICT OF DELAWARE
 2
                                    - - -
 3      BRISTOL-MYERS SQUIBB COMPANY
        and PFIZER INC.,                      : CIVIL ACTION
 4                        Plaintiffs,    :
        v                                     :
 5                                      : (Consolidated)
        AUROBINDO PHARMA USA INC.,            :
 6                                      : NO. 17-374-LPS
                         Defendant.
 7                                  - - -

 8                         Wilmington, Delaware
                         Friday, November 8, 2019
 9                        Bench Trial - Volume G

10                                  - - -

11      BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

12      APPEARANCES:                    - - -

13               FARNAN, LLP
                 BY:  MICHAEL J. FARNAN, ESQ.
14
                          and
15
                 WILMER CUTLER PICKERING HALE and DORR, LLP
16               BY:  AMY K. WIGMORE, ESQ., and
                      HEATHER M. PETRUZZI, ESQ.
17                    (Washington, District of Columbia)

18                        and

19               WILMER CUTLER PICKERING HALE and DORR, LLP
                 BY:  WILLIAM F. LEE, ESQ.,
20                    ANDREW J. DANFORD, ESQ.,
                      TIMOTHY A. COOK, ESQ.,
21                    KEVIN S. PRUSSIA, ESQ., and
                      SHIRLEY X. LI CANTIN, ESQ.
22                    (Boston, Massachusetts)

23                        Counsel for Bristol-Myers Squibb
                          Company and Pfizer Inc.
24
        Valerie J. Gunning            Brian P. Gaffigan
25      Official Court Reporter       Official Court Reporter
```

1    APPEARANCES:  (Continued)

2

3                PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
                 BY:  JOHN C. PHILLIPS, JR., ESQ.

4                     Counsel on behalf of SigmaPharm
                      Laboratories, LLC; Unichem Laboratories,
5                     Ltd., Zydus Pharmaceuticals (USA) Inc.,
                      Sunshine Lake Pharma Co., Ltd., and
6                     HEC Pharm USA

7                and

8                HUSCH BLACKWELL, LLP
                 BY:  PHILIP D. SEGREST, JR., ESQ., and
9                     DON J. MIZERK, ESQ.
                      (Chicago, Illinois)
10

11               and

12               HUSCH BLACKWELL, LLP
                 BY:  THOMAS P. HENEGHAN, ESQ., and
13                    DUSTIN L. TAYLOR, ESQ.
                      (Madison, Wisconsin)

14                    Counsel on behalf of SigmaPharm
                      Laboratories, LLC
15

16               and

17               GREENBLUM & BERNSTEIN, P.L.C.
                 BY:  P. BRANKO PEJIC, ESQ.,
                      PAUL A. BRAIER, ESQ., and
18                    JILL M. BROWNING, ESQ.
                      (Reston, Virginia)

19                    Counsel on behalf of Unichem
20                    Laboratories, Ltd.

21

22

23

24

25

1    APPEARANCES:   Continued)

2

3            YOUNG CONAWAY STARGATT & TAYLOR, LLP
           BY:  KAREN L. PASCALE, ESQ.

4                and

5            LERNER DAVID LITTENBURG KRUMHOLZ & MENTLIK, LLP
           BY:  PAUL H. KOCHANSKI, ESQ., and

6                KENDALL K. GURULE, ESQ.
               (Westfield, New Jersey)

7

8                   Counsel on behalf of Sunshine Lake
                  Pharma Co., Ltd., and HEC Pharm USA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          - oOo -

 2                   P R O C E E D I N G S

 3                 (REPORTER'S NOTE:  The following jury trial was

 4       held in open court, beginning at 8:39 a.m.)

 5                 THE COURT:  Good morning.

 6                 (The attorneys respond, "Good morning, Your

 7       Honor.")

 8                 THE COURT:  Any issues before we call the

 9       witness?

10                 MR. LEE:  Not an issue, Your Honor, but just to

11       report on closings.

12                 We've reached agreement that the plaintiffs will

13       just go first and address all issues, infringement, validity

14       for both patents.  The defendants will then go and address

15       all issues and then we'll rebut briefly.

16                 The time will, of course, depend on how much

17       time anybody has left at that point in time.

18                 THE COURT:  Okay.

19                 MR. LEE:  We're not going to use it all up, but

20       it may constrain the closings.

21                 THE COURT:  Okay.  And everyone should

22       understand I do likely ask questions during closings.  But

23       what you've agreed on is fine.

24                 That is agreeable to the --

25                 MR. MIZERK:  Yeah, it is.  I think the question
```

1  is, when would Your Honor prefer that we have the closing

2  because it looks like there would likely be time on Tuesday

3  to do that.

4                THE COURT:  But --

5                MR. MIZERK:  It's really up to Your Honor's --

6                THE COURT:  Well, I would say two things.

7  Either we could reevaluate this later today before we break,

8  when you have a better sense as to how much of Tuesday will

9  be taken up with evidence, or I'm for perfectly fine saying

10  it will be Wednesday.  That would give you all time, you

11  know, the rest of Tuesday after whenever the evidence is

12  done to prepare for Wednesday.

13                But, you know, I'm open to either way.

14                MR. LEE:  I think, Your Honor, perhaps we should

15  talk about it at the end of the day.  Tuesday, I think, is

16  like a 12:30 to 7:00 day.  And I said to Mr. Mizerk, it may

17  be that neither for the Court nor for us closing at 5:00

18  o'clock to 7 o'clock is ideal.

19                THE COURT:  Right.  I do think there may be some

20  merit to that.  We may all feel like you would be better off

21  going away for a few hours.  Get some sleep.

22                But I'm content to, why don't we just talk about

23  it at 3:00 or 3:30 today when we finish.

24                MR. MIZERK:  That's fine.

25                THE COURT:  That's fine?  Okay.

Kowey - direct

1              Well, thank you for working that out.

2              Are there any issues from confident?

3              MR. LEE:  Not from the plaintiffs.

4              MR. MIZERK:  And not for defendants.

5              THE COURT:  Okay.  Then you can call the witness

6   then, please.

7              MR. LEE:  Your Honor the plaintiffs call

8   Dr. Peter Kowey.

9              ... DR. PETER RUSSELL KOWEY, having been first

10  duly sworn, was examined and testified as follows ...

11             THE COURT:  Good morning, Dr. Kowey.  Welcome.

12             THE WITNESS:  Good morning, Your Honor.

13             THE COURT:  Thank you for being here.

14             THE WITNESS:  Thank you.

15             THE COURT:  You may proceed.

16             MR. LEE:  Thank you, Your Honor.

17                        DIRECT EXAMINATION

18  BY MR. LEE:

19  Q.    Dr. Kowey, will you introduce yourself to the Court?

20  A.    Peter Russell Kowey.

21  Q.    Have you been retained as an expert by Bristol-Myers

22  Squibb and Pfizer in this case?

23  A.    I have.

24  Q.    What do you do for a living?

25  A.    I'm a cardiologist.

Kowey - direct

1    Q.      Where are you currently employed?

2    A.      My employer is Main Line Health in Radnor,

3    Pennsylvania.

4    Q.      Do you have any other appointments?

5    A.      Yes.  I'm a professor of medicine and clinical

6    pharmacology at the Jefferson Medical College of Thomas

7    Jefferson University in Philadelphia.  And,

8            I'm also the William Wikoff Smith Chair in

9    Cardiovascular Surgery at the Lankenau Heart Institute.

10   Q.      Will you summarize your educational background for

11   us?

12   A.      I attended college at Saint Joe's when it was a

13   college in Philadelphia, then went on to medical school at

14   the University of Pennsylvania.

15           I then spent three years in Internal Medicine

16   training at the Milton S. Hershey Medical Center, Penn State

17   University, and then spent my cardiology training years in

18   Boston at the Peter Bent Brigham Hospital, before it was the

19   Brigham and Women's Hospital and the Harvard School of

20   Public Health and also the Roxbury VA Medical Center.

21   Q.      Do you treat patients?

22   A.      I do.

23   Q.      Does your practice have a clinical focus?

24   A.      It does.

25   Q.      What is it?

Kowey - direct

1    A.      The majority of the patients that I see in clinical

2    practice have abnormalities of their cardiac rhythm.

3    Q.      What are the most common cardiac -- cardiovascular

4    diseases that you treat?

5    A.      Oh, by far the most common cardiovascular condition

6    that I treat is a condition called atrial fibrillation.

7    Q.      And we'll come back to that.

8            Do you also treat patients with thromboembolic

9    disorder?

10   A.      Not as frequently, but I do, yes.

11   Q.      How many patients have you treated with any of these

12   disease conditions?

13   A.      Thousands.

14   Q.      And for how long have you been treating patients with

15   these disease conditions?

16   A.      I completed my training in 1981, so since then.

17   Q.      Do you prescribe any anticoagulants?

18   A.      I prescribe them myself, and I follow patients who

19   have had them prescribed by other physicians.

20   Q.      Have you ever prescribed Eliquis?

21   A.      I have.

22   Q.      Do you have job responsibilities in addition to

23   seeing patients?

24   A.      I do.

25   Q.      What are they?

Kowey - direct

1    A.       Well, there's a lot of them, but primarily they fall

2    into two categories.  One is education, so I teach at

3    several different levels.  I teach all the way from college

4    and medical students all the way up to physicians in

5    practice in cardiovascular medicine, predominantly in

6    cardiac rhythm management.  And,

7             Then the other side is I do research.  I provide

8    research and mentor researchers who are conducting both

9    clinical research in people and also basic research in

10   cellular animal models.

11   Q.       What has been the focus of your research over the

12   years?

13   A.       Oh, it's the same as my clinical practice focus,

14   which is cardiac arrhythmia.

15   Q.       Have you published the results of any of your

16   research?

17   A.       I have.

18   Q.       Approximately, how many publications do you have?

19   A.       It's in the range of 400 to 450 peer-reviewed

20   articles in addition to several textbooks and abstracts from

21   national scientific meetings.

22   Q.       And have you published any research about

23   anticoagulants?

24   A.       I have.

25   Q.       Do you have any experience with the drug approval

Kowey - direct

1  process?

2  A.   I do.

3  Q.   Would you tell us what that is?

4  A.   I spent several years -- I mean, I have spent and

5  continue to spend several years at the Food and Drug

6  Administration.  So I have been on both sides of that aisle.

7         I have been on the federal side where I have

8  been sitting on advisory committees to advise the Food and

9  Drug Administration about the approvability of new chemical

10 entities for the variety of cardiac and noncardiac

11 conditions, and then I have been on the other side where

12 I've, where I've consulted with Industry for bringing

13 forward applications for new drugs at the FDA.

14         So I have been in that process ever since I

15 completed my fellowship.

16 Q.   Is there something called the Cardiovascular Devices

17 Panel at the FDA?

18 A.   Yes.  In addition to being on a panel for drug

19 development and approval, I've also sat on the panel that

20 approves new cardiac devices.

21 Q.   Now, turning if you would in tab 1 in the binder that

22 I hope you have before you.

23 A.   Yes.

24 Q.   Do you find PTX-807?

25 A.   Yes.

Kowey - direct

1   Q.      What is it?

2   A.      It's my curriculum vitae dated January 2019.

3   Q.      Dr. Kowey, have you been compensated for your work in

4   this case?

5   A.      I have.

6   Q.      Does your compensation depend in any way on the

7   outcome of the case?

8   A.      In no way.

9   Q.      Does it depend in any way on the substance of your

10  opinion?

11  A.      No.

12                  MR. LEE:  Your Honor, the plaintiffs offer

13  doctor company as an expert in clinical medicine including

14  in particular the treatment of thromboembolic disorders.

15                  MR. TAYLOR:  No objection.

16                  THE COURT:  He's so recognized.

17  BY MR. LEE:

18  Q.      What were you asked to do in this case, Dr. Kowey?

19  A.      I was asked to review materials relating to the

20  patent for apixaban.

21  Q.      And have you prepared a set of demonstratives to

22  assist you in your testimony?

23  A.      I did.

24  Q.      Could I have PDX-10.2 on the screen.

25                  What was the question that you were asked to

1     address?

2     A.     This slide I think states it very clearly.  I was

3     asked whether salts of apixaban within the scope of sound

4     medical judgment could be used in a suitable fashion for

5     human beings in contact with tissue of human beings and

6     animals without excessive toxicity, irritation, allergic

7     response, or other problem or complications commensurate

8     with a reasonable risk-to-benefit ratio.

9     Q.     What did you consider in forming your opinions?

10     A.     I considered all elements of what I knew about

11     apixaban, both what I knew about the compound and also what

12     I knew about its clinical use.

13     Q.     Did you review the '208 patents?

14     A.     I did.

15     Q.     Did you review in particular claims 13 and 104 of the

16     '208 patent?

17     A.     I did.

18     Q.     Have you considered who a person of ordinary skill in

19     the art is in the art for a '208 patent?

20     A.     Yes.

21     Q.     Could you have PDX-10.3 on the screen, please.

22          Do you see the definition of a person of

23     ordinary skill in the art?

24     A.     I do.

25     Q.     Is this the definition that you applied?

Kowey - direct

1   A.      Yes, sir.  That is the definition that I used.

2   Q.      So let me ask you the specific question:  Where in

3   this definition does your clinical expertise fall?

4   A.      At the end of the statement, there's a stipulation

5   about a person on the team, professionals, who has

6   experience in clinical medicine.  That's where I think that

7   I fit in.

8   Q.      And so to be precise, referring to PDX-10.3, there's

9   a reference to a team of professionals?

10  A.      That's correct.

11  Q.      With a variety of disciplines?

12  A.      That's what it said.

13  Q.      And the discipline, your discipline is?

14  A.      Clinical medicine.

15  Q.      Now, were you such a person in 2001?

16  A.      I was.

17  Q.      Now, one of the -- if you go back one, it's

18  PDX-10.2.

19          One of the things you referred to as a

20  reasonable risk/benefit ratio; is that correct?

21  A.      Yes.

22  Q.      And I want to ask you a little bit about that.

23  How does a physician go about evaluating a risk/benefit

24  ratio?

25  A.      Well, it's all we do.  I mean, it's the essence of

Kowey - direct

1    being a doctor, is constantly trying to assess whether a

2    drug or a device or a procedure that we're planning for a

3    patient, that the benefit that we'll confer on that patient

4    outstrips any potential risk that we might be exposing the

5    patient to.  So it's everything we do.

6    Q.    Did the analysis depend in part on the disease

7    conditions you're treating?

8    A.    Oh, yes.  It's of the essence.

9    Q.    All right.  So let's turn to the disease conditions

10   that Eliquis treats.  What conditions have you prescribed

11   Eliquis for?

12   A.    Well, the majority of the patients that I treated

13   with Eliquis or apixaban have been patients with atrial

14   fibrillation.

15   Q.    Turn, if you would, to tab 2 in your notebook.  Do

16   you find PTX-325?

17   A.    I do.

18   Q.    And turn to the first page after the cover letter.

19          Do you see it on the screen?

20   A.    Yes, sir.

21   Q.    Would you tell the Court, what is that?

22   A.    This is a one-page highlight of the prescribing

23   information for Eliquis or apixaban.

24   Q.    So let's look at the page ending Bates number 331,

25   and specifically, I am going to ask Mr. Lane to bring blow

Kowey - direct

1     up the portion that says indications and usage.

2                 Do you see that?

3     A.     Yes, sir.

4     Q.     Have you prepared a demonstrative to show Eliquis'

5     indications?

6     A.     Yes.

7     Q.     Are these the disease conditions which Eliquis is

8     treating?

9     A.     Yes, yes.  These are the indications.

10    Q.     And are these, do these disease conditions you

11    consider in a risk/benefit ratio?

12    A.     For each, yes.

13    Q.     Let's look at PDX-10.4.  What is Eliquis' first

14    indication?

15    A.     So this is where I prescribed the drug most

16    frequently, is for patients who have an arrhythmia in the

17    upper chamber of their heart, atrial fibrillation.

18    Q.     To try some context in a little bit more detail, what

19    is atrial fibrillation?

20    A.     Atrial fibrillation is an electrical disease of the

21    upper chambers of the heart, and when that occurs, the upper

22    chamber of the heart loses its ability to contract

23    symmetrically and forcefully.

24                 As you'll recall perhaps from high school

25    physiology, the atrium is the chamber that primes the bottom

Kowey - direct

1    chamber of the heart, the ventricle.  So in order to

2    maximize the efficiency of the lower chambers of the heart,

3    ultimately, we would like to have the upper chamber priming

4    the bottom chamber.  That's what the atrium's function is.

5    Q.    Are there medical risks associated with atrial

6    fibrillation?

7    A.    Yes, there are risks, and they are primarily,

8    although there are others, the primary risks are stroke and

9    systemic embolism as this indication is -- lists, and then

10   also congestive heart failure.

11   Q.    Have you prepared a demonstrative to help us

12   understand how atrial fibrillation can lead to stroke?

13   A.    I have.

14   Q.    Could I have PDX-10.5.

15         And using the animated PDX-10.5, would you

16   explain to us how atrial fibrillation can lead to stroke.

17   A.    So if you remember what I said about the upper

18   chamber of the heart no longer contracting in an efficient

19   and symmetrical way.  It needs to -- basically, what it

20   looks like if you can see it, it's a quivering of the top

21   chambers of the heart, of the muscle of the heart.  When

22   that happens, blood stagnates in the upper chamber, and when

23   blood congeals because it's stagnating, it forms clots, and

24   as you can see on this cartoon on the left, there's a clump

25   of what are supposed to be platelets and red blood cells

Kowey - direct

1   that have congealed within the left atrial cavity.

2                   Under some set of circumstances, and we

3   don't completely understand all of this, under some set of

4   circumstances, that clot can release from the left atrium,

5   travel into the left ventricle, which is the main pumping

6   chamber of the heart.  And as you can see on the right, the

7   clot can then travel, and it can travel up into the carotid

8   arteries north into the brain, and when it does, it can

9   occlude a large segment of the blood flow to the brain, and

10  that is the definition of a stroke.

11  Q.      And can a stroke lead to death?

12  A.      Yes.  Strokes associated with atrial fibrillation are

13  frequently mortal or disabling.

14  Q.      How much does atrial fibrillation increase a

15  patient's likelihood of having a stroke?

16  A.      It depends.  The risk of stroke over and above what

17  it would be in the normal population depends on the

18  patient's other vascular risk.  That is, what other

19  conditions does a patient have?

20                  If the patient has hypertension, for

21  example, or diabetes or heart failure, the risk of stroke

22  associated with atrial fibrillation can be as high as five

23  times the normal population.

24  Q.      How common is atrial fibrillation in the United

25  States?

Kowey - direct

1   A.      It's a difficult number to come by because we suspect

2   that there are a number of people who are walking around,

3   don't even know that they have it.  They're discovered

4   incidentally or sometimes tragically, they're discovered at

5   the time that they have a stroke, that the stroke was caused

6   by atrial fibrillation.

7                   Our best estimates is that we're dealing

8   with somewhere in the vicinity of two to ten million

9   Americans who are afflicted with this disease.

10  Q.      Could we go back to PDX-10.4, please.  What is

11  Eliquis' second indication?

12  A.      The second indication is for the prevention of

13  clots that can develop in lower extremity veins, deep veins

14  within the lower extremity, at the time of, at the time of

15  surgery that the patients have either to replace the hip or

16  a knee.

17  Q.      And how does deep vein thrombosis relate to pulmonary

18  embolism?

19  A.      Well, once again, under some set of circumstances, a

20  congealed clot within the deep veins in the leg may break

21  loose and travel, which is what an embolism is, and travel

22  into the lungs, and it can cause lack of blood flow to the

23  lung, which in turn leads to lung infarct or death.

24  Q.      Have you prepared a demonstrative to help explain

25  deep vein thrombosis and pulmonary embolism?

Kowey - direct

1    A.    Yes.

2    Q.    Could I have PDX-10.6, please.

3              And would you talk us through deep vein

4    thrombosis and pulmonary embolisms with this animated

5    slide?

6    A.    Well, once again, what we're looking at here is a

7    clump of platelets and red blood cells that have congealed

8    within a deep vein within the leg.  That itself produces

9    symptoms that are distal to or further downstream from where

10   that vein is occluded, will cause swelling of the leg and

11   pain, redness.

12              It's a -- it's a very uncomfortable

13   condition.  The worst part of it, however, is that, again,

14   under conditions that we don't completely understand, that

15   clot can break loose and travel, as this cartoon is

16   indicating, through the veins into the right side of the

17   heart, the other side of the heart, and we talked about

18   previously, into the right ventricle, out the pulmonary

19   arteries which supply blood to the lungs.  Similarly what

20   happens in the brain, the clot occludes blood flow to the

21   lung, causing it to die.

22   Q.    How many people are afflicted by deep vein thrombosis

23   and pulmonary embolism each year?

24   A.    Well, within this indication, we're talking about

25   joint replacement surgery.  Joint replacement surgery is the

Kowey - direct

1    most frequent surgery that is carried out in Medicare

2    populations and it's literally hundreds of thousands of

3    people who have this procedure.  So everyone who has a joint

4    replacement operation is at risk for developing these

5    complications that we're describing.

6    Q.    Let me go back to PDX-10.4.  I'm going to ask you one

7    more question about the second indication for the

8    non-scientist like me.  What is prophylaxis?

9    A.    That's prevention.

10   Q.    Okay.

11   A.    In a simpler term.  It's just basically trying to

12   keep it from happening.

13   Q.    What is the third indication for Eliquis?

14   A.    Well, it's very analogous to the second indication.

15   Now we're dealing with a thrombosis that's, or a clot that

16   has already developed in the lower extremity in a patient

17   who hasn't had hip or knee replacement surgery.  They just

18   spontaneously develop a clot.

19                    Again, this is in concert with people who

20   have disease of the veins of the lower extremity, which is a

21   common condition in older individuals, and that clot can sit

22   in the vein, cause the same kinds of symptoms that I've

23   described, and also can cause an embolism to the lung, which

24   is what the term PE is referring to in that claim.

25   Q.    Are these the risks that you consider in evaluating

Kowey - direct

1    the risk/benefit ratio?

2    A.      Oh, absolutely, they are.

3    Q.      How serious are the conditions that Eliquis is used

4    to treat?

5    A.      They are all potentially life-threatening conditions.

6    Q.      Before Eliquis and modern anticoagulants were

7    available, how were these conditions treated?

8    A.      Well, before these drugs were available, the most

9    frequent treatment was Warfarin.

10   Q.      How widely used was Warfarin?

11   A.      It was, it was widely used, but it wasn't as widely

12   used as we would have liked because it has a number of very

13   significant limitations.

14   Q.      Have you prepared a demonstrative that will help us

15   consider the risks associated with Warfarin?

16   A.      Yes.

17   Q.      Could I have PDX-10.8, please.

18           Would you tell us what is on this slide

19   generally and I will go through the specific language.

20   A.      In general, what this slide in addition is showing

21   you a bottle of Warfarin sodium.  What this slide is

22   indicating is that there were a number of important

23   limitations to the use of the drug that led to poor

24   acceptance by patients and physicians.

25   Q.      Let's start at the top.  The first is therapeutic

Kowey - direct

1    index.   What is the therapeutic index?

2    A.      In clinical medicine, we have drugs that have a wide

3    therapeutic index.   What that means is that almost no matter

4    how much of the drug you give or expose a patient to, that

5    they're likely to get a similar effect, both in terms of the

6    efficacy and safety of the drug.

7            In fact, dabigatran and apixaban and Razaxaban

8    are examples of wide therapeutic index drugs.

9    Unfortunately, Warfarin is at the end of that spectrum.

10   It's a narrow therapeutic index, which means it's almost

11   like hitting the center of a dartboard, the bull's eye.   You

12   have a hit a very small range of concentrations in order to

13   be able to maximize the benefit while not exposing patients

14   to the risk of bleeding.

15   Q.      And what is the consequence of having a narrow

16   therapeutic index?

17   A.      Well, it leads to the second thing on -- the second

18   limitation on this slide.

19           What it means is that if you are going to use

20   the drug, you have to monitor patients extraordinarily

21   carefully in order to make sure that they have the effect

22   size that you're aiming for.

23   Q.      And when you say "frequent," what do you mean?

24   A.      Well, the beginning of treatment, we monitor patients

25   with coagulation testing and Warfarin as often as every five

Kowey - direct

```
 1   to seven days.  Eventually we're able to rachet that back a

 2   bit, but they're still being monitored somewhere between

 3   every two to four weeks.

 4   Q.    And what effect does this monitoring have upon

 5   patients and patient compliance?

 6   A.    Well, it has an obviously chilling effect on

 7   patients' acceptability of this as well as doctors.  It's a

 8   costly, difficult, and arcane procedure that these patients

 9   have to go through.

10   Q.    Now, the third point is interpatient variability;

11   correct?

12   A.    Yes.

13   Q.    What is that?

14   A.    So I believe we've learned over the course of time

15   that your ability to metabolize or to process Warfarin in

16   your liver, which is where it is processed, is genetically

17   determined.  So that depending on your genotype or your

18   genes, you may be a person who metabolizes this drug to a

19   very large extent or to a very small extent.  And,

20         So when we start dosing someone, you can imagine

21   how that creates problems because we start with the dose.

22   And we don't know a priori whether the patient is going to

23   be an extensive or poor metabolizer.  So it makes for

24   difficulties in making decisions about dosing patients,

25   again, in order to optimize the risk/benefit.
```

Kowey - direct

1    Q.      Now, the fourth category is onset of action.  What is

2    onset of action?

3    A.      So that is another problem with Warfarin that we've

4    experienced for -- is that because of the way it is

5    metabolized, and its effect on different portions of the

6    coagulation system, when you start the drug, it takes

7    several days to be able to get to a level in which the

8    patient is sufficiently anticoagulated.  And on the other

9    end, when we stop the drug, it takes several days for the --

10   that effect size to go away.

11   Q.      And what are the problems with a slow onset of

12   action?

13   A.      Well, if we believe that a patient is at risk,

14   someone comes in the Emergency Room or worried that they

15   have a DVT, for example, having to wait several days for

16   the effect of Warfarin to kick in is a distinct therapeutic

17   disadvantage.

18   Q.      The next slide refers to a "Heparin bridge for

19   surgery."

20           Could you explain that to us, please?

21   A.      So because of the slow onset and offset of effect,

22   you can't leave patients unanticoagulated for several days

23   while the effect either comes to bear or goes away.  And so

24   we frequently had to use Heparin, which is a short-acting

25   parenteral, that is, non-oral anticoagulant, in order to get

Kowey - direct

1      patients anticoagulated for a sufficient period of time.

2                   One of the major advantages of the new drugs is

3      that these drugs have very quick onset and offset of action.

4      Q.     The last category is food and drug interactions.

5      What does that refer to?

6      A.     Warfarin, because of the fact that it is metabolized

7      and processed in the liver, can interact with other drugs

8      that are processed in the liver, and patients who take

9      Warfarin are frequently on other drugs or prescribed other

10     drugs, so we're constantly dealing with the contingency of

11     patients having an interference of the effect of Warfarin or

12     an abundance of Warfarin effect because of the effect of

13     other drugs that are administered.  And,

14                  Then the food thing is -- a lot of the foods we

15     eat, especially green, leafy vegetables, have a high rate

16     of Vitamin K content which can interfere with Warfarin

17     supplying this.

18     Q.     Now, what other drugs are used today to treat the

19     same disease conditions as Eliquis?

20     A.     Well, there are -- there have been four so-called new

21     or novel oral anticoagulants approved.  Apixaban is one of

22     them.  The other three are Xarelto, or rivaroxaban; Savaysa

23     or edoxaban; and Pradaxa or dabigatran.

24                  MR. LEE:  And, Your Honor, we'll provide to the

25     reporting staff the precise spellings.

Kowey - direct

1    THE WITNESS:  Sorry.  Sorry.

2    THE COURT:  Appreciate it.

3    MR. LEE:  I'm not going to try now.

4  BY MR. LEE:

5  Q.    Now, are there any risks associated with these drugs?

6  A.    All anticoagulants have risk.  The risk of all

7  anticoagulants is that they can cause bleeding.  And -- and

8  for one of them, which was the dabigatran, Pradaxa, the

9  other liability is that it can cause gastric irritation.

10 Q.    Now, let's turn to your opinion about apixaban salts.

11       Do you have an understanding of the term

12 "pharmaceutically acceptable salts" as that term is used in

13 claim 15 of the '208 patent?

14 A.    Yes.

15 Q.    And have you prepared a demonstrative summarizing

16 your understanding?

17 A.    Yes.

18       MR. LEE:  Could I have PDX-10.9, please.

19 BY MR. LEE:

20 Q.    What does PDX-10.9 set forth?

21 A.    This is the Court's construction of the claim term

22 "pharmaceutically acceptable salts."

23 Q.    There is a portion that is highlighted; correct?

24 A.    Yes.

25 Q.    And why have you highlighted this portion?

Kowey - direct

1    A.        Because it has to do with what we've been talking

2    about and what I think about, which is applying medical

3    judgment whether or not the compound would be suitable for

4    use in human beings without excessive toxicity, irritation

5    or allergic response or other problems.

6              And I think the most important part of this is

7    the last phrase, which is its benefit/risk ratio.

8    Q.        Were you asked to make any assumptions in performing

9    your analysis?

10   A.        I was.

11   Q.        Have you prepared a demonstrative to summarize the

12   assumptions you were asked to make?

13   A.        I did.

14             MR. LEE:   Could I have PDX-10.10 on the screen.

15   BY MR. LEE:

16   Q.        Would you tell us what assumptions you are asked to

17   make in forming your analysis?

18   A.        Well, stated here, I was asked to assume that the

19   salts of apixaban had been made, and specifically the salts

20   were of sodium, potassium, or hydrochloride.  And,

21             Then I was further asked to assume that for the

22   largest indicated dose of apixaban, which happens to be

23   10 milligrams, that that salt would contain less than

24   1 milligram of the cations in salt form.

25   Q.        Now, what is your ultimate opinion concerning an

Kowey - direct

1    apixaban salt with these characteristics?

2    A.     It's my opinion that with these assumptions, that it

3    would be extraordinarily unlikely that there would be any

4    harm caused to the human being using these amounts of

5    cation, and that any risk that would be associated with

6    using this would never come anywhere close to what the

7    benefit of the intervention would be.

8    Q.     In terms of treating the disease conditions.

9    A.     That we've been talking about, yes.  Correct.

10   Q.     What happens to apixaban salts when it enters the

11   body -- strike that.

12          What happens to an apixaban salt when it enters

13   the body and first encounters water?

14   A.     Well, for salts that are administered in that

15   fashion, they dissociate into the parent and into the

16   cation.

17   Q.     And would you explain to us what does it mean to

18   dissociate?

19   A.     They come apart from each other so that the parent is

20   fully available.

21   Q.     Now, did you consider any effect that sodium,

22   potassium, or hydrochloride would have from an apixaban

23   salt?

24   A.     I did.

25   Q.     And what are the reasons that you concluded that the

Kowey - direct

1   sodium, potassium, or hydrochloride in apixaban salt would

2   not cause any additional concerns?

3   A.      I have been doing this for a very long time.  I have

4   been at a regulatory level, I take care of patients, and I

5   do clinical research.

6              I have administered drugs that have salt

7   formulations for years and in amounts that are of this and

8   perhaps even higher concentrations of cation.

9              I have never seen a problem with the salt of a

10  drug with these alternatives using -- using these drugs in

11  patients, and as well as in my exposure to drugs of other

12  form.

13  Q.      Have you prescribed any drugs that are, in fact,

14  sodium salts?

15  A.      Oh, yeah, I have.

16  Q.      Can you give us an example?

17  A.      Warfarin sodium we talked about for a while.  That's

18  a good example.

19  Q.      That is a sodium salt?

20  A.      Yes.

21              MR. LEE:  Let's go to PDX-10.11.

22  BY MR. LEE:

23  Q.      I want to ask you a little bit more about the label.

24              Have you prepared a demonstrative showing how

25  apixaban is dosed?

Kowey - direct

1    A.      Yes.

2    Q.      And what are the doses for which apixaban is

3    approved?

4    A.      As you can see from this, the dose of apixaban is

5    variable depending on the clinical situation for which it is

6    being used.  But the dose range is somewhere between 2.5 and

7    10 milligrams.

8    Q.      And what is the highest dose for which apixaban is

9    approved?

10   A.      It's under the category treatment of DVT and PE, and

11   it's 10 milligrams.

12   Q.      So let me focus you on that 10-milligram dosage.

13           Have you formed an opinion as to whether you

14   would expect any clinically meaningful difference between

15   10 milligrams of Eliquis and the equivalent 10 milligrams of

16   apixaban in salt form?

17   A.      I have.

18   Q.      And what is your opinion?

19   A.      I have absolutely no reason to believe they would be

20   any different.

21   Q.      And what are the reasons for your opinion?

22   A.      Returning to my assumptions.  My assumption that I

23   was given was that the amount of the cation that would be

24   contained in the salt of a milligram of sodium or potassium

25   or hydrochloride would have a negligible effect on an animal

Kowey - direct

1    or a person.

2    Q.      Without putting the claim construction back up, do

3    you recall that His Honor's claim construction refers to

4    excessive toxicity, irritation, complications?  Do you

5    recall that?

6    A.      I certainly do.

7    Q.      Do you have an opinion as to whether an apixaban salt

8    with these assumptions would -- withdrawn.

9            Do you have an opinion as to whether an apixaban

10   salt, as you have assumed it, would have any risk of

11   excessive toxicity, irritation, or other complications?

12   A.      I don't believe that it would.

13   Q.      And what are the reasons?

14   A.      Again, once again, returning to my assumption, it

15   is the amount of the cation in addition to the fact that,

16   again, putting this into concepts of the risk benefit,

17   we're dealing with a life-threatening condition that we're

18   treating, and so that any minor irritation that might occur

19   in the situation, although I think unlikely, would certainly

20   not dissuade me from my assessment of the risk-benefit

21   ratio.

22   Q.      Dr. Kowey, are there any apixaban salts approved by

23   the FDA on the market today?

24   A.      No.

25   Q.      Have you, yourself administered any to patients?

Kowey - direct

1   A.      No.

2   Q.      Have you conducted any clinical trials with apixaban

3   salts?

4   A.      I have not.

5   Q.      Do they -- do those facts, the fact that there's not

6   an FDA approved product, affect your opinion as to whether

7   the apixaban salts you have assumed, could clinical sound

8   medical judgment be used without excessive risk?

9               MR. TAYLOR:  Objection, beyond the scope.

10  Beyond the scope of his report.

11              MR. LEE:  I don't think that's true.

12              THE COURT:  Can you point to where it is

13  disclosed?

14              MR. LEE:  I think we're in a number of different

15  places.  The rebuttal report, page -- paragraph 163.

16              MR. TAYLOR:  In paragraph 163 he simply makes a

17  conclusion.  He doesn't explain any reason why.

18              THE COURT:  Well, I don't think he's going

19  to ask -- well ...

20              MR. LEE:  Yes, I asked for the conclusion.

21              THE COURT:  I think it says it doesn't affect

22  your opinion.

23              MR. LEE:  Right.

24              THE COURT:  I think that was the question.

25              Do you agree that that has been disclosed or not

Kowey - direct

1    disclosed?

2              MR. TAYLOR:   That specifically has been

3    disclosed, yes.

4              THE COURT:   Has.

5              MR. TAYLOR:   Correct.

6              THE COURT:   Then overruled.

7              Let's get the answer.

8    BY MR. LEE:

9    Q.    My question is, does the fact there has been no FDA

10   approved salt of apixaban affect your opinion?

11   A.    No, not at all.

12   Q.    All right.  Have you reviewed Dr. Zusman's trial

13   testimony?

14   A.    I did.

15             MR. LEE:   Let me put on the screen trial

16   transcript page 892, line 17 to 23.

17   BY MR. LEE:

18   Q.    Do you recall the portion of his report that stated:

19             "Although it is unlikely that such salts would

20   have an appreciable effect"?

21   A.    Yes, I did see that.

22   Q.    Now, if such salts refer to apixaban salts, do you

23   and Dr. Zusman agree?

24   A.    Apparently.

25   Q.    There's no dispute between you; right?

Kowey - cross

```
1    A.      I wouldn't disagree with that statement, no.

2             MR. LEE:  Nothing further, Your Honor.

3             THE COURT:  Okay.  Cross-examination.

4                      CROSS-EXAMINATION

5    BY MR. TAYLOR:

6    Q.      Good morning, Dr. Kowey.  Am I pronouncing that

7    correctly?

8    A.      Yes.

9    Q.      Thank you.

10            Now, my name is Dustin Taylor.  I'm an attorney

11   representing SigmaPharm Laboratories, one of the defendants

12   in this case.

13            You and I previously met in Philadelphia?

14   A.      We did.

15   Q.      It's nice to see you again.

16   A.      Same here, Mr. Taylor.

17   Q.      I'd like to begin today by discussing your background

18   and qualifications.

19            You are a medical doctor.

20   A.      I am.

21   Q.      You have a medical degree.

22   A.      I do.

23   Q.      You do not have a degree in chemistry.

24   A.      I do not.

25   Q.      You do not have experience as a pharmaceutical
```

Kowey - cross

1    formulator?

2    A.    I do not.

3    Q.    You have never screened pharmaceutical salts.

4    A.    No.

5    Q.    You are not an immunologist.

6    A.    No.

7    Q.    You are, instead, a medical doctor.

8    A.    I'm sorry?

9    Q.    You are, instead, a medical doctor.

10   A.    I am, instead, a medical doctor.  Yes.

11   Q.    You treat patients.

12   A.    I treat patients.

13   Q.    As parts of your treatment of patients, you have

14   previously prescribed Warfarin?

15   A.    Yes, I have.

16   Q.    Including a Warfarin salt that we just heard about?

17   A.    That's correct.

18   Q.    That was the Warfarin sodium?

19   A.    Warfarin sodium, yes.

20   Q.    Warfarin was FDA approved?

21   A.    It was.

22   Q.    Do you know the pKa of Warfarin?

23   A.    Not off the top of my head.

24   Q.    Would it surprise you if it was in the three to ten

25   range?

Kowey - cross

1  A.      It wouldn't surprise me, no.

2  Q.      As part of your treatment of patients, you also

3  prescribed apixaban?

4  A.      I do.

5  Q.      Apixaban was not approved for use in 2001; is that

6  correct?

7  A.      It was not.

8  Q.      And as we just heard from Mr. Lee, no FDA approved

9  apixaban salt currently exists?

10  A.      That's correct.

11  Q.      Let's talk about what you know regarding whether any

12  apixaban salt exists.  In rendering your opinions in this

13  case, you were asked by plaintiffs' counsel to assume that

14  the sodium, potassium and hydrochloride salt forms of

15  apixaban had been made.

16  A.      That's correct.

17  Q.      You have no independent knowledge of whether a salt

18  form of apixaban had been made?

19  A.      Only what I was told.

20  Q.      You did no independent testing to confirm that a salt

21  form of apixaban had been made?

22  A.      No.

23  Q.      In fact, you don't know how to do independent testing

24  to determine whether an apixaban salt form had been made?

25  A.      It's not my skill set, no.

Kowey - cross

1   Q.      It's not your area of expertise?

2   A.      Correct.

3   Q.      Let's next discuss your opinions that if an apixaban

4   salt could be made, it would be pharmaceutically acceptable.

5           Now, you didn't inquire as to the properties

6   of any salt forms of apixaban that Dr. Jacobsen allegedly

7   made?

8   A.      No.

9   Q.      You never ran any different -- excuse me.  You never

10  ran any tests on different salts of apixaban in terms of

11  toxicity?

12  A.      Myself?

13  Q.      Correct.

14  A.      No.

15  Q.      You never yourself ran any different, any tests on

16  different salts of apixaban in terms of irritation?

17  A.      I did not.

18  Q.      You, yourself, never ran any tests on different salts

19  of apixaban in terms of allergic response?

20  A.      I did not.

21  Q.      The extent of your opinion today is that you were

22  asked to make an assumption about the relative contribution

23  of a salt to the apixaban compound?

24  A.      Correct.

25  Q.      Finally, let's discuss what information you did not

Kowey - cross

1    consider when reaching your opinions.

2              You do not know whether the salt forms of

3    apixaban are stable?

4    A.      I have no, no knowledge of that.

5    Q.      You do not know whether the salt forms of apixaban

6    spontaneously converted to neutral apixaban?

7    A.      I do not.

8    Q.      You do not know the pH value of salt forms of

9    apixaban when it dissolves?

10   A.      I don't know the exact pH value, no.

11   Q.      You made no assumptions about the pH value of any

12   apixaban salt form?

13   A.      Not within the assumptions that I was given.  That's

14   correct.

15   Q.      We can agree though that if the converted salt had a

16   pH of zero, you couldn't give that to someone?

17   A.      No, I don't think we agree with that at all.

18   Q.      You don't think we agree with that?

19   A.      No, I don't think I agree with that, not as a blanket

20   term, no, not without knowing a lot more about the amount

21   and where it was being delivered.

22   Q.      You wouldn't agree that you can't administer anything

23   with a pH value of zero?

24   A.      I know that in my deposition, I was asked that question.

25   Q.      Let's take a look at that deposition.

Kowey - redirect

1    A.      Yes, that's fine.

2    Q.      Dr. Kowey, I'm going to read deposition page 219,

3    lines 7 through 15.  I'm sorry.  This is the video.

4                (Video clip played as follows.)

5                "Question:  If the converted salt form had a pH

6    value of zero, would that be cleaning -- clinically

7    meaningful in your opinion?

8                "The Witness:  pH value where?  You mean in the

9    stomach?  You can't administer anything with a pH of zero.

10   I mean that's toxic.  That's very acidic obviously?"

11               (End of video clip.)

12   BY MR. TAYLOR:

13   Q.      That was you on the video?

14   A.      Yes.

15   Q.      And you gave that testimony?

16   A.      Well, it's a little bit out of context.  I was asked

17   about a substance.  I wasn't told the amount of the

18   substance or exactly where it was going to be delivered, but

19   a large amount of something at a pH of zero would be toxic.

20   Yes, of course.

21               MR. TAYLOR:  Pass the witness.

22               THE COURT:  Redirect?

23               MR. LEE:  Just a few questions.

24                       REDIRECT EXAMINATION

25   BY MR. LEE:

Kowey - redirect

1  Q.      Dr. Kowey, you were asked a series of questions about

2  tests that you didn't perform.

3          Do you recall those?

4  A.      I do.

5  Q.      As far as you know, have the defendants done any

6  tests on apixaban salts themselves?

7  A.      I have not seen any evidence of that, no.

8  Q.      You were asked about a series of things that you

9  didn't do or didn't know.  Did Dr. Zusman do any of those

10 things?

11 A.      Not to my knowledge.

12 Q.      Now, the one clinical expert, the one clinical

13 medical doctor who testified other than you is Dr. Zusman;

14 is that correct?

15 A.      I believe so.

16 Q.      And on the question of the effect of apixaban salts

17 and whether it would be excessive, do you agree or disagree?

18 A.      No, I think we agree.

19          MR. LEE:  Thank you, Your Honor.

20          THE COURT:  Thank you.  You may step down.

21          THE WITNESS:  Thank you, Your Honor.

22          THE COURT:  Thank you very much.

23          (Witness excused.)

24          MR. LEE:  Your Honor, I would offer PTX-807.

25          THE COURT:  Any objection?

1    MR. TAYLOR:  No objection.

2    THE COURT:  All right.  It's admitted.

3    (PTX-807 was admitted into evidence.)

4    THE COURT:  Call back the witness that we

5    interrupted.

6    MR. LEE:  I'm just going to step out for a

7    minute to get Dr. Kowey on his way.

8    THE COURT:  Fine.  Good morning.

9    MR. PEJIC:  Good morning.  I will pass up the

10   witness binders.

11   THE COURT:  Good morning, Doctor.  Welcome back.

12   THE WITNESS:  Thank you.

13   THE COURT:  I hope you had a good evening.  You

14   remain under oath.  Have a seat, and when counsel are ready,

15   we'll begin.

16   ... DR. WALTER G. CHAMBLISS, JR., having been

17   previously sworn, was examined and testified as follows ...

18   DIRECT EXAMINATION (Continued)

19   BY MR. PEJIC:

20   Q.    Ready, Dr. Chambliss?

21   A.    Yes.

22   MR. PEJIC:  Good morning, Your Honor.

23   THE COURT:  Good morning.

24   MR. PEJIC:  Yesterday when we left off, we left

25   off with an objection as to Dr. Chambliss testifying from

Chambliss - direct

1    his stuff based on his experience, if you recall.  I would

2    like to ask that Dr. Chambliss' deposition transcript be put

3    up and I would direct you to page 137.  Also, may I

4    approach?

5              MR. PRUSSIA:  What was the question that was

6    pending?

7              THE COURT:  Why don't you re-ask the question.

8              MR. PEJIC:  There were a number of times I asked

9    about his experience with Class III drugs and his

10   formulation, and I will give examples in the context of his

11   deposition transcript, Your Honor.

12             THE COURT:  Why don't we talk about, what is the

13   relief you're seeking?  What is it you want to do?

14             MR. PEJIC:  That he be able to continue his

15   testimony and continue based on his experience as well.

16             THE COURT:  I believe the issue was whether he

17   had disclosed it adequately.  And are you able to show us

18   now where he disclosed it?

19             MR. PEJIC:  I would first go back to where we

20   were talking about his testimony as a formulator and his

21   experience as a formulator, because this will come up in

22   going through the prior art going forward.

23             THE COURT:  If you recall, what is your

24   objection?

25             MR. PRUSSIA:  Your Honor, I just pulled the

Chambliss - direct

1    transcript.  It's at trial transcript page 1263.

2              The question from Mr. Pejic was:  And can you

3    also tell us why it is not consistent with your experience

4    in the prior art?  This was in the context the of the Cola

5    reference I believe that was on the screen at the time.  And

6    the answer proceeded to describe Dr. Chambliss' experience

7    with Schering-Plough, and that's when I interposed my

8    objection saying it was not disclosed in the report.  So I

9    think that is the issue right then.

10             THE COURT:  So I just need to know where he

11   disclosed it as the issue.

12             MR. PEJIC:  Okay.  Well, the Landis-Kola

13   article.

14             THE COURT:  Well, as a general matter, is it in

15   his report?

16             MR. PEJIC:  Yes, Your Honor.

17             THE COURT:  Okay.

18             MR. PEJIC:  Paragraph 37.

19             MR. PRUSSIA:  Your Honor, the Kola, the dispute

20   here isn't whether Kola is in the report.  The Kola paper, I

21   should say is in the report.  I don't dispute that.  The

22   only place it is in paragraph 37 in the reply report.  And

23   if you look at that paragraph, there's no discussion as to

24   his experience, experience and failures at Schering-Plough

25   in Phase 3 trials.  That is the objection.

Chambliss - direct

1          MR. PEJIC:  What I'm going to show throughout

2     his deposition, Dr. Chambliss testified based on his

3     experience and Mr. Prussia asked him questions based on his

4     experience and could have asked questions based on Landis

5     and Kola and Dr. Chambliss' experience at the time and chose

6     not to.

7          THE COURT:  Okay.  So the first thing is, I

8     think you're acknowledging he did not disclose in his report

9     that a basis of his opinions or the particular opinion is

10    his experience at Schering-Plough.

11         Do you agree with that?

12         MR. PEJIC:  I will, Your Honor.

13         THE COURT:  Okay.  But now I think you are

14    saying to me, if I look at certain portions of his

15    deposition transcript, I will see that, in fact, he did

16    disclose that as a basis of his opinion.  Is that right?

17         MR. PEJIC:  What I will show you is that in

18    several instances he gave testimony based upon his

19    experience at Schering-Plough and overall as a formulator,

20    and that Mr. Prussia did ask him questions based expressly

21    on his experience on issues that were not expressly in his

22    report.

23         And so I'm saying at this point in time that

24    plaintiffs were well aware of the Kola article and Dr.

25    Chambliss actually called out a typo in paragraph 37 of his

Chambliss - direct

1    reply report at the deposition.

2              Plaintiffs were certainly free to ask Dr.

3    Chambliss any questions regarding this during his deposition

4    and did ask questions based upon Dr. Chambliss' experience,

5    so I would submit it's appropriate for him to be able to

6    testify based upon his experience in this connection as

7    well.

8              THE COURT:  What I'm hearing, but correct me if

9    I'm wrong, is, he did not disclose this in his report, nor

10   did he disclose it in his deposition, but had certain

11   questions been asked, he would have disclosed it?

12             MR. PEJIC:  The Landis and Kola in the concept

13   of the failure of paragraph 3 drugs -- I'm sorry, Phase 3

14   clinical trials was fully discussed.

15             The particular experience at Searle was not, but

16   I would at least submit that Dr. Chambliss would be able to

17   testify as to the impact in general of a failure of a Class

18   III, Phase 3 clinical trial.

19             THE COURT:  All right.  I don't know that we

20   have an objection to a question about general Phase 3.

21             MR. PEJIC:  I believe that was my question and

22   Dr. Chambliss turned to his personal experience.

23             THE COURT:  Okay.  Well, I thought you just said

24   he should be allowed to testify to general understanding of

25   failure to Phase 3.  That's different in my mind than him

1    testifying to a specific experience.

2              MR. PEJIC:  Okay.  Well, my understanding was my

3    question was broadly and the testimony that was elicited was

4    giving his experience, but I can certainly ask it.

5              THE COURT:  It may be broad question, but I

6    think the objection is to the specific testimony.

7              Mr. Prussia, we can take the time to look at the

8    deposition, but it sounds like what I'm going to see is he

9    didn't specifically disclose the particular experience that

10   he's drawing on, that he talked generally about his

11   experience and he talked generally about that's the basis

12   for his opinion, and you asked him some questions in that

13   area and, of course, could have asked him more specific

14   questions.

15             Do you agree that's what I would see if I took

16   the time to study the depositions?  And if so, where does

17   that leave your objection?

18             MR. PRUSSIA:  Your Honor, I don't recall any

19   specific discussion at the deposition regarding his

20   experience at Schering-Plough with clinical trials and drugs

21   that had failed in Phase 3 or any other stage.  If my friend

22   wants to make a proffer, I'm happy to take a look at it, but

23   I do not remember that at all.

24             THE COURT:  So you would object?

25             MR. PRUSSIA:  I would object to that, Your

1  Honor.  I don't have any objection with respect to

2  discussion of Kola as it's in the reply report at paragraph

3  37, but this discussion regarding his experience regarding

4  sales, drug products and different states of clinical

5  trials, that has not come up in any part of the litigation I

6  can recall.

7              THE COURT:  Any response?

8              MR. PEJIC:  The testimony was to the failure and

9  the only testimony that we would be asking about now.  And

10 if I ask the question, and I asked Mr. Prussia if it's a

11 problem if Dr. Chambliss is aware of the impact of the

12 failure of Phase 3 clinical trials.  Would that be

13 acceptable?

14             THE COURT:  You mean in general?

15             MR. PEJIC:  Yes.

16             THE COURT:  What is the impact of a failure of

17 Phase 3?

18             MR. PEJIC:  Yes.

19             MR. PRUSSIA:  There's no objection to that, if

20 you want to ask that.

21 BY MR. PEJIC:

22 Q.    Okay.  Good morning, Dr. Chambliss.

23 A.    Good morning.

24 Q.    Sorry for that confusion there, but as you'll recall

25 when we left off yesterday I had asked you about the failure

Chambliss - direct

1    rate of drugs that work in Phase 3 clinicals.

2              Do you recall?

3    A.      Yes, I do.

4    Q.      And that the failure rate was approximately

5    50 percent for drugs that were in Phase III clinicals; is

6    that correct?

7    A.      That's correct.

8    Q.      Are you aware of any examples of the impact of

9    failure of drugs that were in Phase III clinicals?

10   A.      Yes.

11              In general, a company has spent probably

12   hundreds of millions of dollars and spent five to ten years

13   to get to that stage.  So, obviously, that is money that is

14   never -- in time is never recouped; and again, it is, as a

15   pharmacist, it is a drug that has promise that did not get

16   to the market.

17   Q.      Are you aware of the impact directly to any companies

18   of the failure of class -- phase -- Phase III clinicals?

19   A.      Yes, I am -- I am aware.  From personal experience,

20   I'm aware.

21   Q.      I'm not asking personal experience.  Just from the

22   news and generally.

23   A.      Oh, sure.  You read about failures.  I'm on a list

24   server that talks about failures all the time.

25   Q.      Okay.  Thank you, Dr. Chambliss.

Chambliss - direct

1              And now to set the stage for where we were

2      going.  And given the time off, I would like slide 11 on the

3      screen, please.

4              And can you give the Court a summary of your

5      testimony from yesterday leading into our prior art?

6      A.      Yes, just briefly.  That the apixaban compound was

7      known in the prior art.

8              Its properties were known, including its

9      chemical structure, its pharmacological activity, its water

10     solubility, its bioavailability; and

11             One skilled in the art would have been motivated

12     to reduce the particle size of apixaban to improve both

13     content uniformity, and that's totally independent of

14     solubility, and increase bioavailability which is related

15     to solubility and would be motivated for a Class III --

16     potential Class III compound to achieve biowaivers based on

17     reducing particle size and increasing dissolution rate.

18     Q.      Thank you, Dr. Chambliss.

19             Now that we have discussed the state of the art,

20     including that apixaban had known disadvantages which a

21     POSA would have been motivated to address, we're now going

22     to turn to your opinions regarding the obviousness of the

23     asserted claims.

24             MR. PEJIC:  Could we please put DTX-312 at page

25     9 on the screen?

Chambliss - direct

1   BY MR. PEJIC:

2   Q.      And let's start with the first -- your first prior

3   art reference.  This is Carreiro.  Do you recall Carreiro?

4   A.      Yes, I do.

5   Q.      And we discussed the animal and human bioavailably

6   results yesterday; correct?

7   A.      Yes, we did.

8   Q.      Can you tell us what dosages of apixaban were being

9   studies in the Phase III clinicals?

10  A.      Yes.  2.5- and 5-milligram dosage forms.

11          MR. PEJIC:  Okay.  Could we please turn to

12  DTX-312 at page 6.

13  BY MR. PEJIC:

14  Q.      And does Carreiro teach higher dosages than 2.5 and

15  5 milligrams?

16  A.      Yes, higher doses -- dosages have been studied, and

17  about five -- four lines down it talks about 20 milligrams

18  once a day, and then two lines below that it talks about

19  50 milligrams once a day.

20  Q.      Were there any adverse effects associated with these

21  dosages?

22  A.      No, the last sentence in that paragraph says, "No

23  dose limiting adverse effects were noted."

24          And I think we heard from a cardiologist today

25  that apixaban has a wide therapeutic index.  So this is

1  consistent with that.  You can give higher doses without

2  worrying about adverse events.

3  Q.      Thank you.  Does this review of doses of apixaban

4  used in the clinical trials tell a person of ordinary skill

5  in the art anything about the BCS category for apixaban?

6  A.      Again, it's too early to make that calculation

7  because you can't do the solubility calculation yet because

8  you don't know the final doses that will be commercialized.

9  Q.      Okay.  Is that like putting the proverbial cart

10 before the horse?

11 A.      Yes, it is.

12 Q.      Okay.  I'd look to turn to your second primary

13 reference.

14          MR. PEJIC:  Could we please put DTX-303 at page

15 7 on the screen?

16 BY MR. PEJIC:

17 Q.      And I would direct you to paragraph 81.

18          This is the '306 publication that we discussed

19 earlier, and we discussed the solid and IV dosage forms.

20          Do you recall?

21 A.      Yes, I do.

22 Q.      And what would paragraph 81 tell one skilled in the

23 art about the dosages being studied?

24 A.      If you look at four lines up where it starts 2.5, so

25 the doses for apixaban was 2.5 to 10 -- no, the next line

Chambliss - direct

1     down.  Sorry.  To the far right.

2               2.5 to 10 milligrams of apixaban given once

3     daily.

4     Q.     And the asserted claims require apixaban in 2.5- and

5     5-milligram tablets; is that correct?

6     A.     That is correct.

7     Q.     Thank you.

8               MR. PEJIC:  Can we please turn to slide 30?

9     BY MR. PEJIC:

10    Q.     And talking about your third primary reference, the

11    '208 patent, did you prepare this demonstrative to help

12    assist the Court in understanding your testimony?

13    A.     Yes, I did.

14    Q.     Can you please tell us about the '208 patent?

15    A.     The '208 is generally directed to apixaban

16    compounds -- apixaban and other compounds in the same

17    chemical class.

18               Claim 13 is apixaban.

19               Claim 27 is apixaban in a pharmaceutical

20    composition with a pharmaceutically acceptable carrier.

21               It discloses oral dosage forms, tablets and

22    capsules of apixaban, with pharmaceutical carrier that are

23    made according to standard pharmaceutical practice; and

24               It talks about immediate release formulations

25    that contain between 1 and 100 milligrams of active

Chambliss - direct

 1  ingredient and excipients.

 2  Q.     Very good.  Thank you.  And now I'd like to turn to

 3  your combination reference, Wei.

 4              MR. PEJIC:  Can we please put DTX-359, page 7,

 5  on the screen.

 6  BY MR. PEJIC:

 7  Q.     And do you recall in Wei discussing the concept of

 8  using small particles to enhance the dissolution rate of

 9  apixaban?

10  A.     Yes.  There are different paragraphs that talks about

11  this.  This paragraph --

12  Q.     What do you mean by small particle size is my

13  question.

14  A.     Yes, it was by 30 microns is how Wei characterized

15  apixaban small particles.

16  Q.     And does it also characterize large apixaban

17  particles?

18  A.     Yes, it does --

19              MR. PRUSSIA:  Your Honor, I object.  I mean,

20  it's okay to move to try and get the testimony moving, but

21  this is very leading.

22              THE COURT:  Yes.  It's very leading, so

23  sustained.

24  BY MR. PEJIC:

25  Q.     Okay.  So what does this tell you about large --

Chambliss - direct

1    A.    Sure.   If we look at the sentence -- it's the

2    second-to-last sentence starting:   "Generally, large

3    crystals have a particle size of $D_{90}$ greater than 100 microns

4    and small crystals have a particle size $D_{90}$ less than

5    30 microns."

6              So large is greater than 100 and small is 30.

7    Q.    Great.   Thank you, Dr. Chambliss.   Now I'd like to

8    turn to your last reference.

9              MR. PEJIC:   Could we please put DTX-344 on the

10   screen?

11   BY MR. PEJIC:

12   Q.    Do you recognize this reference?

13   A.    Yes, this is what we call the Nause patent

14   publication.

15   Q.    Okay.   Does Nause disclose compositions of apixaban?

16   A.    Yes, it does, as an example of a 5 milligram tablet.

17   Q.    Okay.

18             MR. PEJIC:   Could we please turn to page 75.

19   BY MR. PEJIC:

20   Q.    And is this the example?

21   A.    Yes, this is Example 7.   It gives you the composition

22   for a 5-milligram apixaban immediate-release tablet.

23   Q.    Okay.   Does it also teach pharmaceutical carriers and

24   diluents?

25   A.    Yes.   If you look at the composition in Table 8, you

1   see apixaban 5 milligrams and the list, the rest of the

2   ingredients there would fall into that definition of a

3   carrier or excipient.

4   Q.      Do you know what type of apixaban was being used in

5   this composition?

6   A.      Yes.  Based on the disclosure analysis, it would be

7   crystalline material.

8   Q.      And does Nause teach dosages other than 5 milligrams?

9   A.      Yes, it does.

10  Q.      What are the dosages?

11  A.      It teaches doses -- giving 5 milligrams once a day,

12  which could be 2.5 milligrams -- it talks about giving the

13  total of 5 milligrams a day, which could be 2.5 milligrams

14  twice a day.  So you would just compress half of this

15  formulation to make a 2.5-milligram tablet.

16  Q.      And, again, those are the dosages in the asserted

17  claims; correct?

18  A.      Yes, 2.5 and 5 milligrams.

19  Q.      Thank you.  And talking about the apixaban used in

20  Nause, does Nause talk about any reason why you would want

21  to improve the bioavailability of the apixaban?

22  A.      There's a statement in Nause that we can go to.  I

23  don't recall --

24              MR. PEJIC:  Can we turn to line -- page 4, lines

25  11 and 12.

Chambliss - direct

1    BY THE WITNESS:

2    A.      Yes.  What Nause says:  "There is a continuing needed

3    to find safe and effective methods of delivering Factor Xa

4    inhibitors, including apixaban."  And this invention is

5    about ways of achieving that.

6    Q.      Okay.  Thank you.  And do you know that plaintiffs

7    are challenging whether Nause is prior art?

8    A.      Yes, that's my understanding.

9    Q.      Even if Nause is not prior art, how would it inform

10   your opinion?

11   A.      Even if it is not prior art, it is contemporaneous,

12   so it talks to how a person of ordinary skill would be

13   approaching -- developing apixaban, making improvements,

14   making immediate-release out of the formulations.

15   Q.      Thank you.

16              MR. PEJIC:  Can we please turn to slide 31.  And

17   -- slide 31.

18   BY MR. PEJIC:

19   Q.      And this is -- is this your first combination for

20   invalidity under 103?

21   A.      Yes.  The Carreiro and Wei in view of the FDA

22   guidance in 1997.

23   Q.      Okay.  And in talking about Carreiro, the first

24   limitation, "The solid pharmaceutical composition comprising

25   a therapeutically effective amount of apixaban," did you

Chambliss - direct

1    testify as to this limitation in Carreiro?

2    A.    Yes, it talked about the clinical -- Phase III

3    clinicals trials were using 2.5 and 5 milligrams apixaban

4    compositions.

5    Q.    And did it disclose a pharmaceutically acceptable

6    diluent or carrier?

7    A.    No, but a person of ordinary skill in the art knows

8    you can't administer, in a clinical trial, 2.5 milligrams of

9    apixaban.  It needs to be formulated into a dosage form, so

10   using a diluent or carrier.

11   Q.    Thank you.  And the next limitation, talking about

12   the crystalline apixaban particles and their $D_{90}$, is that

13   taught in Wei?

14   A.    Yes, it is.  We saw this passage where it talked

15   about $D_{90}$ of 30 microns or less.

16   Q.    Thank you.  And just for the sake of brevity, in the

17   other combinations, we will rely on this testimony.

18         And turning to what I will call the dissolution

19   testing limitation that gives the dissolution conditions

20   and then stating that "77 weight percent of the apixaban in

21   the pharmaceutical composition dissolves within 30 minutes,"

22   have you testified as to these limitations?

23   A.    Yes.  The FDA 1997 guidance has these -- these

24   methods.  It's a standard dissolution testing methods.  The

25   77 percent weight in 30 minutes I talked about before, if

1   you're going to have a BCS Class III drug product, which

2   now we can talk about because it's either 2.5 milligrams or

3   a 5-milligram tablet, is going to be BCS Class III, you're

4   motivated to rapid dissolution, which is 85 percent in

5   15 minutes.  So, obviously, 77 percent in 30 minutes is less

6   than 85 percent in 15 minutes.

7   Q.      Thank you.

8   A.      Slower than 85 percent.

9   Q.      Understood.

10          And in the context of the first limitation, we

11  discussed the compositions of apixaban disclosed in

12  Carreiro; correct?

13  A.      Yes.

14  Q.      Thank you.

15          And in the late 2000s, why would one skilled in

16  the art be motivated to combine the teachings of these

17  references?

18  A.      You would know from Carreiro that clinical trials

19  were ongoing on apixaban, and you would know also that

20  apixaban is poorly water soluble, so you would be motivated

21  to use small crystals of apixaban to enhance your

22  dissolution rate and also for content uniformity purposes

23  because it's the potent -- potent drug.

24          And you would be motivated to use the USP FDA

25  recommended dissolution conditions and develop a rapidly

 1    releasing drug product so you could potentially apply the

 2    FDA for a biowaiver.

 3    Q.      Very good.  Would you also be motivated to

 4    continue improving your drug to improve your chances of

 5    FDA approval?

 6    A.      Yes, you're always looking to make sure you have the

 7    best product available -- best formation available when you

 8    submit your final formulation to the FDA.

 9    Q.      Thank you.

10              MR. PEJIC:  Can we please turn to slide 32.

11    BY MR. PEJIC:

12    Q.      Is this your demonstrative to explain the basis of

13    your opinion that the asserted claims are obvious over the

14    '306 publication in Wei in view of FDA guidance 1997?

15    A.      Yes, it is.

16    Q.      Okay.  Do you recall yesterday morning we were

17    talking about the '306 publication and the solid dosage

18    forms and IV dosage forms?

19    A.      Yes, I do.  I am.

20    Q.      And I believe earlier today we talked about the

21    actual dosage amounts of apixaban; is that correct?

22    A.      Yes.

23    Q.      And that was 2.5 and 5 milligrams?

24    A.      Yes.

25    Q.      Thank you.  And does the '306 publication also

Chambliss - direct

 1    disclose the pharmaceutically acceptable carrier or

 2    diluent?

 3    A.       Yes, since the sentence that we looked at --

 4             MR. PRUSSIA:  Your Honor, again, this is very

 5    leading.

 6             THE COURT:  It's less leading than before.

 7             MR. PEJIC:  I asked him if it disclosed it.

 8             THE COURT:  Right.  It is a claim chart we're

 9    all looking at, but try your best to lead a little less.

10    BY MR. PEJIC:

11    Q.       And the '306 publication -- does the '306 publication

12    disclose a pharmaceutically acceptable diluent or carrier?

13    A.       Yes.  They were making a complex of apixaban with a

14    carrier.

15    Q.       Thank you.

16             And, again, the crystalline apixaban D90

17    limitation, you testified as to Wei; is that correct?

18    A.       Yes.  I testified to that already.

19    Q.       And turning to the FDA guidance, you testified to

20    that in connection with the prior combination; is that

21    correct?

22    A.       Yes.

23    Q.       Thank you.

24             And previously this morning did you

25    testify to the amounts of apixaban in the compositions?

Chambliss - direct

1  A.    Yes.  Discussed 2.5 and 5 milligrams of apixaban.

2  Q.    And why would a skilled artisan be motivated to

3  combining the teachings of these references in the late

4  2000s?

5  A.    The same reason for the other combination.  From the

6  '306, you see apixaban is a product being formulated.  It

7  has some poorly water soluble.  You're going to be motivated

8  to use crystals in the tablet formulation.  You're going to

9  be motivated to use the standard FDA recommended dissolution

10  testing, to be motivated to make fast release, potentially

11  get a biowaiver.

12  Q.    Thank you.

13        Can we please turn to slide 33.  And is this

14  your demonstrative to explain your reasoning why the

15  asserted claims are obvious over the '208 publication and

16  Wei in view of the FDA guidance in 1997?

17  A.    Yes, it is.

18  Q.    Okay.  You testified previously today on the '208

19  patent.  And does the '208 patent disclose solid

20  pharmaceutical compositions?

21  A.    Yes.  I showed where it does that.

22  Q.    Does the '208 patent disclose pharmaceutically

23  acceptable diluents and carriers?

24  A.    Yes.  We showed where that occurs.

25  Q.    And we've discussed the where in apixaban comprises

Chambliss - direct

1  crystalline apixaban having a particulate D90.  Have you

2  testified to that?

3  A.      Yes, the same testimony as I did before for Wei.

4  Q.      And as to the dissolution testing limitation that

5  talks about the 77 weight percent of apixaban in the

6  pharmaceutical composition, have you testified that these

7  limitations have been met?

8  A.      Yes, the same dissolution testing from the FDA

9  guidance document.

10  Q.      And turning to claims 21, does the '208 patent

11  disclose 2.5 milligram apixaban formulations?

12  A.      Yes.  It talked about where it discloses 2.5 and also

13  the five as well.

14  Q.      Thank you.  And that's in claim 22, the five

15  milligrams?

16  A.      Yes.

17  Q.      Thank you.

18          And why would a skilled artisan have been

19  motivated to combine the teachings of these references in

20  the late 2000s?

21  A.      Again, the same reason.  You're developing a solid

22  pharmaceutical composition of a poorly water soluble potent

23  drug.  You're going to be motivated to use small particle

24  size, crystalline material, and that is taught in Wei.

25  You're going to be motivated to use standard FDA

Chambliss - direct

1    recommended dissolution testing.  You'll be motivated

2    to have rapid dissolution rate.  That is taught in the

3    FDA guidance and your knowledge of potential biowaivers,

4    and you'll be motivated to make the 2.5 and 5-milligram

5    dosage forms.

6    Q.    Thank you.

7          Could we please turn to slide 34, and I will

8    bring the Court's attention.  We discovered earlier that

9    there's a typo here.  It should read that the claims are

10   obvious over Nause in view of FDA guidance 1997.

11              THE COURT:  That's just the title.  That's all?

12              MR. PEJIC:  Yes, Your Honor.

13              THE COURT:  All right.

14   BY MR. PEJIC:

15   Q.    Dr. Chambliss, does this demonstrative set forth your

16   reasoning why you believe that the asserted claims are

17   obvious over Nause in view of Wei?

18   A.    Yes, it does.

19   Q.    All right.  Do you recall this morning we discussed

20   Nause?

21   A.    Yes, we did.

22   Q.    And was Nause the reference that had Example 7?

23   A.    Yes.  It had Example 7, which is the five milligram

24   immediate-release apixaban tablet.

25   Q.    Okay.  And so is it your testimony that Nause

Chambliss - direct

1  discloses a solid pharmaceutical composition described in

2  limitation one here?

3  A.    Yes, for sure.

4  Q.    Does Nause disclose a pharmaceutically acceptable

5  diluent or carrier?

6  A.    Yes.  Example 7 had a pharmaceutical acceptable

7  carrier, diluent carrier.

8  Q.    Does Nause disclose crystalline apixaban having a D90

9  equal or less than about 89 microns?

10 A.    Nause is silent on what the particle size was of the

11 crystalline apixaban, but a person of ordinary skill in the

12 art knows to make an immediate release formulation that has

13 rapid dissolution, you would use small particles of

14 apixaban.

15 Q.    Thank you.

16       And turning to the dissolution rate limitation,

17 would your testimony be the same that it has been previously

18 in relation to FDA guidance 1997?

19 A.    Yes.  You would use the standard FDA procedures for

20 immediate release formulation.

21 Q.    And does Example 7 and Nause generally teach the

22 formulations, the compositions, I'm sorry, claimed in claims

23 21 and 22, which would be 2.5 and 5 milligrams?

24 A.    Yes.  Nause has an example, a formula of five

25 milligram tablet formulation, and all you do is cut the

Chambliss - direct

1   amount of ingredients in half and you make a 2.5 milligram

2   tablet.

3   Q.      Thank you.

4           And why would a skilled artisan have been

5   motivated to combine the teachings of these references in

6   the late 2000s?

7   A.      Again, the same reason.  Nause has everything in it

8   except for the dissolution criteria, although Nause also

9   talks about dissolution data in Nause.  You would be

10  motivated to use small particle size to get rapid

11  dissolution.

12  Q.      Okay.  And I believe you also testified as to a

13  motivation expressly stated in Nause to improve

14  bioavailability.

15  A.      Yes.  We saw the sentence in Nause.  It talked about

16  needs to improve apixaban composition.

17  Q.      In your opinion, would this teaching of Nause be

18  applicable to the other combinations of prior art that

19  you've discussed today?

20  A.      Yes.  I think it reflects what a person of ordinary

21  skill thinks when the drug is in clinical development.

22  You're always looking for ways to make improvement.

23  Q.      Thank you.

24          Okay.  And now I'd like to talk to plaintiffs'

25  assertions of secondary considerations.

                          Chambliss - direct

1              Are you aware of Dr. Myerson's assertion that

2     their unexpected result that would render the asserted

3     claims patentable even if obvious?

4     A.      Yes, I am.

5     Q.      Could we please turn to DTX-384 at pages 13 and 14.

6     Hold on.   Just DTX-384.   I got ahead of myself.

7              Do you understand -- do you recognize this

8     document?

9     A.      Yes.   This is part of the file history.   It's an

10    amendment.

11    Q.      For the '945 patent; is that correct?

12    A.      Yes.   I'm sorry.   For the '945 patent.

13    Q.      Thank you.

14              Could we turn to pages 13 and 14.   And

15    let's talk about the basis of these alleged unexpected

16    results.   Can you take a look at this and tell us about it,

17    Dr. Chambliss?

18    A.      Yes.   Just to summarize it, what they are saying is

19    they found out that particle size of bulk apixaban affects

20    the bioavailability of apixaban and then it references

21    specifically Figures 3 and 4 from the specification.

22              And it's -- the last sentence, it's referring

23    to apixaban bulk drug substance having a D90 of 89

24    microns.

25    Q.      And does that drug -- you testified that that was

1    bulk.   How was this bulk drug substance measured?

2    A.      It was laser light scanning technique.

3    Q.      Thank you.

4            And so is the conclusion -- what conclusion

5    would you draw from this?

6    A.      That the inventors were saying that there's a

7    correlation between particle size of the bulk apixaban used

8    in a tablet and blood levels, which is bioequivalent,

9    bioavailability.

10   Q.      Thank you.

11           Okay.   Could we please turn to the '945 patent

12   and particularly JTX-2, page 7.  And is this the summary of

13   the invention that talks about surprising and unexpected

14   results?

15   A.      Yes.   It starts off with surprise surprisingly and

16   unexpectedly, it has been found that compositions for

17   tablets comprising up to five milligrams apixaban and the

18   D90 less than 89 microns give you consistent in vivo

19   dissolution and consistent exposure, which is another way of

20   saying bioavailability.

21   Q.      Thank you.

22           Do you agree with the applicant's

23   statement?

24   A.      No.   It's not unsurprising or unexpected.   It's

25   totally expected based on a person of ordinary skill.

Chambliss - direct

1    Q.      Can you please tell us why?

2    A.      As we talked yesterday, we looked at I think Finastid

3    as an example of an analgesic.  All they did was reduce the

4    particle size and significantly increase the blood levels

5    and that was from an early 1990 reference.

6    Q.      Thank you.

7            Could we please turn to column 2, lines 44

8    through 53.

9            And can you tell us about this statement?

10   A.      Yes.  This statement is where they're characterize --

11   they bring in the biopharmaceutics classification in

12   line 51.  And they are saying it's surprising because

13   apixaban would be classified as highly soluble by the BCS

14   system, that this known phenomenon, you reduce particle

15   size, increase dissolution, increase bioavailability for

16   some reason wouldn't apply to apixaban.  And we talked

17   yesterday about, showed at least four examples from the

18   prior art where you would be motivated to reduce the

19   particle size of a BSC III class drug just like you are for

20   other BCS class drugs.

21   Q.      Okay.  And also, do you agree with the statement that

22   the invention is surprising in this respect, however, in

23   that exposures are variable even though apixaban has

24   adequate aqueous solubility that would allow the drug to

25   dissolve rapidly?

1    A.      No.   They're conflating two different issues.

2    They're conflating solubility with dissolution and I gave

3    the example I did yesterday.   A sugar cube versus powdered

4    sugar.   Sucrose is highly soluble, but you can change

5    its dissolution rate just by particles, changing the

6    particle size.

7    Q.      And you discussed this distinction also yesterday, I

8    believe.

9    A.      Yes, I did.

10   Q.      Did you have an example?

11   A.      Yes.   I just gave it.

12   Q.      Okay.   Did you have a prior art reference?

13   A.      Yes.   We talked about Finastid.

14   Q.      Okay.

15   A.      That specific example where they reduced the particle

16   size, increased bioavailability.   I mentioned several other

17   examples.

18   Q.      Okay.   Thank you.

19           And I believe that you've also testified that

20   the prior art recognized that apixaban was poorly water

21   soluble; is that correct?

22   A.      Yes.   It was well-known to be poorly water soluble.

23   Q.      Can you tell us how that impacts your disagreement

24   with Dr. Myerson?

25   A.      A drug that is poorly water soluble, you're going to

Chambliss - direct

1   reduce its particle size.  That's the first step you're

2   going to take in order to enhance the dissolution rate, in

3   order to enhance bioavailability.

4   Q.    Okay.  And you had previously mentioned the reference

5   to the BCS in this -section; is that correct?

6   A.    Yes.

7   Q.    And does that impact your opinion here?

8   A.    No.  As I understand plaintiffs' argument, it would

9   be BSC III, you would not reduce the particle size.  I

10  showed at least four references that you do reduce particle

11  size for BCS III compounds as well.  And totally separate

12  from this, for a potent drug, it doesn't matter what the

13  BCS class at all is.  You're going to be motivated to

14  reduce particle size to address the content uniformity that

15  occurs in a drug that's going to be 2.5 and 5 milligram

16  tablet.

17  Q.    And you're talking about apixaban?

18  A.    Yes, apixaban.

19  Q.    Very good.

20        And, lastly, I'd like to turn to JTX-pages 5 and

21  6.

22        Do you recognize these figures?

23  A.    This is figures out of the patent specification

24  that -- Figure 3 and Figure 4.  Figure 3 is the

25  2.5-milligram apixaban tablet.  Figure 4 is the five

Chambliss - direct

1    milligrams.

2                    I quickly discussed Figure 3, that the

3    same concept applies to Figure 4.  All they did here, and

4    this is very standard, done in formulation sciences.  I've

5    done it or had people in my group do it many times.  You

6    just reduce the particle size of your API and you have

7    different particle sizes of a bulk drug substance and you

8    make tablets with them.  And there's a linear relationship

9    between the particle size and the dissolution rate.

10                   So as you see, as you go on the bottom, as

11   particle size gets smaller going toward the left, the

12   dissolution rate gets faster.  And as the particle size gets

13   bigger, the dissolution rate goes down.  And that's just the

14   physical phenomena.

15   Q.     Okay.  And just to confirm, are these the Figures 3

16   and 4 that were being discussed in the prosecution history

17   that you mentioned earlier?

18   A.     Yes.  This was their support for the surprising

19   unexpected results from dissolution and particle size

20   perspective.

21   Q.     Okay.  Do you have any other reasons the way you

22   disagree with Dr. Myerson?

23   A.     On which point?  I'm sorry.

24   Q.     As to the unexpected results.

25   A.     I see no evidence there is unexpected results.  It is

Chambliss - direct

1    totally expected that if you reduce particle size, you would

2    increase dissolution.  If you increase dissolution, you

3    enhance bioavailability.

4    Q.    Great.  Thank you.  And,

5          Now I'd like to turn to your opinions as to the

6    enablement, written description, and indefiniteness of the

7    asserted claims.

8          You mentioned earlier that the asserted claims

9    are invalid for the failure to satisfy the written

10   description, enablement, and indefiniteness; correct?

11   A.    Yes.

12         MR. PEJIC:  Okay.  Could we please put up slide

13   35.

14   BY MR. PEJIC:

15   Q.    Okay.  Do you recall your testimony regarding the

16   asserted claims, and particularly the limitation requiring

17   that the crystalline apixaban particles have a $D_{90}$ of less

18   than or equal to 89 microns?

19   A.    Yes.

20   Q.    Do you know the technique that the '945 patent

21   teaches to measure the particle size of the apixaban

22   particles?

23   A.    Yes.  It's shown on the screen.  They used a laser

24   light scattering method.

25   Q.    Did you hear Dr. Patel's testimony yesterday, that he

Chambliss - direct

1   agreed with the description of the invention described in

2   the '945 patent at line -- at column 2, lines 7 through 11

3   that's on the screen?

4   A.      Yes, I did.

5   Q.      Does his testimony surprise you?

6   A.      No, he was talking as a formulator would talk, and

7   measure the particle size of the bulk active ingredient and

8   then you formulate from there.  Laser light scattering is

9   the most common industry standard way of determining the

10  bulk particle size of an API.

11  Q.      And just to confirm, laser light scattering, in your

12  opinion, is not suitable to determine the $D_{90}$ of an API after

13  formulation into a finished composition?

14  A.      No, I've heard anybody even trying to do that.

15  Q.      Do you understand that plaintiffs assert that the

16  asserted claims require measuring the apixaban particles

17  after tableting?

18  A.      That's my understanding.

19  Q.      Are you aware of any situation where the $D_{90}$ of an API

20  after tableting was determined?

21  A.      Never, in 30-something years in this business, I've

22  never heard of that being done.

23  Q.      Thank you.  Are you aware of any literature or

24  peer-reviewed publications teaching how to determine the

25  $D_{90}$ of an API after being formulated into a finished

Chambliss - direct

1  composition?

2  A.      No, I'm aware of none.

3  Q.      Okay.  I'd like to return -- well, continue with the

4  '945 patent but now go to column 5, lines 15 through 16.

5          And did you review the methods of manufacture

6  described in the '945 patent?

7  A.      Yes, I did.

8  Q.      Are these the methods of manufacture that you

9  reviewed?

10  A.      Yes, they are.

11  Q.      Can you tell us a little bit about these methods of

12  manufacture?

13          And we can make it brief because there has been

14  a lot of testimony on that.

15  A.      Okay.  I'll go really brief.

16          This talks about two different standard ways of

17  making granules, and a granule is just, you start with fine

18  powders and you make the powder bigger by combining them

19  together into what we call granules.

20          So you can do it by a dry process, you can do it

21  by a wet process, in which you have a glue that glues the

22  particles together, and then you take those granules and you

23  compress them into tablets.

24  Q.      And so do these processes impact the particle size of

25  the bulk API?

1    A.      Yes, they could.

2              MR. PEJIC:  And I'd like to turn to DTX-366.

3    BY MR. PEJIC:

4    Q.      Do you recognize this document?

5    A.      Yes.  We have looked at least two other chapters out

6    of this book.  We are looking at the third chapter now.  We

7    looked at Lanz I and Lanz II for sure.

8              MR. PEJIC:  Okay.  Could we please turn to pages

9    4 and 5?

10   BY MR. PEJIC:

11   Q.      And what would this teach one skilled in the art,

12   Dr. Chambliss?

13   A.      This is a chapter by Dr. Parrot, tablet compression.

14   So what he talks about is what can happen to particles under

15   tablet compression.  It's a -- Section C is fragmentation.

16   That just means breaking, so you can break the particles.

17   And deformation means changing their shape.  So he explains

18   in the third paragraph how that could occur.

19              And if we could scroll down or go to the

20   next, D.

21              It talks about the other thing that can happen

22   is bonding.  So you might have fractured some particles.

23   They could bond together with other particles.  So your

24   particles will get smaller, your particles could get bigger.

25   You don't know.  And there's no way to measure it so you

Chambliss - direct

1    don't know.

2    Q.      Okay.  Thank you.

3                 MR. PEJIC:  And can we now turn to DTX-370.

4    BY MR. PEJIC:

5    Q.      Can you please tell us about this document,

6    Dr. Chambliss?

7    A.      This is a publication from 1992.

8                 If we could just blow up the abstract?

9                 This author's name, I think, is Gahn.

10                Blow up the abstract.

11                What he's talking about he is using Piroxicam as

12   a model drug to see what happens to its morphology when you

13   compress it into a tablet.  And,

14                It starts off as "needle-shaped polymorphs was

15   found to undergo transition to a cubic polymorph during

16   compression."

17                So you take the bulk API, which is needle shape

18   that is long and skinny, and by just simply compressing on a

19   tablet press, you've changed it to cubic shape.

20   Q.      Thank you, Dr. Chambliss.

21                So taking into account the disclosure of the

22   '945 patent and the references that you've discussed, would

23   one skilled in the art be able to predict the size of the

24   apixaban particles in the finished composition after

25   undergoing the manufacturing process of the '945 patent?

Chambliss - direct

1  A.      No, they could not do that.

2  Q.      Thank you.

3          Returning to the disclosure of the '945 patent

4  and discussing the measure -- the technique of measuring the

5  $D_{90}$, is it your testimony -- I believe it's your testimony

6  that the '945 patent only describes laser light scattering

7  to measure particle size of apixaban or determine the $D_{90}$?

8  A.      Yes, that's the only method mentioned in the

9  specification.

10 Q.      And what type of information would a POSA expect to

11 see in order to perform such tests?

12         Did you perform -- did you prepare a

13 demonstrative?

14 A.      Yes, I have a demonstrative, or at least some of that

15 has some of that information.

16         MR. PEJIC:  Could we please put up slide 36.

17 BY MR. PEJIC:

18 Q.      Can you tell us about this information?

19 A.      Yes.

20         In order to reproduce the laser light scattering

21 method discussed in the patent, you would need to know the

22 optical model used in the calculation;

23         The precise Malvern equipment that was used;

24         What data analysis program was used;

25         How was the sample dispersed;

Chambliss - direct

1               What medium was used;

2               Did they use a dispersion agent, for example, a

3       surfactant;

4               What information was available, what sample and

5       the sample preparation;

6               Whether you sonicated there or not and what

7       those conditions were;

8               And then you need to know what concentration the

9       sample was tested at, how long did you measure, and type of

10      sample cell.

11      Q.      Thank you.  Without this information, would a person

12      of skill in the art have been able to practice the full

13      scope of the invention where the $D_{90}$ of the tableted apixaban

14      is determined without undue experimentation?

15      A.      No, I do not believe he could.

16      Q.      And also, you heard Dr. Genck's testimony yesterday

17      regarding the challenges and limitations of comparing

18      results of different techniques used to measure particle

19      size distribution.

20              Do you recall that?

21      A.      Yes.

22      Q.      Do you agree with Dr. Genck's testimony?

23      A.      Yes.  On the issues that are in my expert report, I

24      do.

25      Q.      Thank you.

Chambliss - direct

1    MR. PEJIC:  And could we please put up slide 39?

2    BY MR. PEJIC:

3    Q.    And does this slide reflect your opinions?

4    A.    Yes, it does.

5    Q.    Could you please tell us about it?

6    A.    Yes.

7         The asserted claims 21 and 22 are invalid as

8    obvious over Carreiro and Wei in view of the FDA guidance

9    1997;

10        The '306 publication and Wei in view of FDA

11   guidance 1997;

12        The '208 patent and Wei in view of the FDA

13   guidance 1997;

14        Nause in view of FDA guidance 1997; and,

15        The state of the art at the relevant time of the

16   '945 patent.

17        Also, it's invalid for failure to satisfy the

18   requirements of Section 112.

19        The '945 patent and prosecution history do not

20   describe and inform one skilled in the art that the

21   inventors were in possession of the invention.

22        The '945 and prosecution history do not permit

23   one skilled in the art to practice the full scope of the

24   claims without undue experimentation.  Therefore, the

25   asserted claims are not enabled.  And,

Chambliss - direct

1              One skilled in the art reading the '945 patent,

2     claims, and prosecution history could not reasonably discern

3     the metes and bounds of the asserted claims.

4     Q.     Thank you, Dr. Chambliss.

5              MR. PEJIC:  No more questions.

6              THE COURT:  Okay.  Thank you.  We'll take a

7     short recess and have cross-examination.

8              (Brief recess taken.)

9              *     *     *

10             (Proceedings reconvened after recess.)

11             THE COURT:  Are we ready for cross-examination?

12             MR. PEJIC:  No, you actually -- you called

13     recess before I was able to move the evidence in.

14             THE COURT:  Sorry about that.

15             MR. PEJIC:  I was going to get my list and I

16     turned around --

17             THE COURT:  -- I was gone.  I'm back.

18             MR. PEJIC:  So, okay.  I'd like to move into

19     evidence, and unless otherwise noted, it's going to be a

20     DTX:

21             303, 312, 317, 320, 330, 336, 337, 344, 349,

22     354, 355, 356, 358, 359, 364, 366, 368, 370, 384, 437, and

23     1002.

24             MR. PRUSSIA:  No objection just with the comment

25     that these documents weren't exactly shown to the witness,

Chambliss - cross

1    they were all demonstratives, and if that is acceptable, no

2    objection.

3               THE COURT:  That is acceptable for purposes of

4    this trial.

5               So, thank you, those are all admitted.

6               (Above-referenced exhibits were admitted into

7    evidence.)

8               THE COURT:  And now we will have

9    cross-examination.

10              MR. PRUSSIA:  May I proceed?

11              THE COURT:  Yes.

12                        CROSS-EXAMINATION

13   BY MR. PRUSSIA:

14   Q.    Good afternoon, Dr. Chambliss.

15   A.    Good morning.

16   Q.    How are you again?  Or good morning, I should say.

17              You're not offering any opinions on the compound

18   patent in this case, the '208 patent; is that right?

19   A.    That is correct.

20   Q.    Your opinion in this case is limited to the

21   invalidity of the '945 patent; correct?

22   A.    Correct.

23   Q.    And you have no opinions regarding infringement;

24   correct?

25   A.    That is correct.

Chambliss - cross

1   Q.    And you have no opinions regarding enforceability;

2 correct?

3   A.    That is correct.

4   Q.    And in your own report, you don't offer any opinion

5 about whether the documents that Dr. Myerson cites regarding

6 the invention date of the patents, whether those documents

7 support his opinions; correct?

8   A.    That's correct.

9   Q.    And so just to be clear, you don't have an opinion as

10 to whether the claims were conceived and reduced to practice

11 on the date that Dr. Myerson contends; correct?

12   A.    Correct.

13   Q.    Now, if we could turn, please, to the patent, JTX-2.

14 It's Tab 23 in your binder, if you would like to see it.

15   A.    What number, please?

16   Q.    Tab 23.  It's also on the screen.

17   A.    Thank you.  I'll just look on the screen unless I

18 need to go --

19   Q.    We're just going to go directly to claim 12.

20         Claim 12 is the independent claim from which the

21 asserted claims depend; correct?

22   A.    Correct.

23   Q.    And claim 12 is not a method claim; correct?

24   A.    Correct.

25   Q.    It's a pharmaceutical composition claim; correct?

Chambliss - cross

1    A.      Correct.

2    Q.      And a pharmaceutical composition can include a

3    tablet; correct?

4    A.      Yes.

5    Q.      But it can also include a capsule; correct?

6    A.      Correct.

7    Q.      And the claim does not require any particular

8    particle size measuring technique; correct?

9    A.      Correct.

10   Q.      The claim only requires that the pharmaceutical

11   composition has the recited claims, elements; correct?

12   A.      That is my understanding.

13   Q.      And so just to be clear, we've been talking about a

14   $D_{90}$; right?

15   A.      Yes.

16   Q.      A $D_{90}$, that is a calculated value; correct?

17   A.      Yes.  A particle size distribution.

18   Q.      There's no particle size measuring technique that

19   measures a D90; is that correct?

20   A.      No.  That's correct.

21   Q.      It's something that's calculated; is that correct?

22   A.      It's part of the software.

23   Q.      Right.  It's calculated by software, for example;

24   correct?

25   A.      Yes.

Chambliss - cross

1    Q.      It can also be calculated by a person; is that

2    correct?

3    A.      Yes.  You could do it by hand.

4    Q.      And the claim does not require comparing the D90

5    calculations obtained from different techniques; correct?

6    A.      Correct.

7            MR. PRUSSIA:  Now, we can take that down.

8    BY MR. PRUSSIA:

9    Q.      You agree with me that a person of ordinary skill in

10   the art could make an apixaban pharmaceutical composition

11   with the recited limitations; is that correct?

12   A.      Under my understanding of the particle size being the

13   bulk drug substance, yes.

14   Q.      So a person -- a person of skill in the art could

15   take bulk crystalline apixaban particles with the D90 of

16   89 microns or less, formulate it with excipients that do not

17   interfere with drug release and have an expectation that the

18   composition will meet the claims of the '945 patent; is that

19   correct?

20   A.      Say compressed into a tablet?

21   Q.      Yes, sir.

22   A.      They wouldn't know.  They would start with the bulk

23   drug substance of a certain particle size and as I

24   testified, the manufacturing process could change the

25   particle size and there's no method of testing what the

Chambliss - cross

1  particle size in the finished pat let is.

2  Q.    Take a look at your deposition, page 226, starting at

3  line 20.  And we're going to go all the way to -- I'm sorry,

4  page 228 starting at line 22 and continuing to 229, 3.

5          The question is:

6          "All right.  So there's at least one method that

7  you can employ to meet the claims; right?

8          "Answer:  I think so.  If I start with

9  crystalline apixaban particles and I mix it with an

10  excipient that is doesn't mess up my drug release, I should

11  be fine."

12          Was that my question and was that your answer?

13  A.    Yes.  In the context, I was talking about a powder.

14  If you just took bulk apixaban powder and you mixed it with

15  a carrier, you would not expect you would change the

16  particle size.

17  Q.    And that's a pharmaceutical composition within the

18  scope of the asserted claims; is that correct?

19  A.    That is, but maybe I misunderstood.  I thought your

20  question was if you didn't compress the tablet from that

21  composition.

22  Q.    Okay.  And you would have that expectation that the

23  pharmaceutical composition that we've been discussing would

24  possess the recited limitations even without needing to

25  measure the particle size in the formulated composition

Chambliss - cross

1    itself; is that correct?

2    A.      I'm sorry.  Would you repeat that, please?

3    Q.      You would have that expectation with respect to the

4    apixaban particles and the formulated composition and the

5    D90 particle size without measuring the particle size in the

6    formulated composition itself; is that correct?

7    A.      In that one example, the only example I can think of,

8    is if I took bulk apixaban and know the particle size

9    distribution, know the D90, and I simply mixed it with a

10   lactose, and I wouldn't expect I would change the particle

11   size.

12   Q.      So there's at least one method, we can agree there's

13   at least one method that a person of ordinary skill in the

14   art could employ to meet the claims; is that correct?

15   A.      I'm saying under that one --

16   Q.      My question is correct; correct?

17   A.      Can you repeat the question?

18   Q.      We can agree there's at least one method that a

19   person of skill in the art could employ to meet the claims;

20   is that right?

21   A.      A powder.

22   Q.      Let's take a step back.  A person of skill in the art

23   was aware of multiple techniques to measure particle size as

24   of 2010; is that correct?

25   A.      Correct.

1    Q.     A person of skill could use microscopy prior to 2010;

2   is that correct?

3    A.     Yes.

4    Q.     And a person of skill in the art would know how to

5   calculate a D90 based on those particle size measurements

6   obtained through a microscopy tool.  Is that correct?

7    A.     Yes, if they had enough -- if they observed enough

8   particles, yes.

9    Q.     And the last time that -- so my question was correct;

10   right?

11    A.     Yes.

12    Q.     All right.  The last time that you personally

13   measured particle size was in the 1984 to 1987 time frame;

14   is that correct?

15    A.     Yes.  When I was in industry.

16    Q.     And you've never personally used a Malvern laser

17   light scattering tool to measure particle size; is that

18   correct?

19    A.     Correct.  Members of my group did.  I did not

20   personally run the equipment.

21    Q.     And you've never personally used Raman mapping to

22   measure particle size; correct?

23    A.     Correct.

24    Q.     Never personally used ultrasound attenuation to

25   measure particle size?

Chambliss - cross

```
 1   A.      Correct.
 2   Q.      Now, a person of ordinary skill can obtain a particle
 3   size distribution using a sieving technique; is that
 4   correct?
 5   A.      Yes.
 6   Q.      And that's a weight based distribution; is that
 7   correct?
 8   A.      Yes.
 9   Q.      And a person of skill in the art would know how to
10   convert that weight based distribution to a volume based
11   distribution; is that correct?
12   A.      If they have spherical particles, yes.
13   Q.      You just calculate the volume of the sphere and
14   convert weight to volume; is that correct?
15   A.      Yes.  For a spherical particle size, that's true.
16   Q.      And a person of ordinary skill in the art would know
17   how to do that; is that correct?
18   A.      Yes, I believe they would.
19   Q.      It's a mathematical determination; is that correct?
20   A.      Yes.
21   Q.      It's a routine calculation; correct?
22   A.      Yes.
23   Q.      Now, crystalline apixaban particles, they are
24   granular shaped like sand; is that correct?
25   A.      Correct.
```

Chambliss - cross

1  Q.      Let's shift gears.  If we could pull up PTX-430.

2          This is an article by Bosquillon; is that

3  correct?

4  A.      Yes.

5  Q.      It was published in 2001; is that correct?

6  A.      Yes.

7  Q.      And the title is, comparison of particle sizing

8  techniques.

9          Do you see that?

10  A.      Yes.

11  Q.      And if you look at the abstract, the first sentence,

12  it states:  The objectives of this work were, little one, to

13  validate electrical zone sensing and laser diffraction for

14  the analysis of primary particle size in the case of

15  inhalation dry powders.

16          Do you see that?

17  A.      Yes.

18  Q.      And electrical zone sensing and laser diffraction are

19  two different types of measuring techniques; is that

20  correct?

21  A.      I believe that's correct.

22  Q.      And Bosquillon in the paper conducts a comparison of

23  those two different measuring techniques; is that correct?

24  A.      I need to look the a the publication.  I see it in

25  the abstract.

1356

Chambliss - cross

1    Q.      We talked about this at your deposition.

2    A.      Yes.  It has been awhile and I don't remember reading

3    this.

4    Q.      If we go to Figure 6.

5    A.      Okay.  Which exhibit is it so I can find it in my

6    book?

7    Q.      Sure.  It's tab 15 in your binder.

8    A.      Thank you.

9    Q.      My questions are going to be about Figure 6, which is

10   on your screen.

11   A.      Okay.

12   Q.      Bosquillon shows the reports for comparison; is that

13   correct?

14   A.      What page is Figure 6 on, please?

15   Q.      From the page ending in Bates 3528.

16   A.      Okay.  Thank you.

17   Q.      Okay.  And in Figure 6, she's comparing the particle

18   size analysis on four powders, A, B, C and D.

19           Do you see that?

20   A.      Yes.

21   Q.      And she compared four different particle size

22   measuring techniques; is that correct?  And the four are

23   electron microscopy, light microscopy, laser diffraction by

24   wet dispersion, and laser diffraction by dry dispersion as

25   well as electrical zone sensing.

1          Is that correct?

2   A.      Correct.

3   Q.      And if you look at the text above the figure, the

4   authors conclude that in the case of powders A, B, and C,

5   measurements -- go to the next column -- in the case of

6   powders A, B and C, the authors concluded that the

7   measurements were similar; is that correct?

8   A.      Yes.

9   Q.      And so a person of ordinary skill in the art would

10  understand from Bosquillon that particle size measuring

11  techniques are comparable; is that correct?

12  A.      Under the conditions of this test with the

13  instruments they used and the powder that they analyzed,

14  that was true.

15  Q.      Now, if we go to Plaintiffs' Exhibit 402, the paper

16  by Reverchon, tab 16 in your binder?

17  A.      Thank you.

18  Q.      This was also published before the priority date of

19  the patents; is that correct?  Published in 2008; is that

20  correct?

21  A.      Yes.

22  Q.      And if we turn to the page ending in Bates 2244,

23  there's a Table 1 there.

24  A.      Table 1?  Okay.

25  Q.      Yes, sir.  Table 1 reports particle size distribution

Chambliss - cross

1    data using different measuring techniques; is that correct?

2    A.    I see two different methods, yes.

3    Q.    SEM, which is scanning electron microscopy; is that

4    correct?

5    A.    Yes.

6    Q.    And LS, which refers to laser light scattering; is

7    that correct?

8    A.    Yes.

9    Q.    And they report the D50 and D90 values that were

10   calculated based on the measurements obtained by those two

11   different measuring techniques; is that correct?

12   A.    Correct.

13   Q.    And if we look above the table, the first sentence of

14   the paragraph, the authors conclude that the results are

15   comparable; is that correct?

16   A.    Yes.  Again, for powder form of hydroxypropyl

17   methylcellulose, if you look at the figures, they're

18   spherical.

19   Q.    My question is correct; right?

20   A.    Under the conditions, yes.

21   Q.    Thank you.

22         And PSD is shorthand for particle size

23   distribution; correct?

24   A.    Yes.

25   Q.    And so a person of ordinary skill in the art would

Chambliss - cross

1  understand Reverchon to disclose that particle size

2  distribution data collected from SEMs and laser light

3  scattering can be comparable; is that correct?

4  A.     I think the keyword is can be and sometimes is not.

5  Q.     All right.  Let's shift gears.  Let's talk about your

6  obviousness opinions in this case.

7           And just to be clear, the person of ordinary

8  skill in the art here is a formulation scientist; is that

9  correct?

10 A.     Yes.

11 Q.     Not an M.D.; is that correct?

12 A.     Correct.

13 Q.     And you had no medical training; is that correct?

14 A.     Pharmacy training, not medical training.

15 Q.     Okay.  So not an M.D.; is that correct?

16 A.     Correct.

17 Q.     And when developing a formulation for apixaban, the

18 formulation scientist would consider what was already known

19 about apixaban in the art; is that correct?

20 A.     Yes.

21 Q.     And a person would consider what was known about

22 apixaban's pharmacokinetic properties; is that correct?

23 A.     Correct.

24 Q.     You want to know what was known about apixaban's

25 bioavailability; is that correct?

1    A.      Correct.

2    Q.      And information was known about apixaban's

3    pharmacokinetics in animals, the person of ordinary skill in

4    the art would want to know about that; right?  And if this

5    information was known about apixaban in humans, a person of

6    ordinary skill in the art would want to know about that,

7    too; correct?

8    A.      Correct.

9    Q.      And as of 2009, we can agree there was information

10   published in the scientific literature about apixaban's

11   pharmacokinetics; correct?

12   A.      Yes.

13   Q.      And that's reported animal data; is that correct?

14   A.      Correct.

15   Q.      As well as human data; correct?

16   A.      Yes.  The only data I remember was the three hours

17   for peak blood levels.  I don't remember other data.

18   Q.      We could agree that the most comprehensive

19   publication in the prior art regarding the pharma company

20   kinetics of apixaban was the Carreiro paper that we looked

21   at earlier; is that correct?

22   A.      I believe that's true.

23   Q.      And you think Carreiro is a reliable reference?

24   A.      Yes.

25   Q.      So much so that you relied on it in forming your

1    opinions in this case; is that correct?

2    A.     Yes.

3    Q.     So we agree that Carreiro is the kind of reference

4    that a person of ordinary skill in the art would look to in

5    informing themselves about the pharma company kinetics of

6    apixaban; is that correct?

7    A.     Yes.

8    Q.     And Carreiro itself described the clinical

9    development of apixaban as it was at the time; is that

10   correct?

11   A.     Yes.

12   Q.     And it reported that apixaban was in clinical trials;

13   right?

14   A.     Correct.

15   Q.     Apixaban had completed phase two trials; right?

16   A.     Yes.

17   Q.     And apixaban was in the midst of Phase three trials;

18   is that correct?

19   A.     Yes.

20   Q.     And Carreiro reports that apixaban was being studied

21   in over 40,000 patients; right?

22   A.     Right.  Large Phase three clinical trials.

23   Q.     And it includes P K data from completed phase two

24   trials; right?

25   A.     Point me to anything else.  The only thing I remember

Chambliss - cross

1    is the three-hour onset of action.

2    Q.    So let's pull up Carreiro --

3    A.    Peak level.

4    Q.    Let's pull up Carreiro.  It's PTX-738.  Tab four in

5    your binder?

6    A.    Tab four?

7    Q.    Yes, sir.

8    A.    Thank you.

9    Q.    And we can focus on the abstract to start there.

10          And Carreiro discloses that apixaban is an agent

11   with demonstrated efficacy and a favorable pharmacokinetic

12   profile.

13          Do you see that?

14   A.    Yes.

15   Q.    Let's leave that on the screen.

16   A.    About halfway down.

17   Q.    And if we turn a few pages into Carreiro, to the

18   section describing apixaban's pharmacokinetic and

19   pharmacodynamic studies in humans, and that's -- we're now

20   at page Bates ending in 2540, Carreiro also disclosed that

21   apixaban had rapid oral absorption and bioavailability; is

22   that correct?

23   A.    It did.  As I testified whether we discussed at

24   deposition in context, the rapid absorption he's talking

25   about three-hour peak blood level.

Chambliss - cross

1    Q.      And we'll get to that; right?  But my question was

2    correct; right?

3    A.      You read the sentence correctly.

4    Q.      Okay.  And Carreiro further reported that apixaban

5    was well absorbed from the gastrointestinal tract; correct?

6    A.      Correct.

7    Q.      And if we go back a few pages in Carreiro, the Bates

8    ending in 2538, and here in this section it's talking about

9    the preclinical pharmacological studies in animal models?

10   A.      Yes, I see that.

11   Q.      And there, again, Carreiro reports that apixaban had

12   good oral bioavailability; correct?

13   A.      Yes, the words are there.  The data is 51 percent, 88

14   percent, and 44 percent.

15   Q.      Now, the words are there; correct?

16   A.      Yes.

17   Q.      And so as of 2008, the most comprehensive review

18   article of the clinical study of apixaban described apixaban

19   as having rapid absorption; correct?  Correct?

20   A.      And three hours peak level.

21   Q.      My question was correct; right, sir?

22   A.      It's correct, but not complete.  Yes.

23   Q.      And good oral bioavailability; correct?

24   A.      Yes.

25   Q.      In both human and animal; correct?

Chambliss - cross

1   A.      Yes.

2   Q.      All right.

3   A.      Those words are there.

4   Q.      Now, you've read Carreiro; right?

5   A.      Yes.

6   Q.      And there's no report in Carreiro of any issues being

7   observed with apixaban's exposure in humans; correct?

8   A.      I disagree.  As a person of ordinary skill in the art

9   reading Carreiro, I disagree.

10  Q.      You're referring to that three-hour statement;

11  correct?

12  A.      I'm referring to the three-hour statement.

13  Q.      Okay.

14  A.      And I'm referring to the animal data of 51 percent,

15  88 percent, and 34 percent.

16  Q.      All right.  We'll get to that.

17          Carreiro does not say -- that's your

18  characterization of the prior art; correct?

19  A.      It's a person of ordinary skill in the art, a

20  formulator reading Carreiro.

21  Q.      My question is this, all right?  Let's just focus on

22  my question.

23          Carreiro does not report any issues observed in

24  apixaban's exposure in humans; correct?

25  A.      I don't see the words there.  The data is there.

Chambliss - cross

1    Q.       Okay.   Carreiro does report on a Factor Xa molecule

2    that did have exposure issues; correct?

3    A.       I don't recall.

4    Q.       Well, let's go to page 2538 in Carreiro, under the

5    pharmacology section.

6    A.       Okay.

7    Q.       And here, Carreiro is describing for us that apixaban

8    was designed as a follow-up compound to the oral direct

9    Factor Xa inhibitor, razaxaban; correct?

10   A.       Correct.

11   Q.       And razaxaban was a selective oral direct Factor Xa

12   inhibitor that was discontinued based on less than optimal

13   pharmacologic properties; correct?

14   A.       Correct.

15   Q.       And Carreiro noted that apixaban had improved

16   pharmacokinetic profile relative to razaxaban; correct?

17   A.       Will you point me where that is?

18           (Text highlighted for witness.)

19   BY MR. PRUSSIA:

20   Q.       Is my question correct?

21   A.       Yes.

22   Q.       Now, I know you want to talk about this three-hour

23   thing so we'll go back to it.

24           MR. PRUSSIA:   And it's on page 2540 and section

25   4 of the paper.   And,

1    It's the second paragraph there.  And if we

2    highlight the first two sentences.

3    BY MR. PRUSSIA:

4    Q.    I think you testified about this yesterday, that a

5    person of skill in the art would see that peak plasma level

6    of three hours and will look to improve it; correct?

7    A.    Correct.

8    Q.    And it's your opinion that a person of skill would

9    do that not withstanding Carreiro's statement that the

10   three-hour team is consistent with rapid oral absorption?

11   Is that your opinion?

12   A.    Yes.

13   Q.    So I just want to make sure I understand this.

14         Is it your opinion that the reference to rapid

15   oral absorption does not -- that does not describe the

16   three-hour peak plasma time?

17   A.    I can't speak for Carreiro, what they were thinking,

18   but as a formulator, trying to develop a drug for acute

19   cardiovascular conditions, three-hour peak blood levels need

20   to be improved, if possible.

21   Q.    Now, Carreiro itself doesn't disclose that the

22   three-hour peak plasma time of apixaban was a problem;

23   correct?

24   A.    I agree.

25   Q.    Carreiro didn't even disclose that the three-hour

1   peak plasma time was a potential problem; correct?

2   A.      Not that I recall.

3   Q.      And just to be clear, again, the person of skill in

4   the art does not have any medical training; correct?

5   A.      Correct.

6   Q.      Under your definition?

7   A.      Yes, but a formulator --

8   Q.      As a formulation scientist; correct?

9   A.      A formulator is going to read this as a formulator

10  reads this.

11          MR. PRUSSIA:  Now, let's go to the last page of

12  this, Mr. Lee.

13  BY MR. PRUSSIA:

14  Q.      The authors of Carreiro, they're MDs; right?

15  A.      That's my point.  They're not formulators.

16  Q.      They're medical doctors; correct?

17  A.      Correct.

18  Q.      And they're taking bioavailability data; correct?

19  A.      Correct.

20  Q.      And they're representing to the prior art -- to the

21  public that it reflects good oral bioavailability and rapid

22  absorption; correct?

23  A.      Correct.

24  Q.      And it's your opinion that a formulation scientist

25  would just disregard the doctors and do his own thing.

Chambliss - cross

1     That's your opinion?

2     A.      My opinion is that a formulator would say, good, I

3     can make it better.  Three hours, I can make it more rapid.

4     Q.      Now, I think you characterized the three-hour onset

5     of action as being slow.  I think actually your words were

6     "pretty slow;" correct?

7     A.      For acute conditions, yes.

8     Q.      And so it is your opinion that a three-hour onset of

9     action is pretty slow for an anticoagulant.  That's your

10    opinion?

11    A.      Not for a specific anticoagulant.  I'm not a

12    physician.  I'm responding as a formulator.  I want to get

13    my blood levels to peak levels as high as possible for acute

14    conditions.

15    Q.      But let's just be perfectly clear about this.  There

16    is no single prior art reference that existed before the

17    priority date that described apixaban's onset of actions as

18    being slow; correct?

19    A.      I don't recall.  I didn't look for that.

20    Q.      Now, let's turn to PTX-480.

21            You've seen this document before; right?

22    A.      Which tab is it?

23    Q.      It's Tab 6 in your binder, sir.

24    A.      Thank you.

25            Yes.

Chambliss - cross

1    Q.      And it's a reference titled "New Anticoagulants For

2    Atrial Fibrillation;" correct?

3    A.      Correct.

4    Q.      And it's by -- the last name of the first author is

5    Sobieraj-Teague; correct?

6    A.      Yes.

7    Q.      And we'll refer to it as Teague just for ease of

8    reference.  Is that all right?

9    A.      That would be good.

10   Q.      All right.  And it's a publication of seminars on

11   thrombosis and hemostasis; correct?

12   A.      Yes.

13   Q.      And it was published in 2009; correct?

14   A.      I don't see the date.

15   Q.      If you look at your screen, it's at the bottom.

16   A.      Okay.  Thank you.

17   Q.      And you rely upon this paper in your report; correct?

18   A.      Yes.

19   Q.      So you agree it's the kind of paper that a person

20   of skill in the art would rely upon in looking to get

21   information about the pharmacokinetics of apixaban; correct?

22   A.      Yes.

23   Q.      And if you look at the page ending in Bates 4449,

24   there's a section regarding apixaban; right?

25   A.      Yes.

1  Q.      And it's about the pharmacology of apixaban; right?

2  A.      Yes.

3  Q.      And the very second sentence we see, as Teague

4  discloses that:   "Apixaban is rapidly absorbed, reaching

5  peak plasma concentrations three-hour postinjection."

6  Correct?

7  A.      Yes.

8  Q.      Now, if we take a look at the whole page, Teague also

9  includes a profile for another Factor Xa inhibitor called

10 rivaroxaban?

11 A.      Yes.

12 Q.      And are you familiar with rivaroxaban?

13 A.      Just by name.   I don't know its characteristics.

14 Q.      So as referenced in Teague, it's a Factor Xa

15 inhibitor; correct?

16 A.      Yes.

17 Q.      And it's sold today as Xarelto; correct?

18 A.      I don't know that.

19          MR. PRUSSIA:   Well, if we turn to the right-hand

20 column on page 4449, it identifies rivaroxaban as having a

21 three-hour onset of action.

22          Do you see that?

23          Actually, the sentence starts in the prior

24 column, Mr. Lee.

25 BY MR. PRUSSIA:

Chambliss - cross

1    Q.      Do you see that?

2    A.      Yes.  So higher bioavailably and the same onset of

3    action.

4    Q.      We'll get to that in a minute, the higher

5    bioavailability.

6            But you agree that Teague discloses a three-hour

7    onset of action for rivaroxaban; correct?

8    A.      Correct.

9    Q.      And Teague says, that's a rapid onset of action;

10   correct?

11   A.      Yes.

12   Q.      And so a person of skill in the art -- and just to

13   take a step back.  That's the same onset of action as

14   apixaban; correct?

15   A.      Yes.

16   Q.      And so a person of skill in the art reading the

17   Teague reference would understand that apixaban's three-hour

18   peak plasma time was rapid; correct?

19   A.      I disagree for the same reason we talked about in

20   Carreiro.

21   Q.      So again, it's your view that a person of skill in

22   the art would see rapid onset of action, they don't know

23   what they're talking about, I know better, it's pretty slow.

24           That's your opinion?

25   A.      No, that's not my opinion.

Chambliss - cross

```
 1   Q.      Okay.  Let's turn to -- let's stay here on this

 2   column.

 3           And under "Clinical Evaluation," Teague goes on

 4   to report that:  "Rivaroxaban had been studied in four large

 5   trials and had already been approved in Europe and Canada."

 6           Do you see that?

 7   A.      Yes.

 8   Q.      And so a person of skill in the art reading Teague

 9   would have understood that apixaban had an onset of action

10   that was comparable to another Factor Xa inhibitor that had

11   already been approved; correct?

12   A.      Correct, and lower bioavailability.

13   Q.      All right.  So let's go to the lower bioavailably

14   because I know you want to go there.  All right?

15           Now, lower bioavailability, that would be the

16   opposite of the disclosure of Carreiro that apixaban had

17   good bioavailability; correct?

18   A.      Yes.

19           Now, you said good, you didn't say great.  You

20   said good.

21   Q.      Didn't say great.  I agree with you, but you said

22   good; right?

23   A.      And 50 percent is good in Carreiro's mind.

24   Q.      All right.

25   A.      It's not, in a formulator's mind.
```

Chambliss - cross

1   Q.      Didn't say low, said good; correct?

2   A.      Good is 50.

3   Q.      And it's your opinion that a formulator of skill in

4   the art would look at that 50 percent and say, that's too

5   low?

6   A.      Yes, you're wasting half the drug.

7   Q.      All right.  So let's turn to Table 3 in the Teague

8   reference.

9           And Teague is based on human clinical data;

10  correct?

11  A.      Let me find Table 3 here.

12  Q.      Sure.  It's the preceding page, I believe.

13  A.      Okay.  Thank you.

14  Q.      And Table 3 is entitled "Pharmacologic

15  Characteristics of Emerging Anticoagulants For Atrial

16  Fibrillation."

17          Do you see that?

18  A.      Yes.

19  Q.      And there's a section for Factor Xa inhibitors.

20          Do you see that?

21  A.      Yes.

22  Q.      And let's start with rivaroxaban because that's the

23  approved drug; correct?

24  A.      Yes.

25  Q.      And it has an onset of action of three hours.

Chambliss - cross

1          Do you see that?

2     A.     Yes.

3     Q.     And it has a reported bioavailability of 60 to

4     80 percent; correct?

5     A.     Yes.

6     Q.     And let's turn right above that to apixaban.

7          Do you see that?

8     A.     Yes.

9     Q.     It also has an onset of action of three hours.

10         Do you see that?

11    A.     Yes.

12    Q.     And it has a reported bioavailability of 80 percent;

13    correct?

14    A.     Yes.

15    Q.     And that reported bioavailability was higher than

16    every single drug listed in Table 3 with the exception of

17    one; correct?

18    A.     Exception -- yes.

19    Q.     And that one was --

20    A.     Oh, it's the same as rivaroxaban.  It's the same.

21    Q.     And that one exception was a subcutaneous therapy;

22    correct?

23    A.     Yes.

24              MR. PRUSSIA:  Now, let's put up DDX-14.16,

25    Mr. Lee.

Chambliss - cross

1   BY THE WITNESS:

2   A.      Which tab is that in, please?

3   Q.      This is just your demonstratives, Dr. Chambliss --

4   A.      Oh, I'm sorry.

5   Q.      -- and I'm just focusing on 14 and 16.

6           And this is of the Pinto 2007 reference;

7   correct?

8   A.      Yes.

9   Q.      And you've shown the Court Table 6 from that

10  reference; correct?

11  A.      Yes.

12  Q.      And I believe during your direct testimony I wrote

13  down that a person of skill in the art would look at that

14  58 percent F value -- which is the bioavailability value for

15  apixaban; correct?

16  A.      Correct.

17  Q.      -- and I think I wrote this down correctly:  That it

18  was your opinion that a person of skill in the art would say

19  there's room for improvement there; correct?

20  A.      Correct.

21  Q.      Now, you didn't show the Court the text surrounding

22  Table 6; correct?

23  A.      I don't recall what the test is (sic).

24          MR. PRUSSIA:  Okay.  Well, let's actually pull

25  up Pinto.  It's DTX-349.

1   BY THE WITNESS:

2   A.      What tab is that?

3   Q.      That is Tab 20, sir.

4   A.      (Witness complies.)

5   Q.      That's the same Pinto reference that you provide an

6   excerpt for in DDX-16; correct?

7   A.      Correct.

8   Q.      And it was published in 2007; right?

9   A.      Yes.

10  Q.      And if we turn to the page ending in Bates 413, there

11  is a section titled, "Dog Pharmacokinetics and Rabbit

12  Antithrombotic Efficacy."  Correct?

13  A.      Yes, I see that.

14  Q.      And this section of Pinto reports on the PK profile

15  of apixaban in dogs and rabbits; correct?

16  A.      Correct.

17  Q.      And if we turn to the next page, Pinto discloses that

18  the bioavailability of apixaban in this study was good;

19  correct?

20  A.      Yes, 58 percent.

21  Q.      And that's the reference to 58 percent; right?

22  A.      Right.

23  Q.      So there are two things here to point out.  Number

24  one, that 58 percent was from a dog study; is that correct?

25  A.      Correct.

Chambliss - cross

1    Q.      And dogs are different than humans; right?

2    A.      Yes.

3    Q.      And the second thing to point out is that Pinto

4    itself described the oral bioavailability of apixaban in

5    that dog study at 58 percent to be good; right?

6    A.      That's what Pinto says.

7    Q.      All right.  Now, let's shift gears and talk a little

8    bit about the BCS.  I just want to make sure I understand

9    your position as to this.

10           Is it your opinion that a person of skill in the

11   art would not have looked to the BCS classification system

12   when formulating a drug with low absolute solubility?

13   A.      With low what?  I'm sorry.

14   Q.      What you call water solubility?

15   A.      Could you repeat the question?

16   Q.      Yes, sir.  Is it your opinion that a person of

17   ordinary skill in the art would not have looked to the BSC

18   classification system when formulating a drug with low water

19   solubility?

20   A.      They would not look to it until they have a dose in

21   order to do the BSC solubility calculation.

22   Q.      And it's your view that a formulator would also

23   strive to get the most rapid dissolution to get the highest

24   bioavailability; is that correct?

25   A.      For a cardiovascular drug.

Chambliss - cross

1   Q.      That's for any cardiovascular drug in your view;

2   correct?

3   A.      I'm sorry?

4   Q.      That's for any cardiovascular drug.  That's your

5   view; correct?

6   A.      I hadn't thought about any cardiovascular drug.

7   There could be some that it's better to have slow

8   absorption.  I don't know.

9   Q.      I was just taking your answer.  I thought you said in

10  response to my prior question, for any cardiovascular drug.

11  A.      Yes, for acute conditions is what I should say.

12  Q.      All right.  Let's just be clear.  So in your view, a

13  formulator would always strive to get the most rapid

14  dissolution, to get the highest bioavailability for any drug

15  indicated to treat an acute condition; is that correct?

16  A.      Correct.

17  Q.      And here you think a person of skill in the art would

18  be motivated to get the most rapid dissolution so that they

19  could obtain a biowaiver to avoid regulatory burdens; is

20  that correct?

21  A.      Yes, eventually.

22  Q.      And, again, that's something that applies to any

23  immediate-release drug in your view; is that correct?

24  A.      Yes, if you're Category I or III BCS, not II or IV?

25  Q.      Now, you will agree with as of the priority date,

Chambliss - cross

1   just to contextualize, it's 2010; right?

2   A.      Yes.

3   Q.      Biowaivers, those are only available for BSC Class I

4   drugs?

5   A.      In the U.S.  In Europe, it was earlier.

6   Q.      Biowaivers did not become available for Class III

7   drugs until 2015; right?

8   A.      They didn't become a guidance document.  Based on my

9   experience, if I can share a personal experience.

10  Q.      My question is correct; right?

11  A.      In a guidance document.

12  Q.      Okay.

13  A.      That doesn't mean you couldn't negotiate with the

14  FDA.

15  Q.      I'm sorry.  Were you finished with your answer?

16  A.      I said that doesn't mean you couldn't negotiate with

17  the FDA on your particular drug product.

18  Q.      FDA didn't provide guidance for biowaivers for Class

19  III drugs until 2015.  Is that correct?

20  A.      Correct.  Europe did, but FDA was later.

21  Q.      So as of the priority date for Class III drugs,

22  biowaivers were not available; is that correct?

23  A.      In a guided way.

24  Q.      Okay.  And we can agree that today, right, in order

25  to get a biowaiver, one needs to show that your drug had

Chambliss - cross

1    rapid dissolution; is that correct?

2    A.    Correct.

3    Q.    And rapid dissolution, again, just to clarify these

4    terms, rapid dissolution means that 85 percent of the

5    drug substance releases within 15 or 30 minutes; is that

6    correct?

7    A.    Yes.

8    Q.    And rapid dissolution -- rapid dissolution, that's a

9    subset of an immediate release drug; right?

10   A.    It's a subset of dissolution.  FDA classified it as

11   either rapid or slow.

12   Q.    Well, I just want to make sure we're clear about

13   this.  A drug product can be classified as BSC III and not

14   have rapid dissolution; is that correct?

15   A.    It could.

16   Q.    You just can't get the biowaiver if you are not rapid

17   dissolution; right?

18   A.    You would have difficulty, that's for sure.

19   Q.    But if you have high solubility and low permeability,

20   you're still a BSC III drug regardless of whether you have

21   rapid dissolution; right?

22   A.    Depending on your dose.  Assuming you've done the

23   calculation and your dose, yes.

24   Q.    Now, isn't it true that BCS had relevance beyond this

25   biowaiver context?

1   A.      BCS, as we discussed in deposition, was categorizing

2   drugs based on those four -- two known properties and four

3   different categories.

4   Q.      Well, my question is:  BCS had relevance beyond this

5   biowaiver context; correct?

6   A.      The concept of BCS, the underlying principles have

7   been known for decades.  What BCS just did was categorize

8   them.

9   Q.      Let me state it differently.  You'll agree with me

10  the relevance of the BCS is not only limited to obtaining a

11  biowaiver; is that correct?

12  A.      I would say the relevance of the concepts are not.

13  Q.      Now, if you go to PTX-457, it's an article by Ku; is

14  that correct?

15  A.      Correct.

16  Q.      And it's titled, use of the biopharmaceutical

17  classification system in early drug development; is that

18  correct?

19  A.      Corrected.

20  Q.      And it was published in 2008; correct?

21  A.      Correct.

22  Q.      So it was before the priority date; correct?

23  A.      Correct.

24  Q.      And if you look at the very first sentence, cue

25  discloses that BCS is not only a useful tool for obtaining

1  waivers for in vivo bioequivalence studies but also for

2  decision-making in the discovery and early development of

3  new drugs; is that correct?

4  A.    Correct.

5  Q.    If you look at the right column, first paragraph,

6  second-to-last sentence, Ku discloses that it is arguable

7  that application of BCS in lead compound selection for

8  optimal chemistry may be more important than using BCS in

9  biostudy waiver at a later development stage.

10        Correct?

11 A.    It's talking about the concept of BCS.

12 Q.    Right.  So, again, we can agree that BCS, the

13 relevance of it is not just limited to obtaining the

14 biowaiver; is that correct?

15 A.    Correct.

16 Q.    And that was known by persons of skill in the art

17 prior to the priority date; right?

18 A.    Yes.

19 Q.    Now let's talk a little bit about solubility.  I want

20 to get some terms clarified.  You referenced water

21 solubility on your direct.  You also talked about USP

22 solubility; is that correct?  You're nodding.  I want to

23 make sure it's on the record?

24 A.    Correct.

25 Q.    Both of my questions were correct?

Chambliss - cross

1   A.      Correct, corrected.

2   Q.      Those are two different ways of saying the same

3   thing; right?

4   A.      You've got to repeat the question.

5   Q.      Sure.  USP solubility, water solubility, absolute

6   solubility, intrinsic solubility, those are all describing

7   the same thing; right?

8   A.      It depends on the context.

9   Q.      Let me ask a better question.  Water solubility in

10  your view is different than BCS solubility; is that correct?

11  A.      Water solubility is part of BCS solubility.

12  Q.      The BCS system is a different way of characterizing

13  solubility than the USP; is that correct?

14  A.      A different way of calculating solubility.

15  Q.      The USP uses descriptive terms to describe

16  solubility; is that right?

17  A.      Yes.

18  Q.      Terms like sparingly soluble and impractically

19  insoluble; correct?

20  A.      Correct.

21  Q.      You showed this to the Court yesterday?

22  A.      Yes.

23  Q.      But USP solubility is not always the same thing as

24  BCS solubility; is that correct?

25  A.      As I explained to the Court, BCS is a unique way of

Chambliss - cross

1    dissolving the amount of the drug in 250 1396 liters.

2    Q.    I just want to make sure this is clear for the Court.

3    A drug can be sparingly soluble under the USP and still be

4    highly soluble under the BCS; is that correct?

5    A.    Yes.  Again, apixaban is ten milligrams.  It's highly

6    soluble.  Eleven milligrams, low soluble.

7    Q.    So my question is correct; right?  My question is

8    correct?

9    A.    It depends on the dose.

10   Q.    That's the point; right?  So let's get my question

11   one more time again for the Court.  A drug can be considered

12   sparingly soluble under the USP and also be considered

13   highly soluble under the BCS; is that correct?

14   A.    Correct.  Depends on --

15   Q.    It depends on the dose?

16   A.    It depends on the dose.

17   Q.    All right.  And that's because the BCS accounts for

18   dose when calculating solubility; right?

19   A.    It counts for dose and that a patient takes a full

20   glass of water.

21   Q.    The USP does not account for dose.  Is that correct?

22   A.    No.

23   Q.    My question is correct?

24   A.    Your question is correct.

25   Q.    The BCS is seeking to characterize solubility in the

Chambliss - cross

1    human physiological context; is that correct?

2    A.    Correct, with the assumption they're taking a full

3    glass of water.

4    Q.    Right.  The USP does not; right?

5    A.    No.

6    Q.    My question is correct; right?

7    A.    You're correct.

8    Q.    The BCS measures solubility at a pH range between 1

9    and 7.5.  Is that correct?

10   A.    The original BCS, it depends on which guidance

11   document.  Sometimes it's 6.8, but in general, it's from

12   acid to alkaline.

13   Q.    Let's shift gears a little bit and talk about the

14   expected impact of dissolution rate on a BSC III drug.

15   Okay?

16   A.    Okay.

17   Q.    Now, it's your opinion that dissolution can have

18   an impact on the absorption of a BSC III drug; is that

19   correct?

20   A.    Yes.

21   Q.    And you submitted two expert reports in this case; is

22   that correct?

23   A.    Correct.

24   Q.    And in neither of those reports do you provide any

25   experimental evidence to support the assertion that

Chambliss - cross

1  dissolution can have an impact on a BSC III drug; is that

2  correct?

3  A.      Correct.

4  Q.      You agree with me, the literature has several

5  examples of BSC III drugs where dissolution had no impact on

6  absorption; is that correct?

7  A.      It does have examples where there is no impact.

8  Q.      And that's because the BCS teaches us that Class III

9  drugs are not dissolution rate limited; is that correct?

10  A.      With the understanding that it's rapidly released

11  from your dosage form.  In order to get it rapidly released,

12  you're going to reduce the particle size.

13  Q.      My question was correct; right?

14  A.      With the understanding that the drug is rapidly

15  released, your question was correct, but you left out the

16  rapidly released part.

17  Q.      Let's just be clear about this.  I want to make sure

18  we understand your opinion crystally?

19  A.      Okay.

20  Q.      All right?  No pun intended.

21          It's your opinion --

22  A.      That was a good one.

23  Q.      That was pretty good.  It's your opinion that BSC III

24  drugs are only not dissolution rate limited when they have

25  rapid dissolution; is that correct?

Chambliss - cross

1    A.    No, that's not my opinion.

2    Q.    Oh, okay.  All right.

3    A.    I'm saying the BCS criteria assumes you have rapid

4    dissolution.

5    Q.    And the definition of a BSC III drug is that you're

6    not dissolution rate limited; right?

7    A.    Yes.  With that assumption that dissolution is rapid.

8    Q.    Right.

9    A.    So it's not the variable that you need to be worried

10   about.

11   Q.    But let's take a look at PTX-429, and this is an

12   article that was published by Blume; is that correct?

13   A.    Correct.

14   Q.    And it was published in 1999; is that correct?

15   A.    Correct.

16   Q.    And that's before the priority date; right?

17   A.    Yes.

18   Q.    And if you look at the Bates ending in 3248, the

19   article included a discussion in Section 2.4 of

20   bioavailability of Class III drugs; is that correct?

21   A.    Yes.

22   Q.    And Blume discloses for us in that second paragraph

23   that for these compounds, permeation through the intestinal

24   membrane will be the rate limiting process for drug

25   absorption.  Correct?

Chambliss - cross

1    A.      Correct.

2    Q.      And that means it's not dissolution rate limited; is

3    that correct?

4    A.      Assuming you have rapid dissolution.

5    Q.      And Blume goes on to disclose that in the case of

6    Class III drugs, if we go down to the next page, in the case

7    of Class III compounds, bioavailability will be very much

8    independent of the drug dissolution properties.

9            Is that correct?

10   A.      Correct.

11   Q.      So as of 1999, Blume is teaching the art that

12   changing the dissolution rate will not change the

13   bioavailability of a Class III compound; is that correct?

14   A.      I disagree.

15   Q.      Well, Blume actually demonstrates for us, this for us

16   experimentally; is that correct?

17   A.      He gives an example.

18   Q.      Let's take a look at Blume.  Bates 3249.  And let's

19   actually go to the text first, Mr. Lee.

20   A.      He --

21   Q.      The first full paragraph and the page ends go in

22   3249, Blume states, for this study, several batches of an IR

23   ranitidine product were manufactured, exhibiting different

24   biopharmaceutical properties.

25           Do you see that?

Chambliss - cross

1  A.      Can you tell me which tab?  It's easier for me to see

2  the figure.

3  Q.      Tab 13?

4  A.      Thank you.

5  Q.      And just let me know when you are there.

6  A.      Okay.  I'm there.  Thank you.

7  Q.      The study that Blume is referring to is in Figure 4;

8  correct?

9  A.      Correct.

10 Q.      And if we go to Figure 4, we see two images; right?

11 A.      Yes.

12 Q.      And if we go back -- the figure on the left describes

13 four -- includes the graph of four different dissolution

14 curves.  Do you see that?  The white one is a little hard to

15 see, but there are four different dissolution curves on the

16 left; right?

17 A.      Yes.  I can only see three.

18 Q.      Let's just assume there's three.  There are multiple

19 dissolution curves?

20 A.      Yes.  I see the white now.  Thank you.

21 Q.      And each one of those curves represents a different

22 dissolution rate for the immediate release drug ranitidine;

23 is that correct?

24 A.      Ranitidine.

25 Q.      Ranitidine; is that correct?

Chambliss - cross

1    A.    Yes.

2    Q.    And on the right are those four curves superimposed

3    on each other; is that correct?

4    A.    Yes.

5    Q.    And if we go to the text, Bloom describes the results

6    of this study, of the study, and states that:  "While there

7    are obvious deviations in the dissolution curves, the plasma

8    concentration over time profiles were superimposable."

9    Correct?

10   A.    That's what it says.

11   Q.    So Bloom is saying that despite the differences in

12   dissolution, the absorption was the same; correct?

13   A.    That is what Bloom says.

14   Q.    And Bloom concludes that this behavior may be

15   explained by the BCS as:  "Ranitidine is a Class III drug

16   with high solubility and low permeability.  The rate and

17   extent of its bioavailability is controlled by the

18   permeation process and not so much by in vivo drug release."

19         That's what Bloom taught in the prior art;

20   correct?

21   A.    That's what it says, and you know we had a discussion

22   about Bloom in the deposition.

23   Q.    So my question was correct; right?

24   A.    That is what it says.  We had a good discussion about

25   Bloom at the deposition which I would be glad to have now.

1    MR. PRUSSIA:  I have no further questions, Your

2    Honor.

3    THE COURT:  Not now.  Okay.

4    Redirect.

5    MR. PEJIC:  Yes.

6    REDIRECT EXAMINATION

7    BY MR. PEJIC:

8    Q.    Okay.  Dr. Chambliss, we'll try to make this brief,

9    but do you remember talking about Carreiro and Pinto with

10    Mr. Prussia?

11    A.    Yes, I do.

12    Q.    And their characterization of apixaban being --

13    having good bioavailability and rapid dissolution?

14    A.    Rapid onset of action.

15    Q.    Ah.

16    A.    Yes.

17    Q.    Are Carreiro and Pinto, the authors, related to BMS?

18    Are they employees or contributors?

19    A.    I believe it's BMS, they're either employees or

20    consultants.  I don't recall which.

21    Q.    Would that color your opinion of how apixaban is

22    being characterized in those articles?

23    A.    I don't feel comfortable saying that.

24    Q.    Understood.

25    A.    I don't try to read intention.

Chambliss - redirect

```
 1              But all I say is when a formulator looks at the
 2     data, good could be better, three hours could be shorter.
 3     Q.      Okay.  And when were biowaivers available in Europe?
 4     A.      Some time in the 2000s.  Several years before FDA.  I
 5     don't remember the exact date.
 6     Q.      And is Eliquis approved in Europe?
 7     A.      As far as I know it is.
 8     Q.      Okay.  And do you recall talking about a composition
 9     where you mix powder and do nothing else to reach a
10     pharmaceutical composition?
11     A.      Yes.
12     Q.      Is there any method of manufacture in the '945 patent
13     that does not include granulation?
14     A.      No.
15     Q.      Thank you.  Did Mr. Prussia show you any documents
16     where the particle size distribution of an API was
17     determined after it had been formulated?
18     A.      No, he did not.
19              MR. PEJIC:  No further questions, Your Honor.
20              THE COURT:  All right.
21              MR. PRUSSIA:  Your Honor, I just forgot to move
22     in the last paper I showed, PTX-429.
23              THE COURT:  You may offer it.
24              What was the number?
25              MR. PRUSSIA:  PTX-429.
```

```
 1                    THE COURT:  Thank you.

 2                    Any objection?

 3                    MR. PEJIC:  No, Your Honor.

 4                    THE COURT:  Okay.  429 is admitted.

 5                    (PTX-429 was admitted into evidence.)

 6                    THE COURT:  Dr. Chambliss, you may step down.

 7                    THE WITNESS:  Thank you.

 8                    THE COURT:  Folks, if you could retrieve the

 9      many binders here.

10                    (Witness stand cleared.)

11                    THE COURT:  All right.  What is next?

12                    MR. MIZERK:  Your Honor, we have a series of

13      depositions to play.  They're all, in total, about 12

14      minutes but we can just start now.

15                    The first one is Ruth Wexler.  She's an employee

16      of BMS.

17                    THE COURT:  Okay.

18                    MR. LEE:  Your Honor, could we just ask, for

19      scheduling purposes, I think Dr. Scheidt is next, and then

20      our next witness will be Dr. Jacobsen, who we have to get on

21      today because of teaching obligations.

22                    THE COURT:  Okay.

23                    MR. LEE:  Can we leave the deposition clips for

24      the end of the day?  I understand they're going to play

25      them; just so we don't get in a time crunch.
```

```
 1                    THE COURT:  Any objection?

 2                    MR. MIZERK:  I don't have any objection.

 3                    THE COURT:  All right.  That's fine.  We'll find

 4     time to play the deposition clips.

 5                    MR. LEE:  Thank you.

 6                    THE COURT:  All right.  So then what is next

 7     now?

 8                    MR. MIZERK:  The next witness is Dr. Karl

 9     Scheidt.

10                    THE COURT:  Okay.

11                    MR. MIZERK:  He is being called on behalf of

12     SigmaPharm and Unichem; and Mr. Segrest will conduct the

13     examination.

14                    THE COURT:  Thank you.

15                     ... DR. KARL SCHEIDT, having been first duly

16     sworn, was examined and testified as follows ...

17                    THE COURT:  Good morning, Dr. Scheidt.  Welcome.

18                    THE WITNESS:  Good morning, Your Honor.

19                    THE COURT:  If it's not open, you're welcome to

20     it.  Is it open?

21                    THE WITNESS:  It's open.

22                    THE COURT:  You probably want one all to

23     yourself.

24                    THE WITNESS:  I need a fresh one.

25                    THE COURT:  Do we have a fresh bottle for the
```

Scheidt - direct

1    witness?

2              MR. LEE:  I have one.

3              THE COURT:  Thank you.

4              THE WITNESS:  Thank you, Mr. Lee.  I appreciate

5    it.

6              (A bottle of water passed up to the witness.)

7              THE COURT:  The old bottle, get rid of it.

8              Thank you.

9              THE WITNESS:  Thank you, Your Honor.

10             MR. SEGREST:  May I approach the witness, Your

11   Honor?

12             THE COURT:  You may.

13             (Binders passed forward.)

14                    DIRECT EXAMINATION

15   BY MR. SEGREST:

16   Q.    Good morning, Doctor.  Can you say your name for the

17   Court, by way of introduction?

18   A.    Karl Andrew Scheidt.

19             MR. SEGREST:  And let's go to slide 2.

20   BY MR. SEGREST:

21   Q.    Well, first, in general, what are you here to testify

22   about today?

23   A.    I'm here to testify about whether or not apixaban can

24   be made into a pharmaceutically acceptable salt.

25             MR. SEGREST:  And now on slide 2.

Scheidt - direct

1  BY MR. SEGREST:

2  Q.     Could you tell us a bit about your background,

3  starting with where you went to school?

4  A.     I did my undergraduate degree at the University of

5  Notre Dame, getting a bachelor's in chemistry in 1994.

6            I then went to Indiana University where I

7  obtained my Ph.D. in 1999 under the direction of William

8  Roche.

9            Then I did a National Institute of Health

10  postdoctoral fellowship from 1999 to 2002 at Harvard

11  University the direction of David Evans.

12  Q.     And what did you do after your post-doc?

13  A.     After my post-doc, I applied for academic positions.

14  Q.     Where did you apply?

15  A.     I applied to many places, and eventually ended up at

16  Northwestern University in Evanston, Illinois.

17  Q.     What positions have you held at Northwestern?

18  A.     I was first an assistant professor, then promoted to

19  associate professor, and then full professor in 2003.

20  Q.     Are you still at Northwestern?

21  A.     I'm still gainfully employed at Northwestern, yes.

22  Q.     Is any of your experience at Northwestern

23  particularly relevant to drug discovery?

24  A.     It is.  Not only am I a professor of chemistry, but

25  also a professor of pharmacology in Northwestern's Feinberg

Scheidt - direct

1    School of Medicine.

2                Since 2009, I have been director of Northwestern

3    Center for Molecular Innovation and Drug Discovery, and then

4    most recently another hat in terms of being the executive

5    director of Northwestern's Biotech Accelerator known as the

6    NuCures Accelerators.

7    Q.    So what is the Northwestern Center for Molecular

8    Innovation and Drug Discovery?

9    A.    It's a center that provides resources and advice and

10   help to faculty members and staff and researchers that would

11   like to take molecules that they've discovered and advance

12   them towards clinical endpoints through early drug discovery

13   and development.

14   Q.    And the NuCures Accelerator that you mentioned, what

15   does that do?

16   A.    The Accelerator is supposed to accelerate or help

17   accelerate those types of findings.  It's a little bit later

18   in the therapeutic pipeline where we're trying to make

19   strategic investments in Northwestern assets to make them

20   attractive to strategic partners for further development

21   for clinical use.

22   Q.    Have you participated in any commercial endeavors in

23   the pharmaceutical industry?

24   A.    I have.  I have had a number of technologies been

25   spun out of my laboratory.

1       One of them, the most -- the most recent was

2   Seneca Therapeutics, but the one that's the most, I think,

3   formidable is the Third Coast Therapeutics where some of

4   the technology in my laboratory has been used to develop an

5   antimetastatic for use in cancer treatment.

6   Q.      Have you been recognized with various honors and

7   awards in your career?

8   A.      I have been fortunate to have been honored as such,

9   yes.

10  Q.      And what are some recent or noticeable such awards?

11  A.      So -- excuse me.

12          Recently, I've been elected as a fellow of the

13  Royal Society of Chemistry, and then in the last three years

14  running I've been a highly cited researcher which means my

15  papers have been in the top one percent of citations in the

16  scientific literature.

17  Q.      Are you named as an inventor on any patents?

18  A.      I am.  At this point I think it's higher or more,

19  excuse me, than 10, and many others are in different parts

20  of the prosecution.

21          MR. SEGREST:  If we pull up DTX-586.

22  BY MR. SEGREST:

23  Q.      Now, Dr. Scheidt, is this your resume?

24  A.      It is.

25  Q.      And does it describe what we've discussed today and

1    relate to your background and experience?

2    A.    It does.

3              MR. SEGREST:  The defense move to qualifies as

4    an expert Dr. Scheidt on synthetic organic chemistry,

5    medicinal chemistry, pharmaceutical chemistry, and

6    pharmaceutical development including drug discovery.

7              MR. LEE:  No objection.

8              THE COURT:  Okay.  He is so recognized.

9              Doctor, if you could try to speak a little

10   slower.

11             THE WITNESS:  I apologize.

12             THE COURT:  Go ahead.

13             MR. SEGREST:  Let's go back to slide number 3

14   now.

15   BY MR. SEGREST:

16   Q.    Looking at the claims, what were you asked to provide

17   an opinion about?

18   A.    I was asked to provide an opinion about whether or

19   not apixaban could be made into a pharmaceutically

20   acceptable salt form.

21   Q.    And just to be clear, specifically, what part of the

22   claim are you testifying about?

23   A.    Claim 13, about a pharmaceutically acceptable salt.

24   Q.    Okay.  And is it your understanding that the phrase

25   pharmaceutically -- that the defendants contend the phrase

1    "pharmaceutically acceptable salt" also extend to claim 104?

2    A.    I'm aware, yes.

3    Q.    Now, were you asked to provide any opinions on that

4    issue of claim construction?

5    A.    No, I was not.

6    Q.    And do you have any testimony to offer today

7    concerning the scope of claim 104?

8    A.    I do not.

9    Q.    And have you given any consideration to the scope of

10   claim 104 in comparison to other claims?

11   A.    I have not.

12   Q.    Did you apply the Court's claim construction in

13   forming your opinions in this case?

14   A.    Yes, I did.

15         MR. SEGREST:   Let's take a look at slide 4,

16   please.

17   BY MR. SEGREST:

18   Q.    Is this the claim construction that you applied?

19   A.    It is, yes.

20   Q.    And were you also informed about the legal standard

21   to apply on questions of enablement and written description?

22   A.    I was, yes.

23         MR. SEGREST:   So going to slide 5.

24   BY MR. SEGREST:

25   Q.    For enablement, is this a quote of the legal standard

1    you were instructed to apply?

2    A.    Yes, I believe it is.

3    Q.    Is this the *Wands* factors?  Is that what you were

4    told to apply?

5    A.    Yes, it was.  Yes, they were.

6    Q.    And do you have an opinion as to the level of

7    ordinary skill in the art in the field of the '208 patent?

8    A.    I do, yes.

9              MR. SEGREST:  Put up slide 6.

10   BY MR. SEGREST:

11   Q.    Does this slide state what your view of the level of

12   ordinary skill in the art is?

13   A.    It does, yes.

14   Q.    Where in this description of the skill in ordinary --

15   of the level of ordinary skill in the art, if you can read

16   it on the slide or maybe on your screen, would you fit

17   individually?

18   A.    I would fit definitely in that first paragraph:  A

19   chemist with an advanced degree in chemistry, medicinal

20   chemistry and pharmaceutical chemistry, and I have

21   experience in research, design, and development of small

22   molecules of drugs or drug candidates, and I am currently in

23   academia.

24   Q.    And this says 2002.  I think maybe some slides say

25   2001, but are you familiar with the level of ordinary skill

Scheidt - direct

1  in the art for those people as of the 2001-2002 time frame?

2  A.    I am indeed, yes.

3  Q.    Do you understand that plaintiffs have suggested a

4  different statement as to the level of ordinary skill?

5  A.    Yes.

6  Q.    Would applying plaintiffs' statement instead of this

7  one make any difference in your analysis of the opinions you

8  have offered?

9  A.    No, it would make no difference in my analysis.

10  Q.    Are you, yourself a medical doctor?

11  A.    No, I'm not.

12  Q.    Do you have experience in the process of developing

13  compounds intended for pharmaceutical use?

14  A.    I do have experience in that, yes.

15  Q.    And when a pharmaceutical chemist develops a drug

16  substance compound intended for pharmaceutical use, would

17  she consider the needs of a formulator, like somebody like

18  Dr. Buckton, who will take that compound to make a drug

19  product?

20          MR. LEE:   Your Honor, I object.   It is leading.

21  I let -- the preliminary parts are done, but we're getting

22  into the substance now.

23          THE COURT:   It is certainly on the border.   Why

24  don't you try again.   It is also a very long and complicated

25  question.

Scheidt - direct

1    MR. SEGREST:  Yes, Your Honor.

2    BY MR. SEGREST:

3    Q.    So when a pharmaceutical chemist is making a compound

4    that is going to be used for further development, where

5    would it go next from the chemist?

6    A.    From the chemist, it would go to probably a team of

7    biologists to assess potency and selectivity in different

8    animal models.

9          It would also even at that point be

10   considered -- be evaluated to maybe think about potential

11   toxicology.  And,

12         You would also, even at that early stage, be

13   thinking about how one -- this drug substance or this early

14   substance might even be formulated.

15         So all of those long-term considerations are in

16   the mind of somebody developing molecules even at that early

17   stage.

18   Q.    Let's go back to the Court's claim construction.  If

19   a particular ion or cation has been found to form

20   pharmaceutically acceptable salts of one pharmaceutical

21   compound, does that mean that it would necessary -- does

22   that necessarily mean that the salts of that anion or cation

23   will be pharmaceutically acceptable with other compounds?

24   A.    Absolutely not.  That's a traditional

25   apples-to-oranges comparison.

Scheidt - direct

1    Q.      Is there any way of reliably predicting the influence

2    of a particular salt species on the parent compound in a

3    dosage form?

4    A.      In a general sense, not to my knowledge.

5    Q.      Is it's reasonable to assume that every salt will

6    have the same safety profile as the neutral compounds or

7    parent compound from which it's made?

8              MR. LEE:  I object.  There's not in his report

9    on this seek seeing it's in paragraph 89 of his report.

10             MR. SEGRIST:  Take a look at 89.

11             (Pause while counsel conferred.)

12             MR. SEGREST:  Your Honor, I think it is within

13   the scope of paragraph 89.  Mr. Lee and I disagree on

14   whether it's fairly within the scope of that paragraph.

15             MR. LEE:  Well, the question before was within

16   the scope, which is why we let it go.

17             THE COURT:  Okay.  If you want to hand it up?

18             MR. LEE:  The current one is the one I object to

19   (handing material to the Court).

20             THE COURT:  What is the question you want an

21   answer to now?

22             MR. SEGREST:  The question I asked was:  Is it

23   reasonable to assume that every salt will have the same

24   safety profile as the neutral compound or parent compound

25   from which its made.

Scheidt - direct

```
 1              THE COURT:  And where would I find the concept

 2    of safety profile in paragraph 89?

 3              MR. SEGREST:  I can ask a different question,

 4    see if Mr. Lee will object to this.  Will a salt formed by

 5    the combination of an anion and cation necessarily have the

 6    same pharmaceutical properties as the individual ion?

 7    A.    No, I don't believe they would.

 8              MR. LEE:  I understand the prior question was

 9    withdrawn?

10              MR. SEGREST:  Yes.

11              THE COURT:  Yes, it was withdrawn.  This one was

12    just answered.  Are you okay with that?

13              MR. LEE:  I'm fine with that.

14              THE COURT:  Okay.

15    BY MR. SEGREST:

16    Q.    Can ethanol be a pharmaceutically acceptable

17    substance?

18    A.    Yes, I believe it can be.

19    Q.    What is it used for?

20    A.    I think it's primarily used as an excipient in

21    formulation.

22    Q.    And can a positive sodium ion also be a

23    pharmaceutically acceptable substance?

24    A.    Yes.  I believe we talked about sodium Warfarin and

25    sodium naproxen are examples of that.
```

Scheidt - direct

1    Q.      When you combine ethanol and sodium, is the resulting

2    compound pharmaceutically acceptable?

3    A.      No.  You would get sodium ethoxide, which is a

4    relatively strong base used in organic chemistry.

5    Q.      And why wouldn't sodium ethoxide that's a relatively

6    strong base be pharmaceutically acceptable?

7    A.      Well, it has a pH that's relatively caustic and would

8    potentially cause harm.

9    Q.      Is isobutane a pharmaceutically acceptable substance?

10   A.      I believe it is, yes.

11   Q.      And what might it be used for?

12   A.      I think it's used in aerosols and propellants.

13   Q.      Can a lithium ion be a pharmaceutically acceptable

14   substance?

15   A.      Yes.  I believe it's used to treat central nervous

16   disorders.

17   Q.      What do you get when you combine isobutane and

18   lithium?

19   A.      You would generate a t-Butyllithium, a very

20   dangerous material that one must use extreme precaution

21   when handling.

22   Q.      Is t-Butyllithium a pharmaceutically acceptable

23   salt?

24   A.      No, I don't believe it is.

25   Q.      And if you don't use extreme caution when handling

1  t-Butyllithium, what will happen?

2  A.    It catches fire in air.  It's known as being

3  pyrophoric.  It causes, would cause severe burns if it ever

4  came in contact with human tissue.

5  Q.    Can aluminum be a pharmaceutically acceptable cation?

6  A.    I believe so.  I believe it's used in antacids.

7  Q.    And can chloride be a pharmaceutically acceptable

8  anion?

9  A.    Yes.  It can be a common counterion in drug

10  formulation I believe metformin HCl is a pharmaceutically

11  acceptable substance.

12  Q.    And what do you get when you combine aluminum and

13  chloride?

14  A.    You get aluminum three chloride, which is an

15  anhydrous material.  It's a very, very strong acid.

16  Q.    And is this aluminum three chloride or aluminum

17  trichloride a pharmaceutically acceptable salt?

18  A.    No, it is not.

19  Q.    Now, were you asked questions at your deposition by

20  plaintiffs' counsel about something referred to as aluminum

21  chloride?

22  A.    I was.

23  Q.    And what consumer product did they ask you about?

24  A.    They brought a deodorant.

25  Q.    And what's the actual chemical compound in that

Scheidt - direct

1  deodorant that the label refers to as aluminum chloride?

2  A.    I believe in that case the active ingredient was

3  aluminium chloride hexahydrate.

4  Q.    Is there a difference between aluminum trichloride

5  and aluminum chloride hexahydrate?

6  A.    Yes.  Very different.  Aluminum has already reacted

7  with the water to make the hexahydrate species.

8  Q.    What's the difference between the way those two

9  compounds behave?

10  A.    One I probably used this morning as a deodorant and

11  the other I would never want to get on my skin.

12  Q.    Can compounds with very similar sounding names and

13  even similar elements have very, very different chemical and

14  physical properties?

15  A.    Yes.  That's the beauty of chemistry.

16  Q.    So do you have an opinion as to whether a person of

17  ordinary skill in the art for the '208 patent could make and

18  use a pharmaceutically acceptable salt of apixaban without

19  undue experimentation?

20  A.    Yes.  It's my opinion that cannot be done.

21  Q.    Now, on the other hand, could a skilled synthetic

22  chemist make a compound out of apixaban that might be

23  considered a salt?

24  A.    Yes.

25  Q.    Would such a compound even if it is a salt be a

1    pharmaceutically acceptable salt suitable for use in the

2    pharmaceutical industry without undue experimentation?

3    A.      Not when applying the Court's claim construction, no.

4    Q.      Now, were you here when Dr. Buckton testified?

5    A.      I was not.

6    Q.      Have you reviewed the transcript of his testimony?

7    A.      Yes, I have.

8    Q.      Do you as an expert knowledgeable about

9    pharmaceutical development agree with his testimony about

10   formulators and pharmaceuticals?

11   A.      Yes, I do.

12   Q.      Are you aware of, also of the work done by Dr.

13   Jacobsen in this case?

14   A.      I am.

15   Q.      And did you review his report?

16   A.      I did, yes.

17   Q.      Now, what did Dr. Jacobsen say he had done?

18   A.      In Dr. Jacobsen's report, there are three primary

19   sets of experiments.  Two were to make the sodium or the

20   potassium anions of apixaban and the third experiment was

21   generally to make the HCl salt of apixaban.

22   Q.      Now, based on the results you reviewed, did it appear

23   that he had succeeded in making a pharmaceutically

24   acceptable salt of apixaban?

25   A.      No, he did not.

Scheidt - direct

1   Q.      Now, in your opinion, did it appear he was able to

2   make sodium and potassium salts or something similar to

3   that?

4   A.      Yes, he did.

5   Q.      So were both of those made from strong bases?

6   A.      Yes.  In those cases, there was potassium

7   hexamethyldisilazane and sodium hexamethyldisilazane.  Those

8   are very, very strong bases that we use in organic

9   chemistry.

10  Q.      Were the compounds that he made pharmaceutically

11  acceptable salts?

12  A.      Not based on the Court's claim construction, no.

13  Q.      And what did your review of the data suggest happened

14  when Dr. Jacobsen tried to make the hydrochloride salt?

15  A.      The data seems to support that while there was a

16  protonation event with apixaban, it occurred at a different

17  site and it was only done in solution and never isolated as

18  a solid and solid -- salts need to be solid.

19  Q.      So what are things that a person of ordinary skill in

20  the art in the pharmaceutical industry would take into

21  consideration when trying to make a pharmaceutically

22  acceptable salt?

23  A.      You would need to take into account stability, the

24  ability to purify it, the ability to manipulate it.  Those

25  would be a primary consideration.

Scheidt - direct

1    Q.      Would the pKa range of the compound be a

2    consideration?

3    A.      Yes.  It would be very much so.

4    Q.      How about potential for degradation?

5    A.      As well the degradation would be of concern, yes.

6    Q.      Would a need for a solid state characterization

7    compound be a consideration?

8    A.      If you are dealing with salts, yes, that would be

9    quite important.

10   Q.      Let's go to slide seven now.  What is pKa?

11   A.      PKa is a measure of acidity of molecules, meaning

12   their capacity to donate a proton.

13   Q.      So can a given compound have different pKa values

14   associated with different points on or parts of that

15   molecule?

16   A.      Yes.  Since molecules have many different hydrogen

17   atoms, each area of that molecule has different functional

18   groups, and those functional groups would have different

19   acidities associated with them.

20   Q.      Is there any particular range of pKa values that are

21   needed on those points in order for a compound to be

22   considered a candidate for making a pharmaceutically

23   acceptable salt?

24   A.      That range -- yes.  That range is usually between a

25   pKa of three to pKa of ten.

Scheidt - direct

1    Q.      And why does a pKa need to fall in that range in

2    order for it to be a good candidate for making it a

3    pharmaceutically acceptable salt?

4    A.      Because once you get outside those ranges, for

5    example, if you go below three, the material becomes very,

6    very acidic.  If you go above ten, the material becomes

7    very, very basic, which then could cause damage.

8    Q.      Is that kind of stuff discussed in the literature?

9    A.      Yes.  It very much is.

10   Q.      What is this article, DTX-574-B?

11   A.      That article discusses aspects about acidities of

12   molecules, how to determine them and then effectively

13   summarizes at that pKa range between 3 and 10 is standard

14   and conventional.

15   Q.      Now, have you seen anything from the plaintiffs in

16   this case identifying a pharmaceutically acceptable salt

17   that was formed from a compound with a pKa outside of this

18   range?

19   A.      No, I have not.

20   Q.      Do you otherwise know of any existing

21   pharmaceutically acceptable compounds or pharmaceutically

22   acceptable salts, I'm sorry, that's made from a compounds

23   with a pKa outside of this range?

24   A.      No, I do not.

25   Q.      Referring to slide eight, how important or

1    unimportant is purity when developing a compound for

2    pharmaceutical use?

3    A.      Purity is very important.  You want to make sure you

4    know what kind of drug you're making and that it's a hundred

5    percent pure.

6    Q.      Was that concept discussed in the literature?

7    A.      Yes.

8    Q.      And is does this article, DTX-602, about?

9    A.      This article discusses how you want to make sure you

10   have a pure molecule because impurities in drug material can

11   cause many, many different types of problems.

12   Q.      In making a pharmaceutically acceptable salt, is it

13   important to a pharmaceutical chemist to confirm that that

14   salt can be purified?

15   A.      Yes.  That would be very important.

16   Q.      Did you see anything in the report Dr. Jacobsen

17   provided indicating that he tried to purify whatever it was

18   he made in his experiment?

19   A.      I did not see that, no.

20   Q.      In reviewing his results, was there any indication

21   that impurities might be present in what he had produced?

22   A.      In some of those experiments, yes.  In the NMR

23   spectra, there does seem to be small amounts of impurities.

24   Q.      You say there may be small amounts.  Would small

25   amounts have been a major concern to a synthetic organic

Scheidt - direct

```
1   chemist looking to see if he can make a compound, make a

2   given molecule?

3   A.      No, not necessarily.  Those types of impurities you

4   would assume in the laboratory scale you would be able to

5   purify away and move on to the next experiment.

6   Q.      But would even small amounts of impurities be

7   important to a person of ordinary skill in the art in the

8   pharmaceutical sciences when attempting to make a

9   pharmaceutically acceptable salt?

10  A.      Yes.  In that case, impurities can be very, very

11  important since you have not been able to assess the

12  toxicology or the pharmacology of those particular compounds

13  that you've made.

14  Q.      Moving on to slide 9, what does it mean to a

15  pharmaceutical scientist to perform a solid state

16  characterization of a salt?

17  A.      Solid state characterization generally means you'd

18  want to be sure of the connectivity of the atoms in the

19  molecule in the solid state as well as use instrumentation

20  to understand, like, for example, X-ray crystallography to

21  be able to understand not only the connectivity of the

22  molecule, the atom, but also the molecules in relationship

23  to each other in the solid state.

24  Q.      What is this article DTX-604 about?

25  A.      This article summarizes approaches and aspects of
```

Scheidt - direct

1   solid state characterizations such as X-ray crystallography,

2   either single crystal or powder diffraction, as well as

3   solid state NMR.

4   Q.    Now, would performing a sufficient solid state

5   characterization of a salt be important to a person of

6   ordinary skill in the art if they are trying to make a

7   pharmaceutically acceptable salt?

8   A.    Yes, it would, because then you would be able to

9   confirm that you did, in fact, make what you think you made.

10  Q.    Did Dr. Jacobsen's report indicate if he had done

11  anything in that regard?

12  A.    I believe he utilized an FTIR in one case with the

13  anions to indicate anion formation, but that's the limit of

14  solid state characterization that I'm aware of.

15  Q.    Would a person of ordinary skill in the art normally

16  want to see more than that to understand the nature of

17  whatever it was that was made?

18  A.    Yes, they would.

19  Q.    Moving to slide ten, is the nature of the solvent

20  that's used in making a salt an important factor that a

21  person of ordinary skill in the art would consider in trying

22  to make a pharmaceutically acceptable salt?

23  A.    Yes.  Always thinking about different solvents, so,

24  yes.

25  Q.    What's this article, DTX-596 about?

Scheidt - direct

1    A.      That article talks about how to, again, generally

2    speaking, how to make salts and organic solvents, that those

3    salts will always encounter aqueous environment, so you need

4    to understand the differences between making salts in

5    organic solvents and their eventual use in aqueous systems

6    or water based systems.

7    Q.      And what did -- what solvent did Dr. Jacobsen use

8    when he was making the sodium potassium salt?

9    A.      Dr. Jacobsen, I believe, used tetrahydrofuran, which

10   is a solvent that organic chemists use typically with very

11   strong bases.

12   Q.      And --

13   A.      Among other things.  Excuse me.

14   Q.      Did he give any consideration or did you see anything

15   in his report about how that would affect the performance of

16   that substance in an aqueous environment?

17   A.      I believe that solvent was used in particular because

18   it doesn't have any acidic protons.  So the strong bases

19   that were used to generate the anions of apixaban could be

20   done so because the base that is being used would not

21   protonate the salt.

22              MR. SEGREST:  Let's look first at the '208

23   patent.  This is JTX-1, page 62 of the patent, column 117,

24   lines 1 through 13.

25   BY MR. SEGREST:

Scheidt - direct

1  Q.     So does the '208 patent here refer to using an

2  organic solvent in salt formation?

3  A.     Yes.

4  Q.     Now, how is an organic solvent being used in this

5  process that is described in the '208 patent?

6  A.     My understanding is that organic solvent is being

7  used in the patent to generate and isolate salts.

8         When I say that, I mean when you take a drug

9  substance or a molecule that is soluble in organic solvent

10 and you add acid or base, you would then generate anions

11 that are charged.  They would be less soluble in the organic

12 solvent.  Those would then precipitate out and you would be

13 able to isolate those salts very easily.  Not only generate

14 them, but also isolate them easily.

15 Q.     So is that process about precipitating salts out,

16 does that rely on the relative solubility of the substance

17 formed in organic solvents and in other forms?

18 A.     Yes.  You would be utilizing the lack of solubility

19 of the salts to help precipitate those materials out.

20 Q.     Did that use have anything to do with the solvent

21 being aprotic, something that it's not a proton donor?

22 A.     That doesn't necessarily apply here, no.  It could,

23 but it doesn't necessarily.

24 Q.     Now, is the use of an organic solvent in this way

25 descriptive of what Dr. Jacobsen did when he was using an

1  organic solvent?

2  A.    I think Dr. Jacobsen used tetrahydrofuran primarily

3  so the strong base being used in his anion generation

4  experiments could then deprotonate apixaban and only

5  apixaban and not anything else in the reaction.

6        If you had a solvent that had acidic protons,

7  such as ethanol, it would deprotonate ethanol first and not

8  apixaban.

9  Q.    So the term "deprotonate apixaban," what does that

10  mean is happening to the apixaban molecule?

11  A.    That means that a strong base is taking a proton away

12  from apixaban and leaving behind an electron that makes a

13  negative charge.

14  Q.    Is taking a proton away the same thing as stripping

15  off one of the hydrogens that's on an apixaban molecule?

16  A.    You could say that, yes.  Those are effectively

17  equivalent.

18  Q.    And so what's the effect of this THF being aprotic

19  and it's not a proton donor?

20  A.    That you would be able to do strongly anionic

21  chemistry, or strongly -- excuse me, basic chemistry in that

22  solvent.

23  Q.    If you were going to try to use that compound in an

24  aqueous environment, in an environment with water, would

25  that still be an aprotic environment?

Scheidt - direct

1   A.      No, water has two protons per oxygen, so in water you

2   have many, many, many protons available.

3   Q.      Okay.  So water -- water is $H_2O$.  Even I get that

4   part right.  It's got the two hydrogens on it.

5           If you bring this water molecule with the two

6   hydrogens on it next to the compound that Dr. Jacobsen said

7   he made, that the hydrogen was stripped off in aprotic

8   organic solvent, what happens when you bring those two

9   compounds next to each other?

10  A.      That apixaban anion would remove a proton from water.

11  It would become the neutral apixaban.  And then the

12  remaining HO, because you removed one hydrogen, becomes

13  hydroxide or $HO^-$.

14  Q.      What are the implications for a pharmaceutical

15  chemist forming hydroxide in the mix?

16  A.      Well, you would be forming sodium hydroxide, which is

17  not pharmaceutically acceptable, to my knowledge.

18          MR. SEGREST:  Going to slide 11.

19  BY MR. SEGREST:

20  Q.      What is this disproportionation?

21  A.      Disproportionation is the general term, it's the

22  reverse of salt formation.  So you're taking charged

23  species that are then reverting or reversing back to neutral

24  species.

25  Q.      Is the possibility of disproportionation a concern in

Scheidt - direct

1    trying to make a pharmaceutically acceptable salt?

2    A.    Yes, it is.

3    Q.    And does the scientific literature discuss

4    disproportionation as a concern to a person of ordinary

5    skill in the art?

6    A.    It does, yes.

7    Q.    So what are these articles, DTX-575, 562, and 563?

8    A.    Each of these articles discuss aspects of

9    disproportionation; some in general aspects and how you

10   might wish to avoid it.  Some have specific examples of

11   disproportionation.  But, generally speaking, talking

12   about how to manage or avoid disproportionation with salt.

13   Q.    Based on your view of what Dr. Jacobsen reported, was

14   there any indication that some disproportionation might be

15   going on with those compounds he created?

16   A.    Yes.  In the anion formation experiments, it does

17   seem that there is some disproportionation occurring.

18   Q.    Did Dr. Jacobsen report doing anything to follow-up

19   on that possibility of disproportionation?

20   A.    Not to my knowledge, no.

21   Q.    Are there anything about the environment in which Dr.

22   Jacobsen made that compound that would tend to limit its

23   ability to disproportionate as he had it there?

24   A.    Yeah -- yes.

25              In Dr. Jacobsen's report, he nicely demonstrates

1    that anhydrous or water-free conditions need to be utilized

2    in order to make and then store that particular material

3    that was made.

4    Q.    Well, what did he do to preserve those anhydrous or

5    water-free conditions?

6    A.    Either utilize a vacuum so that air and moisture

7    wasn't present, or also may have used inert gas, dry gas

8    like nitrogen or argon, to get -- blanket that material from

9    any sort of moisture coming in contact, excuse me, with

10   moisture.

11   Q.    Does that have anything to do also with the use of

12   that aprotic organic solvent that he used?

13   A.    Yes.   That follows the major theme that when those

14   anions encounter moisture of any kind, they would undergo

15   that mechanism we just discussed, and it would deprotonate

16   water to form sodium hydroxide.

17   Q.    You said "moisture of any kind."  Would it require,

18   like, little drops of water on it, or is it other exposure

19   that could call that risk?

20   A.    I would think it's a rate issue.  If you added a drop

21   of water, it would go quickly.  If you just add humidity, it

22   would go slowly, but it would proceed, nonetheless.

23   Q.    Are you aware of any pharmaceutically acceptable

24   salts that must be handled in an environment that is

25   completely anhydrous?

1    A.      I'm not aware of one, no.

2    Q.      Do you know of any pharmaceuticals that are made and

3    formulated and shipped, stored, administered to patients in

4    an aprotic solvent?

5    A.      I'm not aware of that, no.

6    Q.      Do you know of any that are made, shipped, processed,

7    stored in a vacuum?

8    A.      I'm not aware of any, no.

9            MR. SEGREST:  Moving on to slide 12.

10   BY MR. SEGREST:

11   Q.      What is degradation?

12   A.      Degradation is the process by which a parent molecule

13   undergoes a change to daughter molecules that are related to

14   the parent compound.

15   Q.      Is there any suggestion out there that apixaban may

16   be subject to degradation?

17   A.      Yes.  There has been a number of studies outlining

18   and detailing different degradation aspects of apixaban.

19   Q.      So what are these three articles, DTX-599, 600, and

20   601?

21   A.      Those are articles or exhibits that are detailing

22   specific processes by which degradation of apixaban occurs

23   under different types of conditions, and including either

24   acidic or basic conditions that would be utilized to make a

25   pharmaceutically acceptability salt.

Scheidt - direct

1    Q.      Would a person of ordinary skill in the art consider

2    apixaban to degrade in this fashion an important

3    consideration if they're attempting to make a

4    pharmaceutically acceptable salt?

5    A.      Yes, they would be very mindful of degradation in

6    trying to make pharmaceutical salts.

7    Q.      So does degradation relate in any way to the

8    environments you subject apixaban to when you are trying to

9    make a pharmaceutically acceptable salt?

10   A.      Yes.  For example, if you were going to use acid or

11   base and promote degradation, that would be converting

12   apixaban into other -- other degradation products, other

13   molecules.

14   Q.      Did Dr. Jacobsen, in the materials you saw, discuss

15   or refer to the degradation pathways of apixaban in his

16   report?

17   A.      It referred to pathways?  I don't believe so.

18   Q.      Did he talk about degradation in general?

19   A.      Not to my knowledge, no.

20   Q.      Is there any indication as a result that you saw in

21   his report that some degradation might have occurred?

22   A.      In the anion experiments it appears that there may be

23   some degradation.

24            MR. SEGREST:  So let's take a look at the

25   apixaban molecule, slide 13.

1   BY MR. SEGREST:

2   Q.      And what is are we looking at on this slide?

3   A.      We're looking at the chemical representation of

4   apixaban.

5   Q.      And what is the red square up there?

6   A.      The red square is circling an amine, an $NH_2$ group, or

7   actually it's an amide, where that is the most acidic site

8   of apixaban.

9   Q.      And so what does that mean for a salt formation?

10   A.      That would be a place where a person of ordinary

11   skill in the art would think to try to deprotonate and make

12   the corresponding anion since it's the most acidic portion

13   of the molecule.

14   Q.      What are the blue squares?

15   A.      The blue squares represents three oxygens and one

16   nitrogen atom in that five-member ring.  And those are sites

17   of potential protonation; again, accepting $H^+$, because those

18   are effectively and almost equally within some order of

19   magnitude the most basic sites of apixaban.

20   Q.      So why are there four of those sites filled in here?

21   A.      It's just the nature of the molecule.  There are

22   four hetero- -- there are four atoms, three oxygens, and one

23   nitrogen atom that can all accept a proton at some point and

24   be protonated.

25   Q.      In Dr. Jacobsen's results that he reported, did he

Scheidt - direct

1  indicate where he thought this protonation was occurring?

2  A.    Yes, I believe so.  In the HCl experiments, the

3  structure that was put forth was where the nitrogen had been

4  protonated to make the overall cationic apixaban.

5  Q.    So he thought the hydrogen chloride was attaching to

6  the N in this blue box?

7  A.    That was the reported structure, yes.

8  Q.    Okay.  Is there anything in the results that you

9  reported that suggested to you that might not be where it

10  was attaching?

11  A.    It seems the data might better suggest or better

12  support, excuse me, that protonation would be occurring on

13  the southwest side of the molecule, where that six-membered

14  ring is at the bottom left.

15  Q.    Is there a name for that six-membered ring at the

16  bottom left with the O and the blue square?

17  A.    That's called a lactam ring.

18  Q.    So this lactam ring, so you're saying there's an

19  indication it was on the lactam ring itself that protonation

20  may have occurred?

21  A.    That is what the NMR data in Dr. Jacobsen's report

22  seems to suggest.

23  Q.    Anything in the literature suggesting that for

24  apixaban protonation may occur on the lactam ring?

25  A.    Yes.  In some of the studies for degradation, that --

1  that protonation of that lactam ring and then ensuing

2  degradation products have been characterized.

3  Q.     So if that's where the hydrogen chloride attached to

4  the apixaban molecule, what would happen to it?

5  A.     I'm sorry.  Could you repeat the question?

6  Q.     Sure.  If that lactam ring is where the hydrogen

7  chloride attached to the apixaban molecule, that is where it

8  protonated, what would happen to the lactam ring?

9  A.     Well, according to some of the studies that were done

10 with degradation, that might help promote ring opening where

11 the breaking of that six-membered ring opens.

12 Q.     So if that six-membered ring breaks open, is it even

13 an apixaban molecule anymore?

14 A.     It is not, no.

15        MR. SEGREST:  Let's look at slide 14.

16 BY MR. SEGREST:

17 Q.     Now, I think Dr. Buckton talked about a similar

18 chart, but I want you to walk me through what this means.

19        What is the X axis showing there, the line along

20 the bottom?

21 A.     The X axis is a log scale where each tick is an order

22 of magnitude, and it's representing the acidity of the

23 environment as measured by the pH.

24 Q.     And I also see pKa indicated on the side.

25        What's pH and what's pKa?

Scheidt - direct

1   A.      PH is the measure of acidity, usually in water, and

2   pKa is effectively equivalent but more specifically, it's

3   the ability for -- it is the propensity for molecules to

4   donate a proton.

5   Q.      And what does the vertical axis, the up and down on

6   this diagram, indicate?

7   A.      The vertical axis is the fraction of species, or you

8   could better think of it as just a percentage from zero at

9   the bottom to 100 percent on the top.

10  Q.      And you say it's the species, fractions of species.

11          What species are being depicted?

12  A.      Well, in the middle, we have the neutral apixaban

13  molecules.

14          On the left, we would have ionized apixaban

15  molecules which are positively charged or they would be

16  cations.

17          And then on the right side, we would have

18  ionized apixaban as represented by an anion or negatively

19  charged species.

20  Q.      Okay.  So what does the red line represent?

21  A.      The red line would represent the amount of neutral

22  apixaban at a given pH measurement.

23  Q.      And then what does the blue line mean?

24  A.      The blue line is the amount of ionized apixaban,

25  either the cation or the anion at a certain pH.

1  Q.      Now, I think you said neutral apixaban.  Does that

2  mean it's unionized?

3  A.      Yes.  That means it's unionized.

4  Q.      So if you add up the red line and the blue line at

5  any point, what do you get?

6  A.      They always add up to a hundred percent.

7  Q.      Accounting for all the species and showing what

8  percentage there are as the different pH values?

9  A.      Assuming there's no degradation, correct.

10 Q.      What does the green box correspond to?

11 A.      The green box represents a range from a pH of 3 to a

12 pH of 10, which is a general, again, the general -- general

13 window to form a pharmaceutically acceptable salt.

14 Q.      At a pH of 7, what kinds of environment are you

15 talking about?

16 A.      Could be glass of water, a bottle of water.

17 Q.      You're holding up a water bottle there?

18 A.      Yes.  I'm sorry.  Water.

19 Q.      And what does this red and blue line at seven tell us

20 is happening to apixaban if it's put into water?

21 A.      You would have a hundred percent of the neutral

22 apixaban and none of any of the ionized apixaban molecules.

23 Q.      So if you move to the left, a pH down around three,

24 plus or minus, what type of environment are you talking

25 about at a pH of 3?

Scheidt - direct

1   A.       Lemon juice, vinegar, Coca-Cola.

2   Q.       And what are the red and blue lines telling us

3 happened to apixaban if you put it in that type of

4 environment?

5   A.       The same as pH seven.  You would effectively have a

6 hundred percent neutral apixaban and zero percent ionized

7 apixaban.

8   Q.       If you moved down to a pH of zero, what type of

9 environment is that describing?

10   A.       Probably dilute battery acid.

11   Q.       And what do the red and blue lines tell us would

12 happen to the concentration of these species if you put

13 apixaban into the dilute battery acid?

14   A.       You know, you would get cross over there at

15 approximately, you know, 50 percent neutral apixaban or

16 unionized apixaban and 50 percent of a cation or ionized

17 apixaban.

18   Q.       If you move over to minus two and any place to the

19 left of minus two, but at minus two, what kind of

20 environment are you talking about?

21   A.       That would be, it's concentrated battery acid most

22 likely.

23   Q.       And what is the relationship between -- how does

24 the -- how does that compare at minus two with the

25 environment at three or at zero?

1  A.      So, for instance, the log scale between minus two and

2  three, that's five orders of magnitude.   That's 100,000

3  times more acidic at minus two than it is at three.

4  Q.      Okay.   So minus two is a hundred thousand times more

5  acidic than the Coca-Cola bath we talked about; right?

6  A.      Yes.   I don't think I mentioned Coca-Cola bath.

7  Q.      Okay.   Putting apixaban into Coca-Cola.

8           And when you get a hundred thousand times more

9  acidic than that, what do the red and blue lines tell us

10 about the relative concentrations of these species of

11 apixaban?

12 A.      Under those harsh conditions, you'd have

13 approximately a hundred percent ionized apixaban as the

14 cation or the positively charged species and you would have

15 0 percent or none of the neutral or unionized apixaban.

16 Q.      Moving in the other direction, what type of

17 environment are we talking about at a pH of 10?

18 A.      That's an antacid like Tums or Milk of Magnesia.

19 Q.      And what does the red and blue lines tell us happens

20 if you put apixaban into that kinds of environment?

21 A.      At that environment, you would still have a hundred

22 percent of the unionized apixaban and 0 amount of any

23 charged species.

24 Q.      And then what type of environment are we talking

25 about when you get up to a pH of 13?

1   A.      Oven cleaner, Drano, things of that nature.

2   Q.      These are getting more basic as we go along; right?

3   A.      Indeed.  Yes, they are.

4   Q.      What do the red and blue lines tell us about the

5   relative concentrations of species of apixaban at a pH

6   of 13?

7   A.      It's approximately a 50/50 mix again of neutral

8   unionized apixaban, but at this point now you've got

9   50 percent of ionized apixaban, which is now the anion or

10  the negatively charged species.

11  Q.      So when you get up to 15 or higher, and specifically

12  at 15, what type of environment are we talking about at a pH

13  of 15?

14  A.      Very caustic.  Concentrated sodium hydroxide.

15  Q.      How does that compare to the Milk of Magnesia or the

16  Tums in the environment at ten?

17  A.      So 15 to 10 is five orders of magnitude again, at

18  this point a hundred thousand times more basic than Tums.

19  Q.      Okay.  When you get a hundred thousand times more

20  basic than the Milk of Magnesia or the Tums, what do the red

21  and blue lines tell us about the concentration.  Different

22  species of apixaban?

23  A.      Well, under those incredibly basic conditions, you

24  would have a hundred percent of the negatively charged

25  ionized apixaban and you would have none, none of the

Scheidt - direct

1   neutral apixaban remaining.

2   Q.      So this is showing us apixaban.  If you had some

3   different compound, would it also have the different species

4   and red and blue lines crossing?

5   A.      It would, because it would have different acidities

6   and basicities because it would have different functional

7   groups and different hydrogens and different environments.

8   Q.      Would red and blue lines cross at different places?

9   A.      They would, yes.

10  Q.      If you wanted a candidate or something to make a

11  pharmaceutically acceptable salt, where would the blue line

12  need to be when you were in the green zone?

13  A.      In the green zone, I would want the blue line to be

14  at a hundred percent.

15  Q.      So at least somewhere in the green zone you need that

16  blue line up high?

17  A.      You would want that blue line up high, yes.

18  Q.      And compounds that have approved pharmaceutically

19  acceptable salts, are they all compounds that have that blue

20  line up at the top of the green zone somewhere?

21  A.      I would say a large majority, yes.

22  Q.      Do you know of any pharmaceutically acceptable salt

23  that is made from a compound that doesn't have that blue

24  line reaching a hundred percent in the green zone?

25  A.      I'm not aware, no.

1   Q.      Now, were you here -- you told me you weren't here,

2   but did you review Dr. Buckton's testimony about the various

3   statements about apixaban, whether it's ionizable and

4   whether it can be made into a salt form?

5   A.      I did read Dr. Buckton's testimony, yes.

6   Q.      Let's go to slide 17.  And what, on these two papers

7   that BMS submitted to the FDA in connection with their

8   compound, what did they tell the FDA about apixaban?

9   A.      That it's non-ionizable.

10  Q.      And going onto slide 18, in these four journal

11  articles that were published, what were the authors telling

12  the scientific community and the world about apixaban?

13  A.      That, A, it's not ionizable because it lacks an

14  ionizable group.

15  Q.      And on the next slide, 19, here's two more

16  publications.  And what were these authors telling the world

17  about apixaban?

18  A.      That it's non-ionizable because it lacks ionizable

19  groups.

20  Q.      And then on slide 20, these were internal

21  communications at BMS.  So what were BMS employees telling

22  each other about apixaban?

23  A.      That it's non-ionizable and that its salt formation

24  is not an option.

25  Q.      So looking back at slide 13 -- I think that's slide

1    four.   Okay.   Go forward one more.

2              This is the one.   So when they said apixaban is

3    not ionizable, do you see ionized versions of apixaban

4    depicted on this chart?

5    A.      In extreme pH's yes.

6    Q.      So what do they mean when they say it's not

7    ionizable?

8              MR. LEE:   I object, Your Honor.   He doesn't know

9    what they meant.

10             THE COURT:   What do you understand them to mean?

11   BY MR. SEGREST:

12   Q.      What would a person -- would a person of ordinary

13   skill in the art in the pharmaceutical sciences describe

14   apixaban as not being ionizable?

15   A.      Yes, they would.

16   Q.      Would they say it doesn't even have a salt form?

17   A.      Yes, they would.

18   Q.      And so what would a person of ordinary skill in the

19   art mean when they use that terminology?

20   A.      That you would -- you would be unable to make a

21   pharmaceutically acceptable salt of apixaban.

22   Q.      And what does that have to do with the areas that are

23   shown on this graph up here?

24   A.      That you would not be able to make a form of apixaban

25   that would be a salt that would fall in that green box.

1  Q.      Okay.  Is that because it's not ionizable in that

2  range?

3  A.      That's correct.

4  Q.      Do some of the statements by BMS employees refer to

5  solubility as an issue?

6  A.      Yes, they do.

7  Q.      Why would they be talking about solubility in

8  connection with forming salts?

9  A.      Salts are typically more soluble in aqueous

10  environments than parent organic molecules, so if they

11  wanted to increase solubility, they would likely make a

12  salt.

13  Q.      Does the difficulty in ionizing apixaban impact any

14  other aspects of pharmaceutical development other than

15  solubility of the compound?

16  A.      Making salts, you need to understand the stability of

17  those salts to be able to handle those salts, again, how to

18  process those salts.  So I think it's more than solubility,

19  yes.

20  Q.      Again, do you know of any pharmaceutically acceptable

21  salt made from compounds that are not ionizable in that

22  green zone?

23  A.      I'm not aware, no.

24  Q.      Are the compounds that Dr. Jacobsen says he made

25  something a skilled pharmaceutical chemist would even

Scheidt - direct

1  consider as a candidate to pass onto the next step in

2  pharmaceutical development?

3  A.      Given the basis of these, no, I don't believe so.

4  Q.      Whether or not Dr. Jacobsen made something that may

5  be considered a salt, did he make a pharmaceutically

6  acceptable salt of apixaban?

7  A.      Not based on the Court's claim construction, no.

8  Q.      Based on the disclosures in the '208 patent, would a

9  person of ordinary skill in the art in 2001 or 2002 have

10  been able to make and use a pharmaceutically acceptable salt

11  of apixaban?

12  A.      No.

13  Q.      And on reading the disclosures of the '208 patent in

14  2001, 2002, would a person of ordinary skill in the art

15  believe that the applicants had invented and had possession

16  of a pharmaceutically acceptable salt of apixaban?

17  A.      No.

18           MR. SEGREST:  Pass the witness.

19           THE COURT:  Okay.  Cross-examination.

20           MR. SEGREST:  Oh, I should move in exhibits

21  while I'm up here.

22           THE COURT:  All right.

23           MR. SEGREST:  We used Exhibit 562, 563, 586,

24  584.  All of these are DTX's.  596, 597, 599, 600, 601, 602,

25  and 604.

Scheidt - cross

```
 1                THE COURT:  Any objection?

 2                MR. LEE:  No objections, Your Honor.

 3                THE COURT:  Those are all admitted.

 4                (DTX-562, DTX-563, DTX-586, DTX-584, 596, 597,

 5    599, 600, 601, 602, and 604 were admitted into evidence.)

 6                MR. LEE:  Just a second to distribute binders,

 7    Your Honor.

 8                THE COURT:  Sure.

 9                (Binders handed to the Court and the witness.)

10                THE WITNESS:  Thank you.

11                MR. LEE:  May I proceed, Your Honor?

12                THE COURT:  Yes.

13                         CROSS-EXAMINATION

14    BY MR. LEE:

15    Q.     Good afternoon, Dr. Scheidt.

16    A.     Good afternoon, Mr. Lee.

17    Q.     You issued one report in this case; is that correct?

18    A.     That's correct.

19    Q.     It was the reply report; is that correct?

20    A.     That's correct.

21    Q.     The issue you're testifying about is enablement and

22    written description; is that correct?

23    A.     That's correct.

24    Q.     You claimed the patent is invalid; is that correct?

25    A.     Correct.
```

1    Q.      You didn't offer an opening report on that issue, did

2    you?

3    A.      I did not.

4    Q.      You understand that the defendants have the burden of

5    demonstrating by clear and convincing evidence the claims

6    are invalid, do you not?

7    A.      That's my understanding.

8    Q.      And you did not file a report until Dr. Jacobsen had

9    filed a report, reported on his testing, and then you filed

10   your first report for the first time; is that correct?

11   A.      Yes, I believe that's correct.

12   Q.      Now, I'm going to come back to that when we talk

13   about what you did and what you have not done.  But you

14   spent a fair amount of time talking about --

15           MR. LEE:  Could I have DDX-15-14.  16-14.

16   BY MR. LEE:

17   Q.      You spent a fair amount of your time discussing this

18   graph; is that correct?

19   A.      Yes.

20   Q.      You didn't prepare that graph; is that correct?

21   A.      Actually, I did help prepare that graph.

22   Q.      For the opening report?

23   A.      No.  Well, as I stated, I have a reply report.

24   Q.      Right.  Now, it's not based upon any data you

25   generated; is that correct?

Scheidt - cross

1   A.      No.

2   Q.      It's not based upon any experiments you conducted.

3   Is that correct?

4   A.      That's correct.

5   Q.      There are no articles or references that are

6   identified to support your chart; is that correct?

7   A.      That's incorrect.  Dr. Jacobsen stated support for

8   many issues on this graph.

9   Q.      Okay.  So Dr. Jacobsen's data supports some of these

10  issues.  Are there any published articles that you cite to

11  support this graph?

12  A.      Yes.

13  Q.      All right.  And are they reported on DDX-16-14 as has

14  been true for the other chart?

15  A.      I'm sorry.  Could you repeat the question?

16  Q.      Sure.

17          Do you have -- do you see DDX-16-14?

18  A.      I still don't understand your question.

19  Q.      Do you see DDX-16-14?

20  A.      Oh.  Yes.  I do see it, yes.

21  Q.      Is there a single exhibit identified by number or

22  name on that chart?

23  A.      On that chart?  No, there is not.

24  Q.      Now, let's go to the Court's claim construction,

25  which you referred to a number of times.

Scheidt - cross

```
 1              The Court's claim construction refers to "within
 2    sound" -- "within the scope of sound medical judgment."
 3    Correct?
 4    A.      Correct.
 5    Q.      And that's the claim construction you applied;
 6    correct?
 7    A.      Correct.
 8    Q.      It also refers to "without excessive toxicity,
 9    irritation, allergic response, or other problem or
10    complication."
11              Have I read that correctly?
12    A.      Yes.
13    Q.      "Commensurate with a reasonable benefit/risk ratio."
14              Have I read that correctly?
15    A.      Yes.
16    Q.      Now, I hope I listened carefully to your testimony on
17    direct.  I don't think you ever mentioned the phrase "risk
18    benefit" or "benefit/risk ratio," did you?
19    A.      Not to my knowledge, no.
20    Q.      In fact, you don't address it in your report, do you?
21    A.      I do not.
22    Q.      But you know that the risk is the risk to the
23    patient; correct?
24    A.      Correct.
25    Q.      The benefit is the benefit to the patient; correct?
```

1     MR. SEGREST:  Objection, Your Honor.  I don't

2  think that is in the Court's claim construction.

3     THE COURT:  Okay.  Well, he's asking for his

4  understanding, isn't he?  Benefit or risk ratio are in the

5  claim construction, are they not?

6     MR. SEGREST:  They are, but as Mr. Lee has

7  established, that they aren't covered in the direct, so he's

8  going beyond the scope of direct now.

9     THE COURT:  Okay.  I can only deal with one

10  thing at a time.

11     Are you still objecting that this is not a claim

12  construction?

13     MR. SEGREST:  I am objecting that the specific

14  language that he's asking about, to the patient, to the

15  patient, that's not part of the Court's claim construction.

16     THE COURT:  Okay.  Let's deal with that

17  objection first.

18     Mr. Lee.

19     MR. LEE:  Your Honor, I'll phrase it more

20  precisely.

21     THE COURT:  Okay.  But --

22     MR. LEE:  I'll withdraw the question.

23     MR. SEGREST:  I'll see where it goes.

24     THE COURT:  Let's see where we go then.

25  BY MR. LEE:

Scheidt - cross

1   Q.      Do you see the reference to a reasonable benefit/risk

2   ratio?

3   A.      I do.

4   Q.      That's something that's supposed to be within the

5   scope of sound medical judgment; correct?

6               MR. SEGREST:  Objection, Your Honor.  This --

7   this is the next objection.

8               I think it's been established before,

9   Dr. Scheidt didn't talk about risk/benefit ratio.  He talked

10  about the risk, but he didn't talk about risk/benefit ratio.

11  So that is beyond the scope of his direct.

12              MR. LEE:  And, Your Honor, it's not beyond the

13  scope of his direct.  He claimed to have been applying Your

14  Honor's claim construction.  He must have said a dozen times

15  in response to question that they weren't pharmaceutically

16  acceptable.  We're just exploring the basis for that

17  opinion.

18              THE COURT:  Okay.  Mr. Segrest, do you have any

19  response?

20              MR. SEGREST:  I believe he explained it wasn't

21  pharmaceutically acceptable because of the risk concerns

22  that were involved in it.

23              THE COURT:  Okay.  But the claim construction

24  about risk and benefits, he applied the claim construction.

25  Any question about the claim construction and its

 1    application is within the scope of the direct, so this is

 2    proper examination.

 3                Go ahead.

 4    BY MR. LEE:

 5    Q.      And do you see the phrase "reasonable benefit/risk

 6    ratio"?

 7    A.      I do.

 8    Q.      And if you go back to my question, Dr. Scheidt, it is

 9    the risk to the patient or the person taking the product;

10    correct?

11    A.      I believe so.

12                MR. SEGREST:  Your Honor, I think we're back now

13    to stuff that is not in the claim construction.

14                THE COURT:  Do you want to respond?

15                MR. LEE:  No.

16                THE COURT:  Okay.  Overruled.

17                This is not an unreasonable interpretation of

18    claim construction, and we'll see what the witness says.

19    And you can question him similarly on redirect, if you want.

20                Go ahead.

21    BY MR. LEE:

22    Q.      And the benefit is the benefit to the patient;

23    correct?

24    A.      Correct.

25    Q.      And during your direct, you didn't offer any opinion

Scheidt - cross

1  on the benefit/risk ratio to a patient taking apixaban salt;

2  correct?

3  A.     I did not.

4  Q.     Okay.  Now, you are not a medical doctor; correct?

5  A.     That is correct.

6  Q.     You have no specific medical training; correct?

7  A.     I have no specific medical training, no.

8  Q.     You are not a cardiologist; correct?

9  A.     No, I am not a cardiologist.

10  Q.     But you know Dr. Zusman is?

11  A.     Correct.

12  Q.     And Dr. Kowey is --

13  A.     Yes.

14  Q.     -- correct?

15          You've read Dr. Zusman's testimony; correct?

16  A.     I believe so.

17  Q.     And you were present for Dr. Kowey's; correct?

18  A.     Yes.

19  Q.     You've never treated a patient with atrial

20  fibrillation; correct?

21  A.     I've never treated a patient for anything.

22  Q.     And so you certainly haven't treated a patient for

23  any of the disease conditions on the Eliquis label.

24  A.     That is correct.

25  Q.     Correct?

Scheidt - cross

1    Okay.  Now -- and so you certainly never

2    prescribed any anticoagulant for any patient; correct?

3    A.    I never treated, nor prescribed anything.

4    Q.    And no one has ever come to you for your sound

5    medical judgment on any issue relating to a thromboembolic

6    disorder; correct?

7    A.    That's correct.

8    Q.    Now, as you told me, Dr. Zusman is a cardiologist;

9    correct?

10   A.    Yes.

11   Q.    Now, you told me a few minutes ago you submitted your

12   report as the reply report; correct?

13   A.    Yes.

14   Q.    Before submitting your report, you didn't talk to

15   Dr. Zusman at all; correct?

16   A.    I did not have a conversation with Dr. Zusman, no.

17   Q.    Well, let's break it down.

18        You didn't meet with Dr. Zusman; correct?

19   A.    That's correct.

20   Q.    You didn't get on the telephone and talk to

21   Dr. Zusman; correct?

22   A.    Not to my knowledge.

23   Q.    Did you even know that Dr. Zusman had submitted an

24   expert report?

25   A.    I don't recall.

1  Q.      The fact of the matter is, you did not review any

2  report from Dr. Zusman in this case before you rendered your

3  opinion; correct?

4  A.      I believe that is correct.

5  Q.      All right.  So to be clear, the defendants had a

6  report from a practicing interventional cardiologist, a

7  report that had been filed, and you did not read it before

8  reaching your opinion; correct?

9  A.      Correct.

10 Q.      Okay.  Now, I just want to ask you a couple more

11 questions about your understanding of what was required for

12 enablement written description.

13         Do you have that in mind?

14 A.      I have that in mind.

15 Q.      You talked to Mr. Segrest a little bit about your

16 understanding.

17         Do you recall that?

18 A.      Um-hmm.

19 Q.      You have to give an audible response.

20 A.      I'm sorry.  Yes.

21 Q.      Now, you understand that the question is decided as

22 of September 2001; correct?

23 A.      Yes.

24 Q.      When was the first time that apixaban had been made?

25 A.      I don't recall.

Scheidt - cross

1    Q.      Was it earlier that year?

2    A.      That apixaban itself was made?

3    Q.      Yes, for the very first time.

4    A.      I don't believe so.

5    Q.      It would not have been possible to have completed

6    apixaban clinical trials by September of 2001; correct?

7    A.      I assume so.

8    Q.      Okay.  Now, there are two claims of the '208 patent

9    that are asserted in this case that you discussed with

10   Mr. Segrest; correct?

11   A.      Mr. Segrest?

12   Q.      You discussed with Mr. Segrest on your direct.

13   A.      Oh.

14   Q.      Correct?

15   A.      Yes.

16   Q.      One is claim 13; correct?

17   A.      Yes.

18   Q.      One is claim 104; correct?

19   A.      Yes.

20           MR. LEE:  Could I have DDX-2-3, please.

21   BY MR. LEE:

22   Q.      Now, you agree with me that claim 13 expressly

23   describes and claims apixaban; correct?

24   A.      I'm sorry, Mr. Lee.  Could you repeat?

25   Q.      Surely.  If my question is unclear, you will let me

1   know.

2   A.      I will.  Don't worry.

3   Q.      Do you agree with me that claim 13 expressly

4   describes and claims apixaban?

5   A.      I believe so, yes.

6   Q.      Do you agree with me that claim 14 also expressly

7   claims apixaban?

8           MR. SEGREST:  Objection, Your Honor.  Claim 14

9   is not up there.

10          MR. LEE:  Claim 13 -- claim 104.  I'm sorry.

11  I'll restate the question.

12          THE COURT:  Okay.

13  BY MR. LEE:

14  Q.      Do you agree with me that claim 104 also expressly

15  claims apixaban?

16          MR. SEGREST:  And, Your Honor, I'll object at

17  this point because we established Dr. Scheidt was not

18  offered any opinions on the scope of claim 104.

19          MR. LEE:  I'm not exploring the scope.  He

20  testified about the nonenablement of two claims.  I'm asking

21  about the claims.

22          THE COURT:  Did he opine on 104 was not enabled?

23          MR. SEGREST:  Yes, but that is based on the

24  larger claim construction, the larger argument about what

25  claim 104 covers.

1              I don't think it is reasonable for them to

2    have a larger argument with the chemist about the claim

3    differentiation of what we're about to get into on the scope

4    of 104.

5              THE COURT:  Let's see how far it go, but I

6    will allow an answer to at least this one question.

7    BY MR. LEE:

8    Q.    Do you have the question in mind, Dr. Scheidt?

9    A.    No, Mr. Lee.  Will you please repeat it for me?

10   Q.    Surely.

11              Does claim 104 expressly claim apixaban?

12   A.    By "expressly," you mean "only"?

13   Q.    No, "expressly" means "explicitly."

14   A.    Could you repeat the question one more time, please?

15   I apologize.

16   Q.    Sure.

17              Does claim 104 expressly claim apixaban?

18   A.    I believe so.

19   Q.    All right.  Now, you do not dispute that the '208

20   patent describes how to make the neutral form of apixaban,

21   do you?

22   A.    I do not.

23   Q.    Let's go to column 117 of the '208 patent.

24              And, Dr. Scheidt, I'll put it both on the screen

25   but it's also at Tab 2 of your notebook.  So use whatever is

1    best for you.  The screen or the hard copy.

2    A.    I'll stick with the screen for now.  Thank you.

3    Q.    So we're going to take you to column 117 of the '208

4    patent which Mr. Segrest addressed with you during your

5    direct.

6              Do you recall this?

7    A.    I do, yes.

8    Q.    Now, claim 117 refers specifically to the concept of

9    pharmaceutically acceptable salts; correct?

10   A.    It does.

11   Q.    You would agree with me that column 117 provides a

12   general approach for accessing pharmaceutically acceptable

13   salts; correct?

14   A.    In the most general way possible, yes.

15   Q.    So the answer to my question is, yes, it describes a

16   general approach for accessing pharmaceutically acceptable

17   salts; correct?

18   A.    Yes, it does.

19   Q.    Okay.  Now, that general approach involves

20   conventional chemical methods; correct?

21   A.    That is what it states.  Yes.

22   Q.    So the answer is yes?

23   A.    Yes.

24   Q.    The '208 patent specifically refers to making

25   pharmaceutically acceptable salts in organic solvents;

1    correct?

2    A.      It does.  Yes.

3    Q.      And, in fact, it says that right in column 117;

4    correct?

5    A.      Yes.

6    Q.      The '208 patent states that nonaqueous media are

7    preferred for preparing pharmaceutically acceptable salts;

8    correct?

9    A.      In a general sense, yes.

10   Q.      That is what it says; correct?

11   A.      Correct.  After it says "generally."

12   Q.      Okay.  Fair enough.

13           It says, generally, nonaqueous media-like ether,

14   ethyl acetate, ethanol, isopropanol, acetonitrile are

15   preferred; correct?

16   A.      Yes.

17           MR. LEE:  Now, claim 116.  If I could have claim

18   116, Mr. Lee.

19   BY MR. LEE:

20   Q.      Claim 116, you would agree, provides some examples of

21   acids or bases.  They could be used to prepare

22   pharmaceutically acceptable salts; correct?

23           MR. SEGREST:  Your Honor, objection.  Just to

24   make sure we're clear on the record, we're saying "claim"

25   and we may mean "column."

Scheidt - cross

1             MR. LEE:  I'm sorry.  Column 116.  My apologies.

2    BY MR. LEE:

3    Q.      Do you have that before you?

4    A.      I do.  I'm looking at the screen.

5    Q.      Okay.

6    A.      Could you restate the question --

7    Q.      Sure.

8    A.      -- Mr. Lee?

9    Q.      Sure.  Sure.

10          We're at column 116; correct?

11   A.      I believe so, yes.

12   Q.      There are some examples of acids or bases that could

13   be used to prepare pharmaceutically acceptable salts;

14   correct?

15   A.      Those are examples, yes.

16   Q.      Now, one of them is an alkali salt; correct?

17   A.      That's what it says, yes.

18   Q.      And alkali salt is formed by reaction of an alkaline

19   base with an acid; correct?

20   A.      Yes.

21   Q.      Sodium is an alkali metal; is it not?

22   A.      It is.

23   Q.      Sodium bases are alkali bases; are they not?

24   A.      They are.

25   Q.      Potassium is an alkali metal; is it not?

1   A.      It is.

2   Q.      Potassium bases are alkali bases; are they not?

3   A.      They are.

4   Q.      Potassium salts are alkali salts; correct?

5   A.      Correct.

6   Q.      Sodium and potassium salts are among the alkali salts

7   that are referred to in column 116 of the '208 patent;

8   correct?

9   A.      Correct.

10  Q.      Now, column 116 also refers to mineral acid salts,

11  correct?

12  A.      It's right there.  Yes.

13  Q.      Yes.  Hydrogen chloride is a mineral acid; correct?

14  A.      It's considered one, yes.

15  Q.      A hydrogen chloride salt is a mineral acid salt;

16  correct?

17  A.      It is.

18  Q.      Hydrogen chloride salts are referred to in the patent

19  itself as examples of salts that could be pharmaceutically

20  acceptable; correct?

21  A.      They could be pharmaceutically acceptable, yes.

22  Q.      Now, there is a reference to Remington's

23  Pharmaceutical Sciences in column 117.  I'll bring it back

24  up.

25          Do you have that before you?

1  A.     I'm getting there.  Yes.

2  Q.     Tell me when you've got it.

3  A.     Got it right there.

4  Q.     In fact, the specification refers to a specific page

5  of Remington's; does it not?

6  A.     Page 1418, correct.

7  Q.     You are familiar both with Remington's and that page;

8  are you not?

9  A.     I am, yes.

10 Q.     Right.  So let's take a look at Remington's.  And

11 that page in particular.

12            MR. LEE:  Could I have page 1418 of JTX-10?

13 BY MR. LEE:

14 Q.     Do you see that?

15 A.     Yes, I do.

16 Q.     This is the Remington that's referred to in column

17 117; is that correct?

18 A.     Table 3, I believe.  Yes.  It doesn't matter.  Yes.

19 Q.     I think Table B?  Let's see.

20 A.     I apologize for being a distraction.

21 Q.     One of us is likely to be right.  No, not a problem.

22            Let's look at the table.  Do you see it?

23 A.     I do see it, yes.

24 Q.     This is on page 1418.

25            Do you have it?

1  A.      I have it.

2  Q.      There is a list of FDA approved commercially marketed

3  salts, is there not?

4  A.      That's what the table title says, yes.

5  Q.      All right.  The top portion of the table, the anions

6  present in FDA approved commercially marketed salts,

7  pharmaceutical agents; is that correct?

8            MR. SEGREST:  Your Honor, this line of

9  questioning is going to the plaintiffs' claim construction

10 that they requested and the Court rejected, where they

11 argued that anything taken from these lists in the patent

12 and in Remington's that was combined would be a

13 pharmaceutically acceptable salt.  That is expressly not the

14 claim construction that we're trying the case.

15           MR. LEE:  Your Honor, the question is whether

16 the specification enabled one of ordinary skill in the art.

17 There was a specific reference to this page and I'm going to

18 this page so you can see what it says.

19           THE COURT:  Are you going to make a claim

20 construction argument?

21           MR. LEE:  No.  Actually, I think we're staying

22 -- we're religiously adhering to Your Honor's claim

23 construction.

24           THE COURT:  The objection is overruled.  You all

25 will make whatever reasonable arguments you can when we get

Scheidt - cross

1 to that stage of the case, but this is the page specifically

2 incorporated by reference in the patent you're trying to

3 invalidate, isn't it?

4        MR. SEGREST:  It's is, Your Honor, yes.

5        THE COURT:  I think it's fair to examine the

6 witness on it.  Overruled.

7        MR. SEGREST:  Okay.

8 BY MR. LEE:

9 Q.     So in the top portion of the table, hydrochloride is

10 included, is it not?

11 A.     Yes, it is.

12 Q.     And of all of the different anions in the top portion

13 of this page, which has -- which anion has the highest

14 percentage use in approved commercially marketed salts?

15 A.     Chloride seems to be the most popular.

16 Q.     Hydrochloride at 42.98 percent; is that correct?

17 A.     Corrects.

18 Q.     Now, let's go to the bottom portion of the table.

19 Are you with me?

20 A.     I'm with you.

21 Q.     Sodium is included in this list; is that correct?

22 A.     It is.

23 Q.     Sodium has the highest percentage of cations for FDA

24 approved commercially marketed salts.  Is that correct?

25 A.     Correct.

Scheidt - cross

1    Q.    Now, turn, if you would, to tab five in your binder.

2    And I could put it on the screen.  It's going to be PTX-436.

3    A.    I think I will use the text.

4    Q.    Whatever is easier.

5    A.    Well, I don't know.

6    Q.    Tab five in the binder.

7    A.    Okay.  Belt and suspenders.

8    Q.    Whichever is easiest for you.

9    A.    Okay.

10   Q.    Do you have it before you?

11   A.    I do.

12   Q.    Do you find PTX-436?

13   A.    Yes, I have.

14   Q.    This is the label for Warfarin under the trade name

15   or brand name Coumadin.

16            Do you see that?

17   A.    I see that, yes.

18   Q.    Let's turn to the page ending 3356.

19            Do you have that page before you?

20   A.    Yes, I have that page.

21   Q.    And do you see the section entitled description?

22   A.    Yes, I do.

23   Q.    Warfarin is a salt; is that correct?

24   A.    As depicted, that is a sodium salt.

25   Q.    Yes.  It's a sodium salt.  Is that correct?

Scheidt - cross

1     A.     Yes.

2     Q.     Let's go back to Remington's and I will bring back

3     Table 2 of Remington's at Table 1418.  This is the page

4     specifically cited in the specification; is that correct?

5     A.     The 1418 page?

6     Q.     Yes, sir.

7     A.     Yes.

8     Q.     All right.  And I will blow it up so it's easier for

9     both of us to see it?

10    A.     Thank you.

11    Q.     Or for all of us to see it.

12           Potassium is also listed among the cations; is

13    that correct?

14    A.     Yes.

15    Q.     And after sodium, potassium is the second highest

16    cation for FDA approved commercially marketed salt; is that

17    correct?

18    A.     Correct.

19    Q.     And the salts that Dr. Jacobsen made included

20    potassium salt?

21    A.     Yes.

22    Q.     A sodium salt?

23    A.     Yes.

24    Q.     A hydrochloride salt; is that correct?

25    A.     I disagree with that.

1    Q.      Well, that's what he said he made; correct?

2    A.      That is the claim, correct.

3    Q.      Now, let me move to a different but related topic.

4            I want to talk about the work that you have done

5    in this case.  You have not conducted any experiments

6    yourself; is that correct?

7    A.      That's correct.

8    Q.      You don't know of anybody on the defendant's side who

9    have tried to make an apixaban salt; is that correct?

10   A.      I think Dr. Jacobsen's report is pretty conclusive,

11   though.   That's correct.

12   Q.      Dr. Scheidt, my question was, do you know anybody on

13   your side of the table, the defendants' side of the

14   courtroom, who had tried to make an apixaban salt?

15   A.      Not to my knowledge.  No, Mr. Lee.

16   Q.      But Dr. Jacobsen did; correct?

17   A.      In certain instances, that's correct.

18   Q.      All right.  Now, do you have a laboratory?

19   A.      Yes.

20   Q.      And you conduct experiments in that laboratory;

21   correct?

22   A.      Correct.

23   Q.      You have synthesized compounds in that laboratory; is

24   that correct?

25   A.      My students have synthesized compounds in that

1     laboratory, correct.

2     Q.     Fair enough.  Your students have made salt forms of

3     compounds in that laboratory; correct?

4     A.     Yes.

5     Q.     Your graduate students have done it; is that correct?

6     A.     Yes.

7     Q.     Your post-docs have done it; correct?

8     A.     Correct.

9     Q.     They've done it over years since you've been on the

10     faculty at Northwestern; is that correct?

11     A.     That's correct.

12     Q.     Now, you submitted your report on May 22nd, 2019;

13     correct?

14     A.     Yes.

15     Q.     Now, I want to focus you on the period of time up

16     through May 22, 2019, when you submitted your report.  Do

17     you have that in mind?

18     A.     I do have that date in mind.

19     Q.     All right.  Now, as of that time, you had never done

20     an experiment of any kind with apixaban, had you?

21     A.     I had not.

22     Q.     None of your students had done an experiment with

23     apixaban; is that correct?

24     A.     Correct.

25     Q.     As of that time, you had not attempted to make a salt

1   of apixaban yourself; is that correct?

2   A.      That's correct.

3   Q.      None of your students had tried to make a salt of

4   apixaban; correct?

5   A.      Correct.

6   Q.      Neither you nor your students had ever tried to

7   purify a salt of apixaban; is that correct?

8   A.      That's correct.

9   Q.      Now, at the very beginning of your cross-examination,

10  I asked you whether you had Dr. Jacobsen's report in hand

11  before you filed your reply report.

12          Do you remember that?

13  A.      I do remember the question.

14  Q.      Right.  So what happened chronologically so the Court

15  knows is, Dr. Jacobsen filed a report that described his

16  experiments; correct?

17  A.      That's my understanding, yes.

18  Q.      And then you responded with your report in May of

19  this year; correct?

20  A.      On the 22nd, correct.

21  Q.      Now, after receiving Dr. Jacobsen's report, you

22  didn't try to replicate any of his experiments, did you?

23  A.      I didn't feel that I needed to, no.

24  Q.      Well, Dr. Scheidt, I didn't ask you if you thought

25  you needed to.

1   A.      I did not.  I did not, Mr. Lee.  I apologize.

2   Q.      Let me finish my question to make it easier for the

3   reporter and for clarity of the record.

4   A.      Understood.

5   Q.      You did not attempt to replicate Dr. Jacobsen's

6   experiments?

7   A.      No, I did not.

8   Q.      You don't have a laboratory notebook recording any

9   data or any work that you've done in connection with this

10  case?

11  A.      No, I do not.

12  Q.      Now, Dr. Jacobsen used something called, and I'm

13  going to be sure I'm going to butcher the name, sodium

14  hexamethyldisilazane in his experiments of apixaban; is that

15  correct?

16  A.      He did, yes.

17  Q.      That is the sodium base that is commercially

18  available; is that correct?

19  A.      Yes.

20  Q.      It's the sodium base that you use in your own

21  research; is that correct?

22  A.      I do.

23  Q.      It's the sodium base that you have sitting on the

24  shelf in your lab; is that correct?

25  A.      Actually, I have it with my hazardous chemicals, so

1  not just sitting on the shelf.

2  Q.    And your graduate students use that sodium base

3  multiple times per month; is that correct?

4  A.    I assume.  It's possible.

5  Q.    That sodium base has been around for at least two or

6  three decades; correct?

7  A.    Hopefully not in my laboratory, but the material,

8  yes.

9  Q.    It was certainly available in 2001; correct?

10 A.    Correct.

11 Q.    Now, Dr. Jacobsen ran his sodium reaction in THF;

12 correct?

13 A.    That's correct.

14 Q.    Thf is an organic solvent?

15 A.    Correct.

16 Q.    Frequently used in your own lab?

17 A.    Yes.

18 Q.    And certainly available in 2001?  Correct?

19 A.    Yes, correct.

20 Q.    Now, Dr. Jacobsen also analyzed his reactions by NMR;

21 is that correct?

22 A.    Yes.

23 Q.    And he provided proton NMR analysis; correct?

24 A.    Yes.

25 Q.    He also did carbon NMR analysis; is that correct?

Scheidt - cross

1   A.    Yes.

2   Q.    And proton and carbon 13 NMR analysis are commonly

3   used techniques; is that correct?

4   A.    Yes.

5   Q.    And they were commonly used in 2001; correct?

6   A.    Yes.

7   Q.    You use those techniques every day in your lab;

8   correct?

9   A.    We do.

10  Q.    But when you decided to respond to Dr. Jacobsen's

11  report, you did no NMR analyses of any kind; is that

12  correct?

13  A.    I did no NMR experiments of any kind, but the

14  analysis I did of the data that Dr. Jacobsen provided.

15  Q.    Sir, you did no NMR analysis of your own; correct?

16  A.    I did no NMR experiments of my own, but I analyzed

17  the data provided in Dr. Jacobsen's report.

18  Q.    Fair enough.

19        Now, if apixaban had been provided to you, you

20  could have tried to make a salt form, couldn't you?

21  A.    It would be possible.

22  Q.    Right.  But you didn't; correct?

23  A.    I'm sorry?

24  Q.    But you did not?

25  A.    I did not.

```
 1    Q.      And the reason is you weren't asked to; correct?

 2    A.      I was not asked to.  That's correct.

 3    Q.      There is a difference between could not do something

 4    and have not done something; correct?

 5    A.      Yes.

 6    Q.      All right.  You did not do it, but that doesn't mean

 7    you could not have done it; correct?

 8    A.      That's correct.

 9    Q.      Okay.  All right.  Let's move to a different topic.

10            You told Mr. Segrest, I believe, that you were

11    not present for Dr. Buckton's testimony but you have

12    reviewed the testimony; correct?

13    A.      I have reviewed the testimony, yes.

14    Q.      Now, Dr. Buckton testified at page 57, line 9 to 11

15    of the trial transcript, that the general concepts of salt

16    formation were well established long before September 21st

17    of 2001.

18            Do you agree with him?

19    A.      That the general concepts of salt?  I agree with

20    that, yes.

21    Q.      All right.  He also testified that Dr. Jacobsen's

22    ionized apixaban had resulted in two salts for sure.

23            Do you recall that testimony?

24    A.      Can I see it on the screen, please?

25    Q.      Sure.
```

1      MR. LEE:  Can I have trial transcript page 52,

2   line 24 to page 53-3.

3   BY MR. LEE:

4   Q.    Question.  And you agree apixaban has been ionized in

5   Dr. Jacobsen's lab; correct?

6   A.    Answer:  Somehow in the solvent, it must be ionized.

7   I agree.

8           "Question:  And he ionized the apixaban more

9   than once, correct?

10          "Answer:  He made two salts for sure, yes.

11          You agree with that, do you not?

12  A.    Agree with Buckton's testimony, yes.

13  Q.    On that issue; correct?

14  A.    On the two salts being formed, correct.

15  Q.    All right.  I will move to a different topic.

16          Now, Dr. Scheidt, in the course of your

17  testimony, you looked at a series of demonstratives, and I

18  want to ask you a few questions about some of them.

19          MR. LEE:  Can I have DDX-6-18.

20  BY MR. LEE:

21  Q.    Now, this is one of the demonstratives that you

22  testified about; is that correct?

23  A.    Yes.

24  Q.    And the title is, apixaban is non-ionizable; is that

25  correct?

1    A.      Correct.

2    Q.      Did you help prepare these slides?

3    A.      I did.  I was involved in preparing the slides.

4    Q.      And did you select the quotations that were included

5    on each side?

6    A.      I was not involved in the selection of all quotes

7    that were involved in the slides.

8    Q.      But some of them; is that correct?  Now, every single

9    one of them has an ellipsis before the portion of the quote

10   you're relying upon, correct, on DDX-6-18; correct?

11              THE COURT:  15-18.

12              MR. LEE:  16-18.  Correct?

13              THE WITNESS:  All highlighted in yellow,

14   correct.

15   BY MR. LEE:

16   Q.      All right.  So let's take the first bullet and see

17   what was represented or what was deleted with the ellipses.

18   DDX-16-18 comes from DTX-579; is that correct?

19   A.      I believe so, yes.

20   Q.      Let's turn to DTX-579, which you used during your

21   direct examination with Mr. Segrest.

22              Do you recall that?

23   A.      Yes.

24   Q.      The quote comes from the second-to-last sentence of

25   the first paragraph of the right column of the first page;

1   correct?

2   A.      Correct.

3   Q.      Now, the complete sentence was:  There are no

4   ionizable moieties in the molecular structure of APX.

5   That's apixaban; correct?

6   A.      Yes.

7   Q.      Thus increasing the solubility of apixaban via salt

8   formation could be impossible.

9               Correct?

10  A.      That's what it reads, yes.

11  Q.      That's what the full sentence reads and the portion

12  on solubility is what was eliminated by the ellipses; is

13  that correct?

14  A.      That's the text that was left out, correct.

15  Q.      All right.  Let's return to DDX-16-18.  The second

16  quote comes from DTX-580; is that correct?

17  A.      Yes.

18  Q.      According to your demonstrative?

19  A.      Yes.

20  Q.      Let's turn to DTX-580.  This is the article that you

21  used to generate the quote; is that correct?

22  A.      Yes.

23  Q.      And I'm going to go to the quote, which is the third

24  to last sentence of the second-to-last paragraph of the

25  left-hand column.

1469

Scheidt - cross

1       Do you see it?

2   A.      Yes.  I see it.

3   Q.      It says, "Apixaban has no ionizable groups," and you

4   have ellipses.  And what your ellipses eliminated was "...

5   and, therefore, does not exhibit pH-dependent aqueous

6   solubility."  Correct?

7   A.      That is what it reads, correct.

8   Q.      Let's go back to DDX-16-18.

9           And the next is DTX-581?

10  A.      Correct.

11  Q.      And this time the ellipses are at the beginning of

12  the sentence; correct?

13  A.      Yes.

14  Q.      But we're talking about DTX-581; correct?

15  A.      Yes, we are.

16  Q.      Let's go to DTX-581 and see what the full sentence

17  says.

18          The quote comes from the last sentence of the

19  second paragraph of the left-hand column on the fourth page,

20  and we'll highlight it for you.

21          And what has been eliminated -- what the

22  sentence says in full is:  "Gastric acid modifying agents

23  such as" -- is it "famotidine"?  Is that the way to

24  pronounce it?

25  A.      I think so.

Scheidt - cross

1   Q.      -- "do not affect absorption of apixaban because of

2   its lack of an ionizable group and pH-independent

3   solubility."  Correct?

4   A.      Correct.

5   Q.      All right.  Let's go back to DDX-16-18.

6           The last one on this page is -- refers to

7   DTX-582, and the ellipses is now in the middle of the

8   sentence; correct?

9   A.      Correct.

10  Q.      It comes from DTX-582 which we will put on the

11  screen?

12          And the quote comes from the last sentence of

13  the first page, paragraph in the right-hand column, and

14  stretches to the top of the second page, left-hand column,

15  but we'll bring it up.

16          Do you have that?

17  A.      I see it, yes.

18  Q.      Now, your quote was "apixaban is ... non-ionizable."

19  Correct?

20  A.      I believe so, yes.

21  Q.      The full quote actually is about three lines longer:

22  "Apixaban is a biopharmaceutics classification system Class

23  3 compound (high solubility/low permeability), and is

24  non-ionizable; and thus, changes in pH do not affect the

25  aqueous solubility of apixaban."

1   That's the complete sentence; correct?

2   A.      Correct.

3   Q.      Now, if I went back to DDX-16-10, which is another

4   one of your slides, do you recall discussing this during

5   direct examination?

6   A.      I do.

7   Q.      This article refers to DTX-596; correct?

8   A.      Correct.

9           MR. LEE:  Let's bring up DTX-596.

10          Let's see what the title of the article is.

11  BY MR. LEE:

12  Q.      The title of the article is not on your slide;

13  correct?

14  A.      If you go back to the slide --

15  Q.      Sure.

16  A.      -- it might be there, but -- I believe the title is

17  there, but it could be difficult to read, so just to be

18  clear.

19  Q.      Yeah, I would put it in the impossible to read

20  category.

21          But what you are referring to is the image of

22  the article on the left.

23  A.      I just want to be clear under oath.  That's all.

24  Q.      But in the portion that you excerpted from the

25  article and put on your slide, the title wasn't there;

1    correct?

2    A.      The title wasn't.

3    Q.      But the title was "Salt Formation to Improve Drug

4    Solubility."  Correct?

5    A.      Correct.

6    Q.      Now, you agree that one of the reasons to make a salt

7    is to alter the solubility of the active pharmaceutical

8    ingredient; correct?

9    A.      I agree with that, yes.

10   Q.      You agree for apixaban, a salt form would not improve

11   solubility of the API; correct?

12   A.      Could you say it -- I'm sorry.  Could you say it

13   again, please?

14   Q.      Sure.  Let me start at the beginning.

15          One of the reasons to make a salt is to alter

16   the solubility of the active pharmaceutical ingredient;

17   correct?

18   A.      That would be correct.

19   Q.      In a case of apixaban, a salt would not improve the

20   solubility of the API; correct?

21   A.      I don't believe that is a correct statement.  I

22   believe that those previous examples you were talking about,

23   they wanted to increase the solubility by making the salt.

24   Q.      Did you review Dr. Knabb's testimony at trial?

25   A.      Dr. Who?

Scheidt - cross

```
 1    Q.      Do you know who Dr. Knabb is?

 2    A.      I don't believe I'm familiar.

 3    Q.      Do you know who Dr. Orwat is?

 4    A.      Yes.

 5    Q.      Mr. Orwat is?

 6    A.      Yes, yes, yes.

 7    Q.      Did you read his testimony at trial?

 8    A.      Yes.  Yes, I did.  Thank you.

 9    Q.      Did you read their testimony where they said that

10    they decided that there was no reason to make a salt to

11    improve solubility?

12    A.      Yes, I believe -- I believe I read those depositions.

13    Q.      Now, let's go to your criticism of Dr. Jacobsen's

14    experiments.  Okay?

15            One of the things that you said on your direct

16    was that Dr. Jacobsen's salts had reverted to the neutral

17    form of apixaban in less than two days; correct?

18    A.      Yes, that is correct.

19            MR. SEGREST:  Your Honor, I don't believe that

20    statement --

21            MR. LEE:  I --

22            THE COURT:  Hold on.

23            You don't think what?

24            MR. SEGREST:  I don't believe that was in his

25    direct.
```

Scheidt - cross

1          MR. LEE:  Well, Your Honor, he testified about

2    reversion in direct, and my specific question is coming from

3    paragraph 59 of his report where he discusses reversion.

4          MR. SEGREST:  I -- the question was, did he

5    testify about it on direct.  Maybe it's in his report, but I

6    don't think he's testified about it.

7          THE COURT:  You don't think reversion came up in

8    direct?

9          MR. LEE:  Well, let me if ask if that's true,

10   and then I will move on.

11   BY MR. LEE:

12   Q.    Is it true that you gave no opinion on reversion

13   during your direct testimony?

14   A.    I don't recall.

15   Q.    Okay.  You don't intend to offer any opinions on

16   reversion in Dr. Jacobsen's experiments in this trial, do

17   you?

18   A.    I do.

19   Q.    Oh, you do.  All right.  Then let's talk about it.

20          You testified -- you said in your report that

21   Dr. Jacobsen's salts had reverted to neutral form in less

22   than two days; correct?

23          THE COURT:  What's the objection?

24          MR. SEGREST:  Your Honor, I think the scope of

25   cross-examination is determined by direct, not on what

1   opinions the witness says he may intend to give later on

2   in rebuttal or at some other point.  This is not discovery.

3   I don't think the report determines the scope of

4   cross-examination.

5           MR. LEE:  Your Honor, if they want to represent

6   that they're withdrawing any opinions on the issue of

7   reversion from him, I will move on to a different topic.

8           THE COURT:  Is reversion an issue in this case

9   for defendants?

10          MR. SEGREST:  I'm sorry, Your Honor.  I was --

11          THE COURT:  Why don't you confer.  My question

12  is, are you all giving up on all relevance as a concept of

13  reversion to this case?

14          MR. SEGREST:  Well, no, not on all relevance of

15  the concept.

16          Now, reversion can touch on a number of

17  concepts that Dr. Scheidt may have testified about.  Like

18  disproportionation may be one form of reversion, but that

19  wasn't the question.  The question was about something

20  reverting in two days.

21          THE COURT:  The question was, do you intend to

22  give any opinions on reversion in this case?

23          Is that true?  I mean, do you want to tell me --

24          MR. SEGREST:  I think disproportionation, for

25  example, I think would be a form of reversion.  He testified

Scheidt - cross

1    about that.  He didn't testify about the question that was

2    asked before.

3              MR. LEE:  Your Honor, disproportionate --

4    disproportionation in their view of a reversion, we're

5    entitled to explore that on cross.

6              THE COURT:  I'm going to allow him to explore

7    reversion.  The witness says he intends to give opinions on

8    reversion.  Defense say it's possibly relevant to an issue

9    in this case.

10             So overruled.

11   BY MR. LEE:

12   Q.    The opinion you gave on reversion in your report

13   was based upon your analysis of Dr. Jacobsen's NMR data;

14   correct?

15   A.    Yes, it is.

16   Q.    Now, you did not observe the sample in Dr. Jacobsen's

17   lab after two days; correct?

18   A.    That is correct.

19   Q.    But Dr. Jacobsen did; correct?

20   A.    I'm not aware of he did or did not.

21   Q.    Because you didn't try to replicate his experiment,

22   you had no experiments of your own that would show what

23   would happen after two days; correct?

24   A.    That is correct.

25   Q.    Now, Dr. Jacobsen's NMR experiments used material

Scheidt - cross

1   that was dissolved in a solvent; correct?

2   A.      Correct.

3   Q.      He used a solution state NMR; correct?

4   A.      Yes.

5   Q.      Solids do not contribute to the signal in a solution

6   state NMR; correct?

7   A.      Correct.

8   Q.      So if I've got a beaker and there's solid material at

9   the bottom, or if I have an NMR tube and there's solid

10  material at the bottom, it's not going to show up in a

11  solution state NMR; correct?

12  A.      That is correct.

13  Q.      So if apixaban salt, resulting from Dr. Jacobsen's

14  experiment, was not in solution, it would not have shown on

15  the solution state NMR; correct?

16  A.      Would you say that one more time, please?

17  Q.      Sure.

18          If Dr. Jacobsen's apixaban salts were not in

19  solution -- do you have that in mind?

20  A.      Right.

21  Q.      I'm now referring to a solution state NMR.

22  A.      Right.

23  Q.      Do you have that in mind?

24  A.      Yes.

25  Q.      They're not going to show; correct?

Scheidt - cross

1    A.      The solid forms of the anion would not show.

2    Q.      Let's go to a topic I think -- my memory may be -- I

3    may have changed or my memory may be slipping, but I'm sure

4    we talked about impurities; correct?

5    A.      Yes, we did.

6    Q.      You testified that -- and I think your phrase was

7    there may have been impurities.  Correct?

8    A.      I believe that is the case.

9    Q.      You have not identified what those alleged impurities

10   are; correct?

11   A.      That's correct.  I have not identified the

12   impurities.

13   Q.      You have not tried to quantify the amount; correct?

14   A.      That's correct.

15   Q.      Now, you testified -- I'll move to it a different

16   topic, Dr. Scheidt.

17   A.      Thank you.

18   Q.      You testified earlier that apixaban salts would not

19   be pharmaceutically acceptable; correct?

20   A.      Correct.

21   Q.      And one of the bases for your opinions is they would

22   generate unacceptable pH values upon contact with water;

23   correct?

24   A.      Correct.

25   Q.      Now, for example, to be precise, according to you a

1   sodium apixaban salt would generate sodium hydroxide upon

2   contact with water; correct?

3   A.      Correct.

4   Q.      So we're all clear, I want to get this precisely, you

5   have a sodium apixaban salt, it contacts water, it's going

6   to generate sodium chloride; correct?

7   A.      Sodium hydroxide.

8   Q.      Sodium hydroxide; correct?

9   A.      Correct.

10  Q.      Now, tell me, do you agree or disagree with this

11  statement:  Any -- no amount of sodium hydroxide is suitable

12  for use in contact with tissues of human beings and animals.

13  A.      Using myself as an example, I disagree that any --

14  sorry.

15          Could you restate the question please, Mr. Lee?

16  I apologize.

17  Q.      Sure.  Tell me if you agree or disagree with this

18  statement.

19  A.      Okay.

20  Q.      I don't think that any amount of sodium hydroxide is

21  suitable for use in contact with tissues of human beings and

22  animals.

23  A.      I would agree with that statement.

24  Q.      No amount at all; correct?

25  A.      I agree with that, your previous statement.

Scheidt - cross

1　　Q.　　And my previous statement referred to no amount at

2　all; correct?

3　　A.　　Sorry.  Are you talking about zero?

4　　Q.　　Yes.

5　　A.　　Well, then, you don't have any sodium hydroxide if

6　you have zero.

7　　Q.　　Any amount would be too much, according to you;

8　correct?

9　　A.　　Phrased like that, that's correct.

10　　Q.　　Now, potassium apixaban salt would generate potassium

11　hydroxide in the presence of water; correct?

12　　A.　　Correct.

13　　Q.　　So if you add potassium apixaban salt, it came in

14　contact with water, the result would be potassium hydroxide.

15　　A.　　Correct.

16　　Q.　　In part.  In part; correct?

17　　A.　　Correct.

18　　Q.　　Now, again, you don't believe that even a small

19　amount of sodium hydroxide -- of potassium hydroxide is

20　suitable for contact with human tissue; correct?

21　　A.　　Correct.

22　　Q.　　So you don't believe that even small amounts of

23　sodium hydroxide or potassium hydroxide are suitable for

24　use under His Honor's claim construction; correct?

25　　A.　　I don't think -- I would agree with that.

1    Q.    So, Dr. Scheidt, I took a trip to Walgreens this week

2    to see what I could buy off-the-shelf with some of these

3    compounds.  Let me approach.

4              MR. LEE:  May I approach, Your Honor?

5              THE COURT:  You may.

6              (Demonstrative passed forward.)

7              (Mr. Lee handed exhibits to the witness and to

8    the Court.)

9    BY MR. LEE:

10    Q.    Now, I've handed up to you a package of Crest, scope

11    whitening toothpaste.

12              Do you have that?

13    A.    I do.  Thank you.

14    Q.    Now, toothpaste is a product that is suitable for

15    contact with tissues of humans; correct?

16    A.    I would believe so, yes.

17    Q.    Let's look at the ingredients, including the inactive

18    ingredients.  One of them is sodium hydroxide, is it not?

19    A.    Apparently, it is.

20    Q.    One of the very things you said to me just five

21    minutes ago would be unsuitable for humans in any amount;

22    correct?

23    A.    Correct.

24    Q.    Let me give you another product we found at

25    Walgreens.

 1                MR. LEE:  May I approach, Your Honor?

 2                THE COURT:  You may.

 3                (Mr. Lee handed Bayer aspirin to the witness and

 4      to the Court.)

 5      BY MR. LEE:

 6      Q.     Now, Dr. Scheidt, I've given you a package of bayer

 7      low dose safety coated aspirin.

 8                Do you see that?

 9      A.     Correct.

10      Q.     You don't have any -- this is an over the counter

11      medication; is that correct?

12      A.     Correct.

13      Q.     You don't dispute these aspirin tablets are

14      pharmaceutically acceptable; correct?

15      A.     I'm not disputing that.

16      Q.     Let's look at the ingredients.  If we could bring up,

17      Mr. Lee, one of the inactive in ingredients is potassium

18      hydroxide; is that correct?

19      A.     Correct.

20      Q.     The very compound you told me would be unsuitable in

21      any amount for contact with human tissue; is that correct?

22      A.     Right.

23      Q.     All right.  Let me give you one more product.

24                (Mr. Lee handed Balmex Complete Protection to

25      the Court and the witness.)

Scheidt - cross

1    BY MR. LEE:

2    Q.      All right.  I've given you some Balmex Complete

3    Protection.

4              Do you see that?

5    A.      Yes.

6    Q.      And it is a treatment for diaper rash; is that

7    correct?

8    A.      Correct.

9    Q.      It's a treatment for babies; correct?

10   A.      I hope so, yes.

11   Q.      And it says right at the box, pediatrician

12   recommended; is that correct?

13   A.      I will take your word for it.  Yes.

14   Q.      All right.  And, in fact, it says on the box, extra

15   protection against skin irritation; is that correct?

16   A.      I will take your word for it:  Correct.

17   Q.      All right.  Now let's look at the direction section

18   and look at the ingredients again.

19              Do you see the inactive ingredient?

20   A.      Yes.

21   Q.      And, again, we find potassium hydroxide; is that

22   correct?

23   A.      Correct.

24   Q.      The very compound you told me a few minutes ago would

25   be unsuitable for any contact in any amount with human

1    tissue; correct?

2    A.      Right.

3    Q.      Now, last question.  In forming your opinions, you

4    compared the salts of apixaban with apixaban itself; is that

5    correct?

6    A.      Could you expound on what you mean by compare?

7    Q.      Sure.  In evaluating, in evaluating whether apixaban

8    salts are pharmaceutically acceptable, you compared apixaban

9    salts to apixaban itself; is that correct?

10   A.      I was mainly concerned about whether or not apixaban

11   could be made into a pharmaceutically acceptable salt.  I

12   don't think that that is what I mean by comparing those

13   salts to apixaban.

14   Q.      Well, let's see what you said at your deposition on

15   page 2 64?

16   A.      Okay.

17   Q.      Lines 32 to 11.  It's at tab 1, but Dr. Scheidt, I

18   will put it on the screen.

19   A.      Thank you.

20   Q.      "Question:  And when performing that risk/benefit

21   ratio, you were specifically comparing the risks of

22   administering the deprotonated apixaban salts with the

23   benefits of the neutral form of apixaban; correct?

24           "Answer:  I was assessing, again, the potential

25   risks associated with those sodium anions generating

1    potassium or sodium hydroxide relative to the benefits of

2    the neutral form."

3                   Have I read that correctly?

4    A.     That's correct.

5    Q.     Were you asked that question, did you give that

6    answer?

7    A.     Yes and yes.

8    Q.     And the neutral form is apixaban; is that correct?

9    A.     Correct.

10   Q.     So you were comparing salts of apixaban with apixaban

11   itself; is that correct?

12   A.     Yes.

13   Q.     You were comparing one part of the invention to

14   another part of the invention; correct?

15   A.     I was comparing molecule to molecule.

16                  MR. LEE:  All right.  Nothing further, Your

17   Honor.  Thank you.

18                  THE COURT:  All right.  Redirect?

19                  MR. LEE:  Your Honor --

20                  THE COURT:  Yes?

21                  MR. LEE:  I was reminded to offer JTX-10.

22                  THE COURT:  Which one is it?

23                  MR. LEE:  JTX-10.

24                  THE COURT:  Any objection?

25                  MR. SEGREST:  No objection.

1    **THE COURT:  It's admitted.**

2    **(DX-10 was admitted into evidence.)**

3    **REDIRECT EXAMINATION**

4    **BY MR. SEGREST:**

5    **Q.     I'm looking at the Crest Complete Scope Whitening**

6    **Toothpaste.**

7    **A.     Okay.**

8    **Q.     Is one of the ingredients benzoic acid?**

9    **A.     For the toothpaste?**

10   **Q.     Yes.  Inactive ingredient?**

11   **A.     Yes.**

12   **Q.     Okay.  So if you talk about ingredients, is that what**

13   **you have at the start of a recipe?**

14   **A.     I believe so, yes.**

15   **Q.     Okay.  So if you take these ingredients and you mix**

16   **the benzoic acid and the sodium hydroxide and all this other**

17   **stuff together, do you know without doing more analysis**

18   **exactly what you are going to have at the end?**

19   **A.     Yes.  It actually says it right here on the package.**

20   **That would be sodium benzoate, which is the salt of**

21   **combining that sodium hydroxide with benzoic acid.  So the**

22   **salt form is also included on the inactive ingredients.**

23   **Q.     Okay.  So, and I keep getting mixed up between the**

24   **Spanish language ingredients and the English language**

25   **ingredients.**

Scheidt - redirect

1    When you look at this and I says something like

2    sodium hydroxide on an ingredient list on this, does that

3    necessarily mean that you are putting pure sodium hydroxide

4    in contact with the tissue?

5    A.    No, it does not.  Just like a recipe, what you start

6    with is different than what you end up with.

7    Q.    Now, in some of the questioning, you were asked about

8    Dr. Jacobsen and making salts.  I think at some point you

9    said Dr. Jacobsen did it and I just want to be sure we're

10   clear here.

11             When you say Dr. Jacobsen did it, what did Dr.

12   Jacobsen do?

13   A.    Dr. Jacobsen made the potassium and sodium salt of

14   apixaban.

15   Q.    And in your opinion, did Dr. Jacobsen make

16   pharmaceutically acceptable salts of apixaban?

17   A.    No, not in my opinion.

18   Q.    Do you think he may have made some salts of apixaban?

19   A.    Yes, I do.

20   Q.    Now, you were shown lists from the '208 patent and

21   from Remington's, the various cations and anions.

22             Is every salt made with those cations and anions

23   pharmaceutically acceptable?

24   A.    No, I don't believe so.

25   Q.    Are the salts Dr. Jacobsen made with those cations

Scheidt - redirect

1    and anions pharmaceutically acceptable?

2    A.      No, I don't believe they are.

3              MR. SEGREST:  No further questions.

4              THE COURT:  Okay.  Thank you.  You can step

5    down, doctor.  Thank you very much.  You can let the others

6    grab those things if you want.

7              We're going to take our lunch break.  We'll be

8    back in about a half-hour.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  Thank you.

11             (Witness excused.)

12             (Luncheon recess taken.)

13                     -  -  -

14             Afternoon Session - 1:45 p.m.

15             THE COURT:  Good afternoon.  What is next?

16             MR. LEE:  Your Honor, we're going to call Dr.

17   Eric Jacobsen to be sure we can get him done today.

18             THE COURT:  All right.  Okay.

19             MR. LEE:  He'll be part of our direct case.

20             MR. HENEGHAN:  No objection.  We're just taking

21   him out of order.

22             THE COURT:  Fine.  Thank you very much.

23             ... DR. ERIC JACOBSEN, having been duly sworn as

24   a witness, was examined and testified as follows ...

25             THE COURT:  Good afternoon, Dr. Jacobsen.  It.

1      THE WITNESS:  Good afternoon.

2      THE COURT:  You may proceed.

3                   DIRECT EXAMINATION

4  BY MR. LEE:

5  Q.      Good afternoon, Professor Jacobsen.

6  A.      Good afternoon.

7  Q.      Would you introduce yourself to the Court?

8  A.      Yes.  My name is Eric Jacobsen.

9  Q.      Dr. Jacobsen, have you been retained by BMS and

10  Pfizer as an expert in this case?

11  A.      Yes, I have.

12      MR. LEE:  Could I have PDX-1-36 on the screen.

13  BY MR. LEE:

14  Q.      Do you have that before you?

15  A.      I do.

16  Q.      What is depicted on PDX-1-36?

17  A.      The Court's construction of pharmaceutically

18  acceptable salt.

19  Q.      Did your work focus on a particular portion of this

20  definition?

21  A.      Yes.  The Court's construction is broken into two

22  parts on the slide and my work was concerned with the first

23  part.  Namely, a derivative of the disclosed compound where

24  in the parent compound is modified by making acid or base

25  salts thereafter.

Jacobsen - direct

1   Q.      Do you understand that other witnesses and experts

2   will be addressing the second portion of the construction?

3   A.      Yes.  That's my understanding.

4   Q.      Generally, what have you been asked to address?

5   A.      Generally, I was asked whether salts of apixaban can

6   be prepared and how much experimental work would be required

7   to prepare those salts.

8   Q.      Excuse me just for a second.  So let's go into your

9   background a little bit.  Okay?

10                     By whom are you employed?

11  A.      Harvard University.

12  Q.      What's your position at Harvard?

13  A.      I'm the Sheldon Emory Professor of Chemistry.

14  Q.      What do you do as a professor of chemistry at

15  Harvard?

16  A.      I have two principal roles.  I teach classes both at

17  the undergraduate and graduate level and I run a research

18  lab of graduate students and post-docs.

19  Q.      And what is the focus of your research?

20  A.      My research is focused broadly in organic chemistry.

21  More specifically, my research is aimed to the discovery and

22  development of reactions for application and synthesis and

23  pharmaceutical synthesis.

24  Q.      Could you briefly describe your educational

25  background for us?

1  A.      Yes.  I was an undergraduate at New York University

2  where I obtained a Bachelor's of science in 1982.  I

3  obtained my Ph.D. from U.C. Berkeley in chemistry in 1986.

4  And I carried out post-doctoral studies as an NIH

5  post-doctoral fellow at MIT between 1986 to 1988.

6  Q.      After you completed your post-doctoral fellowship,

7  what did you do next?

8  A.      I accepted a faculty position at the University of

9  Illinois at Urbana-Champaign.

10 Q.      How long were you at the University of Illinois?

11 A.      Five years.

12 Q.      What did you do next?

13 A.      I accepted a faculty position as full professor at

14 Harvard University.

15 Q.      How long have you been at Harvard University?

16 A.      This is my 27th year.

17 Q.      Have you also served as a consultant to

18 pharmaceutical companies?

19 A.      Yes, I have.

20 Q.      And what has your consulting concerned?

21 A.      It has concerned a small molecule in pharmaceutical

22 drug development discovery, specifically medicinal chemistry

23 and process chemistry.

24 Q.      And for whom have you consulted?

25 A.      I consulted for several companies over the years.  My

1  longest relationship started with Merck and Amgen.

2  Q.    Have you received any honors or awards for your work

3  in organic chemistry?

4  A.    Yes, I have.

5  Q.    I'm going to ask you to be immodest in your own

6  behalf just for a second.  Are there any of the awards that

7  have particular meaning for you?

8  A.    I was elected to the National Academy of Sciences and

9  to the American Academy of Arts and Sciences, and I received

10  several international and national awards for chemistry and

11  organic chemistry.

12  Q.    Have you received the American Chemical Society's

13  Socpe Award?

14  A.    Yes.

15  Q.    And what was that for?

16  A.    That was for achievement in the field of organic

17  chemistry.

18  Q.    Are you being compensated for your time working in

19  this case?

20  A.    I am.

21  Q.    Does your compensation depend on the outcome of the

22  case?

23  A.    No.

24  Q.    Does it depend on the substance of your testimony?

25  A.    It does not.

Jacobsen - direct

```
1   Q.      Dr. Jacobsen, I think you have a binder in front of

2   you?

3   A.      Yes.

4   Q.      If you would turn to tab 1.  And we'll also put it on

5   the screen.  So whatever is easiest for you.

6           Do you find PTX-801?

7   A.      Yes.

8   Q.      What is it?

9   A.      This is my C.V.

10          MR. LEE:  Your Honor, plaintiffs offer Dr. Eric

11  Jacobsen as an expert in the subject matter of organic and

12  medicinal chemistry.

13          MR. HENEGHAN:  No objection, your Honor.

14          THE COURT:  He's so recognized.

15  BY MR. LEE:

16  Q.      Dr. Jacobsen, before we get to the specifics of the

17  work that you did, do you understand that both sides have

18  offered the definition of a person having ordinary skill in

19  the art as of the '208 patent?

20  A.      Yes.

21  Q.      And do you understand that the parties have agreed

22  that each party's opinion and the evidence they offer would

23  not change depending upon the qualifications and the

24  definition of that person?

25  A.      Yes.
```

Jacobsen - direct

1  Q.      Would you have met the qualifications of a person of

2  ordinary skill in the art as of September 2001 under either

3  definition?

4  A.      Yes.

5  Q.      Have you prepared any demonstratives to accompany

6  your testimony today?

7  A.      Yes, I have.

8          MR. LEE:   Could I have PDX-11.2?

9  BY MR. LEE:

10  Q.      Would you tell His Honor what questions you have been

11  asked to address, addressing the first part of his claim

12  construction?

13  A.      Yes.  I was asked to address two questions:

14          Whether a salt form of apixaban can be made.  And,

15          Based on the '208 patent, how much

16  experimentation would have been needed to make a salt form

17  of apixaban.

18  Q.      And what did you do to answer those questions?

19  A.      I reviewed the '208 patent and applied the

20  perspective of a person of ordinary skill and carried out

21  experimental work in my lab at Harvard University.

22  Q.      And did you apply the level of skill for someone as

23  of 2001?

24  A.      I did, yes.

25  Q.      And what conclusions did you reach in answer to these

Jacobsen - direct

1  questions?

2  A.    I concluded from that work that, yes, salt forms of

3  apixaban can be made, and that they can be made with a

4  minimal amount of routine experimentation.

5  Q.    And we'll get to the specifics, but just

6  approximately how much time did it take you to make the

7  three apixaban salts that you made?

8  A.    We made -- I say "we."  My post-doctoral student and

9  I made the three salts that we intended to make on the first

10  day of experimentation within just a few hours.  We did a

11  couple of repeat experiments subsequently.  So the total

12  effort was on the order of about 10 to 20 hours of

13  laboratory work.

14  Q.    Let's do some background principles.  What are salts?

15  A.    Salts are molecules that are held together through

16  ionic interactions.

17  Q.    Are some positively charged?

18  A.    Well, in an ionic interaction in a salt, there is a

19  cationic component that is positively charged and another

20  that is negatively charged.

21          MR. LEE:  Could we have PDX-11.3?

22  BY MR. LEE:

23  Q.    Do you have PDX-11.3 on the screen?

24  A.    Yes.

25  Q.    Can you describe for us what is depicted on this

Jacobsen - direct

1    demonstrative?

2    A.      Well, this is probably one of the simplest salt

3    forming reactions.  This is a reaction between a base,

4    ammonia, which is in blue on the slide, and hydrogen

5    chloride, which is an acid in red.  And those two combined

6    to make a salt.  And in that -- in this reaction, a proton,

7    which is a hydrogen with a plus charge on it, is transferred

8    from the acid to the base resulting in separation of charge

9    in the formation of the salt.

10   Q.      What is an acid?

11   A.      So an acid is a molecule that can donate a proton.

12   Q.      What is a base?

13   A.      A molecule is a base that can accept a proton.

14           MR. LEE:  Now, if I could have PDX-11.4 on the

15   screen, please?

16   BY MR. LEE:

17   Q.      Do you recognize this compound?

18   A.      Yes.  This is a line drawing of the molecular

19   structure of apixaban.

20   Q.      Is apixaban an acid or a base or both?

21   A.      Well, the answer is it's both.  It can be either and

22   acid or a base.

23           MR. LEE:  Could I have DDX-16.13 on the screen,

24   please?

25   BY MR. LEE:

Jacobsen - direct

1  Q.      Using PDX -- DDX-16-13.  This is the defendants'

2  demonstrative.  Do you recognize it?

3  A.      I do, yes.

4  Q.      Can you explain how apixaban acts as an acid and a

5  base?

6  A.      Yes.  So on this slide, the molecule is turned

7  around, but it's the same molecule.  And,

8          The red box has enclosed the portion of the

9  molecule that possesses the hydrogens that are responsible

10 for apixaban's acidity, so its properties as an acid.  The

11 Hs on that are acidic.  And,

12         In the blue boxes are all of the sites in the

13 molecule that are potential sites for protonation.  In other

14 words, sites that can act as a base.

15 Q.      Now, you mentioned that you actually designed and

16 conducted several experiments to prepare for your opinions

17 in this case; correct?

18 A.      Yes.

19 Q.      What did you do to design these experiments?

20 A.      I studied the '208 patent and I applied the

21 perspective of a person of ordinary skill in 2001.

22 Q.      Now, were there particular portions of the '208

23 patent that were relevant to your analysis?

24 A.      Yes.  There is a particular portion in the

25 specification that addresses salts.

Jacobsen - direct

1        MR. LEE:  Could I have column 116 of the '208

2  patent on the screen?

3  BY MR. LEE:

4  Q.    Does column 116 include some of the information that

5  educated your experiments?

6  A.    Yes.  So in this section is a discussion of salts

7  that can be pharmaceutically acceptable in terms of what

8  their composition can be, so specifically saying that they

9  can be alkali organic salts of acidic residues.

10  Q.    And there also, is there a reference to mineral acid

11  salt of basic residues?

12  A.    Exactly, or right above that, mineral or organic acid

13  salts of basic residues.

14  Q.    Let's take that in part.  Can you give me an example

15  of a mineral acid salt of a basic residue?

16  A.    Yes, a hydrochloride is a mineral acid salt.

17  Q.    Can you give me an example of an alkali salt of

18  acidic residue?

19  A.    Yes, a sodium salt.

20  Q.    Would potassium be another example?

21  A.    Yes, potassium is one.

22        MR. LEE:  Let's go to column 117.

23  BY MR. LEE:

24  Q.    Did you review this column, too, in preparing your --

25  in designing your experiments?

Jacobsen - direct

1    A.       I did, yes.  This section provides guidance as to the

2    preparation of the salts.

3    Q.       And what information does it provide you in terms of

4    the preparation of the salts?

5    A.       Yes.  So I should say that acid-based chemistry is

6    among the most fundamental aspect of all chemistry from the

7    very start.  So all people of ordinary skill are familiar

8    with basic principles of acid-based chemistry.  That is

9    alluded to in the section where it says the salts can be

10   prepared by conventional chemical methods.

11            So a person of ordinary skill would understand

12   that that means by reaction with an appropriate acid or

13   base.  And, indeed, in the next sentence, it explains that

14   salts can be prepared by reacting the acid based forms of

15   the compounds with a stoichiometric amount of the

16   appropriate base or acid.

17            Then it provides guidance as to the solvent

18   selection.  This is a critical consideration in any chemical

19   reaction, and it is very expansive.  There are really two

20   types of solvents, aqueous and nonaqueous solvents, but it

21   does indicate nonaqueous media, and they're listing some

22   specific examples are preferred.

23   Q.       And those specific examples include what?

24   A.       Excuse me?

25   Q.       Those specific examples include what?

Jacobsen - direct

1  A.      They include, well, protic and aprotic organic

2  solvents, but specific examples include ether, ethyl

3  acetate, as well as some alcohols and acetonitrile.

4  Q.      Do you see the reference to Remington's

5  Pharmaceutical Sciences?

6  A.      I do.

7  Q.      Were you in the courtroom when I was talking to

8  Dr. Scheidt about it?

9  A.      Yes.

10  Q.      You are familiar with it; correct?

11  A.      Yes.

12  Q.      Turn, if you would, to Tab 2 in your binder, which is

13  Remington's JTX-10.

14  A.      (Witness complies.)

15  Q.      Do you have that?

16  A.      I do.

17  Q.      And I'm going to bring up the table from page 1418.

18          In designing your experiments, did you consider

19  this table on page 1418?

20  A.      Yes.  So a key question in deciding how to proceed

21  experimentally was which salts we would attempt to prepare.

22          So to decide on which salts to target, we

23  consulted this table which is incorporated directly in the

24  patent by reference and specifically looked to the table for

25  what salts are the most common in FDA-approved drugs, and

1  targeted those as the most interesting candidates.

2  Q.    What are the salts that were most common FDA-approved

3  commercially marketed salts?

4  A.    Well, for salts of a basic residue, with acids, the

5  most common by far is the hydrochloride salts, 43 percent

6  almost I think.  No other example is more than 10 percent,

7  so that one stands out by far as the most common.  And,

8           Then for salts of acidic residues using bases,

9  the most common cations are two alkali metals, sodium and

10  potassium.

11  Q.    Now, were the experiments that you designed and

12  conducted documented?

13  A.    Yes.  We documented them in laboratory notebooks.

14  Q.    Turn, if you would, to Tab 3 of your notebook to

15  PTX-802.

16  A.    (Witness complies.)

17  Q.    Let me know when you are there?

18  A.    Yes, I'm there.

19  Q.    Can you identify this document?

20  A.    Yes.  These are the laboratory notebook pages that we

21  generated during the course of our experimental work.

22  Q.    Who made the entries in the notebook?

23  A.    The entries were made by hand by Dr. Russ Algera, a

24  postdoctoral student in my lab under my direction and

25  supervision.

Jacobsen - direct

1  Q.      Were the entries made contemporaneously with the

2  experiments that were conducted?

3  A.      Yes, they were.

4  Q.      And is maintaining these records in that manner

5  consistent with your usual practice in your laboratory?

6  A.      It is, yes.

7  Q.      Turn if you would to Tab 4 in your binder.

8  A.      (Witness complies.)

9  Q.      Do you find PTX-803?

10  A.      Yes.

11  Q.      What is that?

12  A.      These are NMR, nuclear magnetic resonance spectra we

13  obtained during the course of our experimental work on this

14  case.

15  Q.      Turn, if you would, to Tab 5 in your binder, Dr.

16  Jacobsen.

17  A.      (Witness complies.)  I'm there.

18  Q.      Do you find PTX-804?

19  A.      Yes.

20  Q.      Can you tell us what this is?

21  A.      Yes.  These are infrared or IR spectroscopic data

22  that we generated during the course of our work.

23  Q.      Was any other digital data produced by you in the

24  course of your experiments?

25  A.      Yes.  We also obtained other NMR and IR data in

Jacobsen - direct

1  connection with our work as well as the video of one of the

2  experiments.

3  Q.      But is the data that is generated and reported in

4  these notebooks and in these data worked on by you and your

5  post-doctoral student?

6  A.      Yes.

7  Q.      What was the purpose for obtaining this data?

8  A.      The purpose was to answer the questions that we were

9  seeking to address, namely, whether salts of apixaban could

10  be prepared in -- to characterize those salts and to

11  establish the amount needed to do so.

12          MR. LEE:   Let's go specifically to the

13  experiments you did.   Could I have PDX-11.5, please.

14  BY MR. LEE:

15  Q.      Would you describe to us the experiments that you

16  did?

17  A.      Yes.   We did three sets of experiments.   On this

18  slide are the notebook pages corresponding to the actual

19  experimental work for the synthesis of the three salts that

20  we sought to prepare.   Experiments directed to the synthesis

21  of the sodium apixaban salt, the potassium apixaban salt,

22  and the apixaban hydrochloride salt.

23  Q.      Did your experiments successfully produce the sodium

24  salt of apixaban?

25  A.      Yes.

1   Q.      Did your experiments successfully produce the

2   potassium salt of apixaban?

3   A.      Yes.

4   Q.      Did your special experiments successfully produce the

5   hydrochloride salt of apixaban?

6   A.      Yes.

7   Q.      How do you know?

8   A.      Well, we know from our experimental observations,

9   from spectroscopic studies, and also from chemical studies

10  that we did on the salts.

11  Q.      How certain are you that you were successful in

12  making these salts?

13  A.      Completely certain.

14  Q.      How much experimentation was required to make these

15  salts?

16  A.      Well, we made all three of the salts on the very

17  first day of experimentation.  On March 19th of this year,

18  we carried on the experiments to -- initial experiments to

19  prepare all three salts, and they were successful.

20          We then repeated the experiments on different

21  scales subsequently.

22          So in terms of experimentation to actually

23  establish whether we could prepare the salts, that was

24  within just a few hours, I'd say less than five hours, on

25  the first day.

1    Q.     Was the experimentation required to prepare and make

2    the salts -- withdrawn.

3           Would the experimentation required to make the

4    salts have been routine or not routine as of 2001?

5    A.     No, completely routine.

6           MR. LEE:  Let's look at the sodium salt.  Could

7    I have PDX-11.6, please?

8    BY MR. LEE:

9    Q.     Can you tell us what is shown in the four steps on

10   slide PDX-11.6?

11   A.     Yes.  So these actually correspond to four notebook

12   pages recording experiments that we carried out to make the

13   sodium salt.

14   Q.     What was the first experiment?

15   A.     On the first day, March 19th, we actually carried ou

16   two experiments, to answer the question of what solvent or

17   what type of solvent we would want to use to make the sodium

18   salts.

19          So we tested a protic solvent.  This is a

20   solvent that is potentially acidic.  The one we chose is

21   methanol.  And for that experiment, we used a common base

22   sodium methoxide.

23   Q.     And the second experiment?

24   A.     The second experiment was an experiment where we

25   chose a non-protic or aprotic solvent, THF, tetrahydrofuran.

Jacobsen - direct

1  And we chose again a very common base for use in that

2  solvent, sodium hexamethyldisilazide.

3  Q.     What happened in the first experiment?

4  A.     In the first experiment, which we monitored

5  spectroscopically, we did not observe salt formation.

6  Q.     So that sodium methoxide experiment did not result in

7  apixaban salt; correct?

8  A.     Yes, I would say it's really the sodium methoxide in

9  methanol experiment because I think -- the reason or the

10  conclusion that I drew from that result was that the solvent

11  was not compatible with the salt formation.

12  Q.     Did you then conduct on the same day the second

13  experiment?

14  A.     Yes.  Exactly.  So the second experiment in THF using

15  sodium hexamethyldisilazide, we did observe salt formation.

16  In fact, we observed instantaneous salt formation when we

17  combined the reagents.

18  Q.     And I think you answered my question.  I was going to

19  ask what happened when you added the NaHMDS to apixaban.

20  And the answer was?

21  A.     Yes, it was a dramatic result, instantaneous

22  formation of the salt.

23  Q.     What did the formation of the precipitate tell you?

24  A.     It told us we had indeed generated the salt of

25  apixaban.  I should say that reagent that we used, sodium

1  hexamethyldisilazide, is a common reagent.  It's an agent

2  that is used specifically as a base.  It does little else

3  than act as an active base in chemical reactions.

4         So the observation of a distinct reaction which

5  we could visualize from the appearance of the reaction was

6  consistent with salt formation.  We also obtained

7  spectroscopic data, IR data that confirmed the salt

8  formation.

9  Q.     Did you take a video of one of the experimentation?

10  A.     Yes.  So we repeated second experiment about a week

11  later.  We carried it out on larger scale for the purpose

12  of preparing enough salt for characterization, full

13  characterization, and I filmed one of those experiments.

14  Q.     Let's look at the video from PTX-805.  It's a

15  portion, Your Honor, of PTX-805.  We're just going to show

16  this video.  But play the video.  And then perhaps you can

17  describe for us what is happening in the video.

18  A.     Yes.  This is Dr. Russ Algera, a student in my lab,

19  and he's at his hood in my lab at Harvard.  So this is a

20  safe way to do experiments and he's simply describing now

21  more or less what I'm saying, which is that he has prepared

22  a solution of the base, sodium hexamethyldisilazide in THF

23  and another solution of apixaban in THF, so they're in two

24  separate flasks.

25         And now what he's going to do is withdraw

Jacobsen - direct

1   the solution out of the sodium hexamethyldisilazane into a

2   syringe.  This is a standard technique that we use in and

3   all chemists use and did use in 2001 for transferring one

4   solution to another.  So he's withdrawing the solution into

5   the syringe and now you take that syringe, which contains

6   the base, and injects that solution into the solution of

7   apixaban.

8               Now, watch this bottom solution closely and

9   you'll see that as soon as the base of that is added -- you

10  see a white solid.  So that very clearly demonstrated that a

11  reaction had taken place, fully consistent with just salt

12  formation.

13  Q.    Were there any additional steps taken in this

14  experiment?

15  A.    Yes.  So the only additional step we took here was to

16  remove the solvent and what we call the volatiles, so the

17  volatile materials from this reaction mixture and we did

18  that by evaporation, standard procedure.

19  Q.    And what was left after you evaporated the solvent?

20  A.    What was left was the white solid in the flask that

21  corresponds to the sodium salt of apixaban.

22  Q.    So let's go to PDX-11 .7, which are some still shots

23  from the video.  Again, just take us through these steps and

24  tell us what is left at the end.

25  A.    Yes.  So the first two photographs are stills from

1   the video that I just described.  So the one on the left is

2   the solution of apixaban just before Dr. Algera added the

3   base, the sodium hexamethyldisilazane.

4                      The second one is immediately after adding

5   the base, the appearance of the white precipitate.

6                      And then the third is the same flask but

7   after removal of the solvent by evaporation, leaving behind

8   the white solid film of the sodium apixaban salt.

9   Q.     What additional data did you obtain for these

10  reactions?

11  A.     We also obtained spectroscopic data as well as

12  reactivity data.

13  Q.     Did you obtain infrared spectrographic data?

14  A.     We did.

15  Q.     And what is that?

16  A.     Infrared spectroscopy is a technique that's in common

17  use and has been for many decades by organic chemists to

18  characterize organic molecules and also characterize changes

19  in molecules that occur as the result of reactions.  It's a

20  technique that focuses on what we call functional groups.

21  So certain types of groupings of molecules and it provides

22  signature signals for those groupings.

23  Q.     And did those tests indicate that a sodium salt form

24  of apixaban had been prepared?

25  A.     Yes.

1  Q.    Let's have PDX-11.8 on the screen, which is from

2  PTX-804, Your Honor.

3              Can you tell us what is shown on PTX---

4  PDX-11.8?

5  A.    Yes.  These are IR spectrum of the sodium salt

6  experiments.  Specifically, they're three spectrum.  It

7  might look like a lot of noise there, but these are spectra

8  that people of skill learn how to interpret and analyze.

9  The three spectra correspond to apixaban in black and then

10 the apixaban solution upon addition of the base.  Here, it's

11 abbreviated as NaHMDS.  This is the base I have been talking

12 about.  And two different spectra, one having added half of

13 an equivalent, so half enough to deprotonate all of the

14 apixaban, and then the red, enough to deprotonate all of the

15 apixaban and generate the sodium salt.

16              So this technique IR actually detects both

17 species that are in solution and that are solid.  We

18 established definitively that the sodium salt was not

19 soluble in THF, is solvent, in which these were taken.

20              So what these IR measurements is detecting the

21 both what's in solution, but also solid material that had

22 been formed, so the solid that we generated in the

23 experiments that are described and changes in the spectrum

24 are diagnostic with sodium salt formation.

25 Q.    Let me focus you on a specific portion of the

Jacobsen - direct

1    spectrum at 1600 wavenumbers.

2                 Do you see that?

3    A.    Yes.

4    Q.    And that's on the screen now as PDX-11.8.  What does

5    the signal at 1600 indicate to you?

6    A.    Yes.  So as I mentioned, IR detects what we call

7    functional groups and changes in functional groups, and the

8    particular region in the IR spectrum around 1600, 1600 to

9    1800 that's especially diagnostic of what are called

10   carbonyl groups.

11                 Now, based on our knowledge of the

12   structure of the molecule, we expect the changes to what's

13   call the carboxamide group of the apixaban.  So we look for

14   changes in the particular region of the IR spectrum.  What

15   we see clearly when we zoom this particular region, at 1600,

16   there's no signal for apixaban and that's in black, but that

17   there's a sharp signal at 1600 for the sodium salt.

18   Q.    Did you obtain any additional data on your sodium

19   apixaban salt experiment?

20   A.    We did.  We also obtained NMR data.

21   Q.    Now, the Court has heard a lot about NMR data.  Do

22   you use a particular type of NMR?

23   A.    We did.  We used what's called solution NMR.

24   Q.    Is there a difference between solution state NMR and

25   solid state NMR?

Jacobsen - direct

1    A.      Yes.  In fact, they're completely different.  The

2    physics of it are the same, but in terms of the actual

3    measurement, solution NMR only detects material that's in

4    solution that dissolves.  Solids don't appear in solution

5    NMR spectra, but they have the effect of broadening the

6    spectra.

7    Q.      Did the NMR spectroscopy provide information to you

8    concerning your experiments with apixaban?

9    A.      Yes.

10   Q.      What information did it provide to you?

11   A.      Well, it provided definitive information that we had

12   deprotonated apixaban and made the sodium salt.

13   Q.      Can I have PDX.11-9 on the screen, which is from

14   PTX-803.

15           Do you see that on the screen now?

16   A.      Yes.

17   Q.      Can you explain to his Honor what is depicted in each

18   of the three different levels of PDX.11-9?

19   A.      Yes.  So three spectrum that are, when we say stacked

20   above one another, one above the other.  The top one is the

21   spectrum of apixaban.  This is the material that we received

22   from BMS to do our experiment.  We took an NMR spectrum of

23   that material in a solvent and we chose a solvent called

24   DMF.  DMF is an organic polar solvent.

25           The next spectrum down is a spectrum of the

Jacobsen - direct

1   white solid material that we generated in the experiment

2   that I described to you, so we took that flask that contains

3   the white solid and we suspended that white solid in DMF.

4   Not all of it dissolves.  Some of it remained as a solid,

5   but some of it did dissolve, and we were able to obtain an

6   NMR spectrum as shown in the middle.

7            There are several features of the spectrum that

8   I would like to point out.  One is clearly how the signals

9   of apixaban are clearly different in the sodium salt.  They

10  had changed position.  They're also much broader.  The

11  broadness has to do with the fact that there are solids in

12  the NMR, but the change in position of the signal is

13  consistent with a change in the molecule, a change in the

14  structure of the molecule consistent with the formation of

15  the sodium salt.

16           If I may use a laser pointer?

17  Q.    Sure.  Do you have one?

18           THE COURT:  Yes, I may.

19           THE WITNESS:  There's a particular diagnostic

20  change I want to point out.  So this signal and this signal

21  in apixaban, so these are the left most and they're the

22  third from the left most signals.  Those correspond to the

23  protons in apixaban that are potentially acidic.  And you'll

24  notice that in the spectrum of the sodium salt, this whole

25  region is flat, so this disappeared.

1    We have removed one of the protons from

2    apixaban.  The other one is either very broad and in a

3    baseline or buried underneath one of these peaks, but what's

4    clear is that we have removed one of the protons in apixaban

5    consistent with the protonation and the formation of the

6    sodium salt.

7        Now, there's a third spectrum on this slide and

8    I think this is a really key experiment.  So this is an

9    actual chemical test that we did on the sodium salt that we

10   prepared.

11       So if we made the sodium salt, as I said we

12   have, we have removed the proton from the molecule.  So in

13   principle then, we should be able to regenerate apixaban if

14   we added a proton.  So if we add an acid back to the sodium

15   salt.

16       So we did that experiment simply by adding an

17   organic acid, acetic acid to the sodium salt, and we

18   obtained an NMR spectrum of the resulting material.  I

19   should say that just visually on adding the acid, all of the

20   solid that was in the NMR tube dissolved.

21       As I mentioned, the sodium salt is not very

22   soluble even in the solvent that we used, but apixaban is

23   completely soluble in the solvent.  So all of the material

24   dissolved.  Now we're seeing the effect of everything that's

25   in the NMR tube.

Jacobsen - direct

And what we see is a spectrum of apixaban.  All

of the signals due to apixaban are restored in exactly the

same places, the only exception being the two signals that I

mentioned earlier are slightly shifted, and that's to be

expected.  People of skill and chemists know that signals

due to hydrogens that are on atoms other than carbons, they

both -- their positions can be concentration dependent.  And

because we changed the concentration of the sample in

manipulation, those signals changed.  All the other signals

go back to exactly what they were.

So what this says is that we have deprotonated

apixaban within the sodium salt, and then we can add a

proton back to the sodium salt to regenerate apixaban and

only apixaban.

Q.     Did you obtain any other NMR data for sodium

apixaban?

A.     We did.  We also obtained carbon 13 NMR data.

Q.     And what is carbon 13 NMR data?

A.     So this is again a solution method that we used.

This method that I've just been talking about is a method

that sees or detects the hydrogen in the molecule.  Carbon

13 NMR sees or detects the carbons in the molecule.

MR. LEE:  Could we have PDX-11.10 on the screen,

which is from PTX-803.

BY MR. LEE:

Jacobsen - direct

1   Q.      Do you have that on the screen?

2   A.      I do.

3   Q.      Can you tell us what is shown on these graphs?

4   A.      Yes.  So these are carbon 13 NMR spectra of apixaban

5   and of the sodium salt of apixaban.  This technique is less

6   sensitive than the proton NMR and these methods that I

7   showed on the previous slide.  And you can see that by the

8   fact that the spectrum is much noisier and the baseline is

9   much noisier, but still we see lines in the spectrum that

10  correspond to each of the different carbons in the

11  molecules.

12          The main observation here is that the signals

13  due to apixaban and due to the sodium salt of apixaban are

14  in different positions, consistent with a change in

15  structure of the molecule.

16  Q.      Professor Jacobsen, how certain are you that you made

17  a sodium apixaban salt?

18  A.      Completely.

19  Q.      Let's now go to the potassium salt.  Could I have

20  PDX-11.11 on the screen.

21          Can you tell us what is depicted on PDX-11-.11?

22  A.      Yes.  This slide shows the notebook pages associated

23  with the experiments that we did to make the potassium salt

24  of apixaban.  On the same day that we made the sodium salt,

25  we also prepared the potassium salt in a completely

1   analogous way.  Potassium and sodium are closely related.

2   Chemically, they're both alkaline metals.  And we were able

3   to use an analogous base, a base called potassium

4   hexamethyldisilazide in the same solvent that we used for

5   the sodium salt experiment, THF.

6                And we made very similar observations.  The

7   observations were that a precipitate, a solid formed

8   immediately in the reaction.

9   Q.      Did you obtain any other evidence that a potassium

10  apixaban salt had, in fact, been formed?

11  A.      Yes.  We repeated the experiment a few days later

12  just to obtain more material and on that material, we, and

13  on material we first generated, we obtained spectroscopic

14  data and chemical reactivity data.

15  Q.      Let me have PDX-11-.12, which is from PTX-804 on the

16  screen.  Do you see that?

17  A.      Yes.

18  Q.      Can you tell us what this is?

19  A.      Yes.  These are IR spectrum.  So this is really very

20  analogous to what I described to the sodium salts.  In this

21  case, these are IR spectra of the potassium salt of apixaban

22  experiment.  A spectrum of apixaban in black and then of the

23  solution of apixaban upon addition of the base, potassium

24  hexamethyldisilazide or here KHMDS with half an equivalent

25  in blue or full equivalent of the base in red.  And there

1   are changes in these spectrum that are consistent with the

2   deprotonation of apixaban to make the potassium salt.

3   Q.      If I focus on the frequency at 1600, do you see that?

4   A.      Yes.  So completely analogous to the sodium

5   experiment, we see in a region of the IR spectrum that we

6   would expect a change, the emergence of a signal.  So at

7   1600, there's no signal due to apixaban, just noise in

8   the baseline.  But then upon addition of the base, we see

9   the emergence of a sharp signal at 1600 consistent with

10  the deprotonated form of apixaban.  Namely, the potassium

11  salt.

12  Q.      And did you collect solution-based NMR data as well?

13  A.      We did.

14          MR. LEE:  Could I have PDX-11.13 on the screen?

15  BY MR. LEE:

16  Q.      Can describe for us what is depicted on PDX-11.13,

17  which is from PTX-803?

18  A.      Yes.  This might look similar to the previous slide.

19  It's because it is.  It's again the spectrum of apixaban on

20  top, and now the spectrum of apixaban is in the middle.

21  Again, what we see is that all of the signals have changed.

22  The signal that is due to one of the NHs in apixaban has

23  vanished -- now pointing to that -- and the signals are

24  broad.  They're broad because again they're solid in the

25  sample because the salt was only sparingly soluble in the

Jacobsen - direct

1    solvent we used, DMF.

2              We then did the chemical tests essentially to

3    test the structure of the salt.  By adding an acid to the

4    potassium salt, we regenerated apixaban.  And,

5              The evidence for that is in the bottom spectrum

6    where we see all the signals due to apixaban restored,

7    including the two signals due to the hydrogens, again,

8    slightly shifted places due to the change in concentration.

9    But, clearly, we have generated, regenerated apixaban.

10   Q.    Did you obtain any other NMR data for the potassium

11   reaction?

12   A.    We did.  We also obtained carbon 13 NMR data.

13              MR. LEE:  Can I have PDX-11.14 which is from

14   PTX-803.

15   BY MR. LEE:

16   Q.    What is depicted here?

17   A.    These are carbon 13 NMR spectra of apixaban and of

18   potassium salt of apixaban.

19   Q.    How certain are you that made the potassium apixaban

20   salt?

21   A.    Completely certain.

22   Q.    Let's turn to the hydrochloride salt.  Did you

23   prepare a hydrochloride salt of apixaban?

24   A.    Yes.

25              MR. LEE:  Could I have PDX-11.15 on the screen?

1    BY MR. LEE:

2    Q.      And what is depicted or summarized on PDX-11.15?

3    A.      These are the notebook pages associated with the

4    experiments that we did.  Again, on the same day we made

5    the, same day we made the sodium and potassium salts,

6    March 19th, we also did the first experiment to make the

7    hydrochloride salt.

8              In that set of experiments, we tested three

9    solvents, three different types of solvents:  a nonpolar

10   organic solvent, a polar aprotic solvent, and a polar protic

11   solvent; and we added a solution of nitrogen chloride to

12   solutions of apixaban or samples of apixaban in those

13   solvents.

14             What we observed in that first experiment was

15   that in the methanol experiment, we observed spectroscopic

16   changes consistent with the formation of the hydrochloride

17   salts.

18   Q.      Was there a second set of experiments?

19   A.      Yes.  So several days later, we did a second

20   experiment which was the same as the first experiment in

21   methanol, except that we did what we call a titration -- a

22   titration meaning that we added sequential amounts of the

23   acid of hydrogen chloride to the solution of apixaban, and

24   we recorded NMR spectra of those solutions.

25             MR. LEE:  Could I have PDX-11.16, which is from

Jacobsen - direct

1   PTX-803?

2   BY MR. LEE:

3   Q.      Could you tell us what is depicted on PDX-11.16?

4   A.      Yes.  So these are NMR spectra of the titration

5   experiments.  At the very top is the spectrum of apixaban.

6   I should say these are zoomed in regions of the spectrum,

7   and we're zooming in on regions that are the most

8   informative, where the changes are most dramatic.  And,

9           What we see, upon addition of hydrogen chloride,

10  and the amount of hydrogen chloride we added is in the

11  left-most column, we see the signals change position

12  gradually.  Some change more than others.

13          One in particular changes quite dramatically.

14  The signal that starts out at around 2.5 in the bottom axis,

15  pointing to now, this signal is especially sensitive to the

16  protonation, and now highlighted in the box.  We can see

17  that it's shifting to the left in the spectrum of what we

18  call down field in the spectrum.  And,

19          That is consistent with the salt, the

20  hydrochloride salt and the apixaban being present and in

21  equilibrium with one another in solution.

22          So from the amount of the acid that we have

23  added and from the position of these signals, we can

24  actually deduce and calculate how much of the hydrochloride

25  salt is synthesized.

1          MR. LEE:  Let's turn to PDX-11.17, which is from

2     PTX-803 as well.

3     BY MR. LEE:

4     Q.    Do you see the graph on the screen?

5     A.    Yes.

6     Q.    Would you tell us what is shown here?

7     A.    Yes.  So these are data taken directly from the NMR

8     spectra on previous slides, so it is a plot of the position

9     of the signal that moves the most as a function of the

10    amount of hydrogen chloride added.  And,

11          As I said, the position of the signal changes as

12    a function of concentration, and we can fit those data with

13    a curve.  It's a standard practice; and from that fit, we

14    can calculate the percentage of hydrochloride salt that is

15    formed under those conditions.  And,

16          As you can see from the slide, the highest

17    concentration of hydrogen chloride that we added, 74 percent

18    of the salt is formed.

19    Q.    How certain are you that you make the apixaban

20    hydrochloride salt?

21    A.    I'm completely certain.

22    Q.    So I want to reach the end of your experiments and

23    ask you a few questions.  Then I'm going to come to

24    Dr. Scheidt's criticisms of your experiments; okay?  But

25    before I get there, just let me ask you these questions.

Jacobsen - direct

1  What conclusion did you draw from these

2  experiments?

3  A.    I concluded that salts of apixaban, specifically

4  sodium, potassium, and hydrochloride salts of apixaban can

5  in fact be made, and that they can be made with a minimal

6  amount of very routine experimentation.

7  Q.    Would that experimentation have been routine in 2001?

8  A.    Yes.

9  Q.    Were the reagents you used to make the apixaban

10 salts commonly used by people of ordinary skill in the art

11 in 2001?

12 A.    Yes.

13 Q.    Was the experimentation required routine?

14 A.    Yes.

15 Q.    Now, Dr. Scheidt did no experiments of his own;

16 correct?

17 A.    Not to my knowledge.

18 Q.    But he has critiqued your experiments; correct?

19 A.    Yes.

20 Q.    Now, one of his suggestions is that your NMR data

21 indicates impurities in the sodium and potassium salts.  Do

22 you recall that?

23 A.    Yes.

24 Q.    Do you recall Dr. Scheidt's testimony that your salts

25 could not be purified without reverting to apixaban?

1   A.      Yes.

2   Q.      Do you agree with that?

3   A.      No, I do not.

4   Q.      Why not?

5   A.      Because it would be a routine matter to purify the

6   salts without having it revert.  The only precaution that

7   would have to be taken would be to exclude moisture from the

8   manipulations; and this is something that chemists learn how

9   to do routinely.

10  Q.      As a medicinal chemist, did you have any concern

11  about these claimed impurities?

12  A.      No.

13  Q.      In your opinion, could you have purified your salts

14  with routine -- withdrawn.

15          Could you have purified your salts using

16  techniques known to those of ordinary skill in the art in

17  2001?

18  A.      It would be a very routine matter to do so.  In fact,

19  the limited solubility of the salts makes it very easy to

20  purify.

21  Q.      Now, there was some suggestion that I think I have

22  this right but I may have it wrong -- you may have heard it

23  differently.

24          I thought that Dr. Scheidt suggested that

25  there would be concerns with degradation if the site of

Jacobsen - direct

1  protonation was a terminal lactam.  Do you recall that?

2  A.     Yes.

3  Q.     Do you have any concerns?

4  A.     No.  So this is very fundamental organic chemistry.

5  Lactams are amides.  They're amides that happen to be in

6  a ring, but amides are actually very stable and robust to

7  acidic, and the basic conditions of hydrolysis of amides

8  with lactams require very harsh conditions.

9           I think the degradation studies that were

10  referred to were carried out at high temperature, around

11  80 degrees Celsius.  We carried out all of our experiments

12  at room temperature.  It would be a routine matter to carry

13  out the experiments at low temperature.  So one would not

14  expect degradation of an amide under acidic conditions under

15  room temperature.

16  Q.     Now, Dr. Scheidt suggested that the hydrochloride

17  could not have been isolated.  Do you recall that?

18  A.     Yes.

19  Q.     Do you agree with him?

20  A.     No.  We didn't make any effort to isolate it, but it

21  would be a simple matter choosing the appropriate solvent

22  system to induce the isolation of the salt by

23  crystallization.

24  Q.     Would it have been within the ordinary -- would it

25  have been within the skill of the person of ordinary skill

1    in the art to optimize the reaction conditions for those

2    purposes?

3    A.      Yes.

4    Q.      All right.  Now, let me ask you about one more area.

5            There was some discussion about reversion or

6    deprotonation.  Do you recall that?

7    A.      Yes.

8    Q.      And Dr. Scheidt provided some testimony about the

9    possibility of reversion to apixaban within two days?

10   A.      Yes.

11   Q.      Do you agree?

12   A.      No, I do not.

13   Q.      Why not?

14   A.      Well, because we have definitive evidence to the

15   contrary.  The data that Dr. Scheidt refers to are NMR

16   spectra that we provided of the same sample of the sodium

17   salt of apixaban over the course of two days.  And,

18           Over the course of those two days, we obtained

19   spectrum, and there were changes in those spectrum, but

20   those changes are consistent with the fact that the sodium

21   salt has very limited solubility; and it was actually

22   precipitating out.  It was falling out of the solution; and we

23   could see that visually in the NMR tube.

24           So the change in position of the signal is

25   simply due to the fact that there was less of a salt in

```
 1   solution and a small amount of apixaban in solution.  The

 2   small amount of apixaban was rising because there was a

 3   small amount of water in our NMR solvent that we used.  We

 4   didn't take any precautions to purify it.  So ...

 5   Q.    Go ahead.

 6   A.    So we didn't see any evidence at all of reversion or

 7   decomposition; and, in fact, what we saw, when we added

 8   acidic acid, was all of the solid dissolved, and all of the

 9   material reverted in an intentional way to apixaban.  So

10   by adding a proton, all of the material returned cleanly to

11   apixaban.

12         So clearly the material had not reverted on its

13   own; only when we intentionally added acid to it did it

14   revert.

15   Q.    So Professor Jacobsen, I want you to focus on the

16   time 2001.  Can you do that?

17   A.    Yes.

18   Q.    I want you to focus on the person of ordinary skill

19   in the art.  Can you do that?

20   A.    Yes.

21   Q.    And I want you to focus on what would have been known

22   to that person of ordinary skill both from their background

23   but also from the '208 patent.  Can you do that?

24   A.    Yes.

25   Q.    And I want you to focus on the collection of the
```

Jacobsen - direct

1  evidence you have gathered.  The experiments you designed,

2  the experiments you conducted, visual observations, the NMR

3  spectrographs, different kinds.  Considering all of that

4  information, can you form an apixaban salt?

5  A.     Yes.

6  Q.     Does it require a more than routine experimentation?

7  A.     No, it requires only routine, very routine

8  experimentation.

9  Q.     And that would have been true for a person of

10  ordinary skill in the art in 2001; correct?

11  A.     Yes.

12          MR. LEE:  Thank you.

13          Nothing further, Your Honor.

14          THE COURT:  Thank you.

15          (Counsel confer.)

16          THE COURT:  You can go ahead.

17          MR. LEE:  Yes, we would offer PTX-801, 802, 803,

18  804 and 805.

19          THE COURT:  Any objection?

20          MR. HENEGHAN:  No objection.

21          THE COURT:  Okay.  Those are all admitted.

22          (Above-referenced exhibits were admitted into

23  evidence.)

24          THE COURT:  We'll have cross-examination.

25          MR. HENEGHAN:  Judge, may I approach?

1    THE COURT:  Yes.

2    MR. HENEGHAN:  Dr. Jacobsen, I have another

3    binder for you.

4    (Binders passed forward.)

5    THE COURT:  You may proceed when you are ready.

6    MR. HENEGHAN:  Thank you.

7    CROSS-EXAMINATION

8    BY MR. HENEGHAN:

9    Q.    Good afternoon, Dr. Jacobsen.  My name is Tom

10   Heneghan began.  I represent SigmaPharm Laboratories.  We

11   have not had the pleasure of meeting before.  Good

12   afternoon.

13   A.    Good afternoon.

14   Q.    I have handed you up a binder which has some, a few

15   different things in the binder that Mr. Lee handed you.  If

16   you need to refer to Mr. Lee's binder feel free to do so.

17   Just let us know what you are referring to; okay?

18   A.    Okay.

19   Q.    Thanks.  I'd like to talk first about what you're not

20   offering opinions on.

21            You are not offering an opinion that the

22   compounds you made in your experiments are pharmaceutically

23   acceptable; correct?

24   A.    My opinion is a piece of that.

25   Q.    No, no.  You need to listen carefully to my question.

Jacobsen - cross

1    If you remember when your testimony began, Mr. Lee put up a

2    chart that had two boxes to check:

3                The first box was:  Could these compounds be

4    made?

5                The second box is:  Are they pharmaceutically

6    acceptable?

7                And you said you were just going to talk about

8    the first box:  Can these compounds be made without undue

9    experimentation.

10               You are not offering an opinion about whether or

11   not whatever it is you made is pharmaceutically acceptable.

12   Isn't that correct?

13   A.      If we're going to talk about the Court's

14   construction, could we, could we look at it directly?

15   Q.      Actually what I would like you to do is just answer

16   my question.

17   A.      Well, I --

18               MR. HENEGHAN:  Why don't we put that up that

19   first demonstrative slide on -- I'm sorry.  I don't think we

20   have it.  The one you used right at the beginning of his

21   testimony.  The two boxes.

22               THE COURT:  Right.

23               THE WITNESS:  Two checkboxes.

24               MR. HENEGHAN:  I think it's 1.36.  Demonstrative

25   1.36.

1       (Demonstrative displayed on screen.)

2               THE COURT:   Thank you.

3    BY MR. HENEGHAN:

4    Q.    So let's just stick with my question for the moment;

5    okay?

6               You started your testimony with a commitment

7    that you were going to talk about the first part of that,

8    those two boxes; right?

9    A.    Yes.

10   Q.    And so what I'm asking you to confirm is that you are

11   not offering any opinions on the second part.

12   A.    That wasn't the question you asked before.

13               So that -- the answer to that question is

14   correct, yes.

15   Q.    Right.  And you are not offering any opinion about

16   whether or not the compounds you made in your testing for

17   this case are pharmaceutically acceptable; correct?

18   A.    No, that is not correct.

19   Q.    Well --

20   A.    So --

21   Q.    Let's go to your deposition then.  Okay?  If you look

22   at, I believe it's tab 1 in that binder, there's a copy of a

23   transcript of your deposition.  And let's go to page 15,

24   line 20.  And once you find that spot -- and I don't know if

25   it's confusing with just four pages on one and so I'm

Jacobsen - cross

1    actually talking about the actual transcript page 15.

2              Does that make sense to you?

3    A.    Yes, I think I'm there.

4    Q.    Okay.  So do you recall at that time starting at line

5    12 being asked this question.  What did you do to determine

6    that these things you made are suitable for use in contact

7    with the tissue of human beings and animals?

8              And then starting at line 16, the answer:  My

9    work was specifically concerned with preparation of the

10   disclosed compounds, meaning the pharmaceutically acceptable

11   salt.  My work was not concerned with the testing of these

12   compounds.

13             Then continuing on with another.

14             "Question:  Well, how did you determine they

15   were -- I'm sorry.  Slow down.  Pharmaceutically acceptable

16   salts if you didn't determine that they met the Court's

17   construction?

18             And your answer at the top of page 16:  It's my

19   understanding that other experts in this case will have

20   performed and will provide more detailed analysis addressing

21   why the salts that I prepared are pharmaceutically

22   acceptable within the scope of the Court's claim

23   construction.  My work was concerned with the preparation

24   and characterization of the salts.

25             Do you remember that testimony at your

1  deposition?

2  A.     I do.

3  Q.     And also the work that these other experts were going

4  to do or had done in relation to the case, you did not

5  review that work at all; is that correct?

6  A.     Not at the time that I prepared my report or did this

7  deposition.

8  Q.     Right.  You had not reviewed any of that?  That

9  testimony or those opinions; right?

10  A.     That's correct.

11  Q.     Let's talk about salt formation generally for a

12  moment, if I could just change the subject matter?

13  A.     Sure.

14  Q.     Dr. Jacobsen, you would agree with me that a basic

15  consideration which may have some influence on salt

16  selection is physical and chemical stability and solubility;

17  is that correct?

18  A.     It is my context specific; in what context?

19  Q.     Well, let's go to PTX-772, which also happens to be

20  the same as JTX-10.  That's that Remington chapter.

21  A.     Okay.

22  Q.     You remember this.  We talked about this earlier

23  during your direct examination?

24  A.     Yes.

25  Q.     And this was a -- this is a reference that's both

Jacobsen - cross

1   cited by reference in the patent, the '208 patent, and also

2   cited in your report?

3   A.      Yes.

4   Q.      Right.  And just for the record, at I believe in your

5   report, it's at footnote 30 on page 13.  And you can look at

6   the report or take my word for it.

7   A.      I will take your word for it.

8   Q.      And so if we look at this page as a whole, you recall

9   testifying about that chart in the bottom half of Column 2;

10  right?

11  A.      Yes.

12  Q.      Okay.  What I would like to -- no, no.  On the

13  right-hand side and we're not highlighting the chart.

14  Please highlight the paragraph above that's entitled salt

15  formation.  There we go.

16          Now, this is the paragraph right above the chart

17  that you referred to; right?  In that same reference on that

18  same page?

19  A.      I'm not clear of the exact place.  I think that is on

20  the same page.

21  Q.      If it would help, why don't you take a look at tab

22  three of the binder.  Then you'll have the whole page and we

23  can also have a blow up and we can maybe do both references

24  at the same time.  It might make this easier for you.

25          And so since that's an excerpt that's actually

Jacobsen - cross

1    at the 13th page of that exhibit, because just the one

2    chapter is excerpted.

3              Did you find that?

4    A.    I did.

5    Q.    Okay.  So right above the chart listing all of those

6    different salts that were commercially available, there's a

7    paragraph entitled salt formation; right?

8    A.    Yes.

9    Q.    And in this reference that you cited and that's cited

10   in the patent, it says, the basic considerations which may

11   have some influence on salt selection are physical and

12   chemical stability, hygroscopicity, flowability and

13   solubility.  That's what this article that you cited says;

14   right?  I should say this book chapter that you cited says;

15   right?

16   A.    That's one sentence in a paragraph on all the

17   different considerations in salt selection.

18   Q.    And my question is -- you need to listen to my

19   question carefully.

20              My question is:  This is what the

21   reference you cited says; right?  I read that accurately,

22   didn't I?

23   A.    No.  I disagree with that sentence.  This isn't the

24   only thing it says.  The reference says that, but this is

25   exclusive.

Jacobsen - cross

1  Q.      Doctor, I'm not asking you if it's the only thing it

2  says.  This is a book.  I realize it says other things?

3  A.      Okay.

4  Q.      My question to you is:  The sentence directly above

5  the chart that you referred to several times in your direct

6  says:  The basic considerations which may have some

7  influence on salt selection are physical and chemical

8  stability, hygroscopicity, flowability and solubility.

9            This reference says that?

10 A.      Yes.

11 Q.      In that sentence?

12 A.      In that sentence, there's the reference.

13 Q.      Okay.  If we look a little bit above that, a sentence

14 or two in the same paragraph, this reference also says:

15 Unfortunately there is no reliable way of predicting the

16 influence of a particular salt species on the behavior of

17 the parent compound in dosage forms.

18            That's a general rule also stated by this

19 reference; is that right?

20 A.      Yes.  That's in the reference.

21 Q.      Let's talk a little bit about your report in this

22 case.  In your report, you talk about an equilibrium

23 constant, don't you?

24            Do you recall that?

25 A.      Say it again?

Jacobsen - cross

1    Q.      Yes.  You talk about an equilibrium constant.  Do you

2    recall that?

3    A.      I'm not sure I use that specific term, but I did talk

4    about species.

5    Q.      All right.  Well, let's look at PTX-800, and at page

6    13, and do you see paragraph 25?  And actually, I'm sorry.

7    We're going to look at paragraph 26 right below that.

8              In paragraph 26, you refer to a reaction being

9    described by an equilibrium constant, don't you?

10   A.      Yes.  This is in a very general context.

11   Q.      Right.  And actually the page break is a little odd

12   on this page and I think there's a diagram that goes with

13   the bottom of paragraph 26 to the top of the next page.

14   Let's go to the top of the next page.

15             And in between the confidential legend and the

16   next paragraph, is this figure, this equation, general

17   equation?

18   A.      Yes.

19   Q.      And this is the equation that you used to sort of

20   illustrate what an equilibrium constant is; right?

21   A.      Yes.

22   Q.      In general?

23   A.      Yes.

24   Q.      Yes.  I'm not suggesting to you that this is one of

25   the -- the experiments carried out in this case?

Jacobsen - cross

1  A.    Yes.

2  Q.    This is a general illustration of a concept.  And

3  this little symbols with arrows pointing in both directions,

4  that's a symbol for the equilibrium constant; right?

5  A.    Yes.

6  Q.    Right.  And that two-way arrow indicates that this

7  particular reaction can go in either direction; right?

8  A.    Well, it actually means that it is going in both

9  directions.

10 Q.    And when it's going back, that would be

11 disproportionating, wouldn't it?

12 A.    No.  Disproportionation is a -- is not a reversible

13 process.  This would just be called an equilibrium.  One

14 would not call this a disproportionation.

15 Q.    Do you recall your testimony during direct about

16 after you made one of the compounds you made, you added

17 acetic acid to it and it went to, I guess for lack of a

18 better word, natural apixaban?

19 A.    Yes.

20 Q.    Is that a better way to describe it, natural

21 apixaban?

22 A.    Apixaban, yeah.

23 Q.    Went back to apixaban?  But you didn't take a video

24 of that reaction; right?  Like you did of the reaction in

25 the other --

Jacobsen - cross

1    A.      No, we didn't.

2    Q.      And other than the evaporation that you described,

3    you didn't do anything to isolate or purify that residue of

4    the compounds you made, did you?

5    A.      That's correct.

6    Q.      You did not even consider any further purification in

7    relation to using the residue as a pharmaceutical product,

8    did you?

9    A.      Could you ask the question again, please?

10   Q.      Sure.  You did not even consider any further

11   purification in relation to using the residue as a

12   pharmaceutical product, did you?

13   A.      There was no intention of using the residue as a

14   pharmaceutical product.

15   Q.      And so you did not consider doing any purification;

16   right?

17   A.      That is correct.

18   Q.      And you also did not do any solid state NMR on any of

19   that particulate, did you?

20   A.      That's correct.

21   Q.      Okay.  I think you also would agree with me that you

22   have no opinion on whether a strong acid or a strong base is

23   suitable for contact with the tissues of human beings or

24   animals, would you?  No opinion on that?

25   A.      Are you asking my general opinion or specifically?

1  That was not a focus of my work in this case.  I have

2  opinions on that question as a chemist, but not specifically

3  in the context of this case.

4  Q.    Well, let's look at your deposition again if you go

5  back to that tab 1 in the binder and this time turn to page

6  71.  This is beginning at line 15.  Let me know when you get

7  there.

8  A.    I'm there.

9  Q.    Okay.  So beginning at line 15, this question and the

10 following answer:  Can a strong acid or a strong base be

11 suitable for use in contact with the tissues of human beings

12 and animals?

13         And your answer at that time:  I haven't

14 prepared an opinion on that question in connection with my

15 work in this case.  It's my understanding that other experts

16 will address the question of suitability for use in contact

17 with tissues.

18         Do you remember that question, that answer?

19 A.    I do.

20 Q.    Become when you were under oath at your deposition?

21 A.    I do.

22 Q.    And you did absolutely no testing of the compounds

23 you made in this matter to determine if they were suitable

24 for use in contact with the tissues of human beings and

25 animals, did you?

1   A.      I did not perform testing, no.

2             MR. HENEGHAN:  That's all I have.  Thank you.

3             THE COURT:  Okay.  Redirect.

4             MR. LEE:  Very briefly, Your Honor.

5                       REDIRECT EXAMINATION

6   BY MR. LEE:

7   Q.      Professor Jacobsen, the last question asked you

8   whether you had done absolutely no testing.

9             Do you recall that?

10  A.      Yes.

11  Q.      Did Dr. Scheidt do any testing whatsoever?

12            THE COURT:  I'm sorry?

13            MR. HENEGHAN:  I was anticipating Mr. Lee's

14  question and I was wrong.  I will sit back down.

15            THE COURT:  Okay.

16  BY MR. LEE:

17  Q.      Did Dr. Scheidt do any testing whatsoever?

18  A.      Not to my knowledge.

19  Q.      Now, I'm going to bring up paragraph 21 of Dr.

20  Scheidt's report on the issue of enablement and

21  experimentation since Mr. Heneghan asked you about that.

22            Dr. Scheidt states:  I have also been informed

23  by counsel that a patent disclosure must enable a POSA of

24  ordinary skill in the art to make and use the full scope of

25  the claimed invention without undue experimentation as of

Jacobsen - redirect

1    the effective filing date.

2              Do you see that?

3    A.    Yes.

4    Q.    That's the same standard that you applied?

5    A.    Yes.

6    Q.    Is undue experimentation the same thing as no

7    experimentation?

8    A.    No.

9    Q.    Was undue experimentation required to create apixaban

10   salts that you created?

11   A.    No.  It was completely routine experimentation.

12              MR. LEE:  Nothing further, Your Honor.

13              THE COURT:  Thank you.  You may step down,

14   doctor.

15              Let's just take a moment and talk about where we

16   are in the schedule.  After the doctor steps down, we'll

17   clear things away.

18              (Witness excused.)

19              THE COURT:  What do the defendants have left?

20              MR. MIZERK:  The defendants I think just have

21   some depositions to play and we are done.

22              THE COURT:  That would be about 12 minutes?

23              MR. MIZERK:  Yes.

24              THE COURT:  Okay.  All right.  And then what do

25   the plaintiffs anticipate having?

```
 1              MR. LEE:  Your Honor, we have two witnesses
 2   since we've taken a few out of order.  I think probably it
 3   would make sense if we did their 12 minutes, to suspend for
 4   the week, come back and do it on Tuesday.
 5              THE COURT:  And I have scheduled some other
 6   things on Tuesday and Wednesday.  Not all of Tuesday, but
 7   what's your rough estimate as to how long at least your
 8   direct will take of the two witnesses?
 9              MR. LEE:  Can I check?  Just a second.
10              THE COURT:  Yes.  Go confer.
11              (Pause while counsel conferred.)
12              MR. LEE:  Two-and-a-half hours for the combined
13   direct.
14              THE COURT:  Altogether, approximately.  Any
15   ability to estimate how long those crosses of those two
16   witnesses with likely to be?
17              MR. HENEGHAN:  Much shorter than that, Judge.
18              THE COURT:  Okay.  And that would complete the
19   evidence as far as plaintiffs are concerned; right?
20              MR. LEE:  Yes.
21              THE COURT:  And defendants agree with that?
22              MR. HENEGHAN:  (Nodding yes.)
23              THE COURT:  Just for the record, I need an
24   audible response.
25              MR. MIZERK:  I'm -- yes.
```

```
 1              THE COURT:  That's a yes, right?
 2              MR. MIZERK:  Wait a second.  What was the
 3   information?  I want to make sure I have the right
 4   information.
 5              THE COURT:  It is important to answer the
 6   question as asked.
 7              After we do the depositions and then Tuesday
 8   presumably do the two witnesses that the plaintiffs want to
 9   call, as you cross them, do you anticipate any other
10   evidence beyond that or are we done?
11              MR. MIZERK:  It's very possible we will have a
12   brief rebuttal witness, but that is all we expect.
13              THE COURT:  Okay.  And by brief, on the order of
14   a half hour or less?
15              MR. MIZERK:  Yes, yes.
16              THE COURT:  All right.  So then, yes, here is
17   what I'm going to suggest, and possibly have to require
18   given other commitments.  We'll do the depositions now, and
19   then I think we're done for today because I have my next
20   group coming in shortly.  And,
21              Then Tuesday, now, I have to pick a jury on
22   Tuesday morning so I am available as soon as that is done.
23   My best guess is that is 1:00 o'clock.  And, I think that
24   will be all right given what you told me.
25              I can stay until 7:00, if need be, and then I
```

1  think we should plan to do the closings on Wednesday with

2  whatever time you have left.

3              I did have to put some criminal things the first

4  thing in the morning, so the best thing for me would be if

5  we met around 10:30 to do closings on Wednesday.

6              Does that all sound okay to plaintiffs?

7              MR. LEE:  That's good, Your Honor.

8              THE COURT:  Is that all right to do that?

9              MR. MIZERK:  For SigmaPharm, yes.

10             THE COURT:  Okay.

11             MR. PEJIC:  For Unichem, yes.

12             MR. KOCHANSKI:  For Sunshine Lake, yes.

13             THE COURT:  All right.  Great.

14             So let's finish up the week with depositions.

15             MR. MIZERK:  Fantastic.  As we mentioned

16  earlier, we're going to play the deposition of Ruth Wexler.

17  She is an employee of BMS.

18             We have deposition binders.  All the depositions

19  are in one binder.  I can introduce them all or just tell

20  who they are all.  We can just go through them or however.

21             THE COURT:  How many people is it?

22             MR. MIZERK:  It is four people?  Four people,

23  one is in two different depositions.

24             THE COURT:  Let's do them one at a time.  I'll

25  take the binder but then come in between each one.

```
 1                    MR. TAYLOR:  May I approach?

 2                    THE COURT:  Yes.

 3                    MR. LEE:  Your Honor, can I step out to get Dr.

 4      Jacobsen on his way?

 5                    THE COURT:  That's fine.

 6                    (Designations passed forward.)

 7                    THE COURT:  So first is Ms. Wexler; right?

 8                    MR. MIZERK:  Yes.

 9                    THE COURT:  Whenever you are ready, please go

10      ahead.

11                    MR. HENEGHAN:  Can I do the same with

12      Dr. Scheidt?

13                    THE COURT:  Yes.

14                    (Mr. Lee and Mr. Heneghan temporarily leave the

15      courtroom.)

16                    THE COURT:  Go ahead.

17                    (Designations of Ruth Wexler placed into

18      evidence.)

19                    "Question:  So when you said your department,

20      what was your department as you saw it at DuPont Pharma?

21                    "Answer:  At DuPont, I headed the cardiovascular

22      medicinal chemistry group.  At times, I also headed other

23      teams, but I always headed the cardiovascular medchem.  Was

24      always medicinal chemistry.

25                    "Question:  When you went to Bristol-Myers
```

1    Squibb?

2          "Answer:  Same title, head of cardiovascular

3    discovery chemistry.

4          "Question:  Okay.  I'm going to ask you,

5    specifically, what role do you believe Donald Pinto played

6    in the development of apixaban?

7          "Answer:  Apixaban was synthesized in Donald

8    Pinto's lab.

9          "Question:  And do you know who synthesized it?

10          "Answer:  Yes.

11          "Question:  Who was that?

12          "Answer:  Mike Orwat.

13          "Question:  And if we move to 12, you understand

14    you're also here to testify as to any 'research, testing or

15    evaluation of pharmaceutically acceptable salt forms of the

16    compounds disclosed or claimed in the '208 patent, including

17    apixaban, including the identity of all persons involved in

18    such research, testing or evaluation'?

19          "Mr. Moore:  I have marked as Exhibit 360 a

20    document bearing the Bates numbers BMSAPIX9671505 to 07.

21          "Question:  Do you recognize this document?

22          "Answer:  Yes.

23          "Question:  Was it generated in the ordinary

24    course of business at DuPont Pharma?

25          "Answer:  Yes.

```
 1                    "Question:  This is talking about
 2       trifluoroacetic acid salt forms of Factor Xa inhibitors;
 3       correct?
 4                    "Answer:  That's correct.
 5                    "Question:  Was there a concern that these salt
 6       forms were not pharmaceutically acceptable?
 7                    "Answer:  The concern was that we didn't -- the
 8       concern was whether there would be a problem in safety
 9       studies with a TFA salt.  We did not routinely use the TFA
10       salt for safety studies.
11                    "Question:  In terms of safety studies --
12                    "Answer:  In vivo safety.
13                    "Question:  In vivo safety.
14             "Do you equate safety with a compound being
15       pharmaceutically acceptable?"
16                    "Answer:  No.  The compounds that we made in the
17       laboratory were routinely isolated as TFA salts, and we
18       then, if we were going into safety studies, converted them.
19                    "Question:  Do you equate safety with toxicity
20       -- without toxicity as -- do you equate safety with
21       something not having toxicity?
22                    "Answer:  It's relative.
23                    "Question:  And what do you mean by 'relative'?
24                    "Answer:  All medicines at some dose have
25       toxicity, that I'm aware of.
```

```
 1                    "Question:  Would you equate something being

 2      pharmaceutically acceptable as with not having toxicity at

 3      concentrations that are used for therapeutic -- strike that.

 4                    "Would you equate something being

 5      pharmaceutically acceptable with something not having

 6      toxicity at therapeutic concentrations?"

 7                    "Answer:  Yes.

 8                    "Question:  Do you know if anybody ever prepared

 9      a salt of apixaban?

10                    "Answer:  In discovery, we didn't try.

11                    "Question:  And when you say 'in discovery,' is

12      that prior to -- let's take it -- prior to 2001, did anybody

13      make a salt of apixaban, to your knowledge?

14                    "Answer:  Not to my knowledge.

15                    "Question:  Can one make a salt of apixaban?

16                    "Answer:  I believe so, but one never knows

17      until you actually make something.  I believe so.

18                    "Question:  Would that salt that you're thinking

19      of be something that would be nontoxic?

20                    "Answer:  I don't know.

21                    (Designations end.)

22                    THE COURT:  Is that it for Ms. Wexler?

23                    MR. MIZERK:  Your Honor, that is all for

24      Ms. Wexler.

25                    The next deposition is Dr. Jennifer Qiao; and
```

1    Dr. Qiao is an inventor of the '208 patent.

2              THE COURT:  Okay.

3              (Counsel confer.)

4              MR. MIZERK:  It's Q-i-a-o.

5              THE COURT:  Thank you.

6              (Designations of Dr. Jennifer Qiao placed into

7    the record.)

8              "Question:  Dr. Qiao, did you ever synthesize

9    apixaban?

10             "Answer:  No.

11             "Question:  Did you ever work with apixaban as a

12   starting material?

13             "Answer:  I don't recall.

14             "Question:  Did you ever make a salt of

15   apixaban?

16             "Answer:  No.

17             "Question:  You know of anyone whoever made a

18   salt of apixaban at BMS?

19             "Answer:  I don't know.

20             "Ms. Szecliga:  I'm going to mark a document

21   Exhibit 210.

22             "Exhibit 210 has Bates numbers BMSAPIX9721045,

23   and it ends at BMSAPIX9721066.

24             "Dr. Qiao, do you recognize this document?

25             "Answer:  Yes.

1          "Question:  And what is this document?

2          "Answer:  It was my progress report from

3   May 2001 to December 2001.

4          (Designations end.)

5          MR. MIZERK:  Your Honor, I told you they were

6   brief.

7          The next one would be, the next one is actually

8   two depositions from Dr. Donald Pinto.  Dr. Pinto is an

9   inventor on -- is listed as an inventor on the '208 patent.

10          THE COURT:  Okay.

11          (Designations of Donald Pinto placed into

12   evidence.)

13          "Question:  And is it's your understanding that

14   you're also here to testify with respect to your knowledge

15   of Factor Xa compounds and the literature at the time

16   apixaban was discovered?

17          "Answer:  Yes.

18          "Question:  And that's Topic 35 it says in the

19   designation.  Is that right?

20          "Answer:  Can you point me to --

21          "Question:  If you look at the second bolded

22   topic, it's 35.  Is that right?

23          "Answer:  Yes.

24          "Question:  On the front page, Bates numbered

25   749 --

1           "Question:  Oh, okay.  Sorry.

2           "Answer:  -- your name has an asterisk by it?

3           "Answer:  Yes.

4           "Question:  Is that correct?  What does that

5 mean?

6           "Answer:  I'm the presenter.

7           "Question:  What was the title of this

8 presentation?

9           "Answer:  The Discovery of Apixaban, a Potent

10 and Selective Orally Bioavailable Coagulation Factor Xa

11 Inhibitor.

12           "Question:  What is apixaban?

13           "Answer:  BMS-562247.

14           "Question:  And were you involved in the

15 discovery of apixaban?

16           "Answer:  Yes.

17           "Question:  Now, here on slide 1778, the lactam

18 R group renders a compound named BMS-562247.  Is that

19 correct?

20           "Answer:  That's correct.

21           "Question:  And is that apixaban?

22           "Answer:  That is.

23           "Question:  Can we go to slide 1787.

24           "This is a slide discussing apixaban; is that

25 right?

Pinto - designations

1     "Answer:  Profile of apixaban.

2     "Question:  Do you see a bullet point that says,

3   'highly potent, selective, neutral factor, Xa inhibitor'?

4     "Answer:  I see that.

5     "Question:  What do you mean by neutral?

6     "Answer:  It's a compound that does not have any

7   charge.

8     "Question:  So it's electronically neutral.  Is

9   that correct?

10     "Answer:  Overall, the structure is neutral.

11     "Question:  As part of your lab's work, did you

12   make any salts of apixaban?

13     "Answer:  No.

14     "Question:  Is that because apixaban is a

15   neutral compound?

16     "Answer:  No.

17     "Question:  Why not?

18     "Answer:  I didn't have to.

19     "Question:  Did your lab ever attempt to make

20   salts of apixaban?

21     "Answer:  No.

22     "Question:  Do you know if any salts of apixaban

23   have ever been made?

24     "Answer:  No.

25     "Question:  Just so the record is clear, you

1   don't know if apixaban salts were ever made; is that right?

2                   "Answer:  I don't know.

3                   "Question:  Now, I want to direct you to claim

4   13.  It's in column 269.  Are you responsible for inventing

5   claim 13?

6                   "Answer:  Yes.

7                   "Question:  Now, is 13 apixaban -- strike that.

8                   "Is the chemical name in claim 13 apixaban?

9                   "Answer:  Yes.

10                  "Question:  Now, you see it says, 'or a

11  pharmaceutically acceptable salt form thereof'?

12                  "Answer:  Yes.

13                  "Question:  Did you invent any pharmaceutically

14  acceptable salt forms of apixaban?

15                  "Answer:  No.

16                  "Question:  When you -- when your lab made

17  apixaban, were you the one who personally made it?

18                  "Answer:  No.

19                  "Question:  Who made it in your lab?

20                  "Answer:  Mike Orwat.

21                  "Question:  Did you ever make any pharmaceutical

22  compositions of apixaban?

23                  "Answer:  No.

24                  "Question:  And you didn't make any

25  pharmaceutical compositions of apixaban salts, correct?

Kifer - designations

1          "Answer:  Yes."

2          (End of videotaped deposition.)

3          MR. MIZERK:  Okay.  Your Honor, that's the, the

4   last one we have is Ms. Stephanie Kifer and I think she's

5   another inventor of the patent referenced as Stephanie Koch,

6   K-o-c-h, on the patent, the '208.

7          THE COURT:  Okay.  Thank you.

8          (Pause.)

9          THE COURT:  If it not going to play, it's only

10  one minute.  Do you want to read it or do you want to play

11  it on Tuesday?  Any of those things are fine by me.

12          MR. MIZERK:  If we can't get it, just submit the

13  deposition testimony?

14          THE COURT:  It's very short, so maybe you want

15  to just read it.

16          (The videotaped deposition excerpt of Stephanie

17  Lynn Kifer was played as follows.)

18          "Question:  Okay.  Would you please state your

19  fall name for the record?

20          "Answer:  Stephanie Lynn Kifer.

21          "Question:  Did you ever make a salt of

22  apixaban?

23          "Answer:  No.

24          "Question:  Did you ever synthesize the compound

25  known now as apixaban?

1    "Answer:  No.

2         "Question:  And who do you -- who do you

3    attribute the synthesis, the first synthesis, of apixaban

4    to?

5         "Answer:  I know that it was synthesized in my

6    lab by Mike Orwat.

7         "Question:  Did you ever synthesize apixaban?

8         "Answer:  No.

9         "Question:  All the way to present, have you

10   ever synthesized apixaban?

11        "Answer:  No.

12        "Question:  Are you aware of anyone making a

13   salt of apixaban?

14        "Answer:  I don't recall."

15        (End of videotaped deposition.)

16        MR. MIZERK:  And, Your Honor.  That's it.  With

17   those designations we would move in DTX-4, DTX-97 and

18   DTX-202.

19        THE COURT:  Any objection?

20        MR. LEE:  No objection.

21        THE COURT:  Okay.  Those are all admitted.

22        (DTX-4, DTX-97 and DTX-202 were admitted into

23   evidence.)

24        MR. MIZERK:  I think technology is not my

25   friend, but we're getting through it.

```
 1                    THE COURT:  The technology is ready for the
 2     weekend.
 3                    Anything furthers to discuss?
 4                    MR. LEE:  I understand the defendants are
 5     resting now.  We're not going to move now.  There were
 6     motions made for directed verdict.  I think it's Rule 502(c)
 7     that governs us here.  We're not going to move because
 8     asking Your Honor to make sort of intermediate findings of
 9     fact doesn't seem to make sense.  We'll just wait until the
10     end.
11                    THE COURT:  That's fine by me.  I guess for the
12     record, do you all rest?
13                    MR. MIZERK:  For SigmaPharm, yes.
14                    MR. PEJIC:  For Unichem, yes.
15                    MR. KOCHANSKI:  For Sunshine Lake, yes.
16                    THE COURT:  Anything further to talk about?
17                    MR. LEE:  No, Your Honor.
18                    THE COURT:  No?  Anything from any of the
19     defendants?
20                    MR. MIZERK:  Not from SigmaPharm.
21                    MR. PEJIC:  Not from Unichem.
22                    MR. KOCHANSKI:  Not from Sunshine Lake.
23                    THE COURT:  So be available and ready to go at
24     1:00 o'clock Tuesday.  If by chance we're running behind on
25     jury selection, we'll try to let you know, but I think I
```

1  will be ready as close to 1:00 as possible, so you all can

2  be ready and be here unless you hear otherwise from us.  I

3  can be with you until 7:00 if we need it to finish the

4  evidence on Tuesday and then we'll plan on closings at 10:30

5  on Wednesday.

6            Have a nice weekend.  Thank you for an

7  interesting week.

8            (Court adjourned at 3:14 p.m.)

9

10

11

12

13      I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.

14

15                      /s/ Brian P. Gaffigan
                      Official Court Reporter
16                      U.S. District Court

17

18

19

20

21

22

23

24

25