1559

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     IN AND FOR THE DISTRICT OF DELAWARE
 2
                                    - - -
 3     BRISTOL-MYERS SQUIBB COMPANY
       and PFIZER INC.,                      : CIVIL ACTION
 4                         Plaintiffs,       :
       v                                     :
 5                                           : (Consolidated)
       AUROBINDO PHARMA USA INC.,            :
 6                                           : NO. 17-374-LPS
                           Defendant.
 7                                  - - -

 8                          Wilmington, Delaware
                          Tuesday, November 12, 2019
 9                        Bench Trial - Volume H

10                                  - - -

11     BEFORE:       HONORABLE LEONARD P. STARK, Chief Judge

12     APPEARANCES:                  - - -

13                 FARNAN, LLP
                   BY:  MICHAEL J. FARNAN, ESQ.
14
                        and
15
                   WILMER CUTLER PICKERING HALE and DORR, LLP
16                 BY:  AMY K. WIGMORE, ESQ., and
                        HEATHER M. PETRUZZI, ESQ.
17                      (Washington, District of Columbia)

18                      and

19                 WILMER CUTLER PICKERING HALE and DORR, LLP
                   BY:  WILLIAM F. LEE, ESQ.,
20                      ANDREW J. DANFORD, ESQ.,
                        TIMOTHY A. COOK, ESQ.,
21                      KEVIN S. PRUSSIA, ESQ., and
                        SHIRLEY X. LI CANTIN, ESQ.
22                      (Boston, Massachusetts)

23                         Counsel for Bristol-Myers Squibb
                           Company and Pfizer Inc.
24
       Valerie J. Gunning             Brian P. Gaffigan
25     Official Court Reporter        Official Court Reporter
```

1   APPEARANCES:   (Continued)

2

3           PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
            BY:   JOHN C. PHILLIPS, JR., ESQ.

4                     Counsel on behalf of SigmaPharm
                      Laboratories, LLC; Unichem Laboratories,
5                     Ltd., Zydus Pharmaceuticals (USA) Inc.,
                      Sunshine Lake Pharma Co., Ltd., and
6                     HEC Pharm USA

7               and

8           HUSCH BLACKWELL, LLP
            BY:   PHILIP D. SEGREST, JR., ESQ., and
9                 DON J. MIZERK, ESQ.
                  (Chicago, Illinois)
10

11              and

12          HUSCH BLACKWELL, LLP
            BY:   THOMAS P. HENEGHAN, ESQ., and
13                DUSTIN L. TAYLOR, ESQ.
                  (Madison, Wisconsin)

14                    Counsel on behalf of SigmaPharm
                      Laboratories, LLC
15

16              and

17          GREENBLUM & BERNSTEIN, P.L.C.
            BY:   P. BRANKO PEJIC, ESQ.,
                  PAUL A. BRAIER, ESQ., and
18                JILL M. BROWNING, ESQ.
                  (Reston, Virginia)
19

20                    Counsel on behalf of Unichem
                      Laboratories, Ltd.

21

22

23

24

25

```
1    APPEARANCES:   Continued)

2
               YOUNG CONAWAY STARGATT & TAYLOR, LLP
3              BY:  KAREN L. PASCALE, ESQ.

4                    and

5              LERNER DAVID LITTENBURG KRUMHOLZ & MENTLIK, LLP
               BY:  PAUL H. KOCHANSKI, ESQ., and
6                    KENDALL K. GURULE, ESQ.
                     (Westfield, New Jersey)
7
                        Counsel on behalf of Sunshine Lake
8                       Pharma Co., Ltd., and HEC Pharm USA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           - oOo -

 2                    P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following bench trial was

 4     held in open court, beginning at 1:26 p.m.)

 5              THE COURT:  Good afternoon, everyone

 6              (The attorneys respond, "Good afternoon, Your

 7     Honor.")

 8              THE COURT:  Happily for me, I got a jury picked

 9     so I'm all yours.

10              Any issues from plaintiff before we get started?

11              MR. LEE:  Yes, Your Honor, one issue.  It

12     concerns the rebuttal case.

13              Mr. Lee, could I have pages 1474 to 1475 of the

14     trial transcript?

15              Your Honor, this is a colloquy among

16     Mr. Segrest, you and I on Friday.  You may recall it was

17     this odd question of what I could inquire about on

18     cross-examination.

19              And you will see that Mr. Segrest said, about

20     line 24.

21              "Mr. Segrest:  Your Honor, I think the scope of

22     cross-examination is determined by direct, not on what

23     opinions the witness says he might intend to give later or

24     in rebuttal ..."

25              And it's followed by Your Honor:  "Let me ask
```

1    the witness.  Do you intend to give opinions on this issue."

2              This initially got my attention, and I asked

3    Mr. Mizerk on yesterday morning whether he would tell me

4    what they were going to offer in rebuttal because --

5              THE COURT:  Sorry?  Who?  Pardon?

6              MR. LEE:  Mr. Mizerk.

7              THE COURT:  Okay.  Sorry.

8              MR. LEE:  Now, he had no obligation to tell me

9    in advance of 7:00 o'clock, and he didn't tell me in advance

10   of 7:00 o'clock.  I'm not trying to suggest that he did, but

11   this was sufficiently unusual that I thought it might make

12   sense for us to meet and confer.

13             At 7:00 o'clock last night, we got 28 exhibits,

14   a host of new demonstratives for Dr. Scheidt.  As near as I

15   can tell, they're all designed to criticize some portion of

16   Dr. Jacobsen's testing.  They touch on issues that were

17   touched on in his direct examination and his cross.

18             They were issues that Dr. Jacobsen could respond

19   to when he testified on Friday afternoon if they had been

20   elicited on direct.  Instead, we're now in a situation where

21   apparently these opinions that are referred to here that he

22   intends to give later in rebuttal are going to be offered in

23   rebuttal on issues that were in his report that Dr. Jacobsen

24   cannot respond to because he's not here any longer.  And,

25             We don't think that's appropriate risk rebuttal.

1      The Third Circuit in the *Five* case just last year has

2      addressed -- we understand it's in Your Honor's discretion

3      as to whether to allow it or not.  What the Third Circuit

4      said is:  "Whereas counsel was aware of the opposing party's

5      positions and could have brought contrary evidence out

6      during direct examination, rebuttal is inappropriate."

7           And I'm making my best guess, since we couldn't

8      meet and confer yesterday, and I couldn't get an

9      articulation of what they want to cover based upon the

10      exhibits, but I don't think you can save portions of your

11      opinion for rebuttal, not provide them when you put your

12      case-in-chief in, and deprive the opposing party of the

13      opportunity to respond with their witness when they're here.

14           THE COURT:  Now, just remind me.  These are

15      issues that go to invalidity; is that right?

16           MR. LEE:  These are issues that go to invalidity

17      in which they have the burden.

18           And Dr. Scheidt, a substantial portion of

19      Dr. Scheidt's testimony was criticizing or critiquing what

20      Dr. Jacobsen had done.

21           Your Honor will recall he didn't offer an

22      opening report.  Dr. Jacobsen then provided his report on

23      testing.  Dr. Scheidt only then provided a reply report

24      critiquing the testing.  That's where his opinions are set

25      forth to the extent he set them forth, but we ought not be

1    hearing about them on rebuttal.

2              And I think the real prejudice is Dr. Jacobsen

3    is gone.  I can't call him back as I could have on Friday to

4    say, what is your response?

5              THE COURT:  Well, someone has to have the last

6    say on the witness.  It was, at some point you couldn't call

7    him back, it's not just that he is not here.

8              MR. LEE:  That's fair enough.  Fair enough.

9              THE COURT:  All right.  Well, let me hear from

10   them.  Thank you.

11             MR. MIZERK:  Good afternoon, Your Honor.  Just a

12   brief response.

13             I think the colloquy that was put on the screen

14   a minute ago, I think at the end of it, there was over an

15   objection which you overruled.  So there was no limit on

16   Mr. Lee's examination of Dr. Scheidt.

17             Now, the pretrial order says specifically that

18   the parties reserve the right to call any rebuttal witnesses

19   on issues that they bear the burden of proof.  That's in

20   paragraph 54 of the order.

21             Now, we don't know what -- you know, we

22   disclosed Dr. Scheidt per the pretrial order as a potential

23   rebuttal witness in the case because there are two more

24   witnesses that are going to be called today that we don't

25   know what they're going to say.  And so we are prepared, if

1    we need to, to call Dr. Scheidt as a witness to rebut

2    anything specifically.

3              If they have a problem with the question that we

4    ask him, it's beyond the scope or whatever is improper

5    rebuttal, then I think the time to raise that objection

6    would be when we try to do that.

7              Our intent is to respond to things that were

8    said, if needed, and we reserved our right and we disclosed

9    a witness so that we can exercise the right to present a

10   rebuttal witness.

11             THE COURT:  Are you reserving the right to have

12   your rebuttal witness rebut things that their witness has

13   already said and could have dealt with on the front end?

14             MR. MIZERK:  Well, the order was -- the order

15   was Dr. Scheidt went first, and then Dr. Jacobsen went next.

16   He said things during the course of his trial testimony that

17   were things that we -- I don't believe we could have

18   addressed, not knowing what Dr. Jacobsen was going to say.

19             So I think that -- you know, we're not trying to

20   reopen or say something else, but we're trying to reserve

21   the right to rebut something that we believe was being

22   incorrectly stated and want to fix that.

23             So it's not something we could have anticipated.

24             THE COURT:  Well, wasn't Dr. Scheidt's whole

25   point to rebut Dr. Jacobsen?  I mean, I thought that's what

1    he was offered for, but correct me if I'm wrong.

2              MR. MIZERK:  Well, we -- it's our case-in-chief,

3    and then we presented him in our case-in-chief.  Now,

4    granted, Dr. Scheidt did submit just a rebuttal report, but

5    it was, you know, on an area that we had the burden of

6    proof, so...

7              THE COURT:  Right.  But, I mean, are you

8    suggesting that it would be appropriate to parse or separate

9    his opinions into those that you want to use in your

10   case-in-chief and those that you want to use in rebuttal,

11   even when all of the substance of the testimony is to rebut

12   one of their experts?

13             MR. MIZERK:  Well, it's a little bit more

14   complicated than that.  I don't think there's any

15   restriction.  I mean, there certainly has been in both sides

16   of the case people presenting in their case-in-chief stuff

17   that was just presented in rebuttal.  No one has been

18   restricted in that particular way.

19             But I think the issue that -- we're not going to

20   try to do something that is a surprise or not disclosed in a

21   report.  But if, for example, somebody said something that

22   was inaccurate, was not what they said in their original

23   report, then we have an opportunity to have someone explain

24   what it was and what they actually have been saying.  It's

25   all been disclosed.

```
1              So nothing we plan to do is something that would

2    not have been disclosed.  And,

3              These reports are sprawling, so it's not easy

4    for us to completely understand -- appreciate every bit of

5    information that anyone is going to present in any

6    particular presentation.  So we did our best to try to

7    anticipate what was going to be said, but if we feel that

8    there's a need to do it -- I don't know what else we would

9    have in rebuttal -- and I will also point out that we

10   discussed the rebuttal witnesses with plaintiffs beforehand,

11   and there was an e-mail exchange between the parties on

12   October 31st where plaintiffs wrote us to and said:

13             "Following up on defendants' question raised

14   yesterday regarding rebuttal's witness, plaintiffs

15   understand paragraph 54 of the pretrial order to require

16   that the party bearing the burden of proof on an issue must

17   call any witness it intends to present on that issue in its

18   case-in-chief.  A party may not call a witness on rebuttal

19   on issues which it bears the burden of proof if that witness

20   has not been called in its case-in-chief."

21             So they told us beforehand that if we wanted to

22   have a rebuttal witness, we had to call them in our

23   case-in-chief in order to preserve that right, and we

24   agreed.  So I don't know what they're complaining about now.

25             THE COURT:  Okay.  Thank you.
```

1          Mr. Lee, anything else?

2          MR. LEE:  Yes.  Briefly, Your Honor.

3          The articulation that Your Honor provided, which

4   I don't think any expert can come in and parse their

5   opinions into those that we're going to offer on our direct

6   examination or our direct case and those that we're going to

7   offer in rebuttal.

8          I heard Mr. Mizerk just say "everything in his

9   report"; and everything would have to be in his report in

10  order to offer it now.  Well, then, it all could have been

11  offered on Friday, and Dr. Jacobsen could have responded.

12         I just don't think you can use rebuttal to say,

13  I have opinions one, two, and three.  I offer them to you in

14  my direct, but here's opinions four and five that I didn't

15  mention to you.

16         Now, maybe we have to deal with it as we get to

17  the specific issues, but I also didn't want to be in a

18  situation where I waited until then to object and then had

19  someone suggest I should have raised it before we started.

20         THE COURT:  Dr. Jacobsen testified before

21  Dr. Scheidt?

22         MR. LEE:  No, Dr. Scheidt testified first,

23  Dr. Jacobsen second.

24         THE COURT:  And was that to accommodate

25  somebody's schedule?

```
 1                MR. LEE:  No, I think it was actually both.

 2   They were completing their affirmative case, which was the

 3   defense of the infringement claims, plus their affirmative

 4   case on invalidity, and Dr. Jacobsen was responding -- we

 5   were responding to their affirmative case on invalidity.

 6                And so Dr. Jacobsen testified to be followed by

 7   Dr. MacMillan and Dr. Myerson.

 8                THE COURT:  All right.  Thank you.

 9                So, first off, I'm not going to now say that the

10   defendants can't put a witness on as part of their rebuttal

11   case.

12                Nobody has waived any rights.  I'm fully aware

13   now of the objection and I appreciate that.

14                Plaintiffs can renew their objection, even

15   globally, although it probably has a better chance of

16   prevailing if it's on a question-by-question or

17   topic-by-topic basis, but I don't mean to say you can't

18   later today, when we get to that point of the trial, say, we

19   renew our objection to hearing from this witness at all.

20                And further, it may well be that I will hear

21   that objection in the form of a motion to strike in

22   connection with the post-trial briefing.

23                So my strong feeling right now is that I should

24   hear the witness at least in part and perhaps in full if he

25   is here -- were here, but I'm not entirely sure yet that I'm
```

```
 1    comfortable with how this is being handled.  But we're just
 2    going to have to see what happens.
 3                But the way to deal with that is if I'm not
 4    comfortable at the end would be that I can tell the
 5    plaintiffs they can move to strike some or all of the
 6    rebuttal testimony during post-trial briefing.
 7                MR. MIZERK:  Thank you, Your Honor.
 8                MR. LEE:  Thank you, Your Honor.
 9                THE COURT:  Is there any question about that?
10                MR. LEE:  None from the plaintiffs.
11                THE COURT:  Any questions?
12                MR. MIZERK:  No, Your Honor.
13                THE COURT:  Any questions from plaintiffs?
14                MR. LEE:  No, Your Honor.
15                THE COURT:  Defendants?
16                MR. MIZERK:  Yes.  I think there was one
17    housekeeping matter.
18                When reviewing the transcripts and whatnot that
19    happened over the weekend, we noticed that a certain number
20    of exhibits had not been entered, and we wanted to make the
21    record clear we advised the plaintiffs that we were going to
22    do this today.
23                We haven't heard back from them, so I don't
24    believe there was an objection, but it relates to DTX-547,
25    DTX-549, DTX-550, DTX-551 and DTX-964.
```

```
 1                    THE COURT:  Any objection?

 2                    MR. LEE:  No objection.

 3                    THE COURT:  Okay.  Those are all admitted.

 4                    (Above-referenced exhibits were admitted into

 5      evidence.)

 6                    MR. LEE:  Your Honor, there is one other

 7      clarification.  There is one place in the transcript, I

 8      don't have the page right in front of me, that refers to

 9      DTX-10 when actually it was to JTX-10 which is Remington's.

10                    THE COURT:  So JTX-10 is offered into evidence?

11                    MR. LEE:  Yes.

12                    THE COURT:  So no objection?

13                    MR. SEGREST:  No objection.

14                    THE COURT:  JTX-10 is admitted.

15                    (JTX-10 was admitted into evidence.)

16                    THE COURT:  And you may call the witness.

17                    MR. LEE:  The next witness will be Professor

18      David MacMillan; and Mr. Danford will do the examination.

19                    THE COURT:  Thank you.

20                     ... DR. DAVID MacMILLAN, having been first duly

21      sworn, was examined and testified as follows ...

22                    THE COURT:  Good afternoon, Mr. MacMillan.

23      Welcome.

24                    You may proceed.

25
```

MacMillan - direct

1 **DIRECT EXAMINATION**

2 BY MR. DANFORD:

3 Q.      Welcome back, Dr. MacMillan.

4          What issues are you addressing in this phase of

5 the case?

6 A.      I'm addressing my opinions on the issue of validity

7 of the '208 patent.

8 Q.      Have you prepared demonstratives to explain your

9 invalidity opinions?

10 A.      Yes, I have.

11          MR. DANFORD:  Can we have up PDX-12.2.

12 BY MR. DANFORD:

13 Q.      What issues are you addressing with respect to the

14 validity of the '208 patent?

15 A.      As shown on this slide, summarized in my slide, I

16 will be giving opinions on enablement, written description,

17 and claim dependency of the '208 patent.

18 Q.      Have you formed an opinion as to whether the asserted

19 claims of the '208 patent are valid?

20 A.      Yes, I have.

21 Q.      What did you conclude?

22 A.      I concluded that the asserted claims are valid.

23 Q.      What definition of a person of ordinary skill did you

24 apply in addressing validity?

25 A.      I applied the same definition that I applied when I

MacMillan - direct

1    was here 12 days ago when giving opinions on infringement.

2    Q.    Do you understand that the defendants have offered a

3    different definition of a person of ordinary skill?

4    A.    I do.

5    Q.    Would your opinion with respect to the validity of

6    the '208 patent claims be any different with the defendants'

7    definition?

8    A.    No, they would not.

9    Q.    Let me start with the issue of enablement.

10          Were you here when Dr. Buckton and Dr. Scheidt

11   testified?

12   A.    I was.

13   Q.    Do you recall their testimony that the claims of the

14   '208 patent are not enabled, in their opinion?

15   A.    I do recall that.

16   Q.    Do you agree with them?

17   A.    No, I do not.

18   Q.    What is your opinion with respect to the enablement

19   of the asserted claims of the '208 patent?

20   A.    I -- it's my opinion the asserted claims are valid.

21   Q.    Let me start with some background concepts.

22          Are you familiar with what a salt is?

23   A.    Yes, I am.

24   Q.    What is a salt?

25   A.    A salt is when you take a molecule and you identify a

MacMillan - direct

1    acidic or base position.  You treat it with some acid, you

2    treat it with a base, and in doing so, that would generate

3    an anion, a cation.  Those are two ions.  It's an ionic

4    compound.  An ionic compound is a salt.

5    Q.      What is an anion?

6    A.      An anion is a molecule which is a negative charge.

7    Q.      In the context of salt formation, how is an anion

8    formed?

9    A.      An anion is formed when you take a molecule that

10   usually has an acidic position.  You remove the proton and

11   it leaves behind an electron to give you a negative charge

12   and that's an anion.

13   Q.      What is a cation?

14   A.      A cation is the opposite.  That's when you generate a

15   species that removes the electron so it has a net cationic

16   charge, so it has a net positive charge.

17   Q.      In the context of salt formation, how is a cation

18   formed?

19   A.      In the context of a salt formation, a cation is

20   formed whenever you remove or, for example, you would add a

21   proton to it so that it has positive charge.

22   Q.      Are you familiar with how chemists make salts?

23   A.      Yes, I am.

24   Q.      How do chemists make salts?

25   A.      Chemists make salts by taking an acid and a base and

MacMillan - direct

1    combining them to generate an anion and a cation.  That

2    combination, two ions, that's a salt.

3    Q.      How often do organic chemists make salts?

4    A.      Organic chemists make salts all the time.  It's very,

5    very routine.

6    Q.      And how long have techniques for making salts been

7    known?

8    A.      Techniques for making salts have been known for a

9    very long time, more than a hundred years.

10   Q.      When do chemistry students first learn about salts?

11   A.      Chemistry students learn about salts at the very

12   beginning of their education, so normally, that's around

13   about in high school, introductory chemistry, or maybe

14   around the first year in college of taking chemistry, but

15   it's before they receive a degree in chemistry.

16   Q.      Are you familiar with the term counterion?

17   A.      Yes.

18   Q.      What is a counterion?

19   A.      A counterion is when you take a molecule, for

20   example, apixaban, and if you are to say deprotonate it,

21   that is now an anion.  The cation is the other ion that

22   makes up for that charge, so that would give a positive

23   charge.  A positively charged species would be a counterion.

24   Q.      What counterions would a person of ordinary skill use

25   in order to make pharmaceutical compounds?

MacMillan - direct

1   A.      The types of counterions that people would use

2   for pharmaceuticals would be things like sodium, potassium,

3   HCl.

4   Q.      What are the reasons that a person of ordinary skill

5   would look to those type of counterions?

6   A.      They would look to those counterions because that's

7   what is normally used counterions for pharmaceuticals.

8   Q.      Where would a person of ordinary skill look to

9   identify counterions used in pharmaceutical products?

10  A.      A person of ordinary skill would look to the primary

11  literature to see what types of counterions are commonly

12  used with pharmaceuticals.  Thereafter, we would go to

13  curated lists.  For example, the Remington's Pharmaceutical

14  Sciences textbook has a whole section on counterions for

15  pharmaceutical salts.

16  Q.      What is Remington's?

17  A.      Remington's is a textbook that has been around for a

18  very long time which deals with many different issues

19  associated in the pharmaceutical sciences.

20  Q.      How would a person of ordinary skill in the art use

21  the information in a reference like Remington's?

22  A.      Well, a person of ordinary skill would look, for

23  example, at a curated list such as Remington's and it would

24  identify the various different salts or counterions and it

25  would judge which ones would be appropriate or suitable to

MacMillan - direct

1    use in the context of the pharmaceutical they were invested

2    in.

3    Q.      If we could put up PDX-12.3.  Let's turn now to the

4    basis for your enablement opinions.

5                        What are the reasons for your opinion that

6    claim 13 is enabled in?

7    A.      So my opinion for why claim 13 is enabled is

8    summarized in these two bullet points.

9                        First of all, the person of ordinary skill

10   could have easily prepared the salt form of apixaban based

11   on the disclosure of the '208 patent.

12                       The second part is these pharmaceutically, these

13   salts would be pharmaceutically acceptable because they

14   would have an effectively identical safety profile to that

15   of apixaban at therapeutic doses.

16   Q.      Let's have up PDX-12.4.  What understanding of the

17   term pharmaceutically acceptable salts did you apply in

18   forming your opinion?

19   A.      I applied the Court's construction of

20   pharmaceutically acceptable salts in forming my opinion.

21   Q.      Let me start with the first part of the Court's claim

22   construction.

23                       Have you formed an opinion as to whether a

24   person of ordinary skill in 2001 would have been able to

25   make derivatives of apixaban in which apixaban was modified

MacMillan - direct

1  by making acid or base salts thereof?

2  A.      Yes, I am.

3  Q.      What is your opinion?

4  A.      They would have been able to do so.

5  Q.      Let's have up PDX-12.5.  What are your reasons that a

6  person of ordinary skill would have been able to make acid

7  or base derivative salts of apixaban?

8  A.      Again, my reasons are summarized on these, the slide

9  on the bullet point.

10                  The first one is simple acid/base

11  chemistry.  This is a fundamental part of chemistry.  It's

12  one of the first thing you learn.  It's very easy to

13  understand.  The concepts are very predictable and the

14  applications are very straightforward.  Very much routine.

15  So that would be the first part.

16                  The second part is in the '208 patent

17  specification, it clearly describes how to go about making

18  salts of the invention, so that clearly is described.

19                  And then the third.  Professor Jacobsen's

20  experiments in his lab at Harvard, they demonstrated that

21  you could form pharmaceutically acceptable salts of

22  apixaban.

23  Q.      Let me start with that first bullet point.  What do

24  you mean by simple acid/base chemistry?

25  A.      So as I said already, acid/base chemistry is a

MacMillan - direct

1   fundamental piece of knowledge that you learn when you first

2   start to learn about chemistry.  It's a very straightforward

3   theory, just how the acids and the base interact with each

4   other, and it's very, very predictive.  It's very

5   straightforward, very easy to predict.  Thereafter, very

6   easy to actually apply.

7   Q.      How does acid/base chemistry relate to making salts?

8   A.      Well, acid/base chemistry is how you make salts.  You

9   combine acids with bases.

10  Q.      Were those concepts of acid/base chemistry known in

11  2001?

12  A.      Absolutely, yes.

13  Q.      Let me show you DDX-16-3.  Do you recall when Dr.

14  Scheidt showed this demonstrative on Friday?

15  A.      Yes, I do.

16  Q.      What does it show?

17  A.      This is the chemical structure of apixaban.

18  Q.      And how would a person of ordinary skill in 2001 have

19  applied the concept of acid/base chemistry to the chemical

20  structure of apixaban?

21  A.      So a person of ordinary skill would have looked at

22  the structure such as apixaban, an organic molecule.  And

23  the first thing an organic chemist does, he looks to

24  identify an acidic or basic site.

25                  And if you look at the top right-hand

MacMillan - direct

1    portion of apixaban, you can see there's the thing, molecule

2    or the functional group which is called a carboxamide.

3    Carboxamides are very well-known to be acidic.  There are

4    many textbooks that describe it as being acidic.  It even

5    says on the slide it's acidic.  And based upon that, we look

6    to see what the pKa of that group would be.

7                       Now, it states here the pKa is 13 to 15.

8    PKa is just a measure of the inherent acidity of this

9    molecule.  And what an organic chemist would do at this

10   point, would go to look for a base which would have a pKb,

11   which would be higher than 15.  Have him identify that.  You

12   would simply use that in combination with this molecule.

13   That would undergo a reaction to form a salt.

14   Q.    And can you give me an example of a base that a

15   person of ordinary skill in the art might identify from

16   looking at the structure of apixaban to react with that

17   carboxamide group to make a salt?

18   A.    Sure.  There's actually many commonly used bases

19   which have a pKb above 15, so, for example, sodium

20   hexamethyldisilazide, potassium hexamethyldisilazide,

21   lithium dissopropylamide, potassium diisopropylamide.  There

22   are many commonly used species of that type.

23   Q.    What do the blue boxes on the slide show?

24   A.    The blue boxes on the slide are highlighting where

25   the basic moieties would be on this molecule.

MacMillan - direct

1   Q.      And what would a person ever ordinary skill in the

2   art do by identifying the basic moieties on the structure of

3   apixaban?

4   A.      Right.  So this is what they would do to make the

5   opposite type of salt.

6           So what we would did here, identify the basic

7   site, and they would identify what the pKb of those sites

8   would be.  This says it's pKa.  That's not completely right.

9   What they meant to write was pKb.  But with a pKb identified

10  at zero, to simply look for an acid, which is a pKa which

11  would be now lowering that and to find that, that should

12  combine with the basic site to form a salt.  For example,

13  HCI, which has a pKa of about minus 7 would readily combine

14  with these moieties to form salts.

15  Q.      Why are there four different boxes that are shown

16  here?

17  A.      There's four different boxes because these are all

18  basic sites which are on apixaban and roughly all about the

19  same basicity.  So there could be parts of them which are

20  slightly more basic than the other ones, but they all could

21  function as basic sites on apixaban.

22  Q.      In terms of salt formation, does it matter which of

23  those heteroatoms is protonated?

24  A.      Absolutely not.

25  Q.      Why do you say that?

MacMillan - direct

1   A.      Because salt is between an anion and a cation.  It

2   doesn't matter where you would form a cation.  It doesn't

3   matter what the anion would be.  You consider it as two ions

4   to form a salt.

5   Q.      Let's turn back to your slide.  If we could go to

6   PDX-12.7.  What are you showing here?

7   A.      So this is from the specification of the '208 patent.

8   I think it's from column 117.  And this basically describes

9   how to make pharmaceutically acceptable salts of the

10  invention.

11  Q.      And can you explain to us how a person of ordinary

12  skill in the art would use the information from column 117

13  of the '208 patent to make pharmaceutically acceptable salts

14  of apixaban?

15  A.      Sure.  So using the language as described, we would

16  be able to make pharmaceutically acceptable salts of the

17  invention using a parent compound that would contain a basic

18  or acidic moiety.  And this would be valued using

19  conventional chemical methods.  By treating that acid or

20  basic moiety with an appropriate base or acid, and as it

21  states here, we'd do this in organic solvent or a

22  non-aqueous media.  They are actually stating here the

23  organic solvent would be preferred.

24                  And in terms of the salts that are used,

25  suggests that suitable salts, appropriate salts can be

MacMillan - direct

1  found in the same text with Remington's pharmaceutical

2  sciences.

3  Q.      And were you here when Dr. Jacobsen testified on

4  Friday?

5  A.      Yes, I was.

6  Q.      How did this description in the '208 patent compare

7  with what Dr. Jacobsen did?

8  A.      Well, this matches perfectly with what Dr. Jacobsen

9  did in his experiment.

10  Q.      Now, there's language in that first sentence that

11  refers to synthesized from the parent compound that contains

12  a basic or acidic moiety.  Do you see that?

13  A.      Yes.

14  Q.      Were you here whether Dr. Buckton testified about

15  that language?

16  A.      Yes, I was.

17  Q.      Let me just show you trial transcript page 32, line

18  24 through 33, line 8.

19          Do you recall Dr. Buckton's testimony that this

20  passage from column 117 in the '208 patent would not apply

21  to apixaban because it doesn't have basic or acidic

22  moieties?

23  A.      Yes, I do.

24  Q.      Do you agree with that?

25  A.      No, I do not.

MacMillan - direct

1   Q.      What is the reason that you disagree?

2   A.      Because, clearly, apixaban does have an acid and a

3   base component to the molecule.

4   Q.      And was that what we were just looking at on the

5   slide with the boxes around the carboxamide and the

6   heteroatoms?

7   A.      Exactly.  On the previous slide, just identified as

8   it's shown here.  The acidic moiety on the top right as well

9   as the basic moieties and it's even described in the box

10  that these are acidic and basic.

11  Q.      So let's talk about Dr. Jacobsen's experiments for a

12  bit.

13          What role did his experiments play in your

14  analysis?

15  A.      So in my analysis, the first thing I did was, I think

16  about very basic principles of acid-base chemistry and

17  recognized it would be straightforward to make the salt of

18  apixaban.

19          And, secondly, I had an understanding from the

20  '208 patent that it's well described how you would go about

21  making those salts.

22          Professor Jacobsen's experiments, they

23  definitively showed you could, indeed, form those salts, so

24  that combination clearly describes the fact that you can

25  from pharmaceutically acceptable salts of apixaban.

MacMillan - direct

1    Q.      Which salts did Dr. Jacobsen make?

2    A.      He made the sodium and potassium and the HCl salts of

3    apixaban.

4    Q.      Did you review Dr. Jacobsen's experimental procedures

5    and results?

6    A.      Yes.

7    Q.      Was Dr. Jacobsen successful in making the sodium,

8    potassium and hydrochloride salts of apixaban?

9    A.      Yes, he was.

10   Q.      How do you know that?

11   A.      I know that because I reviewed the documents.  I also

12   watched the video that showed that he made the salt in

13   solution and then removed the solvent to leave the salt

14   behind.  I looked at a photograph provided.  But most

15   importantly, I looked at the analytical details of how he

16   was able to determine that he had formed those salts and

17   based upon the spectroscopic evidence, very straightforward

18   to understand he had, in fact, made the salt.

19   Q.      What spectroscopic data are you referring to?

20   A.      I'm referring to he used NMR studies for all three

21   and he also used infrared studies for a few of the salts.

22   Q.      Were Dr. Jacobsen's experiments representative of

23   what a person of ordinary skill would have done in 2001?

24   A.      Absolutely, yes.

25   Q.      Why do you say that?

MacMillan - direct

1   A.      Because it matches exactly what a person in 2001

2   would have done to form a salt, which is exactly the same

3   thing as you would do nowadays, too.  They're exactly the

4   same.

5   Q.      What amount of experimentation did Dr. Jacobsen

6   undertake to make salts of apixaban?

7   A.      If you read the report, it's clear that Dr. Jacobsen

8   actually was able to make all three salts in the course of a

9   day, so it's pretty reasonable to say that he did very

10  little experimentation to generate the salts.

11  Q.      What did you conclude from the amount of

12  experimentation that Dr. Jacobsen undertook?

13  A.      There was no undue experimentation involved.

14  Q.      Let me show you trial transcript page 12, lines 8

15  through 16.

16          Do you recall this testimony from Dr. Buckton's

17  testimony on the first day of trial where he said that Dr.

18  Jacobsen's reaction conditions were outside of what he would

19  regard as normal conditions?

20  A.      I do recall that, yes.

21  Q.      Do you agree with that?

22  A.      No, I do not.

23  Q.      Why do you disagree with that?

24  A.      I disagree with that because as we already know, and

25  the '208 patent describes it, you can use organic solvents.

MacMillan - direct

1   It is actually preferred to do organic solvents to make

2   those salts.

3         And the second part was that Dr. Jacobsen

4   definitively showed that he made these designs.  He, in

5   fact, did make the salts.

6   Q.    Were the reagents from Dr. Jacobsen's experiments

7   commonly used in 2001?

8   A.    Oh, absolutely.  Yes.

9   Q.    Was there anything unusual about Dr. Jacobsen's

10  experimental design?

11  A.    No, that was completely routine.

12  Q.    What do the reaction conditions that Dr. Jacobsen

13  used have to do with whether the resulting salts are

14  pharmaceutically acceptable?

15  A.    So this is often something that people who are known

16  chemists understand, is the way you make a chemical or the

17  way you make a molecule isn't especially relevant how you

18  make it in terms of the characteristics, the molecule you

19  make.

20        So, for example, for any given molecule, there

21  might be five completely different ways you can make it

22  using five different types of conditions, but the way you

23  make it has no impact on the characteristics of the nature

24  of the molecule itself.

25  Q.    Do you recall that Dr. Buckton and Dr. Scheidt

1   discussed several BMS documents addressing the ionizability

2   of apixaban?

3   A.      Yes, I did.

4   Q.      Did you consider those documents in forming your

5   opinion?

6   A.      Yes, I did.

7   Q.      What were the issues that those documents were

8   addressing?

9   A.      The issue the documents were addressing was the

10  question of whether you could form ions that would be

11  soluble under aqueous positions.  It was not related to

12  whether, in fact, you could do it with organic solvents to

13  make pharmaceutically acceptable salts.

14  Q.      Did those documents suggest to you that apixaban

15  could never be ionized to make a pharmaceutically acceptable

16  salt?

17  A.      No.

18  Q.      Why do you say that?

19  A.      Because any organic chemist knows that you can form

20  salts using organic solvents.  So this idea of restricting

21  it to aqueous solutions really has no meaning, no

22  understanding for -- with respect to making salts.

23  Q.      What does the '208 patent say about use of organic

24  solvents to make pharmaceutically acceptable salts?

25  A.      The '208 patent specifically states that organic

MacMillan - direct

1    solvents were preferred to make those types of salts.

2              MR. DANFORD:  So let's turn to the next element

3    of the Court's claim construction; and for that, we'll have

4    PDX-12.8.

5    BY MR. DANFORD:

6    Q.    Can you remind us what this part of the Court's claim

7    construction requires?

8    A.    Sure.

9              This is the "suitable for use" term which a lot

10   of it boils down to this very last line:  "Commensurate with

11   a reasonable benefit-to-risk ratio."

12   Q.    Have you formed an opinion about whether a person of

13   ordinary skill in the art in 2001 would have considered an

14   apixaban salt to meet that limitation?

15   A.    Yes, I have.

16   Q.    What is your opinion?

17   A.    It would meet that limitation.

18   Q.    And what are the reasons for your opinion that salts

19   of apixaban would be suitable for use within a reasonable

20   benefit/risk ratio?

21   A.    So my opinions on that are summarized on the bottom

22   of this slide in terms of these three bullet points.

23             The first bullet point is basically that if a

24   person was to ingest an apixaban salt, it would instantly

25   revert back to neutral apixaban.  So that is point one.

MacMillan - direct

1      The second part is these common salts of

2  apixaban, because they're going to revert back to apixaban,

3  the neutral form, they're effectively going to have the

4  identical profile, safety profile, to that of apixaban.

5      Once it came to those conclusions or those

6  opinions, I was also able to have a discussion with another

7  expert, Dr. Peter Kowey, who is a clinical cardiologist, and

8  he confirmed those opinions and confirmed that Professor

9  Jacobsen's salts would, indeed, satisfy this

10 suitable-for-use requirement.

11      MR. DANFORD:  Let's turn to that first bullet

12 point that you have first; and for that, if we could have

13 PDX-12.9.

14 BY MR. DANFORD:

15 Q.    What would happen with an apixaban salt in the body?

16      THE WITNESS:  Is it okay if I use a laser

17 pointer here?

18      THE COURT:  Sure.

19 BY THE WITNESS:

20 A.    So I'll use this sparingly, but basically this is a

21 case where we take the sodium salt of apixaban and on the

22 left-hand corner here, this is going to be what would be the

23 maximum therapeutic dose of the sodium salt of apixaban.

24      Now, as soon as this reaches your body, it will

25 interact with water in the body, or more likely, the acid in

MacMillan - direct

1    the stomach, and instantly become neutral apixaban again,

2    which is at this amount, 10 milligrams, which is equal to

3    0.02 millimol.

4              This 0.02 millimol number is important because

5    in chemistry, we know it has to generate exactly the same

6    amount of these ions.  And these ions, the sodium ions, the

7    hydroxide ions are going to form into water unless in the

8    case where it actually reacts in the acid in the stomach, in

9    which case the hydroxide will immediately react with the

10   acids to become water, but it only results in the formation

11   of both these ions in trace quantities.

12             As we will talk about in the next few slides,

13   it's the quantity that really matters.

14   Q.    Now, let's go step by step on this.

15             One of the products you have shown here is the

16   neutral form of apixaban; is that right?

17   A.    That's right.

18   Q.    Is generating the neutral form of apixaban in the

19   body a problem?

20   A.    No, it's not.

21   Q.    Why is that not a problem?

22   A.    Well, we know apixaban is a very successful

23   pharmaceutical.  So generating the neutral form of it, which

24   is what people take at the present time, it's clearly not

25   going to be a problem.

MacMillan - direct

1   Q.      What is the maximum therapeutic dose of apixaban?

2   A.      As shown here, it is 10 milligrams, which is 0.02

3   millimols.

4   Q.      I do want to come to that millimol point.

5           What is a millimol?

6   A.      A millimol, in chemistry, is a standardization that

7   we use.  We don't talk about things in terms of their

8   weight, generally, because molecules have different weights,

9   so they don't always end up being apples to apples, but we

10  do talk about things in terms of the number of molecules.

11          So this is .02 millimols of molecules, which is

12  a tiny amount of material.

13  Q.      Why is the number of millimols relevant to your

14  analysis?

15  A.      It's relevant to my analysis because we have to

16  consider the amount of sodium ion and the amount of

17  hydroxide ion that has been created and then consider the

18  impact of the amount of that material.

19  Q.      So what amount of sodium ion will be generated from

20  the maximum therapeutic dose of sodium apixaban salt in the

21  body?

22  A.      So the amount of sodium that was generated here has

23  to be .02 millimols is going to be .49 milligrams.  So this

24  is less than half a milligram of sodium.

25  Q.      Would that amount of sodium ion impose any risk of

MacMillan - direct

1   toxicity, irritations, or allergic response?

2   A.      No, absolutely not.

3   Q.      What is the reason that you say that?

4   A.      I say that because your body can contain so much more

5   sodium, and we ingest amounts every day that have a large

6   amount of sodium.

7   Q.      What amount of hydroxide ion would be generated from

8   the maximum therapeutic dose of sodium apixaban salt?

9   A.      It would be an even smaller amount of hydroxide ion.

10  It would be .36 milligrams.

11  Q.      Would that amount of hydroxide ion pose any risk of

12  toxicity, irritation, or allergic response?

13  A.      Absolutely not.

14  Q.      Why is it that you say that?

15  A.      Two reasons.  One is there is a vast amount of water

16  in the body, and in some cases -- in other cases, it's going

17  to react to the acid in the stomach.

18          It is also -- we consume lots of basic food

19  stuffs, again, on a daily basis that this amount of

20  hydroxide ion is so small, it would have no impact.

21  Q.      You have actually raised a good point.

22          What are the water drops you have shown on this

23  slide?

24  A.      So the water droplets is just to represent.  This is

25  the -- in the body, these things are mutually formed in the

MacMillan - direct

1    presence either of water in the body or in the presence of

2    the acid in your stomach.

3    Q.      And why is that relevant to your analysis?

4    A.      Because as we'll talk about in a few moments, we have

5    to discuss the nature of these ions and the environment that

6    they exist and the amount of water it's dissolved in is

7    important.

8              MR. DANFORD:  So let's put this in some

9    real-world context.  If we could have PDX-12.10.

10   BY MR. DANFORD:

11   Q.      What are you showing here?

12   A.      So, obviously, this is a can of Diet Coke.  And if

13   you turn the can around to the back and look at the

14   nutrition label, the nutrition facts, I just want to zero

15   you in on one part, which is this sodium amount here, and

16   you will see it is actually 40 milligrams in one can of Diet

17   Coke.

18              Now, if you think about the maximum therapeutic

19   dose of sodium apixaban, it would lead to .46 milligrams of

20   sodium ion.  If you did the math, you would realize there is

21   100 times more sodium in one can of Diet Coke than there

22   would be in the sodium salt of apixaban.  And,

23              Just to give you a tiny bit more context, the

24   label also talks about the maximum recommended dose of

25   sodium.  In sodium's case, .46 milligrams wouldn't even be

```
 1    one percent of that -- .1 percent.  It would be .02 of the
 2    maximum dose.
 3    Q.      What did you conclude about the sodium salt of
 4    apixaban based on this comparison to Diet Coke?
 5    A.      It would have no impact on the benefit/risk ratio.
 6                  MR. DANFORD:  If we could have PDX-12.11.
 7    BY MR. DANFORD:
 8    Q.      What would happen with a potassium apixaban salt in
 9    the body?
10    A.      So potassium would be a completely analogous
11    situation.  Just starting with the potassium ion, the same
12    situation.  You have water acid, reforms immediately
13    apixaban, and then, again, you look at hydroxide ion, which
14    is born in water or in the acid in the stomach, but in this
15    case it replaces the sodium with potassium.
16    Q.      In the maximum therapeutic dose of apixaban, what
17    amount of potassium ions and hydroxide ion would be
18    generated?
19    A.      So it's the identical amount of hydroxide, as we
20    talked about in the last slide.  In terms of the maximum, it
21    is 0.02 millimol, which ends up being about .7 milligrams.
22    Q.      Would that amount of potassium ion pose any risk of
23    toxicity, irritation, or other allergic response?
24    A.      No, it would not.  In fact, if you would use a
25    Gatorade bottle, you would realize there would be about 100
```

MacMillan - direct

1    times more potassium in just a bottle of Gatorade than by

2    taking the potassium salts of apixaban.

3    Q.      What about the hydroxide ion that is generated from

4    this reaction?  Would that pose any risk of toxicity,

5    irritation, or allergic response?

6    A.      Again, it would be completely analogous to what we

7    discussed on the previous slide.

8              MR. DANFORD:  So let's have PDX-1.12.

9    BY MR. DANFORD:

10   Q.      Could you explain to us what would happen with an

11   apixaban hydrochloride in the body?

12   A.      So the hydrochloride is slightly different because

13   you now have the HCl salt in this case, known upon exposure

14   to water in the body.  Again, this will immediately release

15   into apixaban, but instead of a hydrogen ion, you get a

16   chloride ion which could form into this water, and we have

17   what is called a hydronium ion would also be born into the

18   presence of water.

19   Q.      What is a chloride ion?

20   A.      A chloride ion is -- if you think about when you

21   sprinkle salt on your meal at dinnertime, that is sodium

22   chloride.  You are ingesting large amounts of chloride ion.

23   This is exactly the same chloride ion we're discussing.

24   Q.      What are hydronium ions?

25   A.      Hydronium is where you have a proton or H+ and you

MacMillan - direct

1    put it in water.  It associates with the water and then

2    surrounds itself with all the other water, which is there.

3    Q.      At the maximum therapeutic dose of apixaban, what

4    amount of hydronium ions and chloride ions would be

5    generated from taking the apixaban hydrochloride salt?

6    A.      So, again, it would be .02 millimols.  In the case of

7    hydronium ions, this ends up being less than half a

8    milligram.  And for chloride ion, it ends up being

9    .7 milligrams.

10   Q.      Would the amount of hydronium ions or chloride ions

11   from apixaban hydrochloride salt pose any source of

12   toxicity, irritation, or allergic response?

13   A.      Absolutely not.

14   Q.      Why do you say that?

15   A.      These are extremely trace amounts of these ions which

16   your body already has in vast amounts, and in terms of the

17   good stuff that you're going to eat on a daily basis.

18              MR. DANFORD:  If we could have up PDX-12.13.

19   BY MR. DANFORD:

20   Q.      What are you showing here?

21   A.      So what I'm showing here are two products which

22   consumers, or what people will consume on a daily basis.  On

23   the left-hand side, we're showing a bottle of Tums.  On the

24   right-hand side, a can of Coke.

25   Q.      Let's start with the left-hand side.

MacMillan - direct

1       What is the relevance of a bottle of Tums to

2  your analysis?

3  A.      So Tums, which we know is an antiacid, we use it to

4  treat heartburn, and if you remember back a few slides ago,

5  we talked about hydroxide ion and a hydroxide being a base;

6  and remember I said it has 0.02 millimol base.  Tums, in one

7  tablet, has 5 millimols.  So that is about 250 times more

8  base in one tablet of Tums.  So, conservatively, it is 250

9  times more.

10      On the back of the Tums label, it says you can

11 take between two and four, so it is really 250 to 1,000

12 times more base in one tablet of Tums compared to the sodium

13 potassium of salt of apixaban.

14 Q.     What did you conclude about the sodium and potassium

15 salts of apixaban based on this comparison to Tums?

16 A.      It clearly will have no impact in comparison to

17 taking tablet forms.

18 Q.     What is the relevance of the can of Coke to your

19 analysis?

20 A.      So a can of Coke -- the reason why I'm showing this,

21 the can of Coke has a pH of 2.37.  And the reason why that

22 is important is in consideration of these things that we

23 call hydronium ions in terms of one can of Coke has 30 times

24 more hydronium ions than you would get from the maximum

25 therapeutic dose of apixaban HCl salt.

MacMillan - direct

1  Q.      What did you conclude, then, about the apixaban

2  hydrochloride salt based on those comparisons to a can of

3  Coke?

4  A.      That amount of hydronium ions is going to have no

5  impact.  There is going to be no change.  There will be a

6  reasonable benefit-to-risk ratio.

7              MR. DANFORD:  Let me show you DDX-16-14.

8  BY MR. DANFORD:

9  Q.      Do you recall Dr. Scheidt's testimony Friday about

10 this feature?

11 A.      Yes, I do.

12 Q.      Let's talk about what this figure shows.

13              What is the bottom scale of the chart showing?

14 A.      The bottom scale of the chart is showing pH.

15 Q.      And if you can go up to the top, do you see where it

16 says, "PKa equals 0 and pKa equals 13"?

17 A.      Yes, I do.

18 Q.      And then there is a dotted line that goes down to the

19 bottom where it's pH 0 and pH 1.

20              Do you see that?

21 A.      Yes, I do.

22 Q.      What do pH and pKa have to do with each other?

23 A.      So this is, I would argue, an unfortunate

24 representation because it's sort of suggesting that pKa and

25 the pH end up in the same thing, and this is absolutely not

MacMillan - direct

1    true.

2             The pKa is an intrinsic characteristic of any

3    molecule.  Any molecule has the ability to ionize or

4    generally become an acid, and that is known as the pKa.

5             The pH is something very, very different.  This

6    is just simply a measure of the amount of H+, a proton that

7    you have in a volume of water.  So the suggestion or the

8    idea here that something has a pKa of 0 has to have a pH

9    of 0 is simply not true.  Something that has a pKa of 0, you

10   would have a pH of 6.9, 6, 5, 4, 3.

11            The only thing that matters there is knowing how

12   much you have of this which dictates what that pH is going

13   to be.  So, again, quantity matters because you can take

14   something with a pKa of 0 and have something with a pKa of

15   6.9.

16   Q.    Could you explain how that works?  Why does the

17   quantity matter in terms of calculating pH?

18   A.    Because it's the amount of ion that's formed, the

19   H-plus, but it's also based upon the amount of water that

20   it's generated into.  So if there is a high concentration of

21   this, then you know maybe you can start the approach at

22   lower pH's.  But, for example, here, the neutral apixaban

23   that we were talking about, if you took the maximum

24   therapeutic dose and just say you could put it in just a cup

25   of water.  There was a lot more water in the human body than

1   a cup, but if you can put it in a cup of water, the pH will

2   actually be up here, 4.2.  It's much less acidic.

3   Q.      Do you recall that Dr. Scheidt testified on Friday

4   that a pH of zero is an environment like dilute battery

5   acid?

6   A.      I do remember that.

7   Q.      Would taking a ten milligram dose of apixaban

8   hydrochloride salt be comparable to dilute battery acid?

9   A.      No, it would not.

10  Q.      Why do you say that?

11  A.      Because you have to dilute, to have a pH to dilute

12  battery acid, it would have to use roughly about 150 grams

13  of apixaban to get to that amount instead of using this idea

14  of using the maximum therapeutic dose, which is ten

15  milligrams, which is obviously a long way away from

16  150 grams.

17  Q.      And in that 150 grams, what's the volume that you're

18  talking about?

19  A.      170 grams would be a one molar solution.  So whatever

20  that solution would be, which in this case it would be the

21  size of a can of Coke.

22  Q.      And do you recall that Dr. Scheidt testified that a

23  pH of 13 is an environment like oven cleaner or Drano?

24  A.      Yes, I do recall that.

25  Q.      Would taking a ten milligram dose of sodium apixaban

MacMillan - direct

1   or potassium apixaban be comparable to oven cleaner or

2   Drano?

3   A.      No.

4   Q.      Why do you say that?

5   A.      Again, the same idea.  You put the maximum

6   therapeutic dose of potassium in just a cup of water.

7   Again, humans have a lot more water than just a cup of

8   water.  If you just use a cup of water, there would be a pH

9   down about 9.5, 9.6.  And keep in mind, like Milk of

10  Magnesia, which people consume every day, way up at 10.5 so

11  obviously, 9.5 is not a problem.

12  Q.      Do you recall that Dr. Scheidt testified that the pH

13  of a can of Coke was 100,000 times less acidic than this

14  region on the left-hand side of the slide where he has

15  illustrated the hydrochloride salt apixaban?

16  A.      Yes.

17  Q.      Do you think that's an accurate comparison?

18  A.      No.

19  Q.      Why is that not an accurate comparison?

20  A.      It's not an accurate comparison because you'd have to

21  do one molar, and that means you would have to have that and

22  it would be a lot of material.  Again, up about 150 grams of

23  apixaban to make that.

24  Q.      Again, and how much volume of water is that 150 grams

25  in?

MacMillan - direct

1    A.      It would be one molar solution, so that would be the

2    size of a can of Coke.

3    Q.      Is that realistic?

4    A.      I think we could consider -- I don't think anyone

5    would want to take 150 grams of apixaban.

6    Q.      Now, do you recall that Dr. Scheidt testified on

7    Friday that a pH of Tums is 100,000 times less basic than

8    this region on the right-hand side of the slide where he has

9    illustrated the sodium and potassium of apixaban salts?

10   A.      Yes.

11   Q.      Do you think that's an accurate comparison?

12   A.      It's exactly the same comparison, but on the other

13   side, where you have to use those salts, it would be

14   150 grams of them in the size of that can, a volume

15   analysis.

16   Q.      Would that ever happen?

17   A.      No.

18   Q.      Now, you mentioned several times that the amount of

19   material matters to determining pH.  Could you give us a

20   real world example and explain why that is?

21   A.      Yes.  In thinking of an example, the example in

22   undergraduate classes, the way that we teach it, the way I

23   teach it.  So I'm British.  I eat fish and chips, and if you

24   think of it, fish and chips, you use salt and vinegar on

25   fish and chips.  Right.  The salt you use, sodium chloride.

MacMillan - direct

1    You add sodium chloride.  You eat it.  It has no effect on

2    your body.  But if I was to take a pint of seawater, which

3    is the same sodium seawater and drink it, that would be

4    extremely toxic.  So the amount clearly matters.

5                        Similarly, with vinegar, you sprinkle some

6    vinegar on your fries, it tastes good.  If you take the same

7    vinegar, a pint of it, and you drink that pint of vinegar,

8    you're going to get incredibly sick.  And the interesting

9    part of it is that the vinegar you use has the same pH

10   that's on your fries that's in the glass.  It's the quantity

11   that matters.

12   Q.    Do you recall that Dr. Buckton and Dr. Scheidt

13   testified that only compounds that have pH, pKa's in that

14   range of from three to ten can be used to make

15   pharmaceutically acceptable salts?

16   A.    I do recall that.

17   Q.    Do you agree with that?

18   A.    No, I do not.

19   Q.    What is the reason that you disagree?

20   A.    I disagree because this is an artificially --

21   boundaries have been introduced to say that has been

22   performed in aqueous conditions within a pH range.  We know

23   salts can be made in organic solvent.  In fact, the '208

24   patent describes you do it in organic solvent.

25   Q.    Now, let me address a related issue.  Do you recall

MacMillan - direct

1  Dr. Buckton's testimony that salts of apixaban would produce

2  an extreme localized pH that in his view would be likely to

3  be damaging to human tissue?

4  A.    I do recall that.

5  Q.    Do you agree with that?

6  A.    No.

7  Q.    What are the reasons that you disagree?

8  A.    This idea of localized pH is meaningless, and I

9  described this in two ways.  The first part is you can't

10  zoom in to a certain area and depend that all the other

11  water is not there.  The water is there.  So the amount

12  therefore matters.

13           These are trace amounts of ions in this

14  water.  But even if you could pretend that all the other

15  water was not there, there's a different factor you have to

16  take into account which has not been used in that analysis.

17  That is a concept of what's called diffusion.  And diffusion

18  for non-chemists is just how rapidly things dissipate away

19  from each other, and it's because that rate of dissipation

20  or diffusion is much faster than a biomolecular reaction --

21  why do you care about biomolecular action?

22           A biomolecular reaction is required for it

23  to react with the tissue.  And so this idea that somehow

24  we're going to keep this localized pH that doesn't exist

25  because diffusion is not probable, it just doesn't simply

1   make sense.

2   Q.    Let me turn to another issue.  In forming your

3   opinion, did you consider whether the toxicity, irritation

4   and allergen profile of an apixaban salt would be

5   commensurate with a reasonable benefit/risk ratio?

6   A.    Yes, I did.

7   Q.    What did you conclude?

8   A.    I concluded it would be.

9   Q.    If we could have up PDX-12.14.  What are the benefits

10  of taking salt forms of apixaban?

11  A.    Well, we know the salt forms of apixaban would

12  immediately become in the body, would become neutral

13  apixaban.  We know the benefits of apixaban as shown here is

14  clearly the risk of stroke, systemic embolism and also are

15  preventive in the treatment of deep vein thrombosis and

16  pulmonary embolism.

17  Q.    How do the benefits of neutral apixaban compare with

18  that of the salt forms of apixaban?

19  A.    They would be identical.

20  Q.    And what are the risks of taking salt forms of

21  apixaban?

22  A.    The risks could be also identical to taking the

23  neutral form of production of apixaban.

24  Q.    Why do you say the risks would be identical?

25  A.    Because again you're immediately forming neutral

MacMillan - direct

1    apixaban and you're generating trace amounts of ions which

2    are going to have no impact.

3    Q.      So in your opinion, how does the risk/benefit ratio

4    of an apixaban salt compare to that of the neutral form of

5    apixaban?

6    A.      It's effectively identical.

7    Q.      And in taking all of this together, is administering

8    a salt form of apixaban commensurate with a reasonable

9    risk/benefit ratio in your opinion?

10   A.      Yes, it is.

11   Q.      Are you a medical doctor?

12   A.      No, I'm not.

13   Q.      How can you then know that the benefits of an

14   apixaban salt would have outweighed the risks within the

15   scope of sound medical judgment?

16   A.      So I'm not a medical doctor, but I am a medicinal

17   chemist.  I am a chemist.  I understand the basics of

18   fundamental chemistry and I can understand how the trace

19   amounts of these ions, which are basically being formed

20   instantly, I also understand that you already have large

21   amounts of these ions in your body and that you consume

22   those on a daily basis anyway.

23   Q.      Did you do anything to confirm your opinion on this

24   risk/benefit ratio issue?

25   A.      Yes, I did.

MacMillan - direct

1   Q.      What did you do?

2   A.      I had a conversation with another expert in the case,

3   doctor Peter Kowey, who was a clinical cardiologist, and in

4   that discussion, he confirmed my opinions were completely

5   aligned with him and that allowed me to come to the same

6   conclusion.

7   Q.      All right.  Were you here when Dr. Kowey testified

8   last week?

9   A.      Yes, I was.

10  Q.      Was his testimony consistent with the conversation

11  you had with him?

12  A.      Yes, it was.

13  Q.      Now, do you recall that Dr. Buckton and Dr. Scheidt

14  testified that salts of apixaban would not be

15  pharmaceutically acceptable because they would

16  disproportionate?

17  A.      I do recall that, yes.

18  Q.      What is disproportionation as Dr. Buckton and Dr.

19  Scheidt have used the term?

20  A.      The way they are using the term, I don't think it's

21  completely right.  Just to say for a moment that it is, what

22  they are saying is that they believe that those salts, if

23  they're exposed to any water or moisture, would have

24  completely reverted back to neutral apixaban, and those ions

25  which again would be solvated with water.

MacMillan - direct

1    Q.      Do you agree with Dr. Buckton and Dr. Scheidt's

2    opinion on the issue of disproportionation?

3    A.      No.

4    Q.      What is the reason you disagree with them?

5    A.      I disagree with them because I had a conversation

6    with another expert in this case, Dr. Myerson, and he

7    explained to me that it would be very straightforward for a

8    formulation technique which would allow you to formulate

9    those salts without them being exposed to moisture or to

10   water.

11   Q.      What's the relevance of forming these salts without

12   exposure to water?

13   A.      I believe the relevance is so you can make sure it

14   would not undergo this idea of disproportionation and if

15   they were to be exposed to moisture or water.

16   Q.      Is water necessary for a salt in apixaban to

17   disproportionate?

18   A.      I think it would be, yes.  It's not going to

19   spontaneously disproportionate on its own.

20   Q.      What would the effect of excluding water from the

21   formulation be?

22   A.      It would just retain its -- its being a salt

23   compound.

24   Q.      Now, even if the salts of apixaban did

25   disproportionate, what would the chemical product be?

MacMillan - direct

1    A.    So if it disproportionates, the chemical products

2    would just be neutral apixaban in those same solvated ions

3    that we've already discussed.

4    Q.    And at therapeutic doses of apixaban, what risk of

5    toxicity, irritation or allergic response to the product of

6    an apixaban salt does disproportionating prevent?

7    A.    It would be identically neutral to apixaban.

8    Q.    To sum up, what's your opinion with respect to the

9    issue of disproportionation?

10   A.    The issue of disproportionation is one where I don't

11   believe that it is an issue because, number one, you can

12   formulate it, so it won't disproportionate, but even if it

13   did, it's just going to lead to neutral apixaban and have no

14   change in the benefit/risk ratio.

15   Q.    Now, let me shift to your ultimate enablement

16   opinion.  Are you familiar with the Wand factors?

17   A.    Yes, I am.

18   Q.    Did you consider the Wand factors in the context of

19   your enablement analysis for this case?

20   A.    I did.

21          MR. DANFORD:  If we could have up PDX-12.15.

22   BY MR. DANFORD:

23   Q.    What are you showing here?

24   A.    I'm showing there the eight Wand factors that

25   considered in this question of enablement claim 15.

MacMillan - direct

1   Q.      Let me just briefly ask you about each of these.

2   What is the breadth of claim 13?

3   A.      So the breadth of claim 13, which is the scope of

4   claim document, is very narrow.  It basically just describes

5   apixaban itself in neutral form or a pharmaceutically

6   acceptable salt thereof.

7   Q.      What is the breadth of a pharmaceutically acceptable

8   salt of Apixaban?

9   A.      So looking at just commonly used pharmaceutical salts

10  and then understanding you now look at them in total to the

11  ones that would be appropriate to use with apixaban, that's

12  an even narrower scope for that claim.

13  Q.      What did you conclude from your assessment was the

14  breadth of claim 13?

15  A.      Based on the breadth of claim 13, it's clear that

16  claim 13 is enabled.

17  Q.      Let's go to the next factor.  What's the nature of

18  the invention at issue here?

19  A.      The nature of the invention is that we have the

20  invention of a factor Xa inhibitor, so apixaban, the neutral

21  salt of apixaban -- I'm sorry, neutral form, I should say,

22  of apixaban is the invention, and the salt is completely

23  routine to make there afterwards.  But a person of ordinary

24  skill would know how to do that.

25          So the nature of the invention, the apixaban

MacMillan - direct

1   itself clearly describes how to make it.  Therefore, the

2   nature of the invention is very straightforward to

3   understand.

4   Q.    Could you explain how a person of ordinary skill in

5   the art would view making salts in the context of this

6   invention?

7   A.    They would view it as completely routine.

8   Q.    What did you conclude then from considering the

9   nature of the invention?

10  A.    Again, based on that, claim 13 is enabled.

11  Q.    What was the state of the art with respect to making

12  pharmaceutically acceptable salts at the time of the

13  invention here?

14  A.    At the time of the invention, the state of the art

15  was extensive.  Salt formation as we know it was very

16  routine.  There were many different salts in a

17  pharmaceutical process.  A very extensive theory.

18  Q.    How did that weigh in your analysis for the Wand

19  factors?

20  A.    Again, it makes me recognize that claim 13 would be

21  enabled.

22  Q.    What did you consider with respect to the level of

23  ordinary skill?

24  A.    Well, as we discussed a few moments ago, the level of

25  skill, you'll learn about salt formation at a various early

MacMillan - direct

1    stages, at high school, the beginning of college.  So a

2    person of ordinary skill would be way above that level in

3    terms of understanding if you could make a salt in a routine

4    fashion.

5    Q.    Would the formation of salts in apixaban have been

6    within the level of ordinary skill as of 2001?

7    A.    Absolutely, yes.

8    Q.    What do you consider with respect to the level of

9    predictability in the art?

10   A.    So the level of predictability is very high.  We

11   talked about it already.  These concepts are very

12   straightforward.  They're easy to implement and it's easy to

13   predict what's going to happen when you, when you make these

14   salts.  Again, the level predictability in the art was very

15   high.  Again, the document being enablement.

16   Q.    What direction was provided by the inventors with

17   respect to making pharmaceutically acceptable salts of

18   apixaban?

19   A.    So in the '208 patent, it explicitly describes how to

20   experimentally make the neutral form of apixaban, so that's

21   a very high level of direction.

22              On top of that, the '208 patent also describes

23   in column 117 how you go about making the pharmaceutically

24   acceptable salts of the invention.

25              So, clearly, more than sufficient amount of

MacMillan - direct

1    direction was provided by the inventor.

2    Q.    Go to the existence of working examples.  What did

3    you consider with respect to those samples?

4    A.    In terms of existence of working examples, there are

5    12 salts which are described in the '208 patent and two

6    of those are HCl salts.  So a good number of working

7    examples.

8    Q.    How do those working examples in the patent compare

9    with what a person of ordinary skill in the art would do to

10   make pharmaceutically acceptable salts of apixaban?

11   A.    You would use exactly the same routine methods as we

12   used to make those, that would be used to make the salts of

13   apixaban.

14   Q.    And, finally, what quantity of experimentation is

15   needed to make pharmaceutically acceptable salts of

16   apixaban?

17   A.    So, again, you know, salt formation is routine.

18   Experimentation is required.  On top of that, Professor

19   Jacobsen clearly demonstrates that, you know, we can do that

20   in the course of a day.  So very little quantity of

21   experimentation is required.

22   Q.    So taking these factors all together, what is your

23   opinion with respect to whether claim 13 of the '208 patent

24   is enabling?

25   A.    Taking all the *Wands* factors all together, clearly 13

MacMillan - direct

1    is enabled.

2    Q.      Did you also form an opinion about enablement of

3    claim 104?

4    A.      I did.

5    Q.      What is that opinion?

6    A.      My opinion is claim 104 is also enabled.

7              MR. DANFORD:  If we could have up PDX-12.16.

8    BY MR. DANFORD:

9    Q.      What's the difference between claims 13 and 104?

10   A.      So claim 13 is a compound, according to claim 8,

11   wherein the compound is -- and then it gives the formal

12   chemical name for apixaban, or a pharmaceutically acceptable

13   salt form thereof.

14             Compound 104 is a compound, according to claim

15   13, and that refers to the neutral form of apixaban, which

16   is the crystalline compound.

17   Q.      Would a person of ordinary skill have understood the

18   plain language of claim 104 to talk about pharmaceutically

19   acceptable salt forms of apixaban?

20   A.      No, they would not.

21   Q.      Why do you say that?

22   A.      They wouldn't know that because if you look at the

23   claims as a whole, in the '208 patent, you read claim 13,

24   but then read claim 27, claim 55, and then claim 104, you

25   would clearly understand that 104 does not relate to a

MacMillan - direct

1    pharmaceutically acceptable salt form in a crystalline form.

2            MR. DANFORD:  Well, let's have up PDX-12.17.

3    BY MR. DANFORD:

4    Q.    Could you explain that to us, again, with respect to

5    what a person of ordinary skill would conclude reading the

6    claims together?

7    A.    Sure.

8            MR. SEGREST:  Your Honor, this is a claim

9    construction argument.  When plaintiffs asserted claim 104

10   in the middle of claim construction, they represented to us

11   that it raised no new claim construction arguments when we

12   were briefing "pharmaceutically acceptable salt."  I think

13   it's that he just waived the issue of claim construction on

14   claim 104.

15           MR. DANFORD:  He's just describing what a person

16   of ordinary skill would understand the plain language of the

17   claim to mean.

18           THE COURT:  You are not asking for a new

19   construction?

20           MR. DANFORD:  No.

21           THE COURT:  Okay.

22           MR. SEGREST:  This is a construction of claim

23   104 they never requested.

24           THE COURT:  I'll overrule it.  I will hear it

25   and you can respond appropriately.

MacMillan - direct

1              Go ahead.

2       BY MR. DANFORD:

3       Q.      Could you explain to us what you are showing here on

4       this slide?

5       A.      Yes.   I'm basically showing the logic a person of

6       ordinary skill would use to understand that 104 does not

7       relate to a compound that is a pharmaceutically acceptable

8       salt.

9       Q.      And why is it that you say that?

10      A.      Again, if you look at 13, it says:  "A compound

11      according to claim 8."  It says:  neutral apixaban or a

12      pharmaceutically acceptable salt form thereof.

13              And then you go to 27, and it says:  a compound

14      of claim 13 or a pharmaceutically acceptable salt form

15      thereof.

16              There'd be no point in saying a pharmaceutically

17      acceptable salt form of a pharmaceutically acceptable salt.

18      That would be superfluous language.  So claim 27 clearly

19      shows that claim 13, a compound of claim 13, is the neutral

20      form.

21              Now, if there's any doubt about this, it is

22      reinforced in claim 55, which says exactly the same thing.

23      So clearly 104 is alluding to the fact that claim 13, a

24      compound, is the neutral form of apixaban.

25      Q.      Are salts compounds?

MacMillan - direct

1   A.      Yes, they are.

2   Q.      Why would a person of ordinary skill in the art then

3   not understand a compound, according to claim 13, to include

4   pharmaceutically acceptable salts of apixaban?

5   A.      Well, again, in this context, given what 27 and 55

6   states, they would understand in this case it's not

7   referring to the salt form.

8   Q.      What does the '208 patent disclose with respect to

9   how to make the neutral form of apixaban?

10  A.      The '208 patent explicitly describes how to make

11  the -- to make the neutral form of apixaban.

12  Q.      What does the '208 patent disclose with respect to

13  how to make crystalline forms of apixaban?

14  A.      Again, it explicitly explains how to make the

15  crystalline form of apixaban.

16  Q.      So, then, what is your opinion as to whether claim

17  104 is enabled?

18  A.      Claim 104 is enabled.

19  Q.      Now, let's assume claim 104 included pharmaceutically

20  acceptable salt forms of apixaban, too.

21          Do you have an opinion about whether the claim

22  would be enabled in these circumstances?

23  A.      Sure.

24          So while I don't think that it incorporates a

25  pharmaceutically acceptable salt, if it did, it would still

MacMillan - direct

1    be enabled.

2    Q.    What's the reason for that?

3    A.    Because salts are usually pretty straightforward to

4    crystallize, so it would be -- I think it wouldn't be any

5    problem if you had the salt form to actually get a crystal

6    form of it.

7    Q.    So let's shift topics.

8          Do you recall Dr. Buckton and Dr. Scheidt's

9    testimony that the asserted claims of the '208 patent lack

10   adequate written description?

11   A.    Yes, I do.

12   Q.    Do you agree with that?

13   A.    No, I do not.

14          MR. DANFORD:   Let's have PDX-12.18.

15   BY MR. DANFORD:

16   Q.    What is your opinion with respect to whether there's

17   adequate written description for the asserted claims of the

18   '208 patent?

19   A.    Basically that a person of ordinary skill would

20   understand that the inventors were in possession of the

21   pharmaceutically acceptable salt forms of apixaban by 21st

22   of September of 2001.

23          MR. DANFORD:   If we could have up PDX-12.19.

24   BY MR. DANFORD:

25   Q.    What are the reasons for your conclusion that a

MacMillan - direct

1    person of ordinary skill would conclude that the inventors

2    were in possession of a pharmaceutically acceptable salt

3    form as of the as priori date?

4    A.    My reasons are, again, summarized here in three

5    bullet points.

6            The first one, the original provisional

7    application, actually, is a claim directed towards the

8    pharmaceutically acceptable salt form of apixaban.

9            As we've stated already, the '208 patent

10   specification has a synthesis detailed of apixaban, as well

11   as it details methods for making salts that can be

12   pharmaceutically acceptable.

13           Then the third part is level of skill in the

14   art.  Again, salt formation is essentially routine.

15   Q.    Let me turn you to Tab 1 in your binder before you,

16   which should be PTX-331.

17           Do you recognize PTX-331?

18   A.    Yes, I do.

19   Q.    What is PTX-331?

20   A.    This is the provisional application for the '208

21   patent.

22   Q.    Is this one of the documents that you considered in

23   forming your opinions?

24   A.    Yes, it was.

25   Q.    When was this application filed?

MacMillan - direct

1  A.      The 21st of September of 2001.

2  Q.      If you could please turn to page 110 of the

3  application.

4          Do you see Example 18 at the bottom of that

5  page.

6  A.      Yes, I do.

7  Q.      And that example carries over to the following pages;

8  correct?

9  A.      That is correct.

10  Q.      What is the chemical structure shown at the top of

11  page 111?

12  A.      That is the chemical structure of apixaban.

13  Q.      And what is described in Example 18 of this

14  application?

15  A.      18 is the exact experimental details to go about

16  making apixaban.

17  Q.      If you turn to page 48 of this application, there's a

18  paragraph that begins at around line 6.

19          Do you see that?

20  A.      I do.

21  Q.      What does this paragraph describe?

22  A.      This describes how to make pharmaceutically

23  acceptable salts of the invention.

24  Q.      And how does this paragraph compare with the text

25  that we have been looking at from column 17 of the '208

MacMillan - direct

1    patent?

2    A.      It's identical.

3    Q.      Now, let me point you to one further part of this

4    patent.

5              If you could turn to claim 8 of this

6    application, which starts at page 223 at 14.

7              What does claim 8 describe?

8    A.      Claim 8 describes a compound, according to claim 1,

9    wherein the compound is selected from a group, and then it

10   goes on to give a number of examples.

11             MR. DANFORD:   If we go to page 225, lines 6 to

12   8.

13   BY MR. DANFORD:

14   Q.      What is that compound that's given as one of the

15   examples in claim 8?

16   A.      That is the neutral form of apixaban.

17   Q.      And if you go to the end of the claim, at page 227,

18   line 21, what does this language refer to?

19   A.      This refers to, "or a pharmaceutically acceptable

20   salt form thereof."

21   Q.      What would a person of ordinary skill in the art have

22   understood to be described by this claim in the provisional

23   application?

24   A.      This -- a person of ordinary skill would have

25   understood that this describes how to -- that the inventors

MacMillan - direct

1    were in possession of apixaban and pharmaceutically

2    acceptable salts of that, of apixaban.

3    Q.      Why do you say that?  Just taking all the information

4    in this provisional application together, what would a

5    person of ordinary skill in the art understand the inventors

6    were in possession of?

7    A.      It would be they understand they were in possession

8    of apixaban and the pharmaceutically acceptable salt of

9    apixaban.

10   Q.      And why do you say that?

11   A.      Because this information clearly describes that.

12              MR. DANFORD:  Now, if we go back to PDX-12.19.

13   BY MR. DANFORD:

14   Q.      What information from the '208 patent specification

15   did you consider on this written description issue?

16   A.      On the written description issue, I considered, first

17   of all, the synthesis of apixaban as described in the '208

18   patent.

19              And I also -- I considered the Section 117,

20   Column 117, it describes how you make salts -- how to make

21   salts that are pharmaceutically acceptable.

22   Q.      And what relevance does that information have to

23   whether the inventors were in possession of pharmaceutically

24   acceptable salt forms of apixaban?

25              MR. SEGREST:  Your Honor, I apologize.  I need

MacMillan - direct

1   to take a short break.

2                    THE COURT:  Oh, sure.

3                    MR. SEGREST:  Physically.

4                    THE COURT:  That's fine.  Let's take a short

5   recess.

6                    (Brief recess taken.)

7                    *      *      *

8                    (Proceedings reconvened after recess.)

9                    THE COURT:  Are you ready to continue?

10                   MR. SEGREST:  Yes, Your Honor.

11                   THE COURT:  Let's continue.

12                   MR. DANFORD:  If we could have up PDX-12.19

13  again.

14  BY MR. DANFORD:

15  Q.     Dr. MacMillan, before we took a break, we were

16  talking about the '208 patent specification.

17                   Do you recall that?

18  A.     Yes, I do.

19  Q.     And I believe you pointed us to the two sections in

20  the '208 patent specification, the synthesis of apixaban and

21  the methods of making salts that can be pharmaceutically

22  acceptable.

23                   Do you recall that?

24  A.     Yes, I do.

25  Q.     What would a person of ordinary skill in the art have

MacMillan - direct

1    concluded given those two parts of the specification

2    together with respect to this issue of written description?

3    A.      They would have concluded that the inventors had

4    possession of the pharmaceutically acceptable salts of

5    apixaban.

6    Q.      And what did you consider with respect to the level

7    of ordinary skill in evaluating this question of adequate

8    written description?

9    A.      It was the same level of ordinary skill as I

10   considered for all of my opinions.

11   Q.      Okay.  And what did you consider with respect to the

12   level of ordinary skill?  How did that factor into your

13   analysis of the question of written description?

14   A.      Oh, the level of skill in the art with respect to

15   salt formation?

16   Q.      That's right.

17   A.      The fact that the -- yes.  I mean, a person of

18   ordinary skill would know how to make salts routinely.

19   Q.      Okay.  So taking all of this information together,

20   the provisional application, the '208 patent specification,

21   and the level of skill in the art, what is your opinion with

22   respect to whether there's adequate written description for

23   any asserted claim in the '208 patent covering

24   pharmaceutically acceptable salts of apixaban?

25   A.      There is adequate written description for any

MacMillan - direct

1   asserted claim.

2   Q.      So let me briefly address SigmaPharm's claim

3   dependency argument.

4            Were you here when Dr. Heathcock testified?

5   A.      Yes, I was.

6   Q.      Do you agree with Dr. Heathcock's opinion that

7   claim 13 and 104 are invalid because claim 1 does not cover

8   apixaban?

9   A.      No, I do not.

10  Q.      What are the reasons that you disagree?

11  A.      I disagree because Dr. Heathcock and SigmaPharm

12  basically advance a concept or a convention for organic

13  chemistry that no organic chemist that I know of would

14  follow, and I certainly do not follow.

15  Q.      Did you previously address this issue in your

16  infringement testimony?

17  A.      Yes, I did.

18  Q.      Is your opinion any different when it comes to

19  invalidity?

20  A.      No, it is not.

21           MR. DANFORD:  So let's have up PDX-12.20.

22  BY MR. DANFORD:

23  Q.      What are you showing here?

24  A.      So I'm showing here the chemical structure of

25  apixaban again, and the fact that it satisfies the

MacMillan - direct

1    limitations which are in dispute.

2    Q.    And I see you have four limitations.  That's the M,

3    A, Q, and E rings.

4            Is that right?

5    A.    That's right.

6    Q.    Are those the only limitations SigmaPharm is

7    disputing from claim 1?

8    A.    Yes, they are.

9    Q.    So let's go through each of them, and if we can start

10   with Ring M.

11           In apixaban, how many $R^{1a}$ groups is Ring M

12   substituted with?

13   A.    Apixaban is substituted with 0 $R^{1a}$.

14   Q.    And what's your reason for saying that?

15   A.    My reason for saying that, again, if we looked at

16   the -- in the white box on the right-hand side, and this is

17   taken directly from the '208 patent, you can see that this

18   ring as shown already incorporates the hydrogens, and all

19   organic chemists know that.

20           You can also see that it maps completely onto

21   the core of apixaban where it says Ring M.  So you can see

22   that the hydrogens are already there, so you know no

23   substitutions have taken place, so, therefore, it's

24   substituted with 0 $R^{1a}$.

25   Q.    In the language of claim 1, how many $R^{1a}$ groups can

MacMillan - direct

1    Ring M be substituted with?

2    A.    It can be substituted with 0 to 2 0 R4a.

3    Q.    How does Ring M in apixaban compare with what the

4    claim requires?

5    A.    It falls within those limitations.

6    Q.    Let's go to Ring A.

7              In apixaban, how many $R^4$ groups is Ring A

8    substituted with?

9    A.    It's substituted with 0 $R^4$ groups.

10   Q.    What's your reason for saying that?

11   A.    Again, the patent language.  It says "A is selected

12   from $C_{3-10}$ carbocycle," and it says it can be unsaturated

13   which includes phenyl rings A, which a phenyl ring which

14   will incorporates hydrogens already on those phenyl rings.

15             So clearly it is substituted with 0 $R^4$.

16   Q.    In the language of claim 1, what may Ring A be

17   substituted with?

18   A.    0 to 2 $R^4$.

19   Q.    How does Ring A in apixaban compare with what the

20   claim requires?

21   A.    It falls within those requirements.

22             MR. DANFORD:  Let's go to Ring Q.

23   BY MR. DANFORD:

24   Q.    In apixaban, how many $R^{4a}$ groups is Ring Q substituted

25   with?

MacMillan - direct

1    A.      It's substituted with 0 R$^{4a}$.

2    Q.      What is your reason for saying that?

3    A.      Again, looking at the white box, which is the patent

4    language, it says that Ring Q is a 6-membered monocycle, and

5    Q1 is a carbonyl.  And so, therefore, this showing Q already

6    has the hydrogens within that ring.  So clearly no

7    substitutions have taken place, so clearly it's substituted

8    with 0 to R$^{4a}$.

9    Q.      In the language at claim 1, what may ring Q be

10   substituted with?

11   A.      It can be substituted for a 0 to 4 R4a.

12   Q.      How does ring Q and apixaban compare with what the

13   claim requires?

14   A.      It falls within those limitations.

15   Q.      Let's go to ring E.  In apixaban, how many R groups

16   is ring E substituted with?

17   A.      It's substituted with 1 R.

18   Q.      And what is the R group substituted on ring E in

19   apixaban?

20   A.      On the bottom of ring E, you can see the small green

21   rectangle.  That's called an methoxy group.  That's what

22   it's substituted with.

23   Q.      What are your reason for saying ring E is substituted

24   with one R group in apixaban?

25   A.      Again, if you look at the patent language, it says

1    that G is a group of formula 2A or 2B.  Then you can see

2    that the ring E is absent.  Ring E is selected from a

3    phenyl.  Ring E is a phenyl group that will contain these

4    hydrogens.  So there's one substituent, which is an epoxy

5    that is substituted with one R.

6    Q.    In the language of claim 1, what may ring E be

7    substituted with?

8    A.    It can be substituted with 1 to 2 R.

9    Q.    How does the number of substitutions on ring E

10   compare with what the claim requires?

11   A.    It falls within the requirements.

12   Q.    In sum, what's your opinion as to whether apixaban is

13   a compound according to claim 1 of the '208 patent?

14   A.    Apixaban is a compound of claim 1 of the '208 patent.

15   Q.    What's your opinion as to whether claim 13 and 104 of

16   the '208 patent are invalid for improper dependency?

17   A.    I do not agree that they're invalid for improper

18   dependency.

19   Q.    Do you recall that Dr. Heathcock told us how he would

20   rewrite the claim language so that apixaban would be covered

21   by claim 1?

22   A.    I do recall that, yes.

23   Q.    Would a person of ordinary skill need to rewrite the

24   claim language of claim 1 in any way in order for apixaban

25   to be covered?

                      MacMillan - cross

1    A.       Absolutely not.

2                 MR. DANFORD:  Nothing further right now.  I just

3    want to offer PTX-331.

4                 THE COURT:  Any objection?

5                 MR. SEGREST:  No objection.

6                 THE COURT:  It's admitted.

7                 (PTX-331 was admitted into evidence.)

8                 MR. DANFORD:  Pass the witness.

9                 THE COURT:  Cross-examination.

10                MR. SEGREST:  May I approach the witness?

11                (Mr. Segrest handed notebooks to the witness and

12   to the Court.)

13                        CROSS-EXAMINATION

14   BY MR. SEGREST:

15   Q.       Good afternoon, Dr. MacMillan.  I'm Phillip Segrest.

16   I have some more questions for you again.

17   A.       Okay.

18   Q.       Can we pull up PDX-12.24 that we were just looking

19   at?

20                    So on this slide, you say that ring E is

21   substituted with 1 to 2 R; right?

22   A.       Yes, that's correct.

23   Q.       So ring E has to have at least one substituent from

24   the R group; right?

25   A.       In this part of the patent language, that would be

MacMillan - cross

1    correct.

2    Q.    Let's take a look at the other parts of the patent

3    language.

4                  Now, remember, at the end of your last

5    testimony, or my cross-examination, I was going to ask you

6    if there weren't some compounds recited in dependent claims

7    that your construction wouldn't read on; right?

8    A.    Can you restate that question for me?

9    Q.    Yes.  At the end of the cross-examination in your

10   earlier testimony, I asked if you were aware that there were

11   some compounds and dependent claims that your way of reading

12   claim 1 would not cover.

13                  Do you recall that?

14   A.    I do remember you asking those questions, yes.

15   Q.    And were you -- you were here for Dr. Heathcock's

16   testimony; right?

17   A.    Yes, I was.

18   Q.    And he explained why your way of reading claim 1

19   wouldn't cover some of those compounds; right?

20   A.    You would have to read back the specific way he

21   described that, but he described what he felt was his

22   opinion of the conventions I believe that he was using.

23   Q.    But in describing your way of approaching this,

24   didn't he identify some compounds and dependent claims that

25   your way of reading claim 1 would not cover?

MacMillan - cross

1    A.      He -- I can't remember exactly the language that he

2    used, but he I believe put forward compounds that may have

3    been that, may have been his opinion, but to be honest, I

4    don't remember them being contrary to what my own opinions

5    would be.

6    Q.      Well, let's look back at claim 1.  If we can pull up

7    JTX-1 right here.

8            This is showing that A ring that you were just

9    talking about; right?

10   A.      Sure.  This --

11   Q.      JTX-1.  I believe it's the first tab in your binder,

12   and this will be column 237.

13   A.      237.  Okay.

14   Q.      So is this a part of claim 1 that refers to that

15   ring E?

16   A.      So claim 1, this part refers to -- this is the part

17   of claim 1 which refers to group G, which incorporates the D

18   ring notation, yes.

19   Q.      And, now, the patent has several certificates of

20   correction.  None of them change this language; right?

21   A.      Off the top of my head, I didn't memorize all of the

22   corrections.  I will take your word for it.

23   Q.      You are not aware of any changes as you sit here

24   today that there was a physical correction made to this part

25   of the patent?

MacMillan - cross

1    A.      Yes, I take your word for it.

2    Q.      So let's focus in on lines 54 and 5.  Does this

3    recite ring E is substituted with 1 to 2 R?

4    A.      This is -- it says ring E is selected from phenyl,

5    pyridyl, yes, substituted with 1 to 2 R.

6    Q.      I believe we pulled up line 59 and 60 there.  That's

7    okay.  That's where I was going next.

8    A.      So the question was with respect to ring D?

9    Q.      Ring E.

10   A.      Oh.

11   Q.      Doesn't this -- well, back up one.  We're missing one

12   there.  Okay.  This is what I was talking about, line 54 to

13   55.  E is substituted with 1 to 2 R?

14   A.      Yes.

15   Q.      So it requires at least one R substituent on ring E?

16   A.      There is one -- it states that there and I completely

17   agree with that, but there also is the part which was in Dr.

18   Heathcock's report where he says you can have ring D and E,

19   and collectively they can have up to the combination of the

20   two numbers.  So based upon Dr. Heathcock using that, we

21   accepted that, or I accepted that in my opinion and thinking

22   about that.

23   Q.      But you agree that this language in the patent

24   requires ring E to be substituted with at least 1 R; is that

25   right?

MacMillan - cross

1  A.     I agree that it says that, absolutely, but at the

2  same time, I do -- you know, in Dr. Heathcock's report, he

3  says that you could combine the two and that was what I used

4  in forming my opinion.

5  Q.     Now, you referred to Dr. Heathcock's report.  You're

6  not referring to his testimony in court; right?

7  A.     I don't -- I don't recall honestly if he said that or

8  not.  I know it was in his report.

9  Q.     So let's look at line 56 through 61.  Yes.

10        So this is describing another potential ring E

11  structure, right, where D is absent and then it gives a list

12  of things for ring E.  Again, it says that ring E is

13  substituted with 1 to 2 R?

14  A.     It does say that, yes.

15  Q.     So, again, this part of claim 1 requires ring E to

16  have at least one substituent from the R group; right?

17  A.     Yes, with the caveat, those two rings, then that

18  changes it.

19  Q.     Okay.  Well, let's look at line 62 through 67.  Now,

20  doesn't this part of claim 1 also require that ring E be

21  substituted with at least one R?

22  A.     I would fully agree with the same caveat, yes.

23  Q.     Go back up to the part that's showing the group G,

24  line 35 through -- back up one more.  Again.

25        I want to go back to the ring that's showing all

1  of group G.  Where is the caveat that you refer to listed

2  here in the claim of the patent?

3  A.      So in forming my opinion, what I did was I read the

4  patent.  I read Dr. Heathcock's report and he stated that.

5  I accepted that and went with that because I was forming my

6  opinions.  So that was for me, that was the part that I used

7  to make my -- my understanding of it was based upon Dr.

8  Heathcock's report and he explicitly states that in his

9  report.

10  Q.      So do you agree with Dr. Heathcock or are you

11  deferring to Dr. Heathcock about how to interpret the claims

12  of the '208 patent?

13  A.      On that specific point with respect to ring D and E,

14  I do, I do -- I just -- to be honest with you, I just read

15  he used that and I followed that and I used that in my

16  analysis.

17  Q.      Now, this says that ring D is substituted with 0 to 2

18  R, doesn't it?

19  A.      Does it say it here?  Yes, it does.

20  Q.      So D and E together, does G group have at least four

21  R substituents on the G group; right?

22  A.      It's saying substituted with.

23  Q.      All right.

24  A.      In terms of the one substituent, you have to be

25  careful using the substituent.  In terms of what it's

MacMillan - cross

1  substituted with, it says that D is substituted with 0 to 2

2  and it says that E is substituted with 1 to 2.

3  Q.     Right.

4  A.     And that combination can therefore be -- I believe if

5  you add those up, those become the combination of D and E

6  can become 1 to 4.

7  Q.     So D and E is at most four substituents; right?

8  A.     D and E can be substituted with up to four groups.

9  Q.     And you understand it was Dr. Heathcock's opinion

10 that D and E together are substituted with more than four

11 members of those Markush groups in apixaban; right?

12 A.     Yes.  Obviously, that's where Dr. Heathcock believes,

13 and that's the part that I think there is no convention that

14 any organic chemist would follow.

15 Q.     That's the only way he was combining D and E; right?

16 He was saying it was more than the four total?

17 A.     I don't know if he was making it in that context.  I

18 would have to ask him specifically.  But I know in his

19 report that's what he did say, so I just accepted that.

20 Q.     But there's nowhere in his testimony where he says

21 that ring E can have -- be substituted with fewer than one

22 member of R, is there?

23 A.     I'd have to go back to his testimony and look through

24 that specifically.

25 Q.     Let's turn now to claim 8, which is in column 265

MacMillan - cross

1    through 268 in your notebook.

2            Now, doesn't claim 8, which spans several

3    columns, it's not all shown here, but doesn't it go through

4    reciting a number of different compounds?

5    A.      Yes, it does.

6    Q.      So basically that's the start of the name of a

7    different compound?

8    A.      Yes, it is.

9    Q.      The ninth compound that he lists, the one at the

10   bottom in the column on the left, is that apixaban?

11   A.      Hold on.  Is it okay if I refer back to another part

12   of the patent?

13   Q.      Sure.  I just want to find out what you are referring

14   to.

15   A.      You know, again, I don't have it completely

16   memorized.  Yes, it is.

17   Q.      Okay.  And let's look at the fifth compound listed in

18   claim 8 there.

19           Now, you were here when Dr. Heathcock testified

20   about this compound; right?

21   A.      To be honest with you, I can't say that I know that

22   he testified about this compound.

23   Q.      Well, in one of your expert reports in this case,

24   didn't you include an appendix where you drew out the

25   structures of all the compounds specifically recited in

MacMillan - cross

1    claim 8?

2    A.      If I have my report, I could -- I mean, I remember

3    drawing out a number of different structures.  I don't

4    remember the extent of those structures, so to say all of

5    them, I don't know if I drew out all of them, to be

6    perfectly honest.

7    Q.      Well, let's put up the page from the appendix to the

8    report.  I don't think it's in your notebook, but this

9    is page B3 from Appendix B to your expert report, isn't

10   it?

11   A.      I will take your word for it, yes.

12   Q.      Okay.  And where it says limitation No. 8.5, is that

13   drawing out the structure of the fifth compound listed in

14   claim 8?

15   A.      It says compound in claim 8.  So, yes, that does --

16   in fact, that name matches that compound on that slide,

17   yes.

18   Q.      So going to the next slide, zoom in a little bit.

19           This is your drawing of that compound from claim

20   8; right?

21   A.      Again, I will take your word for it.  I'm willing to

22   accept that.

23   Q.      And this five-membered ring here in the bottom left

24   that has got the nitrogen and oxygen on the ring, that

25   corresponds to claim -- I'm sorry, to ring D in claim 1;

MacMillan - cross

1    right?

2    A.      It does, but, again, with the caveat that D and E are

3    combined here, so, but, yes.  Nominally on what would be

4    described as D.

5    Q.      And so isn't the $H_2N$ the -- the amino radical there,

6    that that's substituted onto -- so Ring D is substituted

7    with that amino radical; right?

8    A.      The radical amino group, yeah.  Yes, for sure.

9    Q.      And then isn't Ring E the six-cycle ring there?

10   A.      E is a ring there, yes, for sure.

11   Q.      Is Ring E substituted with any member of claim 1, of

12   any member of -- let me start over.

13           Is Ring E substituted with any member of R other

14   than hydrogen?

15   A.      So the way I look at this, and the way, you know, you

16   would work through claim 1 -- so let me -- let me --

17   Q.      I think it's a yes-or-no question.  Is it substituted

18   with any member of R other than hydrogen?

19   A.      It is because as Dr. Heathcock pointed out, when you

20   have D and E together, which is what we do because you

21   showed the D and you showed the E, we know that that ends up

22   being 1 to 4 on D and E, which is what Dr. Heathcock

23   explained.

24           So when I do my analysis of this compound, it

25   clearly has one of the four.  So it fulfills that.

MacMillan - cross

1   Q.      That one is on Ring D; right?

2   A.      It's on the two rings.  It's on the two different

3   rings.  I mean, it is -- I agree with you it's on Ring D,

4   but I also have to point out that Dr. Heathcock pointed out

5   that D and E combined will have 1 to 4.

6   Q.      But there is nothing in the claim language that says

7   Ring D and E combined; right?  The claim language says Ring

8   E is substituted with 1 to 2 R.

9   A.      I think it's pretty straightforward -- the way I look

10  at it, I think it is straightforward.

11          This was Dr. Heathcock's interpretation of that

12  part of the claim.  And I followed what his interpretation

13  was with that part of the claim.

14  Q.      Where on this Ring E, this Ring E, the six-cycle ring

15  there, is it substituted with anything other than a

16  hydrogen?

17  A.      So on Ring E, in this case, it has -- I agree with

18  you it has three hydrogens, but it's not an isolated Ring E.

19          There are two rings, there's a D and an E.  And,

20  again, Dr. Heathcock states that this would be D and E

21  together and have between one to four groups.  And this is D

22  and E together and it has one group.

23  Q.      But that is not in claim 1; right?

24  A.      This would be my -- again, I'm just following what

25  Dr. Heathcock put -- I just followed that analysis.

MacMillan - cross

1   Q.      It's not Dr. Heathcock's testimony in this case, is

2   it?

3   A.      Again, I don't recall if he testified to that or not

4   here.

5   Q.      But you defer to Dr. Heathcock's analysis on claim

6   construction for claim 1?

7   A.      Whenever -- on this specific point, when he said that

8   D and E together was 1 to 4, I accepted that and honestly

9   just use that in my evaluation.

10  Q.      What he was saying is D and E together cannot have

11  more than four total; right?

12  A.      I guess that -- so he is saying if you take D and E

13  together, it would have one to four substitutions.  That

14  would be correct.

15  Q.      But he -- no.  What he said was D and E together

16  could not have more than four, didn't he?

17  A.      He said it was a 1-to-4 substitution that could take

18  place on it.  And that was clearly, if you look at this, it

19  has one.

20  Q.      He said it has more than four, didn't he?

21  A.      This was a very different part of what he was

22  stating, which was that his convention that chemists would

23  look at molecules like this and not see -- and assume they

24  don't have any groups on it, and the problem with that is if

25  you follow that logic, there would be absolutely no

1    molecules in the patent that actually would be -- that could

2    exist in the world right now.

3              So that part is clearly flawed, in my opinion.

4    But this part, where it says, look, D and E can have 0 to 2

5    or 1 and 2 on E and you could put them together so it's a

6    combination of the two, you can have 1 to 4.

7    Q.    There is no such testimony in this case, Doctor.  You

8    have not pointed out me to anything in claim 1 that allows

9    zero substituents on E, have you?

10   A.    All I can do is I can refer you back to if --

11   Q.    Well, you can answer my question.  You haven't

12   pointed me to anything in claim 1 that allows zero

13   substituents on claim E, have you?

14   A.    The issue with the analysis, the way I would look

15   at -- here's the way I would look at it.

16   Q.    I didn't ask you how you would look at it.

17             Have you pointed to anything in claim 1 that

18   allows zero substituents on Ring E?

19   A.    Yes, if you have D and E together.  If you have E in

20   isolation, then I would agree with you, then that's the case

21   where you would follow specifically.  But Dr. Heathcock

22   states together, you have to --

23   Q.    I didn't ask what Dr. Heathcock states.  You haven't

24   pointed to anything in the language of claim 1 that says you

25   read D and E together and E doesn't have to have a

MacMillan - cross

1    substituents of D, does it?

2    A.    Again, I was just following the interpretation of

3    Dr. Heathcock --

4    Q.    Please answer my question.

5    A.    Can you please ask it one more time?

6    Q.    Sure.

7          You haven't pointed to anything in the language

8    of claim 1, not what you think Dr. Heathcock said, but in

9    the language of claim 1 that says that if there is a

10   substituent on D, then it is okay for E to have 0, to be

11   substituted with 0?

12   A.    Does it explicitly state what Dr. Heathcock used in

13   his report?  It doesn't explicitly state that.  I will agree

14   with that.

15         But was there an interpretation where you could

16   believe that?  Clearly Dr. Heathcock did, and clearly I

17   followed that.

18   Q.    Now, you also testified on direct here about

19   Dr. Heathcock's opinion on how claim 1 could be rewritten to

20   cover apixaban; right?

21   A.    I did.

22   Q.    And so one of the things he suggested was that you

23   would have to say is "unsubstituted or substituted with."

24         Do you recall that?

25   A.    I do recall that part, yes.

MacMillan - cross

1    Q.      But your testimony on direct is that no person of

2    ordinary skill in the art would rewrite the claims that way?

3    A.      My testimony was that no one would need to see that

4    to understand what the claims were stating.  The claims are,

5    in my opinion, are pretty straightforward to understand.

6    Q.      Well, you're also named as an inventor on some

7    patents, aren't you?

8    A.      I am.

9    Q.      And is one of those U.S. Patent No. 7,265,249?

10   A.      I don't know, but I think.

11              MR. SEGREST:  We can put that one up on the

12   screen.

13   BY MR. SEGREST:

14   Q.      This is your name on the patent; right?

15   A.      Yes, that is my name.

16   Q.      So you are a named inventor on this patent; right?

17   A.      Yes.

18              MR. SEGREST:  Let's go to column 22.

19              Do we have just the page where we can see what

20   the claim is?

21   BY MR. SEGREST:

22   Q.      This is the -- in the claims in your patent; right?

23   A.      I haven't looked at this patent in a very long time

24   so I assume that is what it is.  And I'm, again, willing to

25   work from it.

MacMillan - cross

1    MR. SEGREST:  Let's focus on the text at the top
2  of column 22.
3  BY MR. SEGREST:
4  Q.    So here in your patent when you wanted to explain
5  substitution, you used the language "either unsubstituted or
6  substituted"; right?
7  A.    This part certainly does, and if I could have a copy
8  of the patent just to see the context, that would be
9  helpful, too.
10 Q.    And you say that it is substituted with 1 to 4
11 nonhydrogen substituents; right?
12    MR. LEE:  I do object.  He just asked for a copy
13 so we should at least point him to where it is.
14    THE COURT:  Do you have a copy for the witness?
15    MR. SEGREST:  I believe so, Your Honor.
16    Yes, it's Tab 3 in your notebook.
17    THE COURT:  Thank you.  Column 22?
18    MR. SEGREST:  Yes.
19 BY THE WITNESS:
20 A.    (Witness reviews document.)
21 Q.    I'm sorry.  You may have answered this question, but
22 I'm not sure if we got to that or not.
23    So here in your patent, you used this language
24 "either unsubstituted or substituted"; right?
25 A.    Hold on.  I'm just making sure I -- is it okay if I

MacMillan - cross

1    just take 30 seconds to read the context of this?

2    Q.      Sure.

3    A.      (Witness reviews document.)

4            Okay.  I got it.

5    Q.      So you agree that when you wanted to spell out that

6    something might not be substituted, you used the language,

7    "either unsubstituted or substituted"; right?

8    A.      I -- clearly, yes.

9    Q.      Okay.  And you also said, with 1-to-4 nonhydrogen

10   substituents; right?

11   A.      That's what it says, yes.

12   Q.      So when you wanted to exclude hydrogen from the

13   potential substituents, you explicitly said "nonhydrogen

14   substituents"; right?

15   A.      Yeah, but this is a very different context.  This is

16   a case where we have an $R^{10}$.  So where we have a group that

17   is designated $R^{10}$ and then where we're going to go there and

18   decide what we're going to put at that position, in the

19   apixaban patent case, what we're doing is we're saying, we

20   already have a ring.  And when you state a ring, say,

21   benzine or cyclohexane, any conventional organic compounds,

22   we already know that they're there.  If we draw them, we

23   know they're there.

24           When they're not there, we use this notation,

25   $R^{10}$.  So we know in this case that we're going to be

MacMillan - cross

1   replacing R$^{10}$ with a hydrogen.  So in this case, you can use

2   that terminology.

3   Q.      So you agree with Dr. Heathcock that the way to

4   indicated unsubstituted in a patent is to say unsubstituted;

5   right?

6   A.      I agree that in the case where we have an R$^{10}$ group --

7   this is a very different situation, and I don't want to

8   conflate the two things.

9           But there are certainly things you can describe

10   as being unsubstituted.  It's not a phrase which is used

11   commonly with organic chemistry, but it is important to

12   state this context dependent.

13           This is R$^{10}$.  This is where we have a group

14   which is specifically designated, if we show the rest of the

15   structure, where R$^{10}$ is given an R$^{10}$ notation, and we're

16   saying that it's being replaced with -- in this context.

17   This is not a case in the apixaban '208 patent.

18           MR. SEGREST:  PDX-12.3, I think.

19   BY MR. SEGREST:

20   Q.      Now, you never had a physical sample of what

21   Dr. Jacobsen said he made; right?

22   A.      What, me, or --

23   Q.      In your possession.

24   A.      I -- yeah.  In my possession, in the normal sense of

25   possession, no, I did not.

MacMillan - cross

1   Q.      And you never did any test or experiments with the

2   stuff that Dr. Jacobsen said he made; right?

3   A.      I did not.

4   Q.      So here, this is a slide from your direct, isn't it?

5   A.      Yes, it is.

6   Q.      So you say that the salts would be pharmaceutically

7   acceptable because they would have a similar safety profile

8   to apixaban at therapeutic doses.

9           Are you predicting what the salts of apixaban

10  will do based on what the participant compound does?

11  A.      So, it's basically -- it's, again -- and maybe I

12  didn't state this very well in my direct, but it's

13  basically -- as soon as you ingest it, it's going to

14  immediately become neutral apixaban, and that is why the

15  statement is stated the way that it is stated.

16  Q.      Doctor, now you said as soon as you ingest it.  Is

17  that immediately, instantaneously?

18  A.      The rate at which they do the reaction is going to be

19  roughly controlled by diffusion rates.

20  Q.      What time frame are we taking about here?  Is it a

21  few hours, a few weeks?

22  A.      If we recall, 10 to the 8th or 10 to 9th.

23  Q.      So very, very quickly; right?

24  A.      Yes.

25  Q.      As soon as it comes in contact with the acid in the

1   stomach.

2   A.      If it is in an aqueous environment or in the stomach,

3   which is an acidic environment.  If it was in an organic

4   environment, it would be a whole different ballgame.  That

5   is a very different situation.

6   Q.      So if it were in contact with the tissue of a human

7   or an animal, that would be different than from being in

8   that acidic environment; right?

9   A.      Right.  But the problem that you run into there is

10  you have to try to get your compound from the -- where it's

11  at to the test-tube without going through any acid or water

12  which is in the body.  It's not like molecules rub up

13  against each other.  They have to travel through media.  And

14  that media in the body is water; or in the stomach, it's a

15  mixture of water and HCl, which is an acid.

16          So that's the problem.  That's why it can't get

17  to the tissue to do that damage.

18  Q.      So because it can't get to the tissue, what you're

19  actually opining about is the safety of neutral apixaban and

20  the various counter ions, once they're in the body; right?

21  Not the salts of apixaban in contact with human or animal

22  tissue.

23  A.      My understanding -- when I was asked to do the

24  analysis of a pharmaceutically acceptable salt, was, could

25  you form this salt and could you administer it without --

MacMillan - cross

1   based upon commensurate with a reasonable benefit-to-risk

2   ratio.

3              With the understanding when you ingest it, it's

4   going to 10 to the 9th, 10 to the 8th.  It become neutral

5   apixaban.  As a chemist, you understand what you're doing;

6   therefore, you are effectively giving someone neutral

7   apixaban and, agreed, trace amounts of salts.

8   Q.    But, again, you didn't do any sort of clinical

9   experiments, any sort of experiments with Dr. Jacobsen's

10  compounds.  You didn't get any empirical information on how

11  they performed; right?

12  A.    The -- personally, I would not.  I did not do that,

13  but, obviously, as I mentioned I talked to Dr. Kowey, who is

14  a clinical cardiologist, and he confirmed that based on his

15  experience and his knowledge, that's what he would expect to

16  happen.

17  Q.    He didn't have any of those compounds Dr. Jacobsen

18  made either, did he?

19  A.    I don't know that to be the case, but, again, I'll

20  take a look.

21  Q.    You are not aware of any test he did with

22  Dr. Jacobsen's compounds, right?

23  A.    I am not.

24  Q.    Okay.  Let's look at slide 12.7.  Now, this is

25  Plaintiffs' Demonstrative Exhibit 12.7.

MacMillan - cross

1    All right.  So you refer to this part of the

2    '208 patent.  It has a reference to Remington's

3    Pharmaceutical Sciences, page 1418?

4    A.    That's right.

5    Q.    That document, Remington's Pharmaceutical Sciences, I

6    believe that page is incorporated by reference in the

7    patent; right?

8    A.    I'm sorry.  You said Dr. -- I'm slightly there.  I

9    apologize.

10   Q.    Let me try again.  So that reference, Remington's

11   Pharmaceutical Sciences, page 1418, is incorporated by

12   reference in the '208 patent; right?

13   A.    That is right.

14   Q.    And you said this is a standard textbook in the

15   field?

16   A.    I said it's a textbook that people in the field are

17   simply aware of and it has been around for a very long

18   time.

19   Q.    Is it considered a reliable authority?

20   A.    Is it considered a reliable authority?  That would

21   depend upon your definition of reliable authority.

22   Q.    Is it a treatise that you would rely on?

23   A.    For pharmaceutically, for knowing about ions or

24   salts and knowing the commonly used ones for

25   pharmaceuticals, yes.

MacMillan - cross

1   Q.      Would you rely on Remington's Pharmaceutical Sciences

2   for what it says about salts?

3   A.      It would be completely dependent upon what it

4   actually states.

5   Q.      But you do consider it a reliable treatise for the

6   part that's being incorporated here?

7   A.      Well, the part which is being incorporated here is

8   for a list of suitable salts, which is exactly what it says.

9   That's what I relied upon it for, the counterions in the

10  salts that are listed on the table in page 1418.

11  Q.      Let's go to JTX-10, which is Remington's

12  Pharmaceutical Sciences.  Page 58 of the exhibit I think is

13  page 1418 of Remington's.

14          Now, the table is in the bottom right down here;

15  right?

16  A.      Yes.  Can you tell me where the tab is?

17  Q.      Yes.  This is -- it should be there.  It's tab 2 in

18  your binder, and we're on page 1418, which is has the Bates

19  number of BMSAPI001665.

20  A.      Okay.

21  Q.      And that table is underneath the heading that says

22  salt formation, isn't it?

23  A.      Yes.

24  Q.      There's even a paragraph on salt formation.

25          So do you see the sentence that begins with,

MacMillan - cross

1   unfortunately; right?

2   A.      Yes.

3   Q.      And so doesn't Remington teach us that unfortunately,

4   there is no reliable way of predicting the influence of a

5   particular salt species on the behavior of the parent

6   compound in dosage forms?

7   A.      So the part about that --

8   Q.      Doesn't it say that?

9   A.      Yes, absolutely it says that, yes.

10  Q.      And you are predicting the behavior of the salt

11  species of apixaban based on the parent compounds in the

12  dosage forms; right?

13  A.      I am telling you that the salts in this case will

14  immediately revert back to apixaban.

15                      And --

16  Q.      But you're predicting the behavior of the salt form

17  based on the parent compound and the dosage form, aren't

18  you?

19  A.      I'm predicting, I'm predicting that the salt -- let

20  me state it this way.  I'm predicting -- I don't know how

21  you want me to answer this.

22  Q.      It's a yes-or-no question.  I would like you to

23  answer that.

24  A.      So the way I would say it is, yes, I'm predicting,

25  because the work here is reliable, and you have to realize

MacMillan - cross

1    that that is modifying the sentence.

2                    And the question in this specific context

3    is:  Does the salt, in this case, can you predict what it's

4    actually going to do?  And in this scenario, it's completely

5    reliable, because it's on the simple idea of will this salt

6    revert to the neutral form being based in water or being an

7    acid and that is predictable, because decades and decades of

8    concepts in chemistry that were very well-known absolutely

9    predicted that.

10   Q.    Can we pull up DDX-16-14.

11                   Now, you testified about this drawing some on

12   your direct; right?

13   A.    I did testify about it, yes.

14   Q.    Okay.  And do you agree that if you take apixaban and

15   put it in an environment that's pH 3 to 10, you won't get

16   any apixaban ions.  You get the neutral apixaban?

17   A.    Absolutely.

18   Q.    Okay.  In any of your testimony, have you identified

19   any compound that makes a pharmaceutically acceptable salt

20   which has a pKa outside of that range in the parent

21   compound?

22   A.    Did you say a pH range?

23   Q.    Outside of that three to ten.  Now, that is unionized

24   in that three to ten range.  That is only ionized when you

25   get outside that three to ten range.

MacMillan - cross

1   A.      So, again, I apologize.  I think I wasn't very clear

2   in my direct.  You can't take those types of salts and

3   define what the pH is just by looking at them.

4   Q.      I didn't ask you about the pH of the salt.  I'm

5   talking about the compound that you are using to make a

6   salt.

7                Have you identified any compound for which there

8   is a proven pharmaceutical salt form where the parent

9   compound is a neutral compound, it's entirely unionized in

10  that range of three to ten?

11  A.      So you're -- from what I'm hearing you saying, you're

12  saying is there a compound that has a pH between three to

13  ten.  The problem is compounds don't have pH's.

14  Q.      I didn't say anything about a compound having a pH.

15  I asked you, the compound would be entirely unionized if you

16  put it in an environment that is a pH of three to ten.

17  A.      I'm sorry.  Can you ask the question?  Is there a

18  compound?  Sorry.

19  Q.      That when like apixaban, when you put it in a pH

20  environment of three to ten, it's entirely unionized.

21                Do you know of any pharmaceutically

22  acceptable salt can be made in such a compound?

23  A.      I have not performed that analysis.

24  Q.      You mentioned there are 12 salts exemplified in the

25  '208 patent?

MacMillan - cross

1   A.      That is correct.

2   Q.      And none of those are salts of apixaban, are they?

3   A.      None of those salts are of apixaban, that is correct.

4   Q.      All right.  Now, you testified on direct that you had

5   also considered some of the statements from BMS employees

6   about apixaban being a neutral compound; right?

7   A.      That is correct.

8   Q.      Can we pull up DTX-629.

9           Now, this DTX-629 is an e-mail that you also

10  considered, isn't it?

11  A.      Can you show me that in the -- sorry?

12  Q.      Yes.  It's in the binder.  It's tab 6.

13          And you listed this particular e-mail in the

14  materials considered in your reports in this case; is that

15  right?

16  A.      Again, I should remember that, but I will absolutely

17  accept that as being the case.

18  Q.      This e-mail says it was written by Patrick Lam; is

19  that right?

20  A.      Yes.

21  Q.      Were you here for Dr. Knabb's testimony?

22  A.      Yes.

23  Q.      You remember Dr. Knabb said doctor Lam was the head

24  of the chemistry side and was the co-chair with Dr. Knabb

25  who was on the clinical side?

MacMillan - cross

1    A.      Actually I do remember that part, yes.

2    Q.      So Patrick Lam is above Dr. Pinto's lab and Dr.

3    Pinto's lab is what had Dr. Orwat; right?

4    A.      I don't remember that for sure.

5    Q.      Okay.  And so here Dr. Knabb is responding to a

6    question from somebody on the clinical side; right?

7    A.      I do not know who he's asking the question to.  I

8    don't know which slide you're on.

9    Q.      Okay.  But he tells him, this person, Patrick, they

10   have a chemistry related question in the quoted part down

11   below; right?

12   A.      The one in the part in yellow.

13   Q.      Not the part -- yes, I'm sorry.  Yes.  So the part in

14   yellow says I have a chemistry related question; right?

15   A.      Okay.  Okay.  I've read it through.

16   Q.      Okay.  So this is a person who is asking a question

17   that they say is important for our clinical pharmacology

18   study design; right?

19   A.      It does state that.

20   Q.      Okay.

21   A.      It says, understanding those are important, yes.

22   Q.      And so don't they have a question for Dr. Lam about

23   apixaban being a neutral compound?

24   A.      They say, I have a question related to apixaban --

25   yes.

MacMillan - cross

1    Q.      And doesn't he respond explaining that a neutral

2    compound is one that does not have any ionizable hydrogen at

3    a pH one to eight?

4    A.      Again, this is in the context of generating a salt.

5    Q.      But did he say that?

6    A.      Yes.  I mean, clearly, he does say it, but for

7    context --

8    Q.      And doesn't he explain that apixaban falls inside

9    this category?

10   A.      He does state that here, yes.

11   Q.      And he explains that the reason they have not done pH

12   dependent viability is because this is a fundamental

13   chemical property, one that can be predicted accurately and

14   there's no exception known?

15   A.      But there's obviously a mistake because he states

16   that the molecule has no pKa and as they showed in the slide

17   earlier today, it does have pKa.  There's a pKa of 13 to 15,

18   which is in lots of different textbooks.

19                   So clearly, what they are referring to

20   here was can you form an ion that was soluble in water.

21   This is what that pH is all about.

22   Q.      Yes.  Where is that language where he says it does

23   not have a pKa?

24   A.      I learned apixaban is a neutral compound and has no

25   pKa value.

MacMillan - cross

1    Q.      Okay.  That's not Patrick Lam; right?

2    A.      That's the person, the other person in the

3    conversation.

4    Q.      That's the person asking the question.  Patrick Lam

5    didn't say this compound had a pKa, did he?

6    A.      In this e-mail, he did not say that.

7    Q.      Right.  But he does say that for purposes of clinical

8    development, it's a neutral compound because it's not

9    ionizable in the pH range of one to eight; right?

10   A.      What he's saying is between the range of pH of one to

11   eight that you would not be able to form a salt between pH

12   one and eight.  On that we completely agree.  The part is

13   can you form a pharmaceutically acceptable salt, and as the

14   '208 patent clearly states, it's preferred to make those in

15   organic solvents.  This is not referring to an organic

16   solvent.

17              MR. SEGREST:  We'll pass the witness.

18              THE COURT:  Okay.  Redirect?  Oh, are there

19   other defendants that want to cross?

20              MR. KOCHANSKI:  No, Your Honor.

21              MR. PEJIC:  No, Your Honor.

22              MR. DANFORD:  No redirect.

23              THE COURT:  Okay.  You can step down.

24              (Witness excused.)

25              MR. LEE:  The next and last witness, Dr. Allan

1    Myerson.  Mr. Prussia will be doing the examination.

2              THE COURT:  Okay.

3              ... DR. ALLAN MYERSON, having been duly sworn as

4    a witness, was examined and testified as follows ...

5              THE COURT:  Good afternoon.  You may proceed

6    whenever you are ready.

7                        DIRECT EXAMINATION

8    BY MR. PRUSSIA:

9    Q.    Good afternoon.

10   A.    Good afternoon.

11   Q.    Would you please introduce yourself to the Court.

12   A.    Yes.  My name is Allan Myerson.

13   Q.    Dr. Myerson, have you been retained by the plaintiffs

14   as an expert witness in this case?

15   A.    I have.

16   Q.    And what, generally, what issue have you been asked

17   to address?

18   A.    The validity of the '945 patent and an issue related

19   to the ability to formulate a salt.

20   Q.    We're going to put up PTX-816 and I will ask you to

21   identify it for the Court, please.

22   A.    Yes.  It's a copy of my C.V.

23   Q.    Can you please describe your educational background

24   after high school?

25   A.    Yes.  I have a Bachelor's degree in chemical

Myerson - direct

1    engineering from Columbia University in 1973, then a

2    Master's and a Ph.D. in chemical engineering from the

3    University of Virginia in 1975 and 1977.

4    Q.    And what have you been doing since your Ph.D.?

5    A.    I have been a chemical engineering professor at

6    several different universities for the last 42 years.

7    Q.    Where are you currently employed?

8    A.    At the Massachusetts Institute of Technology in

9    Cambridge, Massachusetts.

10    Q.    What is the primary focus of your research?

11    A.    The focus of my research is primarily pharmaceutical

12    manufacturing with an emphasis on issues related to

13    crystallization, solid forms of pharmaceuticals, and novel

14    solid dosage forms and, in fact, solid pharmaceutical

15    formulations.

16    Q.    And what is your experience with respect to

17    pharmaceutical formulations?

18    A.    We have been formulating, and my group has been

19    formulating, a number of different drugs for the last ten

20    years or so.

21    Q.    Have you published?

22    A.    Yes.

23    Q.    How many?

24    A.    Approximately 280 refereed publications.

25    Q.    Do you have any editorial responsibilities?

Myerson - direct

1   A.      Yes, I have been associate editor of the American

2   Chemical Society journal, Crystal Growth and Design since

3   its founding in 2001.

4   Q.      Have you received any awards for your research?

5   A.      I have.

6   Q.      Can you give just a few examples?

7   A.      Most notably in 2008, the American Chemical Society

8   award in Separation Science and Technology.

9           In 2015, the American Institute of Chemical

10  Engineers award in Separation Science and Technology.  And,

11          In 2015, American Institute of Chemical

12  Engineers award in Excellence and Process Development.

13  Q.      Do you hold any U.S. patents?

14  A.      Yes.  I'm a named inventor on, I think, 45 U.S.

15  patents and about 10 or 15 pending applications.

16  Q.      Does PTX-816 provide an accurate summary of your

17  education and professional experience?

18  A.      It does.

19          MR. PRUSSIA:  Your Honor, we offer Dr. Myerson

20  as an expert in pharmaceutical formulation analysis.

21          MR. SEGREST:  No objection.

22          THE COURT:  He is so recognized.

23  BY MR. MYERSON:

24  Q.      Dr. Myerson, are you being compensated for the time

25  you spent working on this case?

Myerson - direct

1    A.      I am.

2    Q.      Does your compensation depend on the substance of

3    your opinions or the outcome of this case?

4    A.      It does not.

5    Q.      Have you prepared any demonstratives to accompany

6    your testimony today?

7    A.      I have.

8            MR. PRUSSIA:  Let's start with the PDX-13.2.

9    BY MR. PRUSSIA:

10   Q.      And could you please explain for the Court what you

11   were asked to do in connection with your work on this case?

12   A.      Yes.

13           Well, the questions I've been asked to address

14   are listed on this slide.  They're addressing the arguments

15   the defendants make regarding the validity of the '945

16   patent.

17   Q.      Big agenda, and we'll start first with the

18   obviousness of the '945 patent.

19   A.      Yes.

20           MR. PRUSSIA:  Let's turn to slide 3.

21   BY MR. PRUSSIA:

22   Q.      What is your opinion regarding the definition of a

23   person of ordinary skill in the art with respect to the '945

24   patent?

25   A.      That is up on the screen.  I think we have seen it

Myerson - direct

1   before.  And that is my definition I used.

2   Q.    Did you apply that definition in this case?

3   A.    Yes.

4             MR. PRUSSIA:  If you turn to slide 4.

5   BY MR. PRUSSIA:

6   Q.    What is depicted on this slide?

7   A.    This is the defendant's definition, which you've also

8   seen previously.

9   Q.    Would your opinions change in the defendant's

10  definition?

11  A.    They would not.

12  Q.    Do you meet the definition of a person of ordinary

13  skill in the art under either definition?

14  A.    I do.

15            MR. PRUSSIA:  Let's put claim 12 of the '945

16  patent on the screen.  It's JTX-2.

17  BY MR. PRUSSIA:

18  Q.    It's also Tab 16 in your binder.

19  A.    Yes.

20  Q.    Dr. Myerson, what is claimed by the asserted claims

21  of the '945 patent?

22  A.    Yes.  So we have a solid pharmaceutical composition,

23  and we have a comprising term which says:  "Comprised in a

24  therapeutically effective amount of apixaban and a

25  pharmaceutically accepted diluent or carrier," so that's the

Myerson - direct

1  pharmaceutical composition.  And then focusing on the

2  apixaban, the apixaban comprises crystalline apixaban

3  particles.

4         Then we have a size limitation on the

5  crystalline apixaban particles in terms of something called

6  the $D_{90}$, saying that the $D_{90}$ has to be less than or equal to

7  89 microns.

8         And then we have a specific dissolution rate of

9  the pharmaceutical composition using the conditions

10  described in the rest of the claim.

11         MR. PRUSSIA:  Now, if you turn to the next

12  slide, slide 5.

13  BY MR. PRUSSIA:

14  Q.    What is your understanding of how the inventors came

15  to invent the '945 patent claims?

16  A.    Yes.  I -- well, I'm sure we'll talk about this more,

17  but they show -- they saw unexpectedly diminished apixaban

18  exposure in the clinical trials.  And the surprise to them

19  was that they showed apixaban demonstrated dissolution-rate

20  limited absorption.

21         They found that the 77 percent in 30 minutes

22  ended up giving patients consistent solution-like exposure,

23  and then they did a big study where they determined that

24  particle size was the only parameter in their formulation

25  that was impacting dissolution rates, and then they came up

1   with a $D_{90}$ limitation.

2   Q.     I'm sure we'll come back to some of this later today,

3   but let's talk a little bit about some of the technology

4   underlying the patents.

5   A.     Yes.

6   Q.     What is an immediate-release dosage form?

7   A.     The textbook definition of an immediate-release

8   dosage form is one which you have done nothing to delay --

9   delay or sustain the release.  It's just the release when

10  the formulation would normally release.  And,

11           Typically, a definition that we're going to put

12  a rate on an immediate release is given approximately

13  70 percent or more release in one hour.

14  Q.     Are there other types of dosage forms?

15  A.     Yes.

16           They are sustained release, which is something

17  that you have that will reduce the number of times you have

18  to take a dosage form, which means that lasts a long time.

19           There's delayed release where it doesn't release

20  immediately because it has -- has a specific kind of coating

21  on it.  And,

22           Then within the category of immediate release,

23  we have the subcategory of rapid release and very rapid

24  release.

25  Q.     We heard Dr. Chambliss testify about rapid release.

Myerson - direct

1    What is rapid release absorption?

2    A.     Rapid -- a rapid release oral solid dosage form is

3    typically defined as releasing 85 percent of the active

4    ingredient in 30 minutes.  And then we have a very rapid

5    release which is 85 percent in 15 minutes.

6    Q.     And just to be clear, is an immediate-release

7    composition the same thing as a rapid-release composition?

8    A.     No, an immediate release is a broad -- it's a broad

9    definition, and then subcategories within that would be

10   rapid release.

11   Q.     And what type of release is at issue in the '945

12   patent claims?

13   A.     This is an immediate release.

14          MR. PRUSSIA:  Let's turn to particle and

15   particle sizes.

16   BY MR. PRUSSIA:

17   Q.     What is a particle?

18   A.     A particle is a solid that has three dimensions.

19   Q.     If something crystallizes, is it, by definition, a

20   particle?

21   A.     Yes, all crystals are particles.

22   Q.     Are there circumstances when a crystalline material

23   is not also a particle?

24   A.     No.

25   Q.     What is a particle size distribution?

Myerson - direct

1    A.     Well, when you have a group of particles, they don't

2    have to have -- all have the same size.  And if we describe

3    the sizes of a bunch of particles, we decide it is a size

4    distribution.

5    Q.     How can one describe the size of particles?

6    A.     We can do it lots of different ways, but we might as

7    well talk about the way that is being used in the '945

8    patent; and it's a volume-based distribution calculating

9    something called the $D_{90}$.

10   Q.     And what is a $D_{90}$?

11   A.     I think we need to look at the demonstrative --

12          MR. PRUSSIA:  Go to slide 6.

13   BY THE WITNESS:

14   A.     -- if we have that.

15          We heard a lot about this, and I have to say

16   it's not the easiest concept to understand.  So imagine we

17   have a basket full of golf balls, baseballs and basketballs.

18   Right?

19          So we take the golf balls and we know what their

20   diameter is and we measure them and we get their volume.

21          And we take all the golf balls and we say, this

22   size, we add up all the golf balls we have this much volume,

23   right, and we put a line on the plot.

24          Then we go to the baseballs, we do the same

25   thing.  Baseballs have a different diameter.  We calculate

Myerson - direct

1  the volume of all the baseballs and add that to the plot.

2  It's called a cumulative plot.  We're adding the volumes of

3  everything there.

4           Then we go to the basketballs and do the same

5  thing.

6           So then we get this curve which shows the total

7  cumulative volume or weight versus size.

8           Now, a $D_{90}$ is mathematically determined from

9  this cumulative distribution plot to be the place where the

10 size at which 90 percent of the volume is smaller at the

11 given size and 10 percent of the volume is greater than the

12 given size.

13 Q.    We'll talk -- we'll come back to this a little bit

14 later.

15          But can you remind the Court, can you inform the

16 Court what techniques were available as of 2010 to measure

17 the particle size of an active pharmaceutical ingredient?

18 A.    There are many techniques.

19 Q.    Can you list just a few for us?

20 A.    Sure.

21          If we're talking about the active ingredient

22 itself, we could use laser light scattering, which we heard

23 about quite a bit.

24          We could use microscopy techniques with image

25 analysis.

Myerson - direct

1            We could use also sonic method for doing size

2    analysis.

3            There's something called a Coulter Counter which

4    uses electrical zone sensing.

5            I could go on.  There's just a lot of techniques

6    to measure size.

7    Q.    All right.  A few other terms.

8            What is bioavailability?

9    A.    Bioavailability refers to the amount of drug that

10   actually gets into your bloodstream.

11   Q.    What is a dissolution rate?

12   A.    Dissolution rate relates to the amount of the active

13   ingredient that -- the rate at which the active ingredient

14   dissolves in your body.

15   Q.    Is there a relationship between dissolution rate and

16   bioavailability?

17   A.    There can be.  Sometimes there is, but not always.

18   Q.    What is solubility, generally?

19   A.    Solubility is a concept which tells us the maximum

20   amount of a given compound which can dissolve in a liquid at

21   a given temperature.

22   Q.    We'll come back to some of these concepts during the

23   course of your testimony, but let's go to the summary of

24   your opinions.

25            MR. PRUSSIA:  If we can go to slide 7.

Myerson - direct

1  BY MR. PRUSSIA:

2  Q.    At a high level, why are the claims of the '945

3  patent not obvious over the prior art?

4  A.    Yes, I've listed the four main points, and let's

5  start with the first one.

6           "The apixaban formulations demonstrated rapid

7  absorption and good bioavailability," meaning the

8  formulations that are described in the literature.

9           MR. PRUSSIA:  And if we go to the next slide.

10 BY MR. PRUSSIA:

11 Q.    Just focusing on that first reason.  What is the

12 basis for your opinion that the prior art showed that

13 apixaban had rapid absorption and good bioavailability?

14 A.    Because the papers described in the clinical trials

15 of apixaban certainly do that.  Particularly if we would

16 look at something like the Carreiro reference, which we've

17 seen previously.

18           MR. PRUSSIA:  Let's pull up PDX-738.

19 BY MR. PRUSSIA:

20 Q.    What is this document?

21 A.    We have seen this before.  This is the Carreiro

22 reference which talks about apixaban in its clinical trials.

23 Q.    And when was it published?

24 A.    This was published in 2008.

25 Q.    So it was available as of the priority date; is that

Myerson - direct

1    right?

2    A.      Yes.

3    Q.      And at high level, what does Carreiro discuss?

4    A.      It discusses apixaban as a Factor Xa inhibitor, and

5    talks about the clinical trials and other issues with

6    apixaban.

7    Q.      If we go to the page ending in Bates 2538 under the

8    section titled "Preclinical pharmacological studies in

9    animal models," focusing on the first study, what does the

10   Carreiro disclose regarding the pharmacokinetic of apixaban

11   in animal studies?

12   A.      It does have good oral bioavailability.

13   Q.      If you turn to the page ending in Bates 2540, there

14   is a section under "Pharmacokinetics and pharmacodynamics,

15   apixaban in human studies."  Focus on that second paragraph

16   there.

17           What does Carreiro disclose regarding the

18   pharmacokinetics of apixaban in humans?

19   A.      It says the pharmacokinetic profile of apixaban is

20   consistent with rapid oral absorption in bioavailability.

21   Q.      What would a person of ordinary skill in the art take

22   away from these disclosures in Carreiro regarding these

23   absorptions and bioavailability of apixaban?

24   A.      That it was rapid and it had good bioavailability.

25           MR. PRUSSIA:  Let's take a look at Table 1, page

Myerson - direct

1    ending in Bates 2542.

2    BY MR. PRUSSIA:

3    Q.       What is shown in Table 1 of Carreiro?

4    A.       Table 1 is showing all the clinical trials that were

5    either completed or ongoing for apixaban.

6    Q.       And what was the status of the apixaban clinical

7    trials as of 2008?

8    A.       The Phase II trials that were listed had been

9    completed, and the Phase III trials were ongoing.

10   Q.       And what does Carreiro disclose about the approximate

11   number of patients that had been studied in these clinical

12   trials?

13   A.       Tens of thousands.

14   Q.       And what doses of apixaban were being used in the

15   Phase III trials?

16   A.       2.5 and 10 milligrams.

17   Q.       What would a person of ordinary skill in the art take

18   away from these disclosures in Carreiro regarding

19   formulation used in the apixaban clinical trials?

20   A.       That it was satisfactory.

21   Q.       Now, do you recall -- you were in the courtroom when

22   Dr. Chambliss testified; is that right?

23   A.       Yes.

24   Q.       Do you recall him testifying that a person of

25   ordinary skill in the art would look at the data reported in

Myerson - direct

1   Carreiro and try to improve upon it?

2   A.      I did.

3   Q.      And do you agree with him?

4   A.      I do not.

5   Q.      Why not?

6   A.      When you have an ongoing clinical trial and the

7   doctors say that would have good oral bioavailability and

8   absorption, you would not change the formulation during the

9   clinical trial.

10  Q.      Are there other references that discuss apixaban's

11  bioavailability?

12  A.      There are.

13          MR. PRUSSIA:  Let's pull up PTX-480.

14  BY MR. PRUSSIA:

15  Q.      What is PTX-480?

16  A.      This is the Teague reference.

17          MR. PRUSSIA:  And if we turn to the page ending

18  in Bates 4449.

19  BY MR. PRUSSIA:

20  Q.      What does the Teague reference say about apixaban's

21  bioavailability?

22  A.      It says:  "Apixaban is an oral, selective, direct

23  Factor Xa inhibitor.  Apixaban is rapidly absorbed, reaching

24  peak plasma concentrations in 3 hours postingestion."

25  Q.      Now, if we focus on that second sentence there, the

1   reference to three hours of a peak plasma time, do you

2   recall Dr. Chambliss' testimony that a formulation scientist

3   would look at that and say that it was pretty slow?

4   A.      I remember hearing that, yes.

5   Q.      What is your response to that?

6   A.      That's a medical opinion.  I mean, if the doctor has

7   decided that that was good and you were having the correct

8   biological response, then there's no reason that you would

9   think it was not good.

10  Q.      If we take a look at Table 3 in the Teague reference.

11  A.      Yes.

12  Q.      How do the pharmacokinetics of apixaban compare to

13  rivaroxaban, which at that time was approved in Europe and

14  Canada?

15  A.      It was very similar.

16  Q.      What would the information in Table 3 tell a person

17  of skill in the art regarding the need to improve the

18  apixaban formulation?

19  A.      It would indicate there was no need.

20  Q.      Now, you made reference to this earlier, but the

21  person of ordinary skill in the art here is a formulation

22  scientist?

23  A.      Correct.

24  Q.      And, generally speaking, in drug development, when

25  the clinical team characterizes a drug as having rapid

Myerson - direct

1   absorption and good oral bioavailability in Phase II trials,

2   does the formulation scientist adhere to that or disregard

3   it?

4   A.      They adhere to that.

5   Q.      Does a formulation scientist make his own independent

6   judgment about clinical data?

7   A.      No.

8   Q.      Let's take a look at PTX-320.  What is this document?

9   A.      This is the Eriksson reference.

10  Q.      When was this published?

11  A.      It was published in 2009.

12  Q.      If we turn to the page ending in it's Bates 774,

13  there's a Section 2.2.2, pharmacokinetic properties of

14  apixaban?

15          Do you see that?

16  A.      Yes, I do.

17  Q.      And what does Eriksson disclose about the

18  pharmacokinetics of apixaban in animal studies?

19  A.      It says, In pre-clinical studies, apixaban

20  demonstrated high oral bioavailability, 51 percent,

21  88 percent and 34 percent in chimpanzees, dogs and rats,

22  respectively.

23  Q.      And if you look at the next paragraph, what does

24  Eriksson disclose about the pharmacokinetics of apixaban in

25  humans?

Myerson - direct

1    A.      Again, it says apixaban is rapidly absorbed

2    reaching Cmax approximately one to three hours after

3    administration.

4    Q.      Now, were Carreiro, Teague and Eriksson all available

5    to a person of ordinary skill in the art at the time of the

6    priority date of the '945 patent?

7    A.      They were.

8    Q.      Would a person of skill in the art interested in

9    learning about the pharmacokinetics of apixaban have

10   consulted these references?

11   A.      They would.

12   Q.      And what does good oral bioavailability, high

13   bioavailability, and rapid absorption tell a person of skill

14   in the art about the apixaban formulations that were being

15   used at the time?

16   A.      That they were satisfactory.

17   Q.      Are you aware of any reference in the prior art that

18   stated that the bioavailability of apixaban was something

19   less than good?

20   A.      No.

21   Q.      Are you aware of any reference in the prior art that

22   stated that the absorption of apixaban was something less

23   than rapid?

24   A.      No.

25   Q.      Now, do you recall Dr. Chambliss testifying that a

1    person of ordinary skill would be motivated to improve the

2    bioavailability of apixaban because clinical trials are

3    unpredictable and drugs sometimes fail?

4    A.      I remember that.

5    Q.      And if we pull up DTX-368, is this the reference that

6    Dr. Chambliss relied upon to form that opinion?

7    A.      Yes.

8    Q.      This is the Kola reference.  Do you remember him

9    showing it to the Court?

10   A.      Yes.

11   Q.      And if we look at Figure 3, which is at Bates 3124,

12   what does Figure 3 disclose to a person of skill in the

13   art?

14   A.      Well, this tells you why things fail clinical trials

15   and this is in all three phases.

16   Q.      And what does Figure 3 tell a person of skill in the

17   art about the reasons for drug attrition in 2000?

18   A.      Well, if we look at 2000, which is the silver,

19   efficacy, that means whether the drug actually does what

20   it's supposed to, was the largest, and then toxicology and

21   commercial reasons and clinical safety were the next three

22   largest.

23                    As we know, formulation is a really small

24   percentage and that's for all three phases of clinical

25   trial.  It's exceedingly rare for a drug to fail Phase III

Myerson - direct

1    clinical trials because of formulation means.

2    Q.      So in summary on this first point, would a person of

3    skill in the art be motivated to improve upon the

4    formulation of apixaban in view of the disclosures in the

5    prior art?

6    A.      No.

7    Q.      Let's turn to PDX-13-9 and turn now to your second

8    reason.

9                    Why would a person of ordinary skill in

10   the art not have expected dissolution rates to have impacted

11   apixaban's bioavailability?

12   A.      Well, here we have them talking about the BCS classes

13   and the fact that apixaban is a BCS Class III drug and why

14   that means that dissolution will not, should not improve

15   bioavailability.

16   Q.      All right.  Let's start from the top.  What is the

17   BCS?

18   A.      We've heard about this in prior testimony, the

19   biopharmaceutical classification system that classifies

20   drugs in four quadrants based on two properties.

21   Q.      And what is the purpose of the BCS?

22   A.      To aid in drug development formulation and for the

23   issue of biowaivers, particularly for generic drugs.

24   Q.      And was the BCS information that was available to a

25   person of skill in the art as of the priority date?

Myerson - direct

1    A.      Yes.

2    Q.      If we pull up DDX-14-22, this is one of Dr.

3    Chambliss' demonstratives, what is shown here?

4    A.      These are the four categories of the BCS classes and

5    we see that the two terms that are used.  They're high

6    solubility and permeability, and we divide it up in four

7    classes based on high and low of each.

8    Q.      Let's talk a little bit about some of these terms on

9    this slide.

10          First, if we go to PDX-10, talk first about

11   solubility.

12          Is there a difference between the absolute

13   solubility of the drug and its solubility in the context of

14   BCS?

15   A.      Sure.  Solubility itself, or absolute solubility, it

16   is a physical chemical property of the solid, and as I

17   said previously, it's the maximum amount of a solid which

18   can be dissolved in a particular solution at a given

19   temperature.

20   Q.      Can a drug have low absolute solubility and still be

21   considered highly soluble under the BCS?

22   A.      It can, because BCS solubility is actually a dose

23   solubility ratio, and what the BCS does is it looks at the

24   dose and determines whether the highest dose can dissolve in

25   250 milliliters of solution at a physiological temperature

Myerson - direct

1    of 37 degree C and a physiological pH range.

2    Q.    You've heard a lot of different ways to characterize

3    solubility.  We've heard the term water solubility.  I just

4    used the term absolute solubility.  Dr. Chambliss talks

5    about USP solubility.

6                 Are all of those different ways of saying

7    the same thing?

8    A.    Yes.

9    Q.    And are all of those things different from BCS

10   solubility?

11   A.    Yes.

12   Q.    Can you just again explain how they're different?

13   A.    Well, one is an absolute property, an absolute

14   number.  How much is soluble in a given -- in a unit volume

15   of liquid.  With BCS solubility, it's whether the maximum

16   dose can dissolve in 250 milliliters.

17   Q.    And which would a party of skill in the art rely upon

18   when trying to formulate a drug for clinical use?  Absolute

19   solubility or BCS solubility?

20   A.    Certainly BCS, because it takes into account the

21   dose.

22   Q.    And after you have your dose, which one drives

23   formulation development?

24   A.    The BCS solubility.

25   Q.    And after you know the dose and the BCS class, would

Myerson - direct

1   you make any formulation decision based on absolute

2   solubility?

3   A.      No.

4   Q.      Let's go back to Dr. Chambliss' slide 22.  There's a

5   reference to permeability.

6   A.      Yes.

7   Q.      In addition to solubility, what other information

8   does one need to classify a drug under the BCS?

9   A.      Something about the permeability.

10  Q.      And how does a BCS define high permeability?

11  A.      Absorption of greater than 90 percent.

12  Q.      Are you familiar with the concept of a rate limiting

13  step?

14  A.      I am.

15  Q.      What is that?

16  A.      Well, if you have steps in series, two steps in

17  series, for example, that has to happen.  One of them

18  can be the one that determines the overall rate of the

19  process.

20  Q.      Have you prepared a demonstrative to help illustrate

21  the rate limiting step?

22  A.      I have.

23  Q.      Please turn to tab 11 in PDX-13.

24  A.      Yes.  I thought of this standing in the airport

25  security line.

Myerson - direct

1          So the airport security line actually has

2    two steps.  The first step is checking your I.D. and the

3    second step is going through the X-ray machine, and either

4    one of these under some circumstances could be the rate

5    limiting step.  So look at the next slide.

6          If you get to the airport and there's only one

7    guy checking I.D.'s but there are three lanes open for going

8    through the X-ray machine, what's going to determine how

9    long it takes to get through, it's going to be getting your

10   I.D. checked.

11         So number one is the rate determining step.  But

12   if we go to the next slide, if you have multiple people

13   checking I.D.'s, and only one X-ray machine, the X-ray

14   machine, getting through that is going to be the rate

15   determining step.

16   Q.    So can a person of skill in the art use the BCS to

17   determine the rate limiting step of a drug?

18   A.    Yes.

19   Q.    How?

20   A.    Well, if we look particularly at Class II or Class

21   III, which are the situations where we have one parameter

22   high and one parameter low and the opposite, those, you can

23   use the same analogy as we are using right here.

24   Q.    And so what is the rate limiting step for a BCS Class

25   III drug?

Myerson - direct

1   A.      In the Class III drug, we have high solubility and

2   low permeability, so the second step, the permeability is

3   going to be the rate limiting step.

4   Q.      And using your TSA example, can you explain what it

5   means for a drug to not be dissolution rate limited?

6   A.      It means that dissolution is rapid with respect to

7   the drug getting -- being absorbed, which is the

8   permeability step, which gives you the bioavailability.

9   Q.      So what impact would reducing particle size have on

10  the bioavailability of a drug that is not dissolution rate

11  limited?

12  A.      All it would do using this picture would make the

13  line longer in front of the -- in front of the X-ray

14  machine.  It wouldn't do much.

15  Q.      Let's talk about apixaban's BCS classification.  Was

16  apixaban's BSC classification known as of 2010?

17  A.      Yes.

18  Q.      And what was it?

19  A.      It was Class III.

20  Q.      And if we turn to the next slide.  What is depicted

21  on slide 15?

22  A.      This shows us why apixaban was known to be a Class

23  III drug.

24  Q.      And what information would a person of skill in the

25  art need to have in order to determine apixaban's BCS

Myerson - direct

1  classification?

2  A.    It would need the maximum dosage being used.  We know

3  from Carreiro that the maximum dosage in Phase III trials

4  was ten milligrams.  We would need the solubility at

5  37 degrees and physiological pH, which we know from another

6  reference is approximately 40 micrograms per ml, which is

7  .04 milligrams per ml.  So we know that that dose can

8  dissolve in 250 ml's, making it high solubility.

9              And we also know from another reference that the

10  absorption would measure to be 66 percent, which is lower

11  than 90 percent.  That's in the BCS class, which has low

12  permeability.

13  Q.    All right.  Let's unpack this a little bit.  Why did

14  you identify a ten milligram dose?

15  A.    That's the highest dose in Phase III clinical trials.

16  Q.    Now, Dr. Chambliss testified that the dose was not

17  known, so the BSC could not be used during formulation.

18              Do you remember that?

19  A.    Yes.

20  Q.    And what's your response to him on that?

21  A.    Well, we know that the Carreiro reference, that with

22  all these clinical trials ongoing and the doses ranged from

23  2.5 to 5 to 10 milligrams, so one would know that Phase III

24  clinical trial is a trial for getting a drug approved, so we

25  know what the dose is.

1  Q.     Dr. Chambliss pointed to the 20 milligram dose that

2  is being pointed to in Phase II.  Why didn't you select

3  that?

4  A.     Because it's not being tested in Phase III, which is

5  where you're looking for approval.

6  Q.     Looking at solubility, the forty micrograms per

7  milliliter, where did you get that information?

8  A.     That, I forgot the name of the reference, but that

9  was in one of the -- the prior art references.

10  Q.     Dr. Myerson, was that the only report of apixaban

11  solubility in the prior art?

12  A.     No, it was not.

13  Q.     So on what basis would you select that solubility

14  value over others that were reported?

15  A.     Well, we know today that's the correct solubility

16  value, but a POSA looking at contrary solubility values, I

17  believe there was a report of 40 and there were two reports

18  of one microgram per ml.  If you have contrary reports, you

19  just go and measure it.  It's a simple measurement, the USP

20  method for measuring solubility, and you would have arrived

21  at the 40.

22  Q.     So in summary, Dr. Myerson, based on a BCS

23  classification, what would a person of ordinary skill in the

24  art expect the rate limiting step, absorption of apixaban to

25  be?

Myerson - direct

1    A.       It would be permeability-rate limited absorption.

2    Q.       And what did the literature teach regarding the rate

3    limiting step of BSC III drugs as of 2010?

4    A.       That it was permeability limiting.

5    Q.       And if we take a look at PTX-690, what is this

6    document?

7    A.       This is the Ausburger reference on tablet

8    formulation.

9    Q.       Was it available as of the priority date?

10   A.       It was.

11   Q.       And if we go to the page ending in Bates 82, and we

12   look at the right-hand column under the four different BCS

13   classes halfway down the paragraph.

14   A.       Yes.

15   Q.       There is a sentence that starts, "On the other hand,

16   Class II drugs."

17            Do you see that?

18   A.       Yes.

19   Q.       What does the Augsburger reference disclose about the

20   weight-limiting step of Class II drugs?

21   A.       Class II drugs are more likely to exhibit dissolution

22   rate absorption problems which is exactly what we were

23   talking about previously because those are -- those are

24   low-solubility high permeabilities.

25   Q.       And in contrast, what does the Augsburger reference

1  disclose about talk about the rate-limiting step of Class

2  III drugs?

3  A.     It says:  "Class III drugs are more likely to be

4  prone to absorption (permeability) rate limited absorption."

5  Q.     What does that mean with respect to the role of

6  dissolution in the absorption of a BCS Class III drug?

7  A.     It shouldn't have a significant affect.

8  Q.     Are you aware of any experimental examples in the

9  literature that demonstrates that BCS Class III drugs can

10  have different dissolution rates and the same

11  bioavailability?

12  A.     I am.

13             MR. PRUSSIA:  And let me pull up PTX-429.

14  BY MR. PRUSSIA:

15  Q.     What is this document?

16  A.     This is the Blume reference.

17  Q.     And if we turn to the page ending in Bates 3249,

18  there is a Figure 4.

19             Do you see that?

20  A.     Yes.

21  Q.     Can you walk us through what is shown in Figure 4?

22  A.     Yes.

23             So this is a nice experiment where they're

24  taking three -- they're taking a drug that has been

25  formulated with three different dissolution rates that you

Myerson - direct

1    see on the left.  Right?  And so we see that the bottom

2    curve is dissolving significantly slower than the other two.

3    Right?  The bottom one is probably taking 45 minutes to

4    dissolve about 80 percent and 30 minutes is, if I eyeball

5    that, is probably about 70 percent, and the other one is

6    significantly faster.

7               But if we look on the right graph, that is the

8    concentration of the drug in the bloodstream.  And it's

9    really a measure of bioavailability, the Cmax, and they're

10   identical.  So we see that the dissolution rate in this case

11   has no impact on the bioavailability.

12   Q.    So what does Figure 4 in Blum exemplify regarding the

13   role of dissolution in the absorption of a BCS Class III

14   drug?

15   A.    It shows that it has no impact.

16   Q.    Now, do you recall that Dr. Chambliss testified that

17   the BCS system is premised on the assumption that an

18   immediate-release tablet will dissolve rapidly, 85 percent

19   in 15 minutes?

20   A.    I do recall that.

21   Q.    Do you agree with him?

22   A.    No.

23   Q.    Why not?

24   A.    That is only -- that is only condition for getting a

25   biowaiver.  And biowaivers are something that are done

Myerson - direct

1  mainly by generic companies to reduce -- allow them to come

2  to market without doing clinical trials today for Class I

3  and Class III drugs, but in this time scale it was only for

4  Class I drugs.

5  Q.     Do the predictions that you've testified to regarding

6  the rate limiting step of BCS Class III drugs, do those only

7  apply to rapid-release drugs, or do they apply to all

8  immediate-release tablets?

9  A.     No, any immediate-release drug.

10 Q.     And looking at Figure 4, do all of the tablets shown

11 in figure 4 have rapid dissolution?

12 A.     No.

13 Q.     Now, focusing back on this biowaiver topic.  First of

14 all, was an FDA biowaiver available for BCS Class III drugs

15 as of 2010?

16 A.     No, not in the United States.

17 Q.     Are you aware of any publications suggesting that the

18 BCS only has relevance in the biowaiver context?

19 A.     No.

20 Q.     What is your opinion regarding the role of the BCS in

21 pharmaceutical drug development as of 2010?

22 A.     Very important.  There are a number of references

23 that we can look at to say exactly that.  The BCS class was

24 used in development of new drugs in their formulations.

25            MR. PRUSSIA:  Let's pull up PTX-437.

Myerson - direct

1    BY MR. PRUSSIA:

2    Q.      And what is this document?

3    A.      This is a paper wherein the last author is Gordon

4    Amidon who actually is the developer of the BCS.

5    Q.      When was it published?

6    A.      This was published in 2009.

7    Q.      If we stay on this first page in the right-hand

8    column, there is a sentence that starts:  "The BCS is one

9    of"?

10   A.      Yes.

11   Q.      My question is, what does Dahan disclose about the

12   role of BCS and drug product development?

13   A.      "The BCS is one of the most significant prognostic

14   tools created to facilitate oral drug product development in

15   recent years.

16           "The validity and broad applicability of the BCS

17   has have been the subject of extensive research and

18   discussion."

19           MR. PRUSSIA:  If we take a look at another

20   document, PTX-457.

21   BY MR. PRUSSIA:

22   Q.      What is this document?

23   A.      This is the Ku article published in 2008.

24   Q.      And what is the title?

25   A.      It's, "Use of the biopharmaceutical classification

Myerson - direct

1    system in early drug development."

2    Q.    And if we focus on the right column, the

3    second-to-last sentence in the first paragraph, what does Ku

4    disclose about the role of BCS in drug development?

5    A.    She says:  "It is arguable that the application of

6    BCS in lead compound selection for optimal chemistry may be

7    more important than using BCS in biostudy waiver at a later

8    development stage."

9    Q.    So based on these disclosures in Ku and Dahan and

10   other references you reviewed in connection with forming

11   your opinions in this case, would a person of ordinary skill

12   think that the role of the BCS was limited to do just

13   biowaivers?

14   A.    They would not.

15   Q.    And are the statements in Dahan and Ku reflective of

16   the understanding of a person of ordinary skill as of the

17   priority date?

18   A.    They are.

19   Q.    Let's move to your third point.

20         MR. PRUSSIA:  If we can go to slide 16.

21   BY MR. PRUSSIA:

22   Q.    Just what were some of the known disadvantages of

23   reducing particle size?

24   A.    Well, first of all, if you don't have to add an

25   operation in your manufacturing process, you don't do it.

Myerson - direct

So just adding another step is negative.  And the step you

would have to add is called micronization, which is particle

size reduction.

Secondly, assuming that you were going to

micronize the particle size, micronization can introduce

impurities into the drug product.  That is the drug

substance.  They can change the crystalline form; that is,

induce a polymorphic conversion.  They can take crystalline

material and make it amorphous.  That's the second

disadvantage.

A third disadvantage is when you have a

hydrophobic compound that is a water-hating compound, which

apixaban is, if you make the particle very small, and you

actually expose new surfaces when you attempt to dissolve

those particles or clump together, and when they clump

together, they actually reduce the surface area and they can

even dissolve slower than the original particles might

dissolve.

So those are some of the general reasons for not

reducing particle size.

Q.     Now, are these disadvantages described in the prior

art?

A.     Yes.

MR. PRUSSIA:  Can we turn to PTX-458.

BY MR. PRUSSIA:

Myerson - direct

1    Q.      What is this document?

2    A.      This is Remington.

3    Q.      And if we go to the chapter itself, who is the author

4    of this chapter?

5    A.      This is a chapter on dissolution by Kumar.

6    Q.      And was it available as of the priority date?

7    A.      It was.

8    Q.      If we turn to the page ending in Bates 3600 and

9    looked at the second paragraph in the right-hand column,

10   what does Kumar disclose regarding micronization?

11   A.      It makes the same point that I was making about

12   hydrophobic drugs, and the effective surface area we see in

13   that paragraph.

14   Q.      And would a person of ordinary skill in the art

15   expect agglomeration like this described by Kumar to be a

16   potential issue for apixaban?

17   A.      Yes, because it was very hydrophobic.

18   Q.      And what's the connection between apixaban and

19   hydrophobicity in agglomeration?

20   A.      Again, if it doesn't like water, it will like itself

21   better than the water and it will clump together.

22           MR. PRUSSIA:  Can we turn to PTX-372.

23   BY MR. PRUSSIA:

24   Q.      What is this document?

25   A.      This is a book by Lantz.  It's a chapter by Lantz on

Myerson - direct

1    size reduction.

2    Q.     Was it available as of the priority date?

3    A.     It was.

4             MR. PRUSSIA:   Can we turn to the page ending in

5    Bates 1983.

6    BY MR. PRUSSIA:

7    Q.     Right in the middle of the page there is a series of

8    numbered paragraphs.

9             Do you see that?

10   A.     Yes.

11   Q.     What is described there?

12   A.     It's pretty much a list of the negative things that

13   can happen for size reduction.   It's pretty much the same

14   ones I mentioned at the beginning:   Polymorphic change,

15   degradation, bulk density which is another one which can

16   cause flow problems, and the one about agglomeration,

17   certainly, is there as well.

18   Q.     All right.   One last topic before we get into the

19   combinations.

20             Do you recall that Dr. Chambliss testified that

21   a person of ordinary skill would be motivated to arrive at

22   the claimed $D_{90}$ to improve content uniformity?

23   A.     I did.

24   Q.     And what is your response?

25             First of all, what is content uniformity?

Myerson - direct

1  A.      Content uniformity is important.  It's getting the

2  right amount of the active ingredient in each tablet.  So

3  you -- if you have a 5-milligram dose, you want the amount

4  of API in there to be 5 milligrams plus or minus just a

5  little bit.

6  Q.      And what is your response to Dr. Chambliss's

7  assertion that content uniformity would motivate a person of

8  ordinary skill to arrive at a $D_{90}$ of 89 microns or less?

9  A.      Well, first of all, you want to have content

10  uniformity, but you calculate what size you need in terms of

11  $D_{90}$ or $D_{50}$ for a given drug based on its dosage.

12  Q.      Is this something that is in the literature?

13  A.      Yes.

14          MR. PRUSSIA:  If we turn to PTX-476.

15  BY MR. PRUSSIA:

16  Q.      What is this document?

17  A.      This is a nice paper by Rohrs, who talks about

18  particle size limits to use -- to meet USP content

19  uniformity criteria for tablets and capsules.

20          MR. PRUSSIA:  And if we turn to Figure 3 on

21  Bates 4286.

22  BY THE WITNESS:

23  A.      Yes.  There's a lot of mathematics on this paper, but

24  it is all summarized pretty well on this figure.

25          So what we have on the X axis is the dose.  And

Myerson - direct

1  what we have on the Y axis is the maximum geometric mean

2  particle diameter which is the -- what we call the $D_{50}$.  $D_{50}$

3  means 50 percent of the volume or larger, 50 percent of the

4  volume is smaller.

5          Then the lines on the graph represent different

6  types of size distributions, and what we have is ratios of

7  $D_{90}$ to $D_{50}$, what is actually broadness of the size

8  distribution.  So if we wanted to figure out what -- what

9  size we needed for content uniformity for a given dose,

10  let's go to 10 milligrams, and let's take a line up, and

11  let's go to the third -- the third line from the top in the

12  graph which is the solid line which is a $D_{90}/D_{50}$ ratio of

13  2.4.

14          Now, if we take that over to the Y axis, we see

15  that that gives us a value of oh, somewhere, you know,

16  between, if I may, 150 or so, which would be the $D_{50}$.

17          Since the $D_{90}/D_{50}$ ratio in that is 2.4, you would

18  have to multiply 150 times 2.4 to get what the $D_{90}$ value

19  would be; right?  So it is very large.

20          And we can do the same thing with other doses.

21  If you assumed your distribution was broader, you could go

22  down to some of these other lines.  But a $D_{90}/D_{50}$ ratio of

23  2.4 would be a typical broadness of the distribution.  The

24  2.4 is a little broader than 3.2.

25  Q.    So just to recap, how does this relate to the issues

1    in this case regarding a $D_{90}$ of apixaban and 2.5 or

2    5 milligrams?

3    A.      Well, if you do this analysis of 2.5 and

4    5 milligrams, what you would find is that the $D_{90}$ for content

5    uniformity required is significantly larger than 89 microns.

6    Q.      All right.

7                MR. PRUSSIA:  If you took that down.

8                If we go to slide 17.

9    BY MR. PRUSSIA:

10   Q.      Dr. Myerson, do you have an opinion on the date that

11   the inventions of the '945 patent were conceived and reduced

12   to practice?

13   A.      I do.

14   Q.      What is that date?

15   A.      October 2009.

16   Q.      Does this demonstrative summarize the basis of your

17   opinions regarding the invention date?

18   A.      Yes.

19   Q.      And can you please explain generally the basis for

20   your opinion on the date of the invention of the '945 patent

21   claims?

22   A.      Yes.

23                There are BMS documents and laboratory notebooks

24   that I examined.  For each of these points, the dissolution

25   rate cutoff, 77 percent in 30 minutes;

Myerson - direct

1              The investigation of factors that could impact

2      dissolution rate;

3              The conclusion that only particle size

4      materially impacted dissolution rate; and,

5              The data in the notebooks confirming the

6      selection of the 89 microns of $D_{90}$.

7   Q.      First, how did the inventor select a dissolution rate

8      cutoff of 77 percent and 30 minutes?

9   A.      They were looking for something that gave them the

10     same exposure as an oral solution.

11              MR. PRUSSIA:  If we could pull up PTX-211.

12  BY MR. PRUSSIA:

13  Q.      Do you recognize this document?

14  A.      Yes.  This is the process development study plan.

15  Q.      Is this one of the documents you reviewed in forming

16     your opinions regarding the conception and reduction to

17     practice?

18  A.      Yes.

19  Q.      And who is the author of this document?

20  A.      It was Chandra Vemavarapu, who is one of the

21     inventors of the '945 patent.

22              MR. PRUSSIA:  If we turn to the page ending in

23     Bates 018.

24  BY MR. PRUSSIA:

25  Q.      Are any of the other inventors of the '945 patent on

Myerson - direct

1   the distribution list?

2   A.    Yes, that is Patel and Jia.

3             MR. PRUSSIA:   And if we turn to the page ending

4   in Bates 028.

5   BY MR. PRUSSIA:

6   Q.    And the last sentence there of that first paragraph,

7   what does this document disclose about this inventor's

8   discovery regarding the relationship between dissolution

9   rate and particle size?

10  A.    It says:  "While particle sizes up to a $D_{90}$ of 84 to

11  89 microns were shown to provide rapid in vitro dissolution,

12  greater than 77 percent in 30 minutes, as well as

13  solution-like in-vivo exposure, a more conservative

14  specification, $D_{90}$ less than 30 microns, was set for apixaban

15  drug substance."

16  Q.    If we turn to the page ending in Bates 045, there are

17  two figures there.  What are these?  Do you recognize these

18  two figures?

19  A.    Yes.  These are the figures that found their way into

20  the patent.

21  Q.    And what do these figures show regarding the

22  inventor's discovery about the relationship between

23  dissolution and particle size?

24  A.    Well, this is, this is actually the plot of the data

25  showing that relationship.

Myerson - direct

1   Q.      And what do you understand to be the source of the

2   data that's depicted on these two figures?

3   A.      Laboratory notebooks which were used.

4   Q.      And whose notebooks were they?

5   A.      Sorry.  I don't remember the names BMS.

6   Q.      Were they employed at BMS?

7   A.      Yes.  BMS laboratory scientists.

8   Q.      If you go to PDX-1317, slide 17, does this slide

9   identify the information you reviewed in connection with

10  forming your opinions regarding the invention date of the

11  '945 patent's asserted claims?

12  A.      It does.

13  Q.      Let's talk a little bit the combinations now.

14          THE COURT:  Before we do that, we'll take a

15  break.  We'll be back in a little bit.

16          (Short recess taken.)

17                    -  -  -

18          (Proceedings resumed after the short recess.)

19          THE COURT:  I'm ready for a combination.

20          MR. PRUSSIA:  Hold onto your hat.

21  BY MR. PRUSSIA:

22  Q.      We'll start with slide 18, which is on the screen,

23  Dr. Myerson, and you start with combination one.

24              If the '945 patent claims were reduced to

25  practice in October of 2009, what does that mean for Dr.

Myerson - direct

1    Chambliss' combination one?

2    A.    Well, that would not be prior art, so combination one

3    could not have been used for obviousness.

4    Q.    We'll come back to Nause in a little bit, but let's

5    move on to combination two.

6          Dr. Chambliss testified that the '945 patent is

7    obvious over the combination of Carreiro, Wei and the FDA

8    guidance.

9          Do you recall that?

10   A.    Yes.

11   Q.    And first, can you remind the Court, what does

12   Carreiro disclose to a person of skill in the art regarding

13   apixaban?

14   A.    Well, it reveals the clinical trials, the oral

15   bioavailability and the dose.

16   Q.    And let's shift gears to talk about the second

17   reference, we have not looked at that yet, Wei in that

18   DTX-359.

19          In looking at the summary of the invention of

20   Wei in paragraphs 12 and 13, what does Wei disclose to a

21   person of skill in the art?

22   A.    Wei is disclosing a general method for the

23   transformation of one polymorph to another using a

24   recirculation apparatus, which also will result in reducing

25   the particle size.  Of course, he also specifies the first

Myerson - direct

1    polymorph has to be a less stable form and he transforms

2    into a more stable firm in the particle body.

3    Q.      Is this process disclosed in Wei specific to apixaban

4    or does it apply to any compound?

5    A.      It applies to any compound.

6    Q.      What does Wei have to do with improving

7    bioavailability?

8    A.      It's has nothing to do with improving

9    bioavailability.

10   Q.      If we put paragraph 3 on the screen, I believe Dr.

11   Chambliss referenced this during his testimony and points

12   to paragraph 3 as disclosing apixaban is a sparingly soluble

13   compound and therefore provides a motivation to increase

14   particle size.

15                  Do you remember that testimony?

16   A.      I do.

17   Q.      What's your response to Dr. Chambliss on this point?

18   A.      Well, this is a very general statement relating to

19   sparingly soluble organic compounds and talking about

20   reducing surface areas to get high dissolution times.

21   That's the general statement, and, of course, as we've

22   already noted, you see on the right BCS class, that it is

23   not in the chemical solubility.

24   Q.      Will the bioavailability of a sparingly soluble

25   compound always be enhanced when the particle size is

Myerson - direct

1    reduced?

2    A.      No.   We've already seen that's not the case.

3    Q.      And under what circumstances would the

4    bioavailability of a sparingly soluble compound not be

5    enhanced?

6    A.      If permeability is a rate determining step.

7    Q.      Is that the case for apixaban?

8    A.      Yes.

9    Q.      Does Wei suggest any issues with apixaban's

10   bioavailability?

11   A.      No.

12   Q.      Does Wei disclose any bioavailability data at all for

13   apixaban?

14   A.      No.

15   Q.      Does Wei suggest any significance in selecting an

16   apixaban particle size of 89 microns?

17   A.      No.

18   Q.      Does Wei suggest any significance in selecting a D90

19   of 89 microns or less?

20   A.      No.

21   Q.      Does Wei disclose a solid pharmaceutical formulation

22   containing apixaban?

23   A.      No.

24   Q.      Let's turn now to DTX-696.   Is this -- 696.   I'm

25   sorry.   Yes.   PTX-696.   Sorry.

Myerson - direct

1      Is this the FDA guidance relied upon by Dr.

2  Chambliss?

3  A.      Yes.

4  Q.      And what -- generally, what does the FDA guidance

5  disclose?

6  A.      This is a guidance that explains how to do

7  dissolution testing for solid oral dosage forms, and it

8  talks about the different apparatus that can be used and the

9  sets of conditions that can be used in each of the

10  apparatuses.

11  Q.      If we go to Dr. Chambliss' demonstrative, it's

12  DDX-14-28.

13      Does FDA guidance provide any specific

14  teaching as to apixaban?

15  A.      No.

16  Q.      Does the FDA guidance disclose the dissolution rate

17  of 77 percent in 30 minutes?

18  A.      No.

19  Q.      Would a person of skill in the art have any reason to

20  target that specific dissolution rate with apixaban based on

21  the FDA guidance?

22  A.      No.

23  Q.      Does the FDA guidance include any teaching at all

24  about the significance of a D90 of 89 microns or less?

25  A.      No.

Myerson - direct

1  Q.      Taking a step back to combination two, do any of

2  Carreiro, Wei or FDA guidance disclose the target

3  dissolution rate of the asserted claims?

4  A.      No.

5  Q.      Do any of them provide any motivation to arrive at

6  the target dissolution rate in the asserted claims?

7  A.      No.

8  Q.      Do any of them provide any motivation to arrive at a

9  D90 of 89 microns or less?

10 A.      No.

11 Q.      So if you go to slide 20 in your demonstratives, what

12 is your opinion about the obviousness of the '945 patent in

13 light of combination two?

14 A.      They do not make the claims of the '945 obvious.

15 Q.      Let's talk now about the combination three and

16 this substitute, the '208 patent for Carreiro; is that

17 right?

18 A.      Yes.

19 Q.      And let's pull up JTX-1.  The '208 patent is the

20 other asserted patent in this case; is that correct?

21 A.      Correct.

22 Q.      Does the '208 patent disclose any issues with the

23 bioavailability of apixaban?

24 A.      No.

25 Q.      Does the '208 patent disclose any motivation to

1    arrive at a target dissolution rate of the asserted claims?

2    A.      No.

3    Q.      Does the '208 patent provide a motivation to arrive

4    at the D90 of 89 microns or less?

5    A.      No.

6    Q.      So going back to your demonstrative, slide 21, what

7    is your opinion about the obviousness of the '945 patent

8    claims over combination three?

9    A.      It does not make the claims obvious of the '945

10   patent.

11   Q.      Let's turn now to combination four, and here we have

12   the '306 application substitute for the '208 patent.  And

13   let's pull that up, DTX-303.

14           Dr. Chambliss testified that the '306

15   application discloses a solubility of apixaban as being one

16   micrograms per millimeter.

17   A.      Yes.

18   Q.      Does that provide a motivation to arrive at the

19   target dissolution rate in the claims?

20   A.      No.  As I noted previously, somebody would have seen

21   another reference that said 40 micrograms, and, of course,

22   knowing that you have two contrary pieces of data, you would

23   go and measure it using the USP solubility test.

24   Q.      Does the '306 application include any information

25   that a 2.5 milligram dose of apixaban would be

Myerson - direct

1   therapeutically effective?

2   A.      No.

3   Q.      Does the '306 application provide a motivation to

4   arrive at the D90 of 89 microns or less?

5   A.      No.

6   Q.      So turning back to your demonstrative, slide 22, what

7   is your opinion then about the obviousness of the claims

8   over combination four?

9   A.      They are not obvious.

10  Q.      All right.  You said you'd go back to Nause.  Let's

11  pull up slide 23 and assume for the moment that the Court

12  determines that Nause is prior art.

13  A.      Yes.

14  Q.      Are the claims obvious in light of combination one?

15  A.      No.

16  Q.      Why not?

17  A.      First of all, the preferred invention of Nause is a

18  controlled release amorphous dispersion, and it only

19  discloses an immediate release formulation at the control.

20          In addition, Nause defines immediate release as

21  a dissolution rate of 70 percent in one hour.

22          It has no information on particle size and its

23  impact on dissolution rate, apixaban bioavailability.

24          It does not report on any bioavailability

25  problems.

Myerson - direct

1          It doesn't expressly or inherently disclose the

2    particle size or the dissolution rate of the apixaban in

3    immediate release formulation.

4    Q.    All right.  Let's pull up Nause and unpack this a

5    little bit.  It's DTX-334.

6          Is this the Nause reference?

7    A.    Yes.

8    Q.    And let's turn first to the page ending in '891 and

9    under the summary of the invention.

10          What do these paragraphs disclose about the

11    invention of Nause?

12    A.    Right.  So this summary of the invention, this is

13    talking about a controlled release formulation of apixaban,

14    and it actually says it wants it to release 70 percent in

15    more than two hours, two hours or more.  So it's a sustained

16    release that's slow.

17    Q.    And just remind the Court, what are the claims of the

18    '945 patent directed towards?

19    A.    An immediate release tablet with a specific

20    dissolution rate of 77 percent.

21    Q.    If we take a look at the page ending in Bates '892,

22    there's a paragraph beginning at line 4.

23          What does this paragraph describe as to the

24    preferred aspect of the invention?

25    A.    That it's a solid, solubility improved form.  It's a

Myerson - direct

1  solid amorphous dispersion comprising apixaban and a

2  polymer.

3  Q.    And what is a solid amorphous dispersion?

4  A.    We've heard various discussions of this earlier in

5  the case, but to be clear, a solid amorphous dispersion is a

6  situation where you have an amorphous drug that disperses

7  domain within a polymer, so domains are not individual

8  molecules.  Domains, typically on the order of ten, ten to a

9  hundred nanometers, and they're dispersed throughout the

10  polymer.

11       And the purpose there is, here it says the

12  solubility, improved form of a soluble dispersion.  An

13  amorphous form is generally more soluble than a crystalline

14  form, so that's what they're talking about there.

15  Q.    Is it amorphous -- strike that.

16       What does the stability, what effects the

17  stability of the amorphous region in an amorphous solid

18  dispersion?

19  A.    Right.  So the stability of an amorphous solid

20  dispersion is affected by molecular mobility.  It's the

21  ability of the molecule to move.  And if you have a higher

22  temperature or you introduce moisture, you will see the

23  molecular mobility which makes it possible, for example,

24  that a molecule is in the particular domain to nucleate.

25  Q.    And once that nucleation occurs, is it still an

1  amorphous solid dispersion?

2  A.    Well, the part that can be crystallized is amorphous,

3  is amorphous solid dispersion.

4  Q.    Right.

5  A.    What is crystallized is crystalline.  Generally, when

6  you make an amorphous solid dispersion, your goal is to not

7  have anything crystallize.

8  Q.    If we turn to the page ending in Bates '894 under the

9  first paragraph, detailed description, how does Nause define

10  an immediate release formulation?

11  A.    Immediate release is mentioned at least 70 percent

12  weight of compound is present in the dosage form is released

13  IN one hour or less following introduction to THE use

14  environment.

15  Q.    And is that consistent with your understanding of an

16  immediate release formulation?

17  A.    Yes.

18  Q.    If we turn now to Example 7, the page ending in Bates

19  92, Table 8.  I think Dr. Chambliss testified about that

20  during his direct on Friday.

21         What does this tell you about the dissolution

22  rate of these tablets?

23  A.    It doesn't really tell you anything other than it's

24  defined as immediate release, so that is it.

25  Q.    And can you assume that the immediate release tablet

Myerson - direct

1  in the table has a particular dissolution rate?

2  A.    No.

3  Q.    Is there any disclosure in Nause about the particle

4  size of apixaban in the tablet?

5  A.    No.

6  Q.    Does Nause disclose any reason to select a D90 as

7  equal to or less than 89 microns?

8  A.    It does not.

9  Q.    Does Nause disclose anything about problems with

10  bioavailability of the immediate release tablets?

11  A.    It's does not.

12  Q.    If we turn to the page Bates ending in '891, there's

13  a summary of the invention.  I believe Dr. Chambliss put

14  this up and said it provided a motivation to improve the

15  bioavailability of apixaban.

16             What's your response to that?

17  A.    There's a continuing need to find safe, effective

18  methods of delivering factor XA inhibitors including

19  apixaban isn't related to bioavailability.  It's just

20  dosage forms that are safe and effective when given to a

21  person.

22  Q.    Going to slide 22 in your demonstrative, what then is

23  your opinion about the obviousness of the asserted patent

24  claims in light of combination one if the Court finds that

25  Nause is, in fact, prior art?

Myerson - direct

1   A.      They are not obvious.

2   Q.      Let's turn to slide 24.  Have you formed an opinion

3   regarding secondary considerations?

4   A.      I have.

5   Q.      And what are your opinions with respect to unexpected

6   results?

7   A.      Well, that it's unexpected that a BCS Class III drug

8   would show dissolution rate limited absorption.

9   Q.      Remind us, as BCS Class III drug, what is the

10  expected impact of a dissolution rate on bioavailability?

11  A.      As you talk about that reference, it was expected not

12  to have any.

13  Q.      Let's shift gears now and talk about 112.  If we go

14  to slide 25.

15              Did you review the Court's construction in

16  this case regarding the term apixaban particles have a D90?

17  A.      Yes.

18  Q.      Go to slide 26.  What was the Court's construction?

19  A.      Plain and ordinary meaning.

20  Q.      And what is your understanding of the plain and

21  ordinary meaning of apixaban particles have a D90?

22  A.      Well, that means that you could measure the particle

23  size distribution using any method and then you've got data

24  to calculate the D90.

25  Q.      And looking at the claim as a whole, what does this

Myerson - direct

1  claim cover?

2  A.    This, again, covers the solid pharmaceutical

3  composition.  It has to have a, comprising a therapeutically

4  effective amount of apixaban, pharmaceutically acceptable

5  diluent carrier.

6              The apixaban has to comprise crystalline

7  and particles.  The crystalline particles have to have the

8  D90 equal to or less than 89 microns.  And then there's a

9  specific dissolution rate requirement using the method and

10 conditions.

11 Q.    Does the claim require measuring of particle size --

12 strike that.

13             Does the claim require measuring particle size

14 by a particular measuring -- measurement technique?

15 A.    No.

16 Q.    Does the claim require measuring apixaban before it

17 is formulated into a composition?

18 A.    No.

19 Q.    Now, at the beginning of your testimony this

20 afternoon, you summarized the inventions of the asserted

21 claims?

22 A.    Yes.

23             MR. PRUSSIA:  If you go to the patent

24 specification, JTX-2.

25 BY MR. PRUSSIA:

Myerson - direct

1    Q.    Starting with the summary of the invention, at column

2    1, at line 64 going to the top of column 2, what does the

3    specification disclose regarding invention?

4    A.    Well, it says: "Surprisingly and unexpectedly, it has

5    been found that the compositions for tablets comprising up

6    to 5 milligrams, apixaban particles having a $D_{90}$ (90 percent

7    of the volume), less than 89 microns lead to consistent in

8    vivo dissolution in humans (at physiological pH) hence,

9    consistent exposure and consistent Factor Xa inhibition that

10    will lead to consistency in therapeutic effect."

11    Q.    If you look at the next sentence, how does the patent

12    define "consistent exposure"?

13    A.    Similar to that from a solution.

14    Q.    And what is the significance of solution-like

15    exposure for a drug like apixaban?

16    A.    Well, that should be -- that should be the highest

17    rate of exposure.

18    Q.    And if you look now to column 5, line 27, and

19    continuing down that portion of the column.

20    What does the specification disclose of the

21    nature of the manufacturing methods that can be used to make

22    the claimed pharmaceutical composition?

23    A.    It gives an example of two methods that are quite

24    common in the industry.

25    Dry granulation and wet granulation.

Myerson - direct

1    Q.      Are these standard manufacturing methods?

2    A.      Yes.

3               MR. PRUSSIA:  And if we turn now to column 9,

4    focusing on lines 24 to 29.

5    BY MR. PRUSSIA:

6    Q.     What does the patent disclose about the significance

7    of the 77 percent and 30-minute dissolution rate?

8    A.     That it was -- it was defined as a dissolution rate,

9    as a threshold dissolution rate for achieving consistent

10   exposure.

11              MR. PRUSSIA:  If we continue down to line 33 to

12   line 40.

13   BY MR. PRUSSIA:

14   Q.     What did the inventors conclude about tablets with a

15   particular particle size of 89 microns?

16   A.      It showed that in Figure 3 and Figure 4, consistent

17   exposure is expected once you have -- the tablets with

18   89 microns will always have greater than 77 percent

19   dissolved in 30 minutes so that will give the consistent

20   exposure.

21              MR. PRUSSIA:  Let's take a look at Figure 3.

22   BY MR. PRUSSIA:

23   Q.     What does the patent describe here regarding the

24   relationship between that 77 percent and 30 minute

25   dissolution rate and particle size?

Myerson - direct

1    A.      Well, here it shows the dissolution rate versus

2    particle size, and we see the point -- the last point on the

3    right before you go under the dotted line, that is

4    89 microns and it is showing the 77 percent.

5    Q.      So what do these disclosures in the '945 patent

6    specification tell a person of ordinary skill about what the

7    inventors were in possession of?

8    A.      They were in possession of a formulation of

9    crystalline -- comprising crystalline apixaban with a

10   particular $D_{90}$ of the crystalline apixaban which would show

11   the 77 percent dissolution or greater in 30 minutes.

12   Q.      Now, if a person of ordinary skill wanted to practice

13   the invention of the '945 patent claims, how would they do

14   that?

15   A.      They could easily use the formulation given in the

16   patent and make their initial API and measure its particle

17   size and get a $D_{90}$ and make sure it was below 89 microns, and

18   then they can make the formulation.

19   Q.      So they could take the starting crystalline apixaban

20   particle with a $D_{90}$ of 89 microns and less and arrive at the

21   claimed pharmaceutical composition?

22   A.      They could.

23   Q.      And could they use manufacturing techniques that are

24   disclosed in the '945 patent specification to do so?

25   A.      They could.

Myerson - direct

1    Q.      How could a person of ordinary skill have confidence

2    that particle size would not increase during the

3    manufacturing process?

4    A.      There is no mechanism in the manufacturing process

5    that would allow apixaban -- crystalline apixaban particles

6    to get larger.  They can get slightly smaller, but they

7    can't get larger.

8    Q.      Now, do you recall Dr. Chambliss testifying a little

9    bit about particles fusing together to form larger

10   particles?  Do you remember that?

11   A.      Yes.

12   Q.      What's your response to that?

13   A.      Well, I disagree for several reasons.

14           The first is the formulation has very little

15   apixaban in it; approximately 3 percent by weight total in

16   the formulation.  So it's going to be highly unlikely for

17   two apixaban particles to be able to touch each other.

18           Secondly, apixaban has a relatively high melting

19   point, well above 100 degrees C.  To have particles fused

20   together in a tablet -- in a tablet press, you would have to

21   have a relatively low melting point because the surface has

22   to melt for the particle to fuse.  That typically would --

23   might be something with a melting point of 60 or 70 degrees

24   C.

25   Q.      Now, we talked about measuring the starting API.

1    Under what circumstances would a person of skill in the art

2    need to measure the particle size of the apixaban in the

3    pharmaceutical composition?

4    A.    Only if you were -- you had a process in which you

5    were making crystalline apixaban as part of your process.

6    Meaning, as we heard previously, if you had a process where

7    you took the crystalline apixaban and dissolved it in a

8    solution, and then you sprayed it on excipients where the

9    apixaban would crystallize, then you would have to measure

10   it in the final formulation because there's no -- nothing to

11   measure that relates to the particle size of the apixaban

12   before the final formulation.

13   Q.    Could a person of ordinary skill measure the particle

14   size of apixaban in a formulated pharmaceutical composition?

15   A.    Yes.

16   Q.    And what techniques were available to do so?

17   A.    Well, we heard from Dr. Berkland on the SEM/EDS

18   method, but there are also a number of methods that combine

19   different types of vibrational spectroscopy with imagining

20   techniques like light microscopy or scanning electron

21   microscopy.

22            So typically you get combinations of microscopic

23   techniques with infrared spectroscopy or Raman Spectroscopy

24   or an NIR spectroscopy, or all of them combined.

25   Q.    Have you performed any of these techniques yourself?

Myerson - direct

1   A.      Yes.

2   Q.      Which ones?

3   A.      Actually, all of them.

4   Q.      And were these techniques actually described in the

5   literature?

6   A.      Yes.

7           MR. PRUSSIA:  Let's start with PTX-431.

8   BY MR. PRUSSIA:

9   Q.      What is this document?

10  A.      This is the -- a document describing the use of

11  infrared spectroscopy imaging on pharmaceutical

12  formulations.

13  Q.      And was it available as of the priority date?

14  A.      Yes, in 2003.

15          MR. PRUSSIA:  And if we turn to the page ending

16  in Bates 3262.

17  BY MR. PRUSSIA:

18  Q.      There is a section titled "Experimental Section."

19          Do you see that?

20  A.      Yes.

21  Q.      What does this disclose regarding the nature of the

22  samples being tested?

23  A.      Well, they made a tablet which were the active was

24  caffeine at 3.5 weight percent, and then they described the

25  other components, 35 percent starch and 61.5 percent HPMC.

Myerson - direct

1  Q.      And were the authors able to measure the particle

2  size of the caffeine in the tablet?

3  A.      Yes.

4            MR. PRUSSIA:  If we go to Figure 3, at the page

5  ending in Bates 3264.

6  BY MR. PRUSSIA:

7  Q.      What is shown in Figure 3?

8  A.      This is a nice picture showing the image and the

9  colors represent different compounds.

10  Q.      And there is a legend at the top left-hand corner.

11  What is that?

12  A.      That is the magnification.  That is the size of the

13  image.  It shows a bar.  That line represents 200 microns.

14  Q.      So what -- just what do each of the colors indicate

15  in Figures A, B, and C?

16  A.      Different components.

17  Q.      So what does Khan disclose about the ability to

18  measure the parallel size of ingredients after tableting?

19  A.      It shows it's possible.

20  Q.      Did the authors calculate a $D_{90}$?

21  A.      They did not.

22  Q.      Could they have?

23  A.      Yes.  Once you measure a particle size distribution,

24  you can always calculate a $D_{90}$.

25            MR. PRUSSIA:  Now, if we turn to PTX-435.

Myerson - direct

1   BY MR. PRUSSIA:

2   Q.      What is PTX-435?

3   A.      This is another reference where they discuss the use

4   of FT-NIR.   That's Fournier Transform Near-Infrared

5   Spectroscopy and Raman Spectroscopy using microscopy

6   together to visualize the pharmaceutical formulation.

7   Q.      And when was it published?

8   A.      In 2001.

9           MR. PRUSSIA:   And if we turn to the page ending

10   in Bates 333.

11   BY MR. PRUSSIA:

12   Q.      What is shown in Figures 13 and 14?

13   A.      This is a really nice set of figures that essentially

14   show every component in the tablet in individual pictures

15   based on the colors, and some of them are imaged by Raman

16   and some of them are imaged by NIR.

17   Q.      So if you focus on Figure 13, for example, what is

18   indicated in each one of the boxes surrounding the center

19   box?

20   A.      We have the diluent, the disintegrant, the lubricant,

21   the inorganic binder, and the active by Raman.

22   Q.      So are these ingredients in a formulated tablet?

23   A.      Yes.

24   Q.      And so could a person of ordinary skill in the art

25   use a techniques disclosed in the Clark reference to measure

Myerson - direct

1   particle size of the ingredients of a formulated tablet?

2   A.    Sure.  They could take the photographs and they could

3   do image analysis and get a size distribution.

4   Q.    Did they, in fact, calculate a $D_{90}$ in this paper?

5   A.    No.

6   Q.    Could they have?

7   A.    Yes.

8         MR. PRUSSIA:  Let's turn to PDX-13.27.

9   BY MR. PRUSSIA:

10  Q.    Have you prepared a summary of your responses to

11  Dr. Chambliss's assertions regarding 112?

12  A.    Yes.

13  Q.    Let's start with 28.

14        Do you recall Dr. Chambliss testifying that a

15  person of ordinary skill would not know the particle size of

16  apixaban in the final formulation based on the measurements

17  of starting apixaban API?

18  A.    Yes.

19  Q.    What is your response?

20  A.    Again, the only change that would occur with the

21  particle size distribution gets slightly smaller.  But since

22  we're using a $D_{90}$, $D_{90}$ would only be the larger particles in

23  the distribution, the $D_{90}$ will not change very much.

24  Q.    If you measured the $D_{90}$ of starting apixaban API, what

25  information would that give you about the $D_{90}$ of apixaban in

Myerson - direct

1    the final formulation?

2    A.    It would be -- it would be similar.

3    Q.    If you turn to slide 29.

4          Do you recall Dr. Chambliss and Dr. Genck

5    testifying that a person of ordinary skill would not know

6    how to measure particle size in a final formulation?

7    A.    Yes.

8    Q.    And what's your response to that?

9    A.    Well, we just looked at references showing that they

10   could do so.

11   Q.    Now, Dr. Chambliss and Dr. Genck say that even if

12   those techniques were available, none of them disclose

13   calculating a $D_{90}$.

14         What's your response to that?

15   A.    Well, calculating $D_{90}$ is just mathematics.  I mean, if

16   you have a particle size distribution, it's just a formula

17   to calculate the $D_{90}$.  So the key is being able to measure

18   particle size distribution.

19         MR. PRUSSIA:  Let's go to the next slide.

20   BY MR. PRUSSIA:

21   Q.    Dr. Chambliss and Dr. Genck testified that a person

22   of ordinary skill would not be able to compare particle size

23   measurements taken by different techniques.

24         Do you remember that testimony?

25   A.    I do.

Myerson - direct

1   Q.      Do you think that's the right inquiry?

2   A.      No.

3            MR. PRUSSIA:  Let's turn back to the claim,

4   claim 12.

5   BY MR. PRUSSIA:

6   Q.      Do the claims require a person of ordinary skill to

7   compare particle size measurement techniques?

8   A.      No.

9   Q.      Now, could a person of ordinary skill compare

10  different particle size measurement techniques?

11  A.      Yes.

12  Q.      Is this in the literature?

13  A.      Yes.

14  Q.      Turn to PTX-430.

15  A.       (Witness complies.)

16  Q.      What is this document?

17  A.      This is the document that's a Bosquillian reference,

18  which talks about comparison of particle sizing techniques

19  regarding inhalation powder.

20  Q.      And was it available as to the priority date?

21  A.      Yes, 2001.

22            MR. PRUSSIA:  If we turn to Figure 2, it's on

23  page Bates 3256.

24  BY MR. PRUSSIA:

25  Q.      What's shown here?

Myerson - direct

1    A.      This is an SEM image of the powder that they're

2    measuring -- measuring the particle size distribution of.

3    Q.      And what's your impression as to the shape of these

4    particles?

5    A.      Well, these are irregular particles that have what we

6    would call a small aspect ratio.  Meaning that the two

7    longest dimensions are not -- the ratio of the two longest

8    dimensions are not that different from each other.

9    Q.      Does apixaban have a low aspect ratio?

10   A.      Yes.

11           MR. PRUSSIA:  Would you turn to Figure 6 on the

12   page ending in Bates 3258.

13   BY MR. PRUSSIA:

14   Q.      What is shown here?

15   A.      This is a comparison of measurements made by, I

16   think, five different techniques.  They're described in the

17   caption for Figure 6.

18           MR. PRUSSIA:  And if we go to the text directly

19   above the figure.

20   BY MR. PRUSSIA:

21   Q.      What do the authors disclose regarding the

22   comparability of the different measurement techniques that

23   were studied in these experiments?

24   A.      It says basically a comparison was quite good for

25   powders A, B and C.

Myerson - direct

1  Q.      If you turn to the page ending in Bates 3253, there's

2  a section entitled electron microscopy.

3          Do you see that?

4  A.      Yes.

5  Q.      And in the last sentence of that section, how many

6  particles did the authors measure by electron and light

7  microscopy for these experiments?

8  A.      A hundred.

9  Q.      Turn particularly to PTX-402.  And what's this

10 document?

11 A.      This is a journal, I mean an article, Reverchon

12 talking about supercritical fluid assisted production of

13 HPMC composite microparticles.

14 Q.      And if you turn to Table 1 on the page ending in

15 Bates 2224, can you describe what's shown there?

16 A.      Yes.  This is a direct comparison of D50 and D90

17 obtained from SEM scanning electron microscopy and LS laser

18 light scanner.

19 Q.      And there's a D90 and a D50 value.

20          Do you see that?

21 A.      Yes.

22 Q.      And if you go to the text above the table, what would

23 a person of ordinary skill in the art conclude about the

24 results reflected in Table 1?

25 A.      That you can, you can compare, get pretty consistent

1   results for this system using SEM and laser diffraction.

2   Q.     So based on these two references we looked at,

3   Bosquillon and Reverchon, what would a person of ordinary

4   skill conclude as to the ability to compare particle size

5   measurements obtained by different measurement techniques?

6   A.     They would think they could.

7   Q.     Now, what information have you seen in this case that

8   different techniques will produce different results?

9   A.     Nothing.

10  Q.     Has Dr. Chambliss or Dr. Genck provided any

11  experimental evidence that different techniques will produce

12  different results?

13  A.     No.

14  Q.     Let's go to PDX-13.31.

15         And do you recall Dr. Chambliss testifying

16  that a person of ordinary skill would not be able to conduct

17  an appropriate laser light scattering experiment based on

18  the disclosures in the patent?

19  A.     Yes.

20  Q.     And what's your response to that?

21  A.     I disagree with that.

22  Q.     And if we pull up Dr. Chambliss' DDX-14-36, why do

23  you disagree?

24  A.     Well, first of all, the first is, it talks about the

25  applicable model.  You don't do the calculation, the

1    instrument of the calculation.  Whether it uses Fraunhofer

2    or Mie theory, it's still measuring equivalent spherical

3    diameters.  And I would say almost all modern instruments

4    use Fraunhofer diffraction for laser light scattering.  So

5    that's kind of irrelevant to the argument.

6                         And then, secondly, the modern instruments

7    all pretty much use the same algorithms to get the same

8    results.

9                    And, thirdly, the conditions are you can

10   determine the conditions simply by following the USB on

11   particle size measurements, and there's a nice chapter on

12   how to develop particle size measuring standards and how to

13   actually do it for a given sample, and my students do it all

14   the time.

15   Q.     But was that USP reference available as of the

16   priority date?

17   A.     Yes.

18   Q.     If we turn now to slide 25 in your demonstratives,

19   just in summary, first focusing on written description.

20                    In your opinion, were the inventors in

21   possession of a claimed invention?

22   A.     Yes.

23   Q.     And just to summarize, what is the basis for your

24   opinion?

25   A.     The information in the patent showing the

Myerson - direct

1    formulation, the dissolution rate.  Everything in there

2    shows that they were in possession of pharmaceutical

3    composition that meets the claim limitations.

4    Q.    And were you here when Dr. Genck testified that the

5    claims are invalid to the extent they cover what they refer

6    to as the Berkland method?

7    A.    Yes.

8    Q.    And what's your response to that?

9    A.    Again, I mean, measuring, measuring the size

10   distribution within the drug product is certainly possible

11   by one of a number of methods, and the claim construction

12   did not require any particular method to be used.

13   Q.    Now, Dr. Berkland didn't calculate a D90 though; is

14   that right?

15   A.    That's correct.

16   Q.    Did he need to?

17   A.    He did not because the thing about a D90 is, of

18   course, if there are no particles in the vicinity of

19   89 microns or later, the D90 has to be less.  It's

20   impossible to have a D90 of 89 microns or larger if there

21   are no 89 micron or larger particles.

22   Q.    If we turn to slide 32 in your deck.  In forming your

23   opinions regarding enablement, did you assess the Wand

24   factors?

25   A.    I did.

Myerson - direct

1  Q.      Does this slide contain a summary of your opinions as

2  to that?

3  A.      Yes.

4  Q.      And in your opinion, can a person of skill in the art

5  make and use the invention without undue experimentation?

6  A.      They can.

7  Q.      And once a person of skill in the art appreciates

8  that the claimed D90 and dissolution rate limitations result

9  in improved properties of apixaban formulations, could a

10 person of skill in the art use routine techniques to make

11 such a composition?

12 A.      Yes.

13 Q.      And, finally, if you turn to slide 25, would a person

14 of skill in the art be able to make the claimed compositions

15 with reasonable certainty?

16 A.      Yes.

17 Q.      Shifting gears a little bit, turning to slide 33, the

18 next slide, were you add to address any issues with respect

19 to the '208 patent?

20 A.      Yes.

21 Q.      And what were those issues?

22 A.      It's up on the screen.  I was asked if required,

23 could a salt form of apixaban have been formulated as of

24 September 2001.

25 Q.      If you go to slide 34, what information did you

1    consider in connection with conducting your analysis?

2    A.    I was asked to assume that the sodium, potassium and

3    hydrochloride salts of apixaban had been prepared, and I

4    considered the '208 patent and known formulation and

5    manufacturing method.

6    Q.    What information is provided by the '208 patent

7    in connection with the question you were asked to

8    address?

9    A.    The '208 patent generally indicates that you could

10   formulate apixaban in tablets or capsules.

11   Q.    Does the '208 patent provide information regarding

12   dosage and formulations?

13   A.    Yes.

14   Q.    And what were the assumptions that you were asked to

15   make in connection with conducting your analysis?

16   A.    Again, that the sodium, potassium and hydrochloride

17   salts of apixaban had been prepared.

18   Q.    Did you review the testimony of defendants' expert,

19   Dr. Buckton?

20   A.    I did.

21   Q.    And at a high level, do you agree with Buckton's

22   testimony that an apixaban salt would not provide

23   formulation?

24   A.    I do not.

25   Q.    Again, at a high level, what are the reasons for your

Myerson - direct

1  disagreement?

2  A.     Well, you could come up with a manufacturing method

3  that excluded moisture and you could come up with a

4  packaging method that excluded moisture.  These are not

5  uncommon in pharmaceutical manufacturing.

6  Q.     Just to be clear, is there a way to formulate a salt

7  form of apixaban in a way that would keep it stable?

8  A.     Yes.

9  Q.     And have you prepared a demonstrative to walk the

10  Court through your analysis?

11  A.     I have.

12  Q.     Let's go to slide 35 and let's start with the first

13  bullet.  What does that relate to?

14  A.     That relates to keeping the salt away from moisture.

15  Right.  So the air has moisture in it and you don't want the

16  air with moisture in contact with the salt, so you set up a

17  process which compares, does -- prepares the dosage form

18  under what we call anhydrous conditions and how that is done

19  is by using what we call a nitrogen blanket or a dry air

20  blanket in the manufacturing process.

21  Q.     Just to be clear, what are anhydrous conditions?

22  A.     Anhydrous conditions mean dry conditions.

23  Q.     We've been talking a lot about tablets during your

24  testimony.  Are there any dosage forms other than tablets

25  that can be prepared under dry conditions?

Myerson - direct

1    A.      Yes.  Capsules.

2    Q.      And how could capsules have been prepared under dry

3    conditions?

4    A.      The same way you could do tablets.  The last step

5    would be different.

6    Q.      Are the techniques that you just described, for

7    example, in nitrogen blanket, were those techniques that

8    were available as of 2001?

9    A.      Yes, and there are pharmaceuticals that are made that

10   way because they're very water sensitive.

11   Q.      Now let's turn to the second bullet.  What does the

12   second bullet refer to?

13   A.      Packaging the formulated apixaban salt in a package

14   impermeable to moisture.

15   Q.      In 2001, what packaging methods were available for

16   protecting a formulated oral dosage form from moisture?

17   A.      Yes.  Well, the very common ones are blister packs,

18   where you have individual tablets or capsules packaged, for

19   example, in aluminum foil.

20           If you buy over-the-counter Prilosec,

21   that's what it looks like.  It's an aluminum foil blister

22   pack.  You also see blister packs where you have a polymer

23   on one side and aluminum foil on the other also to protect

24   for moisture.  If you are going to package them in a bottle,

25   you could put them in a glass bottle with a foil seal.  You

Myerson - direct

1   can put them in a polymer bottle with a foil seal.  These

2   are all very common.  And in the bottle you can put what's

3   called a desiccant, which is an inorganic material that

4   absorbs moisture.

5   Q.    You referred to tablet coatings.  What is that?

6   A.    Yes.  You can also coat the tablet with something

7   like UltraDry, which will provide some moisture protection.

8   Q.    Were such tablets commercially available as of 2001

9   then?

10  A.    Yes.

11  Q.    You mentioned desiccants.  What is desiccant?

12  A.    Desiccant is an inorganic species.  Usually, if you

13  are looking at some of your pill bottles, there's usually

14  something that looks like a little package wrapped in paper.

15  It has usually some carbonate in it, and that's a desiccant,

16  so water might that get into your pill bottle after you open

17  it.

18  Q.    Were desiccants available after 2001?

19  A.    Yes.

20  Q.    So in summary, in a moisture-free environment, would

21  a formulated apixaban salt have been stable?

22  A.    Yes.

23  Q.    Are there any marketed drugs with active

24  pharmaceutical ingredients that need to be protected from

25  moisture?

1   A.      Yes.  Quite a few.

2   Q.      Can you give an example of one?

3   A.      We have an example of anticoagulant that I have,

4   Pradaxa.

5   Q.      Turn to slide 36, please.  What is shown on slide

6   36?

7   A.      This is instructions for patients related to Pradaxa,

8   and some of it has to do with keeping it away from moisture.

9   Q.      And what does the Pradaxa package insert disclose

10  regarding instructions for keeping the drug protected from

11  moisture?

12  A.      So if we look at the third line down, it says keep

13  Pradaxa in the original bottle to protect from moisture.  Do

14  not put Pradaxa in pill bottles or pill organizers.

15          Then down three from the bottom, instruct

16  patients to remove only one capsule from the opened bottle

17  at the time of use.  The bottle should be immediately and

18  tightly closed.

19  Q.      If you turn to your next slide -- strike that.

20  Actually, Dr. Myerson, you were in court for Dr. Zaworotko's

21  testimony?

22  A.      I was.

23  Q.      If you pull up his PDX-8-16.  It's a slide from his

24  direct examination?

25  A.      Yes.

Myerson - direct

1  Q.      What is shown here?

2  A.      This is -- this shows SigmaPharm's efforts to

3  maintain separation between the drug product and water.

4  Q.      And what are some of the efforts that SigmaPharm

5  employed to produce them?

6          MR. HENEGHAN:  Your Honor, this is beyond the

7  scope of Dr. Myerson's report.  He didn't offer opinions

8  about this in his report.

9          MR. PRUSSIA:  He obviously didn't offer

10 testimony about this DDX, but the whole basis of his opinion

11 is about techniques that could have been used to formulate

12 the salt form in a way that would be under dry conditions

13 and kept apart from moisture, and I don't think there's

14 anything new here that is on this slide that's apart from

15 what he has already testified to, and I think he's going to

16 testify to that fact.

17         THE COURT:  It's an opinion that these things

18 were available?

19         MR. PRUSSIA:  Yes.  And it's consistent with his

20 testimony and his opinions regarding the techniques that one

21 could employ in order to formulate -- in order to formulate

22 this under dry conditions.

23         MR. HENEGHAN:  Judge, these are SigmaPharm

24 documents and Dr. Myerson did not identify these in his

25 report as being a basis of his opinion.  We had no

Myerson - direct

```
 1    opportunity to question him at deposition about this.
 2                   THE COURT:  Is that all correct?
 3                   MR. PRUSSIA:  Yes.  Yes, Your Honor.
 4                   THE COURT:  I will sustain the objection.
 5                   MR. PRUSSIA:  Okay.
 6                   THE COURT:  Move on.
 7    BY MR. PRUSSIA:
 8    Q.    So, Dr. Myerson, in summary, are the techniques that
 9    you testified to during your examination today regarding the
10    conditions under which a person of skill in the art could
11    have formulated the salt form of apixaban, were those
12    techniques available as of 2001?
13    A.    Yes.
14                   MR. PRUSSIA:  I pass the witness, Your
15    Honor, and I have several exhibits to read into the record.
16                   THE COURT:  Sure.  Go ahead.
17                   MR. PRUSSIA:  And these will all be PTX's unless
18    otherwise noted.  I will start with 13, 164, 167, 168, 170,
19    174, 176, 211, 320, 402, 429, 430, 431, 435, 437, 457, 458,
20    476, 480, 527, 690, 696, 710, 732, 738 and 816.
21                   MR. HENEGHAN:  That's consistent with my notes,
22    Judge.  We have no objection.
23                   THE COURT:  No objection.  All right.  Those are
24    all admitted.
25                   MR. PRUSSIA:  Thank you.
```

 1                     (PTX-13, PTX-164, PTX-167, PTX-168, PTX-170,

 2     PTX-174, PTX-176, PTX-211, PTX-320, PTX-402, PTX-429,

 3     PTX-430, PTX-431, PTX-435, PTX-437, PTX-457, PTX-458,

 4     PTX-476, PTX-480, PTX-527, PTX-690, PTX-696, PTX-710,

 5     PTX-732, PTX-738 and PTX-816 were admitted into evidence.)

 6                     THE COURT:  And we will have cross-examination.

 7                     MR. HENEGHAN:  Judge, the defendants are

 8     dividing this witness between the defendants, so Mr. Pejic

 9     will go first.

10                     THE COURT:  All right.  That's fine.

11                     MR. PEJIC:  Good afternoon.

12                     May I approach, Your Honor?

13                     THE COURT:  You may.

14                     (Documents passed forward.)

15                          CROSS-EXAMINATION

16     BY MR. PEJIC:

17     Q.     Are you ready, Dr. Myerson?

18     A.     Yes.

19     Q.     Good afternoon.  My name is Branko Pejic.  We've met

20     a few times.  How are you doing today?

21     A.     Very good.  Thank you.

22     Q.     Okay.  Just a few preliminary matters.

23             Your opinions in this case are limited to the

24     invalidity of the '945 patent and the '208 patent; correct?

25     A.     My opinions are based on validity of the '945 patent,

Myerson - cross

1    and the only opinion I gave related to the '208 patent is

2    the ability to formulate the salt.

3    Q.      But that would still be related to validity and not

4    infringement; correct?

5    A.      I guess.  I mean, I didn't give an opinion on either

6    thing related to the '208 patent.

7    Q.      Okay.  Just trying to make sure.

8            And you did not offer any opinions as to

9    infringement of either the '945 patent or the '208 patent;

10   is that correct?

11   A.      That's correct.

12   Q.      You provided two expert reports in this case; is that

13   correct?

14   A.      Yes.

15   Q.      The reports are the report related to the validity of

16   the '945 and '208 patent and your reply report in support of

17   the Berkland method; is that correct?

18   A.      My initial report was a response to Dr. Chambliss

19   related to the '945 patent, and I did talk about the salt

20   formation issue.

21           The second report was the reply to Dr. Genck's

22   report, and I don't remember all the details of that report.

23   Q.      But it did deal with the Berkland method, if you

24   recall.

25           We had a deposition in Boston on that.

Myerson - cross

1    A.    It -- I think somewhere -- I think we must have

2    discussed the SEM-EDS method that Dr. Berkland used.

3    Q.    Fair enough.  Thank you.

4          You did not offer any other reports in this

5    case; is that correct?

6    A.    That is correct.

7    Q.    Did you hear Dr. Berkland's and Dr. Chambliss's

8    testimony?

9    A.    I did.

10   Q.    Okay.  And just to clarify, I think Mr. Heneghan told

11   you, but I'll be addressing the '945 patent with you and

12   then he will be following up on the '208 issues.

13         Is that okay?

14   A.    Yes.

15   Q.    Thank you.  Okay.

16         You testified that the asserted claims required

17   determining the $D_{90}$ of the apixaban particles in the solid

18   pharmaceutical composition; correct?

19   A.    I said you could do that.  I also said you could do

20   it before when you have crystalline API that you use

21   directly in formulation.

22         MR. PEJIC:  Okay.  And could we please put up

23   PDX-13.5?

24   BY MR. PEJIC:

25   Q.    This was your demonstrative from earlier today.  And

Myerson - cross

1    we have heard a lot about dosage forms during this trial,

2    and just for clarity, will you agree with me that the '945

3    patent's alleged surprising results are based upon a tablet

4    composition?

5    A.      All their work and all their data is for tablet

6    composition.  I agree with that.

7    Q.      Okay.  Would you also agree with me that the

8    compositions of the '945 patent are made by a wet or dry

9    granulation manufacturing process?

10   A.      The examples are, yes.

11   Q.      Okay.  Thank you.

12           In the pharmaceutical industry, is it routine to

13   measure the $D_{90}$ of an API in a finished dosage form?  Is that

14   correct?

15           Strike that.  I apologize.  I think the question

16   came out wrong.

17           In the pharmaceutical industry, it is not

18   routine to measure the $D_{90}$ of the API in a finished dosage

19   form; is that correct?

20   A.      Yes.

21           Just a slight correction; that you measure the

22   particle size distribution in the final dosage form and

23   calculate the $D_{90}$.  But, yes, it is not -- other than that

24   statement, it is correct.

25   Q.      So will you agree with me it is not routine to

Myerson - cross

1  determine the $D_{90}$ of an API in a finished dosage form?

2  A.    I would agree with that.

3          Oh, it's not routine practice is what I would

4  say.

5  Q.    And would you also agree that it's not routine

6  practice to measure the particle size in a finished dosage

7  form?

8  A.    Yeah.  It's rare that you would want to do that.  You

9  have that very specific reason to do so.

10  Q.    Thank you.

11          In fact, the '945 patent does not disclose a

12  test that would permit a person of skill in the art to

13  measure the size of the apixaban particles and determine the

14  $D_{90}$ after those particles had been formulated into a tablet;

15  is that correct?

16  A.    Yes.  And the '945 patent discloses no such test.  I

17  agree.

18  Q.    Thank you.

19          Would you also agree that the '945 prosecution

20  history does not include any particle size data based upon

21  API in the finished tablet?

22  A.    I agree with that.

23  Q.    You have reviewed the '945 patent prosecution

24  history; correct?

25  A.    Yes.

Myerson - cross

1    Q.      Okay.

2                MR. PEJIC:  Could we please pull up JTX-4.

3    BY MR. PEJIC:

4    Q.      It's in Tab 2 -- or a portion of it is in Tab 2 in

5    your binder, and particularly, this is the June 16, 2015,

6    amendment in the '945 prosecution.  And I would like --

7    pardon me -- to direct you to pages 13 and 14.

8                MR. PEJIC:  Can you please put those up?

9    BY MR. PEJIC:

10   Q.      And if you will look at the screen in front of you,

11   you can see it is highlighted.

12              This is just to confirm your first point, the

13   unexpected results are based upon tablet formulations; is

14   that correct?

15   A.      That's correct.

16   Q.      Okay.  And would you also agree that all of the data

17   used to argue for patentability to the United States Patent

18   Office in the '945 patent was based on apixaban tablets that

19   had bulk apixaban measured as all as opposed to measured in

20   the tablet?

21   A.      As far as I remember, that is correct.

22   Q.      We discussed a number of publications, and I do

23   believe we're in agreement, but would you agree with me that

24   none of the documents that you discussed today or were cited

25   in your expert report determined the $D_{90}$ of an API in a

Myerson - cross

1   finished dosage form?

2   A.      That's correct.

3   Q.      Okay.  And would you also agree -- strike that.

4           You are also not aware of anyone that has

5   actually measured the size of an API in a tablet; is that

6   correct?

7   A.      I think one of the references that we showed with the

8   caffeine, I think they do talk about the size they measured

9   of the caffeine from their -- from their tablet.  But other

10  than that, I can't think of one.

11  Q.      Okay.  Let's just quickly take a look at your

12  deposition transcript.  It's Myerson 1 at page 191, line 7

13  through 11.  And that's in your tab and we'll pull it up on

14  the screen.

15          And I think that when asked if anyone had ever

16  actually measured the particle size of an API, your answer

17  was:

18              "So while they" -- it was no; is that correct?

19              I asked you:

20              "Question:  Okay.  So while they could have

21  potentially done this in your opinion, are you aware of

22  anyone that has actually measured the particle size of an

23  API in a tablet?

24              "Answer:  No."

25              Do you recall that question and your answer?

Myerson - cross

1   A.      Yes.

2   Q.      Thank you, Dr. Myerson.

3           You reviewed the examples and methods of

4   manufacturer of the '945 patent; correct?

5   A.      Yes.

6   Q.      Do you know whether the examples of the '945 patent

7   contain excipients that have nitrogen atoms?

8   A.      I'd have to look.  I don't recall.

9   Q.      Okay.  I direct you to JTX-2 at column 7, lines 19

10  through 45.

11          And it will be up on the screen.  And

12  particularly Table 4.

13          Do you recognize this as one of the examples

14  from the '945?

15  A.      Yes.

16  Q.      And you see povidone?

17  A.      Yes.

18  Q.      Does povidone contain nitrogen atoms?

19  A.      I think it does.

20  Q.      Thank you.  Next.

21          A person of skill in the art could not predict

22  with any precision the particle size in the finished tablet

23  based upon the manufacturing processes disclosed in the '945

24  patent; is that correct?

25  A.      With any precision?  Do you mean -- did you say the

Myerson - cross

1   particle size distribution or the --

2   Q.    I'm asking you whether one skilled in the art could

3   predict with any precision the particle size in the finished

4   tablet based upon the manufacturing process as disclosed in

5   the '945 patent.

6   A.    Yes.  The particle -- the particle size is a rather

7   imprecise term.

8         Do you mean the distribution or some aspect of

9   the distribution?  The $D_{50}$, the $D_{10}$, the $D_{90}$, the average

10  size?

11  Q.    Let's look at your deposition transcript.

12        MR. PEJIC:  Could we please pull up Myerson 1,

13  page 142, line 21 through 143, line 6.

14  BY MR. PEJIC:

15  Q.    And you can see when asked at your deposition:

16        "Question:  Okay.  But can you predict with any

17  precision the particle size in the finished tablet based

18  upon the manufacturing processes disclosed in the '945

19  patent?"

20        Your answer was:

21        "Answer:  Other than saying it would be the same

22  or possibly smaller, that's the best I can do."

23  A.    Right.

24  Q.    Do you recognize --

25  A.    If you go up further in there, we were talking about

Myerson - cross

1   $D_{90}$ or the distribution.

2   Q.     Dr. Myerson, you're not answering my question.  Do

3   you recognize this testimony?

4   A.     I do, and that's what I said.

5   Q.     Thank you.  We'll move on.

6          It is important to the '945 patent that the

7   particle size of the bulk API had to be 90 -- less than or

8   equal to 89 microns; is that correct?

9   A.     I'm sorry.  Could you say that again, please?

10  Q.     It is important to the '945 patent that the particle

11  size of the bulk API have a $D_{90}$ less than or equal to

12  89 microns; is that correct?

13  A.     That's correct.  As long as you are using the bulk

14  API as API in the final formulation, you are not dissolving

15  it first.

16  Q.     Again, we'll just go to your deposition transcript,

17  Myerson 1, at page 140, lines 22 through 141, line 6.

18         Do you see where I asked you:

19         "Question:  Is it important to the '945 patent

20  that the particle size of the bulk API have a $D_{90}$ less than

21  or equal to 89 percent?"

22         And I made a mistake.

23         "Answer:  You mean 89 microns?

24         "Question:  89 microns, yes."

25         And your response was:

Myerson - cross

1           "Answer:  Yes."

2           Is that correct?

3    A.      That's correct.

4    Q.      Thank you.

5           And if you started with an API that had a larger

6    $D_{90}$ than 89 microns, that is, the apixaban particles in the

7    formulated product would be large -- would have a larger $D_{90}$;

8    correct?

9    A.      I'm sorry.  Say that again, please.

10   Q.      If you started with an API that had a larger $D_{90}$, the

11   apixaban particles in the formulated product would be --

12   would have a larger $D_{90}$; is that correct?

13   A.      I'm -- maybe I'm missing a piece of that question.

14   I'm sorry.  Again, I'm not -- you're saying larger twice and

15   maybe I'm not hearing you.

16   Q.      Okay.  You testified that it was important to the

17   '945 patent that the $D_{90}$ be less than or equal to 89 microns;

18   correct?

19   A.      Correct.

20   Q.      Okay.  And so the follow-up question is, if you

21   started with an API that had a larger $D_{90}$, the apixaban

22   particles in the formulated product would have a larger $D_{90}$;

23   is that correct?

24   A.      Correct, if you're using crystalline particles --

25   Q.      Thank you, Doctor.

Myerson - cross

1   A.      -- to make the formulation --

2   Q.      Thank you, Dr. Myerson.

3           That -- if you like, we can look at your

4   deposition.

5   A.      It's the same issue.  You're conflating different

6   issues, and my deposition was all about using crystalline

7   particles in the formulation.

8           Now, I don't know if it's obvious --

9   Q.      Dr. Myerson, thank you.  You answered my question.

10  We can move on.

11  A.      Sure.

12  Q.      And just to confirm, you've also never attempted to

13  measure the change in particle size from the bulk API to

14  what ends up in the apixaban tablet, 2.5 or 5 milligrams of

15  the asserted claims; correct?

16  A.      That is correct.

17  Q.      Okay.  Do you recall talking about Carreiro today?

18  A.      Yes.

19  Q.      It's in Tab 4 of your binder if you want to take a

20  look.  And I just want to confirm Carreiro is prior art to

21  the '945 patent?

22  A.      Yes.

23  Q.      Okay.  And would you agree with me that Carreiro

24  discloses the pharmacological activity of apixaban as an

25  antithrombotic agent?

Myerson - cross

1    A.    Yes.

2    Q.    Thank you.

3          Would you also agree that Carreiro discloses

4    2.5- and 5-milligram dosages of apixaban?

5    A.    Yes.

6    Q.    Thank you.

7          Was this crystalline apixaban?

8    A.    You know, I don't recall whether it says it was

9    crystalline or not.  I'd have to look, but I don't recall.

10   Q.    Okay.  We can move on.

11         And you recall your testimony earlier today

12   regarding FDA guidance in the dissolution testing limitation

13   of claim 12?

14   A.    Yes.

15   Q.    And would you agree with me that there's nothing

16   innovative about coming up with the dissolution profile and

17   testing conditions?

18   A.    The testing conditions themselves?

19   Q.    And the dissolution profile?

20   A.    I'm sorry.  What do you mean by dissolution profile?

21   Q.    The 77 percent within 30 minutes -- 70 percent within

22   30 minutes.

23   A.    I'm sorry.  Let's start again and maybe ask your

24   entire question again.

25   Q.    I'm asking you if you would agree with me that the

Myerson - cross

1    conditions disclosed -- strike that.

2              You testified earlier today that your students

3    knew how to come up with dissolution profiles and

4    dissolution testing; is that correct?

5    A.    Well, yes.  We know, my students and myself, we know

6    how to design dissolution testing based on the FDA guidance,

7    which we routinely do.

8    Q.    Thank you, Dr. Myerson.

9              Isn't that exactly where the dissolution

10   profiles and conditions recited in claim 12 originated?

11   A.    The -- the -- the conditions are a subset of the

12   things that are disclosed in the FDA guidance.  That's

13   correct.  The exact dissolution rate and time are not, but

14   the potential conditions and apparatus that could be used

15   are all disclosed in the FDA guidance.

16   Q.    And there's nothing innovative about that; is that

17   correct?

18   A.    No.  Choosing the conditions within the guidance to

19   do dissolution testing, no, there's nothing innovative about

20   that.

21   Q.    Very good.

22             And you testified that a person of skill in the

23   art would not have been motivated to improve the

24   bioavailability and dissolution rate of apixaban during the

25   relative time; is that correct?

1  A.    Yes.

2  Q.    BMS did not share your confidence in the results of

3  the clinical trials, did they?

4  A.    I guess I don't understand the question.

5  Q.    Were you here when Dr. Knabb testified?

6  A.    No.

7  Q.    Okay.  Can we please put his testimony up.  It's

8  trial transcript Volume B from October 31st, page 204, lines

9  12 through 24.

10          And I would direct you to the line starting

11  with, we had a strategy of continually putting in backups so

12  that in the event that something went wrong, like it did

13  with 423, we didn't have to go back to the drawing board and

14  start all over again.

15  A.    That's what it says.

16  Q.    All right.  So it doesn't surprise you that BMS was

17  looking at backup plans just in case the apixaban clinicals

18  failed?

19  A.    Not at all.

20  Q.    Okay.  Thank you.

21          And do you recall discussing BSC and biowaivers

22  a little bit earlier today with Mr. Prussia?

23  A.    Yes.

24  Q.    And do you know when biowaivers were available in

25  Europe?

1  A.      I believe biowaivers were -- I'm sorry.  A particular

2  class?

3  Q.      For Class III.

4  A.      I believe biowaivers were available in Europe for

5  Class III sometime around or before the priority date of the

6  '945 patent.

7  Q.      Okay.  I will tell you what.  Let's go ahead and take

8  a look at the FDA bioequivalence article.  It's at page 124,

9  tab 9 in your binder.

10  A.      Yes.

11  Q.      And could we please turn to the table?  And do you

12  see BCS Class III?

13  A.      What page are we on?  That's okay.  I can look at it.

14  Q.      Yes.  This is -- does this confirm?

15             MR. PRUSSIA:  Your Honor, the version I have

16  does not have any Bates numbers on it.

17             THE COURT:  Okay.

18             MR. PEJIC:  It's to show him they were available

19  at the time.

20             MR. PRUSSIA:  Was it produced in litigation?

21             MR. PEJIC:  No.  I was earlier.  You asked Dr.

22  Chambliss whether biowaivers are available.

23             THE COURT:  I don't think there's an objection.

24             MR. PEJIC:  Okay.

25             THE COURT:  It's on the screen.

Myerson - cross

```
 1                    MR. PEJIC:  No.  Just to clarify, he didn't
 2     know?
 3                    THE WITNESS:  Yes.  Right.
 4     BY MR. PEJIC:
 5     Q.       Would you agree that this --
 6     A.       Yes.  EMA, European agency, 2008, that's correct.
 7     Q.       Okay.  Thank you.
 8                    And do you remember talking about bloom a
 9     little bit earlier today?
10     A.       About what?
11     Q.       The Blume article, BCS and Class III?
12     A.       You have to put it up.  I forgot the name.
13     Q.       Yes.  Let's put up DTX-424 at tab 7.  It was also
14     discussed as PTX-429 and been admitted into evidence as
15     PTX-429.
16                    So do you recognize Blume?
17     A.       I do.
18     Q.       Okay.  And could we please turn to page 4.  And
19     taking a look at the top first full paragraph of the
20     left-hand column, would you agree with me that Blume is
21     based solely on ratitadine results?
22     A.       Ranitidine.
23     Q.       Ranitidine.  Yes.  Thank you.
24     A.       Yes.
25     Q.       Okay.  And if you will turn to the bottom paragraph,
```

Myerson - cross

1  bottom of the paragraph where it starts with, Consequently,

2  it talks about -- there we go.  The bioavailabilities of

3  ranitidine, and I apologize, will also depend on the

4  transport velocity through the GI tract and thus may be

5  strongly affected by excipients which modify the GI transit

6  time.

7           Do you agree with that?

8  A.    That's what it says.

9  Q.    I didn't rely on Blume.  Do you have any reason to

10  believe that it would be inaccurate?

11  A.    No.

12  Q.    Okay.  And looking at the top of this paragraph,

13  Blume doesn't tell you the excipients in the ranitidine

14  products; is that correct?

15  A.    At least not right here.  I don't know if it does it

16  somewhere else in the paper.

17  Q.    I have not seen it, but we can move on.

18           Blume also does not tell you how the ranitidine

19  products were manufactured; is that correct?

20  A.    Other than, other than knowing that they were

21  tablets, I don't think so.

22  Q.    Okay.  And Blume also does not tell you the particle

23  size of the ranitidine in the respective batches of IR

24  products; is that correct?

25  A.    No.  All you know is that they dissolve a different

Myerson - cross

1    rate.

2    Q.    So do you know how strongly affected ranitidine is

3    affected by the excipients?

4    A.    I'm sorry.  Could you repeat that, please.

5    Q.    Do you know how strongly the excipients affect the

6    ranitidine bioavailability?

7    A.    I do not.

8    Q.    Okay.  I would like to pull up Chen.  This is a

9    document you have not seen, but it's going to explain how

10   highly and strongly dependent ranitidine is on the

11   excipients.

12            If you will take a look at the top, the title,

13   and the abstract.  If you will look at the purpose, the

14   purpose of this study was to examine the effect of common

15   excipients such as sugars (sorbitol versus sucrose) on

16   bioequivalence between pharmaceutical formulations, using

17   ranitidine and metoprolol as model drugs.

18            Do you see that?

19   A.    Yes.

20   Q.    Okay.  And can we please turn to page 26 and put up

21   Table 1.  And I will direct you to the text.

22            Do you see where it says, as shown in Table 1,

23   ranitidine Cmax was decreased by 50 percent in the presence

24   of sorbitol compared to sucrose?

25   A.    Yes.

Myerson - cross

1            MR. PRUSSIA:  Your Honor, I thought the

2  agreement was that if it's only to be used for impeachment,

3  it need to be disclosed.

4            MR. PEJIC:  It is.

5            THE COURT:  They do need to be disclosed?

6            MR. PEJIC:  It is for impeachment.

7            MR. PRUSSIA:  It's not an exhibit.  It hasn't

8  been produced.  And the way that I see this examination

9  going so far, he's trying to read it into evidence.  He's

10 not using it to impeach Dr. Myerson.

11           MR. PEJIC:  I am, because Dr. Myerson says

12 looking at Blume, one could take a one-size-fits-all

13 approach to BCS class drugs.

14           THE COURT:  I don't need to hear the whole

15 argument.  The objection is overruled.  Keep going.

16           MR. PEJIC:  Thank you, Your Honor.

17 BY MR. PEJIC:

18 Q.    And so you see here, ranitidine has approximately

19 50 percent difference in bioequivalence based upon the

20 excipients used; is that correct?

21 A.    That's correct.

22 Q.    Thank you.

23           And I'd like to turn to the Berkland method

24 briefly.  This is the SEM-EDS; is that correct?

25 A.    Yes, it does.  I prefer to call it SEM-EDS.

Myerson - cross

1   Q.      Well, the Berkland method includes more to it,

2   including the sampling methodology, and so that's why I had

3   my preliminary questions.

4           You have heard Dr. Berkland's testimony, I

5   believe you testified.  Okay.  And for purposes of this exam

6   or cross-examination, I would ask if you understood the

7   Berkland method to include not only the SEM-EDS, but also

8   the sample selection and collection techniques; is that

9   correct?

10  A.      That was all part of the experimental protocol.

11  That's correct.

12  Q.      Okay.  And Dr. Berkland did not do any control

13  testing to ensure that his testing methodology did not

14  impact the size of the apixaban API particles that he was

15  liberating from the Unichem ANDA products; is that correct?

16  A.      Right.  I would modify, he was liberating granules

17  from the ANDA products and then looking at those.  With that

18  caveat, I will agree with you.

19  Q.      So it is correct that he did not perform any controls

20  to ensure that his testing methodology did not impact the

21  size of the API particles?

22  A.      That's correct.

23  Q.      Very good.

24          I would like to move into evidence JTX-4, the

25  FDA bioequivalence article and the Chen article.

Myerson - cross

```
 1                    THE COURT:  What was the exhibit number on the

 2      Chen article?

 3                    MR. PEJIC:  There was not.  That was being used

 4      for impeachment, Your Honor.

 5                    MR. PRUSSIA:  Your Honor, he can't move that

 6      into evidence, a bioequivalence article, because that was

 7      not marked as an exhibit.

 8                    THE COURT:  I'm sorry.  What's that JTX-4 or the

 9      second one?  The first was JTX-4.  Is there any objection to

10      that?

11                    MR. PRUSSIA:  No objection.

12                    THE COURT:  That's admitted.

13                    (JTX-4 was admitted into evidence.)

14                    THE COURT:  The second one, Chen, the

15      bioequivalence?

16                    MR. PRUSSIA:  FDA bioequivalence standards.  If

17      the purpose was to use it for impeachment, it hasn't been

18      marked as an exhibit.  He can't move it into evidence.

19                    MR. PEJIC:  I won't try to.

20                    THE COURT:  Okay.

21                    MR. PEJIC:  But Chen was already used.

22                    THE COURT:  Wait.  Hold on.  Hold on, hold on.

23      Are you trying to move --

24                    MR. PEJIC:  I'm happy with where we are, Your

25      Honor.
```

Myerson - cross

1    THE COURT:  Okay.  So you are not offering

2    anything else?  We've admitted JTX-4 and we're done?

3    MR. PEJIC:  Correct.  Yes.

4    MR. PRUSSIA:  You are not moving in Chen just to

5    be clear?

6    MR. PEJIC:  No.

7    THE COURT:  Chen is not being moved in.  All

8    right.

9    MR. HENEGHAN:  May I approach, Your Honor?

10   THE COURT:  You may, yes.

11   MR. HENEGHAN:  Dr. Myerson, I don't have enough

12   binders up there.  I will give you one more (handing binders

13   to the witness and to the Court).

14   BY MR. HENEGHAN:

15   Q.    Good evening, Dr. Myerson.  My name is Tom Heneghan.

16   I represent SigmaPharm, and I will try to get you out of

17   here quickly.

18   A.    Okay.

19   Q.    I realize it's late in the day for all of us.

20         I have some questions about your opinions

21   related to the '208 patent.  Okay?

22   A.    Okay.

23   Q.    You are not offering any opinions in this case

24   regarding claim 104 of the '208 patent; is that correct?

25   A.    No.

Myerson - cross

1   Q.      Correct?  I'm sorry.  I said it backwards.

2   A.      Oh.

3   Q.      You agree with me you are not offering opinions on

4   claim 104?

5   A.      I agree.

6   Q.      Your only opinion is related to claim 13 and whether

7   pharmaceutically acceptable salts of apixaban could have

8   been formulated; is that right?

9   A.      That's correct.

10  Q.      For the '208 patent, your definition of a person of

11  ordinary skill in the art is different from your definition

12  of a person of ordinary skill in the art for the '945

13  patent, isn't it?

14  A.      Yes.

15  Q.      For the '945 patent, you include chemical engineering

16  in the definition of a person of ordinary skill in the art,

17  don't you?

18  A.      I do.

19  Q.      But not for the '208; right?  You don't include

20  chemical engineering as part of the definition?  I can refer

21  you to your report if it would help.

22  A.      Yes, it would.

23  Q.      Let's take a look at your rebuttal report, the first

24  report you did, at paragraph 37.  That's number two in your

25  binder.

Myerson - cross

1    A.      Yes.

2    Q.      And I think we'll pull that up on the screen as well.

3    That will be at paragraph 37.

4             So here is the definition of ordinary skill in

5    the art for the '208 patent.  It talks about organic

6    chemistry, pharmaceutical chemistry, but does not mention

7    chemical engineering; is that correct?

8    A.      No.  It has the or equivalent discipline with

9    experience in purification and design of pharmaceutical

10   compounds.

11   Q.      But your definition of ordinary skill in the for

12   the '945 patent specifically calls out chemical engineering?

13   A.      It does.

14   Q.      So that's a difference between the two?

15   A.      Yes.

16   Q.      And you are a chemical engineer.  That's your

17   discipline; is that correct?

18   A.      I am.

19   Q.      You have three degrees in chemical engineering, a

20   Bachelor's, a Master's and a Ph.D.?

21   A.      Correct.

22   Q.      You don't have a degree in organic chemistry; is that

23   correct?

24   A.      Correct.

25   Q.      You don't have a degree in pharmaceutical chemistry;

Myerson - cross

```
 1    is that correct?

 2    A.      That's correct.

 3    Q.      You don't have a degree in medicinal chemistry?

 4    A.      That's correct.

 5    Q.      Okay.  Dr. Myerson, you would agree with me that

 6    disproportionation of a salt means that it's going back to

 7    its freeform; is that correct?

 8    A.      Yes.

 9    Q.      And that disproportionation can occur when a salt is

10    in the presence of water vapor; right?

11    A.      Yes.

12    Q.      You also agree that disproportionation of the salt

13    form of a drug substance can occur during the formulation

14    process; isn't that right?

15    A.      That's correct.

16    Q.      And once it disproportionates, it's no longer a salt;

17    right?

18    A.      The part that disproportionates is no longer a salt.

19    So assuming it all disproportionated, there wouldn't be any

20    salt left but it can partially disproportionate.

21    Q.      Once it disproportionates, it's no longer a salt;

22    right?

23    A.      The part that -- if you have a mass -- I'm just

24    trying to be precise.

25              If you have a mass, part of the mass that
```

Myerson - cross

1    disproportionates is no longer a salt.  The part that

2    doesn't disproportionate is still a salt.

3    Q.      And my question to you was, once it

4    disproportionates, it's not a salt?

5    A.      I already answered that yes.

6    Q.      And the '208 patent does not teach anything about

7    protecting an apixaban salt from moisture, does it?

8    A.      It does not.

9    Q.      And your expert report does not identify anyplace in

10   the '208 patent which discloses the use of packaging options

11   to prevent disproportionation of apixaban salts, does it?

12   A.      It does not.

13   Q.      You did not review Dr. Jacobsen's report before you

14   drafted your report about the '208 patent; correct?

15   A.      I have never reviewed Dr. Jacobsen's report, no.

16   Q.      And you did not speak with Dr. Jacobsen before you

17   drafted your report about the '208 patent; correct?

18   A.      That is correct.

19   Q.      You did not perform any testing of any kind on any

20   compound for this case; correct?

21   A.      Correct.

22   Q.      Now, you mentioned in your direct testimony, and in

23   your report, that the drug Pradaxa, as an example of a drug

24   can be formulated despite its hygroscopicity for water

25   sensitivity; correct?

Myerson - cross

1   A.      That's correct.

2   Q.      Your report makes no mention of the pKa value of the

3   freebase of Pradaxa, does it?

4   A.      No.

5   Q.      The pKa value of the freebase of Pradaxa is 4 and 6.7

6   because it has two basic sites; isn't that correct?

7   A.      I don't recall, but that sounds correct.

8   Q.      Well, if you turn to Tab 8 of your binder, I'm happy

9   to show that to you.

10  A.      (Witness complies.)

11  Q.      And we can put that up on the screen.  Tab 8 is an

12  article by Doki.

13          And it's -- the title of the article refers to

14  dabigatran etexilate.  And that is Pradaxa, isn't it?

15  A.      I believe that is correct.

16          So if we turn to page 2 of that article, there

17  is a table on page 2, Table 1.  And the fourth row on Table

18  1 talks about the pKa value of the freebase.

19          Do you see the input parameters?

20  A.      Yes.

21  Q.      And that shows the pKa value of that freebase is 4.0

22  and 6.7; right?

23  A.      Correct.

24  Q.      In your report, you do not identify a single compound

25  that has a pKa of less than 3 or more than 10 that has been

1  made into a pharmaceutically acceptable salt, do you?

2  A.    I do not.

3  Q.    Let's talk for a minute about the assumptions you

4  were asked to make in this case.

5          MR. HENEGHAN:  And why don't we look at

6  PDX-13.34.

7  BY MR. HENEGHAN:

8  Q.    You saw this earlier in your direct examination.

9          This shows an assumption you made about the

10  sodium, potassium, and hydrochloride salts of apixaban

11  having been prepared.

12          That was an assumption you made, correct?

13  A.    Yes, that was the assumption I was instructed to use.

14  Q.    And you were also instructed to assume in this case

15  that these apixaban salts would be pharmaceutically

16  acceptable, weren't you?

17  A.    I think -- I don't know if I was given an explicit

18  instruction there, but if I'm formulating them into a

19  pharmaceutical, into a dosage form, you would assume they

20  would be pharmaceutically acceptable.

21  Q.    You were told by the lawyers for the plaintiffs here

22  to assume that they were pharmaceutically acceptable; right?

23  A.    I -- I think I just answered that.  I don't think

24  they ever said assume they were pharmaceutically acceptable.

25  They told me to assume the salt had been prepared and

Myerson - cross

1   whether they could be formulated.  That was the two things I

2   was told to do.

3   Q.     Let's look at your deposition.

4              MR. HENEGHAN:  I'm going to ask Mr. Korea to

5   play video clip B-22, but before, if you want to follow

6   along on your transcripts, it will be shown on the screen,

7   too, but Tab 1 of your binder, page 275 of your deposition

8   once you get there.

9   BY THE WITNESS:

10  A.     Tab 1?

11  Q.     Tab 1.

12  A.     Page 275?

13  Q.     275, starting at line 3, and then we'll go ahead and

14  play the video once you find your spot there.

15             Are you ready?

16  A.     Yes.

17             MR. HENEGHAN:  Okay.  Go ahead and play B-22,

18  please.

19             (Video played.)

20             "Question:  Do you assume for the purposes of

21  the analysis expressed in your report that a

22  pharmaceutically acceptable salt of apixaban could be

23  prepared?

24             "Answer:  Well, what I've just said, and what my

25  report says, is I've been asked to assume that the sodium,

```
1   potassium, hydrochloride salts of apixaban have been
2   prepared, and those are -- those would be pharmaceutically
3   acceptable.
4            "Question:  So -- well, the report says you
5   assume that certain salts of apixaban have been prepared.
6   The report doesn't say there that those salts would be
7   pharmaceutically acceptable, but you made that assumption as
8   well?
9            "Answer:  Yes.
10           "Question:  And when you say you have been
11  asked, asked by plaintiffs' counsel?
12           "Answer:  Yes."
13           (Video ends.)
14  BY MR. HENEGHAN:
15  Q.    Do you recall those questions and answers at your
16  deposition?
17  A.    Yeah, I think it's pretty much what I just said, but
18  I said the same thing at my deposition, but yes.
19  Q.    And at your deposition, you signed an errata sheet
20  related to your testimony; right?  Making some corrections?
21  A.    I guess.  I don't remember.
22  Q.    If you look at Tab 6 in your binder, you will see the
23  errata sheet.
24  A.    Tab 6?
25  Q.    Tab 6.
```

```
1    A.      Yep.   Yes.

2    Q.      And there is no corrections to the testimony we just

3    saw in the video; correct?

4    A.      That's correct.

5                MR. HENEGHAN:   No further questions, Your Honor.

6                THE COURT:   Okay.   That's it for cross, I think?

7                MR. KOCHANSKI:   No, Your Honor.

8                MR. PEJIC:   Nothing further.

9                THE COURT:   Redirect?

10               MR. PRUSSIA:   Nothing further?

11               THE COURT:   Nothing further?

12               MR. PRUSSIA:   Nothing further from us.

13               THE COURT:   All right.   You can step down.

14   Thank you very much, Dr. Myerson.   You can leave the binders

15   there.

16               I'll ask if counsel can, when you get a moment,

17   come up and collect those many binders.

18               (Witness stand cleared of binders by counsel and

19   paralegals.)

20               THE COURT:   All right.   What is next?

21               MR. LEE:   Your Honor, plaintiffs rest.

22               THE COURT:   Okay.   Thank you.

23               Back to the defendants, if they have any

24   rebuttal.

25               MR. MIZERK:   Your Honor, first before we do
```

```
 1         that, during the cross-examination I think that Mr. Segrest
 2         conducted of Dr. MacMillan, we raised on cross-examination
 3         DTX-629, and we would like to move that into evidence.
 4                   THE COURT:  DTX-629?
 5                   MR. DANFORD:  No objection.
 6                   THE COURT:  No objection?  It's admitted.
 7                   (DTX-629 was admitted into evidence.)
 8                   MR. MIZERK:  And defendants will not be calling
 9         any rebuttal witnesses so we are complete.
10                   THE COURT:  Okay.  I guess that's it for the
11         evidence then; correct?
12                   MR. LEE:  That is.
13                   THE COURT:  That's my understanding.
14                   Anything else that we should do other than talk
15         about tomorrow's calendar?
16                   MR. LEE:  No.  We expect to close tomorrow.
17                   THE COURT:  So remind me, it's been a long few
18         days since I saw you, how many closings are we anticipating
19         and any rough idea as to how much time you all are going to
20         need?  I'm available at 10:30.
21                   MR. LEE:  It will be one closing on our side,
22         Ms. Wigmore and I will split it.  And I think what we've
23         agree with the defense is we would go plaintiffs on all
24         issues, infringement, validity of the '208, infringement,
25         validity of the '945, and whatever else gets -- proper
```

1    dependency gets fit in there.

2              And then we yield the floor to defendants

3    collectively, they would close, and then we would have

4    rebuttal.

5              THE COURT:  And then that would be it; right?

6              MR. LEE:  That would be it.

7              THE COURT:  Because you believe you have an

8    agreement on that.

9              First of all, do you agree with that structure?

10             MR. MIZERK:  Yes, Your Honor we do.

11             THE COURT:  Okay.  How much closings should I

12   expect from each defendant?

13             MR. MIZERK:  Well, each party will present a

14   closing on the issues that were kind of being jointly

15   presented.  We will only have one lawyer speaking on those

16   issues.  So basically I will speak on the '208 patent and

17   SigmaPharm infringement issues, and I think Sunshine Lake

18   will speak on behalf of their infringement case.  And then

19   Unichem will address the infringement issues that they have,

20   and then the invalidity case and the '945.

21             THE COURT:  So that sounded like four.  Should I

22   expect four different --

23             MR. MIZERK:  I think it's -- it's going to be

24   three presentations, but I think Mr. Pejic and his

25   colleagues will split their time.

1        MR. PEJIC:  Yes.  Ms. Browning will take the

2   infringement issues, and I will take the broad '945

3   invalidity.

4        THE COURT:  All right.  Am I going to hear from

5   four people on behalf of the defendants?

6        MR. MIZERK:  Yes, Your Honor.

7        THE COURT:  All right.  Then the numbers are

8   just easier for me.

9        MR. MIZERK:  Okay.

10       THE COURT:  And in terms of how much time,

11   roughly, and expect I will have questions, so I know you

12   can't know how many there will be, but --

13       MR. LEE:  I think for us collectively without

14   questions, it would be about an hour and 20 minutes.  So

15   with questions ...

16       THE COURT:  Maybe longer.

17       MR. LEE:  Yes.

18       THE COURT:  Okay.  And any estimates on the

19   defendants' side?

20       MR. MIZERK:  I think we're about an

21   hour-and-a-half is kind of our estimate.  Maybe, you know,

22   only what time we have remaining to have our argument on

23   behalf of the parties.

24       THE COURT:  All right.  Well, I likely will need

25   to be done by 3:00 o'clock.  I do have another hearing at

1   the moment scheduled for 3:00.  So I figure we may need

2   pretty much all of that time, and I will have some questions

3   for you.

4                      Any questions or other issues for me at this

5   point?

6                      MR. LEE:  None for the plaintiffs, Your Honor.

7                      MR. HENEGHAN:  No, Your Honor.  And, obviously,

8   Your Honor, however you would like to conduct the closing

9   argument is your decision.

10                     THE COURT:  I will let all of you speak that

11  have said you want to speak, and I will ask my questions,

12  and we'll see if you have answers.

13                     All right.  I'll look for you at 10:30 tomorrow

14  morning.  We'll be in recess.

15                     (Proceedings adjourn at 6:17 p.m.)

16

17       I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

18

19                          /s/ Brian P. Gaffigan
                            Official Court Reporter
20                             U.S. District Court

21

22

23

24

25