```
 1                    IN THE UNITED STATES DISTRICT COURT
                      IN AND FOR THE DISTRICT OF DELAWARE
 2
                                    - - -
 3      BRISTOL-MYERS SQUIBB COMPANY
        and PFIZER INC.,                       : CIVIL ACTION
 4                          Plaintiffs,    :
        v                                  :
 5                                         : (Consolidated)
        AUROBINDO PHARMA USA INC.,         :
 6                                         : NO. 17-374-LPS
                            Defendant.
 7                                  - - -

 8                          Wilmington, Delaware
                          Wednesday, November 13, 2019
 9                         Bench Trial - Volume I

10                                  - - -

11      BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

12      APPEARANCES:                   - - -

13                 FARNAN, LLP
                   BY:  MICHAEL J. FARNAN, ESQ.
14
                        and
15
                   WILMER CUTLER PICKERING HALE and DORR, LLP
16                 BY:  AMY K. WIGMORE, ESQ., and
                        HEATHER M. PETRUZZI, ESQ.
17                      (Washington, District of Columbia)

18                      and

19                 WILMER CUTLER PICKERING HALE and DORR, LLP
                   BY:  WILLIAM F. LEE, ESQ.,
20                      ANDREW J. DANFORD, ESQ.,
                        TIMOTHY A. COOK, ESQ.,
21                      KEVIN S. PRUSSIA, ESQ., and
                        SHIRLEY X. LI CANTIN, ESQ.
22                      (Boston, Massachusetts)

23                          Counsel for Bristol-Myers Squibb
                            Company and Pfizer Inc.
24
        Valerie J. Gunning            Brian P. Gaffigan
25      Official Court Reporter       Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3                PHILLIPS GOLDMAN McLAUGHLIN & HALL, LLP
                 BY:   JOHN C. PHILLIPS, JR., ESQ.

4                        Counsel on behalf of SigmaPharm
                         Laboratories, LLC; Unichem Laboratories,
5                        Ltd., Zydus Pharmaceuticals (USA) Inc.,
                         Sunshine Lake Pharma Co., Ltd., and
6                        HEC Pharm USA

7                    and

8                HUSCH BLACKWELL, LLP
                 BY:   PHILIP D. SEGREST, JR., ESQ., and
9                      DON J. MIZERK, ESQ.
                       (Chicago, Illinois)
10

11                   and

12               HUSCH BLACKWELL, LLP
                 BY:   THOMAS P. HENEGHAN, ESQ., and
13                     DUSTIN L. TAYLOR, ESQ.
                       (Madison, Wisconsin)

14                       Counsel on behalf of SigmaPharm
                         Laboratories, LLC
15
                     and
16
                 GREENBLUM & BERNSTEIN, P.L.C.
17               BY:   P. BRANKO PEJIC, ESQ.,
                       PAUL A. BRAIER, ESQ., and
18                     JILL M. BROWNING, ESQ.
                       (Reston, Virginia)
19
                         Counsel on behalf of Unichem
20                       Laboratories, Ltd.

21

22

23

24

25

1  APPEARANCES:  Continued)

2

3              YOUNG CONAWAY STARGATT & TAYLOR, LLP
               BY:  KAREN L. PASCALE, ESQ.

4                   and

5              LERNER DAVID LITTENBURG KRUMHOLZ & MENTLIK, LLP
               BY:  PAUL H. KOCHANSKI, ESQ., and

6                   KENDALL K. GURULE, ESQ.
                    (Westfield, New Jersey)

7

8                        Counsel on behalf of Sunshine Lake
                         Pharma Co., Ltd., and HEC Pharm USA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          - oOo -

 2                  P R O C E E D I N G S

 3                  (REPORTER'S NOTE:  The following bench hearing

 4     was held in open court, beginning at 11:44 p.m.)

 5                  THE COURT:  Good morning.

 6                  (The attorneys respond, "Good morning, Your

 7     Honor.")

 8                  THE COURT:  I first apologize for the late

 9     start.  I had criminal proceedings that ran substantially

10     longer than anticipated.  But you will have all of the time

11     that you need up to your time limit, and hopefully for the

12     plaintiffs not all of your time limit.

13                  But I will hear what you have to say, and if I

14     have to start my 3:00 o'clock proceeding a little late,

15     that's fine.

16                  I do expect I will need to take a break.  I'll

17     try keep it as short as I can, but we'll see how things go.

18                  Any issues the plaintiffs want to raise before

19     we get started?

20                  MR. LEE:  Not from the plaintiffs, Your Honor.

21                  THE COURT:  How about defendants?

22                  MR. MIZERK:  None for SigmaPharm.

23                  MR. PEJIC:  None for Unichem.

24                  MR. KOCHANSKI:  None for Sunshine Lake.

25                  THE COURT:  All right.  Then we'll hear from
```

1    plaintiffs.

2           MR. LEE:  Thank you, Your Honor.  We have --

3           THE COURT:  More slides?

4           MR. LEE:  One last time.

5           THE COURT:  One last time.

6           MR. LEE:  One last time.

7           THE COURT:  I have just a little bit of room up

8    here.

9           MS. WIGMORE:  Just a couple.

10          MR. LEE:  And we've made a few promises, but I

11   promise we're not going to use all of our allotted time.

12          THE COURT:  Okay.

13          MR. LEE:  May I proceed, Your Honor?

14          THE COURT:  Yes.

15          MR. LEE:  As I mentioned earlier, Ms. Wigmore

16   and I will share our closing.  I will address the '208

17   patent, Ms. Wigmore will address the '945 patent, and I will

18   provide our rebuttal.

19          Let us begin by thanking the Court and the

20   courtroom staff for providing BMS and Pfizer their day in

21   court, and for your careful attention to the details and at

22   times challenging evidence.

23          The case is, as the Court knows, of critical

24   importance to BMS and Pfizer.  As the evidence has

25   established, Eliquis is a breakthrough invention that has

1    become a blockbuster drug.

2           But much, much more importantly, it has been

3    used to treat millions of patients, and to prevent

4    debilitating events and fatal strokes for millions of

5    patients.

6           Defendant generics want a portion of that market

7    and that success.  To be clear, we're not seeking prevention

8    generic entry in its entirety.  The only question is when.

9           In an effort to accelerate their entry date,

10   the defendants have offered the Court, in our view, a

11   hodgepodge of attacks on the '208 and '945 patents that are

12   legally flawed and factually flawed and logically flawed.

13          For example, SigmaPharm advances an improper

14   dependency argument for the '208 patent, both as a

15   noninfringement defense and its invalidity defense.

16          But as the undisputed evidence demonstrates,

17   under Sigmapharm's claim interpretation, claim 1 would not

18   cover any compounds specifically disclosed the '208 patent.

19          Worse yet, it would not cover any compound on

20   the face of the earth.

21          In contrast, the plaintiffs' construction of

22   claim 1 would cover apixaban, the invention here, and the

23   vast majority of the compounds disclosed in the '208 patent.

24          But this improper dependency argument is one of

25   SigmaPharm's remaining two validity defenses in our view

1    speaks volumes.

2              For the enablement of claims '208 -- of the '208

3    patent, SigmaPharm attempts to carry its burden of proof by

4    clear and convincing evidence with experts who could have,

5    but did not try to make an apixaban salt; who could have,

6    but did not try to test an apixaban salt; who could have,

7    but did not try to replicate Dr. Jacobsen's tests.

8              Instead, it was BMS and Dr. Jacobsen that did

9    those tests.  It was BMS that demonstrated that apixaban

10   salts could actually be made.  It was BMS that demonstrated

11   that those apixaban salts could be tested.  And it was BMS

12   that demonstrated that such salts, if Your Honor remembers

13   that phrase, would be pharmaceutically acceptable.

14             Indeed, on this critical issue of sound medical

15   judgment for your claim interpretation, the only two

16   cardiologists who testified agree.  To quote Dr. Zusman:

17   "It is unlikely that such salts, apixaban salts, would have

18   an appreciable effect in the patient."

19             Dr. Kowey agreed.

20             That the evidence was unequivocal on this issue

21   is not a coincidence.

22             There is no dispute that salt formation is

23   conventional and routine.

24             Both of the defendants' chemistry experts,

25   Dr. Buckton, who you heard a couple weeks ago, and

1   Dr. Scheidt, who you heard last week, agreed with that.

2           And there is also no dispute that the '208

3   patent includes a general description of how to make salts.

4           On the screen now is PDX-14.4.  It is an excerpt

5   from column 117 of the patent.

6           And this is the procedure that Professor

7   Jacobsen applied to make salts of apixaban.

8           As the evidence has come in, Your Honor, all of

9   the chemists in this case have agreed that apixaban salts

10  can be made.  Neither Dr. Buckton, nor Dr. Scheidt disputes

11  that Professor Jacobsen made at least two of the three

12  salts, and both of the clinicians agree that apixaban salts

13  would not appreciably affect the benefit/risk ratio.

14          On Your Honor's claim interpretation, that is

15  the end of the Section 112 challenge.

16          THE COURT:  So there was evidence that the

17  apixaban salts would very quickly convert to, I guess,

18  neutral apixaban in the body.

19          What am I analyzing as a "apixaban salt"?  Is it

20  the thing that would be put in the body and instantaneously

21  convert?  Or is it imagine a world in which it didn't

22  convert and what would that salt actually do to the body if

23  it remained in salt form?

24          MR. LEE:  Your Honor, that's a perfect

25  articulation.  Let me take your hypothetical in two parts.

```
 1              The salt is the salt that Dr. MacMillan
 2     described to you yesterday.  It is a salt form of apixaban.
 3     When it goes into the mouth, it hits water, it dissociates
 4     and becomes apixaban and the salt.
 5              And the question is, this small amount of salt,
 6     would it have any appreciable effect?  And the answer was
 7     no.
 8              It's not a coincidence, Your Honor, that
 9     Dr. Zusman never addressed the risk/benefit ratio.  It's not
10     a coincidence that Dr. Scheidt never addressed risk/benefit
11     ratio.
12              Now, that's what happens as Dr. MacMillan
13     described to Your Honor.
14              The second part of your question is, the
15     alternative is, could I imagine that something different
16     happened when the salt form went into the body?
17              Your Honor, on this evidence, that's the best
18     you can do, is imagine, because there is no proof.
19              What is before you now is that the salt form can
20     be made.  Dr. Jacobsen did it.
21              Dr. Scheidt, Dr. Buckton, at least for two of
22     the three, concede that it's true.
23              Dr. MacMillan explained that when you take the
24     salt form, it dissociates, there's a small amount of salt,
25     but a larger amount of apixaban.  The apixaban is going to
```

1   have a therapeutic effect.  The salt is not.

2           And under Your Honor's claim construction, it

3   was their burden to show that those salts would not be

4   pharmaceutically acceptable.  It was their burden to show

5   that there would be a risk of excessive toxicity,

6   irritation, or complication, and it was their burden to show

7   that the risk/benefit ratio for the patient would not

8   justify -- would not make that salt pharmaceutically

9   acceptable.

10          THE COURT:  So if I find there's a lack of

11  evidence as to what an apixaban salt, if it somehow stayed

12  an apixaban salt and traveled through the body, if I find

13  there's a lack of evidence as to what toxicity, if any, that

14  would have on the body, that's a failure of their case.  Is

15  that --

16          MR. LEE:  That's a failure of their case.  I

17  don't think that they're claiming -- they'll tell you

18  themselves.  As I heard the evidence, I don't think they're

19  claiming the apixaban salts that arrive in the stomach, it's

20  staying as apixaban salt.

21          But I think it would be a failure of proof if

22  that was the issue.  There is certainly a failure of proof.

23          As I said, Ms. Wigmore will address the '945

24  patent, but it was presented in multiple forms of

25  infringement evidence for each defendant.

1        The defendants's collective presentation

2   consists of experts -- of experts who either did no testing

3   or who conducted irrelevant testing, or who conducted tests

4   that were either intentionally or unintentionally not

5   sufficiently sensitive to detect crystalline apixaban.

6        So, Your Honor, we've already turned to the

7   '208 patent.  Let me take the issues of infringement and the

8   invalidity of the '208 patent in order.

9        Infringement of the '208 patent is at issue only

10  for SigmaPharm.  Sunshine Lake does not challenge the '208

11  patent, and Unichem has stipulated to infringing both of the

12  asserted claims.  So only SigmaPharm.

13       We, of course, bear the burden of proof on

14  infringement.  And it is our obligation to prove by a

15  preponderance of the evidence that SigmaPharm's ANDA

16  products infringe claims 13 and claim 104 of the '208

17  patent.

18       We submit that we have more than met that

19  burden.

20       On the screen now, Your Honor, is claim 13 in

21  PDX-14.6.

22       It specifically claims the apixaban compound.

23  It is undisputed that SigmaPharm's ANDA products contain

24  apixaban.

25       This is Uncontested Fact No. 57 on the screen as

1   PDX-14.7.

2              On that basis alone, Your Honor, there is

3   infringement of claim 13.

4              SigmaPharm's only argument to Your Honor that

5   there is no infringement of claim 13 is this improper

6   dependency argument; that claim 13 somehow falls outside the

7   scope of claim 1 from which it indirectly depends.

8              At best, we think this is an invalidity argument

9   or an untimely claim construction argument.

10             We are aware, as best we can determine, of no

11  case to support the attempt to repackage it as an

12  infringement defense and place the burden on us.

13             But at bottom, it doesn't matter.  This really

14  is a new and flawed claim construction.  It is a claim

15  construction asking Your Honor to conclude that a person

16  of ordinary skill in the art would lead claim 1 to cover

17  absolutely nothing.  The position is illogical and

18  unsupported.

19             On this issue, the Court heard about a week ago

20  from one of the plaintiffs' experts, Professor MacMillan of

21  Princeton.  As Professor Macmillan testified, SigmaPharm is,

22  and I quote:  "Using a logic to describe organic molecules

23  that basically doesn't make sense, and they're using a logic

24  that no other organic chemist or a person of skill in the

25  art would use as they're thinking about looking at the

1    structure of the molecules."

2              Professor Macmillan further confirmed that if we

3    read claim 1 as SigmaPharm does, there would be no molecule

4    on earth that would be covered by claim 1.

5              Significantly, Your Honor, SigmaPharm's

6    experiment, Dr. Heathcock, conceded as much.  He

7    acknowledged that the '208 patent expressly discloses

8    apixaban.  He acknowledged that the '208 patent is about

9    apixaban, and he acknowledged that his reading of claim 1

10   would read apixaban out of the claim.

11             His testimony is set forth on PDX-14.10.

12             But he went further than that, Your Honor.  He

13   also conceded that his reading of claim 1 excludes all of

14   the '208 patent examples in the scope of the claims.

15             Even more remarkably, he acknowledged that under

16   his interpretation of claim, it is, as Dr. MacMillan said,

17   impossible for any chemical compound to fall within the

18   scope of the claims.

19             As I said earlier, in other words,

20   Dr. Heathcock's reading of claim 1 renders it a nullity.

21             THE COURT:  Now, that very well may be

22   remarkable if that's the outcome here, but you're not saying

23   that the law precludes such a finding.

24             It is possible that that is how you all claimed

25   in your patent, right?

```
1              MR. LEE:  Your Honor, I think possible in
2   theory, yes.  On these facts, no.  You're confronted with
3   two possible claim interpretations.
4              There is no -- there is no dispute that the
5   heart of the invention here is apixaban.  There is no
6   dispute that that is the invention that is the focus of
7   that.  And there is no dispute that our claim
8   interpretation, if that's what it is, Dr. MacMillan's plain
9   meaning interpretation of the claim covers apixaban.
10             Theirs would cover nothing.
11             As a matter of law, we think that only the first
12  should be covered.
13             So I think -- I hesitate because of the word
14  "possible," but on these facts, the answer would be not
15  possible.
16             Now, Dr. Heathcock suggested that you could fix
17  claim 1 and it could be rewritten, in his view.  You heard
18  some testimony on that yesterday.  But that fix, that
19  correction, demonstrates the lack of logic to SigmaPharm's
20  position.
21             On the screen now is PDX-14.12.  On the
22  left-hand side is the claim as written.  On the right-hand
23  side is his correction.
24             In his view, if you claim, a claim saying
25  unsubstituted or substituted with one to two would cover,
```

1   capture apixaban, but saying substituted with zero to two

2   does not.

3           In other words, Dr. Heathcock interprets

4   substituted with zero to be different from unsubstituted.

5   As Dr. MacMillan testified, and I think it goes to Your

6   Honor's last question, that distinction has no foundation in

7   chemistry, it has no foundation in the claim language, it

8   has no foundation in common English usage.

9           Now, SigmaPharm never sought a construction of

10  any term in claim 1, and the parties agree, as Your Honor

11  knows, that the terms have their plain meaning.

12          As Dr. MacMillan testified, there's no way to

13  square SigmaPharm's argument with the claim's plain meaning,

14  but to the extent the Court views this through the lens of

15  claim construction or perhaps the possibility question Your

16  Honor just asked, the law would dictate that SigmaPharm's

17  viewed the objective.

18          There is ample case law, including Your Honor's

19  recent Align Technology decision, holding, and I quote,

20  "where a particular construction of an independent claim

21  would nullify claims that depend from it, the doctrine of

22  claim differentiation creates a presumption that such a

23  construction is improper."

24          I think that will answer Your Honor's question,

25  it's possible, but very unlikely, and on this very evidence,

1       not at all.

2                    There's also ample case law like the Vitronics

3       case on slide 14.4 that follows a claim interpretation that

4       excludes preferred embodiments are rarely, if ever, correct.

5       Again, this is the effect of SigmaPharm's proposed claim

6       construction.

7                    The patent claims, as I said, claims a novel

8       chemical compound apixaban with remarkable biological and

9       medical properties.  SigmaPharm's reading to exclude that, a

10      compound that is the center of the patent and all other

11      chemical compounds from the claim makes no sense as a matter

12      of law or logic.

13                   Now, let me turn to claim 104 on the

14      infringement issue.  Claim 104 requires crystalline

15      apixaban.  The evidence demonstrates that SigmaPharm

16      infringes claim 104 for two independent reasons.

17                   First, if I go to slide 14.16, Professor

18      MacMillan testified that he concluded that SigmaPharm's ANDA

19      products have crystalline apixaban and that this conclusion

20      was based on Dr. Jerry Atwood's XRPD testing results.  Ms.

21      Wigmore will address those results during the course of her

22      closing, but based on that evidence, SigmaPharm's proposed

23      ANDA products infringe claim 104.  But there's a second

24      reason.  SigmaPharm infringes because it uses crystalline

25      apixaban to manufacture its ANDA tablets in Pennsylvania.

1     SigmaPharm's CEO, Spiridon Spireas, testified by
2  deposition that SigmaPharm's manufacturing process begins
3  with crystalline apixaban particles.  They use crystalline
4  apixaban.
5     He further admitted, and Dr. MacMillan
6  testified, and SigmaPharm's own documents show that
7  SigmaPharm will manufacture its ANDA products using
8  crystalline apixaban in Bensalem, Pennsylvania.  That is a
9  separate act of infringement and should be, should be
10  enjoined.
11     So let me return now to the remaining validity
12  arguments.  I'd like to now turn to defendants' specific
13  enablement arguments and focus on pharmaceutically
14  acceptable salts.  Again, as I mentioned earlier, this is an
15  issue on which the defendants bear the burden of proof.
16  They have offered the Court nothing more than imagination
17  and speculation.  Their experts did not conduct any
18  experiments of any kind to carry that burden.  They did not
19  try to make an apixaban salt.  They did not try to test one.
20  These experts admit, Your Honor, that they could have done
21  so, but they weren't asked to do so, and I will come back to
22  that.
23     Why did they not do the simplest of experiments?
24  Because, as I just said, they conceded that they were not
25  asked to do so, as Dr. Scheidt said just last Friday.  But

1  then that begs the question, why were they not asked to do

2  so?  Why would the party with the burden of proof not do the

3  simplest of experiments?  The fair inference, we suggest, is

4  they were not asked to do so for a reason, and the reason is

5  the defendants knew and anticipated the results would be

6  just as BMS and Dr. Jacobsen achieved.

7          So let me begin with the evidence on

8  pharmaceutically acceptable salts.  During the course of the

9  evidence, we used this slide.  It's now on PDX-14.21, and

10  broke Your Honor's claim construction of pharmaceutically

11  acceptable salts into two portions.

12          The first portion deals with whether the salt

13  can be made.  The second deals with the characteristics of

14  the salt.  Is it in sound medical judgment something that is

15  suitable for use without excessive toxicity, excessive

16  irritation, excessive allergic response commensurate with a

17  benefit/risk ratio?  This is the claim construction that the

18  experts should have addressed if they were going to

19  demonstrate by clear and convincing evidence or otherwise

20  that salts would not be pharmaceutically acceptable.

21          Now, the defendants first argued -- defendants

22  argued actually that neither portion of Your Honor's

23  construction was satisfied, but we suggest the evidence

24  demonstrates unequivocally the opposite.

25          Let me focus on the first element.  On the first

element, SigmaPharm told the Court in its opening statement
that "the evidence will show that apixaban is not like most
compounds.  It is neutral.  It is not ionizable."

Well, as the evidence has demonstrated, that's
simply not correct.  That portion of the opening is on slide
14.22.  The only experimental evidence in this record about
whether apixaban salts can be made was the result of Dr.
Jacobsen's work and his testimony.  And Professor Jacobsen,
a chemistry professor at Harvard, testified that based upon
his experiment, his data and his analysis, he was
"completely certain that he made three different apixaban
salts in less than five hours on the first day."  Using the
general techniques disclosed in the '208 patent, which we
looked at briefly, and those known to ordinary persons of
skill in the art, Professor Jacobsen made each of these
three salts, as the testimony on slide PDX-14.23
demonstrates.

On slide PDX-14.24, Your Honor, are the pictures
that went into evidence.  These photographs were taken over
ten minutes and they showed the sodium salts of apixaban
being made.

These are from PDX-805, which is the video that
Dr. -- Professor Jacobsen showed the Court.  The white solid
on the right is, as Dr. Jacobsen said, the sodium salt of
apixaban.  The defendants represented to you that apixaban

1    salts could not be made.  Your Honor is looking at them on

2    the screen.

3              And on PDX-14.25, you see the NMR spectra

4    showing just what the material in the flask looks like.  As

5    Professor Jacobsen explained, the spectrum at the top, Your

6    Honor, is pure apixaban.  The spectrum in the middle is

7    sodium salt of apixaban.

8              You notice with the peak on the far left

9    disappears, and as Professor Jacobsen said, that's

10   consistent with salt formation, and all of the other peaks

11   move.

12             The spectrum on the bottom shows what happens

13   after the sodium apixaban salt is treated with acid, in this

14   case, essentially, vinegar, and reverts to apixaban just as

15   I suggested in answer to Your Honor's first question.  What

16   happened?  The peak on the left returned and the rest of the

17   peaks snapped back into place.  Acid, like the acid in your

18   stomach, makes apixaban salt turn into apixaban again with a

19   little salt left over.

20             The defendants' experts, Dr. Buckton and Dr.

21   Scheidt, agree that Professor Jacobsen made at least the

22   potassium salt and the sodium salt of apixaban, and

23   significantly, you have not heard from anyone who tried to

24   make a salt and failed.

25             As a result, Your Honor, if I move to slide

1    14.27, the focus of the inquiry really reduces to the second

2    portion of Your Honor's claim construction, whether within

3    the scope of sound medical judgment, the pharmaceutically

4    acceptable salt or the salt is suitable for use in contact

5    with the tissue of human beings and animals without

6    excessive toxicity, irritation, allergic response, or other

7    problem or complication commensurate with a reasonable

8    benefit/risk ratio.

9            Now, the answer is they do.  The Court heard

10   from only one clinician who offered an opinion based upon

11   sound medical judgment as to whether apixaban salts

12   satisfied this claim limitation.  That was Dr. Kowey.

13           First, Dr. Kowey told the Court about the

14   seriousness of the condition that apixaban treats.  Both

15   atrial fibrillation and deep vein thrombosis can be

16   life-threatening if left untreated.  Atrial fibrillation can

17   cause debilitating and fatal strokes and deep vein

18   thrombosis can cause pulmonary emboli that can seriously

19   damage a patient's lungs.  Treating these conditions and

20   mitigating the risk of these life-threatening events is the

21   benefit that apixaban and an apixaban salt would confer.

22   This is the result of apixaban itself, of the compound

23   itself, which as both Dr. Kowey and Dr. MacMillan explained

24   will form into apixaban, in answer to Your Honor's first

25   question, as soon as it arrives in the stomach.

1    Against these life-saving benefits, what are the

2    risks to be weighed and the ratio?  The only risk that

3    defendants have identified are irritation from what Dr.

4    Buckton said was localized pH.  Everything that Your Honor

5    has heard from the defendants' witnesses about

6    disproportionation plays into this localized pH theory.  The

7    defendants cite an apixaban salt would immediately break

8    down in the body into apixaban and a basic or acidic

9    component, which Dr. Scheidt said would cause severe risk to

10   the patient.

11        Dr. Kowey again, the only medical doctor to

12   offer a complete analysis with sound medical judgment, told

13   the Court that a dose of an apixaban salt equivalent to a

14   ten milligram dose of apixaban, the highest approved dose,

15   would not have any risk of excessive toxicity, irritation or

16   other complications.  That, Your Honor, is because the dose

17   is so small.

18

19        In Dr. Kowey's words, given that "we're dealing

20   with a life-threatening condition, any minor irritation that

21   might occur with an apixaban in salt, although I think it

22   unlikely, would certainly not dissuade me from my assessment

23   of the risk/benefit ratio."

24        And as Dr. MacMillan testified just yesterday,

25   set forth on slide PDX-14.29, the amount of acid or base

1   created by the apixaban salt would be miniscule compared to

2   common food products like a Diet Coke.

3           Professor MacMillan testified that an apixaban

4   salt would readily convert back to apixaban in the body and

5   that a medicinal chemist would expect the amount of acid or

6   base in an apixaban salt to have essentially no effect on a

7   patient.

8           What did the defendants offer you in response to

9   carry their burden?  With the exception of one critical

10  concession, the defendants' only clinician, Dr. Zusman,

11  offered no opinion on the critical portions of Your Honor's

12  claim construction.  He offered no opinion about whether

13  apixaban salts could create excessive toxicity, irritation,

14  allergic response, or other problem or complication.

15          He offered no opinion on the risk/benefit ratio

16  of an apixaban salt, but he did make one critical

17  concession.  As he wrote in his report and acknowledged in

18  his cross-examination, he wrote, it is unlikely that such

19  salts would have an appreciable effect.  That is precisely

20  what Dr. Kowey said.  It is correct, and on this record,

21  it's now undisputed.

22          This concession was so devastating to the

23  defendants' defenses that they actually put Dr. Zusman on

24  the stand and had him testify that such salts were not

25  referring to apixaban salts.  But Dr. Zusman was replying

specifically to paragraph 162 of Dr. Kowey's report, and as

we demonstrated in his cross-examination, Dr. Kowey is

referring to a salt of apixaban, the such salts that Dr.

Zusman referred to and described in writing and acknowledged

in cross-examination were apixaban salts.

Why would Dr. Zusman be giving an opinion about

table salt in the abstract?  Why would he limit himself to

unlikely if he was talking about table salt in the abstract?

He wasn't.  He was talking about such salts, the apixaban

salt.

Now, Dr. Scheidt testified last Friday.  He did,

as I said, no tests, although he could have.  He made no

effort to replicate Dr. Jacobsen's test, although he could

have.  He did not talk to Dr. Zusman.  He did not read Dr.

Zusman's report.  And again, Your Honor, as he conceded on

cross-examination, he did not address the benefit/risk

ratio.  He didn't use the words in his direct and

acknowledged on cross that he didn't.

Indeed, to justify his opinion, Dr. Scheidt took

the extreme position that any amount of common chemicals

like sodium hydroxide, potassium hydroxide, renders a

product pharmaceutically unacceptable.  But as you saw,

these chemicals are in a common over-the-counter products,

including toothpaste, aspirin, and diaper rash cream that is

used to treat irritation, not to cause it.

1    THE COURT:  Do I have any evidence on whether

2    those common products in those products, those chemicals

3    convert to something else?

4    MR. LEE:  Your Honor, all you have in the

5    record -- the answer is, if we get the specifics, no.

6    What you have in the record is his statement

7    that any amount at all, and I asked him specifically, any

8    amount above zero would not be suitable for human use, I

9    asked him if that is an active ingredient for each of the

10   three, and he said that it was and that's the evidence you

11   have.

12   The importance of this, Your Honor, is not so

13   much rather it disassociates again once it gets into your

14   mouth, that's your Crest toothpaste, the importance of that

15   evidence is it demonstrates the extreme position that the

16   defendants have had to take to justify their enablement

17   defense.

18   Now, we suggest that that evidence is the end of

19   the 112 inquiry.

20   We now know that apixaban salts can be made

21   using the techniques described in the '208 patent and known

22   to those of ordinary skill in the art.

23   We know, as Dr. Kowey tells us, that those

24   apixaban salts are, within his sound medical judgment,

25   usable in patients.

1    We know that the risk/benefit ratio is manifest.

2         Now, the defendants have sought to go beyond

3    Your Honor's claim construction.  They argued primarily

4    through Dr. Buckton, a little bit from Dr. Scheidt, that an

5    apixaban salt must be capable of formulation or

6    commercialization to be pharmaceutically acceptable.

7         Those contentions are wrong as a matter of law

8    and fact.

9         First, law.  And we'll brief this to Your Honor

10   more fully in the posttrial brief.

11        But as set forth on PDX-14.36, to satisfy the

12   enablement requirement, salts need not have actually been

13   reduced to practice or made.

14        As set forth on PDX-14.37, formulation of salts

15   is not required because it is not required and the claim in

16   formulation techniques as Dr. Myerson testified to

17   yesterday, were well known.

18        As set forth on PDX-14.38, the patent need not

19   enable a commercially successful product.

20        And as set forth on PDX-14.39, as the Federal

21   Circuit held in *In Re:  Brana*, you don't need FDA approval.

22        Now, these cases deal with a host of the

23   questions that were consistently asked of witnesses about

24   whether there were salts actually made, whether salts have

25   been formulated, whether they have gone through clinical

1  trials, whether they've gone to FDA approval.

2          That's not the inquiry.

3          But even if the law were different, the

4  defendants are wrong on the facts.  As Professor Myerson

5  explained yesterday, apixaban salts can be formulated in

6  tablets, like Eliquis, under water-free conditions, or could

7  be formulated as capsules.  These techniques were common and

8  well known.

9          Now, the defendants have emphasized from the

10  start that BMS scientists did not make an apixaban salt and

11  have not tried to do so.

12          That is true, but not relevant to the ultimate

13  inquiry.

14          The defense also focus on the BMS documents and

15  publications, saying that apixaban is non-ionizable and that

16  there is no salt form of apixaban.

17          They argue that this testimony and these

18  documents mean no pharmaceutically acceptable salt can be

19  made.

20          Once again, the arguments are legally flawed as

21  well as the facts are flawed.

22          Legally, neither enablement nor the written

23  description requirement under Section 112 requires, as I

24  said, that a salt actually be made.

25          Nor does the law require certainty in producing

1   a specific result; and,

2           The inquiry certainly doesn't require that the

3   salt has superior properties to the parent compound,

4   apixaban.

5           Instead, Your Honor, the law requires that the

6   pharmaceutically acceptable salt be enabled, as *Wand* said,

7   without undue experimentation.

8           And I have always thought the last sentence of

9   this quote is the most informative.

10          The Federal Circuit said, the keyword is

11  "undue," not "experimentation."

12          There may well be some experimentation in these

13  fields, just as Dr. Jacobsen did with some salts before he

14  came to his salts of apixaban.

15          The question is whether it's undue.

16          The experimentation of several hours and

17  experiments done over several minutes is not undue.

18          But even if the law were different, the factual

19  basis of the claim made under the BMS documents is, in our

20  view, predicated upon a liberal use of ellipses and

21  rendering portions of documents for context.

22          As Your Honor heard Dr. Knabb explain, those

23  documents reflect an ongoing discussion at BMS regarding

24  whether a salt form could enhance solubility.

25          The BMS team determined it would not.

```
 1                    All those BMS documents concern solubility and

 2     use non-ionizable in that context.

 3                    Non-ionizable under certain conditions does not

 4     mean that you can't make the salt form, and we now know that

 5     you can.

 6                    THE COURT:  So I should read, you would say, all

 7     of those internal documents and discussions as being all in

 8     the context of whether or not you could create a salt to

 9     enhance solubility?

10                    MR. LEE:  Your Honor, the fair reading of them

11     is all read in that context, but even if you took one or two

12     and stuck them out of that context, none of those documents

13     say they could never be ionized.  You can't make a salt.

14                    THE COURT:  I think there was focus on

15     particular e-mail.  I think that was yesterday.

16                    MR. LEE:  From Mr. Lam.

17                    THE COURT:  Right.

18                    That one might read as indicating that at least

19     somebody at the company thought, this really can't be done

20     really under any circumstances.

21                    Can I credit that?

22                    MR. LEE:  Your Honor, I don't think -- for the

23     reasons that I think Mr. Prussia addressed, I don't think

24     you can -- that's a fair reading of it, but even if you did,

25     if one person at a company had that particular view, when,
```

```
 1    in fact, we now know a salt can be made, when Mr. Orwet --
 2    Orwat, pardon me, the person who first synthesized the
 3    invention, testified that he considered the possibility of a
 4    salt, he discussed it with Mr. Pinto, they did not think it
 5    would improve solubility, but he had no doubt he could make
 6    one, that is the testimony you can credit.
 7              And even if you credited that and interpreted
 8    the former as Your Honor did, it does not sustain a clear
 9    and convincing evidence burden to any degree.
10              Now, the truncated quotation selected by the
11    defendants' experts, and I think this will go to Your
12    Honor's question, are set forth on PDX-14.44 by way of
13    example.
14              Without going through all of them, I took
15    Dr. Scheidt through every single one of those truncated
16    quotes, and we looked at what was missing as a result of the
17    ellipses.
18              Even Dr. Buckton ultimately admitted that all
19    these documents talk about solubility.  So even if you
20    interpreted that one e-mail, Your Honor, as you suggested,
21    Dr. Buckton's concession puts it in context:  There is no
22    possibility that that one document meets the same, their
23    burden.
24              Now, if I go to PDX-14.46, the testimony I just
25    summarized from Mr. Orwat is on the screen.
```

1    And he also testified, if I move to 14.47, that

2    the reason he didn't make salts was because it was

3    determined that the solubility of apixaban was sufficient.

4    As we said, Your Honor, in our opening, there is

5    a difference between "need not make" and "could not make."

6    BMS documents simply reflect the drug development team's

7    judgment at the time, that it need not make a salt of

8    apixaban because such a salt would not address solubility.

9    Nothing in the documents say they could not make

10   a pharmaceutically acceptable salt of apixaban, and

11   Dr. Jacobsen now has confirmed that you can.

12   But how many times did Your Honor hear the

13   defendants' experts say they could have done something but

14   they did not need to do so?

15   Dr. Scheidt said, their '945 experts said, "I

16   could have done tests, but I didn't need to do so."

17   Yet the same defendants who sponsored that

18   testimony to the Court suggest that the fact that BMS

19   scientists decided back at the time of the invention that

20   they could have made a salt, but didn't need to do so for

21   solubility reasons, somehow have invalidated the claim to

22   this lifesaving invention.

23   Now, let me return to the language at issue

24   here, "pharmaceutically acceptable salts," just for a

25   minute.

1808

1    The language is as Your Honor noticed,

2    ubiquitous in pharmaceutical patents and for good reason.

3        By our count, there are at least 85 Federal

4    Circuit cases dealing with the claims to a compound or

5    pharmaceutically acceptable salt.

6        Those cases make clear that the reason drug

7    patent claims are drafted that way is simple.  Making salts

8    is conventional.  It is routine.  Does not require undue

9    experimentation.

10        If claims were not drafted as the claim before

11   Your Honor, as the claim in these other 85 cases, a

12   defendant would simply design a salt form of an inventive

13   compound and say, "I don't infringe."

14        That would be the wrong result.  And that is why

15   the claims say the compound, or pharmaceutically acceptable

16   salt.

17        As the evidence has established, salt formation

18   is generally straightforward.

19        Even Dr. Buckton agreed, as shown on PDX-14.48,

20   that the general concepts of salt formation were well

21   established long before 2001.

22        They're set forth at column 116 and 117.  All of

23   the chemists agree they were in the field well before that;

24   and the case law recognizes that fact, Your Honor.

25        Here is one example.  And in *Eli Lilly v Barr*,

set forth on PDX-14.49, the Federal Circuit concluded that hydrochloride salts, like the hydrochloride salt that Dr. Jacobsen made, are the most common pharmaceutically acceptable salts of basic drugs, and, hence, are obvious compounds.

In other words, salt forms' active ingredients are so easy to conceive and make, the Federal Circuit deemed them obvious.

But the Federal Circuit is not alone in that.

This is a Hatch-Waxman case.  The Hatch-Waxman Act actually recognizes salt forms are usually simple, obvious, derivatives.

In *Pfizer v Dr. Reddy,* on the screen now as PDX-14.50, the Federal Circuit noted that, and I quote "The Hatch-Waxman Act foresaw and averted the potential loophole of a change in the salt of an active ingredient," but providing patent term extension for all salt forms of the drug.

It is not a coincidence there are no cases that claim to a novel compound and its pharmaceutically acceptable salts have been found not enabled because the salt has not been made.

This is not the first case to address this issue.

By way of example, Your Honor, on PDX-14.51, in

1    *Endo v Mylan*, in this District, Judge Bumb, sitting by

2    designation, addressed this issue.

3              The alleged infringer argued that the salt

4    hydrate form of the drug was not enabled.

5              The Court rejected that argument because the

6    drug compound was the key feature and because salt formation

7    methods were known to a person of ordinary skill in the art.

8              Here, apixaban is a key feature of the

9    invention, and it's column 116 and 117, and Professor

10   MacMillan and, in fact, as conceded by Dr. Buckton.

11             The skills needed and the techniques needed to

12   make those salts were conventional.

13             Let me just say one more thing about this

14   question of pharmaceutically acceptable salts in the

15   language.

16             As I said, the reason for inclusion of the

17   language is to avoid, is to cut off the ability of the

18   unscrupulous copyist just to add a salt to an inventive

19   compound and claim noninfringement.

20             In some sense, the ironic thing here is that we

21   have the opposite circumstance where the generics want to

22   copy the inventive compound.  They intend to duplicate

23   precisely the invention that led to the discovery of

24   apixaban in the '208 patent.

25             Yet they say by seeking "pharmaceutically

acceptable" to cut off at the pass what the Hatch-Waxman

Act, the Federal Circuit says is a problem, they somehow

have a get-out-of-jail-free card.

The enablement issue is governed by the Wands

factors.  Professor MacMillan walked through these for you

yesterday.  He testified the claims are narrow, claiming

only a single compound in a salt.  He testified that the

nature of the invention is straightforward, a chemical

compound, a salt with a method of treatment.  He explained

that the prior art on salt formation was well developed as

the Federal Circuit has recognized, and as Dr. Buckton and

Dr. Scheidt conceded.

He explained that the level of ordinary skill in

the art is high, a graduate degree in chemistry, but that

the level of predictability in the art of salt formation was

high, very high.  And he also testified that the '208 patent

repeats at the top of column 117 the general principles of

salt formation that a skilled artisan would use to make

apixaban salt.

Those are the same principles that Professor

Jacobsen used to make his salts, and both Professor Jacobsen

and Professor MacMillan testified that the quantity of

experimentation necessary to make the salts was low, three

to five hours.

As Your Honor may recall, Dr. Jacobsen actually

```
 1    had two or there failed experiments where he used a solvent
 2    that didn't work.  The fact that you couldn't predict
 3    precisely what would provide the salts with complete
 4    certainty doesn't affect the analysis.  His work
 5    demonstrates that if you do an experiment, the experiment
 6    that the way that a person of ordinary skill in the art
 7    would get the apixaban salt.
 8              There's also no question that the inventors were
 9    in possession of apixaban salts as of the '208's filing
10    date.
11              First, for two reasons.  First, the claimed
12    pharmaceutically acceptable salt was included in haec verba
13    in the original claim.  This is shown on slide PDX-14.53.
14    The Mentor Graphics case says that the inclusion in hoc
15    verba of the original claims of that which is challenged
16    under the written description requirement satisfies that
17    requirement.
18              But, in any event, even if you set that aside,
19    for the same reasons the '208 patent enables apixaban
20    salts, it would have led one of ordinary skill in the art
21    to conclude the inventors were in possession of apixaban
22    salt.
23              As Professor MacMillan testified and the '208
24    patent specification makes clear, the universe of acceptable
25    counterions was well-known.  They are listed, for example,
```

1    at page 1418 of Remington in JTX-10.  And the counterions

2    could be employed in a particular salt that could be

3    reliably predicted, as Professor MacMillan explained.

4              As is the case in innumerable pharmaceutical

5    patents, the inventors describe and claim the key invention

6    apixaban.  They describe the manner in which you could use

7    conventional techniques to make pharmaceutically acceptable

8    salts of apixaban.  They were in possession of the

9    invention.

10             Now, let me just very briefly address enablement

11   and written description for claim 104.  The defendants'

12   argument that claim 104 is not enabled is premised upon

13   contending that claim 104, like claim 13, claims a

14   pharmaceutically acceptable salt form of apixaban.  That

15   argument fails for the same reasons that it fails for claim

16   13.  That in and of itself would be enough to reject the

17   argument.  But as Professor MacMillan testified, a person of

18   ordinary skill in the art would read the plain meaning of

19   claim 104, and if they read claim 104 and gave it its plain

20   meaning, they would understand the compound refers only to

21   the neutral compound.

22             On the screen now is PDX-14.56.  Your Honor

23   may recall this from yesterday.  And the progression, the

24   logical progression from 13 to 27 to 55 to 104 provides

25   us all the information we need as to the claim's plain

1    meaning.

2           13 covered a compound according to claim 8,

3    wherein the compound is:  Apixaban, a pharmaceutically

4    acceptable salt.  But then you move to claim 27, and it is a

5    pharmaceutical composition, comprising:  A pharmaceutically

6    acceptable carrier and a therapeutically effective amount of

7    a compound of claim 13 or a pharmaceutically acceptable salt

8    form thereof.  That distinction is carried forward in claim

9    55.  When you get to claim 104, you are only referring to

10   the compound according to claim 13.

11          If the defendants' interpretation of claim 104

12   was correct, the green portion of claim 27 would be

13   superfluous.  The plain meaning of Dr. MacMillan's point is

14   that it's not superfluous that a compound according to claim

15   13 is apixaban and only apixaban.

16          Now, Your Honor, Ms. Wigmore will address the

17   evidence in the '945 patent.  I will come back after

18   defendants have presented to provide our brief rebuttal.

19   Thank you.

20          THE COURT:  This may fall into your area.  The

21   testimony that we heard about the D and the E group, we

22   heard some of this yesterday, that was in the scope of your

23   topic?

24          MR. LEE:  Yes.

25          THE COURT:  All right.  Help me understand that.

1    MR. LEE:  So --

2    THE COURT:  I heard a lot about, I just did what

3    Dr. Heathcock said.  I'm not sure I'm bound to agree with

4    Dr. Heathcock.  Can you sort that out for me?

5    MR. LEE:  I think the answer to Your Honor's

6    question has two parts.  The first question is:  Does

7    claim 1 cover apixaban?  And Dr. MacMillan walked through it

8    once in his original testimony yesterday and demonstrated

9    why.

10    On cross-examination, he was asked about the

11    place where the D and E rings join, and Dr. Heathcock

12    suggested that where the D and E rings join, you can

13    consider them as a single entity and combine the possible

14    substitutions.

15    Dr. MacMillan just accepted that.  He didn't

16    dispute that and said, if that's the analysis, it's covered.

17    So what he was saying was two things.  One is, setting aside

18    Dr. Heathcock, he walked through the claim limitations and

19    showed that each and every portion of the limitation covered

20    apixaban.

21    Secondly, in response to cross, he said, no,

22    they are joined.  They're not separate independent rings,

23    and when you do, here is the analysis Dr. Heathcock made.

24    I was going to accept it.  There was no reason to test

25    it.

```
 1                   THE COURT:  If I don't accept Dr. Heathcock
 2      on how to count when D and E are joined, where does that
 3      leave --
 4                   MR. LEE:  It leaves us at precisely the same
 5      place.  If you go back to the first day of testimony, Dr.
 6      MacMillan walked through claim 1 and walked through the
 7      limitations and showed just where apixaban, the limitations
 8      that covered apixaban.  Okay.
 9                   So two things, and I have to correct myself.
10      One is, if you could go back to the original testimony, he
11      walked through the claim limitation of claim 1 and showed
12      how apixaban was covered by the claim.  I've been corrected
13      and so I will correct myself, Your Honor, that the D ring is
14      absent in apixaban, so the D-E issue that you heard about
15      yesterday has nothing to do with apixaban.
16                   So there are two parts to the answer.  One is go
17      back to his first day of testimony and you'll see that he
18      demonstrated that apixaban is covered.  The second is the
19      D-E discussion yesterday where he said he accepted Dr.
20      Heathcock's conclusion concerning the joining of D and E has
21      nothing to do with apixaban.
22                   THE COURT:  It's a hypothetical I suppose
23      designed to illustrate some flaws or non-flaws in his
24      analysis?
25                   MR. LEE:  I think that may be true, Your Honor,
```

```
1    but what I say at the end of the day, and this, in fact,

2    goes back to the principle articulated by your own recent

3    decision.  You have two claim interpretations and that's

4    fundamentally what this is.  One of them covers apixaban.

5    One of them doesn't.

6              You have all of the witnesses telling you that

7    the '208 patent, the core of the invention was apixaban,

8    that that is what the inventors invented and intended to

9    claim.

10             Under Dr. MacMillan's interpretation, apixaban

11   is covered.  Under the defendants' interpretation, apixaban

12   is not covered, nor is any other compound on the face of the

13   earth.  Of those two, only one of them makes logical legal

14   sense.

15             THE COURT:  Thank you.

16             MR. LEE:  Thank you.

17             THE COURT:  I will get you back later.  We'll

18   hear from Ms. Wigmore.  Good afternoon.

19             MS. WIGMORE:  Good afternoon, Your Honor.  As

20   Your Honor knows, the '945 patent is directed to apixaban

21   formulation.  Plaintiffs have asserted two claims, claims 21

22   and 22.  Claim 21 is directed to a pharmaceutical

23   composition comprising the 2.5-milligram dose of apixaban,

24   and claim 22 addresses the five-milligram dose.  Both claims

25   depend from claim 12.
```

```
 1              Across the defendants, there are only two

 2     contested limitations.  First, whether defendants' tablets

 3     comprise crystalline apixaban particles and, second, whether

 4     the crystalline apixaban particles in the defendants'

 5     tablets have a D_{90} equal to or less than 89 microns.

 6              Before I discuss the infringement evidence, I

 7     would like to highlight some principles that both sides'

 8     experts agree upon.

 9              First, the experts agree that the plain meaning

10     of the term comprises crystalline apixaban particles means

11     any amount of detectable crystalline apixaban.

12              THE COURT:  Now, when you say the experts agree,

13     is it your understanding that the defendants agree with

14     that?

15              MS. WIGMORE:  Correct.  And we have citations on

16     slide PDX-15.4 of the testimony of Dr. Zaworotko, who

17     testified for SigmaPharm, Dr. Brittain, who testified for

18     Sunshine Lake.

19              THE COURT:  I meant to distinguish between

20     defendants and defendants' experts.  Do you think I'm going

21     to hear an argument today that disagrees with your first

22     bullet point?

23              MS. WIGMORE:  Your Honor, there was no testimony

24     to that effect.  I not sure what the defendants will argue.

25     They have previously in the case tried to argue for a
```

1  different claim interpretation, but all of the testimony was

2  consistent with this plain meaning, which was the

3  agreed-upon construction's plain meaning.

4          The second point that the experts agree upon

5  is that each of the defendants and their manufacturing

6  processes start with the crystalline form of apixaban N-1.

7          And, third, XRPD, everyone agrees, is an

8  appropriate test to identify crystalline materials.

9          Turning to slide PDX-15.5, the experts agree

10  that sharp peaks in either an XRPD pattern or an SSNMR

11  spectrum identify crystalline materials.

12          The parties, the experts also agree that in

13  XRPD, increasing sensitivity by increasing count time is

14  appropriate to detect a small amount of a material, which is

15  what we are addressing with each of the defendant's

16  products.  Each of their products contains only a very

17  small percentage of apixaban relative to the other

18  ingredients.

19          And, finally, there is testimony from both Dr.

20  Brittain and Dr. Zaworotko as well as our expert, Dr.

21  Atwood, that testing on one of the two doses of the tablets

22  would yield similar results as to the other, so there should

23  be no difference in whether crystalline apixaban is present

24  in one versus the other based on the common manufacturing

25  process.

1    Now, Unichem admits that its material is

2  crystalline, so they are not disputing this particular

3  limitation.  So for the comprising crystalline apixaban

4  material, I will address only SigmaPharm and Sunshine Lake

5  in order.

6    I will start with SigmaPharm.  We presented two

7  experts to opine that SigmaPharm's ANDA products contain

8  crystalline apixaban.  Dr. Atwood conducted XRPD testing and

9  Dr. Munson conducted SSNMR testing.

10    The first form of infringement testing is the

11  XRPD conducted by Dr. Atwood.  Again, SigmaPharm's tablet

12  contains a small amount of apixaban, only 3.1 percent.

13  Therefore, he needed to conduct very sensitive XRPD scans

14  and he did so with count times of up to 100 seconds.  And as

15  Your Honor may recall, Dr. Atwood explained that the count

16  time impacts the standard of deviation and a higher count

17  time is more sensitive.  There's no dispute about that from

18  the defendants.

19    Now, turning to the summary of Dr. Atwood's

20  testing, he observed several peaks that were associated with

21  a characteristic peak of crystalline apixaban in the '945

22  patent, that's the 12.3 peak, the 12.9 peak and the 27.1

23  peak.  And then he also compared the material he tested

24  from SigmaPharm to the testing that SigmaPharm conducted

25  on its crystalline API and found that another peak also

1    matched the peak at 22.0.  So in total, there's a total

2    of four matches of peaks that prove the presence of

3    crystalline apixaban.

4              Now, Dr. Zaworotko, who SigmaPharm's expert,

5    conceded that a single sharp peak, turning to slide

6    PDX-15.10, is indicative of the presence of crystalline

7    material, and Dr. Atwood observed four.

8              Now, turning back to 15.9, Dr. Atwood testified

9    that the peaks he did not see from the '945 patent were

10   obscured by excipient peaks, and Your Honor may recall the

11   testimony about how the excipients are present in much

12   greater quantities and therefore have sharp peaks that in

13   some cases mask the peaks that would have been seen for

14   crystalline apixaban.  And this shown on PDX-15.9 is a test

15   of SigmaPharm's placebo tablet, which is all of the

16   ingredients in the tablet except for the active ingredient

17   apixaban.

18             Dr. Atwood did this scan, determined that there

19   were, in fact, peaks of the excipients in the regions where

20   he was unable to see peaks from the apixaban.

21             And so that demonstrated those peaks were, in

22   fact, obscured by the much more voluminous excipients in the

23   material.

24             THE COURT:  Doesn't that illustrate that either

25   the placebo is hiding the peaks of the crystal or the

1  crystal isn't there?  It could be either.  I think -- did I

2  hear anything that would tell me that the scan would look

3  different if it was there as opposed to it was not there?

4          MS. WIGMORE:  Your Honor, Dr. Atwood testified

5  that he is confident that they're there but that these peaks

6  would be expected to conceal them, given the volume of the

7  material.

8          He also testified and cited to the USP, which is

9  a common resource for XRPD practice, that you don't need to

10  match each and every peak of a material to identify its

11  presence.  And as I showed previously, Dr. Zaworotko agreed

12  one sharp peak may be enough so finding four peaks.

13          THE COURT:  He did not agree, I don't think, but

14  correct me if I'm wrong, that one peak is enough to identify

15  crystalline apixaban as opposed to crystalline versus

16  amorphous.

17          MS. WIGMORE:  That is correct.  He was saying,

18  generally speaking, one peak can be enough to identify the

19  presence of crystalline material.

20          In this case, Dr. Atwood found four that

21  corresponded and had a reasonable explanation for why the

22  others were not seen and could not be seen because of the

23  large volume of excipients present.

24          So four is sufficient, based on Dr. Atwood's

25  testimony.

1    THE COURT:  What do you argue or what do you say

2    the evidence is about the minimum number of peaks that could

3    persuade me or should persuade me as a reasonable

4    fact-finder if I'm only persuaded only one of those peaks is

5    really there?  Is that enough for me to find that, yes, we

6    have crystalline apixaban?

7    MS. WIGMORE:  It potentially could, but that is

8    not our circumstance.  We have the four here, and then you

9    will see we have three with respect to Sunshine Lake.  Plus,

10   for each of the two defendants, we have confirmatory

11   evidence, which I will come to.

12   In the case of the SigmaPharm material, we have

13   the SSNMR testing by Dr. Munson; and in the case of Sunshine

14   Lake, we have their own testing showing the presence of

15   crystalline material forming in their product.  And,

16   In fact, I'll come to this slide momentarily,

17   but when Sunshine Lake identified crystalline material

18   present in its product, they relied on the presence of only

19   one peak, at 17.1.  So certainly one of the defendants has

20   deemed the presence of one peak to be indicative of the

21   presence of crystalline apixaban.

22   So turning to the Dr. Munson testing.  This is

23   the second form of infringement evidence we have against

24   SigmaPharm, and Dr. Munson conducted SSNMR testing that

25   independently confirmed Dr. Atwood's conclusion that

1        SigmaPharm ANDA products contain crystalline apixaban.

2                He used the carbon 13 SSNMR method, and he also

3        tested BMS's crystalline API to have a basis for comparison

4        of the peaks.

5                And he observed 12 peaks in the spectrum that

6        were in the same position as the peaks for BMS's crystalline

7        API, and he found that 6 of those 12 peaks were clearly

8        resolved, which means you can visibly see the shape of the

9        peak of SigmaPharm's tablets corresponding with the peaks

10       and what we know to be crystalline API, the BMS API.

11               Now, as Your Honor may recall, turning to

12       PDX-15.13, the six peaks in the SigmaPharm product mapped

13       neatly onto the location and shape of the corresponding

14       peaks of BMS's material.

15               So this, again, is confirmatory evidence that

16       the crystalline apixaban is present.

17               So we have discussed two independent pieces of

18       information that show crystalline material in SigmaPharm's

19       final product, crystalline apixaban, and I would now like to

20       turn to SigmaPharm's response to that evidence.

21               SigmaPharm presented three experts, Dr.

22       Zaworotko, who addressed XRPD, and Dr. Apperley and

23       Dr. Schurko who addressed the SSNMR testing; and I will take

24       them in order.

25

1    With respect to XRPD, Dr. Zaworotko criticized

2    Dr. Atwood's testing but he did no testing of his own.

3    Instead, he relied on two forms of XRPD testing from two

4    different sources.

5    The first was testing conducted by a company

6    called Catalent, a third-party company retained by

7    SigmaPharm.  Catalent tested SigmaPharm's drug product

8    intermediate, which is not its final product, it's something

9    along the way, and the drug product intermediate has

10   6.6 percent apixaban.

11   Dr. Zaworotko conceded that the Catalent test he

12   relied on used a count time of only one second, which is two

13   orders of magnitude below the count time that Dr. Atwood

14   used.

15   In short, the Catalent tests were not

16   sufficiently sensitive to detect the low amount of apixaban

17   in SigmaPharm's intermediate.

18   Second, Dr. Zaworotko relied on XRPD tests on

19   SigmaPharm's final product that SigmaPharm conducted as part

20   of its FDA submission, but it's undisputed that those tests

21   were incapable of detecting any crystalline apixaban present

22   in SigmaPharm's tablets.

23   As SigmaPharm explained to the FDA, and

24   Dr. Zaworotko conceded, SigmaPharm's XRPD test had a limit

25   of detection of 5 percent, but SigmaPharm's tablets contain

1    only 3.125 percent crystalline apixaban.

2              Turning to slide PDX-15.15.

3              Dr. Zaworotko agreed that a limit of detection

4    provides crucial information regarding whether the

5    diffractometer, which is XRPD equipment, can actually detect

6    any crystalline API.

7              He further conceded an XRPD test with a limit of

8    detection of 5 percent is invalid for analyzing a component

9    that is only 3 percent of a sample.

10             SigmaPharm's XRPD testing did not detect

11   crystalline apixaban because it was not sensitive enough to

12   do so.

13             So in short, none of the tests that

14   Dr. Zaworotko relied on was sensitive enough to detect any

15   amount of apixaban in SigmaPharm's ANDA product.

16             By contrast, Dr. Atwood conducted more sensitive

17   XRPD tests, which everyone agrees is needed when you are

18   testing for a small amount of material.

19             So turning now to SigmaPharm's response to

20   Dr. Munson's SSNMR testing.

21             SigmaPharm offered two experts to respond to

22   that:  Dr. Apperley, who conducted some testing, and

23   Dr. Schurko who did not but rather relied on Dr. Apperley's

24   testing.

25             Dr. Apperley's testing is meaningless in view,

1    again, of its insufficiently sensitive limit of detection.

2         Turning to slide PDX-15.17.

3         Dr. Apperley conceded that the only test where

4    he attempted to measure the limit of detection had a

5    1.5 percent limit.  In other words, based on his own

6    estimate, about 50 percent of the apixaban in SigmaPharm's

7    tablet could be crystalline and his test would not detect

8    it.

9         Because his testing was insufficiently

10   sensitive, Dr. Schurko's opinion relying on that data is

11   similarly flawed.

12        The tests were not sensitive enough to reach the

13   conclusion that SigmaPharm's ANDA products contain no

14   crystalline apixaban, which is what they testified to.

15        Now, in addition to relying on Dr. Apperley's

16   insufficiently sensitive testing, Dr. Schurko attempted to

17   repackage Dr. Munson's data and to suggest that the peaks

18   were lacking.

19        But as Mr. Prussia showed during

20   cross-examination of Dr. Schurko, Dr. Schurko actually

21   reprocessed Dr. Munson's data using different parameters in

22   a way that made the spectra seem noisier and changed its

23   appearance.

24        That does not undermine Dr. Munson's conclusions

25   that those peaks were, in fact, present.

1           I'll turn now to the Sunshine Lake infringement

2   evidence.  Again, we have two forms of independent evidence

3   showing their infringement.

4           The first, again, is testing by Dr. Atwood.

5           He tested a 2.5-milligram sample of Sunshine

6   Lake's product using the same XRPD approach I discussed with

7   respect to SigmaPharm.  He compared the peaks he found in

8   his analysis to both the characteristic peaks in the '945

9   patent and to peaks he found in his own analysis of Sunshine

10  Lake's API crystalline apixaban API.

11          Now, Sunshine Lake's product contained only

12  2.5 percent apixaban.  So to ensure his tests were

13  sufficiently sensitive to detect that low amount, Dr. Atwood

14  ran some of his scans on Sunshine Lake's material with a

15  count time of 1,000 seconds.

16          Turning to PDX-15.20.

17          Here is a summary of the peaks that Dr. Atwood

18  found and how they correspond with actual crystalline

19  apixaban peaks.

20          He observed two characteristic peaks in Sunshine

21  Lake's product of crystalline apixaban from the '945 patent

22  at 12.3 and 27.1.

23          He explained, again, that the remaining four

24  characteristic peaks from the '945 patent were obscured by

25  excipient.

1          He then compared the results that he found to

2     the sample of API that he tested from Sunshine Lake and

3     found a corresponding peak at 16.9.  That matched.

4          Now, Dr. Atwood testified that these three

5     corresponding peaks allow him to conclude that Sunshine

6     Lake's ANDA products contain crystalline apixaban.

7          Now, again, as I mentioned previously, we expect

8     the defendants and Sunshine Lake may argue that matching

9     three peaks is not enough.  But let's have a look at

10    Sunshine Lake's own actions and statements.

11         At PDX-15.21, we see a portion of Sunshine

12    Lake's ANDA, and you see they have circled a single peak in

13    one of their lab batches, the six-month accelerated lab

14    batch showing a peak at 17.1.  And as you see below this

15    chart, which is something it submitted to the FDA, they

16    found that Form N-1, which is crystalline apixaban, was

17    generated based on that single peak.  By contrast,

18    Dr. Atwood found three.

19         Our second form of infringement proof against

20    Sunshine Lake is related to what we just saw.  And that is

21    their own testimony and documents.

22         Now, Sunshine Lake's own observations were that

23    its apixaban tablets can convert to crystalline.

24         You may recall the testimony of Dr. Yong Chen.

25    He testified about some internal Sunshine Lake document that

1   showed significant amounts of conversion from apixaban to

2   crystalline apixaban in their products.  And then he

3   testified that Sunshine Lake has observed the conversion of

4   amorphous apixaban to crystalline apixaban in some of its

5   own studies.

6          That admission is consistent with what Sunshine

7   Lake has represented to the FDA.

8          THE COURT:  So there is only one single lab

9   batch; correct?

10          MS. WIGMORE:  In the ANDA, that is true.  But

11   prior to that, we went through an internal HEC, which is

12   a Sunshine Lake parent document, showing that this was a

13   problem they consistently saw in the development of this

14   product.

15          And the laboratory batch they reported to the

16   FDA was on a six-month accelerated stability study which

17   Dr. Atwood said was particularly important given that we're

18   looking at the acceleration of the conditions that could

19   lead to crystallization in a shorter amount of time.

20          He also, although Dr. Chen tried to suggest

21   that they corrected their ANDA, they did submit amendments

22   as was disclosed in this case, but as we showed on his

23   cross-examination, they retained that information.  And,

24          I want to pull up slide PDX-15.23, where he

25   read a statement from their amended ANDA that contains the

1    following language:

2              "Thus, it can be concluded that the polymorph

3    conversion can consistently occur during the stability of

4    apixaban tablets."

5              And that statement remains in Sunshine Lake's

6    ANDA even after the amendment.

7              THE COURT:  But I thought his argument, or at

8    least what he was suggesting, I thought, was this did

9    historically happen.  They did observe it.  They have told

10   the FDA that, and it might be false or worse if they

11   completely take that out.  They can't turn back time.

12             Is this something they saw, bit whether that is

13   at all reliable evidence to predict that their final product

14   will ever convert to crystalline is a different question

15   entirely, isn't it?

16             MS. WIGMORE:  He did suggest that it needed to

17   stay in the ANDA, but the test results prove the opposite of

18   what Sunshine Lake's position is.  Sunshine Lake's position

19   is when you create this amorphous dispersion, there can be

20   no conversion of what they call the amorphous to the

21   crystalline, but their own laboratory batch testing showed

22   that it occurred and it showed that it occurred

23   significantly using the same manufacturing process that they

24   used in their exhibit batches.

25             So this countervails the argument that once you

1    have this amorphous dispersion, you can't have crystalline

2    apixaban.  Their own testing shows it, and, importantly, Dr.

3    Atwood shows it as well in the sample that he received from

4    Sunshine Lake in discovery.

5              Now, how did Sunshine Lake respond to these two

6    forms of proof?  They offered testimony of their expert, Dr.

7    Brittain, and Dr. Brittain's testimony not only fails to

8    undermine Dr. Atwood's testing, it actually supports Dr.

9    Atwood's conclusion.

10             Now, first of all, Dr. Brittain did conduct some

11   testing of Sunshine Lake's products, but that testing was

12   insufficiently sensitive.

13             He agreed in his testimony that Dr. Atwood's

14   method of using slow scans to increase sensitivity was

15   reasonable due to the small percentage of apixaban in

16   Sunshine Lake's ANDA product, yet Dr. Brittain admitted that

17   each of his XRPD scans were the equivalent of a 0.33 second

18   count time, which is orders of magnitude less than the 1,000

19   seconds that Dr. Atwood used.

20             And, again, because of the small amount of

21   material, it does take time to observe these crystalline

22   apixaban particles, but he didn't take the time to do that.

23   Instead he conducted five short scans and he averaged the

24   results, but by his own calculation, even if you take into

25   account those five scans he did, that would only increase

1    the effective count time to 1.7 or 1.75 seconds, which,

2    again, is several orders of magnitude below the thousand

3    seconds that Dr. Atwood was using.

4              Now, turning to the next issue, Dr. Brittain

5    agreed with Dr. Atwood's identification of a peak at

6    12.4 degrees in Sunshine Lake's product.  He conceded that

7    Dr. Atwood's more sensitive testing indisputably showed a

8    reproducible peak at 12.4 degrees, which corresponds with

9    one of the characteristic peaks in the '945 patent.  So

10   there's agreement from both sides' experts that one of the

11   crystalline apixaban peaks was present in Sunshine Lake's

12   tablets.

13             Now, Dr. Brittain tried to explain that away by

14   suggesting that this indisputable 12.4-degree peak was

15   associated not with crystalline apixaban, but instead with

16   an excipient he called lactose anhydrous.

17             Dr. Brittain tested from his own lab what he

18   thought was a sample of lactose anhydrous and claimed that

19   it corresponded with, and therefore explained this

20   12.4-degree peak that Dr. Atwood found.  But when Dr.

21   Atwood obtained a sample of the material Dr. Brittain

22   tested, he proved that Dr. Brittain was wrong.  The material

23   Dr. Brittain had tested was actually lactose monohydrate,

24   and Dr. Brittain conceded that Dr. Atwood was right about

25   that.

1          Lactose monohydrate is not an ingredient in

2    Sunshine Lake's ANDA product.  It's not mentioned anywhere

3    in the ANDA, so it cannot possibly explain the 12.4-degree

4    peak in Sunshine Lake's ANDA product.  That peak is

5    attributable to crystalline apixaban rather than any form of

6    lactose.

7          Now, Dr. Atwood's XRPD scans and Sunshine Lake's

8    own witness testimony and documents confirm that its ANDA

9    products contain crystalline apixaban.  Dr. Brittain's

10   testing is insufficiently sensitive to show otherwise.

11         Now, the question is why did both SigmaPharm and

12   Sunshine Lake rely on testing that clearly was not sensitive

13   enough to detect crystalline apixaban?  The fair inference

14   is that they were not looking to find it, because their

15   tablets, both SigmaPharm's and Sunshine Lake's tablets

16   contain crystalline apixaban, they by definition comprise

17   crystalline apixaban particles.  And as we heard from Dr.

18   Myerson, all crystals are particles, so there's no issue

19   about whether they're particles once we establish that

20   they're crystalline.

21         Now I will turn to the issue of particle

22   size, which is the second disputed limitation.  And,

23   again, there are a number of points on which the experts

24   agreed.

25         Turning to slide 15.28, the experts agree that

1    crystals can form as described by the models of nucleation

2    and crystal growth, which Dr. Atwood testified about.

3    Everyone agreed that it's theoretically possible that is how

4    crystal growth occurs.

5              The experts agree that the manufacturing

6    processes will cause apixaban to be dispersed because the

7    apixaban solution is rapidly dry.  That is true for both

8    Sunshine Lake and for SigmaPharm.

9              The experts agree that limiting the mobility of

10   apixaban particles can inhibit crystal growth once crystals

11   form, because crystals need to move and interact with each

12   other to continue to grow.

13             And the experts agreed that the excipients that

14   are present in significant quantities in these ANDA products

15   can inhibit crystal GROWTH, particularly povidone, which is

16   a polymer found both in SigmaPharm's and Sunshine Lake's

17   final product.

18             So I will start with the evidence against

19   SigmaPharm.  I'm pulling up a slide that SigmaPharm used

20   describing a portion of its manufacturing process just to

21   show that they engage in this quick drying, and then they

22   end up in their intermediate with what they call amorphous

23   dispersion that you can see has the red lines for polymer

24   with a crystalline apixaban in between.  We say the

25   crystalline apixaban.  They deny it, but our testing proves

1   that there's at least some present.

2          Now, because of the nature of this manufacturing

3   process, there's a low concentration of API.  There's rapid

4   drying that will limit mobility and create small domains of

5   apixaban.  The apixaban crystals cannot grow beyond the

6   region because the excipients keep the particles apart.

7          As Dr. Atwood explained, there just won't be

8   enough apixaban in these individual pockets to form large

9   crystalline apixaban particles.  The end result, as Dr.

10  Atwood testified, is that there is just not enough material

11  in these individual pockets to support growth of 89 microns

12  or more.  For SigmaPharm, Dr. Atwood testified that the

13  particle size would be small, roughly two orders of

14  magnitude below that 89 micron cutoff.

15         Now, turning to Sunshine Lake, the process is

16  similar, but not identical.  Again, they are starting with

17  crystalline apixaban.  They use spray-drying to rapidly dry

18  the apixaban solution.  And as Dr. Atwood testified, the

19  excipients separate and keep apart the apixaban, and the

20  manufacturing process means that there will not be large

21  crystalline apixaban entities or large crystallites of

22  apixaban.  Dr. Brittain agrees that Dr. Atwood's explanation

23  that excipients would prevent further crystal growth is a

24  plausible theory.

25         Now, at bottom, SigmaPharm and Sunshine Lake

1   cannot reconcile on the one hand designing a manufacturing

2   method to attempt to avoid crystallinity and, on the other

3   hand, the argument that their manufacturing process would

4   somehow yield large apixaban crystals that would be above

5   the $D_{90}$ threshold of 89 microns.

6           We know from the testing evidence that

7   SigmaPharm's and Sunshine Lake's processes failed to

8   completely prevent the formation of crystalline apixaban

9   particles because we found them, and in the case of Sunshine

10  Lake, they found them.  But none of the other sides' experts

11  has offered any plausible explanation as to how those

12  crystalline apixaban particles that are present could grow

13  anywhere close to 89 microns and deal with the manufacturing

14  constraints that they themselves have imposed.  This is an

15  example of a failed attempt to design around.  They tried to

16  avoid crystalline.  They didn't avoid crystalline, but in

17  doing so, they limited how large the crystalline particles

18  could grow.

19          THE COURT:  All right.  We're on infringement

20  still, so the burden is on you.

21          MS. WIGMORE:  The burden is on us, yes.

22          THE COURT:  And unless I missed it, I don't

23  think I saw any calculation of any $D_{90}$ value from any of your

24  experts.  Isn't that correct?

25          MS. WIGMORE:  There was no calculation of $D_{90}$

1   value because the claim does not require us to recite a

2   calculation.  The claim requires that the particles be equal

3   to or below a $D_{90}$ of 89 microns, and that both Dr. Atwood and

4   Dr. Berkland for Unichem testified that the particles will

5   be substantially below that 89 microns, so substantially

6   below that a calculation would not be necessary.  Again, a

7   precise calculation is not what the claims require.  It's a

8   threshold.

9            THE COURT:  But striking when so much of the

10  plaintiffs' arguments on many points is that the defendants'

11  experts weren't asked to do certain tests that they

12  acknowledge they could have done, it seems like the shoe is

13  on the other foot here.  You could have asked for your

14  experts to calculate a $D_{90}$, couldn't you?

15           MS. WIGMORE:  We certainly could have, but we do

16  have testing evidence contrary to what was being argued

17  about the defendants' case on the '208.

18           First of all, we have multiple forms of evidence

19  showing the presence of crystalline.  We have detailed

20  testimony about the manufacturing process and how that would

21  limit particle size.  We have no testimony from the other

22  side suggesting that these particles would be above

23  89 microns.  And for Unichem, as we'll come to, we do have

24  special measurements of particle size that are substantially

25  below 89 microns.

1    Now, again, Unichem admits, turning to

2    PDX-15.31, they admit that they have the crystalline, so the

3    question for Unichem was only, is it within the particle

4    size limitation?  And we have the -- Dr. Berkland's testing

5    using the SEM-EDS method that shows that that would be the

6    case.

7    Now, we have heard a lot of characterizations of

8    the Berkland method in this case.  Berkland himself denies

9    that name.  He uses technology that was widely used and

10   widely known, which is the SEM-EDS technology.  He put

11   into the record a number of articles showing that that

12   was a well-known and used technique at the time of the

13   invention.

14   So he performed that analysis.  He was able to

15   isolate and identify the apixaban particles because, as he

16   testified, they are the only ingredient in the Unichem

17   product that contains nitrogen.

18   So the elements on mapping that he did using EDS

19   allowed him to distinguish between particles that contain

20   nitrogens and thus were apixaban and the other ingredients

21   in Unichem's tablet.

22   He was then able to measure the size because the

23   equipment, the SEM equipment contains this scale bar, and as

24   we can see here on PDX-15.32, there's a scale bar on ten

25   microns on this particular slide, and you see the timing,

1   nitrogen particles, that are well below that and at a level

2   that Dr. Berkland testified was about one micron.

3              So turning to Dr. Berkland's testimony on

4   PDX-15.33, he testified that he observed thousands of

5   apixaban particles in Unichem's product, all of which were

6   about one micron in size.

7              He saw no particles even approaching 89

8   microns, and based on that observation, he was able to

9   readily conclude that the $D_{90}$ could not be anywhere near

10  89 microns.

11             THE COURT:  Did we hear anything about any tests

12  of statistical significance from Dr. Berkland?

13             MS. WIGMORE:  He testified about the number of

14  granules that he tested and that each granule he assumed

15  would contain a hundred, if not a thousand apixaban

16  particles.

17             So he tested thousands of apixaban particles and

18  he compared that to some of the prior art that he attributes

19  where this method was used.  There's testing in the prior

20  art that's based on only 100 particles.  So he did not do a

21  statistical significance analysis, but he testified that he

22  believed that his sampling was appropriate and

23  representative, particularly given the concept of content

24  uniformity, which we heard about from Dr. Chambliss.

25             Content uniformity occurs in ANDA products

1 because, of course, you want your active ingredient to be

2 uniformly distributed throughout the product.  You don't

3 want there to be isolated pockets, because then therapeutic

4 effect would vary across pills and across perhaps batches.

5           So based on that principle, which the defendants

6 themselves have embraced, if you're testing particles from

7 particular random samples, which he did, and you're

8 consistently seeing the same result, it's reasonable to

9 conclude that that is representative, particularly since the

10 results were consistent.  We entered into the record

11 numerous analyses he did on numerous batch tablets and they

12 were all the same.  So certainly, there is ample evidence

13 that there's nothing close to 89 microns.

14           Now, he then confirmed his opinion by

15 looking at Unichem's manufacturing process, which is

16 illustrated on PDX-15.34.  And, again, this is an

17 oversimplification of the process, but it showed the main

18 step, which includes starting with the excipients,

19 dissolving the API, a very small amount of the API in a

20 drug solution, and then spray drying that onto the excipient

21 granules.  And as Dr. Berkland testified, just based on

22 this manufacturing process, you would expect the particles

23 that come out of this spray-drying process with the rapid

24 drying and the limited amount of apixaban to be very small,

25 in the one micron level, and that's exactly what his testing

1    found.

2              Now, counsel for Unichem had suggested that

3    because the SEM-EDS method is not specifically discussed in

4    the '945 patent, it cannot be a reliable method to prove

5    infringement.  But Dr. Berkland explained that SEM-EDS is a

6    routine and well understood technique.  Dr. Myerson

7    reiterated that.  And a person of ordinary skill would have

8    known that it was an available method to measure the size

9    and composition of the apixaban particles.

10             We talked about $D_{90}$.  Unichem has argued that he

11   failed to calculate the $D_{90}$, but, again, there are two

12   reasons for that.  One is the claims do not require precise

13   value.  You just need to be below the threshold, and every

14   particle he observed was approximately one micron in size.

15   A person of ordinary skill would understand that the claim

16   limitation means 90 percent of the volume of crystalline

17   apixaban particles have to be less than or equal to

18   89 microns.  So it's just not reasonable given the content

19   uniformity principles, given everything he saw was

20   consistent that somehow there would be these giant particles

21   elsewhere that would raise the $D_{90}$ above 89 microns.

22             Now, let me address Unichem's response to

23   Dr. Berkland's opinion.

24             Their response was to conduct irrelevant

25   testing.

1843

1     Unichem's expert, Dr. Genck, tested Unichem's

2  starting API, apixaban in bulk form, but that is irrelevant

3  testing in view of Unichem's spec process; and the reason

4  for that is, as he agreed during his cross-examination,

5  Unichem dissolves that crystalline apixaban.  So whatever

6  the size was at the beginning of the process doesn't tell us

7  anything about the size later in the process.

8     If we could turn to PDX-15.36.

9     Dr. Genck acknowledged he has no evidence that

10  the particle size from the bulk apixaban API is the same as

11  the particle size from the final Unichem product.

12     So the testing he conducted was simply not

13  relevant.

14     In addition, his entire noninfringement opinion

15  is based on the very claim construction that was advanced by

16  Unichem during *Markman* and rejected.

17     Now, during claim construction, Unichem and

18  Dr. Genck proposed that the term "apixaban particles" have

19  a $D_{90}$, be construed as $D_{90}$, as is measured by laser light

20  scattering, such as Malvern light scattering of bulk

21  apixaban particles.

22     But turning to PDX-15.37, that construction was

23  rejected and the claim construction opinion makes clear that

24  nothing in the patent requires particle size to be measured

25  one and only one way.

1        In particular, only by a laser light scattering

2   method using only bulk apixaban particles as Unichem

3   contends.

4        But when we cross-examined Dr. Genck, he

5   admitted that he applied that very same rejected

6   interpretation in his infringement opinion.  He was asked,

7   "Were you aware of the opinion when you prepared your expert

8   report in this case?"

9        And his answer was he was aware of that opinion,

10  but "I'm not necessarily saying that because it is an

11  opinion, that I'm going to agree with it as a person of

12  ordinary skill in the art."

13       So his opinion in this case remains not simply

14  that laser light scattering might be used, but that it must

15  be used to determine the particle size and that you must

16  test the bulk API.  That is directly contrary to the claim

17  construction, and that is the only real basis on which he

18  disputes Dr. Berkland testing.

19       Now, in sum, there is ample evidence of

20  Unichem's infringement based on Dr. Berkland's comprehensive

21  particle size analysis using a well-known method.

22       Dr. Genck's contrary opinion is both

23  inconsistent with the operative claim construction and

24  irrelevant in view of Unichem's specific process.

25       Now I'll turn to the defendant's validity

1    challenges for the '945 patent.

2              The defendants have tried to characterize the

3    invention of the '945 patent as simply reducing particle

4    size to increase dissolution.  But that is not the claimed

5    invention.

6              The invention is to a solid pharmaceutical

7    composition of apixaban that ensures consistent

8    bioavailability or solution-like exposure which is the best

9    oral bioavailability one can achieve.  And,

10             This invention is described in detail in the

11   specification, and we walked through that with Dr. Myerson.

12             To achieve consistent exposure, the inventors

13   unexpectedly discovered that the apixaban formulation had to

14   have a dissolution rate of at least 77 percent in

15   30 minutes.  But that was not the end of the inquiry.

16             After rigorous discovery, the inventors discover

17   the only parameter that materially impacted the dissolution

18   rate was the $D_{90}$ particle size of equal to or less than

19   89 microns.

20             It is the combination of these two factors --

21   and that's critical, it is not just the particle size, it is

22   not just the dissolution rate.  It is the specific

23   dissolution rate cutoff and the particle size limitation

24   that is necessary to achieve it that forms the heart of the

25   '945 patent invention.

1        And that is illustrated in Figures 3 and 4 of

2   the '945 patent which Dr. Myerson discussed at length.

3        Now, on validity, the defendants bear the burden

4   of proof by clear and convincing evidence, and they failed

5   to carry that burden both for their obviousness defense and

6   their 112 defenses.

7        I'll start with obviousness.

8        The defendants's obviousness case rests on the

9   proposition that it would have been obvious for a person of

10  ordinary skill to use a smaller particle size to increase

11  apixaban's bioavailability.

12        That argument fails for two reasons.

13        First, there were no reported issues with

14  apixaban's bioavailability and, therefore, there was no

15  reason a person of skill would have been motivated to

16  improve it.

17        No. 2, even if a person of skill would have

18  wanted to change the formulation, there was no reason to do

19  so.  But even if they wanted to do that, they would not have

20  looked to improve the dissolution rate.  And,

21        Let's look at those one at a time.

22        First of all, the prior art expressly reported

23  that apixaban had good bioavailability.  It had been tested

24  with thousands of patients as of the priority date in Phase

25  II trials, and was in the midst of Phase III trials

 1    involving tens of thousands of patients.

 2              I'm showing on PDX-15.40, the Carreiro reference

 3    which Dr. Chambliss, their validity expert, agreed was the

 4    most comprehensive description of the apixaban clinical

 5    trials as of the priority date.

 6              The Carreiro reference makes clear that apixaban

 7    has good oral bioavailability and rapid oral absorption.

 8              But that was not the only reference to say so.

 9              Turning to the next few slides, we have the

10    Pinto reference, the Teague reference, and the Erickson

11    reference.  And as we can see, each those references, which

12    are all from before the priority date, describe apixaban's

13    good oral bioavailability.  So that was the state of the art

14    at that time.

15              Now, turning to PDX-15.44, this is an excerpt

16    from the Teague reference that showed that apixaban

17    bioavailability is equal to and perhaps even better than the

18    state of the art Factor Xa inhibitor -- oral Factor Xa

19    inhibitors at the time.  So all signs from the prior art

20    were that bioavailability was not a problem.

21              And as Dr. Myerson testified, there is no

22    reason to change a formulation that is already working.

23    Particularly when you are in Phase III and you have trials

24    going on, you don't want to change it and disrupt your FDA

25    process unless there is a good reason to do so, and here

1    there was none.

2            Indeed, on cross-examination, Dr. Chambliss

3    conceded that there is no single prior art reference that

4    existed before the priority date that described apixaban's

5    onset of actions as being slow.  He didn't recall.  He

6    didn't look for that.

7            And Dr. Myerson made clear in his testimony

8    there is not a single reference in the prior art describing

9    apixaban's bioavailability as anything less than good.

10           Now, the defendants's entire argument rests on

11   the premise that a formulation scientist would always look

12   to do better and that good is not great.  But that is

13   classic hindsight.

14           The law tells us that there needs to be some

15   motivation.  While the motivation need not be explicitly

16   taught in the prior art, the defendants cannot rely on

17   generalized notions of a need for better bioavailability;

18   especially here, where the prior art is explicitly taught

19   that the bioavailability of apixaban was good.

20           I'm showing on PDX-15.46 an excerpt from the

21   *Amerigen Pharm v UCB* case rejecting the very premise on

22   which the defendants's obviousness case rests.

23           That case rejected the argument that there need

24   not be a specific problem with bioavailability a drug for

25   one of ordinary skill in the art to be motivated to modify

1   the drug to further improve its bioavailability.

2          The Federal Circuit noted that such a conclusory

3   argument is not sufficient to overcome the substantial

4   evidence to the contrary, underpinning the Board's analysis.

5          Here, we have substantial evidence to the

6   contrary in the form of repeated prior art publications

7   appraising the bioavailability of apixaban.

8          Now, we have heard testimony about BCS, the

9   Biopharmaceutics Classification System.

10         And the defendants' arguments are contrary to

11  the expectations of a person of skill in the art regarding

12  BCS Class III drugs.  There is no real dispute that doses of

13  10 milligrams and under, which are the doses that were being

14  used in the Phase III clinical trials reported in Carreiro,

15  apixaban was known to be a BCS Class III drug.

16         As a BCS Class III compound, apixaban is highly

17  soluble, and absorption of apixaban should not be controlled

18  by dissolution rate but rather by permeability.

19         And if we turn to PDX-15.47.

20         This is the analogy that Dr. Myerson used in his

21  testimony about rate limiting steps.

22         And this shows that if permeability is the

23  rate-limiting step, then dissolution improvement is not

24  going to improve the bioavailability.  And that was the

25  state of the art and the understanding of a person of skill

1       would have had about apixaban at the time of the invention.

2                  So while it's generally known that reducing

3       particle size can, in some instances, improve drug

4       bioavailability, that was only true and only known to be

5       true for dissolution rate limited drugs.

6                  Here, the BCS taught apixaban would not fall in

7       that category.  It was not expected to be dissolution rate

8       limited and, therefore, there was no motivation to reduce

9       its particle size to try to improve bioavailability.

10                 Now, that's particularly true because as shown

11      in PDX-15.48, the Lantz reference, PTX-732 made clear there

12      were known disadvantages of reducing particle size; and they

13      are set forth here and were discussed by Dr. Myerson.

14                 So not only was there no motivation to reduce

15      the particle size, there were known disadvantages for doing

16      so when you don't have to.

17                 Now, the fact that changing dissolution rates

18      would not be expected to improve bioavailability for a BCS

19      Class III drug is not just a theory.  In fact, it was

20      experimentally reported in the art before the time of the

21      invention.

22                 And if we turn to PDX-15.49, this is an excerpt

23      from the Blume reference, PTX-429.

24                 As Dr. Chambliss conceded when confronted with

25      this reference on cross-examination, Figure 4 of the Blume

1    article shows that a Class III BCS drug can have different

2    dissolution rates but identical bioavailability.

3               The chart on the left here, on slide 15.49, is

4    showing the different dissolution rates, but the chart on

5    the right is showing that bioavailability is not impacted

6    because this is a BCS Class III drug where the limiting step

7    is not dissolution rate but rather the permeability.

8               The defendants argue motivation was tied to the

9    desire to obtain a biowaiver; and importantly, I believe

10   Dr. Chambliss conceded and Dr. Myerson testified that

11   biowaivers were not even available for BCS Class III drugs

12   in the U.S. until 2015, long after the time of the

13   invention.

14               Now, I'll turn very briefly to the combination.

15               So, Your Honor has heard a bit about these.

16               There are four combinations that the defendant

17   has relied on, and they cannot prove that any of them render

18   the invention obvious by clear and convincing evidence.

19               Now, for purposes of obviousness, there are two

20   critical claim limitations.  The first is the dissolution

21   rate limitation at 77 percent in 30 minutes; and the second

22   is the $D_{90}$ particle size that ensures consistent

23   bioavailability.

24               Defendants's combinations failed to establish

25   either.

1          First, none of their references discloses the

2     dissolution rate limitation of 77 percent in 30 minutes,

3     which is a very key part of the invention.

4          For this limitation, across all four of their

5     combinations, the only source they rely on is the 1997 FDA

6     guidance, which is PTX-696, but the FDA guidance is merely

7     general guidance on selecting dissolution test parameters.

8     It does not disclose the precise dissolution rate of

9     77 percent in 30 minutes.  It does not discuss apixaban.  It

10    does not say anything about whether such a rate, which is

11    not even specifically described, would provide solution-like

12    exposure for apixaban.

13          So this general reference utterly fails to

14    establish that key limitation.

15          Now, turning to the Nause reference, which is

16    part of their combination.  This is DTX-359.

17          Now, Nause, as Dr. Myerson testified, is not

18    prior art because all of the limitations -- everything

19    described in the claims were available before Nause was even

20    published.  And that's undisputed testimony.  The defendants

21    have not responded in any way or articulated some different

22    priority -- some different date of invention for the '945

23    patent.

24          Now, Dr. Chambliss, in fact, testified that he

25    does not contest and has no basis to contest Dr. Myerson's

1    opinion on that issue.

2         But even if the Court were to determine that

3    Nause is prior art, it does not come close to disclosing the

4    key limitation.

5         Nause concerned a controlled release formulation

6    which is actually the opposite of what the claims are

7    driving toward.  Control release is the amount being

8    released over a longer period of time.  Nause discloses just

9    as an example in a table, it's an immediate release,

10   immediate release tablet, but it does not contain a

11   dissolution rate that is within the scope of the claims, and

12   it says nothing about the specific dissolution rate or

13   particle size of that immediate release tablet.

14        As Dr. Myerson testified, the immediate release

15   tablet could have different dissolution rates or particle

16   sizes than the ones claimed in the '945 patent.  And as a

17   result, a person of skill in the art would not have been

18   motivated to combine the teachings of Nause with the general

19   FDA guidance to come up with any particular particle size or

20   dissolution rate.

21        So for the remaining three combinations, the

22   defendants rely on references that disclose apixaban in a

23   tablet form, but, again, don't contain these key

24   limitations.

25        I will turn to the Wei reference, which is

1  DTX-359.  Now, Wei is not about pharmaceutical compositions.

2  It's about a process of converting one polymorph to another

3  that could apply to any compound, not just apixaban, and it

4  merely uses apixaban as one example of how that polymorph

5  conversion process worked.  There's no teaching or

6  suggestion in Wei regarding the particle size of apixaban

7  that would allow for consistent solution-like exposure, and

8  the general teaching in Wei that you saw during Dr.

9  Chambliss' testimony, a general statement that

10 bioavailability often can be improved by using small

11 particles, is not directed to apixaban, and moreover, given

12 the BCS information that I discussed previously, would not

13 be deemed relevant to apixaban because we know that it was

14 not a dissolution rate limited drug based on its BCS Class

15 III status.

16          Now, in summary, just turning to a slide that we

17 saw during Dr. Myerson's testimony, the apixaban

18 formulations known in the art were reported as having good

19 bioavailability, so there's no motivation at all to change

20 it, particularly in the Phase III process being ongoing.

21          Increasing the dissolution rate of a BCS Class

22 III drug would not have been thought to improve

23 bioavailability given that it was not the rate limiting

24 step.

25          There were known disadvantages of reducing the

1   particle size, and it turned out to be very unexpected that

2   notwithstanding its BCS Class III status, that at the end of

3   the day, the inventors found that apixaban was dissolution

4   rate limited and they found the sweet spot of the

5   dissolution rate and the particle size needed to achieve

6   that that would achieve solution-like exposure.  That

7   problem was not known.  It wouldn't be expected to have

8   occurred, but the inventors discovered it and they solved

9   it.  So the defendants have failed to meet their burden of

10  proving obviousness.

11          I will turn briefly now to the defendants' 112

12  defenses.  They have a written description, enablement

13  and an indefiniteness defense, and they have failed to meet

14  their burden of proving each by clear and convincing

15  evidence.

16          I will start with written description.  The

17  defendants contend that the asserted claims are not

18  adequately described because there's no specific example

19  they say that describes how to measure the particle size

20  distribution in a tablet, but the asserted claims are not

21  method claims.  They are not process claims.  They are

22  pharmaceutical composition claims.

23          Turning back to the claim construction order,

24  the claims don't require any particular particle size

25  measuring technique.  They are not limited by the type of

1   composition being measured.  All the claims require is that

2   there be a pharmaceutical composition having crystalline

3   particles with the recited particle size distribution and

4   meeting the other limitation.

5            Now, I will turn to PDX-15.57.  This is an

6   excerpt from the Eli Lilly versus Teva case that says the

7   test for written description has never been whether the

8   patent includes a description of the steps that may be used

9   to prove infringement, but that is exactly the argument that

10  the defendants are trying to make here.

11           The question for written description is not

12  whether the inventors knew every way to determine whether

13  the pharmaceutical composition had the claimed

14  characteristics.  Rather, the question is whether the

15  inventors were in possession of a composition with the

16  claimed features, and just reviewing the patent on its face,

17  there can be no dispute that they were.

18           The specification describes the inventor's

19  discovery that a dissolution rate of 77 percent in

20  30 minutes would provide for consistent solution-like

21  exposure.  It further explains the discovery that a particle

22  size distribution of 89 microns or less would ensure

23  consistently achieving that goal.  And the specification

24  then goes on to describe how the inventors made tablets with

25  both of those claimed properties.  It describes specific

1    manufacturing processes, and it describes measuring the

2    particle size to achieve the claimed limitation.

3            Now, the defendants allege that the '945 patent

4    does not describe how to conduct particle size measurement

5    using laser light scattering, but as Dr. Myerson testified,

6    there is sufficient information to do that.  That technique

7    is described in the patent.  The results are described in

8    the patent.  And there were numerous references, including

9    the USP, cited by the defendants, that could guide a POSA in

10   selecting what parameters to use.  In fact, Dr. Genck,

11   Unichem's expert, performed his own laser light scattering

12   testing on Unichem's API, making no argument that it was

13   unknown how one could have done that.

14           Now, to be sure, as described previously,

15   Unichem's API was not the right material for Dr. Genck to

16   test in view of their specific manufacturing process where

17   the API has dissolved.  But there's no question that Genck

18   and other experts understood how to conduct laser light

19   scattering to measure particle size.  It was a routine

20   technique.

21           Now, to the extent the defendants are contending

22   that laser light scattering cannot be used to determine

23   particle size in a pharmaceutical composition, the evidence

24   shows otherwise.  Dr. Chambliss agreed that a person of

25   ordinary skill in the art could make a pharmaceutical

1  composition in a powdered form and could measure the API

2  particle size by laser light scattering and that that

3  particle size would not change in the final composition.  So

4  that alone is enough for written description.

5          And Dr. Myerson further made clear that the

6  particle size of the API could be measured by laser light

7  scattering and would not be expected to increase in the case

8  of the manufacturing processes described in the patent and

9  used by BMS, which involves the dry granulation process.

10  That is distinct from the dissolving API approach that

11  Unichem and Dr. Genck were dealing with, but the patent

12  describes a very specific manufacturing process where you're

13  not going to have any increase in the particle size between

14  the beginning and the end and therefore laser light

15  scattering on the API will be sufficient to prove the

16  particle size in the pharmaceutical composition.

17          Now, finally, to the extent the defendants argue

18  that written description is lacking because the patent does

19  not disclose how to measure particle size in a tablet, that

20  is not necessary for the reasons discussed from the Lilly

21  case.  You don't have to describe every method of proving

22  infringement.  But, in any event, as Dr. Myerson and Dr.

23  Berkland both testified, there are a number of methods that

24  a person of ordinary skill could use to test the particle

25  size of crystalline apixaban in a final composition.  These

1  included microscopy, FT-NIR, and Raman mapping.

2         Now, Dr. Myerson walked through some specific

3  references, including Clark, which is PTX-435, and Chen,

4  which is PTX-431, that support that proposition.  And both

5  sides' experts agreed that in terms of the sample

6  preparation method that needs to be used when you have a

7  tablet, which is grinding the tablet and making it into a

8  powder, that was a standard technique.  Dr. Berkland said

9  so, Dr. Atwood said so, but perhaps more importantly, Dr.

10  Brittain agreed and followed that approach himself, and

11  SigmaPharm actually followed that approach in the testing

12  that it reported in its ANDA.

13         So to the extent their written description

14  argument is about the steps needed to take the tablet and

15  make it into a powder that can be tested, that was standard

16  technology that both sides in the case have used.

17         With respect to enablement, Dr. Chambliss and

18  Genck provided only conclusory opinions about undue

19  experimentation, but they did not walk through the Wands

20  factors, which are shown on PDX-15.59.  By contrast, Dr.

21  Myerson did, and he concluded that undue experimentation

22  would not have been required with respect to the claimed

23  invention.

24         Defendants' enablement argument appears to be

25  that the claims are not enabled because it's not possible to

1    measure the particle size distribution once apixaban is

2    formulated into a final composition.  But as addressed with

3    written description, that's simply not the case.  There were

4    known techniques for doing so.  Dr. Berkland testified about

5    his approach and Dr. Myerson discussed a number of

6    publications where such methods are described.

7            And I will just put up for the moment up on the

8    screen an excerpt from Clarke, PTX-435, which shows that

9    very type of technique being used in the art at the time,

10   and that is very similar to the method, in fact, that Dr.

11   Berkland used.  So this was known technology.  This

12   particular technology in Clarke is spectroscopy and the

13   authors show how Raman and NIR can be combined to analyze

14   individual components of two different blends of

15   ingredients, so all of all of that technology was known at

16   the time.

17           Now, turning to PDX-15.61, the fact that these

18   techniques are not actually spelled out in the patent is not

19   a problem.  It is well established that the specification

20   need not disclose what is well-known in the art, and there's

21   ample testimony and documentary support that these

22   techniques work.

23           Defendants also claim the patent does not fully

24   enable a person of skill to conduct laser light scattering,

25   but as discussed, Dr. Myerson made clear that one could do

1    that and Dr. Genck was able to do that, albeit on the wrong

2    starting material.

3            So I will turn to the last of the validity

4    defenses the defendants have raised with the '945, and that

5    is indefiniteness.

6            The defendants argue that different particle

7    size measuring techniques will yield different results.  As

8    Dr. Myerson explained, particles are three-dimensional

9    material and each technique measures particle size a little

10   differently, but simply because that means -- that just

11   means that the technique measures particle size in a

12   different way doesn't make the claim indefinite.

13           As Dr. Chambliss testified, you can do this by

14   mathematical determination.  The $D_{90}$ calculation is actually

15   the mathematical calculation after you've collected the

16   particle size measurement, and there's testimony supporting

17   the fact that you can make math mathematical comparisons

18   among the different techniques.

19           Now, Dr. Myerson showed the Court several papers

20   that demonstrated the consistency and results obtained using

21   different particle size measurements and those included the

22   Bosquillon reference, PTX-430, and the Reverchon reference,

23   PTX-402.  There we have actual D-90s being calculated,

24   comparing ones for the SEM method that Dr. Berkland used to

25   another, to the laser light scattering method, and he showed

1    that those were comparable.

2              So there's no question a person of ordinary

3    skill would understand the metes and bounds of these claims

4    with reasonable certainty, and defendants have not

5    identified any actual evidence of inconsistent results.

6              Turning to slide 15.63, the case law establishes

7    that the mere possibility of different results is

8    insufficient to render a claim indefinite.  Any theoretical

9    minor differences between the two techniques are

10   insufficient to render a patent invalid, and that is exactly

11   the situation we have here.  The defendants have not put

12   forth any evidence of any inconsistent results using one

13   technique versus the other and Dr. Myerson's testimony is to

14   the contrary.

15             In summary, BMS has met its burden of proving

16   infringement by presenting multiple forms of infringement

17   evidence against each defendant.  The defendants' response

18   was either to conduct no testing at all, to conduct

19   irrelevant testing, or to conduct testing that was clearly

20   insufficiently sensitive.

21             On the issue of validity, defendants have failed

22   to carry their burden of proving any of their validity

23   defenses by clear and convincing evidence.

24             Thank you.

25             THE COURT:  Thank you.  All right.  So I do need

```
 1    to take a break.  I will try to keep it to 10 or 15 minutes
 2    so we can get started before 2:00 o'clock.  We'll check with
 3    you right before I come in.
 4              (Brief recess taken.)
 5              *     *     *
 6              (Proceedings reconvened after recess.)
 7              THE COURT:  I'm ready to hear from the
 8    defendants.
 9              MR. MIZERK:  Your Honor, may I approach?
10              THE COURT:  Yes.
11              MR. MIZERK:  Good afternoon, Your Honor.
12              For the record, I am Don Mizerk, and I represent
13    SigmaPharm Laboratories in this matter.
14              On behalf of SigmaPharm and our team, the first
15    thing I want to do is thank the Court and your staff for all
16    of their patience, attention, time throughout the trial and
17    before.
18              I also want to thank Mr. Lee and his team for --
19    we appreciate everyone's ability to work together and
20    confine our fight to the legal and factual issues in this
21    case.
22              Now, in plaintiffs' closing statements, they
23    tried to make the argument that the stakes to the plaintiffs
24    are big, but the stakes are very big here for SigmaPharm,
25    too.
```

```
 1              As the Court can see from the evidence

 2   introduced, SigmaPharm is committed to delivering quality,

 3   generic drug products for the public to the public which

 4   SigmaPharm makes at its facility in Bensalem, Pennsylvania.

 5              SigmaPharm followed the rules Congress set out

 6   and is presenting the case for the marketing of its apixaban

 7   drug products to this Court for consideration.

 8              This case is important to the parties, and it is

 9   even more important to the public.

10              In my closing, I'm going to focus on -- my

11   comments on SigmaPharm's ANDA products.  It's proposed 2.5-

12   and 5-milligram generic apixaban tablets.

13              Plaintiffs have also raised an issue about the

14   Medichem API that SigmaPharm uses to make the amorphous drug

15   product intermediate that is dry-mixed into the ANDA

16   products.

17              This issue is unique to SigmaPharm because

18   SigmaPharm makes its product in the United States, in

19   Pennsylvania.  And I will come back to that at the end of my

20   comments if I have time.  Otherwise, we will address it in

21   our post-trial briefing.

22              But I want to focus on the ANDA product that

23   SigmaPharm seeks to bring to the public and which are the

24   only accused products at issue here under 271(e).  Only

25   271(c) has been asserted -- or 271(a) has been asserted
```

```
 1    against the other accused device.

 2                    The other main goal I want to accomplish in my

 3    time is to answer every question that Your Honor has.

 4                    And before I begin in discussing, I'm going to

 5    first discuss the '945 patent, I want to make sure I answer

 6    any questions Your Honor has.  If you have any questions?

 7                    THE COURT:  I won't hesitate to ask.  Go right

 8    ahead.

 9                    MR. MIZERK:  Thank you.

10                    All right.  As I said, what would happen in my

11    opening, in the opening, plaintiffs have failed to prove

12    infringement of the '945 patent for three reasons.

13                    Now, why don't we put up DDX-18-2.

14                    The claims asserted against SigmaPharm are set

15    forth in -- and these are the three issues.

16                    There is no crystalline apixaban.

17                    No crystalline apixaban particles.

18                    And the ANDA product contains no crystalline

19    apixaban particles that meet the $D_{90}$ limitation.

20                    Now, the claims asserted against SigmaPharm are

21    set forth in DDX-18-3.

22                    Next slide, which is the '945, claims 21 and 22.

23                    And we can talk about claim 12 which is really

24    the -- where the issues are that we're going to be

25    addressing.
```

1    And I'm going to take the three issues I

2    mentioned in reverse order.

3    First, plaintiffs have failed to prove that

4    SigmaPharm's ANDA products comprise crystalline apixaban

5    particles having a $D_{90}$ of equal to or less than 89 microns.

6    The only witness who offered any testimony on

7    this issue with respect to SigmaPharm was Dr. Atwood, who

8    flat-out admitted that he did not measure particle sizes.

9    Quote, "He did not measure particle size for SigmaPharm's

10   material."

11   That is at the transcript at 469, lines 3 and 4.

12   In questioning Dr. Chambliss, plaintiffs'

13   counsel stated that $D_{90}$ is a calculation by software or by

14   hand, but there have been no calculations by software or by

15   hand on anything related to the SigmaPharm ANDA products.

16   Now, plaintiffs stated that there's a plethora

17   of methods to measure particle size to calculate the $D_{90}$,

18   including microscopy, Raman mapping, ultrasound attenuation,

19   slitting techniques, electrical zone sensing, laser

20   diffraction, electron microscopy, light microscopy, laser

21   diffraction by wet dispersion, laser diffraction by dry

22   dispersion, scanning electron microscopy, laser light

23   scattering, and let's not forget, the Berkland method.  And,

24   Not to mention all the additional methods that

25   Dr. Myerson described yesterday.

1        Now, plaintiffs did not use any of these methods

2    on SigmaPharm's ANDA products.  No tests, no laser light

3    scattering, no physical tests on the particle size.  That's

4    at the transcript at 468, 2-6; and, no Berkland method.

5    Nothing.

6        They just can't skip over this requirement.

7        Now, plaintiffs and Dr. Atwood try to escape

8    this requirement by resorting to their unproven theory,

9    their pseudoscience, I'll call it, Dr. Atwood's

10   interpretation.

11       If we put up transcript 467, lines 2 to 6.

12       Dr. Atwood was asked the question:

13       "Question:  But there is no empirical evidence

14   of the particle size at all."

15       And he says:

16       "Answer:  I was going to agree with that.  I did

17   no testing of the particle size, but I simply offered an

18   interpretation based on the ANDA documents I saw."

19       If plaintiffs had actually offered anything on

20   the measurement of particle size and the calculation of the

21   $D_{90}$, they would have had to describe for us what particles

22   that they were actually measuring.

23       We can then look at those particles and examine

24   them, but plaintiffs did not; and that take us to the next

25   part.

1    There are no particles of apixaban, crystalline

2    or otherwise, in SigmaPharm's ANDA products.

3    So let's put up PDX -- I'm sorry, DDX-18-3.  I

4    think that's right.

5    Now, the reason that SigmaPharm has not

6    infringed the '945 patent is because there are no

7    crystalline apixaban particles, crystalline apixaban

8    particles, in SigmaPharm's ANDA products.

9    So, first of all, we have to ask, what is a

10   particle?

11   So if we turn to the next demonstrative,

12   DDX-18-4.

13   This is a demonstrative that the plaintiffs used

14   at the technology tutorial.  But it is just a callout from

15   the patent.  They cite the patent which describes particles

16   as "individual drug substance particles."

17   It's at column 3, at lines -- beginning at line

18   20.

19   There has been no evidence at all of any

20   individual drug substance particles.

21   So in order to kind of get a little background

22   on this, take a look at the SigmaPharm process.

23   Let's go to the next slide, DDX-18-5.

24   This is the SigmaPharm process.  It's important

25   to recall how SigmaPharm manufactures its ANDA product.

SigmaPharm manufactures its ANDA product through a process where SigmaPharm first completely dissolves the Medichem apixaban into a solution and then mix it with a povidone solution such that 94 percent povidone and only 6 percent apixaban are in the solution.  And that is about a 14-to-1 ratio of PVP to apixaban.  That's a lot of PVP and very little drug.  And,

The reason that SigmaPharm uses this process is to prevent crystallization.  It is known in the scientific literature that PVP inhibits crystallization, and even more so at a high ratio of like 14 to 1.

Then, SigmaPharm uses a vacuum-drying method to lock in that amorphous disorder from the solution and turn that complete mixture into a solid.  A solid solution also known as a solid amorphous dispersion.

Now, Dr. Atwood admitted that the mixing of the PVP and the drug was "very thorough."

That's at the transcript at 2 -- I'm sorry, 452, 14 to 19.  And,

As I discussed a few moments ago, SigmaPharm manufactures its products by dissolving apixaban into PVP to create an amorphous solid dispersion with a ratio of 14-to-1 PVP to apixaban.  Once SigmaPharm dissolved the apixaban during step one of its manufacturing process, there are no more apixaban particles.

1        I think Ms. Wigmore just said that in her

2   presentation.

3        But rather, we have PVP and apixaban composite

4   particles.

5        Dr. Zaworotko testified that after this process,

6   there's no more apixaban particles.  That we have our

7   apixaban, PVP particles.

8        And Dr. Myerson, I think, even admitted this

9   yesterday.

10       Now, if we turn to slide 18-7.

11       After we take the granulation from the API

12  that -- the amorphous API that's 6 percent, that dry

13  granulation is mixed with other excipients, mannitol,

14  microcrystalline cellulose, crospovidone, and then it's

15  compressed into a tablet, direct compression.  And then at

16  this point now, the apixaban is at about 3 percent.

17       Now, Dr. Atwood wants to say that's some alleged

18  nanometer-sized crystalline structures that are particles,

19  but that's not right.  These purported crystalline

20  structures, even if they -- if they even exist, are by

21  Dr. Atwood's own admission are part of a much larger solid

22  structure that contains other things, namely, PVP.

23       Now, compare what plaintiffs are arguing with

24  respect to SigmaPharm to what plaintiffs did to prove

25  particles in the Unichem product, for example.  You just

1    heard about them a minute ago.

2              They did not look at the individual structure,

3    these crystalline structures in the Unichem product, but the

4    particles.  And they did not take this approach with

5    SigmaPharm.

6              And I don't think they even took this approach

7    when they were complaining or trying to differentiate the

8    Nause reference in the -- in connection about their

9    opposition to the invalidity challenges.

10             Now, during trial, Dr. Atwood agreed that a

11   composite particle, a particle that contained both apixaban

12   and PVP, for example, could not meet the size limitation of

13   the '945 patent.

14             If we turn to DDX-18-6.

15             We have Dr. Atwood's testimony where he says:

16   "Can we stipulate ... those composite particles would not be

17   apixaban particles that can meet the size limitation of the

18   '945 patent; right?

19             "I believe I agree with that because as I

20   understand your particles, they're not actually apixaban but

21   rather they're apixaban and something else."

22             Apixaban and something else.

23             That constitutes a complete failure in proof of

24   the existence of any individual drug substance particles

25   that could meet the limitation of crystalline apixaban

1    particles.

2               The crystalline apixaban particle limitation is

3    not literally met, and plaintiffs have not alleged

4    infringement under the Doctrine of Equivalents.

5               Now, third, we move to the next issue.

6               Plaintiffs have failed to prove by a

7    preponderance of the evidence that SigmaPharm's products

8    contain any crystalline material.

9               Now, the evidence showed that amorphous solid

10   dispersions made with PVP established -- are

11   well-established in the scientific literature as a reliable

12   and proven method to create stable, amorphous drug

13   dispersions.

14              PVP is a well-known "nucleation inhibitor."  And

15   we entered DTX-768, DTX-767, and DTX-720, all of which make

16   this clear.

17              This was shown by the testimony and the

18   literature.

19              If we turn to DDX-18-8.

20              This was a graphic you might have remembered

21   from Dr. Zaworotko's testimony, which establishes that in

22   the literature, that a 6 percent -- 6 percent API PVP

23   amorphous dispersion will be extremely stable.  This is the

24   graph where he talked about on the lower -- the lower -- the

25   horizontal axis that 100 percent of API content on the

1    right, zero API content on the left.

2              And the literature shows, we're way on the left

3    on this graph on the side there, indicating that our

4    dispersion in the literature is established to being very

5    stable amorphous solid dispersion.

6              Now, what SigmaPharm is doing is

7    well-established in the scientific literature, and is a

8    proven method of creating a solid and reliable solid

9    dispersion.

10             Well, how do we know this in addition to the

11   literature?

12             We know this by reviewing some evidence that is

13   undisputed.

14             After SigmaPharm made a solid amorphous drug

15   dispersion, it tested the 6 percent amorphous dispersion by

16   XRPD.

17             This has been referred -- and so it is

18   undisputed that this 6 percent amorphous API intermediate,

19   we call it sometimes, is amorphous.

20             If we turn to DDX-18-9.

21             It shows you -- DDX -- or DTX Trial Exhibit 650

22   that's, also I believe, PTX-1009.

23             And this is the testing that we received from

24   Catalent of the 6 percent amorphous API.

25             Now, there has been -- you have to remember,

1  this particular substance that is tested isn't like the

2  tablets.  It doesn't have a lot of stuff in it.  It's got

3  really two things in it.  It's got the API and povidone.

4  That's it.

5              And it's a six percent level.  And we asked Dr.

6  Atwood about this, and Dr. Atwood called this an amorphous

7  entity.

8              If you turn to his testimony at, I think it's my

9  next slide, this is at page 455 of the transcript, lines 5

10 to 10.  This page of the Catalent report shows an XRPD scan

11 that has no crystalline peaks for the drug product

12 intermediate; isn't that right?  That's the red line on the

13 graph?

14             And then Dr. Atwood said:  "If you represent

15 that is the drug product, it looks like an amorphous entity

16 from the look of the XRPD."

17             So that's not all Dr. Atwood said about this

18 test.  If you turn to the next slide, he said, "It's the

19 drug product intermediate?"

20             He said, "Yes.  I will accept that, certainly.

21             "Now, in your original report in February, you

22 did not offer any criticism of this graph or this report,

23 did you?

24             "Answer:  Well, I don't recall, but I'm not

25 offering any criticism of this graph in this report right

1    now."

2            Right now is at trial.  No criticism.  And this

3    test, by the way, has also been reviewed and approved by

4    FDA.  This testing was derived from an FDA reviewed and

5    approved XRPD test protocol and it directly contradicts Dr.

6    Atwood's opinion that there are crystalline materials that

7    form, quote, I think he said rather quickly.  If it was

8    going to happen, it would happen rather quickly.

9            Well, here is something that is a few months

10   after, a month or so after we made the material.  It's easy

11   to measure.  It's easy to look at, and there's no sign of

12   any crystalline material in this by Dr. Atwood's admission.

13           Now, as we mentioned earlier, SigmaPharm takes

14   the solid amorphous dispersion, granulates it and uses it

15   with other excipients to compress into its ANDA tablets.

16   Instead of acknowledging that SigmaPharm's manufacturing

17   process produces an amorphous solid dispersion that is

18   thermodynamically stable in a nonconvergent crystalline, Dr.

19   Atwood claims without explanation or empirical evidence that

20   crystalline material spontaneously forms and then stops from

21   growing beyond the size of about ten nanometers.

22           I think Ms. Wigmore referred to that as, I think

23   it was 89, smaller than 89 microns by a factor of two.  That

24   is ten nanometers.  And he says, due to pockets that he

25   images are in the solid solution.

1     Now, Dr. Atwood never explains how this PVP
2  would allow crystal nucleation to begin with since it is a
3  nucleation inhibitor.  He admits it's going to stop the
4  crystals from getting large, but he doesn't acknowledge,
5  well, how do I get started in the first place?  And Dr.
6  Atwood's unsupported speculation is not evidence of any
7  crystalline material.

8     Now, both Dr. Zaworotko and Dr. Atwood agree
9  that a crystal is characterized by long-range order, but as
10 Dr. Atwood was asked, what is the size of the crystal in the
11 outset of nucleation process?  And he answered, two or three
12 nanometers.  And then in his direct examination, Dr.
13 Zaworotko testified that ten nanometers would absolutely not
14 be considered long range.

15    If we turn to DDX-18-12, there was material that
16 Dr. Atwood relied on I think that further disproves his
17 opinion.  During his direct examination, Dr. Atwood relied
18 on PTX-367, and that's a figure on the left side of this
19 picture, which is an article from Yu and it's discussed in
20 the transcript at 327.  And Yu identifies a textbook example
21 of an amorphous solid at page 4 and is shown on our slide
22 here.  And this textbook example is identical to what Dr.
23 Atwood used in his demonstratives to show crystalline
24 material.  On the right is a copy of Dr. Atwood's
25 demonstrative at I think it was PDX-5-9.

1       Simply put, by arguing that SigmaPharm's

2  products meet the $D_{90}$ limitation because SigmaPharm's ANDA

3  products have crystalline apixaban material sized ten

4  nanometers, Dr. Atwood actually proves that there was no

5  crystalline apixaban material in SigmaPharm's product.

6  Ten nanometers would only be short-range order.  Now,

7  plaintiffs try to argue around all of this evidence by

8  presenting some XRD, XRPD and NMR testing of the finished

9  SigmaPharm ANDA product tablets which contain only three

10  percent apixaban.

11       So, first, let's talk about Dr. Atwood's XRPD

12  test.  He did just one.  And we have heard much about XRPD

13  testing, but the basic premise of XRPD testing is that the

14  crystalline, that crystalline products have a ceratin

15  fingerprint that results in peaks and these peaks can be

16  identified.

17       The crystalline apixaban form at issue here has

18  over 20 characteristic peaks, 20.  Now, the trick in

19  reviewing XRPD testing is that you have to distinguish noise

20  from peaks and identify enough peaks to support a finding

21  that crystalline material is present.

22       Now, Dr. Atwood admits that the USP says "It is

23  sometimes difficult or even impossible to identify phases in

24  the following cases," and four of those cases apply to the

25  XRPD testing that he performed, beginning at transcript 445,

1  line 23 through 446, line 12.

2          So it's not an easy thing to do to find

3  crystalline material when you are looking at such small

4  amounts of it in a larger composite material.

5          Now, Dr. Atwood's tests, XRPD tests, were hardly

6  the model of care or precision.  All of Dr. Atwood's tests

7  were performed on only using the same crushed tablet over a

8  couple of months.  So he crushed one tablet and then he put

9  it in a vial and he kept it in his office for months and

10  used it when he wanted to take a test.  Now, he only looked

11  for a few peaks when the USP recommends ten matching peaks

12  for a confirmed identification of crystalline material.  I

13  mean, you know, ten is what they are shooting for, but we're

14  at three or four is what Dr. Atwood ultimately was able to

15  identify from the over 20 peaks that he could have chosen

16  from.

17          THE COURT:  What is your view on what the

18  minimum is that I need to look for before I could find

19  infringement?

20          MR. MIZERK:  Well, I think you'd have to find

21  some and I think you have to be able to find that there are

22  enough so that you can, and it could be a variety of

23  different reasons with these.  If some peaks are really

24  strong, you might feel one peak is good enough, but if

25  they're all kind of iffy, then I wouldn't be comfortable

1  relying on any of them.  And here, we clearly have all the

2  peaks that Dr. Atwood has identified would all be considered

3  iffy, iffy judgment calls.  You can look at the data and

4  there's a lot of up and down and noise in all the XRPDs

5  that he looked at, and we'll talk a little bit more about

6  his tests in a moment, but remember that he only used the

7  six positions from the patent to start out with.  Only

8  found three.  Then later in his reply report he added one

9  more.  He could have used a lot of differences to identify

10 more peaks.  He actually used some other references with

11 some of the other defendants.  He used some crystalline

12 material that he had obtained from someone else with other

13 defendants.  He didn't do that with us.  He could have gone

14 and used any of the, of the documents that were relied

15 either on the Medichem data package or any of the other

16 sources that he had of form N-1, the crystal peak, and he

17 never bothered to check any of those other ones.  He just

18 stuck by the few that he had identified and was -- decided

19 not to look any further than that.

20              In addition to that, he used sandpaper to remove

21 the coating.  He worked from an open bottle.  I mean, the

22 foil was broken on the bottle when he received that.  He

23 never, I think this is important, too -- he never made any

24 determination of the level of detection.  He never did any

25 kind of spiking test.

1    I think Ms. Wigmore put up a slide in her

2    presentation of what she called the placebo tablet.  He had

3    a placebo tablet but he never bothered to spike it with any

4    kind of crystalline material to see what it would look like

5    if a small amount of crystalline material appeared in the

6    placebo.  He never did any of that.

7    He had no lab notebook.  He didn't leave a lab

8    notebook of any of his work and of the samples that he

9    tested that he received in January, or BMS received them in

10   January, but he did not test them until November 2018, and

11   that was after they expired.  They expired, they had

12   expired, a two-year shelf life in about June, I believe.

13   And then there was this mystery about him

14   testing the ANDA products on the same day that Dr. Munson

15   supposedly tested tablets from the same bottle in another

16   location.

17   So he starts out with a list of six peaks from

18   the patent and he could not find three at all.  I think Your

19   Honor had a little discussion with plaintiffs' counsel about

20   the peaks and about the peaks being behind something.  And I

21   think Your Honor is correct, that you can't -- you can't say

22   that they're blocked.  You can't say whether they are there

23   or not.  Since they have the burden of proof, they can't

24   just say, well, the dog ate my homework and so I did it.

25   And I think Dr. Zaworotko testified that

1   blocking is kind of not the right term, that peaks in XRPD

2   are added, so they always get added to what was already

3   there.  It wouldn't be blocked.  It would be on top of

4   whatever was there already.

5           So now for the few alleged peaks that Dr. Atwood

6   thinks he saw, Dr. Zaworotko saw nothing but noise.  The

7   XRPD pattern is a lot of up and downs, and I this Dr. Atwood

8   called that up and down a lot of noise.  If you look at his

9   testimony, it's with respect to DDX-18-13.  Well, the

10  transcript at 488, line 11, he called it random noise.

11          But Dr. Zaworotko closely assessed all the data

12  and did not see any peaks.  He explained what peaks were,

13  what noise were and how you differentiate noise from peaks.

14  He did it in a very systematic and careful way.  And then he

15  started looking each of Dr. Atwood's samples and determined

16  that it was all noise if you use any kind of method to try

17  to standardize your approach to the sample.  Dr. Atwood did

18  none of this.

19          So we turn to I think the next slide, DDX-18-14.

20  This is a great example of Dr. Atwood's using multiple

21  scans.  I think Ms. Wigmore mentioned it in her comments

22  that Dr. Atwood relied only on scans of 100 seconds to

23  analyze SigmaPharm's material.  But Dr. Atwood actually took

24  a few more scans that were actually in high resolution.  So

25  the one that he relied on on the left to look for the 12.24

 1    and 12.84 peaks was done at 100 seconds.

 2              On the right, Dr. Atwood had another scan that

 3    was at 200 seconds that had much less noise, because it's

 4    more sensitive, according to them, but he didn't rely on

 5    that one.  He relied on the one that was less sensitive in

 6    order to find the peaks that he was looking for.

 7              THE COURT:  How does the -- the speed of the

 8    scan he did compare to the Catalent ones that you relied

 9    on?

10              MR. MIZERK:  Well, the Catalent ones were a

11    slower speed, but remember, the Catalent material that they

12    were examining was just apixaban and PVP, both of which are,

13    the PVP is amorphous, it doesn't show up in the scan.  And

14    so remember when he was doing his crystal, whenever anyone

15    scanned any of the crystal material, the signal they would

16    get from the crystalline material that had nothing else in

17    it were done at a very slow, or fast rate.  You didn't have

18    to do a lot of scans, a lot of repetition to identify the

19    crystals because the material was very, I say unadorned, it

20    was plain.  And so you got a clear signal.  Like I said,

21    that signal is clear and FDA has approved that testing for

22    the Catalent product.

23              THE COURT:  The faster speed is less sensitive;

24    is that correct?

25              MR. MIZERK:  Yes.  It's if a shorter scan,

1    longer scan is arguably a more sensitive scan.

2              THE COURT:  And the Catalent ones were faster

3    and less sensitive than Dr. Atwood's; correct?

4              MR. MIZERK:  I think than these, yes, yes.

5    But, again, there wasn't a lot -- there was nothing else in

6    the sample, in the Catalent scan, other than PVP and

7    apixaban.

8              Now, Dr. Atwood never even determined that his

9    testing was sensitive enough to detect the small amount of

10   crystalline material that he was looking for.  He never did

11   an a level detection test.  He had no idea what -- I mean,

12   he could not say what the level of detection was.  He just

13   said I saw peaks, but he never established that his testing

14   was sensitive enough to see the small peaks that he was

15   looking for.

16             And without that and with all the other

17   evidence, Dr. Atwood's XRPD testing is simply insufficient

18   to support any conclusion that any crystalline material is

19   present in the SigmaPharm ANDA product.  Now, curiously,

20   plaintiffs only performed NMR data or testing on

21   SigmaPharm's products.  I think that's a tacit admission

22   that even they thought that Dr. Atwood's testing didn't cut

23   it.

24             The theory I guess is that two poor tests might

25   add up to one decent one, but plaintiffs NMR testing

1  likewise fails to prove that SigmaPharm's ANDA products

2  comprise crystalline apixaban particles.

3          Now, NMR testing in order to identify crystals

4  needs to require examining the width of any peak and

5  comparing it to the width of what would be a crystalline

6  peak.  Amorphous and crystalline compounds both generate

7  peaks and it is only, the only way to discern crystalline

8  tea from NMR testing is by analyzing the width of the peaks.

9  That in and of itself is even more difficult to do with NMR

10 when you have these mixed samples.

11          Now, the NMR testing that Dr. Munson relied upon

12 was performed by Dr. Nethercott and then there was other

13 testing of NMR testing that was performed by Dr. Apperley.

14          Now, you didn't get to meet Dr. Nethercott, and

15 we don't know much about him, but Dr. Nethercott obtained

16 one NMR spectra on SigmaPharm's ANDA product, and one

17 spectra on some BMS crystalline material.  And

18 Dr. Nethercott provided no analysis of his own tests, and

19 did not say if he thought that his own tests detected

20 crystalline material.

21          So, I mean, technically Dr. Munson didn't

22 perform any tests.  Dr. Nethercott performed tests and just

23 gave them to Dr. Munson.

24          Now, the other set of tests were performed by

25 Dr. Apperley.  Now Dr. Apperley literally wrote the book on

1    NMR testing, and Munson has cited Dr. Apperley's work

2    repeatedly -- on multiple occasions and in connection with

3    his opening report.

4             Now, Dr. Apperley conducted not one but a

5    battery of thoughtful, careful tests to determine if SSNMR

6    could be used to detect any crystalline apixaban in

7    SigmaPharm's ANDA products.

8             He conducted three different tests using

9    different size rotors, including a level of detection

10   spiking set of experiments.  And unlike Dr. Nethercott,

11   Dr. Apperley interpreted his own tests and concluded that

12   there was no sign of any crystalline material.

13            Now, the spectra collected by Dr. Nethercott was

14   passed on to Dr. Munson and surprise, Dr. Munson concluded

15   that crystalline apixaban was detected.

16            There was no spiking experiment.  He never

17   measured the line widths, and in many of his publications

18   where he would analyze NMR data by looking at the chemical

19   shift, peak area and line width -- that's at the transcript

20   at 588, lines 18 to 21, he didn't do any of that here in

21   connection with performing his test in this case.

22            Now, Dr. Munson never explained how the PVP

23   would have permitted any crystal formation, even though his

24   own articles recognize that polymers are added to prevent

25   crystallization.

1             If we can put on DTX-651, first page.

2             It's a Munson article.

3             And I think it's in the page 1.

4             In the abstract he discusses how PVP -- he says:

5   "To minimize the possibility of crystallization, a polymer

6   is usually mixed in" -- "mixed with amorphous API to form

7   an amorphous solid dispersion which is then shown to

8   significantly delay the onset of crystallization."

9             Now, Dr. Munson's complete lack of scientific

10  rigor was on display, I think, when the Court asked

11  Dr. Munson the question.  The Court question, I think, is at

12  the transcript at 589:  "Did you express an opinion on how

13  much crystalline apixaban was in the SigmaPharm product?"

14            And, of course, the question was:  "That is how

15  much a percentage or a total?"

16            And the answer was, from Dr. Munson, was:  "So

17  we didn't do the proper experiments to quantify.  It

18  certainly could be, I think it's about 50 or 60 percent

19  crystalline material.  We just didn't do the proper

20  experiments to quantify that."

21            I mean, normally, most respectable scientists

22  who don't do the proper experiments won't offer an opinion.

23  But not Dr. Munson.  He had no apprehension about reaching

24  an opinion without doing the necessary work to justify it.

25            Now, interestingly, Dr. Apperley did a

1   level-detection set of experiments and determined that his

2   test had a -- only a 1 to 1-and-a-half percent level of

3   detection.   That's what -- so he did that.

4           Now, if Dr. Munson was right, the only testing

5   that was proven to actually be able to prove that Dr. Munson

6   was right was Dr. Apperley's test.   Because if it was 50 to

7   60 percent, it would have been something that Dr. Apperley

8   -- would have shown up in Dr. Apperley's tests, but it

9   didn't.

10          As a result, it completely disproves Dr.

11  Munson's conclusion that conversion of apixaban occurred.

12  Dr. Apperley's more rigorous testing demonstrates that

13  Dr. Munson's opinions are completely without basis.

14          Now, finally, all of the NMR spectra were

15  thoroughly analyzed by Dr. Schurko.

16          Now, Dr. Schurko is a professor at Florida State

17  University and was recently appointed to run the National

18  NMR center.

19          He carefully examined all of the data.   He

20  studied the data at zero appertization, 20 appertization,

21  and the 30 appertization that Dr. Munson processed his data.

22  And he looked at everyone's data and he concluded that there

23  was no basis to find or to conclude that crystalline

24  material was present.

25          Now, if we look at the next slide, I think I

1    have.

2                    Here is Dr. Schurko's -- from a page of

3    Dr. Schurko's report that's in evidence, and what he did

4    here was -- well, first of all, this slide shows how noisy

5    and uneven Dr. Nethercott's NMR study was.

6                    On the lower axis is a comparison of

7    Dr. Apperley's data versus Dr. Nethercott's data.

8    Dr. Apperley is the red line and Dr. Nethercott's is the

9    blue line.

10                   And so the normal -- the way the data was

11   initially reported is on the lower axis, and then at the

12   top, they did the -- what we saw -- what we call the

13   lengthening of the data.  Not -- so just you stretch it out

14   a little bit to see the peaks more clearly.

15                   If you look at Dr. Munson's data or Nethercott's

16   data on the lower blue line, it's all over the map.  It's

17   all noise.  It's going all over the place, whereas

18   Dr. Apperley's data is much flatter line, there's not action

19   below the base, and it's a much cleaner set of material to

20   be examining.

21                   The next slide shows an example of when Dr.

22   Munson reviewed the data.  The red line is what the

23   crystalline apixaban should look like, and the blue line

24   is the product.  And he studied this data.

25                   So you can see the peaks are not narrow peaks,

1  they're wide peaks.  The crystalline peaks -- you know, you

2  can see that there's just no basis to conclude that that's,

3  from the testing, that that's a crystalline peak.

4         Now, in sum, plaintiffs have failed to prove the

5  existence of any crystalline particles.  They failed to

6  prove any particles, and they failed to prove the $D_{90}$

7  elements of the '945 patent.

8         THE COURT:  Do you agree that under my claim

9  construction, there's no minimum amount of crystalline

10  apixaban that needs to be found in order to satisfy that

11  limitation?

12         MR. MIZERK:  There is no minimum amount of

13  crystalline.  There is -- it has to be crystalline apixaban

14  particles.  So there has to be particles of crystalline

15  apixaban.  I don't think just crystalline material embedded

16  in a larger structure even if it -- would qualify as a

17  crystalline apixaban particle.

18         THE COURT:  But two crystalline apixaban

19  particles in one tablet of your product would be sufficient

20  to satisfy that limitation, or do you dispute that?

21         MR. MIZERK:  Well, I think -- I mean, I think

22  that (A), I don't -- if there were just two, there wouldn't

23  be -- you couldn't -- there is no one that could detect

24  that.  So two crystalline particles would never appear.  You

25  would have to be able to positively detect crystalline

1  material.

2          So two part -- I mean, there's no way that

3  anybody can even possibly detect that.  So there has to be

4  testing that shows the presence of crystalline material.

5          THE COURT:  If there's testing that shows the

6  presence of any crystalline apixaban material, that

7  limitation is satisfied.

8          MR. MIZERK:  I would say the limitation in the

9  '104 patent would be satisfied because that just requires

10  crystalline apixaban.  But it requires crystalline apixaban

11  particles in -- there has to be a particle that's a

12  crystalline apixaban particle.  And I think that -- that

13  would not -- you know, you would have to look at what the

14  particle consists of.

15          The particle is a mixture of apixaban and PVP.

16  It's not a crystalline apixaban particle.  It's a composite

17  particle.  It's a mixture particle, and it wouldn't meet the

18  limitation as Dr. Atwood has conceded.

19          And I would also say that the Nause reference

20  also indicates there was some -- the patent was -- there's

21  some prosecution history regarding Nause, and there is --

22  there is evidence that the Nause reference, and there was

23  some discussion of some of the reference with respect to

24  validity, that you would need a higher amount of crystalline

25  material present in -- to kind of -- to make it consistent

1   with what they argued in the Patent Office.

2            THE COURT:  And talk about a little more about

3   the level of detection.  There's an argument, I think it

4   applies to your product, but correct me if I'm wrong, that

5   if the level of detection is at a percentage level above

6   the amount of apixaban in your product, and the amount of

7   apixaban is, I think everyone would say, above the amount

8   that could possibly be crystalline apixaban, but if the

9   level of detection is above the amount of crystalline or

10  at least above the amount of apixaban, excuse me, it's

11  irrelevant what your tests -- that your tests didn't detect

12  it because it wouldn't be expected to detect it.

13           MR. MIZERK:  I would agree with that.  And I

14  would say the tests -- there was a test that was referenced,

15  there was a test that Dr. Spireas testified about.

16  Dr. Zaworotko didn't rely on that test.

17           So, I mean, the plaintiffs misspoke when they

18  said that Dr. Zaworotko relied on the SigmaPharm internal

19  test that was being debated with the FDA that was -- the FDA

20  was asking, what's the level of detection by test?  Nobody

21  relied on that from the SigmaPharm side, and it wouldn't

22  have been appropriate for anybody to rely on that test at

23  all because it hadn't been established as being

24  appropriately sensitive.

25           But also, I don't think you can get away with it

1  if you can complain about that test being insufficiently

2  sensitive when you didn't bother to determine in your report

3  the sensitivity of your own test.

4           I mean, Dr. Atwood never reported on the

5  sensitivity of his own test at all.  So he can escape your

6  question by saying I didn't do that kind of quantification.

7           THE COURT:  And then there was an argument I

8  think that goes, if I were to find that there are -- is

9  crystalline apixaban particles in your product, on what

10  basis could I find that they are actually larger than

11  89 microns?

12           That is, you have a process and you have an

13  argument, and arguably you have evidence that there are no

14  crystalline apixaban particles, but if I reject that and am

15  persuaded that there are, on what basis would I have to then

16  say, well, they're so big that they, you know, don't meet

17  the size limitation?

18           MR. MIZERK:  Well, aside from plaintiffs have

19  the burden of proof, there's been no proof -- it's their

20  burden to prove this.  So I would -- you know, and this is

21  how this works.  They prove something and I can respond to

22  it.  I don't have to disprove infringement.  And we're not

23  going to take on that burden.  It's the plaintiffs' burden,

24  and they need to come forward with evidence to support their

25  claims.

```
 1                    THE COURT:  All right.  Do you want to move on
 2        to invalidity?
 3                    MR. MIZERK:  Yes, I do, Your Honor.
 4                    Now, next, Your Honor, I'd like to shift to the
 5        issues relating to the '208 patent.
 6                    The '208 patent presents a classic case of
 7        overclaiming.
 8                    Plaintiffs could have claimed just apixaban, but
 9        they did not.
10                    Perhaps they could have claimed just a salt of
11        apixaban, but they did not.
12                    Instead, they claimed pharmaceutically
13        acceptable salt forms of apixaban.
14                    Now, if I could have the asserted claims, claims
15        13 and 104 on the screen.
16                    Now, we see claim 13 claims a pharmaceutically
17        acceptable salt form of apixaban, and claim 104 incorporates
18        the salts formed by claiming a compound, according to claim
19        13, which is a crystalline compound.
20                    Now, there was a little bit of back and forth, I
21        guess, about there's a new dispute about whether or not
22        claim 14 -- or claim 104 includes pharmaceutically
23        acceptable salts.  I mean, I think everyone is in agreement
24        that plain and ordinary meaning is supposed to apply, and
25        everyone is in agreement, all the witnesses have testified,
```

1     that salts are compounds.

2            So a pharmaceutically acceptable salt would be a

3     compound of claim 13.

4            So I don't see how you can -- unless you try to

5     do some kind of claim construction, which plaintiffs did not

6     do, did not ask for, I don't see how we can continue to kind

7     of, I think, to wrestle with new claim terms that come up.

8            And I will say that the 104 -- claim 104 was not

9     originally asserted by claim -- by the plaintiffs in this

10     case.  They initially asserted, I believe it was claim 27

11     was asserted against SigmaPharm, and we alleged it was

12     invalid because it claimed a pharmaceutically acceptable

13     salt of a pharmaceutically acceptable salt.  You know, they

14     dropped it.

15            And then the opening claim construction brief

16     was filed on June 22 of 2018, DE Docket Entry 206, and claim

17     104 was not added to the infringement contentions until

18     August 1 of 2008, and the rebuttal brief was due on August

19     3.  And plaintiffs assured us in connection with this

20     addition, this additional claim, that the insertion of claim

21     104 did not raise any claim construction issues.  But then,

22     again, they want -- now they want to change their mind on

23     that representation.

24            So we think that your Court's claim construction

25     order, which talks about compound being a salting compound,

1  and the plain ordinary meaning, all the witnesses testified

2  about it, disposes of this particular question.

3          So now let's take a look at these claims.  And,

4  interesting, when you look at this, the first thing you

5  notice is that "pharmaceutically acceptable" does not

6  describe apixaban but only the salt.  There's no requirement

7  that apixaban is pharmaceutically acceptable.  Only the salt

8  has to be pharmaceutically acceptable.  And,

9          There's no promise that any of the primary

10  compounds that are claimed throughout the patent are

11  pharmaceutically acceptable.  Rather, pharmaceutically

12  acceptable modifies only the salt portion of the claim.

13          Now, we have been through this many times, but

14  we all know that the Court construed the term

15  "pharmaceutically acceptable salts;" and can we turn to the

16  next slide, DX-20.

17          I can talk to Your Honor about the law, but I --

18  Your Honor is familiar with the law of enablement, so,

19  talking about the *Idenix* case and whatnot.

20          But the Court's claim construction, we have

21  seen it many times, but the Court's claim construction was

22  taken from the patent and from the section that described

23  pharmaceutically acceptable.  And, Your Honor, I

24  respectfully suggest that most, if not all the evidence that

25  plaintiffs have presented on this issue, misses the point

1    entirely.  It seems like that they're arguing the claim

2    construction that they first proposed and then abandoned, or

3    the one that the Court rejected.

4              Now, the definition that the Court adopted came

5    from the specification at column 16, lines 40 to 47.

6              Let's pull that up on, I think it's on

7    DDX-18-21.

8              And that's -- at the first top of it, it says:

9    "The phrase 'pharmaceutically acceptable' is employed herein

10   to refer to those compounds, materials, compositions and/or

11   dosage forms."

12             This is where the claim term came from.  And,

13             Then the next paragraph that followed was the

14   definition of salts.

15             And Your Honor, in claim construction, merged

16   these two definitions to come up with a claim construction

17   that we saw.

18             But pharmaceutically acceptable in the patent

19   doesn't just refer to salts.  It refers to compounds,

20   materials, compositions, and/or dosage forms.  So when they

21   say the compound is pharmaceutically acceptable, they're

22   talking about -- this same definition applies.

23             When they're talking about materials, they're

24   talking about the same definition applies.

25             And later in the patent, and even in some of the

1  claims, I think, pharmaceutically acceptable also modifies

2  carriers and intercarriers.

3       So you have to look at this definition in the

4  context of what it was used to modify in the patent.  And

5  all of the things that the plaintiffs are kind of focusing

6  on I think are missing the import and meaning of this entire

7  passage.

8       Now, the definition requires an examination.

9  Now the -- note the Court -- the Court has not said what

10  this term claim construction -- what the actual -- put more

11  meat on the bones or so, I would say, of what the definition

12  was other than to say this was the definition.

13       And the definition, we think, requires an

14  examination considering the required factors to determine

15  whether any apixaban salts were enabled or possessed as of

16  2001 that would be suitable for use in the pharmaceutical

17  context.

18       That is what we think the definition means.

19  Would these salts be suitable for use?

20       Now, in the first question, is, did the

21  inventors enable one skilled in the art to make and use

22  pharmaceutically acceptable salt apixaban?

23       Now, the Court knows, "enablement" and the

24  evidence, we think, is overwhelming that the inventors did

25  not provide the required information.

1        Now, the evidence could not be clearer that no

2  one thought that any salts of apixaban would be suitable for

3  use in the pharmaceutical context.

4        If we turn to the next slide, DTX-18-22.

5        Defendants presented overwhelming evidence

6  that -- through internal documents indicating that apixaban

7  was considered neutral, non-ionizable, and that there was no

8  salt form.

9        And if we go to the next slide.

10        This is their -- they told the FDA that there

11  was no salt form.

12        Go to the next slide.

13        And there was published scientific literature

14  indicating apixaban was considered neutral, non-ionizable,

15  and that there was no salt form.

16        There could not be more evidence on this point.

17  And plaintiffs efforts to kind of explain away all these as

18  being related to solubility is just unconvincing.

19        There is no contemporaneous document that they

20  can cite to that supports the argument that they're making.

21        THE COURT:  What is the best example you have

22  that someone was making a broad statement outside of the

23  context to try to improve solubility?

24        MR. MIZERK:  Well, I think -- I think -- I'll

25  answer the question two ways.

```
 1              I think first, saying that they can't use a salt

 2   or the -- is a way to say that solubility can't be improved,

 3   it's kind of the chicken and the egg.  It's like they're

 4   saying, hey, you know, we can't improve the solubility with

 5   a salt form because we can't make a salt form.

 6              It's not saying that -- it's not limiting it

 7   saying we can't make a salt only for purposes of improving

 8   solubility.  I don't think that any of the documents, if you

 9   look at them, can be read in the way that plaintiffs are

10   stating.

11              Dr. Buckton said so during the course of his

12   examination.

13              The e-mail we saw yesterday to answer your

14   second -- your question I think explains that it was not --

15   it was -- it was written in a very absolute way saying that

16   this is a property of the compound that is not negotiable.

17   It's -- it may be the property of the chemicals means

18   there's no salt form and it is not ionizable.

19              And I don't think really, if you look at the

20   evidence that even they presented, we get to Dr. Jacobsen's

21   test, I don't think it's really different.  It's like Dr.

22   Jacobsen did some things that I just think that people in

23   the pharmaceutical industry wouldn't think is appropriate.

24              Now, only people who ever said that apixaban is

25   ionizable or could have been made into a salt are people who
```

1 have been paid or prepped by BMS attorneys in this case.

2         Every single piece of evidence that they pointed

3 to is from somebody who was either paid to represent them in

4 this case or prepared for a deposition after we already

5 identified this issue.

6         They have -- they can't point to a single piece

7 of documentary evidence to support their position.

8         Nobody ever clarified this statement that --

9 these statements that were made in so much different

10 places in the way that plaintiffs are suggesting.

11         Now, we also presented unrebutted scientific

12 evidence that it has never been done.  That no one has ever

13 used a compound with a pKa similar to apixaban in a salt

14 form in a pharmaceutical application.

15         Now, we didn't make this up.  This was raised in

16 the literature.  The Burne reference, DTX-574, and

17 Stevenson, and I think it's the Wei reference.  But DTX-7 --

18 575, and Dr. Buckton and Dr. Scheidt presented the material

19 and the slide.

20         Let's go to DDX-8-25.

21         And I think we refer to this throughout the case

22 as the green zone.  This green zone was not something that

23 Dr. Scheidt made up.  This was something that they -- that

24 was -- that was established by the literature and what was

25 out there.

```
 1              So we believe that the apixaban salts would have
 2    been unstable, you couldn't make a pharmaceutical product
 3    with them, they could not have been purified, they could not
 4    be formulated, they could not be placed in contact with
 5    human tissue, and the list goes on.  And,
 6              I think the most remarkable -- the most
 7    important piece of evidence -- and I'll move on because I
 8    know my codefendants would like to have some time as well.
 9              When they hired Dr. Jacobsen, they brought him
10    all the way here from Harvard to talk about the salts he
11    prepared.
12              Did they ever -- they qualified him as an
13    organic and medicinal chemist.  Did they ever -- and did
14    they ever bother to ask Dr. Jacobsen if the salts that he
15    made could be used in medicine?  They never did.
16              They cut him off.  They wouldn't let him testify
17    about that, about his opinion on that question.
18              He only said he made them.
19              THE COURT:  What about the argument that I only
20    heard from maybe one clinician about whether these salts,
21    you know, on the risk/benefit ratio, is that correct or
22    incorrect?
23              MR. MIZERK:  Well, it's correct that you only
24    heard people talk about the risk/benefit ratio of the salts
25    because in order to talk about the risk/benefit ratio of the
```

1  salt, they have to make it into an application where they

2  can be administered.  And all the evidence is overwhelming

3  that they can never make that far because of you take them

4  out of that little bubble that you saw in the picture that

5  doctor -- that Dr. Jacobsen had, they would completely fall

6  apart.  They would completely disproportionate.

7          They even started to fall apart in that bubble

8  because there was a little bit of water or moisture in some

9  of the solvents that they were with sitting in.

10          They actually were -- the salts were all sitting

11  in a solvent, precipitated on the bottom of the flask, and

12  had never been dried or removed from that solid.

13          And if you remove them from the solid, took them

14  out of that flask, they would immediately disproportionate

15  and be unusable.

16          THE COURT:  It's not clear to me why I couldn't

17  have heard other competing opinions as to the pharmaceutical

18  acceptability of the salts, even if you maintain that they

19  can't be made.

20          MR. MIZERK:  Well, I mean, the risk/benefit

21  ratio that Dr. Kowey, for example, talked about, he

22  relied -- and all their experts who did the risk/benefit

23  ratio thing, they only thing they relied on was the apixaban

24  label -- or the Eliquis label.  That wasn't proved until

25  2012.  That wasn't information that was even available to a

1    person of ordinary skill in the art in 2001.

2              So all the information that Dr. Kowey relied on

3    was over ten years too late.  There was no information about

4    the risk/benefit ratio of apixaban back in 2001 when these

5    things were being formulated, and when this patent was --

6    well, this was still experiment.

7              So I don't know how we could make -- do the --

8    that's why I think they missed the mark on this issue

9    because there wasn't all this information about the

10   risk/benefit ratio back in 2001.

11             And you would have to be -- administer this

12   drug -- and I will say there is a salt in most cases.  Once

13   it disassociates, it will become apixaban and the other --

14   the cation.  But they have to provide information about the

15   salt itself.  The salt itself has to be pharmaceutically

16   acceptable.  And if you can't even take the salt out of the

17   test-tube, then how can it be useful for a pharmaceutical

18   application.

19             Your Honor, if Your Honor has any other

20   questions, I have other things to talk about.  I could talk

21   about the rings in doctor -- the questions Your Honor had

22   about the dispute between Dr. MacMillan.  All I can say is

23   that the question really is about the E ring.  Your Honor

24   asked about it.  MacMillan -- Dr. MacMillan was asked about

25   it.  It's 1 to 2 R.

1    There were over 36 compounds that were

2    identified by Dr. Heathcock that didn't meet that limitation

3    if you adopted Dr. MacMillan's definition about -- because

4    they didn't have 1 or 2 R on it.  They had 0.  They had all

5    hydrogens.

6    And that's what Dr. MacMillan was getting

7    wrapped up like a pretzel trying to avoid the fact that

8    their -- his claim construction is -- his claim construction

9    invalidates or it doesn't cover most -- at least 36

10   compounds in claim 3, another four in claim 8 that are

11   dependent on claim 1.

12   So what they're trying to say is, we'll save

13   apixaban, but apixaban is only one of many, many compounds

14   that are claimed here.  It's not the only thing that this

15   patent is about.  It's actually one of about 100 things that

16   this patent is about.  And they're trying to save apixaban

17   and throw the rest of the patent overboard.

18   The fact of the matter is Dr. Heathcock is one

19   of the best professors in the country.  He explained how

20   patent terms should be read.  And if you read this thing

21   the way it's written, because they have only hydrogens can

22   be substituted, and the Markush group has hydrogens in the

23   Markush group, Dr. MacMillan's position makes no sense.

24   I mean, Dr. MacMillan had to write a patent

25   claim.  He used the exact same kind of technology that

1    Dr. Heathcock said what a person skilled in the art would

2    do.

3                   So under the *Ranbaxy* case, the patent does fail

4    for that reason.

5                   So we'll address all these in our brief, but if

6    Your Honor has anymore questions, I appreciate them.

7                   THE COURT:  I think I will let your colleagues

8    have their chance to talk during the limited time remaining.

9                   MR. MIZERK:  Thank you.

10                  THE COURT:  Thank you very much.

11                  Good afternoon.

12                  MR. KOCHANSKI:  Good afternoon, Your Honor.

13   Paul Kochanski for Sunshine Lake.

14                  Again, much like SigmaPharm does, I want to

15   thank the Court for its indulgence with respect to these

16   last two-and-a-half weeks of trial, and the cooperation

17   between counsel.

18                  Because we're limited on time, Your Honor, I'm

19   not going to repeat a lot that SigmaPharm's counsel said

20   about the general aspects of apixaban and the like, but

21   really direct my attention to Sunshine Lake at this time.

22                  As the Court has heard over the last couple of

23   weeks with respect to Sunshine Lake, there are three issues

24   that must be determined which plaintiffs must prove that

25   Sunshine Lake solid pharmaceutical composition has.

1    Much like SigmaPharm -- if we can put up

2    DDX-11-13.

3    Much like SigmaPharm, the three issues are, one

4    to prove the existence of apixaban in particulate form;

5    To prove that the particulate apixaban is

6    crystalline; and

7    To prove that the particles have a particle size

8    distribution or a $D_{90}$ of equal to or less than 89 microns.

9    As to these three elements, the plaintiffs have

10   failed to show any physical or empirical evidence regarding

11   two out of the three.

12   That being the presence of particles, apixaban

13   particles in Sunshine Lake's pharmaceutical composition, and

14   the particle size issue.

15   To the extent the plaintiffs rely on actual

16   evidence regarding the third element, that being

17   crystallinity, they have failed to consider the entirety of

18   the evidence, or the entirety of the evidence presented by

19   Sunshine Lake or by Dr. Atwood.

20   In this regard, Dr. Atwood has admitted he did

21   no physical testing of Sunshine Lake's tablets to determine

22   the presence of particles, or any testing with respect to

23   determining the particle size.

24   Rather, he has only offered, as stated is a

25   theoretical hypothesis, that based upon the Sunshine Lake

manufacturing process, pockets are formed in the povidone

apixaban layer allowing small apixaban structures to develop

within those pockets.

However, Dr. Atwood has stated that he has never

seen, measured, or otherwise identified these theoretical

pockets, or identified the fact that there is crystalline

apixaban therein.

And as Dr. Brittain, however, testified,

commenting on Dr. Atwood's theoretical model, we go to ...

"But the problem, as I've put on the bottom

here, is that that model is for chemically pure substances,

and, in fact, we do not have a chemically pure substance in

either in the Sunshine Lake product because the apixaban is

dried down in the presence of povidone.  And we know the

presence of povidone, which is a well-known nucleation

and crystallization inhibitor, we know that the chemical

tendency of povidone apixaban solid solution is to exist in

the form of an amorphous dispersion."

Consistent with this understanding of the

process, evidence provided by Dr. Brittain showed that

rapidly removing solvent from the apixaban and povidone

solution will result in the solid solution where individual

apixaban molecules, I'm not talking about particles,

molecules are separate from one another by a povidone

polymer matrix.

1    Dr. Brittain testified to that on page 1063 and

2 1065 of the transcript.

3    This process that Dr. Brittain identified is

4 exactly what is done in the Sunshine Lake's manufacturing

5 process.  It creates a solution of povidone and apixaban in

6 glacial acetic acid wherein both elements, povidone and

7 apixaban, are dissolved and they lose their crystal

8 structure.

9    It then sprays that on excipients, which is a

10 fast-drying technique, where the matrix, the amorphous

11 matrix, the amorphous dispersion, is a layer on that, much

12 like what he talked about here.

13    There are no particles.

14    Dr. Brittain further testified with respect to

15 particle size.  He said, and we'll put up slide 3.

16    "Well, particle size is" -- "really is

17 indefinable at this point because apixaban is dissolved in

18 the povidone layer in the form of a dispersion, and all of

19 the evidence that has been collected over the years about

20 amorphous dispersions, it says that instead of particulate

21 drug substance in dispersions, you have actual individual

22 molecules in a dispersion, which is very critical."

23    And that Dr. Brittain testified at page 1102 in

24 the transcript.

25    Similarly, as with the issues of particles,

1       Dr. Atwood offered no physical evidence as to the $D_{90}$ or

2       particle size.

3               Dr. Chambliss and Dr. Myerson yesterday

4       testified that a POSA would have been aware of multiple

5       methods for measuring particle size to determine the $D_{90}$ of

6       the API in the pharmaceutical composition.

7               However, Dr. Atwood clearly admitted that he

8       performed no technique to measure particle size, and that

9       was at page 497 of the transcript.

10              For these two reasons alone, with respect to

11      the presence of particles and particle size, Sunshine Lake

12      submits that plaintiffs have not met their burden on

13      infringement.  They haven't shown particles with respect to

14      Sunshine Lake's product, nor have they shown the $D_{90}$, the

15      particle size of Sunshine Lake's products.

16              However, we have to go on.

17              With respect to the crystallinity issues,

18      plaintiffs also fall short of their burden in demonstrating

19      that Sunshine Lake pharmaceutical composition includes

20      crystalline apixaban.

21              Plaintiffs and their expert, Dr. Jerry Atwood,

22      failed to consider the totality of Dr. Atwood's work, and,

23      instead, relied upon what we could best say is selected

24      incomplete portions to draw broad conclusions.

25              In contrast, although Sunshine Lake did not have

1    the burden to prove that there was no crystalline apixaban

2    in its product, Sunshine Lake took the initiative in having

3    its expert, Dr. Brittain, undertake an XRPD analysis of the

4    Sunshine Lake 2.5-milligram and 5-milligram tablets.  And we

5    will discuss that in a second.

6            Affirmatively now, for Sunshine Lake,

7    Dr. Brittain also performed a detailed analysis of all of

8    Dr. Atwood's data and results to demonstrate that the whole

9    of the XRPD work by Dr. Atwood really support Dr. Brittain's

10   conclusions.

11           If we can put up slide 4, please.

12           As Dr. Brittain explained during his testimony,

13   in considering whether Sunshine Lake's apixaban tablets

14   included the six characteristic peaks, which are shown

15   as set forth in Table 2 of the '945 patent, Dr. Brittain

16   testified that he ran five scans using five Sunshine Lake

17   crushed tablets and digitally averaged those scans.

18           I heard counsel this morning argue that he used

19   insensitive tests, or, you know, these tests wouldn't work.

20           Well, that's not the case.  Dr. Brittain also

21   testified, which is very important, that digital averaging

22   is an equivalent method to use of long count times which was

23   the method used by Dr. Atwood.

24           And, Dr. Brittain, who is a known expert in

25   XRPD, said that both are effective to increase sensitivity

1  by increasing signal-to-noise ratio.

2          That is very important because it's by

3  increasing signal-to-noise ratio that peaks appear even at

4  lower limits.

5          The whole idea is to limit noise.

6          Although Dr. Brittain agreed, and as plaintiffs

7  counsel stated, that count times are an appropriate process

8  to detect the small amount of apixaban, Dr. Brittain also

9  testified that using scan averaging or digital averaging

10  also increased sensitivity so as to detect a small amount of

11  a crystal substance such as apixaban.

12          In analyzing the full scan of both the 2.5

13  and -- Dr. Brittain also did the 5-milligram tablets,

14  Dr. Brittain, as he testified with respect to the scan shown

15  on DDX-11-17, and with respect to his expanded scans, that

16  he found no authentic peaks within the red boxes on any of

17  the six characteristic locations identified in the '945

18  patent.

19          Again, looking at slide 5.

20          "What I concluded as a result of my XRPD

21  analysis, that neither the 2.5 milligram Sunshine Lake

22  tablet formulation nor the 5-milligram Sunshine Lake

23  apixaban tablet formulation had any peaks that could

24  indicate the presence of crystalline form in those

25  formulations".

1    Again, he took affirmative steps to find the

2  peaks.  He's not trying to hide anything because Sunshine

3  Lake did not have that obligation.

4    As also Dr. Brittain testified, this result was

5  not surprising since, based upon the disclosure in DTX-503,

6  the much-talked about '386 patent publication, he did not

7  anticipate the formation of crystalline apixaban.

8    As he testified with respect to the '386 patent

9  application, he answered:

10    "Answer:  Well, looking at the Sunshine Lake

11  process, which is clearly designed to make an amorphous

12  solid dispersion on the surface of the particles, and then

13  looking at the '386 application, which is another way to

14  make amorphous solvent dispersion of apixaban in a very

15  analogous manner, the conclusions that I reached as a result

16  of my experimental studies are exactly what I would have

17  expected based upon what was disclosed in the '386

18  application."

19    What did the '386 application disclose?  It

20  disclosed the combination of povidone and apixaban put into

21  an organic solvent and that organic solvent being driven off

22  to dry and form the amorphous dispersion.

23    For Sunshine Lake, they take apixaban and

24  povidone and dissolve it in glacial acetic acid, a volatile

25  organic solvent, and, again, get the same thing:  An

1  amorphous dispersion or solid solution as testified to by

2  Dr. Brittain.

3           As to -- let's turn now to Dr. Atwood's data and

4  what he show.

5           And let's look at DDX-11-25.

6           As to Dr. Brittain's analysis of Dr. Atwood's

7  data, Dr. Brittain initially reviewed Dr. Atwood's XRPD scan

8  of Sunshine Lake's API.

9           Dr. Brittain testified about his operations as

10  follows.  If we can look at the next slide.

11           "Question:  Okay.  And just looking at

12  DDX-11-25" -- and we can go back to DDX-11-25 --

13  "approximately how many" -- okay.  Yes -- "approximately how

14  many peaks are present in Dr. Atwood's scan of Sunshine

15  Lake's API?"

16           Dr. Brittain answered:

17           "Answer:  Well, in the region that we're showing

18  here, it is probably anywhere between 20 and 25 peaks that

19  are present.

20           "Question:  And, Dr. Brittain, which peaks,

21  looking at the scan, which peaks did Dr. Atwood rely upon in

22  analyzing Sunshine Lake's tablets?

23           "Answer:  Dr. Atwood relies on either the

24  presence or absence of three peaks.

25           "Question:  And which of those peaks in the API

1    did Dr. Atwood find to be the most intense?

2              "Answer:  Oh, you can see from the plot here

3    that the peak at the 16.9 degrees is the most intense."

4              But what also is important is what Dr. Atwood

5    relied upon is a peak at 12.3, is a peak at 27.1, and a peak

6    at 16.9, which we will come back to, which is the most

7    intense peak.

8              Going to slide 9, please.

9              Here again, looking at DDX-11-26, as

10   Dr. Brittain explained, this demonstrative was an overlay of

11   full scans of Dr. Brittain's 2.5-milligram XRPD pattern

12   which is DTX-504.9, and Dr. Atwood's two full scans of the

13   2.5-milligram apixaban tablet, DTX-526 at 16 to 32, and 37

14   to 55, and PTX-960.2.

15             In looking at this scan, which is the overlay,

16   which shows the equivalence of the peaks and how

17   complementary they are, Dr. Brittain testified:  "When you

18   study these diagrams, it's definitely clear that there are

19   no peaks at angles of 12.3, 16.9 or 27.1."

20             Dr. Brittain went further on to say, okay, he

21   found no peaks here, but he was going to do a deeper

22   analysis.  He was going to look at Dr. Atwood's slow scans.

23             In that regard, rather than just looking at the

24   single selected scan per region that Dr. Atwood relied upon

25   here at trial, to show infringement, Dr. Brittain analyzed

```
 1    Dr. Atwood's data as a whole, all the scans Dr. Atwood did

 2    at each specific region where he would take into

 3    consideration all of the scans and base his conclusion on

 4    the entirety of Dr. Atwood's evidence, which wasn't

 5    presented by Dr. Atwood.

 6                    If we could go to slide 11, please.

 7                    Using Dr. Atwood's electronic data, which

 8    Dr. Brittain testified is the most accurate, Dr. Brittain

 9    superimposed the four scans Dr. Atwood did to determine if

10    there was a characteristic peak at 16.9 degrees 2-theta.

11                    In discussing the superimposed peaks,

12    Dr. Brittain testified as to the importance of considering

13    all the available scans, and concluded with respect to all

14    four scans with respect to the 16.9-degree 2-theta peak that

15    if we go to -- well, if there's a peak in there as

16    Dr. Atwood said, then that peak would have to be present in

17    all four of the scans.

18                    All we see here is noise.

19                    He went further on to state:  "Reproducibility

20    basically says that if you measure something four times,"

21    which Dr. Atwood did, "you should get the same answer four

22    times.  And when I look at this overlay of data, there's

23    lots of noise, but I do not see any reproducible features in

24    there that I could assign and attribute to the presence of a

25    genuine XRPD peak."
```

1    And he confirmed that this information related

2    to the 16.9-degree 2-theta point.

3    Indeed, as Dr. Brittain also testified, if there

4    was a crystalline peak in Sunshine Lake product, the absence

5    of a peak at 16.9 would be -- would be unusual in light of

6    the fact that it is the most intense peak in Dr. Atwood's

7    API scan.

8    As Dr. Brittain's stated -- and if we could put

9    slide -- well, let me just recite his testimony because of

10   time.

11   "Well, 16.9 degrees 2-theta represents our best

12   possible chance to see a crystalline apixaban peak because,

13   as Dr. Atwood's diffraction pattern shows, it's the most

14   intense peak inherent to the N-1 crystal structure.  So if

15   you are going to see any peak at all in the diffraction

16   pattern that would be attributed to apixaban from N-1, it's

17   going to be a peak at 16.9 degrees."

18   Again, looking at the overlay, we do not see a

19   16.9 peak.

20   The second characteristic peak that Dr. Atwood

21   analyzed was a peak at 27.1 degrees 2-theta.

22   In reaching his conclusion, Dr. Atwood

23   concluded:  An overlay of three successful XRPD scans in

24   that region.  And, again, Dr. Atwood relied on only one of

25   those scans.

1          Dr. Brittain, once again, based upon his

2    superimposing scans, analyzed the entirety of Dr. Atwood's

3    available data and came to the conclusion that the single

4    peak that Dr. Atwood relied upon and his data as a whole

5    demonstrate that there is noise and not a reproducible peak

6    at 27.1 degrees 2-theta.

7          One thing that should be pointed out, and here,

8    plaintiffs stated in their closing, that the 12. -- let me

9    get to the 12.4 peak real quickly first.

10         Slide 15.

11         The last peak Dr. Atwood identified was a peak

12   at 12.4 degrees 2-theta.  Dr. Brittain agreed there was a

13   genuine peak at 12.44 degrees 2-theta.  That's not

14   disputable.

15         But Dr. Brittain disagreed that the peak was a

16   characteristic crystalline peak of apixaban.  He, instead,

17   attributed that peak to the presence of lactose anhydrous

18   contaminated with lactose monohydrate.

19         As Dr. Brittain testified, lactose anhydride is

20   a component of Sunshine Lake's formulation.

21         Also, as Dr. Brittain, it is well known that

22   lactose anhydrous will spontaneously convert to lactose

23   monohydrate if exposed to moisture.  This is important in

24   light of Dr. Atwood's use of one crushed tablet in all of

25   his scans conducted over the course of several months.

```
 1              Let's finish up.  I can give my other defendant
 2   a little time.
 3              THE COURT:  Just so you know, defendants have
 4   all together just a little over 20 minutes left.
 5              MR. KOCHANSKI:  Yes.  So let me address one
 6   thing and we can address the other things in the brief.
 7              With respect to the issue of counsel --
 8   plaintiffs' counsel talking about the one scan showing a
 9   17.1-degree 2-theta peak in a lab batch.  And that is
10   DTX-996.
11              Again, what should be remembered and what
12   Dr. Chen testified to and what the evidence shows, DTX-996
13   shows that it was only that lab batch that showed the
14   17.1-degree peak, but no other test that was done, XRPD, on
15   the exhibit batches, which are the manufacturing batches,
16   done at zero time, two-month accelerated, three months,
17   showed any crystalline structure.
18              Forty additional XRPD scans were done, and 39 of
19   them, except for the lab batch, showed that the apixaban in
20   Sunshine Lake's product was amorphous.
21              Let me leave some time for my other counsel.
22              THE COURT:  Okay, you may.
23              MR. KOCHANSKI:  Thank you, Your Honor.
24              MR. PEJIC:  May I approach?
25              THE COURT:  Yes.
```

```
 1                    (PowerPoint slides passed forward.)
 2                    THE COURT:  Good afternoon.  You can go ahead.
 3                    MS. BROWNING:  Thank you, I appreciate that.
 4               May it please the Court, my name is Jill
 5      Browning.  I'm representing defendant Unichem here.  And we
 6      extend our appreciation to the Court and staff as well.
 7      And,
 8               We also echo the sentiments regarding the
 9      importance of this matter to our client.
10               Time being of the essence, I'm just going to
11      jump right into it.
12               If we can go to slide 2.
13               We believe the evidence at trial establishes
14      that the products made in accordance with the Unichem ANDA
15      do not infringe.  We also believe that the evidence has
16      established that the claims are invalid because the '945
17      patent specification does not describe or enable the full
18      scope of the claim as the plaintiffs have asserted them.
19               If we can go to slide 3.
20               A person skilled in the art reading claim 12 in
21      view of the '945 patent specification would understand the
22      plain and ordinary meaning of the claim term certainly
23      includes measuring the $D_{90}$ of the apixaban drug substance
24      before it is formulated into a tablet.
25               To be clear, our position is consistent with the
```

1    Court's claim construction order which concluded that claim

2    12 was not limited to measuring the $D_{90}$ of the bulk apixaban

3    by laser light scattering, but it certainly includes this

4    method.

5              Dr. Berkland, on the other hand -- if we can go

6    to slide 4 -- he contradicts the claims -- Court's

7    construction opinion because he testified that the scope of

8    claim 12 is limited to only assessing the $D_{90}$ of the apixaban

9    in a finished pharmaceutical composition.  A conclusion that

10   is completely out of step with the '945 patent disclosure

11   in that it eliminates the sole way in which the $D_{90}$ was

12   determined by the '945 patent.

13             We do not think the Court's construction is so

14   limited.

15             If we can go to slide 5.

16             Let's turn to the evidence that was presented in

17   this case that does show noninfringement.

18             If we can go to slide 6.

19             First of all, we have the Unichem ANDA itself.

20   The Court was presented with evidence that the ANDA

21   specification requires the apixaban to have a $D_{90}$ between 150

22   and 1,000.

23             And, in fact, the testing of the apixaban

24   conformed to that specification, showing that a $D_{90}$ of the

25   apixaban is between 416 and 509 microns.

1     Going to slide 7.

2          The Court was also presented with evidence of

3     testing that Dr. Genck had performed of the apixaban, and

4     here again, the evidence shows that the $D_{90}$ of the Unichem

5     product is significantly higher than the 89 microns or less

6     required by the claim.

7          And what did Berkland -- Dr. Berkland do to

8     assess infringement?

9          If we can go to slide 8.

10         Well, obviously I can tell you what he did not

11    do.  He did not determine the $D_{90}$ of Unichem's apixaban at

12    any stage of processing.  He did not determine the $D_{90}$ of the

13    apixaban before it was incorporated into a tablet, although

14    his testimony as shown in this slide 8 confirmed that his

15    observations are consistent with Unichem's noninfringement

16    evidence in that he found the API starting material to be

17    quite large, on the order of several hundred microns.

18         Going to slide 9.

19         Dr. Berkland, by his own admission, and, of

20    course, Dr. Myerson admitted this as well, he did not

21    determine the $D_{90}$ of the apixaban particles after the

22    apixaban was incorporated into a tablet.  If Dr. Berkland

23    could have calculated the $D_{90}$, then it seems he would have,

24    and certainly he should have, given that it was the

25    plaintiffs that had the burden of proving infringement.

1    But he didn't.

2    One may ask why the party with the burden of

3    proof did not perform this calculation, especially, as the

4    plaintiffs have argued, it is so simple.  And how do you

5    know if the $D_{90}$ is above or below if you don't actually

6    calculate it?

7    Just to address one thing that the plaintiffs

8    had said in their opening, that the testing that we

9    performed on the Unichem ANDA bulk substance is irrelevant,

10   I think that's a very curious position in view of the

11   disclosure of the patent and the state of the art.

12   The entire premise of the '945 patent and what

13   it alleges is inventive is based on the correlation between

14   the $D_{90}$ of the apixaban before tableting compared to the

15   apixaban released from the tablet.

16   This is the standard the patent set forth.  It

17   is the only standard.

18   Measuring the bulk substance is also the

19   industry standard.

20   The '945 patent does not describe or disclose

21   the $D_{90}$ of the apixaban in the finished tablet.  And neither

22   the '945 patent nor a single publication or reference

23   calculates the $D_{90}$ of an API once it is tableted.

24   Moving on to slide 10.

25   The method employed by Dr. Berkland, what we

1     have referred to throughout as the Berkland method, can

2     only be characterized as something that is highly irregular.

3           The evidence at trial overwhelmingly established

4     that the Berkland method finds no basis in any peer

5     publications or anywhere else in the art.

6           Dr. Myerson admitted that none of the articles

7     he discussed or relied upon in his report include any

8     calculation of a $D_{90}$ of an API that had already been

9     formulated into a finished dosage form.

10          Even Dr. Berkland admits that he never

11    determined or attempted to determine the $D_{90}$ of an API

12    that was already formulated into a tablet except for this

13    litigation.

14          There is no evidence cited during the entirety

15    of the trial that the Berkland method or any method of

16    determining the $D_{90}$ of an API that was already tableted was

17    ever disclosed or discussed in any reference used by anyone

18    of skill in the art in 2010 or even today.

19          In fact, the evidence definitively shows that no

20    such publication exists.

21          Dr. Genck testified that a person of skill in

22    the art in 2010, or even today, would not consider it

23    possible to measure the $D_{90}$ of an API based on granules

24    shaved from a finished tablet, and Dr. Chambliss testified

25    that he had never heard of anybody trying to determine this

1    $D_{90}$ of an API after formulated into a finished composition.

2    Plain and simple, the evidence shows that the

3    Berkland method was litigation inspired and was created in

4    2018 or 2019 by a person who far exceeds the credentials of

5    a person of skill in the art in 2010.

6    Moving to slide 11.

7    It was created by a person, moreover, who admits

8    he did not consult with the '945 patent when designing the

9    Berkland method.

10   Dr. Berkland's method is completely divorced

11   from the '945 patent.

12   Dr. Berkland's method is also unreliable for

13   many reasons.

14   Go to slide 12.

15   He only observed a statistically insignificant

16   number of granules that contained an insignificant number of

17   particles.

18   He did not separate these particles, by the way,

19   from the excipient.  He looked at a total of five tablets,

20   all of which were 5-milligram tablets from three batches,

21   and he observed a total of 68 granules.

22   Even before determining the particle size, the

23   SEM method employed by Dr. Berkland is recognized in the

24   art -- or rather the SEM method employed by Dr. Berkland is

25   recognized in the art as being susceptible to inaccuracy

because of the limited two dimensions, it doesn't measure

volume, and also it had a very small sample size, it can be

very subjective, you can only count very few particles, and

particularly where you don't supplement the method with

computers or automated methods, none of which were employed

by Dr. Berkland in this case.

THE COURT:  How do we know it was not

statistically significant?

MS. BROWNING:  Because he never -- if we go to

slide 13, he never provided an estimate with respect to how

many granules that could be in the tablets or certainly not

how many red dots that he associated or equated with the

particle, he never determined how many those are.

If you don't know what the total number is, how

can you possibly determine whether what you have observed is

representative of what is in the tablet.

THE COURT:  Did anyone say it was not

statistically significant, or is it just an absence of

evidence that it is statistically significant?

MS. BROWNING:  There is an absence of evidence,

but also Dr. Genck testified that it was a statistically

insignificant number of granules that he viewed.

Dr. Berkland, moreover, admitted that the $D_{50}$

value of the granules in the Unichem product is about

150 microns, meaning half the granules by weight would be

1    less, but then the other half would be more.  There's a lot

2    of large granules Dr. Berkland did not observe.

3              It is not disputed that the SEM method used by

4    Dr. Berkland can only measure one to two microns below the

5    surface, so he also did not observe any apixaban particles

6    that may be embedded within the granules.

7              And Dr. Myerson confirmed in his testimony, the

8    Berkland method did not include any controls to ensure that

9    his sampling method did not impact the size of the apixaban

10   particles.

11             Dr. Berkland simply, as he testified, counted on

12   his observations being consistent with his expectations.

13             Going to slide 14.

14             Moving on to the validity of the asserted claim.

15             The claims are invalid for failing to meet the

16   written description and the enablement requirements of

17   Section 112.

18             Taking the written description first, the test

19   is whether the disclosure of the patent specification

20   reasonably conveys to one skilled in the art whether the

21   inventor had possession of the claimed subject matter.

22             It is black letter law that a claim can be

23   interpreted so broadly as to render the claims invalid under

24   the written description requirement.

25             Just because a claim has been construed with the

1    broad scope does not mean that the patent specification can

2    cash that check, to so to speak.

3              Here, we have that exact same situation.  The

4    '945 patent specification simply cannot support the scope of

5    the claims as now asserted.

6              As the Federal Circuit noted in 2010 decision,

7    *Eli Lilly v Teva*, found at 619 F3d 1329, a case remarkably

8    on all fours with the present case, even though Lilly won

9    on claim construction, the District Court ruled that the

10   breadth of the limitation rendered the particle size patent

11   invalid for failure to comply with the written description

12   requirement of 112.

13             In the *Lilly/Teva* case, the asserted claims were

14   construed to cover the mean particle size both before and

15   after formulations, but the patent specification was found

16   not to support this scope because a person skilled in the

17   art reading the patent would not know how to extract the API

18   from the formulation to determine the particle size, and,

19   likewise, would not have known what the particle size was in

20   the finished tablet.

21             In the instant case, the clear and convincing

22   evidence shows that Drs. Genck, Chambliss, and Myerson all

23   testified that the '945 patent only describes measuring the

24   $D_{90}$ of the apixaban before its formulated into a tablet,

25   which, as Dr. Chambliss testified, is the industry standard.

1    Dr. Berkland was simply unaware of the '945

2  patent and what it disclosed, and he testified that he did

3  not conduct the analysis of the '945 patent to determine

4  whether the patent referred to determining the $D_{90}$ of the

5  apixaban either before or after it was tableted.

6    The '945 patent, as I already mentioned before,

7  so I will go quickly, it correlates the $D_{90}$ of the apixaban

8  particles before tableting with the dissolution rate of the

9  apixaban after tableting.

10    That is the whole reason, basically, that the

11 plaintiffs assume that they have created something inventive

12 here.

13    The '945 patent does not describe measuring the

14 $D_{90}$ of the apixaban either in or extracted from a finished

15 tablet.  Again, Drs. Genck, Chambliss, and Myerson all agree

16 on this point, and this is consistent with the testimony of

17 Dr. Patel, who is one of Bristol-Myers Squibb Rule 30(b)(6)

18 witness, and also an inventor in this case, and he testified

19 that they only assess the $D_{90}$ particle size of the apixaban

20 in the API before it was formulated into a tablet, and there

21 were no attempts to identify the particle size of the API

22 once it was formed into a finished tablet.

23    Further to this, it is not even disputed by

24 Dr. Berkland that the '945 patent does not describe or

25 disclose the Berkland method.

1    Moreover, even if the Berkland method could

2    determine the $D_{90}$, which it cannot, and even if it were

3    known in 2010, which, of course, it was not, the Berkland

4    method gets you nowhere because it would not work for the

5    formulations disclosed in the '945 patents, at least for

6    those excipients that include povidone because that includes

7    nitrogen.

8    So just like apixaban, there would be no hope of

9    distinguishing the API from the excipient because they would

10   both have nitrogen.

11   So a person of skill in the art would not follow

12   this SEM-EDS method in mind even if it were known to solve

13   the problem of ascertaining the $D_{90}$ of the API once it was

14   tableted in the context of the '945 patent.

15   As confirmed by the testimony of Dr. Genck and

16   Dr. Chambliss, and Dr. Myerson, all skilled -- the skilled

17   artisans reading the '945 patent, including the disclosed

18   wet or dry granulation methods, would not know or be able to

19   predict with any precision the size of the API once it has

20   been tableted.

21   In short, plaintiffs have asserted claims 21 and

22   22 to encompass determining the $D_{90}$ of the apixaban before

23   it is formulated into a tablet, and this is simply not

24   described anywhere -- after it is formulated into a tablet,

25   and this is simply not described anywhere in the patent.

1                    The testimony is clear and unanimous on this

2     point.  There is not a single publication in 2010 or even

3     today that teaches or describes determining the $D_{90}$ of an API

4     after that API has been formulated into a tablet.

5                    Dr. Myerson confirms this, and on his last day

6     of testimony.

7                    And turning to the enablement requirement for

8     many of the same reasons, which I won't go into, I'll just

9     try to give a few minutes, if we have a few minutes, on

10    validity.

11                   THE COURT:  You have five minutes heft.

12                   MS. BROWNING:  Okay.

13                   So for many of the same reasons, the claims are

14    also not enabled.

15                   And the last thing I want to briefly do is

16    comment on the articles that Dr. Myerson and Dr. Berkland

17    both cited to.

18                   They are careful to distinguish between

19    measuring an individual particle or mapping and trying to

20    figure out whether there actually is a particle that's

21    present and determining a $D_{90}$.

22                   And the evidence -- the evidence is clear and

23    convincing that the '945 patent simply fails to describe or

24    enable the full scope of the asserted claims.

25                   And Dr. Myerson had to admit that none of the

1  documents that he discussed during trial or that he recited

2  in his report determined the $D_{90}$ of an API in a finished

3  dosage form; and,

4           Of course, even Dr. Berkland admitted that he

5  had never attempted to do this before this litigation

6  either.

7           So in closing, the evidence of noninfringement

8  far exceeds that of infringement and we ask that the Court

9  find that Unichem does not infringe any of the asserted

10  claims of the '945 patent, and we likewise ask the Court to

11  find that the asserted claims are invalid for failing to

12  meet the written description and the enablement

13  requirements.

14           THE COURT:  Thank you.  Four minutes left.

15           MR. PEJIC:  Unless you have any questions for my

16  colleague, Ms. Browning.

17           THE COURT:  I don't have any.

18           MR. PEJIC:  Thank you, Your Honor.  I'm going to

19  go ahead and forego demonstratives.

20           THE COURT:  All right.

21           MR. PEJIC:  My name is Branko Pejic.  You

22  have heard from me several times today.  Well, not today,

23  but throughout the trial, and given the time, I'm not

24  really going -- I don't intend to discuss the actual

25  references unless Your Honor has questions.  I would rather

1  touch on motivation to combine, which I think is the true

2  focus here.

3           As an initial matter, plaintiffs say that the

4  prior art taught that apixaban had good bioavailability and

5  that would be a reason one skilled in the art would not be

6  motivated to improve the properties of the apixaban, whether

7  it be the dissolution rate, bioavailability, all of these

8  related issues.

9           Well, the kicker here is, I do not dispute the

10  data and I think one skilled in the art can take away from

11  the data what they like, but all four articles, Carreiro,

12  Pinto, Eriksson and Teague, all contain statements from

13  people at BMS or sourced to BMS.  The authors Carreiro,

14  Pinto and Eriksson all include BMS attributions, and Teague,

15  the part cited in PDX-1542, Footnote 33, references again an

16  article by BMS employees or consultants.

17           I'm not saying anything beyond the fact that

18  people can take and one skilled in the art would take their

19  own characterization of the data as, would motivate them as

20  opposed to just the characterization in the articles.  And a

21  POSA also would not view the data in the sense of a

22  one-size-fit-all.

23           If you recall yesterday, we talked about BCS

24  Class III drugs in the Blume article.  That was the

25  ranitidine article, which concluded and that the BCS Class

1    III drugs' dissolution rates would be independent of the

2    formulation.  We only learned later in the Chen article that

3    indeed ranitidine had a 50 percent differential on

4    dissolution based upon the excipients.  So with this

5    learning and this teaching, one skilled in the art would not

6    know BSC III drugs to be in a one-size-fits-all.

7            And for the reasons of content uniformity,

8    biowaivers, which we have shown were available in Europe

9    before the filing date of the '945 patent, these things

10   would have motivated one skilled in the art to combine the

11   references to arrive at the claimed invention.

12           And as far as the status of the Phase III

13   clinical trials, there was -- there were a number of people

14   studied, and regardless of what the results were, BMS did

15   not agree with Dr., or did not share Dr. Myerson's

16   confidence in those results, because as Dr. Knabb testified,

17   BMS was prepared and had a strategy in place just in case

18   the apixaban trials failed.

19           THE COURT:  My question is:  If you're right on

20   motivation to combine, when will there not be motivation to

21   combine?  I mean, presumably, everybody is always worrying

22   about the worst case or having backups or looking into,

23   you know, compounds.  Can that be enough to satisfy your

24   burden?

25           MR. PEJIC:  I think what we have here is the

1  contemporaneous motivations of BMS actually realizing that

2  there was potentially a problem of failure as well as the

3  fact that it was known in the art that Phase III drugs,

4  drugs -- pardon me.  Drugs in clinical Phase III trials had

5  a high rate of failure, and so I think that that is a

6  motivation to combine because it shows as well as the Nause

7  patent, which even if not prior art, still has

8  contemporaneous statements that in 2009, even the BMS folks

9  were looking for better, more improved ways to provide

10  apixaban effectively to people.  So in this situation, I

11  believe there is a good reason for motivation.

12          THE COURT:  All right.  I'm going to have to

13  stop you.

14          MR. PEJIC:  Understood, Your Honor.  Thank you

15  very much for the indulgence.

16          THE COURT:  Thank you all.  I'm going to hold

17  you to your promise not to use every last minute.

18          MR. LEE:  I'm going to keep the promise.

19          THE COURT:  I will give you some time for brief

20  rebuttal.

21          MR. LEE:  Your Honor, before I move directly to

22  rebuttal on the patents, let me say this.  I listened

23  closely to the closings and there was one part that was

24  remarkable to me.  One is an attack on the witnesses and the

25  suggestion that a professor from Princeton, Harvard, MIT,

1    Kansas, Missouri, Purdue and Jefferson Medical College were

2    somehow paid to give testimony and they just bought the

3    company in line is both remarkable and a little offensive.

4         The suggestion that BMS scientists were writing

5    contemporaneous articles which you just heard at the time

6    that they were doing clinical research somehow

7    misrepresented what they were doing in anticipation of a

8    case to be litigated a decade later is illogical and indeed

9    remarkable and so is the characterization of the evidence.

10   The idea that there's overwhelming evidence you cannot make

11   an apixaban salt when the only evidence is that you can, the

12   idea that witnesses got wrapped up like pretzels.  I mean, I

13   confess during some of the examinations I got wrapped up

14   like a pretzel trying to understand what was happening, but

15   these witnesses didn't.

16        We have trials for a reason and let's look at

17   what happened during the presentation of their case.  Every

18   single one of their witnesses was a retained expert except

19   for the Sunshine Lake representative.  We never suggested

20   the mere fact that they were being paid for their services,

21   as they should be, somehow suggested that they weren't

22   testifying honestly.  But when they testified honestly,

23   here's what they said.

24        Dr. Zaworotko said he didn't do any test and he

25   relied upon the Catalent tests that were done at a much

1  lower scan rate.  Dr. Genck applied the wrong claim

2  construction.

3            Dr. Schurko didn't do his own tests and then

4  presented the data to Your Honor, rerunning it with

5  different parameters, without ever telling Your Honor that

6  that is what had happened.  But for the cross-examination,

7  the record and Your Honor would never have known.

8            Dr. Brittain found a peak that he said was

9  reproducible and important and then attributed it to a

10 compound that wasn't present.  As he honestly said, and I

11 think he was being candid and honest, that peak was

12 reproducible, it was important.

13           Dr. Atwood told me I was wrong.  I was wrong.

14 That peak was an apixaban peak.

15           And then you have Dr. Buckton, Dr. Scheidt,

16 who did no tests at all, and Dr. Zusman, who I've talked

17 about.

18           So let me talk about the '945 patent first since

19 that was the principal focus of much of the closing.

20           First, to correct the record, there's a reason

21 we didn't test the SigmaPharm API.  They refused to give it

22 to us in discovery.  Hard to test what you cannot get.  But

23 if we take all of what Your Honor has heard today, there are

24 a few simple propositions.

25           Dr. Atwood testified honestly that he found

1     three or four peaks.  One peak is enough to answer Your

2     Honor's question.  How do you know?  Mr. Mizerk conceded

3     today that one peak is enough.  Sunshine Lake told the FDA

4     that one peak is enough.  Dr. Zaworotko, now in the general

5     context as Your Honor suggested in your inquiry to Ms.

6     Wigmore, suggested that one peak was enough.

7            Dr. Brittain thought that peak at 12.4 was

8     enough and important.  He just happened to mischaracterize

9     what the peak indicated.

10           So one peak is enough to indicate the presence

11     of crystalline apixaban and that is what Dr. Atwood found

12     repeatedly.

13           Now, the second point is crystalline materials

14     are particles.  That's what Dr. Myerson said yesterday, and

15     with one exception on this agglomeration contention, that is

16     what the record demonstrates.  But the patent itself

17     dismisses this agglomeration theory.

18           Can I have the '945 patent at column 3, line 20

19     to 30.

20           The term particles refers to individual drug

21     substance particles whether the particles exist singly or

22     are agglomerated.

23           So to walk through my logic of what I'm hoping

24     to communicate, Dr. Atwood found three or four peaks.  One

25     peak is enough, according to both parties.  Those peaks

1    indicate crystalline apixaban because you compare them to

2    the scans or the graphs for apixaban itself.

3              THE COURT:  And if what they showed was a

4    composite article of apixaban and povidone, if that's what I

5    find, you say that satisfies your burden?

6              MR. LEE:  That satisfies our burden.  It

7    satisfied our burden for this portion, to show that it's

8    crystalline apixaban.  I'm going to come to the other part

9    on the particle size right now.

10             If this satisfies our burden to show that

11   there's crystalline apixaban, and crystalline apixaban is or

12   are particles, which they are, then the question becomes, is

13   the $D_{90}$ limitation satisfied?

14             And if I could have claim -- let me see.  Maybe

15   the easiest way to bring out PDX-18.3 from the presentation

16   today.  All right.  This is good.  Claim 12.

17             The question then becomes, the $D_{90}$ limitation.

18   And I want to address two questions Your Honor specifically

19   asked.

20             You asked Mr. Mizerk is any crystalline apixaban

21   enough?  Are two particles enough was your question.  The

22   answer is:  There is no minimum amount of crystalline

23   apixaban in the claim.  Two particles could be enough, but

24   that limitation doesn't stand in isolation.  That, the

25   amount of crystalline apixaban particles has to be enough to

satisfy the wherein as measured using a USP apparatus two

and then the required dissolution rate.

So you are going to have to, in the composition,

you're going to have to have enough crystalline apixaban to

satisfy that last limitation, which as you heard was a

critical part of the invention.  77 percent by weight of

apixaban dissolved within 30 minutes.  That is what tells

you how much crystalline apixaban you have, and, Your Honor,

here's why you know they have enough.  None of them can test

that limitation.  They all concede they satisfy that

limitation.

So you have Dr. Atwood saying, I have three or

four peaks.  You have them saying that that's enough.  You

have the simple fact that crystalline apixaban are

particles, and then you have the fact that they're

satisfied, they satisfy the limitation, which is one of the

two key aspects of the invention.

Now, they also have to satisfy the $D_{90}$.  And

here I think, Your Honor, at least as I understood it,

we're confusing the idea of no evidence with a calculation.

It's almost as if the calculation is the only direct

evidence and circumstantial evidence doesn't satisfy the

limitation.

That limitation, Your Honor, says only that the

$D_{90}$ has equal to or less than 89 microns.  Now, you could do

1   that with a calculation.  That would be one way to do it,

2   but it's not the only way to do it.  And instead what Your

3   Honor has is this.  You have the fact that there's

4   crystalline apixaban in small amounts.  You have the

5   nucleation theory, but it's a theory that the defendants'

6   experts concede is correct.  And you have the fact that when

7   you nucleate with provolone -- povidone.  I'm sorry.  I like

8   provolone.  With povidone, the crystal size growth is

9   limited.

10          So you have a theory that everybody is telling

11   you.  You have the manufacturing process that is undisputed.

12   You have a specific part of povidone that limits the growth.

13   And you have the opinion of the expert that says in that

14   circumstance, it's going to be less than 89 microns by order

15   of magnitude.

16          Your Honor, here is the analogy.  If I invented

17   a vehicle and the claim said a vehicle that traveled at

18   speeds a hundred miles an hour or less and that was the

19   claim and the accused device was a bicycle, I don't have to

20   prove what the limits of the speed of the bicycle are.  I

21   just have to prove as a matter of evidence, circumstantial

22   evidence, that that bike isn't ever going to travel a

23   hundred miles an hour or more.

24          That's what this evidence does.

25          There is evidence.  There is no measurement.

 1      The claims don't require the latter, the claims do require

 2      the former, and we offered it.

 3                  THE COURT:  I'm going to have to stop you in a

 4      few minutes.  Let me just ask you a few last questions.

 5                  MR. LEE:  Sure.

 6                  THE COURT:  This point about whether the $D_{90}$ is

 7      measured in the bulk before the tableting or at the end

 8      after the tableting, have you identified any evidence before

 9      me where outside of this litigation, either a patent or

10      other reference or any witness, ever measured $D_{90}$ or particle

11      size after tableting.

12                  MR. LEE:  Let me check.  Let me ask the person

13      who knows best.

14                  THE COURT:  That's fine.

15                  MR. LEE:  Can I ask Ms. Wigmore?

16                  THE COURT:  As long as you're quick.

17                  MS. WIGMORE:  The answer is yes, there are

18      particle size measurements in the prior art.  I gave the

19      exhibit numbers during my presentations.

20                  The $D_{90}$ in a tablet that's not in the prior art

21      but the techniques that are in the references that I

22      mentioned show how to measure the particle size that you

23      can get from the tablet, and the $D_{90}$ is a mathematical

24      calculation that can be made.

25                  THE COURT:  All right.  To either one of you at

```
 1    this point.  Dr. Atwood and Dr. Munson supposedly doing the
 2    testing on the same day, you guys didn't address that.
 3                MS. WIGMORE:  I can address that.
 4                MR. LEE:  I'll let Ms. Wigmore address the
 5    conspiracy theory.
 6                THE COURT:  Go ahead.
 7                MS. WIGMORE:  It's clear from the reports that
 8    the samples went to the experts from counsel.  So the
 9    bottles went to the expert, they took what they needed, came
10    back to counsel, went to the next expert.
11                So it wasn't the same pill that they were each
12    testing.  We just conducted the getting the samples to the
13    experts through counsel.
14                MR. LEE:  And Your Honor will recall that
15    Dr. Atwood's photograph showed that the seal at the top had
16    been broken.  This is -- goes back to where I started it,
17    which is the experts on both sides, people who are
18    accomplished; right?
19                There is no reason to have conspiracy theories
20    to attack their credibility.
21                The question is, let's look at what they say and
22    what they did.
23                Last three points on the '208, to keep our
24    promise that we're not going to use all of our time.  And
25    that's these.
```

```
 1              The first is DTX-629, if we can put it on the
 2    screen that Your Honor asked about.
 3              And when you asked what the best document was to
 4    suggest that these documents didn't all concern solubility.
 5              If you look, Your Honor, the second sentence --
 6    third sentence:  "I don't know if we have done pH dependent
 7    solubility."
 8              So it falls into that category.
 9              And if I showed you PDX-14.45.
10              Dr. Buckton concedes that that, in fact, is so.
11              Second point.
12              On the DE ring.  That is all intended to suggest
13    that there are certain disclosed examples that fall outside
14    the scope of claim 8.
15              Your Honor has seen cases before where not all
16    disclosed embodiments are covered by the claims.  The
17    Federal Circuit had recognized that.  Here is the question
18    for Your Honor.
19              Is a claim interpretation that might disclose
20    some embodiments for claim 8 more likely correct, or is
21    it more likely that an interpretation disclosed every
22    embodiment for claim 1 in the entire patent correct?
23              We suggest it is the former.
24              And then the last thing is the answer to Your
25    Honor's question from Mr. Mizerk on the risk/benefit ratio
```

 1     was revealing.

 2                It indicates what Dr. Zusman tried to say, which

 3     is, I think you have to have something close to FDA approval

 4     in order to satisfy enablement and written description.

 5                The answer is, the law is not so impractical and

 6     doesn't put people in such a box.

 7                What's disclosed at columns 116 to 117

 8     demonstrates both that the inventors were in possession of

 9     the concept, and the claim described in haec verba, and as

10     the law makes clear, that is sufficient given the *Wands*

11     factors to predictability of the art, that's the

12     conventional nature of the production of salts.  And,

13                Lastly, Mr. Mizerk started by saying on the

14     '208, you could have just claimed apixaban.

15                Here is what would have happened, Your Honor.

16     If we just claimed apixaban, they would have made a salt and

17     tried to get it approved, and we would be back here before

18     Your Honor hearing a noninfringement defense which was, oh,

19     you didn't claim the salts of apixaban.

20                There is a reason those 85 cases are what they

21     are.

22                Thank you, Your Honor.

23                THE COURT:  Thank you.  I thank you all for the

24     helpful argument today and for the, believe it or not,

25     enjoyable two-and-a-half weeks of the trial.

1    I've lost track of what you had proposed for

2  posttrial briefing.  I want you to put your heads together,

3  in any event, and by Friday, if you can get me your

4  proposal, your updated proposal, in light of how things

5  played out at trial, I'll then take a look at that.

6  Hopefully you can agree on what you want, but if you have

7  disputes, obviously, give me your -- your competing

8  proposals.

9    I really do appreciate you recognizing the

10  sacrifices my staff made.  We have had some odd times that

11  we've been having this trial, and we've had to balance you

12  against other trials and against other hearings, and that

13  has put a lot of stress on a lot of folks, and so I do

14  appreciate you recognizing the sacrifices that they have

15  made.

16    I wish you all safe travels, and we will look

17  forward to receiving your briefing.

18    Thank you very much.  And we will be in recess.

19    (Bench trial ends at 3:56 p.m.)

20

21    I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

22

23                                  /s/ Brian P. Gaffigan
                                  Official Court Reporter
24                                  U.S. District Court

25