**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY and PFIZER INC., <br><br> Plaintiffs, <br><br> v. <br><br> AUROBINDO PHARMA USA INC. and AUROBINDO PHARMA LTD., <br><br> Defendants. | C.A. No. 17-cv-374-LPS (CONSOLIDATED) |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**
**ON THE VALIDITY OF THE PATENTS-IN-SUIT**

Dated: February 7, 2020

*Of Counsel:*

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

FARNAN LLP

Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs Bristol-Myers Squibb Company and Pfizer Inc.*

# TABLE OF CONTENTS

I.   Plaintiffs' Experts ..........................................................................1

II.   The '208 Patent..........................................................................2

    A.   The '208 Patent's Asserted Claims Are Not Invalid for Improper Dependency..........................................................2

        1.   Apixaban falls within the scope of claim 1................................2

        2.   Sigmapharm's improper-dependency defense is not based on the actual claim language............................4

        3.   The patent's definition of "substituted" does not support Sigmapharm's position. ................................6

        4.   Sigmapharm did not prove that any compound falls outside the scope of claim 1.......................................7

    B.   The '208 Patent's Asserted Claims Are Not Invalid for Lack of Enablement. ..........................................................8

        1.   Salt formation was routine as of the priority date.....................8

        2.   The '208 patent discloses how to make pharmaceutically acceptable salts. ................................8

        3.   Dr. Jacobsen made the sodium, potassium, and hydrochloride salts of apixaban in less than 5 hours applying the '208 patent's disclosure. .....................10

        4.   Salts of apixaban are "within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio." .................................................13

        5.   BMS's documents address whether apixaban is ionizable to improve its aqueous solubility, not whether apixaban can form "pharmaceutically acceptable salts" in non-aqueous media. ..........................................18

        6.   BMS had no need to make a salt form of apixaban. ................20

        7.   Administering an apixaban salt would have no harmful effect on pH.......................................................21

        8.   Salts of apixaban can be formulated to remain stable..............23

        9.   The *Wands* factors support enablement. ................................24

        10.   Claim 104 is enabled.............................................25

    C.   The '208 Patent's Asserted Claims Are Not Invalid for Lack of Written Description. ....................................................26

III.  The '945 Patent ..................................................................................28

    A.  Technology Background ..................................................................28

    B.  Subject Matter of the Asserted Claims .............................................30

    C.  The '945 Patent's Asserted Claims Were Conceived and
        Reduced to Practice by October 2009 ...............................................31

    D.  The '945 Patent's Asserted Claims Are Not Invalid for Lack
        of Written Description. ...................................................................32

        1.  The '945 patent describes how to determine the $D_{90}$ of
            the crystalline apixaban in a formulated product. ...................33

        2.  The '945 patent does not describe the $D_{90}$ of the bulk
            apixaban as "critical." ...........................................................34

        3.  A POSA would have known how to determine the $D_{90}$
            of crystalline apixaban after formulation. ...............................34

    E.  The '945 Patent's Asserted Claims Are Not Invalid for Lack
        of Enablement. .............................................................................37

    F.  The '945 Patent's Asserted Claims Would Not Have Been
        Obvious. ......................................................................................39

        1.  Defendants have not demonstrated any motivation for
            changing the apixaban formulations in the prior art,
            which demonstrated rapid absorption and good
            bioavailability. ......................................................................39

        2.  A POSA would not have expected that reducing the
            dissolution rate would improve bioavailability ......................43

        3.  A POSA would not have been motivated to reduce
            particle size. .........................................................................46

        4.  The prior art does not disclose the limitations of the
            '945 patent's asserted claims. ...............................................47

        5.  Objective indicia confirm that asserted claims'
            nonobviousness. ....................................................................50

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '208 patent | U.S. Patent No. 6,967,208 (JTX-1) |
| '945 patent | U.S. Patent No. 9,326,945 (JTX-2) |
| POSA | Person of ordinary skill in the art.  For the '208 patent, a POSA would have the characteristics described at UF ¶ 20 as of September 21, 2001; for the '945 patent, a POSA would have the characteristics described at UF ¶ 31 as of February 24, 2011. |
| FDA | United States Food and Drug Administration |
| CoC | Certificate of Correction |
| BMS | Bristol-Myers Squibb Co. |
| Pfizer | Pfizer, Inc. |
| Plaintiffs | BMS and Pfizer |
| Sigmapharm | Sigmapharm Laboratories, LLC |
| Sunshine Lake | Sunshine Lake Pharma Co., Ltd. and HEC Pharm USA Inc. |
| Unichem | Unichem Laboratories, Ltd. |
| Defendants | In general and when discussing the '945 patent, Sigmapharm, Sunshine Lake, and Unichem; when discussing the '208 patent, Sigmapharm and Unichem |
| Tr. | Final Trial Transcripts (D.I. 692-700) |
| UF | Uncontested Facts (D.I. 672, Ex. 1) |
| Br. | Defendants' Opening Post-Trial Brief on Invalidity (D.I. 690) |
| POFOF | Plaintiffs' Opening Proposed Findings of Fact (Sigmapharm) (D.I. 685) |
| DOFOF | Defendants' Opening Proposed Findings of Fact (D.I. 691) |

These Proposed Findings of Fact supplement Plaintiffs' Proposed Findings of Fact on

Infringement, D.I. 685, 687 and 689, which provide background on the dispute, the asserted

claims, and level of skill in the art, POFOF ¶¶ 1-5, 8-13, 30-39.

## I.    Plaintiffs' Experts

1.      Dr. David MacMillan testified about the infringement and validity of the '208

patent's asserted claims.  Dr. MacMillan has 21 years of experience as a professor of organic

chemistry at leading universities, most recently at Princeton University.  Tr. 271:2-6

(MacMillan); PTX-811.  As of September 2001, Dr. MacMillan had all the qualifications of a

POSA under each party's definition.  Tr. 278:10-13 (MacMillan).  The Court recognized Dr.

MacMillan as an expert in organic and medicinal chemistry.  *Id.* at 274:8-12.

2.      Dr. Eric Jacobsen testified about his experimental work in which he prepared

three salts of apixaban in less than a day.  Dr. Jacobsen is the Sheldon Emory Professor of

Chemistry at Harvard, where he has taught for 27 years.  Tr. 1490:8-13 (Jacobsen); PTX-801.

As of September 2001, Dr. Jacobsen had all the qualifications of a POSA under each party's

definition.  Tr. 1494:1-4 (Jacobsen).  The Court recognized Dr. Jacobsen as an expert in organic

and medicinal chemistry.  *Id.* at 1493:10-14.

3.      Dr. Peter Kowey testified that apixaban salts, including the salts made by

Dr. Jacobsen, would be suitable for use within the scope of sound medical judgment.  Dr. Kowey

is a clinical cardiologist at Main Line Health in Radnor, Pennsylvania.  Tr. 1272:24-1273:3

(Kowey); PTX-807.  He is also a professor of medicine and clinical pharmacology at the

Jefferson Medical College at Thomas Jefferson University and the William Wikoff Smith Chair

in Cardiovascular Surgery at the Lankenau Heart Institute.  Tr. 1273:4-9 (Kowey).  Dr. Kowey

treats patients with thromboembolic disorders and has prescribed Eliquis®.  *Id.* at 1274:8-21.  As

of 2001, Dr. Kowey was a clinical medical professional with whom a POSA would have

consulted. *Id.* at 1278:22-1279:16. The Court recognized Dr. Kowey as an expert in clinical

medicine including in particular the treatment of thromboembolic disorders. *Id.* at 1277:12-16.

4.     Dr. Allan Myerson testified that apixaban salts could be made, formulated, and

packaged in a way that would prevent their exposure to moisture and about the validity of the

'945 patent. Dr. Myerson is a professor of chemical engineering at the Massachusetts Institute of

Technology. Tr. 1662:23-1663:9 (Myerson); PTX-816. The Court recognized Dr. Myerson as

an expert in pharmaceutical formulation analysis. Tr. 1664:19-22 (Myerson).

## II.    The '208 Patent

5.     No defendant disputed that apixaban is novel, non-obvious, and useful.

Undisputed evidence showed that Eliquis® is a lifesaving drug that has improved the lives of

millions of patients. *See, e.g.*, Tr. 221:3-5 (Knabb); Tr. 1281:13-1287:5 (Kowey).

### A.    The '208 Patent's Asserted Claims Are Not Invalid for Improper Dependency.

#### 1.    Apixaban falls within the scope of claim 1.

6.     Claim 1 of the '208 patent is directed to a chemical genus. JTX-1 at 237:2-242:23

& Dec. 2, 2008 CoC at 1-2. Claim 1 defines the genus in two ways: First, claim 1 defines a

scaffold chemical structure that the claimed compounds may have (e.g., the rings). Tr. 284:1-

285:21 (MacMillan). Second, claim 1 allows changes such that the scaffold structure may be

"substituted with" a certain number of recited groups at each position. *Id.* at 286:10-17.

7.     For example, "ring M" is one of the scaffold components recited in claim 1:

ring M, including $P_1$, $P_2$, $M_1$, and $M_2$ is substituted with 0-2 $R^{1a}$ and
is

JTX-1 at 237:14-23 & Dec. 2, 2008 CoC at 1.

8.      It is undisputed that a POSA would have understood the chemical subunit recited in claim 1's ring M limitation to have four hydrogens, as shown below:

Tr. 285:2-6 (MacMillan); Tr. 715:23-716:1 (Heathcock); PTX-779.

9.      Claim 1's ring M limitation allows claim 1 to be "substituted with 0-2 $R^{1a}$" groups. $R^{1a}$ is a *Markush* group of various chemical structures.  JTX-1 at 238:62-239:13.

10.     To determine how many times ring M in a given compound has been "substituted with" $R^{1a}$, a POSA would look at the number of changes between the compound and the structure for ring M recited in claim 1.  Tr. 300:24-301:23 (MacMillan).  If ring M in a compound is the same as the ring M recited in claim 1—as it is in apixaban—a POSA would understand that it has been "substituted with 0" $R^{1a}$, which claim 1 allows.  *Id.* at 285:7-286:21.

11.     A POSA would understand the structure on the left below to be a scaffold that is recited in claim 1.  *See, e.g.*, *id.* at 1628:11-1631:11 (MacMillan).  A POSA would understand the structure on the right below to be apixaban.  UF ¶¶ 37-38.  Sigmapharm disputes only whether apixaban satisfies the limitations relating to rings M, A, Q, and E (in blue).  Br. 2.



**Scaffold Recited in Claim 1**                         **Apixaban**

– 3 –

12.     A POSA would understand that there is only one difference between the two structures. Tr. 1628:11-1631:11 (MacMillan).  Apixaban has an $OCH_3$ group (also called a methoxy group) on ring E.  *Id.* at 1630:18-22.

13.     Claim 1 states that "ring E is substituted with 1-2 R" and recites $OCH_3$ as an option for R.  *Id.* at 1630:23-1631:18.  Apixaban therefore meets the ring E limitation of claim 1. *Id.* at 1630:15-1631:11.  The other disputed rings in apixaban (M, A, and Q) are exactly the same as the scaffold structure recited in claim 1, so they have been "substituted with 0" $R^{1a}$, $R^4$, and $R^{4a}$ groups, respectively, which claim 1 allows.  *Id.* at 1628:11-1630:14.  Apixaban thus satisfies the "substituted with" limitations in claim 1 and falls within the scope of claim 1.  *See also* POFOF ¶¶ 15-23 (discussing each limitation separately).

## 2.     Sigmapharm's improper-dependency defense is not based on the actual claim language.

14.     Sigmapharm argued that "[t]he number of ***substituents*** present in apixaban for each of rings M, A, E, and Q exceeds the number permitted by Claim 1," DOFOF ¶ 27,[1] because, for ring M, "apixaban ***has*** four hydrogens ***attached*** to the structure corresponding to Ring M," *id.* ¶ 29; *see also* Tr. 689:10-18 (Heathcock) ("And if you look at the structure in the box, at the lower right, you can count that there are actually four Hs ***attached*** to ring M, and that's more than two, and that's why apixaban fails this test in the -- this limitation."); *id.* at 690:21-691:7 ("[I]f you look at the structure in the box and count the things that are ***attached*** to ring E by bonds, four of them are hydrogen."); *id.* at 691:14-692:2 ("[I]f you look at the structure in the box, you will see that there are actually one, two, three, four Hs ***attached*** by bonds to ring A."); *id.* at 692:9-21 ("[I]f you go down to the box in the lower right and you count how many Hs are

---

[1] Emphases added unless otherwise noted.

*attached* to ring Q, there are eight."); *id.* at 716:19-22 ("Q. Now, you've interpreted the phrase

ring M is substituted with 0 to 2 $R^{1a}$ to allow only 0 to 2 $R^{1a}$ groups to be *attached* to ring M;

correct?  A. Yes, I have.").  Sigmapharm did not apply the actual language of claim 1 to support

its improper-dependency defense.  Indeed, Sigmapharm's rewriting of claim 1's limitations is

evident from Dr. Heathcock's demonstrative purporting to summarize them (DDX-6-5):

- Ring **M** requires **0-2** substituents from group **$R^{1a}$**, not **4.**
- Ring **E** requires **1-2** substituents from group **R**, not **5.**
- Ring **A** requires **0-2** substituents from group **$R^4$**, not **4.**
- Ring **Q** requires **0-2** substituents from group **$R^{4a}$**, not **8.**

15.     It is undisputed that the words "substituent" and "attached" are not in claim 1.  Tr.

716:19-717:18 (Heathcock).

16.     As Dr. MacMillan explained, "[t]here is a difference between [']substitution[']

and [']substituent.[']"  Tr. 310:25-311:1, 1637:17-1638:2 (MacMillan) (correcting

Sigmapharm's counsel's use of the term "substituent" because the claim says "substituted with").

"Substitution," or being "substituted with" something, describes replacing one thing with

something else.  *Id.* at 300:24-302:14.  By contrast, a "substituent" is just "something that is

bonded to some particular position."  Tr. 699:22-700:5 (Heathcock).

17.     Sigmapharm's rewriting of claim 1 alters it such that "apixaban, which is a

compound that the '208 patent is about and which the '208 patent expressly claims, is not within

the scope of claim 1," *id.* at 718:8-12; "none of the compounds that are specifically disclosed in

the '208 patent would fall within the scope of claim 1," *id.* at 713:8-14; and "it's impossible for

any compound to fall within claim 1's scope," *id.* at 718:17-20.  Under Sigmapharm's alteration

of the claim language, claim 1 would not cover any chemical compounds.  *Id.* at 713:15-19; *see*

*also* Tr. 288:10-13 (MacMillan).

### 3.   The patent's definition of "substituted" does not support Sigmapharm's position.

18.     The '208 patent's specification states that "[t]he term 'substituted,' as used herein, means that any one or more hydrogens on the designated atom is replaced with a selection from the indicated group, provided that the designated atom's normal valency is not exceeded, and that the substitution results in a stable compound."  JTX-1 at 113:66-114:3; *see also id*. at 117:43-48.  This definition is consistent with the plain meaning of "substituted" to a POSA.  Tr. 299:22-300:18 (MacMillan); Tr. 693:12-694:5 (Heathcock).

19.     Sigmapharm contends that this definition requires at least one hydrogen to be replaced, even when the scaffold is substituted with zero groups.  Br. 4.  A POSA would not understand claim 1 this way.  *See, e.g.*, Tr. 302:7-303:9 (MacMillan).  Even Dr. Heathcock testified on direct examination that a POSA would understand this definition to be conditional on a replacement actually taking place:  "Q. Does this definition encompass replacing none of the hydrogens?  A. Well, it says one or more hydrogens.  I mean, yeah, *if* you're doing a replacement you would be -- you are replacing one or more [hydrogens]."  Tr. 694:6-10 (Heathcock).

20.     Claim 1 does not treat the hydrogens in its *Markush* groups differently from the other members.  As Dr. MacMillan explained, claim 1 allows the hydrogens in each *Markush* group to be used in the same ways as every other member of those groups; it simply states, through the "substituted with" phrasing, that if there is already a hydrogen present in the scaffold chemical structure set forth in claim 1, the claimed compounds are not "substituted with" anything when that same hydrogen appears in the same place.  Tr. 300:24-302:14, 309:14-310:15 (MacMillan).  The hydrogens are also not surplusage in claim 1 because deletion of a hydrogen would alter the scope of the claim.  *See id.* at 315:15-316:2; Tr. 703:9-22 (Heathcock) (agreeing

that if hydrogen were omitted from $R^{1a}$, compounds with a hydrogen on ring P would no longer be within the scope of claim 1).  Likewise, Dr. MacMillan testified that the scaffold may be "substituted with" a hydrogen on a heteroatom (i.e., an atom other than carbon).  Tr. 308:11-17 (MacMillan).

> **4.   Sigmapharm did not prove that any compound falls outside the scope of claim 1.**

21.     Sigmapharm asserts that, even under Plaintiff's position, "36 of the structures recited in dependent Claim 3, and 4 of the compounds in dependent Claim 8" fall outside the scope of claim 1.  DOFOF ¶ 46.  Sigmapharm offered no proof at trial to support that contention.  The only evidence that Sigmapharm cites is Dr. Heathcock's testimony (Tr. 705:15-709:13), which does not accurately reflect Plaintiffs' position and instead continues to rely on Sigmapharm's alteration to the language of claim 1.  For example, in the testimony Sigmapharm cites on this point, Dr. Heathcock and Sigmapharm's counsel refer to groups "attached" to the scaffold or "substituents" at least 13 times, and never once use the phrase "substituted with," which is the actual language of claim 1.  Tr. 705:15-709:13 (Heathcock).

22.     All the structures from non-asserted claims 3 and 8 that Sigmapharm alleges fall outside the scope of claim 1 have a specific chemical group (rings D and E).  Tr. 706:11-707:8, 708:16-709:9 (Heathcock).  However, it is undisputed that claim 1 allows ring D to be absent, as it is in apixaban.  Tr. 312:16-25 (MacMillan); Tr. 690:13-691:7 (Heathcock); DDX-6-5; JTX-1 at 237:62.  This issue thus has nothing to do with whether claim 1 covers apixaban; it relates to a chemical structure that is neither present in apixaban nor needed for apixaban to be a compound of claim 1.

23.     As Dr. MacMillan testified, it is "[a]bsolutely not" necessary "to rewrite the claim language of claim 1 in any way in order for apixaban to be covered."  Tr. 1631:23-1632:1.

24.     Claims 13 and 104 are not invalid for improper dependency.  *Id*. at 1631:15-18
(MacMillan).

**B.     The '208 Patent's Asserted Claims Are Not Invalid for Lack of Enablement.**

     **1.     Salt formation was routine as of the priority date.**

25.     Salts are made of positively-charged cations and negatively-charged anions.  Tr.
1574:24-1576:2 (MacMillan); Tr. 1495:14-20 (Jacobsen); Tr. 17:21-18:3 (Buckton).  Chemists
make salts by reacting compounds with acids and bases.  Tr. 1575:24-1576:2 (MacMillan); Tr.
1495:25-1496:9 (Jacobsen); Tr. 17:3-7 (Buckton).  An acid is a molecule that can donate a
proton; a base is a molecule that can accept a proton.  Tr. 1496:10-13 (Jacobsen).

26.     Making salts is routine in organic chemistry.  Tr. 1576:3-5 (MacMillan).
Chemists learn about salts at the very beginning of their education, either in high school or the
first year of college.  *Id.* at 1576:10-15.  Techniques for making salts have been known for over
100 years and were known in 2001.  *Id*. at 1576:6-9, 1580:7-12; Tr. 57:9-11 (Buckton); Tr.
1465:14-20 (Scheidt).  The concepts of acid/base chemistry underlying salt formation would
have been well known to a POSA in 2001.  Tr. 1579:5-1580:6 (MacMillan).  In 2001, salt
formation was understood by a POSA to be predictable and straightforward.  *Id.*

27.     In 2001, a POSA would have understood that making salts of apixaban is a matter
of simple acid/base chemistry.  *Id*. at 1579:5-22.  A POSA in 2001 would have been able to look
at the structure of apixaban and identify both acidic and basic sites that could form salts.  *Id*. at
1580:18-1582:21; Tr. 1496:20-22, 1497:4-14 (Jacobsen); Tr. 1424:3-24 (Scheidt).  A POSA then
would have been able to identify commonly used acids or bases to react with apixaban to form
salts.  Tr. 1580:18-1583:4 (MacMillan).

     **2.     The '208 patent discloses how to make pharmaceutically acceptable salts.**

28.     The '208 patent explains how to make apixaban in Example 18.  Tr. 246:13-14,

– 8 –

251:16-252:5 (Orwat); Tr. 54:2-8 (Buckton); JTX-1 at 174:21-175:51.

29.     The '208 patent also explains how to make pharmaceutically acceptable salts of the disclosed compounds.  Tr. 1579:5-22 (MacMillan); Tr. 32:9-23 (Buckton); Tr. 1450:8-23 (Scheidt).  Column 117 of the '208 patent explains that "[t]he pharmaceutically acceptable salts of the present invention can be synthesized from the parent compound that contains a basic or acidic moiety by conventional chemical methods."  JTX-1 at 117:1-4; Tr. 1583:7-1584:2 (MacMillan); Tr. 1498:22-1500:6 (Jacobsen).  A POSA would have understood that apixaban is a parent compound that contains both basic and acidic moieties that could be used to form salts using the "conventional chemical methods" described in column 117 of the '208 patent.  Tr. 1584:19-1585:10 (MacMillan); Tr. 1496:20-22, 1499:3-22 (Jacobsen).

30.     The '208 patent explains that "[g]enerally, such salts can be prepared by reacting the free acid or base forms of these compounds with a stoichiometric amount of the appropriate base or acid in water or in an organic solvent, or in a mixture of the two."  JTX-1 at 117:4-9.  The '208 patent further states that performing such reactions in a non-aqueous, organic solvent is "preferred."  Tr. 1583:11-1584:9, 1586:22-1587:4 (MacMillan); Tr. 1499:3-22 (Jacobsen); Tr.1450:24-1451:16 (Scheidt); JTX-1 at 117:4-9.  This paragraph of the '208 patent also directs POSAs to *Remington's*:  "Lists of suitable salts are found in *Remington's Pharmaceutical Sciences*, 17th ed., Mack Publishing Company, Easton, Pa., 1985, p.1418, the disclosure of which is hereby incorporated by reference."  JTX-1 at 117:9-13; Tr. 1583:11-1584:2 (MacMillan).

31.     Column 116 of the '208 patent provides examples of acids and bases that can be used to prepare pharmaceutically acceptable salts.  JTX-1 at 116:48-67; Tr. 1498:1-21 (Jacobsen); Tr. 1452:10-15 (Scheidt).  It lists "alkali . . . salts of acidic residues" as exemplary

pharmaceutically acceptable salts.  JTX-1 at 116:51-54; Tr. 1498:4-9 (Jacobsen); Tr. 1452:17-18

(Scheidt).  Alkali salts are formed by reacting an acid with an alkali base, such as sodium and

potassium bases; sodium and potassium salts are therefore alkali salts as referred to in the '208

patent.  Tr. 1452:18-1453:9 (Scheidt); Tr. 1498:17-21 (Jacobsen); Tr. 254:20-255:12 (Orwat).

The '208 patent also lists "mineral . . . acid salts of basic residues" as exemplary pharmaceutical

salts.  JTX-001 at 116:51-54; Tr. 1498:10-13 (Jacobsen); Tr. 1453:10-12 (Scheidt).  Hydrogen

chloride is a mineral acid, and hydrogen chloride salts are mineral acid salts as explicitly referred

to in the '208 patent.  Tr. 1453:13-21 (Scheidt); 1498:14-16 (Jacobsen).  The '208 patent lists

"hydrochloric" salts as examples as "pharmaceutically acceptable salts."  JTX-1 at 116:60.

32.     A POSA could have prepared salt forms of apixaban based on the disclosure of

the '208 patent without undue experimentation.  Tr. 1584:6-9, 1586:22-1587:13, 1615:14-21

(MacMillan); Tr. 1494:10-1495:13, 1498:1-1499:2, 1504:14-1505:5, 1523:3-14 (Jacobsen).

### 3.     Dr. Jacobsen made the sodium, potassium, and hydrochloride salts of apixaban in less than 5 hours applying the '208 patent's disclosure.

33.     Dr. Jacobsen performed several experiments to make pharmaceutically acceptable

salts of apixaban.  Tr. 1494:10-1495:13 (Jacobsen).  Dr. Jacobsen designed those experiments

based upon the disclosure of the '208 patent and the knowledge of a POSA in 2001.  *Id.* at

1497:15-21.  Dr. Jacobsen's experimental procedures followed the procedures in columns 117 of

the '208 patent (Tr. 1497:15-1500:3 (Jacobsen); Tr. 1584:6-9 (MacMillan)), and were

representative of what a POSA would have done in 2001 (Tr. 1497:19-21, 1507:14-1508:12

(Jacobsen); Tr. 1586:22-1587:4 (MacMillan)).  He used chemicals that were commonly used in

2001 and an experimental design that was routine.  Tr. 1588:6-11 (MacMillan); Tr. 1523:9-14

(Jacobsen); Tr. 1462:12-1464:6 (Scheidt).

34.     Sodium, potassium, and hydrochloride are commonly used pharmaceutical

counterions.  Tr. 1500:17-1501:10 (Jacobsen); Tr. 57:23-58:8 (Buckton).  According to the page of *Remington's Pharmaceutical Sciences* incorporated by reference into the '208 patent, sodium and potassium are the two most commonly used counterions in commercially available basic salts, with sodium appearing in 61.97% of such salts and potassium appearing in 10.82%.  JTX-10 at 1418; Tr. 1500:18-1501:10 (Jacobsen); Tr. 58:9-61:2 (Buckton); Tr. 1456:18-25, 1458:12-18 (Scheidt).  And hydrochloride is the most commonly used counterion in commercially available acidic salts, appearing in 42.98% of such salts.  JTX-10 at 1418; Tr. 1501:2-10 (Jacobsen); Tr. 61:3-13 (Buckton); Tr. 1456:16-17 (Scheidt).  Dr. Jacobsen chose to make the sodium, potassium, and hydrochloride salts of apixaban based upon the disclosure of the '208 patent and the lists provided in *Remington's*.  Tr. 1500:4-1501:10 (Jacobsen).

35.     Dr. Jacobsen successfully made sodium, potassium, and hydrochloride salt forms of apixaban with "a minimal amount of routine experimentation."  Tr. 1494:10-1495:4, 1523:1-6, 1527:15-1528:11 (Jacobsen); Tr. 1587:5-13 (MacMillan); *see also* Tr. 1503:15-1509:8, 1516:21-1517:14, 1519:22-1520:24 (Jacobsen); PTX-802; PTX-805.  Dr. Jacobsen and his student were able to make all three salts of apixaban on the first day, in less than five hours.  Tr. 1495:5-13, 1504:14-25 (Jacobsen).  They later repeated the experiments on a larger scale.  *Id.*  The total time they spent experimenting was on the order of about 10 to 20 hours.  *Id.*  That experimentation and amount of time would have been considered routine as of 2001.  Tr. 1505:3-5, 1523:7-8 (Jacobsen).

36.     Dr. Jacobsen recorded a video of his experiment to prepare the sodium apixaban salt.  Tr. 1507:9-13 (Jacobsen); PTX-802 at 7; PTX-805.  The video shows the formation of the sodium apixaban salt as a white solid precipitate immediately upon addition of a base to a solution of apixaban.  Tr. 1507:14-1508:12 (Jacobsen); PTX-805.

37.     Dr. Jacobsen confirmed the formation of the sodium, potassium, and hydrochloride salts of apixaban using nuclear magnetic resonance ("NMR"); the NMR spectra showed shifted peaks consistent with the formation of those three salts.  Tr. 1511:18-1516:18, 1518:12-1519:21, 1520:25-1522:21 (Jacobsen); PTX-803.  Dr. Jacobsen also observed changes to the infrared absorption of the sodium and potassium apixaban salts consistent with salt formation.  Tr. 1509:9-1511:17, 1517:15-1518:11 (Jacobsen); PTX-804.  Dr. Jacobsen also performed a chemical test on the sodium and potassium apixaban salts by treating them with acetic acid; the result of that experiment confirmed the formation of sodium and potassium apixaban salts.  Tr. 1512:17-1515:14, 1518:16-1519:9 (Jacobsen).

38.     Dr. Jacobsen was "completely certain" that he had successfully made the sodium, potassium, and hydrochloride salts of apixaban.  Tr. 1504:11-13, 1516:16-18, 1519:19-21, 1522:19-21 (Jacobsen).

39.     Defendants do not dispute that Dr. Jacobsen made the sodium and potassium salts of apixaban.  Tr. 1409:18-1410:4, 1458:19-23 (Scheidt); Tr. 12:14-16, 52:24-54:1 (Buckton).

40.     Defendants do not dispute that Dr. Jacobsen made at least some of the hydrochloride salt of apixaban.  *See* DOFOF ¶¶ 123-124; 1504:4-13, Tr. 1522:19-21 (Jacobsen); Tr. 1586:1-21 (MacMillan).

41.     Defendants did no testing of their own, although they could have.  Tr. 31:23-32:1, 55:1-22 (Buckton); Tr. 1459:4-1465:8 (Scheidt).

42.     Dr. Jacobsen did not attempt to purify and isolate the salts he made, but he was confident that he could have done so using routine techniques known to POSAs in 2001, and that the salts would have been "very easy to purify."  Tr. 1523:20-1524:20, 1525:20-1526:3 (Jacobsen).  It "would be a routine matter" to purify the salts without having them revert to

neutral apixaban.  *Id.* at 1523:24-1524:9.  The only precaution would be to exclude moisture

from the manipulations, which is something "chemists learn how to do routinely."  *Id.*  Dr.

Scheidt acknowledged that the "small amounts of impurities" he claims to have seen in the NMR

spectra would not have been a major concern because "you would assume in the laboratory scale

you would be able to purify [them] away and move on to the next experiment."  Tr. 1413:20-

1414:5 (Scheidt).  Dr. Jacobsen had no concerns about those alleged impurities.  Tr. 1524:10-12

(Jacobsen).

     43.    Dr. Jacobsen observed that the sodium apixaban salt that he prepared was stable

after sitting for two days in his lab.  Tr. 1526:5-1527:14 (Jacobsen).  Dr. Jacobsen performed an

experiment in which he added acetic acid to the sodium apixaban salt after two days; the

experiment showed that there had been no spontaneous reversion or decomposition of the

sodium apixaban salt.  *Id.*  Defendants presented no evidence at trial that the apixaban salts that

Dr. Jacobsen prepared are unstable.

     44.    A POSA at the time of the invention would have been able to prepare "derivatives

of [apixaban] where in the parent compound is modified by making acid or base salts thereof," as

required by the Court's claim construction, without undue experimentation.  Tr. 1489:19-25,

1542:6-11 (Jacobsen); Tr. 1578:5-1579:22, 1586:1-1587:13 (MacMillan).

     **4.**    **Salts of apixaban are "within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio."**

     45.    A POSA would have considered salts of apixaban to be within the scope of sound

medical judgment, suitable for use in contact with the tissues of human beings and animals

without excessive toxicity, irritation, allergic response, or other problem or complication,

commensurate with a reasonable benefit/risk ratio.  Tr. 1590:2-17 (MacMillan); Tr. 1293:16-

– 13 –

1294:9 (Kowey).  For example, the sodium, potassium, and hydrochloride salts of apixaban would be pharmaceutically acceptable because they would have a safety profile that is effectively identical to that of apixaban at therapeutic doses.  Tr. 1578:5-15 (MacMillan).

46.     The court's construction of "pharmaceutically acceptable salts" requires that salts of apixaban be suitable for use "commensurate with a reasonable benefit/risk ratio."  D.I. 381 at 1.  When clinicians evaluate the benefit/risk ratio, they assess whether a drug will confer a benefit on the patient that outweighs any potential risk the patient would be exposed to, including risks associated with the disease conditions.  Tr. 1279:22-1280:8, 1286:25-1287:2 (Kowey); *see also* Tr. 1440:22-24, 1443:5-24 (Scheidt).

47.     Defendants do not dispute that apixaban itself, in its neutral form, has a favorable benefit/risk ratio.  Tr. 71:5-7 (Buckton).

48.     The benefits of apixaban include reducing the risk of stroke and systemic embolism in patients with atrial fibrillation, preventing deep vein thrombosis and pulmonary embolism in patients who have had joint replacement surgery, and treating deep vein thrombosis and pulmonary embolism.  Tr. 1607:9-19 (MacMillan); Tr. 1281:7-17, 1284:10-16, 1286:13-24 (Kowey); Tr. 190:13-17 (Knabb); *see also* UF ¶¶ 41-43.  These are serious diseases, and the consequences of not treating them can cause downstream injury, necrosis, or even death.  Tr. 190:18-23 (Knabb); Tr. 1287:3-5 (Kowey).

49.     The benefits of taking a salt form of apixaban would be identical to the benefits of taking neutral apixaban because it immediately converts to neutral apixaban in the body.  Tr. 1607:8-18 (MacMillan).

50.     If a person were to ingest an apixaban salt, it would revert back to neutral apixaban and trace quantities of other ions.  Tr. 1590:18-1592:13, 1596:8-21, 1597:10-1598:9

(MacMillan); *see also id.* at 1650:6-1652:7; Tr. 65:5-8, 65:19-66:6, 66:20-67:3 (Buckton).  For example, the sodium salt of apixaban would react with either the water in the body or the acid in the stomach and become neutral apixaban, sodium ions, and either hydroxide ions (from water) or water (from stomach acid).  Tr. 1591:15-1592:13 (MacMillan); *see also* Tr. 1418:23-1419:13 (Scheidt).  The potassium salt of apixaban would become neutral apixaban, potassium ions, and hydroxide ions.  Tr. 1596:8-21 (MacMillan).  And the hydrochloride salt of apixaban would become neutral apixaban, chloride ions, and hydronium ions.  *Id.* at 1597:10-18.

51.     Generating neutral apixaban in the body would have no detrimental effect on a patient; indeed, neutral apixaban is the active ingredient in Eliquis®, which is a safe and effective pharmaceutical.  Tr. 1592:18-25 (MacMillan); PTX-325.  When any drug is made into a pharmaceutical salt, it is generally the neutral form of the drug, generated in the body, which is ultimately absorbed into the blood stream and pharmaceutically active.  Tr. 72:5-15, 73:2-5 (Buckton); DTX-567 at 567.00005, 567.00010 (explaining that the charged form of a drug molecule is generally not lipophilic enough to be absorbed, and that it is the fraction of "non-ionized, *i.e.*, the more lipophilic form" which is "in the state to be readily absorbed").

52.     The maximum therapeutic dose of apixaban is 10 mg.  Tr. 1593:1-3 (MacMillan); Tr. 1296:2-11 (Kowey); PTX-325.  10 mg of apixaban is 0.02 millimoles of apixaban, where millimoles is a measure of the number of molecules.  Tr. 1593:1-12 (MacMillan).  Upon ingestion, the maximum therapeutic dose of sodium, potassium, or hydrochloride salt of apixaban (0.02 millimoles) would form 0.02 millimoles of neutral apixaban; 0.02 millimoles of sodium, potassium, or chloride ions; and 0.02 millimoles of hydroxide or hydronium ions inside the body.  Tr. 1590:18-1592:13, 1593:1-12, 1596:8-21, 1597:10-1598:9 (MacMillan); *see also* Tr. 65:5-8, 65:19-66:6, 66:20-67:3 (Buckton).

53.     Generating 0.02 millimoles of sodium, potassium, or chloride ions in the body would not pose any risk of toxicity, irritation, or allergic response.  Tr. 1593:19-1594:2, 1596:16-1597:5, 1598:10-17 (MacMillan).  0.02 millimoles of each of these ions amounts to less than a milligram of each.  *Id.* at 1593:19-24, 1595:11-1596:2, 1596:16-1597:5.  There is 40 mg of sodium in a 12 oz. can of Diet Coke, which is almost 100 times as much sodium as would be generated by the maximum therapeutic dose of a sodium apixaban salt.  *Id.* at 1595:11-1596:2.  There is about 100 times more potassium in a 16 oz. bottle of Gatorade than there is in the maximum therapeutic dose of a potassium salt of apixaban.  *Id.* at 1596:8-21.  And 0.02 millimoles is a trace amount of chloride in comparison to the amount already in the body and foods people eat on a daily basis.  *Id.* at 1598:10-17.  The sodium, potassium, and chloride formed in the body from taking apixaban salts would have no impact on its benefit/risk ratio.  *Id.* at 1596:3-5, 1607:2-1608:2.

54.     Generating 0.02 millimoles of hydroxide ions in the body similarly would not pose any risk of toxicity, irritation, or allergic response because that amount of hydroxide is very small.  Tr. 1594:7-20, 1596:16-1597:5 (MacMillan).  Hydroxide ion is a base.  *Id.* at 1599:1-13.  A 500 mg tablet of TUMS, an over-the-counter antacid, contains 5 millimoles of base.  *Id.*  Therefore, there is about 250 times more base in one tablet of TUMS than there is in the maximum therapeutic dose of a sodium salt of apixaban.  *Id.*  And the TUMS label says that a person can take two to four tablets at a time, so there could be as much as 1,000 times more base in a dose of TUMS relative to the maximum therapeutic dose of a sodium salt of apixaban.  *Id.*  The hydroxide ion formed from taking a sodium salt of apixaban would have no impact on the body in comparison to taking a tablet of TUMS.  *Id.* at 1599:14-17.

55.     Generating 0.02 millimoles of hydronium ion also would not pose any risk of

toxicity, irritation, or allergic response.  Tr. 1598:10-17 (MacMillan).  The amount of hydronium ion in a  12 oz. can of Diet Coke is 30 times more than the amount of hydronium ion that would be generated in the body by the maximum therapeutic dose of a hydrochloride salt form of apixaban.  *Id.* at 1599:18-25.  Therefore, the amount of hydronium ion formed by taking the maximum therapeutic dose of a hydrochloride salt of apixaban will have no impact in comparison to drinking a can of Coke and will not meaningfully affect the benefit/risk ratio as compared to neutral apixaban.  *Id.* at 1600:1-6.

56.     At the maximum therapeutic doses of apixaban, the sodium, potassium, and hydrochloride salts of apixaban do not pose a risk of excessive toxicity, irritation, allergic response, or other complication.  Tr. 1297:9-21 (Kowey); Tr. 1593:19-1594:20, 1596:16-1597:7, 1598:3-17 (MacMillan).  And the risks of taking a salt form of apixaban would be identical to the risks of taking neutral apixaban.  Tr. 1607:19-1608:6 (MacMillan).  The trace amounts of additional ions formed from administering the salt form of apixaban would have no impact on the patient.  Tr. 1607:17-1608:2 (MacMillan); Tr. 1294:21-1295:12, 1296:13-1297:1 (Kowey); *see* Tr. 892:17-25 (Zusman).

57.     The benefits of apixaban outweigh the risks for patients who need treatment or preventative care for the indicated thromboembolic disorders.  Tr. 219:9-221:5 (Knabb); Tr. 1281:7-12, 1293:25-1294:9 (Kowey); Tr. 70:21-71:7 (Buckton).  The risk/benefit ratio of an apixaban salt is identical to that of the neutral form of apixaban.  Tr. 1608:3-6 (MacMillan); Tr. 1296:12-1297:1 (Kowey).  Administering a salt form of apixaban is commensurate with a reasonable benefit/risk ratio.  Tr. 1607:2-8, 1608:7-10 (MacMillan); Tr. 1293:16-1294:9 (Kowey).

58.     The Court's construction of "pharmaceutically acceptable salts" requires that salts

of apixaban be suitable for use "within the scope of sound medical judgment."  D.I. 381 at 1.

Defendants offered no evidence addressing this issue of "sound medical judgment."  Dr. Scheidt

conceded that he did not offer an opinion addressing a reasonable benefit/risk ratio; that he is not

a medical doctor; and that no one has ever come to him for his sound medical judgment.  Tr.

1402:10-11, 1440:1-21, 1442:1-1444:3, 1445:4-7 (Scheidt).  Dr. Buckton likewise conceded that

he was not a medical doctor and did not have medical judgment to apply.  Tr. 49:20-24, 50:21-25

(Buckton).  To the extent Defendants' clinical expert Dr. Zusman had an opinion on the matter,

he agreed with Dr. Kowey that the effects of apixaban salts on the body would not appreciably

differ from neutral apixaban at therapeutic doses.  Tr. 892:17-25 (Zusman).

59.     At trial, Dr. Zusman attempted to recast his opinion as pertaining to table salt.  Tr.

894:22-895:6 (Zusman).  But that portion of his expert report was directly responding to Dr.

Kowey's discussion of apixaban salts.  *Id.* at 894:3-21.  Dr. Zusman's trial testimony attempting

to disavow the opinion expressed in his expert report is inconsistent with the unambiguous

language of his expert report and is not credible.

### 5.     BMS's documents address whether apixaban is ionizable to improve its aqueous solubility, not whether apixaban can form "pharmaceutically acceptable salts" in non-aqueous media.

60.     One of main reasons that pharmaceutical development teams make salt forms of

potential drugs is to try to improve the drugs' solubility.  Tr. 213:11-23 (Knabb); Tr. 1435:7-12

(Scheidt); Tr. 17:8-20 (Buckton) ("[Q.  W]hy would one make salts of a pharmaceutical

compound?  A.  You would make if for a variety of reasons.  One of the main reasons is

solubility."); Tr. 1472:6-9 (Scheidt); *see also* Tr. 233:24-25 (Knabb) ("That is the context in

which we discussed salt formation, was solubility.").  A drug's solubility refers to how much of

it will dissolve in water or blood.  Tr. 212:19-23 (Knabb).  In order for a salt form to effectively

improve a drug's solubility, the drug has to be ionizable in water, and more specifically at the

physiological pH range, which is about 1 to 8.5.  *Id.* at 213:11-23, 231:6-21; DTX-629; *see also*

Tr. 18:4-10 (Buckton) (explaining that neutral compounds have the same solubility throughout

the whole GI tract); Tr. 213:11-23 (Knabb) ("[I]t is referring to, although not explicitly stated,

it's non-ionizable in the physiological range, which is what's relevant to solubility in, for

development as a pharmaceutical.").

61.     Certain BMS documents refer to apixaban as being "nonionizable."  For example,

DTX-632, a BMS document prepared to help determine whether to advance apixaban into

clinical studies, states:  "Since BMS-562247-01 [apixaban] is non-ionizable, salt formation

cannot be used to enhance solubility."  DTX-632; Tr. 211:3-18, 212:24-213:6 (Knabb).  The

document refers to ionizability in the physiological pH range because that is what is relevant to

solubility in the context of pharmaceutical development.  Tr. 213:11-23 (Knabb).  Similarly,

DTX-188, a DEDIT Program Data Summary for apixaban, states "Salt form:  None,"

immediately after describing apixaban's solubility in the physiological pH range:  "Solubility:

0.047 (pH1.1), 0.056 (pH3.4), 0.046 (pH7.2), 0.0423 (pH8.5) mg/ml."  DTX-188 at 5; Tr.

233:12-20 (Knabb).

62.     All the BMS documents that discussed the ionizability of apixaban did so in the

context of addressing whether apixaban could be ionized to improve its aqueous solubility.  Tr.

213:24-214:4 (Knabb); Tr. 28:17-24 (Buckton) ("All these documents talk about solubility.");

Tr. 1472:19-23 (Scheidt) ("I believe that those previous examples you were talking about, they

wanted to increase the solubility by making the salt.").  Dr. Knabb explained these documents

from the development team at BMS indicate that making a salt form of apixaban was not an

approach for enhancing solubility, not that apixaban could never be ionized or never form a salt.

Tr. 214:5-13 (Knabb).

63.     In order to form a pharmaceutically acceptable salt, a compound does not need to be ionizable within a pH range that would improve its solubility in water or even be ionizable in an aqueous environment at all.  On the contrary, the '208 patent explicitly states that it is "preferred" to prepare "pharmaceutically acceptable salts" in "non-aqueous media."  JTX-1 at 117:4-9; Tr. 1589:7-22 (MacMillan).

64.     Defendants do not dispute that apixaban can, in fact, be ionized and that the salt form can be made.  Tr. 52:21-53:10 (Buckton) ("Q.  Now, you agree that apixaban can be ionized; correct?  A.  It can. . . .  Q.  It was never your opinion that it's impossible to make a salt form of apixaban; correct?  A.  Correct.  It's not impossible to make the salt form.").

**6.      BMS had no need to make a salt form of apixaban.**

65.     Mr. Orwat and Dr. Pinto discussed how to make a salt form of apixaban using the routine techniques that are described in the '208 patent.  Tr. 243:21-244:3, 250:23-251:1 (Orwat).  Mr. Orwat believed that he would have been successful in making an apixaban salt, and he had no concerns that an apixaban salt would be toxic.  *Id.* at 243:4-8.

66.     Mr. Orwat ultimately did not make a salt of apixaban because "it was determined that the solubility of apixaban was sufficient."  *Id.* at 244:12-15.  Dr. Pinto similarly testified that the reason that he did not make any apixaban salts because he "didn't have to," not because he thought he could not do so.  Tr. 1553:11-18 (Pinto).

67.     The development team at BMS discussed the solubility of apixaban and whether a salt form of apixaban could improve its solubility.  Tr. 213:3-214:24, 215:17-21 (Knabb).  During those meetings, no one at BMS expressed "any concern that a salt form [of apixaban] would be toxic" or "would cause excessive irritation."  *Id.* at 215:22-216:2.  Dr. Knabb testified that BMS ultimately never made a salt form of apixaban because "[w]e concluded that one wasn't needed."  *Id.* at 232:17-19.  As Dr. Knabb explained, there is "a difference between can't

be made and don't need to be made." *Id.* at 234:4-6.

**7.   Administering an apixaban salt would have no harmful effect on pH.**

68.   pH and p$K_a$ are not the same thing.  Tr. 1600:18-1601:15 (MacMillan).  pH is a

measure of the concentration of hydronium ions in a solution of water, whereas p$K_a$ is an

intrinsic measure of the susceptibility of a molecule to act as an acid.  *Id*.; *see also* Tr. 1426:24-

1427:4 (Scheidt).  Because pH is a measure of concentration, it depends on both the amount of

acid and the amount of water.  Tr. 1604:18-1605:11 (MacMillan) (explaining concentration

dependence by comparing fish and chips to pints of vinegar and seawater).  For example, the

acid in the vinegar on fish and chips (which is not toxic) has the same p$K_a$ as the acid in vinegar

in a pint glass (which would be toxic if consumed in such large quantities).  *Id*.

69.   A compound that has a given p$K_a$ can form a solution with a range of pH values

depending on the amount of the compound and the volume of water.  *Id.*  For example, an

aqueous solution of a compound with a p$K_a$ of 0 could have a pH of 6.9, which is near neutral.

*Id*. at 1600:22-1602:2; Tr. 1428:14-18 (Scheidt) (water is pH 7).  Taking the maximum

therapeutic dose of a hydrochloride salt of apixaban would therefore not be comparable to

ingesting dilute battery acid because the amount of hydrochloride in such a dose is too small to

meaningfully alter the pH.  Tr. 1601:16-1602:21 (MacMillan).  And taking the maximum

therapeutic dose of a sodium or potassium salt of apixaban would likewise not be comparable to

ingesting oven cleaner or drain cleaner, again because the small amount of hydroxide formed by

the apixaban salt would not meaningfully alter the pH.  *Id.* at 1602:22-1603:11.

70.   It would require about 150,000 milligrams of the hydrochloride salt of apixaban

in the volume of a 12 oz. can of Coke to produce a pH environment 100,000 times more acidic

than a 12 oz. can of Coke.  *Id*. at 1603:12-1604:2.  Likewise, it would require about 150,000

milligrams of the sodium or potassium salt of apixaban in about the volume of a can of Coke in

order for the sodium and potassium salts of apixaban to produce a pH environment 100,000

times more basic than a Tums tablet.  *Id.* at 1604:6-17.  That is tens of thousands of times more

apixaban salt than the maximum therapeutic dose of apixaban, which is not a realistic amount for

use with a patient.  *Id.* at 1604:3-5.

71.     Defendants' experts testified about a chart (reproduced at Br. 12 and DOFOF

¶ 109) that purports to show the percentage of ***apixaban*** that will be ionized in a solution with a

given pH.  Tr. 35:3-36:1 (Buckton); Tr. 1429:2-7 (Scheidt).  The chart shows what "happen[s] to

apixaban if you put it in that type of environment."  Tr. 1429:2-7 (Scheidt).  For example, in a

solution with a pH of 15 or –2, all the apixaban will be ionized.  *Id*. at 1428:10-1432:1.  The

chart, however, does not show what effect an ***apixaban salt*** has on the pH of its environment.

Tr. 1600:22-1602:2 (MacMillan).

72.     Therapeutic doses of apixaban salts would not create a "localized pH" that would

be dangerous to human tissue.  Tr. 1605:25-1607:1 (MacMillan).  At therapeutic doses, the

amount of apixaban salt present is too small to have an effect on pH.  *Id.*; *see also id.* at 1592:4-

13, 1593:5-1594:20, 1596:16-1597:7,1598:3-17, 1599:14-17, 1600:1-6, 1601:16-1603:11,

1604:18-1605:11.  In addition, any hydronium (acid) or hydroxide (base) generated from the

apixaban salt would diffuse into solution faster than it could react with other molecules to cause

any damage.  *Id.* at 1605:25-1607:1.

73.     Dr. Buckton's testimony about a supposed "localized pH" did not address the

amount of apixaban salt present or take into account the effects of diffusion.  *See* Tr. 66:7-19,

67:8-11, 68:11-18 (Buckton).  Dr. Buckton also admitted that enteric coatings that would deliver

the drug directly to the already-acidic stomach were available at the time of the invention, *id.* at

63:10-64:11, and that, "by the time [a dissolving salt of apixaban] dilutes into the stomach, I

don't believe it's damaging." *Id.* at 65:9-18; *see also id.* at 68:11-18.  And he explained that he

did not believe that taking an apixaban salt would make "any meaningful change" to the total pH

of the body.  *Id.* at 67:19-24.

74.     Pharmaceutically acceptable salts can be made from compounds with p$K_a$ values

outside the 3-to-10 range.  Tr. 1065:10-23 (MacMillan).  The '208 patent explains that "non-

aqueous media" are preferred for making pharmaceutically acceptable salts (JTX-1 at 117:4-9),

so there is no requirement that pharmaceutically acceptable salts can only be made from

compounds with p$K_a$ values that allow them to be ionized in an aqueous environment or within a

specified pH range.  Tr. 1065:10-23 (MacMillan); *see* Tr. 74:13-15, 87:20-88:1 (Buckton).

**8.     Salts of apixaban can be formulated to remain stable.**

75.     Apixaban salts could have been formulated to remain stable.  Tr. 1735:6-8

(Myerson).  Because salt forms of apixaban will not disproportionate in the absence of water,

excluding water would have prevented disproportionation.  *Id.* at 1737:18-20 (Myerson); Tr.

1610:11-23 (MacMillan); *see* Tr. 1421:11-22 (Scheidt).  Salt forms of apixaban could have been

formulated without being exposed to moisture and packaged to exclude moisture.  Tr. 1734:21-

1735:8 (Myerson); Tr. 1610:1-10 (MacMillan).  For example, the dosage form (either tablets or

capsules) could have been prepared using a nitrogen blanket or a dry-air blanket.  Tr. 1735:12-

1736:5 (Myerson).  Such techniques were available in 2001.  *Id.* at 1736:6-10, 1740:8-13.

Notably, Defendants did not produce any testimony or other evidence suggesting that apixaban

salts cannot be put into capsules without disproportionation.  *Compare* Tr. 98:19-99:10

(Buckton) (discussing only tablets), *with* Tr. 1735:23-1736:10 (Myerson) (discussing capsules).

76.     Packaging techniques impermeable to water, such as aluminum-film blister packs,

were known in 2001 and could have prevented compounds from being exposed to outside

moisture.  Tr. 1736:11-1737:4 (Myerson); Tr. 88:23-89:19 (Buckton).  Another option known in

2001 would have been to package the drug in a glass or polymer bottle with a foil seal.  Tr.
1736:11-1737:4 (Myerson).  The use of desiccants to reduce a drug's exposure to moisture was
also known as of September 2001.  Tr. 1736:11-1737:17 (Myerson); Tr. 90:9-16 (Buckton).

### 9.    The *Wands* factors support enablement.

77.    Dr. MacMillan was the only expert in the case to provide testimony addressing
the eight *Wands* factors in the context of the '208 patent.  Tr. 1611:15-25 (MacMillan).  All the
*Wands* factors support a finding that claim 13 is enabled.  *Id.* at 1615:22-1616:1.

78.    The first factor, the breadth of the claim, supports enablement.  Tr. 1612: 13-16
(MacMillan).  The scope of claim 13 is narrow.  *Id.* at 1612:1-6.  It claims just apixaban in the
neutral form or a pharmaceutically acceptable salt form thereof.  *Id.*  There are a limited number
of common pharmaceutical counterions and a POSA would have understood that only a subset of
those would be appropriate to use with apixaban.  *Id.* at 1612:7-12.

79.    The second factor, the nature of the invention, supports enablement.  Tr. 1613:7-9
(MacMillan).  The nature of the invention is the neutral form of apixaban.  *Id.* at 1612:17-1613:3.
The '208 patent describes how to make neutral apixaban.  *Id.*  It would have been routine to
make pharmaceutically acceptable salt forms of apixaban starting from the neutral form of the
compound.  *Id.* at 1612:17-1613:7.

80.    The third factor, the state of the art, supports enablement.  Tr. 1613:11-21
(MacMillan).  At the time of invention, the state of the art of making pharmaceutically
acceptable salts was extensive.  *Id.*  Salt formation was routine; the theory behind it was
extensively developed; and there were many examples of salts in pharmaceutical processes.  *Id.*

81.    The fourth factor, the level of skill in the art, supports enablement.  Tr. 1613:22-
1614:7 (MacMillan).  Salt formation is taught at the very early stages of a chemist's education
and a POSA would have been well beyond that level.  *Id.*  The formation of salts of apixaban

would have been within the level of ordinary skill in 2001.  *Id.*; Tr. 57:9-11 (Buckton).

82.     The fifth factor, the level of predictability in the art, supports enablement.  Tr. 1614:8-15 (MacMillan).  The level of predictability of salt formation is very high.  *Id.*  The concepts of what acids and bases will react with a pharmaceutical compound to form a salt are straightforward, easy to implement, and easy to predict.  *Id.*

83.     The sixth factor, the level of direction provided by the inventors, supports enablement.  Tr. 1614:16-1615:1 (MacMillan).  The inventors provide sufficient direction by describing how to synthesize the neutral form of apixaban and explaining in column 117 how to make pharmaceutically acceptable salts of the invention.  *Id.*

84.     The seventh factor, the existence of working examples, supports enablement.  Tr. 1615:2-13 (MacMillan).  The inventors provided examples of 12 salts in the '208 patent, three of which are hydrochloride salts.  *Id.*  The routine methods shown in the '208 patent to make those salts are of the same type as the methods a POSA would have used to make pharmaceutically acceptable salts forms of apixaban.  *Id.*

85.     Finally, the eighth factor, the quantity of experimentation needed to make pharmaceutically acceptable salt forms of apixaban, supports enablement.  Tr. 1615:14-21 (MacMillan).  The work required to form a pharmaceutically acceptable salt form of apixaban would have been routine.  *Id.*  For example, Dr. Jacobsen prepared three different pharmaceutically acceptable salt forms in a matter of hours.  *Id.*  Very little experimentation would have been required.  *Id.*  Defendants' experts did no experiments to rebut Dr. Jacobsen's testimony.  Tr. 55:7-22 (Buckton); Tr. 1459:4-7 (Scheidt).

86.     Claim 13 is not invalid for lack of enablement.  Tr. 1615:22-1616:1 (MacMillan).

**10.   Claim 104 is enabled.**

87.     A POSA would have understood that the plain language of claim 104 does not

cover pharmaceutically acceptable salt forms of apixaban.  Tr. 1616:17-20 (MacMillan).  A POSA would read the all the claims of the '208 patent together and use that context to inform the plain meaning of claim 104.  *Id.* at 1616:21-1617:1, 1618:3-1619:7.  Claim 13 recites "[a] compound according to claim 8 … or a pharmaceutically acceptable salt form thereof."  JTX-001 at 269:1-6.  Claims 27 and 55 recite "a compound of claim 13 or a pharmaceutically acceptable salt form thereof."  JTX-001 at 270:7-8, 272:55-56.

88.     If "a compound of claim 13" included pharmaceutically acceptable salt forms, there would have been no need for claims 27 and 55 to say "or a pharmaceutically acceptable salt form thereof"—that language would be superfluous.  Tr. 1618:3-24 (MacMillan); *see* Tr. 95:1-8, 95:21-96:3 (Buckton) (agreeing that under his interpretation of claim 104, the words "or a pharmaceutically acceptable salt form thereof" are extraneous in claims 27 and 55).

89.     When claim 104 recites "a compound according to claim 13" with no mention of pharmaceutically acceptable salt forms, a POSA would have understood that pharmaceutically acceptable salt forms were not included.  Tr. 1618:3-1619:7 (MacMillan).

90.     Even if claim 104 encompassed pharmaceutically acceptable salts, it would still be enabled for the same reasons that claim 13 is enabled.  Tr. 1619:19-1620:6 (MacMillan).  Defendants do not contend that, even if pharmaceutically acceptable salt forms of apixaban are enabled, crystalline pharmaceutically acceptable salt forms are not.  Tr. 54:22-25 (Buckton).  In any event, salt forms are straightforward to crystallize.  Tr. 1619:19-1620:6 (MacMillan).

91.     Claim 104 is not invalid for lack of enablement.  *Id.*

**C.    The '208 Patent's Asserted Claims Are Not Invalid for Lack of Written Description.**

92.     A POSA would have understood that the'208 patent's inventors were in possession of pharmaceutically acceptable salt forms of apixaban as of September 21, 2001.  Tr.

1620:16-22 (MacMillan).  Indeed, apixaban was first synthesized on January 3, 2001, by

Michael Orwat.  Tr. 240:22-241:3, 241:16-242:1 (Orwat).  Mr. Orwat synthesized crystalline

apixaban no later than June 29, 2001.  Tr. 243:1-17, 249:21-250:5 (Orwat).

93.     The earliest provisional application to which the '208 patent claims priority is

U.S. Provisional App. No. 60/324,165, filed on September 21, 2001.  PTX-331.

94.     Example 18 of the '165 application describes how to synthesize apixaban.  PTX-

331 at BMSAPIX10238133-36; Tr. 1622:2-16 (MacMillan).  The '165 application contains the

same paragraph describing how to make pharmaceutically acceptable salts of the invention that

later appears in column 117 of the '208 patent.  PTX-331 at BMSAPIX10238071; Tr. 1622:17-

1623:2 (MacMillan).  And the '165 application contains a claim (claim 8) to a short list of

specifically named compounds, one of which is apixaban, and their pharmaceutically acceptable

salt forms.  PTX-331 at BMSAPIX10238246, 223:14-227:21 (apixaban at 225:6-8); Tr. 1623:3-

1624:2 (MacMillan).  A POSA would have understood from this claim in the provisional

application that the inventors were in possession of apixaban and pharmaceutically acceptable

salt forms of apixaban.  Tr. 1623:21-1624:2 (MacMillan).

95.     The '208 patent's specification describes apixaban by chemical name and

describes how to synthesize it.  JTX-001 at 174:21-175:51; Tr. 1624:14-21, 1625:19-1626:5

(MacMillan).  The '208 patent's specification also specifically identifies what "pharmaceutically

acceptable salts of the present invention" are and how to make them.  JTX-001 at 117:1-13; Tr.

1624:14-21, 1625:19-1626:5 (MacMillan).  A POSA as of September 2001 would have

understood from the disclosure in the '208 patent that the inventors were in possession of

pharmaceutically acceptable salt forms of apixaban.  Tr. 1625:25-1626:5 (MacMillan).

96.     Claims 13 and 104 are not invalid for inadequate written description.  *Id.* at 1626:19-1627:1.

97.     Additionally, claim 104 does not cover pharmaceutically acceptable salts forms of apixaban.  Defendants' arguments with respect to lack of written description therefore do not apply to claim 104.

## III.   The '945 Patent

### A.   Technology Background

98.     The dosage form of the '945 patent is an immediate-release tablet.  Tr. 1669:11-13 (Myerson).  An immediate-release tablet is one in which the formulator has not done anything to delay or sustain the release of the active ingredient; immediate release is commonly defined as 70% or more released in one hour.  Tr. 1668:6-13, 1713:8-16 (Myerson); DTX-344 at -894.

99.     The Biopharmaceutical Classification System, or "BCS," classifies drugs based on two properties:  Solubility and permeability.  Tr. 1681:16-20, 1684:7-9 (Myerson).  These may be categorized as high or low, yielding four quadrants: high solubility and permeability (Class I), low solubility/high permeability (Class II), high solubility/low permeability (Class III), low solubility and permeability (Class IV).  *Id.* at 1682:2-7; DTX-437 at DTX-437.00002.

100.    Solubility is the maximum amount of a compound that can dissolve in a liquid at a given temperature.  Tr. 1672:18-21, 1682:8-19 (Myerson).  Absolute solubility is a physical chemical property of a solid.  *Id.*  Absolute solubility does not consider the amount of the dose to be administered to a patient.  Tr. 1384:21-24 (Chambliss).  Absolute solubility may also be called water solubility and USP solubility.  Tr. 1683:2-8 (Myerson).

101.    BCS solubility is a dose-solubility ratio that determines whether the highest administered dose can dissolve in 250 milliliters of solution at physiological temperature and pH.  *Id.* at 1682:20-1683:1.  Dr. Chambliss agrees that BCS solubility is not the same thing as USP

solubility.  Tr. 1256:4-24; 1383:12-14 (Chambliss).  The USP does not characterize solubility in the human physiological context.  *Id.* at 1384:25-1385:78.

102.    A drug can have low absolute solubility and still be considered highly soluble under the BCS.  *Id.* at 1384:2-16; Tr. 1682:20-1683:1 (Myerson).

103.    The BCS describes a drug as highly permeable if the *in vivo* absorption is greater than 90 percent.  Tr. 1684:10-11 (Myerson).

104.    Bioavailability is the amount of drug that gets into the blood.  *Id.* at 1672:7-10.

105.    Dissolution rate is the rate at which the drug's active ingredient dissolves in the body.  *Id.* at 1672:11-14.

106.    As of 2010, there were several methods for measuring particle size, including laser light scattering, microscopy, sonic methods, electrical zone sensing, among others.  *Id.* at 1671:13-1672:6.  Dr. Chambliss agreed that a POSA would have been aware of multiple techniques to measure particle size as of 2010.  Tr. 1352:23-1353:1 (Chambliss).  Dr. Genck and Dr. Chambliss also agreed that imaging techniques, such as SEM-EDS, could be used to measure particle size.  Tr. 1178:6-9, 1202:5-1203:24 (Genck); Tr. 1352:22-1353:3 (Chambliss).

107.    Particle size may be described by several parameters, including volume.  Tr. 1670:5-9 (Myerson).  The size of particles in a composition may vary, so it is typically described as a particle size distribution.  *Id.* at 1669:25-1670:4.

108.    A $D_{90}$ is a calculated value, not something that is measured.  Tr. 1349:16-22 (Chambliss); Tr. 1670:10-1671:12 (Myerson).  A $D_{90}$ is mathematically determined from the cumulative distribution plot to be the size at which 90 percent of the volume is smaller and 10 percent of the volume is larger than a particular value.  Tr. 1670:10-1671:12 (Myerson).

Calculating a $D_{90}$ from particle size distribution data can be done by software or by hand.  Tr. 1349:16-22, 1349:23-1350:3, 1353:4-11 (Chambliss); Tr. 1670:10-1671:12 (Myerson).

**B.    Subject Matter of the Asserted Claims**

109.    The inventors of the '945 patent surprisingly and unexpectedly discovered that "compositions for tablets comprising up to 5 mg apixaban particles having a $D_{90}$ (90% of the volume) less than 89 microns ($\mu$m) lead to consistent *in vivo* dissolution in humans (at physiologic pH), hence consistent exposure and consistent Factor Xa inhibition that will lead to consistency in therapeutic effect."  Tr. 1667:14-1668:1, 1717:1-1717:10 (Myerson); JTX-2 at 1:64-2:3.  More specifically, the inventors discovered that to achieve consistent exposure, the apixaban formulation had to have a dissolution rate of at least 77% in 30 minutes.  JTX-2 at 9:14-28.  They also discovered that particle size is an important factor in controlling dissolution rate, and that when the crystalline apixaban particle size has a $D_{90}$ less than 89 microns along with the requisite dissolution rate, the composition achieves consistent exposure.  *Id.* at 9:29-42.

110.    Consistent exposure is defined as *in vivo* exposure from tablets that is similar to that from a solution.  *Id.* at 2:3-5; Tr. 1717:11-13 (Myerson).  Solution-like exposure is the highest oral exposure that can be achieved.  *Id.* at 1717:14-17.

111.    The '945 patent describes at least one example of a manufacturing method that can be used to make the claimed pharmaceutical compositions, dry granulation.  JTX-2 at 5:27-63; Tr. 1717:18-25 (Myerson).  Dry granulation is a standard manufacturing method in the pharmaceutical industry.  Tr. 1340:11-23 (Chambliss); Tr. 1718:1-2 (Myerson).  The '945 patent shows in Table 6, Figures 3 and 4, and the supporting text how these methods can produce a composition meeting the dissolution rate and particle size claim limitations.  JTX-2 at 8:28-9:46.  The specification contains a specific example involving measuring via laser light scattering the

$D_{90}$ of apixaban before formulation and subsequently using a dry granulation to prepare the solid pharmaceutical composition.  *Id.* at 5:18-65, 6:15-18.

112.     Figures 3 and 4 show the relationship between dissolution rate and particle size. *Id.* at Figs. 3 & 4; Tr. 1718:21-1719:4 (Myerson).  The last experimental value in both plots that provides a dissolution rate of 77% in 30 minutes corresponds to a particle size of 89 microns. JTX-2 at Figs. 3 & 4; Tr. 1718:21-1719:4 (Myerson).

113.     The '945 patent discloses that the claimed particle size is needed "at the site of dissolution."  JTX-2 at 5:18-21.  Similarly, the dissolution test is done using parameters that mimic those "observed in the gastrointestinal tract."  *Id.* at 3:8-11.

114.     No claim limitation requires measuring particle size using a specific technique. Tr. 1716:12-14 (Myerson).  The claims also do not have any limitation that requires measuring apixaban particle size before it is formulated into a composition.  *Id.* at 1716:15-17.

115.     The '945 patent expressly notes that the invention is "exemplified and disclosed by … non-limiting examples."  JTX-2 at 6:50-51; Tr. 1212:14-18 (Genck).

## C.     The '945 Patent's Asserted Claims Were Conceived and Reduced to Practice by October 2009.

116.     The inventors discovered that a dissolution rate of 77 percent in 30 minutes ensured consistent, solution-like exposure after conducting clinical studies.  Tr. 1667:14-1668:1 (Myerson); JTX-2 at 1:64-4:23, 9:14-28; PTX-13 at BMSAPIX0010816, 841-42; PTX-164 at BMSAPIX0049238, 240, 254, 256, 260, 262, 268, 270.  The inventors thus chose 77 percent in 30 minutes as the dissolution-rate cutoff for their formulations.  Tr. 1701:7-10, 1702:6-15 (Myerson); PTX-211 at BMSAPIX7734028.

117.     The inventors then underwent a large study and determined that particle size was the only parameter that impacted dissolution rates.  Tr. 1667:14-1668:1 (Myerson); PTX-211 at

BMSAPIX7734027-28, 37-38, 45. The inventors established a relationship between dissolution rate and apixaban particle size. Tr. 1702:15-1703:6 (Myerson); JTX-2 at 9:29-46 & figs. 3 & 4; PTX-211 at BMSAPIX7734027-28, 37-38, 45; PTX-167 at BMSAPIX0050063, 70, 89, 96; PTX-168 at BMSAPIX0050272, 273, 284, 291, 298, 311, 312, 323, 330, 337; PTX-170 at BMSAPIX0050980, 987, 996, 1002; PTX-174 at BMSAPIX0051945; PTX-176 at BMSAPIX0052490. From there, the inventors established a $D_{90}$ particle size limitation of 89 microns. Tr. 1667:13-25 (Myerson); JTX-2 at 9:40-46; PTX-211 at BMSAPIX7734027-28.

118. All the experiments establishing the asserted claim limitations were completed as of October 2009. Tr. 1700:10-1701:6 (Myerson); PTX-167 at BMSAPIX0050061, 68, 87, 94; PTX-168 at BMSAPIX0050280-81, 92, 99, 306, 19-20, 31, 38, 45; PTX-170 at BMSAPIX0050988, 95, 1004, 09; PTX-174 at BMSAPIX0051953; PTX-176 at BMSAPIX0052498; PTX-211 at BMSAPIX7734037-38. As of October 2009, the inventors had made and tested a pharmaceutical composition within the scope of the claims and understood it would be an effective therapeutic agent. Tr. 1700:19-1703:12 (Myerson); PTX-13 at BMSAPIX0010816, 41-42; PTX-164 at BMSAPIX0049250, 52, 66, 68, 72, 74, 80, 82; PTX-211 at BMSAPIX7734027-28, 37-38, 45; PTX-167 at BMSAPIX0050071, 78, 97, 104; PTX-168 at BMSAPIX0050280-81, 92, 99, 306 , 319-20, 31, 38, 45; PTX-170 at BMSAPIX0050988, 95, 1004, 10; PTX-174 at BMSAPIX0051953; PTX-176 at BMSAPIX0052498.

119. Dr. Chambliss offered no opinion on whether the claims of the '945 patent were conceived and reduced to practice by October 2009. Tr. 1348:9-12 (Chambliss).

## D. The '945 Patent's Asserted Claims Are Not Invalid for Lack of Written Description.

120. The disclosures in the '945 patent convey to a POSA that the inventors were in possession of a formulation comprising crystalline apixaban with a particular $D_{90}$ particle size

with a dissolution rate of at least 77 percent in 30 minutes.  Tr. 1719:5-11, 1731:23-1732:3

(Myerson).  The specification discloses that, "[s]urprisingly and unexpectedly, it has been found

that compositions for tablets comprising up to 5 mg, apixaban particles having a $D_{90}$ (90% of the

volume) less than 89 microns ($\mu$m) lead to consistent in-vivo dissolution in humans (at

physiologic pH), hence, consistent exposure and consistent Factor Xa inhibition that will lead to

consistency in therapeutic effect."  JTX-2 at 1:64-2:3.

121.    A POSA would understand from the disclosure of the '945 patent that the

inventors were in possession of the claimed invention.  Tr. 1731:18-22 (Myerson).

### 1.   The '945 patent describes how to determine the $D_{90}$ of the crystalline apixaban in a formulated product.

122.    The specification contains a specific example involving measuring the $D_{90}$ of

crystalline apixaban by laser light scattering before formulation and then using dry granulation to

prepare the solid pharmaceutical composition.  *Id.* at 1719:12-1720:7. 1743:15-21.  Dr. Myerson

explained that the particle size of the bulk crystalline apixaban would not increase using this

technique because: (1) the apixaban comprises a low percentage of the final solid pharmaceutical

composition and would therefore not be located near other apixaban particles; and (2) apixaban

has a high melting point and would therefore not fuse together.  *Id.* at 1720:8-24.  Thus, by

measuring the $D_{90}$ of the bulk crystalline apixaban and ensuring it was below the claimed particle

size distribution, a POSA would have known that the $D_{90}$ would either stay the same or decrease

in the final pharmaceutical composition.  *Id.* at 1719:23-1720:7, 1725:19-1726:2.

123.    Unichem's expert, Dr. Genck, did not explain how the particle size of bulk API

could increase using the manufacturing methods disclosed in the tablet.  Tr. 1153:13-22 (Genck).

Dr. Chambliss testified about a book chapter by Dr. Parrott in which Dr. Parrott theorizes that

tablet compression can cause some particles to bond with one another.  Tr. 1341:11-1342:1

– 33 –

(Chambliss).  The Parrott book chapter does not discuss apixaban and specifically notes that its theories "have not been substantiated by experimentation and have not been useful in the prediction of the compressional properties of materials."  DTX-366 at BMSAPIXE_0002015. Dr. Chambliss performed no testing to demonstrate whether the particle size increased during formulation.  Tr. 1350:14-1351:1 (Chambliss).

124.    During claim construction, Dr. Genck proposed that the term "apixaban particles have a $D_{90}$" be construed as: "$D_{90}$ is measured by laser light scattering (such as Malvern light scattering) of bulk apixaban particles."  Tr. 1193:11-15 (Genck).  The Court rejected that construction and adopted the term's plain meaning.  Id. at 1194:19-1195:6; D.I. 380 at 10.

125.    Dr. Genck was aware of the Court's decision, but stated "I'm not necessarily saying that[,] because it is an opinion, that I'm going to agree with it as a person – a person of ordinary skill in the art."  Id. at 1195:17-22.  Dr. Genck applied his own opinion that the only particle size testing method claimed by the '945 patent is one that measures the particle size of the starting apixaban API by laser light scattering.  Id. at 1195:23-1196:3, 1196:8-19.

### 2. The '945 patent does not describe the $D_{90}$ of the bulk apixaban as "critical."

126.    The '945 patent's claims cover solid pharmaceutical compositions.  Dr. Genck agreed the composition is the final product and that the claims do not require a specific particle size measuring technique.  Id. at 1191:16-1192:10.  The specification provides that the compositions must have crystalline apixaban particles with a $D_{90}$ of less than or equal to 89 μm *at the site of dissolution*.  JTX-2 at 5:18-21.

### 3. A POSA would have known how to determine the $D_{90}$ of crystalline apixaban after formulation.

127.    There were several methods available at the time of the invention to measure particle size in a formulated pharmaceutical composition, including SEM-EDS and methods that

combine vibrational spectroscopy, such as infrared spectroscopy, Raman spectroscopy, or FT-NIR spectroscopy, with imaging techniques like light or SEM microscopy.  Tr. 1721:13-24, 1723:4-13 (Myerson).  Dr. Myerson had used each of these techniques before, *id.* at 1721:24-1722:2, and Dr. Berkland had used SEM to measure particle size.  Tr. 609:22-24 (Berkland).

128.    Chan (2003) describes the use of infrared spectroscopy imaging on pharmaceutical formulations.  Tr. 1722:9-14 (Myerson); PTX-431.  The article discloses testing on tablets containing caffeine as the active ingredient along with the excipients starch and HPMC.  Tr. 1722:21-25 (Myerson); PTX-431 at BMSAPIXE_0003262.  The authors measured the particle size of caffeine in the tablets.  Tr. 1723:1-3 (Myerson); PTX-431 at BMSAPIXE_0003263-65.  Chan was able to distinguish the different components in the tablet and measure particle size by using the scale bar generated in the images.  Tr. 1723:7-19 (Myerson); PTX-431 at BMSAPIXE_0003264-65.

129.    Clarke (2001) describes the use of FT-NIR and Raman Spectroscopy and imaging to visualize the components of a pharmaceutical formulation.  Tr. 1724:2-8 (Myerson); PTX-435.  Using these techniques, the authors were able to examine each component in a tablet including the diluent, disintegrant, lubricant, inorganic binder, and active ingredient.  *Id.* at 1724:11-20; PTX-435 at BMSAPIXE_0003333-334.  A POSA could use the techniques disclosed in Clarke to measure particle size and calculate a $D_{90}$.  Tr. 1724:24-1725:3 (Myerson).

130.    Chan and Clarke did not a calculate a $D_{90}$, but they could have because a $D_{90}$ can be calculated from any particle size distribution.  *Id.* at 1723:20-24 1725:4-7, 1726:11-18.

131.    Bosquillon (2001) measures the particle size of an inhalation powder with irregular particles with a low aspect ratio.  *Id.* at 1727:16-1728:8; PTX-430 at BMSAPIXE_0003256.  A low aspect ratio means that the two longest dimensions are not very

different from each other.  Tr. 1728:2-7 (Myerson).  Bosquillon compares measurements made

by five different techniques, SEM microscopy, light microscopy, laser diffraction wet method,

laser diffraction dry method, and electrozone sensing.  *Id.* at 1728:14-17; PTX-430 at

BMSAPIXE_0003258.  The authors conclude that the techniques were comparable for three of

the samples tested.  Tr. 1356:21-1357:14 (Chambliss); Tr. 1728:20-24 (Myerson); PTX-430 at

BMSAPIXE_0003258.

132.    Reverchon (2008) discusses the supercritical fluid assisted production of

hydroxypropyl methylcellulose ("HPMC") composite microparticles.  Tr. 608:1-14 (Berkland);

1729:8-12 (Myerson); PTX-402 at BMSAPIXE_0002240.  Reverchon describes the analysis of

composite microparticles containing HPMC and ampicillin.  Tr. 608:15-22 (Berkland); PTX-402

at BMSAPIXE_0002240.

133.    Powders, like those measured in Reverchon, are an example of a solid

pharmaceutical composition.  Tr. 666:17-667:2 (Berkland).

134.    Reverchon analyzes particle size of HPMC/ampicillin microparticles by both

SEM imaging and laser light scattering.  *Id.* at 609:25-610:10; Tr. 1729:9-18 (Myerson); PTX-

402 at BMSAPIXE_0002244.  Reverchon measures the particle size of the microparticles by

SEM by examining 20 images.  Tr. 666:8-16 (Berkland); PTX-402 at BMSAPIXE_0002242.

135.    Reverchon discloses calculating a $D_{90}$ from SEM particle size data.  PTX-402 at

BMSAPIXE_0002244 (Table 1); Tr. 666:8-16 (Berkland); Tr. 1358:10-12, 1358:14-1359:5

(Chambliss); Tr. 1729:13-20 (Myerson).  In Table 1, Reverchon directly compares the $D_{50}$ and

$D_{90}$ particles sizes obtained from SEM and laser light scattering measurements.  PTX-402 at

BMSAPIXE_0002244 (Table 1); Tr. 666:8-16 (Berkland); Tr. 1358:10-12, 1358:13-1359:4

(Chambliss); Tr. 1729:14-21 (Myerson).  Reverchon concludes that the results from SEM and

laser light scattering were comparable.  Tr. 1357:25-1358:20 (Chambliss); Tr. 1729:22-1730:1 (Myerson); PTX-402 at BMSAPIXE_0002244.

136.     Based on Bosquillon and Reverchon, a POSA would have known that particle size measurements from different techniques were comparable.  Tr. 1358:25-1359:4 (Chambliss); Tr. 1730:2-6 (Myerson).  Neither Dr. Chambliss nor Dr. Genck provided any experimental evidence that different techniques produce different results.  Tr. 1730:10-13 (Myerson).

137.     Dr. Berkland measured thousands of apixaban particles from 68 granules in Unichem's tablet.  D.I. 689 ¶ 66 (Unichem's proposed findings).  In total, he observed thousands of apixaban particles.  *Id.*  Dr. Berkland testified that, given the small size of the crystalline apixaban particles he evaluated, he "didn't see a reason to calculate an exact $D_{90}$ value."  Tr. 629:6-16 (Berkland).  However, a $D_{90}$ could have been calculated.  Tr. 1723:17-24, 1724:24-1725:7 (Myerson).  Dr. Chambliss admitted that a POSA could calculate a $D_{90}$ from particle size data obtained from image analysis.  Tr. 1353:4-11 (Chambliss).

138.     The dry granulation composition shown in Table 3 of the '945 patent does not disclose povidone as an excipient.  JTX-2 at 6:56-7:18.  The formulation disclosed in Table 3 has the same excipients as those used in Unichem's formulation.  Tr. 610:22-611:5 (Berkland).

**E.     The '945 Patent's Asserted Claims Are Not Invalid for Lack of Enablement.**

139.     A POSA looking to practice the invention of the '945 patent could, without undue experimentation, use the formulation given in the patent, measure the particle size of the starting apixaban API, use the manufacturing techniques disclosed in the patent, and arrive at the claimed pharmaceutical composition.  Tr. 1719:12-25, 1743:15-21 (Myerson).  A POSA could make and use the invention of the '945 patent without undue experimentation.  *Id.* at 1733:4-6.

140. Dr. Myerson assessed the *Wands* factors. *Id.* at 1732:22-1733:3 & PDX 13.32. After applying the *Wands* factors, Dr. Myerson concluded that a POSA can make and use the invention without undue experimentation. Tr. 1733:4-6. He also concluded that, once a POSA had appreciated the claimed $D_{90}$ and dissolution rate limitations, that POSA could use routine techniques to make the claimed composition. *Id.* at 1733:7-12 (Myerson).

141. The nature of the claimed invention is a solid pharmaceutical composition. *Id.* at 1716:11-15, 1732:22-1733:3 & PDX 13.32 (Myerson). The claims cover solid pharmaceutical compositions having crystalline apixaban with the claimed particle size and claimed dissolution rate. *Id.*

142. The '945 patent provided working examples by disclosing multiple examples of the claimed solid pharmaceutical composition. Tr. 1717:18-25, 1732:22-1733:3 & PDX 13.32 (Myerson). As Dr. Myerson explained, the '945 patent provides substantial direction to a POSA hoping to practice the asserted claims, including describing methods for formulation, methods for measuring the particle size of the crystalline apixaban particles, tables demonstrating the dissolution rate of different compositions having the proper particle size, and examples of solid pharmaceutical compositions that meet the claim limitations. Tr. 1732:22-1733:3. Methods and ingredients for formulating solid pharmaceutical compositions were well known. *Id.*

143. A POSA could use routine techniques to make a composition that had the claimed $D_{90}$ particle size and dissolution rate limitations that result in improved properties of an apixaban formulation. *Id.* at 1733:7-12.

144. Dr. Chambliss agreed that a POSA could make an apixaban pharmaceutical composition within the recited limitations of the asserted claims of the '945 patent. Tr. 1350:1-13, 1351:2-1352:21 (Chambliss).

145.    The '945 patent discloses that particle size can be determined by Malvern laser light scattering.  JTX-2 at 6:15-16.  Upon measurement completion, the sample cell is emptied and cleaned, refilled with suspending medium, and the sampling procedure repeated for a total of three measurements.  *Id.* at 6:20-23.

146.    To select the conditions to measure particle size using a laser light scattering instrument, a POSA would simply follow the guidance in references like the USP.  Tr. 1730:22-1731:17 (Myerson) ("[M]y students do it all the time.").  Unichem's expert, Dr. Genck, testified that laser light scattering was the "gold standard" being used in the pharmaceutical industry in 2010.  Tr. 1145:11-19 (Genck).

**F.    The '945 Patent's Asserted Claims Would Not Have Been Obvious.**

**1.    Defendants have not demonstrated any motivation for changing the apixaban formulations in the prior art, which demonstrated rapid absorption and good bioavailability.**

147.    The literature as of the priority date described existing apixaban formulations used in clinical trials as demonstrating rapid absorption and good bioavailability.  Tr. 1673:2-8, 1673:11-17 (Myerson).

148.    Carreiro (2008) discusses apixaban preclinical studies and clinical trials.  Tr. 1673:20-24, 1674:3-6 (Myerson); PTX-738.  Carreiro was the "most comprehensive" publication in the prior art about the pharmacokinetics of apixaban.  Tr. 1360:18-22 (Chambliss).  Dr. Chambliss agreed Carreiro was a "reliable reference" and one a POSA would have looked to in informing themselves about the pharmacokinetics of apixaban.  *Id.* at 1360:23-24, 1361:3-7.

149.    Carreiro discloses that apixaban had good oral bioavailability in animals and humans.  *Id.* at 1360:15-17, 1362:9-1363:24, 1363:25-1364:3, 1372:21-23, 1376:1-20; Tr. 1674:7-20, 1676:20-24 (Myerson); PTX-738 at DEFAPIX002538, 40; PTX-480 at BMSAPIXE_0004449.  Carreiro further discloses that apixaban was well absorbed from the

gastrointestinal tract.  Tr. 1363:4-6 (Chambliss); PTX-738 at DEFAPIX002540.  A POSA

reading Carreiro would have understood apixaban to have rapid absorption and good

bioavailability.  Tr. 1674:21-24 (Myerson).  Carreiro does not report any issues with apixaban's

exposure in humans.  Tr. 1364:23-25 (Chambliss).

150.    Carreiro discloses that apixaban had finished Phase II clinical trials and that Phase

III clinical trials were ongoing.  Tr. 1361:12-19 (Chambliss); Tr. 1675:5-8 (Myerson); PTX-738

at DEFAPIX002542.  Carreiro discloses that apixaban was being studied in over 40,000 patients.

Tr. 1361:20-22 (Chambliss); Tr. 1675:10-13 (Myerson); JTX-738 at DEFAPIX002538, 42.

151.    A POSA reading Carreiro would have understood the apixaban formulations used

in the clinical trials to be satisfactory.  Tr. 1675: 17-20 (Myerson).  A POSA would not have

changed a formulation during clinical trials if it had been reported to have good oral

bioavailability and absorption.  *Id.* at 1675:21-1676:9 (Myerson).

152.    Sobieraj-Teague (2009) discloses that apixaban is rapidly absorbed, reaching peak

plasma concentrations 3 hours post-injection.  Tr. 1370:3-7 (Chambliss); Tr. 1676:20-24

(Myerson); PTX-480 at BMSAPIXE_0004449.  It also reports that apixaban had bioavailability

of 80 percent, Tr. 1374:12-14 (Chambliss); PTX-480 at BMSAPIXE_0004448, which was

higher than every other drug discussed except for one, which was a subcutaneous therapy (which

has 100% bioavailability since it can be injected directly under the skin).  Tr. 1374:15-1375:23

(Chambliss); PTX-480 at BMSAPIXE_0004448.

153.    Sobieraj-Teague discusses another Factor Xa inhibitor, rivaroxaban.  Tr. 1370:9-

17 (Chambliss); PTX-480 at BMSAPIXE_0004449. Rivaroxaban had been studied in four large

clinical trials and had already been approved in Europe and Canada.  Tr. 1372:1-7 (Chambliss);

PTX-480 at BMSAPIXE_0004449.  Rivaroxaban has an onset of action of three hours.  Tr.

1370:19-1371:8 (Chambliss); PTX-480 at BMSAPIXE_0004449.  Sobieraj-Teague describes

this onset of action as "rapid."  Tr. 1371:9-11 (Chambliss); PTX-480 at BMSAPIXE_0004449.

Rivaroxaban has the same onset of action as apixaban, Tr. 1371:12-15 (Chambliss), so a POSA

would have understood apixaban to have the same onset of action as rivaroxaban.  *Id.* at 1372:8-

12.  Rivaroxaban also has a bioavailability of 60 to 80 percent.  *Id.* at 1374:3-14; PTX-480 at

BMSAPIXE_0004448.  Dr. Chambliss agreed that Sobieraj-Teague was the type of reference a

POSA would have relied on in looking for information about the pharmacokinetics of apixaban.

Tr. 1369:19-22 (Chambliss).

154.    The information disclosed in Sobieraj-Teague would have indicated to a POSA

that there was no need to improve the apixaban formulation.  Tr. 1676:25-1677:9; 1677:16-19

(Myerson).

155.    Pinto (2007) discloses apixaban's bioavailability in preclinical studies to be 58

percent.  Tr. 1376:14-25 (Chambliss); DTX349 at DEFAPIX000414.  Pinto describes this

bioavailability as "good."  Tr. 1376:17-22, 1377:3-6 (Chambliss); DTX349 at DEFAPIX000414.

156.    Eriksson (2009) describes the pharmacokinetics of apixaban in animal studies.

Tr. 1678:12-22 (Myerson); PTX-320 at BMSAPIX9726774.  It states that in preclinical studies,

apixaban demonstrated high oral bioavailability: 51 percent, 88 percent, and 34 percent in

chimpanzees, dogs, and rats, respectively.  Tr. 1678:17-22 (Myerson); PTX-320 at

BMSAPIX9726774.  Eriksson discloses that apixaban is rapidly absorbed in humans, reaching

$C_{max}$ approximately one to three hours after administration.  Tr. 1678:23-1679:3 (Myerson);

PTX-320 at BMSAPIX9726774.

157.    Dr. Chambliss agreed that a POSA for purposes of the '945 patent is a

formulation scientist, not a medical doctor.  Tr. 1359:5-12 (Chambliss).  After the clinical team

had characterized a drug as having good oral bioavailability and rapid absorption, a formulator would not have conducted an independent assessment of the clinical data, but instead would have accepted the clinical team's conclusion.  Tr. 1677:24-1678:9 (Myerson).

158.    Dr. Chambliss agreed that as of 2009, the prior art disclosed information about the pharmacokinetics of apixaban in both animals and humans.  Tr. 1360:9-17 (Chambliss).  Dr. Chambliss agreed that a POSA would have considered what was already disclosed in the prior art about apixaban's pharmacokinetic properties and bioavailability.  *Id.* at 1359:17-1360:1.

159.    No reference stated that apixaban's bioavailability was anything less than good. Tr. 1679:17-20 (Myerson).  No reference stated that apixaban's absorption was anything less than rapid.  *Id.* at 1679:21-24.  Dr. Chambliss could not identify a single reference that existed as of the priority date that described apixaban's onset of actions as slow.  Tr. 1368:15-19 (Chambliss).  He did not look for any such reference.  *Id.*

160.    Based on the prior art characterizing apixaban as having good bioavailability and rapid absorption, a POSA would have concluded that the formulations being used were satisfactory.  Tr. 1679:12-16 (Myerson).

161.    Kola (2004) describes why pharmaceuticals fail clinical trials.  *Id.* at 1680:11-15; DTX-368 at DEFAPIX003124.  Kola discloses that the main reasons for drug attrition in 2000 were toxicology, commercial reasons, and clinical safety.  Tr. 1680:14-1681:1 (Myerson), DTX-368 at DEFAPIX003124.  Kola discloses that it is exceedingly rare for a drug to fail because of formulation, pharmacokinetic, or bioavailability reasons.  Tr. 1680:16-1681:1 (Myerson), DTX-368 at DEFAPIX003124.

162.    BMS had backups for its Factor Xa program because earlier compounds had pathology and toxicology issues. Tr. 203:19-204:11 (Knabb). BMS's general strategy was to continually develop backups in case something went wrong with a compound. *Id.* at 204:12-24.

163.    In view of the disclosures in the prior art, a POSA would not have been motivated to improve upon the formulation of apixaban. Tr. 1681:2-6 (Myerson).

## 2.    A POSA would not have expected that reducing the dissolution rate would improve bioavailability.

### (a)    BCS III drugs would not have been expected to have dissolution-rate-limited absorption.

164.    As of the priority date, a POSA could have used the BCS to predict the rate-limiting step of drug absorption. Tr. 1685:16-18 (Myerson).

165.    The rate-limiting step for the absorption of a BCS Class III drug, which has high solubility and low permeability, will be permeability. Tr. 1685:24-1686:3, 1689:2-4 (Myerson); PTX-690 at DEFAPIX000082. This is true even for drugs with poor absolute or USP solubility because "even a very poorly soluble drug having a sufficiently small therapeutic dose may completely dissolve under physiological conditions." *Id*. This means that the dissolution rate and solubility of a BCS Class III drug would not have been expected to have a significant effect on absorption. Tr. 1690:5-7 (Myerson). Therefore, a POSA would not have expected reducing particle size to impact the bioavailability of a drug that did not demonstrate dissolution-rate-limited absorption. *Id*. at 1686:9-14, 1705:24-1706:6.

166.    Blume (1999) discloses that permeation through the intestinal membrane is the rate-limiting step for drug absorption of BCS Class III drugs. Tr. 1387:22-1388:1 (Chambliss); PTX-429 at BMSAPIXE_0003248. Blume further discloses that bioavailability of Class III drugs will be independent of drug dissolution properties. Tr. 1388:5-10 (Chambliss); PTX-429 at BMSAPIXE_0003248.

167.    Blume describes an example in which several batches of an immediate-release ranitidine product with different biopharmaceutical properties were manufactured.  Tr. 1388:21-1389:9 (Chambliss); Tr. 1690:21-1691:11 (Myerson); PTX-429 at BMSAPIXE_0003249. Figure 4 of Blume shows that each ranitidine product had different dissolution rates, including one as slow as 70 percent in 30 minutes, yet the bioavailability data was essentially the same. Tr. 1389:10-1390:13 (Chambliss); Tr. 1690:21-1691:11, 1692:10-12 (Myerson); PTX-429 at BMSAPIXE_0003249.  The similar bioavailability of ranitidine tablets with different dissolution rates was due to ranitidine being a Class III drug.  Tr. 1390:14-25 (Chambliss); Tr. 1691:12-15 (Myerson); PTX-429 at BMSAPIXE_0003249.

168.    Dr. Chambliss did not submit any experimental evidence to show that dissolution rate can have an impact on absorption of a BCS III drug, Tr. 1385:24-1386:3 (Chambliss), and agreed that the literature had examples showing that dissolution had no impact on the absorption of BCS III drugs, *id.* at 1386:4-7.

(b)    *Apixaban was known to be a BCS Class III drug.*

169.    Apixaban was known as a BCS Class III drug in 2010.  Tr. 1686:15-19 (Myerson).

170.    Carreiro discloses that 2.5, 5, and 10 mg doses of apixaban were being used in Phase III clinical trials.  *Id.* at 1675:14-16, 1686:24-1687:25; PTX-738 at DEFAPIX002542. Carreiro discloses that 20 mg apixaban doses had been discontinued and were not being used in Phase III clinical studies.  Tr. 1688:1-1688:5 (Myerson); PTX-738 at DEFAPIX002542.  Dr. Chambliss agreed that 2.5 and 5 mg dosages were being used in Phase III clinical trials.  Tr. 1316:8-10 (Chambliss).

171.    Pinto discloses that apixaban's solubility is 40 micrograms per milliliter.  Tr. 1688:6-9 (Myerson); DTX-349 at DEFAPIX000413.  Because there were conflicting reports in the literature, a POSA would have easily measured the solubility of apixaban to arrive at the 40

microgram per milliliter value.  Tr. 1688:10-21, 1709:18-23 (Myerson).

172.    A POSA would have known that apixaban had low permeability because the absolute bioavailability of apixaban was 66 percent, which is less than 90 percent.  Tr. 1686:24-1687:12 (Myerson); PTX-320 at BMSAPIX9726774.

173.    A POSA would not have expected dissolution rate to impact apixaban's bioavailability because it is a BCS Class III drug.  Tr. 1681:7-15 (Myerson).  Based on its BCS classification, a POSA would have expected permeability to be the rate-limiting step of apixaban absorption.  *Id.* at 1688:22-1689:1.

174.    A POSA seeking to formulate a drug for clinical use would have relied on a drug's BCS solubility, not absolute solubility, in predicting its bioavailability because the BCS solubility takes into account the dose of drug to be administered under physiological conditions.  *Id.* at 1682:20-1683:1, 1683:17-24.  Once a dose is known, a POSA would not have made any formulation decisions based on absolute solubility.  *Id.* at 1683:25-1684:3.

### (c)    *The BCS is used in drug development, not just biowaivers.*

175.    Ku (2008) is titled "Use of the biopharmaceutical classification system in early drug development."  *Id.* at 1693:22-1694:1; PTX-457 at BMSAPIXE_0003590.  It discloses that the BCS is a useful tool not only for obtaining biowaivers, but also for decision-making in the discovery and early development of new drugs.  Tr. 1381:24-1382:4 (Chambliss); PTX-457 at BMSAPIXE_0003590.  Ku discloses that "it is arguable that application of BCS in lead compound selection for optimal chemistry may be more important than using BCS in biostudy waiver at a later development stage."  PTX-457 at BMSAPIXE_0003590; Tr. 1382:5-11 (Chambliss); Tr. 1694:2-8 (Myerson).

176.    Dahan, published in 2009 by Amidon, the BCS's developer, states: "The BCS is one of the most significant prognostic tools created to facilitate oral drug product development in recent years.  DTX-437 at BMSAPIXE_0003369; Tr. 1693:2-18 (Myerson).

177.    The FDA did not provide guidance on biowaivers for Class III drugs until 2015. Tr. 1379:6-12, 1379:18-23 (Chambliss).

178.    Based on the disclosures in the prior art, a POSA would have understood the role of the BCS was not limited to biowaivers.  Tr. 1694:9-18 (Myerson).  Dr. Chambliss agreed that the BCS had relevance in drug development outside of obtaining a biowaiver.  Tr. 1381:9-12, 1382:12-18 (Chambliss).

### 3.    A POSA would not have been motivated to reduce particle size.

179.    A POSA would not have added an unnecessary step to the manufacturing process to reduce particle size.  Tr. 1694:22-1695:20 (Myerson).  Micronization can introduce impurities into the drug substance.  *Id.*  It can also induce polymorphic changes, cause degradation, and impact bulk density.  *Id.*; PTX-732 at DEFAPIX001983.

180.    Small particles such as apixaban that are hydrophobic (meaning they avoid water) can clump together and reduce the surface area of the drug available to the solution.  Tr. 1694:22-1695:20 (Myerson); PTX-458 at BMSAPIXE_0003600; PTX-732 at DEFAPIX001983; JTX-2 at 5:66-6:3.  This causes a drug to dissolve slower, not faster.  Tr. 1694:22-1695:20 (Myerson); PTX-458 at BMSAPIXE_0003600; PTX-732 at DEFAPIX001983.  A POSA would have expected that reducing the particle size of apixaban would cause it to clump together and reduce the surface area.  Tr. 1696:14-21 (Myerson).

181.    Thus, there were known disadvantages to reducing particle size.  Tr. 1694:22-1695:20, 1696:14-21 (Myerson); PTX-732 at DEFAPIX001983.

182.    Content uniformity ensures that the right amount of active ingredient is contained in every tablet by uniformly dispersing the active ingredient in the tablet.  Tr. 1243:8-1244:2 (Chambliss); Tr. 1697:24-1698:5 (Myerson).

183.    A POSA could have calculated the particle size of a drug needed to ensure content uniformity based on its dosage.  Tr. 1698:6-20 (Myerson); PTX-476.  For 2.5 and 5 mg doses, the calculated $D_{90}$ particle size to ensure content uniformity is significantly larger than 89 microns.  Tr. 1699:25-1700:5 (Myerson); PTX-476 at BMSAPIXE_0004286.

184.    Content uniformity thus would not have motivated a POSA to reduce particle size.

### 4.    The prior art does not disclose the limitations of the '945 patent's asserted claims.

### (a)    The References

185.    *Nause* is a patent application that was filed on June 15, 2010.  DTX-344 at DEFAPIX000888.  Because the invention of the asserted claims was conceived and reduced to practice in October 2009, Nause is not prior art.  Tr. 1703:22-1704:3 (Myerson).

186.    The preferred invention in Nause is a controlled-release amorphous dispersion, *id.* at 1710:16-1711:3, 1711:21-1712:2; DTX-344 at DEFAPIX000891-92, with a preferred dissolution rate of 70 percent in more than two hours.  Tr. 1711:8-16 (Myerson); DTX-344 at DEFAPIX000891.

187.    The immediate-release formulation disclosed in Nause is only used as a control. Tr. 1710:16-1711:3 (Myerson); DTX-344 at DEFAPIX000897.  Nause defines an immediate-release formulation as a dissolution rate of 70 percent in one hour.  Tr. 1710:16-1711:3, 1713:8-14 (Myerson); DTX-344 at DEFAPIX000894.  The bioavailability of the immediate-release apixaban formulation in Nause tells a POSA only that it is an immediate-release formulation.  Tr. 1713:18-24 (Myerson).  A POSA could not have assumed that the immediate-release apixaban

tablet has a particular dissolution rate.  *Id.* at 1713:25-1714:2.

188.    Nause does not expressly or inherently disclose any information about the particle

size of apixaban in the immediate-release formulation or about the dissolution rate of the

immediate-release formulation.  Tr. 1330:8-14 (Chambliss); Tr. 1710:16-1711:3, 1714:3-5

(Myerson).  Nause does not disclose any information about the impact apixaban particle size

may have on apixaban dissolution or bioavailability, Tr. 1710:16-1711:3 (Myerson); any reason

to select an apixaban particle size of $D_{90}$ equal to or less than 89 microns, *id.* at 1714:6-8; or any

problems with the bioavailability of apixaban, *id.* at 1710:16-1711:3, 1714:9-11.

189.    Nause's summary discloses a continuing need to find safe, effective methods of

delivering Factor Xa inhibitors.  Tr. 1714:12-21 (Myerson); DTX-344 at DEFAPIX000891.

This disclosure is unrelated to apixaban bioavailability.  Tr. 1714:12-21 (Myerson).

190.    ***Wei*** is directed to a general method of transforming one polymorph to another

using a recirculation apparatus.  *Id.* at 1704:16-1705:2; DTX-359 at [0012], [0013].  The process

disclosed in Wei is not specific to apixaban.  Tr. 1705:3-5 (Myerson).  The process described in

Wei has nothing to do with improving bioavailability.  *Id.* at 1705:6-9.  Wei contains only a

general statement that reducing particle size often increases the bioavailability of sparingly

soluble compounds.  *Id.* at 1705:10-23; DTX-359 at [0003].

191.    Wei does not suggest any issues with apixaban's bioavailability.  Tr. 1706:9-11

(Myerson).  Wei does not disclose any bioavailability data for apixaban.  *Id.* at 1706:12-14.  Wei

does not explicitly refer to a threshold of a $D_{90}$ particle size of 89 microns or less.  *Id.* at 1706:18-

20.  Wei does not disclose a solid pharmaceutical formulation of apixaban.  *Id.* at 1706:21-23.

192.    ***The FDA Guidance***, published in 1995, is a general guidance that explains how

to do dissolution testing for solid oral dosage forms.  Tr. 1707:4-10 (Myerson); PTX-696.  It

discusses different apparatuses and sets of conditions that can be used.  Tr. 1707:4-10 (Myerson).

The FDA Guidance does not provide any specific teaching for apixaban, *id.* at 1707:13-15; does

not specifically disclose a dissolution rate of 77 percent in 30 minutes, *id.* at 1707:16-18, 1754:8-

15; and does not disclose selecting a particle size distribution with a $D_{90}$ of 89 microns or less, *id.*

at 1707:23-25.  A POSA would have had no reason to target 77 percent in 30 minutes for

apixaban based on the FDA Guidance's disclosures.  *Id.* at 1707:19-22, 1754:8-15.

193.    Dr. Myerson made clear the claimed dissolution rate of 77% in 30 minutes was

part of the '945 patent invention and not specifically disclosed in the prior art.  *Id.* at 1667:14-

1668:1, 1707:16-22.  Dr. Myerson stated only that there was nothing innovative about the

particular dissolution testing conditions claimed in the '945 patent.  *Id.* at 1754:16-20.  The exact

rate and time, however, were not disclosed in the FDA Guidance.  *Id.* at 1754:9-15.

194.    **The '208 patent** does not disclose any issues with the bioavailability of apixaban.

*Id.* at 1708:19-24.  The '208 patent does not disclose any motivation to select a dissolution rate

of 77 percent in 30 minutes.  *Id.* at 1708:25-1709:2.  The '208 patent would not have provided

any motivation to select a $D_{90}$ of 89 microns or less.  *Id.* at 1709:3-5.

195.    **The '306 application** is primarily directed to injectable formulations, Tr. 1232:21-

24 (Chambliss).  The '306 application would not have provided any motivation to select a $D_{90}$ of

89 microns or less.  Tr. 1710:3-5 (Myerson).

(b)    *Combinations*

196.    Even if Nause is considered to be prior art, the '945 patent would not have been

obvious in light of Nause and FDA Guidance.  *Id.* at 1714:22-1715:1.

197.    With respect to the combination of Nause and FDA Guidance, Nause only

discloses that the dissolution rate is an immediate release, but it does not disclose the claimed

dissolution rate.  *Id.* at 1713: 8-24.  Nause does not have any disclosure about the particle size of

apixaban in the tablets, nor any reason to select a $D_{90}$ of 89 µm or less, nor any problems with the bioavailability of the immediate-release tablets. *Id.* at 1714:3-21.

198.    With respect to the combination of Carreiro, Wei, or FDA Guidance, none of the references disclose a dissolution rate of 77 percent in 30 minutes or a motivation to achieve this rate. Tr. 1707:25-1708:6 (Myerson). None of them would have provided any motivation to arrive at an apixaban particle size of $D_{90}$ equal to or less than 89 microns. *Id.* at 1708:5-7.

199.    The claims of the '945 patent would not have been not obvious in light of Carreiro, Wei, and FDA Guidance. *Id.* at 1708:11-14.

200.    With respect to the combination of the '208 patent, Wei, and FDA Guidance, the references do not disclose any bioavailability issue nor would they have provided any motivation to arrive at the claimed dissolution rate or at a $D_{90}$ of 89 µm or less. *Id.* at 1708:15-1709:5.

201.    The '945 patent would not have been obvious over the '208 patent, Wei, and the FDA Guidance. *Id.* at 1709:6-10.

202.    With respect to the combination of the '306 Application, Wei, and FDA Guidance, the references would not have provided a motivation to arrive at the claimed dissolution rate nor any motivation to arrive at a $D_{90}$ of 89 µm or less. *Id.* at 1709:11-1710:5.

203.    The '945 patent claims would not have been obvious in light of the '306 Application, Wei, and FDA Guidance. *Id.* at 1710:6-9.

**5.    Objective indicia confirm that asserted claims' nonobviousness.**

204.    It would have been unexpected that a BCS Class III drug, like apixaban, would show dissolution-rate-limited absorption. Tr. 1715:5-8 (Myerson). It was not expected that dissolution rate would impact the bioavailability of a BCS Class III drug. Tr. 1715:9-12 (Myerson). However, the inventors of the '945 patent surprisingly found that apixaban had dissolution-rate limited absorption. Tr. 1667:14-1668:1 (Myerson); JTX-2 at 1:46-60.

Dated: February 7, 2020

Respectfully submitted,

FARNAN LLP

*Of Counsel:*

/s/ Michael J. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

*Counsel for Plaintiffs Bristol-Myers Squibb
Company and Pfizer Inc.*

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363