## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY and PFIZER INC., | |
| Plaintiffs, | |
| v. | C.A. No. 17-cv-374-LPS (CONSOLIDATED) |
| AUROBINDO PHARMA USA INC. and AUROBINDO PHARMA LTD., | |
| Defendants. | |

## PLAINTIFFS' RESPONSIVE POST-TRIAL BRIEF
## ON VALIDITY OF THE ASSERTED PATENTS

Dated: February 7, 2020

*Of Counsel:*

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

FARNAN LLP

Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs Bristol-Myers Squibb Company and Pfizer Inc.*

# TABLE OF CONTENTS

I.     Introduction ............................................................................................1

II.    Argument .................................................................................................2

    A.   Defendants Have Not Proven Invalidity of the '208 Patent's
        Asserted Claims. ..............................................................................2

        1.   Claims 13 and 104 properly depend from claim 1 ......................2

            (a)   Apixaban is within the scope of claim 1 .............................2

            (b)   Sigmapharm ignores the "substituted with" terms in
                 claim 1 .................................................................................4

            (c)   Sigmapharm's definition-based argument is
                 unsupported. ........................................................................5

            (d)   Sigmapharm's criticisms of Plaintiffs' position are
                 unsupported. ........................................................................6

        2.   Claims 13 and 104 are enabled. ...................................................8

            (a)   The '208 patent enables pharmaceutically
                 acceptable salts of apixaban. ..............................................8

            (b)   Defendants' arguments lack support. .................................15

            (c)   Claim 104 does not cover salt forms of apixaban
                 and thus is enabled regardless of whether
                 "pharmaceutically acceptable salts" are enabled. ..............23

        3.   Claims 13 and 104 are supported by adequate written
            description. ...................................................................................24

    B.   Defendants Have Not Proven Invalidity of the '945 Patent's
        Asserted Claims. ............................................................................27

        1.   Defendants Have Not Proven Lack of Written
            Description or Non-Enablement. .................................................27

            (a)   Defendants' arguments that claims 21 and 22 are
                 not supported by adequate written description lack
                 both legal merit and factual support. .................................29

            (b)   Claims 21 and 22 are enabled. ..........................................32

        2.   Claims 21 and 22 would not have been obvious .........................34

            (a)   Defendants failed to establish a motivation or
                 reasonable expectation of success. .....................................34

            (b)   Defendants' combinations do not render the claims
                 obvious. ..............................................................................38

            (c)   Objective indicia confirm nonobviousness. .......................40

III.   Conclusion .............................................................................................40

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps;">Cases</span>

*Ajinomoto Co. v. ITC*,
   932 F.3d 1342 (Fed. Cir. 2019)...................................................................................31

*Alcon Research Ltd. v. Barr Labs., Inc.*,
   745 F.3d 1180 (Fed. Cir. 2014)...................................................................................17

*Amerigen Pharm. Ltd. v. UCB Pharma GmbH*,
   913 F.3d 1076 (Fed. Cir. 2019)...................................................................................36

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003)............................................................................28, 30

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008)............................................................................28, 30

*Bos. Sci. Corp. v. Johnson & Johnson*,
   647 F.3d 1353 (Fed. Cir. 2011)...................................................................................25

*Cephalon v. Mylan Pharm., Inc.*,
   962 F. Supp. 2d 688 (D. Del. 2013)............................................................................23

*Cephalon, Inc. v. Watson Pharms., Inc.*,
   707 F.3d 1330 (Fed. Cir. 2013)...................................................................................34

*CFMT, Inc. v. Yieldup Int'l Corp.*,
   349 F.3d 1333 (Fed. Cir. 2003)...................................................................................19

*Cordis Corp. v. Boston Sci. Corp.*,
   658 F.3d 1347 (Fed. Cir. 2011)...................................................................................30

*Eli Lilly & Co. v. Barr Labs., Inc.*,
   251 F.3d 955 (Fed. Cir. 2001).....................................................................................20

*Eli Lilly v. Teva Pharms, USA, Inc.*,
   619 F.3d 1329 (Fed. Cir. 2010)............................................................................27, 28

*Endo Pharms. Inc. v. Mylan Pharms. Inc.*,
   No. 11-CV-00717, 2014 WL 334178 (D.Del. Jan. 28, 2014)....................................26

*Ericsson Inc. v. Intellectual Ventures I LLC*,
   890 F.3d 1336 (Fed. Cir. 2018)...................................................................................36

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
   941 F.3d 1149 (Fed. Cir. 2019)...................................................................................26

*In re Cyclobenzaprine HCl Extended-Release Capsule Patent Litig.*,
   676 F.3d 1063 (Fed. Cir. 2012)......................................................................40

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988).......................................................................15

*Johns Hopkins Univ. v. CellPro, Inc.*,
   152 F.3d 1342 (Fed. Cir. 1998).....................................................................32

*Mahurkar v. C.R. Bard, Inc.*,
   79 F.3d 1572 (Fed. Cir. 1996).......................................................................39

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
   851 F.3d 1275 (Fed. Cir. 2017).....................................................................25

*Oil-Dri Corp. of Am. v. Nestlé Purina Petcare Co.*,
   No. 15 C 1067, 2019 WL 861394 (N.D. Ill. Feb. 22, 2019)........................27

*Ormco Corp. v. Align Tech., Inc.*,
   498 F.3d 1307 (Fed. Cir. 2007).....................................................................19

*Pfizer Inc. v. Dr. Reddy's Labs., Ltd.*,
   359 F.3d 1361 (Fed. Cir. 2004).....................................................................20

*Pfizer Inc. v. Micro Labs USA Inc.*,
   No. 17-158-LPS, 2018 WL 5294507 (D. Del. Oct. 24, 2018).......................5

*Pfizer, Inc. v. Ranbaxy Labs., Ltd.*,
   457 F.3d 1284 (Fed. Cir. 2006).....................................................................24

*Takeda Pharm. Co. v. TWi Pharm., Inc.*,
   No. 11-cv-1609-JCS, 2013 WL 12164680 (N.D. Cal. May 20, 2013)..........26

*Takeda Pharms. Co. v. Zydus Pharms. USA, Inc.*,
   743 F.3d 1359 (Fed. Cir. 2014).....................................................................27

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996).........................................................................5

## STATUTES, RULES & REGULATIONS

35 U.S.C. § 112..............................................................................1, 27, 30

35 U.S.C. § 282.........................................................................................7

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '208 patent | U.S. Patent No. 6,967,208 (JTX-1) |
| '945 patent | U.S. Patent No. 9,326,945 (JTX-2) |
| POSA | Person of ordinary skill in the art.  For the '208 patent, a POSA would have the characteristics described at UF ¶ 20 as of September 21, 2001; for the '945 patent, a POSA would have the characteristics described at UF ¶ 31 as of February 24, 2011. |
| FDA | United States Food and Drug Administration |
| CoC | Certificate of Correction |
| BMS | Bristol-Myers Squibb Co. |
| Pfizer | Pfizer, Inc. |
| Plaintiffs | BMS and Pfizer |
| Sigmapharm | Sigmapharm Laboratories, LLC |
| Sunshine Lake | Sunshine Lake Pharma Co., Ltd. and HEC Pharm USA Inc. |
| Unichem | Unichem Laboratories, Ltd. |
| Defendants | In general and when discussing the '945 patent, Sigmapharm, Sunshine Lake, and Unichem; when discussing the '208 patent, Sigmapharm and Unichem |
| Tr. | Final Trial Transcripts (D.I. 692-700) |
| UF | Uncontested Facts (D.I. 672, Ex. 1) |
| Br. | Defendants' Opening Post-Trial Brief on Invalidity (D.I. 690) |
| POFOF | Plaintiffs' Opening Proposed Findings of Fact (Sigmapharm) (D.I. 685) |
| DOFOF | Defendants' Opening Proposed Findings of Fact (D.I. 691) |
| PRFOF | Plaintiffs' Responsive Proposed Findings of Fact (filed contemporaneously) |

## I.    INTRODUCTION

Over nine days of trial, no defendant disputed that apixaban—the active ingredient in Plaintiffs' Eliquis® product that is claimed in the '208 patent—is novel, non-obvious, and useful. Indeed, undisputed evidence showed that Eliquis® is a lifesaving drug that has improved the lives of millions of patients. *See, e.g.*, Tr. 221:3-5 (Knabb); Tr. 1281:13-1287:5 (Kowey); PRFOF ¶ 5. Defendants instead raised two technical challenges to the '208 patent's validity under 35 U.S.C. § 112. Each of these theories is legally, factually, and scientifically flawed.

The primary validity challenge, advanced only by Sigmapharm, is improper dependency—i.e., that the claims to apixaban are invalid because they are supposedly outside the scope of the claim from which they depend. But this argument rests on Sigmapharm ignoring claim 1's actual language and rewriting it to exclude every compound known to man.

The Defendants' other validity challenge is that "pharmaceutically acceptable salt" forms of apixaban are not enabled or described. But Defendants' own experts agree that Plaintiffs' expert, Dr. Jacobsen, made three apixaban salts in less than a day by applying the patent's disclosure; Defendants' experts did no experiments to rebut this. And despite urging the Court to adopt a claim construction that requires the claimed salts to be suitable for use "within the scope of sound medical judgment," Defendants presented no testimony from a clinician suggesting that apixaban salts fail to meet this limitation. Indeed, the parties' medical experts agree that "it is ***unlikely that such salts would have an appreciable effect***"[1] on toxicity, irritation, or allergic response. Tr. 1299:19-24 (Kowey); Tr. 892:14-23 (Zusman); PRFOF ¶ 58.

Defendants' main arguments about the '945 patent are lack of written description and non-enablement. These theories disregard this Court's construction of the phrase "$D_{90}$ equal to

---

[1] Emphases added unless otherwise noted.

or less than about 89 microns" by importing process limitations into the claims.  Defendants also raise several obviousness theories but fail to establish that the key dissolution-rate limitation was known in the art and that a POSA would have had a motivation to improve apixaban's bioavailability by reducing particle size or a reasonable expectation of success in doing so.

Because Defendants have failed to carry their burden to prove invalidity of any asserted claim by clear and convincing evidence, their invalidity defenses should be rejected.

## II.   ARGUMENT

### A.   Defendants Have Not Proven Invalidity of the '208 Patent's Asserted Claims.

#### 1.   Claims 13 and 104 properly depend from claim 1.

##### (a)   Apixaban is within the scope of claim 1.

Sigmapharm first argues that asserted claims 13 and 104 of the '208 patent are invalid because apixaban supposedly does not fall within claim 1's scope.  Br. 2-7.  The argument is difficult to decipher, but one thing is clear:  Sigmapharm is not applying claim 1's actual language.  Sigmapharm starts by changing the claim term "substituted with" to "substituent," and the problems that it imagines snowball from there.  But claim 1's actual language is "very straightforward" to a chemist, Tr. 302:11-14 (MacMillan), and a POSA would understand that apixaban is within claim 1's scope.  *Id.* at 1627:21-1632:1; PRFOF ¶¶ 11-13.

Claim 1 is directed to a chemical genus that it defines in two ways.  PRFOF ¶ 6.  First, claim 1 defines chemical scaffolds that the claimed compounds may have (e.g., the rings), Tr. 284:1-285:21 (MacMillan); and second, claim 1 allows the scaffold structure to be "substituted with" a certain number of recited groups at certain positions.  *Id.* at 286:10-17.

For example, claim 1 defines the claimed compounds as including "ring M."  JTX-1 at 237:2-34 & Dec. 2, 2008 CoC at 1-2; PRFOF ¶ 7.  It is undisputed that the chemical structure for ring M that is recited in claim 1 has four hydrogens.  Tr. 285:2-6 (MacMillan); Tr. 715:23-716:1

(Heathcock); PTX-779; PRFOF ¶ 8.  Claim 1 then says that "ring M … is substituted with 0-2 $R^{1a}$," and it allows each of those "$R^{1a}$" groups to be one of many options.  JTX-1 at 237:23-24, 238:62-239:13; PRFOF ¶¶ 7, 9.  As Dr. MacMillan explained, to determine how many times ring M in a given compound has been "substituted with" $R^{1a}$, a POSA would look at the number of changes between the compound and the structure for ring M recited in claim 1.  Tr. 300:24-301:23.  If ring M in the compound is the same as the structure for ring M recited in claim 1—as it is in apixaban—a POSA would understand that it has been "substituted with 0" $R^{1a}$, which claim 1 expressly allows.  *Id.* at 285:7-286:21; PRFOF ¶ 10.

The figure below illustrates this comparison (with the disputed rings labeled in blue).  PRFOF ¶ 11.  The structure on the left is a scaffold from claim 1 before it has been "substituted with" anything, and apixaban is on the right.  Tr. 1628:11-1631:11 (MacMillan).  There is only one difference between the two structures.  *Id.*; PRFOF ¶ 12.  Apixaban has an $OCH_3$ group (also called a methoxy group) on ring E.  Tr. 1630:18-22 (MacMillan); PRFOF ¶ 12.  That is allowed by claim 1, which states that "ring E is substituted with 1-2 R" and recites $OCH_3$ as an option for R.  Tr. 1630:23-1631:18 (MacMillan); PRFOF ¶ 13.  The other disputed rings in apixaban (M, A, and Q) are identical to the scaffold in claim 1, so they have been "substituted with" 0 $R^{1a}$, $R^4$, and $R^{4a}$ groups, respectively, which claim 1 allows.  Tr. 1628:11-1630:14 (MacMillan); PRFOF ¶ 13.  Apixaban thus satisfies the "substituted with" limitations and is covered by claim 1.  PRFOF ¶ 13; *see* POFOF ¶¶ 15-23 (discussing each limitation separately).



**Scaffold Recited in Claim 1**        **Apixaban**

>    *(b)*   ***Sigmapharm ignores the "substituted with" terms in claim 1.***

Sigmapharm does not follow this straightforward analysis; instead, it rewrites claim 1 to introduce a supposed problem that does not exist in the actual claim language.  Where claim 1 says that the scaffold "is substituted with" a certain number of groups, Sigmapharm treats the claim as if it recited that the structure "has" that number of "substituents" "attached" to the scaffold.  PRFOF ¶¶ 14-15.  For example, Sigmapharm argues that "[t]he number of ***substituents*** present in apixaban for each of rings M, A, E, and Q exceeds the number permitted by claim 1," DOFOF ¶ 27, because, for ring M, "apixaban ***has*** four hydrogens ***attached*** to the structure corresponding to ring M," *id.* ¶ 29; PRFOF ¶¶ 14 (collecting examples of testimony).

This alteration of the claim language changes its meaning.[2]  As Dr. MacMillan testified, "[t]here is a difference between [']substitution['] and [']substituent.[']"  Tr. 310:25-311:1; Tr. 1637:17-1638:2 (MacMillan) (correcting Sigmapharm's counsel's use of the term "substituent" because the claim says "substituted with"); PRFOF ¶ 16.  Being "substituted with" something means replacing one thing with something else.  Tr. 300:24-302:14 (MacMillan); PRFOF ¶ 16.  By contrast, a "substituent" is just "something that is bonded to some particular position."[3]  Tr. 699:22-700:5 (Heathcock); PRFOF ¶ 16.  By stating that a position is "substituted with" "***0***-2 R," the claim expressly tells a POSA that there might not be any replacement of the original substituents (i.e., hydrogens).  Tr. 302:7-21 (MacMillan).

---

[2] Sigmapharm offered how it would rewrite claim 1 to cover apixaban.  Br. 5.  Those revisions stem from Sigmapharm's initial error altering the claim language.  There is no need to rewrite claim 1 to cover apixaban.  Tr. 1631:23-1632:1 (MacMillan); PRFOF ¶ 23.

[3] Conceptually, the difference between "substituents" and "substitutions" is similar to the difference between the players on a basketball court and the subbing in of new players.  There are always five players on the basketball court.  They are like the "substituents."  But those five players may be "substituted with" players from the bench, such that 0-2 new players are put on the court to replace 0-2 old ones by making 0-2 "substitutions."  These substitutions still leave five players in the game, which is different from having only 0-2 players ("substituents") in total in the game.

– 4 –

It is undisputed that the words "substituent" and "attached" are not in claim 1.  Tr. 716:19-717:18 (Heathcock); PRFOF ¶ 15.  Yet, Dr. Heathcock based his opinions on the term "substituent"—not "substituted with"—as his own trial demonstratives illustrate (DDX-6-5):

- Ring **M** requires **0-2** substituents from group **R¹ᵃ**, not **4**.
- Ring **E** requires **1-2** substituents from group **R**, not **5**.
- Ring **A** requires **0-2** substituents from group **R⁴**, not **4**.
- Ring **Q** requires **0-2** substituents from group **R⁴ᵃ**, not **8**.

This is not an issue of claim construction; it is Sigmapharm disregarding the claim language. But to the extent Sigmapharm's defense rests on claim interpretation, applicable precedent favors rejecting Sigmapharm's position because it would exclude all embodiments from the scope of the claims.  *See, e.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *Pfizer Inc. v. Micro Labs USA Inc.*, C.A. No. 17-158-LPS, 2018 WL 5294507, at *4 (D. Del. Oct. 24, 2018); *see also* Tr. 713:8-19, 718:8-12 (Heathcock); PRFOF ¶ 17.

The absurd consequences of Sigmapharm's position highlights its errors:  Sigmapharm's change to claim 1 would mean that the Patent Office issued a patent that excludes not only every embodiment in the patent, including apixaban, but every chemical compound known to man.  Tr. 713:8-19, 718:8-12 (Heathcock); PRFOF ¶ 17.

### (c)   *Sigmapharm's definition-based argument is unsupported.*

Sigmapharm also argues that the definitions of "substituted" in the patent's specification require at least one hydrogen to be replaced, such that claim 1 is contradictory when it allows the scaffold to be "substituted with 0" groups.  Br. 4.  But there is nothing contradictory here:  Zero means zero to a POSA, just as it does to everyone else.  As Dr. MacMillan testified, "substituted with 0" means that nothing is replaced and the scaffold remains unchanged.  Tr. 300:24-302:14; PRFOF ¶¶ 10, 19.  Even Dr. Heathcock recognized that a replacement is not mandatory: "*if* you're doing a replacement you would be -- you are replacing one or more [hydrogens]."  Tr.

694:6-10 (Heathcock); PRFOF ¶ 19.  Sigmapharm's position that this definition of "substituted" requires a hydrogen to be replaced when the claim language specifically allows replacement of zero hydrogens is entirely unsupported.  And its suggestion that "unsubstituted" is "the correct" way to describe making no change, Br. 4, is beside the point; just because there are other ways to say the same thing does not make one of them wrong.

### (d)   *Sigmapharm's criticisms of Plaintiffs' position are unsupported.*

Sigmapharm asserts that there are problems with the '208 patent's claims even under Plaintiffs' position.  Br. 6-7.  But Sigmapharm's criticisms are unsupported by the claim language and do not cure the fundamental defects in its defense.

Sigmapharm attempts to cast its dependency defense as a dispute about whether a POSA would "count[] hydrogen as a member of the *Markush* groups that the rings are 'substituted with,'" Br. 2, or "treat[] [hydrogens] differently from every other member" of the *Markush* groups, Br. 6.  That misstates Plaintiffs' position.  The relevant *Markush* groups include hydrogen, and there are no special rules for how hydrogen may be used.  PRFOF ¶ 20.  That does not mean that the claimed compounds are "substituted with" hydrogen every time hydrogen appears.  *Id.*  As Dr. MacMillan testified, if there is already a hydrogen present in the scaffold recited in claim 1, the claimed compounds are not "substituted with" anything when that same hydrogen appears in the same place.  *Id.*; Tr. 300:24-302:14, 309:14-19.  Hydrogen is no different in that regard from any other member of the *Markush* group.  PRFOF ¶ 20; Tr. 309:20-310:15 (MacMillan).  And the hydrogens are not surplusage:  Dr. MacMillan explained how deleting hydrogen from the *Markush* group for $R^{1a}$ would alter the claim scope because there are compounds covered by claim 1 for which substitution with hydrogen is required, Tr. 315:15-316:2, and Dr. Heathcock agreed, Tr. 703:2-22; *see also* PRFOF ¶ 20.  And on cross-examination, Dr. MacMillan referred to another situation in which the deletion of hydrogen from

– 6 –

the *Markush* group would matter.  Tr. 308:11-17 (nitrogen substituted with hydrogens); PRFOF

¶ 20.  Sigmapharm, by contrast, offered nothing to support its surplusage argument.

Sigmapharm also contends that Plaintiffs' position "excludes 36 of the structures recited

in dependent claim 3, and 4 of the compounds in dependent claim 8."  Br. 6.  But the only

support Sigmapharm cites is Dr. Heathcock's testimony, which does not accurately reflect

Plaintiffs' position and instead is infected with Sigmapharm's alteration to the claim language.

Tr. 705:17-709:13; PRFOF ¶ 21.  This cited testimony is rife with references to "substituents"

and groups "attached" to apixaban, and it never once uses the actual claim language of

"substituted with."  *Id.*  Put simply, Sigmapharm has offered no proof that there is a problem

with the patent's claims as they are written.

Sigmapharm's arguments about non-asserted claims 3 and 8 are also irrelevant to this

case.  These arguments relate to a specific chemical structure—a two-ring structure made up of

rings D and E—that appears in certain compounds in non-asserted claims 3 and 8.  Tr. 706:11-16

(Heathcock); PRFOF ¶ 22.  Apixaban is not one of those compounds.  And claim 1 does not

even require the two-ring structure that is present in the compounds that Sigmapharm identifies;

claim 1 permits ring D to be absent, just as it is in apixaban and claims 13 and 104.  PRFOF

¶ 22; Tr. 312:19-25 (MacMillan); JTX-1 at 237:57-61.  This issue therefore has nothing to do

with whether claim 1 covers apixaban.  And even if Sigmapharm had shown that some small

subset of chemical structures in non-asserted claims 3 and 8 are outside the scope of claim 1

(which it has not),[4] that does not support Sigmapharm's attempt to alter the language of claim 1

so that apixaban (and every other compound known to man) would be excluded too.

---

[4] The validity of the asserted claims is independent of the validity of non-asserted claims in the '208 patent.  *See* 35 U.S.C. § 282.

## 2.   Claims 13 and 104 are enabled.

### (a)   *The '208 patent enables pharmaceutically acceptable salts of apixaban.*

Defendants' non-enablement argument fares no better.  Defendants do not dispute that

the '208 patent enables the apixaban molecule, which is covered by claim 13, or claim 104's

crystalline apixaban.  Br. 7-20; Tr. 54:22-25 (Buckton).  They only contend that the patent does

not enable "pharmaceutically acceptable salt" forms of apixaban.  Br. 7.  But Defendants failed

to prove that defense at trial.  The trial record shows that a POSA could have readily prepared

"pharmaceutically acceptable salt" forms of apixaban using the techniques disclosed in the

patent.  PRFOF ¶ 32; Tr. 1584:6-9, 1586:22-1587:13, 1615:14-21 (MacMillan); 1494:10-

1495:13, 1498:1-1499:2, 1504:14-1505:5, 1522:22-1523:14 (Jacobsen).

The Court construed "pharmaceutically acceptable salts" in the '208 patent as:

> [1]   derivatives of the disclosed compounds wherein the parent
> compound is modified by making acid or base salts thereof,
>
> [2]   which are, within the scope of sound medical judgment,
> suitable for use in contact with the tissues of human beings
> and animals without excessive toxicity, irritation, allergic
> response, or other problem or complication, commensurate
> with a reasonable benefit/risk ratio.

D.I. 381; UF ¶ 23.  This construction has two elements.  Part [1] requires reacting the parent

compound with an acid or base to form a salt, and part [2] describes certain properties of the

resulting salt.  A POSA could have prepared "pharmaceutically acceptable salt" forms of

apixaban (i.e., salts that meet both of these elements) as of the priority date without undue

experimentation using the '208 patent's disclosure and well-known techniques.  PRFOF ¶ 32.

### (i)   *A POSA could have prepared "acid or base salts" of apixaban from the '208 patent's disclosure without undue experimentation.*

Salts are made by reacting a compound with an acid or a base.  PRFOF ¶ 25; Tr.

1575:24-1576:2 (MacMillan); Tr. 1495:25-1496:9 (Jacobsen); Tr. 17:3-7 (Buckton).  Techniques

– 8 –

for preparing salts were well known long before the invention of the '208 patent.  PRFOF ¶ 26;

Tr. 1576:3-15, 1579:5-1580:12 (MacMillan); Tr. 57:9-11 (Buckton); Tr. 1465:14-20 (Scheidt).

As both parties' experts agreed, a POSA would have recognized that the chemical

structure of apixaban contains acidic (red) and basic (blue) groups:



DDX16-13; PRFOF ¶ 27; Tr. 1580:18-1582:21 (MacMillan); Tr. 1497:4-14 (Jacobsen); Tr.

1424:2-24 (Scheidt).  A POSA in 2001 would have been able to identify common bases or acids

to react with those acidic or basic groups to form apixaban salts.  PRFOF ¶ 27; Tr. 1580:18-

1583:4 (MacMillan).  The '208 patent describes those "conventional chemical methods" for

making salts and specifically identifies reaction conditions and exemplary chemicals for

preparing "pharmaceutically acceptable salts of the present invention."  JTX-1 at 116:48-117:13;

PRFOF ¶¶ 28-31; Tr. 1583:5-1584:2 (MacMillan); Tr. 1498:22-1500:6 (Jacobsen); Tr. 32:9-23

(Buckton); Tr. 1450:8-23 (Scheidt).  Among other things, the '208 patent explains that it is

"preferred" to prepare such salts in "non-aqueous media," JTX-1 at 117:4-9, and refers to the

"[l]ists of suitable salts" provided in *Remington's Pharmaceutical Sciences*, which it

incorporates by reference, *id.* at 117:9-13.  *See* PRFOF ¶ 30; Tr. 1583:11-1584:9, 1586:22-

1587:4 (MacMillan); Tr. 1499:3-22 (Jacobsen); Tr. 1450:24-1451:16 (Scheidt).

A POSA in 2001 could have prepared apixaban salts without undue experimentation.

PRFOF ¶¶ 32-34; Tr. 1578:5-15, 1584:19-1585:10 (MacMillan); Tr. 1496:20-22, 1499:3-22

(Jacobsen).  Indeed, Plaintiffs' expert Dr. Jacobsen successfully prepared the sodium, potassium,

and hydrochloride salts of apixaban in less than five hours in a single day by following the

procedures described in the '208 patent, which are ordinary and routine methods.  PRFOF ¶¶ 33,

35; Tr. 1494:10-1495:13, 1497:15-1500:3, 1504:14-25, 1523:1-6, 1527:15-1528:11 (Jacobsen),

Tr. 1584:6-9 (MacMillan).  The sodium, potassium, and hydrochloride salts are the most

commonly used salts of pharmaceutical compounds, as stated in *Remington's*.  PRFOF ¶ 34;

JTX-10 at 1418; Tr. 1500:17-1501:10 (Jacobsen); Tr. 57:23-61:13 (Buckton); Tr. 1456:9-1458:1,

1458:12-18 (Scheidt).  Dr. Jacobsen's experiments used readily available chemicals and standard

reaction conditions for salt preparation.  PRFOF ¶ 33; Tr. 1588:6-11 (MacMillan); Tr. 1523:9-14

(Jacobsen); Tr. 1462:12-1464:6 (Scheidt).  Dr. Jacobsen was "completely certain" that he had

prepared the sodium, potassium, and hydrochloride salts of apixaban because he confirmed his

results using multiple analytical techniques.  Tr. 1504:11-13 (Jacobsen); PRFOF ¶¶ 37-38.  Dr.

Jacobsen even recorded a video, which he played at trial, showing the instantaneous formation of

the sodium apixaban salt as a white solid.  PRFOF ¶ 36; Tr. 1507:9-1508:21 (Jacobsen); PTX-

802 at 7; PTX-805.  And he also observed that the sodium apixaban salt remained stable for at

least two days, PRFOF ¶ 43; Tr. 1526:5-1527:14 (Jacobsen), and re-formed neutral apixaban

when treated with acid, PRFOF ¶¶ 37, 43; Tr. 1514:16-1515:14 (Jacobsen).  This salt-to-

apixaban reaction proved that Dr. Jacobsen made apixaban salts and that the process of making

those salts did not cause apixaban to degrade.  Tr. 1514:7-1515:14, 1526:5-1527:14 (Jacobsen);

PRFOF ¶¶ 37, 43.

Defendants concede that Dr. Jacobsen prepared the sodium and potassium salts of

apixaban, PRFOF ¶ 39; Tr. 1409: 17-1410:4, 1458: 19-23 (Scheidt); Tr. 12: 8-16, 52:24-54:1

(Buckton); DOFOF ¶ 120; and they admit that he made the hydrochloride salt of apixaban in

solution, *see* DOFOF ¶¶ 123-124 (admitting that "74% of neutral apixaban converted to a

hydrochloride-apixaban salt"); PRFOF ¶ 40.[5]   Defendants performed no experiments attempting to make or study apixaban salts.  PRFOF ¶ 41; Tr. 31:23-32:1, 55:1-22 (Buckton); Tr. 1459:4-1465:8 (Scheidt).  Defendants also presented no evidence that the amount of experimentation to prepare pharmaceutically acceptable salt forms of apixaban would have been undue.

> ### (ii)   Apixaban salts are "within the scope of sound medical judgment, suitable for use in contact with the tissues of human beings and animals without excessive toxicity, irritation, allergic response, or other problem or complication, commensurate with a reasonable benefit/risk ratio."

Salt forms of apixaban—including the sodium, potassium, and hydrochloride salts that Dr. Jacobsen prepared—are "suitable for use" under the Court's claim construction.  Defendants do not dispute that apixaban itself would satisfy this aspect of the Court's construction.  PRFOF ¶ 47; Tr. 71:5-7 (Buckton).  The trial record showed that, even at the maximum therapeutic dose (i.e., 10 mg of apixaban), apixaban salts would provide the same benefits as apixaban without additional risks.  PRFOF ¶¶ 45, 49, 56-57; Tr. 1578:5-15 (MacMillan).

The benefits of apixaban are substantial:  Apixaban is a highly effective drug for the treatment and prevention of potentially fatal blood-clotting disorders.  PRFOF ¶ 48; Tr. 1607:2-19 (MacMillan); Tr. 1281:7-17, 1284:10-16, 1286:13-24 (Kowey); Tr. 190:13-17 (Knabb); UF ¶¶ 41-43.  Those benefits outweigh the risks for patients.  PRFOF ¶ 57; Tr. 219:9-221:5 (Knabb); Tr. 1281:7-12, 1293:25-1294:9 (Kowey); Tr. 70:21-71:7 (Buckton).

---

[5]  Contrary to Defendants' assertion (DOFOF ¶ 127), Dr. Jacobsen did not testify that the hydrochloride reaction resulted in a product that "is not an apixaban molecule."  He said that *if* a *further* reaction occurred such that the lactam ring on apixaban were to break open, then the resulting product would not be apixaban.  Tr. 1426:12-14 (Jacobsen).  There is no evidence that this reaction occurred in Dr. Jacobsen's experiments.  And Defendants' arguments about the specific protonation site for the apixaban hydrochloride salt are irrelevant:  The product of the hydrochloride reaction is an apixaban hydrochloride salt regardless of where the acid protonates apixaban.  Tr. 1582:15-1583:4 (MacMillan).  Defendants offered no evidence to the contrary.

Salt forms of apixaban, like the salts Dr. Jacobsen made, provide the same benefits as apixaban.  PRFOF ¶ 49; Tr. 1607:2-19 (MacMillan).  Apixaban salts undisputedly would react with water or acid in the body to form the neutral apixaban molecule; thus, apixaban salts would provide the same therapeutic benefits as apixaban.  PRFOF ¶ 50; Tr. 1591:15-1592:25, 1596:8-21, 1597:10-18 (MacMillan); Tr. 72:5-15, 73:2-5 (Buckton); Tr. 1418:23-1419:13 (Scheidt).

Administering apixaban salts would not present any additional risk of "excessive toxicity, irritation, allergic response, or other complication."  PRFOF ¶ 56; Tr. 1297:9-21 (Kowey); Tr. 1593:19-1594:20, 1596:16-1597:7, 1598:3-17 (MacMillan).  As Dr. MacMillan explained, at the maximum therapeutic dose of apixaban, apixaban salts would generate less than a milligram of sodium, potassium, or chloride ions, along with trace amounts of hydroxide (base) or hydronium (acid) ions that would have no negative effect on the body.  Tr. 1590:18-1598:17; PRFOF ¶¶ 52-53; Tr. 64:12-67:7 (Buckton).  Indeed, common foods such as Diet Coke and Gatorade contain vastly greater amounts of sodium, potassium, or chloride ions.  PRFOF ¶ 53; Tr. 1593:19-1594:2, 1595:11-1596:2, 1596:16-1597:7, Tr. 1598:10-17 (MacMillan).  And other common items, such as Coca-Cola and TUMS, contain much more acid or base than the small amount that would result from the maximum therapeutic dose of an apixaban salt.  PRFOF ¶¶ 54-55; Tr. 1594:7-20, 1596:16-1597:7, 1598:20-1600:6 (MacMillan).

Defendants assert that apixaban salts would produce a "localized pH" at the surface of the salt particle that they allege would cause toxicity.  *See, e.g.*, Tr. 66:7-19, 67:8-11, 68:11-18 (Buckton).  But that theory lacks any scientific or evidentiary support.  It is undisputed that pH is a measure of the concentration of acid and that it depends on ***how much*** acid or base is present in a volume of water.  PRFOF ¶ 68; Tr. 1600:22-1601:10 (MacMillan); *see* Tr. 1426:24-1427:4 (Scheidt).  Defendants offered no evidence that therapeutic amounts of apixaban salts (i.e., 10

mg of apixaban or less) would produce dangerous pH values when given to a patient; Drs. Buckton and Scheidt did not discuss the amount of apixaban salt at all in their testimony.  As Drs. MacMillan and Kowey explained, therapeutic amounts of an apixaban salt would not have a clinically meaningful effect on pH.  PRFOF ¶¶ 56, 72; Tr. 1297:7-21 (Kowey); Tr. 1593:19-1594:20, 1596:16-1597:7, 1598:3-17 (MacMillan).

Defendants further ignore the effects of diffusion on their "localized pH" theory. Dr. Buckton conceded that an apixaban salt would have no harmful effect on pH once the acid or base ions diffuse into solution.  PRFOF ¶ 73; Tr. 65:9-18 (Buckton).  But neither Dr. Buckton nor Dr. Scheidt addressed how quickly that diffusion would occur.  As Dr. MacMillan explained (and Defendants did not rebut), any acid or base ions generated from an apixaban salt would diffuse into solution much faster than they could react with other molecules in the body.  PRFOF ¶ 72; Tr. 1605:25-1607:1 (MacMillan).  As a result, an apixaban salt could not produce a dangerous "localized pH"; the small amount of acid or base produced by the salt would not stay "localized" long enough to do any harm.

Based on these fundamental principles, Dr. MacMillan opined that apixaban salts would satisfy the second part of the Court's claim construction.  Tr. 1590:6-1591:10; PRFOF ¶¶ 45, 56-57.  And Dr. Kowey, a cardiologist with over 38 years of experience, reinforced that opinion: He testified that the trace amounts of ions formed by administering apixaban salts would have no impact on the patient.  Tr. 1294:21-1295:12, 1296:13-1297:1; PRFOF ¶¶ 45, 56-57.  "[P]utting this into concepts of the risk[/]benefit," Dr. Kowey testified, "we're dealing with a life-threatening condition that we're treating, and so that any minor irritation that might occur in the situation, although I think unlikely, would certainly not dissuade me from my assessment of the risk-benefit ratio."  Tr. 1297:9-1297:21; *see also id.* at 1293:25-1294:9.

Despite bearing the burden of proof, Defendants offered no evidence addressing the "sound medical judgment" element of the Court's construction.  Dr. Scheidt conceded that he did not offer an opinion addressing a reasonable benefit/risk ratio, that he is not a medical doctor, and that no one has ever come to him for his medical judgment.  Tr. 1402:10-11, 1440:1-21, 1442:1-1444:3, 1445:4-7; PRFOF ¶ 58.  Dr. Buckton likewise conceded that he was not a medical doctor and did not have medical judgment to apply.  Tr. 49:20-24, 50:21-25; PRFOF ¶ 58.  To the extent Defendants' clinical expert had an opinion on the matter, he agreed with Dr. Kowey that the effects of apixaban salts on the body would not appreciably differ from neutral apixaban at therapeutic doses.  PRFOF ¶ 58; Tr. 892:17-25 (Zusman).[6]

Defendants now argue that "a medical doctor" would not be the source of "sound medical judgment."  Br. 8.  That makes no sense, and it is inconsistent with Defendants' definition of a POSA, which includes consultation with "*clinical* research and development" professionals.  UF ¶ 21.  Having embraced "sound medical judgment" as the measure of what is "pharmaceutically acceptable" by advocating the claim construction adopted by the Court, Defendants cannot abandon that requirement now that the trial record is so decidedly against them.  *See, e.g.*, Defs.' Claim Const. Br. (D.I. 204) at 5 ("In its entirety, the '208 Patent consistently describes the claimed subject matter as something to be applied in the treatment of a patient—thus, requiring it to be, within the scope of sound medical judgment, suitable for use with human patients.").

---

[6] Dr. Zusman tried to disavow the opinion in his report that "it is unlikely that such salts would have an appreciable effect" on apixaban's toxicity, irritation, or allergen profile by claiming that "such salts" meant table salt.  *See* Tr. 892:17-25, 894:22-895:6.  But his report was directly responding to Dr. Kowey's discussion of apixaban salts.  *Id.* at 894:3-21.  Dr. Zusman's attempt to recast his opinion as pertaining to table salt is nonsensical.

### (iii)   The **Wands** *factors support enablement.*

Defendants' experts provided no meaningful analysis of the factors set out in *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).  *See* Tr. 1400:20-1401:5 (Scheidt) (testifying only that he was informed about the *Wands* factors and told to apply them).  By contrast, Dr. MacMillan provided a thorough analysis of the *Wands* factors, explaining why each supported enablement.  Tr. 1611:15-1616:6; PRFOF ¶¶ 77-85.  Among other things, he explained that it would have been routine to make a pharmaceutically acceptable salt form of apixaban using the methods in the '208 patent; that salt formation was a predictable, highly developed field in 2001; and that the level of experimentation required is minimal.  *Id.*

### (b)   *Defendants' arguments lack support.*

Defendants largely ignore the evidence above that conclusively shows enablement; instead, they advance unsupported or even counterfactual arguments to prop up their defense.  That is insufficient to carry their burden.

### (i)   *It is undisputed that apixaban has been ionized.*

Defendants first argue at length that "apixaban is not ionizable"—meaning that it cannot react with an acid or a base to form a salt.  Br. 11-14; DOFOF ¶¶ 82, 84.  They even go so far as to say that "[t]here are no apixaban salts in existence."  Br. 11.  But it is undisputed that apixaban is ionizable and has, in fact, been ionized multiple times.  Both Dr. Buckton and Dr. Scheidt admitted that Dr. Jacobsen successfully prepared the sodium and potassium salts of apixaban (PRFOF ¶ 39; Tr. 1409:17-1410:9, 1458:19-25 (Scheidt); Tr. 12:8-16, 52:24-54:1 (Buckton)), and Defendants' own proposed findings concede that "74% of neutral apixaban converted to a hydrochloride-apixaban salt" in Dr. Jacobsen's experiments (DOFOF ¶ 123).  That Defendants rest their enablement defense on a debunked premise speaks volumes.

– 15 –

To be sure, Defendants introduced BMS and industry documents that refer to apixaban as "neutral" and "not ionizable."  Br. 11-14.  But context matters:  These documents were not discussing salt formation in general; they were discussing the specific question of whether apixaban could be made into a salt that would improve its water solubility under physiological conditions.  *See, e.g.*, DTX-632.36; DTX-635.7.  As Dr. Knabb explained, "the context in which we discussed salt formation[] was solubility."  Tr. 233:12-25 (Knabb); *see also id.* at 213:11-23 ("[I]t is referring to, although not explicitly stated, it's non-ionizable in the physiological range, which is what's relevant to solubility in, for development as a pharmaceutical."); PRFOF ¶ 60.  Dr. Buckton admitted that "*[a]ll* of these documents talk about solubility," PRFOF ¶ 62; Tr. 28:17-24 (Buckton), and Dr. Scheidt admitted that these documents reflect a desire "to increase the solubility by making the salt."  PRFOF ¶ 62; Tr. 1472:19-23 (Scheidt).[7]  Even Defendants agree that these documents are about whether "an ionized form of apixaban can exist *in a physiologic range*," Br. 14, not whether apixaban could be ionized to form a salt in general.

"Pharmaceutically acceptable salts" for purposes of the '208 patent do not need to be ionizable within a pH range that would improve their water solubility under physiological conditions.  To the contrary, the '208 patent states that it is "preferred" to prepare "pharmaceutically acceptable salts" in "non-aqueous media," JTX-1 at 117:4-9—i.e., in solvents other than water—which are conditions under which Dr. Jacobsen showed that apixaban is ionizable.  *See* PRFOF ¶¶ 30, 63, 74, 33-36; PTX-802 at 4, 5, 7, 10.

---

[7] Even the documents Defendants cited as "[m]ost telling[]" and not "connected to statements regarding solubility," Br. 13, are, in fact, about solubility.  DTX-629 addresses apixaban's "pH dependent solubility" in water within the range of "pH 1 to 8" and actually supports Plaintiffs' point that any discussion of "neutral" was limited to aqueous environments and the pH range relevant to solubility.  Likewise, DTX-188 refers to apixaban having no salt form *immediately after* providing apixaban's solubility at pH 1.1, 3.4, 7.2, and 8.5.  Neither document addresses the ability to ionize apixaban in other environments—for example, in non-aqueous media as preferred in the patent.  JTX-1 at 117:4-9.

Defendants emphasize that nobody at BMS made apixaban salts, Br. 11, but that is

legally irrelevant.  Enablement does not require working examples or an actual reduction to

practice.  *Alcon Res. Ltd. v. Barr Labs., Inc.*, 745 F.3d 1180, 1189-90 (Fed. Cir. 2014).  And to

the extent BMS's efforts matter, Mr. Orwat testified that he discussed how to make apixaban

salts with his co-inventor and knew that he could have prepared them.  PRFOF ¶ 65; Tr. 243:21-

244:6 (Orwat).  Mr. Orwat simply chose not to because "[i]t was determined that the solubility of

apixaban was sufficient"—not out of concern that he would be unsuccessful or that a salt would

be toxic.  PRFOF ¶ 66; Tr. 244:4-15 (Orwat).  As Dr. Knabb testified, there is "a difference

between can't be made and don't need to be made."  Tr. 234:4-6 (Knabb); PRFOF ¶ 67.

### (ii) The p$K_a$ of apixaban does not determine whether its salts are "pharmaceutically acceptable."

Defendants next assert that apixaban's p$K_a$ values necessarily render its salts not

pharmaceutically acceptable and suggest that giving someone an apixaban salt would be like

giving them "concentrated sodium hydroxide" or "concentrated battery acid."  Br. 11-12, 15-16;

DOFOF ¶¶ 111-112, 142-143.  That argument, again, has no support in the record.

As they repeatedly did during the trial, Defendants continue to conflate p$K_a$ with pH.  pH

is a measure of the ***concentration*** of acid (or, more specifically, hydronium ion) in water.

PRFOF ¶ 68; Tr. 1600:18-1601:15 (MacMillan); *see* Tr. 1426:24-1427:4 (Scheidt).  Because pH

is a measure of concentration, it depends on both the amount of acid and the amount of water.

Tr. 1604:18-1605:11 (MacMillan); PRFOF ¶ 68.  By contrast, p$K_a$ is a measure of an acid's

strength; it is an intrinsic property of a compound that is independent of how much is present.

PRFOF ¶ 68; Tr. 1600:18-1601:15 (MacMillan); Tr. 1426:24-1427:4 (Scheidt).  For example, as

Dr. MacMillan explained, the acid in the vinegar on fish and chips (which is not toxic) has the

same p$K_a$ as the acid in vinegar in a pint glass (which would be toxic if consumed in such large quantities).  Tr. 1604:18-1605:11 (MacMillan); PRFOF ¶ 68.

The pH of a solution containing a compound will rarely overlap with the compound's p$K_a$.  PRFOF ¶¶ 68-69; Tr. 1600:22-1603:11 (MacMillan).  As Dr. MacMillan explained, a compound with a p$K_a$ of 0 could form a solution with a pH of 6.9, which is near neutral.  *Id.* This is because the pH of the solution depends on how much compound is present and how much water it is dissolved in.  *Id.*  In short, p$K_a$ and pH are not the same thing, and it is wrong as a matter of science to treat them as such.  But that is what Defendants do:  Their proposed findings are filled with assertions that conflate pH and p$K_a$ or simply assert that apixaban salts in solution will have a certain pH that is the same as one of apixaban's p$K_a$ values.[8]

Defendants' proposed findings on this issue find no support in the testimony they cite. Defendants' experts testified about a chart (reproduced at Br. 12 and DOFOF ¶ 109) that purports to show the percentage of ***apixaban*** that will be ionized in a solution with a given pH. PRFOF ¶ 71; Tr. 35:3-6 (Buckton); Tr. 1429:2-7 (Scheidt).  In other words, the chart assumes an environment at a particular pH and shows what "happen[s] to apixaban if you put it in that type of environment."  Tr. 1429:2-7 (Scheidt).  For example, in a solution with a pH of 15 or –2, all the apixaban will be ionized.  Tr. 1428:10-1432:1 (Scheidt).  But that is the opposite of what would happen with an apixaban salt in the body.  The human body is essentially a large volume of liquid at physiological (near-neutral) pH.  When a therapeutic amount of an apixaban salt is

---

[8] *See, e.g.*, DOFOF ¶ 112 ("Compounds with p$K_a$s outside of this range have pH values that are orders of magnitude lower or higher."); *id.* ¶ 142 ("When Dr. Jacobsen's potassium and sodium-apixaban salt products disproportionate, they would have localized pH of 15, which is equivalent to 'concentrated sodium hydroxide' and 100,000 times more basic than pharmaceutically acceptable products such as Tums."); *id.* ¶ 143 ("If Dr. Jacobsen's apixaban-HCl was made, then the localized pH would be negative two (-2), which is equivalent to 'concentrated battery acid' and 100,000 times more acidic than pharmaceutically acceptable products such as Coca-Cola.").

added to that environment, there would not be any meaningful effect on the pH inside the body. PRFOF ¶ 72; Tr. 1591:15-1592:13, 1593:5-1594:20, 1596:16-1597:7,1598:3-17, 1599:14-17, 1600:1-6, 1601:16-1603:11, 1604:18-1605:11 (MacMillan); Tr. 67:19-24 (Buckton) ("You did not consider the effect of the apixaban salt or its counterions on the total pH of the body; is that correct?  A. Absolutely not.  I don't think there would be any meaningful change there.").  As Dr. MacMillan explained, the pH values that Defendants throw around (without any explanation or factual support) would require thousands of times more apixaban salt than a 10 mg therapeutic dose, and all of it in a small volume of water—a scenario that is completely unrealistic.  Tr. 1602:3-1604:5; PRFOF ¶ 69.

Defendants point to the $pK_a$ range of 3 to 10 and make much of the fact that Plaintiffs have not provided an example of a commercialized pharmaceutical salt that has a parent compound with a $pK_a$ similar to apixaban's.  Br. 12.  But that is unsurprising and irrelevant. Whether an invention is commercialized or commercializable does not affect whether it is enabled.  *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003).[9]  And as both parties' witnesses explained, scientists make salts to improve aqueous solubility.  PRFOF ¶ 60; Tr. 213:11-23 (Knabb); Tr. 1435:7-12, 1472:6-9 (Scheidt); Tr. 17:8-16 (Buckton).  But salts of compounds with $pK_a$ values like apixaban's will revert to the neutral compound in water, Tr. 1590:18-25 (MacMillan); Tr. 1418:23-1419:13 (Scheidt), and thus will not have better solubility, *see* Tr. 18:4-10 (Buckton).  It is no wonder then that there are no such commercial salts.

There is only one reason that a company might seek to commercialize a salt of apixaban: to avoid infringing an apixaban patent that did not also claim apixaban's pharmaceutically

---

[9] *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1318 (Fed. Cir. 2007), does not say otherwise.  *See* Br. 12.  There, the Federal Circuit held that the inventor's inability to practice the claimed invention was evidence of non-enablement.  *Id.* at 1316-18.  Here, the inventors never tried and certainly never failed to make pharmaceutically acceptable salts of apixaban.

acceptable salts.  If the '208 patent did not claim apixaban's pharmaceutically acceptable salts, generic pharmaceutical companies would have a straightforward path to designing around BMS's intellectual property rights.  Indeed, salt forms are so common and so easy to make that the Federal Circuit often holds them to be obvious.  *See, e.g.*, *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 969 (Fed. Cir. 2001).  Congress, recognizing the same thing, has excluded salt variations from eligibility for patent-term extension.  *Pfizer Inc. v. Dr. Reddy's Labs., Ltd.*, 359 F.3d 1361, 1366 (Fed. Cir. 2004).  Innovator pharmaceutical companies routinely claim "pharmaceutically acceptable salts" to prevent competitors from using salt forms as an end-run around their inventions,[10] just as Plaintiffs did here with the pharmaceutically acceptable salts of apixaban that could be prepared from the patent's disclosure without undue experimentation.

### (iii) *Defendants failed to prove that apixaban salt forms were unstable or incapable of being purified.*

Defendants next assert that salts of apixaban would be too unstable to use, Br. 13-15, but this theory too has no meaningful support.  The only evidence Defendants cite is Dr. Buckton's opinion that he "d[id]n't think a salt like this would survive the process of coating in terms of the same issue with formulation … it's too unstable to survive that." Tr. 39:18-40:14 (Buckton).  That opinion was based entirely on facts and analysis from Dr. Scheidt.  Tr. 36:8-24, 55:23-56:7 (Buckton) ("My views on that are from a discussion with Dr. Scheidt.  He was the one who analyzed the data so I was taking his view on that.  I haven't done an independent analysis of the data.").  But when Dr. Scheidt testified, he never offered any facts or analysis on this issue.  *Cf.* Tr. 1473:15-1476:10 (Scheidt) (Defendants' objections to attempted cross examination on this

---

[10] As of Jan. 30, 2020, the USPTO's full-text patent database showed that 60,312 issued U.S. patents recite "pharmaceutically acceptable salt" in their claims.  *See* http://bit.ly/37GNVax.

topic as beyond the scope of Dr. Scheidt's testimony).  Defendants bear the burden of proof, and they failed to present any evidence to carry their burden.

Indeed, the only facts about stability in the record show that the apixaban salts Dr. Jacobsen prepared are stable.  Dr. Jacobsen testified that he observed that the sodium apixaban salt was stable after sitting for two days in his lab and that the acid reversion (salt-to-apixaban) experiment showed that there was no spontaneous reversion or decomposition of the apixaban salts.  Tr. 1526:8-1527:15; PRFOF ¶ 43.  Defendants assert that "Dr. Jacobsen actively attempted to avoid exposure to moisture" in his experiments, Br. 14-15 (citing Tr. 1527:1-3 (Jacobsen)), but Dr. Jacobsen's experiments were completely routine, using chemicals and techniques that would have been commonly used in 2001.  PRFOF ¶¶ 33, 36; Tr. 1507:9-1508:12, 1523:1-14 (Jacobsen); Tr. 1462:12-1464:6 (Scheidt).  To the extent that preparing salts of apixaban requires excluding moisture, as Dr. Jacobsen explained, "this is something that chemists learn how to do routinely."  Tr. 1524:4-9; PRFOF ¶ 37; *see also* Tr. 1734:18-1736:10 (Myerson) (explaining that salts can be routinely formulated even if they are water-sensitive).

Defendants also criticize Dr. Jacobsen for not attempting to purify the apixaban salts that he made.  DOFOF ¶ 122.  But Dr. Jacobsen explained that it would have been routine to isolate the purified apixaban salts; in fact, "the limited solubility of the salts makes it very easy to purify."  Tr. 1523:20-1524:20; PRFOF ¶ 42.  And even though Defendants bear the burden, their experts neither performed any experiments nor offered any facts to rebut that testimony.

Finally, Defendants criticize Plaintiffs for allegedly failing to show that apixaban salts could have been formulated and packaged without exposure to moisture.  Br. 15.  But again, to the extent that Defendants believe this is a relevant consideration, it was their burden to offer proof to substantiate it.  Defendants did no testing or other experimental analysis to meet their

burden and cannot prevail simply by criticizing Plaintiffs' evidence.  Moreover, Defendants

mischaracterize Plaintiffs' experts' testimony on this issue.  Dr. Myerson testified that salts of

apixaban could have been formulated and packaged to *exclude* moisture, not just reduce it, using

routine methods known to a POSA in 2001.  Tr. 1734:25-1735:5; PRFOF ¶¶ 75-76.  Dr.

MacMillan did not testify otherwise, *see* DOFOF ¶ 131; he merely explained that it is impossible

to exclude acid or water *in the human body*.  Tr. 1651:6-17.

> ### (iv)   Apixaban salts are "suitable for use in contact with the tissues of human beings."

Defendants argue for the *first time* in their post-trial brief that apixaban salts fail to meet

the requirements of being "pharmaceutically acceptable" not because they would harm human

tissue, but because the salts supposedly would never contact it.  Br. 8-9.  That argument lacks

support; none of Defendants' experts testified to this.  Defendants cite testimony in which Dr.

MacMillan explained what would happen to apixaban salts inside the human body, Tr. 1590:18-

1598:17, 1650:6-1652:7, but that does not support their position.  If ingesting the salt is not "use

in contact with the tissues of human beings," it is not clear what is.  Defendants acknowledged as

much during claim construction.  *See, e.g.*, Defs.' Resp. Claim Const. Br. (D.I. 245) at 5

(equating "administration" with "contact").

The testimony from Dr. MacMillan that Defendants cite simply addresses why there is no

risk of toxicity, irritation, allergic response, or other problem or complication from an apixaban

salt "when you ingest it."  Tr. 1650:6-1652:7.  As Dr. MacMillan explained, once inside the

body, an apixaban salt "can't get to the tissue to do that damage" because it will convert to the

neutral form of apixaban before it can possibly cause any harm.  *Id.* 1651:6-17.  In other words,

salts of apixaban, like the salts that Dr. Jacobsen made, are "effectively going to have the

identical profile, safety profile, to that of apixaban" when ingested.  *Id.* 1590:18-1591:4.

To the extent Defendants are suggesting that "suitable for use in contact with the tissues of human beings" means that an apixaban salt must remain a salt even after it is ingested, they are seeking to impose an additional requirement that conflicts with their own expert's testimony. As Dr. Buckton explained, salt forms of drugs commonly convert back to their neutral form in the body and often must do so in order to be absorbed.  Tr. 85:17-86:6 (Buckton) ("It will be not a salt.  Most likely, it will be absorbed as a neutral form. … [U]ltimately, in terms of the thing that's getting onto a receptor somewhere in the body, that will not be the salt."); *see also* PRFOF ¶ 51; *Cephalon v. Mylan Pharm., Inc.*, 962 F. Supp. 2d 688, 693-695 (D. Del. 2013) (explaining that fentanyl is ionized when dissolved, but must be un-ionized to be absorbed).  Defendants' new argument seeks to impose an unrealistic requirement divorced from the reality of how pharmaceutically acceptable salts work.

### (c)  *Claim 104 does not cover salt forms of apixaban and thus is enabled regardless of whether "pharmaceutically acceptable salts" are enabled.*

If claim 13 is enabled, then claim 104 is enabled because Defendants' arguments for both claims are the same.  But there is an independent basis for rejecting Defendants' defense for claim 104:  Claim 104 does not cover "pharmaceutically acceptable salt" forms of apixaban.

Claim 104 recites "[a] compound according to claim 13, which is a crystalline compound."  JTX-1, Dec. 2, 2008 & Sept. 11, 2018 CoC.  It does not refer to "pharmaceutically acceptable salts" of apixaban and is drafted differently from the other dependent claims, which explicitly recite "pharmaceutically acceptable salt" forms of apixaban.  *See* JTX-1 at 270:7-8 (claim 27) ("a compound of claim 13 or a pharmaceutically acceptable salt form thereof"); *id.* at 272:55-56 (claim 55) (same).  As Dr. MacMillan explained, a POSA would understand that the plain meaning of claim 104 does not cover pharmaceutically acceptable salts because it refers only to "[a] compound according to claim 13," not "a compound according to claim 13 or its

pharmaceutically acceptable salts" as in those other claims.[11]  Tr. 1616:17-1617:1, 1618:3-

1619:7; PRFOF ¶¶ 87, 89.  And even Dr. Buckton suggested that the reference to

"pharmaceutically acceptable salt" forms in claims 27 and 55 would be superfluous if claim 104

covered "pharmaceutically acceptable salt" forms of apixaban too.  Tr. 95:1-8, 95:21-96:3;

PRFOF ¶ 88.

        To be sure, the Court noted during claim construction that "it is undisputed that 'salts' are

also 'compounds.'"  D.I. 380 at 8.  That general observation, however, does not resolve this

specific issue, which is how a POSA would have understood the plain meaning of "a compound

of claim 13."  Defendants now argue that claim 104 must include pharmaceutically acceptable

salts because the claim refers to "a" compound as opposed to "the" compound of claim 13.  But

"a" is not open-ended in the context of these claims.  The claims as a whole make clear that "a"

compound according to claim 13 refers only to the neutral form of apixaban; otherwise, the

reference to "pharmaceutically acceptable salt" forms in claims 27 and 55 would be superfluous.

Indeed, that is how the Federal Circuit has resolved this issue when presented with a nearly

identical claim structure.  *See Pfizer, Inc. v. Ranbaxy Labs., Ltd.*, 457 F.3d 1284, 1288, 1292 n.6

(Fed. Cir. 2006) (dependent claim 2 referring to "[a] compound of claim 1" did not include the

"pharmaceutically acceptable salts thereof" given "the absence of the 'pharmaceutically

acceptable salts thereof' language which was used in claim 1").

        **3.      Claims 13 and 104 are supported by adequate written description.**

        Defendants' written description defense is likewise unpersuasive.  The '208 patent

describes apixaban by chemical name.  PRFOF ¶ 95; JTX-1 at 63:16-18, 174:21-175:51.  The

---

[11] Defendants' suggestion that Plaintiffs are seeking an untimely claim construction is
unfounded.  Br. 20-21.  The parties agreed that all claim terms not briefed at *Markman* (like this
term) have their plain meaning, D.I. 182 at 2, which remains Plaintiffs' position.

'208 patent also specifically describes what "pharmaceutically acceptable salts of the present invention" are and how to make them.  PRFOF ¶ 95; JTX-1 at 116:40-117:13.  As Dr. MacMillan explained, a POSA would have readily been able to identify the pharmaceutically acceptable salt forms of apixaban based on that written description and would have understood that the inventors were in possession of them.  PRFOF ¶¶ 28-30, 78, 92, 95; Tr. 1612:7-12, 1620:8-1627:1 (MacMillan).

Defendants concede that the specification specifically identifies "a pharmaceutically acceptable salt form" of apixaban as a "preferred embodiment" of "the present invention."  Br. 19; *see* JTX-1 at 62:37-39, 63:16-18, 66:7.[12]  But they dismiss that *ipsis verbis* description because it appears in "a list of compounds."  *Id.*  But this is not a case where the claimed invention is described generically or functionally.  *See Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1367-1368 (Fed. Cir. 2011) (criticizing claims to a "large genus of compounds" with a "functional disclosure[]" which lacked sufficient "blaze marks" to indicate what might be of special interest).  Rather, the '208 patent describes the compounds by name, JTX-1 at 62:36-66:7, and identifies specific "pharmaceutically acceptable salt" forms within the scope of the invention, JTX-1 at 116:40-117:13.[13]  That written description leaves nothing to the imagination and clearly conveys that the inventors were in possession of what they claimed.

---

[12] Defendants incorrectly assert that "[t]he application for the '208 Patent, as filed, did not include any claim for apixaban 'or a pharmaceutically acceptable salt form' thereof."  Br. 18.  As Dr. MacMillan explained, claim 8 in the originally filed application claims "a pharmaceutically acceptable salt" of apixaban by name.  PRFOF ¶ 94; Tr. 1621:15-21, 1623:5-1624:11; PTX-331 at 225:6-8, 227:21.  The originally filed application also contains the same description of apixaban and "pharmaceutically acceptable salt forms of the present invention" as the '208 patent.  PRFOF ¶ 94; Tr. 1621:15-1623:2; PTX-331 at 110:29-113:29, 47:21-48:18; *see Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1297 (Fed. Cir. 2017).

[13] Defendants also assert—without citing any evidence—that some of the listed compounds, including apixaban, do not have pharmaceutically acceptable salts and thus that a POSA would not have understood the references to "pharmaceutically acceptable salt forms" at the end of this section of the specification to include apixaban.  Br. 19.  That argument fails for the same reason

Defendants argue that claims 13 and 104 lack adequate written description because the inventors "admitted they did not synthesize or invent a pharmaceutically acceptable salt of apixaban." Br. 19.  But adequate written description does not require an actual reduction to practice or the disclosure of working examples.  *Endo Pharms., Inc. v. Mylan Pharms., Inc*., No. 11-CV-00717-RMB/KW, 2014 WL 334178, at *28 (D. Del. Jan. 28, 2014); *Takeda Pharm. Co. v. TWi Pharm., Inc.*, No. 11-cv-1609-JCS, 2013 WL 12164680, at *7-8, 24 (N.D. Cal. May 20, 2013) (denying summary judgment of lack of written description even where inventors never made salt forms of the compound).  What matters is what a POSA would have understood from the "four corners" of the disclosure.  *Idenix Pharms. LLC v. Gilead Scis. Inc.*, 941 F.3d 1149, 1163 (Fed. Cir. 2019).  To the extent the inventors' testimony is relevant at all, it confirms that pharmaceutically acceptable salts of apixaban are part of what they invented.  Mr. Orwat testified that he and Dr. Pinto discussed making salt forms of their novel compound, apixaban, using the same methods described in the '208 patent.  Tr. 243:21-244:3, 250:23-251:1, 254:20-255:12; PRFOF ¶ 65; JTX-1 at 116:52-54, 117:4-9.[14]

Finally, claim 104 does not cover pharmaceutically acceptable salts of apixaban.  *See supra* § II.A.2(c).  This is another reason that Defendants' written description defense fails for that claim.

---

that that Defendants' non-enablement argument fails.  *See supra* pp. 9-11; Tr. 1623:14-1624:11 (MacMillan).

[14] Defendants cite Dr. Pinto's testimony that he did not "invent any pharmaceutically acceptable salt forms of apixaban," Br. 20, but that is irrelevant to written description. Defendants did not ask Dr. Pinto if he was in ***possession*** of pharmaceutically acceptable salt forms of apixaban, which is the written description standard.  And Dr. Pinto's testimony makes clear that he never made apixaban salts because he "didn't have to," not because he thought he could not do so.  PRFOF ¶ 66; Tr. 1553:11-1554:6.  Indeed, as Mr. Orwat testified, Mr. Orwat and Dr. Pinto discussed how to make pharmaceutically acceptable salt forms of apixaban using standard techniques.  Tr. 243:21-244:3, 250:23-251:1, 254:20-255:12; PRFOF ¶ 65.

**B.      Defendants Have Not Proven Invalidity of the '945 Patent's Asserted Claims.**

     **1.      Defendants Have Not Proven Lack of Written Description or Non-Enablement.**

Defendants contend that claims 21 and 22 of the '945 patent are invalid because the patent fails to adequately describe or enable the limitation requiring that crystalline apixaban particles "have a $D_{90}$ equal to or less than about 89 μm."  Br. at 22-23.  The basis for this argument is difficult to follow because Defendants cannot dispute that the patent describes apixaban formulations satisfying this limitation and how to make and use them.  PRFOF ¶ 111; JTX-2 at 5:27-63 (describing a dry granulation process that produces a composition with crystalline apixaban particles having a $D_{90}$ equal to or less than about 89 μm).  Rather, Defendants contend that the asserted claims are invalid because the $D_{90}$ of the particles in those embodiments was based on measurements of bulk apixaban particles rather than the final product.[15]  Defendants' argument should be rejected for three general reasons.

First, Defendants' theory fails as a matter of law because neither the written description nor the enablement requirement demands that a patent describe or enable multiple ways to determine whether a product is covered by the claims.  *See Takeda Pharms. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1368-1370 (Fed. Cir. 2014) (finding Section 112 satisfied where patent only disclosed using laser light diffraction to measure bulk API particle size); *Eli Lilly v. Teva Pharms, USA, Inc.*, 619 F.3d 1329, 1345 (Fed. Cir. 2010) ("The test for written description, however, has never been whether the patent includes a description of the steps that may be used to prove infringement."); *Oil-Dri Corp. of Am. v. Nestlé Purina Petcare Co.*, No. 15-1067, 2019 WL 861394, at *11-12, 34 (N.D. Ill. Feb. 22, 2019) (rejecting argument that

---

[15] Defendants are incorrect to suggest that Plaintiffs' expert, Dr. Berkland, opined that the $D_{90}$ can only be determined post-formulation.  Br. 23 n.2.  When asked the question, he answered "No."  Tr. 639:3-6.  The claims are clear that it is the particle size in the formulated composition that is relevant, but there are different ways that can be determined.  PRFOF ¶¶ 113-115.

patent had insufficient written description because it did not describe a method for measuring particle size in accused products).  The claims recite compositions with particular features—the specification need only describe the compositions and how to make and use them.

Second, Defendants repeatedly mischaracterize the '945 patent's disclosure by contending that it only describes compositions in which the bulk API complies with the asserted claims' $D_{90}$ limitation.  Br. 24.  To be sure, the patent describes ways of measuring the $D_{90}$ of crystalline particles in bulk API.  But the evidence overwhelmingly showed that the crystalline apixaban particles in the finished compositions—compositions that were formulated using the process described in the patent—would have the same or smaller size as those in the bulk API and would therefore satisfy the claims' $D_{90}$ limitation.  PRFOF ¶ 122; Tr. 1719:12-1720:24. 1743:16-21 (Myerson).  Defendants' heavy reliance on the *Eli Lilly* case is misplaced.  In *Eli Lilly*, the patentee ***conceded*** that one "would ***not know*** whether the particle size [of the API] was being increased or decreased" when formulated using the techniques disclosed in that patent, 619 F.3d at 1345; but here, Plaintiffs have established that a POSA ***would not expect the particle size distribution of apixaban to increase*** using the manufacturing techniques exemplified in the specification.  PRFOF ¶ 122.  Defendants (who have the burden) failed to adduce evidence demonstrating otherwise.  PRFOF ¶ 123; Tr. 1350:14-1351:1 (Chambliss).

Third, Defendants' suggestion that the claims are invalid unless the patent enables and describes multiple methods of making the claimed composition is incorrect as a matter of law. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1333 (Fed. Cir. 2003) ("[U]nder our precedent the patentee need only describe the invention as claimed, and need not describe an unclaimed method of making the claimed product"); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008).  There is nothing about the asserted claims in this case

that makes this black-letter law inapplicable; indeed, Defendants acknowledge that the Court construed the asserted claims not to require any specific methods of making the claimed compositions. PRFOF ¶ 126; Tr. 1191:16-1192:10 (Genck).

Because Defendants' arguments rest on a flawed legal foundation, many of the specific allegations they advance are irrelevant. Nonetheless, we respond below to the specific arguments in Defendants' brief in the order in which they are raised.

> **(a)    Defendants' arguments that claims 21 and 22 are not supported by adequate written description lack both legal merit and factual support.**

> > **(i)    The '945 patent describes how to determine the $D_{90}$ of the crystalline apixaban in a formulated product.**

First, Defendants contend that the '945 patent's specification only describes determining the $D_{90}$ of bulk apixaban. Br. at 24-25. That is incorrect: The evidence showed that the method of making the claimed composition set forth in the specification permits a POSA to determine that the crystalline apixaban in the formulated product meets the claimed $D_{90}$ limitation.

An example in the specification describes measuring the $D_{90}$ of crystalline apixaban by laser light scattering ("LLS") before formulation and then using dry granulation to prepare the solid pharmaceutical composition. PRFOF ¶¶ 111, 122; JTX-2 at 5:27-63. Dr. Myerson explained why the particle size of the bulk crystalline apixaban would not increase using this formulation technique. PRFOF ¶ 122; Tr. 1720:8-24 (Myerson). Thus, by measuring the $D_{90}$ of the crystalline apixaban before formulation (and ensuring it was within the claimed particle size distribution), a POSA would have known that the crystalline apixaban in the final composition would be within the claimed $D_{90}$ threshold. PRFOF ¶ 122.[16] The patent therefore specifically describes how to make a solid pharmaceutical composition meeting the scope of the claims.

---

[16] Although Dr. Chambliss theorized, based on the Parrott book chapter, that bonding ***could*** occur between particles undergoing direct compression, that Parrott chapter is not specific to

Defendants incorrectly suggest that the specific method of making the pharmaceutical composition is the claimed invention, Br. 24-25, but it is not. The composition itself constitutes the invention, and the claims cover compositions that have the recited properties, regardless of the method used to make or test them.[17] Section 112 does not require the specification to describe these other methods. *Amgen*, 314 F.3d at 1333; *Baldwin Graphic*, 512 F.3d at 1344.

### (ii) The '945 patent does not describe the $D_{90}$ of the bulk apixaban as "critical" to the invention.

Next, Defendants incorrectly (and irrelevantly) assert that the '945 patent considers the $D_{90}$ of the bulk apixaban as "critical" to improving *in vivo* dissolution. Br. 25-26. But the claims and the specification address apixaban's particle size in the solid pharmaceutical composition, explaining that the composition must have crystalline apixaban particles with a $D_{90}$ of less than or equal to 89μm at the *site of dissolution*. PRFOF ¶ 126; JTX-2 at 5:18-21; *see also* Tr. 1191:16-1192:10 (Genck) (agreeing that "solid pharmaceutical composition" refers to the finished drug product). Although measuring the particle size of bulk apixaban via LLS and formulating by dry granulation (as described in the specification) is *one* way of making the claimed composition and confirming that it falls within the scope of the claims, this approach is not required by the claims, nor is it the *only* possible technique. PRFOF ¶¶ 126-138.

### (iii) A POSA would have known how to determine the $D_{90}$ of crystalline apixaban after formulation.

Defendants next assert that a POSA would not have known how to determine the $D_{90}$ after formulation, Br. at 27-31, but that again ignores the record. There were several known

---

apixaban and specifically notes that its theories "have *not been substantiated by experimentation*." PRFOF ¶ 123. Defendants offered no evidence that the particle size of *apixaban* would increase during manufacture. *Id.*

[17] Defendants' § 112 challenge rests on the opinion of an expert who disregarded the Court's claim construction. PRFOF ¶ 125; Tr. 1195:17-22 (Genck). That testimony should be disregarded. *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011).

methods for measuring the particle size of a component in a solid pharmaceutical composition,

including SEM-EDS and methods that combine vibrational spectroscopy—such as infrared

spectroscopy, Raman spectroscopy, or FT-NIR spectroscopy—with imaging techniques such as

microscopy.  PRFOF ¶¶ 127-138; Tr. 1352:22-25 (Chambliss); 1178:6-8, 1202:5-1203:24

(Genck); Tr. 1721:13-24, 1723:4-13 (Myerson).[18]  The Federal Circuit has repeatedly held that

"a patentee may rely on information that is well-known in the art,"—like the methods above—

"for purposes of meeting the written description requirement, because the specification is viewed

from the perspective of [a POSA]," *Ajinomoto Co. v. ITC*, 932 F.3d 1342, 1359 (Fed. Cir. 2019)

(quotations omitted), so Defendants' assertion has no merit.

Several articles addressed by Plaintiffs' experts describe how to use these different

techniques to image particles in pharmaceutical formulations and to measure their size.  PRFOF

¶¶ 127-138.  At least one article, Reverchon (PTX-402), describes how to use SEM to measure

particle size of components of a powder, i.e., a solid pharmaceutical composition, and calculate a

$D_{90}$ for the measured particles.  PRFOF ¶¶ 132-136.  Similarly, Chan (PTX-431), describes the

use of infrared spectroscopy imaging to distinguish the different components in a tablet.  PRFOF

¶ 128.  Chan discloses measuring the particle size of caffeine, the active ingredient in the tablets,

by using the image's scale bar.  *Id*.  Bosquillon (PTX-430) also describes using different

techniques, including microscopy, to measure the particle size of one component in a powder.

PRFOF ¶ 131.[19]

---

[18] Defendants rely on a statement from Dr. Myerson that measuring particle size post-formulation was not a routine practice, DOFOF ¶ 177, but the relevant question is whether a POSA could have done it using well-known techniques.  *Ajinomoto*, 932 F.3d at 1359.  Dr. Myerson confirmed one could.  PRFOF ¶¶ 126-138.

[19] Defendants contend that that a POSA would not have used SEM-EDS to measure particle size because povidone is a potential excipient, Br. at 30; DOFOF ¶¶ 197-198, but the dry granulation composition shown in Table 3 does not contain povidone.  PRFOF ¶ 138.

Defendants tout the absence of any references containing $D_{90}$ determinations for post-formulation API, Br. 27-30, but their reliance on this point is misplaced. As Defendants concede, a $D_{90}$ is a calculated value, not one that is directly measured. Br. 22; PRFOF ¶ 108. Dr. Chambliss agreed that this calculation can be performed by software or even by hand, Tr. 1349:18-1350:3 (Chambliss), and that a POSA would have known how to calculate a $D_{90}$ based on particle size measurements obtained using an imaging technique like those described in the above-cited references, *id.* at 1353:4-11 (Chambliss); *see also* PRFOF ¶ 108. Thus, after using the particle size measurement techniques disclosed in the art, a POSA could have easily, by hand, calculated a $D_{90}$ value. *Id.* This is not akin to building the Empire State building using a hammer, as Defendants' suggest, Br. at 29; rather, it is the application of a standard calculation to determine a mathematical value.

### (b) Claims 21 and 22 are enabled.

Defendants' non-enablement arguments, Br. at 31-34, are based on the same mistaken legal and factual premises as their written description arguments. The law does not require that the disclosure enable all methods of manufacturing a claimed composition. *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1361 (Fed. Cir. 1998). Here, Dr. Chambliss agreed that a POSA could make an apixaban pharmaceutical composition that fell within the limitations of the claims based on the disclosure in the patent and knowledge of the art. PRFOF ¶ 144; Tr. 1350:1-13, 1351:2-1352:21 (Chambliss). Nothing more is required. *Johns Hopkins Univ.*, 152 F.3d at 1361.

Defendants walk through the *Wands* factors in their brief, but only Plaintiffs' expert addressed the *Wands* factors at trial. As Dr. Myerson testified, analysis of the *Wands* factors demonstrates that a POSA could make and use the solid pharmaceutical composition of the asserted claims without undue experimentation. PRFOF ¶¶ 139-146.

As explained above, Defendants misconstrue the nature of the invention and the breadth of the claims (Factors 4 & 8), and therefore incorrectly suggest there is an absence of working examples or direction provided by the inventors (Factors 2 & 3). *See supra* pp. 27-30. Dr. Myerson explained that the claimed invention is a solid pharmaceutical composition with certain features, including a specific crystalline apixaban particle size distribution and dissolution rate. PRFOF ¶ 141; Tr. at 1732:22-1733:3 & PDX 13.32 (Myerson). The patent discloses multiple working examples of how to manufacture the claimed compositions and provides substantial direction, including describing methods for formulation, methods for measuring the particle size distribution, the dissolution rate of different compositions having the proper particle size, and examples of compositions that meet the limitations. PRFOF ¶ 142; Tr. at 1732:22-1733:3 & PDX 13.32 (Myerson). Thus, each of these factors weighs in favor of enablement.

As to the remaining *Wands* factors, Defendants improperly focus on whether any reference disclosed the calculation of a $D_{90}$ for an API in a final formulation. Br. 32-33. But again, the claims cover a solid composition, not a method or process. As explained above, the specification discloses and shows how to make and use a solid pharmaceutical composition meeting the scope of the claims. *See supra* pp. 27-30. Defendants have not argued, nor can they, that making such a composition would have required undue experimentation.

Furthermore, as discussed above, a number of methods for measuring the particle size of a component in a solid pharmaceutical composition were known in the art. PRFOF ¶¶ 127-138. Dr. Myerson testified that those methods could have been used to measure enough particles to calculate the $D_{90}$. PRFOF ¶¶ 127-130.[20] If a POSA wanted to analyze enough particles to

---

[20] Dr. Berkland measured thousands of apixaban particles from 68 granules in Unichem's tablet and found that they were consistently in the 1 micron range—orders of magnitude below the claimed $D_{90}$ threshold. PRFOF ¶ 137. Thus, he "didn't see a reason to calculate an exact $D_{90}$ value," but one could have been calculated. *Id.*; Tr. 629:6-16 (Berkland).

calculate a $D_{90}$ value, that would not require undue experimentation but merely the repetition of a known technique. *Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1338-39 (Fed. Cir. 2013) ("[E]xtensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques.").

Defendants also incorrectly contend that determining the $D_{90}$ of bulk apixaban using LLS is not enabled by the '945 patent. Br. at 33-34. Using LLS to measure particle size was, and still is, a routine process performed by a machine. PRFOF ¶¶ 145-146. Dr. Myerson testified that a POSA would consult standard references like the USP to use a laser light scattering instrument. PRFOF ¶ 146; Tr. 1145:11-19 (Genck) (LLS was the "gold standard"). Dr. Myerson testified that standard references like the USP were available to guide a POSA's use of a LLS instrument. PRFOF ¶ 146; Tr. 1730:22-1731:17 (Myerson) ("[M]y students do it all the time.").

## 2. Claims 21 and 22 would not have been obvious.

### (a) Defendants failed to establish a motivation or reasonable expectation of success.

Defendants' primary obviousness argument is that a POSA would have been motivated to reduce the particle size of apixaban to improve bioavailability. Br. 35-37. The trial record provides no support for that assertion.

At the time of the claimed invention, apixaban was in advanced clinical development: It had been tested in thousands of patients in Phase II trials and was in ongoing Phase III trials. PRFOF ¶ 150. The "most comprehensive" report in the prior art about apixaban's clinical properties reported no issues with apixaban's bioavailability; in fact, it disclosed that apixaban's bioavailability was good and that apixaban had rapid absorption. PRFOF ¶ 148; Tr. 1360:18-24 (Chambliss); Tr. 1673:1-7, 1673:11-17 (Myerson). As Defendants concede, this observation was repeated throughout the literature, including in Sobieraj-Teague (PTX-480), Pinto 2007 (DTX-

– 34 –

349), and Eriksson (PTX-320),[21] all of which "characterized the bioavailability of apixaban as 'good' or 'high.'" Br. 35; *see also* PRFOF ¶¶ 147-160.  Apixaban's bioavailability was known to be comparable to, if not better than, its closest competitor, rivaroxaban.  PRFOF ¶¶ 152-153; Tr. 1374:3-14 (Chambliss); PTX-480 at -4448.

As Dr. Myerson testified, there is no reason to change a formulation that is working well, particularly when it is late in clinical trials.[22]  PRFOF ¶ 151; Tr. 1675:24-1676:9 (Myerson). Indeed, it was known that reducing particle size could introduce impurities and polymorphic changes, so a POSA would not have reduced particle size unnecessarily.  PRFOF ¶ 179.  And it was also known that, for a hydrophobic compound like apixaban, reducing particle size can result in slower dissolution.  PRFOF ¶¶ 180-181; Tr. 1694:22-1695:20 (Myerson).[23]

Because nothing in the prior art characterized apixaban's bioavailability as less than good, a POSA would have had no motivation to change the formulation.  PRFOF ¶ 159; Tr. 1679:17-24 (Myerson).  Dr. Chambliss testified that he was not aware of any art characterizing apixaban's onset of action as slow.[24]  PRFOF ¶ 159; Tr. 1368:15-19 (Chambliss).  Defendants

---

[21] Defendants imply that these references are unreliable because they were authored by BMS employees or associates.  Br. 36.  That suggestion is flatly contradicted by Dr. Chambliss's testimony that Carreiro is a "reliable" reference that a POSA would look to regarding the pharmacokinetics of apixaban.  PRFOF ¶ 148; Tr. 1360:23-24, 1361:3-7 (Chambliss).

[22] Defendants assert that cardiovascular drugs have a high failure rate in clinical trials, Br. 35, but the main reasons clinical trials failed were related to toxicology, commercial reasons, or safety—not formulation.  Br. 35; PRFOF ¶ 161.  BMS produced backup compounds for the Factor Xa program because of unpredictable toxicities, not formulation challenges.  PRFOF ¶ 162; Tr. 203:19-204:24 (Knabb).

[23] Contrary to Defendants' assertion, a POSA would not have been motivated to seek a biowaiver, Br. 35, because biowaivers were not available for BCS Class III drugs in the U.S. until 2015.  PRFOF ¶ 177.

[24] Defendants also point to the statement in Nause that there was a need to find "safe, effective methods of delivering [Factor Xa inhibitors including] apixaban."  Br. 35.  However, Nause is not prior art, *see infra* pp. 39-40, and in any case the generic statement in Nause is not tied to any issue with bioavailability of apixaban.  PRFOF ¶¶ 188-189, 197.

rely only on the *ipse dixit* of their expert in their attempt to establish a motivation:  Their

motivation evidence boils down to the aphorism that "[y]ou're always looking for ways to make

improvement."[25]  DOFOF ¶ 217; Tr. 1331:17-22 (Chambliss).

Expert say-so cannot overcome explicit teachings in the prior art.  *Ericsson Inc. v.

Intellectual Ventures I LLC*, 890 F.3d 1336, 1346 (Fed. Cir. 2018) (reversing obviousness

finding where the PTAB credited an expert who provided opinions that were contradicted by the

prior art).  Moreover, Defendants' argument, taken on its face, would apply to nearly every solid

pharmaceutical drug because they all have less than 100% bioavailability.  Such generalized

motivations are insufficient—especially where, as here, they fly in the face of the explicit

teachings of the prior art.  *See, e.g.*, *Amerigen Pharm. Ltd. v. UCB Pharma GmbH*, 913 F.3d

1076, 1087 (Fed. Cir. 2019) (a generalized motivation to enhance bioavailability is sufficient).

Defendants' conclusory, one-sentence assertion that a POSA would have been motivated

to reduce particle size to improve "content uniformity" is also unsupported.  Br. 35.  Defendants

have not identified any reports of concern in the prior art with apixaban's content uniformity.

Further, it was known that for the claimed apixaban doses of 2.5 and 5 mg doses, the $D_{90}$ particle

size needed to ensure content uniformity is much ***higher*** than 89 μm.  PRFOF ¶ 183.  As a result,

content uniformity would not have motivated a POSA to reduce the particle size to a $D_{90}$ equal to

or less than about 89 μm, which is what the asserted claims require.

Even if a POSA had been motivated to improve apixaban's bioavailability, a POSA

would not reasonably have expected that speeding up apixaban's dissolution rate would do so.

Defendants cite publications stating that apixaban is "poorly water soluble," DOFOF ¶¶ 212,

---

[25] Contrary to Defendants' assertion, Br. 35, there is no evidence in the record that the POSA (a formulator) would substitute their own independent clinical judgment for that of the clinical team.  PRFOF ¶ 157.

218, 265, but those references refer to absolute or USP solubility, which is different from BCS solubility.  PRFOF ¶ 101; Tr. 1256:4-24; 1383:12-17 (Chambliss).  BCS solubility is more relevant to pharmaceutical formulations because it considers solubility based on a dose at physiological conditions, whereas USP solubility does not.  PRFOF ¶¶ 101, 174.  It is undisputed that at 2.5 and 5 mg, which are the claimed doses, apixaban was known to be highly soluble BCS Class III drug.[26]  PRFOF ¶ 169; Tr. 1686:15-19 (Myerson).

The BCS sorts drugs into four categories that are predictive of the rate-limiting step of absorption.  BCS Class III drugs, i.e., those with high solubility and low permeability, are not expected to be dissolution-rate limited.  PRFOF ¶¶ 164-168.  For example, as the below image from PTX-429 shows, it was known that BCS III drugs with significantly different dissolution rates (left) could have nearly identical bioavailability (right), *see also* PRFOF ¶¶ 166-167:



Fig. 4.  In vitro dissolution (left graph, mean curves n=6) and mean plasma profiles (right graph, n=14) of four IR ranitidine dosage forms (Polli, 1997).

Defendants do not dispute that the literature provided experimental examples showing that dissolution had no impact on the absorption of BCS Class III drugs.  PRFOF ¶ 168.  Instead, Defendants argue that: (1) the BCS only has relevance in the regulatory context, i.e., to obtain a biowaiver; and (2) BCS Class III drugs do not fall into a "one-size-fits-all" category but should be considered "individually based upon [each drug's] unique physical properties."  Br. 36. Defendants' first point is contradicted by the prior art, which explicitly stated that the BCS had

_____

[26] Defendants suggest that a POSA would not know the BCS classification of apixaban because it is dose dependent.  DOFOF ¶¶ 236-237.  But these doses were being pursued in the Phase III trial.  PRFOF ¶ 170; Tr. 1316:8-10 (Chambliss).  Defendants cannot argue both that a POSA would not know which dose to select and that a POSA would select 2.5 and 5 mg.

an important role in drug discovery beyond obtaining biowaivers (indeed, FDA biowaivers were not even available for BCS III drugs as of the priority date). PRFOF ¶¶ 175-178.  Defendants' second assertion is irrelevant because the prior art consistently reported that apixaban had good oral bioavailability and was rapidly absorbed.  PRFOF ¶¶ 147-163; *see also supra* p. 35.

> **(b)   *Defendants' combinations do not render the claims obvious.***

For all the reasons stated above, a POSA would not have been motivated to combine any of the cited references and would have had no reasonable expectation of success in doing so.  *See supra* § II.B.2.(a).  In addition, none of Defendants' references discloses the dissolution rate limitation of 77% in 30 minutes, which is a key part of the invention.

*First*, a POSA would not have been motivated to combine **Carreiro and Wei in view of the FDA Guidance**, especially where Carreiro itself teaches that apixaban's bioavailability is good.  PRFOF ¶ 149.  Wei is directed to a process for converting one polymorph to another, which could be applied to any compound, not just apixaban.  PRFOF ¶ 190.  Wei does not teach reducing apixaban particle size to enhance the dissolution rate.  Br. 37.  Wei makes only a general statement about the relationship between particle size and bioavailability, disconnected from apixaban.  *Id*.  Wei does not discuss any apixaban formulations or doses, and it does not disclose any bioavailability data or dissolution data for apixaban.  PRFOF ¶ 191.

Further, as Defendants concede, the FDA Guidance does not recite the claimed dissolution rate of 77% in 30 minutes.  Br. 37.  Instead, it discloses only ***general*** guidance on selecting dissolution parameters.  PRFOF ¶ 192.  Defendants assert that the FDA Guidance discloses a dissolution rate of 85% in 15 minutes for BCS Class III drugs, which "subsumes" the

claimed rate.  Br. 38.[27]  But 85% in 15 minutes is plainly not the same as 77% in 30 minutes.  A POSA would not have had a reason to pursue a 77% in 30 minutes dissolution rate for apixaban based on the FDA Guidance or anything else in the prior art.  PRFOF ¶ 192.

*Second*, the claims would not have been obvious over the **'306 Publication and Wei in view of the FDA Guidance**.  As explained immediately above, Wei and FDA Guidance fail to teach the particle size and dissolution rate limitations, respectively, and the '306 Publication does not remedy this failure.  Further, the '306 Publication does not disclose solid pharmaceutical compositions comprising 2.5 or 5 mg of apixaban.  PRFOF ¶ 195.  To the contrary, as Dr. Chambliss admitted, the '306 publication discloses 5 mg and 2.5-100 mg *injectable* doses of apixaban.  *Id*.

*Third*, the claims would not have been obvious over the **'208 patent and Wei in view of the FDA Guidance** because, again, Wei and the FDA Guidance fail to teach the particle size and dissolution rate terms, respectively, and the '208 patent does not fill this gap.  PRFOF ¶ 194.

*Finally*, the claims would not have been obvious over **Nause in view of the FDA Guidance**.  As a threshold matter, Nause is not prior art.  Nause is a PCT application filed by BMS and Pfizer in June 2010.  PRFOF ¶ 185.  The '945 Patent's priority date is no later than February 24, 2011.  UF ¶ 31.  Plaintiffs adduced evidence at trial showing that the inventions of the '945 patent were conceived and reduced to practice by October 2009.  PRFOF ¶¶ 116-119; 185.  Defendants did nothing to rebut that evidence.  Defendants have thus failed to carry their burden of showing that Nause is prior art.  *Mahurkar v. C.R. Bard, Inc*., 79 F.3d 1572, 1578 (Fed. Cir. 1996) (holding that defendant bears the burden on prior art status after plaintiff

---

[27] Contrary to Defendants' assertion, Br. 38, the experts did not "agree that this [limitation] is not innovative."  The dissolution *testing conditions* specified in the claims are standard, but Dr. Myerson made clear that the *claimed dissolution rate* was innovative.  PRFOF ¶ 193.

presents evidence of prior conception and reduction to practice).  In apparent recognition of this failure, Defendants assert that even if Nause is not prior art, it is supposedly a "contemporary document showing the state of the art and the knowledge of a POSA."  Br. 35 n.5. This is an attempt at an end run around the law, and Defendants cite no case supporting such an approach.

Even if Nause were prior art, which it is not, Defendants admit that Nause "is silent as to the apixaban particle size," and it therefore fails to provide any disclosure of the claimed $D_{90}$ limitation.  Br. 39.  Nause also does not disclose a solid pharmaceutical composition comprising 2.5 or 5 mg of apixaban that meets the dissolution rate limitations.[28]  PRFOF ¶ 188.  Further, the FDA Guidance fails to teach the dissolution-rate limitation, *supra* p. 39.

### (c)   *Objective indicia confirm nonobviousness.*

Unexpected results and other objective indicia of non-obviousness must be considered where presented.  *In re Cyclobenzaprine HCl Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068-72 (Fed. Cir. 2012).  The specification reports in the summary of the invention that having a $D_{90}$ less than 89 microns "[s]urprisingly and unexpectedly" results in consistent exposure.  PRFOF ¶¶ 109; 120.  As Dr. Myerson testified, it would have been unexpected that a BCS Class III drug like apixaban would show dissolution rate limited absorption and that dissolution rate would impact bioavailability.  PRFOF ¶ 204.

## III.   CONCLUSION

For the reasons above, Plaintiffs respectfully request that the Court conclude the asserted claims are not invalid and enter judgment in favor of Plaintiffs.

---

[28] Nause relates solely to a controlled release dosage form, not an immediate release form, which is only discussed as an experimental control.  PRFOF ¶ 187.

Dated: February 7, 2020

Respectfully submitted,

FARNAN LLP

*Of Counsel:*

/s/ Michael J. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

*Counsel for Plaintiffs Bristol-Myers Squibb Company and Pfizer Inc.*

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363