IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ———————————————————— ) | | |
| BRISTOL-MYERS SQUIBB COMPANY AND ) | | |
| PFIZER INC., ) | | |
| ) | | |
| Plaintiffs and Counterclaim-Defendants, ) | | |
| ) | | |
| v. ) | C.A. No. 17-374-LPS | |
| ) | | |
| AUROBINDO PHARMA USA INC., et al., ) | | |
| ) | (CONSOLIDATED) | |
| Defendants and Counterclaim-Plaintiffs. ) | | |
| ———————————————————— ) | | |

## DEFENDANT UNICHEM LABORATORIES LTD.'S PROPOSED FINDINGS OF FACT ON NON-INFRINGEMENT

Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning

GREENBLUM & BERNSTEIN, P.L.C.

1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

*Counsel for Unichem Laboratories Ltd.*

Dated: February 7, 2020

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.

1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

## TABLE OF CONTENTS

I.    THE '945 PATENT ......................................................................................... 1

    A.    Background of the '945 Patent And Asserted Claims ............................................ 1

    B.    Claim Construction ................................................................................ 2

    C.    Level of Ordinary Skill in the Art ................................................................. 3

    D.    Plaintiffs Have Not Submitted Sufficient Reliable Evidence of Infringement ....... 4

        1.    Plaintiffs Did Not Calculate A $D_{90}$ For Unichem's Tablet(s) .................... 4

        2.    Dr. Berkland's Analysis ................................................................. 5

        3.    Dr. Berkland Viewed A Statistically Insignificant Sample Size ............... 6

        4.    The SEM-EDS Technology Employed By Dr. Berkland Is Not Suitable For Calculating The $D_{90}$ Value ........................................... 8

        5.    The State of The Art in 2010-2011 Does Not Show A Single Example Of Determining the D90 of An API After Tableting ................. 10

        6.    The Berkland Method Had No Controls .................................... 14

    E.    The Evidence At Trial Establishes The Unichem Tablets Would Not Infring ..... 15

        1.    The Unichem ANDA And Dr. Genck's Independent Testing ................. 15

        2.    Dr. Genck's Testing Does Not Ignore The Court's Claim Construction Order And Is Highly Relevant ........................................... 18

**ABBREVIATIONS**

| | |
|---|---|
| The '945 Patent | U.S. Patent No. 9,326,945 |
| ANDA | Abbreviated New Drug Application |
| API | Active pharmaceutical ingredient |
| Asserted '945 Claims | Claims 21 and 22 of U.S. Patent No. 9,326,945 |
| BMS | Plaintiff Bristol-Myers Squibb Company |
| EDS | energy dispersive x-ray spectroscopy |
| FDA | U.S. Food and Drug Administration |
| NDA | New Drug Application |
| Pfizer | Plaintiff Pfizer Inc. |
| Plaintiffs | BMS and Pfizer |
| POSA | Person of Ordinary Skill in the Art |
| PSUF | Parties' Statement of Uncontested Facts, Pretrial Order, Exhibit 1 (D.I. 672–1.) |
| SEM | Scanning Electron Microscopy |
| Unichem | Defendant Unichem Laboratories, Ltd. |
| Unichem ANDA | Unichem ANDA No. 210108 |

## I.      THE '945 PATENT

### A.      Background of the '945 Patent And Asserted Claims

1.      The '945 Patent, titled "Apixaban Formulations," issued on May 3, 2016. (JTX-2; PSUF ¶¶ 24, 29.)

2.      The '945 Patent lists the following inventors: Jatin Patel, Charles Frost, Jingpin Jia, and Chandra Vemavarapu. (PSUF ¶ 25.)

3.      The earliest effective filing date for the '945 Patent is February 25, 2010 (JTX-2; Tr. 600:18-601:4 (Berkland); Tr. 1228:4-17 (Chambliss)) and the priority date is no later than February 24, 2011. (PSUF ¶ 30.)

4.      Plaintiffs assert that Unichem infringes Claims 21 and 22 of the '945 Patent. (Tr. 135:8-13 (Plaintiffs' Opening Statement).)

5.      Both Claims 21 and 22 depend from Claim 12, which recites:

12. A solid pharmaceutical composition comprising a therapeutically effective amount of apixaban and a pharmaceutically acceptable diluent or carrier,

>    wherein apixaban comprises crystalline apixaban particles,

>    wherein the crystalline apixaban particles have a D90 equal to or less than about 89 µm, and

>    wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 mL, of a dissolution medium at 37° C, at least 77 wt% of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate.

(JTX-2 at 10:14-27.)

6.      Claim 21 recites "[t]he composition as defined in claim 12, wherein the pharmaceutical composition comprises 2.5 mg of apixaban." (*Id.* at 10:46-47.)

7.      Claim 22 recites "[t]he composition as defined in claim 12, wherein the

pharmaceutical composition comprises 5 mg of apixaban." (*Id.* at 10:48-49.)

**B.     Claim Construction**

8.     The Court construed one claim term of the '945 Patent ("the $D_{90}$ Limitation"),

"apixaban particles that have a $D_{90}$", to have its plain and ordinary meaning. (D.I. 381 at 1.)  As

support, the Court cited to the specification of the '945 Patent, noting that "$D_{90}$ of 89 µm means

that 90% of the volume of particles in an apixaban composition have a diameter less than 89

µm." (D.I. 380 at 9-10).  The parties agreed that all other claim terms from the '945 Patent

should be accorded their plain and ordinary meaning to a POSA. (D.I. 182 at 2; PSUF ¶ 34.)

9.     Dr. Myerson testified that: "A particle is a solid that has three dimensions." (Tr.

1171:17-18 (Myerson).)

10.    Dr. Myerson testified that:

**Q.**    And what is a $D_{90}$?
**A.**    -- if we have that.  We heard a lot about this, and I have to say it's not the easiest
       concept to understand. So imagine we have a basket full of golf balls, baseballs
       and basketballs.  Right?  So we take the golf balls and we know what their
       diameter is and we measure them and we get their volume.  And we take all the
       golf balls and we say, this size, we add up all the golf balls we have this much
       volume, right, and we put a line on the plot.  Then we go to the baseballs, we do
       the same thing. Baseballs have a different diameter. We calculate the volume of
       all the baseballs and add that to the plot.  It's called a cumulative plot. We're
       adding the volumes of everything there. Then we go to the basketballs and do the
       same thing. So then we get this curve which shows the total cumulative volume or
       weight versus size. Now, a $D_{90}$ is mathematically determined from this
       cumulative distribution plot to be the place where the size at which 90 percent of
       the volume is smaller at the given size and 10 percent of the volume is greater
       than the given size.

(Tr. 1670:10, 1670:14-1671:12 (Myerson).)

11.    The $D_{90}$ value cannot be directly measured but must be *calculated.* (Tr. 649:15-

650:1 (Berkland); Tr. 1670:10-1671:12 (Myerson); Tr. 1145:11-1146:21 (Genck); Tr. 1349:16-

1350:3 (Chambliss).)

12.     The Malvern instrument described in the '945 Patent (and used by Unichem in its testing) is an instrument that determines the $D_{90}$ value by measuring the scattering of laser light off of powdered particles and then, using a mathematical algorithm assuming the uniformity of the particle sizes, calculates the "equivalent spherical diameter" (a volumetric measurement) of a particle population. (Tr. 1145:20-1146:15, 1177:6-12 (Genck); Tr. 649:15-650:1 (Berkland).)

13.     The Court's claim construction of the $D_{90}$ Limitation did not exclude using a Malvern laser light scattering instrument to determine the $D_{90}$ value of the bulk apixaban particles (e.g., pre-tableting).  (D.I. 381; D.I. 380 at 10.)

14.     In construing the $D_{90}$ Limitation, the Court indicated that the claim language did not specify the way in which the particle size must be measured, noting that: "The claims are silent as to a method of measurement."  (D.I. 380 at 10.)

15.     The Court's construction of the $D_{90}$ Limitation encompasses determining the $D_{90}$ of the apixaban particles before the particles are tableted using laser light scattering, which is the only technique described in the '945 Patent to determine the $D_{90}$ of apixaban particles.  (Tr. 1150:5-18, 1146:2-1147:5, 1152:8-18, 1153:4-12 (Genck); Tr. 643:11-15, 641:6-10 (Berkland); Tr. 1338:20-24, 1339:11-14 (Chambliss); Tr. 1475:10-16 (Myerson).)

16.     Plaintiffs' expert, Dr. Berkland applied an improper claim construction, as he opined that in his view, the scope of the $D_{90}$ Limitation was constricted to ***only*** determining the $D_{90}$ of apixaban after formulation into a finished composition. (Tr. 637:24-639:24 (Berkland).)

17.     The $D_{90}$ value is not the same as a two-dimensional "particle size" measurement provided by Dr. Berkland.  (Tr. 1670:9, 1670:14-1671:11 (Myerson).)

**C.     Level of Ordinary Skill in the Art**

18.     The definition of a POSA applied by Plaintiffs' experts for the purposes of the Asserted '945 Claims is:

A person that has a Ph.D. or Master's degree or a Bachelor's degree with commensurate experience in chemistry, chemical engineering, pharmacy, pharmaceutical science or an equivalent discipline and has an understanding of the properties of active pharmaceutical ingredients, the design of solid pharmaceutical dosage forms, and knows or has access to techniques to characterize solid pharmaceutical products.

(PSUF ¶ 31.)

19.    The definition of a POSA applied by Defendants' experts for the purposes of the

Asserted '945 Claims is:

A person that has a  Ph.D. in pharmaceutical sciences or a closely related field with two or more years of experience in that field or a master's degree in pharmaceutical sciences or a closely related field and five or more years of experience, or the equivalent, in pharmaceutical formulation, or a bachelor's degree in chemistry, pharmaceutics, or chemical engineering, and significant work experience in the manufacture and characterization of materials having pharmaceutical interest. That POSA would have been capable of designing and formulating pharmaceutical formulations, including immediate release compositions of low solubility active pharmaceutical ingredients, such as, for example, apixaban for thromboembolic therapy. This POSA at the relevant time had training in, experience in, and/or an understanding of particle size and dissolution testing that frequently accompanies the development of pharmaceutical formulations. Such a person generally would have supervised and/or collaborated with others having skill and/or expertise in the testing discussed above.

(PSUF ¶ 32.)

20.    The opinions offered by each side's experts as to the validity and infringement of

the '945 Patent do not change based on which of the two definitions in paragraphs 18 and 19 is

applied. (PSUF ¶ 33.)

### D.    Plaintiffs Have Not Submitted Sufficient Reliable Evidence of Infringement

### 1.    Plaintiffs Did Not Calculate A $D_{90}$ For Unichem's Tablet(s)

21.    Dr. Berkland did not calculate a $D_{90}$ value for the pre-formulated bulk apixaban

particles to be used in manufacturing the Unichem tablet(s) or a $D_{90}$ value for apixaban particles

after the apixaban had been tableted in accordance with Unichem's ANDA. (Tr. 629:6-9, 647:12-

16 (Berkland).)

– 4 –

22.     Dr. Berkland did not use any software or algorithms to attempt to convert his SEM-EDS particle size measurements into a calculated $D_{90}$ value of the apixaban particles of Unichem's tablet(s).  (Tr. 664:8-10 (Berkland).)

### 2.     Dr. Berkland's Analysis

23.     Dr. Berkland created the Berkland Method solely for this litigation without consulting the '945 Patent.  (Tr. 652:1-653:1, 651:13-17 (Berkland).)

24.     Dr. Berkland used scanning electron microscopy ("SEM"). (Tr. 610:13-21 (Berkland).)  SEM uses a high-powered microscope with an electron beam projected onto the surface of a sample.  (Tr. 597:13-598:3 (Berkland).)

25.     The electrons from the electron beam of the microscope are reflected to a detector that converts the electrons into an image.  (Tr. 597:13-598:3 (Berkland).)

26.     Dr. Berkland also used "energy dispersive x-ray spectroscopy" or "EDS." (Tr. 610:13-21 (Berkland).)

27.     EDS is not quantitative, but, in combination with SEM, can sometimes be used to identify atoms in a sample based on that atom's unique x-ray emission. (Tr. 598:16-599:7 (Berkland).)

28.     With the SEM-EDS technique, the detector converts the x-ray signatures into colors to create an elemental map depicting the location of the atoms.  (Tr. 598:16-599:7 (Berkland).)  The maps generated by Dr. Berkland only show one atomic signature (one color). (PTX-1205 at 7; PTX-1222 at 11).

29.     Each apixaban molecule has 5 nitrogen atoms.  (JTX-2, 1:16-33; Tr. 604:23-25 (Berkland).)

30.     The primary excipients in the Unichem tablet(s) are lactose anhydrous, microcrystalline cellulose and croscarmellose sodium, none of which include nitrogen.  (Tr.

612:16-613:10 (Berkland).)

31.     Dr. Berkland first used SEM-EDS to develop an elemental map, distinguishing the raw apixaban from the other excipients that are used to manufacture the Unichem tablet(s) (Tr. 610:13-612:12 (Berkland).)

32.     Dr. Berkland testified that the two-dimensional particle size of the Unichem bulk apixaban particles is on the order of "several hundred microns" in size. (Tr. 615:22-616:2 (Berkland).)

33.     Dr. Berkland testified that the two-dimensional particle size of each individual excipient (pre-formulation) "was typically around 100 microns."   (Tr. 617:13-18 (Berkland).)

34.     Dr. Berkland took 5 finished 5 mg Unichem tablets and "fractured" them, and then, using a razor blade, he scraped material from the core of the tablet.  (Tr. 618:4-5, 618:8-9, 619:14-25, 644:12-16 (Berkland).)

35.     Dr. Berkland observed, using SEM-EDS, a few granules, some of which included apixaban particles on the surface, and subjectively estimated the apixaban particles were somewhere in the vicinity of 1 micron.  (PTX-1205 at 7; Tr. 621:14-22 (Berkland).)

### 3.     Dr. Berkland Viewed A Statistically Insignificant Sample Size

36.     To obtain reliable results and data to calculate a reliable particle size distribution, one must determine and measure a statistically significant number of particles in the discrete sample.  (DTX-421.00107 ("For size distributions, repeatability also depends on the number of particles counted (number statistics; e.g., Poisson statistics; see Chap. 20.; and under "Critical Points": "A sufficient number of particles should be considered."); DTX-354.00008 ("A more fundamental sampling issue is the number and weight of samples required.").)

37.     Dr. Berkland only observed five tablets, all of which were 5 mg tablets and none

of which were 2.5 mg tablets. (Tr. 653:8–18 (Berkland).)

38.     Dr. Berkland viewed only 68 granules total (from all 5 tablets) (Tr. 653:20-24 (Berkland)) and only 85% of the 68 granules included any apixaban particles that Dr. Berkland could observe. (Tr. 620:5-11 (Berkland).)

39.     Dr. Genck testified that testing only 5 tablets out of three batches is "a very, very small, percentage-wise" number and looking at only 68 granules "is the same.  It's statistically insignificant."  (Tr. 1177:23-1178:5 (Genck).)

40.     Dr. Berkland cited to nothing in the literature to support a finding that 68 granules would be a statistically significant number of granules to study.  (Tr. 657:12-25 (Berkland).)

41.     Dr. Berkland did not provide an estimate of how many apixaban particles are in a single Unichem 5 mg tablet or even how many granules might be in a Unichem tablet. (Tr. 653:25-654:6 (Berkland).)

42.     Dr. Berkland did not have an estimate of how many particles of apixaban were on the surface of the granules he observed, testifying that "[t]he the number of apixaban particles on a single granule was dozens, if not hundreds, of apixaban particles on one granule." (Tr. 620:12-16 (Berkland).)

43.     The SEM-EDS technique does not permit apixaban particles that are below the surface of the granules to be viewed. (Tr. 1180:17-1181-5 (Genck).)

44.     Tablets made in accordance with the manufacturing process described in the Unichem ANDA would likely result in apixaban particles distributed below the surface of the granules.  (Tr. 1179:1-11 (Genck).)

45.     Dr. Genck testified that three steps in the Unichem manufacturing process would have led to apixaban particles becoming embedded within the granules, including (i) adding

water which dissolves the lactose and would bring apixaban into the granule bed; (ii) adding 15% extra granular material on top of the granules which would obscure the apixaban on the surface of the granule; and (iii) compressing the granules to form the tablet.  (Tr. 1179:12-1180:16 (Genck).)

### 4. The SEM-EDS Technology Employed By Dr. Berkland Is Not Suitable For Calculating The $D_{90}$ Value

46.     SEM and SEM-EDS were known microscopy methods as of the filing date of the '945 Patent.  (Tr. 1178:6-8 (Genck).)

47.     A POSA would not have used either SEM, SEM-EDS or any other technique in the 2010-2011 time (or even today) to "estimate" or otherwise determine a $D_{90}$ value of tableted API particles. (Tr: 1177:6-12 (Genck); Tr. 1744:16-1745:9 (Myerson); Tr. 1338:25-1340:2 (Chambliss).)

48.     SEM-EDS permits visual observation of individual particles to estimate the area (not volume) of individual particle sizes by taking a two-dimensional measurement. (Tr. 646:23-647:10 (Berkland); Tr. 1177:6-17 (Genck).)

49.     Dr. Berkland testified that SEM-EDS creates "a picture on a screen or page so it is in two dimensions" and not a three-dimensional volumetric measurement.  (Tr. 646:23-647:10 (Berkland).)

50.     It is not possible to calculate the $D_{90}$ value from using SEM-EDS alone because SEM-EDS cannot provide the three-dimensional volumetric measurement required to calculate the $D_{90}$.  (Tr. 1177:6-12 (Genck).)

51.     It may be possible to combine two-dimensional particle size information with algorithms or software to approximate a $D_{90}$ value. (Tr. 1215:9-1216:1 (Genck); Tr. 1349:17-23, 1349:23-1350:3 (Chambliss); 1670:10-1671:12 (Myerson).)  But, Dr. Berkland did not employ

– 8 –

any of these. (Tr. 664:8-10 (Berkland).)

52.     Both Drs. Genck and Berkland relied on the 2009 book titled *Particle Size Measurements* by Henk G. Merkus ("Merkus") (DTX-343, DTX-421, PTX-394[1]), making it clear that a POSA would have been aware of Merkus in the 2010-2011 timeframe.  (Tr 1181:6-18 (Genck); Tr. 605:15-23, 660:9-19 (Berkland).)

53.     Merkus categorizes the SEM method as a "counting" or "fingerprint" technique, limited to "picking out each particle and very few particles at a time in order to get a fingerprint" but not to provide a volume.  (Tr. 1183:1-9 (Genck); DTX-421-00086).)

54.     There is no teaching in Merkus to use SEM-EDS to determine the equivalent spherical diameter of particles, which is the basis of the $D_{90}$ limitation. (DTX-421.00145 (Merkus).)

55.     Merkus distinguishes these "counting" methods (such as the SEM method) from "particle ensemble" methods, which includes the laser light scattering method employed by the Malvern instrument used in the '945 Patent and by Dr. Genck, and Unichem in calculating the $D_{90}$ of the apixaban particles in the Unichem tablet. (DTX-421.00086-87; Tr. 1181:19-25, 1183:10-1184:9 (Genck).)

56.     Merkus indicates that the particle ensemble methods, such as laser light scattering, generate "both size and quantity information" and the "quantity information of the PSD [particle size distribution] is volume based." (DTX-421.00088).)

57.     Dr. Berkland acknowledged that the microscopy techniques have drawbacks,

---

[1] Different chapters of Merkus were submitted under different Exhibit numbers.  DTX-343 is Chapter 6 of Merkus; PTX-394 and DTX-421 both include Chapters 2, 4, 6, 7 and 10.  For convenience, all citations to Merkus will be to DTX-421.

acknowledging that Merkus states, with respect to the SEM technique that he used:

> For determination of *particle size distribution*, there is a *strong limitation to the width of the distribution*.  This is due to the fat that only a limited number of particles is allowed in a field of view to avoid overlapping particles, that only a limited range of sizes can be measured at a single magnification at reasonable precision, and that typically only a few hundred particles are being measured.

(Tr. 660:1-21 (Berkland); DTX-421.00145 (emphasis added).)

58.     Dr. Berkland also relied on a chapter from a book by Xian-Ming Zeng, titled

*Particulate Analysis-Particle Size, in Solid State Characterization of Pharmaceuticals* (1st Ed.

2011) (PTX-412) ("Zeng") which addresses the analysis of pharmaceutical particles.  (Tr.

608:23-8 (Berkland).)

59.     Dr. Berkland acknowledged and agreed with the following statement from

Section 11.7.2 of Zeng regarding "Microscopy Image Analysis": "However, there are a number

of limitations associated with the use of microscopy for measuring particle size.  First,

microscopy is a subjective measure that is prone to observer bias and error." (PTX-412 at

BMSAPIXE_0002547; Tr. 662:9-663:16 (Berkland).)

60.     Zeng states that the error injected by the observer bias and subjectivity might be

remedied by employing "automatic image analysis techniques."  (PTX-412 at

BMSAPIXE_0002547; Tr. 663:21-664:2 (Berkland).)

61.     Dr. Berkland admitted he did not employ any automatic image or analysis

techniques in the context of his SEM-EDS analysis.  (Tr. 664:8-10 (Berkland).)

## 5.   <u>The State of The Art in 2010-2011 Does Not Show A Single Example Of Determining the D90 of An API After Tableting</u>

62.     The Berkland Method was not generally accepted in the scientific community in

2010-2011 for determining the $D_{90}$ of an API post-tableting.

63.     The Berkland Method has never been published in a peer reviewed article or journal wherein the $D_{90}$ of an API has been ascertained (or estimated).

64.     The state of the art in 2010-2011 does not teach or suggest *any method* for determining the $D_{90}$ of an API *after it has been tableted.*  (Tr. 1744:16-1745:17, 1746:21-1747:25 (Myerson), Tr. 1338:25-1340:2 (Chambliss), Tr. 1941:6-11, 17-24 (Plaintiffs' Closing).)

65.     Plaintiffs' counsel conceded, on direct questioning from the Court, that there is no prior art showing a determination of the $D_{90}$ of an API after tableting:

> THE COURT: This point about whether the $D_{90}$ is measured in the bulk before the tableting or at the end after the tableting, have you identified any evidence before me where outside of this litigation, either a patent or other reference or any witness, ever measured $D_{90}$ or particle size after tableting.
>
> ***
>
> MS. WIGMORE: The answer is yes, there are particle size measurements in the prior art. I gave the exhibit numbers during my presentations. **The $D_{90}$ in a tablet that's not in the prior art** but the techniques that are in the references that I mentioned show how to measure the particle size that you can get from the tablet, and the $D_{90}$ is a mathematical calculation that can be made.

(Tr. 1941:6-11, 1941:17-24 (Plaintiffs' Closing)(emphasis added).)

66.     Dr. Myerson testified:

> Q.     We discussed a number of publications, and I do believe we're in agreement, but would you agree with me that none of the documents that you discussed today [or] were cited in your expert report determined the $D_{90}$ of an API in a finished dosage form?
> A.     That's correct.

(Tr. 1746:22-1747:2 (Myerson).)

67.     Dr. Genck testified:

> Q.     Are you aware of any reports in the literature of measuring the $D_{90}$ equivalent spherical volume of an active pharmaceutical ingredient that had already been formulated into a tablet?
> A.     No, I'm not. I certainly was not aware of one in the 2010/2011 time frame and I'm not aware of one today.

(Tr. 1178:20-25 (Genck).)

68.     Dr. Chambliss testified:

Q.     Are you aware of any situation where the $D_{90}$ of an API after tableting was determined?
A. Never, in 30-something years in this business, I've never heard of that being done.
Q. Thank you. Are you aware of any literature or peer-reviewed publications teaching how to determine the $D_{90}$ of an API after being formulated into a finished composition?
A. No, I'm aware of none.

(Tr. 1339:19-1340:2 (Chambliss).)

69.     Dr. Berkland admitted that, before this litigation, he had never attempted to

estimate or otherwise determine the $D_{90}$ of an API post-formulation using any measuring

technique. (Tr. 651:13-17 (Berkland).)

70.     SEM and EDS were known microscopy methods in the 2010-2011 time period,

but they were not known by a POSA for determining the $D_{90}$ of tableted API particles. (Tr.

1178:6-19 (Genck).)

71.     Dr. Genck testified:

Q.     Was the use of SEM-EDS generally known to those of skill in the art in 2010?
A.     Yes, it was, but for different applications.
Q.     What types of applications would it have been used for?
A.     For example, one of which is simply looking to particle shape. That you could do if you kind of want to get a feel for porosity. In other words, how are the particles held together, is there a void volume there? You could get that. And then if you want to use the EDS capabilities, you could do a little bit of issuing measurement in terms of chemical analysis, but nothing to do with the volume of particles.

(Tr. 1178:6-19 (Genck).)

72.     The state of the prior art, as shown in Merkus, describing SEM-EDS and other

microscopy methods establishes these techniques were not known (or even able) to determine the

$D_{90}$ of tableted API. (Tr. 1181:6-1184:16 (Genck); DTX-421.00086-88.)

73.    SEM-EDS permits the visual observation and measurement of a single dimension (e.g., length) or 2-dimensional cross sections—not three-dimensional volume. (Tr. 1181:6-1184:16 (Genck); DTX-421.00086-88.)

74.    Reverchon, et al., *Supercritical fluid assisted production of HPMC composite microparticles,* J. of Supercritical Fluids, 46 (2008) 185-196 ("Reverchon"), used SEM-EDS to verify uniformity of a two component blend of powder before tableting. (Tr. 666:8-14 (Berkland); PTX-402 at 185.)

75.    Reverchon used SEM qualitatively and to observe the shape of the mixture of HPMC/API powder particles.  (PTX-402 at 188-189 (Section 3.1.2, describing the use of SEM images to show "a qualitative evaluation of the increase in particle size ….").)

76.    Reverchon used SEM to view particles of a powder mixture of HPMC and ampicillin (before these ingredients were formulated into tablets). (PTX-402 at 192 ("Drug release of SAA coprecipitates was analyzed from ***tablets and from gelatin capsule containing co-precipitated microparticles . . . .***").)

77.    Reverchon did not use SEM-EDS to calculate the $D_{90}$ of the API after it was tableted or capsuled. (PTX-402.)

78.    At most, Reverchon used SEM, along with laser light scattering, to estimate a $D_{90}$ value of a powder mixture of two components, an API (ampicillin) and an excipient (HPMC or hydroxypropyl methylcellulose), ***before (not after) the mixture was formulated into a solid dosage form*** (i.e., either tableted or placed into a capsule). (PTX-402 at 187 (describing first the analysis of the mixture of powders and then the drug release studies after the HPMC and AMP had been formulated into tablets and gelatin capsules)).)

79.    Moreover, Reverchon did not use SEM-EDS to determine a $D_{90}$ value, as the EDS

– 13 –

was used only in conjunction with element of mapping the location of the API in the powdered

mixture of API plus the HPMC.  (PTX-402 at 191-192).

80.     The estimated $D_{90}$ in Reverchon did not distinguish between the API and the

HPMC.  The particle size population obtained was the estimated $D_{90}$ of the combination of

excipient and API before tableting. (Tr. 666:8-16 (Berkland); PTX-402 at 189).

### 6.   <u>The Berkland Method Had No Controls</u>

81.     Dr. Berkland did not employ a single valid control to ensure that the method he

employed did not impact the particle size of the particles he observed within the granules.  (Tr.

1761:12-22 (Myerson).)  The use of valid controls is essential in obtaining reliable results.

(DTX-421.00138 ("Good practice requires: … validated measurement procedure (SOP)"); DTX-

421.00142 ("Sample preparation is critical for obtaining two-dimensional optimum results.").)

82.     Dr. Berkland tested Unichem's bulk apixaban and concluded that the nitrogen, as

well as the oxygen and carbon, was uniformly distributed throughout the apixaban particles.  (Tr.

615:10-16 (Berkland).)

83.     Dr. Berkland tested Unichem's bulk apixaban and concluded that the particle size

of the API before being formulated was on the level of "several hundred microns" (Tr. 615:22-

616:2 (Berkland).)

84.     Dr. Berkland compared the two-dimensional particle size of the excipients prior to

formulation (i.e., lactose anhydrous, microcrystalline cellulose and croscarmellose sodium), with

the size of the actual granule he sliced out of the tablets – which included not just the excipients

but also the apixaban.  (Tr. 618:22-619:8 (Berkland).)  Dr. Berkland appeared to incorrectly

testify that he "compared the particle size compressed into the tablet to the particle size of the

excipients that come back out of the tablet."  (Tr. 668:2-22 (Berkland).)

85.     Dr. Berkland qualitatively observed that the excipients (pre-formulation) were about 100 microns.  (Tr. 617:13-18 (Berkland).)

86.     Dr. Berkland testified that the granules he sliced from the tablet were "consistent with the size of the excipients that were used in the starting formulation" and that this somehow tells him that he "hadn't somehow adulterated the sample."  (Tr. 617:23-618:8 (Berkland).)

87.     There is no evidence that explains why the size of the excipients pre-formulation would serve as a control to determine whether the Berkland Method impacts the particle size since Dr. Berkland could not differentiate between the three excipients in his SEM/EDS pictures.

88.     Dr. Berkland testified that, if his procedure would do something "to adulterate the particle size in some way," he assumed it would "be evident in" his analysis.  (Tr. 668:9-22 (Berkland).)

89.      Plaintiffs' expert, Dr. Myerson, testified as follows:

Q.     Okay. And Dr. Berkland did not do any control testing to ensure that his testing methodology did not impact the size of the apixaban API particles that he was liberating from the Unichem ANDA products; is that correct?
A.     Right. I would modify, he was liberating granules from the ANDA products and then looking at those. With that caveat, I will agree with you.
Q. So it is correct that he did not perform any controls to ensure that his testing methodology did not impact the size of the API particles?
A. That's correct.

(Tr. 1761:12-22 (Myerson).)

**E.     The Evidence At Trial Establishes The Unichem Tablets Would Not Infringe**

     **1.     <u>The Unichem ANDA And Dr. Genck's Independent Testing</u>**

90.     The Unichem ANDA specifies that the apixaban particles must have a $D_{90}$ value between 150-1000 microns. (Tr. 1165:2-12 (Genck); DTX-942.00003-4 (August 24, 2018 Complete Response Amendment).)

91.     Unichem's ANDA includes a specification for particle size distribution that requires the $D_{90}$ of apixaban to be between 150-1000 microns.  (Tr. 1165:2-12 (Genck); DTX-942.00003-4 (August 24, 2018 Complete Response Amendment).)

92.     The Unichem tablet(s) are made from apixaban having a $D_{90}$ value ranging from 416.333 microns to 509.377 microns.  (Tr. 1165:19-1166:4 (Genck); DTX-942.00004.)

93.     Dr. Genck testified at trial that the $D_{90}$ value for Batch No. 2010002631 in the chart below should read "**4**90.445) as opposed to "90.445" based on the Certificate of Analysis provided in Unichem's ANDA.  (Tr. 1166:5-1167:9 (Genck); DTX-946.00013) (showing the $D_{90}$ value for SAP Batch No. 2010002631 to be 490.445 microns.)

**Apixaban Tablets, 2.5 mg & 5 mg**
**Applicant: Unichem Laboratories Limited**

| Limits | Drug Substance Batch # & Results | | |
|---|---|---|---|
| | 2010002629 | 2010002630 | 2010002631 |
| D90: Between 150 to 1000 micron | 416.333 | 509.377 | 90.445 |

94.     The Unichem ANDA specifies the methodology to be employed in determining the $D_{90}$ of the apixaban, which includes the conditions and parameters for carrying out the testing using the Malvern Mastersizer laser light scattering instrument. (Tr. 1167:14-1168:13 (Genck); DTX-943.00005.)

95.     The methodology described in the Unichem ANDA for determining the $D_{90}$ value of the apixaban was very typical of what one of ordinary skill in the art would have expected. (Tr. 1168:14-24 (Genck).)

96.     The use of laser light scattering to determine the $D_{90}$ of a particle population of a bulk API is standard in the pharmaceutical industry.  (Tr. 1145:11-19 (Genck); Tr. 1338:15-1339:10 (Chambliss); Tr. 1744:16-1745:16 (Myerson).)

97.     Using the Malvern instrument to determine the $D_{90}$ of the apixaban is the only method described in the '945 Patent. (Tr. 1146:24-1147:5, 1152:8-18, 1153:4-12 (Genck); Tr. 643:11-15, 641:6-10 (Berkland); Tr. 1339:11-14 (Chambliss); Tr. 1745:10-17 (Myerson).)

98.     Dr. Patel, a named inventor of the '945 patent as well as Plaintiffs' Rule 30(b)(6) witness on particle size testing, testified at trial that "[t]he particle size was assessed for the API" prior to formulation.  (Tr. 1127:15-1128:2 (Patel).)

99.     Dr. Patel testified at trial that he was not aware of any efforts made at BMS to identify the particle size of the API within the tablet of the '945 Patent.  (Tr. 1127:24-1128:2 (Patel).)

100.    Dr. Patel testified that he agreed with the statement at Column 2, lines 7-11 of the '945 Patent that "Accordingly, the invention provides a pharmaceutical composition comprising crystalline apixaban particles having a $D_{90}$ equal to or less than about 89 micrometers as measured by laser light scattering method and a pharmaceutically acceptable diluent or carrier."  (Tr. 1128:3-1129:2 (Patel).)

101.    Unichem is required to make the 2.5 and 5 mg apixaban tablets in accordance with the Unichem ANDA. (Tr. 1164:1-6 (Genck).)

102.    The Unichem ANDA shows that the bulk apixaban particles have a $D_{90}$ of above 89 microns, and therefore the tablets made in accordance with the Unichem ANDA do not meet the $D_{90}$ Limitation of the Asserted '945 Claims. (Tr. 1169:5-1170:1 (Genck).)

103.    Dr. Genck had an independent laboratory, Particle Technologies Laboratories measure the $D_{90}$ value of a sample of Unichem bulk apixaban from batch 2010002631.  (Tr. 1170:2-7, 1170:22-1171:10 (Genck).)

104.    Dr. Genck testified to the appropriate manner in which he obtained and maintained the sample of Unichem apixaban before providing it to Particle Technologies Laboratories as well as inspecting the Malvern instrument and ensuring the technicians understood standard protocol.  (Tr. 1171:14-1173:7 (Genck).)

105.    Particle Technology Laboratories employed a Malvern Mastersizer 2000 instrument (liquid dispersion) to test the apixaban sample, using essentially the same parameters and conditions set forth in the Unichem ANDA.  (Tr. 1170:8-21 (Genck); DTX-545).

106.     Particle Technology Laboratories provided a Lab Report (DTX-546) with the following results reproduced below:

PARTICLE SIZE DATA SUMMARY

| SAMPLE ID | CUMULATIVE VOLUME % LESS THAN INDICATED SIZE | | | SAMPLE MASS (g) | OBSCURATION % |
|---|---|---|---|---|---|
| | D[v,0.10](µm) | D[v,0.50](µm) | D[v,0.90](µm) | | |
| Apixaban | | | | | |
| SAP Batch 2010002631 | 40.36 | 155.19 | 321.38 | 0.5349 | 7.23 |
| SAP Batch 2010002631 | 38.55 | 154.74 | 321.64 | 1.0448 | 13.65 |

107.    The $D_{90}$ values obtained from this independent testing were approximately 321 microns, which falls well outside the scope of the $D_{90}$ Limitation recited in the Asserted '945 Claims.  (DTX-546.00002; Tr. 1175:6-16 (Genck).)

108.    Dr. Genck explained that, in his experience, the differences in the $D_{90}$ values reported in the Unichem ANDA and the Particle Technology Laboratories Report are not unusual given the testing methodology. (Tr. 1217:1-16 (Genck).)

## 2.    Dr. Genck's Testing Does Not Ignore The Court's Claim Construction Order And Is Highly Relevant

109.    The '945 Patent teaches a POSA that the inventors regarded the $D_{90}$ of the ***bulk apixaban particles*** to be critical in improving the *in vivo* dissolution of the ***apixaban formulated***

– 18 –

***in a tablet***. (JTX-2 at 1:64-2:3, 1:56-60, 2:53-54, 9:29-32; Tr. 1154:23-1155:10; 1157:8-11

(Genck); Tr. 1332:14-1333:9 (Chambliss); Tr. 1746:16-21 (Myerson).)

110.    The '945 Patent (although disputed by Defendants) indicates that using bulk

apixaban particles having a $D_{90}$ of less than 89 μm "surprisingly and unexpectedly" led to

"consistent *in-vivo* dissolution in humans" of the tablets made therefrom.  (JTX-2, 1:64-2:5; Tr.

1715:5:12 (Myerson).)

111.    The relationship between the bulk apixaban $D_{90}$ value and the *in vivo* dissolution

is not surprising or unexpected.  (Tr. 1333:10-1335:6 (Chambliss).)

112.    The particle size (as well as the $D_{90}$) of the apixaban in the tablets of the '945

Patent is not known or knowable by a POSA based on the wet and dry manufacturing processes

disclosed in the '945 Patent. (Tr. 1340:5-1343:2 (Chambliss); Tr. 1749:15-1750:4 (Myerson); Tr.

1157:12-1158:2 (Genck).)  Gahn, *Effect of Compressional forces on piroxicam polymorphs*, J.

Pharm. Pharmacol. 44:678-681 (1992) ("Gahn" DTX-370) shows the transformation of a needle-

shaped polymorph API into a cubic shape caused by compressing the API into a tablet.  (Tr.

1342:3-19 (Chambliss).)

113.    Dr. Myerson testified that he could not know the actual $D_{90}$ of the apixaban

particles in the finished tablets of the '945 Patent, noting that "other than saying it would be the

same or possibly smaller [than the $D_{90}$ of the bulk apixaban used to manufacture the tablets],

that's the best I can do."  (Tr. 1749:15-1750:4 (Myerson).)

114.    The wet and dry granulation manufacturing processes of the '945 Patent will

impact the particle size and thus $D_{90}$ of the bulk apixaban particles such that a POSA would not

be able to predict with any certainty the resulting size or $D_{90}$ of the apixaban particles in the

claimed tablet.  (Tr. 1153:13-22, 1157:12-18, 1152:8-18 (Genck); Tr. 1342:20-1343:1

(Chambliss).)

     115.    Even knowing both the $D_{90}$ of the bulk apixaban drug substance and reading the

'945 Patent, including the processes used to manufacture the formulation, do not provide

sufficient information to a POSA to determine (at the relevant time or even today) the $D_{90}$ value

of the apixaban particles once formulated into a finished dosage form as recited in the Asserted

'945 Patent Claims.  (Tr. 1153:13-22 (Genck); Tr. 1342:20-1343:1 (Chambliss).)

     116.    Dr. Genck testified:

| | |
|---|---|
| Q. | Dr. Genck, you're aware that the Court construed the claim term $D_{90}$; correct? |
| A. | Yes, I am. |
| Q. | And I think we have established this, but you're aware that the Court gave it its plain and ordinary meaning? |
| A. | Correct. |
| Q. | And is that the definition that you applied when you rendered your opinions in this case? |
| A. | It is. |

(Tr. 1219:16-24 (Genck).)

     117.    Dr. Genck testified:

| | |
|---|---|
| Q. | Are you aware that the Court has construed the meaning of the claim phrase apixaban particles have a D90 as it appears in claim 12? |
| A. | Yes, I am. |
| Q. | Do you understand the Court construed the phrase to have its plain and ordinary meaning? |
| A. | That's my understanding, yes. |
| Q. | And is that the claim construction that you applied when rendering your opinion? |
| A. | It is. |

(Tr. 1144:10-19 (Genck).)

Dated: February 7, 2020

Respectfully submitted,

*/s/ John C. Phillips, Jr.*

OF COUNSEL:
Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning
GREENBLUM & BERNSTEIN, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Unichem Laboratories Ltd.*