IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRISTOL-MYERS SQUIBB COMPANY and PFIZER INC., | ) ) ) | |
| Plaintiffs and Counterclaim-Defendants, | ) ) | |
| v. | ) ) | C.A. No. 17-374-LPS |
| AUROBINDO PHARMA USA INC., et al., | ) ) | (CONSOLIDATED) |
| Defendants and Counterclaim-Plaintiffs. | ) ) | |

## DEFENDANT SIGMAPHARM LABORATORIES, LLC'S RESPONSIVE POST-TRIAL BRIEF ON NON-INFRINGEMENT

Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Femi Masha
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300
Madison, WI 53701
Tel: (608) 234-6032
Tom.Heneghan@huschblackwell.com

Dustin L. Taylor
HUSCH BLACKWELL LLP
1801 Wewatta St., Suite 1000
Denver, CO 80202
Tel: (303) 749-7200
Dustin.Taylor@huschblackwell.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Sigmapharm Laboratories, LLC*

Dated: February 7, 2020

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iv

ABBREVIATIONS ............................................................................................. v

INTRODUCTION................................................................................................ 1

ARGUMENT ....................................................................................................... 3

I.    PLAINTIFFS FAILED TO MEET THEIR BURDEN TO PROVE INFRINGEMENT OF THE '945 PATENT. ...................................................................................................... 3

    A.    Plaintiffs failed to prove the existence of particles less than or equal to 89 microns in Sigmapharm's ANDA Products. ............................................. 5

    B.    Plaintiffs failed to prove the existence of apixaban particles in Sigmapharm's ANDA Products. ................................................................ 7

        1.    Plaintiffs distinguished "apixaban particles" as differing from apixaban-polymer dispersions in obtaining the '945 Patent. ...................... 8

        2.    Sigmapharm's ANDA Products do not comprise apixaban particles. ........ 9

    C.    XRPD and NMR testing does not show evidence of crystalline apixaban material in Sigmapharm's ANDA Products. ......................................... 11

        1.    XRPD testing does not show evidence of crystalline apixaban material in Sigmapharm's ANDA Products. ........................................... 11

            a.    Dr. Atwood's testing is not reliable. ............................................ 12

            b.    What Dr. Atwood identifies are not crystalline apixaban peaks. .............................................................................................. 13

        2.    NMR testing shows amorphous material in Sigmapharm's products. ....... 14

II    PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROOF FOR INFRINGEMENT OF THE '208 PATENT. ................................................................................................... 18

    A.    Plaintiffs Failed to Prove that Claim 1 Covers Apixaban. ..................................... 18

1.      Claim 1 Requires Counting Hydrogens as Substituents. .......................... 20

2.      Patentee Bears the Risk of Poor Draftsmanship. ...................................... 23

B.      Claim 13 Is Not Infringed Because It Depends From Claim 1 ............................ 24

C.      Claim 104 Is Not Infringed and Plaintiffs Fail to State a Claim .......................... 24

**CONCLUSION** ....................................................................................................................... **25**

# **TABLE OF AUTHORITIES**

Page

## **Cases**

Abano v. Chertoff,
No. L-06-CV-23, 2007 WL 2086673 (S.D. Tex. July 18, 2007).................................. 6

Abbott Labs. v. Sandoz, Inc.,
486 F. Supp. 2d 767 (N.D. Ill. 2007) .......................................................................... 6

Alcon Research, Ltd. v. Apotex Inc.,
687 F.3d 1362 (Fed. Cir. 2012) ................................................................................. 18

Bayer AG v. Elan Pharm. Research Corp.,
212 F.3d 1241 (Fed. Cir. 2000) ................................................................................... 5

Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP,
616 F.3d 1249 (Fed. Cir. 2010) ................................................................................. 21

Bicon, Inc. v. Straumann Co.,
441 F.3d 945 (Fed. Cir. 2006) ............................................................................... 9, 20

Glaxo, Inc. v. Novopharm, Ltd.,
110 F.3d 1562 (Fed. Cir. 1997) ................................................................................. 25

In re Harnisch,
631 F.2d 716 (CCPA 1980) ........................................................................................ 21

Kim v. ConAgra Foods, Inc.,
465 F.3d 1312 (Fed. Cir. 2006) ................................................................................... 6

Lupin Ltd. v. Abbott Labs.,
491 F. Supp. 2d 563 (E.D. Va. 2007) .......................................................................... 7

Martek Biosciences Corp. v. Nutrinova Inc.,
579 F.3d 1363 (Fed. Cir. 2009) ................................................................................... 6

Phillips v. AWH Corp.,
415 F.3d 1303 (Fed. Cir. 2005) ............................................................................ 9, 21

Robertson v. Allied Signal, Inc.,
914 F.2d 360 (3d Cir. 1990) ........................................................................................ 6

Vitronics Corp. v. Conceptronic, Inc.,
90 F.3d 1576 (Fed. Cir. 1996) ................................................................................... 21

*Wahpeton Canvas Co. v. Frontier, Inc.*,
   870 F.2d 1546 (Fed. Cir. 1989) ............................................................................... 18

**Statutory Authorities**

35 U.S.C. § 112 ............................................................................................ 23, 24

35 U.S.C. § 271 ............................................................................................... 25

## **ABBREVIATIONS**

| | |
|---|---|
| The '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| The '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| Amorphous Apixaban | The drug product intermediate described in DMF No. 030774 |
| ANDA | Abbreviated New Drug Application |
| API | Active Pharmaceutical Ingredient |
| ASD | Amorphous Solid Dispersion |
| Asserted '208 Claims | Claims 13 and 104 of U.S. Patent No. 6,967,208 |
| Asserted '945 Claims | Claims 21 and 22 of U.S. Patent No. 9,326,945 |
| BHA | butylated hydroxyanisole |
| BMS | Plaintiff Bristol-Myers Squibb Company |
| Drug Product Intermediate | *See* Amorphous Apixaban |
| FDA | U.S. Food and Drug Administration |
| LOD | Limit of Detection |
| Nause | International patent application No. WO 2010/147978 A1 titled "Dosage Forms of Apixaban"; U.S. Patent Application US 2012/0087978 to Nause |
| NDA | New Drug Application |
| NMR or SSNMR | Solid State Nuclear Magnetic Resonance |
| Pfizer | Plaintiff Pfizer Inc. |
| Plaintiffs | BMS and Pfizer |
| POSA | Person of Ordinary Skill in the Art |
| ppm | Parts Per Million |
| PVP | Polyvinylpyrrolidone |
| Sigmapharm | Defendant Sigmapharm Laboratories, LLC |

| Sigmapharm's ANDA Products | The generic drug product described in ANDA No. 210053 |
|---|---|
| Tg | Glass transition temperature |
| Wei | U.S. Patent Application Publication No. 2006/0160841 to Chenkou Wei et al. |
| XRPD | X-Ray Powder Diffraction |
| Yu | Lian Yu, *Amorphous Pharmaceutical Solids: Preparation, Characterization and Stabilization*, 48 Advanced Drug Delivery Reviews 27, 27–42 (2001) (DTX-367) |

**INTRODUCTION**

It is Plaintiffs' burden to prove infringement of each asserted claim of the '945 and '208 Patents by a preponderance of the evidence. (Tr. 1837:19–21 ("The burden is on us, yes.").) Plaintiffs failed to meet their burden of proving that Sigmapharm infringes Claims 21 and 22 of the '945 Patent. Both claims require the presence of apixaban particles, that those apixaban particles be crystalline, and that the crystalline apixaban particles have a $D_{90}$ less than or equal to 89 $\mu$m. Plaintiffs did not even attempt to measure the size of any particle in Sigmapharm's ANDA Products. Instead, they relied on a "theory" of particle size that not only simply assumed the existence of crystalline particles, but also ignored that Sigmapharm's ANDA Products contain an amorphous solid dispersion, which is specifically designed with an extremely high polymer-to-drug ratio ($\approx$ 14:1) to prevent crystal formation. Had Plaintiffs attempted to measure any "particle size" in Sigmapharm's products, Plaintiffs would have had to first identify the "particle." Plaintiffs did not do this because there is no "apixaban particle" in Sigmapharm's products. Instead, during Sigmapharm's manufacturing process, apixaban molecules dissolve completely in a solid PVP polymer, resulting in an amorphous apixaban-PVP solid solution. As Plaintiffs' Dr. Atwood admits, this does not infringe the '945 Patent.

Plaintiffs' exclusive reliance on XRPD and NMR testing cannot meet their burden to show crystalline apixaban particles having a $D_{90}$ of equal to or less than 89 $\mu$m. Even if Dr. Atwood's tests are taken as true, they show no evidence of crystalline apixaban particles. Dr. Atwood's XRPD testing suffers from major methodological errors that render the results un-reliable. Dr. Atwood did not determine a LOD and therefore cannot conclude that any peaks he identifies are due to apixaban material because he has not established that apixaban (which is present only at 3% in Sigmapharm's products) is even detectable by his tests. Absent establishing that baseline, his tests cannot reliably show anything. What Dr. Atwood identifies as

"peaks" at specific positions are mere noise that lack the height and width to be an XRPD peak. Moreover, even if Dr. Atwood's tests showed evidence of crystalline apixaban **material** (which they do not), his tests cannot be used to assume crystalline apixaban **particles** that are distinct from, and not integrally bound with, the surrounding amorphous solid dispersion. Thus, there is no proof of any "apixaban particles."

NMR testing also does not show crystalline apixaban particles having a $D_{90}$ of equal to or less than 89 $\mu$m. Plaintiffs' Dr. Munson conducted only one set of experiments, which were inconclusive due to severe baseline distortions and the interference caused by a spinning side band that obscured critical portions of the spectrum. Moreover, Dr. Munson focused on peak position and ignored line width even though line width is the main parameter distinguishing amorphous from crystalline forms. Despite his focus on peak position, while excluding line width, Dr. Munson also ignored that at least one characteristic peak shown in NMR scans of pure crystalline apixaban material is entirely absent from scans of Sigmapharm's ANDA Products. Like Dr. Atwood, described above, Dr. Munson did not determine a LOD for his tests and his opinions regarding Sigmapharm's ANDA Products are simply self-fulfilled prophesies.

Sigmapharm's Dr. Apperley also conducted NMR tests. Unlike Dr. Munson, Dr. Apperley conducted not one, but three sets of experiments to establish a standard of comparison and to correct for the presence of a spinning side band. Dr. Apperley determined that his tests had a LOD of 1.5% or better; meaning that if even 50% of the amorphous apixaban in Sigmapharm's ANDA Products had converted (the amount Dr. Munson guessed had converted), the evidence would have been present in Dr. Apperley's scans. There was no evidence of crystalline apixaban in Dr. Apperley's NMR scans. Dr. Schurko examined both the data and scans on which Dr. Munson relied and those Dr. Apperley collected. He opined that neither sets

of experiments showed evidence of crystalline apixaban in Sigmapharm's ANDA Products. Plaintiffs have thus not only failed to meet their burden to prove the existence of crystalline apixaban particles having a $D_{90}$ equal to or less than 89 μm, but the data actually shows that crystalline apixaban material is not present at all.

Plaintiffs also failed to meet their burden of proving that Sigmapharm infringes Claims 13 and 104 of the '208 Patent. Plaintiffs' theory of infringement relies on a novel claim construction, never advanced during *Markman* proceedings, which rests entirely on extrinsic evidence, is contrary to the intrinsic evidence, and further requires the Court to accept that "substituted" here means "unsubstituted" and that zero (0) means "one or more."

## ARGUMENT

### I. Plaintiffs Failed to Meet Their Burden to Prove Infringement of the '945 Patent.

Plaintiffs assert that Sigmapharm infringes Claims 21 and 22 of the '945 Patent. To prove infringement, Plaintiffs must prove by a preponderance of the evidence that Sigmapharm's ANDA Products have crystalline apixaban particles having a $D_{90}$ equal to or less than 89 μm. (JTX-2 col.9:51–54.) Thus, Plaintiffs must prove: (1) the existence of apixaban particles in Sigmapharm's ANDA Products; (2) that those apixaban particles are crystalline; and (3) that the crystalline apixaban particles have a certain size range. Plaintiffs have failed to meet this burden.

Plaintiffs never even tried to measure the size of any particle in Sigmapharm's ANDA Products. (PRF ¶¶ 26–27; Tr. 464:20–22, 467:1–5 (Atwood).) Plaintiffs also failed to identify any apixaban particle in Sigmapharm's products. This is unsurprising because Sigmapharm's products do not contain apixaban particles because the apixaban is dissolved in the PVP polymer, creating an amorphous solid dispersion. (PRF ¶ 34, Tr. 908:10–23, 911:9–912:17, 929:5–22 (Zaworotko); DTX-647.) Thus, by definition, there are no "apixaban particles," but

just composites of "apixaban and something else." (PRF ¶ 36; Tr. 470:12–472:3 (Atwood).)

Failing to identify any apixaban particle within Sigmapharm's ANDA Products that could either

be crystalline or meet the required size limitation, Plaintiffs instead rely on the testimony of Drs.

Atwood and Munson, who conducted XRPD and NMR testing, respectively, of Sigmapharm's

products to claim that some crystalline apixaban exists in Sigmapharm's ANDA Products.

This testing, however, fails to satisfy Plaintiffs' burden. Even if Dr. Atwood's XRPD

tests did show crystalline material (and they do not), he does nothing to prove that any such

material exists in discrete particles and is not integral to the larger solid amorphous dispersion.

Dr. Atwood's testing is also replete with methodological errors that render his results meaning-

less. (PRF ¶¶ 39–43.) Moreover, his test results fail to show any evidence of crystalline

apixaban. (PRF ¶¶ 44–50.) Dr. Atwood claims he found three[1] peaks listed in the '945 Patent in

his XRPD analysis of Sigmapharm's products, but what he identifies is merely noise; not peaks.

Moreover, Dr. Atwood assumes the existence of crystalline material based on the behavior of

neat amorphous forms of the drug itself while Sigmapharm's ANDA Products contain an

amorphous solid dispersion of apixaban fully dissolved into a solid PVP polymer. (PRF ¶¶ 36–

39.) Dr. Atwood's assumptions, which he provides in place of actual testing or analysis of

Sigmapharm's products are therefore irrelevant.

NMR testing also does not meet Plaintiffs' burden. Dr. Munson, relying on testing done

afar by other scientists, failed to follow his own published protocols, ignored excessive

interference, failed to measure the most important aspect of the peaks he claimed to be able to

---

[1] Before trial, Dr. Atwood testified that he looked at only the six peaks listed in the '945 Patent. (PRF ¶ 50; Tr. 461:2–462:24 (Atwood).) But at trial he claimed to see another peak at 22°, not listed in the '945 Patent. (*Id.*; Tr. 370:4–17 (Atwood).) Regardless, what Dr. Atwood identifies at 22° is merely noise, lacking the height and width to be a peak. (*Id.*; Tr. 951:3–19 (Zaworotko).)

see, and made assumptions about peaks he could not see to arrive at a predetermined opinion regarding the presence of crystalline apixaban in Sigmapharm's products. Plaintiffs have failed to meet their burden to prove infringement.

A. **Plaintiffs failed to prove the existence of particles equal to or less than 89 microns in Sigmapharm's ANDA Products.**

The '945 Patent requires the existence of crystalline apixaban particles "hav[ing] a $D_{90}$ equal to or less than about 89 μm." (PRF ¶ 24; JTX-2 col.9:53–54.) Dr. Atwood admits he "did not do any test to measure the particle size" in Sigmapharm's ANDA Products. (PRF ¶ 26; Tr. 464:20–22 (Atwood) ("Q. But you did not do any test to measure the particle size, did you? A. No."); *see also* Tr. 467:1–5; 468:24–469:7 (Atwood).)

Many testing methods were available. In response to invalidity arguments, Plaintiffs identified numerous methods to determine the size of particles, including "microscopy," "ultrasound attenuation," "sieving technique," "electrical zone sensing," "laser diffraction," "electron microscopy," "light microscopy," "laser diffraction by wet dispersion," "laser diffraction by dry dispersion," "scanning electron microscopy," "laser light scattering," and what at trial was called the "Berkland method," which Plaintiffs actually applied to co-defendant Unichem's product. (PRF ¶¶ 25–26; Tr. 1352:22–1359:4 (Chambliss).) Despite claiming to have so many different options available for testing, Plaintiffs did not even try to measure the particle size in Sigmapharm's ANDA Products in order to calculate a $D_{90}$. They offered no "laser light scattering," no "physical test on the particle size," and no "Berkland" method. (PRF ¶ 26; Tr. 467:6–469:7 (Atwood).) They offered no test at all. (*Id.*) Plaintiffs completely failed to prove that Sigmapharm's ANDA Products meet this claim element. This failure alone requires the Court to find that Plaintiffs have failed to prove infringement. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000) ("If any claim limitation is absent from

the accused device, there is no literal infringement as a matter of law.")

Instead of objective, replicable testing (which they did not even attempt), Plaintiffs relied on speculative theory. (PRF ¶ 27; Tr. 467:1–5 ("I simply offered an **interpretation** based on the ANDA documents that I saw.") (emphasis added).) Such evidence does not even raise a genuine issue of material fact, because no reasonable trier of fact could rely on such evidence. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("[A]n inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."); *Abano v. Chertoff*, No. L-06-CV-23, 2007 WL 2086673, at *5 (S.D. Tex. July 18, 2007) ("The Court finds Ragels's averments to be mere speculative theories which are inappropriate within the realm of summary judgment.") *aff'd*, 269 F. App'x 445 (5th Cir. 2008). It is certainly not sufficient to meet Plaintiffs' burden of proof on infringement in this case.

Plaintiffs' reliance on *Martek* does not excuse their failures here. (Pls. Br. 23 (citing *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009).) *Martek* confirms that a patentee can prove a functional limitation (corrosion) by measuring a linked substance (chlorine). 579 F.3d at 1373. Here, however, Dr. Atwood measured nothing at all and instead opined as to his speculation and conjecture, not circumstantial evidence. Although Plaintiffs elicited testimony that a calculation of $D_{90}$ could be performed either by software or by hand, Plaintiffs' experts performed no such calculation. (PRF ¶¶ 25–26; Tr. 464:20–22 (Atwood).) Rather, as the Federal Circuit states in *Martek*, this is the type of "conclusory expert testimony" that it has previously excluded. *Id.* at 1373–74 (discussing *Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006)). It is exactly the type of baseless, unsupported testimony *from this very expert* that other courts have properly rejected. *See Abbott Labs. v. Sandoz, Inc.*, 486 F. Supp. 2d 767, 776 (N.D. Ill. 2007) ("Dr. Atwood failed to establish that he

had supported his opinion with empirical or substantive evidence. While an expert may offer an

opinion on infringement, we need not credit unsupported conclusions."); *Lupin Ltd. v. Abbott*

*Labs.*, 491 F. Supp. 2d 563, 569 (E.D. Va. 2007) ("Without more, Dr. Atwood's conclusory and

abstract opinion is simply insufficient to support a finding of infringement . . . .").

Moreover, Plaintiffs' theory is incorrect. Although Dr. Atwood relies on PVP's tendency

to inhibit crystal growth, he ignores that PVP will also preclude crystal formation at all. (PRF

¶ 20; Tr. 934:17–935:1 (Zaworotko); DTX-768.1; DTX-767.1; DTX-720.2.) Furthermore,

despite testifying that crystallization would occur "rather quickly" (Tr. 385:13–23 (Atwood)),

Dr. Atwood agreed that XRPD testing of Sigmapharm's Drug Product Intermediate, which is the

only component in Sigmapharm's ANDA Products to contain apixaban, showed no evidence of

crystal formation three months after creation. (PRF ¶¶ 19; Tr. 455:5–10, 456:7–13 (Atwood); *see*

*also* PTX-1071 at 6–11 (showing textbook amorphous form).) Dr. Atwood's adherence to his

unproven theory about Sigmapharm's ANDA Products, even after acknowledging the existence

of contrary facts that undermine his theory, demonstrates that this is yet again an unsupported

conclusion from Dr. Atwood masquerading as expert opinion. Dr. Atwood's unsupported

conclusory assertions do not meet Plaintiffs' burden to prove infringement of the '945 Patent.

**B.     Plaintiffs failed to prove the existence of apixaban particles in Sigmapharm's ANDA Products.**

Had Plaintiffs attempted to measure any particle in Sigmapharm's ANDA Products, they

would have been required to identify what purported particles they claimed were "apixaban

particles." There are none in Sigmapharm's ANDA Products, which instead comprise an

amorphous solid dispersion created by completely dissolving apixaban in a solid PVP polymer

such that the resulting product is an amorphous solid composite of apixaban-PVP with a

polymer:drug ratio of ≈ 14:1. Accordingly, Sigmapharm's ANDA Products do not comprise

apixaban particles at all. During prosecution of the '945 Patent, Plaintiffs distinguished such dispersions from the claimed "apixaban particles." (PRF ¶¶ 29–33.) Moreover, Plaintiffs have failed to rebut the substantial evidence that the amorphous solid dispersion in Sigmapharm's ANDA Products is both kinetically and thermodynamically stable, and—as taught by unrebutted scientific literature—will not convert to crystalline. (PRF ¶ 23; Tr. 938:21–939:18 (Zaworotko).) Plaintiffs do not dispute these points and instead rely exclusively on their XRPD and NMR testing to assume the existence of apixaban particles. (Pls. Br. 21.) As discussed in section C, however, these tests are methodologically flawed and, regardless, fail to show evidence of crystalline apixaban material whatsoever, much less distinct apixaban particles.

### 1.    Plaintiffs distinguished "apixaban particles" as differing from apixaban-polymer dispersions in obtaining the '945 Patent.

During prosecution of the application that led to the '945 Patent, the USPTO rejected claims as unpatentable over Wei in view of Nause. (PRF ¶ 29; JTX-4 at BMSAPIX0008156–57, 8572–73.) Plaintiffs overcame this rejection by arguing that Nause taught an "amorphous dispersion," which "is clearly different from a composition that includes crystalline apixaban particles recited in the present claims." (PRF ¶ 30; JTX-4 at BMSAPIX0010467.) Nause defines a "solid amorphous dispersion" as "a solid material in which **at least a portion** of apixaban is in the amorphous form and dispersed in the polymer." (PRF ¶ 32; DTX-344.43.) In response to the Applicant's statements and arguments that the claimed "apixaban particles" are different than the amorphous dispersion taught in Nause, the USPTO allowed the claims of the '945 Patent over Nause. (PRF ¶ 31; JTX-4 at BMSAPIX0010502–510.) Thus, even if Plaintiffs' testing showed evidence of **some** crystalline material—which, as discussed in section C, it does not—such a showing would not show infringement of the '945 Patent claims, but merely that Sigmapharm's ANDA Products included the same type of amorphous dispersion taught in Nause. Having

distinguished solid amorphous dispersions (even containing some crystalline material) to overcome Nause, Plaintiffs cannot now prove infringement merely by showing something crystalline.

**2. Sigmapharm's ANDA Products do not comprise apixaban particles.**

It is undisputed that during Sigmapharm's manufacturing process, the apixaban is completely dissolved in a polymer solution to create an amorphous solid dispersion. (PRF ¶ 18; Tr. 928:25–930:8 (Zaworotko); DTX-647.) All apixaban molecules bond with the PVP polymer. (PRF ¶ 4, 34; Tr. 911:9–912:17 (Zaworotko).) Even if any of that apixaban later crystallized while embedded in the solid amorphous dispersion, there would still be no "apixaban particle," but instead a composite particle consisting of PVP-apixaban bonded together. Plaintiffs' expert Dr. Atwood admitted that such a composite would not be an apixaban particle because "they're not actually apixaban but rather apixaban and something else." (PRF ¶ 36; Tr. 470:12–472:3 (Atwood).) These composites are not the same as the "agglomerates" taught in the '945 Patent because that disclosure merely refers to individual particles of apixaban agglomerated on to one another, not a composite of apixaban and a polymer bonded together. (PRF ¶ 35; JTX-2 col.3:20–22; Tr. 469:10–471:10 (Atwood).) Dr. Atwood confirmed this point. (*Id.*)

Dr. Munson's testimony that "all crystals are particles" contradicts the plain and ordinary meaning of that claim term. First, the language of the claims themselves recited "crystalline apixaban particles," but Dr. Munson's extrinsic testimony would render the noun "particles" superfluous. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim."). The specification, which is "the single best guide to the meaning of a disputed term," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005), expressly defines "particles" as "**_individual drug_**

*substance* particles whether the particles exist singly or are agglomerated" (PRF ¶ 35; JTX-2, col.3:20–22), but Dr. Munson completely ignores this requirement. The patentee told the USPTO that this "crystalline apixaban particle" limitation distinguished it from Nause, an amorphous solid dispersion with up to 40% crystalline material, contradicting Dr. Munson's testimony. Plaintiffs' other expert, Dr. Atwood, also agreed that crystalline material integrally bound with something other than apixaban in a composite particle would not be a "crystalline apixaban particle." (PRF ¶¶ 35–36; Tr. 469:10–470:21 (Atwood).) Plaintiffs sought through Dr. Munson's testimony to vitiate this element requiring apixaban **particles** because of their abject failure of proof, presenting no evidence on this limitation. Instead, Plaintiffs fail to prove their case.

There is also no evidence of, or reason for the existence of, crystalline apixaban material in Sigmapharm's ANDA Products. Sigmapharm's amorphous dispersion will not convert because it is both kinetically and thermodynamically stable. (PRF ¶ 23; Tr. 938:21–939:18 (Zaworotko).) Plaintiffs present no evidence or reason why Sigmapharm's amorphous solid dispersion would convert, and Dr. Atwood never even addressed the properties of amorphous solid dispersions, choosing instead to base his opinions on the properties of a type of amorphous form that Sigmapharm does not use. (PRF ¶ 6; Tr. 927:16–19, 941:19–22, 960:2–7 (Zaworotko).) Moreover, Dr. Atwood claims that Sigmapharm's ANDA Products will contain crystalline material that is approximately "a couple" to ten nanometers in size. (PRF ¶ 28; 397:19–398:4, 431:1–25 (Atwood).) The Yu article, on which Dr. Atwood relied, proves Dr. Atwood's opinion is wrong because it teaches that ten nanometers would not be long-range order, and therefore not crystalline. (PRF ¶¶ 2–6; Tr. 910:13–913:23 (Zaworotko).) Thus, even if Dr. Atwood's unproven hypothesis was correct and there was short-range order of approximately ten nanometers, the apixaban in Sigmapharm's products would, by definition, not be crystalline.

Plaintiffs have no explanation for why the amorphous solid dispersion in Sigmapharm's ANDA Products, which is both thermodynamically and kinetically stable, would convert to the crystalline form despite the unchallenged scientific literature that teaches such conversion will not occur. Plaintiffs instead argue that Sigmapharm's amorphous solid dispersion is not effective because Drs. Atwood and Munson claim to be able to detect crystalline apixaban in their poorly conducted XRPD and NMR testing. (Pls. Br. 21.) As discussed immediately below, however, this testing does not show any crystalline apixaban particles.

### C.   XRPD and NMR testing does not show evidence of crystalline apixaban material in Sigmapharm's ANDA Products.

Plaintiffs failed to conduct any measurements to determine the size of any particles in Sigmapharm's ANDA Products. Although Plaintiffs claim to rely on a theory of crystallization and particle size, they failed to identify any particle in Sigmapharm's ANDA Products that is the required "apixaban particle." Plaintiffs attempt to excuse these failures by relying on XRPD and NMR testing by Drs. Atwood and Munson, respectively. For the reasons set forth below, however, Plaintiffs' testing is unreliable and, even if taken as true, does not show evidence of crystalline apixaban particles in Sigmapharm's ANDA Products.

### 1.   XRPD testing does not show evidence of crystalline apixaban material in Sigmapharm's ANDA Products.

Plaintiffs engaged Dr. Atwood to conduct XRPD testing of Sigmapharm's ANDA Products. Although Dr. Atwood opined that his XRPD testing identified four peaks he attributes to crystalline apixaban material in Sigmapharm's ANDA Products, his testing cannot support this position because major methodological errors render his test results unreliable. Even if Dr. Atwood's tests were reliable, his test results do not show evidence of crystalline apixaban material in Sigmapharm's ANDA Products. The signals Dr. Atwood identifies as "peaks" do not

have the required height and width to be properly considered a peak, and are merely noise.

### a. *Dr. Atwood's testing is not reliable.*

Numerous methodological errors make Dr. Atwood's XRPD analysis unreliable. (PRF ¶¶ 39–43; Tr. 941:2–949:14 (Zaworotko).) Dr. Atwood did not: (1) retain a laboratory notebook or keep sufficient records of how he conducted his tests or handled his samples; (2) follow USP recommendations concerning the testing he conducted; (3) determine a LOD; (4) compare his test results to a reliable reference; or (5) consider that Sigmapharm's Amorphous Apixaban (aka "Drug Product Intermediate") was an amorphous solid dispersion, and **not** a neat amorphous solid. (PRF ¶¶ 39–43; Tr. 941:5–942:2 (Zaworotko).) Cumulatively, these errors render Dr. Atwood's results and opinions unreliable and insufficient to meet Plaintiffs' burden. (*Id*.)

Most critically, Dr. Atwood did not perform a LOD analysis despite acknowledging that Sigmapharm's ANDA Products comprise only 3.1 % apixaban. (PRF ¶ 42; Tr. 983:9–17 (Zaworotko).) Thus, if testing established the LOD was 5%, no crystalline apixaban (were it to exist) could even be detected. (PRF ¶ 42; Tr. 947:20–948:2 (Zaworotko).) Plaintiffs' argument that no LOD was necessary because Dr. Atwood "was able to detect four characteristic peaks" is nonsensical. (Pls. Br. 18.) Any peaks in Dr. Atwood's test results **could not be** apixaban because there was not enough apixaban in Sigmapharm's ANDA Products to detect, even if 100% of it converted to crystalline from the stable amorphous solid dispersion.[2] (Tr. 947:20–948:2 (Zaworotko).) Thus, what Dr. Atwood identifies as crystalline peaks in the "four characteristic positions" are either not peaks at all (and thus mere noise) or are due to a substance in

---

[2] Even if Dr. Munson's "purely speculative" opinion that 50–60% of the apixaban material in Sigmapharm's ANDA Products might have converted to crystalline form was taken as accurate (Tr. 589:8–590:15 (Munson), the LOD for Dr. Atwood's experiments would have to be 1.86% to detect any crystalline apixaban material, 8.14% lower than the USP suggests as the likely LOD. Plaintiffs avoid this quandary by having Dr. Atwood simply not evaluate LOD at all.

Sigmapharm's products other than apixaban and therefore unrelated to the issue of infringement.

>    ***b.***    ***What Dr. Atwood identifies are not crystalline apixaban peaks.***

Even assuming that Dr. Atwood's tests were reliable, his test results do not show evidence of crystalline apixaban material in Sigmapharm's ANDA Products. Dr. Atwood opines that there are crystalline peaks at three of the six peak positions identified in the '945 Patent (at 12.3°, 12.9°, and 27.1°), and one position (22.1°) shown in Sigmapharm's XRPD testing of its crystalline starting material. None of these positions have the required height and width to be considered a peak. (PRF ¶ 44; Tr. 958:16–959:2 (Zaworotko).)

For the XRPD patterns at 12.24° and 12.84°, "there are no peaks whatsoever above the noise so there is neither height nor width that would allow a person to assign the noise as a peak." (PRF ¶ 48; Tr. 955:21–956:18, 1000:4–1001:15 (Zaworotko).) Similarly, there is no evidence of a crystalline peak at 27.1°. (PRF ¶ 49; Tr. 956:19–958:15 (Zaworotko).) Although Dr. Atwood conducted four scans around 27.1°, ranging from 30 to 300 seconds, he chose to rest his testimony on the noisiest, least reliable scan. (Tr. 956:19–957:10 (Zaworotko).) Regardless, none of Dr. Atwood's scans at 27.1° show a signal that has the required height and width to be a peak. (*Id*. at 957:11–958:15.) Finally, no signal at 22.1° (± 0.1°) has the required height and width to be a peak. (PRF ¶ 50; Tr. 951:3–19 (Zaworotko).) Nothing Dr. Atwood calls "peaks" are evidence of the presence of crystalline apixaban in Sigmapharm's ANDA Products.

Plaintiffs' attempts to discredit Sigmapharm's expert Dr. Zaworotko fail. The Court recognized Dr. Zaworotko as an expert witness in the areas of pharmaceutical formulation and analysis, synthesis and structural chemistry, crystallization, crystal engineering, and x-ray crystallography. (PRF ¶ 1; Tr. 906:16–22 (Zaworotko).) Dr. Zaworotko interpreted the results of Dr. Atwood's XRPD tests and conclusively testified that no signal at the positions Dr. Atwood

identified had the required height and width to be a peak. (PRF ¶ 44; Tr. 949:15–25, 955:21–959:2 (Zaworotko).) Moreover, Dr. Zaworotko's use of Catalent's tests of Sigmapharm's Amorphous Apixaban does not discredit his opinions that there is no evidence of crystalline apixaban material in Sigmapharm's ANDA Products. Those tests properly used a 1-second count time because they were run on the Amorphous Apixaban, which had a higher concentration of apixaban than Sigmapharm ANDA Products. (Tr. 978:16–23 (Zaworotko).) Additionally, Dr. Atwood agreed and admitted on cross examination that this testing showed an "amorphous entity from the look of the XRPD." (PRF ¶ 19; Tr. 455:5–456:13 (Atwood).) He offered "no criticism" of the XRPD graphs that Catalent generated. (*Id.*) Finally, Dr. Zaworotko did not rely on Sigmapharm's XRPD testing of its ANDA Products. (Tr. 999:6–1000:1.) Plaintiffs' attempt to discredit those tests, along with Dr. Zaworotko's opinions, is merely a red herring.

## 2.     NMR testing shows amorphous material in Sigmapharm's products.

It is Plaintiffs' burden to prove that Sigmapharm's ANDA Products comprise crystalline apixaban particles having a $D_{90}$ equal to or less than about 89 μm. (Tr. 1837:19–21 ("The burden is on us, yes.").) Dr. Munson's NMR testing does not satisfy that burden while Dr. Apperley's testing further proves that the apixaban in Sigmapharm's ANDA Products remains amorphous. Dr. Munson did no testing himself, but merely reviewed the testing of his assistant, Dr. Nethercott, who did not provide an expert report. Dr. Nethercott's test is unreliable and Dr. Munson's interpretation of those tests does not show the presence of crystalline apixaban in Sigmapharm's ANDA Products. (PRF ¶¶ 54–61.)

*First*, Dr. Nethercott's tests (which Dr. Munson interpreted) suffer problematic baseline distortions in the relevant portion of the NMR spectrum. (PRF ¶¶ 55–56; Tr. 791:22–794:13 (Schurko).) NMR uses a technique called "magic-angle spinning" to acquire the data. (PRF ¶ 13;

– 14 –

Tr. 550:19–551:2 (Munson).) A consequence of this method, however, is the presence of a

"spinning side band," which is a residual signal (peak) that may mask a portion of the NMR

spectrum. (PRF ¶ 13; Tr. 746:17–22 (Apperley).) Its position depends on the spin rate used to

obtain the spectrum. (*Id*.) In Dr. Nethercott's tests, the sideband obscures a portion of the

spectrum where there are crucial and important peaks that would be needed to identify the

apixaban as crystalline. (PRF ¶ 56; Tr. 791:22–794:13 (Schurko).) Plaintiffs' experts could have

corrected this error by conducting additional tests at different spin rates, which would have

moved the sideband position and revealed the area blocked by the spinning sideband. (PRF ¶ 13;

Tr. 746:17–22 (Apperley).) Indeed, Dr. Apperley did exactly this and showed that a critical

crystalline apixaban peak was **missing** at the relevant position (121.7 ppm). (PRF ¶ 56; Tr.

747:2–8 (Apperley); Tr. 794:21–25 (Schurko).) Dr. Munson, however, did no further testing to

move the spinning sideband, instead he simply assumed that crystalline apixaban peaks were

present. (Tr. 551:3–18 (Munson).)

*Second*, Dr. Munson failed to consider the line width of the peaks he observed and thus

cannot reliably opine that a peak is due to crystalline or amorphous material. (PRF ¶¶ 57–58.) An

NMR spectrum, unlike an XRPD diffraction pattern, shows peaks for both crystalline and

amorphous material. (PRF ¶ 14; Tr. 567:5–568:1 (Munson).) Thus, the presence of a peak in an

NMR spectrum does **not** necessarily indicate crystalline material. (*Id*.) Instead, line width and

intensity must be analyzed to determine if the peak indicates crystallinity. (PRF ¶ 16; Tr.

785:18–786:6 (Schurko).) Despite this, Dr. Munson did not determine the line width of the peaks

he identified and instead relied solely on the peak position. (PRF ¶ 58; Tr. 809:3–21 (Schurko).)

*Finally*, Plaintiffs' experts did not determine a LOD. (PRF ¶¶ 59–60; Tr. 577:8–17

(Munson).) As a result, Dr. Munson cannot reliably say that his tests would detect any apixaban

in either form. (*Id.*) He agreed, however, that if the LOD was 10%, then detecting apixaban, which was only present at 3%, would be difficult. (PRF ¶ 60; Tr. 584:10–21 (Munson).)

The consequence of these issues is that the NMR data obtained by Plaintiffs' experts cannot be used to prove that Sigmapharm's ANDA Products comprise crystalline apixaban material. (PRF ¶¶ 54–61.) The peaks on which Dr. Munson relies are subject to interfering signals and there is no reliable way to determine the line width and thus distinguish between amorphous and crystalline forms. (*Id.*)

In contrast to Dr. Munson's unreliable methodology and opinions, Sigmapharm's Dr. Apperley personally conducted and testified about three sets of systematic and careful NMR experiments, including experiments to: establish a baseline for comparison; shift spinning side bands to different points of the NMR spectrum to allow visualization at all points; and determine a LOD for his testing. (PRF ¶¶ 62–71.) Dr. Apperley's first set of experiments established an NMR spectra fingerprint reference of apixaban in crystalline and amorphous form in terms of line positions and widths. (PRF ¶ 63; Tr. 731:13–24 (Apperley).) His third set of experiments established a LOD of 1.5%, which was lower than the approximately 3% of apixaban in Sigmapharm's ANDA Products. (PRF ¶¶ 69–70; Tr. 757:18–24 (Apperley).) His second set of experiments, which were even more sensitive and thus had a lower LOD than his third set, conclusively determined that no crystalline apixaban material was present in Sigmapharm's ANDA Products. (PRF ¶¶ 67–68; Tr. 742:13–21, 744:18–745:6 (Apperley).) Dr. Munson did no such LOD analysis and simply assumed what might be under the spinning side band.

Sigmapharm expert Dr. Robert Schurko analyzed all of the data and concluded that Dr. Munson's opinions were not only unsupported by the data upon which Dr. Munson relied, but also inconsistent with Dr. Munson's own published articles. Dr. Schurko also compared the

NMR data relied upon by Dr. Munson side-by-side with the NMR data from Dr. Apperley's work and conclusively demonstrated how Dr. Apperley's more careful approach produced better, more reliable data, thereby demonstrating further how Dr. Munson's opinions are flawed.

Plaintiffs' attempts to discredit the testimony of Drs. Apperley and Schurko fail. Dr. Apperley's NMR tests were sufficiently sensitive to detect crystalline apixaban, if it were present in Sigmapharm's ANDA Products. (PRF ¶¶ 67–71; Tr. 803:9–13 (Schurko).) The LOD of Dr. Apperley's third set of experiments was 1.5% and his second set were **even more sensitive**. (PRF ¶¶ 70–71; Tr. 761:11–14, 772:2–12 (Apperley).) In response to the Court's questioning, Dr. Munson testified that he believed approximately 50–60% of the apixaban in Sigmapharm's ANDA Products had converted to crystalline. (Tr. 589:8–590:15 (Munson); *see also* Tr. 771:7–14 (Apperley).)[3] That being said, even if Dr. Munson were correct and half or more of the apixaban in Sigmapharm's 3.1% drug product converted to crystalline, it would be above the LOD of Dr. Apperley's tests and would therefore have been detected by those tests. Dr. Apperley's tests, however, show no evidence of crystalline apixaban material in Sigmapharm's ANDA Products. (PRF ¶ 68; Tr. 742:13–21, 744:18–745:6 (Apperley).)

Plaintiffs' criticisms of Dr. Schurko are likewise futile. Although Dr. Schurko did not perform any NMR testing of his own, neither did Dr. Munson, who instead interpreted the testing of Dr. Nethercott, who did not testify. (PRF ¶¶ 52; Tr. 534:18–23 (Munson).) Moreover, Dr. Schurko did not present Dr. Munson's data in an unfair matter, but instead "processed the same spectra with different line broadening and showed those results in multiple locations in the reports to be fair about things like signal to noise and influence on line widths." (PRF ¶¶ 52–53;

---

[3] There is absolutely no data supporting Dr. Munson's opinion anywhere in Dr. Munson's work in this case. Based upon that lack of disclosure of data or analysis, Dr. Schurko criticized Dr. Munson's opinion on that topic as pure speculation. (PRF ¶ 61; Tr. 814:13–16 (Schurko).)

Tr. 838:11–22 (Schurko).) Dr. Schurko merely took the same data that Dr. Munson reviewed and presented it for analysis and comparison in a way that showed the limitations of Dr. Nethercott's methodology, on whose data Dr. Munson relied. (PRF ¶ 53; Tr. 838:11–839:8 (Schurko).) The results do not misdirect the review of that data, for example, expanding the vertical scale does not make the peaks' width appear wider than they are. (Tr. 795:19–23 (Schurko).)

Both Dr. Apperley and Dr. Schurko used their experience and expertise in NMR testing and analysis to present a clear and unencumbered view of the NMR spectra of Sigmapharm's ANDA Products and explained how NMR testing did not show the presence of crystalline apixaban. Dr. Munson started out looking for crystalline apixaban and ignored his standard protocols to claim he found crystalline apixaban despite spinning side bands and a lack of any evidence of long-range order. Dr. Munson's testimony does not meet Plaintiffs' burden to prove infringement on the element of the presence of crystalline apixaban in Sigmapharm's products and, even though Sigmapharm does not bear the burden of proving that there is no crystalline apixaban in its products, the testimony of Drs. Apperley and Schurko proves it is not there.

## II      Plaintiffs Failed to Meet Their Burden of Proof for Infringement of the '208 Patent.

### A.      Plaintiffs Failed to Prove that Claim 1 Covers Apixaban.

Although Claim 1 is not one of the Asserted '208 Claims, it is the only independent claim of the '208 Patent. Both Claim 13 and Claim 104 depend indirectly from Claim 1, and necessarily *cannot* be infringed unless Claim 1 reads on the accused Sigmapharm ANDA Products. "It is axiomatic that a dependent claim cannot be broader than the claim from which it depends." *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012); *accord, e.g.,* *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). In order for Sigmapharm to infringe the asserted claims of the '208 Patent based on the presence of apixaban

in the Sigmapharm ANDA Products, the asserted claims must actually claim apixaban. As explained at trial and further below, the '208 Patent claims do not cover apixaban and therefore, Plaintiffs cannot meet their burden to prove that Sigmapharm's products infringe the '208 Patent.

The key facts are largely undisputed. Both sides agree that Claim 1 requires four rings to be "substituted with" **<u>not more than two (2)</u>** of the members of four, respective, Markush groups, each of which has hydrogen as a member, resulting in no more than two (2) hydrogens on any of the four substituted rings. (PRF ¶ 72; Tr. 686:18–687:13 (Heathcock); *see* DDX 6–5.) More specifically, Claim 1 requires that:

- Ring M is "substituted with 0–2 $R^{1a}$" (JTX-1 col.237:22–23), and hydrogen is the first listed member of Markush group $R^{1a}$ (JTX-1 cols.238:62–239:14). To the contrary, the structure in apixaban corresponding to Ring M has *four (4)* hydrogen substituents, which is more than two (2) (PRF ¶ 72; Tr. 688:23–690:12 (Heathcock); *see* DDX 6-9);

- Ring E is "substituted with 1–2 R" (JTX-1 col.237:56–61), and hydrogen is the first listed member of Markush group R (JTX-1 col.238:5–19). To the contrary, the structure in apixaban corresponding to Ring E has *five (5)* substituents from R, including *four (4)* hydrogens, which is more than two (2) (PRF ¶ 72; Tr. 690:13–691:7; *see* DDX 6-10);

- Ring A is "substituted with 0–2 $R^{4}$" (JTX-1 col.238:21), and hydrogen is the first listed member of Markush group $R^{4}$ (JTX-1 col.240:48–64). To the contrary, the structure in apixaban corresponding to Ring A has *four (4)* hydrogen substituents, which is more than two (2) (PRF ¶ 72; Tr. 691:8–692:2 (Heathcock); *see* DDX 6-11); and

- Ring Q is "substituted with 0–2 $R^{4a}$" (JTX-1 col.238:36), and hydrogen is the first listed member of Markush group $R^{4a}$ (JTX-1 cols.240:65–241:13). To the contrary, the structure in apixaban corresponding to Ring Q has *eight (8)* hydrogen substituents, which

is more than two (2) (PRF ¶ 72; Tr. 692:3–21 (Heathcock); DDX 6-12).

None of the substitutions recited as limitations in Claim 1 of the '208 Patent can bring apixaban within its scope. Claim 1 cannot be found to cover apixaban.

To avoid this result, Plaintiffs now argue that hydrogens do not count as substituents, even though they are listed as members of the Markush groups, or only count as a substituent when something other than hydrogen is replaced with a hydrogen or when hydrogen is present on a heteroatom. That, however, is a new claim construction by Plaintiffs,[4] never advanced during the *Markman* phase of this matter, and contrary to the plain and ordinary meaning of the claim language as reflected by express definitions in the specification. Plaintiffs now argue that rings M, A, and Q are substituted with zero members of their respective Markush groups, and that Ring E is substituted with only one. That analysis cannot be reconciled with the plain and ordinary meaning of the claim language or the language of the specification of the '208 Patent. Accordingly, Plaintiffs have failed to carry their burden of proof to show that Sigmapharm infringes the '208 Patent asserted claims, both of which depend from Claim 1.

### 1.     Claim 1 Requires Counting Hydrogens as Substituents.

In its Opening Brief, Sigmapharm explained in detail why the claim language requires counting the hydrogens listed in the Markush groups when determining the number of substituents on each ring. (Defendants' Opening Post-Trial Brief on Invalidity (Opening Inv. Br.") D.I. 690, at 2–5.) Looking to the claims themselves, counting the hydrogens as substituents is necessary because otherwise the hydrogens expressly recited in the Markush group are rendered superfluous. (PRF ¶¶ 73–74; Opening Inv. Br. at 3.) *Bicon*, 441 F.3d at 950 ("For that

---

[4] When Plaintiffs added Claim 104, they represented that its addition presented no new claim construction issues. Plaintiffs' arguments here, however, contradict that representation and should be rejected. *See also* Sigmapharm's Motion to Strike, D.I. 536–537.

reason, claims are interpreted with an eye toward giving effect to all terms in the claim.");

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010).

Treating the hydrogens differently from every other member of the Markush group would render

the Markush groups improper. (PRF ¶ 74; Opening Inv. Br. at 3, 6) MPEP 706.03(y)II; *In re*

*Harnisch*, 631 F.2d 716, 721–22 (C.C.P.A. 1980). The language of other dependent claims also

confirms that hydrogens must count as substituents, because Claim 1 requires that Ring E have at

least one substituent and in thirty-six (36) structures in Claim 3 and four (4) compounds recited

in Claim 8, the **only** substituent on the structure corresponding to Ring E is hydrogen. (PRF ¶ 76;

Opening Inv. Br. at 3–4, 6.) If hydrogen is ignored as a substituent, the language in claims 3 and

8 is meaningless. The specification, which is always highly relevant and usually dispositive as

the single best guide to the meaning of claim language, *Phillips*, 415 F.3d at 1315; *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), also confirms that hydrogen

counts as a substituent on these ring structures, because it twice recites a definition of

"substituted" as "any one or more hydrogens on the designated atom is replaced with a selection

from the indicated group" or "one or more hydrogens on the atom indicated in the expression

using 'substituted' is replaced with a selection from the indicated group(s)." (PRF ¶ 79; JTX-1,

cols.113:66–114:3, 117:42–48.) This definitional language does not change the plain and

ordinary meaning of "substituted," but instead confirms it. (PRF ¶ 80.)

Plaintiffs' infringement theory cannot be reconciled with this definition, as explained

further below. Instead, it relies on a novel and unsupported claim construction, never raised

during this Court's *Markman* proceedings, and based entirely on the extrinsic, litigation-induced

opinion testimony of their retained expert Dr. MacMillan. (PRF ¶ 81.)

*First,* Plaintiffs' infringement theory would require the Court to find that replacing ***zero***

*(0)* hydrogens on rings M, A, and Q satisfies the claim limitation of "substituted," which the specification specifically says means "replacing **one or more**" hydrogens. Dr. MacMillan admitted in cross examination that his theory means that **<u>none</u>** of the hydrogens depicted in the structure are replaced—none, zero, not any:

> Q.    Are you replacing more than one hydrogen?
> A.    You're not replacing any hydrogens.
> Q.    So you're not replacing one hydrogen?
> A.    You're not replacing any hydrogens.

(Tr. 301:14–17 (MacMillan).) The claim requires "substituted," which means replacing one or more. Zero is less than one. It is not one or more. (PRF ¶¶ 81–83.)

*Second,* Plaintiffs' infringement theory would require the Court to treat the word "substituted" in Claim 1 as meaning "unsubstituted" when applied to apixaban. The words substituted and unsubstituted are not equivalent. They are antonyms. Dr. MacMillan agreed, once again on cross examination, that Claim 1 uses the word "substituted" and not the word "unsubstituted" (Tr. 298:7–18), but for purposes of his infringement analysis he treats Rings M, A, and Q as **<u>unsubstituted</u>**. (PRF ¶ 75.)

Having started from that conclusion, Dr. MacMillan contends that the two express definitions of "substituted" in the specification do not fully describe how the term is used, but there is no other definitional language in the specification to support Dr. MacMillan's approach. He certainly could not identify anywhere in the specification where substituted and unsubstituted were defined to mean the same thing. He argued that substituted could mean replacing something other than a hydrogen with a hydrogen, but that usage contradicts the express definitional language that says substitute means to replace one or more **<u>hydrogens</u>**. (PRF ¶ 83.) He argued that substituted could mean attaching a hydrogen to a heteroatom, i.e., an atom on a ring other than a carbon, but again nothing in the specification supports that reading. (*Id.*) Instead, the

language in the specification that discusses such heterocycles twice says, "The nitrogen atom

may be substituted or unsubstituted (i.e., N or NR wherein R is H or another substituent, if

defined)." (JTX-1 col.115:43–45, 60–62.) Far from supporting Dr. MacMillan's strained

construction, that sentence instead makes perfectly clear that hydrogen is indeed a substituent

with the phrase "H **or another substituent**." (*Id.* (emphasis added).) It also makes clear that

substituted and unsubstituted are two different, antithetical concepts with the phrase "substituted

or unsubstituted." *Id.*

### 2.    Patentee Bears the Risk of Poor Draftsmanship.

Plaintiffs argue that the patent was intended to cover apixaban, and that if hydrogen

counts as a substituent then the claims do not cover any real-world compounds. Be that the case

then blame for that failure falls at the feet of the drafter of the patent language. Those arguments

merely demonstrate that the patentee failed to draft its claims properly. Even though the

specification shows that the applicant was well aware of the distinction between substituted and

unsubstituted, the patentee did not draft its claim using that language. Even though the

specification clearly shows that hydrogen counts as a substituent when it is so listed, the patentee

still included hydrogen in its Markush groups that Plaintiffs now say they do not want to count.

A patent is a property right, a rare legal monopoly to exclude competition in a limited, defined

area, and it is the patentee's obligation to "particularly point out and distinctly claim the subject

matter the applicant regards as his invention." 35 U.S.C. § 112(b). The consequence of failing to

do so, and the risk of any drafting error, must fall to the patentee. Here, Claim 1 as drafted

cannot properly read on apixaban. Plaintiffs have therefore failed to meet their burden of proving

that Sigmapharm would infringe the '208 Patent by having apixaban in its ANDA product.

The patentee may have intended the patent to cover apixaban, and Plaintiffs certainly

wish it did, but that is not how Claim 1 of the '208 Patent reads. Dr. Heathcock explained how Claim 1 could have been written differently so that it would not suffer this defect, and Dr. MacMillan in his own patents has used the word "unsubstituted" in a claim where that was what he meant. The fact that here the patent owner did not carefully draft its claim to describe apixaban or particularly point out and distinctly claim apixaban does not allow a court after the fact to rewrite the claim more broadly to fit the allegation at hand.

### B.      Claim 13 Is Not Infringed Because It Depends From Claim 1.

Plaintiffs failed to prove that Sigmapharm infringes Claim 13 of the '208 Patent because Claim 13 depends indirectly from Claim 1, and incorporates all of its limitations. 35 U.S.C. § 112(d). The very first limitation of Claim 13 is that it must be a compound "according to Claim 8."  Claim 8, in turn, has as its first limitation a compound "according to Claim 1." Because Claim 1 as properly construed does not read on apixaban, Plaintiffs have failed to meet their burden of proving that Sigmapharm's ANDA Products infringe Claim 13. (PRF ¶¶ 88.)

### C.      Claim 104 Is Not Infringed and Plaintiffs Fail to State a Claim.

Claim 104, in turn, depends from Claim 13, and Sigmapharm's ANDA Products do not infringe for the same reasons set forth immediately above with respect to Claim 13. (PRF ¶ 89.)

In addition, Claim 104 includes another limitation that the compound must be crystalline. Dr. MacMillan did no independent analysis of that claim element, but instead relied entirely on Dr. Atwood for his opinion of infringement of that element. As set forth above in discussing the lack of proof of infringement of the '945 Patent, Dr. Atwood's conclusions on crystallinity are unsupported and must be disregarded, just as his opinions have been in other cases where they were not supported by adequate empirical testing. (PRF ¶ 90.)

Also, Plaintiffs' infringement theory for Claim 104 fails to state a claim on which relief

can be granted in the context of Hatch-Waxman litigation over an ANDA product. Plaintiffs claim that the importation of crystalline material for processing in the United States into an amorphous drug product is itself an infringement. However, the Hatch-Waxman Act provides a remedy in 35 U.S.C. § 271(e)(2) only with respect to what the ANDA applicant will market as its drug, not on the starting ingredients. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997) ("[T]he question of infringement must focus on what the ANDA applicant will likely market if its application is approved, an act that has not yet occurred."). In the absence of any claim under § 271(e)(2), Plaintiffs would have to be relying on § 271(a), but it is undisputed that any such alleged acts of hypothetical, potential infringement have not yet occurred (PRF ¶ 92), which is the very reason that Congress created the artificial act of infringement in § 271(e)(2). *Glaxo,* 110 F.3d at 1569 ("Thus, § 271(e)(2) provided patentees with a defined act of infringement sufficient to create case or controversy jurisdiction to enable a court to promptly resolve any dispute concerning infringement and validity."). In the absence of such an act, there is no case or controversy and no subject matter jurisdiction under Article III. Moreover, any activity that Sigmapharm allegedly engaged in to date was done in support of submitting its ANDA application, and is therefore immune from infringement claims under the safe harbor provisions of § 271(e)(1) ("It shall not be an act of infringement to make, use, offer to . . . import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs . . ."). Accordingly, Plaintiffs' "importation" theory fails to state a claim on which relief may be granted.

## **CONCLUSION**

For the foregoing reasons, Sigmapharm respectfully requests entry of judgment in its favor finding no infringement and denying Plaintiffs all relief.

Dated: February 7, 2020

OF COUNSEL:
Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Femi Masha
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300
Madison, WI 53701
Tel: (608) 234-6032
tom.heneghan@huschblackwell.com

Dustin Taylor
HUSCH BLACKWELL LLP
1801 Wewatta St., Suite 1000
Denver, CO 80202
Tel: (303) 749-7200
dustin.taylor@huschblackwell.com

Respectfully submitted,

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Defendant*
*Sigmapharm Laboratories, LLC*

– 26 –