## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY AND PFIZER INC., | ) ) ) |
| Plaintiffs and Counterclaim-Defendants, | ) ) |
| v. | ) ) C.A. No. 17-374-LPS |
| AUROBINDO PHARMA USA INC., et al., | ) ) (CONSOLIDATED) |
| Defendants and Counterclaim-Plaintiffs. | ) ) |

## DEFENDANT SIGMAPHARM LABORATORIES LLC'S
## RESPONSIVE FINDINGS OF FACT ON NON-INFRINGEMENT

Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Femi Masha
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300
Madison, WI 53701
Tel: (608) 234-6032
Tom.Heneghan@huschblackwell.com

Dustin L. Taylor
HUSCH BLACKWELL LLP
1801 Wewatta St., Suite 1000
Denver, CO 80202
Tel: (303) 749-7200
Dustin.Taylor@huschblackwell.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Sigmapharm Laboratories LLC*

Dated: February 7, 2020

# TABLE OF CONTENTS

I.   OVERVIEW .............................................................................................................. 1

   A.   Crystalline and Amorphous Forms ................................................................ 1

   B.   XRPD ............................................................................................................. 2

   C.   NMR ............................................................................................................... 3

   D.   Overview of Sigmapharm's Manufacturing Process ..................................... 4

II.  PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROVING INFRINGEMENT OF CLAIMS 21 OR 22 OF THE '945 PATENT. .................................................................................... 6

   A.   Plaintiffs Conducted No Testing to Measure the Size of Any Particles in Sigmapharm's ANDA Products. .................................................................... 6

   B.   Sigmapharm's ANDA Products Have No Apixaban Particles. ...................... 7

      1.   The '945 Patent Applicant distinguished apixaban particles from crystalline apixaban-polymer dispersions. ...................................................................... 7

      2.   Sigmapharm's ANDA Products comprise an amorphous dispersion that does not contain any "apixaban particles." .................................................................. 8

   C.   Plaintiffs' XRPD Testing Does Not Show Evidence of Crystalline Apixaban Particles in Sigmapharm's ANDA Products. ................................................. 8

      1.   Numerous methodological errors undermine the reliability of Dr. Atwood's opinions. ........................................................................................................... 9

      2.   Dr. Atwood's XRPD testing shows no evidence of crystalline apixaban particles in Sigmapharm's ANDA Products. .............................................. 10

   D.   NMR Testing Shows No Evidence of Crystalline Apixaban Particles in Sigmapharm's ANDA Products. .................................................................. 11

      1.   Dr. Munson's NMR tests cannot reliably show evidence of crystalline apixaban material in Sigmapharm's ANDA Products. ................................ 12

      2.   Dr. Apperley conducted three tests, which reliably show there is no crystalline apixaban material in Sigmapharm's ANDA Products. .............. 13

III. PLAINTIFFS HAVE FAILED TO PROVE INFRINGEMENT OF THE '208 PATENT. ....... 15

**ABBREVIATIONS**

| | |
|---|---|
| The '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| The '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| Amorphous Apixaban | The drug product intermediate described in DMF No. 030774 |
| ANDA | Abbreviated New Drug Application |
| API | Active Pharmaceutical Ingredient |
| Asserted '208 Claims | Claims 13 and 104 of U.S. Patent No. 6,967,208 |
| Asserted '945 Claims | Claims 21 and 22 of U.S. Patent No. 9,326,945 |
| BHA | butylated hydroxyanisole |
| BMS | Plaintiff Bristol-Myers Squibb Company |
| Drug Product Intermediate | *See* Amorphous Apixaban |
| FDA | U.S. Food and Drug Administration |
| LOD | Limit of Detection |
| Nause | International patent application No. WO 2010/147978 A1 titled "Dosage Forms of Apixaban"; U.S. Patent Application US 2012/0087978 to Nause |
| NDA | New Drug Application |
| NMR or SSNMR | Solid State Nuclear Magnetic Resonance |
| Pfizer | Plaintiff Pfizer Inc. |
| Plaintiffs | BMS and Pfizer |
| POSA | Person of Ordinary Skill in the Art |
| ppm | Parts Per Million |
| PVP | Polyvinylpyrrolidone |
| Sigmapharm | Defendant Sigmapharm Laboratories, LLC |

| Sigmapharm's ANDA Products | The generic drug product described in ANDA No. 210053 |
|---|---|
| $T_g$ | Glass transition temperature |
| Wei | U.S. Patent Application Publication No. 2006/0160841 to Chenkou Wei et al. |
| XRPD | X-Ray Powder Diffraction |
| Yu | Lian Yu, *Amorphous Pharmaceutical Solids: Preparation, Characterization and Stabilization*, 48 Advanced Drug Delivery Reviews 27, 27–42 (2001) (DTX-367) |

## I.    OVERVIEW[1]

### A.    Crystalline and Amorphous Forms

1.      The Court recognized Dr. Michael Zaworotko as an expert witness in the areas of pharmaceutical formulation and analysis, synthesis and structural chemistry, crystallization, crystal engineering, and x-ray crystallography. (Tr. 906:16–22 (Zaworotko).)

2.      A crystalline particle contains a substance with molecules in a long-range order. (Tr. 326:4–9 (Atwood); 969:2–8 (Zaworotko).) An amorphous form, in contrast, may have short-range order, or no order, but **not** long-range order. (Tr. 910:13–911:8 (Zaworotko); Tr. 457:4–459:17 (Atwood).) Long-range order means "enough molecules to generate enough lattice planes to generate an XRPD pattern." (Tr. 910:13–911:8 (Zaworotko).) Neither "a couple" of nanometers nor 10 nanometers would be considered long-range order. (*Id.*)

3.      Yu (PTX-367) shows "a textbook example of a neat amorphous solid where there is short-range order." (Tr. 912:20–25, 913:17–23 (Zaworotko); Tr. 327:12–328:9 (Atwood).) What Dr. Atwood described at trial as "long-range order" indicative of a crystalline form, (Tr. 326:24–327:1, 327:12–21 (Atwood) (discussing PDX 5-9)), is the same as Yu's textbook example of a neat amorphous form. (Tr. 913:1–23 (Zaworotko).)



4.      An amorphous form may be (1) a neat amorphous solid, like the one shown in Yu above, or (2) an amorphous solid dispersion. (*Id.* at 911:9–912:14 (describing DDX 8-5).) A neat amorphous solid may exhibit some aggregation of the molecules in random orientation, with

---

[1] Unless otherwise stated, Sigmapharm disputes Plaintiffs' opening proposed findings of fact. (D.I. 685.)

some short-range order. (*Id.*) An amorphous solid dispersion, in contrast, has no order at all—instead, its molecules are dissolved in a polymer such that: (1) there are few molecules compared to polymer; and (2) the molecules are bonded to the polymer and do not touch each other. (*Id.*)

5.  Pharmaceutical products use amorphous solid dispersions because they are more stable than neat amorphous solids. (*Id.* at 922:13–19.) For crystallization to occur in a solid, the molecules must be able to move. (*Id.* at 923:2–15.) amorphous solid dispersions, however, may be kinetically stable (regions II and III), which means the molecular motion is so restricted that it is often referred to as a "glass state." (*Id.*) For a kinetically stable amorphous solid dispersion, crystallization will not occur within a reasonable time frame, perhaps not within thousands of years. (*Id.* at 923:16–24.)



amorphous solid dispersions may also be thermodynamically stable (regions I and II), which means "that the solid in question is already in its lowest energy state and, therefore, it has nowhere to go in terms of lower energy." (*Id.* at 923:25–924:5.) Crystallization of a thermodynamically stable amorphous solid dispersion is **not possible**. (*Id.*)

6.  Dr. Atwood's conversion opinions are based on the properties of neat amorphous solids, not amorphous solid dispersions. (*Id.* at 927:16–19, 941:19–22, 960:2–7.)

**B.    XRPD**

7.  XRPD is "the gold standard" for distinguishing between crystalline and amorphous solids." (Tr. 913:24–914:24 (Zaworotko).) XRPD testing produces "sharp peaks," if the material is crystalline, or an "amorphous hump," if the material is amorphous. (*Id.*)

8.  To be considered a peak, and thus evidence of crystalline material, a signal must have **both** the required height and width. (*Id.* at 919:10–17.) To determine whether a signal is a peak, a POSA must first assess the noise. (*Id.* at 919:18–920:21.) After the noise is assessed,

2

signals can be analyzed to determine whether they can properly be considered a peak. (*Id.* at 920:22–922:9.) Signals that are taller than the noise, termed 2-sigma data, have the required height. (*Id.*) Signals that are broad, meaning they run over multiple steps, have the required width to be considered a peak. (*Id.*)

9.     XRPD testing can be conducted on a physical mixture of solids that contain both crystalline and amorphous components, such as chocolate or a pharmaceutical formulation. (*Id.* at 915:20–916:10.) Whether XRPD can detect the presence of a specific crystalline solid (e.g., apixaban) in a physical mixture depends on whether the solid is a major component (the component that has the highest weight percentage) or minor component. (*Id.* at 916:11–20.)

10.     XRPD can be used to identify a minor component **only if** the component is present above the LOD. (*Id.* at 917:18–24.) A LOD is the minimum weight content of the analyte that XRPD could detect. (*Id.* at 917:25–918:7.)

11.     To determine the LOD, a POSA would conduct a "spiking test," wherein the POSA tests a placebo—a mixture without the compound of interest—and then deliberately adds known amounts of the compound of interest until the POSA is able to detect, with a reasonable degree of certainty, the presence of the particular crystalline solid. (*Id.* at 918:18–919:9.)

**C.     NMR**

12.     Drs. Apperley and Schurko testified on behalf of Sigmapharm. The Court recognized Dr. Apperley as an expert in NMR testing and analysis. (Tr. 726:11–15 (Apperley).) Dr. Apperley has worked in the solid state NMR service at the University of Durham Industrial Research Laboratories since 1986. (*Id.* at 723:6–19.) The Court also recognized Dr. Robert Schurko as an expert in solid state NMR testing and analysis. (Tr. 783:21–25 (Schurko).) Dr. Schurko is assuming the position of director of the NMR users program at the National High Field Magnetic Laboratory in Tallahassee, Florida, and was previously a full professor at the

3

University of Windsor in Windsor, Ontario, Canada. (*Id.* at 780:6–22.)

13.     NMR uses a technique called "magic-angle spinning" to acquire the data. (Tr. 550:19–551:2 (Munson).) The sample is spun in a rotor to generate an isotropic chemical shift. (*Id.*) This also produces a "spinning side band," which is a residual signal that may mask a portion of the NMR spectrum. (Tr. 746:17–22 (Apperley).) The position of the side band depends on the spin rate used to obtain the spectrum. (*Id.*)

14.     Although both can be used to detect crystalline and amorphous forms, a POSA interprets NMR spectra and XRPD diffractions differently. (Tr. 567:5–568:1 (Munson).) In NMR, peaks are shown for **both** amorphous and crystalline material. (*Id.*) Thus, the presence of a peak in an NMR spectrum does **not** necessarily indicate crystalline material. (*Id.*)

15.     In an NMR spectrum, crystalline materials "tend to have very sharp" peaks, while amorphous materials "tend to have broader" peaks. (Tr. 532:5–17 (Munson).) Amorphous substances have much broader peak widths because of the "lack of long-range repeating order in the amorphous state, which results in a wide range or orientations and environments for the carbon atoms." (Tr. 727:14–728:1, 770:12–25 (Apperley).)

16.     Examining not only peak intensity, but also peak position and shape, is therefore important for NMR data. (Tr. 573:16–22 (Munson); Tr. 785:20–786:6 (Schurko).) Peak width helps distinguish between amorphous and crystalline forms. (Tr. at 573:25–574:9 (Munson).)

### D.     Overview of Sigmapharm's Manufacturing Process

17.     Sigmapharm's ANDA Products comprise 6.58% Amorphous Apixaban (called the "drug product intermediate") and several excipients. (Tr. 928:7–24 (Zaworotko); PTX-1074.)

18.     Sigmapharm creates the Amorphous Apixaban through a two-step process. (Tr. 928:25–930:8 (Zaworotko).) In the first step, a PVP polymer is added to a solution of BHA and methanol (*id.* at 929:5–22; *see also* DTX-647) and then Apixaban is added. (Tr. 928:25–930:8

4

(Zaworotko).) These solids are dissolved in the solution for about thirty minutes. (*Id*.) In the second step, the solution is quickly dried using a proprietary system. (*Id*. at 929:23–930:8.) The resultant solid is mainly PVP (93.1%), plus apixaban (6.6%) and BHA (0.4%). (*Id*.; DTX-647.)

19.     Plaintiffs' Dr. Atwood opined that if conversion from amorphous to crystalline occurred, it would do so "rather quickly." (Tr. 331:14–25 (Atwood).) Independent testing by third-party Catalent, however, confirms that the Amorphous Apixaban product placed into Sigmapharm's ANDA Products remains a "textbook example" of an amorphous form three months after creation. (Tr. 931:11–933:18 (Zaworotko); PTX-1071 at 6–11; DTX-650.5) Dr. Atwood admitted that this testing showed an "amorphous entity from the look of the XRPD" and offered "no criticism" of the graphs (Tr. 455:5–10, 456:7–13 (Atwood).)

20.     These results are not surprising. Numerous peer-reviewed publications explain that PVP inhibits both nucleation and thus also crystallization. (Tr. 934:17–935:1 (Zaworotko); DTX-768.1; DTX-767.1; DTX-720.2.)

21.     The Amorphous Apixaban is then formulated with a mixture of excipients, including additional PVP. (Tr. 935:4–12 (Zaworotko).) Together, the PVP in the Amorphous Apixaban plus the additional PVP added to the ANDA Product make up slightly over 69% of the Sigmapharm ANDA Product. (PTX-1074 at 4.) In contrast, apixaban is only 3.1%. (*Id*.)

22.     Sigmapharm's ANDA Products are subjected to accelerated stability testing and long-term stability testing, and are proven stable for two years after the manufacture of the Amorphous Apixaban. (Tr. 936:22–937:4 (Zaworotko).) To maintain this stability, Sigmapharm utilizes several techniques to reduce the amount of moisture to which the ANDA Product is exposed. (*Id*. at 937:5–938:9.) Stability testing shows these efforts are successful, as no significant water increase was reported. (*Id*. at 938:11–20; PTX-1073.)

23.     Even if Sigmapharm's efforts were not completely successful and its ANDA

Products demonstrated water increase, the apixaban in Sigmapharm's ANDA Products would not

convert to crystalline because (1) the $T_g$ of both PVP and apixaban is high (above 100° C),

meaning that the Products would remain kinetically stable; and (2) the low concentration of

apixaban means that they are **also** thermodynamically stable. (*Id.* at 924:24–927:11, 938:21–

939:18; DTX-764.2) Thus, Sigmapharm's ANDA Products are in region II of the graph above

and will **not** convert to crystalline form. (PRF ¶ 5; Tr. 927:2–11 (Zaworotko).)

## II.     PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROVING INFRINGEMENT OF CLAIMS 21 OR 22 OF THE '945 PATENT.

### A.     Plaintiffs Conducted No Testing to Measure the Size of Any Particles in Sigmapharm's ANDA Products.

24.     The '945 Patent requires that "the crystalline apixaban particles have a $D_{90}$ equal

to or less than about 89 μm." (JTX-2 col.9:53–54.)

25.     $D_{90}$ is a value that can be calculated by software or by hand. (Tr. 1349:13–1350:3

(Chambliss).) In response to invalidity arguments, Plaintiffs identified numerous methods to

determine the size of particles, including "microscopy," "ultrasound attenuation," "sieving

technique," "electrical zone sensing," "laser diffraction," "electron microscopy," "light

microscopy," "laser diffraction by wet dispersion," "laser diffraction by dry dispersion,"

"scanning electron microscopy," "laser light scattering," and what was referred to at trial as the

"Berkland method." (*Id.* at 1352:22–1359:4.)

26.     For defendant Unichem's ANDA Product—where the existence of crystalline

apixaban particles was stipulated—Plaintiffs actually used the "Berkland method." (Tr. 644:12–

20 (Berkland).) For Sigmapharm's ANDA Products, however, Plaintiffs failed to conduct any

testing whatsoever. (Tr. 464:20–468:5 (Atwood); Tr. 959:14–960:7 (Zaworotko); *see also* Tr.

1838:13–15 (Plaintiffs' closing) ("THE COURT: You could have asked for your experts to

6

calculate a $D_{90}$, couldn't you? [Plaintiffs' Counsel]: We certainly could have . . . .").) Although

the '945 Patent discloses measuring particle size by laser light scattering, Dr. Atwood did not do

that with the Sigmapharm ANDA Products. (Tr. 467:6–12 (Atwood).)

27.     In place of objective testing, Plaintiffs instead rely on conjecture. (*Id.* at 467:1–5

("I simply offered an interpretation based on the ANDA documents that I saw."))

28.     Dr. Atwood opined that Sigmapharm's ANDA Products will comprise crystalline

material sized "on the order of nanometers," which is approximately between "a couple" of

nanometers and ten nanometers in size. (*Id*. at 397:19–398:4, 431:1–25.)

**B.      Sigmapharm's ANDA Products Have No Apixaban Particles.**

1.      The '945 Patent Applicant distinguished apixaban particles from
        crystalline apixaban-polymer dispersions.

29.     During prosecution of the application that subsequently issued as the '945 Patent,

the USPTO found certain claims were unpatentable as obvious under 35 U.S.C. § 103(a) over

Wei in view of Nause. (JTX-4 at BMSAPIX0008156–57, 8572–78.)

30.     Applicant argued in response that the amorphous dispersions Nause taught "are

clearly different from the crystalline apixaban particles recited in the present claims." (*Id*. at

9370; *see also id.* at 10467 (arguing that Nause achieved its goals "by providing a solid amor-

phous dispersion, **which is clearly different from a composition that includes crystalline**

**apixaban particles** recited in the present claims.") (emphasis added).)

31.     In response to the Applicant's argument, the USPTO allowed the '945 Patent's

claims over Nause. (*Id*. at 10502–10.)

32.     Nause teaches that a "solid amorphous dispersion" of apixaban means "a solid

material in which at least a portion of apixaban is in the amorphous form and dispersed in the

polymer" where "at least 60 wt% of the drug in the solid amorphous dispersion is in the

7

amorphous form, rather than the crystalline form." (DTX-344.43.)

33.     Even if Plaintiffs had shown that Sigmapharm's ANDA Products contain some crystalline apixaban material (and Plaintiffs have failed to prove even that, as stated in the findings next below), that showing would be insufficient to meet Plaintiffs' burden of proving discrete crystalline apixaban particles not embedded in a solid amorphous dispersion like Nause.

>       2.     Sigmapharm's ANDA Products comprise an amorphous dispersion that does not contain any "apixaban particles."

34.     Any apixaban used in Sigmapharm's manufacturing process is entirely dissolved in PVP, which creates an amorphous solid dispersion (a "solid solution") wherein the apixaban molecules bond to the PVP. (Tr. 908:10–13, 911:9–912:17, 929:5–22 (Zaworotko); DTX-647.)

35.     Although the '945 Patent refers to individual drug substance particles existing either singularly or as agglomerates, this disclosure merely refers to individual particles of apixaban agglomerated on to each other, not a composite of apixaban and another substance. (JTX-2 col.3:20–22; Tr. 469:10–471:10 (Atwood).)

36.     Dr. Atwood agreed that a composite particle would not be apixaban particles that can meet the size limitation of the '945 Patent because "they're not actually apixaban but rather apixaban and something else." (Tr. 470:12–472:3 (Atwood).)

>   **C.     Plaintiffs' XRPD Testing Does Not Show Evidence of Crystalline Apixaban Particles in Sigmapharm's ANDA Products.**

37.     Plaintiffs have failed to prove by a preponderance of the evidence that Sigmapharm's ANDA Products comprise crystalline apixaban particles.

38.     To conduct XRPD testing of Sigmapharm's ANDA Products, Plaintiffs engaged Dr. Jerry Atwood, who claims to have identified peaks due to crystalline apixaban at degrees 12.3, 12.9, 22.1, and 27.1. (Tr. 363:14–365:7, 366:13–367:10, 369:15–370:7 (Atwood).)

1.      Numerous methodological errors undermine the reliability of
            Dr. Atwood's opinions.

39.     Dr. Zaworotko identified numerous methodological errors that undermine the

reliability of Dr. Atwood's testing and conclusions. (Tr. 941:2–949:14 (Zaworotko).)

Dr. Atwood did not: (1) retain a laboratory notebook or keep sufficient records of how he

conducted his tests/handled his samples; (2) follow USP recommendations concerning the testing

he conducted; (3) establish a LOD; (4) compare his test results to a reliable reference; or (5)

consider that Sigmapharm's Amorphous Apixaban was an amorphous solid dispersion, and **not** a

neat amorphous solid. (*Id*. at 941:5–22.) Cumulatively, these errors render Dr. Atwood's results

and opinions inconclusive and unreliable. (*Id.* at 941:23–942:2.)

40.     Dr. Atwood's inadequate recordkeeping lacked a chain of custody of the samples

he tested. (*Id*. at 942:3–944:12.) Plaintiffs produced documents showing that Plaintiffs' attorneys

shipped Sigmapharm's ANDA Products to Dr. Munson's assistant in Colorado, but no evidence

that the Products were shipped from Colorado. (*Id.*) Yet Dr. Atwood somehow tested samples

from the **same** bottle on the **same** day in Missouri as did Dr. Munson's assistant in Colorado.

(*Id.*) This is not a "conspiracy theory," but is rather "suggestive of an overall sloppiness with

how the samples were handled and kept." (*Id*. at 944:8–12.)

41.     Dr. Atwood did not follow USP guidelines to conduct XRPD testing properly. (*Id.*

at 946:11–947:8.) He removed the tablet coating with sandpaper, which can introduce crystalline

material to the sample. (*Id*. at 945:25–946:6.) Moreover the USP requires that an intact sample

be tested as a control if grinding is elected. (*Id.* at 946:7–947:8.) Dr. Atwood did not do this. (*Id*.)

42.     Although a LOD is necessary to determine if XRPD is even a viable test, Dr.

Atwood failed to determine a LOD. (*Id*. at 947:9–948:2.) Sigmapharm's ANDA Products only

have 3.1% apixaban. (PTX-1074 at 4.) Thus, if testing established the LOD was 5%, no crystal-

line apixaban (were it to exist) could even be detected. (Tr. 947:20–948:2 (Zaworotko).) Any

peaks in Dr. Atwood's results therefore **_could not be_** apixaban because Sigmapharm's ANDA

Products do not have enough apixaban to detect, even if 100% of it converted to crystalline. (*Id.*)

43.     Dr. Atwood relied on only **_four_** peak positions, despite the USP's recommenda-

tion that **_ten (10)_** peak matches are required to determine that evidence of crystalline material is

due to a known substance (i.e., apixaban) instead of other material (i.e., the excipients in

Sigmapharm's ANDA Product). (*Id.* at 948:3–949:14.)

2.     <u>Dr. Atwood's XRPD testing shows no evidence of crystalline apixaban
particles in Sigmapharm's ANDA Products.</u>

44.     There is no evidence of crystalline apixaban material in Sigmapharm's ANDA

Products. (*Id.* at 958:17–959:2.) What Dr. Atwood identified as a peak due to crystalline

apixaban particles is mere noise because none of the signals he identified have the required

height and width to constitute a peak. (*Id.* at 949:15–25, 955:22–959:2.)

45.     Dr. Atwood crushed an Apixaban ANDA Product and used the same crushed

sample to conduct 11 separate scans over a period of a couple of months. (Tr. 449:23–451:4

(Atwood).) Although he ran 11 scans at various speeds and degrees, Dr. Atwood relied on only 2

scans. (*Id.* at 463:12–464:15; *see also* Tr. 950:3–17, 951:22–24 (Zaworotko).)

46.     The '945 Patent does not include a complete diffractogram for the N-1 form of

apixaban, but instead lists only six representative peaks at degrees 10.0, 10.6, 12.3, 12.9, 18.5,

and 27.1. (Tr. 341:7–20 (Atwood); JTX-2 col.5:5–13 ("Table 2").)

47.     Dr. Atwood could not identify evidence of crystalline apixaban material at

degrees 10.0, 10.6, and 18.5. (Tr. 354:23–355:9, 462:25–463:2 (Atwood); Tr. 952:12–955:20

(Zaworotko).) Although Dr. Atwood opined that any peaks at these degrees would be blocked by

other material (i.e., amorphous apixaban and/or excipients), XRPD patterns are additive; thus, if

10

"a peak were present, one would expect to see it as a satellite." (Tr. 955:4–16 (Zaworotko).)

48.    For the XRPD pattern at 12.24° and 12.84°, "there are no peaks whatsoever above the noise so there is neither height nor width that would allow a person to assign the noise as a peak." (Tr. 955:22–956:18 (Zaworotko); *see also id.* at 1000:4–1001:15.)

49.    Similarly, there is no evidence of a crystalline peak at 27.1°. (*Id.* at 956:20– 958:15.) Dr. Atwood conducted four scans around 27.1°, from 30 to 300 seconds. (*Id.* at 956:20– 957:1.) Although the 300-second scan would have the highest signal-to-noise ratio, Dr. Atwood instead relied on the 30-second scan. (*Id.* at 957:2–10.) Regardless, none of Dr. Atwood's scans at 27.1° show a signal with the required height and width to be a peak. (*Id.* at 957:11–958:15.)

50.    In his deposition, Dr. Atwood testified that he looked at only the six peaks in the '945 Patent. (Tr. 461:2–462:24 (Atwood) ("Q. So those six peaks in the patent are the only ones you looked at . . . ? A. . . . [T]hat appears to be the case.").) At trial, however, Dr. Atwood testified about another peak at 22°. (*Id.* at 370:4–17.) No signal at 22.1° (± 0.1°) has the required height and width to be a peak. (Tr. 951:3–19 (Zaworotko).)

**D.    NMR Testing Shows No Evidence of Crystalline Apixaban Particles in Sigmapharm's ANDA Products.**

51.    Analysis of NMR testing proves Sigmapharm's ANDA Products do not contain crystalline apixaban. (Tr. 730:6–10 (Apperley); Tr. 784:18–785:7 (Schurko).)

52.    Dr. Schurko carefully examined NMR testing conducted by both Dr. Nethercott (and interpreted by Dr. Munson) and by Dr. Apperley. (Tr. 784:5–14 (Schurko).) He concluded that all the NMR evidence showed no evidence of crystalline apixaban in Sigmapharm's ANDA Products **and** instead showed amorphous apixaban. (*Id.* at 784:21–785:7, 789:23–791:6.)

53.    Dr. Schurko processed the data relied upon by Dr. Munson from multiple points of view with different sets of parameters to be fair about things like signal to noise and influence

11

on line widths. (*Id.* at 838:11–839:8.)

            1.      <u>Dr. Munson's NMR tests cannot reliably show evidence of crystalline apixaban material in Sigmapharm's ANDA Products.</u>

54.      Dr. Munson's analysis is unreliable because he infers crystalline apixaban without quantifying any peak widths and when the chemical shifts do not match. (*Id.* at 798:15–811:6.)

55.      Dr. Munson's tests show problematic baseline distortions in the crucial part of the spectrum, which are particularly significant given the low-weight percent of apixaban in the tablet. (*Id.* at 791:22–794:13) The presence of "artifacts" in Dr. Munson's tests of the Sigmapharm ANDA Products also cause distortion and interference with peaks. (*Id.* at 809:22–810:6.) Such distortions are not present in Dr. Apperley's data. (*Id.* at 794:21–-25).

56.      Dr. Munson's analysis is further impacted by the presence of a "spinning sideband" that interferes with a portion of the spectrum. (*Id.* at 791:22–794:13.) To ensure that the spinning sideband did not affect his interpretation of the spectrum, Dr. Apperley (unlike Dr. Munson) conducted additional measurements at different spin rates, which moved the spinning sideband. (*Id.* at 747:2–8; Tr. 794:21–25 (Schurko).)

57.      Although Dr. Munson concludes that "peak one" ($\approx$ 25 ppm) in his NMR data arises from crystalline apixaban in Sigmapharm's product, there is no evidence this is true. (Tr. 795:24–796:13 (Schurko); DTX-645.33–34.) The interfering signal and lack of a baseline make determining the width of the peak impossible. (*Id.* at 796:16–797:18; DTX-645.33.) Dr. Munson's analysis of "peak one" makes no mention of the peak width. (*Id.* at 797:22–798:5.) Dr. Munson's conclusion that "peak two" ($\approx$ 55 ppm) is evidence of crystalline apixaban is also incorrect because the line width is too broad and thus shows amorphous apixaban. (*Id.* at 798:18–799:4; DTX-645.33–35.) Indeed, none of the peaks Dr. Munson identifies (including those he claimed were partially obstructed) support a claim there is crystalline apixaban because

"[t]here is simply too much interfering signal and no reliable way here to comment on the line width of the peaks which would be very important for identifying crystalline form." (*Id*. at 800:14–19; *see also id*. at 799:5–800:19 (discussing peak positions ca. 100–180 ppm).)

58.     Although he has published papers on the importance of analyzing line width, Dr. Munson simply identifies the intensity of the peak position but does not determine the line width to distinguish crystalline from amorphous peaks. (*Id*. at 809:3–21.)

59.     Dr. Munson did not: perform a regression analysis; provide a signal-to-noise ratio; or provide any quantitative mathematical evaluation of line widths. (Tr. 577:3–578:11 (Munson).) He also did not perform a LOD. (*Id*. at 577:8–11.)

60.     Because Dr. Munson did not establish a LOD, he cannot reliably say that his tests would detect any apixaban in either crystalline or amorphous form. (*Id*. at 577:8–17; Tr. 810:7–16 (Schurko).) He agreed however, that if the LOD was 10% then detecting a material that was only 3% would be difficult. (Tr. 584:12–21 (Munson).)

61.     Dr. Munson's attempt to quantify the amount of crystalline apixaban in Sigmapharm's products lacked analytical support and was pure speculation. (Tr. 814:13–16 (Schurko).)

        2.     <u>Dr. Apperley conducted three tests, which reliably show there is no crystalline apixaban material in Sigmapharm's ANDA Products.</u>

62.     Dr. Apperley conducted three sets of experiments. (Tr. 730:11–731:1 (Apperley).) He conducted his first set of experiments using both a sample of crystalline apixaban ("API") and a sample of Sigmapharm's ANDA Product. (*Id*. at 732:13–20.) Because the signal-to-noise ratio is proportional to the amount of material in the sample, Dr. Apperley ran the crystalline material for one hour and the tableted material (which contained only 3% apixaban) for 16 hours to provide an equivalent signal-to-noise ratio. (*Id*. at 735:3–25.)

13

63. Dr. Apperley's first set of experiments established both the experimental conditions under which apixaban could be detected in either crystalline or amorphous form and the appearance of an NMR fingerprint for crystalline apixaban in terms of line positions and line widths. (*Id.* at 731:13–24.) This is common for materials of this type and used instrumentation available to NMR practitioners. (*Id.* at 733:16–22.)

64. The spectrum of crystalline apixaban provided 19 resolved signals that can be used to determine whether apixaban is detectable in tableted material. (*Id.* at 736:3–8.)

65. The first set of experiments are "not consistent with the presence of crystalline apixaban" in Sigmapharm's products. (*Id.* at 737:3–12.) The NMR data for the Sigmapharm ANDA Products features broad peaks and thus shows amorphous material. (*Id.* at 737:16–740:5.)

66. Although a signature line at 121.7 ppm is present in the crystalline sample, it is missing in the Sigmapharm ANDA Product sample. (*Id.*)

67. Dr. Apperley's second set of experiments used the same experimental parameters, but with a larger sample size and accumulation time (both of which improved the signal-to-noise ratio) and a different spin rate. (*Id.* at 741:3–7, 741:25–742:9.) This second set was designed to try to detect crystalline apixaban material in the Sigmapharm ANDA Product. (*Id.* at 741:22–24.)

68. The second test also showed a spectrum with broader line widths than the crystalline material, which suggests amorphous material. (*Id.* at 742:14–21.) There was no evidence of crystalline apixaban. (*Id.*) The peak at 121.7 was also again missing from the Sigmapharm ANDA Product spectrum. (*Id.* at 744:18–745:6.)

69. Dr. Apperley's third set of experiments involved a mixture of crystalline apixaban and a placebo. (*Id.* at 748:7–12.) The purpose of the third set was to determine how the spectrum would appear if Sigmapharm's ANDA Product contained crystalline apixaban in addition to the

other excipients. (*Id*. at 748:22–25.) Dr. Apperley also tested the placebo alone to confirm that there were no signals from other ingredients in the Sigmapharm ANDA Product that would affect the analysis of apixaban. (*Id*. at 750:9–17; Tr. 804:7–807:6 (Schurko).)

70.　　In the third set, Dr. Apperley established a LOD of ≈ 1.5%. (*Id*. at 757:18–24.)

71.　　Although Dr. Apperley did not calculate the specific LOD for the second set of experiments, it would have a LOD lower than 1.5% because it was run with a higher sample amount and for a longer duration than the third set. (*Id*. at 761:11–14, 771:8–14, 772:2–12.) Dr. Munson admitted that Dr. Apperley's second test could have a higher signal-to-noise ratio than Dr. Munson's experiments, and thus be more reliable. (Tr. 569:7–14 (Munson).) All of Dr. Apperley's experiments "ha[d] a substantial signal to noise." (Tr. 803:9–13 (Schurko).)

## III.　　PLAINTIFFS HAVE FAILED TO PROVE INFRINGEMENT OF THE '208 PATENT.

72.　　Plaintiffs failed to prove by a preponderance of the evidence that the apixaban compound in Sigmapharm's ANDA Products would infringe Claim 1 of the '208 Patent because structures in apixaban corresponding to rings M, E, A, and Q in Claim 1 are "substituted with" (as properly construed) more than two members of, respectively, Markush groups $R^{1a}$, R, $R^4$, and $R^{4a}$. (JTX-1 cols.237:22–23, 238:62–239:14, 237:56–61, 238:5–19, 238:20–21, 238:34–36, 240:48–64, 240:65–241:13; Tr. 686:18–687:13, 689:1–692:21 (Heathcock).)

73.　　The intrinsic evidence of the language of Claim 1 itself requires counting hydrogens when comparing accused compounds to the structures corresponding to rings M, E, A, and Q because the claim lists hydrogen as the first member of Markush groups $R^{1a}$, R, $R^{4,}$ and $R^{4a}$. (JTX-1 cols.238:62–239:14, 238:5–16, 240:48–64, 240:65–241:13.)

74.　　Dr. MacMillan's extrinsic evidence testimony, which contradicts this intrinsic evidence, is not credible because it would treat the hydrogen member of these four Markush

15

groups differently from every other member. (*See* Tr. 692:22–693:9 (Heathcock).) It would also render the recitation of hydrogen in those Markush group members superfluous for all four of the ring structures. (*Id.* at 702:15–21.) When asked, Dr. MacMillan could not identify any way in which the scope of the claims would differ under his interpretation if hydrogen, the first member of the Markush groups, was simply deleted. (Tr. 307:11–18 (MacMillan).)

75.   Although the specification uses the word "unsubstituted," Claim 1 does not. (*Id.* at 297:7–298:18.) Dr. MacMillan's extrinsic evidence testimony reading the word "substituted with" as meaning "unsubstituted" for the apixaban compound is contrary to the intrinsic evidence of the plain meaning of the claim language and the specification's usage of "substituted" and "unsubstituted" as alternatives, using the word "unsubstituted" to indicate that a ring structure like ring M had no substitutions. (*Id.* at 295:20–298:9 ("Obviously, unsubstituted means unsubstituted . . . .")

76.   The intrinsic evidence of the language of other, non-asserted claims also requires counting hydrogens when determining how many substituents the rings are "substituted with" because Ring E requires that it be substituted with "one or more" (i.e., at least one) member of R, and for thirty-six (36) structures in dependent Claim 4, and four (4) compounds in dependent Claim 8, the only substituent on the structure corresponding to Ring E is hydrogen.

77.   Thus, Dr. MacMillan's extrinsic evidence testimony contradicting this intrinsic evidence would not preserve the validity of the dependent claims.

78.   Dr. MacMillan's extrinsic evidence testimony that he was "applying Dr. Heathcock's construction" by combining rings D and E is not credible and unpersuasive. Dr. Heathcock offered no such testimony in trial. To the extent he indicated in his expert report that those two rings together could have a maximum total number of substituents that is not of record

16

at trial and, moreover, would not support Dr. MacMillan's opinion that the requirement of having at least one substituent on Ring E could be satisfied by having a substituent on Ring D. (Tr. 1635:15–1645:14 (MacMillan).)

79.     The intrinsic evidence of the patent specification twice states substantially the same express definition of "substituted with" as meaning "any one or more hydrogens on the designated atom is replaced with a selection from the indicated group." (JTX-1 cols.113:66–114:3, 117:42–48; *see also* Tr. 693:10–693:23 (Heathcock); Tr. 298:19–300:5 (MacMillan) ("Yes. If you're asking me does it specifically say that here? Yes, it absolutely does. Yes."); *id.* at 303:10–24; DDX 6-13.)

80.     This express definition of "substituted with" in the patent does not alter the plain and ordinary meaning of the term to a POSA,[2] but is instead fully consistent with a POSA's understanding of that term. (Tr. 693:24–694:5 (Heathcock); Tr. 300:6–18 (MacMillan) ("[T]he common and normal definition of what 'substituted' would be to an organic chemist.").)

81.     Dr. MacMillan's extrinsic evidence testimony that the hydrogen Markush group member can never "replace" a hydrogen on a structure "substituted with" a Markush group member is neither persuasive nor credible because it contradicts the intrinsic evidence of this definitional language in the patent specification, which requires replacing one or more hydrogens with a Markush group member. Dr. MacMillan testified on re-direct that even though the patent's own definition explains that "substitute" means to replace "one or more hydrogens," he instead interpreted it to mean "[y]ou replace none of them." (Tr. 315:14 (MacMillan).)

82.     For purposes of his infringement analysis, Dr. MacMillan construed the claim

---

[2] Dr. Heathcock and Dr. MacMillan offered slightly differing definitions of the level of ordinary skill in the art. (Tr. 684:4–685:5 (Heathcock); Tr. 277:10–278:2 (MacMillan).) Both, however, testified that their infringement opinions are the same under either's definition. (Tr. 684:4–685:5 (Heathcock); Tr. 277:10–278: 9 (MacMillan); *see also* PDX 4.5.)

language "substituted with" to mean "not replacing any hydrogens." (*Id.* at 301:14–17.) He adopts a construction of "substituted" as meaning to replace zero (0) hydrogens instead of replacing one or more hydrogens. (*Id.* at 300:19–23.) He treats "substituted" as meaning "unsubstituted" based on his opinion that "zero modifies substitution" such that "there is no replacement," despite the express definition to the contrary that appears twice in the specification requiring the replacement of at least one or more hydrogens. (*Id.* at 300:24–301:13.) This testimony is not credible because it contradicts the intrinsic evidence of definitional language in the specification requiring that it replace "one or more" hydrogens. Because "substituted with" here means replacing one or more hydrogens, a POSA would use the word "unsubstituted" to indicate replacing no hydrogens. (Tr. 694:6–13 (Heathcock).)

83.     Dr. MacMillan's extrinsic evidence testimony that hydrogen can count as a substituent when it replaces a non-hydrogen on a structure contradicts this intrinsic evidence definitional language of "substituted with" that requires replacing a hydrogen. (*Id.* at 694:6–10, 696:23–700:5.) Dr. MacMillan's extrinsic evidence testimony that hydrogen can count as a substituent not when attached to a carbon but instead when attached to a heteroatom is also contrary to the specification language that he references, which twice states, "[t]he nitrogen atom may be substituted or unsubstituted (i.e., N or NR wherein R is H or another substituent, if defined)." (JTX-1 col.115:43–45, 60–62; Tr. 304:3–25 (MacMillan); Tr. 694:14–696:18 (Heathcock).) Contrary to Dr. MacMillan's extrinsic evidence testimony, this intrinsic evidence from the specification clearly shows that the patentee's usage of "unsubstituted" in contrast to the word "substituted" and the language "H **or another substituent**" clearly shows that the patent counts H as a substituent.

84.     Dr. Heathcock's testimony that a POSA would count all the hydrogens attached to

the structures in apixaban corresponding to the four rings M, A, E, and Q when determining how many Markush group members those rings are "substituted with" is credible and persuasive. (Tr. 689:1–692:21 (Heathcock).)

85.     Dr. Heathcock's background in teaching students for work in the pharmaceutical industry, and writing one of the standard texts in the field used by hundreds of thousands of students to learn organic chemistry (*id.* at 680:23–682:10) makes him a credible witness on how a POSA would determine the number of Markush group members the apixaban compound is "substituted with" for each of the rings M, A, E, and Q from Claim 1.

86.     Dr. Heathcock acknowledges that his explanation of determining how many substituents the rings M, A, E, and Q are "substituted with" in compounds like apixaban means that Claim 1 does not read on any real-world compounds. (*Id.* at 700:6–10.) This reflects the patentee's choice of language in drafting Claim 1, and the Court is not free to rewrite the claims.

87.     Dr. Heathcock explained how the claims could have been drafted to cover apixaban by (1) using "substituted or unsubstituted," as the patentee did in the specification, (2) eliminating the "hydrogen" member from the four Markush groups, and (3) changing the range of permissible substituents to start with 1. (*Id.* at 700:14–702:14.) Dr. MacMillan denied that a POSA would have needed to use the word "unsubstituted" in Claim 1, but in his own patent he used "unsubstituted" instead of "substituted with 0." (Tr. 1646:9–1648:11 (MacMillan).)

88.     It is undisputed that Claim 13 has as its first limitation "a compound according to Claim 8," which in turn requires "a compound according to Claim 1." Because Plaintiffs have failed to carry their burden of proving that the apixaban in Sigmapharm's ANDA Product infringes Claim 1, they have failed to prove infringement of Claim 13. (JTX-1 cols.267:1, 265:39–40; Tr. 687:16–688:14 (Heathcock); Tr. 278:19–279:12, 280:21–281:14 (MacMillan).)

19

89.     It is undisputed that Claim 104 has as its first limitation "a compound according to Claim 13." Because Plaintiffs have failed to prove infringement of Claim 13 they have also failed to prove infringement of Claim 104. (JTX-1 at BMSAPIX10263498; Tr. 688:16–22 (Heathcock); Tr. 278:19–279:23 (MacMillan); *see* PDX 4.6.)

90.     In addition, Plaintiffs have also failed to meet their burden of proof that apixaban satisfies the "crystalline" limitation of Claim 104, because the only basis Dr. MacMillan gave for stating that this limitation was met was his hearsay reliance on Dr. Atwood's testimony, which is insufficient as explained *supra*, ¶¶ 37–50. (Tr. 288:21–291:15 (MacMillan); PDX 4.14.)[3]

91.     Moreover, any importation or use of crystalline apixaban material by Sigmapharm before the Complaint was filed, and up to and including the time of trial, is protected and immune from infringement under the safe harbor provisions of 35 U.S.C. § 271(e)(1) as having been done for FDA submission.

92.     Any theoretical prospective future use of crystalline apixaban material by Sigmapharm as a starting material is not within the scope of the artificial act of infringement defined under 35 U.S.C. § 271(e)(2), and is accordingly too speculative and premature to support a case of actual controversy conveying article III jurisdiction over a claim under § 271(a), and therefore fails to state a claim on which relief can be granted.

---

[3] The Court overruled Sigmapharm's hearsay objection at trial. For purposes of the record, Sigmapharm maintains its hearsay objection, and does not waive that objection with these proposed findings, and reserves the right to raise that issue on appeal.

Dated: February 7, 2020

OF COUNSEL:
Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Femi Masha
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300
Madison, WI 53701
Tel: (608) 234-6032
tom.heneghan@huschblackwell.com

Dustin Taylor
HUSCH BLACKWELL LLP
1801 Wewatta St., Suite 1000
Denver, CO 80202
Tel: (303) 749-7200
dustin.taylor@huschblackwell.com

Respectfully submitted,

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Defendant*
*Sigmapharm Laboratories, LLC*

21