## IN IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY, and PFIZER INC., | ) ) ) |
| Plaintiffs, | ) )   C.A. No. 17-374-LPS ) (CONSOLIDATED) |
| v. | ) ) |
| AUROBINDO PHARMA USA INC., et al., | ) ) |
| Defendants. | ) ) ) |

## **DEFENDANT SUNSHINE LAKE'S POST-TRIAL BRIEF ON NONINFRINGEMENT**

OF COUNSEL:

Paul H. Kochanski
Kendall K. Gurule
**LERNER, DAVID, LITTENBERG,**
  **KRUMHOLZ & MENTLIK, LLP**
20 Commerce Drive
Cranford, NJ 07016
Telephone: (908) 654-5000
pkochanski@lernerdavid.com
kgurule@lernerdavid.com

Karen L. Pascale (#2903)
Robert M. Vrana (#5666)
**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Attorneys for Defendants Sunshine Lake Pharma
Co., Ltd. and HEC Pharm USA Inc.*

February 7, 2020

## <u>TABLE OF CONTENTS</u>

Page(s)

TABLE OF AUTHORITIES ................................................................................................. ii

TABLE OF ABBREVIATIONS ........................................................................................... iii

I.      NATURE AND STAGE OF THE PROCEEDINGS .......................................................1

II.     SUMMARY OF THE ARGUMENT ...............................................................................1

III.    STATEMENT OF FACTS ...............................................................................................3

IV.     ARGUMENT ....................................................................................................................3

      A.      Infringement Legal Standard ................................................................................3

      B.      Common Technical Background ............................................................................4

            1.      Crystalline and Amorphous Materials in Pharmaceutical
                 Compositions ..............................................................................................4

            2.      Amorphous Solid Dispersions ...................................................................6

            3.      X-Ray Powder Diffraction (XRPD).............................................................7

      C.      Plaintiffs' Have Not Proven That Sunshine Lake's ANDA Product Contains
           Crystalline Apixaban Particles..............................................................................9

            1.      Sunshine Lake's Production Method Is Well Known In The
                 Art To Produce A Stable Amorphous Solid Dispersion .............................9

            2.      Sunshine Lake's Testing Showed That The Apixaban In Its
                 ANDA Product Is In The Form Of A Stable Amorphous
                 Solid Dispersion......................................................................................11

            3.      Dr. Brittain's Testing Showed That The  Apixaban In
                 Sunshine Lake's ANDA Product Is In The Form Of A
                 Stable Amorphous Solid Dispersion.........................................................13

            4.      Dr. Atwood's Testing Failed To Identify Crystalline
                 Apixaban In Sunshine Lake's ANDA Product ..........................................15

V.      PLAINTIFFS HAVE NOT PROVEN THATSUNSHINE LAKE'S ANDA
      PRODUCT CONTAINS CRYSTALLINE APIXABAN PARTICLES
      HAVING A $D_{90}$ OF LESS THAN OR EQUAL TO 89 μM ............................................23

VI.     CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Acorda Therapeutics Inc. v. Mylan Pharm Inc.*,
   817 F.3d 755 (Fed. Cir. 2016)................................................................3

*Ferring B.V. v. Watson Labs, Inc.*,
   764 F.3d 1382 (Fed. Cir. 2014).............................................................4

*Glaxo Inc. v. Novopharm Ltd.*,
   110 F.3d 1562 (Fed. Cir. 1997)..........................................................4, 12

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009)............................................................24

*Pfizer, Inc. v. Teva Pharms. U.S.A., Inc.*,
   882 F.Supp.2d 643 (D. Del. 2012).........................................................23

*Reckitt Benckiser LLC v. Aurobindo Pharma LLC*,
   239 F.Supp.3d 822 (D. Del. 2017).........................................................25

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995)..........................................................4, 23

**Statutes, Rules & Other Authorities**

35 U.S.C. § 271(e)(2)(A) ....................................................................3

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| ANDA | Abbreviated New Drug Application |
| Asserted Claims | For the '945 Patent, claims 21 and 22 |
| FDA | United States Food and Drug Administration |
| BMS | Bristol-Myers Squibb Co. |
| Pfizer | Pfizer, Inc. |
| Plaintiffs | BMS and Pfizer |
| Sigmapharm | Sigmapharm Laboratories, LLC |
| Sunshine Lake | Sunshine Lake Pharma Co., Ltd. and HEC Pharm USA Inc. |
| Unichem | Unichem Laboratories, Ltd. |
| Defendants | Sigmapharm, Sunshine Lake, and Unichem |
| UF | Uncontested Facts |
| POSA | Person of Ordinary Skill in the Art |
| XRPD | X-Ray Powder Diffraction |
| SLF | Sunshine Lake's Findings of Fact |

## I.      NATURE AND STAGE OF THE PROCEEDINGS

Defendants Sunshine Lake Pharma Co. Ltd. and HEC Pharm USA Inc. (collectively hereafter referred to as "Sunshine Lake") submit this Post-Trial Brief and accompanying Proposed Findings of Fact on Noninfringement ("SLF ¶") in support of their position that Plaintiffs failed to meet their burden at trial in proving that Sunshine Lake's ANDA product infringes U.S. Patent No. 9,326,945 ("the '945 Patent").

Sunshine Lake submitted ANDA No. 209994 to the FDA seeking approval to engage in the commercial manufacture, use, and sale of apixaban oral tablets in 2.5 mg and 5 mg doses. In its ANDA, Sunshine Lake submitted a Paragraph IV Certification alleging that the claims of U.S. Patent No. 9,326,945 were not infringed. The '945 Patent was listed in the FDA's Orange Book in connection with apixaban 2.5 mg and 5 mg oral tablets sold by Plaintiffs under the trademark Eliquis®. United States Patent No. 6,967,208 was also listed in the Orange Book but was not challenged by Sunshine Lake, and therefore, was not asserted against Sunshine Lake. It is based on this Paragraph IV Certification that the Plaintiffs initiated an action in this Court pursuant to the Hatch-Waxman Act alleging infringement of the '945 Patent.

## II.     SUMMARY OF THE ARGUMENT

Plaintiffs have not met their burden of proving that Sunshine Lake's ANDA products will infringe the asserted claims 21 and 22 of the '945 Patent by demonstrating that Sunshine Lake's ANDA product contains crystalline apixaban, and if so, whether it contains crystalline apixaban particles having a $D_{90}$ of less than or equal to 89 μm.

As the evidence at trial demonstrated, XRPD testing of Sunshine Lake's exhibit batches submitted to the FDA showed that the apixaban in Sunshine Lake's formulation is stable in the amorphous form as opposed to converting to a crystalline form for up to at least three years. In addition to Sunshine Lake's own testing, and although it did not have the burden of disproving

infringement, Sunshine Lake also had an expert conduct XRPD testing on its apixaban product. This testing similarly showed the presence of no crystalline apixaban. In conducting this testing, contrary to Plaintiffs' assertions, Sunshine Lake's expert used a valid and scientifically accepted method to appropriately reduce noise and increase the sensitivity of his XRPD scans for the purpose of detecting any potential crystalline apixaban in Sunshine Lake's dosage form.

In contrast, although Plaintiffs had the burden, Plaintiffs offered only three "cherry-picked" XRPD scans of limited angle regions out of at least 12 scans conducted by their expert. Plaintiffs' expert purports to have found one characteristic peak in each of these three XRPD scans. However, as was shown at trial, this conclusion was highly questionable in that two of those scans appear not to be genuine peaks as defined by the experts, and the one genuine peak appears not to be crystalline apixaban. Plaintiffs argue that this is enough to show the presence of crystalline apixaban in Sunshine Lake's ANDA product. However, the industry standard of matching 10 peaks for identification of a crystalline form, the disclosure of six characteristic peaks of N-1 apixaban in the '945 Patent, and the overwhelming weight of the evidence offered by Sunshine Lake, all say otherwise.

As to the limitation related to particle size of the crystalline apixaban, to the extent there was crystalline apixaban in Sunshine Lake's tablets at all, which Sunshine Lake denies, Plaintiffs have offered no empirical evidence whatsoever to show the particle size limitation. Plaintiffs' expert admitted at trial that he has performed no particle size testing nor any $D_{90}$ calculations. Rather, Plaintiffs' expert offered only a theoretical hypothesis in support of Plaintiffs' argument that the particle size limitation is met. However, as was shown at trial, the theoretical hypothesis only applies to pure amorphous apixaban and not to an amorphous dispersion of apixaban in polyvinylpyrrolidone.

## III.  **STATEMENT OF FACTS**

The '945 Patent is directed to solid pharmaceutical compositions containing certain forms of apixaban. JTX-2.9:49-10:67. Claim 12, the independent claim from which the asserted claims depend, reads:

> A solid pharmaceutical composition comprising a therapeutically effective amount of apixaban and a pharmaceutically acceptable diluent or carrier,
> wherein apixaban comprises crystalline apixaban particles,
> wherein the crystalline apixaban particles have a D90 equal to or less than about 89 μm, and
> wherein, as measured using a USP Apparatus 2 at a paddle rotation speed of 75 rpm in 900 ml, of a dissolution medium at 37° C., at least 77 wt % of apixaban in the pharmaceutical composition dissolves within 30 minutes in the dissolution medium, and the dissolution medium is 0.05 M sodium phosphate at a pH 6.8 containing 0.05% sodium lauryl sulfate.

SLF ¶ 6. The asserted claims 21 and 22 add the limitations that the compositions comprise 2.5 or 5 mg of apixaban, respectively. SLF ¶ 5.

The Court construed "apixaban particles have a D90 equal to or less than about 89 μm" to have its plain and ordinary meaning, which is that 90% of the apixaban crystalline particles by volume have a diameter of less than or equal to 89 μm "irrespective of whether the apixaban particles is bulk apixaban". SLF ¶ 9.  While the Court held that the '945 Patent does not limit the measurement technique for apixaban particle size to any one particular method, the Court emphasized the importance of Plaintiffs' argument concerning particle size in the prosecution history of the '945 Patent and implied that *some* form of physical measurement is necessary. D.I. 380 at 10-11.

## IV.  **ARGUMENT**

### A.  **Infringement Legal Standard**

The Federal Circuit has long recognized that the infringement inquiry called for by 35 U.S.C. § 271(e)(2)(A) is "whether, if a particular drug were put on the market, it would infringe the relevant patent." *Acorda Therapeutics Inc. v. Mylan Pharm Inc.*, 817 F.3d 755, 760

(Fed. Cir. 2016). For a claim to be literally infringed, "every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed. Cir. 1995). [1]

Plaintiffs have the burden of proving infringement of by a preponderance of the evidence by showing that the alleged infringer will more likely than not market an infringing product. *Ferring B.V. v. Watson Labs, Inc.*, 764 F.3d 1382, 1388 (Fed. Cir. 2014). "Especially in a case…involving a compound capable of existing in various forms, the statute requires an infringement inquiry focused on what is *likely* to be sold following FDA approval". *Glaxo Inc. v. Novopharm Ltd.*, 110 F.3d 1562, (Fed. Cir. 1997) (emphasis added).

Therefore, in order to show infringement in this case, Plaintiffs must prove by a preponderance of the evidence that Sunshine Lake's ANDA product contains crystalline apixaban, that any crystalline apixaban is in particulate form, and that, if crystalline apixaban particles are present, they have a $D_{90}$ equal to or less than about 89 μm. SLF ¶ 8.

## B.    Common Technical Background

### 1.    Crystalline and Amorphous Materials in Pharmaceutical Compositions

Pharmaceutical compositions are made up of an active pharmaceutical ingredient (API) and one or more excipients. SLF ¶ 15. An API is an active ingredient that treats a disease, and an excipient is a component that is not an active ingredient. SLF ¶ 15. Here, the API is apixaban. SLF ¶ 15. In its formulation, Sunshine Lake utilizes bulk crystalline apixaban having a particle size of greater than 89 μm as a starting material. SLF ¶¶ 15, 37.

The API and excipients can exist in one of two physical forms: a crystalline form or an amorphous form. Materials in crystalline form are materials whose molecules have a long-range

---

[1] Plaintiffs made no effort to prove infringement under the doctrine of equivalents.

order called a crystal lattice or array. SLF ¶ 16. Long-range order means that there are enough ordered molecules to generate an XRPD pattern. SLF ¶ 16. If the molecules of a material lack long-range order, then the material is in amorphous form. SLF ¶ 17.

Under certain circumstances, it is possible for crystals to form in a pure amorphous material by a process called nucleation and crystal growth. SLF ¶ 18. Nucleation is required for a crystal to form. SLF ¶ 18. Nucleation is a process in which molecules in a material move together and aggregate to form a nucleus. SLF ¶ 18; Tr. 330:2-9 (Atwood). Crystal growth follows nucleation if more molecules can continue to move towards the nucleus to aggregate into a larger ordered crystal array. Tr. 331:1-7 (Atwood). Nucleation, and therefore crystal growth and formation, cannot occur without sufficient molecular mobility for molecules to come together. SLF ¶¶ 18, 22. When individual molecules are isolated and immobilized, such as in an amorphous solid dispersion, nucleation is prevented and a crystal cannot form. SLF ¶ 22. As was demonstrated at trial, the above nucleation process leading to crystal growth does not take place with respect to Sunshine Lake's apixaban product. SLF ¶ 40.

Amorphous to crystalline conversion has the potential to occur under certain circumstances in a pure material because amorphous material is at a higher energy state than crystalline material. SLF ¶ 25; Tr. 328:20-329:13 (Atwood). This is similar in concept to a ball rolling down a hill. The ball is at a higher energy state at the top of the hill than it is at the bottom, so it is energetically favorable for the ball to roll down the hill since thermodynamics dictates that things at a higher energy state tend to move to a lower energy state. However, the fact that something is energetically favorable does not mean that it will necessarily happen. If you put the ball in a box and restrict its mobility, it will not roll down. The same is true with respect to Sunshine Lake's apixaban product. Although the amorphous form of apixaban is at a

higher energy state than crystalline apixaban, Sunshine Lake's manufacturing process results in an amorphous dispersion which restricts the mobility of apixaban molecules to prevent nucleation in Sunshine Lake's formulation. SLF ¶¶ 25, 40.

### 2.    Amorphous Solid Dispersions

In analyzing the behavior of a solid amorphous material, it is very important to distinguish between neat amorphous solids and amorphous solid dispersions (also called "solid solutions" or "solid dispersions"). SLF ¶¶ 20-21; Tr. 909:12-14 (Zaworotko), 1063:13-1064:8 (Brittain). A neat amorphous solid is a pure amorphous material containing only one type of material – for example, pure amorphous apixaban. SLF ¶ 19. In contrast, an amorphous solid dispersion is an amorphous mixture of a polymer, such as PVP (also called "povidone" or "polyvinylpyrrolidone"), and a small amount of material such as apixaban. SLF ¶ 20. These two types of amorphous materials should not be confused because they have very different properties. SLF ¶ 21.

For example, in a neat amorphous solid, the classical models of nucleation and crystal growth may apply because there is nothing to restrict the mobility of the apixaban molecules. Tr. 923:9-11, 924:6-14 (Zaworotko). However, it is inappropriate to apply these models to an amorphous solid of pure substance dispersion. SLF ¶ 21; Tr. 909:21-24 (Zaworotko). In fact, Plaintiffs' expert Dr. Atwood admitted that his diagrams depicting nucleation and crystal growth applied only to neat amorphous solids of pure substances. By contrast, in an amorphous solid dispersion of apixaban in PVP, individual molecules of apixaban are dispersed in a matrix of PVP such that they are separated from one another and immobilized because they are bonded to sites on the PVP polymer. SLF ¶ 22. Due to this molecular level separation, amorphous solid dispersions do not contain discrete particles or crystals. SLF ¶ 23. The immobilization of the individual molecules also prevents them from coming together to nucleate to form a crystal.

SLF ¶ 22. PVP is well known in the art for its ability to prevent not only crystal growth, but also nucleation. SLF ¶ 24. Accordingly, while it is possible for a neat amorphous solid to convert to crystalline form, amorphous solid dispersions are much more stable in the amorphous form and may never convert to crystalline form. SLF ¶ 25.

An amorphous solid dispersion of apixaban in PVP can be produced by dissolving bulk apixaban and a sufficient amount of PVP in a solvent and then rapidly drying down to drive off the solvent. SLF ¶¶ 36, 38. When bulk apixaban is dissolved in the solvent along with PVP, any crystalline or particulate character it may have had is destroyed because individual apixaban molecules become separated from one another by solvent and PVP. SLF ¶ 37. When the solvent is removed rapidly, the apixaban molecules have no time to nucleate before they are trapped and bound to the PVP. The result is an amorphous solid dispersion in which individual apixaban molecules are separated and immobilized in a PVP matrix. Tr. 1058:10-1059:8, 1063:13-1064:8, 1102:12-22 (Brittain). This is evidenced by Sunshine Lake's own XRPD testing of its intermediates which do not show the presence of crystalline apixaban.   DTX-996.156-157; SLF ¶ 41. Accordingly, the important factors in forming an amorphous solid dispersion of apixaban are (i) dissolution with a sufficient amount of PVP to bind and separate the apixaban molecules and (ii) sufficiently rapid dry down so that molecules do not have time to aggregate.

### 3.    X-Ray Powder Diffraction (XRPD)

The parties agree that XRPD is an appropriate analytical tool for distinguishing between amorphous and crystalline solids and, in some scenarios, for the identification of crystalline solids.  SLF ¶ 26. Dr. Atwood testified that an XRPD pattern is a "fingerprint" of a crystalline substance. SLF ¶ 31. As in fingerprint identification, the identity of a crystalline form in an unknown sample can be based on comparison of its XRPD pattern to a known reference. SLF ¶ 32. The industry standard recommends the matching of at least 10 peaks of an unknown

material to a reference standard to reasonably identify a crystalline form, although even a match of 10 peaks of an unknown is not considered definitive without further testing. SLF ¶ 32. The '945 Patent discloses six characteristic peaks that should at least be matched within a tolerance of 0.1º2Θ for the identification of form N-1 crystalline apixaban. SLF ¶ 33. While one peak in an XRPD pattern may show the *presence* of some crystalline material, one peak is not sufficient to establish the *identity* of that crystalline material without more information because different compounds may have similar or almost identical XRPD patterns. SLF ¶ 30.

However, there are circumstances where one peak may be used in combination with other information to identify a specific crystalline substance. For example, Sunshine Lake used one peak at 17.1º2Θ as an indicator of the presence of the N-1 form of crystalline apixaban in testing of its exhibit batches. SLF ¶ 43. However, it did not rely on that one peak alone to establish the presence of N-1 apixaban. SLF ¶ 43. Rather, Sunshine Lake was only able to rely on the 17.1º2Θ peak as an indicator in light of extensive additional information about the samples it was testing. SLF ¶ 43. In particular, Sunshine Lake knew the composition of the samples it was testing prior to conducting XRPD analysis and had conducted extensive characterization of its composition to exclude the possibility of any contaminants or unexpected crystalline species. DTX-518.2, DTX-996.133-140, 205-233; SLF ¶ 43. Further, Sunshine Lake had conducted prior XRPD analysis of both its API and placebo tablets (*i.e.* tablets containing only the excipients) and compared them to ensure that the only possible source of a peak at 17.1º2Θ was the N-1 crystalline apixaban of its API. DTX-996.35-36, 152, 157, 159; SLF ¶ 43.

Another factor which must be considered when analyzing an XRPD pattern is "noise." Noise is random signal which create random fluctuations that appear throughout the entirety of an XRPD pattern. SLF ¶ 29. Because noise is simply random up and down fluctuations, if one

chooses an angle location and runs enough scans at that location, a noise spike will eventually appear at that location in one of the scans. Accordingly, it is important to distinguish genuine peaks from mere noise spikes in XRPD analysis. SLF ¶ 28. A genuine XRPD peak must have both a sufficient height and a sufficient width (approximately 0.2 to 0.3º2Θ at the base of the peak) in comparison to the noise. SLF ¶ 28. A real peak is also reproducible, meaning that if multiple scans are run on the same material, the peak will appear at the same location in each one of the scans. SLF ¶ 28. By contrast, a noise spike is not reproducible in multiple scans. SLF ¶ 29.

When a component of a sample is present in small amounts, a sensitive XRPD method should be used to detect it. SLF ¶ 34. Sensitivity is increased by reducing noise so that genuine peaks stand out more clearly. SLF ¶ 35. It is known that there is more than one valid method of increasing sensitivity.  SLF ¶ 35. As was testified to at trial, sensitivity can be increased by: (i) performing multiple scans and averaging their results ("scan averaging") or (ii) performing slower scans to increase count time per step ("slow scans"). SLF ¶ 35. These are simply two different but equally valid methods of accomplishing the same goal. SLF ¶ 35.

     **C.**    **Plaintiffs' Have Not Proven That Sunshine Lake's
          ANDA Product Contains Crystalline Apixaban Particles**

         **1.**    **Sunshine Lake's Production Method Is Well Known In
              The Art To Produce A Stable Amorphous Solid Dispersion**

Pharmaceutical compositions and production methods similar to those used by Sunshine Lake to produce its ANDA product are well known in the art to produce stable amorphous solid dispersions. SLF ¶¶ 36-37. Plaintiffs have not proven by a preponderance of the evidence that Sunshine Lake's ANDA product would somehow contravene the knowledge in the art.

The apixaban in Sunshine Lake's ANDA product is mixed with PVP. SLF ¶¶ 37-38. PVP is well recognized by POSAs, as well as by various references in the art, for inhibiting and preventing both nucleation and crystal growth because it separates and immobilizes individual

molecules to form amorphous solid dispersions. SLF ¶¶ 22, 24. More particularly, it is known in the art that PVP forms amorphous solid dispersions when mixed with apixaban. SLF ¶ 20. As an especially relevant example of the knowledge in the art, DTX-503 discloses that formulations having a PVP:apixaban ratio in the range of 1:1 to 8:1, made by a process including (i) dissolution of apixaban and PVP in a solvent followed by (ii) rapid dry down, results in an amorphous solid dispersion. SLF ¶ 36, 38; DTX-503.10. In that regard, Sunshine Lake's product is produced by a similar process including (i) dissolving crystalline apixaban and PVP in a solvent and (ii) rapidly drying down the material to eliminate the solvent and form a solid amorphous dispersion. SLF ¶ 37.

Thus, based on Sunshine Lake's tablet composition, its manufacturing process, and current knowledge in the art, a POSA would expect the apixaban in Sunshine Lake's ANDA product to be in the form of an amorphous solid dispersion of apixaban in PVP. SLF ¶ 40. Therefore, Sunshine Lake's ANDA product would contain no crystalline apixaban or crystalline apixaban particles because individual apixaban molecules are separated from one another by bonding to sites on the PVP polymer. SLF ¶¶ 22, 40. Sunshine Lake's own testing has demonstrated that this is actually the case. DTX-996.156-157. A POSA would expect the apixaban in Sunshine Lake's ANDA product to remain stable in its amorphous state because individual apixaban molecules are immobilized in their separated state and thus cannot come together to nucleate. SLF ¶¶ 22, 40.

Plaintiffs correctly point out that DTX-503 is not Sunshine Lake's patent application and does not describe Sunshine Lake's exact process. D.I. 868 at 15. However, this is inapposite because Sunshine Lake has never alleged either of these things. The art teaches that PVP is well known to create stable amorphous dispersions and both Drs. Brittain and Zaworotko have

testified that this is the general knowledge of a POSA. SLF ¶ 24. DTX-503 is particularly relevant example of this body of knowledge because it uses a composition and production process which is closely analogous to that of Sunshine Lake. SLF ¶¶ 24, 39. Sunshine Lake uses a PVP:apixaban ratio of 1.2:1 which is within the range disclosed in DTX-503 and includes a rapid dry down step. SLF ¶¶ 37-38. Thus, the two processes are comparable in all important aspects. SLF ¶ 39; *Supra* pp. 7.

2.     **Sunshine Lake's Testing Showed That The Apixaban In Its ANDA Product Is In The Form Of A Stable Amorphous Solid Dispersion**

Sunshine Lake's extensive stability testing data shows that, as expected, the composition and production process of its ANDA product does in fact produce apixaban which is stable in an amorphous form for at least three years. SLF ¶¶ 40, 42. Sunshine Lake conducted stability testing on its exhibit batches of its ANDA product at the time points of 0, 2-months, 3-months, 6-months, and 3 years, for a total of 40 tests. SLF ¶ 42; DTX-996.160-182. The exhibit batches are the batches which are submitted to the FDA as representative of Sunshine Lake's ANDA product. SLF ¶¶ 3, 45. Not one of Sunshine Lake's tests for its exhibit batches showed the presence of any crystalline apixaban at any point from time zero to three years. SLF ¶¶ 42, 45; DTX-996, 160-182. These tests represent the largest body of empirical data as to the physical form of apixaban in Sunshine Lake's ANDA product offered by any party or expert at trial. Plaintiffs have failed to offer any comparable body of evidence.

In addition, Sunshine Lake conducted nine tests of lab scale batches. SLF ¶¶ 42, 44. While all data collected must be reported to the FDA, lab scale batches are produced merely for research and development purposes and are not representative of the ANDA product, as exhibit batches are. SLF ¶ 44; Tr. 1104:23-1105:7 (Brittain). While the composition and production process for lab scale batches is theoretically the same as that of the exhibit batches, in practice

the lab scale batches may have less stringent production process and testing standards than exhibit batches. SLF ¶ 44. Of the lab scale batches, Plaintiffs only focuses on one outlier (a 6-month accelerated test of a 5 mg tablet) that showed some crystalline conversion. SLF ¶ 44. However, all other tests of the lab scale batches showed no crystalline conversion. SLF ¶ 44. Further, the 6-month accelerated test of the 2.5 mg lab scale batch and each of the 6-month accelerated tests of the exhibit batches, all performed under the same conditions as the 6-month accelerated test of the 5 mg tablet lab scale batch, showed no crystalline conversion. DTX-996.160-182; SLF ¶ 42. Notwithstanding Plaintiffs' arguments, a single test result of one lab scale batch showing some crystalline conversion should not be considered controlling over the 31 tests of Sunshine Lake's exhibit batches and over the 39 total tests of both the lab scale and exhibit batches which showed no crystalline conversion. DTX-996.160-182. The relevant standard is not whether one anomalous crystalline conversion is *possible* – the standard is what is what is most *likely* to happen in Sunshine Lake's ANDA product. *Glaxo, supra*. Clearly, 39 out of 40 tests tell us it is most likely that Sunshine Lake's apixaban will remain stable in amorphous form.

Plaintiffs ignore the weight of the empirical evidence to focus on acknowledged erroneous language in Sunshine Lake's ANDA suggesting that the apixaban will have a tendency to convert to crystalline apixaban. D.I. 686 at 10; SLF ¶¶ 46-47. However, as Dr. Yong Chen, the Director of the Excipient Department at Sunshine Lake, testified at trial, such statements were in error because such statements did not reflect the actual data also shown in Sunshine Lake's ANDA. SLF ¶ 47. Once Sunshine Lake became aware of the errors in its ANDA, it filed amendments in April 2019 and August 2019 which were intended to correct all of the errors. SLF ¶¶ 48-49. These amendments did successfully correct at least eight out of the approximately

nine errors. SLF ¶ 49. Despite Sunshine Lake's best attempts to correct all of the errors, Plaintiffs point to one remaining statement left in Sunshine Lake's ANDA. D.I. 686 at 10. However, one inadvertently remaining erroneous statement should not be taken as controlling over the 31 actual tests of exhibit batches, eight lab scale batches, and the successful correction of at least eight of the nine statements.

Plaintiffs additionally point to an internal presentation of an affiliate of Sunshine Lake from 2015, citing isolated statements from the presentation such as "during the stability process, amorphous apixaban will partially convert to crystalline form N" in attempt to satisfy their burden. D.I. 686 at 10; Tr. 1009:14-19 (Chen). Notably, Plaintiffs did not offer any testimony showing: whether such statements referred to bulk apixaban or to amorphous apixaban in a pharmaceutical composition; what the formulation of such a pharmaceutical composition might be; what, if any, testing data was the basis for these statements; or what stage of R&D this presentation related to. What is certain is that these statements do not refer to Sunshine Lake's ANDA product as represented by its exhibit batches or to the stability thereof, given that the presentation was dated 2015 and Sunshine Lake's exhibit batches were not manufactured until 2016. SLF ¶ 54. Accordingly, this presentation cannot be considered relevant in light of its suspect applicability to Sunshine Lake's product—which is represented by its exhibit batches.

### 3. Dr. Brittain's Testing Showed That The Apixaban In Sunshine Lake's ANDA Product Is In The Form Of A Stable Amorphous Solid Dispersion

Dr. Brittain's testing also showed that there was no crystalline apixaban present at the three-year mark in either Sunshine Lake's 2.5 mg or 5 mg apixaban tablets. SLF ¶¶ 53-56. Although Sunshine Lake did not have the burden to conduct testing in this litigation, based upon its own extensive studies showing that its apixaban was stable in amorphous form, Sunshine Lake felt confident in having Dr. Brittain conduct his own testing of its ANDA product.

Accordingly, Dr. Brittain obtained XRPD patterns for both Sunshine Lake's 2.5 mg and 5 mg apixaban tablets from its exhibit batches. SLF ¶¶ 50-51. Knowing that the apixaban in Sunshine Lake's tablets was present in a small percentage and recognizing the need to reduce noise, Dr. Brittain used a scientifically accepted method to increase the sensitivity of his XRPD testing. SLF ¶¶ 35, 51, 57. Specifically, Dr. Brittain used scan averaging—he ran multiple scans of multiple samples and then averaged the results to smooth and reduce noise in the resulting single XRPD pattern for each tablet. SLF ¶¶ 35, 51, 57.

Neither Dr. Brittain's XRPD pattern for the 2.5 mg Sunshine Lake tablet nor for the 5 mg tablet showed any peaks within $0.1°2\Theta$ of any of the six peaks identified in Table 2 of the '945 Patent for crystalline form N-1. SLF ¶¶ 53-54. The 2.5 mg and 5 mg tablets Dr. Brittain analyzed were three years old when he tested them. SLF ¶ 55. Accordingly, Dr. Brittain's testing corroborates Sunshine Lake's testing data showing that the apixaban in its exhibit batches are stable in amorphous form for up to three years. SLF ¶ 56.

Plaintiffs attempt to discredit Dr. Brittain's testing data by alleging that his testing methods were insufficiently sensitive to detect crystalline apixaban in Sunshine Lake's tablets. D.I. 686 at 11-12. However, this attempt to discredit Dr. Brittain is without basis. Plaintiffs correctly note that Dr. Brittain did not attempt to replicate Dr. Atwood's technique of using slow scans to increase sensitivity. D.I. 686 at 11. This is because Dr. Brittain had no need to. Dr. Atwood's method of using slow scans is not the only way to increase sensitivity. SLF ¶ 35. As Dr. Brittain testified, practicing scan averaging is an equally valid and effective method of increasing sensitivity to visualize weak peaks of crystalline material present in small amounts. SLF ¶¶ 35, 57. Both methods are simply different ways to decrease noise in order to more easily discern genuine peaks. SLF ¶ 35.

Plaintiffs allege that "Dr. Atwood's XRPD testing is several orders of magnitude more sensitive than Dr. Brittain's," but have failed to introduce any evidence that demonstrates this to be true. D.I. 686 at 11. Instead, Plaintiffs merely make this statement without any support. D.I. 686 at 11; SLF ¶ 59. Plaintiffs' assert that Dr. Atwood's time spent counting is "a lot bigger" than Dr. Brittain's and imply that therefore Dr. Atwood's sensitivity will be equally "a lot bigger" than Dr. Brittain's. D.I. 686 at 11. However, this theory is a false equivalency which is not supported by the available evidence. SLF ¶ 59. The advantage of scan averaging is that it allows for obtaining lower noise and higher sensitivity in a much shorter time.

For example, in obtaining his XRPD pattern of Sunshine Lake's 2.5 mg tablet, Dr. Brittain performed scan averaging and spent a total of 1.75 seconds counting at each step. SLF ¶ 59. In contrast, Dr. Atwood ran an XRPD scan of Sunshine Lake's 2.5 mg tablet with the file name "apix1" using a count time of approximately 3.5 times longer, but performed no scan averaging. SLF ¶ 78. However, Dr. Atwood's scan was not 3.5 times more sensitive, as Plaintiffs' theory would suggest. Because Dr. Brittain used scan averaging, Dr. Brittain's scan actually showed lower noise and higher sensitivity, than Dr. Atwood's "apix1" scan. SLF ¶ 59. Scan averaging and long count times are separate noise reduction techniques whose sensitivity cannot be compared by comparing the time spent counting. SLF ¶ 59.

### 4.    Dr. Atwood's Testing Failed To Identify Crystalline Apixaban In Sunshine Lake's ANDA Product

#### a.    *Dr. Atwood's Analysis Failed To Meet Industry Standards Or To Identify The N-1 Apixaban Peaks Defined In The '945 Patent*

Dr. Atwood predicated his opinion on the alleged presence of the N-1 form of crystalline apixaban. SLF ¶ 60. Dr. Atwood's own analysis of Sunshine Lake's N-1 crystalline API shows that N-1 apixaban has approximately 20-25 XRPD peaks in its "fingerprint" that could be used

for identification. SLF ¶ 61. Notwithstanding the 20-25 peaks in this "fingerprint", Dr. Atwood relied upon the alleged presence of only three peaks at 12.3, 16.9 and 27.1º2Θ in his analysis of Sunshine Lake's 2.5 mg tablet. SLF ¶ 62. Of those three peaks, 12.3º2Θ and 27.1º2Θ were listed in the '945 Patent and 16.9º2Θ was identified in the fingerprint of the crystal form N-1 of apixaban.  SLF ¶ 57; JTX-2 at Table 2. Dr. Atwood's reliance on only three peaks failed to meet the six characteristic peaks of N-1 apixaban disclosed in the '945 Patent much less the industry standard of matching 10 peaks. SLF ¶ 77.

Dr. Atwood explained his failure to even attempt to identify four out of the six characteristic peaks disclosed in the '945 Patent by asserting that they were hidden by excipient peaks. Tr. 415:9-21 (Atwood). However, Dr. Atwood did not explain what excipients these peaks might be from. Nor did he compare his XRPD patterns to patterns of a placebo or to patterns of any individual excipients unlike Sunshine Lake's process. Instead, regarding the missing N-1 peaks, Dr. Atwood "concluded they were present because crystal form N-1 was present". Tr. 405:13-19 (Atwood). This reasoning is backwards. The presence of characteristic peaks should be the evidence leading to the conclusion that a certain crystalline form is present and not the opposite – that crystalline apixaban is present and therefore, characteristic peaks are present.

> **b.** **_Dr. Atwood Failed To Identify Any Genuine Peaks Attributable To Crystalline Apixaban In The Three Angle Regions He Did Analyze_**

After running two full scans of Sunshine Lake's 2.5 mg tablet from approximately zero to 30º2Θ and failing to find any peaks that could be attributable to apixaban crystal form N-1 apixaban, Dr. Atwood then commenced running multiple scans with longer count times in limited angle regions around 16.9, 27.1, and 12.3º2Θ. Tr. 1083:12-23, 1084:4-7, 1086:10-19 (Brittain), 484:6-485:3 (Atwood); DTX-526.1, 10, 16-33, 35-55,74-76, 92-93, 97, PTX-960.2, 5, 8, 13, 16, 18, 21, 23.

Around the region of 16.9º2Θ, Dr. Atwood ran four scans having count times of 100 ("SunshineLakeg"), 200 ("apix6" and "SunshineLakeg2"), and 1000 ("apix9") seconds. SLF ¶ 65. The 16.9 region is particularly relevant because, as testified by Drs. Brittain and Atwood, the 16.9º2Θ peak is the most intense peak of apixaban crystal form N-1, and therefore represents the best chance to see a peak. SLF ¶ 61. Clearly, if only one peak of apixaban crystal form N-1 was discernable, it would be at 16.9º2Θ. However, out of the four scans shown below, Dr. Atwood purports to have identified a peak in only the 1000 second "apix9" scan. SLF ¶ 65.



As testified by Dr. Brittain, that single "peak" identified by Dr. Atwood is merely a noise spike, not a genuine peak. SLF ¶ 66. None of Dr. Atwood's scans shown above of the 16.9º2Θ region has a peak with sufficient width and height to be a genuine peak. SLF ¶ 66. More tellingly, the alleged "peak" is not reproducible and does not appear in three out of four scans. In fact, both "SunshineLakeg" and "apix6" scans show downward spikes at 16.9º2Θ. SLF ¶ 66.

Around the region of 27.1º2Θ, Dr. Atwood ran three successful scans having count times of 100 ("SunshineLakec" and "SunshineLaked"), and 1000 ("SunshineLakej") seconds. SLF

¶ 67. Out of these three scans shown below, Dr. Atwood purports to have identified a peak in only the 1000 second "SunshineLakej" scan. SLF ¶ 67.



As testified to by Dr. Brittain, again that single "peak" is a noise spike, not a genuine peak. SLF ¶ 68. As shown above, none of Dr. Atwood's two remaining scans of the 27.1º2Θ region has a peak with sufficient width and height to be a genuine peak. SLF ¶ 68. Once again, the "peak" identified by Dr. Atwood in the "SunshineLakej" scan is not reproducible and does not appear in each of the three scans, as a genuine or real peak would. SLF ¶ 68.

Dr. Atwood has found nothing but noise in the 16.9º2Θ and 27.1º2Θ angle regions. SLF ¶¶ 66-68. Because noise is random, if one runs enough scans past a certain angle location, a noise spike will eventually appear at that location. *Supra* pp. 8-9. That is what Dr. Atwood has done in these regions – he ran multiple scans of each location and then selected the scan where a noise spike appeared at the location of interest, and discarded the remaining scans where a noise spike did not appear at the correct location for it to be crystalline apixaban.

Around the region of 12.3º2Θ, as shown below, Dr. Atwood ran three scans having count times of 100 ("apix8"), 400 ("SunshineLakef"), and 1000 ("SunshineLakei") seconds. SLF ¶ 69.

Out of three scans, Dr. Atwood purports to have identified a peak in only the 1000 second "SunshineLakej" scan. SLF ¶ 69.



As shown above, admittedly, in the 12.3º2Θ region, Dr. Atwood's three scans showed a genuine peak at 12.43-12.44º2Θ. SLF ¶ 70. That is, each of Dr. Atwood's three scans of the 12.3º2Θ region has a peak with sufficient width and height to be a genuine peak, and notwithstanding the different count times of each scan, the peak is reproducible. SLF ¶ 70. Plaintiffs argue that this peak is attributable to crystalline apixaban and imply that Dr. Brittain has admitted the same. D.I. 686 at 2, 11-12. This implication is incorrect. Dr. Brittain admits the *existence* of a genuine peak at 12.43-12.44º2Θ is "indisputable", but he has testified clearly that this "indisputable" peak is not attributable to crystalline apixaban. SLF ¶ 75.

The sole genuine peak Dr. Atwood was able to identify at 12.43-12.44º2Θ is unlikely to be due to crystalline apixaban. First, there is a probable source for this peak other than crystalline apixaban. SLF ¶¶ 71, 75. The parties agree that Sunshine Lake's ANDA product contains a high amount of anhydrous lactose, which is a crystalline excipient, and anhydrous lactose tends to spontaneously convert to lactose monohydrate. SLF ¶ 72. Dr. Brittain obtained an XRPD pattern

of a sample of what he thought was anhydrous lactose, which showed a peak at about 12.45º2Θ that matches with the peak at 12.43-12.44º2Θ identified by Dr. Atwood. SLF ¶¶ 73-74. The parties agree that some of Dr. Brittain's sample of anhydrous lactose had spontaneously converted into lactose monohydrate, which is known to have a peak near 12.4º2Θ. SLF ¶ 73. Based upon Dr. Atwood's experimental procedure, Dr. Brittain testified that some of the anhydrous lactose in the tablet that Dr. Atwood tested had similarly converted into lactose monohydrate. SLF ¶ 75. Therefore, the genuine peak at 12.43-12.44º2Θ identified by Dr. Atwood is most probably due to lactose monohydrate contamination of the anhydrous lactose excipient. SLF ¶ 75.

Second, it is unlikely that the peak at 12.43-12.44º2Θ is due to crystalline apixaban in light of the fact that Dr. Atwood failed to identify peaks at 16.9º2Θ or 27.1º2Θ. The 16.9º2Θ and 27.1º2Θ peaks are the two most intense peaks in the fingerprint of apixaban crystal form N-1. SLF ¶ 61; PTX-960.26. Both are markedly more intense than the 12.3º2Θ peak. PTX-960.26. If a real apixaban peak were visible at 12.3º2Θ as suggested by Dr. Atwood, surely the more intense peaks of 16.9º2Θ and 27.1º2Θ would be not only easily discernable but even more apparent than the peak at 12.3º2Θ if the material was crystalline apixaban. The fact that the 16.9º2Θ and 27.1º2Θ peaks are absent strongly suggests that the peak at 12.43-12.44º2Θ is not due to crystalline apixaban.

\*          \*          \*

In total, Dr. Atwood conducted at least 12 tests of Sunshine Lake's 2.5 mg tablet and "cherry-picked" three of them to rely on. SLF ¶ 76. In attempt to explain why he only chose to rely on a selected minority of his XRPD scans, Dr. Atwood explained that only a 1000 second scan can be considered a sufficiently "slow scan" to identify any potential crystalline apixaban in

Sunshine Lake's formulation and that a faster scan such as a 100 second scan is insufficient. SLF ¶ 76. However, this explanation is inconsistent with Plaintiff's argument that the genuine peak in the 12.3°2Θ region is an apixaban peak. If, as Plaintiffs allege, the peak in the 12.3°2Θ region is an apixaban peak, then it cannot also be true that only a 1000 second scan can discern apixaban peaks because, as shown above, a 100 second scan and a 400 second scan of the 12.3°2Θ region showed the genuine peak just as clearly as the 1000 second scan. SLF ¶ 76. There was reducibility with respect to all three scans. SLF ¶ 70. Accordingly, Dr. Atwood would have no cogent explanation for why he discarded three of his scans at 16.9°2Θ, and two of his scans at 27.1°2Θ nor any explanation for why his discarded scans failed to show reproducible peaks at those locations. Conversely, if Dr. Atwood's explanation is correct and a 100 second scan is not long enough to be able to detect crystalline apixaban in Sunshine Lake's formulation, then the peak in the 12.3°2Θ region must be due to something other than crystalline apixaban, because it was successfully detected by a 100 second scan.

### c.     Taken In Context, Dr. Atwood's Testing Does Not Show The Presence Of N-1 Apixaban

Dr. Atwood did not attempt to find or match 10 peaks of apixaban crystal form N-1, as suggested by industry standard nor to identify or match all of the six peaks of apixaban crystal form N-1 disclosed in the '945 Patent. SLF ¶ 77. Out of the three angle regions he did analyze, Dr. Atwood was not able to identify any peaks that were indisputably attributable to crystalline apixaban. SLF ¶¶ 66, 68, 70, 71, 75.

Plaintiffs allege that a single peak should be enough because Sunshine Lake allegedly identified N-1 crystalline apixaban in its own testing by using only one peak. D.I. 686 at 9. Once again, Plaintiffs rely on an interpretation of selected information taken out of context. Sunshine Lake did not rely on the presence of a single peak *alone* to identify N-1 apixaban. SLF ¶ 43.

Rather, Sunshine Lake used a single peak in combination with previous testing that (i) established that the peak at 17.1°2Θ was the most intense peak in the fingerprint of apixaban crystal form N-1; and (ii) that no other components of the system or contaminants which could produce a peak in the 17.1°2Θ region, other than crystalline apixaban. SLF ¶ 43.

Neither of these conditions (i) or (ii) is true to support Plaintiffs' argument that Dr. Atwood's single peak identifies crystalline apixaban. First, Dr. Atwood has admitted that 12.3°2Θ is not the most intense peak in the fingerprint of apixaban form N-1. Tr. 413:21-23 (Atwood). Second, Dr. Atwood had not rigorously (or otherwise) established that there are no other components or contaminants of the 2.5 mg tablet sample he tested that could produce a peak in the vicinity of 12.3°2Θ. And given that Dr. Atwood ground a single tablet and conducted 12 tests on it over the course of approximately three months, the majority of his testing was conducted on a tablet that had been sitting in a ground state, with a large surface area exposed to the atmosphere for weeks to months of time. SLF ¶ 63. Although Dr. Atwood testified his sample was in a "sealed" vial, he admitted his normal practice is to open and close the same vial repeatedly to conduct his testing resulting in a significant potential for alteration or contamination. Tr. 450:3-451:4 (Atwood).

Dr. Atwood's limited XRPD testing is the only empirical evidence offered by the plaintiffs in support of their position. This must be viewed in light of the extensive evidence relied on Sunshine Lake in the nature of Sunshine Lake's own testing and the testing undertaken by Dr. Brittain. Taken in context of the body of evidence presented in the case, Dr. Atwood's three XRPD tests fall far short of Plaintiffs' burden.[2] SLF ¶ 78.

---

[2] On similar facts, Judge Sleet of this Court previously found Dr. Atwood's XRPD results unreliable when he attempted to rely on only a single peak present in a single scan to identify a compound in a composition, and discarded the majority of his scans which failed to show the

## V.    PLAINTIFFS HAVE NOT PROVEN THAT SUNSHINE LAKE'S ANDA PRODUCT CONTAINS CRYSTALLINE APIXABAN PARTICLES HAVING A $D_{90}$ OF LESS THAN OR EQUAL TO 89 μM

Plaintiffs' have not shown by a preponderance of the evidence that Sunshine Lake's apixaban products have a $D_{90}$ equal to or less than 89 μm. SLF ¶ 79. Plaintiffs have offered no physical or empirical evidence whatsoever to support their burden on this issue. Dr. Atwood admits that he has performed no particle size testing on Sunshine Lake's ANDA products. SLF ¶ 80. Dr. Atwood admits that he has not performed any $D_{90}$ calculations with respect to Sunshine Lake's ANDA product. SLF ¶ 80. While the Court has held that the '945 Patent does not require one particular technique of particle size measurement, the Court has never said than no particle size measurement is required at all. To the contrary, the Court noted that particle size is given particular importance in the specification and prosecution of the '945 Patent. D.I. 380 at 10-11. It would be an odd result if a claim limitation that was particularly important to patentability did not need to be rigorously established. Again, Plaintiffs' burden is to prove that every limitation is found in the accused ANDA product "exactly." *Southwall, supra*.

Instead of empirical evidence, Dr. Atwood offers only the classical models of nucleation and crystal growth in support of his theory that Sunshine Lake's ANDA products have apixaban particles with a $D_{90}$ equal to or less than 89 μm. SLF ¶ 82. However, as testified by both Drs. Brittain and Zaworotko, these models are not applicable to amorphous solid dispersions. SLF ¶ 83. Indeed, Dr. Atwood has admitted that his explanation and illustration of nucleation and crystal growth only deal with pure materials – not mixtures or amorphous dispersions. Tr. 493:20-25, 495:18-496:2 (Atwood).

---

peak in question. *Pfizer, Inc. v. Teva Pharms. U.S.A., Inc.*, 882 F.Supp.2d 643, 681 (D. Del. 2012).

Nevertheless, Dr. Atwood theorizes that nucleation of apixaban will occur in hypothetical "pockets" that form in the PVP of Sunshine Lake's tablet when the solvent is removed during the manufacturing process. Tr. 426:13-427:11 (Atwood). However, this is not the case with respect to Sunshine Lake's apixaban product. In addition to the tests of its final product, Sunshine Lake also conducted XRPD testing of its intermediates which showed no presence of crystalline apixaban – and therefore that there are no "pockets" of crystalline apixaban present at the point of dry down, contrary to Dr. Atwood's theory. DTX-996.156-157. Dr. Atwood admits that he did no actual testing, visualization, or any other confirmation of such hypothetical pockets of crystalline apixaban. SLF ¶ 81. Having assumed without evidence that nucleation will occur, Dr. Atwood then theorizes that crystal growth will be limited because PVP is a well-known crystallization inhibitor. D.I. 686 at 16-17. However, as Plaintiffs note in their brief, the record evidence is that PVP "is a well-known *nucleation* and crystallization inhibitor". D.I. 686 at 17. PVP will not only prevent crystal growth, but will also prevent nucleation so that no crystalline material is able to form at all. SLF ¶ 24. Instead, individual apixaban molecules will be kept separate and immobilized by bonding to sites on the PVP polymer. SLF ¶ 22.

This result is borne out by the 31 tests conducted on Sunshine Lake's exhibit batches, as well as Dr. Brittain's separate testing, all showing no presence of any crystalline material in Sunshine Lake's exhibit batches. SLF ¶ 45.

Plaintiffs cite *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009) to argue that they do not need to conduct any actual testing to establish the $D_{90}$ limitation, and that circumstantial evidence may suffice.[3] D.I. 686 at 17. However, *Martek* is

---

[3] While circumstantial evidence may be relied upon in some cases, this Court has previously held that Plaintiffs had not carried their burden when they offered only flawed circumstantial

distinguishable because the theoretical evidence offered by experts in that case was not directly contradicted by actual testing data. The idea that mere theory could be considered controlling when there is direct empirical evidence to the contrary flies in the face of both logic and the basic scientific method, which states that a scientific theory is only valid so long as there is no empirical evidence that disproves it. As Dr. Brittain testified, Dr. Atwood's theory could only be considered valid if there was no actual experimental data to the contrary. SLF ¶ 85.

## VI.    <u>CONCLUSION</u>

Plaintiffs have not proven by a preponderance of the evidence that Sunshine Lake's ANDA product contains crystalline apixaban particles, nor that Sunshine Lake's ANDA product contains crystalline apixaban particles having a $D_{90}$ of less than or equal to 89 µm. Sunshine Lake's therefore respectfully requests that the Court find that Sunshine Lake's 2.5 mg and 5 mg ANDA products will not infringe claims 21 and 22 of the '945 Patent.

DATED:  February 7, 2020

Of Counsel:

Paul H. Kochanski
Kendall K. Gurule
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
20 Commerce Drive
Cranford, NJ 07016
Telephone: (908) 654-5000
pkochanski@lernerdavid.com
kgurule@lernerdavid.com

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

Karen L. Pascale (#2903)
Robert M. Vrana (#5666)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Attorneys for Defendants Sunshine Lake*
*Pharma Co., Ltd. and HEC Pharm USA Inc.*

---

evidence and no direct evidence at all to show a claim limitation. *Reckitt Benckiser LLC v. Aurobindo Pharma LLC*, 239 F.Supp.3d 822, 829-33 (D. Del. 2017).

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on February 7, 2020, I caused to be

electronically filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF (which will send notification that such filing is available for viewing and

downloading to all registered counsel), and in addition caused true and correct copies of the

foregoing document to be served upon the following counsel of record in the manner indicated:

### *By E-Mail*

Joseph J. Farnan, Jr. [farnan@farnanlaw.com]
Brian E. Farnan [bfarnan@farnanlaw.com]
Michael J. Farnan [mfarnan@farnanlaw.com]
**FARNAN LLP**
919 North Market Street
12th Floor
Wilmington, DE  19801

Amy K. Wigmore [amy.wigmore@wilmerhale.com]
Gregory H. Lantier [gregory.lantier@wilmerhale.com]
Heather M. Petruzzi [heather.petruzzi@wilmerhale.com]
Christa J. Laser [christa.laser@wilmerhale.com]
Alexis Cohen [alexis.cohen@wilmerhale.com]
William G. McElwain [william.mcelwain@wilmerhale.com]
**WILMER CUTLER PICKERING HALE AND DORR LLP**
1875 Pennsylvania Ave, NW
Washington, DC 20006

Andrew J. Danford [andrew.danford@wilmerhale.com]
Timothy A. Cook [tim.cook@wilmerhale.com]
Kevin M. Yurkerwich [kevin.yurkerwich@wilmerhale.com]
Kevin S. Prussia [kevin.prussia@wilmerhale.com]
Katherine P. Kieckhafer [katherine.kieckhafer@wilmerhale.com]
Annaleigh E. Curtis (annaleigh.curtis@wilmerhale.com]
William F. Lee [william.lee@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA  02109

*WHEliquisANDAPlaintiffsServiceList@wilmerhale.com*

*Attorneys for Plaintiffs Bristol-Myers Squibb
Company and Pfizer Inc.*

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

Karen L. Pascale (#2903) [kpascale@ycst.com]
Robert M. Vrana (# 5666) [rvrana@ycst.com]
Rodney Square
1000 North King Street
Wilmington, DE 19899-0391
Telephone:  302-571-6600

*Attorneys for Defendants Sunshine Lake*
*Pharma Co., Ltd. and HEC Pharm USA Inc.*