IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

|  |  |  |
|---|---|---|
| BRISTOL-MYERS SQUIBB COMPANY AND PFIZER INC., | ) ) ) | |
| Plaintiffs and Counterclaim-Defendants, | ) ) ) | |
| v. | ) ) | C.A. No. 17-374-LPS |
| AUROBINDO PHARMA USA INC., et al., | ) ) ) | (CONSOLIDATED) |
| Defendants and Counterclaim-Plaintiffs. | ) ) ) | |

_____

## CORRECTED DEFENDANT UNICHEM LABORATORIES LTD'S RESPONSIVE POST-TRIAL BRIEF ON NON-INFRINGEMENT*

Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning

GREENBLUM & BERNSTEIN, P.L.C.

1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

*Counsel for Unichem Laboratories Ltd.*

Dated: February 7, 2020

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.

1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

\* Unichem submits this Corrected Responsive Post-Trial Brief to correct certain citations to the trial exhibits.  No substantive changes have been made

# **TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.     ARGUMENT ................................................................................................................ 2

    A.      Legal Standard .................................................................................................. 2

    B.      The Meaning of the $D_{90}$ Limitation ......................................................... 3

    C.      Plaintiffs Have Not Submitted Sufficient Reliable Evidence Establishing That The Unichem Tablet(s) Meet The $D_{90}$ Limitation ......................................... 5

        1.      Plaintiffs Did Not Calculate A $D_{90}$ Value For The Unichem Tablet(s)...... 5

        2.      The Berkland Method ................................................................. 6

        3.      Dr. Berkland's Results Were Based On A Statistically Insignificant Sample Size And Should Be Given No Weight......................................... 8

        4.      The SEM-EDS Technique Employed By Dr. Berkland Is Not Suitable For Calculating The $D_{90}$ Value ................................................. 10

        5.      Based On the State of the Art, the Berkland Method Is Unreliable And Should Be Given No Weight ........................................................ 13

        6.      Dr. Berkland Failed To  Employ Controls To Ensure His Testing Method Did Not Impact The Results ...................................................... 16

    D.      The Evidence At Trial Establishes The Unichem Tablet(s) Would Not Infringe The Asserted '945 Claims ......................................................... 19

        1.      Unichem's ANDA Requires The Apixaban Have A $D_{90}$ Above $89\mu m$ ......................................................................................... 19

        2.      Unichem's Independent Testing Confirms The Apixaban Does Not Meet The $D_{90}$ Limitation ............................................................ 21

        3.      Plaintiffs' Argument That This Testing Is Irrelevant Is Inconsistent With The '945 Patent ............................................................... 22

III.    CONCLUSION............................................................................................................ 25

## TABLE OF AUTHORITIES

**CASES**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
 314 F.3d 1313 (Fed. Cir. 2003)......................................................................................... 2

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
 257 F.3d 1364 (Fed. Cir. 2001)....................................................................................... 23

*Duncan Parking Technologies v. IPS Group, Inc.*,
 914 F.3d 1347 (Fed. Cir. 2019)....................................................................................... 23

*Eli Lilly & Co. v. Teva Pharms, USA, Inc.*,
 657 F. Supp. 2d 967 (S.D. Ind. 2009) ............................................................................... 2

*Eli Lilly v. Teva Pharms, USA, Inc.*,
 619 F.3d 1329 (Fed. Cir. 2010)......................................................................................... 2

*Glaxo Inv. v. Novopharm*,
 110 F.3d 1562 (Fed. Cir. 1997)......................................................................................... 2

*Hospira, Inc. v. Amneal Pharm., LLC*,
 285 F. Supp. 3d 776 (D. Del. 2018) ................................................................................. 2

*Markman v. Westview Instruments, Inc.*,
 517 U.S. 370 (1996)........................................................................................................... 2

*Medtronic Inc. v. Boston Sci. Corp.*,
 558 F. App'x 998 (Fed. Cir. 2014) ................................................................................... 10

*Spectrum Pharm., Inc. v. Sandoz Inc.*,
 802 F.3d 1326 (Fed. Cir. 2015)......................................................................................... 2

*Supernus Pharms., Inc. v. Twi Pharms., Inc.*,
 265 F. Supp. 3d 490 (D.N.J. 2017) ................................................................................. 19

*Trs. of Boston Univ. v. Everlight Elecs. Co.*,
 896 F.3d 1357 (Fed. Cir. 2018)....................................................................................... 10

*Vitrionics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996)......................................................................................... 23

*Zenith Lab. Inc. v. Bristol-Myers Squibb Co.*,
 19 F.3d 1418 (Fed. Cir. 1994)........................................................................................... 2

**ABBREVIATIONS**

| | |
|---|---|
| The '945 Patent | U.S. Patent No. 9,326,945 |
| ANDA | Abbreviated New Drug Application |
| API | Active pharmaceutical ingredient |
| Asserted '945 Claims | Claims 21 and 22 of U.S. Patent No. 9,326,945 |
| BMS | Plaintiff Bristol-Myers Squibb Company |
| EDS | energy dispersive x-ray spectroscopy |
| FDA | U.S. Food and Drug Administration |
| NDA | New Drug Application |
| Pfizer | Plaintiff Pfizer Inc. |
| Plaintiffs | BMS and Pfizer |
| POSA | Person of Ordinary Skill in the Art |
| PSUF | Parties' Statement of Uncontested Facts, Pretrial Order, Exhibit 1 (D.I. 672–1.) |
| SEM | Scanning Electron Microscopy |
| Unichem | Defendant Unichem Laboratories, Ltd. |
| Unichem ANDA | Unichem Anda No. 210108 |
| U-PF | Unichem's Proposed findings of Fact |

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiffs have not established infringement of the Asserted '945 Claims at least because Plaintiffs have not shown that the Unichem tablet(s) manufactured in accordance with the Unichem ANDA would meet the $D_{90}$ Limitation recited in independent Claim 12, from which both asserted Claims 21 and 22 ("the Asserted '945 Claims") depend.

Plaintiffs, who asserted only literal infringement of the Asserted '945 Claims, did not calculate the $D_{90}$ value for apixaban in the Unichem tablet(s).  Instead, Plaintiffs submit an estimate of the "particle sizes" of a statistically insignificant number of "particles" in the Unichem tablet(s), and try to use these limited measurements (and observations) as a proxy for the $D_{90}$ value recited in the Asserted '945 *Claims*.

The evidence presented by Plaintiffs should be given no weight because the method employed by Plaintiffs' expert, Dr. Cory Berkland, is not suitable for calculating the $D_{90}$ value of a particle population.  In addition to basing his conclusions on a statistically insignificant sample size, Dr. Berkland's method ("the Berkland Method") has not been shown to be reliable, as it has never before been used to "estimate" the $D_{90}$ value of an API after tableting, and it is not disclosed or reported in any publication of record.  In fact, the evidence clearly establishes that the $D_{90}$ value of an API extracted from a tablet has never been determined by any method, much less the Berkland Method.  Dr. Berkland, moreover, failed to put into place a single valid control that would demonstrate that his newly minted method did not impact the results of his analysis.

The evidence put forward by Unichem, by contrast, is based on testing done in accordance with the industry standards and the '945 Patent.  The evidence put forward by Unichem shows that the bulk apixaban used to manufacture the Unichem tablet(s) does not meet the $D_{90}$ Limitation, and thus the Unichem tablet(s) does not literally infringe the Asserted '945 Claims.

In short, when viewed as a whole, Plaintiffs have not met their burden of establishing, by a preponderance of the evidence, that the Unichem tablet(s) would infringe the Asserted '945 Claims.

## II.   ARGUMENT

### A.   Legal Standard

A patent infringement analysis involves two steps: construing the claims and then applying the construed claims to the accused product. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1324 (Fed. Cir. 2003); *Hospira, Inc. v. Amneal Pharm., LLC*, 285 F. Supp. 3d 776, 784-85 (D. Del. 2018). Application of the construed claims to the accused product is a question of fact. *See Markman*, 517 U.S. at 384.

Plaintiffs bear the burden of proving infringement by a preponderance of the evidence. *See Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1336 (Fed. Cir. 2015) (internal citation omitted). To prove infringement, "a patentee must show that every limitation of the claims asserted to be infringed is found in the accused" product. *Glaxo Inv. v. Novopharm*, 110 F.3d 1562, 1565 (Fed. Cir. 1997). "It is elementary patent law that all limitations are material," and thus the patentee "is required to establish the presence of each limitation of the asserted claims." *Id.* at 1566 (citing *Zenith Lab. Inc. v. Bristol-Myers Squibb Co.,* 19 F.3d 1418, 1423 (Fed. Cir. 1994)). While, under some circumstances, the patent need not describe every step that may be used to show infringement, the inventors must disclose sufficient information in their patent specification to comply with 35 U.S.C. §112 and show the inventors had possession of the full scope of the claim. *See Eli Lilly v. Teva Pharms, USA, Inc.*, 619 F.3d 1329, 134 (Fed. Cir. 2010) (quoting *Eli Lilly & Co. v. Teva Pharms, USA, Inc.*, 657 F. Supp. 2d 967, 1027 (S.D. Ind. 2009)). Here, Plaintiffs cannot establish a POSA viewing the '945 Patent would conclude that it

discloses, teaches or suggests even a rudimentary grasp of the idea, desire or ability to measure the particle size of an API post-tableting.  This is not a situation where the claimed concept is described and enabled and a new method has been developed to determine infringement.  Rather, in the present case, Plaintiffs attempt to ensnare a concept (post-tableted API particle size with improved *in vivo* dissolution) that was not contemplated, described or enabled by the '945 Patent.

As Plaintiffs noted at page 4 of their Opening Post-Trial Brief on Unichem Laboratories, Ltd.'s Infringement (D.I. 688) (hereinafter "Plaintiffs' Opening Unichem Brief"), whether a product infringes is "based on consideration of all the relevant evidence, including the ANDA filing, other materials submitted by the accused infringer to the FDA, and other evidence provided by the parties."  As will be shown below, evaluating all the evidence adduced at trial, Plaintiffs have failed to establish that the Unichem tablet(s) would literally infringe the Asserted '945 Claims.

### B.    The Meaning of the $D_{90}$ Limitation

The claim limitation at issue is recited in independent Claim 12, from which the Asserted '945 Claims depend, as part of the following clause: "wherein the crystalline ***apixaban particles have a $D_{90}$*** equal to or less than 89 μm." (U-PF ¶ 8; JTX-2 at 2:12-17, Claim 12 (emphasis added).)  The bolded language is referred to as the "$D_{90}$ Limitation."

The Court construed the $D_{90}$ Limitation to have its "plain and ordinary meaning" (U-PF ¶ 8; D.I. 381; PSUF 34) and, in so doing, relied on the following statement in the '945 Patent to further explain the meaning:  "$D_{90}$ of 89 μm means that ***90% of the volume of particles*** in an apixaban composition have a diameter less than 89 μm." (U-PF ¶ 8; D.I. 380 at 9-10 (emphasis added).)

The evidence establishes that the $D_{90}$ value cannot be directly measured but must be

*calculated.* (U-PF ¶ 11; Tr. 649:15-650:1 (Berkland); Tr. 1670:10-1671:12 (Myerson); Tr. 1145:11-1146:21 (Genck); Tr. 1349:16-1350:3 (Chambliss).)  As Dr. Myerson testified: "A particle is a solid that has three dimensions."  (U-PF ¶ 9; Tr. 1669:17-18 (Myerson).) Dr. Myerson explained that the $D_{90}$ value must be mathematically calculated by first measuring the diameter of the spheres in the sample, then calculating the volume of the spheres from the diameter, and finally plotting the diameters vs. the volume or cumulative weights to form a "cumulative plot" where the $D_{90}$ value (the diameter at which 90% of the volume of the particles is below) can be determined.  (U-PF ¶ 10; Tr. 1670:10-1671:12 (Myerson).)

The $D_{90}$ value of a substance is, thus, a calculated value based upon a three-dimensional volumetric measurement that is not the same as a two-dimensional "particle size" measurement, such as that offered by Plaintiffs' expert Dr. Berkland.

Plaintiffs admit that they failed to calculate the $D_{90}$ value for the apixaban particles in the Unichem tablet(s). (U-PF ¶ 22.)  Instead, Plaintiffs use Dr. Berkland's rough estimate of the two-dimensional "particle size" of a statistically insignificant number of apixaban particles as a proxy for the $D_{90}$ value.  This is folly, as the two are not the same thing at all.

The Malvern instrument used in the '945 Patent (and used by Unichem in its testing) calculates the $D_{90}$ value by recording the scattering of laser light off thousands of particles and then, using a mathematical algorithm and assuming uniformity of particle size, calculates the "equivalent spherical diameter" (a volumetric measurement) of a particle population. (U-PF ¶ 12; Tr. 1145:20-1146:15, 1177:6-12 (Genck); Tr. 649:15-650:1 (Berkland).)

The SEM-EDS employed by Dr. Berkland, on the other hand, only permits observation of a few individual particles and estimates the area (not volume) of individual particle sizes by taking a two-dimensional measurement. (U-PF ¶¶ 48-49; Tr. 646:23-647:10 (Berkland); Tr.

1177:6-17 (Genck).)  As discussed in more detail below (in Section II(D)(4)-(5)), SEM-EDS is

not suitable for determining the $D_{90}$ of an entire particle population; in fact, it is not possible to

calculate the $D_{90}$ value from SEM-EDS data alone[1] because it is not possible to obtain the

volumetric measurement required to determine the $D_{90}$.  (U-PF ¶ 50; Tr. 1177:6-12 (Genck).)

### C. Plaintiffs Have Not Submitted Sufficient Reliable Evidence Establishing That The Unichem Tablet(s) Meet The $D_{90}$ Limitation

#### 1. Plaintiffs Did Not Calculate A $D_{90}$ Value For The Unichem Tablet(s)

Despite Plaintiffs' assertion that the $D_{90}$ value can be calculated from the particle size

data of tableted API "by software or by hand" (Plaintiffs' Proposed Findings of Fact  (D.I. 389)

at 48), Plaintiffs admit that Dr. Berkland did not calculate the $D_{90}$ value of the apixaban particles

of the Unichem tablet(s)[2].  (U-PF ¶ 21.)  Accordingly, Plaintiffs lack any direct evidence to

determine whether the Unichem tablet(s) meet the $D_{90}$ Limitation of the Asserted '945 Claims.

Plaintiffs, instead, argue that, in their view, the Asserted '945 Claims do not require

Plaintiffs to establish the precise $D_{90}$ value of the Unichem tablet(s) because the claim limitation

"merely sets a threshold."  (Plaintiffs' Opening Unichem Brief at 12.)

Plaintiffs' argument misses the mark.  Plaintiffs have not provided any value that can be

used to determine whether the $D_{90}$ "threshold" recited in the Asserted '945 Claims has been met.

---

[1] There may be algorithms or software that *could be* used in limited circumstances and with varying degrees of accuracy to convert the measurements taken by SEM-EDS (if, for example, a sufficient number of particles are measured) to approximate the $D_{90}$ from particle size information. (U-PF ¶ 51; Tr. 1215:9-1216:1 (Genck); Tr. 1349:17-23, 1349:23-1350:3 (Chambliss); 1670:10-1671:12 (Myerson).)  However, here, Dr. Berkland did not employ any such algorithm, and did not convert the two-dimensional measurements into a $D_{90}$ value.  (U-PF ¶ 22; Tr. 647:12-16 (Berkland).)

[2] While Dr. Berkland did not calculate the $D_{90}$ of the bulk apixaban used to manufacture the Unichem tablets, he testified that the particle size of the bulk apixaban used to manufacture the Unichem tablet(s) is on the order of "several hundred microns" in size.  (U-PF ¶ 32; Tr. 615:22-616:2 (Berkland).)

Plaintiffs have instead only offered evidence of apixaban *particle size* taken from a very small sample of granules (68) obtained from a very small number of tablets (5).  Merely observing a statistically insignificant number of particles is not a proxy for calculating a $D_{90}$ value.  As discussed above, the two are simply not the same thing. And, as will be discussed below, the subjective evidence Plaintiffs present is unreliable because it is based on a litigation-inspired method that has not been reported or described in any journal or peer reviewed article or even used by its creator (Dr. Berkland) in any context prior to this litigation.

### 2.    The Berkland Method

Dr. Berkland created the Berkland Method solely for this litigation and without consulting the '945 Patent.  (U-PF ¶ 23; Tr. 652:1-653:1 (Berkland).)  The Berkland Method used images (overhead views) of granules that were extracted from a fractured tablet, alongside a scale bar that is used to approximate a measurement.

Generally, the Berkland Method consists of the following steps:

- Fracturing 5 finished 5 mg tablets (U-PF ¶ 34; Tr. 618:4-5; 618:8-9; 619:14-25 (Berkland));

- Using a razor blade to scrape material from the exposed core of the tablet (U-PF ¶ 34; Tr. 644:12-16 (Berkland));

- Observing granules scraped from the Unichem tablet(s) using SEM-EDS[3], some of which included apixaban particles on the surface denoted by the red coloration; (U-PF ¶ 35; Tr. 618:10-12; 619:9-12 (Berkland)); and

---

[3] SEM, or scanning electron microscopy, involves a high-powered microscope with an electron beam projected onto the surface of a sample.  (U-PF ¶ 24; Tr. 597:13-598:3 (Berkland).)  The electrons are reflected to a detector that converts the electrons into an image.  (U-PF ¶ 25; Tr. 597:13-598:3 (Berkland).) EDS can be used in conjunction with SEM to identify the presence of an atom based on its unique x-ray emission. (U-PF ¶¶ 26, 27; Tr. 598:16-599:7 (Berkland).)  The detector converts the x-ray signatures into colors to create an elemental map depicting the location of certain atoms.  (U-PF ¶ 28; Tr. 598:16-599:7 (Berkland).)

- Roughly measuring the two dimensional (e.g., length and width) size of SEM photographs of a few selected granules containing apixaban (U-PF ¶ 35; PTX-1205, page 7; Tr. 621:14-22 (Berkland).)

Dr. Berkland distinguishes the apixaban particles in the Unichem tablet(s) from the excipients (i.e., primarily lactose anhydrous, microcrystalline cellulose and croscarmellose sodium) by "nitrogen atoms," which are not contained in any of the excipients. (U-PF ¶ 30; Tr. 617:13-18 (Berkland).)  Each apixaban molecule has 5 nitrogen atoms. (U-PF ¶ 29.)

It should be noted, however, that when viewing the apixaban particle map (based on the nitrogen signature), it is not possible to determine the identity of the non-apixaban particles that are being observed because the maps generated by Dr. Berkland only show one atomic signature at a time.  (U-PF ¶ 28; PTX-1205 at 7; PTX-1222 at 11.)

Before performing the Berkland Method on the 5 Unichem tablet(s), Dr. Berkland used SEM to measure the two-dimensional particle size of the bulk apixaban (pre-tableting) and concluded that the apixaban has a particle size on the order of "several hundred microns." (U-PF ¶ 32; Tr. 615:22-616:2 (Berkland).)  Dr. Berkland also testified that he estimated the particle size of the excipients (pre-formulation) and that he believed they all had two dimensional particle sizes of around 100 microns.  (U-PF ¶ 33; Tr. 617:13-18 (Berkland).)

Dr. Berkland certainly did not create either SEM or SEM-EDS.  Both were known microscopy methods as of the filing date of the '945 Patent.  (U-PF ¶ 46.)  However, the evidence at trial definitively establishes that neither SEM nor SEM-EDS was known or used by a POSA[4] (as of the filing date of the '945 Patent or even now) to "estimate" or otherwise attempt to determine a $D_{90}$ value of tableted API particles. (U-PF ¶ 47.)  In fact, as noted above, Dr.

---

[4] The Parties have proposed definitions for a POSA and their respective experts testified that their opinions would not change under either Party's definition. (D-PF ¶ 160; PSUF ¶¶ 31-33.)

Berkland did not even attempt to calculate the $D_{90}$ value of the apixaban particles in the Unichem tablet(s).

The Berkland Method, as used in this case, suffers from numerous defects which, taken as a whole, make Dr. Berkland's conclusions unreliable.  Dr. Berkland based his conclusions on a statistically insignificant sample size; the SEM-EDS technology is not suitable for calculating the $D_{90}$ value because it does not provide a three-dimensional volumetric measurement; SEM-EDS has never before been used to calculate (or even estimate, as was done here) the $D_{90}$ value of API that has been liberated from a tablet; and Dr. Berkland employed no controls to ensure that the Berkland Method did not impact the results.

Each of these defects is discussed in detail below.

### 3.   Dr. Berkland's Results Were Based On A Statistically Insignificant Sample Size And Should Be Given No Weight

The Berkland Method is not a quantitative analysis or a true scientific analysis in any sense.  To obtain reliable results and data to calculate a reliable particle size distribution, one must determine and measure a statistically significant number of particles in the discrete sample. (U-PF ¶ 36; PTX-394 at BMSAPIXE_0001805 (under "Critical Points:" "A sufficient number of particles should be considered.")  Dr. Berkland did not do this.

Rather, Dr. Berkland only tested five Unichem tablet(s), all of which were 5 mg tablets and none of which were 2.5 mg tablets. (U-PF ¶ 37; Tr. 653:8-18 (Berkland).)  From these five tablets, Dr. Berkland viewed only 68 granules (U-PF ¶ 38; Tr. 653:20-24 (Berkland).)  Of these 68 granules, only 57 or 58 (about 85%) included any apixaban particles at all. (U-PF ¶ 38; Tr. 620:5-11 (Berkland).)

The unrebutted trial testimony is that testing only 5 tablets out of three batches is "a very, very small, percentage-wise" number and looking at only 68 granules "is the same.  It's

statistically insignificant."  (U-PF ¶ 39; Tr. 1177:23-1178:5 (Genck).)  Dr. Berkland had no

basis, in fact or the literature, for believing that 68 granules would be a statistically significant

number and he cited to nothing to support this judgment, other than circular reasoning based on

his limited observations.  (U-PF ¶ 40; Tr. 657:12-25 (Berkland).)

      With respect to the number of particles observed (not even measured), Dr. Berkland did

not provide an estimate of how many apixaban particles are in a single 5 mg tablet or even how

many granules might be in a Unichem tablet. (U-PF ¶ 41; Tr. 653:25-654:6 (Berkland).)  Dr.

Berkland does not even have a reasonable idea of how many apixaban particles were on the

surface of the limited granules he observed, testifying that "[t]he the number of apixaban

particles on a single granule was dozens, if not hundreds, of apixaban particles on one granule."

(U-PF ¶ 42; Tr. 620:12-16 (Berkland).)

      Without knowing how many apixaban particles might be in a single tablet (or even a

single granule), it is not possible to understand whether a "statistically significant" number have

been observed, much less measured.  For this reason alone, Dr. Berkland's conclusions are

unreliable.

      The SEM-EDS of the Berkland Method, moreover, did not permit Dr. Berkland to view

any apixaban particles that may be below the surface of the granules because SEM-EDS cannot

detect subsurface apixaban particles. (U-PF ¶ 43; Tr. 1180:17-1181:5 (Genck); Tr. 618:17-21

(Berkland).)  Based on the manufacturing process described in the Unichem ANDA, Dr. Genck

testified that Dr. Berkland's assumption that all the apixaban particles are distributed on the

surface of the granule(s) is incorrect. (U-PF ¶ 44; Tr. 1179:1-11 (Genck).)  Dr. Genck testified

that at least three steps of the Unichem manufacturing process are likely to lead to subsurface

apixaban particles, including (i) adding water which dissolves the lactose and would bring

apixaban into the granule bed; (ii) adding 15% extra granular material on top of the granules which would obscure the apixaban; and (iii) compressing the granules into a tablet.  (U-PF ¶ 45; Tr. 1179:12-1180:16 (Genck).)

Taken as a whole, Dr. Berkland has failed to analyze a statistically significant number of apixaban particles, and has, moreover, made incorrect assumptions about the location of the apixaban particles.  He cannot by fiat take these minimal observations and convert them into an "estimate" of what is acknowledged to be a ***calculated*** value.

An expert's opinion is required to be supported by fact and not merely conclusory statements. *Medtronic Inc. v. Boston Sci. Corp.*, 558 F. App'x 998, 1000 (Fed. Cir. 2014) ("The district court correctly noted that conclusory statements are insufficient to support a verdict finding infringement under the doctrine of equivalents . . . ."); *Trs. of Boston Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1363 (Fed. Cir. 2018).

### 4. The SEM-EDS Technique Employed By Dr. Berkland Is Not Suitable For Calculating The $D_{90}$ Value

Dr. Berkland employed SEM-EDS microscopy, which is understood by those in the art to be "a counting" technique used to view and measure individual particles in two dimensions, as opposed to providing necessary volumetric particle size data to calculate the $D_{90}$ value.  Further, microscopy techniques are well-known to be prone to user error and bias.  Indeed, the evidence at trial established that there are several limitations associated with the use of microscopy methods, which come into play in situations where, as here, the subjective, qualitative observations are being used as a proxy for a mathematical, calculated parameter.

Both Dr. Genck and Dr. Berkland relied on the 2009 book titled *Particle Size Measurements* by Henk G. Merkus ("Merkus") (DTX-343; DTX-421, PTX-394[5]) for their respective reports and opinions, making it clear that a POSA would have been aware of Merkus in the 2010-2011 timeframe.  (U-PF ¶ 52; Tr. 1181:6-18 (Genck); Tr. 605:15-23, 660:9-19 (Berkland).)  Dr. Genck testified that Merkus categorizes the SEM method as a "counting" or "fingerprint" technique, limited to "picking out each particle and very few particles at a time in order to get a fingerprint" or particle size, but not to provide a volumetric measurement.  (U-PF ¶ 53; Tr. 1183:1-9 (Genck); PTX-394 at BMSAPIXE_0001784-85.)

Merkus distinguishes these "counting" methods (such as the SEM method) from "particle ensemble" methods, which includes the laser light scattering method employed by the Malvern laser light scattering instrument used by Dr. Genck and Unichem in calculating the $D_{90}$ of the apixaban. (U-PF ¶ 55; PTX-394 at BMSAPIXE_0001784-85; Tr. 1181:19-25, 1183:10-1184:9 (Genck).)  The particle ensemble methods, such as laser light scattering, generate "both size and quantity information" and the "quantity information of the PSD [particle size distribution] is volume based."  (U-PF ¶ 56; PTX-394 at BMSAPIXE_0001786.)

Dr. Berkland acknowledges that Merkus makes clear that the "counting" techniques, such as SEM, have serious drawbacks if used for any type of particle size distribution determination, acknowledging that Merkus states with respect to the SEM technique that he used:

> For determination of **particle size distribution**, there is a **strong limitation to the width of the distribution**.  This is due to the fact that only a limited number of  particles is allowed in a field of view to avoid overlapping particles, that only

---

[5] Different chapters of the textbook Merkus were submitted under different Exhibit numbers. DTX-343 is Chapter 6 of Merkus; PTX-394 and DTX-421 both include Chapters 2, 4, 6, 7 and 10.  DTX 421 was not entered into evidence and so, for convenience, all citations to Merkus will be to PTX-394.

a limited range of sizes can be measured at a single magnification at reasonable precision, and that typically only a few hundred particles are being measured.

(U-PF ¶ 57; Tr. 660:1-21 (Berkland); PTX-394 at BMSAPIXE_0001843)(emphasis added).)

Dr. Berkland also relied on a chapter by Zian-Ming Zeng, titled *Particulate Analysis-Particle Size, in Solid State Characterization of Pharmaceuticals* (1st Ed. 2011) ("Zeng") which addresses the analysis of pharmaceutical particles. (U-PF ¶ 58; Tr. 608:23-8 (Berkland); PTX-412). Zeng indicates that, even when used for measuring particle size, microscopy methods have limitations: "However, there are a number of limitations associated with the use of microscopy for measuring particle size. First, microscopy is a subjective measure that is prone to observer bias and error." (U-PF ¶ 59; Tr. 662:9-663:16 (Berkland); PTX-412 at BMSAPIXE_0002547.)

Zeng suggests that the error injected by observer bias and subjectivity might be remedied by employing "automatic image analysis techniques." (U-PF ¶ 60; PTX-412 at BMXAPIXE_0002547; Tr. 663:21-664:2 (Berkland).) However, Dr. Berkland admitted that he did not employ any such automatic image or analysis techniques in the context of his SEM-EDS analysis when determining the particle size of the apixaban observed on the surface of the granules. (U-PF ¶ 61; Tr. 664:8-10 (Berkland).)

Even had Dr. Berkland employed such methods, however, merely determining the particle size of a few particles is not the same as determining the $D_{90}$ value of a particle population. As discussed above in Section II(A), these two are different concepts.

In fact, it is not possible to calculate the $D_{90}$ value from using SEM-EDS *alone* because it is not possible to obtain the volumetric measurement required to calculate the $D_{90}$. (U-PF ¶ 50; Tr. 1177:6-12 (Genck).) SEM-EDS, as Dr. Berkland admits, creates "a picture on a screen or page so it was in two dimensions" and not a three-dimensional volumetric measurement. (U-PF ¶ 49; Tr. 646:23-647:10 (Berkland).) While it may be theoretically possible to combine such

– 12 –

two-dimensional particle size information with algorithms or software to approximate a $D_{90}$ value, (U-PF ¶ 51), Dr. Berkland did not employ any such method and he did not calculate a $D_{90}$. (U-PF ¶¶ 21, 22, 61).

### 5. Based On the State of the Art, the Berkland Method Is Unreliable And Should Be Given No Weight

The Berkland Method is not generally accepted in the scientific community.  In fact, this method is wholly unknown to the scientific community for any such purpose.  Neither the Berkland Method, nor the use of the Berkland Method, has ever been published in an article or journal wherein the $D_{90}$ of a tableted API has been calculated (or estimated).  This is to be expected, given, as discussed above, the inappropriateness of using SEM-EDS to determine volumetric measurements, such as the $D_{90}$ of a particle population.

This is further expected given that, as was established at trial, the prior art simply does not teach or suggest ***any method*** for determining the $D_{90}$ of an API ***after it has been tableted*** – much less the use of SEM-EDS.  (U-PF ¶¶ 64-65; Tr. 1941:6-11, 17-24 (Plaintiffs' Closing).) Experts for both Plaintiffs and Unichem testified that they were unaware of a single publication or example available at the time of the invention (or even today) where the particle size of the API was measured and $D_{90}$ determined after the API was formulated into a tablet. For example, Dr. Myerson testified:

> Q.   We discussed a number of publications, and I do believe we're in agreement, but would you agree with me that none of the documents that you discussed today [or] were cited in your expert report determined the $D_{90}$ of an API in a finished dosage form?

> A.   That's correct.

(U-PF ¶ 66; Tr. 1746:22-1747:2 (Myerson).)  Dr. Genck testified:

> Q.   Are you aware of any reports in the literature of measuring the $D_{90}$ equivalent spherical volume of an active pharmaceutical ingredient that had already

been formulated into a tablet?

A.     No, I'm not. I certainly was not aware of one in the 2010/2011 timeframe and I'm not aware of one today.

(U-PF ¶ 67; Tr. 1178:20-25 (Genck).) Similarly, Dr. Chambliss testified:

Q.     Are you aware of any situation where the $D_{90}$ of an API after tableting was determined?

A. Never, in 30-something years in this business, I've never heard of that being done.

Q. Thank you. Are you aware of any literature or peer-reviewed publications teaching how to determine the $D_{90}$ of an API after being formulated into a finished composition?

A. No, I'm aware of none.

(U-PF ¶ 68; Tr. 1339:19-1340:2 (Chambliss).)

In fact, Dr. Berkland, whose credentials far exceed a POSA, admitted that, before this litigation, he had never attempted to estimate or otherwise determine the $D_{90}$ of an API post-formulation, using the Berkland Method or any other method. (U-PF ¶ 69; Tr. 651:13-17 (Berkland).)  Of course, even in this case, Dr. Berkland did not use the Berkland Method to calculate the $D_{90}$ value of the apixaban in the Unichem tablet(s). (U-PF ¶¶ 21, 22; Tr. 629:6-9 (Berkland ).)

Certainly, Plaintiffs cannot, and do not, dispute that no knowledge existed in the prior art regarding the use of SEM-EDS to determine the $D_{90}$ of an API after tableting.  (U-PF ¶¶ 64-70.) While Dr. Berkland may have used some techniques that were individually known, he combined them (in 2019 no less, not in 2010) in a way that was not contemplated by the prior art or a POSA, not shown to be scientifically accepted and certainly not disclosed in the '945 Patent.  (U-PF ¶¶ 64-72; 97.)

While, as noted above, SEM-EDS microscopy was a known tool, it was not known by a POSA for determining the $D_{90}$ of tableted API particles. (U-PF ¶¶ ; Tr. 1178:6-19 (Genck).)  As

Dr. Genck testified:

> Q.      Was the use of SEM-EDS generally known to those of skill in the art in 2010?
>
> A.      Yes, it was, but for different applications.
>
> Q.      What types of applications would it have been used for?
>
> A.      For example, one of which is simply looking to particle shape. That you could do if you kind of want to get a feel for porosity. In other words, how are the particles held together, is there a void volume there? You could get that. And then if you want to use the EDS capabilities, you could do a little bit of issuing measurement in terms of chemical analysis, but nothing to do with the volume of particles.

(U-PF ¶ 71; Tr. 1178:6-19 (Genck).)

The state of the art describing SEM-EDS and other microscopy methods establishes these techniques were not known for (or capable of) determining the $D_{90}$ of tableted API. (U-PF ¶¶ 64-72; PTX-394 at BMSAPIXE_0001784-86 (Merkus).)  Rather, SEM-EDS visually observes and permits a particle size to be determined by measuring either a single dimension (length) or two dimensions (width and length), but not volume, which is a three-dimensional measurement. (U-PF ¶ 73; PTX-394 at BMSAPIXE_0001784-86 (Merkus).)

To attempt to dispel the clear state of the art, Plaintiffs point to a single 2008 article titled "Supercritical Fluid assisted production of HPMC composite microparticles", E. Reverchon, J. of Supercritical Fluids 46 (2008) at 185-196 ("Reverchon," PTX-402).  Dr. Berkland relies on Reverchon as teaching how to determine a $D_{90}$ value of an API after tableting using microscopy. However, Reverchon provides a $D_{90}$ value using SEM in a far different context than what Dr. Berkland has done via the Berkland Method.  Importantly, Reverchon did not determine the $D_{90}$ value of an API after it was formulated into a finished dosage form (i.e., tablet/capsule).  In fact, Reverchon did not determine the $D_{90}$ value of an API at all – only a powder pre-formulation mixture of two distinct powdered substances.

– 15 –

Reverchon did not use SEM-EDS to calculate a $D_{90}$ of an API after the API had been tableted or encapsulated.  (U-PF ¶ 77; PTX-402).  Rather, Reverchon used SEM, along with laser light scattering, to estimate the $D_{90}$ of a coprecipitated *mixture* of powder API (ampicillin) and powder excipient (hydroxypropyl methylcellulose or "HPMC") *before (not after) the mixture was formulated into a solid dosage form* (i.e., either tableted or placed into a capsule).  (U-PF ¶ 78; PTX-402 at 187)(describing first the analysis of the mixture of powders and then the drug release studies after the HPMC and AMP had been formulated into tablets and gelatin capsules).

Moreover, Reverchon did not use SEM-EDS to determine a $D_{90}$ value, as the EDS was used only in conjunction with mapping the location of the API in the powdered mixture of API plus the HPMC.  (PTX-402 at 191-192).  The $D_{90}$ estimates provided used only SEM and did not distinguish between the API and the HPMC.  (Tr. 666:8-16 (Berkland); PTX-402 at 189).

Further, Reverchon used SEM primarily to qualitatively verify the uniformity of the HPMC-ampicillin powder (before the ingredients were incorporated into a tablet or capsule) (U-PF ¶ 74; Tr. 666:8-14 (Berkland); PTX-402 at 185) or to qualitatively check the shape of the HPMC/API particles.  (U-PF ¶ 75; PTX-402 at 188-189 (Section 3.1.2 HPMC micronization (describing the use of SEM images to show "a qualitative evaluation of the increase in particle size …."))

Accordingly, Reverchon does not teach a POSA, in the 2010-2011 timeframe (or even today), that SEM-EDS could be used to calculate a $D_{90}$ value of an API after it was tableted. At most, Reverchon shows that a $D_{90}$ value could, in very limited circumstances, indicate some confirmatory $D_{90}$ values in uniform powdered substances *prior to tableting*.

### 6.   Dr. Berkland Failed To  Employ Controls To Ensure His Testing Method Did Not Impact The Results

Despite Dr. Berkland proposing a litigation inspired method that had never before been

used by him or anyone else, he failed to employ a single valid control to ensure that the Berkland Method did not impact the particle size of the particles he observed on the surface of the granules.  (U-PF ¶ 89; Tr. 1761:12-22(Myerson).)  The use of valid controls is essential in obtaining reliable results.  (U-PF ¶ 81; PTX-394 at BMSAPIXE_0001836 ("Good practice requires: … validated measurement procedure (SOP).").)

Plaintiffs argue that Dr. Berkland ran a number of controls, but none of the steps Dr. Berkland took when performing the Berkland Method provide a basis for concluding that the various steps of the Berkland Method did not impact the results.

First, Plaintiffs note that Dr. Berkland tested Unichem's bulk apixaban and concluded that the nitrogen was uniformly distributed across the apixaban particle (U-PF 82), and that the particle size of the apixaban before being formulated was on the level of "several hundred microns." (Plaintiffs' Opening Unichem Brief at 8-9; U-PF ¶ 32; Tr. 615, 22-616:2 (Berkland).) Plaintiffs do not articulate how this could possibly serve as a control to determine whether the Dr. Berkland Method impacts the results he obtained.

Dr. Berkland also testified that one control he used to show his method did not impact the particle size results was to "compare the particle size compressed into the tablet to the particle size of the excipients that come back out of the tablet."  (U-PF ¶ 84; Tr. 668:2-22 (Berkland).) Even if this were an appropriate control (and there is no evidence it is), Dr. Berkland did not make this comparison.  Dr. Berkland could not make this comparison because, when viewing the "red" apixaban map, he could not identify which of the three excipients the non-apixaban particles on the granule surface might be. (U-PF ¶ 28; PTX-1205 at 7; PTX-1222 at 11).

Instead, Dr. Berkland compared the particle size of the excipients prior to formulation (i.e., lactose anhydrous, microcrystalline cellulose and croscarmellose sodium), with the size of

the granules he sliced out of the tablets – which included (presumably) all three excipients along

with apixaban.  (U-PF ¶ 84; Tr. 618:22-619:8 (Berkland).)  He qualitatively observed that the

excipients (pre-formulation) were about 100 microns.  (U-PF ¶ 85; Tr. 617:13-18 (Berkland).)

Dr. Berkland then testified that the granules he sliced from the tablet were "consistent with the

size of the excipients that were used in the starting formulation" which told him that he "hadn't

somehow adulterated the sample."  (U-PF ¶ 86; Tr. 617:23-618:8 (Berkland).)  Neither Dr.

Berkland nor Plaintiffs offer any explanation as to why this would serve as a control to determine

whether the Berkland Method impacts the apixaban particle size.

Finally, Dr. Berkland also testified that, if he did something "to adulterate the particle

size in some way," he assumed it would "be evident in" his analysis.  (U-PF ¶ 88; Tr. 668:9-22

(Berkland).) This is not a control, but an assumption.  And this is the exact reason controls must

be included in testing protocols – to ensure the testing protocol does not unexpectedly impact the

size of the particle in some manner.  (PTX-394 at BMSAPIXE_0001840 (for microscopy,

"sample preparation is critical for obtaining optimum results…").)

The truth of the matter is that, notwithstanding Dr. Berkland's equivocations, and

Plaintiffs' arguments, Dr. Berkland did not employ a single control that would gauge the impact

that his litigation-inspired method would have on his observed results.  Plaintiffs' expert, Dr.

Myerson, acknowledged this at trial:

> Q.     Okay. And Dr. Berkland did not do any control testing to ensure that his testing
> methodology did not impact the size of the apixaban API particles that he was liberating
> from the Unichem ANDA products; is that correct?
>
> A.     Right. I would modify, he was liberating granules from the ANDA products and
> then looking at those. With that caveat, I will agree with you.
>
> Q. So it is correct that he did not perform any controls to ensure that his testing
> methodology did not impact the size of the API particles?

A. That's correct.

(U-PF ¶ 89; Tr. 1761:12-22 (Myerson).)

Dr. Berkland's testimony should be given little if any weight due to his failure to include reasonable controls. *Supernus Pharms., Inc. v. Twi Pharms., Inc.,* 265 F. Supp. 3d 490, 513 (D.N.J. 2017) (refusing to credit Dr. Berkland's testimony in part because: "More perplexingly, Dr. Berkland did not prepare any control TEM images of solutions with known solid oxcarbazepine to confirm that the TEM images of the filtered solutions actually displayed undissolved oxcarbazepine.").

### D.     The Evidence At Trial Establishes The Unichem Tablet(s) Would Not Infringe The Asserted '945 Claims

Unichem submitted substantial evidence of non-infringement, including (i) the specification contained in Unichem's ANDA, which requires the $D_{90}$ of the apixaban particles to be between 150 and 10000 microns; and (ii) independent testing of the apixaban particles which confirmed the $D_{90}$ value to be well over the claimed 89 microns or less.

### 1.     Unichem's ANDA Requires Apixaban To Have A $D_{90}$ Above 89μm

The Unichem ANDA specifies that the apixaban particles must have a $D_{90}$ value between 150-1000 microns. As Dr. Genck testified at trial, Unichem's ANDA includes a specification for particle size distribution and, as part of that specification, requires the $D_{90}$ of apixaban to be between 150-1000 microns. (U-PF ¶ 90; Tr. 1165:2-12 (Genck); DTX-942.00003-4 (August 24, 2018 Complete Response Amendment).)

As Dr. Genck testified, and as is shown in the below chart from Unichem's ANDA, the Unichem tablet(s) are made from bulk apixaban having a $D_{90}$ value ranging from 416.333 microns to 509.377 microns[6].  (U-PF ¶ 92; Tr. 1165:19-1166:4 (Genck); DTX-942.00004.)

**Apixaban Tablets, 2.5 mg & 5 mg**
**Applicant: Unichem Laboratories Limited**

| Limits | Drug Substance Batch # & Results | | |
|---|---|---|---|
| | 2010002629 | 2010002630 | 2010002631 |
| D90: Between 150 to 1000 micron | 416.333 | 509.377 | 90.445 |

The Unichem ANDA, moreover, specifies the technique to determine the $D_{90}$ of the apixaban, which includes the conditions and parameters for carrying out the testing using the Malvern Mastersizer laser light scattering instrument. (U-PF ¶ 93; Tr. 1167:14-1168:13 (Genck); DTX-943.00005).)

The methodology described in the Unichem ANDA for determining the $D_{90}$ value of the apixaban was very typical of what one of ordinary skill in the art would have expected.  (U-PF ¶¶ 94-95; DTX-943.00005; Tr. 1167:14-1168:13, 1168:14-24 (Genck).)  Further, the use of laser light scattering to determine the $D_{90}$ of a particle population of bulk API is standard in the pharmaceutical industry.  (U-PF ¶ 96; Tr. 1145:11-19 (Genck); Tr. 1339:5-14 (Chambliss).)

Using the Malvern instrument to determine the $D_{90}$ of apixaban pre-tableting is, moreover, the only method described in the '945 patent. (U-PF ¶ 97; Tr. 1146:24-1147:5, 1152:8-18, 1153:4-12 (Genck); Tr. 643:11-15, Tr. 641:6-10 (Berkland); Tr. 1338:15-1339:10 (Chambliss).)  And, moreover, laser light scattering was the only method employed by the

---

[6] Dr. Genck testified at trial that the $D_{90}$ value for Batch No. 2010002631 should read "**4**90.445) as opposed to "90.445" based on the Certificate of Analysis provided in Unichem's ANDA.  (U-PF ¶ 93; Tr. 1166:5-1167:9 (Genck); DTX-946-00013) (showing the $D_{90}$ value for SAP Batch No. 2010002631 to be 490.445 microns).

named inventors of the '945 Patent, as Plaintiffs' Rule 30(b)(6) and named inventor Dr. Patel testified.  (U-PF ¶¶ 98-100; Tr. 1127:15-1129:2 (Patel).)

Unichem is, of course, required to make its tablets in accordance with its ANDA. (U-PF ¶ 101; Tr. 1164:1-6 (Genck).)  Taking all of these factors into account, the Unichem ANDA and expert testimony provide relevant and persuasive evidence that the Unichem tablet(s) do not meet the $D_{90}$ Limitation of the Asserted '945 Claims. (U-PF ¶ 102; Tr. 1169:5-1170:1 (Genck).)

### 2.      Unichem's Independent Tests Confirm The $D_{90}$ Limitation Is Not Met

Unichem's expert Dr. Genck also had an independent laboratory, Particle Technologies Laboratories determine the $D_{90}$ value of a sample[7] of Unichem bulk apixaban batch 2010002631. (U-PF ¶ 103; Tr. 1170:2-7, 1170:22-1171:10 (Genck).)  The testing employed a Malvern Mastersizer 2000 instrument (liquid dispersion) using essentially the same parameters and conditions set forth in the Unichem ANDA (which details were lacking in the '945 Patent). (U-PF ¶ 105; Tr. 1170:8-21 (Genck); DTX-00545.)

Particle Technology Laboratories provided a Lab Report, the results of which are reproduced below.

PARTICLE SIZE DATA SUMMARY

| SAMPLE ID | CUMULATIVE VOLUME % LESS THAN INDICATED SIZE | | | SAMPLE MASS (g) | OBSCURATION % |
|---|---|---|---|---|---|
| | D[v,0.10](µm) | D[v,0.50](µm) | D[v,0.90](µm) | | |
| Apixaban | | | | | |
| SAP Batch 2010002631 | 40.36 | 155.19 | 321.38 | 0.5349 | 7.23 |
| SAP Batch 2010002631 | 38.55 | 154.74 | 321.64 | 1.0448 | 13.65 |

(U-PF ¶ 106; DTX-546.)

---

[7] Dr. Genck testified regarding the appropriate manner in which he obtained and maintained the sample of apixaban as well as inspected the Malvern instrument and ensured the technicians understood the standard protocol.  (U-PF ¶ 104; Tr. 1171:14-1173:7 (Genck).)

As Dr. Genck testified, the $D_{90}$ value obtained from this independent testing showed a $D_{90}$ of approximately 321[8] microns, which falls well outside the scope of the $D_{90}$ Limitation.  (U-PF ¶ 107; DTX-546-00002; Tr. 1175:6-16 (Genck).)

### 3.    Plaintiffs' Argument That This Testing Is Irrelevant Is Inconsistent With The '945 Patent

Plaintiffs do not dispute the validity of the underlying evidence, only its relevance. Plaintiffs argue Unichem's evidence of non-infringement is not relevant based on Unichem's manufacturing process and the fact that Unichem is not aware of the particle size of the apixaban in the tablet.  (Plaintiffs' Opening Unichem Brief  at 15-16.)  Plaintiffs' position is not consistent with the Court's construction of the $D_{90}$ Limitation or the '945 Patent.

Plaintiffs' position contradicts the Court's claim construction because the Court certainly did not exclude the type of testing expressly disclosed by the '945 Patent, performed by Dr. Genck and specified in Unichem's ANDA.  (U-PF ¶¶ 13-15).  Rather, in construing the $D_{90}$ Limitation, the Court indicated that the claim language did not limit the point at which the $D_{90}$ value of the apixaban should be measured or specify the way in which the $D_{90}$ must be calculated, noting that: "The claims are silent as to a method of measurement."  (U-PF ¶ 14, D.I. 380 at 10).

Certainly, the $D_{90}$ Limitation encompasses determining the $D_{90}$ of the apixaban particles before tableting,[9] given that the '945 Patent *only describes and discloses* determining the $D_{90}$ of

---

[8] Dr. Genck explained that the differences in the $D_{90}$ values reported in the Unichem ANDA and his Report are not unusual. (U-PF ¶ 108; Tr. 1217:1-16 (Genck).)

[9] Dr. Berkland applied an improper claim construction in rendering his opinions, given his opinion that the $D_{90}$ Limitation was limited to *only* determining the $D_{90}$ of apixaban after incorporation into a finished dosage form. (U-PF ¶ 16; Tr. 637:24-639:24 (Berkland).)  This is contrary to the plain and ordinary meaning.  (U-PF ¶¶ 13-15).

bulk apixaban particles using laser light scattering.  (Tr. 1150:5-18, 1146:24-1147:5, 1152:8-18, 1153:4-12 (Genck); Tr. 643:11-15, 641:6-10 (Berkland); Tr. 1338:20-24, 1339:11-14 (Chambliss).)  It is rarely appropriate to eliminate the preferred embodiment from the claim scope.  *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001); *Duncan Parking Technologies v. IPS Group, Inc.,* 914 F.3d 1347, 1364 (Fed. Cir. 2019) ("a claim construction that excludes the preferred embodiment is 'rarely, if ever, correct and would require highly persuasive evidentiary support.'")(quoting *Vitrionics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584 (Fed. Cir. 1996)).

Plaintiffs' position is inconsistent with the '945 Patent because the '945 Patent ties only the $D_{90}$ of the bulk apixaban with the improved *in vivo* dissolution of the tableted apixaban – even though the $D_{90}$ of the tableted apixaban is not known or knowable based on the manufacturing process to make the tablet.  (U-PF ¶¶ 109-113).  The '945 Patent teaches a POSA that the inventors regarded the $D_{90}$ of the ***bulk apixaban particles*** to be critical in improving the *in vivo* dissolution of the ***apixaban formulated in a tablet***. (U-PF ¶ 109; JTX-2 at 1:64-2:3, 1:56-60, 2:53-54, 9:29-32; Tr. 1154:23-1155:10, 1157:8-11 (Genck); Tr. 1746:16-21 (Myerson).)

In fact, the '945 Patent indicates that using bulk apixaban particles having a $D_{90}$ of less than 89 µm "surprisingly and unexpectedly" led to "consistent *in-vivo* dissolution in humans" of the tablets made therefrom.  (JTX-2, 1:64-2:5; Tr. 1715:5:12 (Myerson).)  The fact is that the relationship between the bulk apixaban $D_{90}$ and the *in vivo* dissolution is not surprising or unexpected.  (U-PF ¶ 111; Tr. 1333:10-1335:6 (Chambliss).)  However, the parties cannot dispute that the '945 Patent ties the $D_{90}$ value of the pre-tableted apixaban with the performance of the tableted apixaban *in vivo.*  (U-PF¶ 109).

And yet, the particle size (as well as the $D_{90}$) of the apixaban in the tablets of the '945 Patent is not known or knowable by a POSA based on the wet and dry granulation manufacturing processes disclosed in the '945 Patent.  (U-PF ¶ 112; Tr. 1340:5-1343:2 (Chambliss); DTX-370; Tr. 1749:15-1750:4 (Myerson); Tr. 1157:12-1158:2 (Genck).)  These manufacturing processes will surely impact the particle size, and the $D_{90,}$ of the bulk apixaban particles and a POSA would not be able to predict with any certainty the resulting size or $D_{90}$ of the tableted apixaban.  (U-PF ¶ 114; Tr. 1153:13-22, 1157:12-18, 1152:8-18 (Genck); Tr. 1342:20-1343:1 (Chambliss).)  That is, even knowing both the $D_{90}$ of the bulk apixaban drug substance, and the manufacturing processes used to make the tablet as described in the '945 Patent, a POSA would have insufficient information to determine (in 2010 or even today) the $D_{90}$ of the tableted apixaban.[10] (U-PF ¶ 115; Tr. 1153:13-22 (Genck); Tr. 1342:20-1343:1 (Chambliss).)

It is no different for the Unichem tablet(s).  Unichem has provided extensive evidence of the $D_{90}$ of the bulk apixaban prior to tableting (as described in the '945 Patent), because it is not possible to determine, with any certainty, the $D_{90}$ of the apixaban once tableted.

Plaintiffs also assert that Dr. Genck, when formulating his opinions in this matter, applied a claim construction that was rejected by the Court.  This is not correct.  Dr. Genck made clear that he applied the Court's "plain and ordinary meaning" claim construction when formulating his opinions:

Q.      Dr. Genck, you're aware that the Court construed the claim term $D_{90}$; correct?

A.      Yes, I am.

---

[10] Dr. Myerson, Plaintiffs' expert, acknowledged this point and could not offer any predictions as to the actual $D_{90}$ of the tableted apixaban, noting that "other than saying it would be the same or possibly smaller, that's the best I can do."  (U-PF ¶ 113; Tr. 1749:15-1750:4 (Myerson).)

Q.     And I think we have established this, but you're aware that the Court gave it its plain and ordinary meaning?

A.     Correct.

Q.     And is that the definition that you applied when you rendered your opinions in this case?

A.     It is.

(U-PF ¶ 116-117; Tr. 1219:16-24; 1144:10-19 (Genck).)  Despite Plaintiffs' counsel's attempts to confuse Dr. Genck with legalese, Dr. Genck made clear that he was aware of the Court's ruling and applied it.  (Tr. 1193:16-1195:22 (Genck).)  Moreover, as noted above, the construction of the $D_{90}$ Limitation certainly encompasses the methods employed by Unichem in its ANDA and Dr. Genck in the testing he had done.  Thus, even had Dr. Genck construed the $D_{90}$ Limitation more narrowly by limiting it to determining the $D_{90}$ value of the apixaban pre-tableting, his definition falls within the scope of the plain and ordinary meaning of the $D_{90}$ Limitation and thus creates no error.  (P-UF ¶¶ 13-15)

Viewing the evidence as a whole, Plaintiffs have failed to establish that the Unichem tablet(s)  would infringe the Asserted '945 Claims.

## III.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant Unichem respectfully requests that Unichem tablet(s) be found not to infringe the Asserted '945 Claims.

Dated: February 7, 2020

Respectfully submitted,

*/s/ John C. Phillips, Jr.*

OF COUNSEL:

Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning
GREENBLUM & BERNSTEIN, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Unichem Laboratories Ltd.*