**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

BRISTOL-MYERS SQUIBB COMPANY and
PFIZER INC.,

        Plaintiffs,

        v.

AUROBINDO PHARMA USA INC. and
AUROBINDO PHARMA LTD.,

        Defendants.

C.A. No. 17-cv-374-LPS
(CONSOLIDATED)

**PLAINTIFFS' REPLY POST-TRIAL BRIEF
ON SIGMAPHARM LABORATORIES, LLC'S INFRINGEMENT**

Dated: February 21, 2020

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs Bristol-Myers Squibb
Company and Pfizer Inc.*

**TABLE OF CONTENTS**

I.      Introduction ....................................................................................................1

II.     Sigmapharm's ANDA Products Infringe the '208 Patent's Asserted
        Claims ...........................................................................................................1

III.    Sigmapharm's Manufacturing Process Infringes Claim 104 ......................4

IV.     Sigmapharm's ANDA Products Infringe the '945 Patent's Asserted
        Claims ...........................................................................................................5

        A.      Sigmapharm's ANDA Products Contain Crystalline
                Apixaban Particles. .........................................................................6

        B.      Sigmapharm's Testing Was Insufficiently Sensitive to
                Undermine Plaintiffs' Tests or Rule Out the Presence of
                Crystalline Apixaban. ...................................................................10

        C.      Sigmapharm's Attempt to Distinguish "Crystalline
                Apixaban Material" from "Crystalline Apixaban Particles"
                Is Unavailing. ...............................................................................12

        D.      The Crystalline Apixaban Particles in Sigmapharm's
                ANDA Products Have a $D_{90}$ Equal to or Less Than 89
                Microns. ........................................................................................14

V.      Conclusion ..................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Bristol-Myers Squibb Co. v. Mylan Pharms. Inc.*,
No. CV 09-651-LPS, 2013 WL 12322088 (D. Del. Oct. 17, 2013) .............................7

*Cephalon, Inc. v. Watson Pharms., Inc.*,
629 F. Supp. 2d 338 (D. Del. 2009).............................................................................5

*Glaxo, Inc. v. Novopharm, Ltd.*,
110 F.3d 1562 (Fed. Cir. 1997).....................................................................................5

*Janssen Prods., L.P. v. Lupin Ltd.*,
109 F. Supp. 3d 650 (D.N.J. 2014) ...............................................................................7

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009)...................................................................................15

*Mass. Inst. of Tech. v. Shire Pharms., Inc.*,
839 F.3d 1111 (Fed. Cir. 2016)...................................................................................14

*Monsanto Co. v. David*,
516 F.3d 1009 (Fed. Cir. 2008).....................................................................................9

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
279 F.3d 1357 (Fed. Cir. 2002)...................................................................................14

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996).......................................................................................3

**STATUTES**

35 U.S.C. § 271(a) ..............................................................................................................5

35 U.S.C. § 271(e) ..............................................................................................................4

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| ANDA | Abbreviated New Drug Application |
| Asserted Claims | For the '208 Patent, claims 13 and 104.<br>For the '945 Patent, claims 21 and 22. |
| FDA | United States Food and Drug Administration |
| Patents-in-Suit | The '208 Patent and '945 Patent |
| BMS | Bristol-Myers Squibb Co. |
| Pfizer | Pfizer, Inc. |
| Plaintiffs | BMS and Pfizer |
| Sigmapharm | Sigmapharm Laboratories, LLC |
| Sunshine Lake | Sunshine Lake Pharma Co., Ltd. and HEC Pharm USA Inc. |
| Defendants | Sigmapharm, Sunshine Lake, and Unichem Laboratories, Ltd. |
| UF | Uncontested Facts (D.I. 672, Ex. 1) |
| POSA | Person of ordinary skill in the art.  For the '208 Patent, a POSA would have the characteristics described at UF ¶ 20 as of September 21, 2001; for the '945 Patent, a POSA would have the characteristics described at UF ¶ 31 as of February 24, 2011. |
| Pls.' Br. | Plaintiffs' Opening Post-Trial Brief on Sigmapharm's Infringement (D.I. 684) |
| POFOF | Plaintiffs' Proposed Findings of Fact on Infringement (Sigmapharm) (D.I. 685) |
| Sig. Br. | Sigmapharm's Responsive Post-Trial Brief on Non-Infringement (D.I. 705) |
| SRFOF | Sigmapharm's Proposed Findings of Fact on Non-Infringement (D.I. 706) |
| Pls.' Resp. Br. | Plaintiffs' Responsive Post-Trial Brief on Validity (D.I. 702) |

| Abbreviation | Description |
|---|---|
| PRFOF | Plaintiffs' Proposed Findings of Fact on Validity (D.I. 701) |
| XRPD | X-ray Powder Diffraction |
| SSNMR | Solid-State Nuclear Magnetic Resonance |
| USP | United States Pharmacopeia |

## I.     Introduction

Sigmapharm's main non-infringement argument for the '208 Patent is simply a
repackaged form of its improper-dependency defense.  Sigmapharm's argument begins by
rewriting claim 1, and it proceeds to explain all the reasons that its rewritten claim covers
absolutely nothing.  But claim 1, as written, plainly covers apixaban.

Sigmapharm's non-infringement arguments for the '945 Patent are also unavailing.
Plaintiffs presented two independent forms of evidence (XRPD testing by Dr. Atwood and
SSNMR testing by Dr. Munson) establishing the presence of crystalline apixaban particles in
Sigmapharm's ANDA products.  Sigmapharm's critiques of that evidence are unfounded, and its
testing is insufficiently sensitive to rebut Plaintiffs' evidence.  Sigmapharm's argument that its
products cannot contain crystalline apixaban "particles" because they are in an "amorphous
dispersion" is belied by the evidence, which shows peaks in Sigmapharm's ANDA products that
match characteristic peaks of crystalline apixaban.  And Dr. Atwood provided a reasoned
opinion, supported by scientific evidence about Sigmapharm's manufacturing process, as to why
the $D_{90}$ particle size distribution threshold in the asserted claims is satisfied.  Sigmapharm's only
response was its disproven theory that no crystalline apixaban particles form.  Sigmapharm could
not explain how the crystalline apixaban particles shown to exist in Sigmapharm's ANDA
products could conceivably exceed the claimed particle size distribution threshold.

## II.     Sigmapharm's ANDA Products Infringe the '208 Patent's Asserted Claims

Sigmapharm's dependency-based non-infringement defense fails for the same reasons as
its dependency-based invalidity defense.  The parties have already briefed whether apixaban falls
within claim 1, and the trial evidence shows that it does.  *See* Pls.' Br. 5-9; Pls.' Resp. Br. 2-7.
Sigmapharm raises no new arguments or authority, but it does highlight the fatal flaw in
Sigmapharm's position:  Sigmapharm continues to ignore claim 1's actual language.

Claim 1 recites many options for chemical scaffolds and allows them to be "substituted with" other atoms or chemical groups at certain positions.  As Dr. MacMillan testified, that language is clear to a POSA:  If the differences between a compound and a recited scaffold are allowed by the "substituted with" terms, the compound falls within claim 1's scope.  Tr. 300:24-301:23; PRFOF ¶ 10.  Apixaban differs from a recited scaffold at one position—it has an -OCH$_3$ group on ring E.  PRFOF ¶ 12.  Claim 1 permits that difference (i.e., it allows ring E to be "substituted with 1-2 R" and allows R to be -OCH$_3$) and allows the compound to have 0 substitutions at the remaining positions, so apixaban is within claim 1's scope.  Tr. 1630:23-1631:18 (MacMillan); PRFOF ¶ 13.  Sigmapharm calls this a "novel claim construction" (Sig. Br. 3), but it is not; it is the plain language of claim 1.[1]

Sigmapharm's defense does not apply the actual language of claim 1.  Sigmapharm instead changes claim 1's language that allows the scaffold to be "substituted with" a certain number of groups to instead say that the scaffold "has" that number of total "substituents."[2]  For example, where Sigmapharm argues that apixaban is outside of claim 1's scope, it says that "the structure in apixaban corresponding to Ring M *has* four (4) hydrogen *substituents*."  Sig. Br. 19 (emphasis changed).  But "may be substituted with *X* groups" does not mean the same thing as "has *X* substituents."  The former phrasing, which is in claim 1, is comparative and explains how the compound differs from the recited scaffolds; the latter phrasing, which does not appear in claim 1, is descriptive and explains how the compound exists.  *See, e.g.*, Tr. 310:23-311:1, 1637:17-1638:2 (MacMillan); PRFOF ¶ 16; Pls.' Resp. Br. 4 n.3 (analogy to players in a

---

[1] Sigmapharm protests that Plaintiffs are seeking an untimely claim construction, but it is Sigmapharm's filings that read like *Markman* papers.  Sigmapharm's proposed findings use the phrases "intrinsic evidence" and "extrinsic evidence" at least 18 times.  SRFOF ¶¶ 73-79, 81-83.

[2] Plaintiffs do not agree with Sigmapharm's assertion and distorted reading that "Claim 1 requires … no more than two (2) hydrogens on any of the four substituted rings."  Sig. Br. 19.

basketball game, which are like substituents, versus players that are "substituted" from the bench).

Sigmapharm's criticisms based on altered claim language fail under claim 1's actual terms. For example, Sigmapharm wrongly asserts that "Plaintiffs now argue that hydrogens do not count as substituents."[3] Sig. Br. 20. But what "count[s] as a substituent" is irrelevant because the term "substituent" does not appear in claim 1. Sigmapharm also repeats the same criticisms in its invalidity brief—strained arguments about supposedly superfluous hydrogens, improper *Markush* groups, and claim differentiation—but these arguments are all flawed for reasons that Plaintiffs explained in their responsive validity brief. *See* Pls.' Resp. Br. 6-7. Sigmapharm acknowledges that its reading of claim 1, the '208 Patent's only independent claim, "does not read on any real-world compounds." SRFOF ¶ 86. Such interpretations are "rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Sigmapharm's argument about the specification's definitions of "substituted"—which the parties agree are consistent with the plain meaning of "substituted," PRFOF ¶ 18—fares no better. Sigmapharm's argument appears to boil down to a single proposition: claim language allowing the recited scaffolds to be "substituted with 0" groups does not allow the scaffolds to remain unchanged. This makes no sense. *See, e.g.*, Tr. 300:24-302:14 (MacMillan); PRFOF ¶¶ 10, 19. Sigmapharm's framing as whether "substituted" and "unsubstituted" mean the same thing is flawed in at least two ways: First, claim 1 never uses the term "unsubstituted," so that term is irrelevant; and second, even if it were, the question would be whether "substituted ***with***

---

[3] Sigmapharm's claim is incorrect. Dr. MacMillan explained how deleting hydrogen from the *Markush* group for $R^{1a}$ would alter the claim scope because there are compounds covered by claim 1 for which substitution with hydrogen is required (Tr. 315:15-316:2), and Dr. Heathcock agreed (Tr. 703:2-22; *see also* PRFOF ¶ 20).

*0*" means the same thing as "unsubstituted," which it does, *see, e.g.*, Tr. 298:3-9 (MacMillan).

No POSA would interpret "substituted with 0" to require at least one substitution.

On claim 104, Sigmapharm offers only two responses to Plaintiffs' infringement evidence:  Its dependency argument, which should be rejected for the reasons above, and its criticisms of Dr. Atwood's crystallinity conclusions, which should be rejected for the reasons below.[4]  Sig. Br. 24.  Because Sigmapharm's ANDA products will contain crystalline apixaban, they will literally infringe claim 104.  Pls.' Br. 9; POFOF ¶¶ 63-64.

## III.  Sigmapharm's Manufacturing Process Infringes Claim 104

Sigmapharm next raises several scattershot arguments to try to escape liability for infringing claim 104 of the '208 Patent based on its U.S.-based manufacturing process.  Each of its arguments fails.  Sigmapharm should be enjoined from using crystalline apixaban, and thus infringing claim 104, in the United States.  *See* Pls.' Br. 9-10; POFOF ¶¶ 27-29.

First, Sigmapharm mischaracterizes this claim as an "'importation' theory."  Sig. Br. 25.  Importation is not the act that Plaintiffs have accused of infringing; rather, Plaintiffs have argued that "Sigmapharm will … infringe claim 104 … by ***using*** crystalline apixaban in the United States ***to manufacture*** its ANDA products."  Pls.' Br. 9.  Sigmapharm's future importation of crystalline apixaban is likely a separate act of infringement, but it is not the one before the Court.

Second, to the extent Sigmapharm argues that its use-based infringement is not actionable under 35 U.S.C. § 271(e)(2) or is protected by the § 271(e)(1) safe harbor, Sigmapharm misunderstands Plaintiffs' claim.  Plaintiffs are seeking a declaratory judgment and injunction based on Sigmapharm's future use of crystalline apixaban starting material in the United States

---

[4] Sigmapharm cannot bootstrap its '945 Patent arguments here; it agreed that claim 104 is infringed "[i]f there's … any crystalline apixaban material" in Sigmapharm's product, even if the '945 Patent claims are not infringed.  Tr. 1890:5-10 (Sigmapharm closing).

to manufacture it ANDA products, which will infringe claim 104 under 35 U.S.C. § 271(a).  *See, e.g.*, Compl. (D.I. 1), ¶ 7 & Prayer ¶¶ 1 & 3, C.A. No. 14-408-LPS (seeking judgment that "Sigmapharm's making … the Sigmapharm ANDA product will infringe the claims of the patents-in-suit," order permanently enjoining such "making," and citing 28 U.S.C. § 2201).

Third, Sigmapharm contends there is no case or controversy because its future acts of "potential infringement" are "hypothetical" and "have not yet occurred."  Sig. Br. 25.  But courts routinely exercise declaratory-judgment jurisdiction over claims like this one, particularly where "Defendants have filed the ANDA and have declared their intent to manufacture, market, and sell potentially infringing products in the event that the FDA approves the ANDA."  *Cephalon, Inc. v. Watson Pharm., Inc.*, 629 F. Supp. 2d 338, 351 (D. Del. 2009) (denying motion to dismiss declaratory judgment claim based on future infringement); *see also Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1571 (Fed. Cir. 1997) (holding that "declaratory relief is available to the patentee asserting a 'method of making' claim" in an ANDA case if, for example, there is "imminent FDA approval and actual threats of future infringement").  Sigmapharm's ANDA has been pending for over three years; Sigmapharm has not indicated that it will delay its launch after approval; and Sigmapharm's ANDA only allows its product to be made in the United States starting from crystalline apixaban.  POFOF ¶ 28.  That is sufficient to establish jurisdiction over Plaintiffs' declaratory judgment claim.

## IV.   Sigmapharm's ANDA Products Infringe the '945 Patent's Asserted Claims

Plaintiffs proved that both strengths of Sigmapharm's ANDA products will infringe claims 21 and 22 of the '945 Patent.[5]

On the first disputed limitation, Dr. Atwood's XRPD testing established and

---

[5] Sigmapharm does not contest its 2.5 mg and 5 mg tablets are the same for infringement purposes.

– 5 –

Dr. Munson's SSNMR testing confirmed that the apixaban in Sigmapharm's ANDA products "comprises crystalline apixaban particles."  Sigmapharm's critiques of Plaintiffs' tests are unfounded, and Sigmapharm's testing was not sensitive enough to contradict Plaintiffs' results. Sigmapharm's belated attempt to distinguish "crystalline apixaban material" from "crystalline apixaban particles" is also unsupported.  Both sides' experts agree that sharp peaks in an XRPD pattern indicate long-range order and, thus, crystalline material.  Plaintiffs established that all crystals are particles, and Sigmapharm offered no evidence to the contrary.  Testing of Sigmapharm's ANDA products showed crystalline peaks matching established peaks of crystalline apixaban and therefore confirmed the presence of crystalline apixaban particles as opposed to crystalline particles of some other compound, mixture, or composite.

On the second disputed limitation, the evidence establishes that the crystalline apixaban particles in Sigmapharm's ANDA products fall well within the claimed 89-micron $D_{90}$ particle size distribution threshold.  Sigmapharm's main defense is a theoretical argument that its manufacturing process makes it impossible for crystalline apixaban particles to form, but Drs. Atwood and Munson tested and disproved that theory.  Sigmapharm concedes that the povidone it uses in its manufacturing process inhibits crystal growth, and Dr. Atwood explained that its manufacturing process would necessarily limit the size of the crystalline apixaban particles to well below the claimed threshold.  Sigmapharm failed to rebut that testimony.

### A.      Sigmapharm's ANDA Products Contain Crystalline Apixaban Particles.

As Sigmapharm's expert, Dr. Zaworotko, agreed, the phrase "[w]herein, apixaban comprises crystalline apixaban particles," as used in the asserted claims, includes "any amount of crystalline apixaban that can be detected."  Tr. 968:18-24, 995:14-20; POFOF ¶ 36.  Plaintiffs offered two independent forms of evidence establishing that Sigmapharm's ANDA products contain crystalline apixaban.  First, Dr. Atwood used the "gold standard" of XRPD testing (Tr.

971:14-16 (Zaworotko)) and performed appropriately sensitive scans on material from Sigmapharm's tablet. POFOF ¶¶ 56-57, 59, 70; Pls.' Br. 15-17. He found several peaks that matched peaks associated with crystalline apixaban and thus concluded that crystalline apixaban particles were present in Sigmapharm's ANDA products.[6] Second, Dr. Munson's SSNMR testing confirmed Dr. Atwood's conclusion. Pls.' Br. 18-20.

Sigmapharm's critiques of **Dr. Atwood's testing** lack merit:[7]

**Laboratory Notebook / Sample-Handling Records (Sig. Br. 12):** Dr. Atwood's XRPD results and testing parameters were produced, so no notebook was necessary. POFOF ¶ 71; PTX-1098. Moreover, Dr. Atwood explained that his sample preparation and storage involved standard methods that did not compromise the integrity of the samples. POFOF ¶¶ 65-69. Dr. Zaworotko offered no contrary evidence; he testified that he had no doubt Dr. Atwood received Sigmapharm tablets (Tr. 991:6-15) and that crushing samples is standard (Tr. 946:19-947:2).

**USP Recommendations (Sig. Br. 12):** The USP refers to using ten peaks when a researcher needs to identify an ***unknown*** sample by comparing its spectrum to a database of over 60,000 XRPD patterns. Tr. 974:2-975:14 (Zaworotko). Here, all of the components of the sample were known (*id.* at 975:7-14), and the characteristic peaks of crystalline apixaban were

---

[6] Sigmapharm misstates Dr. Atwood's testimony in claiming that he identified only "short-range order of approximately ten nanometers." Sig. Br. 10. Dr. Atwood testified that when crystalline particles first form, they are about 10 nanometers. Tr. 431:10-25. Those crystals then grow by converting surrounding amorphous apixaban, subject to the constraints imposed by Sigmapharm's manufacturing process. POFOF ¶¶ 45-48, 94-99.

[7] Sigmapharm's reliance on unrelated cases in which Dr. Atwood opined (Sig. Br. 6-7) is ill-founded. The sufficiency of expert testimony in different matters does not affect the evidence presented here or this Court's determination of experts' credibility and qualifications. In any event, Dr. Atwood's testimony has been credited by many courts, including this one. Tr. 505:12-17 (Atwood); *Bristol-Myers Squibb Co. v. Mylan Pharm. Inc.*, No. CV 09-651-LPS, 2013 WL 12322088, at *15 (D. Del. Oct. 17, 2013) (describing Dr. Atwood's testimony as credible). And Sigmapharm's expert, Dr. Zaworotko, has had his opinions rejected and his credibility questioned by other courts. Tr. 996:2-997:22 (Zaworotko); *Janssen Prods., L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650, 656 (D.N.J. 2014).

also known (POFOF ¶¶ 72-74).  Sigmapharm's expert, Dr. Zaworotko agrees that "a single sharp

peak" in an XRPD spectrum is indicative of crystallinity.  Tr. 969:17-19; POFOF ¶ 54.

**Limit of Detection (Sig. Br. 12):**  Dr. Atwood did not need to determine a limit of

detection for his tests because he ***detected*** crystalline apixaban particles (Tr. 371:10-372:5;

POFOF ¶ 82), and he did not need to quantify the amount of the particles because any amount

infringes (POFOF ¶ 36).  Sigmapharm, however, did need to determine the limit of detection for

the tests that it, Catalent, and Dr. Apperley performed because it was trying to ***rule out*** the

presence of crystalline apixaban particles.  It failed to do that.  Pls.' Br. 17-18, 20; POFOF ¶¶ 81-

82, 89-90.  And as explained further below, Sigmapharm's tests were not sufficiently sensitive to

contradict Plaintiffs' results.[8]  *See infra* § IV.B.

**Comparison to a Reference (Sig. Br. 12):**  Dr. Atwood relied on the six peaks for

crystalline apixaban identified in the '945 Patent, as well a peak identified in Sigmapharm's

ANDA as associated with its crystalline apixaban API.  POFOF ¶ 72.  Sigmapharm fails to

explain, nor can it, why the peaks identified in the patent and Sigmapharm's own ANDA are not

reliable bases for a comparison.[9]  POFOF ¶ 74.

**Consideration of Apixaban Intermediate (Sig. Br. 12):**  Sigmapharm claims Dr.

Atwood failed to consider that its apixaban intermediate was an "amorphous solid dispersion,

and not a neat amorphous solid."  Sig. Br. 12.  This critique is irrelevant and unsupported.  As

explained below, the question is whether crystalline apixaban particles are in Sigmapharm's

ANDA products, not its apixaban intermediate; the Catalent testing of Sigmapharm's apixaban

---

[8] Defendants improperly rely on testimony from Dr. Munson to speculate about the limit of detection in Dr. Atwood's and Dr. Apperley's tests.  Sig. Br. 2, 12 n.2, 17.  Dr. Munson offered no opinion about the percentage of crystalline apixaban in Sigmapharm's ANDA products and testified that he did not do experiments to quantify it.  Tr. 589:8-590:15 (Munson).

[9] Dr. Atwood's reply report identified the peak at 22 degrees (Tr. 506:18-507:22 (Atwood)), as Dr. Zaworotko and Mr. Mizerk admitted (Tr. 951:3-8 (Zaworotko), 1879:3-9 (Mizerk)).

intermediate was insufficiently sensitive to detect or rule out the presence of crystalline apixaban particles; and Dr. Atwood's XPRD test results reveal crystalline apixaban particles in Sigmapharm's ANDA products, belying Sigmapharm's theory that its "amorphous dispersion" cannot contain such particles.

**Identification of Peaks and Noise (Sig. Br. 13-14):**  Dr. Atwood identified four characteristic peaks (POFOF ¶¶ 72, 74) and explained how he distinguished noise from peaks (i.e., the peaks were present for multiple steps).  Tr. 364:23-366:8.  He also explained that those peaks would be small because Sigmapharm's ANDA products contain a small percentage of apixaban, 3.125%.  Tr. 356:25-357:9.

Sigmapharm's criticisms of **Dr. Munson's testing** are similarly unfounded:[10]

**Dr. Nethercott's Role (Sig. Br. 4, 14):**  Dr. Munson properly relied on SSNMR testing performed by Dr. Nethercott.  Dr. Munson gave detailed instructions to Dr. Nethercott and explained the methods and results.  Tr. 534:15-537:4, 543:23-555:13.  Experts can rely on tests by others, *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008), as Sigmapharm's own experts did (e.g., Dr. Zaworotko relying on Catalent's testing).

**Spinning Sidebands (Sig. Br. 14):**  Dr. Munson accounted for the spinning sidebands that Sigmapharm mischaracterizes as "problematic baseline distortions."[11]  Sig. Br. 14.  Spinning sidebands are common in SSNMR testing and did not impair Dr. Munson's analysis.  Tr. 550:4-551:13; POFOF ¶ 87.  He explained that peaks 7 and 8 were partially obscured but still observable.  *Id.*  Sigmapharm contends that the crystalline peak was missing at one position when Dr. Apperley tried to move the spinning sideband (Sig. Br. 15), but Dr. Apperley's testing

---

[10] Sigmapharm's accusation that Dr. Munson's opinion was "predetermined" (Sig. Br. 5) has no support in the record.

[11] It is undisputed that Dr. Schurko used different line broadening settings that changed the appearance of Dr. Munson's data.  Sig. Br. 17-18; Pls.' Br. 20; POFOF ¶ 92.

was insufficiently sensitive for the reasons described below. *See infra* § IV.B.

**Line Width (Sig. Br. 15):**  Dr. Munson considered line width when he visually observed the peaks and compared the peak widths and locations to known crystalline apixaban peaks from BMS's crystalline apixaban API.  Tr. 536:6-15.  He testified that measuring line width was not necessary to confirm the presence of crystalline apixaban because one can see that the line widths are comparable to the reference peaks.  *Id.* 561:9-562:18.  Sigmapharm's assertion that Dr. Munson did not follow his own protocols (Sig. Br. 4, 18; SRFOF ¶ 58) is contradicted by the record:  Dr. Munson testified he was not aware of any requirement that line width needs to be measured to determine if crystalline material is present.  Tr. 564:9-13, 585:16-586:4.

**Limit of Detection (Sig. Br. 15-16):**  Dr. Munson did not need a limit of detection study.  His tests showed the presence of crystalline apixaban, confirming it was detectable using his methods, unlike Dr. Apperley's testing.  *See supra* p. 8.  Dr. Munson confirmed that he observed (but did not quantify) the signal-to-noise ratio (i.e., the height of the peaks in the spectrum compared to the root mean square average of the noise).  Tr. 559:5-561:8.  The signal-to-noise ratio in his experiments gave Dr. Munson confidence in his conclusions and was much better than that observed in the experiments by Sigmapharm's experts.  Tr. 560:3-21 (Munson).

**B.** **Sigmapharm's Testing Was Insufficiently Sensitive to Undermine Plaintiffs' Tests or Rule Out the Presence of Crystalline Apixaban.**

Sigmapharm's tests were insufficiently sensitive to counter Plaintiffs' tests or rule out the presence of crystalline apixaban particles in Sigmapharm's ANDA products.  Pls.' Br. 17-18, 20.

As for XRPD testing, Dr. Zaworotko performed no tests and relied on other testing that was insufficiently sensitive.[12]  Sigmapharm does not contest, nor can it, that its XPRD testing of

---

[12] Dr. Zaworotko could have replicated Dr. Atwood's sensitive tests but did not.  Tr. 962:20-963:14, 976:15-22 (Zaworotko); POFOF ¶ 57.

its ANDA proves nothing about whether crystalline apixaban particles are present.  Sig. Br. 14.

The limit of detection for that testing (5%) is simply not sensitive enough to detect any

crystalline apixaban particles because there is only 3.125% apixaban in those products.  POFOF

¶¶ 70, 81.  Sigmapharm's attempt to rely on testing that Catalent performed on Sigmapharm's

Drug Product Intermediate misses the point.  The relevant question is whether there are

crystalline apixaban particles in Sigmapharm's ANDA products, not an intermediate.  In any

event, as explained by Dr. Atwood, the Catalent testing is insufficiently sensitive because it used

a count time of 1 second, which is orders of magnitude faster than the count times in the scans on

which Dr. Atwood relied.  Tr. 373:13-374:4; POFOF ¶¶ 70, 81.  Although Sigmapharm points

out there is more apixaban (6.6%) in its Drug Product Intermediate than in its ANDA products

(Sig. Br. 14), Sigmapharm provides no scientific support for its suggestion that the fast Catalent

scans would be sufficiently sensitive to detect any crystalline apixaban particles in its

intermediate.  And Sigmapharm takes Dr. Atwood's testimony about the Catalent testing out of

context.  Although Dr. Atwood offered no criticism of Catalent's graphs (Sig. Br. 14; Tr. 456:9-

19), he made abundantly clear in his testimony that using count times of 0.5 to 1 second per step,

as Catalent did, was insufficiently sensitive to detect crystalline apixaban.  Tr. 373:13-374:4;

POFOF ¶ 81.

As for SSNMR testing, the testing performed by Dr. Apperley and interpreted by

Dr. Schurko was not sensitive enough to rule out the presence of crystalline apixaban particles.[13]

Tr. 560:16-561:3 (Munson); Pls.' Br. 20.  And Sigmapharm overstates Dr. Apperley's and Dr.

Schurko's conclusions.  At best, Dr. Apperley opined: "I saw no evidence of crystalline apixaban

---

[13] As explained above, *supra* note 8, Sigmapharm's reliance on speculation about the amount of crystalline apixaban in Sigmapharm's ANDA products (which Dr. Munson made clear he did not test) to bolster the reliability of Dr. Apperley's testing (Sig. Br. 17) is misplaced.

in my measurements." Tr. 760:18-22.  When asked if Sigmapharm tablets contain no crystalline

apixaban, Dr. Apperley testified his "experiments were not designed for that end."  Tr. 760:23-

761:1.  Thus, Sigmapharm is wrong that Dr. Apperley's experiments "conclusively determined

that no crystalline material was present in Sigmapharm's ANDA products" (Sig. Br. 16), and that

"the testimony of Drs. Apperley and Schurko proves it is not there" (Sig. Br. 18).

The presence of amorphous material (Sig. Br. 14) is consistent with the evidence that

crystalline apixaban particles are also present.  Both sides' experts agreed that amorphous and

crystalline forms can coexist (POFOF ¶ 44) and that the "crystalline apixaban particles" claim

limitation is satisfied by "any amount of crystalline apixaban that can be detected"  (Tr. 968:18-

24, 995:14-20 (Zaworotko); POFOF ¶ 36; *supra* § IV.A).

### C.     Sigmapharm's Attempt to Distinguish "Crystalline Apixaban Material" from "Crystalline Apixaban Particles" Is Unavailing.

Sigmapharm argues the disputed limitations are not met because "crystalline apixaban"

and "crystalline apixaban particles" are different.  Sig. Br. 7-11.  The trial record shows that this

distinction is false and that Sigmapharm's ANDA products contain crystalline apixaban particles.

Sigmapharm's "no crystalline particles" argument relies on a theory that its products

constitute a "solid amorphous dispersion" and supposedly "will not convert to crystalline." Sig.

Br. 8.  Plaintiffs rebutted that proposition with two independent forms of testing evidence

showing that Sigmapharm's ANDA products contain crystalline apixaban particles.  *See* s*upra*

§ IV.A.[14]  Both sides' experts agree that the presence of sharp peaks in an XRPD indicates the

presence of long-range order and, thus, crystalline material.  POFOF ¶¶ 43, 54.

---

[14] The claim that amorphous dispersions never convert was also rebutted by evidence showing the conversion of amorphous to crystalline apixaban in Sunshine Lake's amorphous dispersion. Tr. 399:9-401:24 (Atwood), 1009:14-1011:14 (Chen); PTX-846.

The characteristic peaks that Drs. Atwood and Munson identified (*id.* ¶¶ 72, 74, 85) defeat Sigmapharm's unsupported claim that the apixaban is "integrally bound" with something else (Sig. Br. 9-10). Only crystalline apixaban particles would cause its characteristic peaks.[15] *See* POFOF ¶¶ 74, 78; Tr. 968:18-969:19 (Zaworotko).

Plaintiffs established that all crystals are particles (Tr. 1669:17-21 (Myerson)), and Sigmapharm cites no evidence to the contrary. And the uncontroverted fact that a crystal is a particle does not render the term "particles" superfluous, as Sigmapharm suggests. Sig. Br. 9. The term "particles" establishes that there must be more than one crystalline apixaban particle, which is consistent with the later claim limitation establishing a $D_{90}$ particle size distribution threshold for those particles. It is also consistent with the specification, which explains that "'particles' refers to individual drug substance particles whether the particles exist singly or are agglomerated." '945 Patent at 3:20-22; Tr. 348:6-22 (Atwood); POFOF ¶ 102.

Sigmapharm's attempt to recharacterize the disputed claim limitations by reference to the prosecution history (Sig. Br. 8-10) is untimely and meritless. There was no claim construction dispute as to the term "crystalline apixaban particles," and the parties agreed that the term should be accorded its plain and ordinary meeting. UF ¶ 34; D.I. 182 at 2. Also, both sides' experts agree that the phrase "[w]herein, apixaban comprises crystalline apixaban particles," as used in the asserted claims, includes "any amount of crystalline apixaban that can be detected." Tr. 968:18-24, 995:14-20 (Zaworotko), 1889:8-13 (Mizerk); POFOF ¶ 36. The suggestion that the

---

[15] Sigmapharm mispresents Dr. Atwood's testimony where he acknowledged a hypothetical "if apixaban crystallized around or on the surface of some other particle," such that it would be "not actually apixaban but rather [it is] apixaban and something else." Tr. 470:18-472:3. Dr. Atwood never agreed that this actually occurs and instead testified that his testing establishes the presence of crystalline apixaban particles in Sigmapharm's ANDA products. POFOF ¶ 73; Tr. 371:5-9.

claims cannot cover amorphous dispersions that contain less than 40% crystalline apixaban (Sig. Br. 10) contradicts the plain meaning adopted by Sigmapharm's own expert at trial.

In any event, this prosecution-disclaimer argument is futile because disclaimer requires a clear and unambiguous statement by the applicant about the scope of the claims. *See Mass. Inst. of Tech. v. Shire Pharm., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016). Sigmapharm has made no such showing. Sigmapharm relies on portions of the prosecution history that do not relate to the asserted claims, which were never rejected over Nause because they were added after the rejection. JTX-4 at BMSAPIX0010463 (claims 43-44), 502-6, 517. During prosecution, applicants never made any statement about any specific percentage of crystalline apixaban. Sigmapharm relies instead on the term "amorphous dispersion," which appears in Nause but not in the asserted claims. Sig. Br. 8.

Finally, to the extent Sigmapharm is arguing that it is entitled to practice the prior art, that is not a defense to infringement. *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002). Also, Plaintiffs established at trial that Nause is not prior art. Pls.' Resp. Br. 39-40; PRFOF ¶¶ 116-119, 185.

**D.    The Crystalline Apixaban Particles in Sigmapharm's ANDA Products Have a $D_{90}$ Equal to or Less Than 89 Microns.**

Sigmapharm's primary defense to the second disputed limitation is a theoretical argument that its "amorphous dispersion" cannot contain crystalline apixaban particles. Sig. Br. 7-11. That theory has been disproven for the reasons explained above. *See supra* § IV.A.

First, Plaintiffs are not required to measure the particle size of the crystalline apixaban particles in Sigmapharm's ANDA products to prove they will have a $D_{90}$ at or below 89 microns. As discussed in Plaintiffs' opening brief (Pls.' Br. 23-24), the Federal Circuit has held that infringement may be shown by "any method of analysis that is probative of the fact of

– 14 –

infringement." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009).  Sigmapharm cites no case law to the contrary.

The '945 Patent's asserted claims do not require a precise $D_{90}$ calculation—they require only that the particle size distribution is at or below the 89-micron threshold.  As discussed in Plaintiffs' opening brief (Pls.' Br. 22-24), Sigmapharm's manufacturing process ***necessarily*** limits the crystalline apixaban particle size to ***well*** below 89 microns.  S*ee, e.g.*, Tr. 382:17-384:9, 385:5-386:3 (Atwood); Pls.' Br. 22-24; POFOF ¶¶ 49, 94-101.  It was therefore not necessary for Plaintiffs' to calculate the $D_{90}$ because the uncontradicted evidence establishes that the crystalline apixaban particles will be so much smaller than 89 microns that the claim limitation is met.  Tr. 385:24-386:19 (Atwood); POFOF ¶ 101.

Plaintiffs' showing is not "speculative," Sig. Br. 6—it is an application of well-accepted principles about nucleation and crystal growth applied to:  (1) scientific evidence showing the existence of crystalline apixaban particles in Sigmapharm's ANDA products (Pls.' Br. 14-20; *supra* § IV.A); (2) the undisputed details of Sigmapharm's manufacturing process (Pls.' Br. 22-24); and (3) Sigmapharm's own admissions that the povidone in its ANDA products limits crystal growth (*e.g.*, POFOF ¶ 95).  Sigmapharm and its experts did not explain how, in view of the constraints imposed by its process, the crystalline apixaban particle size distribution could even approach the asserted claims' 89-micron threshold.  POFOF ¶ 100.  Its only retort is that the povidone in its process will "preclude crystal formation at all" (Sig. Br. 7), but the evidence proves otherwise.

## V.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court find infringement and grant the relief discussed in Plaintiffs' prayer for relief and opening brief (Pls.' Br. 24).

Dated: February 21, 2020

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Plaintiffs Bristol-Myers Squibb
Company and Pfizer Inc.*