**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

BRISTOL-MYERS SQUIBB COMPANY and
PFIZER INC.,

      Plaintiffs,

      v.

AUROBINDO PHARMA USA INC. and
AUROBINDO PHARMA LTD.,

      Defendants.

C.A. No. 17-cv-374-LPS
(CONSOLIDATED)

**PLAINTIFFS' REPLY POST-TRIAL BRIEF ON
SUNSHINE LAKE PHARMA CO., LTD. & HEC PHARM USA INC.'S INFRINGEMENT**

Dated: February 21, 2020

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs Bristol-Myers Squibb
Company and Pfizer Inc.*

## TABLE OF CONTENTS

I.      Introduction ............................................................................................... 1

II.     Sunshine Lake's ANDA Products Will Infringe the '945 Patent's Asserted
        Claims. .................................................................................................... 2

        A.      Sunshine Lake's ANDA Products Will Contain Crystalline
                Apixaban. ................................................................................... 2

                1.      Sunshine Lake's Own Evidence Shows That Its
                        Amorphous Solid Dispersion Does Not Prevent Nucleation
                        and Crystal Growth. ........................................................ 3

                2.      Sunshine Lake's Criticisms of Dr. Atwood's Testing Are
                        Unfounded. ..................................................................... 5

                3.      Dr. Brittain's "Scan Averaging" Method Is Not
                        Comparably Sensitive to Dr. Atwood's Slower Scan Times. ........ 10

        B.      The Crystalline Apixaban Particles in Sunshine Lake's ANDA
                Products Will Necessarily Have a $D_{90}$ Equal to or Less Than About
                89 Microns. ............................................................................... 13

III.    Conclusion ........................................................................................... 15

# TABLE OF AUTHORITIES

CASE

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
579 F.3d 1363 (Fed. Cir. 2009)....................................................................................13

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| ANDA | Abbreviated New Drug Application |
| Asserted Claims | For the '208 Patent, claims 13 and 104.<br>For the '945 Patent, claims 21 and 22. |
| FDA | United States Food and Drug Administration |
| NDA | New Drug Application |
| Patents-in-Suit | The '208 Patent and '945 Patent |
| BMS | Bristol-Myers Squibb Co. |
| Pfizer | Pfizer, Inc. |
| Plaintiffs | BMS and Pfizer |
| Sigmapharm | Sigmapharm Laboratories, LLC |
| Sunshine Ltd. | Sunshine Lake Pharma Co., Ltd. |
| HEC | HEC Pharm USA Inc. |
| Sunshine Lake | Sunshine Ltd. and HEC |
| Unichem | Unichem Laboratories, Ltd. |
| Defendants | Sigmapharm, Sunshine Lake, and Unichem |
| UF | Uncontested Facts (D.I. 672, Ex. 1) |
| POSA | Person of ordinary skill in the art.  For the '208 Patent, a POSA would have the characteristics described at UF ¶ 20 as of September 21, 2001; for the '945 Patent, a POSA would have the characteristics described at UF ¶ 31 as of February 24, 2011. |
| Pls.' Br. | Plaintiffs' Opening Post-Trial Brief on Sunshine Lake Pharma Co., Ltd. & HEC Pharm USA Inc.'s Infringement (D.I. 686) |

| Abbreviation | Description |
|---|---|
| POFOF | Plaintiffs' Proposed Findings of Fact on Sunshine Lake Pharma Co., LTD. & HEC Pharm USA Inc.'s Infringement (D.I. 687) |
| SL Br. | Defendant Sunshine Lake's Post-Trial Brief on Noninfringement (D.I. 707) |
| SLFOF | Sunshine Lake's Proposed Findings of Fact on Noninfringement (D.I. 708) |
| XRPD | X-ray Powder Diffraction |

I.     **Introduction**

The great weight of the evidence shows that Sunshine Lake's ANDA products contain crystalline apixaban particles.  Sunshine Lake's attempt to rebut this ample evidence only reveals the weakness of its position.

Sunshine Lake's primary argument is that its apixaban, by virtue of being in an amorphous solid dispersion, is incapable of forming any crystalline particles.  But that theoretical argument is disproven by its very own testing, which—even after the litigation-inspired revisions to its ANDA—shows that the amorphous solid dispersion in at least one of its lab batches converted to crystalline apixaban.

Sunshine Lake also seeks to discredit Dr. Atwood's test results by accusing him of passing noise off as peaks and cherry-picking data favorable to Plaintiffs' position.  Not so.  Dr. Atwood did not repeatedly run the same test until he found something he could call apixaban crystals, as Sunshine Lake suggests.  Instead, he ran quicker scans as well as more sensitive scans and was ultimately was able to detect three peaks—which he rigorously distinguished from surrounding noise—that are evidence of crystalline apixaban particles in Sunshine Lake's ANDA products.  Even Sunshine Lake agrees that at least one of these peaks is genuine, but it tries to attribute that peak to a compound—lactose monohydrate—that is not even a component of its ANDA products.

Faced with three crystalline apixaban peaks in the XRPD scans of its ANDA products, Sunshine Lake suggests that Dr. Atwood needed to find ten peaks in order to detect crystalline apixaban.  Not only is the standard Sunshine Lake cites inapplicable to situations where the components of the XRPD sample are known, it also contradicts Sunshine Lake's own documented practice of detecting crystalline apixaban from a single XRPD peak.

Dr. Brittain's testing was insufficiently sensitive to rebut Dr. Atwood's evidence. Sunshine Lake contends that Plaintiffs misled the Court by arguing that Dr. Brittain's tests were several orders of magnitude less sensitive than Dr. Atwood's because, according to Sunshine Lake, scan averaging and long count times "cannot be compared by comparing the time spent counting."  SL Br. 15.  But it was Dr. Brittain who made that comparison and admitted that, even accounting for the scan averaging he did, Dr. Atwood's count times were "a lot bigger."  Dr. Brittain never testified that his tests were as sensitive as Dr. Atwood's, and Dr. Atwood explained why Dr. Brittain's scan averaging was not sufficient to overcome the short count times of his scans.

Finally, if, as Plaintiffs have shown, there is crystalline apixaban in Sunshine Lake's ANDA products, the evidence was unrebutted that these particles must be smaller than 89 microns.  Sunshine Lake's argument to the contrary consists of nothing more than repetition of its disproven theory that its products cannot contain crystalline apixaban and an unsupported legal argument that Plaintiffs were required to directly measure the particle size of the crystalline apixaban particles in Sunshine Lake's tablet to prove infringement.  Neither is correct.

## II.   Sunshine Lake's ANDA Products Will Infringe the '945 Patent's Asserted Claims.

Sunshine Lake concedes that its ANDA products meet every limitation of claims 21 and 22 of the '945 Patent except those requiring crystalline apixaban particles with a $D_{90}$ equal to or less than about 89 microns.  The evidence at trial showed that Sunshine Lake's ANDA products satisfy those disputed limitations.

### A.      Sunshine Lake's ANDA Products Will Contain Crystalline Apixaban.

Sunshine Lake's own documents and Dr. Atwood's testing prove that Sunshine Lake's ANDA products do, in fact, contain crystalline apixaban particles.  Sunshine Lake's attempts to

argue otherwise ignore the import of its own admissions and rest on a misunderstanding of the sensitivity of Dr. Atwood's tests.

### 1.   Sunshine Lake's Own Evidence Shows That Its Amorphous Solid Dispersion Does Not Prevent Nucleation and Crystal Growth.

Sunshine Lake's argument that its amorphous solid dispersion cannot, by its nature, contain any crystalline apixaban particles because the molecules are immobilized in a separated state (SL Br. 9-11) is disproved by the evidence.

First, Sunshine Lake's own testing of a 5 mg[1] ANDA product from a larger lab-scale batch showed that "polymorph conversion can consistently occur during the stability of Apixaban tablets."  DTX-996.00160; POFOF ¶¶ 51-53.[2]  As Dr. Chen conceded, "there was part conversion for the six-month accelerated larger lab scale batch from amorphous apixaban to form N-1." Tr. 1017:25-1018:5.  Although Sunshine Lake revised its ANDA after Dr. Chen's deposition, the data showing the crystallization in that lab batch remains in Sunshine Lake's ANDA; there is no question about the reliability of that result.  Tr. 1018:3-5 (Chen) ("[A]t the lab research, we have one incident that these conditions [conversion to form N-1] have happened and we respected that as part of the data collected from the lab.").  Thus, amorphous solid dispersions are capable of crystallizing; Sunshine Lake's own data undisputedly proves that fact.

Further, Sunshine Lake admitted this fact in its internal documents.  An internal presentation from Sunshine Lake's affiliate discussing stability studies on Sunshine Lake's apixaban tablets explains that "during the stability process, amorphous apixaban will partially

---

[1] Sunshine Lake does not argue that there is any difference between its 2.5 mg and 5 mg tablets in terms of infringement.

[2] Although Sunshine Lake's attorneys attempt to characterize the statement about consistency of conversion as yet another mistake (SL Br. 13), there is no evidence to support that assertion—not even from Dr. Chen.  *See* Tr. 1017:2-1018:16 (Chen).  In the absence of any such testimony, Sunshine Lake's ANDA should be taken at face value.

convert to crystalline form N." POFOF ¶ 54; Tr. 1010:3-1011:14 (Chen).[3]  Consistent with Dr.

Atwood's testimony about how nucleation and crystal growth occur, this presentation shows that

the ratio of crystalline apixaban to amorphous apixaban increases over time.  Tr. 1010:3-7

(Chen) ("The longer, the higher the conversion ratio.").  And, in his sworn testimony, Dr. Chen

admitted that amorphous apixaban "can convert" to crystalline form N-1 apixaban.  POFOF ¶ 54;

Tr. 1010:23-1011:1 (Chen).

Sunshine Lake urges the Court to ignore its own tests that showed conversion to

crystalline material in favor of other tests that it alleges showed no conversion.  But Sunshine

Lake's evidence shows that conversion *can* occur—a single test is enough to show that.

Furthermore, the fact that crystallization was proven to occur in a lab batch and not an exhibit

batch does not make the experimentally observed conversion less telling—Sunshine Lake

conceded that its manufacturing method did not change as between the larger lab-scale batches

and its exhibit batches.  POFOF ¶ 53.  Sunshine Lake's theory is that because its apixaban API is

an amorphous solid dispersion with a PVP-to-apixaban ratio of 1.2:1, crystallization is

impossible; but Sunshine Lake does not allege that the lab batch was not an amorphous solid

dispersion with a PVP-to-apixaban ratio of 1.2:1, nor does it purport to explain what relevant

qualities the amorphous solid dispersion in its lab batch would have that the amorphous solid

dispersion of its exhibit batches lacked.

---

[3] This presentation (PTX-875) is written in Chinese and was not entered into evidence.  Dr. Chen nevertheless testified to its contents through an interpreter.  Although Sunshine Lake's attorneys now attempt to contend that these statements about crystallization referred to "bulk apixaban" or apixaban in a different pharmaceutical composition from Sunshine Lake's ANDA products, Dr. Chen was clear that the presentation discusses "research of the apixaban, the polymorphic form of the apixaban … *in the tablet*." Tr. 1011:8-14 (Chen) (emphasis added).  There was no testimony to the contrary.

Perhaps most importantly, Sunshine Lake offered no testimony addressing the sensitivity or parameters of the testing in Sunshine Lake's ANDA that purported to show that no crystalline apixaban was present.  Indeed, Dr. Brittain simply accepted Sunshine Lake's test results at face value and did not know what parameters were used.  POFOF ¶ 58; Tr. 1116:24-1118:2 (Brittain).  As Dr. Atwood showed, the use of more-sensitive parameters can reveal crystalline apixaban—which, because apixaban is only 2.5% of the tablet, will exist only in small quantities—that is hidden in less-sensitive tests.  *See infra* II.A.2(a).  And there is no dispute that *any* amount of crystalline apixaban infringes.  POFOF ¶ 18.  In the absence of any evidence, such as a limit of detection, to show that Sunshine's Lake's tests can actually find infringing crystalline apixaban particles, Sunshine Lake's negative results deserve little or no weight.

Finally, Sunshine Lake's reliance on another company's patent to support its amorphous dispersion argument is misplaced.  Sunshine Lake admits that "DTX-503 is not Sunshine Lake's patent application and does not describe Sunshine Lake's exact process." SL Br. 10-11.  Testing of Sunshine Lake's own ANDA products is, of course, more probative of whether its amorphous apixaban can convert—the only reason it clings to a different process in someone else's patent application is to avoid its own admissions about the results of that testing.  That testing shows that, regardless of what Sunshine Lake now argues about the distinction between "neat" amorphous apixaban and its amorphous solid dispersion, the amorphous apixaban in Sunshine Lake's tablets can convert to crystalline form.

### 2.      Sunshine Lake's Criticisms of Dr. Atwood's Testing Are Unfounded.

Dr. Atwood's testing revealed three XRPD peaks that show that crystalline apixaban particles are present in Sunshine Lake's ANDA products.  Pls.' Br. 8-9.  Importantly, there is no dispute that XRPD peaks are proof of crystallinity.  Sunshine Lake concedes that "[m]aterials in

crystalline form are materials whose molecules have a long-range order," and that "[l]ong-range

order means that there are enough ordered molecules to generate an XRPD pattern." SL Br. 4-5;

SLFOF ¶ 16.  Instead, Sunshine Lake tries to discredit Dr. Atwood's results and cast its own

expert, Dr. Brittain's, inferior testing as conclusive.  Both arguments fail.

### (a)    *Dr. Atwood Identified Three Genuine Peaks Corresponding to Crystalline Apixaban.*

As described in Plaintiffs' opening brief, Dr. Atwood identified peaks at 12.4, 16.9, and

27.1 degrees that are evidence of crystalline apixaban particles in Sunshine Lake's ANDA

products.  Pls.' Br. 8-9.

Sunshine Lake does not contest that XRPD peaks at 16.9 and 27.1 degrees are evidence

of crystalline apixaban.  Instead, it contends that those peaks are noise because Dr. Atwood did

not find those peaks in experiments with faster scan times.  But that argument reveals a

fundamental misunderstanding of Dr. Atwood's experiments.  Dr. Atwood did not run the same

experiment multiple times and "cherry pick" only the those results favorable to Plaintiffs; he ran

scans with ***different sensitivities*** and ultimately found that there was indeed crystalline apixaban

in Sunshine Lake's tablets.  POFOF ¶¶ 45-47.  Experiments with slower scan times are expected

to be more sensitive than those with faster scan times.  POFOF ¶ 54.  Thus, it cannot be said that

a peak appearing in a slow scan is not "reproducible" if it does not also appear on a faster scan.[4]

If Sunshine Lake had wanted to show that Dr. Atwood's most sensitive scans did not

reproducibly show peaks at 16.9 and 27.1 degrees, it could easily have attempted to repeat those

scans, using the same parameters.  It did not.

---

[4] That is why Sunshine Lake's representation of Dr. Atwood's slow scan data overlaid with his fast-scan data is misleading (SL Br. 17-18)—the experiments are not comparable and would not be expected to be identical.

Furthermore, Dr. Atwood took care to distinguish noise from peaks.  He explained that "noise will be a random fluctuation due to cosmic rays" so "the noise will be a short burst, so it might be up for one count time, down for the next count time."  Tr. 411:13-21.  Referring to the peak at 27.1 degrees, Dr. Atwood explained that he identified the peak "by the fact that it has height but *it also has breadth*"; because this scan had "steps of 0.01 degrees," the peak represented not a single random fluctuation that was "up for one count time, down for the next count time," but "five separate counts that were done, that were taken of 1,000 seconds each," and that formed a peak over those counts.  Tr. 412:2-20.



PTX-960 at 23 (annotations added).

Sunshine Lake does not dispute that the peak Dr. Atwood identified at 12.4 degrees is genuine (SL Br. 19); instead it attempts to attribute this peak to lactose monohydrate.  But there

is no evidence of any lactose monohydrate in Sunshine Lake's ANDA products and therefore no

basis to assume that that peak is attributable to anything but crystalline apixaban.  Although there

was evidence that pure, bulk anhydrous lactose can convert to lactose monohydrate, Sunshine

Lake offered no explanation as to how anhydrous lactose could spontaneously convert in the

context of a pharmaceutical formulation.  The only evidence Sunshine Lake cites is Dr. Brittain's

speculation that the lactose in the samples Dr. Atwood tested must have converted because the

peak at 12.4 degrees was purportedly first found months after Dr. Atwood's first scan.  But, as

Plaintiffs explained (Pls.' Br. 13), that theory fails—Dr. Atwood found the peak in the first slow

scan that he ran (which was just one week after his first scan, not months later).  POFOF ¶ 65.[5]

Finally, Sunshine Lake offers nothing more than attorney argument in support of its

contention the 12.4-degree peak is probably not due to crystalline apixaban because, in a scan of

crystalline apixaban form N-1, the 16.9- and 27.1-degree peaks should be more intense than the

12.4-degree peak.  SL Br. 20.  Dr. Atwood's scans show that the 16.9- and 27.1-degree peaks

Dr. Atwood identified *are* more intense than the peak at 12.4 degrees:  Dr. Atwood's 1,000

second scans show that the peak at 12.4 is about 146 counts per second high (PTX-960 at 21; Tr.

409:10-412:1 (Atwood)); the peak at 16.9 is about 237.5 counts per second high (PTX-960 at 13;

Tr. 414:10-415:7 (Atwood)); and the peak at 27.1 is about 234.5 counts per second high (PTX-

960 at 23; Tr. 412:2-20 (Atwood)).[6]  There is therefore no inconsistency between the relative

intensities of the crystalline apixaban peaks Dr. Atwood identified in Sunshine Lake's ANDA

---

[5] Furthermore, a crystalline apixaban peak at 12.4 degrees is consistent with the crystalline apixaban peaks Dr. Atwood found at 16.9 degrees and 27.1 degrees.  Tr. 412:2-20, 414:10-416:5 (Atwood).

[6] The intensity of the peak is shown by the number of counts the detector picks up on the Y axis of the XRPD plot.  Tr. 334:8-19 (Atwood).

products and the relative intensities of the same peaks in a scan of pure crystalline apixaban form N-1.

To the extent Sunshine Lake is arguing that the 16.9- and 27.1-degree peaks should be more "discernable" or "apparent" because they are more intense peaks, that argument has no basis in the evidence. Dr. Atwood testified that many of the crystalline apixaban peaks were hidden by larger excipient peaks. POFOF ¶ 48. And he specifically testified that the 16.9- and 27.1-degree peaks were only detectable on the shoulder of other excipient peaks. Tr. 412:2-20, 414:10-415:7. If these peaks are less "discernable" than the peak at 12.4, it is because the 16.9- and 27.1-degree peaks are on the shoulders of excipient peaks.

### (b)       *Sunshine Lake's Own Evidence Shows That a Single Peak Is Sufficient to Identify Crystalline Apixaban in Its Tablets.*

Sunshine Lake concedes that it relied on a single peak at 17.1 degrees "as an indicator of the presence of the N-1 form of crystalline apixaban in testing of its exhibit batches" and that it was able to do so because it "knew the composition of the samples it was testing." SL Br. 8; SLFOF ¶ 43. Nevertheless, it criticizes Dr. Atwood for relying on "only three peaks," suggesting that "the industry standard" requires "matching 10 peaks." SL Br. 16. But the "industry standard" Sunshine Lake cites properly applies when a researcher needs to identify an *unknown* sample by comparing its spectrum to a library of known reference spectra. *See* Tr. 336:14-340:15 (Atwood); PTX-681 (explaining that it is "generally sufficient to scan past the 10 strongest reflections identified in single-phase X-ray powder diffraction database files" to determine "the phase composition of an *unknown* sample" (emphasis added)). In that situation, where the sample could be one of tens of thousands of compounds, more peaks are required. *See* Tr. 338:1-18 (Atwood) (explaining that the database contains more than 60,000 reference spectra). As Sunshine Lake concedes, however, in the situation where the components of the

sample are known, one peak can be enough.  And Sigmapharm's expert, Dr. Zaworotko, agrees that "a single sharp peak" in an XRPD spectrum is indicative of crystallinity.  POFOF ¶ 36; Tr. 969:17-19 (Zaworotko).

Here, like Sunshine Lake, Plaintiffs knew the identity of the components of Sunshine Lake's tablets.  PTX-843 at HECAPIX000398; Tr. 405:25-406:19 (Atwood).  Thus, like Sunshine Lake, Dr. Atwood could have relied on a single peak to detect crystalline apixaban. But as discussed, Dr. Atwood actually found three peaks, which is more than enough to show the presence of crystalline apixaban.

Sunshine Lake also criticizes Dr. Atwood for allegedly failing to establish that no other components of the system could produce the peaks he found.  SL Br. 22.  Although Sunshine Lake did not provide Plaintiffs with a placebo for Dr. Atwood to test, Dr. Atwood did run a fast, full scan of the tablet to see where the excipients would be.  Tr. 407:4-409:3, 489:2-15 (Atwood). Because the excipients are present in much greater amounts than apixaban (which is only 2.5% of the tablet), Dr. Atwood was able to distinguish peaks due to excipients from peaks due to crystalline apixaban.  Tr. 408:17-409:3, 406:10-19 (Atwood); *see* Tr. 420:9-20 (Atwood) (explaining that the peak at 12.4 is too small to be from lactose anhydrous because lactose anhydrous is 48% of the tablet).  In any event, Sunshine Lake has not explained what other components of its tablet could be responsible for the peaks Dr. Atwood found at 16.9 and 27.1 degrees.  And its attempt to explain away the peak at 12.4 degrees by assigning it to a compound that isn't even part of its ANDA products has no basis in the evidence.  *See supra* § II.A.2(a).

### 3.   Dr. Brittain's "Scan Averaging" Method Is Not Comparably Sensitive to Dr. Atwood's Slower Scan Times.

Sunshine Lake attempts to defend its expert's inferior scans by accusing Plaintiffs of creating a "false equivalency" between the time spent on each expert's scans and the sensitivity

of the test.  SL Br. 15.  But Dr. Brittain himself acknowledged that his 0.33-second scans, ***when***

***averaged***, translated into a 1.75-second count time:

> Q.  So the count time for your XRPD scans was 0.3 seconds per step; correct?
>
> A.  It is actually 0.33, but that is correct.
>
> …
>
> Q.  [PDX-9.1] just shows how make that conversion; correct?
>
> A.  That's correct.  It's a little misleading, of course, because we see ***the effect of running the diffraction pattern five times is to multiply that seconds per step by five***.

Tr. 1113:16-1114:1 (Brittain) (emphasis added).[7]

> Q.  So with respect to Dr. Atwood's 1,000 count time scans, your count time was 3,000 times shorter than his; correct?
>
> A.  No., [sic] because as I said, ***by running the diffraction pattern five times, that actually makes my seconds per step equal to 1.75***. So the number is not right, but, yeah, his thousand is … [a] lot bigger than 1.75.

Tr. 1114:14-20 (Brittain) (emphasis added).  In other words, Dr. Brittain himself, in comparing

his scans to Dr. Atwood's, already took the scan averaging into account in comparing his count

times to Dr. Atwood's.  It is undisputed that slower scans result in increased sensitivity.  POFOF

¶ 39 (citing Atwood, Brittain, and Zaworotko).  Furthermore, Dr. Atwood explained why Dr.

---

[7] PDX-9.1 did not show the multiplication by five—Dr. Brittain volunteered that as a conversion between his method and Dr. Atwood's:



Brittain's scan averaging—which is equivalent to "scanning the room quickly" multiple times and taking an "average of what one saw"—did not cure the deficiencies of his tests, which require "a significant number of counts so that the standard deviation of the peak is in the acceptable range." Tr. 422:16-423:12 (Atwood); POFOF ¶ 57. Thus, the record—including Dr. Brittain's own explanation of his testing methodology—is more than sufficient to establish the inadequacy of Dr. Brittain's tests.

It is Sunshine Lake, not Plaintiffs, that peddles a "false equivalency which is not supported by the available evidence" (SL Br. 15)—namely, that that Dr. Brittain's "scan averaging" technique is an "equally valid and effective method of increasing sensitivity" (*id.* 14). Dr. Brittain ***never testified*** that his tests were equally sensitive to any of Dr. Atwood's scans, much less his 1,000-second scans—nor could he, as he acknowledged that Dr. Atwood's 1,000-second scan time was "[a] lot bigger" than his.[8]

Notably, Sunshine Lake offers no reason that its expert chose to use scan averaging instead of slower scans. Sunshine Lake does not contend that Dr. Atwood's slower scans are flawed because they were slow, or that slower scans fail to increase sensitivity. Plaintiffs produced Dr. Atwood's test results and parameters before Dr. Brittain ran his experiments. If the two methods were indeed equally valid ways to increase sensitivity, Dr. Brittain could have used Dr. Atwood's slower-scan method. And if Dr. Brittain were truly convinced that Dr. Atwood's identified peaks at 16.9 and 27.1 degrees were not genuine, the most compelling thing he could have done would have been to offer evidence that he ran the same tests and obtained different

---

[8] At most, Sunshine Lake cites testimony from Dr. Brittain that (1) his "digital averaging" was "aimed at accomplishing the same goal" as Dr. Atwood's slower scans, which is to "observe a weak feature if it happens to be there" (SLFOF ¶¶ 35, 57 (citing Tr. 1071:20-1072:17 (Brittain))); and (2) that Dr. Brittain's averaged scan showed lower signal-to-noise than Dr. Atwood's fastest, ***six-second*** scan (SLFOF ¶ 59 (citing Tr. 1084:21-1085:1 (Brittain))).

results.  But he did not.  Absent any other explanation, it is reasonable to infer that Dr. Brittain

used less sensitive parameters for his test because he was afraid of confirming Dr. Atwood's

results:  that there are crystalline apixaban particles in Sunshine Lake's ANDA products.

> **B.    The Crystalline Apixaban Particles in Sunshine Lake's ANDA Products Will Necessarily Have a $D_{90}$ Equal to or Less Than About 89 Microns.**

Unable to dispute that the apixaban in its ANDA products is incapable of forming

crystals larger than 89 microns, Sunshine Lake attempts to fabricate a physical-measurement

requirement that is contrary to law and to cast Plaintiffs' argument as a "theoretical hypothesis."

Both tactics fail.

First, Plaintiffs are not required to measure the particle size of the crystalline apixaban

particles in Sunshine Lake's ANDA products to prove that they will have a $D_{90}$ equal to or less

than about 89 microns.  As discussed in Plaintiffs' opening brief (Pls.' Br. 16-18), the Federal

Circuit has held that infringement may be shown by "any method of analysis that is probative of

the fact of infringement."  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372

(Fed. Cir. 2009).  Sunshine Lake cites no case law to the contrary.[9]  Instead, it searches in vain

for such a requirement in the Court's claim construction.  Tellingly, Sunshine Lake does not

identify the precise language from the Court's claim construction opinion which it contends

"implied that *some* form of physical measurement is necessary" (SL Br. 3, 23 (citing generally

D.I. 380 at 10-11)), and Plaintiffs can find none.  That "particle size is given particular

---

[9] Sunshine Lake attempts to distinguish *Martek* by alleging that, in *Martek*, there was no test data contradicting infringement.  SL Br. 24-25.  Not only does that fail to impose any legal requirement that Plaintiffs directly measure particle size here, it also fails to draw any factual distinction: Dr. Atwood provided scientific support for his opinion that the claimed particle size threshold would not be exceeded, and Sunshine Lake has provided no evidence to the contrary. POFOF ¶¶ 46-50, 66-73.

importance in the specification and prosecution of the '945 Patent" (SL Br. 23) in no way restricts the methods by which Plaintiffs may prove up the particle size limitation.

The asserted claims of the '945 Patent do not require a precise $D_{90}$ calculation—they require only that the particle size distribution is at or below the 89-micron threshold.  As discussed in Plaintiffs' opening brief (Pls.' Br. 16-18), Sunshine Lake's manufacturing process *necessarily* limits the crystalline apixaban particle size to *well* below 89 microns.  It was therefore not necessary for Plaintiffs to calculate the $D_{90}$ because the uncontradicted evidence establishes that the crystalline apixaban particles will be so much smaller than 89 microns that the claim limitation is met.  POFOF ¶ 73; Tr. 428:2-429:1 (Atwood).

Plaintiffs' showing is not "hypothetical"—it is an application of well-accepted principles about nucleation and crystal growth applied to:  (1) scientific evidence showing the existence of crystalline apixaban particles in Sunshine Lake's ANDA products (e.g., Pls.' Br. 8-9; *supra* § II.A); (2) the undisputed details of Sunshine Lake's manufacturing process (e.g., Pls.' Br. 16-18); and (3) Sunshine Lake's own admissions that PVP limits crystal growth (e.g., SL Br. 24), combined with its own testing showing that it does not completely prevent crystal formation (*supra* § II.A.1).  Sunshine Lake does not contend that any crystalline apixaban particles in its ANDA products would have a $D_{90}$ greater than 89 microns; rather, it rehashes its flawed theoretical argument that there can be no crystalline apixaban at all because its amorphous solid dispersions are incapable of crystallizing.  That hypothesis has been disproven.  *See supra* § II.A.1.

In sum, Sunshine Lake's non-infringement argument for the particle size limitation simply assumes that there is no crystalline apixaban in its ANDA products.  Sunshine Lake has offered no argument as to why, if there is crystalline apixaban in its ANDA products (as

Plaintiffs have shown), that crystalline apixaban does not meet the particle size limitation.  The Court should find that this limitation is satisfied.

## III.  Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court find that Sunshine Lake's making, using, offering to sell, or selling in the United States, or importing into the United States of Sunshine Lake's ANDA products will literally infringe the asserted claims of the '945 Patent and, therefore, that the submission of Sunshine Lake's ANDA infringes those claims under 35 U.S.C. § 271(e)(2)(A).  Plaintiffs request the Court enter the relief as discussed at Pls.' Br. 18-19.

Dated: February 21, 2020

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Plaintiffs Bristol-Myers Squibb
Company and Pfizer Inc.*