# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY and PFIZER INC.,<br><br>Plaintiffs,<br><br>v.<br><br>AUROBINDO PHARMA USA INC. and AUROBINDO PHARMA LTD.,<br><br>Defendants. | C.A. No. 17-cv-374-LPS<br>(CONSOLIDATED) |

## PLAINTIFFS' REPLY POST-TRIAL BRIEF ON UNICHEM LABORATORIES, LTD.'S INFRINGEMENT

Dated: February 21, 2020

William F. Lee (admitted *pro hac vice*)
Kevin S. Prussia (admitted *pro hac vice*)
Andrew J. Danford (admitted *pro hac vice*)
Timothy A. Cook (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000

Amy K. Wigmore (admitted *pro hac vice*)
William G. McElwain (admitted *pro hac vice*)
Heather M. Petruzzi (admitted *pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 663-6000
Fax: (202) 663-6363

Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Tel: (302) 777-0300
Fax: (302) 777-0301
farnan@farnanlaw.com
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiffs Bristol-Myers Squibb Company and Pfizer Inc.*

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | Introduction................................................................................................1 | |
| II. | The '945 Patent Does Not Require a Precise $D_{90}$ Value or Any Particular Method of Proving Infringement....................................................2 | |
| III. | Plaintiffs Presented Overwhelming Evidence That the Only Disputed Claim Limitation Is Satisfied. ........................................................................4 | |
| IV. | Unichem Attempts to Rely on Irrelevant Testing of Bulk Apixaban API That Was Subsequently Dissolved. ......................................................11 | |
| V. | Conclusion ...................................................................................................13 | |

– ii –

## TABLE OF AUTHORITIES

**CASES**

*Eli Lilly & Co. v. Teva Pharms, USA, Inc.*,
    619 F.3d 1329 (Fed. Cir. 2010)......................................................................................2

*Supernus Pharms., Inc. v. Twi Pharms., Inc.*,
    265 F. Supp. 3d 490 (D.N.J. 2017) ............................................................................10

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| '208 Patent | U.S. Patent No. 6,967,208 (JTX-1) |
| '945 Patent | U.S. Patent No. 9,326,945 (JTX-2) |
| ANDA | Abbreviated New Drug Application |
| Asserted Claims | For the '208 Patent, claims 13 and 104.<br>For the '945 Patent, claims 21 and 22. |
| FDA | United States Food and Drug Administration |
| Patents-in-Suit | The '208 Patent and '945 Patent |
| BMS | Bristol-Myers Squibb Co. |
| Pfizer | Pfizer, Inc. |
| Plaintiffs | BMS and Pfizer |
| Sigmapharm | Sigmapharm Laboratories, LLC |
| Sunshine Lake | Sunshine Lake Pharma Co., Ltd. and HEC Pharm USA Inc. |
| Unichem | Unichem Laboratories, Ltd. |
| Defendants | Sigmapharm, Sunshine Lake, and Unichem |
| '208 Defendants | Sigmapharm and Unichem |
| UF | Uncontested Facts (D.I. 672, Ex. 1) |
| POSA | Person of ordinary skill in the art. For the '208 Patent, a POSA would have the characteristics described at UF ¶ 20 as of September 21, 2001; for the '945 Patent, a POSA would have the characteristics described at UF ¶ 31 as of February 24, 2011. |
| Pls.' Br. | Plaintiffs' Opening Post-Trial Brief on Unichem's Infringement (D.I. 688) |
| POFOF | Plaintiffs' Proposed Findings of Fact on Infringement (Unichem) (D.I. 689) |
| Unichem Br. | Unichem's Responsive Post-Trial Brief on Non-Infringement (D.I. 703) |

| Abbreviation | Description |
|---|---|
| URFOF | Unichem's Proposed Findings of Fact on Non-Infringement (D.I. 704) |
| Pls.' Resp. Br. | Plaintiffs' Responsive Post-Trial Brief on Validity (D.I. 702) |
| PRFOF | Plaintiffs' Proposed Findings of Fact on Validity (D.I. 701) |

## I. Introduction

Unichem disputes only one limitation of the asserted claims of the '945 Patent: "wherein the crystalline apixaban particles have a $D_{90}$ equal to or less than about 89 microns." POFOF ¶ 20.  Plaintiffs showed by a preponderance of the evidence that Unichem's ANDA products meet this claim limitation, and the irrelevant testing of Unichem's bulk apixaban API offered by Unichem and its expert, Dr. Genck, fails to rebut that conclusion.

Dr. Berkland relied on multiple forms of evidence to support his opinion that the particle size distribution of crystalline apixaban in Unichem's ANDA Products falls well below the claimed $D_{90}$ threshold.  He used standard sample preparation methods to prepare material from Unichem's ANDA Products for testing.  POFOF ¶¶ 58-61.  He then used a well-established imaging technique, SEM-EDS, to identify crystalline apixaban particles from that material and measure them.  POFOF ¶¶ 33-48, 51, 58, 64-73, 80.  Dr. Berkland analyzed thousands of crystalline apixaban particles and determined that they were consistently no larger than 1 micron.  POFOF ¶¶ 66, 73, 75-76.  That is orders of magnitude below the 89-micron $D_{90}$ particle size distribution threshold in the asserted claims.  POFOF ¶¶ 73-76, 80.  Dr. Berkland also relied on the undisputed concept of content uniformity and the details of Unichem's manufacturing process to confirm his opinion that this claim limitation is satisfied.  POFOF ¶¶ 77-79, 81-92.

Unichem's attacks on Dr. Berkland's methodology import limitations into the asserted claims that simply do not exist.  As the Court's claim construction opinion makes clear, there is no requirement that any particular method be used to determine infringement of the asserted claims.  D.I. 380, 10; POFOF ¶ 22; PRFOF ¶ 114.  Yet, Unichem persists in criticizing Dr. Berkland's testing because he did not use the Malvern laser-light-scattering (LLS) method.  *See, e.g.*, Unichem Br. at 4.  Unichem also attempts to layer in additional requirements, such as

the use of a "statistically significant sample size" (Unichem Br. at 8), that find no basis in the asserted claims, the specification, the case law, or the publications cited by Unichem. Furthermore, although Unichem faults Dr. Berkland for failing to calculate a precise $D_{90}$ value, the claims do not require one but instead establish a particle size distribution threshold of "equal to or less than about 89 microns." POFOF ¶ 21; Tr. 1732:12-20 (Myerson). Dr. Berkland thoroughly explained how his own testing, along with the undisputed facts regarding content uniformity and Unichem's manufacturing process, supported the conclusion that Unichem's ANDA Products fall well within that threshold. POFOF ¶¶ 51-93.

Unichem attempts to rebut Dr. Berkland's amply supported infringement opinion by relying on testing of Unichem's bulk apixaban API. Unichem Br. at 19-22. But the testimony of Unichem's own expert, Dr. Genck, makes clear that such testing is irrelevant. First, the claims address the particle size of apixaban in the solid pharmaceutical composition (i.e., the final product), not the bulk apixaban API. PRFOF ¶ 126; Tr. 1191:16-1192:10 (Genck). Second, because Unichem dissolves its bulk apixaban API during its formulation process, $D_{90}$ values for Unichem's bulk API prove nothing about the particle size distribution of the new crystals that will form from that solution in Unichem's solid pharmaceutical composition. POFOF ¶¶ 50, 56; Tr. 1201:10-17, 1207:21-24 (Genck).

## II. The '945 Patent Does Not Require a Precise $D_{90}$ Value or Any Particular Method of Proving Infringement.

The asserted claims are solid pharmaceutical composition claims, not method claims. PRFOF ¶ 126; Tr. 1348:23-1349:6 (Chambliss); 1666:19-1667:9 (Myerson). Thus, they do not mandate any particular method of establishing whether a composition infringes. *Eli Lilly & Co. v. Teva Pharms, USA, Inc.*, 619 F.3d 1329, 1345 (Fed. Cir. 2010).

Contrary to Unichem's suggestion (Unichem Br. at 5-6), the asserted claims do not require a precise $D_{90}$ calculation. Tr. 1732:13-21 (Myerson). The $D_{90}$ limitation in the claims sets a threshold for the distribution of the size of crystalline apixaban particles in the claimed composition. '945 Patent (JTX-2) at 9:40-43. It simply requires that 90% of the particles by volume in the distribution fall at or below a specified threshold of 89 microns. UF ¶ 34; POFOF ¶¶ 21, 74-76, 80; Tr. 604:12-17 (Berkland), 1715:18-24, 1732:13-21 (Myerson). The parties agree that a $D_{90}$ is not a direct measurement of particle size. Instead, it is simply a calculation that can be performed to determine a specific particle size distribution once particle size measurements are taken. POFOF ¶ 48; Unichem Br. at 3-4; URFOF ¶ 11.

Dr. Berkland analyzed the size of thousands of crystalline apixaban particles from Unichem's ANDA Products. POFOF ¶ 69. He found the size of those particles to be consistently and uniformly in the range of 1 micron or less, which is orders of magnitude below the 89-micron claim limitation threshold. POFOF ¶¶ 73-76, 80. Especially in view of the undisputed concept that a pharmaceutical composition must have content uniformity, Dr. Berkland's analysis is more than sufficient to establish that 90% of the crystalline apixaban particles in Unichem's product are equal to or less than about 89 microns. POFOF ¶¶ 77-80.

The Court's claim construction decision rejected Unichem's effort to limit the ways of proving infringement of the asserted claims, finding, "Nothing in the patent requires particle size to be measured one and only one way." D.I. 380, 10; POFOF ¶¶ 22, 110. There is no requirement of a precise $D_{90}$ calculation (Unichem Br. at 5-6), measuring the particle size of a statistically significant number of particles (Unichem Br. at 8-10), or using a three-dimensional measurement technique (Unichem Br. at 10-13). *See* POFOF ¶¶ 74, 80, 110; Tr. 604:12-17 (Berkland), 1715:18-24 (Myerson). Unichem is seeking to add these limitations notwithstanding

the Court's unequivocal guidance that there are no limitations on how infringement may be determined.[1]

Dr. Genck recognized that it is not necessary to calculate a specific $D_{90}$ value to determine whether a composition falls within the scope of the claims. Dr. Genck's analysis of Unichem's bulk API produced a different result than the particle size testing in Unichem's ANDA. POFOF ¶ 97. The two results differed by more than 150 microns. *Id.* However, Dr. Genck testified that the different results did not matter because the results were "all well above [a] $D_{90}$ of 89 microns." Tr. 1217:12-20 (Genck); POFOF ¶ 98.[2] Applying that same rationale, Dr. Berkland's testing was sufficient to show that the apixaban in Unichem's tablet meets the particle size limitation because the particles were approximately 100 times smaller than the threshold value. POFOF ¶ 80.

### III. Plaintiffs Presented Overwhelming Evidence That the Only Disputed Claim Limitation Is Satisfied.

Dr. Berkland's infringement analysis overwhelmingly showed that Unichem's ANDA products infringe the asserted claims of the '945 Patent.[3] Dr. Berkland used SEM-EDS to determine the particle size of crystalline apixaban particles in Unichem's tablets. POFOF ¶ 51. Dr. Berkland began by confirming that the nitrogen signal could be used to distinguish apixaban particles from the excipients. POFOF ¶ 57. Then, he used a standard, common method to

---

[1] Plaintiffs address Unichem's arguments about measuring a statistically significant number of particles and using a three-dimensional measuring technique in further detail in Section III below.

[2] Unichem's testing of its bulk apixaban API is irrelevant for the reasons discussed on pages 15-16 of Plaintiffs' opening brief (D.I. 688) and in Section IV below.

[3] Dr. Berkland rejected Unichem's characterization of his analysis as the "Berkland Method." Tr. 605:10-14 ("Q. Dr. Berkland, did you invent using the SEM EDS test methods for that purpose? A. No, I did not. Q. Is it called the Berkland[] method? A. No, it is not."); *see also id.* 644:12-20 (Berkland).

prepare a powder sample of the tablet contents for analysis. POFOF ¶¶ 60-61. He randomly selected tablets from three different batches of Unichem's 5 mg tablets, and randomly selected granules for analysis.[4] POFOF ¶¶ 64-65. Dr. Berkland analyzed thousands of apixaban particles on the granules and found that the apixaban particles were consistently almost 100 times smaller than 89 microns. POFOF ¶¶ 69, 73-76. Given the random sampling, content uniformity of apixaban in the tablets, and the manufacturing process, he confirmed that his samples were representative of the apixaban particle size in Unichem's tablets. POFOF ¶¶ 61, 75-80, 81, 93.

Unichem's critiques of Dr. Berkland's analysis are without merit and are unsupported by the evidence. Unichem Br. at 5-19.[5] Plaintiffs address each of these critiques in turn.

**No Precise $D_{90}$ Calculation Required.** Unichem incorrectly contends that Dr. Berkland was required to calculate a $D_{90}$. Unichem Br. at 5-6. For the reasons discussed in Section II above, no precise $D_{90}$ calculation was necessary to determine that Unichem's ANDA products fall below the $D_{90}$ particles size distribution threshold and, thus, infringe the asserted claims.

**No Need to Resolve Excipient Identity.** Unichem next contends that Dr. Berkland was required to determine the identity of each of the non-apixaban particles he observed. Unichem Br. at 7. There was no need for Dr. Berkland to identify each excipient particle. The excipients were known and were all around the same size. POFOF ¶¶ 57, 61, 68. Further, the absence of nitrogen made them easy to distinguish from apixaban. POFOF ¶ 57.

---

[4] Unichem does not argue that there is any difference between its 2.5 mg and 5 mg tablets in terms of infringement.

[5] Unichem (Unichem Br. at 5-19) attempts to resuscitate the same "reliability" arguments it raised in its failed *Daubert* motion against Dr. Berkland (D.I. 567). In addressing essentially the same arguments before trial, the Court concluded that "Dr. Berkland's analysis is sufficiently reliable and fits the facts of the case and, thus, will be helpful to it as the trier of fact." D.I. 675 at 5. For all the reasons set forth herein, the evidence presented at trial confirms the reliability of Dr. Berkland's infringement analysis.

**No "Statistical Significance" Requirement.** Unichem also incorrectly contends that Dr. Berkland's analysis was on a "statistically insignificant sample size and should be given no weight." Unichem Br. at 8. But Unichem points to nothing in the asserted claims or specification that require measuring a statistically significant sample size, nor do they cite any case law supporting such a requirement. And the publications on which Unichem relies in attempting to support a "statistical significance" limitation (Unichem Br. at 8; URFOF ¶ 36, citing DTX 421 (PTX 394) and DTX 354) do no such thing. Instead, they stand for the proposition that a POSA must measure "a sufficient number of particles." URFOF ¶ 36; Tr. 663:21-664:7 (Berkland).

Dr. Berkland's testimony made clear that he analyzed a sufficient number of particles. Contrary to Unichem's assertion (Unichem Br. at 9), Dr. Berkland *did* provide an estimate of how many apixaban particles he observed. He analyzed 68 granules that contained "hundreds and even thousands of apixaban particles." Tr. 660:22-661:8 (Berkland); POFOF ¶¶ 66, 69, 80. The granules were randomly selected, and what Dr. Berkland observed is consistent with Unichem's manufacturing process. POFOF ¶¶ 64-66, 69, 76, 80-92; Tr. 663:21-664:7 ("I would state that as a person of skill, I had to image a sufficient number of particles, and I did it randomly as specified in this section.").

The prior art demonstrates that Dr. Berkland analyzed more than a sufficient number of particles to conclude that Unichem's tablet had crystalline apixaban particles with a $D_{90}$ well below 89 microns. In Bosquillon (PTX 430), published in 2001, SEM was used to measure only 100 particles. POFOF ¶ 43; PTX 430 at BMSAPIXE_0003253. Based on the particle size measurements for only 100 particles, the results obtained from SEM were deemed comparable to measurements taken by several other methods, including LLS. POFOF ¶ 43; PTX 430 at

BMSAPIXE_0003258. Thus, not only is SEM, a "number-based" particle size measuring technique, comparable to LLS, a "volume-based" measuring technique, the art shows that measuring 100 particles is sufficient to draw that conclusion. Dr. Berkland examined far more than 100 particles. POFOF ¶ 69.

Moreover, both sides' experts agreed that content uniformity (that is, ensuring that the right amount of active ingredient is contained in every tablet by uniformly dispersing the active ingredient in the tablet) is required in a pharmaceutical composition. POFOF ¶ 77; Tr. 1243:14-1244:2 (Chambliss), 1697:23-1698:4 (Myerson). Based on the concept of content uniformity, a POSA would expect that apixaban would be uniformly distributed throughout the tablets and, thus, that a random sample of apixaban particles would be representative. POFOF ¶¶ 77-79; Tr. 628:23-629:4 (Berkland), 1243:14-1244:2 (Chambliss). Although Unichem speculates about the existence of subsurface apixaban particles that could not be detected by SEM-EDS (Unichem Br. at 9), Dr. Genck offered no experimental evidence of any subsurface particles in Unichem's ANDA Products. POFOF ¶ 104. But even if there were any, a POSA would expect them to be the same size due to content uniformity. *Id.* ¶¶ 77-79.

**Suitability of SEM-EDS For Analyzing Infringement.** Unichem contends that SEM-EDS is an inappropriate technique for analyzing infringement of the asserted claims (Unichem Br. at 10-16), but that is incorrect. Unichem first argues that SEM-EDS is not a three-dimensional technique that can provide "volumetric particle size data" and therefore cannot be used to assess a particle size distribution. Unichem Br. at 10-13. Nothing in the '945 Patent, the asserted claims, or the Court's claim construction mandates that particle size be determined using a three-dimensional technique instead of a two-dimensional technique. POFOF ¶¶ 17, 21-22.[6]

---

[6] In fact, the evidence shows that different particle size measurement techniques are comparable. Tr. 1728:14-1729:8 (Myerson).

Further, Unichem's argument ignores the fact that LLS, which was used by Unichem and referenced in the '945 Patent, also does not directly calculate a volumetric measurement, but instead makes assumptions to calculate an equivalent spherical diameter by volume. Tr. 649:15-650:1 (Berkland). In fact, many techniques including LLS and microscopic observation (such as SEM) require the assumption of an equivalent spherical structure. Tr. 1213:1-1214:18 (Genck); DTX-343.00008-09. Dr. Genck admitted that LLS generates the "equivalent spherical diameter" by taking "an irregular-shaped particle" and providing a size value that is "representative of a sphere of a particular equivalent diameter." Tr. 1145:20-1146:9 (Genck). Dr. Berkland explained on cross-examination that he used a similar process: "I took an image that's in three-dimension and I approximated what that would be, what its spherical diameter would be." Tr. 649:15-650:7 (Berkland).

Second, referring to the Merkus (PTX 394) and Zeng (PTX 412) publications, Unichem contends that microscopy techniques like SEM "are well-known to be prone to user error and bias." Unichem Br. at 10-13. But, Dr. Berkland directly addressed those publications in his testimony and explained the steps he took to ensure the reliability of his analysis.[7] POFOF ¶¶ 69, 76, 80; Tr. 658:17-664:7, 664:24-665:8 (Berkland). Merkus and Zeng provide that SEM, a microscopy technique, can be used to measure particle size, despite having some known limitations that a POSA would understand and address. POFOF ¶¶ 34, 35; Tr. 605:19-606:16, 609:9-18, 662:21-665:8 (Berkland).[8] Dr. Berkland explained that he addressed any limitations due to small sample size and bias because he randomly imaged and analyzed a sufficient number

---

[7] Zeng acknowledges that microscopy provides a direct particle size measurement and is used as a reference method, so it is understood to be a reliable method. Tr. 662:21-663:16 (Berkland).

[8] Unichem notes that Merkus describes LLS and SEM as two different types of methods, Br. at 11, but Dr. Genck agreed that Merkus describes both LLS and SEM as particle size measurement techniques. Tr. 1213:16-1214:11 (Genck).

of crystalline apixaban particles to ensure that his sample was representative, and the particles were consistent from granule to granule and batch to batch. POFOF ¶¶ 69, 76, 80; Tr. 658:17-661:23, 662:21-664:7 (Berkland).

Unichem further argues that SEM-EDS cannot be used to calculate a $D_{90}$ for tableted API particles. Unichem Br. at 12-16. This is a red herring. As set forth in Section II above, there was no need to calculate a precise $D_{90}$ value because Dr. Berkland's analysis showed that the crystalline apixaban particle size in Unichem's tablets was orders of magnitude below the 89-micron $D_{90}$ particle size distribution threshold. POFOF ¶¶ 73-76, 80. In any event, Dr. Berkland's testimony made clear that all the tools he used to determine infringement of the asserted claims were well-established in the art. POFOF ¶¶ 45-46, 60; Tr. 605:4-14, 644:12-20 (Berkland). The prior art showed SEM-EDS was a well-known method for identifying components of a solid pharmaceutical composition and measuring particle size. POFOF ¶¶ 33-48; Tr. 605:4-14 (Berkland). Further, Dr. Berkland used a standard sample preparation method that was similar to the methods used by Sigmapharm and Sunshine Lake. POFOF ¶ 60; Tr. 644:12-20 (Berkland); DTX-257.00004. The prior art discloses that the particle sizes measured using SEM-EDS can be used to calculate a $D_{90}$.[9] POFOF ¶¶ 42, 48. And both sides' experts agreed that a $D_{90}$ is a standard calculation based on particle size measurements. POFOF ¶ 48; PRFOF ¶ 108; Tr. 1349:16-1350:3 (Chambliss), 1670:10-1671:12 (Myerson). Therefore, Dr. Berkland's analysis is the application of known, standard methods that could have been used to calculate a $D_{90}$ of API in a solid pharmaceutical composition. Pls.' Resp. Br. at 30-32.

---

[9] Reverchon (PTX 402) used SEM to determine the $D_{90}$ of a powder. POFOF ¶¶ 39-42; Tr. 608:1-4 (Berkland). Although Unichem critiques the Reverchon publication because it did not determine the $D_{90}$ value of an API after it was formulated into a tablet or capsule, Unichem Br. at 15, the asserted claims are not so limited. POFOF ¶ 17. Dr. Berkland and Dr. Chambliss agree that a powder, like that disclosed in Reverchon, is a solid pharmaceutical composition within the scope of the claims. POFOF ¶ 40; Tr. 1351:6-21 (Chambliss); 666:17-667:2 (Berkland).

**Dr. Berkland's Controls**. Finally, Unichem contends that Dr. Berkland failed to employ appropriate "controls." Unichem Br. at 16-19. There was no requirement for Dr. Berkland to use any specific "controls." However, as discussed in Plantiffs' opening brief, Dr. Berkland took several steps to ensure the reliability of his analysis. Pls.' Br. at 8-11. He analyzed the Unichem starting API and all excipients using SEM-EDS. POFOF ¶¶ 53-57. Dr. Berkland confirmed that none of the excipients contained nitrogen, such that nitrogen could be used to identify apixaban. POFOF ¶ 57; Tr. 616:14-617:18 (Berkland). He also observed that nitrogen was uniformly distributed across the crystalline apixaban API, as would be expected based on the concept of content uniformity. POFOF ¶ 55; Tr. 613:22-615:16 (Berkland). When observing the granules, Dr. Berkland confirmed that their size was consistent with the size of the excipients used in the starting formulation. POFOF ¶ 61; Tr. 618:22-619:4, 668:2-22 (Berkland). Because the size of the excipients was not affected by Dr. Berkland's sample preparation, he could conclude that his sample preparation had no impact on the sample and that the size of the apixaban particles was not affected either. POFOF ¶ 61; Tr. 618:22-619:4, 668:2-22 (Berkland). He also confirmed that the nitrogen signal on the excipients appeared as small, discrete islands, indicating the areas rich in apixaban, whereas the oxygen and carbon signals were uniform across the excipients' surface because those atoms are present in all of the excipients. POFOF ¶¶ 70-72; Tr. 624:9-24 (Berkland). Dr. Berkland also confirmed that the size of the apixaban particles on the granules was consistent with Unichem's manufacturing process. POFOF ¶¶ 81-91. Therefore, Dr. Berkland employed controls to ensure his analysis is reliable.[10]

---

[10] The *Supernus Pharmaceuticals* case is inapposite. There, the court found that Dr. Berkland had not performed an analysis to confirm that he was actually observing solid oxcarbazepine particles via transmission electron microscopy. *Supernus Pharms., Inc. v. Twi Pharms., Inc.*, 265 F. Supp. 3d 490, 513 (D.N.J. 2017). Here, Dr. Berkland confirmed he was actually observing apixaban on the liberated granules because he had confirmed the presence of a nitrogen signal

### IV. Unichem Attempts to Rely on Irrelevant Testing of Bulk Apixaban API That Was Subsequently Dissolved.

The evidence on which Unichem relies in an attempt to rebut Plaintiffs' robust infringement evidence (Unichem Br. at 19-22) is irrelevant. Unichem relies on specifications from its ANDA requiring that its bulk apixaban, which is the starting API, have a $D_{90}$ above 89 microns. *See id.* at 19-21. Unichem also relies on particle size testing of Unichem's starting API reported in the ANDA and further testing of that material performed by Particle Technologies Laboratories. *See id.* at 19-22.

All of this evidence is irrelevant because it addresses the particle size of Unichem's starting API, which Unichem's own expert concedes bears no relationship to the crystalline apixaban particle size in Unichem's ANDA Products.[11] Unichem fully dissolves its API such that the bulk apixaban API particle size reveals nothing about the apixaban particle size of the crystals that form from that solution in the final composition. POFOF ¶ 84; Tr. 611:6-16, 616:3-9 (Berkland). Dr. Genck agrees. POFOF ¶ 103; Tr. 1201:10-17, 1207:21-24 (Genck). Unichem also agrees that the asserted claims address the particle size in the solid pharmaceutical composition (i.e., the final tablet). POFOF ¶ 17; Tr. 1191:15-18 (Genck).[12] Thus, the fact that

---

from the apixaban API, and the absence of any nitrogen signal in the tablet's excipients. POFOF ¶¶ 55, 57; Tr. 616:14-617:18 (Berkland).

[11] Unichem cites conclusory testimony from Dr. Genck suggesting that he applied the plain and ordinary meaning of the term $D_{90}$. Unichem Br. at 24. However, testimony elicited from Dr. Genck on cross-examination reveals that, in assessing infringement, he applied the opinion that the only particle size testing method claimed by the '945 Patent is one that measures the particle size of the starting apixaban API by laser light scattering, which is directly contrary to the Court's claim construction opinion. Pls.' Br. at 16-17; POFOF ¶¶ 108-112; Tr. 1195:23-1196:3, 1196:8-19 (Genck).

[12] Unichem's brief and proposed findings include a mischaracterization of the '945 Patent specification. Unichem states that the specification "teaches a POSA that the inventors regarded the $D_{90}$ of the ***bulk apixaban particles*** to be critical in improving the *in vivo* dissolution of the ***apixaban formulated in a tablet***." Unichem Br. at 23; URFOF ¶¶ 109-111. However, the

– 11 –

Unichem's bulk apixaban API has a $D_{90}$ above 89 microns is irrelevant to whether Unichem's ANDA products infringe the asserted claims.

Contrary to Unichem's assertion (Unichem Br. at 22-25), Plaintiffs do not contend that testing bulk apixaban API with LLS is *always* an inappropriate method for analyzing infringement of the asserted claims. Unichem Br. at 22-25. Indeed, it is appropriately used in some circumstances, such as in the example provided in the '945 Patent specification where the starting API is not dissolved, and the solid pharmaceutical composition is formulated using dry granulation. PRFOF ¶ 122; Tr. 1719:23-1720:7, 1725:19-1726:2 (Myerson). Thus, Plaintiffs are not excluding a preferred embodiment from the asserted claims, as Unichem suggests (Unichem Br. at 22-23).[13]

The record contradicts Unichem's assertion that "the particle size (as well as the D90) of the apixaban tablets of the '945 Patent is not known or knowable by a POSA based on the wet and dry granulation manufacturing processes disclosed in the '945 Patent." Unichem Br. at 23. An example in the patent specification describes measuring the $D_{90}$ of crystalline apixaban by LLS before formulation and then using dry granulation to prepare the solid pharmaceutical composition. PRFOF ¶¶ 111, 122; '945 Patent at 5:27-63. Dr. Myerson explained why the particle size of the bulk crystalline apixaban would not increase using that formulation technique. PRFOF ¶ 122; Tr. 1720:8-24 (Myerson). Thus, by measuring the $D_{90}$ of the crystalline apixaban

---

portion of the specification Unichem cites in support of that proposition, refers to "***compositions for tablets***" rather than bulk apixaban API. '945 Patent at 1:64-2:2 (emphasis added).

[13] Unichem is also incorrect that Dr. Berkland testified that the $D_{90}$ limitation is limited to only determining the $D_{90}$ of apixaban after incorporation into a finished dosage form. Unichem Br. at 22 n.9. When asked the question, he answered, "No." Tr. 639:3-6 (Berkland). The asserted claims address the crystalline apixaban particle size distribution in the formulated solid pharmaceutical composition, but there are different ways that can be determined. PRFOF ¶¶ 113-115.

before formulation (and ensuring it was within the claimed particle size distribution), a POSA would have known that the crystalline apixaban in the final composition prepared using that technique would be within the claimed $D_{90}$ threshold.  PRFOF ¶ 122.  Although measuring the particle size of bulk apixaban via LLS and formulating by dry granulation is *one* way of making the claimed composition and confirming that it falls within the scope of the claims, this approach is not required by the claims, nor is it the *only* possible technique.  PRFOF ¶¶ 126-138.  Because the particle size of Unichem's API provides no information about the particle size of crystalline apixaban in its final product, a different technique must be used to determine whether its ANDA products fall within the scope of the claims.

### V.     Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court find that Unichem's making, using, offering to sell, or selling in the United States, or importing into the United States of Unichem's ANDA products will literally infringe the asserted claims of the '945 Patent and, therefore, that the submission of Unichem's ANDA infringes those claims under 35 U.S.C. § 271(e)(2)(A).  Plaintiffs request the Court enter the relief as discussed at Pls.' Br. 18.

| | |
|---|---|
| Dated: February 21, 2020 | Respectfully submitted,<br><br>FARNAN LLP<br><br>/s/ Brian E. Farnan<br>Joseph J. Farnan, Jr. (Bar No. 100245)<br>Brian E. Farnan (Bar No. 4089)<br>Michael J. Farnan (Bar No. 5165)<br>919 N. Market Street, 12th Floor<br>Wilmington, DE 19801<br>Tel: (302) 777-0300<br>Fax: (302) 777-0301<br>farnan@farnanlaw.com<br>bfarnan@farnanlaw.com<br>mfarnan@farnanlaw.com<br><br>William F. Lee (admitted *pro hac vice*)<br>Kevin S. Prussia (admitted *pro hac vice*)<br>Andrew J. Danford (admitted *pro hac vice*)<br>Timothy A. Cook (admitted *pro hac vice*)<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>60 State Street<br>Boston, MA 02109<br>Tel: (617) 526-6000<br>Fax: (617) 526-5000<br><br>Amy K. Wigmore (admitted *pro hac vice*)<br>William G. McElwain (admitted *pro hac vice*)<br>Heather M. Petruzzi (admitted *pro hac vice*)<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br>1875 Pennsylvania Avenue NW<br>Washington, DC 20006<br>Tel: (202) 663-6000<br>Fax: (202) 663-6363<br><br>*Counsel for Plaintiffs Bristol-Myers Squibb Company and Pfizer Inc.* |