IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRISTOL-MYERS SQUIBB COMPANY AND PFIZER INC., | ) ) ) | |
| Plaintiffs and Counterclaim-Defendants, | ) ) | |
| v. | ) ) | C.A. No. 17-374-LPS |
| AUROBINDO PHARMA USA INC., et al., | ) ) | (CONSOLIDATED) |
| Defendants and Counterclaim-Plaintiffs. | ) ) | |

## **DEFENDANTS' REPLY POST-TRIAL BRIEF ON INVALIDITY**

Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Femi Masha
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street, Suite 300
Madison, WI 53701
Tel: (608) 234-6032
Tom.Heneghan@huschblackwell.com

Dustin L. Taylor
HUSCH BLACKWELL LLP
1801 Wewatta St., Suite 1000
Denver, CO 80202
Tel: (303) 749-7200
Dustin.Taylor@huschblackwell.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Sigmapharm Laboratories, LLC*

Paul H. Kochanski
Kendall K Gurule

LERNER, DAVID, LITTENBURG,
KRUMHOLZ & MENTLIK, LLP

20 Commerce Drive
Cranford, NJ 07016
Tel: (908)654-5000
pkochanski@lernerdavid.com
kgurule@lernerdavid.com

Karen L. Pascale
Robert M. Vrana

YOUNG, CONAWAY, STARYGATT &
TAYLOR LLP

Rodney Square
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Counsel for Sunshine Lake Pharma Co., Ltd.
and HEC Pharm USA Inc.*

Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning

GREENBLUM & BERNSTEIN, P.L.C.

1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

John C. Phillips, Jr. (#110)
David A. Bilson (#4986)

PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.

1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Unichem Laboratories Ltd.*

Dated: February 21, 2020

## TABLE OF CONTENTS

**Page**

**TABLE OF CONTENTS** ................................................................................. I

**TABLE OF AUTHORITIES** ......................................................................... III

**ABBREVIATIONS** ...................................................................................... V

I.    **THE '208 PATENT** ................................................................................. 1

    A.    The Asserted '208 Claims Are Improperly Dependent Because "Substituted With" Counts Every Markush Group Member, Including Hydrogen. .................... 1

    B.    The Asserted '208 Claims Are Neither Enabled nor Described Because Apixaban Salts Cannot Be Pharmaceutically Acceptable. .................................... 3

        1.    Dr. Jacobsen's salts cannot be "suitable for use **in contact with** tissue." ........................................................................................ 3

        2.    Any apixaban salt will disproportionate before administration and is thus not suitable for contact with human or animal tissue. ........................ 4

        3.    Dr. Jacobsen's alleged salts are not pharmaceutically acceptable. ............. 6

        4.    Claim 104 includes "pharmaceutically acceptable salts." ......................... 8

        5.    The patent specification does not demonstrate to a POSA that the inventors possessed pharmaceutically acceptable salt forms of apixaban. ...................................................................................... 9

II.    **THE '945 PATENT** ........................................................................... 10

    A.    The Asserted '945 Claims Are Invalid Under Section 112. .............................. 10

        1.    The full scope of the claims must be described and enabled. ................... 10

        2.    The '945 Patent does not describe the $D_{90}$ of API post-formulation. ....... 11

        3.    State of the art does not teach determining a $D_{90}$ value in tableted API. .......................................................................................... 12

        4.    The *Wands* factors establish the Asserted '945 Claims are not enabled. ...................................................................................... 13

    B.    The Asserted '945 Claims Are Invalid As Obvious. .......................................... 13

    C.    The Are No Surprising Results in the '945 Patent. ........................................... 15

**II.     CONCLUSION** ................................................................................................................ **15**

# TABLE OF AUTHORITIES

Page

**Cases**

*Ariad v. Eli Lilly,*
  598 F.3d 1336 (Fed. Cir. 2010) ............................................................ 10

*AstraZeneca v. Breath,*
  88 F. Supp. 3d 326 (D.N.J. 2015), *aff'd* 603 Fed. Appx. 999 (Fed. Cir. 2015) ....................... 14

*Auto. Techs. v. BMW,*
  501 F.3d 1274 (Fed. Cir. 2007) ............................................................ 11

*Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.,*
  738 F.2d 1237 (Fed. Cir. 1984) ............................................................ 2

*Bos. Sci. Corp. v. Johnson & Johnson,*
  647 F.3d 1353 (Fed. Cir. 2011) ............................................................ 9

*Eli Lilly v. Teva,*
  619 F.3d 1329 (Fed. Cir. 2010) ........................................................ 10, 11

*Ericsson v. Intellectual Ventures,*
  890 F.3d 1336 (Fed. Cir. 2018) ............................................................ 13

*ICU Medical v. Alaris,*
  558 F.3d 1368 (Fed. Cir. 2009) ............................................................ 11

*In re Wright,*
  999 F.2d 1557 (Fed. Cir. 1993) ............................................................ 10

*Liebel-Flarsheim v. Medrad,*
  481 F.3d 1371 (Fed. Cir. 2007) ........................................................ 10, 11

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.,*
  347 F.3d 1367 (Fed. Cir. 2003) ............................................................ 9

*Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co.,*
  Case No. 15 C 1067, 2019 WL 861394 (N.D. Ill. Feb. 22, 2019) .......................................... 10

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.,*
  457 F.3d 1284 (Fed. Cir. 2006). ............................................................ 8

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) ............................................................ 2

*Plant Genetic Sys. v. DeKalb*,
   315 F.3d 1335 (Fed. Cir. 2003) ............................................................................... 14

*Raytheon Co. v. Roper Corp.*,
   724 F.2d 951 (Fed. Cir. 1983) ................................................................................... 6

*Sitrick v. Dreamworks*,
   516 F.3d 993 (Fed. Cir. 2008) ................................................................................. 11

*Takeda v. Zydus*,
   743 F.3d 1359 (Fed. Cir. 2014) ............................................................................... 10

*Trs. of Boston Univ. v. Everlight Elecs.*,
   896 F.3d 1357 (Fed. Cir. 2018) ............................................................................... 10

**ABBREVIATIONS**

| The '208 Patent | U.S. Patent No. 6,967,208 |
|---|---|
| The '306 Publication | U.S. Patent Application Publication No. 2007/0191306 to Munir N. Nassar et al. |
| The '945 Patent | U.S. Patent No. 9,326,945 |
| ANDA | Abbreviated New Drug Application |
| API | Active Pharmaceutical Ingredient |
| Asserted '208 Claims | Claims 13 and 104 of U.S. Patent No. 6,967,208 |
| Asserted '945 Claims | Claims 21 and 22 of U.S. Patent No. 9,326,945 |
| BMS | Plaintiff Bristol-Myers Squibb Company |
| Carreiro | Jennifer Carreiro & Jack Ansell, *Apixaban, An Oral Direct Factor Xa Inhibitor: Awaiting the Verdict*, 17 EXPERT OPINION INVESTIGATIONAL DRUGS 1937–45 (2008) |
| Defendants | Collectively, Sigmapharm, Sunshine Lake, and Unichem |
| Defs.' Op. Br. | Defendants' Opening Post-Trial Brief on Invalidity, D.I. 690 |
| D-PF | Defendants' Proposed Findings of Fact on Invalidity, D.I. 691 |
| EDS | energy dispersive x-ray spectroscopy |
| FDA | U.S. Food and Drug Administration |
| FDA Guidance 1997 | FDA GUIDANCE FOR INDUSTRY, DISSOLUTION TESTING OF IMMEDIATE RELEASE SOLID ORAL DOSAGE FORMS, CDER (Aug. 1997) |
| HEC | Defendant HEC Pharm USA Inc. |
| LDA | lithium diisopropylamide |
| Nause | International Publication No. WO2010/147978 titled "Dosage Forms of Apixaban" was filed based upon a June 16, 2009 priority document (U.S. Provisional Application 61/187,442) |
| NDA | New Drug Application |

| Pfizer | Plaintiff Pfizer Inc. |
|---|---|
| Plaintiffs | BMS and Pfizer |
| Pls.' Br. | Plaintiffs' Responsive Post-Trial brief on Validity of the Asserted Patents, D.I. 702 |
| Pinto 2007 | Donald J.P. Pinto et al., "Discovery of 1-(4-Methoxyphenyl)-7-oxo-6-(4-(2-oxopiperidin-1-yl)phenyl)-4,5,6,7-tetrahydro-1H-pyrazolo[3,4-c]pyridine-3-carboxamide (Apixaban, BMS-562247), A Highly Potent, Selective, Efficacious, and Orally Bioavailable Inhibitor of Blood Coagulation Factor Xa," J. MED. CHEM. 50(22):5339–56 (2007) |
| POSA | Person of Ordinary Skill in the Art |
| PSUF | Parties' Statement of Uncontested Facts, Pretrial Order, Exhibit 1, D.I. 672–1 |
| SEM | Scanning Electron Microscopy |
| Sigmapharm | Defendant Sigmapharm Laboratories, LLC |
| Sunshine Lake | Defendant Sunshine Lake Pharma Co., Ltd. |
| Unichem | Defendant Unichem Laboratories, Ltd. |
| Wei | U.S. Patent Application Publication No. 2006/0160841 to Chenkou Wei et al. |

## I.       THE '208 PATENT

The invalidity of the '208 Patent arises from the choices Plaintiffs made when drafting the claims: (1) to tie every claim to a byzantine Claim 1, with internal inconsistencies in its claim language describing substitutions; and (2) to claim not just "salt" forms of apixaban in general, but specifically "**pharmaceutically acceptable** salts" of apixaban, which simply cannot exist.

### A.       The Asserted '208 Claims Are Improperly Dependent Because "Substituted With" Counts Every Markush Group Member, Including Hydrogen.

Plaintiffs admit that the validity of the '208 Patent rests on the meaning of "substituted with" in Claim 1. Their argument that Sigmapharm ignored the claim language "substituted" is belied by their very next argument admitting that Sigmapharm relies on the express definition of "substituted" in the specification. (Pls.' Br. 4–5.) It is Plaintiffs who ignore and never address that definitional language. (Pls.' Br. 5–6.) Dr. Heathcock's testimony "if you're doing a replacement," (Tr. 694:6–10 (Heathcock)), referred to the case in which the patent uses the word "substituted," and did not in any way agree that a ring could be "substituted" without replacing a hydrogen, which is what the definitional language in the specification requires. Instead, such a ring would be "unsubstituted," as Dr. Heathcock explained. (*Id.* at 694:11–13.)

Plaintiffs' argument that referring to substituents as the thing substituted "changes the meaning" is meritless. (Pls.' Br. 4–5.) The patent itself repeatedly uses the word "substituent" to mean the thing substituted (*see, e.g.*, JTX-1 cols.115:31–32, 116:5–6), which is its plain and ordinary meaning, as Dr. Heathcock explained. (Tr. 719:3–720:10 (Heathcock).) When Dr. MacMillan wanted to exclude hydrogens from the thing "substituted with" in his own patent, in addition to using "substituted or unsubstituted," he also specified "nonhydrogen substituents." (Tr. 1646:6–1649:2 (MacMillan).) While ignoring the specification's express definition of "substituted," Dr. MacMillan also claimed to rely on the specification's reference to

"substituents on nitrogen" as defining the word "substituted," thus **admitting** the relatedness of the terms. (*Id.* at 300:6–18.) When confronted with the actual language on which he purported to rely, he also admitted that it referred to **hydrogen** as a substituent. (*Id.* at 304:3–306:10.) Many cases also use the word substituent in this way. *See, e.g., Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1241 (Fed. Cir. 1984) (using the phrase "can only be substituted with three substituents" when noting that the magistrate misstated the law on file history estoppel, but not on the frivolity of patentee's claim construction arguments).

Plaintiffs' basketball analogy also fails. (Pls.' Br. 4 n.3.) The usage is not similar because the same Markush group member, like hydrogen, can serve as multiple substituents, but any given individual on a team cannot fill more than one of the five spots on the floor. Plaintiffs here provided the roster of substituents in their Markush group, and expressly included hydrogen.

Plaintiffs argue that listing hydrogen in the Markush groups with which rings are substituted is not "surplusage" because $R^{1a}$ appears elsewhere in the scaffolding in Claim 1. (Pls.' Br. 6–7; Tr. 315:15–316:2 (MacMillan).) But that part of the claim: (i) does not use the language "substituted with"; (ii) is not a ring structure; and (iii) does not explain the analogous recitation of a hydrogen in Markush groups R, $R^4$, and $R^{4a}$, leaving it undisputed that Plaintiffs' approach would render that usage meaningless surplusage in those Markush groups.

Plaintiffs cite no case to support their assertion that it is "irrelevant" that Claims 3 and 8 are invalid under their argument that the rings are never "substituted with" a hydrogen because those claims are "unasserted." (Pls.' Br. 7.) The law is to the contrary. *E.g., Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) ("both asserted and nonasserted").

In the end, Plaintiffs' argument is irreconcilably at odds with the language in the patent itself. Plaintiffs argue that a structure cannot be "substituted with" a hydrogen if a hydrogen was

– 2 –

"already" present in a chemical template, but in the patent, they (i) expressly defined "substituted" to mean "replace one or more hydrogens" and (ii) expressly included hydrogen in the Markush group list of substituents with which the claim says rings are "substituted." Plaintiffs' inability to provide any internally consistent explanation for the claim language they themselves drafted should convince the Court that Claims 13 and 104 are invalid.

### B. The Asserted '208 Claims Are Neither Enabled nor Described Because Apixaban Salts Cannot Be Pharmaceutically Acceptable.

Claims 13 and 104 of the '208 Patent claim a "pharmaceutically acceptable salt" of apixaban, which is an impossibility. The extreme pKa values of apixaban mean that any salt form will be unstable and unusable, immediately disproportionating upon its inevitable exposure to any moisture. Upon disproportionation, there is no longer an apixaban salt. There is thus no benefit/risk ratio to consider because an apixaban salt that would survive long enough to contact tissue is an **impossibility**. Nevertheless, even if the apixaban salt could survive, upon contact with tissue it would cause a localized pH akin to concentrated battery acid or sodium hydroxide, outweighing any potential benefit. Defendants have thus met their burden.

### 1. Dr. Jacobsen's salts cannot be "suitable for use **in contact with** tissue."

Plaintiffs' Dr. MacMillan conceded that the alleged salts cannot even get to any tissue:

> They have to travel through media. And that media in the body is water; or in the stomach, it's a mixture of water and HCl, which is an acid. So that's the problem. That's why **it can't get to the tissue** to do that damage.

(Tr. 1651:6–17 (MacMillan) (emphasis added).) Thus, no apixaban salt can ever be pharmaceutically acceptable under the Court's construction, which requires the salt be "suitable for use **in contact with** the tissue of a human or animal" because, according to Dr. MacMillan, "it can't get to the tissue." (*Id.*) If the apixaban salt can **never** contact human tissue, the Court need not even reach any question of sound medical judgment under a reasonable benefit/risk

ratio. This was far from the first time Defendants have raised this argument. (*See e.g.*, *Markman*

Hr'g 38:18–40:9, Sept. 6, 2018 ("why it matters" *et seq.*); Tr. 13:1–2, 71:19–72:4 (Buckton).)

What is new is Dr. MacMillan's cross-examination admission.

Plaintiffs argue that if putting a formulation into the gastric fluids of the stomach is not

contact with tissue then "it is not clear what is." (Pls.' Br. 22.) But the difference was clear to

their expert Dr. MacMillan when he testified that "**it can't get to the tissue**." (Tr. 1651:6–17

(MacMillan).) Unlike a pharmaceutically acceptable salt, which would merely **dissolve** in bodily

fluids at a physiological pH, a sodium- or potassium-apixaban salt will **react** chemically with the

body's own fluids to strip a hydrogen from the water and will both (i) generate either sodium

hydroxide or potassium hydroxide, respectively—neither of which is **ever** pharmaceutically

acceptable—and (ii) reduce the number of water molecules. (Tr. 1419:3–17, 1421:11–22,

1480:13–15 (Scheidt).) That chemical reaction is very different from the physical dissolution that

Dr. Buckton describes in his testimony that Plaintiffs cite. (Pls.' Br. 23.)

Plaintiffs' assertion that Defendants equated "'administration' with 'contact'" is also

false. (Pls.' Br. 22.) Responding to Plaintiffs' arguments that the "suitable for use" construction

required **actual** use and excluded products stored to use later, Defendants explained that the

construction did not require immediate "administration or contact—only that it is '**suitable** for

use in contact . . . .'" (Defs.' Resp. Claim Const. Br. 5, D.I. 245.) The apixaban salts, however,

can **never** be "**suitable** for use in contact," because they "can't get to the tissue."

2. Any apixaban salt will disproportionate before administration and is thus not suitable for contact with human or animal tissue.

Plaintiffs concede that apixaban is not ionizable within the relevant pH range. (Pls.' Br.

16.) They try to confuse the issue by arguing that this relates only to solubility, but this is not

only incorrect, as stated in Defendants' opening brief, but, more importantly, misses the point.

Because apixaban is not ionizable within the relevant range, any resulting salt will be unstable and will not survive long enough to be administered. (Tr. 19:22–21:14; DTX-574.14.) Plaintiffs' focus on the opinion of a medical doctor is thus irrelevant and ignores the Court's construction. No apixaban salt is "suitable for use **in contact** with human or animal tissue" because it will no longer be a salt when it contacts such tissue.

Salts formed[1] from compounds with pKa values outside the pH range 3–10 **will** disproportionate **before** they can be used. Although salts can be made from compounds with pKa values outside of this range, it is undisputed outside this litigation that such salts will have "poor physical stability in the solid state . . . [and] can easily disproportionate in water and even in the solid state under certain conditions." (DTX-574.14.) Weak bases and acids, like apixaban, "**will inevitably** be exposed to surface microenvironments that exceed their pHmax in the formulation," making disproportionation "**spontaneous** . . . ." (DTX-575.4, .2 (emphasis added).)

It is impossible to design a pharmaceutical product that is never exposed to moisture. (D-PF ¶¶ 104, 131.) To the extent Dr. Myerson disagrees, his opinions are undermined by his **assumption** that the salt being formulated is pharmaceutically acceptable. (D-PF ¶ 106; Tr. 1770:19–1771:18 (Myerson).) While a pharmaceutically acceptable salt could be formulated to reduce moisture exposure, the extreme pKa value of apixaban means **any** exposure to moisture will cause disproportionation and destroy the salt. (*See supra*.) Even if one avoided all other sources of moisture, the air has moisture, to which any apixaban salt would be exposed when the tablet is removed from the package to be used. Even the salts Dr. Jacobsen made under carefully

---

[1] It is irrelevant that the '208 Patent teaches formation of the salt in a non-aqueous environment because the salt **will** be exposed to an aqueous environment before use. (Tr. 1415:25-1426:6 (Scheidt); DTX-596.2 ("One particular issue with the use of salts in drug development is that, while salts are usually prepared from organic solvents, they are **destined** to encounter aqueous environment (water, humidity) during dosage form development . . . .") (emphasis added).)

controlled laboratory conditions showed instability, which Dr. Jacobsen confirmed was due to a "small amount of water" in the testing solvent used. (Tr. 1527:1–4 (Jacobsen).) Although Plaintiffs repeatedly point to the health benefits of Eliquis®, (*see e.g.*, Pls.' Br. 1, 11,) they also ignore that Eliquis® itself contains excipients with water content that would expose any apixaban salt to moisture and thus destroy the salt form before use. (*See* PTX-325 at BMSAPIX9829352 (identifying ingredients in Eliquis®); DTX-562.11 (noting that croscarmellose sodium and magnesium stearate, two Eliquis® excipients, are known to cause disproportionation).)

That no apixaban salt (or other compound with a similar pKa value) could survive to be formulated and administered in a salt form is further corroborated by the fact that no one—not the '208 Patent inventors, not Plaintiffs' employees, and not any of Plaintiffs' experts—has **ever** made such a usable salt. (D-PF ¶¶ 49, 51, 54–81, 91–97.) This is additional corroborative evidence that proves making a pharmaceutically acceptable salt form of a compound with pKa values similar to apixaban is **impossible**, and the claims are thus invalid. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956 (Fed. Cir. 1983) ("Because it is for the invention as claimed that enablement must exist, and because the impossible cannot be enabled, a claim containing a limitation impossible to meet may be held invalid under § 112."). When (not if) the apixaban salt encounters moisture before administration and spontaneously disproportionates, it is no longer a salt and any benefit/risk ratio of the neutral compound is irrelevant to the Court's claim construction. (D-PF ¶ 103; Tr. 21:5–8 (Buckton); Tr. 1766:12–1767:5 (Myerson).)

3.    Dr. Jacobsen's alleged salts are not pharmaceutically acceptable.

Apixaban's extreme pKa values mean that its disproportionation causes a localized pH like concentrated battery acid or concentrated sodium hydroxide. (D-PF ¶¶ 140–144.) Plaintiffs' responses are unpersuasive. Undisputed scientific literature corroborates the chart on which Drs. Buckton and Scheidt relied. (*See, e.g.,* DTX-563.4; DTX-576.6.) Defendants do not conflate pKa

and pH—the pKa value identifies at what pH level the compound donates or accepts a proton. (Tr. 1426:25–1427:4 (Scheidt).) The pH at the surface of the tablet is governed by the pKa of the drug substance. (Tr. 40:15–21 (Buckton).) For example, once even 50% of the apixaban-HCl salt disproportionates, the pH is 0. (Tr. 1429:8–17 (Scheidt); DDX 16-14).) Per Dr. Kowey: "You can't administer anything with a pH of zero. . . . [T]hat's toxic." (Tr. 1305:5–10 (Kowey).)

Plaintiffs' arguments that the harmful pH would quickly diffuse are incorrect and irrelevant. (Pls.' Br. 13.) As explained above, these alleged salts would not **<u>dissolve</u>** in bodily fluids, but instead would chemically **<u>react</u>** with them. If Plaintiffs' diffusion theory was correct, then any salt would be pharmaceutically acceptable. That Plaintiffs' theory encompasses harmful salts, e.g., sodium ethoxide, proves that it is wrong. (DPF ¶ 151.) Plaintiffs' characterizations of the benefits and risks of apixaban salts ignore reality. The benefits of Plaintiffs' commercial-ization of neutral apixaban are irrelevant. No one has studied the apixaban salt because, again, it is impossible to create such a salt that can be administered. Moreover, salt forms do not necessarily "provide the same benefits" as the parent compound. (JTX-10 at BMSAPIX0010665 ("Unfortunately there is no reliable way of predicting the influence of a particular salt species on the behavior of the parent compound in dosage forms."); Tr. 1405:3–7 (Scheidt).)

Finally, a treating physician, such as Dr. Kowey or Dr. Zusman, will not determine whether a salt is "suitable for use" with tissue without excessive toxicity. The determination of whether a compound is pharmaceutically acceptable is made by others—i.e., a pharmaceutical or medicinal chemist[2], a toxicologist, and/or FDA—before a drug would be available for a medical doctor to choose to prescribe to patients. (Tr. 868:5–869:20 (Zusman).) Tellingly, Dr. Kowey

---

[2] Although he is a medicinal chemist, Dr. Jacobsen failed to opine that the salts he created were "pharmaceutically acceptable." (D-PF ¶ 119; Tr. 1530:18-1531:14, 1539:21-1541:1 (Jacobsen).)

opined that the salts Dr. Jacobsen created were pharmaceutically acceptable only by **assuming** their clinical effect. (D-PF ¶ 135, 145–147; Tr. 1304:2–14, 1303:9–24 (Kowey).) Moreover, Dr. Kowey based his opinions about the benefits of neutral apixaban entirely upon the prescribing label, which was not available until 2012—approximately ten years after the claimed invention. (Tr. 1280:15–23 (Kowey); Tr. 218:6–7 (Knabb).)

### 4.    Claim 104 includes "pharmaceutically acceptable salts."

When Plaintiffs first added Claim 104 to their infringement contentions the day before responsive *Markman* briefs were due, they represented that it raised no new issues of claim construction. In their responsive *Markman* brief, they indicated that Claim 104 was a "pharma-ceutical composition claim," i.e., "claims that use the term 'pharmaceutically acceptable'. . . ." (Pls.' Resp. Claim Constr. Br. 7, D.I. 243.) But Plaintiffs' argument now, which is a new claim construction and thus waived, is also legally incorrect. Claim 13 defines its "compound" as **including** pharmaceutically acceptable salts, with the language "wherein **the compound is**: [apixaban] or a pharmaceutically acceptable salt form thereof." Claim 104's reference to a "compound according to Claim 13" necessarily incorporates Claim 13's statement of what its "compound **is**" and includes both. The *Pfizer* case used a very different claim structure. Its Claim 1 did not use the word "compound" but instead recited three alternatives: "(1) atorvastatin acid; or (2) atorvastatin lactone; or (3) pharmaceutically acceptable salts thereof." *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1291 (Fed. Cir. 2006). Its Claim 2 recited a "compound of claim 1 which is [atorvastatin acid]." *Id.* Unlike here, that usage did not refer to a definition of compound in the parent claim, but instead specified one of the three alternative structures, i.e., the acid and not the pharmaceutically acceptable salts. *Id.* The Court agreed that but for that language, "a claimed acid could be liberally construed to include the corresponding salts," *Id.* at 1291 n.6 (citing *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1372 (Fed. Cir.

2003) (holding that a salt did **not** design around a claim reciting an acid in a pharmacological art)). *Pfizer* actually holds that a dependent claim (i.e., Claim 13) reciting subject matter broader than the independent claim (i.e., Claim 1) cannot be disregarded as a "technical problem in the drafting," but instead invalidates the claim. *Id.* at 1291.

> 5. <u>The patent specification does not demonstrate to a POSA that the inventors possessed pharmaceutically acceptable salt forms of apixaban.</u>

Contrary to Plaintiffs' assertion (Pls.' Br. 25), Defendants never "concede" that the specification identifies a pharmaceutically acceptable salt of apixaban as a "preferred embodiment"—indeed the word "preferred" does not even appear on the page Plaintiffs cite. It is instead undisputed that the specification lists some eighty compounds, including apixaban, as preferred, followed collectively by "or a pharmaceutically acceptable salt form thereof." (JTX-1 cols.62:36–66:7.) But not every compound on the list **has** a pharmaceutically acceptable salt form. The boilerplate description of salts in cols.116–117 does not make **all** such salts pharmaceutically acceptable, which was the point of the Court's *Markman* construction. A POSA would, at best, view that list as describing pharmaceutically acceptable salts only of those compounds that have a pharmaceutically acceptable salt form and would have understood apixaban as **not** having such a pharmaceutically acceptable salt form—just as Plaintiffs themselves described it in contemporaneous publications, internal documents, internal correspondence, and FDA submissions. (Defs.' Op. Br. 12–14; D-PF ¶¶ 61–74, 80–81.) The application as filed never indicated that apixaban **in particular** had a pharmaceutically acceptable salt form. That was added later, after filing, in Claim 13. This does not provide sufficient "blaze marks" for a written description. *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1367–1368 (Fed. Cir. 2011).

## II.      THE '945 PATENT

### A.      The Asserted '945 Claims Are Invalid Under Section 112.

Plaintiffs have stretched the scope of the Asserted '945 Claims beyond the patent's disclosure. Indeed, the "motto, 'beware of what one asks for,'" applies here. *Liebel-Flarsheim v. Medrad,* 481 F.3d 1371, 1380 (Fed. Cir. 2007).

#### 1.      The full scope of the claims must be described and enabled.

The specification must describe and enable the full scope of the claim. *Ariad v. Eli Lilly,* 598 F.3d 1336, 1351 (Fed. Cir. 2010); *In re Wright,* 999 F.2d 1557, 1561 (Fed. Cir. 1993); *Trs. of Boston Univ. v. Everlight Elecs.,* 896 F.3d 1357, 1362 (Fed. Cir. 2018). Here, the scope of the Asserted '945 Claims includes determining the apixaban $D_{90}$ value before or after tableting.

Plaintiffs try to excuse the '945 Patent's failure to describe and enable both scenarios by arguing that the Asserted '945 Claims are composition claims and thus multiple ways to determine whether a **product is covered by the claims** need not be disclosed, citing *Eli Lilly v. Teva*, 619 F.3d 1329, 1345 (Fed. Cir. 2010). (Pls.' Br. 27–28.)[3] Plaintiffs confuse infringement tests with complying with section 112; and a composition claim, like any other claim, must satisfy the written description and enablement requirements of every recited limitation. Here, BMS chose to draft claims to a composition with the API having the $D_{90}$ Limitation (a "calculated" value) and to broadly assert the claims to encompass determining the $D_{90}$ of both

---

[3] Of note, *Eli Lilly* invalidated the claims for lack of written description, despite noting the written description test is not whether the patent describes ways to show infringement. 619 F.3d at 1388. Plaintiffs cited *Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co.,* Case No. 15 C 1067, 2019 WL 861394 *11-12, 34 (N.D. Ill. Feb. 22, 2019), stating it rejected an argument for lack of written description because it did not describe a method for measuring particle size. (Pls.' Br. 27.) This is wrong—the court rejected the argument that the patent was invalid because it did not describe the accused product. Plaintiffs also cited *Takeda v. Zydus,* 743 F.3d 1359, 1368-70 (Fed. Cir. 2014), which is easily distinguished because it related to particle size (not $D_{90}$) and the evidence showed (unlike here) the tableting method did not impact the granules.

bulk and tableted apixaban. In these situations, the patent must describe and enable both scenarios. *See Eli Lilly*, 619 F.3d at 1344 (claims covering measuring particle size in bulk API and extracted from a tablet invalid as patent only described measuring bulk); *ICU Medical v. Alaris,* 558 F.3d 1368, 1378 (Fed. Cir. 2009) (claims covering valves with and without spikes invalid as specification described only valves with spikes); *Auto. Techs. v. BMW,* 501 F.3d 1274, 1282 (Fed. Cir. 2007) (claims covering mechanical and electrical sensor not enabled by description of mechanical); *Liebel-Flarsheim*, 481 F.3d at 1378–79 (claims covering both jacketed and jacket-free needle holders not enabled by description of jacketed holders); *Sitrick v. Dreamworks*, 516 F.3d 993, 999 (Fed. Cir. 2008) (patent must enable both movies and video games if claims cover both).

### 2. The '945 Patent does not describe the $D_{90}$ of API post-formulation.

The written description requirement ensures that the scope of the claimed invention does not "overreach" the inventor's contribution described in the patent. *Ariad,* 598 F.3d at 1353–4. The evidence shows that the '945 Patent's contribution was limited to determining the $D_{90}$ of the **bulk apixaban** and did not extend to the tableted apixaban. (D-PF ¶¶ 167–71.)

Plaintiffs argue that the '945 Patent describes how to determine the $D_{90}$ of tableted apixaban if the tablet is made by the dry granulation method described in the '945 Patent. (Pls.' Br. 29.) This is not correct. Describing a way to make a tablet does not describe how to determine the $D_{90}$ of apixaban in that tablet. Indeed, the parties' experts agree that the '945 Patent does **not** describe a way to determine the $D_{90}$ of tableted API. (D-PF ¶¶ 180–2; Tr. 1157:12–18, 1152:8–18 (Genck); Tr. 1342:20–1343:1 (Chambliss); Tr. 1745:10–17 (Myerson).)

Further, Dr. Myerson did not testify that the apixaban particles would not increase when tableted per the methods disclosed in the '945 Patent. At best, he **guessed** that the $D_{90}$ might **possibly** be smaller than the starting apixaban, noting that "other than saying it would be the

same or **possibly smaller**, that's the best I can do." (D-PF ¶ 184; Tr. 1749:15–22, Tr. 1725:13–1726:2 (Myerson) (emphasis added).) Today, no one knows the $D_{90}$, and a "possibility" is not evidence that the '945 Patent describes determining the $D_{90}$ of a tableted apixaban. (D-PF ¶¶ 178–185; Tr. 1752:12–16 (Myerson); Tr. 1342:20–1343:1 (Chambliss); Tr. 1127:15-1128:2 (Patel).) The evidence shows that the apixaban $D_{90}$ value could increase in tablets made according to the '945 Patent. (DTX-366.4-5 (bonding increases particle size); DTX-370.1 (compression increases particle size); Tr. 1340:3–1343:1 (Chambliss).)

Plaintiffs incorrectly assert that Defendants suggest the claims are invalid because the patent does not describe multiple methods **of making** the claimed composition. (Pls.' Br. 28–9.) Defendants submitted clear and convincing evidence that the '945 Patent does not describe or enable the full scope of the $D_{90}$ Limitation regardless of how made.

3. <u>State of the art does not teach determining a $D_{90}$ value in tableted API.</u>

Plaintiffs argue that the '945 Patent need not describe how to determine the $D_{90}$ of tableted apixaban because the state of the art taught techniques to determine the **particle size** of individual particles, from which a POSA **could have** calculated the $D_{90}$. Plaintiffs are using improper hindsight and failing to apply the perspective of a POSA in 2009–10. The evidence is clear that the art does not provide a single example, or any guidance, that would have taught a POSA to use particle imaging techniques to calculate the $D_{90}$ of tableted API. (D-PF ¶¶ 186–95.)

Plaintiffs point to Reverchon, but this measures the $D_{90}$ of a combination of powdered API and excipient **pre**-tableting. (D-PF ¶¶ 201–204.) Plaintiffs also cite Chan and Bosquillon, which only measure particle size, but do not calculate the $D_{90}$. (Tr. 1727:14–1728:2, 1723:1–3; 20–21 (Myerson); PTX-431 at BMSAPIXE0003263–5; PTX 430 at BMSAPIXE0003256.) Even the litigation-inspired Berkland Method did not calculate the $D_{90}$ of tableted apixaban using

– 12 –

SEM-EDS. (D-PF ¶¶ 190-1.) The state of the art cannot supplant the '945 Patent's section 112 obligations.

Reliance on the *ipse dixit* of Plaintiffs' experts in the face of the contradictory evidence would be improper. *Ericsson v. Intellectual Ventures*, 890 F.3d 1336, 1346 (Fed. Cir. 2018).

    4.    <u>The *Wands* factors establish the Asserted '945 Claims are not enabled.</u>

The *Wands* factors establish non-enablement of the full scope of the Asserted '945 Claims. (Defs.' Op. Br. 31–3.) Plaintiffs' attempt to substitute knowledge of measuring particle size for determining the $D_{90}$ is unavailing, given that neither the '945 Patent nor the state of the art enables a POSA to determine the $D_{90}$ Limitation of post-tableted apixaban.

**B.    The Asserted '945 Claims Are Invalid As Obvious.**

There is no real dispute that the prior art (i) recognized the physical properties of apixaban and (ii) would have motivated a POSA to improve the known apixaban formulations with an expectation of success.[4] (Defs.' Op. Br. 34–9.) This is not "generalized" motivation; the evidence shows both BMS' apixaban specific express admission of motivation as well as other motivation, including biowaivers and tableting efficiencies. (D-PF ¶¶ 217–33.)

In 2009, BMS acknowledged the "continuing need to find safe, effective methods of delivering . . . apixaban" in Nause, which disclosed 2.5 mg and 5 mg tablets comprising crystalline apixaban. (D-PF ¶¶ 217, 270; DTX344.4, .75; Tr. 1321:19–1322:14, 1331:12–22

---

[4] Plaintiffs' argument that the prior art does not teach the dissolution limitation ignores the plain language of Claim 12. (Pls.' Br., 38-40). Claim 12 recites "**at least 77 wt % of apixaban** … **dissolves within 30 minutes.**" (JTX-2 col.10:23-25 (emphasis added).) FDA Guidance 1997 discloses, for BCS III drugs, the dissolution rate should be 85% in 15 minutes to ensure the bioavailability of the drug is not limited by dissolution rate. (DTX-320.6.) Having 85% of the apixaban dissolve in 15 minutes necessarily meets the limitation of "**at least**" 77% dissolved in 30 minutes. (D-PF ¶ 264; Tr. 1323:16-1324:8 (Chambliss).)

– 13 –

(Chambliss).)[5] In Wei, BMS also taught making small particle crystalline apixaban and that reducing particle size improves bioavailability. (D-PF ¶¶ 253–6; DTX-359; Tr. 1233:21–1234:9, 1247:20–1248:11 (Chambliss).) Yet, Plaintiffs argue that the admission is not related to bioavailability based solely on Dr. Myerson's *ipse dixit*. (Pls.' Br., p. 35 n.24.)

Plaintiffs also incorrectly argue that a POSA would have blindly accepted BMS' statement that apixaban's bioavailability was "good" without looking at the underlying data, which shows obvious room for improvement. (Pls.' Br. 35 n.21.) A POSA, as Dr. Chambliss testified, would have reviewed the data and been motivated to improve apixaban's bioavailability because it treats acute condition(s) where "it is important to get as much drug absorbed as fast as possible." (D-PF ¶¶ 222–4; Tr. 1235:2–1236:17, 1363:17–1377:6, 1391:8–1392:2 (Chambliss).)

Plaintiffs further mischaracterize the prior art's discussion of the eighty percent (80%) failure rate of cardiovascular drugs in clinical trials, completely ignoring that the prior art identifies (i) "bioavailability" as the top reason why drugs failed clinical trials between 1991 and 2000 and (ii) the related concept of "efficacy"—not "toxicity"—as the top reason drugs failed in 2000. (D-PF ¶¶ 219–21; DTX-368.2, .4; Tr. 1263:10–1264:21, 1313:24–1314:7 (Chambliss).)

A POSA, moreover, would have expected reducing apixaban particle size to improve bioavailability, notwithstanding the BCS. Apixaban was known to be poorly water soluble, as Plaintiffs admit in Carreiro and Nause, which states "[a]pixaban has low solubility in aqueous environments." (D-PF ¶ 212; DTX-344.33; Tr. 1240:4–18 (Chambliss).) And, reducing particle size was known to typically achieve rapid dissolution and improve bioavailability even for

---

[5] Dr. Chambliss and the Court may rely on Nause because its priority date of June 16, 2009, pre-dates Plaintiffs' purported October 2009 conception (DTX-344.1). The Federal Circuit "has approved use of later publications as evidence of the state of art existing on the filing date of an application." *Plant Genetic Sys. v. DeKalb*, 315 F.3d 1335, 1344 (Fed. Cir. 2003); *AstraZeneca v. Breath*, 88 F. Supp. 3d 326, 365-367 (D.N.J. 2015), *aff'd* 603 Fed. Appx. 999 (Fed. Cir. 2015).

highly soluble compounds; e.g., the difference between sugar cubes and powdered sugar. (D-PF ¶¶ 175, 218; DTX-337.6–7; Tr. 1240:19–1243:7, 1244:21–1245:18, 1248:19–1250:19 (Chambliss).) Moreover, biowaivers (which reduce regulatory hurdles/costs) were available for BCS III drugs in Europe and scientific publications were advocating biowaivers for BCS III drugs in the U.S. in 2009. (D-PF ¶¶ 227–9; DTX-355.7; DTX-364.3; DTX-437.2; Tr. 1755:24– 1756:6 (Myerson); Tr. 1259:1–25, 1260:4–18, 1378:25–1379:23, 1392:3–7 (Chambliss).)

Plaintiffs—unlike a POSA—lump all BCS III drugs together. Plaintiffs point to Blum (PTX-429) which studied ranitidine, to argue that all BCS III drugs with "different dissolution rates could have nearly identical bioavailability." (Pls.' Br. 37.) Blum contradicts Plaintiffs' position. Blum acknowledges that the bioavailability of BCS III drugs depends on many factors, including a strong dependence on the excipients, yet Blum failed to provide information it admits is critical (e.g., excipients, manufacturing process, and particle size). (D-PF ¶ 230; PTX-429 at 4; Tr. 1757:7–1759:7 (Myerson); Tr. 1388:11–14, 1390:5–1391:2 (Chambliss).) Indeed, ranitidine's bioavailability was later shown to vary by about fifty percent (50%) based only on the excipient used (sorbitol vs. sucrose). (D-PF ¶ 231; Tr. 1759:8–1760:21 (Myerson).)

### C.    The Are No Surprising Results in the '945 Patent.

The are no surprising results. Figures 3 and 4 of the '945 Patent show an expected linear relationship where the dissolution rate (and bioavailability) increased as the bulk apixaban particle size decreased, which relationship is consistent with the state of the art as discussed above. The statement calling this surprising "conflates solubility with dissolution." (D-PF ¶¶ 175–6; Tr. 1333:11–1338:3 (Chambliss).)

## II.    <u>CONCLUSION</u>

For the reasons set forth above and in their Opening Brief, Defendants respectfully request that the Asserted Claims of the '208 and '945 Patents be held invalid.

Dated: February 21, 2020

Respectfully submitted,

OF COUNSEL:
Marc R. Wezowski
Don J. Mizerk
Phillip D. Segrest, Jr.
Femi Masha
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Tel: (312) 655-1500
marc.wezowski@huschblackwell.com
don.mizerk@huschblackwell.com
philip.segrest@huschblackwell.com
femi.masha@huschblackwell.com

Thomas P. Heneghan
HUSCH BLACKWELL LLP
33 East Main Street
Suite 300
Madison, WI 53701
Tel: (608) 234-6032
tom.heneghan@huschblackwell.com

Dustin L. Taylor
HUSCH BLACKWELL LLP
1801 Wewatta Street, Suite 1000
Denver, CO 80202
Tel: (303) 749-7200
dustin.taylor@huschblackwell.com

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Sigmapharm Laboratories, LLC*

OF COUNSEL:
Paul H. Kochanski
Kendall K Gurule
LERNER, DAVID, LITTENBURG,
KRUMHOLZ & MENTLIK, LLP
20 Commerce Drive
Cranford, NJ 07016
Tel: (908)654-5000
pkochanski@lernerdavid.com
kgurule@lernerdavid.com

*/s/ Karen L. Pascale*
Karen L. Pascale
Robert M. Vrana
YOUNG, CONAWAY, STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Tel: (302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*Counsel for Sunshine Lake Pharma Co., Ltd.
and HEC Pharm USA Inc.*

OF COUNSEL:
Paul A. Braier
P. Branko Pejic
Michael J. Fink
Jill M. Browning
GREENBLUM & BERNSTEIN, P.L.C.
1950 Roland Clarke Place
Reston, VA 20191
Tel: (703) 716-1191
pbraier@gbpatent.com
bpejic@gbpatent.com
mfink@gbpatent.com
jbrowning@gbpatent.com

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, GOLDMAN, MCLAUGHLIN &
HALL, P.A.
1200 North Broom Street
Wilmington, DE 19806
Tel: (302) 655-4200
jcp@pgmhlaw.com
dab@pgmhlaw.com

*Counsel for Unichem Laboratories Ltd.*